# 23-589

IN THE

# United States Court of Appeals
# for the Second Circuit

---

MICHAEL DAVIS-GUIDER,
*Plaintiff-Appellant,*

— v. —

CITY OF TROY, RONALD FOUNTAIN, INDIVIDUALLY,
DANIELLE COONRADT, INDIVIDUALLY,
CHARLES MCDONALD, INDIVIDUALLY,
TIM COLANERI, INDIVIDUALLY,
*Defendants-Cross-Claimants-Counter-Claimants-Appellees,*

RENSSELAER COUNTY,
MICHAEL SIKIRICA, INDIVIDUALLY,
*Defendants-Cross-Claimants-Counter-Claimants-Appellees.*

---

On Appeal from the United States District Court
for the Northern District of New York
Case No. 1:17-cv-1290 (FJS/DJS)

---

## APPENDIX VOLUME 3 OF 11

## APPENDIX VOLUME 3 TABLE OF CONTENTS

ECF 115-8: Exhibit "E" ................................................................ 376

ECF 115-9: Exhibit "F" ............................................................... 493

# EXHIBIT "E"

1

2                    **DEPOSITION of JOEL ABELOVE**

3

4   UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF NEW YORK
5   -------------------------------------------X
    MICHAEL DAVIS-GUIDER,
6
                            Plaintiff,
7
    -against-          Civil Case No.: 1:17-cv-01290
8                      (FJS/DJS)

9   CITY OF TROY, RONALD FOUNTAIN, Individually,
    DANIELLE COONRADT, Individually, CHARLES
10  MCDONALD, Individually, TIM COLANERI,
    Individually, ADAM R. MASON, Individually,
11  RENSSELAER COUNTY, MICHAEL SIKIRICA,
    Individually, and JOEL ABELOVE,
12  Individually,

13                          Defendants.
    -------------------------------------------X
14

15      DEPOSITION of the Defendant, **JOEL ABELOVE,**

16  held on May 28, 2021, commencing at 9:35 a.m.,

17  being held virtually by Zoom, pursuant to Notice;

18  before Susan Florio, a Registered Professional

19  Reporter and Notary Public in and for the State of

20  New York.

21

22

23

```
 1


 2
      APPEARANCES:
 3


 4            BRETT H. KLEIN, ESQ., P.C.
              Attorneys for Plaintiff
 5            305 Broadway, Suite 600
              New York, New York 10007
 6            BY:  BRETT H. KLEIN, ESQ.


 7
              BAILEY, JOHNSON & PECK, P.C.
 8            Attorneys for Defendants Rensselaer
                County, Michael Sikirica, and
 9              Joel Abelove
              Pine West Plaza 5, Suite 507
10            Washington Avenue Extension
              Albany, New York 12205
11            BY:  CRYSTAL R. PECK, ESQ.


12
              PATTISON, SAMPSON, GINSBERG & GRIFFIN, P.C.
13            Attorneys for Defendant City of Troy,
                Ronald Fountain, Danielle Coonradt,
14              Charles McDonald, Tim Colaneri, and
                Adam R. Mason
15            22 First Street, P.O. Box 208
              Troy, New York 12181-0208
16            BY:  RHIANNON I. SPENCER, ESQ.


17


18


19


20


21


22

23    Indexes........................... Pg. 104
```

# APPENDIX

3

```
 1

 2                    S T I P U L A T I O N S

 3  IT IS HEREBY STIPULATED AND AGREED by and between

 4  the parties hereto, that all rights provided by the

 5  F.R.C.P. including the right to object to any

 6  question except as to the form, or to move to

 7  strike any testimony at this examination, are

 8  reserved, and, in addition, the failure to object

 9  to any question or move to strike testimony at this

10  examination shall not be a bar or waiver to make

11  such motion at, and is reserved for, the trial of

12  this action;

13  It is further stipulated and agreed that this

14  examination may be sworn to by the witness being

15  examined before a Notary Public other than the

16  Notary Public before whom this examination was

17  begun;

18  It is further stipulated and agreed that the filing

19  and certification of the original of this

20  examination are waived;

21          It is further stipulated and agreed that

22   the examining party will furnish the examined

23   party with a copy of the transcript free of charge.
```

4

1

2                    JOEL ABELOVE,

3    having been first duly sworn/affirmed remotely by

4    the notary public, was examined and testified as

5    follows:

6

7    BY MR. KLEIN:

8        Q.   Good morning, Mr. Abelove.  I'm Brett

9    Klein.  I represent Mike Davis in a lawsuit

10   pending in the Northern District.  We are here

11   today to ask you questions about your knowledge

12   of the facts and circumstances of his prosecution

13   for the, involving the death of V.D.

14            Do you understand that's why you are here

15   today generally?

16       A.   Yes.

17       Q.   Is there any reason why you can't testify

18   fully and accurately today?

19       A.   No.

20       Q.   Have you had sufficient time to prepare

21   with your attorney, Ms. Peck?

22       A.   Yes.

23       Q.   Have you ever been deposed before?

1    **[JOEL ABELOVE - By Mr. Klein]**

2        A.    I don't believe so.  No.

3        Q.    I mean, you are -- are you familiar with

4    the rules of depositions?  Have you conducted

5    depositions?

6        A.    I've conducted one since I've been in

7    private practice.

8        Q.    I'll just go over them.  Presuming you

9    know them, but just for the record.  Let me

10   finish my question even if you know the answer so

11   the reporter can take a clean record.  Okay?

12       A.    Sure.

13       Q.    And if you don't understand a question as

14   I phrase it, which sometimes I need some help,

15   let me know and I'll be happy to rephrase it for

16   you.  Otherwise, we'll assume you understood a

17   question if you answer as asked.  Okay?

18       A.    Yes.

19       Q.    And if you need a break no problem.

20   We'll ask you answer any pending question before

21   you take a break.  Okay?

22       A.    Okay.

23       Q.    Okay.  So, in connection with today's

1    **[JOEL ABELOVE - By Mr. Klein]**

2    deposition have you reviewed any documents,

3    videos, photos, or anything else to refresh your

4    recollection of the case People versus Michael

5    Davis?

6        A.    Yes.

7        Q.    What have you reviewed?

8        A.    I reviewed a copy of an e-mail dated

9    March 1st from that year of the incident and a

10   news article that was printed out.

11       Q.    Anything else?

12       A.    No.

13       Q.    Do you recall the case?

14       A.    Vaguely I do.

15       Q.    Were you the elected and serving district

16   attorney from the time this case came into the

17   D.A.'s Office in Rensselaer until the time it was

18   through the acquittal after trial?

19       A.    That's correct.  Yes.

20       Q.    Okay.  Before we get into the case I just

21   want to go over your background.  Can you just

22   walk us through your education and legal career

23   experience?

1    **[JOEL ABELOVE - By Mr. Klein]**

2        A.    Sure.  Do you want me to start with law

3    school?

4        Q.    Where did you go to undergrad?

5        A.    I attended Tufts University in Medford,

6    Massachusetts, and following my graduation from

7    Tufts I attended Albany Law School.  I've had a

8    couple different career paths.  I had a civilian

9    career path in the military, career path as well.

10            So, after college, right before I started

11   law school, I enlisted in the United States Army.

12   So, I completed my first year of law school and

13   then I shipped out to Fort McClellan, Alabama,

14   for 17 weeks or so for basic training and

15   military police school.  Completed that, came

16   back, started law school again, a semester late

17   because I had to take a semester off for the

18   military.  So, I continued in the New York Army

19   National Guard with my career there while I was

20   in law school.  Got done with law school in

21   December of 1994 and then started working in the

22   Rensselaer County District Attorney's Office in

23   June of 1995 and I spent ten years as an

1    **[JOEL ABELOVE - By Mr. Klein]**

2    Assistant DA in that office and left I think

3    around August 12th of 2005 and then I became a

4    prosecutor for the New York State Department of

5    Health for the Bureau of Professional Medical

6    Conduct where I spent nine years.  My military

7    career, I had done my eight-year enlistment from

8    '91-99.  I had a break in service and then after

9    9/11 I decided to get back into the military.  I

10   received a commission in the Judge Advocate

11   General's Corps in July of 2003.  I ended up

12   spending 15 more years in the Army National Guard

13   as a judge advocate and serving in various

14   capacities in different units, deploying overseas

15   and such and I retired from that about three

16   years ago.  I spent nine years total at the

17   health department and then I got elected as

18   district attorney in 2014 and served for four

19   years as the Rensselaer County District Attorney

20   and then for the past couple of years plus I've

21   been in private practice owning my own practice.

22       Q.    Doing criminal defense?

23       A.    Amongst some other things but, yes, I

Case 1:17-cv-01290-DJS Document 91-1 Filed 02/04/22 Page 107 of 117

1  [JOEL ABELOVE - By Mr. Klein]

2  certainly do criminal defense.

3      Q.   What other types of matters do you

4  handle?

5      A.   I've handled a couple of matrimonials, a

6  couple of real estate closings, Article 81s out

7  of surrogate court.  A lot of Second Amendment

8  issue, helping individuals, to help with their

9  Second Amendment rights.

10     Q.   Got you.  Is it a solo practice or do you

11  have any partners or associates?

12     A.   It's a solo practice.

13     Q.   Okay.  Do you have any plans to run for

14  office in the future?

15     A.   Not currently.

16     Q.   Okay.  Have you ever been disciplined by

17  the bar?

18     A.   No.

19     Q.   Other than the case which obviously

20  highly publicized with the AG's Office, have you

21  ever been indicted or convicted of a crime?

22     A.   No.

23     Q.   When you were an ADA with the Rensselaer

1  **[JOEL ABELOVE - By Mr. Klein]**

2  County D.A.'s Office for ten years were you in a

3  variety of different bureaus or was there just

4  one general crimes assignment and you get

5  different, more complex cases as you get

6  experience?  Can you just describe your

7  experience there?

8      A.    Certainly.  When I joined the D.A.'s

9  Office in June of 1995 there were only

10  approximately, I think I was one of eight

11  Assistant DAs.  So, part of my duties initially

12  were to handle local criminal courts.  I think I

13  had about seven local criminal courts throughout

14  the county of which there were approximately 19

15  at the time.  Shortly thereafter I started

16  working on felony cases because when I was hired

17  by the then district attorney, Mary Donohue, she

18  hired me with the understanding that I was going

19  to have to learn how to do special victims cases.

20  She only had one Assistant DA in the office who

21  specialized in those and she wanted somebody else

22  to be trained in that area in case that person

23  ever left or went on vacation or what have you.

1    **[JOEL ABELOVE - By Mr. Klein]**

2    And, in fact, that person did leave in January of

3    1996 to become the first chairperson of the Board

4    of Examiners of Sex Offenders for New York State

5    once Megan's Law was passed.  So, I had been in

6    the office maybe seven months and I was suddenly

7    in charge of every felony sex crime case in the

8    office, child abuse cases.  I did my first felony

9    trial, five months in there they gave me a

10   robbery first case.  So, you very quickly got

11   into doing felony work because of the necessity,

12   the size of the office, and the limited number of

13   ADAs that they had at the time.  So, I got into

14   doing special victims cases.  I ended up becoming

15   the bureau chief of the special victims bureau

16   that ended up being created and I oversaw not

17   only adult and child sex crimes but child

18   physical abuse and domestic violence cases as

19   well.  I had a variety of experiences not just

20   with special victims cases, but I tried just

21   about every type of case from drugs, robbery,

22   burglary to homicide.  Pretty much the whole

23   gamut of the Penal Law during my career during

1    **[JOEL ABELOVE - By Mr. Klein]**

2    that time.

3        Q.    And then --

4        A.    And I also became the Chief Assistant DA

5    at one point while I was there.

6        Q.    Towards the end or at some other point?

7        A.    Yes.  Towards the end.  Yes.

8        Q.    And why did you leave?

9        A.    Well, ten years is a long time to do that

10   kind of work and I had an opportunity to go to

11   the state health department.  It's the same

12   retirement system and broaden my experiences a

13   little bit and still be a prosecutor but just

14   handle different types of cases so I was able to

15   do that.

16       Q.    And so did you litigate at the State

17   Department of Health or were you a supervisor or

18   both?

19       A.    No.  I wasn't a supervisor.  I was a line

20   associate counsel for Bureau of Professional

21   Medical Conduct.  So, we would handle the

22   administrative hearings for physician discipline.

23       Q.    Okay.  You now represent individuals

1  **[JOEL ABELOVE - By Mr. Klein]**

2  defending charges against that bureau?

3     A.   No.  No.  No.  We brought the charges

4  against the physicians to discipline their

5  medical licenses.

6     Q.   Do you now represent physicians on the

7  defense side?

8     A.   Oh, do I now?  No.  I do not.  I would,

9  but I haven't had the opportunity to do that.

10    Q.   Okay.  And then when you got elected DA

11 in 2014 you became the chief law enforcement

12 officer for Rensselaer County, is that fair?

13    A.   Yes.

14    Q.   And what were your duties and

15 responsibilities as the elected DA for Rensselaer

16 County?

17    A.   Well, we were the offices charged with

18 prosecuting all offenses within the county.  So,

19 setting policy for the office, the hiring,

20 managing all the personnel in the office, whether

21 it's Assistant DAs or victim advocates or other

22 staff, investigators, working on our budget and

23 had to be submitted to the county every year,

1    **[JOEL ABELOVE - By Mr. Klein]**

2    appearing before members of the county

3    legislature to discuss your budget, coordinating

4    all matters of local law enforcement, state law

5    enforcement, sometime federal.  So, you are in

6    charge of --

7         Q.   Just a few things.

8         A.   Yeah.  Just a few things.  You are in

9    charge of the entire office.  That's correct.

10        Q.   Were you the policy maker for that

11   office?

12        A.   Yes.

13        Q.   Okay.  Did you work through your career

14   as an ADA and then as the DA with the Rensselaer

15   County medical examiner's office?

16        A.   Well, yes.  I don't know if it's called

17   the Rensselaer County medical examiner's office.

18   The county, my understanding was, contracts with

19   various individuals to provide those services.

20        Q.   Okay.  Including Dr. Sikirica?

21        A.   Correct.

22        Q.   And was Dr. Sikirica, from around 2001

23   through and including your time as DA, was he the

# APPENDIX

**391**

15

1    **[JOEL ABELOVE - By Mr. Klein]**

2    chief medical examiner for Rensselaer County to

3    your knowledge?

4        A.    I couldn't tell you when he started, but

5    I know he's been there for a long time.  I've

6    dealt with him a long time.

7        Q.    And was he, to your knowledge, the policy

8    maker for that office?

9                MS. PECK:  Objection.  You can

10            answer.

11       A.    I don't know.

12       Q.    Okay.  Well, was there anyone above him

13    or to your knowledge was he the chief executive

14    of that office?

15       A.    I don't know.

16       Q.    Did you work with Dr. Sikirica on

17    homicides or other matters involving deaths in

18    your capacity as an ADA?

19       A.    Yes.

20                MS. PECK:  Form.

21       Q.    And did you work with him directly

22    involving cases as a DA or indirectly as a

23    supervisor in that office?

1    **[JOEL ABELOVE - By Mr. Klein]**

2        A.    Yes.

3        Q.    Okay.  In the article that you looked at,

4    is it the article that was published after the

5    acquittal where you made some comments about Dr.

6    Sikirica?

7        A.    I believe so.

8                MS. PECK:  Just for the --

9        A.    I'm not sure if it's the same one you are

10   referring to though.

11       Q.    Well, I'll pull it up and ask you about

12   it.  It's the article in the Troy Record from

13   August 25th, 2016, former professional basketball

14   player acquitted in Lansingburgh, daughter's

15   death.

16                MS.  PECK:  Just for the record,

17                Brett.  I've got a copy of it here.  So,

18                he's looking at something.  I want to

19                make sure it's the same as represented on

20                the record.  It's the same article in our

21                disclosure.

22                MR. KLEIN:  Exhibit C.

23                MS. PECK:  To you.  So, I just want

1    **[JOEL ABELOVE - By Mr. Klein]**

2              to make sure.  So, if you see him looking

3              at something, that's what it is.

4                    MR. KLEIN:  Okay.  And it's Exhibit

5              C in your disclosure dated May 21st,

6              2021, correct?

7                    MS. PECK:  Yes.

8                    MR. KLEIN:  Okay.

9         Q.   So, in that article you say, there's

10   reference to, that you continue to have the most

11   confidence in Sikirica despite concerns expressed

12   by Dr. Teas about the number of autopsies he

13   performs, which he estimated at more than 700 per

14   year, which Teas said is more than double the

15   recommended amount.  And you, attributed to you,

16   "I'm still very satisfied with his opinion.  I've

17   known Dr. Sikirica for many years and I find him

18   entirely professional, very thorough, and have no

19   qualms about his qualifications or his abilities

20   whatsoever."

21              Have you ever questioned Dr. Sikirica's

22   judgment or professional opinions on any case for

23   any reason whether it's because he, you know, was

1    [JOEL ABELOVE - By Mr. Klein]

2    doing too many autopsies per year or for any

3    other reason?

4        A.    No.

5        Q.    Had you ever met him personally?

6              MS. PECK:  Objection.  You can

7              answer.

8        A.    I certainly met him many times.  I don't

9    know what you mean by personally.  I mean,

10   I've --

11       Q.    Have you ever like spoken with him,

12   interacted with him other than knowing he worked

13   on cases in your office, have you ever personally

14   interacted with him?

15             MS. PECK:  Objection.  Just to -- I

16             think there's some confusion as to what

17             you mean by personally.  Do you mean

18             outside his capacity as district attorney

19             or an ADA?

20             MR. KLEIN:  No.

21       Q.    Have you ever spoken with him with regard

22   to any -- in your capacity as a DA or ADA?

23       A.    Absolutely, yes.

1  [JOEL ABELOVE - By Mr. Klein]

2      Q.   Okay.

3      A.   He's testified for me before in cases.

4      Q.   Okay.  And this idea, this fact that came

5  out at trial that he did over 700 autopsies a

6  year in 2015, is that something that was known to

7  you before this trial?

8      A.   I don't recall.  I know I knew it at some

9  point.  I don't know when I knew that number.

10      Q.   Okay.  Were you aware of the volume of

11  autopsies he had performed per year during the

12  years that you were an ADA in the office, had it

13  ever come up?

14      A.   I don't believe so.

15      Q.   When did you take office?

16      A.   January 1st, 2015.

17      Q.   Okay.  You came in after the Adrian

18  Thomas trial, but were you familiar with the

19  outcome of that trial, the Court of Appeals

20  decision and then the outcome of that trial?

21      A.   I think at some point I was made aware of

22  it or I became aware of it.  I don't recall how.

23      Q.   Did it ever come to your attention that

1    **[JOEL ABELOVE - By Mr. Klein]**

2    in that case Dr. Sikirica, that there was an

3    acquittal when the testimony was premised mainly

4    on his opinions in that case?

5              MS. PECK:  Objection.

6        A.   I don't recall that.  No.

7        Q.   Okay.  Did it ever come to your attention

8    that there was an issue with Dr. Sikirica

9    aligning his opinions with the police

10   investigation rather than looking at the full

11   picture of the child's health including

12   pre-existing conditions or other natural causes

13   of death?

14             MS. PECK:  Objection.

15       A.   Which case are you referring to?

16             MS. SPENCER:  Objection.

17       Q.   Generally had that ever come to your

18   attention?

19       A.   No.

20       Q.   The death of V.D. occurred on February

21   26, 2015.  Do you recall that either specifically

22   or at least generally it was around that time?

23       A.   I don't.  I've been told that.  I don't

1    **[JOEL ABELOVE - By Mr. Klein]**

2    recall the date.

3        Q.   Okay.  And Mr. Davis was, I believe he

4    surrendered on the indictment on October 2nd of

5    2015.  Do you recall that general time frame of

6    the arrest, of being taken into custody?

7        A.   I do not.

8        Q.   Okay.  Well, around that time was around

9    the time of the incident where Detective Fountain

10   was alleged to have been involved in that 911

11   recording incident involving Mayor Gordon.  Do

12   you recall that incident?

13       A.   I do.

14       Q.   And so after the time that Mr. Davis was

15   indicted and during the pendency of the

16   prosecution -- well, withdrawn.

17           Do you also recall that Detective

18   Fountain was the lead detective or the assigned

19   detective in People versus Davis for the Troy PD?

20       A.   I do not.

21       Q.   Okay.  Fair to say that during the

22   pendency of the Michael Davis prosecution you

23   indicted and were prosecuting for a period of

1    **[JOEL ABELOVE - By Mr. Klein]**

2    time Detective Fountain?

3

4            *COUNSEL REQUESTS COURT RULING*

5

6            MS. PECK:  Objection.  Wait.

7            Pause.  Brett, those records, if my

8            recollection is correct, are sealed and

9            he as a DA cannot talk about a matter

10           that was sealed unless you have an

11           unsealing order.  I cannot let him talk

12           about any indictment he may have

13           participated in for Fountain or any of

14           that criminal trial.

15           MR. KLEIN:  Okay.  Well, there's

16           certainly a lot of public information

17           about it so that's what I'm referring to.

18           I'll mark it for a ruling.

19           MS. PECK:  Okay.

20           MR. KLEIN:  And I'll determine how

21           I'm going to proceed with it.

22           MS. PECK:  Okay.

23           MR. KLEIN:  I'm going to ask the

1    [JOEL ABELOVE - By Mr. Klein]

2              following question, Crystal.  If you have

3              the same objection then we'll mark it.

4              But if the question, if you think the

5              question can go, that would be helpful.

6    Q.    Mr. Abelove, did the circumstances of

7    your office's case with Ron Fountain, without

8    getting into the merit, the details of it,

9    because I understand it was ultimately dismissed

10   and without prejudice being represented, did that

11   impact your offices dealings with him in People

12   versus Davis?

13             MS. SPENCER:  Object to form.

14             MS. PECK:  Object to form.  But you

15             can testify to that.

16   A.    Okay.  I'm sure it did not.  I don't --

17   because as I sit here today I don't even recall

18   Detective Fountain being the lead investigator in

19   the Davis case, you know, I'm sure it did not.

20   Q.    Did you create any kind of wall, you

21   know, between you and/or the assistants involved

22   in People versus Fountain, again without getting

23   into the merits of that case, and those that were

1    **[JOEL ABELOVE - By Mr. Klein]**

2    dealing with Fountain in People versus Davis?

3         A.   I don't recall establishing any type of a

4    wall in that regard.

5         Q.   Who was the assigned -- based on my

6    understanding you personally appeared in court on

7    People versus Fountain.  Were you personally

8    handling that or did you have an assistant that

9    was lead in that?

10              MS. PECK:  Objection.  I'm not

11              going to let him talk about --

12              MR. KLEIN:  I'm not asking about

13              the merits.  I'm just asking about

14              personnel.

15              MS. PECK:  You can testify about

16              personnel.  You can testify to if it

17              was --

18         A.   No.  No one else was assigned to it.

19         Q.   Okay.  You personally handled it?

20         A.   Correct.

21         Q.   Okay.  Were there certain matters during

22    your tenure as DA that you personally handled and

23    if you could describe them and what was your

**APPENDIX**

1    [JOEL ABELOVE - By Mr. Klein]

2    criteria for you taking on cases personally

3    versus delegating them to assistants or other

4    staff?

5        A.   The answer to the first part of your

6    question is yes, there were cases I handled

7    personally.  The second part of your question, I

8    didn't ask specific criteria.  They were often

9    homicide cases or very serious cases, perhaps an

10   arson, sometimes factors that may weigh into that

11   decision included how tasked out other individuals

12   were at that time, how many cases were pending,

13   workloads and, you know, the severity of the

14   alleged offense.  Since I was a DA who had fairly

15   considerable experience litigating or handling

16   some cases I felt very comfortable handling some

17   cases myself.  There were notably some homicides

18   I handled.

19       Q.   Okay.  How many cases other than People

20   versus Fountain did you personally prosecute?

21       A.   I don't recall the number off the top of

22   my head.

23       Q.   Was it like under ten or could it have

1    **[JOEL ABELOVE - By Mr. Klein]**

2    been fifteen or just roughly?

3        A.    I think it's certainly under ten.

4        Q.    Did you have any type of working

5    relationship with Ron Fountain either from your

6    experience as an ADA, because I believe he was

7    with Troy PD through those years and/or through

8    your experience as DA?

9        A.    Yes.

10       Q.    Can you describe it?

11       A.    He was a police officer with the City of

12   Troy Police Department.  I'm sure I had

13   interactions with him at various times over the

14   years with cases that he was involved in that I

15   prosecuted.  He surely testified for me as a

16   witness on occasion on a case I was assigned to

17   prosecute.

18       Q.    Did you ever have any experience,

19   interactions with him either personally or that

20   came to your attention that called into question

21   his veracity?

22                   MS. SPENCER:  Object to form.

23                   MS. PECK:  Object to form.  You can

**[JOEL ABELOVE - By Mr. Klein]**

2          answer generally, but you just have to be

3          mindful if there's any statements sealed

4          you have to be cautious about that.

Q. Separate and apart from People versus Fountain, which I'm not going to get to the details given the objections but I reserve the right to subject to a court ruling, have you had any dealings, interactions or come to learn any information that called into question Detective Fountain's veracity?

A. No.

Q. When did you officially take office in 2015?

A. Technically I guess just after midnight on January 1st.

Q. Okay. And directing your attention to February 26th, which I'll represent to you was the day that V was -- 911 was called and she was found, declared deceased.

How did you become aware -- well, did you become aware of this incident and, if so, under what circumstances?

Case 1:17-cv-01290-DJS Document 87-4 Filed 02/04/22 Page 297 of 117

1    **[JOEL ABELOVE - By Mr. Klein]**

2        A.    I don't recall.

3        Q.    At that time were you notified of any

4    deaths or other types or categories of incidents

5    whether they were determined to be criminal in

6    nature yet or not?

7        A.    Yes.

8        Q.    Is this the type of incident where you

9    would have been notified, but you just don't

10   recall the circumstances?

11       A.    Yes.

12       Q.    Okay.  And what was your -- what do you

13   recall learning about the incident when you first

14   became aware of it?

15       A.    I do not.

16       Q.    Okay.  What do you recall about the

17   incident in terms of in sequence?

18       A.    Very little.  I recall that there was an

19   incident.  I recall that the police were

20   investigating.  I recall that members of my

21   office, as we always do, make ourselves available

22   to assist the police with any questions that they

23   may have, or to get the subpoenas for them that

1  **[JOEL ABELOVE - By Mr. Klein]**

2  they may need or, you know, whether it's a grand

3  jury subpoena or a judicial subpoena, have our

4  office assist them in any way that they need for

5  their investigation.  That's about it.

6      Q.   The autopsy was conducted the day after

7  the death, which was February 27th, 2015.  Are

8  you aware of that from looking at notes or just

9  generally does that sound right?

10     A.   Well, I'm not aware of it from looking at

11 any type of notes but generally that does sound

12 right.  The autopsy is often the following day.

13     Q.   And there's a sign-in sheet from that

14 autopsy where Andra Ackerman is there together

15 with a number of Troy PD officers and I believe

16 an evidence tech and someone from the Rensselaer

17 medical examiner's office.

18          But generally do you recall that Andra

19 Ackerman was assigned to work, that she otherwise

20 attended the autopsy?

21               MS. PECK:  Object to form.

22               MS. SPENCER:  Object to form.

23     A.   I don't recall that she attended the

1    **[JOEL ABELOVE - By Mr. Klein]**

2    autopsy.  I know she was assigned to be the

3    person from my office who was the liaison with

4    the Troy Police Department to help them with

5    their case.

6        Q.    And is her name Andra, not Andrea,

7    A-n-d-r-a?

8        A.    Correct.  Andra.

9        Q.    And what was her job or role in your

10   office at that time?

11       A.    She was an assistant district attorney.

12       Q.    Did she have a supervisory role or was

13   she like a line assistant?

14       A.    Her immediate supervisor would have been

15   my Chief Assistant District Attorney Jessica Hall

16   who then reports to me.

17       Q.    And Jessica Hall remained your chief

18   assistant through conclusion of the Davis trial,

19   is that fair?

20       A.    Yes.

21       Q.    Okay.  So, would you have been involved

22   in assigning Andra Ackerman to attend the autopsy

23   or was Jessica Hall involved in that or it could

1    **[JOEL ABELOVE - By Mr. Klein]**

2    have been either of you?

3        A.    I don't recall.

4                    MS. PECK:   Objection.

5        Q.    Typically who would assign an ADA to

6    attend an autopsy during your time in the office?

7                    MS. PECK:   Objection.

8        A.    It wouldn't be a matter of assigning an

9    ADA to an autopsy, it would be assigning an ADA

10   to be the person who's assigned to that case,

11   assuming it's -- anticipating it may become a

12   case and part of their involvement with that

13   incident may be to attend the autopsy.

14       Q.    Okay.  So, was your office typically

15   involved in the investigatory phases of cases

16   such as this investigation into the death of

17   V.D.?

18                   MS. PECK:   Object to form.

19       A.    I guess I'm -- it depends on what you

20   mean by involved in the investigatory phase.  We

21   certainly are made aware of it and we make

22   ourselves available to law enforcement to assist

23   them in any way that they need our help.  Again,

1    **[JOEL ABELOVE - By Mr. Klein]**

2    as I alluded to earlier, sometimes they need

3    subpoenas for various types of information to

4    assist with their investigations that they are

5    not able to obtain on their own.  That only we

6    can assist --

7         Q.   Hold on one second.  I'm going to ask you

8    to repeat what you said if that's okay?  Oh, hold

9    on one second.

10        A.   Sure.  That's no problem.

11             MR. KLEIN:  So, my phone gets a

12             call and the Bluetooth goes into the

13             Zoom.  Other than that it's moot.

14        Q.   Can we repeat the answer or if we need it

15   read back maybe but can you --

16        A.   Sure.  I recall what I said.

17             We very often are involved while the

18   investigation is occurring because we assist law

19   enforcement with various matters to include

20   applying for, helping apply for search warrants,

21   drafting subpoenas that may need to be issued and

22   serve upon various parties for all manner of

23   records or video footage and such.  We often

1    **[JOEL ABELOVE - By Mr. Klein]**

2    assist them in helping them to evaluate whether

3    something meets a legal standard under the law,

4    if they have questions about that.  But we don't

5    direct them to do their investigation.  They

6    don't work for me as the DA, I'm not their boss.

7    So, sometimes I make suggestions if they ask for

8    help, but I don't direct them on how to conduct

9    an investigation.

10       Q.   So, would you describe the D.A.'s Office

11   role in the investigation of the Michael Davis

12   case as advisory or was it collaborative or some

13   combination?

14       A.   Well, since I don't really have -- I

15   mean, the person to ask about their direct

16   involvement with the police would be now Judge

17   Ackerman.  However, I mean, generally speaking

18   our role is advisory to assist them with certain

19   advice, but it can be collaborative if you are

20   talking about assisting them with obtaining or

21   applying for search warrants if they want us to

22   review before it's submitted to a court, or

23   obtaining subpoenas or things like cell phone

1    [JOEL ABELOVE - By Mr. Klein]

2    records or medical records.  It depends on -- I

3    would define it as somewhat collaborative because

4    you are rendering a certain level of assistance

5    in the investigation that they can't do on their

6    own.

7        Q.    How about working up a theory of criminal

8    liability in a case where there's a potential

9    noncriminal cause of death?  In this case the

10   child was described as nonresponsive before

11   Mr. Davis even interacted with her and then there

12   was extensive resuscitating efforts to save her

13   life which were unsuccessful.

14        Was there any discussion that you were

15   aware of or consultation with your office about

16   charging this criminally versus the possibility

17   that this was a -- that any injuries from

18   resuscitation occurred post a natural death?

19        A.    I don't recall.

20             MS. PECK:  Objection.

21             MS. SPENCER:  Object to form.

22        Q.    Okay.  Would you have been involved in

23   those discussions or would that have been -- like

1   **[JOEL ABELOVE - By Mr. Klein]**

2   if those discussions occurred among Andra

3   Ackerman and the police, would those have been

4   shared with you necessarily in your experience

5   dealing with Andra Ackerman or could they have

6   just been dealt with, worked on by her at a

7   supervisory level?

8           MS. PECK:  Objection.

9           MS. SPENCER:  Object to form.

10  A.   Either one.

11  Q.   Do you have any notes, e-mails, or

12  anything else relating to the Davis case other

13  than that e-mail that you looked at that you were

14  cc'd on March 1st, 2015?

15  A.   I don't have any possession of any

16  e-mails.

17  Q.   Okay.  From the office?

18  A.   Right.  I don't have any -- I don't

19  possess any e-mails related to this case.

20  Q.   Okay.  There was an article in the Times

21  Union last year that said you took a bunch of

22  files to your Gmail account before, in the days

23  before you left office after your reelection was

1  **[JOEL ABELOVE - By Mr. Klein]**

2  not successful.  Did you send yourself all files

3  from the office, including Davis files, or were

4  they just particular files or is that reporting

5  not true?

6  　　　　　MS. PECK:  Objection.

7  　　　　　MR. KLEIN:  You can answer.

8  　　　　　MS. PECK:  In what context did that

9  　　　come up?  I haven't seen the article,

10  　　　Brett.  I --

11  Q.   Mr. Abelove, are you familiar with the

12  article from February 1st, 2020, Abelove sends

13  sealed court files to his private e-mail account?

14  A.   Yes.  I am.

15  Q.   Okay.  So, I'm not asking you about any

16  sealed records from the Fountain case, but I want

17  to know if you sent files or e-mails from any

18  other matters to yourself?

19  　　　　　MS. PECK:  Brett, I'm going to

20  　　　direct him not to answer that question.

21  　　　I need to look at that issue.

22  　　　　　MR. KLEIN:  I'll send it to you.

23  　　　　　MS. PECK:  You can mark it for a

1    **[JOEL ABELOVE - By Mr. Klein]**

2        ruling, that's fine, and we can readdress

3        it.

4            MR. KLEIN:  Okay.  I can send you

5        the article during the break.

6    Q.   Let me ask you this way.  I know you

7    don't have access to the DA's files, e-mail

8    system, but do you have any records from People

9    versus Davis in your possession?

10   A.   No.

11   Q.   The other officers involved -- two of the

12   other officers involved in this case and some

13   parts of the investigation were Tim Colaneri and

14   Adam Mason.  You are familiar with them?

15   A.   I am.

16   Q.   And they were given immunity by you in

17   the case with Fountain.  And I'm not getting into

18   the merits of it, but I want to know from a

19   personnel standpoint were there any concerns

20   raised with regard to that as to the -- as it

21   related to the viability of the Mike Davis case?

22           MS. SPENCER:  Object to form.

23           MS. PECK:  Object to form.

1    **[JOEL ABELOVE - By Mr. Klein]**

2        A.    I don't understand your question.

3        Q.    Well, was there any concern that there

4    was a conflict among the involved investigators

5    from the Troy PD who gathered evidence that was

6    going to be used in the indictment and

7    prosecution.  Was there any concern about the

8    conflict between themselves or between them and

9    you with regard to the viability of this case

10   going to trial -- bringing this case to trial?

11       A.    Not to my knowledge.

12             MS. SPENCER:  Object to form.

13       Q.    So, when Andra Ackerman attended the

14   autopsy did she report back to you either in real

15   time from the autopsy, in a meeting subsequent to

16   it or in some other way, in any way?

17       A.    I don't recall.

18       Q.    Would it have been your -- would it have

19   been a practice in your office for her to have

20   done so in such a matter involving a child, death

21   of a child?

22       A.    Not necessarily.  She may have.  She may

23   not have.  There wasn't a policy on that.  She

Case 1:17-cv-01290-DJS Document 79-41 Filed 02/04/22 Page 42 of 117
Case 1:17-cv-01290-DJS Document 84 Filed 02/04/22 Page 407 of 117

**APPENDIX** **415**

39

1    **[JOEL ABELOVE - By Mr. Klein]**

2    could have reported back to my chief assistant or

3    not at all.  I don't recall.

4        Q.   Okay.  What, if any -- so, when you

5    received that e-mail on March 1st, 2015, it was

6    an e-mail from Andra thanking the police

7    generally for including her and indicating what

8    things she would do to help gather records

9    generally.  Is that a fair summary?

10                   MS. SPENCER:  Object to form.

11                   MS. PECK:  Brett, just for the

12              record I'm going to say I got that e-mail

13              that has been disclosed and I'm going to

14              just put it in front of Mr. Abelove for

15              the discussion.

16                   MR. KLEIN:  Sure.

17        Q.   It's an e-mail dated March 1st, 2015, and

18    it was part of I believe the Troy PD -- it's an

19    e-mail from -- it says Ron Fountain at the top.

20    Do you see that?

21        A.   Yeah.  I'm looking at it.

22        Q.   And March 1st, 2015, at 11:38 a.m. to Ron

23    Fountain, Tim Colaneri, cc'd to you.  Is that

1    **[JOEL ABELOVE - By Mr. Klein]**

2    what you are looking at, one page?

3        A.    Yes.

4        Q.    Okay.  Under what circumstances were you

5    cc'd on this, does this indicate that you were

6    personally involved in discussing the

7    investigatory steps with Andra or was it a

8    courtesy to keep you in the loop or something

9    else?

10       A.    I don't know.  The document itself just

11   indicates that I was cc'd on this e-mail.

12       Q.    Okay.  Well, what recollection do you

13   have about the circumstances surrounding around

14   you being included in this e-mail?

15       A.    I have none.

16       Q.    Have you called Andra Ackerman or anyone

17   else to try to refresh your recollection?

18       A.    I have not talked to Andra Ackerman.  I

19   have talked to Jessica Hall to try to refresh my

20   recollection about it.  My recollection has not

21   been refreshed at all.

22       Q.    Okay.  What did Andra -- I'm sorry, what

23   is Ms. Hall's first name?

1    **[JOEL ABELOVE - By Mr. Klein]**

2        A.   Jessica.

3        Q.   What did Jessica Hall tell you about the

4    incident?

5        A.   She remembered very little as well.

6        Q.   What did she remember, even if it was a

7    little bit?

8        A.   Just that there was the incident, Andra

9    Ackerman was the assigned ADA as we've discussed

10   to handle the matter.  She doesn't remember time

11   frames.  She doesn't remember when the incident

12   occurred.  She didn't remember when it went to

13   the grand jury or when he was arrested.  It was a

14   very brief conversation, but she had almost as

15   little recollection as I did as far as details.

16       Q.   Was there anything else that she did

17   recall?

18       A.   Not that I remember.  No.

19       Q.   Did you guys discuss the circumstances of

20   Mike Davis getting acquitted and whether either

21   of you had any recollection of how that -- how he

22   was found not guilty or things that contributed

23   to him being found not guilty?

Case 1:17-cv-01290-DJS Document 117 Filed 02/04/22 Page 45 of 117

1  **[JOEL ABELOVE - By Mr. Klein]**

2      A.    Can you break that up?  There were like

3  three different --

4      Q.    Yes.  Did your conversations with her

5  address jogging one another's memory about why it

6  was believed or theorized that Mike Davis was

7  found not guilty?

8      A.    I don't believe that was part of our

9  conversation.

10     Q.    Okay.  In the article that we discussed

11  earlier that was produced on May 21st, 2021, by

12  Ms. Peck, on Page 2 of 5 of the article it says,

13  "Rensselaer County District Attorney Joel Abelove

14  admitted the case against Davis, prosecuted by

15  Assistant District Attorney Cindy Chavkin was not

16  a strong one but he added that he did not regret

17  pursuing it."

18          Did you make that comment to the press or

19  to someone else and they reported it?  Who did

20  you make that comment to?

21     A.    I don't recall.

22     Q.    Okay.  Do you agree that it was not a

23  strong case?

1    [JOEL ABELOVE - By Mr. Klein]

2        A.    Well, if I said that then I must have

3    believed that.

4        Q.    What was the basis for that belief?

5        A.    Well, I mean, I've dealt with lots of

6    cases over the years and different cases have

7    different strengths.  Some cases are much

8    stronger than others.  Some cases you have

9    confessions.  Sometimes that confession is in

10   writing.  Sometimes that written confession is

11   also video and audiotaped.  Sometimes there are

12   eyewitness accounts to a crime.  Sometimes

13   there's video evidence showing a crime happening.

14   So, from that standpoint we did not have in this

15   case, my recollection, is an eyewitness to the

16   alleged crime.  We did not have it caught on

17   tape.  We did not have a traditional confession

18   in the sense that people think of confessions

19   when somebody admits fully their culpability.

20   So, compared to other cases that may have those

21   elements to them this case did not.

22       Q.    Were there any other reasons why this was

23   not a strong case in your opinion?

1    [JOEL ABELOVE - By Mr. Klein]

2        A.    No.

3        Q.    At trial there was testimony by Dr. Teas

4    that's referenced in this article where she

5    opined that and demonstrated to the jury that,

6    that the child more likely than not died and was

7    deceased when Mr. Davis found her and made his

8    resuscitation efforts, just a few, and then his

9    efforts were followed by over a thousand attempts

10   at CPR, a thousand chest compressions by fire

11   department and hospital staff, and that more

12   likely than not caused injuries to her liver and

13   ribs after she had already been dead.

14           Do you recall that to be the general

15   theme of the defense at the trial?

16               MS. PECK:  Objection.  And, Brett,

17           you are referring to this article a lot.

18           Can we have it a marked as an exhibit to

19           the deposition?

20               MR. KLEIN:  Yeah.

21               (Abelove Exhibit No. 1, Article,

22           marked this date for identification.)

23       Q.   But you can answer the question.

1    [JOEL ABELOVE - By Mr. Klein]

2       A.   So, I think the question, can you repeat

3    the question for me?

4       Q.   Yes.  The defense, do you understand the

5    defense at trial to be in substance, sum and

6    substance, that V tragically passed for maybe

7    unexplained reasons, whether a sudden unexplained

8    death, arrhythmia or something like that,

9    seizure, and that any injuries to her liver and

10   ribs occurred due to resuscitative efforts but

11   she had already been deceased when those efforts

12   were made?  Do you recall that to be generally

13   the theory of the defense?

14             MS. PECK:  Objection to form.

15      A.   No.  I read that in the article now.  But

16   if you were to ask me that a week or two ago, you

17   know, before whenever I read it, I didn't recall

18   exactly what the theory of the defense was.

19      Q.   If I asked you a week or two before you

20   read it, what do you recall the defense being in

21   this case or did you not recall it?

22      A.   I didn't have a great recollection of it.

23   I know that they, I believe I recall that the

1   **[JOEL ABELOVE - By Mr. Klein]**

2   defense was challenging the conclusions that Dr.

3   Sikirica had made.

4       Q.   Okay.  Well, did this article refresh

5   your recollection as to the defense theory

6   insofar as it states it or summarizes Dr. Teas'

7   testimony?

8       A.   No.

9       Q.   Okay.  So, with regard to the e-mail on

10  March 1st, which we'll also mark this as Abelove

11  2.

12      A.   Mr. Klein, just so you know, it's

13  pronounced Abelove.

14      Q.   Abelove.  I'm sorry.

15      A.   Not Abelove.

16      Q.   Okay.

17               (Abelove Exhibit No. 2, 3/1/15

18          E-mail, marked this date for

19          identification.)

20      Q.   What's been marked as Abelove 2, did you

21  take any action in response to that e-mail or was

22  it --

23      A.   Not that I recall.

1    [JOEL ABELOVE - By Mr. Klein]

2       Q.   Okay.  Did you have any meetings with --

3    internal meetings in the office or involving

4    anyone from Troy PD and/or the medical examiner

5    that you attended?

6       A.   Not that I recall.

7       Q.   On March 2nd, 2015, Mike Davis was

8    brought into Troy headquarters and he was

9    interrogated on video.  Had you ever seen that

10   video any time from then up until today?

11      A.   I don't believe I have.

12           MS. SPENCER:  Object to form.

13      Q.   Okay.  And then after that video was

14   taken there was a meeting with a sign-in sheet

15   indicating Andra Ackerman, some Troy police

16   officers and Michael Sikirica had a meeting on

17   March 12th.

18           Were you involved in that meeting even if

19   you didn't personally attend it, did you attend

20   by phone, were you briefed on it after or

21   anything else?

22      A.   Not --

23           MS. PECK:  Objection to form.

1    **[JOEL ABELOVE - By Mr. Klein]**

2        A.    Not that I recall.

3        Q.    Was this case being handled by your

4    office as a criminal investigation or was it

5    just -- or was your office involved just

6    monitoring it in the event it became criminal?

7    Like what was, how was this investigation viewed

8    by your office in the weeks after your office was

9    involved in these meetings, the autopsy, and the

10   March 12th meeting?

11               MS. SPENCER:  Object to form.

12               MS. PECK:  Objection to form.

13       A.    I don't recall my office being involved

14   in the investigation unless we thought there was

15   a, potentially criminal investigation.  And some

16   may turn out not to be criminal, but you don't

17   always know that right away.  So, my office was

18   involved in matters of potential criminal

19   liability.

20       Q.    Do you recall any meetings that you had

21   with Andra Ackerman relating to the investigation

22   of V.D.'s death?

23       A.    I do not recall.

1   **[JOEL ABELOVE - By Mr. Klein]**

2      Q.   Were there any, even if you don't recall

3   them?  In other words, you know that you had them

4   but you don't recall what was discussed?

5      A.   I don't recall.

6      Q.   Do you know if Andra Ackerman met with

7   Jessica Hall in regards to this and you may have

8   been briefed on those but you weren't at the

9   meetings?

10      A.   I don't know.  I don't recall.

11      Q.   What do you believe, how do you believe

12   this was handled in your office given that you

13   don't remember it, given how these types of

14   matters were handled, how do you believe it was

15   handled?

16               MS. SPENCER:  Object to form.

17               MS. PECK:  Objection.

18      A.   How do I believe it was handled?

19      Q.   Yes.  In the months before the

20   indictment.

21               MS. PECK:  Objection.

22      A.   I believe that Ms. Ackerman was the

23   assigned ADA to work with the police department,

1    **[JOEL ABELOVE - By Mr. Klein]**

2    that she developed information based upon their

3    investigation and that that information was

4    ultimately compiled within our office to the

5    point where the matter was presented to a grand

6    jury.

7        Q.    Did you have personal involvement in any

8    aspects of the investigation, the pre-indictment

9    phase of the case?

10       A.    Not that I recall.

11       Q.    Did Andra Ackerman leave the office in or

12   around May of 2015?

13       A.    Somewhere around there.  I think she was

14   there no longer than the first six months into my

15   first year of my term.

16       Q.    So, who took over the handling of this

17   case in your office after she left?

18       A.    I don't recall.

19       Q.    I believe Jessica Hall presented it to

20   the grand jury.  Does that suggest she was lead

21   on it after Andra Ackerman left or does it not

22   necessarily mean --

23       A.    It may, but it doesn't necessarily mean

1    **[JOEL ABELOVE - By Mr. Klein]**

2    that.

3                    MS. PECK:  Objection to form.

4        Q.   So, we'd have to talk to Jessica Hall to

5    find out?

6        A.   She might know that, yes.

7        Q.   Where does she work now?

8        A.   She works for the New York State

9    Department of Health.

10       Q.   In Albany?

11       A.   Yes.

12       Q.   Did you know Detective Sergeant Michael

13   Parrow, P-a-r-r-o-w?

14       A.   Yes.

15       Q.   He's since deceased, correct?

16       A.   That is correct.

17       Q.   Were you aware of his involvement in this

18   investigation?

19       A.   Was I aware?

20       Q.   Yes.

21       A.   I don't recall that he was involved, but

22   he may have been.  He was a medicolegal death

23   investigator for the county.

1    **[JOEL ABELOVE - By Mr. Klein]**

2        Q.   Okay.

3        A.   As well as member of the Troy Police

4    Department.

5        Q.   Okay.  I believe around August 2015 Dr.

6    Sikirica issued his autopsy.  Did you become

7    aware of that, would you necessarily have been

8    given a copy of it or would it have been

9    transmitted to your staff and they'd share it

10   with you or anything else?  Did it come to your

11   attention?

12       A.   I don't recall if it came to my

13   attention.

14       Q.   Is it more likely than not that it did,

15   you just don't recall today?

16       A.   It may have.

17       Q.   Okay.  Was this considered a high profile

18   case in your office?

19       A.   Again, certainly any potential homicide

20   is considered a high profile case.  I would

21   certainly categorize homicides as high profile

22   cases.

23       Q.   Were there any homicides handled by your

1    **[JOEL ABELOVE - By Mr. Klein]**

2    office where you didn't look at an autopsy?

3        A.    Me personally?

4        Q.    Yes.

5        A.    Yeah.  I think there were some.

6        Q.    Okay.  As DA?

7        A.    Yes.

8        Q.    Now, in this case there was a grand jury

9    presentation pre-arrest.  Do you recall that,

10   that that was the sequence?  Some cases there can

11   be post-arrest, grand jury presentation, some

12   cases there's pre-arrests, indictments, is that

13   accurate?

14       A.    That is accurate.  You can have

15   indictments, post-arrests or pre-arrests.

16       Q.    So, in this case whose determination was

17   it to seek a pre-arrest indictment?

18       A.    I don't recall.

19       Q.    Is that ultimately your call as the chief

20   executive in the office at that time and you just

21   don't recall making it or could it have been

22   Jessica Hall's call or someone else's strategic

23   decision?

Case 1:17-cv-01290-DJS   Document 91-4   Filed 02/04/22   Page 57 of 117

1    [JOEL ABELOVE - By Mr. Klein]

2        A.   I mean, ultimately I have the authority

3    to tell anybody working for me that the case is

4    not going to be presented if they want to present

5    a case.  I don't recall in this instance who made

6    the decision to present the case to the grand

7    jury.  You know, if Jessica Hall presented it and

8    said this is what we have and it's ready to go,

9    I'd like to put it into the grand jury.

10   Obviously that's what happened in this case.  I

11   just don't have a recollection of sequence of

12   events or how the decision was made.

13       Q.   In your experience generally is there a

14   difference in the notice or rights of the accused

15   in doing a pre-indictment, a pre-arrest

16   indictment versus post-arrest?  Are there any

17   differences?

18       A.   Yeah.

19       Q.   Can you explain that, what those

20   differences are?

21       A.   Certainly.  If an individual is arrested

22   via a summary arrest by a police agency prior to

23   any type of indictment being issued by a superior

1    [JOEL ABELOVE - By Mr. Klein]

2    court judge and the criminal procedure law grants

3    certain rights to that defendant with regard to

4    notice of a presentation of their case to a grand

5    jury.  If the suspect or individual has not been

6    arrested but their case is being presented to a

7    grand jury what's called a sealed indictment,

8    they have different rights with respect to

9    whether or not they can appear and testify before

10    that grand jury.  Generally speaking they do not

11    get told about the fact that it's going to be

12    presented.  However, if they are aware of an

13    investigation and they provide notice to the

14    district attorney that they wish to appear before

15    the grand jury in the event the case is going to

16    be presented to the grand jury then the

17    prosecutor is required to give them that notice

18    and the opportunity to testify.

19         Q.   To your knowledge was Michael Davis given

20    any type of notice of the grand jury proceedings?

21         A.   I do not recall.

22         Q.   Okay.  And you agree that the district

23    attorney's obligation under the law is to do

1  **[JOEL ABELOVE - By Mr. Klein]**

2  justice, correct, not to seek a conviction?

3      A.   That's correct.

4      Q.   And that means you had an obligation as

5  the chief law enforcement officer to protect

6  innocent people from being wrongfully convicted

7  or wrongfully maligned in a grand jury

8  proceeding, correct?

9      A.   Yes.

10     Q.   And that's -- so your job as DA wasn't to

11  seek a conviction at all costs, it was to seek

12  justice, correct?

13             MS. PECK:  Objection.

14     Q.   And avoid wrongful prosecutions and

15  convictions to the extent that you were able to?

16             MS. PECK:  Objection.

17     Q.   Correct?

18     A.   Yes.  That's what we --

19     Q.   And you took those obligation seriously,

20  I'm sure, right?

21     A.   Correct.

22     Q.   So, in this case Michael Davis had a

23  defense that ultimately -- withdrawn.

1  **[JOEL ABELOVE - By Mr. Klein]**

2      In this case you felt it wasn't a strong

3  case.  We've talked about that before.  But

4  that's fair, correct?

5          MS. PECK:  Objection.

6  A.   In the context of other cases it

7  wasn't as strong as some other cases.

8  Q.   And we know from trial that at least from

9  the article, even if you don't remember it, there

10  was a very powerful defense that Michael Davis

11  didn't cause the death that was ultimately

12  credited by the jury.

13      Would it have been, do you think that in

14  this case in your experience that had this case

15  been presented to the grand jury with Michael

16  Davis' side of it, that it may not have resulted

17  in an indictment?

18          MS. PECK:  Objection.

19  A.   I have no way of knowing that.  That's

20  entirely speculative.

21          (Whereupon, a discussion was held

22      off the record.)

23  Q.   Do you recall whether you were involved

1   **[JOEL ABELOVE - By Mr. Klein]**

2   in the grand jury presentation, whether it was

3   strategic meetings, witness prep or anything

4   else?

5       A.   I don't recall.

6       Q.   Would you have been involved given your

7   experience, your interest in these cases and that

8   this was a high profile case because it was a

9   potential homicide -- it was a death case, a

10  manslaughter case, do you believe that you more

11  likely than not would have been involved in some

12  aspects of the grand jury preparation?

13              MS. SPENCER:  Object to form.

14              MS. PECK:  Object to form.

15      A.   No.  I don't believe I was involved in

16  the grand jury preparation.  It's more likely

17  that somebody is just keeping me apprised of the

18  status of what was going on.

19      Q.   Okay.  In your experience in the D.A.'s

20  Office, whether as an ADA and including as a

21  district attorney, has your office ever declined

22  or exercised discretion not to prosecute a death

23  as criminally notwithstanding an autopsy finding

1  [JOEL ABELOVE - By Mr. Klein]

2  from Dr. Sikirica that suggested it could be

3  criminal?

4              MS. PECK:  Objection to form.

5      A.   I'm aware of declinations to prosecute.

6  I don't know if the second half of your

7  question -- it's a little confusing because when

8  you say notwithstanding the finding from Dr.

9  Sikirica that something may be criminal, Dr.

10  Sikirica isn't the one who makes that

11  determination as to whether or not a case is

12  prosecutable or not.  That's a legal

13  determination not a medical one.  So, it's not

14  very often Dr. Sikirica's opinion is something

15  that's factored into the decision-making process

16  by the district attorney's office.

17      Q.   Well, Dr. Sikirica in this case looked at

18  the video of Michael Davis demonstrating how he

19  made resuscitation efforts and factored that into

20  his autopsy.  Are you aware of that or do you

21  recall that?

22      A.   I do not.

23              MS. SPENCER:  Object to form.

1    **[JOEL ABELOVE - By Mr. Klein]**

2              MS. PECK:  Objection to form.

3        Q.   He talked about an injury caused by a

4    large hand or a large person.  And do you recall

5    Michael Davis being a large man, was a basketball

6    player?

7              MS. PECK:  Object to form.

8              MS. SPENCER:  Objection.

9        Q.   Do you recall that?

10       A.   I recall being told that he was a large

11   man.

12       Q.   Okay.  Did you ever vet the statements of

13   fire department and/or emergency room staff with

14   regard to the nature and extent and duration of

15   their resuscitation efforts in this case?

16             MS. SPENCER:  Object to form.

17       A.   I did not personally.  No.

18       Q.   Okay.  Do you know if anyone did in your

19   office?

20       A.   I don't recall.

21       Q.   Did that come up in your discussions with

22   Jessica when you recently spoke with her?

23       A.   I don't believe it did.  No.

1   **[JOEL ABELOVE - By Mr. Klein]**

2     Q.   Okay.  At trial, I believe I touched on

3   this earlier, fire department staff testified

4   that 16 minutes of CPR was done in the home, 20

5   minutes in the ambulance at approximately 100

6   chest compressions per minute.  Did you know that

7   before trial?

8             MS. PECK:  Objection to form.

9     A.   I don't recall.

10     Q.   Do you know if that was ever disclosed to

11   you by the Troy Police Department?

12     A.   I don't recall.

13     Q.   And at trail, Dr. Crisafulli, the doctor

14   from St. Mary's ER, do you know her?

15     A.   I don't think I do.

16     Q.   Okay.  She testified that among three or

17   so staff at the ER, because there's a lot of

18   exertion involved in doing CPR, even on a

19   two-year-old, that there were 30 minutes of chest

20   compressions at about a hundred per minute.  Were

21   you aware of that testimony at trial?

22             MS. PECK:  Objection to form.

23     A.   I don't recall being aware of that

1   **[JOEL ABELOVE - By Mr. Klein]**

2   testimony.

3     Q.  Okay.  Do you recall anyone from the Troy

4   Police Department informing you or anyone in your

5   office of this, the nature and extent of the

6   resuscitation efforts at the hospital?

7           MS. SPENCER:  Object to form.

8     A.  No.  I don't recall that.

9           MS. PECK:  Brett, can we take a

10        quick minute?

11           MR. KLEIN:  Yeah.  Do you want to

12        take -- up to everyone else?  10 minutes?

13          (Recess taken at 10:35 a.m.;

14        proceedings resumed at 10:45 a.m.)

15          (Whereupon, the question was read

16        back.)

17          (Whereupon, the answer was read

18        back.)

19     Q.  So, Mr. Abelove, do you recall that in

20   the course of this case there was a Brady

21   disclosure at least one or two?

22     A.  No.  I do not.

23     Q.  One of them was that Ron Fountain was the

1   **[JOEL ABELOVE - By Mr. Klein]**

2   subject of charges in the 911 case.  Is that the

3   type of thing that would have been disclosed as a

4   Brady disclosure?

5      A.   Anything that fits the definition of a

6   Brady disclosure would have been made as a Brady

7   disclosure.

8      Q.   Well, that one was in a cover letter by

9   Jessica Hall in the disclosure of Rosario

10  materials as a Brady disclosure.  Does that fit

11  the definition?

12     A.   I'm sure it does if she disclosed it as

13  such.

14     Q.   I believe there was testimony of Dr.

15  Sikirica that was disclosed as a Brady, disclosed

16  under Brady.  Do you recall that?

17     A.   I do not.

18     Q.   If you had known what came out at trial

19  in the prosecution's case -- withdrawn.

20          Is it your understanding, do you recall

21  that the prosecution called a firefighter who did

22  resuscitation efforts, Bayly, B-a-y-l-y, on its

23  direct case?

1    **[JOEL ABELOVE - By Mr. Klein]**

2        A.    No.

3        Q.    Do you recall that the prosecution called

4    the ER doctor, Crisafulli, on its direct case?

5        A.    No.

6        Q.    It came out at trial, I'll represent to

7    you that what I said earlier that there were

8    collectively over 6,000 chest compressions over

9    the course of more than an hour after Mike Davis

10   said he tried, you know, a few times to press the

11   chest in sum and substance.

12        If you had known that there were upwards

13   of 6,000 chest compressions by emergency medical

14   staff in the field and in the hospital, is that

15   something you would have disclosed under Brady

16   had you known it before trial?

17             MS. PECK:  Object to form.

18             MS. SPENCER:  Object to form.

19        Q.    Under the circumstances of this case?

20             MS. PECK:  Objection to form.

21             MS. SPENCER:  Object to form.

22        A.    I would have disclosed anything that we

23   would have determined would have been potentially

1  **[JOEL ABELOVE - By Mr. Klein]**

2  exculpatory or would have affected the

3  credibility of a witness.

4     Q.   Right.  So now let's -- generally I agree

5  with that proposition.  Now let's drill down to

6  the 6,000 chest compressions or evidence

7  surrounding the nature and extent of the

8  resuscitation efforts.

9         Given that testimony, had you been aware

10  of it before trial would it have probably been --

11  should it have been the subject of a Brady

12  disclosure had it been known to your office?

13         MS. PECK:  Objection.

14     A.   I don't know.  It depends on how somebody

15  would have -- I'm certain -- I would certainly

16  imagine that that would be something we'd inquire

17  about with the medical professionals and if it

18  was determined that those actions represented

19  potentially exculpatory information or would have

20  affected the credibility of a prosecutorial

21  witness then it would then of course have to be

22  disclosed under Brady, but if not, then no it

23  would not.

Case 1:17-cv-01290-DJS   Document 117-4   Filed 02/04/22   Page 69 of 117

1  **[JOEL ABELOVE - By Mr. Klein]**

2      Q.   Well, from this case, what you know about

3  the case, is it the type of thing that in your

4  opinion and based on what you know about this

5  case and also from your training, education, and

6  experience that you would have disclosed had you

7  been aware of it?

8              MS. PECK:  Objection to form.

9              MS. SPENCER:  Objection.

10     A.   I can't say.  Like I just said, I

11  wouldn't have been able to make that

12  determination on my own.  I'd have to find out

13  more information about it.

14     Q.   Well, there's research in the file and

15  the Rosario material about CPR-related liver

16  lacerations and rib fractures.  I mean, are you

17  familiar with any literature on that, whether

18  from this file or just generally?

19     A.   No.

20     Q.   In the Rosario material, and I'll mark

21  all this, I'm just asking generally if you are

22  aware of it.  There's notes about -- the manual

23  for police section that says that make note of

1  **[JOEL ABELOVE - By Mr. Klein]**

2  any resuscitative techniques used in an attempt

3  to revive the victim.  Some of these techniques

4  may cause postmortem injuries, such as fractured

5  ribs, lacerated liver and the like.  And the two

6  injuries in this case were fractured ribs and

7  lacerated liver.

8  Were you aware of these issues being

9  potential Brady concerns in this case, whether or

10  not they were -- there were any Brady disclosures

11  made?

12  MS. PECK:  Objection.

13  MS. SPENCER:  Object to form.

14  A.  Not that I recall.

15  Q.  Is Chief McAvoy, is he the chief of the

16  Troy PD?

17  A.  No.  He's now retired, but he was not the

18  chief.  He was an assistant or a deputy chief.

19  Q.  Okay.  Was he the deputy chief in

20  approximately 2015 to 2016?

21  A.  He may have been.

22  Q.  Okay.  Do you recall ever having any

23  discussions with him about any of the issues in

1   **[JOEL ABELOVE - By Mr. Klein]**

2   this investigation?

3       A.   I do not recall.

4               MS. SPENCER:   Object to form.

5       Q.   When it came down to trial it looks like

6   Cindy Chavkin was the assistant who prosecuted

7   this case at trial.   Is that your understanding?

8       A.   Yes.

9       Q.   Did you assign her to the role of lead

10  prosecutor in this case or did someone else

11  delegate this to her or how did that happen?

12      A.   I don't recall exactly.

13      Q.   Okay.   And did she handle the case

14  properly in your estimation from what you know?

15      A.   What do you mean by properly?

16      Q.   Well, were there any concerns with her,

17  with how she handled the case, either

18  strategically, ethically, or from any other

19  perspective that you had as DA?

20      A.   Well, I didn't watch the trial so it's

21  hard for me to comment on her performance in the

22  courtroom or her dealings with witnesses, you

23  know, in her preparation of them.   So it's hard

1 **[JOEL ABELOVE - By Mr. Klein]**

2 for me to answer your question accurately.

3     Q.   Were you involved in trial prep for any

4 witnesses?

5     A.   No.  I don't believe I was.

6     Q.   Were you involved in trial prep just with

7 her and/or with Jessica Hall or anyone else

8 supervising her?

9     A.   I don't believe I was.

10     Q.   Do you recall Dr. Sikirica calling you to

11 his office along with Jessica Hall after he

12 testified on the day of his testimony?

13           MS. PECK:  Objection.

14     A.   I don't recall when it was but I recall

15 that, that occurring.

16     Q.   Had that ever occurred in your career,

17 either where you were called to Dr. Sikirica's

18 office because -- well, withdrawn.

19        Did he call you because he was frustrated

20 or upset with the situation, how the case was

21 handled?

22           MS. PECK:  Objection.

23     A.   He called me because he was not happy

1    [JOEL ABELOVE - By Mr. Klein]

2    with how the examination went when he testified.

3       Q.    Had that ever happened in your career

4    either as a DA or did you ever hear of that

5    happening when you were an ADA, Dr. Sikirica

6    seeking a meeting because he wasn't happy with

7    the way an assistant handled the case?

8       A.    Not that I can recall.

9       Q.    And so when he called you do you recall

10   what he said?  Did he call you personally or did

11   he call someone to reach out to you to notify you

12   that he wanted a meeting?

13      A.    I don't recall that.

14      Q.    What do you recall about what he said,

15   either -- whether it was conveyed to you and then

16   including in the meeting?

17      A.    My recollection of the meeting was that

18   he was dissatisfied with the ADA's lack of

19   redirect or insufficiency with which she was --

20   or had elicited testimony I think on redirect

21   examination to try to get him to clarify some of

22   the issues that were brought up on cross.  That's

23   my recollection.

1    **[JOEL ABELOVE - By Mr. Klein]**

2        Q.   He testified last week.  I think he said

3    she was inept, he said some pretty harsh words.

4    He'll never work with her again.  Do you remember

5    like him being angry during the meeting?

6                    MS. PECK:  Objection.

7        A.   I do recall him not being happy with her

8    at all.

9        Q.   Right.  So, how did he express it, what

10   was his demeanor?  Was he raising his voice?  Was

11   he just pissed off?  Was he --

12       A.   I don't recall if he raised his voice.

13   It was very clear to me that he was not happy

14   with the way she conducted the examination.

15       Q.   Did he express his concern that there

16   would be an acquittal or the case was going to go

17   south because of the way she was handling the

18   case?

19       A.   That I don't recall.

20       Q.   He watched -- he testified that he

21   observed Dr. Teas' testimony and that part of his

22   frustration was that he wanted to go up and do a

23   rebuttal and that he was -- the court didn't

**APPENDIX**

**448**

72

1    [JOEL ABELOVE - By Mr. Klein]

2    allow him to do that.  Do you recall that in sum

3    and substance?

4        A.   I don't.

5        Q.   Do you recall in -- even if it's not

6    specifically in sum and substance, that he wanted

7    to do a rebuttal because the defense presentation

8    was damaging?

9             MS. PECK:  Objection.

10       Q.   It was indicative of innocence?

11            MS. PECK:  Objection.

12       A.   I don't recall that.

13       Q.   What do you recall then?  Just so we have

14   a clear record.  Just for the record what do you

15   recall about your meeting with Dr. Sikirica from

16   start to finish?

17       A.   Sure.  It's just what I said a moment

18   ago.  That's all I recall.

19       Q.   Okay.  Did that meeting come up in your

20   recent conversation with Jessica Hall, did either

21   of you discuss or refresh one another's

22   recollection of what was discussed at the meeting

23   with Dr. Sikirica?

Case 1:17-cv-01290-DJS   Document 94-17   Filed 02/04/22   Page 77 of 117

1   [JOEL ABELOVE - By Mr. Klein]

2       A.   I don't believe we talked about that.  I

3   don't think so.  We were more focused on, I was

4   trying to recall the timeline, when did this

5   incident occur, when did it go to the grand jury,

6   do you recall presenting it to the grand jury,

7   that sort of thing.  And she had very little

8   recollection as well.

9       Q.   Do you recall Dr. Sikirica calling you in

10  for the meeting prior to the jury's verdict in

11  the case?

12      A.   I don't recall when it was.

13      Q.   Do you recall taking a more active role

14  or directing anyone else to take a more active

15  role in monitoring the trial after Dr. Sikirica

16  met with you?

17      A.   No.

18      Q.   Did you take any action in response to

19  what Dr. Sikirica said to you, did you speak to

20  Cindy Chavkin, did you get her side of it or

21  anything else?

22      A.   I don't recall what I did after that

23  meeting in regard to taking any action.

1    **[JOEL ABELOVE - By Mr. Klein]**

2       Q.   Did anyone else take any action in

3    response to that meeting even if you didn't?

4       A.   I don't recall.

5               MR. KLEIN:  Just off the record.

6               (Whereupon, a discussion was held

7          off the record.)

8               MR. KLEIN:  Exhibit 3 is going to

9          the Rosario material, one of two, 7/2/19

10         with Bates numbers.  It's a 316-page

11         document.  I'm just going to refer to

12         some Bates numbers on it.

13              (Abelove Exhibit No. 3, Supporting

14         Deposition of Kathleen Crisafulli, Bates

15         495, marked this date for identification.)

16      Q.   So, I'm showing you what's Exhibit 3,

17   Bates No. 495, produced by I believe Ms. Peck.

18   This is a supporting dep from Kathleen Crisafulli

19   that I mentioned earlier.  She's the ER physician.

20           Had you ever seen this?  Do you know if

21   you saw this during the pendency of the case or

22   any time since?

23      A.   I don't recall ever seeing that.

1    **[JOEL ABELOVE - By Mr. Klein]**

2        Q.    Okay.  When a supporting deposition like

3    this, this was drafted on March 5th, several days

4    after the death, are these types of supporting

5    depositions in this kind of case, were they just

6    given to your office by the police or did your

7    office have a policy of undertaking to

8    independently interview all such witnesses before

9    trial?

10        A.    That question assumes that it's either

11    one or the other.  It can often be both.

12        Q.    Okay.

13        A.    I would expect that in all cases the

14    police provide us with a copy of all depositions

15    of witnesses that they've taken and we also

16    frequently, if not always, speak with witnesses

17    before they testify.

18        Q.    Okay.  In this supporting deposition,

19    among other things, I just want to point to a

20    relevant part that I want to ask you about.  It

21    says I, along with staff, worked to resuscitate

22    the child.  We were unable and I pronounced the

23    death of the child.  It doesn't go into the

1    **[JOEL ABELOVE - By Mr. Klein]**

2    testimony at trial which was that it was three

3    individuals strenuously attempting to resuscitate

4    the child at 100 compressions per minute for a

5    30-minute period of time.

6         Do you know if that detail was known or

7    communicated to your office by the Troy PD?

8    A.   I don't know.

9    Q.   Do you know if when it came out at trial

10   on the direct case presented by your office if it

11   was a surprise or if it was something that was

12   known to Cindy Chavkin or anyone else in your

13   office?

14   A.   I'm unaware of what came out during the

15   trial.

16   Q.   You never reviewed the transcript

17   afterwards to do like a post-trial review of what

18   happened there, did you ever look at the

19   transcripts?

20   A.   I've never looked at the transcript of

21   the trial.

22   Q.   Did you ever have a meeting with Cindy or

23   Jessica or both or anyone else to do a, for lack

1    **[JOEL ABELOVE - By Mr. Klein]**

2    of a better word, term postmortem to try to

3    figure out what went wrong?

4        A.   I don't recall.

5        Q.   Is that something you would have done as

6    a matter of practice?

7        A.   It might have happened.  It might not.

8    There's not a standard practice for that sort of

9    thing.

10       Q.   Well, when you had to like comment to the

11   press that this was a weak, not a strong case,

12   did you just kind of come up with that or did you

13   confer with your staff?

14       A.   As I indicated earlier, I made that

15   statement based upon my understanding of certain

16   types of evidence that were not present in this

17   case.

18       Q.   Okay.  So, I'm going to flip forward to

19   what we'll call the next page, Exhibit 4, and

20   this is Bates No. 496.  This is the supporting

21   deposition of Michael Bayly, B-a-y-l-y.  Did you

22   know Michael Bayly or did you ever know who he

23   is?

1    [JOEL ABELOVE - By Mr. Klein]

2        A.    I don't think I do.

3                (Abelove Exhibit No. 4, Supporting

4            Deposition of Michael Bayly, Bates 496,

5            marked this date for identification.)

6        Q.    In this supporting dep it just says that,

7    relevant to CPR in the middle, I then continued

8    CPR with members of my unit and talks about other

9    life saving efforts.  But it doesn't talk about

10    there were 16 minutes of CPR at the home and 20

11    minutes in the ambulance at 100 plus compressions

12    per minute as he testified at trial.

13        Do you know if that information was known

14    to Troy PD but not communicated to your office in

15    advance of trial?

16                MS. PECK:  Objection to form.

17                MS. SPENCER:  Form.

18        A.    I do not know.

19        Q.    Had you known that information would you

20    have disclosed it under Brady, the nature and

21    extent of the CPR efforts beyond that it was just

22    done?

23        A.    I don't know.  It depends as I indicated

1    **[JOEL ABELOVE - By Mr. Klein]**

2    earlier.

3        Q.   Do we need to talk to Jessica about that,

4    Jessica Hall, would she be more aware of the

5    circumstances of this case and whether that would

6    be a Brady issue?

7        A.   I don't know what you need to do.  When

8    you just said do we need to talk to her --

9        Q.   Well, who would have the knowledge, the

10   information about that?  Who would have been in a

11   position to know the facts and circumstances of

12   this case and whether those facts, had they been

13   known would have constituted Brady?

14       A.   You can certainly speak with Andra

15   Ackerman.  You could speak with Cindy Chavkin.

16   You can speak with Jessica Hall.  Any of them may

17   know but I don't know that they do.

18       Q.   Okay.  Now, I'm going to show you

19   what's -- we'll call this Exhibit 5, Bates No.

20   94.  This is a note.  "Adam, Manual For Police,

21   relevant but not exculpating (completely) DC

22   McAvoy."

23            Does that appear to be Deputy Chief

**APPENDIX**

1    **[JOEL ABELOVE - By Mr. Klein]**

2    McAvoy's note?

3        A.   I have no idea.  I --

4        Q.   I know you don't know.  Sitting here you

5    are not a handwriting expert, but DC McAvoy, does

6    this suggest that this is DC McAvoy even though

7    you can't vouch for who wrote this?

8        A.   I don't know.  It may be.

9        Q.   Okay.

10       A.   I can't make that conclusion.

11       Q.   Okay.

12       A.   I don't know who wrote it.

13       Q.   Okay.  So, this is produced as part of

14   the Rosario material to us.  So presuming it was

15   the Rosario produced in your file in trial.  And

16   it says what I read to you earlier.  Make note of

17   any resuscitative techniques to revive the

18   victim.  Some of these techniques may cause

19   postmortem injuries such as fractured ribs,

20   lacerated liver and the like.

21           Does this jog your memory as to whether

22   this was any -- an issue to any extent, whether

23   it was a concern or not a concern, just that it

Case 1:17-cv-01290-DJS Document 79-1 Filed 02/04/22 Page 82 of 117

1    [JOEL ABELOVE - By Mr. Klein]

2    came up as an issue at trial that the supporting

3    depositions didn't talk about the specifics of

4    the resuscitative techniques as set forth in this

5    manual?

6        A.   No.  It does not jog my memory in that

7    regard.

8        Q.   Okay.  In this packet of Rosario material

9    are a number of, looks like peer review articles,

10   CPR may lead to severe injuries of internal

11   organs.  This is Page 99.  We'll call this

12   Exhibit 6.  That CPR, trauma related to CPR is

13   rare, but it may lead to severe injuries of the

14   organs.  And there's other articles in here about

15   injuries resulting from resuscitation procedures.

16   Do you know who pulled these articles?

17       A.   Do I know what?

18       Q.   Do you know who pulled these articles?

19       A.   Who pulled them?

20       Q.   Yes.  Were they collected by the police

21   department or by your office?

22       A.   I have no idea.  I don't even know where

23   these articles are located.

```
1   [JOEL ABELOVE - By Mr. Klein]

2       Q.   Okay.  Well, it's part of the Rosario

3   material and I believe one of them says with --

4   well, withdrawn.  I'll find it.

5           There are articles, these articles are in

6   the file.  Here's another article, Bates 84,

7   we'll call them Exhibit 7 -- Exhibit 6.  "Liver

8   rupture caused by isolated blunt force impact:

9   The result of a blow, a kick or fall?"

10          So, is it your testimony that you have no

11  recollection of anyone researching or having,

12  otherwise having any concern about their being a

13  viable defense here of postmortem CPR injuries

14  being present but that didn't cause the death?

15      A.   Correct.

16      Q.   You don't recall that?

17      A.   Correct.

18              MS. PECK:  Objection.  Brett, just

19          so that we have a clean record, can we

20          get just a range of Bates stamp numbers

21          for --

22              MR. KLEIN:  Yes.  This was produced

23          in discovery.  Pages 84 through 108.
```

1   **[JOEL ABELOVE - By Mr. Klein]**

2          We'll just call this Exhibit 5.  Instead

3          of 5 and 6.  We'll call this whole --

4                  MS. PECK:  Because you had Exhibit

5          5 as Page 94.

6                  MR. KLEIN:  Right.  So, we're just

7          going to call this entire document, as it

8          was produced in discovery, we'll mark

9          this one thing, the whole thing, 84

10         through 108.  We'll mark this as Exhibit

11         5 to avoid any confusion.

12                 MS. PECK:  Okay.

13                 MR. KLEIN:  So, 1 is the article.

14         2 is the e-mail.  3 is 495.  4 is 496.  5

15         is 84 through 108.

16                 MS. PECK:  Okay.

17                 (Abelove Exhibit No. 5, Packet of

18         Bates Pages 84-108, marked this date for

19         identification.)

20     Q.  Have you ever worked with Dr. Teas in

21     your career, whether in the D.A.'s Office or in

22     private practice?

23     A.  No.

1   [JOEL ABELOVE - By Mr. Klein]

2       Q.   Did Dr. Sikirica express to you his views

3   or any other statements about Dr. Teas' testimony

4   in your meeting with him?

5       A.   I don't recall.

6       Q.   Did you or Jessica Hall or anyone else

7   take notes during that meeting?

8       A.   I don't recall taking any notes.  I don't

9   recall Ms. Hall taking any notes.

10      Q.   Okay.  Whether or not you recall it, is

11  it the type of meeting where you would have

12  necessarily taken notes or recorded it?

13      A.   No.

14      Q.   Had a record of it?  No?

15      A.   No.

16      Q.   Okay.  As the district attorney you had a

17  discretion to not pursue charges, even after they

18  were presented to a grand jury that were

19  indicting if you didn't support those charges,

20  correct?

21      A.   Yes.

22      Q.   And certainly you had discretion not to

23  present a case to a grand jury if you felt there

1    **[JOEL ABELOVE - By Mr. Klein]**

2    was a viable or valid defense, correct?

3                MS. SPENCER:  Object to form.

4        A.    The district attorney always have

5    discretion whether or not to present a case to a

6    grand jury for a number of reasons.

7        Q.    And that was your duty, your duty was to

8    ensure justice is done not to pursue charges at

9    all costs, correct?

10               MS. PECK:  Objection.

11       A.    As I stated earlier, that's correct.

12   Yes.

13       Q.    This is not like a trick question.  I

14   just want to know from what you've learned about

15   this case would you have -- would you still

16   pursue this case if you were the district

17   attorney today if you knew the details about the

18   injuries more likely than not being postmortem

19   injuries?

20               MS. PECK:  Objection.

21               MS. SPENCER:  Object to form.

22       A.    It's impossible for me to answer that

23   question because I don't have enough familiarity

1    **[JOEL ABELOVE - By Mr. Klein]**

2    with all of the facts of the case in order to

3    make a determination.

4        Q.   And you didn't brush up on that, on the

5    case for today's deposition?

6        A.   Nor would I have been able to.  I don't

7    have access to the case file.

8        Q.   Okay.  Who from the District Attorney's

9    Office would have the most knowledge of this

10   case?  Would it be Jessica Hall?

11       A.   I don't know who has the most knowledge.

12   It depends on what they recall.  It may be Ms.

13   Hall.  It may be Ms. Ackerman.  It may be Ms.

14   Chavkin.

15       Q.   Okay.  What was the basis of your

16   statement in the article, Exhibit 1, that I'm

17   still very satisfied with his opinion, if you

18   weren't versed in the details, the facts and

19   circumstances of the case?

20               MS. PECK:  Objection.

21       A.   Well, at the time I'm sure I had a better

22   recollection of what he testified to and knowing

23   my -- knowing his history and having dealt with

1    [JOEL ABELOVE - By Mr. Klein]

2    him on numerous occasions I never had any reason

3    to doubt his professionalism or his competence.

4    So, I'm sure at the time I made the statement it

5    was based on what I knew at that time not what I

6    recall now.

7        Q.   Well, were you aware, not from public

8    reporting because you weren't in the office at

9    the time, that he was wrong about Adrian Thomas

10   that there were, that there were from public

11   reporting that there were -- that this was a

12   child homicide charge that resulted in a not

13   guilty verdict?

14             MS. PECK:  Objection.

15             MS. SPENCER:  Form.

16       A.   No.  I don't believe I was aware of that.

17   But certainly a not guilty verdict doesn't mean

18   that somebody is wrong about a professional

19   opinion that they give.

20       Q.   Well, without discussing the

21   circumstances of it did you ever look into them,

22   of whatever happened in that case?

23       A.   No.

Case 1:17-cv-01290-DJS   Document 117-3   Filed 02/04/22   Page 89 of 117

1    [JOEL ABELOVE - By Mr. Klein]

2    Q.    Were you ever briefed on it?

3    A.    No.

4    Q.    So, you don't know whether or not in

5    other cases that were prosecuted when you were

6    not in the office whether he had failed to

7    overlook congenital or natural causes of deaths

8    in cases that were charged as homicide, you don't

9    know either way; do you?

10   A.    Where he failed to overlook something?

11   Q.    Where he failed to look at or overlooked

12   potential other causes of death like natural

13   causes of death?

14         MS. PECK:  Objection.

15   A.    I'm not aware of that.  No.

16   Q.    Were there any other homicide cases

17   prosecuted during your tenure as DA involving

18   Michael Sikirica giving his testimony as medical

19   examiner that resulted in acquittals other than

20   Michael Davis?

21         MS. PECK:  Objection.  And, Brett,

22         if they resulted in acquittals they would

23         be sealed and he as a district attorney

1    **[JOEL ABELOVE - By Mr. Klein]**

2              would not be able to speak about them.

3                   MR. KLEIN:  He can say yes or no.

4              He doesn't have to say name of the case.

5              He's not divulging any records of the

6              prosecution.

7    A.    Not that I know.  Not that I can recall.

8    Q.    This is the only one that you can recall?

9    A.    Yes.

10   Q.    Has any legal disciplinary or any other

11   proceedings been alleged or brought against you

12   with regard to sending yourself copies of e-mails

13   to your private e-mail from the office from the

14   DA's office?

15                  MS. PECK:  Objection.  And, Brett,

16             I'm going to direct him not to answer

17             that question.

18                  MR. KLEIN:  Okay.  So, I think we

19             are going to call the court on that one.

20             I'm just going to see if I have any other

21             issues and then -- I have a list here.  I

22             think there were some other issues.  Hold

23             on.

1    **[JOEL ABELOVE - By Mr. Klein]**

2              MS. PECK:  And you were going to

3              send me over that article.

4              MR. KLEIN:  Sure.  Yup.  Can I ask

5              a few more questions and then we'll call

6              the court?

7              MS. PECK:  Sure.

8    Q.    Mr. Abelove, are you aware of any

9    exculpatory information as it pertains to Michael

10   Davis, whether you learned it since the trial or

11   any time from the death of V.D. up until today,

12   are you aware of anything that you've learned to

13   be exculpatory?

14   A.    Not independently, no.

15   Q.    Well, how about through other sources

16   other than counsel representing you?

17   A.    Just what you've told me today.

18   Q.    Okay.  And were aware of it before I told

19   you today?  You became aware of it through the

20   course of the trial or through the press or other

21   sources?

22   A.    I don't recall becoming aware of it

23   before today, but if I knew it at the time I just

1   **[JOEL ABELOVE - By Mr. Klein]**

2   don't recall it now.

3   Q.   Okay.  And is the information about 6,000

4   plus chest compressions, are you -- I just want

5   to be clear.  Are you testifying that you can't

6   say whether it's exculpatory in this case or you

7   just don't know enough or is it your testimony

8   that it would have been exculpatory, you just

9   don't know whether it was known or not?

10   A.   I believe my testimony is that I don't

11   know as I sit here today what that -- whether or

12   not that would constitute Brady material, that I

13   would have to learn more information about it,

14   speak to medical professionals and assess it in

15   the context of the case to know whether or not it

16   constitutes Brady material.

17   Q.   Okay.  Do you know whether that

18   information was discussed and assessed whether

19   with medical professionals or any other experts

20   or in-house or otherwise?

21   A.   I don't.

22   Q.   You don't know?

23   A.   I do not know.

1    [JOEL ABELOVE - By Mr. Klein]

2        Q.   Upon completion of the autopsy that

3    seemed to -- that was followed by a chain of

4    events that I'm aware of that included an

5    interview of Mike Davis on video at Troy PD

6    headquarters and then the indictment and then

7    Mike Davis surrendering and being arraigned.

8            Whose determination was it to present the

9    case to the grand jury upon receipt of the

10   autopsy?  Was there a meeting with Dr. Sikirica

11   and your office?

12       A.   I don't know the answer to that question.

13           MS. SPENCER:  Object to form.

14       Q.   Okay.  Is it because you have no

15   knowledge of it or you just don't recall it?

16       A.   I don't recall.

17       Q.   What is the universe of individuals who

18   would have been in a position to decide to

19   proceed with the grand jury upon receipt of the

20   autopsy?  Is that you, Jessica Hall and anyone

21   else or?

22       A.   Certainly that universe includes myself

23   and Jessica Hall.  Others may have had input into

1    **[JOEL ABELOVE - By Mr. Klein]**

2    that decision, but ultimately that universe is

3    fairly small.

4        Q.    Okay.

5              MR. KLEIN:  Can we call the judge

6              and excuse the witness while we call the

7              judge?

8              MS. PECK:  Can you give me a minute

9              to talk to my client?  Because this is

10             all new to me.

11             MR. KLEIN:  Yeah.  Of course.

12             MS. PECK:  All right.  So, give me

13             ten minutes and then we can hop back on.

14             MR. KLEIN:  You got it.

15             (Recess taken at 11:25 a.m.;

16             proceedings resumed at 11:40 a.m.)

17             (Whereupon, there was a pause in

18             the proceedings to call the Judge

19             Stewart.  Transcription will be bound

20             separately from deposition.)

21             MS. PECK:  Give me one second and

22             I'll get Joel back in here.

23

**APPENDIX**

1    **[JOEL ABELOVE - By Mr. Klein]**

2    BY MR. KLEIN:

3        Q.   Mr. Abelove, are you aware of any other

4    matters relating to the grounds for this

5    prosecution that we haven't discussed today,

6    whether there were concerns that have not been

7    addressed in your testimony so far today?

8                    MS. SPENCER:  Object to form.

9                    MS. PECK:  Object to form.

10       A.   I don't understand your question.  Could

11   you ask again?

12       Q.   Well, other than this not being a strong

13   case for the reasons you said, other than issues

14   that I raised that were set forth in the article

15   about what happened at trial, Dr. Teas'

16   testimony, et cetera, are there any other facts

17   or information that you are aware of that relate

18   to this case and the merits of the prosecution in

19   your view?

20       A.   Not that I can recall.

21                   MS. SPENCER:  Object to form.

22       Q.   Have you ever personally handled any case

23   where there were CPR-related injuries whether

1    **[JOEL ABELOVE - By Mr. Klein]**

2    presented as part of the prosecution or defense?

3                    MS. SPENCER:  Object to form.

4        A.   I don't believe so.

5        Q.   Are you aware, and I believe this is set

6    forth in one of the articles in Exhibit 5, that

7    medical staff can be prosecuted for CPR-related

8    injury under some circumstances?  Have you ever

9    been involved in any such case or heard of such

10   case?

11                   MS. PECK:  Objection to form.

12       A.   No.

13       Q.   No?

14       A.   No.  I have not.

15       Q.   Okay.  Do you have an understanding from

16   any source as to whether V.D. may have been or

17   was believed to be unresponsive before Michael

18   Davis interacted with her in a physical manner

19   trying to resuscitate her on the date of her

20   death?

21                   MS. SPENCER:  Object to form.

22                   MS. PECK:  Objection to form.

23       A.   No.

1    **[JOEL ABELOVE - By Mr. Klein]**

2        Q.    Okay.  I'm sorry.  I saw the lips move

3    but the answer is no?

4        A.    No.

5        Q.    Okay.  In your career have you ever been

6    involved in a case whether on the prosecution or

7    defense side of a case involving CPR-related

8    injuries?

9                    MS. SPENCER:  Object to form.

10       A.    I can't recall.  It's possible.  I just

11   can't recall right now.

12       Q.    I believe Dr. Sikirica was involved in a

13   case, I'm not sure if -- well, withdrawn.

14            I believe Dr. Sikirica testified he had a

15   case where Dr. Rutley (phonetic) was an opposing

16   expert where there was a homicide prosecution and

17   there was a defense that injuries were caused by

18   CPR.  The individual's convicted.  It was in the

19   early to mid 2000s.  Do you have any recollection

20   of that matter?

21                    MS. PECK:  Objection to form.

22       A.    With doctor who?

23       Q.    Sikirica.

1   **[JOEL ABELOVE - By Ms. Spencer]**

2       A.   No.  No.

3       Q.   Dr. Rutley (phonetic) was the defense

4   expert.

5       A.   No.  I don't.  I don't know the case that

6   you are referring to.

7                MR. KLEIN:  All right.  I'm going

8               to reserve the right to hold the

9               deposition open pending further rulings

10              by the court that may be relevant and

11              want to thank you for your time and

12              cooperation, Mr. Abelove.  I appreciate

13              it.

14               THE WITNESS:  You're welcome.

15              Thank you.

16  BY MS. SPENCER:

17      Q.   Hello, Mr. Abelove.  My name is Rhiannon

18  Spencer.  I am the attorney for the City of Troy,

19  Ronald Fountain, Danielle Coonradt, Charles

20  McDonald, Tim Colaneri and Adam Mason in this

21  matter.

22      A.   Good afternoon.

23      Q.   Good afternoon.  I just have hopefully a

1    **[JOEL ABELOVE - By Ms. Spencer]**

2    couple questions, very brief.

3            With regards to the investigation of the

4    death of V.D., did you ever personally meet with

5    Ronald Fountain?

6        A.   Not that I recall.

7        Q.   Did you ever personally meet with

8    Danielle Coonradt with regards to the

9    investigation of the death of V.D.?

10       A.   Not that I recall.

11       Q.   Charles McDonald, did you ever meet with

12   him with regards to the investigation of the

13   death of V.D.?

14       A.   Not that I recall.

15       Q.   Tim Colaneri, did you ever meet with him

16   with regards to the investigation of V.D.?

17       A.   Not that I recall.

18       Q.   And did you ever meet with Adam Mason

19   with regards to the investigation of V.D.'s

20   death?

21       A.   Not that I recall.

22       Q.   Did you have any conversations with those

23   same individuals either by phone or by e-mail or

1   **[JOEL ABELOVE - By Mr. Klein]**

2  by letter with regards to the investigation of

3  V.D.?

4     A.   No.  Not that I recall.

5           MS. SPENCER:  All right.  That is

6          all my questions.

7          THE WITNESS:  Thank you.

8  BY MR. KLEIN:

9     Q.   Just because you don't -- the fact that

10  you don't recall doesn't mean you didn't have any

11  such conversations, is that accurate, you just

12  don't recall whether or not you did?

13     A.   I don't believe I did because I don't

14  know -- I think I'd recall that.  I had such

15  little involvement with this case that my lack of

16  recollection leads me to believe that I did not.

17          MR. KLEIN:  Okay.  I'm just going

18         to continue to reserve because the next

19         question has to do with the circumstances

20         of Mr. Fountain's case at the time.

21          So, with that said, thank for your

22         time today.  Maybe we'll see you again

23         down the road but stay well.  Thank you.

1    **[JOEL ABELOVE - By Mr. Klein]**

2              THE WITNESS:  Thank you.  You as

3         well.  Take care.

4                  (Whereupon, the testimony of JOEL

5         ABELOVE concluded at 12:10 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1

2

3      STATE OF NEW YORK

4      COUNTY OF _____

5

6

7            I have read the foregoing record of my

8      testimony taken at the time and place noted in the

9      heading hereof, and I do hereby acknowledge it to

10     be a true and correct transcript of same.

11

12

13

14            _____

15            JOEL ABELOVE

16

17

18     Sworn to before me this

19     _____ day of _____, 20__.

20     _____

21     NOTARY PUBLIC

22

23

Case 1:17-cv-01290-DJS   Document 47/38-4   Filed 02/04/22   Page 105 of 117

1

2   DEPOSITION TRANSCRIPT ERRATA SHEET
   ERRATA SHEET FOR TRANSCRIPT OF:
3   JOEL ABELOVE - May 28, 2021

4 PAGE/LINE     CORRECTION

5

6 ___ ___  _____

7 ___ ___  _____

8 ___ ___  _____

9 ___ ___  _____

10 ___ ___  _____

11 ___ ___  _____

12 ___ ___  _____

13 ___ ___  _____

14 ___ ___  _____

15 ___ ___  _____

16 ___ ___  _____

17 ___ ___  _____

18 ___ ___  _____

19 ___ ___  _____

20 ___ ___  _____

21 ___ ___  _____

22 ___ ___  _____

23 ___ ___  _____

```
 1

 2                    C E R T I F I C A T I O N

 3

 4         I, SUSAN FLORIO, Registered Professional

 5   Reporter and Notary Public in and for the State of

 6   New York, do hereby certify that the foregoing is a

 7   true, complete and accurate transcript to the best

 8   of my knowledge, skill and ability on the date and

 9   place hereinbefore set forth.

10         I FURTHER CERTIFY that I am not related

11   to or employed by any of the parties to the action

12   in which the proceedings were taken, or any

13   attorney or counsel employed in this action, nor am

14   I financially interested in the case.

15         IN WITNESS WHEREOF, I have hereunto set

16   my hand this 22nd day of June, 2021.

17

18

19         _____

20                    SUSAN FLORIO, RPR

21              (The foregoing certification of
             this transcript does not apply to any
22           reproduction of the same by any means
             unless under the direct control and/or
23           supervision of the certifying reporter.)
```

1

2    INDEX TO EXAMINATION:                          PAGE
     --------------------------------------------------
3
     BY MR. KLEIN:                                4; 99
4
     BY MS. SPENCER:                                 97
5

6

7

8    INDEX TO ABELOVE EXHIBITS:                     PAGE
     --------------------------------------------------
9
     1, Article                                      44
10
     2, 3/1/15 E-mail                                46
11
     3, Supporting Deposition of Kathleen            74
12        Crisafulli, Bates 495

13   4, Supporting Deposition of Michael Bayly,      78
          Bates 496
14
     5, Packet of Bates Pages 84-108                 83
15

16

17   INDEX TO CERTIFIED QUESTIONS:                  PAGE
     --------------------------------------------------
18
     Fair to say that during the pendency of the     22
19   Michael Davis prosecution you indicted and
     were prosecuting for a period of time
20   Detective Fountain?

21

22

23

# APPENDIX

**'**

**'91-99** [1] - 8:8

## 1

**1** [4] - 44:21, 83:13, 86:16, 104:9
**10** [1] - 62:12
**100** [3] - 61:5, 76:4, 78:11
**10007** [1] - 2:5
**104** [1] - 2:23
**108** [3] - 82:23, 83:10, 83:15
**10:35** [1] - 62:13
**10:45** [1] - 62:14
**11:25** [1] - 93:15
**11:38** [1] - 39:22
**11:40** [1] - 93:16
**12181-0208** [1] - 2:15
**12205** [1] - 2:10
**12:10** [1] - 100:5
**12th** [3] - 8:3, 47:17, 48:10
**15** [1] - 8:12
**16** [2] - 61:4, 78:10
**17** [1] - 7:14
**19** [1] - 10:14
**1994** [1] - 7:21
**1995** [2] - 7:23, 10:9
**1996** [1] - 11:3
**1:17-cv-01290** [1] - 1:7
**1st** [9] - 6:9, 19:16, 27:16, 35:14, 36:12, 39:5, 39:17, 39:22, 46:10

## 2

**2** [6] - 42:12, 46:11, 46:17, 46:20, 83:14, 104:10
**20** [2] - 61:4, 78:10
**2000s** [1] - 96:19
**2001** [1] - 14:22
**2003** [1] - 8:11
**2005** [1] - 8:3
**2014** [2] - 8:18, 13:11
**2015** [14] - 19:6, 19:16, 20:21, 21:5, 27:14, 29:7, 35:14, 39:5, 39:17, 39:22, 47:7, 50:12, 52:5, 67:20
**2016** [2] - 16:13, 67:20
**2020** [1] - 36:12
**2021** [5] - 1:16, 17:6,

42:11, 102:3, 103:16
**208** [1] - 2:15
**20___** [1] - 101:19
**21st** [2] - 17:5, 42:11
**22** [2] - 2:15, 104:18
**22nd** [1] - 103:16
**25th** [1] - 16:13
**26** [1] - 20:21
**26th** [1] - 27:18
**27th** [1] - 29:7
**28** [2] - 1:16, 102:3
**2nd** [2] - 21:4, 47:7

## 3

**3** [5] - 74:8, 74:13, 74:16, 83:14, 104:11
**3/1/15** [2] - 46:17, 104:10
**30** [1] - 61:19
**30-minute** [1] - 76:5
**305** [1] - 2:5
**316-page** [1] - 74:10

## 4

**4** [5] - 77:19, 78:3, 83:14, 104:3, 104:13
**44** [1] - 104:9
**46** [1] - 104:10
**495** [4] - 74:15, 74:17, 83:14, 104:12
**496** [1] - 77:20, 78:4, 83:14, 104:13

## 5

**5** [11] - 2:9, 42:12, 79:19, 83:2, 83:3, 83:5, 83:11, 83:14, 83:17, 95:6, 104:14
**507** [1] - 2:9
**5th** [1] - 75:3

## 6

**6** [3] - 81:12, 82:7, 83:3
**6,000** [4] - 64:8, 64:13, 65:6, 91:3
**600** [1] - 2:5

## 7

**7** [1] - 82:7
**7/2/19** [1] - 74:9

**700** [2] - 17:13, 19:5
**74** [1] - 104:11
**78** [1] - 104:13

## 8

**81s** [1] - 9:6
**83** [1] - 104:14
**84** [4] - 82:6, 82:23, 83:9, 83:15
**84-108** [2] - 83:18, 104:14

## 9

**9/11** [1] - 8:9
**911** [3] - 21:10, 27:19, 63:2
**94** [2] - 79:20, 83:5
**97** [1] - 104:4
**99** [2] - 81:11, 104:3
**9:35** [1] - 1:16

## A

**a.m** [6] - 1:16, 39:22, 62:13, 62:14, 93:15, 93:16
**Abelove** [22] - 2:9, 4:8, 23:6, 36:11, 36:12, 39:14, 42:13, 44:21, 46:10, 46:13, 46:14, 46:15, 46:17, 46:20, 62:19, 74:13, 78:3, 83:17, 90:8, 94:3, 97:12, 97:17
**ABELOVE** [8] - 1:2, 1:11, 1:15, 4:2, 100:5, 101:15, 102:3, 104:8
**abilities** [1] - 17:19
**ability** [1] - 103:8
**able** [6] - 12:14, 32:5, 56:15, 66:11, 86:6, 89:2
**absolutely** [1] - 18:23
**abuse** [2] - 11:8, 11:18
**access** [2] - 37:7, 86:7
**account** [2] - 35:22, 36:13
**accounts** [1] - 43:12
**accurate** [4] - 53:13, 53:14, 99:11, 103:7
**accurately** [4] - 4:18, 69:2
**accused** [1] - 54:14
**Ackerman** [18] - 29:14, 29:19, 30:22,

33:17, 35:3, 35:5, 38:13, 40:16, 40:18, 41:9, 47:15, 48:21, 49:6, 49:22, 50:11, 50:21, 79:15, 86:13
**acknowledge** [1] - 101:9
**acquittal** [4] - 6:18, 16:5, 20:3, 71:16
**acquittals** [2] - 88:19, 88:22
**acquitted** [2] - 16:14, 41:20
**action** [7] - 3:12, 46:21, 73:18, 73:23, 74:2, 103:11, 103:13
**actions** [1] - 65:18
**active** [2] - 73:13, 73:14
**ADA** [14] - 9:23, 14:14, 15:18, 18:19, 18:22, 19:12, 26:6, 31:5, 31:9, 41:9, 49:23, 58:20, 70:5
**ADA's** [1] - 70:18
**Adam** [5] - 2:14, 37:14, 79:20, 97:20, 98:18
**ADAM** [1] - 1:10
**ADAs** [1] - 11:13
**added** [1] - 42:16
**addition** [1] - 3:8
**address** [1] - 42:5
**addressed** [1] - 94:7
**administrative** [1] - 12:22
**admits** [1] - 43:19
**admitted** [1] - 42:14
**Adrian** [2] - 19:17, 87:9
**adult** [1] - 11:17
**advance** [1] - 78:15
**advice** [1] - 33:19
**advisory** [2] - 33:12, 33:18
**Advocate** [1] - 8:10
**advocate** [1] - 8:13
**advocates** [1] - 13:21
**affected** [2] - 65:2, 65:20
**afternoon** [2] - 97:22, 97:23
**afterwards** [1] - 76:17
**AG's** [1] - 9:20
**agency** [1] - 54:22
**ago** [3] - 8:16, 45:16, 72:18
**agree** [3] - 42:22, 55:22, 65:4
**AGREED** [1] - 3:3

**agreed** [3] - 3:13, 3:18, 3:21
**Alabama** [1] - 7:13
**Albany** [3] - 2:10, 7:7, 51:10
**aligning** [1] - 20:9
**alleged** [4] - 21:10, 25:14, 43:16, 89:11
**allow** [1] - 72:2
**alluded** [1] - 32:2
**almost** [1] - 41:14
**ambulance** [2] - 61:5, 78:11
**Amendment** [2] - 9:7, 9:9
**amount** [1] - 17:15
**AND** [1] - 3:3
**Andra** [20] - 29:14, 29:18, 30:6, 30:8, 30:22, 35:2, 35:5, 38:13, 39:6, 40:7, 40:16, 40:18, 40:22, 41:8, 47:15, 48:21, 49:6, 50:11, 50:21, 79:14
**ANDRA** [1] - 30:7
**Andrea** [1] - 30:6
**angry** [1] - 71:5
**another's** [2] - 42:5, 72:21
**answer** [17] - 5:10, 5:17, 5:20, 15:10, 18:7, 25:5, 27:2, 32:14, 36:7, 36:20, 44:23, 62:17, 69:2, 85:22, 89:16, 92:12, 96:3
**anticipating** [1] - 31:11
**apart** [1] - 27:5
**Appeals** [1] - 19:19
**appear** [2] - 55:9, 55:14, 79:23
**APPEARANCES** [1] - 2:2
**appeared** [1] - 24:6
**appearing** [1] - 14:2
**apply** [2] - 32:20, 103:21
**applying** [2] - 32:20, 33:21
**appreciate** [1] - 97:12
**apprised** [1] - 58:17
**area** [1] - 10:22
**Army** [3] - 7:11, 7:18, 8:12
**arraigned** [1] - 92:7
**arrest** [7] - 21:6, 53:9, 53:11, 53:17, 54:15, 54:16, 54:22

arrested [3] - 41:13, 54:21, 55:6
arrests [3] - 53:12, 53:15
arrhythmia [1] - 45:8
arson [1] - 25:10
Article [3] - 9:6, 44:21, 104:9
article [22] - 6:10, 16:3, 16:4, 16:12, 16:20, 17:9, 35:20, 36:9, 36:12, 37:5, 42:10, 42:12, 44:4, 44:17, 45:15, 46:4, 57:9, 82:6, 83:13, 86:16, 90:3, 94:14
articles [8] - 81:9, 81:14, 81:16, 81:18, 81:23, 82:5, 95:6
aspects [2] - 50:8, 58:12
assess [1] - 91:14
assessed [1] - 91:18
assign [2] - 31:5, 68:9
assigned [9] - 21:18, 24:5, 24:18, 26:16, 29:19, 30:2, 31:10, 41:9, 49:23
assigning [3] - 30:22, 31:8, 31:9
assignment [1] - 10:4
assist [8] - 28:22, 29:4, 31:22, 32:4, 32:6, 32:18, 33:2, 33:18
assistance [1] - 34:4
Assistant [7] - 8:2, 10:11, 10:20, 12:4, 13:21, 30:15, 42:15
assistant [8] - 24:8, 30:11, 30:13, 30:18, 39:2, 67:18, 68:6, 70:7
assistants [2] - 23:21, 25:3
assisting [1] - 33:20
associate [1] - 12:20
associates [1] - 12:20
assume [1] - 5:16
assumes [1] - 75:10
assuming [1] - 31:11
attempt [1] - 67:2
attempting [1] - 76:3
attempts [1] - 44:9
attend [5] - 30:22, 31:6, 31:13, 47:19
attended [6] - 7:5, 7:7, 29:20, 29:23, 38:13, 47:5
attention [7] - 19:23,

20:7, 20:18, 26:20, 27:17, 52:11, 52:13
attorney [14] - 4:21, 6:16, 8:18, 10:17, 18:18, 30:11, 55:14, 58:21, 84:16, 85:4, 85:17, 88:23, 97:18, 103:13
Attorney [4] - 8:19, 30:15, 42:13, 42:15
attorney's [1] - 55:23, 59:16
Attorney's [1] - 7:22, 86:8
Attorneys [3] - 2:4, 2:8, 2:13
attributed [1] - 17:15
audiotaped [1] - 43:11
August [3] - 8:3, 16:13, 52:5
authority [1] - 54:2
autopsies [4] - 17:12, 18:2, 19:5, 19:11
autopsy [19] - 29:6, 29:12, 29:14, 29:20, 30:2, 30:22, 31:6, 31:9, 31:13, 38:14, 38:15, 48:9, 52:6, 53:2, 58:23, 59:20, 92:2, 92:10, 92:20
available [2] - 28:21, 31:22
Avenue [1] - 2:10
avoid [2] - 56:14, 83:11
aware [35] - 19:10, 19:21, 19:22, 27:21, 27:22, 28:14, 29:8, 29:10, 31:21, 34:15, 51:17, 51:19, 52:7, 55:12, 59:5, 59:20, 61:21, 61:23, 65:9, 66:7, 66:22, 67:8, 79:4, 87:7, 87:16, 88:15, 90:8, 90:12, 90:18, 90:19, 90:22, 92:4, 94:3, 94:17, 95:5

## B

B-a-y-l-y [1] - 77:21
background [1] - 6:21
BAILEY [1] - 2:7
bar [2] - 3:10, 9:17
based [5] - 24:5, 50:2, 66:4, 77:15, 87:5
basic [1] - 7:14
basis [2] - 43:4, 86:15

basketball [2] - 16:13, 60:5
Bates [13] - 74:10, 74:12, 74:14, 74:17, 77:20, 78:4, 79:19, 82:6, 82:20, 83:18, 104:12, 104:13, 104:14
Bayly [5] - 63:22, 77:21, 77:22, 78:4, 104:13
BAYLY [1] - 63:22
became [7] - 8:3, 12:4, 13:11, 19:22, 28:14, 48:6, 90:19
become [5] - 11:3, 27:21, 27:22, 31:11, 52:6
becoming [2] - 11:14, 90:22
begun [1] - 3:17
belief [1] - 43:4
best [1] - 103:7
better [2] - 77:2, 86:21
between [4] - 3:3, 23:21, 38:8
beyond [1] - 78:21
bit [2] - 12:13, 41:7
blow [1] - 82:9
Bluetooth [1] - 32:12
blunt [1] - 82:8
Board [1] - 11:3
boss [1] - 33:6
bound [1] - 93:19
Box [1] - 2:15
Brady [17] - 62:20, 63:4, 63:6, 63:10, 63:15, 63:16, 64:15, 65:11, 65:22, 67:9, 67:10, 78:20, 79:6, 79:13, 91:12, 91:16
break [5] - 5:19, 5:21, 8:8, 37:5, 42:2
brett [1] - 22:7
BRETT [2] - 2:4, 2:6
Brett [10] - 4:8, 16:17, 36:10, 36:19, 39:11, 44:16, 62:9, 82:18, 88:21, 89:15
brief [2] - 41:14, 98:2
briefed [1] - 47:20, 49:8, 88:2
bringing [1] - 38:10
broaden [1] - 12:12
Broadway [1] - 2:5
brought [3] - 1:3, 47:8, 70:22, 89:11
brush [1] - 86:4
budget [2] - 13:22, 14:3

bunch [1] - 35:21
Bureau [2] - 8:5, 12:20
bureau [3] - 11:15, 13:2
bureaus [1] - 10:3
burglary [1] - 11:22
BY [8] - 2:6, 2:16, 4:7, 94:2, 97:16, 99:8, 104:3, 104:4

## C

cannot [2] - 22:9, 22:11
capacities [1] - 8:14
capacity [2] - 15:18, 18:18, 18:22
care [1] - 100:3
career [12] - 6:22, 7:8, 7:9, 7:19, 8:7, 11:23, 14:13, 69:16, 70:3, 83:21, 96:5
case [116] - 6:4, 6:13, 6:16, 6:20, 9:19, 10:22, 11:7, 11:10, 11:21, 17:22, 20:2, 20:4, 20:15, 23:7, 23:19, 23:23, 26:16, 30:5, 31:10, 31:12, 33:12, 34:8, 34:9, 35:12, 35:19, 36:16, 37:12, 37:17, 37:21, 38:9, 38:10, 42:14, 42:23, 43:15, 43:21, 43:23, 45:21, 48:3, 50:9, 50:17, 52:18, 52:20, 53:8, 53:16, 54:3, 54:5, 54:6, 54:10, 55:4, 55:6, 55:15, 56:22, 57:2, 57:3, 57:14, 58:8, 58:9, 58:10, 59:11, 59:17, 60:15, 62:20, 63:2, 63:19, 63:23, 64:4, 64:19, 66:2, 66:3, 66:5, 67:6, 67:9, 68:7, 68:10, 68:13, 68:17, 69:20, 70:7, 71:16, 71:18, 73:11, 74:21, 75:5, 76:10, 77:11, 77:17, 79:5, 79:12, 84:23, 85:5, 85:15, 85:16, 86:2, 86:5, 86:7, 86:10, 86:19, 87:22, 89:4, 91:6, 91:15, 92:9, 94:13, 94:18, 94:22, 95:9, 95:10, 96:6, 96:7, 96:13, 96:15, 97:5, 99:15,

99:20, 103:14
Case [1] - 1:7
cases [36] - 10:5, 10:16, 10:19, 11:8, 11:14, 11:18, 11:20, 12:14, 15:22, 18:13, 19:3, 25:2, 25:6, 25:9, 25:12, 25:16, 25:17, 25:19, 26:14, 31:15, 43:6, 43:7, 43:8, 43:20, 52:22, 53:10, 53:12, 57:6, 57:7, 58:7, 75:13, 88:5, 88:8, 88:16
categories [1] - 28:4
categorize [1] - 52:21
caught [1] - 43:16
caused [4] - 44:12, 60:3, 82:8, 96:17
causes [4] - 20:12, 88:7, 88:12, 88:13
cautious [1] - 27:4
cc'd [4] - 35:14, 39:23, 40:5, 40:11
cell [1] - 33:23
certain [6] - 24:21, 33:18, 34:4, 55:3, 65:15, 77:15
certainly [4] - 9:2, 10:8, 18:8, 22:16, 26:3, 31:21, 52:19, 52:21, 54:21, 65:15, 79:14, 84:22, 87:17, 92:22
certification [2] - 3:19, 103:21
CERTIFIED [1] - 104:17
certify [1] - 103:6
CERTIFY [1] - 103:10
certifying [1] - 103:23
cetera [1] - 94:16
chain [1] - 92:3
chairperson [1] - 11:3
challenging [1] - 46:2
charge [5] - 3:23, 11:7, 14:6, 14:9, 87:12
charged [2] - 13:17, 88:8
charges [6] - 13:2, 13:3, 63:2, 84:17, 84:19, 85:8
charging [1] - 34:16
Charles [3] - 2:14, 97:19, 98:11
CHARLES [1] - 1:9
Chavkin [6] - 42:15, 68:6, 73:20, 76:12, 79:15, 86:14

**chest** [8] - 44:10, 61:6, 61:19, 64:8, 64:11, 64:13, 65:6, 91:4
**chief** [12] - 11:15, 13:11, 15:2, 15:13, 30:17, 39:2, 53:19, 56:5, 67:15, 67:18, 67:19
**Chief** [4] - 12:4, 30:15, 67:15, 79:23
**child** [11] - 11:8, 11:17, 34:10, 38:20, 38:21, 44:6, 75:22, 75:23, 76:4, 87:12
**child's** [1] - 20:11
**Cindy** [6] - 42:15, 68:6, 73:20, 76:12, 76:22, 79:15
**circumstances** [14] - 4:12, 23:6, 27:23, 28:10, 40:4, 40:13, 41:19, 64:19, 79:5, 79:11, 86:19, 87:21, 95:8, 99:19
**CITY** [1] - 1:9
**City** [3] - 2:13, 26:11, 97:18
**Civil** [1] - 1:7
**civilian** [1] - 7:8
**clarify** [1] - 70:21
**clean** [2] - 5:11, 82:19
**clear** [3] - 71:13, 72:14, 91:5
**client** [1] - 93:9
**closings** [1] - 9:6
**COLANERI** [1] - 1:10
**Colaneri** [5] - 2:14, 37:13, 39:23, 97:20, 98:15
**collaborative** [3] - 33:12, 33:19, 34:3
**collected** [1] - 81:20
**collectively** [1] - 64:8
**college** [1] - 7:10
**combination** [1] - 33:13
**comfortable** [1] - 25:16
**commencing** [1] - 1:16
**comment** [4] - 42:18, 42:20, 68:21, 77:10
**comments** [1] - 16:5
**commission** [1] - 8:10
**communicated** [2] - 76:7, 78:14
**compared** [1] - 43:20
**competence** [1] - 87:3
**compiled** [1] - 50:4
**complete** [1] - 103:7

**completed** [2] - 7:12, 7:15
**completely** [1] - 79:21
**completion** [1] - 92:2
**complex** [1] - 10:5
**compressions** [9] - 44:10, 61:6, 61:20, 64:8, 64:13, 65:6, 76:4, 78:11, 91:4
**concern** [6] - 38:3, 38:7, 71:15, 80:23, 82:12
**concerns** [5] - 17:11, 37:19, 67:9, 68:16, 94:6
**concluded** [1] - 100:5
**conclusion** [2] - 30:18, 80:10
**conclusions** [1] - 46:2
**conditions** [1] - 20:12
**conduct** [1] - 33:8
**Conduct** [2] - 8:6, 12:21
**conducted** [4] - 5:4, 5:6, 29:6, 71:14
**confer** [1] - 77:13
**confession** [3] - 43:9, 43:10, 43:17
**confessions** [2] - 43:9, 43:18
**confidence** [1] - 17:11
**conflict** [2] - 38:4, 38:8
**confusing** [1] - 59:7
**confusion** [2] - 18:16, 83:11
**congenital** [1] - 88:7
**connection** [1] - 5:23
**considerable** [1] - 25:15
**considered** [2] - 52:17, 52:20
**constitute** [1] - 91:12
**constituted** [1] - 79:13
**constitutes** [1] - 91:16
**consultation** [1] - 34:15
**context** [3] - 36:8, 57:6, 91:15
**continue** [2] - 17:10, 99:18
**continued** [2] - 7:18, 78:7
**contracts** [1] - 14:18
**contributed** [1] - 41:22
**control** [1] - 103:22
**conversation** [3] - 41:14, 42:9, 72:20
**conversations** [3] -

42:4, 98:22, 99:11
**conveyed** [1] - 70:15
**convicted** [3] - 9:21, 56:6, 96:18
**conviction** [2] - 56:2, 56:11
**convictions** [1] - 56:15
**Coonradt** [3] - 2:13, 97:19, 98:8
**COONRADT** [1] - 1:9
**cooperation** [1] - 97:12
**coordinating** [1] - 14:3
**copies** [1] - 89:12
**copy** [5] - 3:23, 6:8, 16:17, 52:8, 75:14
**Corps** [1] - 8:11
**correct** [23] - 6:19, 14:9, 14:21, 17:6, 22:8, 24:20, 30:8, 51:15, 51:16, 56:2, 56:3, 56:8, 56:12, 56:17, 56:21, 57:4, 82:15, 82:17, 84:20, 85:2, 85:9, 85:11, 101:10
**CORRECTION** [1] - 102:4
**costs** [2] - 56:11, 85:9
**COUNSEL** [1] - 22:4
**counsel** [3] - 12:20, 90:16, 103:13
**county** [6] - 10:14, 13:18, 13:23, 14:2, 14:18, 51:23
**COUNTY** [2] - 1:11, 101:4
**County** [10] - 2:8, 7:22, 8:19, 10:2, 13:12, 13:16, 14:15, 14:17, 15:2, 42:13
**couple** [5] - 7:8, 8:20, 9:5, 9:6, 98:2
**course** [5] - 62:20, 64:9, 65:21, 90:20, 93:11
**court** [10] - 9:7, 24:6, 27:8, 33:22, 36:13, 55:2, 71:23, 89:19, 90:6, 97:10
**Court** [1] - 19:19
**COURT** [2] - 1:4, 22:4
**courtesy** [1] - 40:8
**courtroom** [1] - 68:22
**courts** [2] - 10:12, 10:13
**cover** [1] - 63:8
**CPR** [16] - 44:10, 61:4,

61:18, 66:15, 78:7, 78:8, 78:10, 78:21, 81:10, 81:12, 82:13, 94:23, 95:7, 96:7, 96:18
**CPR-related** [4] - 66:15, 94:23, 95:7, 96:7
**create** [1] - 23:20
**created** [1] - 11:16
**credibility** [2] - 65:3, 65:20
**credited** [1] - 11:17
**crime** [5] - 9:21, 11:7, 43:12, 43:13, 43:16
**crimes** [2] - 10:4, 11:17
**criminal** [15] - 8:22, 9:2, 10:12, 10:13, 22:14, 28:5, 34:7, 48:4, 48:6, 48:15, 48:16, 48:18, 55:2, 59:3, 59:9
**criminally** [2] - 34:16, 58:23
**Crisafulli** [5] - 61:13, 64:4, 74:14, 74:18, 104:12
**criteria** [2] - 25:2, 25:8
**cross** [1] - 70:22
**CRYSTAL** [1] - 2:11
**Crystal** [1] - 23:2
**culpability** [1] - 43:19
**custody** [1] - 21:6

# D

**D.A.'s** [6] - 6:17, 10:2, 10:8, 33:10, 58:19, 83:21
**DA** [19] - 8:2, 10:20, 12:4, 13:10, 13:15, 14:14, 14:23, 15:22, 18:22, 22:9, 24:22, 25:14, 26:8, 33:6, 53:6, 56:10, 68:19, 70:4, 88:17
**DA's** [2] - 37:7, 89:14
**damaging** [1] - 72:8
**Danielle** [3] - 2:13, 97:19, 98:8
**DANIELLE** [1] - 1:9
**DAs** [2] - 10:11, 13:21
**date** [8] - 21:2, 44:22, 46:18, 74:15, 78:5, 83:18, 95:19, 103:8
**dated** [3] - 6:8, 17:5, 39:17
**daughter's** [1] - 16:14

**Davis** [33] - 4:9, 6:5, 21:3, 21:14, 21:19, 21:22, 23:12, 23:19, 24:2, 30:18, 33:11, 34:11, 35:12, 36:3, 37:9, 37:21, 41:20, 42:6, 42:14, 44:7, 47:7, 55:19, 56:22, 57:10, 59:18, 60:5, 64:9, 88:20, 90:10, 92:5, 92:7, 95:18, 104:19
**DAVIS** [1] - 1:5
**Davis'** [1] - 57:16
**DAVIS-GUIDER** [1] - 1:5
**days** [2] - 35:22, 75:3
**DC** [3] - 79:21, 80:5, 80:6
**dead** [1] - 44:13
**dealing** [1] - 24:2, 35:5
**dealings** [3] - 23:11, 27:9, 68:22
**dealt** [4] - 15:6, 35:6, 43:5, 86:23
**death** [26] - 4:13, 16:15, 20:13, 20:20, 29:7, 31:16, 34:9, 34:18, 38:20, 45:8, 48:22, 51:22, 57:11, 58:9, 58:22, 75:4, 75:23, 82:14, 88:12, 88:13, 90:11, 95:20, 98:4, 98:9, 98:13, 98:20
**deaths** [3] - 15:17, 28:4, 88:7
**deceased** [4] - 27:20, 44:7, 45:11, 51:15
**December** [1] - 7:21
**decide** [1] - 92:18
**decided** [1] - 8:9
**decision** [7] - 19:20, 25:11, 53:23, 54:6, 54:12, 59:15, 93:2
**decision-making** [1] - 59:15
**declared** [1] - 27:20
**declinations** [1] - 59:5
**declined** [1] - 58:21
**Defendant** [2] - 1:15, 2:13
**defendant** [1] - 55:3
**Defendants** [1] - 1:13, 2:8
**defending** [1] - 13:2
**defense** [20] - 8:22, 9:2, 13:7, 44:15, 45:4, 45:5, 45:13,

45:18, 45:20, 46:2,
46:5, 56:23, 57:10,
72:7, 82:13, 85:2,
95:2, 96:7, 96:17,
97:3
**define** [1] - 34:3
**definition** [2] - 63:5,
63:11
**delegate** [1] - 68:11
**delegating** [1] - 25:3
**demeanor** [1] - 71:10
**demonstrated** [1] -
44:5
**demonstrating** [1] -
59:18
**dep** [2] - 74:18, 78:6
**Department** [8] - 8:4,
12:17, 26:12, 30:4,
51:9, 52:4, 61:11,
62:4
**department** [7] - 8:17,
12:11, 44:11, 49:23,
60:13, 61:3, 81:21
**deploying** [1] - 8:14
**deposed** [1] - 4:23
**DEPOSITION** [3] - 1:2,
1:15, 102:2
**Deposition** [4] -
74:14, 78:4, 104:11,
104:13
**deposition** [8] - 6:2,
44:19, 75:2, 75:18,
77:21, 86:5, 93:20,
97:9
**depositions** [5] - 5:4,
5:5, 75:5, 75:14,
81:3
**deputy** [2] - 67:18,
67:19
**Deputy** [1] - 79:23
**describe** [4] - 10:6,
24:23, 26:10, 33:10
**described** [1] - 34:10
**despite** [1] - 17:11
**detail** [1] - 76:6
**details** [5] - 23:8, 27:7,
41:15, 85:17, 86:18
**Detective** [7] - 21:9,
21:17, 22:2, 23:18,
27:10, 51:12, 104:20
**detective** [2] - 21:18,
21:19
**determination** [6] -
53:16, 59:11, 59:13,
66:12, 86:3, 92:8
**determine** [1] - 22:20
**determined** [3] - 28:5,
64:23, 65:18
**developed** [1] - 50:2
**died** [1] - 44:6

**difference** [1] - 54:14
**differences** [2] -
54:17, 54:20
**different** [9] - 7:8,
8:14, 10:3, 10:5,
12:14, 42:3, 43:6,
43:7, 55:8
**direct** [9] - 33:5, 33:8,
33:15, 36:20, 63:23,
64:4, 76:10, 89:16,
103:22
**directing** [2] - 27:17,
73:14
**directly** [1] - 15:21
**disciplinary** [1] -
89:10
**discipline** [2] - 12:22,
13:4
**disciplined** [1] - 9:16
**disclosed** [11] - 39:13,
61:10, 63:3, 63:12,
63:15, 64:15, 64:22,
65:22, 66:6, 78:20
**disclosure** [6] - 16:21,
17:5, 62:21, 63:4,
63:6, 63:7, 63:9,
63:10, 65:12
**disclosures** [1] -
67:10
**discovery** [2] - 82:23,
83:8
**discretion** [4] - 58:22,
84:17, 84:22, 85:5
**discuss** [3] - 14:3,
41:19, 72:21
**discussed** [6] - 41:9,
42:10, 49:4, 72:22,
91:18, 94:5
**discussing** [2] - 40:6,
87:20
**discussion** [4] -
34:14, 39:15, 57:21,
74:6
**discussions** [4] -
34:23, 35:2, 60:21,
67:23
**dismissed** [1] - 23:9
**dissatisfied** [1] -
70:18
**district** [13] - 6:15,
8:18, 10:17, 18:18,
30:11, 55:14, 55:22,
58:21, 59:16, 84:16,
85:4, 85:16, 88:23
**District** [7] - 4:10,
7:22, 8:19, 30:15,
42:13, 42:15, 86:8
**DISTRICT** [2] - 1:4, 1:4
**divulging** [1] - 89:5
**doctor** [3] - 61:13,

64:4, 96:22
**document** [3] - 40:10,
74:11, 83:7
**documents** [1] - 6:2
**domestic** [1] - 11:18
**done** [7] - 7:20, 8:7,
38:20, 61:4, 77:5,
78:22, 85:8
**Donohue** [1] - 10:17
**double** [1] - 17:14
**doubt** [1] - 87:3
**down** [3] - 65:5, 68:5,
99:23
**Dr** [38] - 14:20, 14:22,
15:16, 16:5, 17:12,
17:17, 17:21, 20:2,
20:8, 44:3, 46:2,
46:6, 52:5, 59:2,
59:8, 59:9, 59:14,
59:17, 61:13, 63:14,
69:10, 69:17, 70:5,
71:21, 72:15, 72:23,
73:9, 73:15, 73:19,
83:20, 84:2, 84:3,
92:10, 94:15, 96:12,
96:14, 96:15, 97:3
**drafted** [1] - 75:3
**drafting** [1] - 32:21
**drill** [1] - 65:5
**drugs** [1] - 11:21
**due** [1] - 45:10
**duly** [1] - 4:3
**duration** [1] - 60:14
**during** [14] - 11:23,
19:11, 21:15, 21:21,
24:21, 31:6, 37:5,
71:5, 74:21, 76:14,
84:7, 88:17, 104:18
**duties** [2] - 10:11,
13:14
**duty** [2] - 85:7

### E

**e-mail** [16] - 6:8,
35:13, 36:13, 37:7,
39:5, 39:6, 39:12,
39:17, 39:19, 40:11,
40:14, 46:9, 46:21,
83:14, 89:13, 98:23
**E-mail** [2] - 46:18,
104:10
**e-mails** [5] - 35:11,
35:16, 35:19, 36:17,
89:12
**early** [1] - 96:19
**education** [2] - 6:22,
66:5
**efforts** [12] - 34:12,

44:8, 44:9, 45:10,
45:11, 59:19, 60:15,
62:6, 63:22, 65:8,
78:9, 78:21
**eight** [2] - 8:7, 10:10
**eight-year** [1] - 8:7
**either** [15] - 20:21,
26:5, 26:19, 31:2,
35:10, 38:14, 41:20,
68:17, 69:17, 70:4,
70:15, 72:20, 75:10,
88:9, 98:23
**elected** [4] - 6:15,
8:17, 13:10, 13:15
**elements** [1] - 43:21
**elicited** [1] - 70:20
**emergency** [2] -
60:13, 64:13
**employed** [2] -
103:11, 103:13
**end** [2] - 12:6, 12:7
**ended** [3] - 8:11,
11:14, 11:16
**enforcement** [6] -
13:11, 14:4, 14:5,
31:22, 32:19, 56:5
**enlisted** [1] - 7:11
**enlistment** [1] - 8:7
**ensure** [1] - 85:8
**entire** [2] - 14:9, 83:7
**entirely** [2] - 17:18,
57:20
**ER** [4] - 61:14, 61:17,
64:4, 74:19
**ERRATA** [2] - 102:2,
102:2
**ESQ** [4] - 2:4, 2:6,
2:11, 2:16
**establishing** [1] - 24:3
**estate** [1] - 9:6
**estimated** [1] - 17:13
**estimation** [1] - 68:14
**et** [1] - 94:16
**ethically** [1] - 68:18
**evaluate** [1] - 33:2
**event** [2] - 48:6, 55:15
**events** [2] - 54:12,
92:4
**evidence** [5] - 29:16,
38:5, 43:13, 65:6,
77:16
**exactly** [2] - 45:18,
68:12
**examination** [8] - 3:7,
3:10, 3:14, 3:16,
3:20, 70:2, 70:21,
71:14
**EXAMINATION** [1] -
104:2
**examined** [3] - 3:15,

3:22, 4:4
**examiner** [3] - 15:2,
47:4, 88:19
**examiner's** [3] -
14:15, 14:17, 29:17
**Examiners** [1] - 11:4
**examining** [1] - 3:22
**except** [1] - 3:6
**exculpating** [1] -
79:21
**exculpatory** [6] - 65:2,
65:19, 90:9, 90:13,
91:6, 91:8
**excuse** [1] - 93:6
**executive** [2] - 15:13,
53:20
**exercised** [1] - 58:22
**exertion** [1] - 61:18
**exhibit** [1] - 44:18
**Exhibit** [19] - 16:22,
17:4, 44:21, 46:17,
74:8, 74:13, 74:16,
77:19, 78:3, 79:19,
81:12, 82:7, 83:2,
83:4, 83:10, 83:17,
86:16, 95:6
**EXHIBITS** [1] - 104:8
**existing** [1] - 20:12
**expect** [1] - 75:13
**experience** [13] - 6:23,
10:6, 10:7, 25:15,
26:6, 26:8, 26:18,
35:4, 54:13, 57:14,
58:7, 58:19, 66:6
**experiences** [2] -
11:19, 12:12
**expert** [3] - 80:5,
96:16, 97:4
**experts** [1] - 91:19
**explain** [1] - 54:19
**express** [3] - 71:9,
71:15, 84:2
**expressed** [1] - 17:11
**Extension** [1] - 2:10
**extensive** [1] - 34:12
**extent** [6] - 56:15,
60:14, 62:5, 65:7,
78:21, 80:22
**eyewitness** [2] -
43:12, 43:15

### F

**F.R.C.P** [1] - 3:5
**fact** [4] - 11:2, 19:4,
55:11, 99:9
**factored** [2] - 59:15,
59:19
**factors** [1] - 25:10

**facts** [6] - 4:12, 79:11, 79:12, 86:2, 86:18, 94:16
**failed** [3] - 88:6, 88:10, 88:11
**failure** [1] - 3:8
**Fair** [1] - 104:18
**fair** [5] - 13:12, 21:21, 30:19, 39:9, 57:4
**fairly** [2] - 25:14, 93:3
**fall** [1] - 82:9
**familiar** [5] - 5:3, 19:18, 36:11, 37:14, 66:17
**familiarity** [1] - 85:23
**far** [2] - 41:15, 94:7
**February** [4] - 20:20, 27:18, 29:7, 36:12
**federal** [1] - 14:5
**felony** [4] - 10:16, 11:7, 11:8, 11:11
**felt** [3] - 25:16, 57:2, 84:23
**few** [5] - 14:7, 14:8, 44:8, 64:10, 90:5
**field** [1] - 64:14
**fifteen** [1] - 26:2
**figure** [1] - 77:3
**file** [5] - 66:14, 66:18, 80:15, 82:6, 86:7
**files** [7] - 35:22, 36:2, 36:3, 36:4, 36:13, 36:17, 37:7
**filing** [1] - 3:18
**financially** [1] - 103:14
**fine** [1] - 37:2
**finish** [2] - 5:10, 72:16
**fire** [3] - 44:10, 60:13, 61:3
**firefighter** [1] - 63:21
**First** [1] - 2:15
**first** [10] - 4:3, 7:12, 11:3, 11:8, 11:10, 25:5, 28:13, 40:23, 50:14, 50:15
**fit** [1] - 63:10
**fits** [1] - 63:5
**five** [1] - 11:9
**FJS/DJS** [1] - 1:8
**flip** [1] - 77:18
**Florio** [1] - 1:18
**FLORIO** [2] - 103:4, 103:20
**focused** [1] - 73:3
**followed** [2] - 44:9, 92:3
**following** [3] - 7:6, 23:2, 29:12
**follows** [1] - 4:5
**footage** [1] - 32:23

**FOR** [1] - 102:2
**force** [1] - 82:8
**foregoing** [3] - 101:7, 103:6, 103:21
**form** [54] - 3:6, 15:20, 23:13, 23:14, 26:22, 26:23, 29:21, 29:22, 31:18, 34:21, 35:9, 37:22, 37:23, 38:12, 39:10, 45:14, 47:12, 47:23, 48:11, 48:12, 49:16, 51:3, 58:13, 58:14, 59:4, 59:23, 60:2, 60:7, 60:16, 61:8, 61:22, 62:7, 64:17, 64:18, 64:20, 64:21, 66:8, 67:13, 68:4, 78:16, 78:17, 85:3, 85:21, 87:15, 92:13, 94:8, 94:9, 94:21, 95:3, 95:11, 95:21, 95:22, 96:9, 96:21
**former** [1] - 16:13
**Fort** [1] - 7:13
**forth** [4] - 81:4, 94:14, 95:6, 103:9
**forward** [1] - 77:18
**Fountain** [21] - 2:13, 21:9, 21:18, 22:2, 22:13, 23:7, 23:18, 23:22, 24:2, 24:7, 25:20, 26:5, 27:6, 36:16, 37:17, 39:19, 39:23, 62:23, 97:19, 98:5, 104:20
**FOUNTAIN** [1] - 1:9
**Fountain's** [2] - 27:11, 99:20
**four** [1] - 8:18
**fractured** [3] - 67:4, 67:6, 80:19
**fractures** [1] - 66:16
**frame** [1] - 21:5
**frames** [1] - 41:11
**free** [1] - 3:23
**frequently** [1] - 75:16
**front** [1] - 39:14
**frustrated** [1] - 69:19
**frustration** [1] - 71:22
**full** [1] - 20:10
**fully** [2] - 4:18, 43:19
**furnish** [1] - 3:22
**FURTHER** [1] - 103:10
**future** [1] - 9:14

**G**

**gamut** [1] - 11:23

**gather** [1] - 39:8
**gathered** [1] - 38:5
**general** [3] - 10:4, 21:5, 44:14
**General's** [1] - 8:11
**generally** [16] - 4:15, 20:17, 20:22, 27:2, 29:9, 29:11, 29:18, 33:17, 39:7, 39:9, 45:12, 54:13, 55:10, 65:4, 66:18, 66:21
**GINSBERG** [1] - 2:12
**given** [9] - 27:7, 37:16, 49:12, 49:13, 52:8, 55:19, 58:6, 65:9, 75:6
**Gmail** [1] - 35:22
**Gordon** [1] - 21:11
**graduation** [1] - 7:6
**grand** [26] - 29:2, 41:13, 50:5, 50:20, 53:8, 53:11, 54:6, 54:9, 55:4, 55:7, 55:10, 55:15, 55:16, 55:20, 56:7, 57:15, 58:2, 58:12, 58:16, 73:5, 73:6, 84:18, 84:23, 85:6, 92:9, 92:19
**grants** [1] - 55:2
**great** [1] - 45:22
**GRIFFIN** [1] - 2:12
**grounds** [1] - 94:4
**Guard** [2] - 7:19, 8:12
**guess** [2] - 27:15, 31:19
**GUIDER** [1] - 1:5
**guilty** [5] - 41:22, 41:23, 42:7, 87:13, 87:17
**guys** [1] - 41:19

**H**

**half** [1] - 59:6
**Hall** [19] - 30:15, 30:17, 30:23, 40:19, 41:3, 49:7, 50:19, 51:4, 54:7, 63:9, 69:7, 69:11, 72:20, 79:4, 79:16, 84:6, 86:10, 92:20, 92:23
**hall** [2] - 84:9, 86:13
**Hall's** [1] - 53:22
**hall's** [1] - 40:23
**hand** [2] - 60:4, 103:16
**handle** [6] - 9:4, 10:12, 12:14, 12:21,

41:10, 68:13
**handled** [15] - 9:5, 24:19, 24:22, 25:6, 25:18, 48:3, 49:12, 49:14, 49:15, 49:18, 52:23, 68:17, 69:21, 70:7, 94:22
**handling** [5] - 24:8, 25:15, 25:16, 50:16, 71:17
**handwriting** [1] - 80:5
**happy** [5] - 5:15, 69:23, 70:6, 71:7, 71:13
**hard** [2] - 68:21, 68:23
**harsh** [1] - 71:3
**head** [1] - 25:22
**heading** [1] - 101:9
**headquarters** [2] - 47:8, 92:6
**Health** [3] - 8:5, 12:17, 51:9
**health** [3] - 8:17, 12:11, 20:11
**hear** [1] - 70:4
**heard** [1] - 95:9
**hearings** [1] - 12:22
**held** [4] - 1:16, 1:17, 57:21, 74:6
**hello** [1] - 97:17
**help** [5] - 5:14, 9:8, 30:4, 31:23, 33:8, 39:8
**helpful** [1] - 23:5
**helping** [3] - 9:8, 32:20, 33:2
**HEREBY** [1] - 3:3
**hereby** [2] - 101:9, 103:6
**hereinbefore** [1] - 103:9
**hereof** [1] - 101:9
**hereto** [1] - 3:4
**hereunto** [1] - 103:15
**high** [4] - 52:17, 52:20, 52:21, 58:8
**highly** [1] - 9:20
**hired** [2] - 10:16, 10:18
**hiring** [1] - 13:19
**history** [1] - 86:23
**hold** [4] - 32:7, 32:8, 89:22, 97:8
**home** [2] - 61:4, 78:10
**homicide** [8] - 11:22, 25:9, 52:19, 58:9, 87:12, 88:8, 88:16, 96:16
**homicides** [4] - 15:17, 25:17, 52:21, 52:23

**hop** [1] - 93:13
**hopefully** [1] - 97:23
**hospital** [3] - 44:11, 62:6, 64:14
**hour** [1] - 64:9
**house** [1] - 91:20
**hundred** [1] - 61:20

**I**

**idea** [3] - 19:4, 80:3, 81:22
**identification** [5] - 44:22, 46:19, 74:15, 78:5, 83:19
**imagine** [1] - 65:16
**immediate** [1] - 30:14
**immunity** [1] - 37:16
**impact** [2] - 23:11, 82:8
**impossible** [1] - 85:22
**IN** [1] - 103:15
**in-house** [1] - 91:20
**incident** [14] - 6:9, 21:9, 21:11, 21:12, 27:22, 28:8, 28:13, 28:17, 28:19, 31:13, 41:4, 41:8, 41:11, 73:5
**incidents** [1] - 28:4
**include** [1] - 32:19
**included** [5] - 25:11, 40:14, 92:4
**includes** [1] - 92:22
**including** [8] - 3:5, 14:20, 14:23, 20:11, 36:3, 39:7, 58:20, 70:16
**independently** [2] - 75:8, 90:14
**INDEX** [3] - 104:2, 104:8, 104:17
**Indexes.....................
.......** [1] - 2:23
**indicate** [1] - 40:5
**indicated** [2] - 77:14, 78:23
**indicates** [1] - 40:11
**indicating** [2] - 39:7, 47:15
**indicative** [1] - 72:10
**indicted** [4] - 9:21, 21:15, 21:23, 104:19
**indicting** [1] - 84:19
**indictment** [12] - 21:4, 22:12, 38:6, 49:20, 50:8, 53:17, 54:15, 54:16, 54:23, 55:7, 57:17, 92:6

**indictments** [2] - 53:12, 53:15

**indirectly** [1] - 15:22

**individual** [2] - 54:21, 55:5

**individual's** [1] - 96:18

**Individually** [7] - 1:9, 1:9, 1:10, 1:10, 1:11, 1:12

**individuals** [7] - 9:8, 12:23, 14:19, 25:11, 76:3, 92:17, 98:23

**inept** [1] - 71:3

**information** [15] - 22:16, 27:10, 32:3, 50:2, 50:3, 65:19, 66:13, 78:13, 78:19, 79:10, 90:9, 91:3, 91:13, 91:18, 94:17

**informing** [1] - 62:4

**injuries** [15] - 34:17, 44:12, 45:9, 67:4, 67:6, 80:19, 81:10, 81:13, 81:15, 82:13, 85:18, 85:19, 94:23, 96:8, 96:17

**injury** [2] - 60:3, 95:8

**innocence** [1] - 72:10

**innocent** [1] - 56:6

**input** [1] - 92:23

**inquire** [1] - 65:16

**insofar** [1] - 46:6

**instance** [1] - 54:5

**instead** [1] - 83:2

**insufficiency** [1] - 70:19

**interacted** [4] - 18:12, 18:14, 34:11, 95:18

**interactions** [3] - 26:13, 26:19, 27:9

**interest** [1] - 58:7

**interested** [1] - 103:14

**internal** [2] - 47:3, 81:10

**interrogated** [1] - 47:9

**interview** [2] - 75:8, 92:5

**investigating** [1] - 28:20

**investigation** [25] - 20:10, 29:5, 31:16, 32:18, 33:5, 33:9, 33:11, 34:5, 37:13, 48:4, 48:7, 48:14, 48:15, 48:21, 50:3, 50:8, 51:18, 55:13, 68:2, 98:3, 98:9, 98:12, 98:16, 98:19, 99:2

**investigations** [1] - 32:4

**investigator** [2] - 23:18, 51:23

**investigators** [2] - 13:22, 38:4

**investigatory** [3] - 31:15, 31:20, 40:7

**involved** [29] - 21:10, 23:21, 26:14, 30:21, 30:23, 31:15, 31:20, 32:17, 34:22, 37:11, 37:12, 38:4, 40:6, 47:18, 48:5, 48:9, 48:13, 48:18, 51:21, 57:23, 58:6, 58:11, 58:15, 61:18, 69:3, 69:6, 95:9, 96:6, 96:12

**involvement** [5] - 31:12, 33:16, 50:7, 51:17, 99:15

**involving** [8] - 4:13, 15:17, 15:22, 21:11, 38:20, 47:3, 88:17, 96:7

**IS** [1] - 3:3

**isolated** [1] - 82:8

**issue** [6] - 9:8, 20:8, 36:21, 79:6, 80:22, 81:2

**issued** [3] - 32:21, 52:6, 54:23

**issues** [6] - 67:8, 67:23, 70:22, 89:21, 89:22, 94:13

**IT** [1] - 3:3

**itself** [1] - 40:10

**J**

**January** [3] - 11:2, 19:16, 27:16

**Jessica** [24] - 30:15, 30:17, 30:23, 40:19, 41:2, 41:3, 49:7, 50:19, 51:4, 53:22, 54:7, 60:22, 63:9, 69:7, 69:11, 72:20, 76:23, 79:3, 79:4, 79:16, 84:6, 86:10, 92:20, 92:23

**job** [2] - 30:9, 56:10

**JOEL** [7] - 1:2, 1:11, 1:15, 4:2, 100:4, 101:15, 102:3

**Joel** [2] - 2:9, 42:13, 93:22

**jog** [2] - 80:21, 81:6

**jogging** [1] - 42:5

**JOHNSON** [1] - 2:7

**joined** [1] - 10:8

**Judge** [3] - 8:10, 33:16, 93:18

**judge** [4] - 8:13, 55:2, 93:5, 93:7

**judgment** [1] - 17:22

**judicial** [1] - 29:3

**July** [1] - 8:11

**June** [3] - 7:23, 10:9, 103:16

**jury** [28] - 29:3, 41:13, 44:5, 50:6, 50:20, 53:8, 53:11, 54:7, 54:9, 55:5, 55:7, 55:10, 55:15, 55:16, 55:20, 56:7, 57:12, 57:15, 58:2, 58:12, 58:16, 73:5, 73:6, 84:18, 84:23, 85:6, 92:9, 92:19

**jury's** [1] - 73:10

**justice** [3] - 56:2, 56:12, 85:8

**K**

**Kathleen** [3] - 74:14, 74:18, 104:11

**keep** [1] - 40:8

**keeping** [1] - 58:17

**kick** [1] - 82:9

**kind** [4] - 12:10, 13:20, 75:5, 77:12

**Klein** [2] - 4:9, 46:12

**KLEIN** [34] - 2:4, 2:6, 4:7, 16:22, 17:4, 17:8, 18:20, 22:15, 22:20, 22:23, 24:12, 32:11, 36:7, 36:22, 37:4, 39:16, 44:20, 62:11, 74:5, 74:8, 82:22, 83:6, 83:13, 89:3, 89:18, 90:4, 93:5, 93:11, 93:14, 94:2, 97:7, 99:8, 99:17, 104:3

**knowing** [4] - 18:12, 57:19, 86:22, 86:23

**knowledge** [11] - 4:11, 15:3, 15:7, 15:13, 38:11, 55:19, 79:9, 86:9, 86:11, 92:15, 103:8

**known** [12] - 17:17, 19:6, 63:18, 64:12, 64:16, 65:12, 76:6, 76:12, 78:13, 78:19,

79:13, 91:9

**L**

**lacerated** [3] - 67:5, 67:7, 80:20

**lacerations** [1] - 66:16

**lack** [3] - 70:18, 76:23, 99:15

**Lansingburgh** [1] - 16:14

**large** [4] - 60:4, 60:5, 60:10

**last** [2] - 35:21, 71:2

**late** [1] - 7:16

**law** [15] - 7:2, 7:11, 7:12, 7:16, 7:20, 13:11, 14:4, 31:22, 32:18, 33:3, 55:2, 55:23, 56:5

**Law** [3] - 7:7, 11:5, 11:23

**lawsuit** [1] - 4:9

**lead** [7] - 21:18, 23:18, 24:9, 50:20, 68:9, 81:10, 81:13

**leads** [1] - 99:16

**learn** [3] - 10:19, 27:9, 91:13

**learned** [3] - 85:14, 90:10, 90:12

**learning** [1] - 28:13

**least** [3] - 20:22, 57:8, 62:21

**leave** [3] - 11:2, 12:8, 50:11

**left** [5] - 8:2, 10:23, 35:23, 50:17, 50:21

**legal** [4] - 6:22, 33:3, 59:12, 89:10

**legislature** [1] - 14:3

**letter** [2] - 63:8, 99:2

**level** [2] - 34:4, 35:7

**liability** [2] - 34:8, 48:19

**liaison** [1] - 30:3

**licenses** [1] - 13:5

**life** [2] - 34:13, 78:9

**likely** [4] - 44:6, 44:12, 52:14, 58:11, 58:16, 85:18

**limited** [1] - 11:12

**line** [2] - 12:19, 30:13

**lips** [1] - 96:2

**list** [1] - 89:21

**literature** [1] - 66:17

**litigate** [1] - 12:16

**litigating** [1] - 25:15

**liver** [7] - 44:12, 45:9,

66:15, 67:5, 67:7, 80:20, 82:7

**local** [3] - 10:12, 10:13, 14:4

**located** [1] - 81:23

**look** [5] - 36:21, 53:2, 76:18, 87:21, 88:11

**looked** [4] - 16:3, 35:13, 59:17, 76:20

**looking** [7] - 16:18, 17:2, 20:10, 29:8, 29:10, 39:21, 40:2

**looks** [2] - 68:5, 81:9

**loop** [1] - 40:8

**M**

**mail** [18] - 6:8, 35:13, 36:13, 37:7, 39:5, 39:6, 39:12, 39:17, 39:19, 40:11, 40:14, 46:9, 46:18, 46:21, 83:14, 89:13, 98:23, 104:10

**mails** [5] - 35:11, 35:16, 35:19, 36:17, 89:12

**maker** [2] - 14:10, 15:8

**maligned** [1] - 56:7

**man** [2] - 60:5, 60:11

**managing** [1] - 13:20

**manner** [2] - 32:22, 95:18

**manslaughter** [1] - 58:10

**manual** [2] - 66:22, 81:5

**Manual** [1] - 79:20

**March** [10] - 6:9, 35:14, 39:5, 39:17, 39:22, 46:10, 47:7, 47:17, 48:10, 75:3

**mark** [7] - 22:18, 23:3, 36:23, 46:10, 66:20, 83:8, 83:10

**marked** [7] - 44:18, 44:22, 46:18, 46:20, 74:15, 78:5, 83:18

**Mary** [1] - 10:17

**Mary's** [1] - 61:14

**Mason** [4] - 2:14, 37:14, 97:20, 98:18

**MASON** [1] - 1:10

**Massachusetts** [1] - 7:6

**material** [6] - 66:15, 66:20, 74:9, 80:14, 81:8, 82:3, 91:12, 91:16

**materials** [1] - 63:10
**matrimonials** [1] - 9:5
**matter** [8] - 22:9, 31:8, 38:20, 41:10, 50:5, 77:6, 96:20, 97:21
**matters** [9] - 9:3, 14:4, 15:17, 24:21, 32:19, 36:18, 48:18, 49:14, 94:4
**Mayor** [1] - 21:11
**McAvoy** [4] - 67:15, 79:22, 80:5, 80:6
**McAvoy's** [1] - 80:2
**McClellan** [1] - 7:13
**McDonald** [3] - 2:14, 97:20, 98:11
**MCDONALD** [1] - 1:10
**mean** [16] - 5:3, 18:9, 18:17, 31:20, 33:15, 33:17, 43:5, 50:22, 50:23, 54:2, 66:16, 68:15, 87:17, 99:10
**means** [2] - 56:4, 103:22
**Medford** [1] - 7:5
**medical** [14] - 13:5, 14:15, 14:17, 15:2, 29:17, 34:2, 47:4, 59:13, 64:13, 65:17, 88:18, 91:14, 91:19, 95:7
**Medical** [2] - 8:5, 12:21
**medicolegal** [1] - 51:22
**meet** [5] - 98:4, 98:7, 98:11, 98:15, 98:18
**meeting** [21] - 38:15, 47:14, 47:16, 47:18, 48:10, 70:6, 70:12, 70:16, 70:17, 71:5, 72:15, 72:19, 72:22, 73:10, 73:23, 74:3, 76:22, 84:4, 84:7, 84:11, 92:10
**meetings** [6] - 47:2, 47:3, 48:9, 48:20, 49:9, 58:3
**meets** [1] - 33:3
**Megan's** [1] - 11:5
**member** [1] - 52:3
**members** [3] - 14:2, 28:20, 78:8
**memory** [3] - 42:5, 80:21, 81:6
**mentioned** [1] - 74:19
**merit** [1] - 23:8
**merits** [4] - 23:23, 24:13, 37:18, 94:18
**met** [4] - 18:5, 18:8,

49:6, 73:16
**MICHAEL** [2] - 1:5, 1:11
**Michael** [21] - 2:8, 6:4, 21:22, 33:11, 47:16, 51:12, 55:19, 56:22, 57:10, 57:15, 59:18, 60:5, 77:21, 77:22, 78:4, 88:18, 88:20, 90:9, 95:17, 104:13, 104:19
**mid** [1] - 96:19
**middle** [1] - 78:7
**midnight** [1] - 27:15
**might** [3] - 51:6, 77:7
**Mike** [8] - 4:9, 37:21, 41:20, 42:6, 47:7, 64:9, 92:5, 92:7
**military** [5] - 7:9, 7:15, 7:18, 8:6, 8:9
**mindful** [1] - 27:3
**minute** [6] - 61:6, 61:20, 62:10, 76:4, 78:12, 93:8
**minutes** [7] - 61:4, 61:5, 61:19, 62:12, 78:10, 78:11, 93:13
**moment** [1] - 72:17
**monitoring** [2] - 48:6, 73:15
**months** [4] - 11:6, 11:9, 49:19, 50:14
**moot** [1] - 32:13
**morning** [1] - 4:8
**most** [3] - 17:10, 86:9, 86:11
**motion** [1] - 3:11
**move** [3] - 3:6, 3:9, 96:2
**MR** [32] - 4:7, 16:22, 17:4, 17:8, 18:20, 22:15, 22:20, 22:23, 24:12, 32:11, 36:7, 36:22, 37:4, 39:16, 44:20, 62:11, 74:5, 74:8, 82:22, 83:6, 83:13, 89:3, 89:18, 90:4, 93:5, 93:11, 93:14, 94:2, 97:7, 99:8, 99:17, 104:3
**MS** [113] - 15:9, 15:20, 16:8, 16:16, 16:23, 17:7, 18:6, 18:15, 20:5, 20:14, 20:16, 22:6, 22:19, 22:22, 23:13, 23:14, 24:10, 24:15, 26:22, 26:23, 29:21, 29:22, 31:4, 31:7, 31:18, 34:20, 34:21, 35:8, 35:9,

36:6, 36:8, 36:19, 36:23, 37:22, 37:23, 38:12, 39:10, 39:11, 44:16, 45:14, 47:12, 47:23, 48:11, 48:12, 49:16, 49:17, 49:21, 51:3, 56:13, 56:16, 57:5, 57:18, 58:13, 58:14, 59:4, 59:23, 60:2, 60:7, 60:8, 60:16, 61:8, 61:22, 62:7, 62:9, 64:17, 64:18, 64:20, 64:21, 65:13, 66:8, 66:9, 67:12, 67:13, 68:4, 69:13, 69:22, 71:6, 72:9, 72:11, 78:16, 78:17, 82:18, 83:4, 83:12, 83:16, 85:3, 85:10, 85:20, 85:21, 86:20, 87:14, 87:15, 88:14, 88:21, 89:15, 90:2, 90:7, 92:13, 93:8, 93:12, 93:21, 94:8, 94:9, 94:21, 95:3, 95:11, 95:21, 95:22, 96:9, 96:21, 97:16, 99:5, 104:4
**must** [1] - 43:2

## N

**name** [4] - 30:6, 40:23, 89:4, 97:17
**National** [2] - 7:19, 8:12
**natural** [4] - 20:12, 34:18, 88:7, 88:12
**nature** [5] - 28:6, 60:14, 62:5, 65:7, 78:20
**necessarily** [6] - 35:4, 38:22, 50:22, 50:23, 52:7, 84:12
**necessity** [1] - 11:11
**need** [12] - 5:14, 5:19, 29:2, 29:4, 31:23, 32:2, 32:14, 32:21, 36:21, 79:3, 79:7, 79:8
**never** [4] - 71:4, 76:16, 76:20, 87:2
**NEW** [2] - 1:4, 101:3
**new** [1] - 93:10
**New** [10] - 1:20, 2:5, 2:10, 2:15, 7:18, 8:4, 11:4, 51:8, 103:6
**news** [1] - 6:10
**next** [2] - 77:19, 99:18
**nine** [2] - 8:6, 8:16

**noncriminal** [1] - 34:9
**none** [1] - 40:15
**nonresponsive** [1] - 34:10
**NORTHERN** [1] - 1:4
**Northern** [1] - 4:10
**notably** [1] - 25:17
**notary** [1] - 4:4
**NOTARY** [1] - 101:21
**Notary** [4] - 1:19, 3:15, 3:16, 103:5
**note** [4] - 66:23, 79:20, 80:2, 80:16
**noted** [1] - 101:8
**notes** [8] - 29:8, 29:11, 35:11, 66:22, 84:7, 84:8, 84:9, 84:12
**notice** [5] - 54:14, 55:4, 55:13, 55:17, 55:20
**Notice** [1] - 1:17
**notified** [2] - 28:3, 28:9
**notify** [1] - 70:11
**notwithstanding** [2] - 58:23, 59:8
**number** [7] - 11:12, 17:12, 19:9, 25:21, 29:15, 81:9, 85:6
**numbers** [3] - 74:10, 74:12, 82:20
**numerous** [1] - 87:2

## O

**Object** [22] - 29:22, 35:9, 37:22, 38:12, 39:10, 47:12, 48:11, 49:16, 58:13, 59:23, 60:16, 62:7, 64:18, 64:21, 67:13, 68:4, 85:3, 85:21, 92:13, 94:21, 95:3, 95:21
**object** [16] - 3:5, 3:8, 23:13, 23:14, 26:22, 26:23, 29:21, 31:18, 34:21, 37:23, 58:14, 60:7, 64:17, 94:8, 94:9, 96:9
**objection** [52] - 15:9, 18:6, 18:15, 20:5, 20:14, 20:16, 22:6, 23:3, 24:10, 31:4, 31:7, 34:20, 35:8, 36:6, 44:16, 45:14, 47:23, 48:12, 49:17, 49:21, 51:3, 56:13, 56:16, 57:5, 57:18,

59:4, 60:2, 60:8, 61:8, 61:22, 64:20, 65:13, 66:8, 66:9, 67:12, 69:13, 69:22, 71:6, 72:9, 72:11, 78:16, 82:18, 85:10, 85:20, 86:20, 87:14, 88:14, 88:21, 89:15, 95:11, 95:22, 96:21
**objections** [1] - 27:7
**obligation** [3] - 55:23, 56:4, 56:19
**observed** [1] - 71:21
**obtain** [1] - 32:5
**obtaining** [2] - 33:20, 33:23
**obviously** [2] - 9:19, 54:10
**occasion** [1] - 26:16
**occasions** [1] - 87:2
**occur** [1] - 73:5
**occurred** [6] - 20:20, 34:18, 35:2, 41:12, 45:10, 69:16
**occurring** [2] - 32:18, 69:15
**October** [1] - 21:4
**OF** [5] - 1:4, 1:9, 101:3, 101:4, 102:2
**Offenders** [1] - 11:4
**offense** [1] - 25:14
**offenses** [1] - 13:18
**office** [64] - 8:2, 9:14, 10:20, 11:6, 11:8, 11:12, 13:19, 13:20, 14:9, 14:11, 14:15, 14:17, 15:8, 15:14, 15:23, 18:13, 19:12, 19:15, 27:13, 28:21, 29:4, 29:17, 30:3, 30:10, 31:6, 31:14, 34:15, 35:17, 35:23, 36:3, 38:19, 47:3, 48:4, 48:5, 48:8, 48:13, 48:17, 49:12, 50:4, 50:11, 50:17, 52:18, 53:2, 53:20, 58:21, 59:16, 60:19, 62:5, 65:12, 69:11, 69:18, 75:6, 75:7, 76:7, 76:10, 76:13, 78:14, 81:21, 87:8, 88:6, 89:13, 89:14, 92:11
**Office** [9] - 6:17, 7:22, 9:20, 10:2, 10:9, 33:10, 58:20, 83:21, 86:9
**office's** [1] - 23:7
**officer** [3] - 13:12,

26:11, 56:5
**officers** [4] - 29:15, 37:11, 37:12, 47:16
**offices** [2] - 13:17, 23:11
**officially** [1] - 27:13
**often** [6] - 25:8, 29:12, 32:17, 32:23, 59:14, 75:11
**old** [1] - 61:19
**once** [1] - 11:5
**one** [27] - 5:6, 10:4, 10:10, 10:20, 12:5, 16:9, 24:18, 32:7, 32:9, 35:10, 40:2, 42:5, 42:16, 59:10, 59:13, 62:21, 62:23, 63:8, 72:21, 74:9, 75:11, 82:3, 83:9, 89:8, 89:19, 93:21, 95:6
**open** [1] - 97:9
**opined** [1] - 44:5
**opinion** [6] - 17:16, 43:23, 59:14, 66:4, 86:17, 87:19
**opinions** [3] - 17:22, 20:4, 20:9
**opportunity** [3] - 12:10, 13:9, 55:18
**opposing** [1] - 96:15
**order** [2] - 22:11, 86:2
**organs** [2] - 81:11, 81:14
**original** [1] - 3:19
**otherwise** [4] - 5:16, 29:19, 82:12, 91:20
**ourselves** [1] - 28:21, 31:22
**outcome** [2] - 19:19, 19:20
**outside** [1] - 18:18
**overlook** [2] - 88:7, 88:10
**overlooked** [1] - 88:11
**oversaw** [1] - 11:16
**overseas** [1] - 8:14
**own** [4] - 8:21, 32:5, 34:6, 66:12
**owning** [1] - 8:21

**P**

**P.C** [3] - 2:4, 2:7, 2:12
**p.m** [1] - 100:5
**P.O** [1] - 2:15
**packet** [1] - 81:8
**Packet** [2] - 83:17, 104:14

**page** [3] - 40:2, 77:19, 104:2
**Page** [2] - 42:12, 81:11, 83:5
**PAGE** [2] - 104:8, 104:17
**PAGE/LINE** [1] - 102:4
**pages** [1] - 82:23
**Pages** [2] - 83:18, 104:14
**Parrow** [1] - 51:13
**PARROW** [1] - 51:13
**part** [11] - 10:11, 25:5, 25:7, 31:12, 39:18, 42:8, 71:21, 75:20, 80:13, 82:2, 95:2
**participated** [1] - 22:13
**particular** [1] - 36:4
**parties** [3] - 3:4, 32:22, 103:11
**partners** [1] - 9:11
**parts** [1] - 37:13
**party** [2] - 3:22, 3:23
**passed** [2] - 11:5, 45:6
**past** [1] - 8:20
**path** [2] - 7:9
**paths** [1] - 7:8
**PATTISON** [1] - 2:12
**pause** [2] - 22:7, 93:17
**PD** [10] - 21:19, 26:7, 29:15, 38:5, 39:18, 47:4, 67:16, 76:7, 78:14, 92:5
**peck** [3] - 4:21, 42:12, 74:17
**PECK** [80] - 2:7, 2:11, 15:9, 15:20, 16:8, 16:16, 16:23, 17:7, 18:6, 18:15, 20:5, 20:14, 22:6, 22:19, 22:22, 23:14, 24:10, 24:15, 26:23, 29:21, 31:4, 31:7, 31:18, 34:20, 35:8, 36:6, 36:8, 36:19, 36:23, 37:23, 39:11, 44:16, 45:14, 47:23, 48:12, 49:17, 49:21, 51:3, 56:13, 56:16, 57:5, 57:18, 58:14, 59:4, 60:2, 60:7, 61:8, 61:22, 62:9, 64:17, 64:20, 65:13, 66:8, 67:12, 69:13, 69:22, 71:6, 72:9, 72:11, 78:16, 82:18, 83:4, 83:12, 83:16, 85:10, 85:20, 86:20, 87:14, 88:14, 88:21, 89:15,

90:2, 90:7, 93:8, 93:12, 93:21, 94:9, 95:11, 95:22, 96:21
**peer** [1] - 81:9
**Penal** [1] - 11:23
**pendency** [4] - 21:15, 21:22, 74:21, 104:18
**pending** [4] - 4:10, 5:20, 25:12, 97:9
**People** [9] - 6:4, 21:19, 23:11, 23:22, 24:2, 24:7, 25:19, 27:5, 37:8
**people** [2] - 43:18, 56:6
**per** [7] - 17:13, 18:2, 19:11, 61:6, 61:20, 76:4, 78:12
**performance** [1] - 68:21
**performed** [1] - 19:11
**performs** [1] - 17:13
**perhaps** [1] - 90:9
**period** [3] - 21:23, 76:5, 104:19
**person** [6] - 10:22, 11:2, 30:3, 31:10, 33:15, 60:4
**personal** [1] - 50:7
**personally** [20] - 18:5, 18:9, 18:13, 18:17, 24:6, 24:7, 24:19, 24:22, 25:2, 25:7, 25:20, 26:19, 40:6, 47:19, 53:3, 60:17, 70:10, 94:22, 98:4, 98:7
**personnel** [4] - 13:20, 24:14, 24:16, 37:19
**perspective** [1] - 68:19
**pertains** [1] - 90:9
**Pg** [1] - 2:23
**phase** [2] - 31:20, 50:9
**phases** [1] - 31:15
**phone** [4] - 32:11, 33:23, 47:20, 98:23
**phonetic** [2] - 96:15, 97:3
**photos** [1] - 6:3
**phrase** [1] - 5:14
**physical** [2] - 11:18, 95:18
**physician** [2] - 12:22, 74:19
**physicians** [2] - 13:4, 13:6
**picture** [1] - 20:11
**Pine** [1] - 2:9
**pissed** [1] - 71:11

**place** [2] - 101:8, 103:9
**Plaintiff** [2] - 1:6, 2:4
**plans** [1] - 9:13
**player** [2] - 16:14, 60:6
**Plaza** [1] - 2:9
**plus** [3] - 8:20, 78:11, 91:4
**point** [6] - 12:5, 12:6, 19:9, 19:21, 50:5, 75:19
**police** [15] - 7:15, 20:9, 26:11, 28:19, 28:22, 33:16, 35:3, 39:6, 47:15, 49:23, 54:22, 66:23, 75:6, 75:14, 81:20
**Police** [6] - 26:12, 30:4, 52:3, 61:11, 62:4, 79:20
**policy** [5] - 13:19, 14:10, 15:7, 38:23, 75:7
**position** [2] - 79:11, 92:18
**possess** [1] - 35:19
**possession** [2] - 35:15, 37:9
**possibility** [1] - 34:16
**possible** [1] - 96:10
**post** [5] - 34:18, 53:11, 53:15, 54:16, 76:17
**post-arrest** [2] - 53:11, 54:16
**post-arrests** [1] - 53:15
**post-trial** [1] - 76:17
**postmortem** [5] - 67:4, 77:2, 80:19, 82:13, 85:18
**potential** [6] - 34:8, 48:18, 52:19, 58:9, 67:9, 88:12
**potentially** [3] - 48:15, 64:23, 65:19
**powerful** [1] - 57:10
**practice** [5] - 5:7, 8:21, 9:10, 9:12, 38:19, 77:6, 77:8, 83:22
**pre** [8] - 20:12, 50:8, 53:9, 53:12, 53:15, 53:17, 54:15
**pre-arrest** [3] - 53:9, 53:17, 54:15
**pre-arrests** [2] - 53:12, 53:15
**pre-existing** [1] - 20:12

**pre-indictment** [1] - 50:8, 54:15
**prejudice** [1] - 23:10
**premised** [1] - 20:3
**prep** [3] - 58:3, 69:3, 69:6
**preparation** [3] - 58:12, 58:16, 68:23
**prepare** [2] - 4:20
**present** [7] - 54:4, 54:6, 77:16, 82:14, 84:23, 85:5, 92:8
**presentation** [5] - 53:9, 53:11, 55:4, 58:2, 72:7
**presented** [11] - 50:5, 50:19, 54:4, 54:7, 55:6, 55:12, 55:16, 57:15, 76:10, 84:18, 95:2
**presenting** [1] - 73:6
**press** [4] - 42:18, 64:10, 77:11, 90:20
**presuming** [2] - 5:8, 80:14
**pretty** [2] - 11:22, 71:3
**printed** [1] - 6:10
**private** [5] - 5:7, 8:21, 36:13, 83:22, 89:13
**problem** [2] - 5:19, 32:10
**procedure** [1] - 55:2
**procedures** [1] - 81:15
**proceed** [2] - 22:21, 92:19
**proceeding** [1] - 56:8
**proceedings** [6] - 55:20, 62:14, 89:11, 93:16, 93:18, 103:12
**process** [1] - 59:15
**produced** [6] - 42:11, 74:17, 80:13, 80:15, 82:22, 83:8
**Professional** [4] - 1:18, 8:5, 12:20, 103:4
**professional** [4] - 16:13, 17:18, 17:22, 87:18
**professionalism** [1] - 87:3
**professionals** [3] - 65:17, 91:14, 91:19
**profile** [4] - 52:17, 52:20, 52:21, 58:8
**pronounced** [2] - 46:13, 75:22
**properly** [2] - 68:14, 68:15
**proposition** [1] - 65:5

## R

raised [3] - 37:20, 71:12, 94:14
raising [1] - 71:10
range [1] - 82:20
rare [1] - 81:13
rather [1] - 20:10
reach [1] - 70:11
read [8] - 32:15, 45:15, 45:17, 45:20, 62:15, 62:17, 80:16, 101:7
readdress [1] - 37:2
ready [1] - 54:8
real [2] - 9:6, 38:14
really [1] - 33:14
reason [4] - 4:17, 17:23, 18:3, 87:2
reasons [4] - 43:22, 45:7, 85:6, 94:13
rebuttal [2] - 71:23, 72:7
receipt [2] - 92:9, 92:19
received [2] - 8:10, 39:5
recent [1] - 72:20
recently [1] - 60:22
Recess [2] - 62:13, 93:15
recollection [20] - 6:4, 22:8, 40:12, 40:17, 40:20, 41:15, 41:21, 43:15, 45:22, 46:5, 54:11, 70:17, 70:23, 72:22, 73:8, 82:11, 86:22, 96:19, 99:16
recommended [1] - 17:15
Record [1] - 16:12
record [13] - 5:9, 5:11, 16:16, 16:20, 39:12, 57:22, 72:14, 74:5, 74:7, 82:19, 84:14, 101:7
recorded [1] - 84:12
recording [1] - 21:11
records [8] - 22:7, 32:23, 34:2, 36:16, 37:8, 39:8, 89:5
redirect [2] - 70:19, 70:20
reelection [1] - 35:23
refer [1] - 74:11
reference [1] - 17:10
referenced [1] - 44:4
referring [5] - 16:10, 20:15, 22:17, 44:17, 97:6
refresh [5] - 6:3, 40:17, 40:19, 46:4, 72:21
refreshed [1] - 40:21
regard [10] - 18:21, 24:4, 37:20, 38:9, 46:9, 55:3, 60:14, 73:23, 81:7, 89:12
regards [7] - 49:7, 98:3, 98:8, 98:12, 98:16, 98:19, 99:2
Registered [2] - 1:18, 103:4
regret [1] - 42:16
relate [1] - 94:17
related [8] - 35:19, 37:21, 66:15, 81:12, 94:23, 95:7, 96:7, 103:10
relating [3] - 35:12, 48:21, 94:4
relationship [1] - 26:5
relevant [4] - 75:20, 78:7, 79:21, 97:10
remained [1] - 30:17
remember [8] - 41:6, 41:10, 41:11, 41:12, 41:18, 49:13, 57:9, 71:4
remembered [1] - 41:5
remotely [1] - 4:3
rendering [1] - 34:4
Rensselaer [12] - 2:8, 6:17, 7:22, 8:19, 9:23, 13:12, 13:15, 14:14, 14:17, 15:2, 29:16, 42:13
RENSSELAER [1] - 1:11
repeat [3] - 32:8, 32:14, 45:2
rephrase [1] - 5:15
report [1] - 38:14
reported [2] - 39:2, 42:19
reporter [2] - 5:11, 103:23
Reporter [1] - 1:19, 103:5
reporting [1] - 36:4, 87:8, 87:11
reports [1] - 30:16
represent [4] - 4:9, 12:23, 13:6, 27:18, 64:6
represented [3] - 16:19, 23:10, 65:18
representing [1] - 90:16

reproduction [1] - 103:22
REQUESTS [1] - 22:4
required [1] - 55:17
research [1] - 66:14
researching [1] - 82:11
reserve [3] - 27:7, 97:8, 99:18
reserved [2] - 3:8, 3:11
respect [1] - 55:8
response [4] - 46:21, 73:18, 74:3
responsibilities [1] - 13:15
result [1] - 82:9
resulted [4] - 57:16, 87:12, 88:19, 88:22
resulting [1] - 81:15
resumed [2] - 62:14, 93:16
resuscitate [3] - 75:21, 76:3, 95:19
resuscitating [1] - 34:12
resuscitation [8] - 34:18, 44:8, 59:19, 60:15, 62:6, 63:22, 65:8, 81:15
resuscitative [4] - 45:10, 67:2, 80:17, 81:4
retired [2] - 8:15, 67:17
retirement [1] - 12:12
review [3] - 33:22, 76:17, 81:9
reviewed [4] - 6:2, 6:7, 6:8, 76:16
revive [7] - 67:3, 80:17
RHIANNON [1] - 2:16
Rhiannon [1] - 97:17
rib [1] - 66:16
ribs [5] - 44:13, 45:10, 67:5, 67:6, 80:19
rights [5] - 3:4, 9:9, 54:14, 55:3, 55:8
road [1] - 99:23
robbery [2] - 11:10, 11:21
role [7] - 30:9, 30:12, 33:11, 33:18, 68:9, 73:13, 73:15
Ron [5] - 23:7, 26:5, 39:19, 39:22, 62:23
RONALD [1] - 1:9
Ronald [3] - 2:13, 97:19, 98:5
room [1] - 60:13

Rosario [8] - 63:9, 66:15, 66:20, 74:9, 80:14, 80:15, 81:8, 82:2
roughly [1] - 26:2
RPR [1] - 103:20
rules [1] - 5:4
RULING [1] - 22:4
ruling [3] - 22:18, 27:8, 37:2
rulings [1] - 97:9
run [1] - 9:13
rupture [1] - 82:8
Rutley [2] - 96:15, 97:3

## S

SAMPSON [1] - 2:12
satisfied [2] - 17:16, 86:17
save [1] - 34:12
saving [1] - 78:9
saw [2] - 74:21, 96:2
school [7] - 7:3, 7:11, 7:12, 7:15, 7:16, 7:20
School [1] - 7:7
sealed [7] - 22:8, 22:10, 27:3, 36:13, 36:16, 55:7, 88:23
search [2] - 32:20, 33:21
second [5] - 25:7, 32:7, 32:9, 59:6, 93:21
Second [2] - 9:7, 9:9
section [1] - 66:23
see [4] - 17:2, 39:20, 89:20, 99:22
seeing [1] - 74:23
seek [4] - 53:17, 56:2, 56:11
seeking [1] - 70:6
seizure [1] - 45:9
semester [2] - 7:16, 7:17
send [4] - 36:2, 36:22, 37:4, 90:3
sending [1] - 89:12
sends [1] - 36:12
sense [1] - 43:18
sent [1] - 36:17
separate [1] - 27:5
separately [1] - 93:20
sequence [3] - 28:17, 53:10, 54:11
Sergeant [1] - 51:12
serious [1] - 25:9

## Q

qualifications [1] - 17:19
qualms [1] - 17:19
questioned [1] - 17:21
QUESTIONS [1] - 104:17
questions [6] - 4:11, 28:22, 33:4, 90:5, 98:2, 99:6
quick [1] - 62:10
quickly [1] - 11:10

prosecutable [1] - 59:12
prosecute [4] - 25:20, 26:17, 58:22, 59:5
prosecuted [6] - 26:15, 42:14, 68:6, 88:5, 88:17, 95:7
prosecuting [3] - 13:18, 21:23, 104:19
prosecution [13] - 4:12, 21:16, 21:22, 38:7, 63:21, 64:3, 89:6, 94:5, 94:18, 95:2, 96:6, 96:16, 104:19
prosecution's [1] - 63:19
prosecutions [1] - 56:14
prosecutor [4] - 8:4, 12:13, 55:17, 68:10
prosecutorial [1] - 65:20
protect [1] - 56:5
provide [3] - 14:19, 55:13, 75:14
provided [1] - 3:4
PUBLIC [1] - 101:21
public [4] - 4:4, 22:16, 87:7, 87:10
Public [4] - 1:19, 3:15, 3:16, 103:5
publicized [1] - 9:20
published [1] - 16:4
pull [1] - 16:11
pulled [3] - 81:16, 81:18, 81:19
pursuant [1] - 1:17
pursue [3] - 84:17, 85:8, 85:16
pursuing [1] - 42:17
put [2] - 39:14, 54:9

**seriously** [1] - 56:19
**serve** [1] - 32:22
**served** [1] - 8:18
**service** [1] - 8:8
**services** [1] - 14:19
**serving** [2] - 6:15, 8:13
**set** [5] - 81:4, 94:14, 95:5, 103:9, 103:15
**setting** [1] - 13:19
**seven** [2] - 10:13, 11:6
**several** [1] - 75:3
**severe** [2] - 81:10, 81:13
**severity** [1] - 25:13
**sex** [2] - 11:7, 11:17
**Sex** [1] - 11:4
**shall** [1] - 3:10
**share** [1] - 52:9
**shared** [1] - 35:4
**sheet** [2] - 29:13, 47:14
**SHEET** [2] - 102:2, 102:2
**shipped** [1] - 7:13
**shortly** [1] - 10:15
**show** [1] - 79:18
**showing** [2] - 43:13, 74:16
**side** [4] - 13:7, 57:16, 73:20, 96:7
**sign** [2] - 29:13, 47:14
**sign-in** [2] - 29:13, 47:14
**SIKIRICA** [1] - 1:11
**Sikirica** [30] - 2:8, 14:20, 14:22, 15:16, 16:6, 17:11, 17:17, 20:2, 20:8, 46:3, 47:16, 52:6, 59:2, 59:9, 59:10, 59:17, 63:15, 69:10, 70:5, 72:15, 72:23, 73:9, 73:15, 73:19, 84:2, 88:18, 92:10, 96:12, 96:14, 96:23
**Sikirica's** [3] - 17:21, 59:14, 69:17
**sit** [2] - 23:17, 91:11
**sitting** [1] - 80:4
**situation** [1] - 69:20
**six** [1] - 50:14
**size** [1] - 11:12
**skill** [1] - 103:8
**small** [1] - 93:3
**solo** [2] - 9:10, 9:12
**someone** [5] - 29:16, 42:19, 53:22, 68:10, 70:11
**sometime** [1] - 14:5

**sometimes** [8] - 5:14, 25:10, 32:2, 33:7, 43:9, 43:10, 43:11, 43:12
**somewhat** [1] - 34:3
**somewhere** [1] - 50:13
**sorry** [3] - 40:22, 46:14, 96:2
**sort** [2] - 73:7, 77:8
**sound** [2] - 29:9, 29:11
**source** [1] - 95:16
**sources** [2] - 90:15, 90:21
**south** [1] - 71:17
**speaking** [2] - 33:17, 55:10
**special** [4] - 10:19, 11:14, 11:15, 11:20
**specialized** [1] - 10:21
**specific** [1] - 25:8
**specifically** [2] - 20:21, 72:6
**specifics** [1] - 81:3
**speculative** [1] - 57:20
**SPENCER** [36] - 2:16, 20:16, 23:13, 26:22, 29:22, 34:21, 35:9, 37:22, 38:12, 39:10, 47:12, 48:11, 49:16, 58:13, 59:23, 60:8, 60:16, 62:7, 64:18, 64:21, 66:9, 67:13, 68:4, 78:17, 85:3, 85:21, 87:15, 92:13, 94:8, 94:21, 95:3, 95:21, 96:9, 97:16, 99:5, 104:4
**Spencer** [1] - 97:18
**spending** [1] - 8:12
**spent** [3] - 7:23, 8:6, 8:16
**spoken** [2] - 18:11, 18:21
**St** [1] - 61:14
**staff** [11] - 13:22, 25:4, 44:11, 52:9, 60:13, 61:3, 61:17, 64:14, 75:21, 77:13, 95:7
**stamp** [1] - 82:20
**standard** [2] - 33:3, 77:8
**standpoint** [2] - 37:19, 43:14
**start** [2] - 7:2, 72:16
**started** [5] - 7:10, 7:16, 7:21, 10:15, 15:4
**state** [2] - 12:11, 14:4

**STATE** [1] - 101:3
**State** [6] - 1:19, 8:4, 11:4, 12:16, 51:8, 103:5
**statement** [3] - 77:15, 86:16, 87:4
**statements** [3] - 27:3, 60:12, 84:3
**states** [1] - 46:6
**States** [1] - 7:11
**STATES** [1] - 1:4
**status** [1] - 58:18
**stay** [1] - 99:23
**steps** [1] - 40:7
**Stewart** [1] - 93:19
**still** [4] - 12:13, 17:16, 85:15, 86:17
**stipulated** [3] - 3:13, 3:18, 3:21
**STIPULATED** [1] - 3:3
**strategic** [2] - 53:22, 58:3
**strategically** [1] - 68:18
**Street** [1] - 2:15
**strengths** [1] - 43:7
**strenuously** [1] - 76:3
**strike** [2] - 3:7, 3:9
**strong** [7] - 42:16, 42:23, 43:23, 57:2, 57:7, 77:11, 94:12
**stronger** [1] - 43:8
**subject** [3] - 27:8, 63:2, 65:11
**submitted** [2] - 13:23, 33:22
**subpoena** [2] - 29:3
**subpoenas** [4] - 28:23, 32:3, 32:21, 33:23
**subsequent** [1] - 38:15
**substance** [5] - 45:5, 45:6, 64:11, 72:3, 72:6
**successful** [1] - 36:2
**sudden** [1] - 45:7
**suddenly** [1] - 11:6
**sufficient** [1] - 4:20
**suggest** [2] - 50:20, 80:6
**suggested** [1] - 59:2
**suggestions** [1] - 33:7
**Suite** [2] - 2:5, 2:9
**sum** [4] - 45:5, 64:11, 72:2, 72:6
**summarizes** [1] - 46:6
**summary** [2] - 39:9, 54:22
**superior** [1] - 54:23

**supervising** [1] - 69:8
**supervision** [1] - 103:23
**supervisor** [4] - 12:17, 12:19, 15:23, 30:14
**supervisory** [2] - 30:12, 35:7
**support** [1] - 84:19
**Supporting** [4] - 74:13, 78:3, 104:11, 104:13
**supporting** [7] - 74:18, 75:2, 75:4, 75:18, 77:20, 78:6, 81:2
**surely** [1] - 26:15
**surprise** [1] - 76:11
**surrendered** [1] - 21:4
**surrendering** [1] - 92:7
**surrogate** [1] - 9:7
**surrounding** [2] - 40:13, 65:7
**SUSAN** [2] - 103:4, 103:20
**Susan** [1] - 1:18
**suspect** [1] - 55:5
**Sworn** [1] - 101:18
**sworn** [1] - 3:14
**sworn/affirmed** [1] - 4:3
**system** [2] - 12:12, 37:8

**T**

**talks** [1] - 78:8
**tape** [1] - 43:17
**tasked** [1] - 25:11
**Teas** [3] - 17:12, 17:14, 44:3
**teas** [1] - 83:20
**Teas'** [4] - 46:6, 71:21, 84:3, 94:15
**tech** [1] - 29:16
**technically** [1] - 27:15
**techniques** [5] - 67:2, 67:3, 80:17, 80:18, 81:4
**ten** [6] - 7:23, 10:2, 12:9, 25:23, 26:3, 93:13
**tenure** [1] - 24:22, 88:17
**term** [2] - 50:15, 77:2
**terms** [1] - 28:17
**testified** [12] - 4:4, 19:3, 26:15, 61:3, 61:16, 69:12, 70:2,

**71:2, 71:20, 78:12, 86:22, 96:14
**testify** [4] - 4:17, 23:15, 24:15, 24:16, 55:9, 55:18, 75:17
**testifying** [1] - 91:5
**testimony** [22] - 3:7, 3:9, 20:3, 44:3, 46:7, 61:21, 62:2, 63:14, 65:9, 69:12, 70:20, 71:21, 76:2, 82:10, 84:3, 88:18, 91:7, 91:10, 94:7, 94:16, 100:4, 101:8
**thanking** [1] - 39:6
**THE** [2] - 97:14, 99:7, 100:2
**theme** [1] - 44:15
**themselves** [1] - 38:8
**theorized** [1] - 42:6
**theory** [4] - 34:7, 45:13, 45:18, 46:5
**thereafter** [1] - 10:15
**they've** [1] - 75:15
**Thomas** [2] - 19:18, 87:9
**thorough** [1] - 17:18
**thousand** [2] - 44:9, 44:10
**three** [4] - 8:15, 42:3, 61:16, 76:2
**throughout** [1] - 10:13
**Tim** [5] - 2:14, 37:13, 39:23, 97:20, 98:15
**TIM** [1] - 1:10
**timeline** [1] - 73:4
**TO** [3] - 104:2, 104:8, 104:17
**today** [15] - 4:11, 4:15, 4:18, 23:17, 47:10, 52:15, 85:17, 90:11, 90:17, 90:19, 90:23, 91:11, 94:5, 94:7, 99:22
**today's** [2] - 5:23, 86:5
**together** [1] - 29:14
**took** [3] - 35:21, 50:16, 56:19
**top** [2] - 25:21, 39:19
**total** [1] - 8:16
**touched** [1] - 61:2
**towards** [2] - 12:6, 12:7
**traditional** [1] - 43:17
**tragically** [1] - 45:6
**trail** [1] - 61:13
**trained** [1] - 10:22
**training** [2] - 7:14, 66:5
**transcript** [6] - 3:23,

76:16, 76:20,
101:10, 103:7,
103:21
**TRANSCRIPT** [2] -
102:2, 102:2
**Transcription** [1] -
93:19
**transcripts** [1] - 76:19
**transmitted** [1] - 52:9
**trauma** [1] - 81:12
**trial** [42] - 3:11, 6:18,
11:9, 19:5, 19:7,
19:18, 19:19, 19:20,
22:14, 30:18, 38:10,
44:3, 44:15, 45:5,
57:8, 61:2, 61:7,
61:21, 63:18, 64:6,
64:16, 65:10, 68:5,
68:7, 68:20, 69:3,
69:6, 73:15, 75:9,
76:2, 76:9, 76:15,
76:17, 76:21, 78:12,
78:15, 80:15, 81:2,
90:10, 90:20, 94:15
**trick** [1] - 85:13
**tried** [2] - 11:20, 64:10
**TROY** [1] - 1:9
**Troy** [21] - 2:13, 2:15,
16:12, 21:19, 26:7,
26:12, 29:15, 30:4,
38:5, 39:18, 47:4,
47:8, 47:15, 52:3,
61:11, 62:3, 67:16,
76:7, 78:14, 92:5,
97:18
**true** [3] - 36:5, 101:10,
103:7
**try** [4] - 40:17, 40:19,
70:21, 77:2
**trying** [2] - 73:4, 95:19
**Tufts** [2] - 7:5, 7:7
**turn** [1] - 48:16
**two** [7] - 37:11, 45:16,
45:19, 61:19, 62:21,
67:5, 74:9
**two-year-old** [1] -
61:19
**type** [10] - 11:21, 24:3,
26:4, 28:8, 29:11,
54:23, 55:20, 63:3,
66:3, 84:11
**types** [7] - 9:3, 12:14,
28:4, 32:3, 49:13,
75:4, 77:16
**typically** [2] - 31:5,
31:14

## U

**ultimately** [7] - 23:9,
50:4, 53:19, 54:2,
56:23, 57:11, 93:2
**unable** [1] - 75:22
**unaware** [1] - 76:14
**under** [13] - 25:23,
26:3, 27:22, 33:3,
40:4, 55:23, 63:16,
64:15, 64:19, 65:22,
78:20, 95:8, 103:22
**undergrad** [1] - 7:4
**understood** [1] - 5:16
**undertaking** [1] - 75:7
**unexplained** [2] - 45:7
**Union** [1] - 35:21
**unit** [1] - 78:8
**United** [1] - 7:11
**UNITED** [1] - 1:4
**units** [1] - 8:14
**universe** [3] - 92:17,
92:22, 93:2
**University** [1] - 7:5
**unless** [3] - 22:10,
48:14, 103:22
**unresponsive** [1] -
95:17
**unsealing** [1] - 22:11
**unsuccessful** [1] -
34:13
**up** [18] - 8:11, 11:14,
11:16, 16:11, 19:13,
34:7, 36:9, 42:2,
47:10, 60:21, 62:12,
70:22, 71:22, 72:19,
77:12, 81:2, 86:4,
90:11
**upset** [1] - 69:20
**upwards** [1] - 64:12

## V

**V.D** [10] - 4:13, 20:20,
31:17, 90:11, 95:16,
98:4, 98:9, 98:13,
98:16, 99:3
**V.D.'s** [2] - 48:22,
98:19
**vacation** [1] - 10:23
**vaguely** [1] - 6:14
**valid** [1] - 85:2
**variety** [1] - 10:3,
11:19
**various** [6] - 8:13,
14:19, 26:13, 32:3,
32:19, 32:22
**veracity** [2] - 26:21,

27:11
**verdict** [3] - 73:10,
87:13, 87:17
**versed** [1] - 86:18
**versus** [12] - 6:4,
21:19, 23:12, 23:22,
24:2, 24:7, 25:3,
25:20, 27:5, 34:16,
37:9, 54:16
**vet** [1] - 60:12
**via** [1] - 54:22
**viability** [2] - 37:21,
38:9
**viable** [2] - 82:13, 85:2
**victim** [3] - 13:21,
67:3, 80:18
**victims** [4] - 10:19,
11:14, 11:15, 11:20
**video** [8] - 32:23,
43:11, 43:13, 47:9,
47:10, 47:13, 59:18,
92:5
**videos** [1] - 6:3
**view** [1] - 94:19
**viewed** [1] - 48:7
**views** [1] - 84:2
**violence** [1] - 11:18
**virtually** [1] - 1:17
**voice** [2] - 71:10,
71:12
**volume** [1] - 19:10
**vouch** [1] - 80:7

## W

**wait** [1] - 22:6
**waived** [1] - 3:20
**waiver** [1] - 3:10
**walk** [1] - 6:22
**wall** [2] - 23:20, 24:4
**warrants** [2] - 32:20,
33:21
**Washington** [1] - 2:10
**watch** [1] - 68:20
**watched** [1] - 71:20
**weak** [1] - 77:11
**week** [3] - 45:16,
45:19, 71:2
**weeks** [2] - 7:14, 48:8
**weigh** [1] - 25:10
**welcome** [1] - 97:14
**West** [1] - 2:9
**whatsoever** [1] -
17:20
**WHEREOF** [1] -
103:15
**whole** [3] - 11:22,
83:3, 83:9
**wish** [1] - 55:14

**withdrawn** [6] - 21:16,
56:23, 63:19, 69:18,
82:4, 96:13
**witness** [6] - 3:14,
26:16, 58:3, 65:3,
65:21, 93:6
**WITNESS** [4] - 97:14,
99:7, 100:2, 103:15
**witnesses** [5] - 68:22,
69:4, 75:8, 75:15,
75:16
**word** [1] - 77:2
**words** [2] - 49:3, 71:3
**workloads** [1] - 25:13
**works** [1] - 51:8
**writing** [1] - 43:10
**written** [1] - 43:10
**wrongful** [1] - 56:14
**wrongfully** [2] - 56:6,
56:7
**wrote** [2] - 80:7, 80:12

## Y

**year** [11] - 6:9, 7:12,
8:7, 13:23, 17:14,
18:2, 19:6, 19:11,
35:21, 50:15, 61:19
**years** [14] - 7:23, 8:6,
8:12, 8:16, 8:19,
8:20, 10:2, 12:9,
17:17, 19:12, 26:7,
26:14, 43:6
**YORK** [2] - 1:4, 101:3
**York** [10] - 1:20, 2:5,
2:10, 2:15, 7:18, 8:4,
11:4, 51:8, 103:6
**yourself** [2] - 36:2,
36:18, 89:12
**yup** [1] - 90:4

## Z

**Zoom** [2] - 1:17, 32:13

103

```
1
2              C E R T I F I C A T I O N
3
4          I, SUSAN FLORIO, Registered Professional
5     Reporter and Notary Public in and for the State of
6     New York, do hereby certify that the foregoing is a
7     true, complete and accurate transcript to the best
8     of my knowledge, skill and ability on the date and
9     place hereinbefore set forth.
10         I FURTHER CERTIFY that I am not related
11    to or employed by any of the parties to the action
12    in which the proceedings were taken, or any
13    attorney or counsel employed in this action, nor am
14    I financially interested in the case.
15         IN WITNESS WHEREOF, I have hereunto set
16    my hand this 22nd day of June, 2021.
17
18
19         _____
20              SUSAN FLORIO, RPR
21              (The foregoing certification of
              this transcript does not apply to any
22         reproduction of the same by any means
              unless under the direct control and/or
23         supervision of the certifying reporter.)
```

# EXHIBIT "F"

1  UNITED STATES DISTRICT COURT
   NORTHERN DISTRICT OF NEW YORK
2  - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

3  MICHAEL DAVIS-GUIDER,

4                                    Plaintiff,

5          - against -          CV:  1:17-cv-01290

6  CITY OF TROY, RONALD FOUNTAIN, Individually,
   DANIELLE COONRADT, Individually, CHARLES McDONALD,
7  Individually, TIM COLANERI, Individually,
   ADAM R. MASON, Individually, RENSSELAER COUNTY,
8  MICHAEL SIKIRICA, Individually, and JOEL ABELOVE,
   Individually,
9
                                    Defendants.
10 - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

11

12       DEPOSITION of MICHAEL SIKIRICA, held on the 24th

13 day of May 2021, commencing at 9:33 a.m., via ZOOM,

14 before Jeanne O'Connell, Registered Professional

15 Reporter and Notary Public in and for the State of New

16 York.

17

18

19

20

21

22

23

```
 1   APPEARANCES:

 2   Brett H. Klein, Esq.
     305 Broadway
 3   Suite 600
     New York, New York 10007
 4   Attorney for Plaintiff/Claimant

 5   Pattison Sampson Ginsberg & Griffin, PLLC
     22 First Street
 6   Troy, New York 12180
     By: Rhiannon I. Spencer, Esq.
 7   Attorneys for City of Troy, Ronald Fountain, Danielle
     Coonradt, Charles McDonald, Tim Colaneri and
 8   Adam R. Mason

 9   Bailey, Johnson & Peck, P.C.
     5 Pine West Plaza
10   Washington Avenue Extension
     Albany, New York 12205
11   By: Crystal R. Peck, Esq.
     Attorneys for Michael Sikirica and Joel Abelove

12

13

14

15

16

17

18

19

20

21

22

23
```

```
 1              S T I P U L A T I O N S

 2   It is hereby stipulated and agreed by

 3   and between the attorneys for the respective

 4   parties hereto that, this examination may be signed and

 5   sworn to before any Notary Public of the State of New

 6   York.

 7

 8   It is further stipulated and agreed that the filing and

 9   certification of the said examination shall be waived.

10

11   It is further stipulated and agreed that all objections

12   to questions, except as to form, shall be reserved for

13   the trial of this action.

14

15   It is further stipulated and agreed that there are no

16   objections to Notice of this Examination Before Trial

17   and the qualifications of the court reporter to take

18   this deposition and administer an oath or affirmation.

19

20

21

22

23
```

```
 1              MICHAEL SIKIRICA, after first having been
 2         duly sworn, was examined and testified as
 3         follows:
 4    EXAMINATION
 5    BY MR. KLEIN:
 6         Q.   Good morning, Dr. Sikirika.
 7              How are you today?
 8         A.   Very good.  Thank you.
 9         Q.   As you know, I'm Brett Klein.  We met before at
10    the Adrian Thomas case, correct?
11         A.   Yes.
12         Q.   I'm here today representing Michael Davis, and
13    we're here to ask you questions about your involvement
14    in the autopsy of ███████████ in or around 2015 and your
15    testimony at trial in around 2016.
16              Do you understand that generally that's why we're
17    here today, to ask you questions about that?
18         A.   Yes.
19         Q.   Have you had sufficient time to prepare for
20    today's proceedings?
21         A.   Yes.
22         Q.   Ms. Peck is your attorney in the room with you?
23              She's representing you in this case?
```

1    A.   Yes.

2    Q.   And the rules of a deposition, just want to go

3    over them briefly.  Even if you know the answer, just

4    give me a couple of seconds of space before you answer

5    so the court reporter can get all the questions and

6    answers down separately, okay?

7    A.   Yes.

8    Q.   If you don't understand a question I ask, which

9    is going to be my fault and not yours, let me know and

10   I'll be happy to rephrase it, okay?

11   A.   Yes.

12   Q.   Otherwise, if you don't, and you go ahead and

13   answer a question, it will be assumed you understood the

14   question.

15        Further, if you need a break, let us know.  We'll

16   just ask that you answer any pending question before we

17   take a break, okay?

18   A.   All right.

19   Q.   Any reason why you can't testify fully and

20   accurately today?

21   A.   No.

22   Q.   In connection with today's deposition, did you

23   review documents, recordings, videos or anything else,

1    to refresh your recollection of the case involving ███

2    ███?

3        A.   Yes.

4        Q.   What have you reviewed?

5        A.   I reviewed my autopsy report, the police report,

6    records from Samaritan Hospital, records from a

7    pediatric facility where ███ was seen in New York

8    City, testimony from the grand jury, testimony at trial,

9    and testimony by Dr. Teas, who testified for the defense

10   at the trial, and my original notes from the time of the

11   autopsy.

12       Q.   Are all of these items, other than the testimony

13   of Dr. Teas, are they part of your file?  Or is Dr.

14   Teas' testimony part of your file as well?

15       A.   It was given to me by Ms. Peck, who provided

16   copies of my testimony, the grand jury testimony, and

17   Dr. Teas' testimony.

18       Q.   Was everything else that you looked at other than

19   the testimonies part of your file, or is there anything

20   that was not part of your file that was additional that

21   you looked at?

22            Just so I know where it was obtained.

23       A.   No.  There was no additional material.

1    Q.  In Dr. Teas' testimony, she talked about

2  microscopic studies that she performed that sounded like

3  she did that that maybe you did not; is that fair, that

4  she did some microscopic studies for trial?

5    A.  I can explain that.

6        I did the first microscopic examination of the

7  tissues that I obtained at the autopsy, and she

8  requested recuts of the blocks that those slides were

9  made from.

10       So, she got her own set of slides, a duplicate of

11  mine, that she reviewed at her discretion.

12   Q.  But she showed -- at least her testimony that she

13  discussed blowups, you know, certain views that she took

14  under the microscope.

15       Does that sound right that she had her own

16  exhibits for trial?

17   A.  Yes.  She had some exhibits from other cases that

18  she had worked on, but she did not have any more

19  additional tissues or specimens from ████.

20   Q.  But, at trial, did she apparently enlarge or zoom

21  in on certain parts of the slides in a way that she

22  distinguished from the way you did it?

23       I'm just trying to ascertain whether she had

1  exhibits from this case that were enlarged or blown up

2  or looked different than the one that you had originally

3  used.

4      A.   Yes.  She had enlargements for the jury to

5  understand the histology, yes.

6      Q.  So, just in terms of the documents, not getting

7  into the substance yet, have you seen those as part of

8  your preparation for this deposition?

9      A.  No.

10      Q.  Dr. Sikirika, you testified in the Thomas case.

11          It was September 5th and 6th of 2019.  Does that

12  sound right to you?

13      A.  The Thomas case?

14      Q.  Yeah, the date of your deposition?

15      A.  We're talking about ████████.

16      Q.  Do you recall testifying at a deposition that

17  went over two days on September 5th and 6th of 2019 in

18  the Thomas case?

19      A.  Yes, I recall that.

20      Q.  So, because we have a very extensive transcript

21  of your -- not only your testimony in that case but

22  information about your background, I'm not going to

23  revisit each and every thing because we have a record of

1    your testimony from there.

2            MS. PECK:  Brett, if I can just interject

3        one second.

4            The only concerns I have with this is

5        that, if you're going to try to rely on his

6        testimony regarding an autopsy he did in the

7        Thomas case, without having that being released

8        properly, I think there could be concerns.

9            I don't have necessarily a problem

10       relying on his background information.

11            MR. KLEIN:  I'm talking about background

12       for now.  If we determine that other issue,

13       Crystal, we'll issue a subpoena or we'll deal

14       with that in terms of discovery with the judge.

15       But I'm talking about his background, so we don't

16       have to spend an hour today on his CV and his

17       experience.

18            MS. PECK:  That's not a problem.  That's

19       fine.  I don't have a problem with that.

20   BY MR. KLEIN:

21    Q.  So, Dr. Sikirika, with that frame of reference,

22   that date of September 5th and 6th of 2019, just wanted

23   to ask you about from then up until today what have you

Case 1:17-cv-01290-DJS Document 71-11 Filed 02/04/22 Page 130 of 178

1  been doing, your duties and responsibilities and

2  workload, what have they been like since that time, and

3  so forth.

4       Can you walk us through?  Have you remained the

5  medical examiner for Rensselaer County and also contract

6  with other counties as you had at that time?

7    A.  Yes.  I am still the Rensselaer County ME.  I

8  have terminated my employment as an Albany County

9  coroner's pathologist, but I've also extended my

10  services up north.

11       I now cover Warren and Washington County

12  exclusively.  I no longer cover Albany County.  So, that

13  is about the only major change.

14    Q.  Why did you terminate your position with Albany

15  County?

16    A.  It's a complicated issue that deals with the need

17  for this region to establish a medical examiner's

18  office, and I felt frustrated that Albany, Schenectady

19  and Rensselaer are not basically coming on board to

20  assure we have good services in the future.

21    Q.  In what way weren't they coming on board to

22  ensure good services for the future?

23    A.  They led me to believe that they were interested

Case 1:17-cv-08290-DJS Document 71-4 Filed 02/04/22 Page 131 of 178

1    in establishing a regional medical examiner's office

2    from a tri-county perspective, which I think is very

3    necessary.  There's enough of a population to do that

4    here.

5         But politics, I guess, were obstructive to them,

6    and over time I became frustrated.  I spent time working

7    on the idea.  I approached the state police about some

8    real estate that could be used.

9         They decided they didn't even want to do a

10   preliminary survey, which would probably cost them a few

11   thousand dollars, so I eventually became frustrated and

12   just decided I didn't want to deal with Albany County

13   anymore.

14   Q.  You still deal with Rensselaer?

15   A.  Yes, I do.

16   Q.  Have you worked with Schenectady?  I don't

17   recall.

18   A.  Yes.  I do work with Schenectady on occasion.  I

19   cover their homicides and any cases that are of a

20   suspicious nature.

21   Q.  So, why did you terminate Albany but not

22   Schenectady or Rensselaer, given your frustrations that

23   you indicated previously?

1    A.  Well, Albany, being the biggest county, had to

2    take the lead, and the other counties would follow

3    along.  I had support from Rensselaer County and I had

4    support from Schenectady County, but Albany County, for

5    reasons unknown to me, decided they wanted me to avoid

6    the topic.

7    Q.  Were you the medical examiner for Albany County

8    or do they have a coroner separately?

9        How is it set up there?

10    A.  Albany County has a coroner system, and I was one

11    of the physicians, pathologists, providing autopsy

12    services for that county.

13        Schenectady has a medical examiner system, and

14    I'm also the medical examiner under somewhat part-time

15    basis for Schenectady.

16    Q.  So, did you leave Albany, in essence, in an act

17    of protest?

18    A.  Yes.

19    Q.  I know you mentioned previously that you had left

20    Ulster or you were resigning from Ulster or

21    discontinuing that contract.

22        Do you recall that?

23    A.  Yes.

Case 1:17-cv-08290-DJS Document 112-4 Filed 02/04/22 Page 129 of 178

1    Q.  Did that happen?  Did you leave?  Did you stop

2   working with Ulster?

3    A.  Yes, I did.  I did stop working with Ulster, and

4   that was left in good terms.  I simply decided it was

5   just too much driving to go back and forth, similar to

6   what I had done in Oneida County.

7        I used to cover Oneida County way out to Utica,

8   but it was a two-hour trip and it was starting to wear

9   on me.  Similar to Ulster County, which was a little

10   closer, but still quite a trip.

11    Q.  You say you left there on good terms, Ulster.

12        Albany it's fair to characterize as not great --

13   not good terms, correct?

14    A.  Well, I gave them proper notice, several month

15   notice, but I think they realized that I was leaving in

16   a protest.

17    Q.  Have you left any other work with any other

18   county or municipality under terms that you can say were

19   not good terms either because you were upset or they

20   took issue with any of your conduct?

21        MS. SPENCER:  Objection to form.

22   BY MR. KLEIN:

23    Q.  In other words, have you discontinued working

1   with any other municipality or entity or has an entity

2   discontinued work with you for reasons that were not

3   mutual?

4     A.  No entity has discontinued any work with me.  No

5   entity has.  I did disconnect from Oneida County many

6   years ago, partially because of the drive and partially

7   because they decided to replace their coroners, who I

8   worked for several years with and had a good

9   relationship with, and for political reasons they

10   decided that they didn't like coroners anymore.  So, I

11   left when the coroners did.

12     Q.  At the time of the Michael Davis trial in

13   2015-2016, do you recall testifying that you were

14   performing approximately 600 autopsies a year?

15     A.  Yes.

16     Q.  And that the NAME recommended amount per year was

17   250; is that fair?

18     A.  Yes.

19     Q.  And that at the ceiling they didn't want you

20   doing more than 360 per year?

21     A.  Correct.

22     Q.  I believe, as of 2019, when you were deposed in

23   the Thomas deposition, you were still doing several

Case 1:17-cv-08290-DJS Document 142-4 Filed 02/04/22 Page 135 of 178

1    hundred a year, approximately; is that fair?

2        A.   Yes.

3        Q.   From September of 2019 up until the present, what

4    volume of autopsies have you been doing per year?

5        A.   It would be still around the number of 600.

6        Q.   Did the numbers spike or get impacted in any

7    material way due to Covid, or did you find your caseload

8    last year was comparable to other years?

9        A.   The caseload did not really spike, but different

10   cases started to be more frequent due to Covid, but

11   there was no real increase in the actual numbers.

12       Q.   And currently, what counties are you employed by

13   or contract with to do autopsies?

14       A.   Well, I have full coverage of Rensselaer County,

15   Herkimer County, Saratoga County, Washington County and

16   Warren County, and then I also provide services as

17   needed for a number of other counties.

18       Q.   Including which ones?

19       A.   It would be Montgomery, Fulton, Hamilton,

20   Schoharie, Essex, St. Lawrence, Franklin and Clinton.

21       Q.   Are there any municipalities, state or federal

22   entities, that you work with as well?

23       A.   No.

1    Q.  Now, with regard to the number of autopsies per

2  year recommended under NAME guidelines, has that number

3  changed, to your knowledge, since we've spoken to you in

4  2019?

5      Have the recommendations gone up or down or have

6  they remained static?

7       MS. PECK:  Objection.  Brent, just to

8    clarify for the record, can we just put out there

9    what NAME is.

10  BY MR. KLEIN:

11    Q.  National Association of Medical Examiners, is

12  that the board that sets the recommendations, Dr.

13  Sikirika?

14    A.  Yes.

15    Q.  Are you a member of the National Association of

16  Medical Examiners still?

17    A.  Yes.

18    Q.  You were back in 2019 as well, correct?

19    A.  Yes.

20    Q.  Do you hold any positions, offices, titles or

21  anything else with NAME, or are you just a subscribing,

22  accredited member?

23    A.  I'm just an associate member.

Case 1:17-cv-01290-DJS Document 147-4 Filed 02/04/22 Page 137 of 178

1    Q.   What does that mean?

2         Do you pay dues each year and you're an associate

3    member?  Do you have to do anything else, like show that

4    you're licensed or submit any other credentials to them,

5    or is it just paying dues?

6    A.   No.  You have to apply with your license

7    initially and your certification, but now it's simply a

8    question of paying your dues.

9    Q.   So, we'll refer to the National Association of

10   Medical Examiners as NAME.

11        Is that okay for today?

12   A.   Yes.

13   Q.   Have the NAME recommendations with regard to --

14   withdrawn.

15        This guideline of 250 autopsies per year with a

16   ceiling of 360, are these guidelines or recommendations?

17   A.   Well, they're guidelines for accreditation of

18   facilities.

19        So, a facility cannot employ a pathologist who

20   does more than that number and still keep their

21   accreditation if they're NAME accredited.

22   Q.   So, how do the facilities that you contract with

23   get around that, or are they not facilities, they're

Case 1:17-cv-01290-DJS Document 112-4 Filed 02/04/22 Page 139 of 178

1    municipalities or counties?

2          Can you explain how that works?

3      A.  Yes.  I don't work actually at any medical

4    examiner's offices.  I work in different hospitals using

5    their morgue facilities.

6          That was the issue with Albany, that I really

7    wanted to spearhead an effort to build the facility in

8    Albany that could be NAME accredited eventually, and

9    hire a sufficient number of pathologists to meet the

10   accreditation, but that wasn't forthcoming, so I left.

11     Q.  Are there any ramifications for professionals

12   like yourself for professionally, whether from NAME or

13   any other entity, for routine, you know, systematically

14   engaging in autopsies that greatly exceed the

15   recommended amount under NAME guidelines?

16     A.  No.

17     Q.  Have you received any critique, pushback or

18   criticism of any sort from any professional hospital,

19   organization, county employer or anyone else, about the

20   number of autopsies you do per year as it relates to

21   your ability to effectively do your job?

22              MS. PECK:  Objection.

23              THE WITNESS:  No.

Case 1:17-cv-08290-DJS Document 112-1 Filed 02/04/22 Page 207 of 178

 1  BY MR. KLEIN:

 2     Q.  You were cross-examined about it at trial in the

 3  Davis case, correct?

 4     A.  Correct.

 5     Q.  I think in the Thomas case as well, correct?

 6     A.  Yes.

 7     Q.  So, other than being -- so, have you been

 8  cross-examined about it in the other cases that you can

 9  recall or just those two?

10     A.  Multiple times.

11     Q.  So, it's been an issue raised at trial, but

12  beyond that it hasn't been raised -- it hasn't impacted

13  your employment at all.

14     A.  Correct.

15     Q.  In your opinion -- you've been doing this for how

16  many years, sir?  How long have you been a forensic

17  pathologist?

18     A.  Since it would be early '90s, early '90s.

19     Q.  You've done well over 10,000 autopsies, right,

20  and maybe significantly more?

21     A.  Yes.

22     Q.  In your opinion, looking back and looking at

23  these issues you have with Albany and wanting to have a

1   full staff of MEs, can you state now that the number of

2   autopsies you've done per year has impacted your ability

3   to do your job to the fullest?

4          In other words, has it impacted your ability to

5   put enough time and focus into each autopsy given you're

6   doing two or three a day.

7                  MS. PECK:  Object to form.

8                  THE WITNESS:  It has not affected the

9   quality of my work.  The only thing it has affected is

10  the speed of getting out my reports.

11  BY MR. KLEIN:

12     Q.  I think you said your personal life, you

13  sacrificed personal time for this as well, correct?

14     A.  Yes.  I have no personal life.

15     Q.  So, have there been any changes in the NAME

16  guidelines or procedures since we last spoke in

17  September 2019 that you're aware of?

18     A.  Not that I am aware of, Mr. Klein, no.

19     Q.  In Thomas and in this case there were district

20  attorney and police officers attending your autopsy; is

21  that correct?

22     A.  Yes.

23     Q.  So this idea of law enforcement attending an

# APPENDIX

**514**

21

1   autopsy, have any of the -- are there any guidelines or

2   rules or regulations or best practices that govern that?

3       A.   Not to my knowledge.  They attend in some places

4   and some places they don't.

5       Q.   Have you read any peer review articles from

6   colleagues or, you know, in your field who have said

7   that it's not proper or not recommended to have law

8   enforcement influence or give a narrative before you

9   objectively conduct your autopsy?

10              MS. SPENCER:  Object to form.

11  BY MR. KLEIN:

12      Q.   In sum and substance.

13      A.   The National Academy of Sciences said that the

14  medical examiners should not be influenced by police or

15  prosecution.  That's true.  I've read that in the past.

16  But influence and attending are two different things.

17      Q.   Has there been any evolution of that -- other

18  than National Academy of Science, has there been any

19  evolution of that in terms of rules, guidelines or best

20  practices in the field, or not to your knowledge, in the

21  last couple of years?

22      A.   Not on influence.

23      Q.   Now, your grand jury testimony in this case, that

1    was on September 29th of 2015.  Does that date sound

2    about right?

3          I don't know if you have it in front of you, but

4    did you testify in the grand jury in September of 2015?

5    A.  Yes.

6    Q.  You've had a chance to review it either today or

7    yesterday, recent days?

8    A.  Yes.

9    Q.  Did you tell the truth as to all matters in the

10   grand jury?

11   A.  Yes.

12   Q.  Now, the prosecution turned over some of your

13   grand jury testimony as Brady material to Mr. Davis's

14   attorneys.

15         Were you aware of that?

16   A.  I wasn't aware of that, no.

17   Q.  Did anyone from the prosecution ever discuss with

18   you that they felt some of your testimony may have been

19   exculpatory?

20   A.  No.

21   Q.  Now, your trial testimony was on -- just getting

22   the date -- August 22nd of 2016.

23         You've had a chance to review it in full?

1    A.   Yes.

2    Q.   Did you tell the truth as to all matters in that

3  court?

4    A.   Yes.

5    Q.   Looking back at your testimony now, having

6  considered Dr. Teas' testimony and anything else, is

7  there anything about your opinions and otherwise about

8  your testimony that you would wish to change or amend in

9  this case?

10   A.   Not that I could see at this point, no.

11   Q.   Has there been any -- have you done any research

12  on postmortem liver lacerations or CPR injuries,

13  postmortem CPR injuries, or are you aware of any peer

14  review articles or authoritative treatises on this issue

15  that have come out since this trial?

16   A.   No.

17   Q.   Have you attempted to search for any or you just

18  don't know either way?

19   A.   I have searched for those and I haven't found

20  any.

21   Q.   You have seen some articles on hemorrhage from

22  hepatic lacerations after CPR.  Have you seen articles

23  about issues like that?

1    A.  Yes.

2    Q.  Have any of the articles or treatises or peer

3 review articles that you've read, have any of them

4 impacted or changed your review of this case in any way?

5    A.  No.

6    Q.  Can you point to any that support your opinions

7 in this case?

8          MS. SPENCER:  Object to form.

9          MS. PECK:  Objection to form.

10         THE WITNESS:  Yes.  Offhand, I can

11    remember one paper from Wake Forest University.

12    It was probably about 2010.  They looked at close

13    to 400 children who had undergone CPR, and none

14    of them had any significant injuries.

15        The only injuries that tended to occur

16    were injuries to the airway around the mouth.

17    None of them died.  None of them had major liver

18    lacerations.

19 BY MR. KLEIN:

20    Q.  Was that an article you were aware of as of the

21 time of the Michael Davis trial in 2016, or is that

22 something you've become aware of since the trial?

23    A.  I was aware of that at the trial.

1    Q.   Other than that Wake Forest article, are there

2    any others that either you have in your file noted or

3    that come to mind that you believe support your

4    positions in this case?

5    A.   Not offhand I can remember.

6            MR. KLEIN:   I'm going to ask that we mark

7        your file, at least as I believe I received it.

8        We'll call it Sikirika 1, and I'll share the

9        screen and then I'll send it to the court

10       reporter after I guess to mark it.

11           (Sikirika Exhibit 1 marked for

12       identification.)

13   Q.   Let me ask you this, Dr. Sikirika:   In this case,

14   ▮▮▮▮▮▮▮▮▮  died in February of 2016, about February

15   26th, correct?

16   A.   Yes.

17   Q.   You did an autopsy on February 27th.

18       Does that sound right?

19   A.   Yes.

20   Q.   There was subsequent meetings with

21   representatives from the Troy PD and someone from the

22   DA's office sometime around mid-March.

23       Do you recall that?

Case 1:17-cv-08290-DJS Document 141-1 Filed 02/04/22 Page 279 of 178

26

 1      A.   I think it was early March, yes.

 2      Q.   Early March.

 3           And then was the next thing you issued your

 4   report sometime in August or so?

 5      A.   Yes.

 6      Q.   And then you, thereafter, met with the DA's

 7   office after that?

 8      A.   Yes.

 9      Q.   And then you testified in the grand jury?

10      A.   Correct.

11      Q.   And then you testified at trial?

12      A.   Correct.

13      Q.   Presumably, you met with the DA to prepare for

14   trial at least once or a few times, correct?

15                MS. PECK:  Objection to form.

16                You can answer.

17                THE WITNESS:  Yes.

18   BY MR. KLEIN:

19      Q.   Have I missed any significant meetings in this

20   case, or events?

21      A.   I did meet with the defense attorneys as well,

22   yes.

23      Q.   And was it just -- how many defense attorneys

1    were there?

2        A.   I can't recall.  At least one.

3        Q.   Would you have taken notes at a meeting like that

4    or just no notes?

5        A.   No.  It was an informal meeting.

6        Q.   And we'll go through the meetings, but have I

7    covered all of the events that you can recall in this

8    case in terms of key events in this case that you were

9    involved in?

10       A.   Yes.

11       Q.   Now, when you testified at trial in 2016, did you

12   witness or have an opportunity to read the testimony of

13   any other witnesses during the trial, either after they

14   testified or did you witness their testimony in

15   realtime?

16       A.   I witnessed the testimony of Dr. Teas in

17   realtime, yes.

18       Q.   So, did reviewing the testimony transcript in

19   recent days, did that refresh your recollection of what

20   you observed her testify to in court?

21       A.   Yes.

22       Q.   Was there any discussion of you going up to do

23   rebuttal testimony after Dr. Teas testified?

Case 1:17-cv-08290-DJS Document 112-4 Filed 02/04/22 Page 297 of 178

1    A.  Yes, there was.

2    Q.  Was a determination made that you would not do

3  that?

4    A.  Well, the judge didn't allow rebuttal.

5    Q.  Is it your understanding that the prosecution

6  sought permission to do it but the judge wouldn't allow

7  it?

8    A.  Correct.

9    Q.  Do you recall what the subject of your rebuttal

10  was going to be?

11    A.  It would be her testimony.

12    Q.  Anything in particular, though, that you recall

13  that was point or points that you planned to address on

14  rebuttal?

15    A.  Yes.

16    Q.  Can you state them now?

17    A.  The idea that the histology would be an important

18  factor in determining the origin of these liver

19  lacerations and the timing of them.

20      The idea that the child was suffering from

21  diabetes, was undiagnosed.  They were all issues that I

22  was prepared to contend with.

23    Q.  The histology being important, how would you have

1  addressed that?

2    A.  I think Dr. Teas made assumptions that the

3  microscopic appearance of the tissues would indicate

4  that they were postmortem as opposed to antemortem, and

5  I think that was flawed logic.  I think that was never

6  been established in any literature and she never

7  published any discovery of that process or that

8  knowledge by herself.  I think it was faulty science.

9        In regards to the ability to look at the

10  microscopic slides and say that you could differentiate

11  when that occurred to that degree of certainty is very

12  flawed, and I think that's a misinterpretation of

13  science.

14    Q.  That has to do with the histology aspect of it?

15    A.  Yes.

16    Q.  What about the idea that ████ may have been

17  suffering from diabetes, you mentioned that.

18        What did Dr. Teas opine about that and what was

19  your rebuttal -- what would it have been if you were

20  permitted to give it?

21    A.  Well, that Dr. Teas said the child could have

22  suffered from undiagnosed diabetes when the child was

23  totally asymptomatic for the symptoms of diabetes.

Case 1:17-cv-08290-DJS Document 14-994 Filed 02/04/22 Page 319 of 178

30

1    She had no polyuria, no polydipsia, no

2    polyphagia.  Those are signs of diabetes.

3    And when the child had made it to the emergency

4    room, a fingerstick glucose was not indicative of any

5    sort of diabetic reaction.

6    Q.  She had a point about that, though, that you

7    could tell from the fluid in the eye but that other

8    blood inter stick would not have been accurate at that

9    time.

10   Do you recall that point that she made about

11   that?

12   MS. PECK:  Objection to form.

13   THE WITNESS:  Yes.  She made a legitimate

14   point that diabetes can be detected in the

15   vitreous fluid if the person is hyperglycemic, if

16   their sugar's very high.  Typically it's above

17   500 that we would expect in a diabetic to die

18   from this in a process called ketoacidosis.

19   But this child had nothing close to that

20   level in the bloodstream, and she had a glucose

21   that was actually diminished, most likely due to

22   the postmortem changes that occurred in the blood

23   after death.  Glucose tends to fall.  There was

Case 1:17-cv-08290-DJS Document 71-1 Filed 02/04/22 Page 32 of 178

1     no evidence of any hyperglycemia.

2  BY MR. KLEIN:

3    Q.  Other than the histology point, the undiagnosed

4  diabetes point, were there any other points that you

5  planned or hoped or would have liked to have rebutted if

6  you had the opportunity to?

7          MS. SPENCER:  Object to form.

8          THE WITNESS:  Well, the idea that the

9     child suffered from death due to a seizure is

10     also erroneous.  Children, unless they have some

11     physiological defect, unless there is a lesion in

12     the brain, unless there is something that causes

13     a mass effect in the brain, they do not die from

14     seizures when you're a child.  It just doesn't

15     happen.

16  BY MR. KLEIN:

17    Q.  Any other points that you would have liked to

18  have rebutted had you been given the opportunity to do

19  so?

20    A.  That's all I can think of right now.

21    Q.  If you think of any others, let me know.

22    A.  Yeah.

23    Q.  Do you have an opinion about Dr. Teas otherwise?

1       Did you know of her before this?  Have you had

2  any dealings with her personally in your career?

3     A.  No, never.  I never met her before.

4     Q.  Do you have any opinion about her in terms of

5  respect for her as a colleague?  Have you ever formed an

6  opinion about her work?

7     A.  I can only address what she presented at the time

8  of the trial.  And that was, in my opinion, substandard.

9     Q.  Have you dealt with her in the context of your

10  dealings with NAME, or read about her work in any other

11  cases, or have colleagues that have dealt with her

12  before, other than your dealings with her in this case?

13     A.  No.

14     Q.  Did you ever have a chance to speak with her

15  about her opinions in this case since the time of trial

16  up until today?

17     A.  No.

18          MR. KLEIN:  I'm now going to share a

19       screen.  Hopefully I'll do this right.

20     Q.  Do you see, Dr. Sikirika, what's been marked as

21  Sikirika 1?  It's 121-page document, starting with Bates

22  number 1585 at the bottom and it goes consecutively

23  through Bates number 1705.

1          Do you see the screen?  Do you see these

2     documents?

3     A.   Yes.

4     Q.   Do I need to enlarge it or make it smaller?

5          Can you see it clearly?

6     A.   No.  It represents my case file.

7     Q.   Do you see any other parts of my screen or do you

8     just see this one document?

9     A.   I see -- right now I see a pink form from Neogen

10    Corporation, which is a part of the receipt that I sent.

11    Q.   And the next page is a record of court appearance

12    made by Michael Sikirica.

13         Is this part of your file?

14    A.   Yes.

15    Q.   So, I just want to know, generally, if this

16    appears to be your complete file.  Can I just flip

17    through it and you can let me know if it appears to be

18    your file and then we'll stop at certain pages?

19    A.   Yes.

20    Q.   I'm just going to slowly scroll through it.

21         MS. PECK:  Brett, I think we may be able

22     to give him remote control of it to allow him to

23     go through it once to make sure it's all there.

```
 1              MR. KLEIN:  Let's do that.

 2              (Recess taken.)

 3   BY MR. KLEIN:

 4      Q.  That appears to be all your file notes, your

 5   report, etc., correct?

 6      A.  Yes.

 7      Q.  Other than with the exception of the photos that

 8   have some notations on them that we'll hopefully be able

 9   to see today?

10              MS. PECK:  Yes.  With the exception of

11        the CDs that we discussed this morning.

12              MR. KLEIN:  Got it.

13   BY MR. KLEIN:

14      Q.  So, Dr. Sikirika, I just want to walk through

15   some key parts of your file that we want to ask you

16   about it and try to get you out of here at a decent

17   time.

18          This date appeared on page 1586.  Is this your

19   grand jury appearance?

20      A.  Yes.

21      Q.  It says below at the bottom "meeting 4/10/16" or

22   is that some other date?

23      A.  It seems to say "meeting 8/1/16".
```

 1      Q.   Well, above that, in the middle of the sheet,

 2   says, "20 minutes 9 a.m. DA office with public defender

 3   and ADA Hall"?

 4      A.   Yes.

 5      Q.   Is that a prior meeting?

 6      A.   That is -- I think that is the meeting, yes.

 7      Q.   You believe that's the meeting you had with the

 8   public defender?

 9      A.   Yes.

10      Q.   And then it says there's another meeting at the

11   bottom on 8/1/16.

12      A.   Yes.

13      Q.   Do you recall who that was with?

14      A.   It might be listed in one of my meeting sheets,

15   but I don't recall that.

16      Q.   Now, starting on page 1587 through 1597, is this

17   your autopsy report for ██████████?

18      A.   Yes.  Not including the other studies, correct.

19      Q.   Are the other studies considered part of the

20   report, such as the lab reports?

21      A.   Yes.

22      Q.   So 1598, this page, PerkinElmer Genetics.

23           Is this part of the autopsy?

1    A.   It would be part of the autopsy report, yes.

2    Q.   The next page, 1599, is this part of the autopsy?

3    A.   What does that page say?

4    Q.   It's also PerkinElmer Genetics.

5        Looks like a report --

6    A.   Yeah.  That would be the report from the

7  metabolic screen that I sent out.

8    Q.   And the next page is a skeletal survey.

9        Is that part of the autopsy?

10    A.   Yes.

11    Q.   And then the next page to -- next three pages,

12  are these part of the autopsy from the Albany Medical

13  Center?

14    A.   Yes.

15    Q.   Cultures?

16    A.   Blood and viral cultures, yes.

17    Q.   That's pages 1601, 1602, 1603.

18        Then, 1604, is this part of the autopsy, this

19  growth chart?

20    A.   Yes.

21    Q.   1605, that's part of the autopsy?

22    A.   Yes.

23    Q.   And then we have a forensic toxicology report,

1  1606, is that part of the autopsy?

2     A.   Yes.

3     Q.   And then we have a sign-in sheet, so this would

4  not be part of the autopsy.

5     A.   Correct.

6     Q.   So the autopsy, is the last page of the autopsy

7  inclusive of reports, this page, forensic toxicology

8  report, page 1606?

9     A.   Yes.

10    Q.   Are the photos considered part of the autopsy or

11 those are just part of your file but technically not

12 part of the report?

13    A.   The photos are not given out as a part of the

14 report, correct.

15    Q.   So, I believe that, as of February 27, 2015, you

16 listed the cause of death as pending until you completed

17 your review and analysis and issued a report, correct?

18    A.   Yes.

19    Q.   So, can you just describe for the record what

20 were the circumstances here that led to the district

21 attorney and Troy PD officers being present at the

22 autopsy on the 27th before there was any sense of

23 whether there was criminality or not?

```
1              MS. PECK:  Objection to form.

2              MS. SPENCER:  Object to form.

3              THE WITNESS:  I really can't speak for

4       them, but it's not uncommon, in a childhood death

5       of any sort, that the police are going to be

6       present.

7  BY MR. KLEIN:

8     Q.  Well, did anyone from Troy PD or the DA's office

9  inform you that they were suspicious of this death as

10 being -- rising to the level of criminal rather than

11 accidental or some other unexplained cause, as of the

12 date of your autopsy?

13    A.  No, not that I recall.

14    Q.  Would you recall that?  I know you do several

15 hundred a year.  You've done thousands since then.

16         Is that the kind of thing that you would recall

17 or you just don't recall either way?

18    A.  I'm not sure I would recall it, but would not be

19 common for them to come and tell me that they suspect

20 something.

21    Q.  You have done thousands of autopsies since

22 February 26, 2015; is that true?

23    A.  Correct.
```

1    Q.   And do you have any independent recollection of

2    working on this case, working on ▓▓▓▓▓▓▓▓▓?

3         Separate and apart from looking at your report

4    and reviewing the photos, do you have an independent

5    recollection of your dealings with the autopsy or anyone

6    subsequent to that in this case?

7    A.   No.  I don't, no.

8    Q.   Do you remember the trial generally?

9         I mean, you don't testify at trials all the time,

10   do you?

11   A.   No.  Many of my cases don't require a trial.

12   Q.   So, do you remember the trial even if you don't

13   remember the specifics of it?

14        Without reviewing your testimony, do you remember

15   going to trial?

16   A.   Yes, I do.

17   Q.   Were you in court or with the DA's office at the

18   time of the acquittal or were you somewhere else when

19   the acquittal became -- was handed down?

20   A.   I would not have waited around at the DA's

21   office.  I would be back doing something else.

22   Q.   Who notified you of the acquittal, if anyone?

23   A.   I don't recall.

1    Q.  Did anyone ever give you -- from the DA's office

2    or the police department -- ever discuss with you why

3    they thought Michael Davis was acquitted in this case?

4              MS. PECK:  Object to form.

5              THE WITNESS:  I don't recall, but I did

6        have a meeting shortly afterwards, after the

7        acquittal, with two representatives, the district

8        attorney and the assistant district attorney, in

9        my office.

10   BY MR. KLEIN:

11   Q.  Joel Abelove, was he one of them?

12   A.  Yes.

13   Q.  He came to your office in Watertown?

14   A.  Waterford.

15   Q.  Who did he come with?  Was it ADA Hall, who tried

16   the case, or someone else?

17   A.  It was Jessica Hall.

18   Q.  Was the meeting specifically to do like a --

19   excuse the pun -- a postmortem for this case?

20        What was the reason for this meeting?

21   A.  I requested a meeting myself.

22   Q.  Were you upset about the outcome and wanted to

23   discuss what happened in this case?

1       What was the -- why did you request it yourself?

2               MS. PECK:  Object to form.

3               MS. SPENCER:  Object to the form.

4               THE WITNESS:  I requested the meeting

5       because I thought the prosecutor had very poor

6       performance in her duty during this trial, at

7       least what I witnessed of it.

8               Because I was able to witness Dr. Teas'

9       testimony, and I thought the prosecutor, frankly,

10      was inept.

11  BY MR. KLEIN:

12    Q.  Did you prepare with her for trial alone with her

13  or with anyone else pretrial?

14    A.  Well, the first meeting I had with the

15  prosecutor, it was very short, and I requested that she

16  return for a second meeting with Assistant District

17  Attorney Hall, which she did.

18      I was able to explain the case to them, but I'm

19  not sure the primary prosecutor ever had a good handle

20  on what this case was about.

21    Q.  So, when you requested the second meeting with

22  ADA Hall after the first meeting with just the line

23  prosecutor, did you let ADA Hall or Joel Abelove know

1    that you wanted a meeting with someone senior because of

2    your concerns about the first meeting?

3        A.  Yes.

4        Q.  Who did you notify?  Was it Joel Abelove

5    personally or someone else?

6        A.  I had my assistant -- to the best of my

7    recollection, I had my assistant schedule a meeting.  I

8    told -- believe her name was Cindy, if I could check my

9    records.

10       Q.  Sure.

11               MS. PECK:  Brett, just so you know, he's

12           got a hard copy of his file in front of him.  So,

13           that's what he's checking.

14               The only thing I'd ask, Doc, is whatever

15           you're looking at to check your records, if you

16           could just hold it up to the computer so that

17           Brett can see what you're looking at.

18               THE WITNESS:  Yes.

19               The first record I had of the meeting

20           with Cindy Chavkin was on the 28th of July of

21           2016, and then we had a meeting again with her,

22           and at this point Jessica Hall and myself, so I

23           could really explain the case details to them.

```
 1              I don't think Ms. Chavkin really
 2       understood the medical aspects in this case.
 3  BY MR. KLEIN:
 4    Q.  In what way?  Was she pushing back on your cause
 5  -- your determinations of cause of death or manner of
 6  death or anything else?
 7          Was it just she wasn't grasping -- what specific
 8  can you point to?
 9               MS. PECK:  Object to form.
10               THE WITNESS:  It was like talking to a
11       rock.
12  BY MR. KLEIN:
13    Q.  Was there any type of, just if you know, argument
14  you had with her about this or did you leave -- did you
15  kind of end the meeting early, your first meeting with
16  Cindy Chavkin?
17          How did that go in terms of the demeanor of the
18  meeting, the tone of the meeting, and how it ended?
19               MS. PECK:  Objection to form.
20               THE WITNESS:  No.  The first meeting was
21       very pleasant.  I just got the feeling that she
22       was not picking up on the issues here.
23               We left on very politely, and I said, I
```

1      think it's important that you return with a more

2      experienced prosecutor to go over this.

3  BY MR. KLEIN:

4      Q.  Was she skeptical about whether there was

5  criminality in this case?

6              MS. PECK:  Objection.

7              THE WITNESS:  Not at all.  She did not

8      understand any of the case.  She did not

9      understand the medical issues of this case.

10             She wasn't skeptical of anything.  She

11     made no objection to my ruling.  She didn't

12     contest it.  She just didn't understand it.

13 BY MR. KLEIN:

14     Q.  And then, how long did that meeting last, the

15 initial one with Cindy Chavkin?  Was it brief?  Was it

16 an hour?  How would you...

17     A.  It would have been less than an hour.

18     Q.  It looks like you had a meeting on 8/1/16.  So

19 I'm looking -- I'm showing you on the screen page 1607.

20         Does this look like it was the next meeting that

21 you had after July 28th with Cindy Chavkin, yourself and

22 Jessica Hall?

23     A.  Yes.

1     Q.   And how long did this meeting last?

2     A.   It would have probably been about an hour.

3     Q.   Was this prep for grand jury or what was the

4  purpose of this meeting -- this was trial, actually,

5  right?

6     A.   Yes.

7     Q.   Who prepped you for grand jury?

8     A.   No one prepped me for grand jury.  They simply

9  instructed me to be there.

10    Q.   Who presented it to the grand jury?

11         Was it Jessica Hall or do you recall?

12    A.   To the best of my knowledge, I can't recall.

13    Q.   I'll check it out.

14         How did the meeting go on August 1st with Jessica

15  Hall present?  Did she understand the case?

16    A.   Jessica had a much better understanding of the

17  case, and I thought that she would be able to

18  communicate her understanding to Ms. Chavkin in a way

19  that I couldn't.

20    Q.   And then, after that, from that date up until

21  trial, did you have any other meetings with the

22  prosecution, or was that your prep meeting?

23    A.   That would have been the prep meeting.

1    Q.  Then I believe we said you testified on...

2        MS. PECK:  August 22nd.

3  BY MR. KLEIN:

4    Q.  From August 21st through August 22nd, you didn't

5  have any further meetings with the DA's office about

6  this case?

7    A.  Not to my recollection.

8    Q.  Cindy Chavkin presented your testimony at trial?

9    A.  Yes.

10    Q.  And did she have a second chair or was she a

11  second seat to another attorney at trial?

12    A.  No.  She was not.

13    Q.  She was alone up there.

14    A.  Completely alone.

15    Q.  So, when your testimony ended, did you see Dr.

16  Teas the same day or was Dr. Teas another day?

17    A.  I can't remember if it was the same day or if it

18  was the next day.  I can't remember.  I was there for

19  her testimony.

20    Q.  After you testified, did you have any further

21  meetings with the prosecution to help them prepare for

22  Dr. Teas?

23    A.  I had 15 minutes to talk to Ms. Chavkin.

**APPENDIX**

1     Q.  Did you do that in the courthouse hallway or

2  where did that take place?

3     A.  We went down to the office of the district

4  attorney.

5     Q.  Was that on the day that Dr. Teas testified or

6  some other time?

7     A.  That was after she testified and before we asked

8  for a chance to rebut her testimony.

9     Q.  So, were you concerned at that point that,

10  between the way your testimony went and the way Dr. Teas

11  went, that you needed to get back in there or this case

12  could be lost?

13          MS. PECK:  Objection.

14          MS. SPENCER:  Objection.

15          THE WITNESS:  I thought I had to get back

16     in there to explain her testimony and her

17     conclusions.  I had to counter her conclusions.

18  BY MR. KLEIN:

19     Q.  And then, at some point, did Cindy Chavkin let

20  you know that the judge disallowed it?

21     A.  I was in the courtroom when the judge disallowed

22  it.

23     Q.  And then you left?

APPENDIX 541

48

Case 17-2901, Document 70-1, 11/13/2017, 2165404, Page49 of 178
Case 1:17-cv-08290-DJS Document 1-1 Filed 02/04/22 Page 49 of 178

1      A.   Yes.

2      Q.   Then at some point thereafter you heard about the

3    acquittal?

4      A.   Yes.

5      Q.   And then, how long after that did you reach out

6    to set up this meeting with Joel Abelove and Jessica

7    Hall?

8          Was it upon hearing about the acquittal or weeks

9    or months later, if you know?

10     A.   It would have been very shortly afterwards, maybe

11   the same day.  I instructed one of the investigators

12   that I had to talk to them immediately, and we had the

13   meeting at my office.

14     Q.   Did you convey that message through your

15   assistant that you were upset about how the case went?

16              MS. PECK:  Objection.

17              MS. SPENCER:  Object to form.

18              THE WITNESS:  Yes.

19   BY MR. KLEIN:

20     Q.   How did you communicate that?  Let them know I

21   need to see them right away, or what type of words or

22   message was communicated?

23     A.   Well, I told the investigator for the office that

1    I wanted to see them immediately, and they came.

2      Q.  And can you describe, walk us through that

3    meeting?

4        Who was present for it and what was discussed?

5      A.  Well, this is the meeting with Jessica Hall and

6    Joel Abelove.  That was the meeting.  And we discussed

7    the -- we discussed the prosecution ineptness at

8    following through on questioning Dr. Teas.

9        Also, the judge had not given -- in my opinion,

10   the judge had not given me enough time, for 15 minutes,

11   to go over the flaws I found in Dr. Teas' testimony, and

12   I was very frustrated.

13     Q.  So, what was the tone of the meeting?  Was it

14   just you venting or was it -- did they share your

15   concerns, or did they push back on it, or something

16   else?

17     A.  They were like spanked puppies.

18     Q.  What do you mean by that?

19     A.  They were very apologetic and they totally

20   understood where I was coming from.

21     Q.  Dr. Sikirika, were you a little sore, so to

22   speak, from the experience you had the year before on

23   the Adrian Thomas acquittal?

1    Did that prompt some of your feelings in seeking

2  a meeting with the DA directly after this?

3         MS. PECK:  Objection.

4  BY MR. KLEIN:

5    Q.  You can answer.

6    A.  No.  This was a whole different animal.

7         This was my frustration with an attorney that I

8  did not think belonged in a prosecutor's office.  That

9  was the extent of my frustration.

10        This woman may be a fine person, I'm sure she

11  was, but she did not belong in the courtroom.

12    Q.  What did Joel Abelove say in response that you

13  can recall?

14        Did he agree?  Did he say he would look into it

15  or anything else?

16    A.  He did.  He basically said, I understand where

17  you're coming from.  She came highly recommended and I'm

18  very disappointed in her performance.

19    Q.  What about Jessica Hall, what if anything do you

20  recall her saying at the meeting?

21    A.  Basically the same thing.

22    Q.  What else was said at the meeting that you can

23  recall?

1    A.  That was about it.

2    Q.  Was anyone else present at the meeting other than

3  you, DA Abelove, and ADA Hall?

4    A.  No.

5    Q.  To your knowledge, did they take any job action

6  against ADA Chavkin, whether a transfer, demotion or

7  anything else, because of this case?

8            MS. PECK:  Objection.

9            THE WITNESS:  Not to my knowledge.

10  BY MR. KLEIN:

11    Q.  Have you dealt with her again since that case up

12  until today?

13    A.  No, and I never will.

14         (Sikirica Exhibit 2 marked for

15    identification.)

16    Q.  Now, DA Abelove issued a statement to the press.

17  I'm showing it to you now.  Do you guys see this?  We'll

18  call this Exhibit 2, Sikirika 2 -- this is Defendant's

19  Response to Plaintiff's Request for Interrogatories and

20  Request for Production of Documents.

21      I will scroll down to page Exhibit C which starts

22  at page 53.

23      Did you ever see or were you aware of the

1  statements that Joel Abelove made to the press about

2  this case?

3    A.  No, I was not.

4    Q.  In this article in the Troy Record entitled

5  "Former Professional Basketball Player Acquitted in

6  Lansingburgh Toddler's Death", dated August 25, 2016,

7  Abelove says -- there's a statement attributed to him

8  admitting -- the bottom of the page we're looking at

9  now, which is 54 in this packet.

10      Admitted the case against Davis prosecuted by

11  Assistant District Attorney Cindy Chavkin was not a

12  strong one, but he added that he did not regret pursuing

13  it.

14      Did he ever indicate to you that this was not a

15  strong case?

16    A.  No.

17    Q.  Did you ever hear any statement that the case was

18  weak attributed to Abelove, or anyone in the DA's

19  office, prior to me just telling you about this article?

20    A.  Never did.

21    Q.  Now, going back to Exhibit 1.  I want to go back

22  to your -- well, let's just continue to talk about the

23  trial and then we'll talk about your autopsy.

1    At the trial, did you witness or were you made

2 aware of the testimony of the responding fire department

3 witness named Bayly?

4    A.  Well, I was not aware or -- I was not made aware

5 of his testimony, but I did have the copy of a statement

6 that he had previously made.

7    Q.  Right.  I'm going to flip to that right now on

8 Exhibit 1.

9    Michael Bayly, from the City of Troy Fire

10 Department, issued a statement.  The Bates number in

11 Exhibit 1 is 1682.

12    Is this the statement that was in your file?

13    A.  Yes.

14    Q.  So, in this statement, other than receiving this

15 written typed out deposition, did you ever meet or speak

16 with Michael Bayly?

17    A.  No.

18    Q.  Other than receiving written or typed out

19 depositions from other fire department employees, like

20 James Titans, lieutenant, James Lucey, firefighter

21 medic, Frank Shumaker, captain, and maybe others, did

22 you ever speak with any of them?

23    A.  No.

**APPENDIX** **547**

1   Q.  Did you come to learn, either during trial or

2   since trial, that Firefighter Bayly testified that they

3   were working on ███████ for about 20 minutes, doing I

4   believe as many -- approximately a hundred chest

5   compressions a minute from the time they started working

6   on her in the home.  There was a period of time until

7   they put her in an ambulance, maybe about 10, 15

8   minutes.  And there was another 20-minute period of time

9   where they continued working on her a hundred chest

10  compressions per minute to the hospital.

11      Were you aware of that, of in sum and substance

12  testimony of that nature by Firefighter Bayly?

13   A.  I knew that the child had received CPR

14  resuscitation at the scene and during transport and in

15  the emergency room.

16      I'm not sure I could imagine 100 pumps per

17  minute, but I was aware that CPR had been given to her

18  over a long period, yes.

19   Q.  Actually, I have the details here.

20      Bayly, who was the EMT, said 120 per minute is

21  what he recalled.  16 minutes at home and then 20

22  minutes on the way to the hospital, with three or so men

23  switching because of exertion, to avoid being exerted.

1       Are those facts that you were aware of when you

2   issued your report?

3       A.   Yes.

4       Q.   You knew that there were thousands of chest

5   compressions just done by EMTs alone before she even got

6   to the hospital?

7       A.   Yes.

8       Q.   And then there was a Dr. Crisafulli, an ER

9   doctor, from St. Mary's.

10      Did you have a deposition from her?

11      A.   Yes.

12      Q.   And I'm showing you that, page 1689.

13      This deposition, other than this written

14  deposition, did you ever speak with her?

15      A.   No.

16      Q.   This doesn't say anything about the number of

17  chest compressions that were done by hospital staff,

18  does it?

19      A.   No.

20      Q.   She testified at trial.  Did you know that?

21      Did you see her testimony or did you ever get to

22  read it?

23      A.   No.

56

1    Q.  She said that the standard, or the proper amount,

2    is a hundred compressions per minute and that that was

3    done for 30 minutes at the hospital.

4         So, doing the math, that's another 3,000

5    compressions; am I right on that?

6    A.  Yes.

7    Q.  Approximately?

8    A.  Yes.

9    Q.  She also described different staff switching

10   because of -- to avoid exertion.  Even with a small

11   child, it's tiring for adults to do that many

12   compressions.

13        Is that your understanding of the way CPR is

14   conducted even with children, that even adults would

15   have to switch because it's tiring?

16   A.  Yes.

17   Q.  So, if we have approximately 36 minutes between

18   the home and the ride to the hospital, and 30 minutes at

19   the hospital, we have approximately 66 minutes of CPR,

20   of compressions.

21        If you round it down to a hundred, that's 6600

22   compressions?

23   A.  Make it simple, yes.

1    Q.  Did you have an understanding of that when you

2    rendered your opinions in this case, that there were,

3    more likely than not, 6,000 chest compressions done by

4    fire department and hospital staff?

5    A.  Yes.

6            MS. SPENCER:  Object to form.

7    BY MR. KLEIN:

8    Q.  When medical, EMTs and hospital staff do chest

9    compressions, they are literally squishing the heart so

10   that the blood will pump through it, correct?

11           MS. PECK:  Objection to form.

12           THE WITNESS:  Correct.

13   BY MR. KLEIN:

14   Q.  Were you familiar with literature on CPR-related

15   trauma as of 2015?

16   A.  Yes.

17   Q.  Were you aware that prolonged CPR was

18   significantly associated with a higher incidence of rib

19   fractures?

20           MS. PECK:  Objection to form.

21           THE WITNESS:  Some studies have suggested

22      that, yes.

23   BY MR. KLEIN:

Case 1:17-cv-01290-DJS Document 112-4 Filed 02/04/22 Page 59 of 178

1    Q.  Any reason that you discount those or think that

2  those are not right?

3    A.  Other studies have disclaimed that, have

4  countered that.

5    Q.  Can you point to any of them?

6        Do you have them?

7    A.  The Wake Forest study.  The Wake Forest study.

8    Q.  For 2010?

9    A.  Yes.

10    Q.  Do you agree that CPR typically is performed for

11  less than 30 minutes?

12    A.  In children, it can be prolonged, yes.  Most of

13  the time it's less than 30 minutes, but in children, you

14  want to do as much as possible, and it can go on for a

15  considerable amount of time.

16    Q.  And during CPR sometimes rib fractures can't be

17  avoided.  Is that a fair statement?

18    A.  Can be voided?

19    Q.  Can't be avoided.

20    A.  Can't be avoided, that's correct, yes.

21    Q.  There are studies that document avoidable rib

22  fractures, meaning that hand placement may have been

23  incorrect by trained medical staff, right?

1          MS. PECK:  Objection to form.

2     BY MR. KLEIN:

3       Q.  Are you aware of that?

4            Are you aware of any literature where there were

5     avoidable rib fractures at the hands of EMTs or medical

6     staff?

7          MS. PECK:  Objection.

8          THE WITNESS:  Yes.  There's

9       recommendations that certain positions in the

10       hands be avoided to prevent rib fractures.

11    BY MR. KLEIN:

12      Q.  But even -- so is it your understanding, just

13    from the literature and your experience, that even

14    trained EMTs and medical providers trained in CPR can

15    get the hand placement wrong and resulting in avoidable

16    hand fractures -- avoidable rib fractures?

17      A.  I don't quite understand the question.

18          Could you repeat it, please.

19      Q.  Are there incidents that you're aware of either

20    anecdotally, through literature, or through colleagues,

21    of avoidable rib fractures at the hands of well

22    intending EMTs and medical staff?

23          MS. PECK:  Object to form.

1          THE WITNESS:  I'm not aware of those

2      studies, but I know studies have proven that, if

3      you put your hands behind the decedent and you

4      try to perform CPR, you do risk fractures.

5  BY MR. KLEIN:

6      Q.  Similarly, if you do it on a soft surface you

7  risk fracturing as well, correct?

8          MS. PECK:  Objection to form.

9          THE WITNESS:  Not so much fracturing on a

10      soft surface, but if you do it on your knee.

11          If you take a child and try and perform

12      CPR with the child's back against your knee, you

13      do risk fracture.

14  BY MR. KLEIN:

15      Q.  What were the ribs that were fractured in this

16  case?

17      A.  I believe -- if I can check my report quickly.

18      Q.  Yeah.

19      A.  They were the posterior aspects of the ninth and

20  tenth rib.

21      Q.  Are you aware of the literature or other reports

22  of ruptured livers attributed to placement of the hands

23  or compressions that are too vigorously applied by

1  medical staff, including EMTs?

2    A.  Yes.  I've personally seen that.

3    Q.  On how many occasions?

4    A.  At least half a dozen anecdotally.

5    Q.  Can you describe them under an umbrella of facts,

6  or are they each different, or is just EMTs or doctors

7  vigorously applied CPR and they did it too vigorously

8  such that the liver ruptured?

9      Or how would you describe?  Can you describe

10  these in some consistent way or are they all different?

11    A.  Well, they all tend to be associated with the

12  fractures to the anterior chest wall and the sternum.

13  These are anterior fractures.

14      The ones I have seen have been in adults, in

15  older adults particularly, when bones have calcified and

16  it's very easy to fracture ribs in an older adult.  And

17  it's not impossible to lacerate the liver with a small

18  single laceration or a small tear.  That's what I've

19  seen in my personal experience.

20    Q.  But the liver -- you're not saying the liver is

21  torn by the rib.  Right?

22      I'm talking about liver rupture due to placement

23  of hands during cardiac compression vigorously applied,

Case 1:17-cv-01290-DJS   Document 141-1   Filed 02/04/22   Page 63 of 178

1    too vigorously applied by medical staff.

2        A.   Yes.

3        Q.   Have you seen those in your experience?

4        A.   Yes.

5        Q.   So, am I correct that these are really two

6    separate things.  One, there are incidents or cases of

7    fractured ribs that occur during CPR.

8            That's one aspect of CPR-related injuries,

9    correct?

10       A.   Yes.

11       Q.   And then there's another aspect of CPR-related

12   injuries that include ruptured livers that you've seen

13   in your personal experience that occurred due to the

14   vigorous application of CPR by medical or EMTs.

15       A.   Yes.

16       Q.   Does this occur due to positioning that's too

17   low, positioning of the thorax compression at the costal

18   arch, in conjunction with violent pressure application?

19           Is this considered to be the cause of abdominal

20   organ contusions?

21       A.   Yes.

22       Q.   And the costal arch, that's the area just below

23   the sternum where the right and left lobes of the liver

1    meet, right?

2       A.   Yes.

3       Q.   The arch is bordered by the ribs, 7 through 10.

4       A.   Yes.

5       Q.   And those are the ribs that were fractured in

6    this case?

7       A.   Well, these were the posterior aspects of the

8    ribs.   Again, let me refer to this.

9           These were the back of the ribs, not the costal

10   portions of the rib.   These were the posterior portions

11   of the ribs 9 and 10.

12      Q.   So, in your experience, Dr. Sikirika, do

13   lacerations of the liver, are they usually caused by

14   compressing the abdomen below the sternum?

15      A.   Yes.

16      Q.   So, is it your opinion, Dr. Sikirika, that every

17   EMT and emergency room doctor, that they always get the

18   hand positioning right on CPR, or do they make mistakes

19   as well in your experience?

20           MS. PECK:   Objection to form.

21           THE WITNESS:   Well, in my experience, I

22      can only tell you that I see broken sternums and

23      ribs in many, many cases, and these are always

```
 1        broken along the anterior and lateral aspects of

 2        the ribs, whether it's done by EMS, or firemen or

 3        doctors.

 4              I can't tell you the position of the

 5        hand.

 6   BY MR. KLEIN:

 7        Q.  Did you ever inspect the futon where the EMTs did

 8   CPR for 16 minutes in the house?

 9            Did you ever inspect that futon?

10        A.  No.

11        Q.  Do you know whether that contributed to the

12   anterior rib fractures?

13        A.  They were posterior rib fractures.

14        Q.  I'm sorry.  Let me rephrase that.

15            Do you know whether the surface of the futon,

16   where CPR was administered for 16 minutes inside the

17   home, do you know whether that contributed to the

18   posterior rib fractures?

19        A.  It would not have contributed to the posterior

20   rib fractures.

21        Q.  Why not?

22        A.  Because it's a relatively soft surface.

23        Q.  The futon is, or the ribs?
```

1       A.   The ribs and the futon.

2       Q.   Are you aware of literature or other data

3   documenting abdominal hemorrhaging due to CPR-caused

4   liver lacerations?

5       A.   Yes.  It's been described.

6       Q.   So, here we have -- would you call the abdominal

7   hemorrhaging in this case, would you say it was massive

8   hemorrhaging?

9       A.   Yes.

10      Q.   It's your opinion that the massive hemorrhaging

11  was due to what you believe it was due to some type of

12  compression only by Michael Davis, not possibly by

13  anybody else?

14          Is that your opinion in this case?

15              MS. PECK:  Objection to form.

16              MS. SPENCER:  Objection.

17              THE WITNESS:  It was due to five

18       lacerations in the liver that are most consistent

19       with force applied to the abdomen and the back

20       simultaneously, similar to what the video I

21       reviewed showed Michael Davis doing.

22  BY MR. KLEIN:

23      Q.   Are they also consistent with CPR-caused

1   mechanisms that could be from the I think we said 6,000

2   compressions?

3         Could they be caused by that?

4            MS. PECK:  Objection.

5            THE WITNESS:  No.

6   BY MR. KLEIN:

7    Q.  No?  Not at all?  No way?

8            MS. PECK:  Objection to form.

9            THE WITNESS:  Correct.  No way.

10    Q.  Why no way?

11    A.  Because these liver lacerations were extremely

12  severe.  Actually, a portion of the liver had been torn

13  away from itself.  These went way beyond anything

14  described in the literature or in my experience.  I have

15  never seen more than one laceration of the liver with

16  any person suffering from CPR, and I've never seen

17  lacerations over the top of the liver like that.

18       These were a question of quantity.  The quantity

19  of the lacerations, the five of them, are way beyond

20  what would be expected in any kind of CPR situation.

21    Q.  So, do you dispute that  █████  Davis was found

22  unresponsive, possibly in cardiac arrest, before any

23  compressive compression was done to her by Michael Davis

1    as described in the video?

2       A.   I can't dispute that, but I can't confirm it

3    either.  I can't confirm she was in cardiac arrest.

4       Q.   If you can't dispute it, how do you know she

5    hadn't already -- she wasn't already postmortem when

6    Michael Davis attempted just a few efforts at CPR?

7       A.   Well, I found no reason for her to be dead.

8       Q.   You heard or -- you heard and you read Dr. Teas'

9    testimony about sudden unexplained death, right?

10      A.   Yes.

11      Q.   Is that something that you credit as a cause of

12   death?

13      A.   No.

14      Q.   What is sudden unexplained death and can you tell

15   us what your view on that is as a diagnosis?

16      A.   Are you referring to SUDI or SIDS?

17      Q.   Well, this would be a SUDI situation because of

18   her age, right?

19      A.   No, it wouldn't be.

20      Q.   It would be a SIDS?

21      A.   No.  It wouldn't be a SIDS at all.  It would be

22   neither.

23      Q.   Well, Dr. Teas testified that it was a SUDI

1    situation, correct?

2        A.   Yes.

3        Q.   For the record, that acronym is what?

4        A.   Sudden unexplained death in infancy.

5        Q.   What is it and why is it not applicable here?

6        A.   Well, first of all, this is not an infant.  This

7    is a toddler.  Toddler definition is of age two.  That

8    is the definition of a toddler.

9            This is not a SUDI death because this is not an

10   infant, to begin with.  We should be able to find out

11   something that caused this child's death.  So, there is

12   no syndrome of sudden toddler death that is described.

13           So, she is out of the category here of SUDI and

14   she's well out of the category of SIDS.  SIDS does not

15   occur after one year.

16       Q.   When does SUDI start?  What age?

17       A.   It's an infant, a death in an infant, and by

18   definition, an infant is up to the age of two.  Then you

19   become a toddler.

20       Q.   Right, so this...

21       A.   She assigned SUDI inappropriately to this case.

22   That does not qualify as a SUDI death.

23       Q.   What age -- what would the diagnosis be if there

1  was an unexplained death of a toddler of [REDACTED] age?

2     A.  Well, you'd have to find something, or you just

3  call it a cardiac arrythmia of undetermined etiology if

4  you could not find anything else.

5       But you can't label it with a syndrome that is

6  limited to infants.  She is not an infant anymore.  She

7  is a toddler.

8     Q.  So, SIDS goes up to age two.

9     A.  No.

10     Q.  Age one.

11     A.  Correct.

12     Q.  And SUDI starts at what age?

13     A.  It would be in infancy, which infants are called

14  toddlers after two.

15     Q.  So, [REDACTED] was old enough to be -- for her death

16  to be characterized as a SUDI death but in your opinion

17  it was not; is that correct?

18     A.  No.  She's beyond a SUDI death.  She's outside

19  the category of a SUDI because she's no longer an

20  infant.  She's a toddler.

21     Q.  So, SIDS is from birth to age one.  SUDI is from

22  age one to age two?

23     A.  It would be -- no.  It could still be used --

Case 1:17-cv-01290-DJS Document 70-1 Filed 02/04/22 Page 71 of 178

1   SUDI is just a classification of a death, unexplained

2   death in infancy, and that would include SIDS.

3        Some people use that to include SIDS.  But SUDI

4   is meant to represent deaths that occur from other

5   reasons, perhaps things like co-sleeping or something

6   that's unexplained by the autopsy in the investigation.

7        After the age of two, SUDI doesn't really apply

8   anymore because the child is no longer an infant.  So,

9   we don't have a category for unexplained deaths in

10  toddlers.  We just try and find out what killed these

11  toddlers, what caused their death.

12  Q.   There was discussion at trial about these stories

13  we hear about in the news about like seemingly healthy

14  high school athletes would just drop dead and things of

15  that nature.

16       Do you recall that?

17  A.   Yes.  That can occur and I have seen those cases,

18  yes.

19  Q.   Whether it's a toddler, or someone in their

20  preteen years, or adolescence, other instances where

21  children from two through teenage years died for

22  unexplained reasons in your experience.

23  A.   Yes.  They do die of unexplained reasons and we

1  never are able to find out.  There's always a small

2  percentage of sudden death, either in adults or

3  children, that we cannot determine from a gross

4  histologic study.

5      But that is a minute number, and that these

6  people often do have some symptoms beforehand, but they

7  go unrecognized.

8    Q.  Well, given that, whether we -- even if we don't

9  call it SUDI and Dr. Teas did and you disagree with

10  that, the applicability of that based on ████████age,

11  what is your basis for opining that this is not one of

12  those minute, rare, but still a case of an unexplained

13  death?

14    A.  Well, I can't -- I can't use that explanation to

15  describe ██████ because ██████ has a cause of death,

16  number one.  She has a cause of death of severe liver

17  lacerations beyond the scope of cardiopulmonary

18  resuscitation, beyond the scope of anything I've ever

19  seen in cardiopulmonary resuscitation.

20    Q.  Have you ever seen 6,000 chest compressions on a

21  two-year-old of her size?

22    A.  I'm sure I have.  I'm sure I've had prolonged

23  CPR.  Every child pretty much that makes it to the

1    hospital has prolonged CPR.  It's very, very common.

2         I wish the EMTs would leave them at the scene,

3    actually, when they know they're dead, because now you

4    complicate it with all the therapeutic changes that are

5    going to occur.

6         They do what they have to do to save the child's

7    life, so they do prolong CPR all the time.  It's very,

8    very common.  And I've never in my career seen anything

9    like these liver lacerations from CPR.

10   Q.  Well, do you think it would have been important

11   to know how the fire department employees actually did

12   the CPR by speaking with each one of them?

13        Same with the emergency room personnel.  Was that

14   something that would have been helpful for you to rule

15   out CPR post injuries as being postmortem or premortem?

16   A.  No, because they are trained how to do the CPR

17   properly and I assume they would do it properly.

18   Q.  Right, but we all know that people make mistakes

19   or, you know, even well-intentioned medical

20   professionals could get it wrong, which is why there are

21   CPR injuries that are not intended but may occur; is

22   that fair?

23   A.  I suppose that's fair.

1    Q.  So, what would be the reason to not interview the

2    fire department?  In a case like this where there's such

3    extreme injury as you described to the liver, that

4    you've never seen before, why make the assumption that

5    they did it properly or they were well trained?

6         What if they weren't?  What if you could have

7    helped expose that they weren't and maybe they had a

8    real system failure here in how they do CPR in infants?

9         Maybe they knew how to do adults well but they

10   didn't know how to adjust it to this size to ████████

11   stature?

12        You just never evaluated any of that, did you?

13             MS. PECK:  Objection.

14             THE WITNESS:  No, I did not.  I trusted

15       the CPR was done properly by the trained

16       personnel.

17   BY MR. KLEIN:

18    Q.  If it was not, and we don't know whether it was

19   or was not because you didn't speak with them, that

20   could be a contributing cause to the rib and liver

21   injuries, whether or not that caused the death, correct?

22             MS. PECK:  Objection to form.

23             THE WITNESS:  Even with an untrained --

1    even with improper CPR, these injuries are beyond

2    what would be expected in any CPR situation.  The

3    injuries are blunt force, severe, compressive

4    injuries to the abdomen.

5 BY MR. KLEIN:

6   Q.  So, the theory is that this man just squeezed a

7 baby for no reason to do CPR but it was really an act of

8 abuse?

9    What is your thought about why this happened?

10     MS. PECK:  Objection to form.

11     THE WITNESS:  I have no thoughts about

12    why it happened.  I don't make that assumption

13    why it happened, but I can tell you that it

14    happened because someone applied very severe

15    compressive injuries to that child's abdomen,

16    crushing two breaks -- breaking two ribs and

17    crushing the liver.

18 BY MR. KLEIN:

19   Q.  But you would never know if it's someone or if it

20 was multiple people because you never specifically

21 inquired with Bayly or any of these other fire

22 department personnel or medical, ER personnel, correct?

23     MS. PECK:  Objection.

1              Brett, you're asking and answering the

2      same question over and over again.

3              MR. KLEIN:  You can object to form.

4              THE WITNESS:  So, you're asking me why I

5      didn't interrogate the EMS people?

6  BY MR. KLEIN:

7     Q.  Not interrogate, more just interview them so that

8  you were -- had clear understanding of the nature of the

9  CPR intervention in this case.

10    A.  I simply assumed they knew how to do it in

11 children.

12    Q.  Is that an assumption that in retrospect would

13 have been better not to assume in a case like this?

14             MS. PECK:  Objection.

15             THE WITNESS:  No.

16 BY MR. KLEIN:

17    Q.  When they testified at trial to collectively

18 6,000 chest compressions, is that something that you

19 fully expected at trial, or were you surprised that it

20 was that long?

21             MS. PECK:  Objection.

22             THE WITNESS:  No.  Again, Brett, as I've

23      said, you know, these children receive very

1       prolonged CPR.  So, the number is -- sounds like

2       a lot, but it's common.  It's very common in my

3       opinion.

4    BY MR. KLEIN:

5       Q.  In terms of the fluid in the abdominal cavity,

6    the bleeding, the internal bleeding, every time there

7    was a pump of the heart that's pumping blood through the

8    heart to the liver?

9       A.  As effectively as possible, yes, but it's pumping

10   actually blood to the liver but throughout the entire

11   body as well.

12      Q.  Do you agree that liver lacerations typically do

13   not kill people instantly or quickly, that it's a slow

14   bleeding organ?

15      A.  It would depend on the severity of the

16   lacerations, definitely.

17      Q.  Do you agree that each chest compression was a --

18   do you agree that a human like ███████████ can bleed

19   postmortem, that she could continue to bleed after her

20   -- after she was in cardiac arrest and dead?

21      A.  There may be postmortem bleeding.  I agree with

22   that, yes.

23      Q.  You have cases where you have to use suction and

Case 1:17-cv-01290-DJS Document 70-24 Filed 02/04/22 Page 197 of 178

1    you see bleeding as much as a day after a death?

2         Have you had that experience?

3    A.  Yes.  I've used suction after cases of CPR with

4    liver lacerations.

5    Q.  So, when you're seeing 350 or 400 CCs of blood or

6    is it MLs or CCs?  I'm sorry.

7    A.  ML is equivalent to a CC.  They're basically the

8    same thing.

9    Q.  So, when you're seeing that much blood in an

10   abdominal cavity, are you correct in assuming the whole

11   amount was present in a case like this when ████ died,

12   or do you assume that there was a significant amount of

13   blood pumped in through extensive CPR efforts?

14            MS. PECK:  Objection.

15            THE WITNESS:  Well, I would always assume

16       that some of it could be accounted for by CPR.  I

17       would, yes.

18   BY MR. KLEIN:

19   Q.  Do you note that in your report anywhere?

20   A.  No.

21   Q.  Any particular reason why not?

22   A.  Because it's simply an assumption.  I tend to

23   report what I see.

1    Q.  Well, wasn't it an assumption that it was Michael

2  Davis that did the compression but not the EMTs that

3  caused the injuries, whether or not they caused the

4  death?

5      Didn't you make an assumption there that they

6  just did it right so he must have been the one who did

7  it wrong?

8    A.  Well, he illustrated doing something to the

9  child.  So, he's the one who did the compression of the

10  abdomen.  So, I assumed that he is the one who did it.

11    Q.  Well, when they did CPR, they would have done

12  compression of the abdomen as well; would they not?

13    A.  No.  They would have been working on the chest.

14    Q.  But with such a small body, the hand would have

15  -- if they used the hand rather than fingers, they would

16  have been in the area of the chest cavity, correct?

17    A.  Well, they would have been in the area of the

18  liver possibly, yes, but they would have concentrated on

19  the chest.

20    Q.  So, I'm sorry if you asked and answered this, but

21  I don't recall.

22      Do you agree that liver lacerations typically

23  bleed slowly?

1     A.  I would agree if they're small lacerations, yes.

2     Q.  So, in this case, was it a large one or was it a

3 small one that would be the type that bleeds slowly?

4     A.  These lacerations would have bled profusely,

5 because they were very large and a portion of the liver

6 had actually been torn away.

7     Q.  Did you consider, in your evaluation in this

8 case, that -- withdrawn.

9         You testified at trial that this would have been

10 very painful for ▮▮▮▮▮ that just the broken ribs alone

11 she would have been screaming and crying, correct?

12              MS. PECK:  Objection.

13              THE WITNESS:  I don't recall if I used

14       the words "very painful".  I may have.  But the

15       ribs would have been painful, yes.

16 BY MR. KLEIN:

17     Q.  So, what do you make of the fact that she was not

18 responsive and flat lining asystole when they got there?

19 There was no reports of her screaming, crying or

20 anything like that, and the only report was from the

21 father that she just was lethargic and then didn't wake

22 up.

23         Would you expect that there would have been a

1  witness to her screaming, whether by EMS, by EMTs or by

2  neighbors or anyone else, and is there any significance

3  if there is no note of that in this case?

4          MS. PECK:  Objection to form.

5          THE WITNESS:  No, I don't.

6          I think she had already passed out from a

7      significant loss of blood.  That's my assumption.

8  BY MR. KLEIN:

9     Q.  How do you know she didn't pass out from whatever

10  caused her to pass out which lead to Mr. Davis being

11  concerned that she was passed out?

12      How do you know that?  Other than that it's

13  unexplained, which is rare but it happens.

14     A.  You're asking me to chase gremlins.

15     Q.  No.  I'm asking you -- this is what Mr. Davis,

16  who has been found not guilty, said from his first

17  interview on the night of the incident, to his recorded

18  interview that you were given, to a subsequent interview

19  that he did right before the grand jury, to his

20  testimony at trial, and he was consistent about that.

21  Doesn't mean, you know, and so, he -- there's no other

22  account other than that she was unresponsive.

23      We may assume she was because you see this

81

1  damaged her liver, but crediting that she was

2  unresponsive, how do you know that there was not some

3  unexplained cause of death, even if it's extremely rare,

4  that this was not one of those situations?

5       MS. PECK:  Objection to form.

6       THE WITNESS:  You could never, ever rule

7    out that in any circumstances if you wanted to

8    use that logic, because even a traffic accident

9    could have been caused by some arrythmia rather

10   than a drunk driver.  Even a person who dies of

11   pneumonia may have some cardiac arrythmia that

12   went undiagnosed.

13       That's why we do a complete autopsy on

14   these children.  We look for anything that we can

15   rule out that would put her in a state of

16   unconsciousness or cardiac arrest.  We look for

17   bacterial infections.  We look for viral

18   infections.

19       I sent out a metabolic screening to make

20   sure she didn't have an inherited disease that we

21   could not detect.

22       We took x-rays.  We did a full workup on

23   this child to rule out any reason that she would

1    be deceased that could explain why he supposedly

2    did this.  I could find no reason, other than

3    this mysterious sudden death, which she had no

4    symptoms of prior.

5         It's possible, I will not say it's

6    impossible, but it's very, very highly unlikely

7    that she had died from a natural event before

8    this series of events.

9    Q.  When you're charging someone -- when you're

10  ruling this a homicide rather than, at most,

11  undetermined, it's foreseeable to you that someone is

12  going to be charged with murder and face life in prison;

13  is that fair?

14    A.  I would assume that, yes.

15    Q.  So, why not call this at most undetermined and

16  let the prosecutor decide if there's criminality?

17        If that's something you can't exclude, and the

18  only firsthand account, corroborated by his wife, that

19  she was up that morning but sluggish and then went back

20  to bed and then was unresponsive before any chest

21  compressions, and before 6,000 compressions by EMS, why

22  not say this is at most undetermined?  It didn't

23  preclude a prosecution, did it?

1          MS. PECK:  Objection.

2          THE WITNESS:  Well, even by calling it a

3     homicide does not guarantee a prosecution.  The

4     district attorney can do whatever he wants to do

5     or she wants to do to pursue this.

6          If the district attorney seriously thinks

7     that Mr. Davis did this in a flurry of panic or

8     whatever, he's free not to prosecute this.  My

9     homicide ruling is only my ruling for the death

10    certificate.  Whatever they do with it is up to

11    them.

12  BY MR. KLEIN:

13    Q.  You looked at the video -- well, apparently it's

14  part of your file but we don't have it here.

15       Is that the video from Mr. Davis's interview with

16  Detective Fountain on March, I believe, 2nd of 2015?

17    A.  Yes.

18    Q.  So, you saw his interview and you determined that

19  he committed a murder; is that fair?

20          MS. PECK:  Objection.

21          THE WITNESS:  I never determined murder.

22  BY MR. KLEIN:

23    Q.  I'm not saying you made a legal determination,

1  but you determined -- his statement and demonstration of

2  compression, you determined that to be the cause of

3  death rather than looking at -- and you assumed that the

4  EMTs and hospital staff acted appropriately, you linked

5  it to him based on the interview; did you not?

6             MS. PECK:  Objection.

7             THE WITNESS:  Well, I linked the pattern

8      of injuries to be the most consistent, the far

9      most consistent, with what he demonstrated doing

10     to         .  That's what I linked him to.  That's

11     the only linkage I made.

12     Q.  Well, when you watched that video, did you ever

13  watch it with anyone from the police department and/or

14  the DA's office or did you watch it either alone or with

15  your own staff?

16     A.  I watched it in my office later on after I

17  received it, by myself.

18     Q.  Did you then speak with Detective Fountain,

19  anyone from the DA's office, or anyone else, after you

20  watched it?

21     A.  No.

22     Q.  Did the police department video inform your

23  findings in this case about specifically -- let me

1   scroll to the autopsy report.

2        So, looking at the anatomic diagnoses on page

3   1596 of Exhibit 1, hypovolemic shock due to large

4   hemoperitoneum due to multiple lacerations of the liver

5   with right rib fractures due to blunt force trauma, A,

6   history of decedent reportedly found unresponsive with

7   reported history of attempted CPR, cardiopulmonary

8   resuscitation, by a large adult.

9        So, this part about a large adult, you

10  specifically incorporated what you were informed by the

11  police and what you saw in the video in this autopsy

12  diagnosis, correct?

13              MS. PECK:  Object to form.

14              THE WITNESS:  Yes.

15              MR. KLEIN:  Why don't we take a break

16     now.

17              (Recess taken.)

18  BY MR. KLEIN:

19    Q.  Good morning, Dr. Sikirika.  We just took about a

20  20-minute break.

21        Given the break, is there anything you wish to

22  clarify, change or correct with your testimony so far

23  today?

Case 1:17-cv-01290-DJS Document 71-4 Filed 02/04/22 Page 87 of 178

1    A.  Yes, please.

2        With regard to the meeting that I had with

3    Jessica Hall and Joel Abelove, that didn't occur after

4    the verdict.

5        That actually occurred after I witnessed the

6    testimony of Dr. Teas and the prosecution's line of

7    questioning.  That's the day that I insisted on seeing

8    them.

9        As soon as that testimony of Dr. Teas was done

10   and I wasn't allowed a chance to give a rebuttal,

11   through the investigator, Jimmy Morgan, I told them that

12   I had to see them ASAP, and they came over that

13   afternoon.

14   Q.  Do you have any e-mails, notes, memoranda, or any

15   other writings, that document this meeting?

16   A.  No.

17   Q.  Either --

18   A.  Didn't have notes on that.

19   Q.  Did Joel Abelove or anyone in his office ever

20   correspond you with in writing, even if you didn't with

21   them in writing, about the meeting?

22   A.  No.  Nothing ever written down.  They were, you

23   know, very attentive and apologetic about the way -- the

1    performance, but nothing was ever put on paper.

2        Q.  Did you ever speak with either or both of them

3    after the acquittal, the not guilty verdict?

4        A.  Not that I recall, no.

5        Q.  Do you recall testifying at the grand jury,

6    quote, with regard to the -- you were asked about

7    district attorneys and police being at the autopsy, that

8    quote, "they are there to feed me information about what

9    the police or other people may know about the case, so

10   they are there to feed me information.  I'm there to ask

11   them questions.  It's a give and take situation".

12           You said that on page one, lines 12 to 21.

13           Do you recall giving that testimony?

14       A.  Yes.

15       Q.  Is that accurate?  You stand by that today?

16       A.  Yes.

17       Q.  So, they're not just there to observe, they're

18   there to feed you information true, correct?

19       A.  Yes.  They're there to give me the information

20   that I'm requesting about the case and let me know about

21   it.

22       Q.  And is it your testimony that their narrative

23   does not influence you in any way, or are you maybe

1   naturally influenced by the narrative they give you?

2        Do you pursue the thread, pull on the thread that

3   they give you when you look at an autopsy, when you look

4   at your task before you?

5        MS. PECK:  Objection to form.

6        THE WITNESS:  Well, I wouldn't say I'm

7        influenced by it, but I consider what they tell

8        me.  The police often have information that I'm

9        not aware of, so they bring their portion of the

10       information to the table, and I work with that,

11       as well as the autopsy findings and any inquiry

12       findings, to determine the cause or manner.

13  BY MR. KLEIN:

14   Q.  Well, did the police officers, law enforcement

15  information to you, including the video, do you think

16  that steered you in a direction that led you away from

17  the unexplained death and more towards some type of

18  traumatic conduct caused by Mr. Davis?

19       Do you think that contributed to that direction

20  your autopsy went in?

21        MS. PECK:  Objection to form.

22        THE WITNESS:  Well, I didn't receive the

23        videos until after the autopsy and I had still

 1      pended the case at that point.

 2              So, it is very common I receive things

 3      sometimes weeks or months after the autopsy, and

 4      I eventually consolidate all those into my

 5      report.

 6              But the police really didn't influence my

 7      report in any way, either -- whatever they

 8      wanted.

 9  BY MR. KLEIN:

10     Q.  Well, it did influence it.  You used their

11  interview and you used information in this give and take

12  situation, right, to factor into your report.

13          Whether you call that influenced or factoring in,

14  you factored it in.

15              MS. PECK:  Objection.

16              THE WITNESS:  Yes.  I factored it in.

17  BY MR. KLEIN:

18     Q.  Now, you talked about how when you did the

19  Y-shaped incision -- in the grand jury -- there was

20  large amount of blood oozing from the abdominal cavity

21  and you normally don't see free blood circulating.

22          Do you recall that?

23     A.  Yes.

Case 1:17-cv-01290-DJS Document 117-4 Filed 02/04/22 Page 210 of 178

1    Q.  Would that have been a good time to tell the

2  grand jury that there's going to be a significant amount

3  of blood just from an hour of chest compressions?

4              MS. PECK:  Objection.

5              THE WITNESS:  I don't know if I would

6       have mentioned that.  I don't think I would have

7       mentioned it.

8  BY MR. KLEIN:

9    Q.  Would that have been significant to mention?

10             Was it misleading to not to tell the jury, the

11  grand jury and the jury at trial, a large portion of the

12  blood may have been from chest compressions?

13             MS. PECK:  Objection.

14             THE WITNESS:  I don't think it's

15      misleading.  I didn't know what the whole story

16      was at that time.

17             No.  I don't think it's misleading to

18      think that.

19  BY MR. KLEIN:

20    Q.  Well, you had that measuring cup --

21    A.  Yes.

22    Q.  -- with the -- as an exhibit with the blood in

23  it.

1          Do you recall that?

2     A.   Yes.

3     Q.   You gave the impression, would you agree, that

4     all of that blood was due to internal bleeding.

5     A.   Yes.  It was all due to internal bleeding.

6     Q.   But a substantial amount of it, you would agree,

7     was there accumulated due to CPR efforts.

8     A.   No.

9          MS. PECK:  Objection.

10          THE WITNESS:  I would not say a

11     substantial amount was there due to CPR efforts.

12     I would say a substantial amount, the majority,

13      that came from the severely lacerated liver,

14      which is independent of the CPR.

15  BY MR. KLEIN:

16     Q.   In the grand jury, do you think you were clear

17     enough that the ribs along the back of the lower right

18     chest -- when you said they were in the area of the

19     liver, do you think you gave the grand jury the

20     impression that they were the cause of the laceration of

21     the liver?

22     A.   I hope I did not provide that.  I never said in

23     the trial that it was a cause of the liver lacerations.

1    Q.  We spoke with Detective Fountain last week, and

2  he says that you told him, or at least it was his

3  impression, that the ribs lacerated the liver and that's

4  what he told Michael Davis when he interviewed him.

5      Did you ever tell law enforcement, whether

6  Fountain specifically or law enforcement generally,

7  maybe even initially, that you believe the ribs

8  lacerated the liver?

9          MS. PECK:  Objection.

10         MS. SPENCER:  Objection.

11         THE WITNESS:  No.  I never would have

12    said that, because the ribs were not

13    protuberating into the chest cavity.  They were

14    really displaced.

15  BY MR. KLEIN:

16    Q.  So, if Ronald -- if Detective Fountain made that

17  conclusion as a premise in his questioning of the

18  witness, is that a lead that was not supported by the

19  science?

20    A.  It's possibly a misinterpretation of what I was

21  explaining to him.

22    Q.  Or it could be a fabrication.  You don't know

23  either way, though, right?

1                MS. SPENCER:  Objection.

2                THE WITNESS:  Yes.  I would not have said

3       that the lacerations came from broken ribs.

4  BY MR. KLEIN:

5     Q.  So, if Detective Fountain said that you said that

6  he's misinterpreting or misrepresenting what you said.

7                MS. SPENCER:  Objection.

8                THE WITNESS:  Yes.

9  BY MR. KLEIN:

10    Q.  Now, did you recall -- as of February 2015 when

11  you did the autopsy in this case, did you know that the

12  Court of Appeals had thrown out Adrian Thomas's

13  confession due to the tactics used by Detective Fountain

14  and Detective Mason in that case?

15                MS. SPENCER:  Object to form.

16                MS. PECK:  Objection.

17                THE WITNESS:  I don't recall when I was

18        aware that verdict had been overturned.  I'm not

19        sure when it was.

20  BY MR. KLEIN:

21    Q.  I'll tell you the trial was the June before, June

22  of 2014.  So, you knew by the time that you testified at

23  the retrial in June of 2014 that their conduct was

1 called into question.

2     There was a reason why the confession didn't come

3 into trial at the retrial, right?

4         MS. SPENCER: Objection.

5         THE WITNESS: Yes, I would have been

6    aware of that, yes.

7 BY MR. KLEIN:

8   Q. So, given that I'll tell you it was about several

9 months before that trial, several months before █████

10 Davis's death, did you factor in any question about

11 Ronald Fountain's credibility when you used evidence

12 that he gave you to factor into your autopsy?

13         MS. SPENCER: Objection to form.

14         MS. PECK: Objection.

15         THE WITNESS: Well, the only evidence

16    that I factored into the autopsy finding on the

17    final report was the video of Michael Davis

18    applying pressure or replicating applying

19    pressure to █████.

20 BY MR. KLEIN:

21   Q. Did you come to learn that in the Thomas case

22 that anytime Adrian Thomas was throwing the briefcase on

23 the floor the court determined, as a matter of law, it

1  was only in response to the detective demonstrating it

2  to him to do it, so that he could help his child or help

3  his wife or for whatever reason they offered?

4      Did you know that generally or specifically that

5  whenever he demonstrated something it was in response to

6  the detectives telling him to and not because he did it

7  on his own?

8          MS. SPENCER:  Object to form.

9          THE WITNESS:  I wasn't aware of all the

10       grounds for the reason that the case went back to

11       trial.  I just knew that -- I was under the

12       impression that the police had lied to him in

13       some way, whether in fact or not I don't know,

14       but it didn't have anything to do with this case.

15  Q.  Did you know that Detective Fountain got indicted

16  for some type of political corruption type of case

17  involving the mayoral race, taking evidence from the

18  precinct, that occurred around the time of the

19  indictments in this case for Michael Davis?

20      Did you know about that?

21          MS. SPENCER:  Object to form.

22          THE WITNESS:  No.  I didn't know anything

23       about that, no.

1  BY MR. KLEIN:

2    Q.  Ron Fountain said he saw you once in a diner

3  since then.

4      Have you seen him since the incident?  Do you

5  recall seeing him any time?

6    A.  I can't even remember seeing him at a diner, but

7  if he does.  I see so many people, I can't even remember

8  the -- I wouldn't know if I saw him today.  If he said

9  hello to me, he would have to tell me who he is.

10    Q.  Between the Adrian Thomas case, before Michael

11  Davis, and then this criminal issue, which was very

12  publicized up in the Troy area, did his name ever come

13  up in your conversations with Abelove and Hall?

14      Just like you discussed Chavkin, did anyone ever

15  discuss Ronald Fountain's credibility or fitness?

16          MS. SPENCER:  Object to form.

17          THE WITNESS:  No, never.

18  BY MR. KLEIN:

19    Q.  Now, when you testified at the grand jury, you

20  said "the fractures would have been very painful".

21  That's a quote.

22      You don't doubt that you said something like

23  that, do you?

Case 1:17-cv-08290-DJS Document 117-2 Filed 02/04/22 Page 93 of 178

1    A.   Correct.

2    Q.   So, how -- what do you attribute the lack of any

3  report of her screaming and crying in pain?

4            MS. PECK:   Objection.

5            THE WITNESS:   I don't attribute it to

6       anything other than the fact that she probably

7       passed out very quickly as they occurred.   And

8       she may have been -- she may have been smothered,

9       even.   I can't tell you.

10  BY MR. KLEIN:

11   Q.   There's no evidence of that here, though, right?

12   A.   Well, there isn't any, but it doesn't leave any

13  evidence.

14   Q.   And you said conclusively that she lost

15  consciousness because of the bleeding in her abdominal

16  cavity, but as you said earlier, isn't it true that

17  there is a remote possibility, but a possibility that

18  you can't discount, that she died before for unexplained

19  reasons?

20            MS. SPENCER:   Object to form.

21            THE WITNESS:   I would say that it's not

22       impossible, but it's beyond a reasonable medical

23       certainty that she died of something else.

BY MR. KLEIN:

1

2    Q.  If you had not seen the video, would you have

3 opined that the injury occurred due to compression of

4 the abdominal cavity?

5              MS. SPENCER:  Object to form.

6              THE WITNESS:  No.  I would have -- could

7      you repeat that question, please.

8 BY MR. KLEIN:

9    Q.  Had you not seen the video of Detective

10 Fountain's interview, would you have opined and

11 testified that the injury occurred due to compression of

12 the abdominal cavity?

13    A.  Yes.

14    Q.  So, you would have found that there was blunt

15 force compressive injury leading to the loss of blood,

16 leading to the blood in the cavity, even if you had not

17 seen the video?

18    A.  Yes.

19    Q.  Now, if you had not seen the video, would you

20 have been able to conclude that it was Michael Davis

21 versus EMTs or emergency room physicians?

22              MS. SPENCER:  Objection.

23              THE WITNESS:  Without seeing the video, I

1          would not know who did it, who applied the

2          pressure, but I would not assume that it was EMS

3          or done by CPR.

4     BY MR. KLEIN:

5        Q.  When you put in the words that we've discussed

6     before the break in your anatomic diagnoses, attempted

7     CPR by a large adult, you were specifically linking

8     Michael Davis to the injuries in this case in your

9     autopsy, correct?

10       A.  Not specifically linking him to it.  I didn't

11    mention his name.

12          It said -- if I could refer to my report.  It

13    said, history of decedent, reportedly found unresponsive

14    with reported history, reported history of attempted

15    cardiopulmonary resuscitation by a large adult.

16          He reported that he did this.  There are no

17    witnesses that Michael Davis ever did CPR to this child.

18    None.

19       Q.  Well, he's a witness.

20          What about the 6,000 compressions of attempted

21    CPR by potentially small, medium and large other adults,

22    EMTs and ER staff, what was the reason you didn't put

23    that in here, or did not know of it at the time you did

```
 1   your report?

 2              MS. PECK:  Object to form.

 3              THE WITNESS:  I knew about it.  It's

 4       standard practice to do CPR to a child brought

 5       into the hospital.  And the extent of the

 6       injuries on ███████ were far beyond anything

 7       applicable to -- attributable to CPR.

 8   BY MR. KLEIN:

 9      Q.  Well, as you said earlier, you assume they did it

10   right, but if they didn't, it could be attributable to

11   some or many of the 6,000 compressions.

12          You just don't know either way because you

13   assumed.  Is that fair?

14              MS. PECK:  Objection.

15              THE WITNESS:  It's fair to say that

16        whatever Michael Davis was doing to her abdomen

17        was not CPR.

18   BY MR. KLEIN:

19      Q.  It's also fair that trained -- individuals

20   trained in CPR are -- it's documented that they can

21   cause injuries to ribs and liver related even if they're

22   trained in CPR, correct?

23      A.  That is correct.
```

1    Q.  So, when you say there's a history here of

2  attempted CPR by a large adult, there's likewise a

3  history of CPR over the course of over an hour by other

4  adults that you don't put in here.

5        I guess my question is just simple.  Why was that

6  history not significant enough to put in your report?

7        Was it an oversight?  Would it have been more

8  complete to put that in your report?

9              MS. PECK:  Objection.

10             THE WITNESS:  It was simply assumed that

11      CPR would have been performed all the way into

12      the hospital.  I just assumed that people would

13      understand that she was pronounced in the

14      hospital.

15             If you read the entire report, there are

16      hospital records.  I simply assumed that CPR

17      would have been performed all the way until the

18      time she was pronounced.

19  BY MR. KLEIN:

20    Q.  Right, but it's not -- my question is different.

21        You may assume that, maybe anybody would have

22  assumed that, but isn't it relevant history here, when

23  you have potential CPR related injuries, isn't it

1  important history so that you could explain why they

2  were not causative of the injuries or death?

3     A.  Well, this is not CPR-related injury.  This is

4  blunt force, compressive injury to the abdomen which

5  does not qualify as CPR.

6     Q.  Well, you seem to document it as a reported

7  history of attempted CPR.  So, you just reported it but

8  you don't believe that's what it was?

9     A.  No.

10     Q.  But when you know, based on your training and

11  extensive experience, and review of the literature, that

12  these types of injuries could be -- could occur due to

13  CPR, even if you don't believe that happened here, isn't

14  it important to document that in your report and rule it

15  out?

16           MS. PECK:  Objection.

17           THE WITNESS:  No.  You said that -- these

18      are not consistent with CPR.  They're vastly more

19      severe than anything that's been seen in CPR.

20  BY MR. KLEIN:

21     Q.  Do you agree the ribs, even the posterior ribs,

22  are stress points that can fracture during CPR, even if

23  the rear ribs are more rarely fractured than the front

1  ribs and side ribs?

2     A.  Yes.  They have been described as occurring

3  rarely in CPR in adults.

4     Q.  Now, did you ever look into or analyze what Dr.

5  Teas discussed as the gross liver injuries and the

6  microscopic findings that she thought were significant

7  in this case?

8     A.  Yes.

9     Q.  So, she said that, when there's injury to living

10  tissues, such as crushing of the tissue, such that under

11  a microscope there will not only be bleeding, but there

12  will be destruction of the cells that make up the organ;

13  is that accurate?

14     A.  No.

15     Q.  That's inaccurate?

16     A.  Yes.

17     Q.  What is your view of that?

18        When there's injury to living tissues, is there

19  no change in the structure, whether it's premortem or

20  antemortem?

21     A.  There are always changes in the structure if the

22  tissue is damaged premortem, before death, and those are

23  reparative changes that come into play, but you cannot

Case 1:17-cv-03290-DDD Document 17-34 Filed 02/04/22 Page 105 of 178

1   detect with microscopic findings any cellular image that

2   would suggest crushing or anything else like that.

3       The size of the cells are very, very, very small,

4   and you cannot look at these cells and say they were

5   crushed or pulled or whatever under the microscope to

6   any reasonable degree of certainty.

7   Q.  What is the word l-y-s-e, lyse, what does that

8   mean?

9   A.  Lyse simply means breaking down.

10  Q.  So, in this case, on the slides that she

11  discussed at trial, she described that you could see red

12  blood cells that are pretty rounded.  You could

13  recognize the cell, the liver cell or hepatocyte.  The

14  blue part is the nucleus.  The pink part is the

15  cytoplasm.  And that if this was a crush injury those

16  cells would not be recognizable.  They would lyse.

17      Do you disagree with that?

18  A.  I disagree with that.

19  Q.  So, you believe you would still be able to

20  recognize?

21  A.  Absolutely.

22  Q.  What about, do you recall the testimony about on

23  a high-powered microscope that the presence of necrosis

1    or comparisons where blood is stopped and not moving

2    versus seeing the cell intact, do you agree that there

3    is a distinction in that nature where there is necrosis

4    in certain cases and others there is not?

5        A.   Well, there may be to her, but I've never seen

6    any literature or anything to suggest that.  I can't, in

7    my own capacity, see it.

8        Q.   Well, look.  We all learn something new every

9    day.

10        When she showed those slides under high power at

11    trial, did you see what she was talking about even if

12    you had never thought about it that way before?

13        A.   No.

14        Q.   Now, the top laceration, do you agree that that

15    was not in a location where the big blood vessels come

16    from the liver and that the artery was intact?

17        A.   I didn't trace every artery in that liver, but

18    the laceration was such that it would have involved at

19    least medium size cells, but I believe the vena cava and

20    the hepatic artery were intact.

21        Q.   You didn't mention the inferior mesenteric vein,

22    correct?

23        A.   Correct.

1    Q.   And the pressure in the veins being lower.

2         You didn't mention any of that.  You don't know

3    -- you didn't look for any of that stuff, right?

4    A.   No.

5    Q.   Now, arteries were not mentioned in your report

6    as being torn or ruptured, correct?

7    A.   Correct.

8    Q.   Torn or ruptured arteries, would you agree, would

9    cause extensive bleeding very quickly.

10   A.   Yes.

11   Q.   And that would bleed much quicker -- you would

12   bleed out from a torn or ruptured artery much faster

13   than you would from a ruptured liver.

14        Would you agree with that?

15   A.   Well, there are arteries in the liver.  There are

16   hepatic arteries that perfuse the entire liver.  So,

17   damage to the liver is going to need to bleed from those

18   arteries and portal veins.

19   Q.   Right, but those arteries didn't cause the bleed

20   out here, correct?

21   A.   The arteries in the liver is what caused the

22   bleeding out, yes.

23   Q.   Now, Dr. Teas talked about her assessment that

1 you didn't see pieces of blood clots stuck in the liver,

2 I believe where in other comparison cases there were

3 pieces of clumpy blood or blood clots.

4     Do you recall that testimony?  Do you disagree

5 with those distinctions?

6   A.  I didn't see them and I wouldn't be expecting in

7 that interval of time.  The child is only picked up at

8 -- the EMS got there at 1:14.  He died at 2:08.

9     So, in that span of time and the small time

10 before 911 was called, you're not going to see

11 significant clotting.  You're not going to see

12 significant fiber and deposition on the liver.  And

13 you're not going to see any kind of significant

14 reparative process.  It's too soon.

15   Q.  Do you believe that under high power you can see

16 whether cells are intact or not?

17   A.  You can see if they're intact.  You can see, yes,

18 you can -- but you can't tell if they're intact or

19 damaged because of trauma.

20     You can see cells that are damaged, but again,

21 that takes time.  Cellular changes don't occur

22 immediately.

23   Q.  Now, do you agree that, when there's cases of

1    trauma with a lacerated liver, there is -- typically the

2    nearby organs or tissues will be affected, like

3    pancreas, adrenals, kidneys, that there will be

4    hemorrhage among these tissues as well if you have

5    trauma in the liver?

6    A.  It would depend on how focused the trauma was.

7    You may not see splenic injuries, you may not see

8    hepatic injuries, you may not see intestinal injuries,

9    if the force is applied to the liver itself.

10        If it's a broader force, you may find all the

11   damage throughout the abdomen.

12   Q.  But here, none of this was present here with

13   ████, no damage to the nearby other tissues, right, the

14   adrenal?

15   A.  Correct.

16   Q.  So, what is the significance of that, of it being

17   so localized, the injury in this case?

18        That it was from CPR?

19            MS. PECK:  Objection.

20            THE WITNESS:  No.  That was from

21        compression over the liver.

22   BY MR. KLEIN:

23   Q.  You can have compression over the liver when CPR

1    is done on a very small toddler like ███ correct?

2       A.   You can have damage to the liver if CPR is done

3    improperly on anyone, child or adult, correct.

4       Q.   Do you agree, when there's bleeding from the

5    liver, it's the kind of thing that you could see on a CT

6    and that emergency room physicians will watch or treat

7    or monitor if there's just liver bleeding and not other

8    organ damage?

9       A.   Yes.  I would agree that the clinicians may

10   determine that it's not necessary to do surgery, that

11   they could monitor perhaps in a hospital environment to

12   make sure your hematocrit and hemoglobin doesn't drop,

13   correct.  I would agree to that.

14      Q.   In terms of the idea of an undetected seizure,

15   you're not saying that it's impossible, are you?

16           You're just saying that you see no evidence of

17   it; is that fair?

18      A.   Correct, and I would not expect to find any

19   evidence.

20      Q.   I'm sorry.  My phone cut into my bluetooth and I

21   missed the answer, if you gave it.  Could you repeat

22   that if you said anything, or I could ask again.

23      A.   If you wouldn't mind asking again.  Thank you.

1    Q.  Is it your testimony that there was not --

2    there's no way that an undetected seizure happened here

3    or just that there's no evidence of it so you don't

4    believe it occurred?

5    A.  There's no clinical history of a seizure disorder

6    and there is no anatomic finding associated with most

7    seizures.

8    Q.  Well, does there have to be a clinical finding?

9    Like, in other words, would you have to like look at the

10   brain more in depth like you did to know if there was

11   seizure activity, or do some other type of testing that

12   was not done here to confirm conclusively?

13   A.  Well, as a neuropathologist, as well as a

14   forensic pathologist, I look at the brain especially.

15   And you may not ever, ever find the focus of a seizure

16   no matter how hard you look.

17   Q.  Right, and there are instances where someone has

18   a seizure that results in death without any history of

19   seizure.

20       Isn't that rare but still something that happens

21   in science?

22   A.  That would be extremely rare and it doesn't

23   happen in children without some brain defect.  I looked

Case 1:17-cv-03290-DDD Document 47/595 Filed 02/04/22 Page 1127 of 178

1   carefully at her brain, and there were no defects in the

2   brain that would cause a seizure.

3      Q.  Do you know if she was dehydrated before at the

4   time in the moments, hours, before she died?

5      A.  She did not appear dehydrated.  I touched her

6   skin.  She did not have any loss of turgor.  She was not

7   dehydrated.

8      Q.  Are you familiar with the term reperfusion

9   injuries?

10      A.  Yes.

11      Q.  What are those?

12      A.  Those are injuries that become apparent after a

13   tissue or organ had been starved of blood and oxygen.

14   As the blood comes back into the organ with oxygen, the

15   injuries start to occur and become manifest.

16      Q.  So, is it possible, even if you don't think it's

17   likely, that her injuries were reperfusion injuries

18   after she was already postmortem?

19      A.  No.  No.

20      Q.  That's essentially what Dr. Teas said and you

21   disagree with that; is that fair?

22      A.  Yes.

23      Q.  Dr. Sikirika, I have your report up, I don't have

1   to show it on the screen if you have it in front of you.

2       Can you just walk us through the key parts of

3   your finding in this report that relate to the liver and

4   the ribs and anything else that you think is significant

5   to the death in this case.

6   A.   Yes.

7       At the time of autopsy, of course, we did detect,

8   as we opened up the abdomen, 350 MLs of liquid blood and

9   a small amount of blood clot in the abdominal cavity.

10      As we removed the organs, there were fractures

11   along the back with the posterior aspect of the ninth

12   and tenth ribs on the right side.  They did show

13   evidence of hemorrhage around them.

14      There was also evidence of the lacerations to the

15   liver along the posterior aspect of the left lobe.  That

16   was about 5 by 5 by 0.5 centimeters.

17      An additional laceration along the anterior

18   aspect of the medial left lobe measuring 2.5 by 1.4

19   centimeters.

20      The lacerations along the upper right lobe, which

21   is 7.5 by 0.5 centimeters, with tearing off a

22   significant portion of lung tissue.  It perforates along

23   the posterior right lobe, measuring 1.8 by 0.4

1   centimeters and 1 by 0.3 centimeters.

2        There was additional slight tearing along the

3   caudate and the quadrate lobes.  And there was a

4   hemorrhage behind the liver 18 by 30 centimeters in

5   size.  This was in the soft tissue.

6        Those were the significant anatomic findings.

7   Q.  The lacerations, were they all present when the

8   liver was intact in the body, or did you notice them

9   after you removed the liver?

10       In other words, is there any chance that the

11  lacerations either were created or became bigger due to

12  handling of the liver, which I know can be dented and

13  damaged very easily just by handling it with a glove on.

14  A.  No.  These were all there at the time of the

15  examination in situ.  I saw these while they were in

16  place, and then I measured them when they came out.

17  They appeared to be the exact same size.

18  Q.  I want to just show you the photos.

19       Dr. Sikirika, I'm showing you page 1612 of

20  Exhibit 1, which is your file.  These are the

21  thumbnails.  Can you see them well enough to just point

22  out which photos you think are -- we should focus on as

23  significant in this case?

Case 1:17-cv-03290-DLJ-SMG Document 47-3 Filed 02/04/22 Page 1157 of 178

1    A.  Number 7442 is a measuring cup with the blood

2  that was recovered.

3    Q.  Got it.

4    A.  Then, if we go further downstream, we can see

5  that there are lacerations on number 7445.

6    Q.  Got it.

7    A.  And 46.

8    Q.  Okay.

9    A.  And then 49 and 50 and then 51.  And we can see

10  the chest wall hemorrhage in 7452.  And we can see --

11  all those pictures at the bottom show the liver after it

12  had been removed.

13    Q.  61, 62, 63, 64, 65, as well as 60?

14    A.  Yes.

15    Q.  I'm going to go to the next page or keep

16  scrolling down actually.

17       And then 66 and 67, are those the liver as well?

18    A.  Yes.  And the rest of them just show the normal

19  features showing that there was no head damage.

20       And I believe 86 and 87 are close ups of the rib.

21    Q.  The fractures that you observed at autopsy but

22  didn't observe on x-ray.

23    A.  Correct.

1    Q.  Are there any other significant clinical findings

2  of note or have you covered them all?

3    A.  No.  I've covered them all.

4    Q.  Are there any additional findings that, if you

5  were doing your report today, you would add in given

6  your knowledge of the case or other secondary diagnoses

7  or causes or anything else?

8    A.  No.

9    Q.  1614 is a page -- a document entitled

10  "medical/burial death correction report"?

11    A.  Yes.

12    Q.  What is this about?

13        What is this for, this document?

14    A.  Well, this is a form that we use if we have to

15  amend or correct the death certificate.  Sometimes used

16  for when a case is pending to unpend the case.

17    Q.  What is page 1616?  What is this document?

18    A.  This is a copy of a three-part form that is

19  filled out by the medical-legal death investigator who

20  handled the case on█████.

21    Q.  It's like an intake form?

22    A.  Yes.  It's an intake form for the medical

23  examiner's office.

1       Q.   I'm looking at 16, 17, 18, 19, 20, 21.

2            Are those all kind of related?

3       A.   Yes.

4       Q.   What are these documents?

5       A.   That first document, procedure and specimens,

6    lists the details of ███████ -- the way she was

7    received, and what samples were taken, and also how she

8    was identified, and the time they gave the autopsy.

9            Would you like me to continue?

10      Q.   Please tell us what page 1618 shows.

11      A.   Yes.  This is a standard toddler diagram that I

12   filled out for ██████, including some measurements of her

13   size and characteristics, and of course the medical

14   intervention.

15           It's a very standard form.

16      Q.   Other than some non-incident related damage to

17   her toenail, there was no sign of trauma on her body,

18   correct?

19      A.   Correct.

20           This is a diagram of her internal organs and

21   listing the weights of the features and sizes of the

22   injuries and the features of the heart.

23      Q.   For the record, this is page 1619.

Case 1:17-cv-01290-DDD-JPM Document 47-34 Filed 02/04/22 Page 237 of 178

1        And then what are the notes on page 1620?  What

2   does it say?

3     A.  Those were additional notes that were describing

4   the initial injuries to the liver and the rib.

5     Q.  So, can you read what it says?

6     A.  Yes.

7        Posterior right lobe, 1.8 by .4, 1 by .3, small

8   tear quad and caud.  The compression injury of liver.

9   Posterior lower anterior, 18 by 30.  Break with

10  hemorrhage.  Ribs 9 and 10 with hemorrhage and fracture.

11  Slight hemorrhage number 8.

12    Q.  When you wrote "severe compressive injury to

13  liver", was that after the give and take discussion that

14  you discussed earlier, the back and forth with the

15  police?

16       Did they tell you what they had learned from

17  Michael Davis?

18    A.  No.  They hadn't told me anything at that point.

19  That was my conclusion.

20    Q.  Now at that point wasn't it, in your mind, a

21  possible cause of death, that compression to injury --

22  compressive injury to the liver that occurred during

23  CPR?

Case 1:17-cv-01290-DJS   Document 47-34   Filed 02/04/22   Page 1297 of 178

1      A.   No.

2      Q.   That's because of the extent of the tearing to

3  the liver that you described earlier?

4      A.   Yeah.

5      Q.   And the amount of blood?

6      A.   Correct.

7      Q.   Any other reason or those are the two reasons?

8      A.   Those are the reasons.

9      Q.   Then we have the Albany Med file.  So that's just

10  an order for radiological consult.

11      Did you request the full skeletal survey?

12      A.   Yes.

13      Q.   Those results were nonsignificant, correct?

14      A.   Correct.

15      Q.   So, this is -- page 1624 is the post-autopsy

16  meeting on March 12, 2015?

17      A.   Yes.

18      Q.   Do you recall when you got the interview, a copy

19  of the video, from March 2nd?

20      In other words, would it have been at this

21  meeting that they brought you a copy of it, or did you

22  have it in advance of this meeting, or subsequent, or

23  something else?

Case 1:17-cv-01290-DJS   Document 47/59 34 Filed 02/04/22   Page 1207 of 178

1    A.  I can't remember if I got it at this meeting or I

2  may have looked at the -- at this myself and been unable

3  to open it.  Sometimes the Troy PD programs I can't open

4  on my computer --

5    Q.  Same here.

6    A.  -- and we looked at it here, but it was done at

7  my office.

8    Q.  Do you know if it was a video watched or at least

9  given to you during this meeting?

10      Is that typically what happens?

11    A.  I don't recall if it was given prior or after

12  this meeting.

13    Q.  Is there typically a post-autopsy meeting like

14  this a few weeks after the autopsy, or was this unusual

15  in this case?

16    A.  In a child it's pretty normal.

17    Q.  Do you have any notes of the agenda from that day

18  or any notes of what was discussed?

19    A.  No.

20    Q.  Do you remember?

21    A.  No.

22    Q.  The next page, 1625, is the sign-in sheet for the

23  autopsy?

Case 1:17-cv-01290-DJS Document 147-34 Filed 02/04/22 Page 121 of 178

1    A.  Yes.

2    Q.  Do you remember anything that Charles McDonald,

3  Ronald Fountain, Anthony Buttofucco, Tim Colineri,

4  anything that any Troy PD officers said or did during

5  this autopsy?

6    A.  No, I don't.

7    Q.  How about Andra Ackerman, was she -- do you

8  remember anything she said or did at the autopsy?

9    A.  No, I don't.

10      She was working for the DA's office at that time,

11  but I don't recall any specifics.

12    Q.  When these officials are at these autopsies with

13  you in a case like this, are they literally standing

14  around the decedent at the table with you or are they

15  like in some room behind the window without -- out of

16  earshot from you?

17    A.  They're usually in the autopsy room.  They don't

18  tend to get too close to the table.  They're usually

19  over by the wall, maybe 15 feet away.

20    Q.  In this case, do you remember where they were?

21    A.  I don't remember the specifics, but I would

22  wager, based on their performance, that they don't get

23  too close.

1    Q.   Pages 1626 and 1627, is this a request for, what,

2  for lab -- for testing?

3    A.   Yes.  Those are the toxicology tests.

4    Q.   Looks like you have medical records from the

5  child's pediatrician; is that right?

6    A.   Yes.

7    Q.   And then we come up to a page -- and so, were the

8  pediatrician records helpful in any way or did they not

9  shed any light at all on the death?

10   A.   Well, they were helpful to tell me that she

11  appeared to be a healthy, normally developed young

12  child, toddler.

13   Q.   There's another page, 1638 and 1639 and 1640.

14        Were these taken at the autopsy at the same time

15  as those other ones?  Are these pre-autopsy, pre-cutting

16  of the child?  Like when were these taken?

17   A.   These were taken at the hospital.  We can see a

18  notation at the top "hospital".  These were taken by

19  police at the hospital.

20   Q.   Okay.  Is there any significance to your findings

21  of any of these photos?

22   A.   No.

23   Q.   There's a subpoena here, 1641, for the grand

Case 1:17-cv-01290-DLC   Document 473-4   Filed 02/04/22   Page 127 of 178

1  jury.

2      Were you resistant to testifying in the grand

3  jury, or is it standard procedure for you to respond to

4  a subpoena?

5   A.  No.  Most of the time I don't require a subpoena.

6  They simply call my office.  I don't resist testifying

7  in the grand jury.

8   Q.  In this case, did the issuance of a subpoena on

9  August 15th of 2016 have to do with some of the tension

10  you had with Cindy Chavkin?

11          MS. PECK:  Objection.

12          THE WITNESS:  No.  There was no tension

13      with Cindy.  I never saw Cindy again.  The

14      subpoena doesn't mean anything to me.  Sometimes

15      they send it.  Sometimes they don't.  I can't

16      explain why.

17  BY MR. KLEIN:

18   Q.  This was a trial subpoena, not a grand jury

19  subpoena.  It's from August of 2016, August 15th.

20      I think earlier you said you met with Cindy on

21  the 20th of July or 29th, and then August 1st there's a

22  sign in sheet with you, ADA Hall and Cindy.

23      This is about two weeks after that, right before

1 the trial.  So, do you recall why you needed to be

2 subpoenaed for trial in this case and did it have to do

3 with the situation with your comments about Cindy?

4     MS. PECK:  Objection.

5     THE WITNESS:  No.  Sometimes they will

6   send me a subpoena.  It depends on the

7   secretarial staff.  Sometimes I don't.  It's

8   simply a call, you know, Doc, we have a trial

9   going on.  This is when we want to put you on.

10   And then we'll follow up, you know, the day

11   before or something.

12    Sometimes they'll send a subpoena.  It's

13   not necessary in my county.  It has nothing to do

14   with my thoughts on Cindy.

15 BY MR. KLEIN:

16  Q.  In your file is a list of all the fire and EMTs.

17   Was that -- do you in some cases reach out to

18 them to interview them?

19  A.  No.

20  Q.  I think we discussed the supporting depositions.

21   Was there any significance of these supporting

22 depositions to your case other than background

23 information?

1   A.   Well, they did say that in the scene was found

2   unresponsive, that there was a large male in the room

3   and no CPR was being done when they arrived.

4   Q.   What is the significance of that, that no CPR was

5   being done when they arrived?

6   A.   Well, I don't know the significance.  I

7   understand there was a telephone issue and had to run

8   out to get the telephone.  So, we didn't have a

9   telephone that worked.

10       I don't put much on that other than the fact that

11  there is no witness to CPR.  He may have been panicked.

12  He may have decided it's not worth it, the baby's

13  already dead.

14  Q.   I mean, you're speculating there, right?

15  A.   Yes.

16  Q.   I mean, the baby may have been dead, as you said,

17  before he even tried CPR, but you think it's just a very

18  low chance, but you'd be speculating as to any of that,

19  correct?

20           MS. PECK:  Objection.

21           THE WITNESS:  Correct.

22  BY MR. KLEIN:

23  Q.   The story that Michael Davis told of the baby

1   being unresponsive was not impossible to be true, right?

2   You just felt it was more likely true that he squeezed

3   in the way that you saw him on the video; is that fair?

4       A.  At the time, I didn't know what could have caused

5   any kind of unconscious state in this child, so that's

6   why I pended the case and did a more thorough

7   examination looking for some reason that she could be

8   unresponsive.

9           I never found a reason that she could be

10  unresponsive.

11      Q.  Have you ever concluded that there's undetermined

12  cause of -- that the cause of death is undetermined

13  because it's one of these unexplained deaths?

14      A.  Well, I've concluded, yes, I have, but there are

15  cases that I've looked very thoroughly, and based on the

16  circumstances I find no cause of death, and I have

17  called them cardiac arrythmia unknown etiology.

18      Q.  Are you aware of any way to conclusively, or at

19  least to a degree of medical certainty, to determine

20  whether ███████ was -- to tie her death, in other words,

21  whether the injuries to her liver or ribs were

22  postmortem or premortem, antemortem?

23      A.  The injuries to her ribs would have been

1  antemortem injuries.  That would be extensive bleeding

2  around the ribs, a large amount of hemorrhage in the

3  back of the chest.

4     Q.  Other than your speculation, how do you know --

5  in other words, you have no explanation for why she

6  would have been unresponsive, but it was reported that

7  she was, and EMS gets there and she was flat lining, and

8  it's reported by the firsthand witness that she was

9  unresponsive, whether you believe it or not.

10       So, what is the science, the medical basis to say

11  that the rib fracture was antemortem versus postmortem?

12     A.  Well, there's two questions in there that I don't

13  understand.

14       Are you telling me how do I know she was not

15  already dead?

16     Q.  Yeah.  I think you said you don't.  You just --

17  you think she probably wasn't?

18     A.  She wasn't dead when all this occurred, but she

19  bled out profusely.

20     Q.  But she could bleed profusely after she's dead,

21  right?

22       We talked about that.

23     A.  She could bleed significantly after she was dead,

Case 1:17-cv-03290-DJS Document 173-4 Filed 02/04/22 Page 127 of 178

**APPENDIX**                                    **620**

127

1    but these injuries to the liver would have bled her out

2    very quickly and that would explain why she is

3    unresponsive.

4         Nothing else I did in her examination showed me

5    why she was unresponsive.  Nothing showed why she had

6    any reason to be unresponsive other than these liver

7    lacerations.

8    Q.  Unless it was a sudden, unexplained death that

9    you misdiagnosed, but in your view you correctly

10   diagnosed it, but that would be fair, right?

11        If you misdiagnosed a sudden, unexplained death,

12   that would be an explanation for it.

13   A.  There is no such thing as misdiagnosing a sudden,

14   unexplained death.  It's simply a sudden, unexplained

15   death.

16   Q.  Right.

17   A.  Rule out everything else, and if you have no

18   other cause of death that's what you would put, but

19   there is no cause of death on her other than bleeding

20   from liver laceration as largely appeared to me.

21   Q.  If it was -- assume hypothetically for this

22   question that if the rib injuries and liver injuries

23   were caused by EMS and medical ER personnel, not by

1    Michael Davis, and those injuries caused the death,

2    would it be considered a homicide because it was at the

3    hands of another just medical personnel rather than

4    Michael Davis?

5         A.  It would have probably been left undetermined or

6    accidental.

7         Q.  So, explain why in that scenario, if CPR caused,

8    even if unintended, caused her death, why that would not

9    be a homicide just by virtue of it being at the hands of

10   another.

11        A.  Well, it's at the hands of another during

12   resuscitative process, which she is already in extremis.

13   So, I would not call that a homicide.

14        Q.  So, if Michael Davis -- you have no reason to

15   question his veracity that he was attempting CPR.

16        You just think he did it wrong, correct?

17        A.  No.  I don't think he ever -- he may have

18   attempted CPR after he did something that's not CPR,

19   crushing her abdomen.

20        Q.  So, just to be clear:  The demonstration that you

21   saw on the video that you determined to be attempted

22   CPR, is that the crushing?  Or do you think there was

23   something that he didn't demonstrate that preceded the

1  attempted CPR?

2    A.  I think there's a good possibility that he did

3  something and is making this motion to cover up what he

4  really did.

5    Q.  So, what he did on the video, the pressing with

6  two hands and then one hand on top, one hand under the

7  back -- do you agree with that description generally?

8    A.  Yes.

9    Q.  Is that the acts that you say were the

10  compression that caused the injuries, or is it your

11  testimony that you believe he did something prior to

12  those acts which can be characterized as attempted CPR?

13    A.  I cannot say what he did prior to that, but I'm

14  saying that there is a possibility that something else

15  was done to ██████, and then Michael Davis tried to

16  explain what he had done by showing you what he had done

17  and calling it CPR.

18    Q.  So, showing the attempted CPR and calling it CPR,

19  you know, what you saw on the video, is it your view

20  that that, just what you saw, could have caused the

21  death, or are you saying here today, and was it your

22  opinion at trial, that there had to have been more than

23  that that caused the death that he's not telling us?

1    A.   No.  I think what he explained and what we saw in

2    the video would be sufficient to cause the injury, but I

3    cannot rule out that something else was done prior to

4    that, or something else was done differently.

5         Perhaps it was a double handed squeeze with

6    thumbs behind the back and the fingers over the chest,

7    or vice versa, the thumbs in the front and squeezing

8    from the back.  I can't say he did this.

9    Q.   You don't know what specifically Michael Davis

10   did that could have caused this child's death.  You just

11   believe something happened at or around that time

12   because you wouldn't have this kind of bleeding and

13   tearing.

14        Is that a fair summary?

15   A.   That would be fair, yes.

16   Q.   So there is some inference drawing here that

17   Michael's conduct that he described on the video

18   contributed to it.  If not, he said he did more than

19   what he said.

20        Right?  Is there some inference drawing here that

21   you do?

22   A.   He may -- if I could clarify.

23        He may have done something else to this child

Case 1:17-cv-01290-DJS Document 17-94 Filed 02/04/22 Page 132 of 178

1 that he is trying to explain away with his rendition of

2 CPR, which involves squeezing the child.

3       That's all I can say and that is speculation.  I

4 can't say that it was done because I wasn't there and

5 there are no witnesses.

6   Q.  Dr. Sikirika, do you not know exactly how this

7 child died?  You just believe it's more likely than not

8 that Michael did it because of his statements that he

9 did some compression on -- four or five compressions of

10 the chest?

11   A.  Well, the chest compressions did not kill this

12 child.  The compressions that killed her were the

13 compressions and the squeezing of the abdomen.

14   Q.  Does he show that?  In your opinion, did he show

15 that during the video?

16   A.  Yes.

17   Q.  It was filled with air so he pressed it down?

18   A.  Yes.

19   Q.  So, in your view, that had to have shredded her

20 liver and broken her rib, broken ribs?

21   A.  Yes.

22   Q.  And are you speculating that that happened as the

23 most -- as the only likely possible cause, but you don't

Case 1:17-cv-03290-DLC Document 47/593-4 Filed 02/04/22 Page 1397 of 178

1  know for sure?

2    A.  No.  It's my opinion, my medical opinion, to a

3  reasonable degree of medical certainty, is that that

4  type of action is what caused the severe lacerations of

5  the liver and the broken rib.

6    Q.  So, even though lacerated livers and broken ribs

7  happen during CPR, am I correct in understanding that in

8  this case you believe it was the pressing of the stomach

9  and the back, which is not, in your view, considered

10  CPR, that caused -- injuries that could happen during

11  CPR but here they happened from stomach pressing?

12        MS. PECK:  Objection.

13  BY MR. KLEIN:

14    Q.  Does that make sense?

15    A.  Yes.  The injuries would not have happened during

16  CPR.

17    Q.  Even though they're consistent with CPR

18  generally.

19        MS. PECK:  Objection.

20        THE WITNESS:  Liver lacerations may be

21    consistent with CPR, but not five of them

22    sheering away a portion of the liver.  That is

23    not a CPR-related injury.

Case 1:17-cv-03290-DLC Document 47-1 Filed 02/04/22 Page 134 of 178

1  BY MR. KLEIN:

2    Q.  Now, if he did this in the course of believing he

3  did CPR trying to save the child's life, you don't know

4  what was in his mind when he did what he described in

5  the video, did you?

6    A.  No.  I never know what's in anybody's mind.

7    Q.  But you knew that, by drawing the conclusions

8  that you did, this man was going to face life in prison.

9           MS. SPENCER:  Objection.

10           THE WITNESS:  I don't make those kind of

11     jumps.

12  BY MR. KLEIN:

13    Q.  You don't make what?

14    A.  I don't make those kind of jumps.  It's not my

15  prerogative.  I don't consider guilt or anything else.

16  I just try to explain how things occurred.

17    Q.  You know as you're one of the key witnesses in a

18  criminal case like this, right, when there's only a body

19  and a suspect, correct?

20    A.  Yes.

21    Q.  And so, whether you make the decision of what to

22  charge or what the consequences or not, I'm not

23  suggesting that, but what I'm saying is you're aware of

Case 1:17-cv-01290-DJS Document 179-4 Filed 02/04/22 Page 135 of 178

1  the natural and probable consequences of you making a

2  decision like this?

3      A.  I am very aware everything I do, and I understand

4  that it's very important to make the right decisions and

5  not to over describe or over testify to things that are

6  not based on a reasonable degree of medical certainty.

7          I feel all my findings are to a reasonable degree

8  of medical certainty.

9      Q.  You have cases where you have law enforcement

10  involved in in-custody deaths on many occasions,

11  correct?

12     A.  Yes.

13     Q.  It's publicly available, your autopsy and the

14  report of the New York State Attorney General for the

15  Andrew Kearse case in Syracuse.

16          Do you recall that case?

17     A.  Kearse.

18     Q.  I believe died in a patrol car?  Cardiac arrest?

19     A.  I'm sorry.  I don't recall that case.  I never

20  did anything in Onondaga County.

21     Q.  It may not be Onondaga, but do you recall that

22  case that was investigated by the New York State

23  Attorney General?

Case 1:17-cv-03290-DJS   Document 47-34   Filed 02/04/22   Page 136 of 178

1    A.  It could be, but I don't recall the name.

2    Q.  That individual had CPR injuries.

3        You don't recall that incident?

4    A.  No, sorry.

5    Q.  Do you tend to find that with law -- have you

6  ever found that in a case involving law enforcement, a

7  death in custody, that law enforcement was responsible

8  for a homicide?

9    A.  Well, I have ruled deaths in custody as

10  homicides.

11    Q.  That's because like, you know, someone's being

12  subdued but they may have had a heart attack.

13        Have you ever found that it was due to blunt

14  force trauma or some, you know, culpable conduct even

15  though you're not charging the conduct in court, versus

16  like an accidental death during a homicide, as to law

17  enforcement?

18    A.  I don't ever recall that.

19        I do recall a case where I did not have enough

20  information to call a case one way or the other up north

21  in a case, but I believe I left that undetermined

22  because no one would talk from either side.

23    Q.  Were you hesitant, or is there any pressure on

1    you working with law enforcement to not look to fire

2    department or medical personnel responsibility for death

3    in a case like this, when you have someone like Mike

4    Davis who was involved?

5          In other words, do you -- are you steered in a

6    direction of the civilian rather than law enforcement,

7    fire department or hospital staff, when you should be

8    looking at all of them in a case like this?

9      A.   No.   Police don't do much steering in my

10   direction.

11     Q.   Okay.

12     A.   They know better.

13     Q.   Well, they did with Adrian Thomas, right?

14          MS. PECK:   Objection.

15     Q.   I mean, well, you found out that they committed

16   misconduct, they were getting Adrian to say stuff that

17   you factored into your report, right?

18          MS. PECK:   Objection.

19          THE WITNESS:   Only to the mechanism of

20      how the injuries occurred and who might be

21      responsible for it, yes.

22   BY MR. KLEIN:

23     Q.   So, and here you describe the back and forth that

Case 1:17-cv-01290-DJS   Document 47-34   Filed 02/04/22   Page 138 of 178

1    in every case that you have with them, and they came in

2    here, having interviewed him on the date of the

3    incident, you do your autopsy, they give you the video.

4         MR. KLEIN:  I'm just going to take a

5         moment to see if I have any other questions about

6         this file.  And I think I want to take a look at

7         your photos, Crystal, and then see if we can get

8         close to wrapping it up.

9    Q.   Were you involved in a case 10, 15 years ago, a

10   criminal case, where you testified for the prosecution

11   that there was blunt force trauma and Dr. Wentley

12   testified that there was CPR injuries and the person was

13   convicted of murder?

14   A.   Would that be in Scoharie County?

15   Q.   I believe so.

16   A.   Yes.  Yes.

17   Q.   What happened in that case?

18   A.   The best of my recollection was a woman with a

19   history of alcoholism who was found unresponsive in a

20   trailer with lacerations of the liver, and the argument

21   was made that her son could come in to find her

22   afterwards and then performed CPR, and they had

23   accidentally lacerated the liver because they didn't

1  know what they were doing.

2      The gentleman was convicted based on my testimony

3  and other things.

4      Q.  And have your views on that case changed or

5  evolved over time?

6      A.  No.

7      Q.  In that case, was there a liver rupture or

8  injury?  I'm sorry if you said that.  I just don't

9  recall.

10     A.  There was.

11     Q.  There were rib fractures.

12     A.  Yes.

13     Q.  Were there other injuries as well, if you know,

14  or just liver or rib?

15     A.  I believe there were some other minor injuries,

16  but I can't exactly recall what they were.

17     Q.  Are you aware of studies that document CPR-caused

18  liver lacerations?  I'm sorry.

19     Are you aware of studies that document massive

20  abdominal hemorrhaging due to CPR-caused liver

21  lacerations?

22     A.  I have heard of studies, yes.

23     Q.  Are you familiar with a treatise "Essentials of

1    Autopsy Practice", Rutty, Edition 2001?

2        A.    No.

3        Q.    Have you looked at the -- have microscopes

4    evolved since this incident?  Do you have higher power

5    microscopes now than you did in 2015 or has the

6    technology changed in that regard?

7        A.    Well, the technology has improved, but it

8    wouldn't be higher power.  It would be more of a digital

9    microscopy that's being done now.  The microscope hasn't

10   really changed much in 50 years except that now it's

11   much more digitally.

12       Q.    Did you do a digital view or review of the slides

13   in this case back in 2015?

14       A.    No.  I just used my Olympus microscope.

15       Q.    What would be -- would you expect to see more or

16   anything different with a digital instrument?

17       A.    No.  It would just allow you to teach and perhaps

18   the storage is better in a way that they could be

19   retrieved in the future, tumors and such that can be

20   reexamined or reevaluated with different techniques.

21               MR. KLEIN:  So, can we just take a

22        several minute break.

23               (Recess taken.)

1   BY MR. KLEIN:

2      Q.  So, Dr. Sikirika, in this case, were you aware

3   that Detective Fountain was the lead Troy investigator

4   in this case?

5      A.  I don't recall ever knowing that he was the lead,

6   but I knew he was one of the investigators.

7      Q.  Were you aware -- were you working in cooperation

8   with the Troy police department throughout the

9   investigation of this case before it was indicted?

10     A.  Yes.  We cooperated with each other, yes.

11     Q.  Did you have an understanding, during the

12  investigatory phase of this case, that your testimony,

13  plus Ron Fountain's testimony at this meeting with

14  Michael Davis, formed the evidence that would lead to a

15  prosecution in this case?

16                 MS. PECK:  Object to form.

17                 MS. SPENCER:  Object to form.

18                 THE WITNESS:  I didn't know how much

19           Detective Fountain was involved in the case, but

20           I knew that my testimony would be important in

21            the case.  That's all I can tell you.

22  BY MR. KLEIN:

23     Q.  Even though you didn't know it was Ron Fountain,

1 was it your understanding that it was your testimony, in

2 tandem with Troy police department, that was going to be

3 making out a case or not at trial in this case?

4     A.  Yes.  That's quite typical.  Yes.

5     Q.  It's typical generally but you knew specifically

6 in this case as well based on the nature of this?

7     A.  I know it in every case.  Every case I'm not the

8 only person who testifies.  PD testify, witnesses

9 testify.  So, it's just -- I just assume that PD would

10 be involved.

11     Q.  In the nature of your conversation with DA

12 Abelove and ADA Hall, did you ever speak with Ron

13 Fountain or anyone from Troy about the way this case was

14 handled by the DA's office or by anyone else?

15     A.  Not to my recollection, no.

16     Q.  DA Abelove subsequently prosecuted Ron Fountain

17 in a criminal case.

18         Did you know about that?

19            MS. SPENCER:  Object to form.

20            THE WITNESS:  I heard rumors about that

21    but I never followed up on it.  I didn't get any

22    of the details.  I don't know.

23 BY MR. KLEIN:

Case 1:17-cv-03301-DdS Document 47/593 4 Filed 02/04/22 Page 143 of 178

1    Q.  So, that never came up during these proceedings

2  or any of your conversations in this case?

3    A.  No.  I don't involve myself in PD or DA politics.

4    Q.  Whether you do or don't, it may have come up, so

5  I just want to know either way whether it came up.

6    A.  Not to my recollection, no.

7    Q.  In the news article that I referenced earlier, DA

8  Abelove said the following about you.

9        He said that he continues to have the utmost

10  confidence in you despite concerns expressed by Dr. Teas

11  about the number of autopsies you perform, which you

12  estimated at more than 700 per year, which Dr. Teas said

13  is more than double the recommended amount by the

14  national academy.

15        He said, quote, I'm still very satisfied with his

16  opinion.  Abelove said, I've known Dr. Sikirika for many

17  years and I find him entirely professional, very

18  thorough, and I have no qualms about his qualifications

19  or his abilities whatsoever.

20        Did you know about that statement before I just

21  read it to you?

22    A.  No, I never heard that.

23    Q.  Pretty complimentary.

1        So, did you -- in what way did you know Joel

2   Abelove for many years before this?  Because I don't

3   think he was DA -- how many years was he DA for, if you

4   know?

5     A.  Oh God.  Several years.

6        I've been through so many DAs, starting with

7   Trish Deangelis, McNally, Joel, the new DA.  I can't

8   even remember her name, you know.

9        That was nice of Joel to say, but I didn't know

10  him before this really.

11    Q.  So anything you knew about him was in the course

12  of your dealings.

13       Did you have any dealings with him professionally

14  in any other cases like you did in this case, or just

15  with his office through, like, you know, his

16  subordinates?

17    A.  Yes.  I worked with a lot of his subordinates on

18  cases, different cases.  I can't remember another case

19  where Joel was the primary, but it could have been

20  another case.

21    Q.  Even not as a primary, did you have any other

22  cases where you had meetings with him or his inner, you

23  know, his executive staff, other than like the one in

1   this case where you met with him directly?

2       A.   I'm sure I have.   I would guarantee you I have.

3       Q.   Have you ever met him before other than that

4   meeting that you had with him?

5       A.   Yes.

6       Q.   You have?

7       A.   Yes.

8       Q.   How many times?

9       A.   I don't know.   I probably was introduced to him

10   several years before.   I don't have any real

11   recollection of any significant meeting with him, no.

12       Q.   So, just to button that up.

13           You don't recall any meetings with him prior to

14   your meeting with him after you testified in this case?

15       A.   No.   I would have met him prior to this case I'm

16   sure, but I can't remember any individual cases.

17               MR. KLEIN:   Just one moment here.   I'm

18       just going to look at some other notes.

19               Off the record.

20               (Brief recess.)

21   BY MR. KLEIN:

22       Q.   If ████████ had some type of arrythmia -- withdrawn.

23           Are you familiar with the phenomenon of

Case 1:17-cv-03290-DLS Document 70-6 17-34 Filed 02/04/22 Page 146 of 178

**APPENDIX**                                                    **638**

1   arrythmias leading to sudden death?

2       A.   Yes.

3       Q.   Can two-year-olds have arrythmias?

4       A.   Yes.

5       Q.   Can two-year-olds have arrythmias, cardiac

6   arrythmias, that lead to death, sudden death?

7       A.   Yes.

8       Q.   Is that something that you considered in this

9   case?  If so, did you -- what significance did that

10  factor in here?

11      A.   Well, I looked for -- during the gross and

12  microscopic examination, I looked for any source of

13  arrythmia.  I look for what could cause arrythmia.

14          Most of them are caused by physiological changes

15  or structural changes in the heart that occur.  And I

16  looked at that grossly and microscopically and

17  determined that there was no physiological evidence of

18  arrythmia, but I will qualify that, to be honest.

19          I mean, to examine the heart would take tens and

20  tens of thousands of slides.  So we, as pathologists,

21  only look at what we can look at to a reasonable degree

22  of certainty, and there was no major arrhythmogenic

23  focus into her heart.

1    Q.  Doesn't mean it didn't happen.  You just didn't

2    do the deep analysis, which is maybe understandable, but

3    you didn't do that to confirm conclusively; is that

4    right?

5    A.  Well, you may never find arrythmia.  Arrythmia is

6    electrophysiological.  It's like looking at a wire and

7    saying is there a current in it or not.  You may not

8    find the current.

9    Q.  Is that similar to the stroke -- I'm sorry -- the

10   seizure?  You may not necessarily see the focus of a

11   seizure.  You may or may not.  There may be, you know --

12   the subject may bite their tongue.  They may not.

13        There could be a seizure even if you don't see

14   evidence of a seizure, correct?

15   A.  Yes.  Only a quarter of the people bite their

16   tongue.

17   Q.  So, there could an arrythmia that lead to this,

18   which would explain why nothing showed up, right?  Is

19   that one possibility?

20        MS. PECK:  Objection.

21        THE WITNESS:  Arrythmia out of the blue

22    would be a very, very remote possibility, yes.

23   BY MR. KLEIN:

1    Q.   And a seizure would also be a possibility but, in

2    your view, very remote; is that fair?

3    A.   Very, very remote, yes.

4    Q.   Are there any other causes of her death that,

5    while remote, are possible in this -- given the facts

6    that you know in this case?

7    A.   Not that I'm aware of, no.

8    Q.   If ████ had died of an arrythmia and any

9    subsequent injuries that you observed on autopsy to the

10   liver and rib were postmortem, would you have -- what

11   would the manner of death have been?

12        Would it have been natural causes or undetermined

13   or what would you say there?

14   A.   If I had -- if she had died from arrythmia, her

15   cause of death would be arrythmia.  That would not be

16   included in the finding.  It would be mentioned in the

17   final anatomic diagnosis, but they would not be part of

18   the cause of death.

19   Q.   There are times, Doctor, that you make

20   assumptions or you assume something happened if there's

21   no other way to explain the subsequent event.

22        Isn't that something that you do in your

23   practice?

```
 1      A.  Yes.

 2              MS. PECK:  Objection.

 3   BY MR. KLEIN:

 4      Q.  Like, in other words, with Adrian Thomas, with

 5   that infant, there was no evidence of congestion, but

 6   you found that there must have been congestion which

 7   lead to pneumonia.

 8              MS. PECK:  He does not have the ability

 9         to talk about his autopsy findings or his autopsy

10         in this case, technically under law --

11              MR. KLEIN:  He talked about it at trial

12         in a proceeding.

13              MS. PECK:  The proceeding is sealed

14         because he was acquitted.

15              MR. KLEIN:  Right.

16              MS. PECK:  It can't be a part of this

17         discussion, Brett.  If you wanted it to be a part

18         of this discussion it needed to be opened for

19         this case.

20              MR. KLEIN:  Okay.

21      Q.  Are there -- hypothetically, are there situations

22   where you have someone who develops pneumonia, and you

23   assume that there was congestion, there was aspiration,
```

```
 1    even if there's no evidence of aspiration?

 2              MS. PECK:  Objection.

 3              THE WITNESS:  Yes.

 4    BY MR. KLEIN:

 5      Q.  Similarly, you could assume there was an

 6    arrythmia or a seizure given -- in certain

 7    circumstances, even if you have no objective evidence

 8    that it occurred, right?

 9          You could opine that there's an unexplained

10    death, more likely than not due to an arrythmia or

11    something like that, can't you?

12      A.  You'd have to attribute the arrythmia to

13    something, and that would have to be cardiovascular

14    disease or scarring of the heart or infection of the

15    heart.  We all die from a cardiac arrythmia.

16          Cardiac arrythmia, one form of cardiac arrythmia

17    is asystole.  Basically your heart stops.  That is

18    classified as arrythmia.  Arrythmia is very, very

19    general term.

20          That's why, when we do an autopsy like ████, we

21    look at the heart.  We look at other organs.  We try to

22    determine is there something that could cause an

23    arrythmia to death, and to a reasonable degree of
```

1    medical certainty, I did not find anything in ███.

2       Q.   Right.   Just to kind of close that up.

3          The absence of not finding it doesn't mean it

4    didn't happen.   You just didn't find it affirmatively.

5       A.   Correct.

6       Q.   Are there rules, regulations or guidelines or

7    best practices that dictate that, that if there are

8    secondary potential causes of death, even if they're

9    rare or not, less likely in your opinion, that you still

10   need to list them for full transparency?

11      A.   No.   There's no ruling on that.   It's simply

12   assumed that, you know, to the best of our medical

13   ability, we have found a cause of death.

14          And there could always be something hidden in the

15   woodpile, I guess.

16      Q.   When you prepared your autopsy report, your final

17   report, did you -- what was the moment where you

18   classified this as a, you know, blunt force trauma?

19          What was the moment that you determined the cause

20   of death?

21      A.   Well, that would have been when I finally signed

22   off on the change form.   That would have been the time.

23      Q.   Did you send your draft autopsy to Troy PD and/or

1     the DA's office before finalizing it?

2        A.   I don't send out draft autopsies.

3        Q.   Do you give them a heads up before you finalize

4     it to say, hey, this is coming your way, you'll have it

5     within a week, and this is what I'm going to find?

6        A.   They may beg for it, but I don't necessarily -- I

7     never call them and tell them it's coming.  Often

8     they're looking for a report and they call my office.

9            Doc, we need a report.  What are you doing?  And

10    I will say, it's coming, and eventually it does make it

11    to them.  But my reports don't go to the police.  They

12    only go to the health department.

13       Q.   Doctor, are there any other facts or

14    circumstances involving ███████████ death that are

15    significant in this case that we haven't discussed?

16       A.   Not that I'm aware of, Brett.  I think we covered

17    everything.

18       Q.   Are there any other conversations or involvements

19    with any law enforcement in this case that stand out as

20    significant that you haven't already discussed, other

21    than your prep meetings, your autopsy meeting, your post

22    autopsy meeting, your DA preps, your critique of

23    Chavkin, your trial testimony, anything else?

Case 1:17-cv-01290-DJS   Document 47-34  Filed 02/04/22  Page 153 of 178

1    A.  No.  No.  That's about it.

2    Q.  Is there anything about the way the science has

3  evolved, your view of Dr. Teas' testimony, learning your

4  about the details of the 6,000 compressions by Fireman

5  Bayly and Dr. Crisafulli, anything else that impacts

6  your views in this case?

7    A.  No.  Not at this time, no.

8           MR. KLEIN:  Well, thanks for this time.

9    You've been very generous with it.  We appreciate

10    it.

11  EXAMINATION

12  BY MS. SPENCER:

13    Q.  Dr. Sikirika, my name is Rhiannon Spencer.  I'm

14  an attorney for Pattison Sampson Ginsberg and Griffin.

15  I represent the City of Troy, Ronald Fountain, Danielle

16  Coonradt, Charles McDonald, Tim Colaneri and Adam Mason,

17  I believe are all the individuals named from the Troy

18  police department.

19         I just have a few questions for you.  Same rules

20  as with Brett.

21         Let's see.  So, in your experience, are there

22  certain or specific types of scenarios when the police

23  or the ADA or the district attorney's office would

1    request to be present during an autopsy?

2     A.   Yes.   If they know that it is a homicide from the

3    beginning, they're often there.   If there's anything

4    suspicious about a death in a young person, they're

5    often there, even if it's not suspicious.

6      Young people generate more interest,

7    understandably, whenever they die, especially children.

8    Even if the child is in an accident, they may often be

9    there.

10      So, they are there quite a bit if there's

11    anything unusual about a case or unknown.

12     Q.   And is it part of the expected standards or

13    customary practices for medical examiners to work

14    cooperatively with the police and the ADA's office?

15     A.   Yes.   Forensic pathology is a medical legal

16    investigation of death.   So, we have to rely on police

17    many times for things that we don't have access to.

18      Sometimes the DAs have to give us things that we

19    don't have access to.   They may provide subpoenas and

20    get us records if required, but it's a cooperative

21    effort and we all function independently of each other.

22     Q.   And part of that cooperative relationship would

23    include, you know, reviewing the police reports from the

1  Troy PD, or reviewing statements made by individuals

2  that provided that information to you upon your request,

3  or if they find that maybe it would be of interest.

4      Is that kind of those scenarios?

5  A.  Yes.  An autopsy never exists in a vacuum.  We

6  have to have circumstances and a background, a

7  reasonable degree of study.

8      I mean, I don't need a kindergarten record on

9  some people.  You know, if you're 20 years old and died

10 of a gunshot, I don't need your kindergarten grades, but

11 I'd like to know the police report, perhaps what was

12 found at the scene, are there any videos of what went

13 down, what was the general medical condition.  And then

14 we all put it together and, you know, I do the ultimate

15 condensation of this in my report.

16 Q.  And as part of that cooperative relationship,

17 those meetings that we discussed, for instance, in this

18 case on February 27th and March 12th and any other ones,

19 that would be a typical cooperative relationship and

20 meeting that occurs, correct?

21 A.  Yes.

22 Q.  During any of those meetings referenced, did any

23 member of the Troy police department attempt in any

1    manner to exert what you would consider as undue

2    influence on your medical determinations?

3       A.  Absolutely not.

4       Q.  And during the autopsy of ███████████, did any

5    member of the Troy police department tell you to rule

6    this death a homicide?

7       A.  Never, no.

8       Q.  In rendering the final autopsy report that you

9    prepared in this matter, did any member of the Troy

10   police department tell you what to put in the report or

11   what they believed was relevant information?

12      A.  No, absolutely not.

13      Q.  For instance, did any Troy police department

14   member tell you to put in anatomic diagnosis, the

15   history, or any of those kind of findings?

16      A.  No.

17            MS. SPENCER:  That is all the questions

18     that I have for you, Doctor.  Thank you very

19     much.  I really appreciate it.

20           Are you all set, Brett?

21           MR. KLEIN:  I am.

22           (Deposition concluded at 1:37 p.m.)

23

Case 1:17-cv-01290-DJS   Document 173-4   Filed 02/04/22   Page 137 of 178

```
1                    INDEX OF EXHIBITS

2    Sikirika                                Marked

3        1    Sikirika file                    25

4        2    Abelove press release            51

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

```
 1    STATE OF NEW YORK     )

 2    COUNTY OF

 3

 4    I, MICHAEL SIKIRICA, do hereby certify that I have read

 5    the foregoing record of my testimony taken at the time

 6    and place noted in the heading hereof and that it is

 7    a true and correct transcript of the same and the whole

 8    thereof.

 9

10

11

12

13                                MICHAEL SIKIRICA

14

15    Subscribed and sworn to

16    before me this        day

17    of _____, 2021

18

19

20

21

22    _____

23
```

Case 1:17-cv-03129-DJS Document 47/393 4 Filed 02/04/22 Page 1597 of 178

1              <u>C E R T I F I C A T I O N</u>

2

3

4   I, Jeanne O'Connell, Registered Professional Reporter

5   and Notary Public in and for the State of New York, do

6   hereby certify that the foregoing to be a true and

7   accurate transcription of the stenographic notes as

8   taken by me of the aforesaid proceedings.

9

10

11

12  _____          _____

13      Date                                Jeanne O'Connell

14

15

16

17

18

19

20

21

22

23

**'**

**'90s** [2] - 19:18

**0**

**0.3** [1] - 113:1
**0.4** [1] - 112:23
**0.5** [2] - 112:16, 112:21

**1**

**1** [11] - 25:8, 25:11, 32:21, 52:21, 53:8, 53:11, 85:3, 113:1, 113:20, 117:7, 156:3
**1.4** [1] - 112:18
**1.8** [2] - 112:23, 117:7
**10** [5] - 54:7, 63:3, 63:11, 117:10, 137:9
**10,000** [1] - 19:19
**100** [1] - 54:16
**10007** [1] - 2:3
**12** [2] - 87:12, 118:16
**120** [1] - 54:20
**121-page** [1] - 32:21
**12180** [1] - 2:6
**12205** [1] - 2:10
**12th** [1] - 154:18
**15** [5] - 46:23, 49:10, 54:7, 120:19, 137:9
**1585** [1] - 34:22
**1586** [1] - 34:18
**1587** [1] - 35:16
**1596** [1] - 85:3
**1597** [1] - 35:16
**1598** [1] - 35:22
**1599** [1] - 36:2
**15th** [2] - 122:9, 122:19
**16** [4] - 54:21, 64:8, 64:16, 116:1
**1601** [1] - 36:17
**1602** [1] - 36:17
**1603** [1] - 36:17
**1604** [1] - 36:18
**1605** [1] - 36:21
**1606** [2] - 37:1, 37:8
**1607** [1] - 44:19
**1612** [1] - 113:19
**1614** [1] - 115:9
**1616** [1] - 115:17
**1618** [1] - 116:10
**1619** [1] - 116:23
**1620** [1] - 117:1
**1624** [1] - 118:15
**1625** [1] - 119:22
**1626** [1] - 121:1
**1627** [1] - 121:1

**1638** [1] - 121:13
**1639** [1] - 121:13
**1640** [1] - 121:13
**1641** [1] - 121:23
**1682** [1] - 53:11
**1689** [1] - 55:12
**17** [1] - 116:1
**1705** [1] - 32:23
**18** [3] - 113:4, 116:1, 117:9
**19** [1] - 116:1
**1:14** [1] - 107:8
**1:17-cv-01290** [1] - 1:5
**1:37** [1] - 155:22
**1st** [2] - 45:14, 122:21

**2**

**2** [4] - 51:14, 51:18, 156:4
**2.5** [1] - 112:18
**20** [5] - 35:2, 54:3, 54:21, 116:1, 154:9
**20-minute** [2] - 54:8, 85:20
**2001** [1] - 139:1
**2010** [2] - 24:12, 58:8
**2014** [2] - 93:22, 93:23
**2015** [4] - 4:14, 22:1, 22:4, 37:15, 38:22, 57:15, 83:16, 93:10, 118:16, 139:5, 139:13
**2015-2016** [1] - 14:13
**2016** [9] - 4:15, 22:22, 24:21, 25:14, 27:11, 42:21, 52:6, 122:9, 122:19
**2019** [8] - 8:11, 8:17, 9:22, 14:22, 15:3, 16:4, 16:18, 20:7
**2021** [2] - 1:13, 157:17
**20th** [1] - 122:21
**21** [2] - 87:12, 116:1
**21st** [1] - 46:4
**22** [1] - 2:5
**22nd** [3] - 22:22, 46:2, 46:4
**24th** [1] - 1:12
**25** [2] - 52:6, 156:3
**250** [2] - 14:17, 17:15
**26** [1] - 38:22
**26th** [1] - 25:15
**27** [1] - 37:15
**27th** [3] - 25:17, 37:22, 154:18
**28th** [2] - 42:20, 44:21
**29th** [2] - 22:1, 122:21
**2:08** [1] - 107:8
**2nd** [2] - 83:16, 118:19

**3**

**3** [1] - 117:7
**3,000** [1] - 56:4
**30** [6] - 56:3, 56:18, 58:11, 58:13, 113:4, 117:9
**305** [1] - 2:2
**350** [2] - 77:5, 112:8
**36** [1] - 56:17
**360** [2] - 14:20, 17:16

**4**

**4** [1] - 117:7
**4/10/16** [1] - 34:21
**400** [2] - 24:13, 77:5
**46** [1] - 114:7
**49** [1] - 114:9

**5**

**5** [3] - 2:9, 112:16
**50** [2] - 114:9, 139:10
**500** [1] - 30:17
**51** [2] - 114:9, 156:4
**53** [1] - 51:22
**54** [1] - 52:9
**5th** [2] - 8:11, 8:17, 9:22

**6**

**6,000** [8] - 57:3, 66:1, 71:20, 75:18, 82:21, 99:20, 100:11, 152:4
**60** [1] - 114:13
**600** [3] - 2:3, 14:14, 15:5
**61** [1] - 114:13
**62** [1] - 114:13
**63** [1] - 114:13
**64** [1] - 114:13
**65** [1] - 114:13
**66** [2] - 56:19, 114:17
**6600** [1] - 56:21
**67** [1] - 114:17
**6th** [3] - 8:11, 8:17, 9:22

**7**

**7** [1] - 63:3
**7.5** [1] - 112:21
**700** [1] - 142:12
**7442** [1] - 114:1
**7445** [1] - 114:5
**7452** [1] - 114:10

**8**

**8** [1] - 117:11
**8/1/16** [2] - 35:11, 44:18
**8/1/16"** [1] - 34:23
**86** [1] - 114:20
**87** [1] - 114:20

**9**

**9** [3] - 35:2, 63:11, 117:10
**911** [1] - 107:10
**9:33** [1] - 1:13

**A**

**a.m** [1] - 1:13, 35:2
**abdomen** [12] - 63:14, 65:19, 74:4, 74:15, 78:10, 78:12, 100:16, 102:4, 108:11, 112:8, 128:19, 131:13
**abdominal** [11] - 62:19, 65:3, 65:6, 76:5, 77:10, 89:20, 97:15, 98:4, 98:12, 112:9, 138:20
**ABELOVE** [1] - 1:8
**Abelove** [21] - 2:11, 40:11, 41:23, 42:4, 48:6, 49:6, 50:12, 51:3, 51:16, 52:1, 52:7, 52:18, 86:3, 86:19, 96:13, 141:12, 141:16, 142:8, 142:16, 143:2, 156:4
**abilities** [1] - 142:19
**ability** [6] - 18:21, 20:2, 20:4, 29:9, 148:8, 150:13
**able** [9] - 33:21, 34:8, 41:8, 41:18, 45:17, 68:10, 71:1, 98:20, 104:19
**absence** [1] - 150:3
**absolutely** [3] - 104:21, 155:3, 155:12
**abuse** [1] - 74:8
**Academy** [2] - 21:13, 21:18
**academy** [1] - 142:14
**access** [2] - 153:17, 153:19
**accident** [2] - 81:8, 153:8

**accidental** [3] - 38:11, 128:6, 135:16
**accidentally** [1] - 137:23
**account** [2] - 80:22, 82:18
**accounted** [1] - 77:16
**accreditation** [3] - 17:17, 17:21, 18:10
**accredited** [3] - 16:22, 17:21, 18:8
**accumulated** [1] - 91:7
**accurate** [4] - 30:8, 87:15, 103:13, 158:7
**accurately** [1] - 5:20
**Ackerman** [1] - 120:7
**acquittal** [8] - 39:18, 39:19, 39:22, 40:7, 48:3, 48:8, 49:23, 87:3
**Acquitted** [1] - 52:5
**acquitted** [2] - 40:3, 148:14
**acronym** [1] - 68:3
**act** [2] - 12:16, 74:7
**acted** [1] - 84:4
**action** [3] - 3:13, 51:5, 132:4
**activity** [1] - 110:11
**acts** [2] - 129:9, 129:12
**actual** [1] - 15:11
**ADA** [9] - 35:3, 40:15, 41:22, 41:23, 51:3, 51:6, 122:22, 141:12, 152:23
**ADA's** [1] - 153:14
**ADAM** [1] - 1:7
**Adam** [2] - 2:8, 152:16
**add** [1] - 115:5
**added** [1] - 52:12
**additional** [7] - 6:20, 6:23, 7:19, 112:17, 113:2, 115:4, 117:3
**address** [2] - 28:13, 32:7
**addressed** [1] - 29:1
**adjust** [1] - 73:10
**administer** [1] - 3:18
**administered** [1] - 64:16
**admitted** [1] - 52:10
**admitting** [1] - 52:8
**adolescence** [1] - 70:20
**adrenal** [1] - 108:14
**adrenals** [1] - 108:3
**Adrian** [8] - 4:10, 49:23, 93:12, 94:22,

96:10, 136:13, 136:16, 148:4
**adult** [7] - 61:16, 85:8, 85:9, 99:7, 99:15, 101:2, 109:3
**adults** [9] - 56:11, 56:14, 61:14, 61:15, 71:2, 73:9, 99:21, 101:4, 103:3
**advance** [1] - 118:22
**affected** [3] - 20:8, 20:9, 108:2
**affirmation** [1] - 3:18
**affirmatively** [1] - 150:4
**aforesaid** [1] - 158:8
**afternoon** [1] - 86:13
**afterwards** [3] - 40:6, 48:10, 137:22
**age** [14] - 67:18, 68:7, 68:16, 68:18, 68:23, 69:1, 69:8, 69:10, 69:12, 69:21, 69:22, 70:7, 71:10
**agenda** [1] - 119:17
**ago** [2] - 14:6, 137:9
**agree** [20] - 50:14, 58:10, 76:12, 76:17, 76:18, 76:21, 78:22, 79:1, 91:3, 91:6, 102:21, 105:2, 105:14, 106:8, 106:14, 107:23, 109:4, 109:9, 109:13, 129:7
**agreed** [4] - 3:2, 3:8, 3:11, 3:15
**ahead** [1] - 5:12
**air** [1] - 131:17
**airway** [1] - 24:16
**Albany** [18] - 2:10, 10:8, 10:12, 10:14, 10:18, 11:12, 11:21, 12:1, 12:4, 12:7, 12:10, 12:16, 13:12, 18:6, 18:8, 19:23, 36:12, 118:9
**alcoholism** [1] - 137:19
**allow** [4] - 28:4, 28:6, 33:22, 139:17
**allowed** [1] - 86:10
**alone** [6] - 41:12, 46:13, 46:14, 55:5, 79:10, 84:14
**ambulance** [1] - 54:7
**amend** [2] - 23:8, 115:15
**amount** [15] - 14:16, 18:15, 56:1, 58:15,

77:11, 77:12, 89:20, 90:2, 91:6, 91:11, 91:12, 112:9, 118:5, 126:2, 142:13
**analysis** [2] - 37:17, 146:2
**analyze** [1] - 103:4
**anatomic** [6] - 85:2, 99:6, 110:6, 113:6, 147:17, 155:14
**Andra** [1] - 120:7
**Andrew** [1] - 134:15
**anecdotally** [2] - 59:20, 61:4
**animal** [1] - 50:6
**answer** [7] - 5:3, 5:4, 5:13, 5:16, 26:16, 50:5, 109:21
**answered** [1] - 78:20
**answering** [1] - 75:1
**answers** [1] - 5:6
**antemortem** [5] - 29:4, 103:20, 125:22, 126:1, 126:11
**anterior** [6] - 61:12, 61:13, 64:1, 64:12, 112:17, 117:9
**Anthony** [1] - 120:3
**anytime** [1] - 94:22
**apart** [1] - 39:3
**apologetic** [2] - 49:19, 86:23
**apparent** [1] - 111:12
**Appeals** [1] - 93:12
**appear** [1] - 111:5
**appearance** [3] - 29:3, 33:11, 34:19
**APPEARANCES** [1] - 2:1
**appeared** [4] - 34:18, 113:17, 121:11, 127:20
**applicability** [1] - 71:10
**applicable** [2] - 68:5, 100:7
**application** [2] - 62:14, 62:18
**applied** [8] - 60:23, 61:7, 61:23, 62:1, 65:19, 74:14, 99:1, 108:9
**apply** [2] - 17:6, 70:7
**applying** [2] - 94:18
**appreciate** [2] - 152:9, 155:19
**approached** [1] - 11:7
**appropriately** [1] - 84:4
**arch** [3] - 62:18,

62:22, 63:3
**area** [5] - 62:22, 78:16, 78:17, 91:18, 96:12
**argument** [2] - 43:13, 137:20
**arrest** [5] - 66:22, 67:3, 76:20, 81:16, 134:18
**arrhythmogenic** [1] - 145:22
**arrived** [2] - 124:3, 124:5
**arrhythmia** [24] - 69:3, 81:9, 81:11, 125:17, 144:22, 145:13, 145:18, 146:5, 146:17, 146:21, 147:8, 147:14, 147:15, 149:6, 149:10, 149:12, 149:15, 149:16, 149:18, 149:23
**arrhythmias** [4] - 145:1, 145:3, 145:5, 145:6
**arteries** [7] - 106:5, 106:8, 106:15, 106:16, 106:18, 106:19, 106:21
**artery** [4] - 105:16, 105:17, 105:20, 106:12
**article** [5] - 24:20, 25:1, 52:4, 52:19, 142:7
**articles** [6] - 21:5, 23:14, 23:21, 23:22, 24:2, 24:3
**ASAP** [1] - 86:12
**ascertain** [1] - 7:23
**aspect** [6] - 29:14, 62:8, 62:11, 112:11, 112:15, 112:18
**aspects** [4] - 43:2, 60:19, 63:7, 64:1
**aspiration** [2] - 148:23, 149:1
**assessment** [1] - 106:23
**assigned** [1] - 68:21
**Assistant** [2] - 41:16, 52:11
**assistant** [4] - 40:8, 42:6, 42:7, 48:15
**associate** [2] - 16:23, 17:2
**associated** [3] - 57:18, 61:11, 110:6
**Association** [3] - 16:11, 16:15, 17:9
**assume** [14] - 72:17,

75:13, 77:12, 77:15, 80:23, 82:14, 99:2, 100:9, 101:21, 127:21, 141:9, 147:20, 148:23, 149:5
**assumed** [10] - 5:13, 75:10, 78:10, 84:3, 100:13, 101:10, 101:12, 101:16, 101:22, 150:12
**assuming** [1] - 77:10
**assumption** [7] - 73:4, 74:12, 75:12, 77:22, 78:1, 78:5, 80:7
**assumptions** [2] - 29:2, 147:20
**assure** [1] - 10:20
**asymptomatic** [1] - 29:23
**asystole** [2] - 79:18, 149:17
**athletes** [1] - 70:14
**attack** [1] - 135:12
**attempt** [1] - 154:23
**attempted** [13] - 23:17, 67:6, 85:7, 99:6, 99:14, 99:20, 101:2, 102:7, 128:18, 128:21, 129:1, 129:12, 129:18
**attempting** [1] - 128:15
**attend** [1] - 21:3
**attending** [3] - 20:20, 20:23, 21:16
**attentive** [1] - 86:23
**attorney** [11] - 4:22, 20:20, 37:21, 40:8, 46:11, 47:4, 50:7, 83:4, 83:6, 152:14
**Attorney** [5] - 2:4, 41:17, 52:11, 134:14, 134:23
**attorney's** [1] - 152:23
**Attorneys** [2] - 2:7, 2:11
**attorneys** [5] - 3:3, 22:14, 26:21, 26:23, 87:7
**attributable** [2] - 100:7, 100:10
**attribute** [3] - 97:2, 97:5, 149:12
**attributed** [3] - 52:7, 52:18, 60:22
**August** [11] - 22:22, 26:4, 45:14, 46:2, 46:4, 52:6, 122:9,

122:19, 122:21
**authoritative** [1] - 23:14
**autopsies** [13] - 14:14, 15:4, 15:13, 16:1, 17:15, 18:14, 18:20, 19:19, 20:2, 38:21, 120:12, 142:11, 151:2
**autopsy** [68] - 4:14, 6:5, 6:11, 7:7, 9:6, 12:11, 20:5, 20:20, 21:1, 21:9, 25:17, 35:17, 35:23, 36:1, 36:2, 36:9, 36:12, 36:18, 36:21, 37:1, 37:4, 37:6, 37:10, 37:22, 38:12, 39:5, 52:23, 70:6, 81:13, 85:1, 85:11, 87:7, 88:3, 88:11, 88:20, 88:23, 89:3, 93:11, 94:12, 94:16, 99:9, 112:7, 114:21, 116:8, 118:15, 119:13, 119:14, 119:23, 120:5, 120:8, 120:17, 121:14, 121:15, 134:13, 137:3, 147:9, 148:9, 149:20, 150:16, 150:23, 151:21, 151:22, 153:1, 154:5, 154:4, 155:8
**Autopsy** [1] - 139:1
**available** [1] - 134:13
**Avenue** [1] - 2:10
**avoid** [3] - 12:5, 54:23, 56:10
**avoidable** [5] - 58:21, 59:5, 59:15, 59:16, 59:21
**avoided** [4] - 58:17, 58:19, 58:20, 59:10
**aware** [35] - 20:17, 20:18, 22:15, 22:16, 23:13, 24:20, 24:22, 24:23, 51:23, 53:2, 53:4, 54:11, 54:17, 55:1, 57:17, 59:3, 59:4, 59:19, 60:1, 60:21, 65:2, 88:9, 93:18, 94:6, 95:9, 125:18, 133:23, 134:3, 138:17, 138:19, 140:2, 140:7, 147:7, 151:16

**B**

**baby** [3] - 74:7, 124:16, 124:23
**baby's** [1] - 124:12
**background** [6] - 8:22, 9:10, 9:11, 9:15, 123:22, 154:6
**bacterial** [1] - 81:17
**Bailey** [1] - 2:9
**based** [8] - 71:10, 84:5, 102:10, 120:22, 125:15, 134:6, 138:2, 141:6
**basis** [3] - 12:15, 71:11, 126:10
**Basketball** [1] - 52:5
**Bates** [3] - 32:21, 32:23, 53:10
**Bayly** [8] - 53:3, 53:9, 53:16, 54:2, 54:12, 54:20, 74:21, 152:5
**became** [4] - 11:6, 11:11, 39:19, 113:11
**become** [4] - 24:22, 68:19, 111:12, 111:15
**bed** [1] - 82:20
**beforehand** [1] - 71:6
**beg** [1] - 151:6
**begin** [1] - 68:10
**beginning** [1] - 153:3
**behind** [4] - 60:3, 113:4, 120:15, 130:6
**belong** [1] - 50:11
**belonged** [1] - 50:8
**below** [3] - 34:21, 62:22, 63:14
**best** [7] - 21:2, 21:19, 42:6, 45:12, 137:18, 150:7, 150:12
**better** [4] - 45:16, 75:13, 136:12, 139:18
**between** [4] - 3:3, 47:10, 56:17, 96:10
**beyond** [9] - 19:12, 66:13, 66:19, 69:18, 71:17, 71:18, 74:1, 97:22, 100:6
**big** [1] - 105:15
**bigger** [1] - 113:11
**biggest** [1] - 12:1
**birth** [1] - 69:21
**bit** [1] - 153:10
**bite** [2] - 146:12, 146:15
**bled** [3] - 79:4, 126:19, 127:1
**bleed** [9] - 76:18,

76:19, 78:23, 106:11, 106:12, 106:17, 106:19, 126:20, 126:23
**bleeding** [16] - 76:6, 76:14, 76:21, 77:1, 91:4, 91:5, 97:15, 103:11, 106:9, 106:22, 109:4, 109:7, 126:1, 127:19, 130:12
**bleeds** [1] - 79:3
**blocks** [1] - 7:8
**blood** [30] - 30:8, 30:22, 36:16, 57:10, 76:7, 76:10, 77:5, 77:9, 77:13, 80:7, 89:20, 89:21, 90:3, 90:12, 90:22, 91:4, 98:15, 98:16, 104:12, 105:1, 105:15, 107:1, 107:3, 111:13, 111:14, 112:8, 112:9, 114:1, 118:5
**bloodstream** [1] - 30:20
**blown** [1] - 8:1
**blowups** [1] - 7:13
**blue** [2] - 104:14, 146:21
**bluetooth** [1] - 109:20
**blunt** [7] - 74:3, 85:5, 98:14, 102:4, 135:13, 137:11, 150:18
**board** [3] - 10:19, 10:21, 16:12
**body** [5] - 76:11, 78:14, 113:8, 116:17, 133:18
**bones** [1] - 61:15
**bordered** [1] - 63:3
**bottom** [5] - 32:22, 34:21, 35:11, 52:8, 114:11
**Brady** [1] - 22:13
**brain** [7] - 31:12, 31:13, 110:10, 110:14, 110:23, 111:1, 111:2
**break** [8] - 5:15, 5:17, 85:15, 85:20, 85:21, 99:6, 117:9, 139:22
**breaking** [2] - 74:16, 104:9
**breaks** [1] - 74:16
**Brent** [1] - 16:7
**brett** [1] - 42:11
**Brett** [11] - 2:2, 4:9,

9:2, 33:21, 42:17, 75:1, 75:22, 148:17, 151:16, 152:20, 155:20
**Brief** [1] - 144:20
**brief** [1] - 44:15
**briefcase** [1] - 94:22
**briefly** [1] - 5:3
**bring** [1] - 88:9
**broader** [1] - 108:10
**Broadway** [1] - 2:2
**broken** [8] - 63:22, 64:1, 79:10, 93:3, 131:20, 132:5, 132:6
**brought** [2] - 100:4, 118:21
**build** [1] - 18:7
**Buttofucco** [1] - 120:3
**button** [1] - 144:12
**BY** [85] - 4:5, 9:20, 13:22, 16:10, 19:1, 20:11, 21:11, 24:19, 26:18, 31:2, 31:16, 34:3, 34:13, 38:7, 40:10, 41:11, 43:3, 43:12, 44:3, 44:13, 46:3, 47:18, 48:19, 50:4, 51:10, 57:7, 57:13, 57:23, 59:2, 59:11, 60:5, 60:14, 64:6, 65:22, 66:6, 73:17, 74:5, 74:18, 75:6, 75:16, 76:4, 77:18, 79:16, 80:8, 83:12, 83:22, 85:18, 88:13, 89:9, 89:17, 90:8, 90:19, 91:15, 92:15, 93:4, 93:9, 93:20, 94:7, 94:20, 96:1, 96:18, 97:10, 98:1, 98:8, 99:4, 100:8, 100:18, 101:19, 102:20, 108:22, 122:17, 123:15, 124:22, 132:13, 133:1, 133:12, 136:22, 140:1, 140:22, 141:23, 144:21, 146:23, 148:3, 149:4, 152:12

**C**

**calcified** [1] - 61:15
**cannot** [6] - 17:19, 71:3, 103:23, 104:4, 129:13, 130:3
**capacity** [1] - 105:7
**captain** [1] - 53:21

**car** [1] - 134:18
**cardiac** [13] - 61:23, 66:22, 67:3, 69:3, 76:20, 81:11, 81:16, 125:17, 134:18, 145:5, 149:15, 149:16
**cardiopulmonary** [4] - 71:17, 71:19, 85:7, 99:15
**cardiovascular** [1] - 149:13
**career** [2] - 32:2, 72:8
**carefully** [1] - 111:1
**case** [140] - 4:10, 4:23, 6:1, 8:1, 8:10, 8:13, 8:18, 8:21, 9:7, 19:3, 19:5, 20:19, 21:23, 23:9, 24:4, 24:7, 25:4, 25:13, 26:20, 27:8, 32:12, 32:15, 33:6, 39:2, 39:6, 40:3, 40:16, 40:19, 40:23, 41:18, 41:20, 42:23, 43:2, 44:5, 44:8, 44:9, 45:15, 45:17, 46:6, 47:11, 48:15, 51:7, 51:11, 52:2, 52:10, 52:15, 52:17, 57:2, 60:16, 63:6, 65:7, 65:14, 68:21, 71:12, 73:2, 75:9, 75:13, 77:11, 79:2, 79:8, 80:3, 84:23, 87:9, 87:20, 89:1, 93:11, 93:14, 94:21, 95:10, 95:14, 95:16, 95:19, 96:10, 99:8, 103:7, 104:10, 108:17, 112:5, 113:23, 115:6, 115:16, 115:20, 119:15, 120:13, 120:20, 122:8, 123:2, 123:22, 125:6, 132:8, 133:18, 134:15, 134:16, 134:19, 134:22, 135:6, 135:19, 135:20, 135:21, 136:3, 136:8, 137:1, 137:9, 137:10, 137:17, 138:4, 138:7, 139:13, 140:2, 140:4, 140:9, 140:12, 140:15, 140:19, 140:21, 141:3, 141:6, 141:7, 141:13, 141:17,

142:2, 143:14, 143:18, 143:20, 144:1, 144:14, 144:15, 145:9, 147:6, 148:10, 151:15, 151:15, 151:19, 152:6, 153:11, 154:18
**caseload** [2] - 15:7, 15:9
**cases** [22] - 7:17, 11:19, 15:10, 19:8, 32:11, 39:11, 62:6, 63:23, 70:17, 76:23, 77:3, 105:4, 107:2, 107:23, 123:17, 125:15, 134:9, 143:14, 143:18, 143:22, 144:16
**category** [4] - 68:13, 68:14, 69:19, 70:9
**caud** [1] - 117:8
**caudate** [1] - 113:3
**causative** [1] - 102:2
**caused** [27] - 63:13, 65:3, 65:23, 66:3, 68:11, 70:11, 73:21, 78:3, 80:10, 81:9, 88:18, 106:21, 125:4, 127:23, 128:1, 128:7, 128:8, 129:10, 129:20, 129:23, 130:10, 132:4, 132:10, 138:17, 138:20, 145:14
**causes** [5] - 31:12, 115:7, 147:4, 147:12, 150:8
**cava** [1] - 105:19
**cavity** [10] - 76:5, 77:10, 78:16, 89:20, 92:13, 97:16, 98:4, 98:12, 98:16, 112:9
**CC** [1] - 77:7
**CCs** [2] - 77:5, 77:6
**CDs** [1] - 34:11
**ceiling** [2] - 14:19, 17:16
**cell** [3] - 104:13, 105:2
**cells** [8] - 103:12, 104:3, 104:4, 104:12, 104:16, 105:19, 107:16, 107:20
**cellular** [2] - 104:1, 107:21
**Center** [1] - 36:13
**centimeters** [6] - 112:16, 112:19,

112:21, 113:1, 113:4
**certain** [7] - 7:13, 7:21, 33:18, 59:9, 105:4, 149:6, 152:22
**certainty** [9] - 29:11, 97:23, 104:6, 125:19, 132:3, 134:6, 134:8, 145:22, 150:1
**certificate** [2] - 83:10, 115:15
**certification** [2] - 3:9, 17:7
**certify** [2] - 157:4, 158:6
**chair** [1] - 46:10
**chance** [7] - 22:6, 22:23, 32:14, 47:8, 86:10, 113:10, 124:18
**change** [5] - 10:13, 23:8, 85:22, 103:19, 150:22
**changed** [5] - 16:3, 24:4, 138:4, 139:6, 139:10
**changes** [8] - 20:15, 30:22, 72:4, 103:21, 103:23, 107:21, 145:14, 145:15
**characteristics** [1] - 116:13
**characterize** [1] - 13:12
**characterized** [2] - 69:16, 129:12
**charge** [1] - 133:22
**charged** [1] - 82:12
**charging** [2] - 82:9, 135:15
**Charles** [3] - 2:7, 120:2, 152:16
**CHARLES** [1] - 1:6
**chart** [1] - 36:19
**chase** [1] - 80:14
**Chavkin** [14] - 42:20, 43:1, 43:16, 44:15, 44:21, 45:18, 46:8, 46:23, 47:19, 51:6, 52:11, 96:14, 122:10, 151:23
**check** [4] - 42:8, 42:15, 45:13, 60:17
**checking** [1] - 42:13
**chest** [23] - 54:4, 54:9, 55:4, 55:17, 57:3, 57:8, 61:12, 71:20, 75:18, 76:17, 78:13, 78:16, 78:19, 82:20, 90:3, 90:12, 91:18,

92:13, 114:10, 126:3, 130:6, 131:10, 131:11
**child** [28] - 28:20, 29:21, 29:22, 30:3, 30:19, 31:9, 31:14, 54:13, 56:11, 60:11, 70:8, 71:23, 78:9, 81:23, 95:2, 99:17, 100:4, 107:7, 109:3, 119:16, 121:12, 121:16, 125:5, 130:23, 131:2, 131:7, 131:12, 153:8
**child's** [7] - 60:12, 68:11, 72:6, 74:15, 121:5, 130:10, 133:3
**childhood** [1] - 38:4
**children** [12] - 24:13, 31:10, 56:14, 58:12, 58:13, 70:21, 71:3, 75:11, 75:23, 81:14, 110:23, 153:7
**Cindy** [15] - 42:8, 42:20, 43:16, 44:15, 44:21, 46:8, 47:19, 52:11, 122:10, 122:13, 122:20, 122:22, 123:3, 123:14
**circulating** [1] - 89:21
**circumstances** [6] - 37:20, 81:7, 125:16, 149:7, 151:14, 154:6
**CITY** [1] - 1:6
**City** [4] - 2:7, 6:8, 53:9, 152:15
**civilian** [1] - 136:6
**clarify** [3] - 16:8, 85:22, 130:22
**classification** [1] - 70:1
**classified** [2] - 149:18, 150:18
**clear** [3] - 75:8, 91:16, 128:20
**clearly** [1] - 33:5
**clinical** [3] - 110:5, 110:8, 115:1
**clinicians** [1] - 109:9
**Clinton** [1] - 15:20
**close** [7] - 24:12, 30:19, 114:20, 120:18, 120:23, 137:8, 150:2
**closer** [1] - 13:10
**clot** [1] - 112:9
**clots** [2] - 107:1, 107:3
**clotting** [1] - 107:11
**clumpy** [1] - 107:3

**co** [1] - 70:5
**co-sleeping** [1] - 70:5
**COLANERI** [1] - 1:7
**Colaneri** [2] - 2:7, 152:16
**Colineri** [1] - 120:3
**colleague** [1] - 32:5
**colleagues** [3] - 21:6, 32:11, 59:20
**collectively** [1] - 75:17
**coming** [7] - 10:19, 10:21, 49:20, 50:17, 151:4, 151:7, 151:10
**commencing** [1] - 1:13
**comments** [1] - 123:3
**committed** [2] - 83:19, 136:15
**common** [6] - 38:19, 72:1, 72:8, 76:2, 89:2
**communicate** [2] - 45:18, 48:20
**communicated** [1] - 48:22
**comparable** [1] - 15:8
**comparison** [1] - 107:2
**comparisons** [1] - 105:1
**complete** [3] - 33:16, 81:13, 101:8
**completed** [1] - 37:16
**completely** [1] - 46:14
**complicate** [1] - 72:4
**complicated** [1] - 10:16
**complimentary** [1] - 142:23
**compressing** [1] - 63:14
**compression** [17] - 61:23, 62:17, 65:12, 66:23, 76:17, 78:2, 78:9, 78:12, 84:2, 98:3, 98:11, 108:21, 108:23, 117:8, 117:21, 129:10, 131:9
**compressions** [26] - 54:5, 54:10, 55:5, 55:17, 56:2, 56:5, 56:12, 56:20, 56:22, 57:3, 57:9, 60:23, 66:2, 71:20, 75:18, 82:21, 90:3, 90:12, 99:20, 100:11, 131:9, 131:11, 131:12, 131:13, 152:4

**compressive** [7] - 66:23, 74:3, 74:15, 98:15, 102:4, 117:12, 117:22
**computer** [2] - 42:16, 119:4
**concentrated** [1] - 78:18
**concerned** [2] - 47:9, 80:11
**concerns** [5] - 9:4, 9:8, 42:2, 49:15, 142:10
**conclude** [1] - 98:20
**concluded** [3] - 125:11, 125:14, 155:22
**conclusion** [2] - 92:17, 117:19
**conclusions** [3] - 47:17, 133:7
**conclusively** [4] - 97:14, 110:12, 125:18, 146:3
**condensation** [1] - 154:15
**condition** [1] - 154:13
**conduct** [7] - 13:20, 21:9, 88:18, 93:23, 130:17, 135:14, 135:15
**conducted** [1] - 56:14
**confession** [2] - 93:13, 94:2
**confidence** [1] - 142:10
**confirm** [4] - 67:2, 67:3, 110:12, 146:3
**congestion** [3] - 148:5, 148:6, 148:23
**conjunction** [1] - 62:18
**connection** [1] - 5:22
**consciousness** [1] - 97:15
**consecutively** [1] - 32:22
**consequences** [2] - 133:22, 134:1
**consider** [4] - 79:7, 88:7, 133:15, 155:1
**considerable** [1] - 58:15
**considered** [7] - 23:6, 35:19, 37:10, 62:19, 128:2, 132:9, 145:8
**consistent** [6] - 61:10, 65:18, 65:23, 80:20, 84:8, 84:9, 102:18, 132:17, 132:21

**consolidate** [1] - 89:4
**consult** [1] - 118:10
**contend** [1] - 28:22
**contest** [1] - 44:12
**context** [1] - 32:9
**continue** [3] - 52:22, 76:19, 116:9
**continued** [1] - 54:9
**continues** [1] - 142:9
**contract** [4] - 10:5, 12:21, 15:13, 17:22
**contributed** [5] - 64:11, 64:17, 64:19, 88:19, 130:18
**contributing** [1] - 73:20
**control** [1] - 33:22
**contusions** [1] - 62:20
**conversation** [1] - 141:11
**conversations** [3] - 96:13, 142:2, 151:18
**convey** [1] - 48:14
**convicted** [2] - 137:13, 138:2
**Coonradt** [2] - 2:7, 152:16
**COONRADT** [1] - 1:6
**cooperated** [1] - 140:10
**cooperation** [1] - 140:7
**cooperative** [4] - 153:20, 153:22, 154:16, 154:19
**cooperatively** [1] - 153:14
**copies** [1] - 6:16
**copy** [5] - 42:12, 53:5, 115:18, 118:18, 118:21
**coroner** [2] - 12:8, 12:10
**coroner's** [1] - 10:9
**coroners** [3] - 14:7, 14:10, 14:11
**Corporation** [1] - 33:10
**correct** [70] - 4:10, 13:13, 14:21, 16:18, 19:3, 19:4, 19:5, 19:14, 20:13, 20:21, 25:15, 26:10, 26:12, 26:14, 28:8, 34:5, 35:18, 37:5, 37:14, 37:17, 38:23, 57:10, 57:12, 58:20, 60:7, 62:5, 62:9, 66:9, 68:1, 69:11, 69:17, 73:21, 74:22, 77:10,

78:16, 79:11, 85:12,
85:22, 87:18, 97:1,
99:9, 100:22,
100:23, 105:22,
105:23, 106:6,
106:7, 106:20,
108:15, 109:1,
109:3, 109:13,
109:18, 114:23,
115:15, 116:18,
116:19, 118:6,
118:13, 118:14,
124:19, 124:21,
128:16, 132:7,
133:19, 134:11,
146:14, 150:5,
154:20, 157:7
**correction** [1] - 115:10
**correctly** [1] - 127:9
**correspond** [1] -
86:20
**corroborated** [1] -
82:18
**corruption** [1] - 95:16
**cost** [1] - 11:10
**costal** [3] - 62:17,
62:22, 63:9
**counter** [2] - 47:17
**countered** [1] - 58:4
**counties** [5] - 10:6,
12:2, 15:12, 15:17,
18:1
**COUNTY** [2] - 1:7,
157:2
**County** [23] - 10:5,
10:7, 10:8, 10:11,
10:12, 10:15, 11:12,
12:3, 12:4, 12:7,
12:10, 13:6, 13:7,
13:9, 14:5, 15:14,
15:15, 15:16,
134:20, 137:14
**county** [6] - 11:2,
12:1, 12:12, 13:18,
18:19, 123:13
**couple** [2] - 5:4, 21:21
**course** [5] - 101:3,
112:7, 116:13,
133:2, 143:11
**COURT** [1] - 1:1
**Court** [1] - 93:12
**court** [9] - 3:17, 5:5,
23:3, 25:9, 27:20,
33:11, 39:17, 94:23,
135:15
**courthouse** [1] - 47:1
**courtroom** [2] - 47:21,
50:11
**cover** [5] - 10:11,
10:12, 11:19, 13:7,

129:3
**coverage** [1] - 15:14
**covered** [4] - 27:7,
115:2, 115:3, 151:16
**Covid** [2] - 15:7, 15:10
**CPR** [105] - 23:12,
23:13, 23:22, 24:13,
54:13, 54:17, 56:13,
56:19, 57:14, 57:17,
58:10, 58:16, 59:14,
60:4, 60:12, 61:7,
62:7, 62:8, 62:11,
62:14, 63:18, 64:8,
64:16, 65:3, 65:23,
66:16, 66:20, 67:6,
71:23, 72:1, 72:7,
72:9, 72:12, 72:15,
72:16, 72:21, 73:8,
73:15, 74:1, 74:2,
74:7, 75:9, 76:1,
77:3, 77:13, 77:16,
78:11, 85:7, 91:7,
91:11, 91:14, 99:3,
99:7, 99:17, 99:21,
100:4, 100:7,
100:17, 100:20,
100:22, 101:2,
101:3, 101:11,
101:16, 101:23,
102:3, 102:5, 102:7,
102:13, 102:18,
102:19, 102:22,
103:3, 108:18,
108:23, 109:2,
117:23, 124:3,
124:4, 124:11,
124:17, 128:7,
128:15, 128:18,
128:22, 129:1,
129:12, 129:17,
129:18, 131:2,
132:7, 132:10,
132:11, 132:16,
132:17, 132:21,
132:23, 133:3,
135:2, 137:12,
137:22, 138:17,
138:20
**CPR-caused** [4] -
65:3, 65:23, 138:17,
138:20
**CPR-related** [5] -
57:14, 62:8, 62:11,
102:3, 132:23
**created** [1] - 113:11
**credentials** [1] - 17:4
**credibility** [2] - 94:11,
96:15
**credit** [1] - 67:11
**crediting** [1] - 81:1

**criminal** [5] - 38:10,
96:11, 133:18,
137:10, 141:17
**criminality** [3] - 37:23,
44:5, 82:16
**Crisafulli** [2] - 55:8,
152:5
**criticism** [1] - 18:18
**critique** [2] - 18:17,
151:22
**cross** [2] - 19:2, 19:8
**cross-examined** [2] -
19:2, 19:8
**crush** [1] - 104:15
**crushed** [1] - 104:5
**crushing** [6] - 74:16,
74:17, 103:10,
104:2, 128:19,
128:22
**crying** [3] - 79:11,
79:19, 97:3
**Crystal** [3] - 2:11,
9:13, 137:7
**CT** [1] - 109:5
**culpable** [1] - 135:14
**cultures** [2] - 36:15,
36:16
**cup** [2] - 90:20, 114:1
**current** [2] - 146:7,
146:8
**custody** [3] - 134:10,
135:7, 135:9
**customary** [1] -
153:13
**cut** [1] - 109:20
**cutting** [1] - 121:15
**CV** [2] - 1:5, 9:16
**cytoplasm** [1] -
104:15

## D

**DA** [13] - 26:13, 35:2,
50:2, 51:3, 51:16,
141:11, 141:16,
142:3, 142:7, 143:3,
143:7, 151:22
**DA's** [13] - 25:22, 26:6,
38:8, 39:17, 39:20,
40:1, 46:5, 52:18,
84:14, 84:19,
120:10, 141:14,
151:1
**damage** [7] - 106:17,
108:11, 108:13,
109:2, 109:8,
114:19, 116:16
**damaged** [5] - 81:1,
103:22, 107:19,
107:20, 113:13

**Danielle** [2] - 2:7,
152:15
**DANIELLE** [1] - 1:6
**DAs** [2] - 143:6,
153:18
**data** [1] - 65:2
**date** [9] - 8:14, 9:22,
22:1, 22:22, 34:18,
34:22, 38:12, 45:20,
137:2
**Date** [1] - 158:12
**dated** [1] - 52:6
**Davis** [41] - 4:12, 4:14,
6:2, 8:15, 14:12,
19:3, 24:21, 25:14,
35:17, 39:2, 40:3,
52:10, 65:12, 65:21,
66:21, 66:23, 67:6,
76:18, 78:2, 80:10,
80:15, 83:7, 88:18,
92:4, 94:17, 95:19,
96:11, 98:20, 99:8,
99:17, 100:16,
117:17, 124:23,
128:1, 128:4,
128:14, 129:15,
130:9, 136:4,
140:14, 155:4
**deaths** [5] - 70:4,
70:9, 125:13,
134:10, 135:9
**deceased** [1] - 82:1
**decedent** [4] - 60:3,
85:6, 99:13, 120:14
**decent** [1] - 34:16
**decide** [1] - 82:16
**decided** [7] - 11:9,
11:12, 12:5, 13:4,
14:7, 14:10, 124:12
**decision** [2] - 133:21,
134:2
**decisions** [1] - 134:4
**deep** [1] - 146:2
**defect** [2] - 31:11,
110:23
**defects** [1] - 111:1
**Defendant's** [1] -
51:18
**Defendants** [1] - 1:9
**defender** [2] - 35:2,
35:8
**defense** [3] - 6:9,
26:21, 26:23
**definitely** [1] - 76:16
**definition** [3] - 68:7,
68:8, 68:18
**degree** [9] - 29:11,
104:6, 125:19,
132:3, 134:6, 134:7,
145:21, 149:23,
154:7
**dehydrated** [3] -
111:3, 111:5, 111:7
**demeanor** [1] - 43:17
**demonstrate** [1] -
128:23

77:1, 78:4, 81:3,
82:3, 83:9, 84:3,
88:17, 94:10, 102:2,
103:22, 110:18,
112:5, 115:10,
115:15, 115:19,
117:21, 121:9,
125:12, 125:16,
125:20, 127:8,
127:11, 127:14,
127:15, 127:18,
127:19, 128:1,
128:8, 129:21,
129:23, 130:10,
135:7, 135:16,
136:2, 145:1, 145:6,
147:4, 147:11,
147:15, 147:18,
149:10, 149:23,
150:8, 150:13,
150:20, 151:14,
153:4, 153:16, 155:6
**DAVIS** [1] - 1:3
**Davis's** [4] - 22:13,
83:15, 94:10, 151:14
**DAVIS-GUIDER** [1] -
1:3
**days** [3] - 8:17, 22:7,
27:19
**dead** [10] - 67:7,
70:14, 72:3, 76:20,
124:13, 124:16,
126:15, 126:18,
126:20, 126:23
**deal** [3] - 9:13, 11:12,
11:14
**dealings** [6] - 32:2,
32:10, 32:12, 39:5,
143:12, 143:13
**deals** [1] - 10:16
**dealt** [3] - 32:9, 32:11,
51:11
**Deangelis** [1] - 143:7
**Death** [1] - 52:6
**death** [78] - 30:23,
31:9, 37:16, 38:4,
38:9, 43:5, 43:6,
67:9, 67:12, 67:14,
68:4, 68:9, 68:11,
68:12, 68:17, 68:22,
69:1, 69:15, 69:16,
69:18, 70:1, 70:2,
70:11, 71:2, 71:13,
71:15, 71:16, 73:21,

**demonstrated** [2] - 84:9, 95:5

**demonstrating** [1] - 95:1

**demonstration** [2] - 84:1, 128:20

**demotion** [1] - 51:6

**dented** [1] - 113:12

**department** [19] - 40:2, 53:2, 53:19, 57:4, 72:11, 73:2, 74:22, 84:13, 84:22, 136:2, 136:7, 140:8, 141:2, 151:12, 152:18, 154:23, 155:5, 155:10, 155:13

**Department** [1] - 53:10

**deposed** [1] - 14:22

**Deposition** [1] - 155:22

**DEPOSITION** [1] - 1:12

**deposition** [12] - 3:18, 5:2, 5:22, 8:8, 8:14, 8:16, 14:23, 53:15, 55:10, 55:13, 55:14, 107:12

**depositions** [3] - 53:19, 123:20, 123:22

**depth** [1] - 110:10

**describe** [8] - 37:19, 49:2, 61:5, 61:9, 71:15, 134:5, 136:23

**described** [11] - 56:9, 65:5, 66:14, 67:1, 68:12, 73:3, 103:2, 104:11, 118:3, 130:17, 133:4

**describing** [1] - 117:3

**description** [1] - 129:7

**despite** [1] - 142:10

**destruction** [1] - 103:12

**details** [5] - 42:23, 54:19, 116:6, 141:22, 152:4

**detect** [3] - 81:21, 104:1, 112:7

**detected** [1] - 30:14

**detective** [1] - 95:1

**Detective** [11] - 83:16, 84:18, 92:1, 92:16, 93:5, 93:13, 93:14, 95:15, 98:9, 140:3, 140:19

**detectives** [1] - 95:6

**determination** [2] -

28:2, 83:23

**determinations** [2] - 43:5, 155:2

**determine** [6] - 9:12, 71:3, 88:12, 109:10, 125:19, 149:22

**determined** [8] - 83:18, 83:21, 84:1, 84:2, 94:23, 128:21, 145:17, 150:19

**determining** [1] - 28:18

**developed** [1] - 121:11

**develops** [1] - 148:22

**diabetes** [7] - 28:21, 29:17, 29:22, 29:23, 30:2, 30:14, 31:4

**diabetic** [2] - 30:5, 30:17

**diagnosed** [1] - 127:10

**diagnoses** [3] - 85:2, 99:6, 115:6

**diagnosis** [5] - 67:15, 68:23, 85:12, 147:17, 155:14

**diagram** [2] - 116:11, 116:20

**dictate** [1] - 150:7

**die** [3] - 30:17, 31:13, 70:23, 149:15, 153:7

**died** [14] - 24:17, 25:14, 70:21, 77:11, 82:7, 97:18, 97:23, 107:8, 111:4, 131:7, 134:18, 147:8, 147:14, 154:9

**dies** [1] - 81:10

**different** [12] - 8:2, 15:9, 18:4, 21:16, 50:6, 56:9, 61:6, 61:10, 101:20, 139:16, 139:20, 143:18

**differentiate** [1] - 29:10

**differently** [1] - 130:4

**digital** [3] - 139:8, 139:12, 139:16

**digitally** [1] - 139:11

**diminished** [1] - 30:21

**diner** [2] - 96:2, 96:6

**direction** [4] - 88:16, 88:19, 136:6, 136:10

**directly** [2] - 50:2, 144:1

**disagree** [5] - 71:9, 104:17, 104:18, 107:4, 111:21

**disallowed** [2] - 47:20, 47:21

**disappointed** [1] - 50:18

**disclaimed** [1] - 58:3

**disconnect** [1] - 14:5

**discontinued** [3] - 13:23, 14:2, 14:4

**discontinuing** [1] - 12:21

**discount** [2] - 58:1, 97:18

**discovery** [2] - 9:14, 29:7

**discretion** [1] - 7:11

**discuss** [4] - 22:17, 40:2, 40:23, 96:15

**discussed** [15] - 7:13, 34:11, 49:4, 49:6, 49:7, 96:14, 99:5, 103:5, 104:11, 117:14, 119:18, 123:20, 151:15, 151:20, 154:17

**discussion** [5] - 27:22, 70:12, 117:13, 148:17, 148:18

**disease** [2] - 81:20, 149:14

**disorder** [1] - 110:5

**displaced** [1] - 92:14

**dispute** [3] - 66:21, 67:2, 67:4

**distinction** [1] - 105:3

**distinctions** [1] - 107:5

**distinguished** [1] - 7:22

**district** [9] - 20:19, 37:20, 40:7, 40:8, 47:3, 83:4, 83:6, 87:7, 152:23

**District** [2] - 41:16, 52:11

**DISTRICT** [2] - 1:1, 1:1

**Doc** [3] - 42:14, 123:8, 151:9

**Doctor** [2] - 147:19, 155:18

**doctor** [3] - 55:9, 63:17, 151:13

**doctors** [2] - 61:6, 64:3

**document** [12] - 32:21, 33:8, 58:21, 86:15, 102:6, 102:14, 115:9, 115:13, 115:17, 116:5, 138:17,

138:19

**documented** [1] - 100:20

**documenting** [1] - 65:3

**Documents** [1] - 51:20

**documents** [4] - 5:23, 8:6, 33:2, 116:4

**dollars** [1] - 11:11

**done** [30] - 13:6, 19:19, 20:2, 23:11, 38:15, 38:21, 55:5, 55:17, 56:3, 57:3, 64:2, 66:23, 73:15, 78:11, 86:9, 99:3, 109:1, 109:2, 110:12, 119:6, 124:3, 124:5, 129:15, 129:16, 130:3, 130:4, 130:23, 131:4, 139:9

**double** [2] - 130:5, 142:13

**doubt** [1] - 96:22

**down** [11] - 5:6, 16:5, 39:19, 47:3, 51:21, 56:21, 86:22, 104:9, 114:16, 131:17, 154:13

**downstream** [1] - 114:4

**dozen** [1] - 61:4

**Dr** [51] - 4:6, 6:9, 6:13, 6:17, 7:1, 8:10, 9:21, 16:12, 23:6, 25:13, 27:16, 27:23, 29:2, 29:18, 29:21, 31:23, 32:20, 34:14, 41:8, 46:15, 46:16, 46:22, 47:5, 47:10, 49:8, 49:11, 49:21, 55:8, 63:12, 63:16, 67:8, 67:23, 71:9, 85:19, 86:6, 86:9, 103:4, 106:23, 111:20, 111:23, 113:19, 131:6, 137:11, 140:2, 142:10, 142:12, 142:16, 152:3, 152:5, 152:13

**draft** [2] - 150:23, 151:2

**drawing** [3] - 130:16, 130:20, 133:7

**drive** [1] - 14:6

**driver** [1] - 81:10

**driving** [1] - 13:5

**drop** [2] - 70:14, 109:12

**drunk** [1] - 81:10

**due** [26] - 15:7, 15:10, 30:21, 31:9, 61:22, 62:13, 62:16, 65:3, 65:11, 65:17, 85:3, 85:4, 85:5, 91:4, 91:5, 91:7, 91:11, 93:13, 98:3, 98:11, 102:12, 113:11, 135:13, 138:20, 149:10

**dues** [3] - 17:2, 17:5, 17:8

**duly** [1] - 4:2

**duplicate** [1] - 7:10

**during** [23] - 27:13, 41:6, 54:1, 54:14, 58:16, 61:23, 62:7, 102:22, 117:22, 119:9, 120:4, 128:11, 131:15, 132:7, 132:10, 132:15, 135:16, 140:11, 142:1, 145:11, 153:1, 154:22, 155:4

**duties** [1] - 10:1

**duty** [1] - 41:6

**E**

**e-mails** [1] - 86:14

**early** [5] - 19:18, 26:1, 26:2, 43:15

**earshot** [1] - 120:16

**easily** [1] - 113:13

**easy** [1] - 61:16

**Edition** [1] - 139:1

**effect** [1] - 31:13

**effectively** [2] - 18:21, 76:9

**effort** [2] - 18:7, 153:21

**efforts** [4] - 67:6, 77:13, 91:7, 91:11

**either** [19] - 13:19, 22:6, 23:18, 25:2, 27:13, 38:17, 54:1, 59:19, 67:3, 71:2, 84:14, 86:17, 87:2, 89:7, 92:23, 100:12, 113:11, 135:22, 142:5

**electrophysiological** [1] - 146:6

**emergency** [6] - 30:3, 54:15, 63:17, 72:13, 98:21, 109:6

**employ** [1] - 17:19

**employed** [1] - 15:12

**employees** [2] - 53:19, 72:11
**employer** [1] - 18:19
**employment** [2] - 10:8, 19:13
**EMS** [8] - 64:2, 75:5, 80:1, 82:21, 99:2, 107:8, 126:7, 127:23
**EMT** [2] - 54:20, 63:17
**EMTs** [16] - 55:5, 57:8, 59:5, 59:14, 59:22, 61:1, 61:6, 62:14, 64:7, 72:2, 78:2, 80:1, 84:4, 98:21, 99:22, 123:16
**end** [1] - 43:15
**ended** [2] - 43:18, 46:15
**enforcement** [12] - 20:23, 21:8, 88:14, 92:5, 92:6, 134:9, 135:6, 135:7, 135:17, 136:1, 136:6, 151:19
**engaging** [1] - 18:14
**enlarge** [2] - 7:20, 33:4
**enlarged** [1] - 8:1
**enlargements** [1] - 8:4
**ensure** [1] - 10:22
**entire** [3] - 76:10, 101:15, 106:16
**entirely** [1] - 142:17
**entities** [1] - 15:22
**entitled** [2] - 52:4, 115:9
**entity** [5] - 14:1, 14:4, 14:5, 18:13
**environment** [1] - 109:11
**equivalent** [1] - 77:7
**ER** [4] - 55:8, 74:22, 99:22, 127:23
**erroneous** [1] - 31:10
**especially** [2] - 110:14, 153:7
**Esq** [3] - 2:2, 2:6, 2:11
**essence** [1] - 12:16
**essentially** [1] - 111:20
**Essentials** [1] - 138:23
**Essex** [1] - 15:20
**establish** [1] - 10:17
**established** [1] - 29:6
**establishing** [1] - 11:1
**estate** [1] - 11:8
**estimated** [1] - 142:12
**etc** [1] - 34:5
**etiology** [2] - 69:3,

125:17
**evaluated** [1] - 73:12
**evaluation** [1] - 79:7
**event** [2] - 82:7, 147:21
**events** [4] - 26:20, 27:7, 27:8, 82:8
**eventually** [4] - 11:11, 18:8, 89:4, 151:10
**evidence** [17] - 31:1, 94:11, 94:15, 95:17, 97:11, 97:13, 109:16, 109:19, 110:3, 112:13, 112:14, 140:14, 145:17, 146:14, 148:5, 149:1, 149:7
**evolution** [2] - 21:17, 21:19
**evolved** [3] - 138:5, 139:4, 152:3
**exact** [1] - 113:17
**exactly** [2] - 131:6, 138:16
**Examination** [1] - 3:16
**examination** [7] - 3:4, 3:9, 7:6, 113:15, 125:7, 127:4, 145:12
**EXAMINATION** [2] - 4:4, 152:11
**examine** [1] - 145:19
**examined** [3] - 4:2, 19:2, 19:8
**examiner** [4] - 10:5, 12:7, 12:13, 12:14
**examiner's** [4] - 10:17, 11:1, 18:4, 115:23
**Examiners** [3] - 16:11, 16:16, 17:10
**examiners** [2] - 21:14, 153:13
**exceed** [1] - 18:14
**except** [2] - 3:12, 139:10
**exception** [2] - 34:7, 34:10
**exclude** [1] - 82:17
**exclusively** [1] - 10:12
**exculpatory** [1] - 22:19
**excuse** [1] - 40:19
**executive** [1] - 143:23
**exert** [1] - 155:1
**exerted** [1] - 54:23
**exertion** [2] - 54:23, 56:10
**exhibit** [1] - 90:22
**Exhibit** [9] - 25:11, 51:14, 51:18, 51:21,

52:21, 53:8, 53:11, 85:3, 113:20
**exhibits** [3] - 7:16, 7:17, 8:1
**EXHIBITS** [1] - 156:1
**exists** [1] - 154:5
**expect** [4] - 30:17, 79:23, 109:18, 139:15
**expected** [4] - 66:20, 74:2, 75:19, 153:12
**expecting** [1] - 107:6
**experience** [14] - 9:17, 49:22, 59:13, 61:19, 62:3, 62:13, 63:12, 63:19, 63:21, 66:14, 70:22, 77:2, 102:11, 152:21
**experienced** [1] - 44:2
**explain** [15] - 7:5, 18:2, 41:18, 42:23, 47:16, 82:1, 102:1, 122:16, 127:2, 128:7, 129:16, 131:1, 133:16, 146:18, 147:21
**explained** [1] - 130:1
**explaining** [1] - 92:21
**explanation** [3] - 71:14, 126:5, 127:12
**expose** [1] - 73:7
**expressed** [1] - 142:10
**extended** [1] - 10:9
**Extension** [1] - 2:10
**extensive** [5] - 8:20, 77:13, 102:11, 106:9, 126:1
**extent** [3] - 50:9, 100:5, 118:2
**extreme** [1] - 73:3
**extremely** [3] - 66:11, 81:3, 110:22
**extremis** [1] - 128:12
**eye** [1] - 30:7

---

**F**

**fabrication** [1] - 92:22
**face** [2] - 82:12, 133:8
**facilities** [4] - 17:18, 17:22, 17:23, 18:5
**facility** [3] - 6:7, 17:19, 18:7
**fact** [4] - 79:17, 95:13, 97:6, 124:10
**factor** [5] - 28:18, 89:12, 94:10, 94:12, 145:10
**factored** [4] - 89:14,

89:16, 94:16, 136:17
**factoring** [1] - 89:13
**facts** [4] - 55:1, 61:5, 147:5, 151:13
**failure** [1] - 73:8
**fair** [19] - 7:3, 13:12, 14:17, 15:1, 58:17, 72:22, 72:23, 82:13, 83:19, 100:13, 100:15, 100:19, 109:17, 111:21, 125:3, 127:10, 130:14, 130:15, 147:2
**fall** [1] - 30:23
**familiar** [4] - 57:14, 111:8, 138:23, 144:23
**far** [3] - 84:8, 85:22, 100:6
**faster** [1] - 106:12
**father** [1] - 79:21
**fault** [1] - 5:9
**faulty** [1] - 29:8
**features** [3] - 114:19, 116:21, 116:22
**February** [7] - 25:14, 25:17, 37:15, 38:22, 93:10, 154:18
**federal** [1] - 15:21
**feed** [3] - 87:8, 87:10, 87:18
**feelings** [1] - 50:1
**feet** [1] - 120:19
**felt** [3] - 10:18, 22:18, 129:22
**few** [5] - 11:10, 26:14, 67:6, 119:14, 152:19
**fiber** [1] - 107:12
**field** [2] - 21:6, 21:20
**file** [21] - 6:13, 6:14, 6:19, 6:20, 25:2, 25:7, 33:6, 33:13, 33:16, 33:18, 34:4, 34:15, 37:11, 42:12, 53:12, 83:14, 113:20, 118:9, 123:16, 137:6, 156:3
**filing** [1] - 3:8
**filled** [3] - 115:19, 116:12, 131:17
**final** [4] - 94:17, 147:17, 150:16, 155:8
**finalize** [1] - 151:3
**finalizing** [1] - 151:1
**finally** [1] - 150:21
**findings** [12] - 84:23, 88:11, 88:12, 103:6, 104:1, 113:6, 115:1,

115:4, 121:20, 134:7, 148:9, 155:15
**fine** [2] - 9:19, 50:10
**fingers** [2] - 78:15, 130:6
**fingerstick** [1] - 30:4
**fire** [9] - 53:2, 53:19, 57:4, 72:11, 73:2, 74:21, 123:16, 136:1, 136:7
**Fire** [1] - 53:9
**firefighter** [1] - 53:20
**Firefighter** [2] - 54:2, 54:12
**Fireman** [1] - 152:4
**firemen** [1] - 64:2
**first** [11] - 4:1, 7:6, 41:14, 41:22, 42:2, 42:19, 43:15, 43:20, 68:6, 80:16, 116:5
**First** [1] - 2:5
**firsthand** [2] - 82:18, 126:8
**fitness** [1] - 96:15
**five** [4] - 65:17, 66:19, 131:9, 132:21
**flat** [2] - 79:18, 126:7
**flawed** [2] - 29:5, 29:12
**flaws** [1] - 49:11
**flip** [2] - 33:16, 53:7
**floor** [1] - 94:23
**fluid** [3] - 30:7, 30:15, 76:5
**flurry** [1] - 83:7
**focus** [5] - 20:5, 110:15, 113:22, 145:23, 146:10
**focused** [1] - 108:6
**follow** [2] - 12:2, 123:10
**followed** [1] - 141:21
**following** [2] - 49:8, 142:8
**follows** [1] - 4:3
**force** [10] - 65:19, 74:3, 85:5, 98:15, 102:4, 108:9, 108:10, 135:14, 137:11, 150:18
**foregoing** [2] - 157:5, 158:6
**forensic** [5] - 19:16, 36:23, 37:7, 110:14, 153:15
**foreseeable** [1] - 82:11
**Forest** [4] - 24:11, 25:1, 58:7
**form** [53] - 3:12, 13:21,

20:7, 21:10, 24:8, 24:9, 26:15, 30:12, 31:7, 33:9, 38:1, 38:2, 40:4, 41:2, 41:3, 43:9, 43:19, 48:17, 57:6, 57:11, 57:20, 59:1, 59:23, 60:8, 63:20, 65:15, 66:8, 73:22, 74:10, 75:3, 80:4, 81:5, 85:13, 88:5, 88:21, 93:15, 94:13, 95:8, 95:21, 96:16, 97:20, 98:5, 100:2, 115:14, 115:18, 115:21, 115:22, 116:15, 140:16, 140:17, 141:19, 149:16, 150:22

**formed** [2] - 32:5, 140:14

**Former** [1] - 52:5

**forth** [4] - 10:3, 13:5, 117:14, 136:23

**forthcoming** [1] - 18:10

**FOUNTAIN** [1] - 1:6

**Fountain** [17] - 2:7, 83:16, 84:18, 92:1, 92:6, 92:16, 93:5, 93:13, 95:15, 96:2, 120:3, 140:3, 140:19, 140:23, 141:13, 141:16, 152:15

**Fountain's** [4] - 94:11, 96:15, 98:10, 140:13

**four** [1] - 131:9

**fracture** [5] - 60:13, 61:16, 102:22, 117:10, 126:11

**fractured** [4] - 60:15, 62:7, 63:5, 102:23

**fractures** [20] - 57:19, 58:16, 58:22, 59:5, 59:10, 59:16, 59:21, 60:4, 61:12, 61:13, 64:12, 64:13, 64:18, 64:20, 85:5, 96:20, 112:10, 114:21, 138:11

**fracturing** [2] - 60:7, 60:9

**frame** [1] - 9:21

**Frank** [1] - 53:21

**Franklin** [1] - 15:20

**frankly** [1] - 41:9

**free** [2] - 83:8, 89:21

**frequent** [1] - 15:10

**front** [5] - 22:3, 42:12,

102:23, 112:1, 130:7

**frustrated** [4] - 10:18, 11:6, 11:11, 49:12

**frustration** [2] - 50:7, 50:9

**frustrations** [1] - 11:22

**full** [6] - 15:14, 20:1, 22:23, 81:22, 118:11, 150:10

**fullest** [1] - 20:3

**fully** [2] - 5:19, 75:19

**Fulton** [1] - 15:19

**function** [1] - 153:21

**futon** [2] - 64:7, 64:9, 64:15, 64:23, 65:1

**future** [3] - 10:20, 10:22, 139:19

### G

**general** [2] - 149:19, 154:13

**General** [2] - 134:14, 134:23

**generally** [8] - 4:16, 33:15, 39:8, 92:6, 95:4, 129:7, 132:18, 141:5

**generate** [1] - 153:6

**generous** [1] - 152:9

**Genetics** [2] - 35:22, 36:4

**gentleman** [1] - 138:2

**Ginsberg** [2] - 2:5, 152:14

**given** [17] - 6:15, 11:22, 20:5, 31:18, 37:13, 49:9, 49:10, 54:17, 71:8, 80:18, 85:21, 94:8, 115:5, 119:9, 119:11, 147:5, 149:6

**glove** [1] - 113:13

**glucose** [3] - 30:4, 30:20, 30:23

**God** [1] - 143:5

**govern** [1] - 21:2

**grades** [1] - 154:10

**grand** [24] - 6:8, 6:16, 21:23, 22:4, 22:10, 22:13, 26:9, 34:19, 45:3, 45:7, 45:8, 45:10, 80:19, 87:5, 89:19, 90:2, 90:11, 91:16, 91:19, 96:19, 121:23, 122:2, 122:7, 122:18

**grasping** [1] - 43:7

**great** [1] - 13:12

**greatly** [1] - 18:14

**gremlins** [1] - 80:14

**Griffin** [2] - 2:5, 152:14

**gross** [3] - 71:3, 103:5, 145:11

**grossly** [1] - 145:16

**grounds** [1] - 95:10

**growth** [1] - 36:19

**guarantee** [2] - 83:3, 144:2

**guess** [4] - 11:5, 25:10, 101:5, 150:15

**guideline** [1] - 17:15

**guidelines** [8] - 16:2, 17:16, 17:17, 18:15, 20:16, 21:1, 21:19, 150:6

**GUIDER** [1] - 1:3

**guilt** [1] - 133:15

**guilty** [2] - 80:16, 87:3

**gunshot** [1] - 154:10

**guys** [1] - 51:17

### H

**half** [1] - 61:4

**Hall** [18] - 35:3, 40:15, 40:17, 41:17, 41:22, 41:23, 42:22, 44:22, 45:11, 45:15, 48:7, 49:5, 50:19, 51:3, 86:3, 96:13, 122:22, 141:12

**hallway** [1] - 47:1

**Hamilton** [1] - 15:19

**hand** [9] - 58:22, 59:15, 59:16, 63:18, 64:5, 78:14, 78:15, 129:6

**handed** [2] - 39:19, 130:5

**handle** [1] - 41:19

**handled** [2] - 115:20, 141:14

**handling** [2] - 113:12, 113:13

**hands** [10] - 59:5, 59:10, 59:21, 60:3, 60:22, 61:23, 128:3, 128:9, 128:11, 129:6

**happy** [1] - 5:10

**hard** [2] - 42:12, 110:16

**head** [1] - 114:19

**heading** [1] - 157:6

**heads** [1] - 151:3

**health** [1] - 151:12

**healthy** [2] - 70:13, 121:11

**greatly** - cont.

**hear** [2] - 52:17, 70:13

**heard** [6] - 48:2, 67:8, 138:22, 141:20, 142:22

**hearing** [1] - 48:8

**heart** [12] - 57:9, 76:7, 76:8, 116:22, 135:12, 145:15, 145:19, 145:23, 149:14, 149:15, 149:17, 149:21

**held** [1] - 1:12

**hello** [1] - 96:9

**help** [3] - 46:21, 95:2

**helped** [1] - 73:7

**helpful** [3] - 72:14, 121:8, 121:10

**hematocrit** [1] - 109:12

**hemoglobin** [1] - 109:12

**hemoperitoneum** [1] - 85:4

**hemorrhage** [9] - 23:21, 108:4, 112:13, 113:4, 114:10, 117:10, 117:11, 126:2

**hemorrhaging** [5] - 65:3, 65:7, 65:8, 65:10, 138:20

**hepatic** [4] - 23:22, 105:20, 106:16, 108:8

**hepatocyte** [1] - 104:13

**hereby** [3] - 3:2, 157:4, 158:6

**hereof** [1] - 157:6

**hereto** [1] - 3:4

**Herkimer** [1] - 15:15

**herself** [1] - 29:8

**hesitant** [1] - 135:23

**hidden** [1] - 150:14

**high** [5] - 30:16, 70:14, 104:23, 105:10, 107:15

**high-powered** [1] - 104:23

**higher** [3] - 57:18, 139:4, 139:8

**highly** [2] - 50:17, 82:6

**hire** [1] - 18:9

**histologic** [1] - 71:4

**histology** [5] - 8:5, 28:17, 28:23, 29:14, 31:3

**history** [15] - 85:6, 85:7, 99:13, 99:14,

**hear** - cont.

101:1, 101:3, 101:6, 101:22, 102:1, 102:7, 110:5, 110:18, 137:19, 155:15

**hold** [2] - 16:20, 42:16

**home** [4] - 54:6, 54:21, 56:18, 64:17

**homicide** [10] - 82:10, 83:3, 83:9, 128:2, 128:9, 128:13, 135:8, 135:16, 153:2, 155:6

**homicides** [2] - 11:19, 135:10

**honest** [1] - 145:18

**hope** [1] - 91:22

**hoped** [1] - 31:5

**hopefully** [2] - 32:19, 34:8

**hospital** [20] - 18:18, 54:10, 54:22, 55:6, 55:17, 56:3, 56:18, 56:19, 57:4, 57:8, 72:1, 84:4, 100:5, 101:12, 101:14, 101:16, 109:11, 121:17, 121:19, 136:7

**Hospital** [1] - 6:6

**hospital"** [1] - 121:18

**hospitals** [1] - 18:4

**hour** [7] - 9:16, 13:8, 44:16, 44:17, 45:2, 90:3, 101:3

**hours** [1] - 111:4

**house** [1] - 64:8

**human** [1] - 76:18

**hundred** [6] - 15:1, 38:15, 54:4, 54:9, 56:2, 56:21

**hyperglycemia** [1] - 31:1

**hyperglycemic** [1] - 30:15

**hypothetically** [2] - 127:21, 148:21

**hypovolemic** [1] - 85:3

### I

**idea** [7] - 11:7, 20:23, 28:17, 28:20, 29:16, 31:8, 109:14

**identification** [2] - 25:12, 51:15

**identified** [1] - 116:8

**illustrated** [1] - 78:8

**image** [1] - 104:1

imagine [1] - 54:16
immediately [3] - 48:12, 49:1, 107:22
impacted [5] - 15:6, 19:12, 20:2, 20:4, 24:4
impacts [1] - 152:5
important [8] - 28:17, 28:23, 44:1, 72:10, 102:1, 102:14, 134:4, 140:20
impossible [5] - 61:17, 82:6, 97:22, 109:15, 125:1
impression [4] - 91:3, 91:20, 92:3, 95:12
improper [1] - 74:1
improperly [1] - 109:3
improved [1] - 139:7
in-custody [1] - 134:10
inaccurate [1] - 103:15
inappropriately [1] - 68:21
incidence [1] - 57:18
incident [6] - 80:17, 96:4, 116:16, 135:3, 137:3, 139:4
incidents [2] - 59:19, 62:6
incision [1] - 89:19
include [4] - 62:12, 70:2, 70:3, 153:23
included [1] - 147:16
including [5] - 15:18, 35:18, 61:1, 88:15, 116:12
inclusive [1] - 37:7
incorporated [1] - 85:10
incorrect [1] - 58:23
increase [1] - 15:11
independent [3] - 39:1, 39:4, 91:14
independently [1] - 153:21
INDEX [1] - 156:1
indicate [2] - 29:3, 52:14
indicated [1] - 11:23
indicative [1] - 30:4
indicted [2] - 95:15, 140:9
indictments [1] - 95:19
individual [2] - 135:2, 144:16
Individually [7] - 1:6, 1:6, 1:7, 1:7, 1:8, 1:8

individuals [3] - 100:19, 152:17, 154:1
inept [1] - 41:10
ineptness [1] - 49:7
infancy [3] - 68:4, 69:13, 70:2
infant [9] - 68:6, 68:10, 68:17, 68:18, 69:6, 69:20, 70:8, 148:5
infants [3] - 69:6, 69:13, 73:8
infection [1] - 149:14
infections [2] - 81:17, 81:18
inference [2] - 130:16, 130:20
inferior [1] - 105:21
influence [7] - 21:8, 21:16, 21:22, 87:23, 89:6, 89:10, 155:2
influenced [4] - 21:14, 88:1, 88:7, 89:13
inform [2] - 38:9, 84:22
informal [1] - 27:5
information [14] - 8:22, 9:10, 87:8, 87:10, 87:18, 87:19, 88:8, 88:10, 88:15, 89:11, 123:23, 135:20, 154:2, 155:11
informed [1] - 85:10
inherited [1] - 81:20
initial [2] - 44:15, 117:4
injuries [49] - 23:12, 23:13, 24:14, 24:15, 24:16, 62:8, 62:12, 72:15, 72:21, 73:21, 74:1, 74:3, 74:4, 74:15, 78:3, 84:8, 99:8, 100:6, 100:21, 101:23, 102:2, 102:12, 103:5, 108:7, 108:8, 111:9, 111:12, 111:15, 111:17, 116:22, 117:4, 125:21, 125:23, 126:1, 127:1, 127:22, 128:1, 129:10, 132:10, 132:15, 135:2, 136:20, 137:12, 138:13, 138:15, 147:9
injury [17] - 73:3, 98:3, 98:11, 98:15, 102:3,

102:4, 103:9, 103:18, 104:15, 108:17, 117:8, 117:12, 117:21, 117:22, 130:2, 132:23, 138:8
inner [1] - 143:22
inquired [1] - 74:21
inquiry [1] - 88:11
inside [1] - 64:16
insisted [1] - 86:7
inspect [2] - 64:7, 64:9
instance [2] - 154:17, 155:13
instances [2] - 70:20, 110:17
instantly [1] - 76:13
instructed [2] - 45:9, 48:11
instrument [1] - 139:16
intact [7] - 105:2, 105:16, 105:20, 107:16, 107:17, 107:18, 113:8
intake [2] - 115:21, 115:22
intended [1] - 72:21
intending [1] - 59:22
intentioned [1] - 72:19
inter [1] - 30:8
interest [2] - 153:6, 154:3
interested [1] - 10:23
interject [1] - 9:2
internal [4] - 76:6, 91:4, 91:5, 116:20
interrogate [2] - 75:5, 75:7
Interrogatories [1] - 51:19
interval [1] - 107:7
intervention [2] - 75:9, 116:14
interview [12] - 73:1, 75:7, 80:17, 80:18, 83:15, 83:18, 84:5, 89:11, 98:10, 118:18, 123:18
interviewed [2] - 92:4, 137:2
intestinal [1] - 108:8
introduced [1] - 144:9
investigated [1] - 134:22
investigation [3] - 70:6, 140:9, 153:16
investigator [4] - 48:23, 86:11,

115:19, 140:3
investigators [2] - 48:11, 140:6
investigatory [1] - 140:12
involve [1] - 142:3
involved [7] - 27:9, 105:18, 134:10, 136:4, 137:9, 140:19, 141:10
involvement [1] - 4:13
involvements [1] - 151:18
involves [1] - 131:2
involving [4] - 6:1, 95:17, 135:6, 151:14
issuance [1] - 122:8
issue [9] - 9:12, 9:13, 10:16, 13:20, 18:6, 19:11, 23:14, 96:11, 124:7
issued [5] - 26:3, 37:17, 51:16, 53:10, 55:2
issues [5] - 19:23, 23:23, 28:21, 43:22, 44:9
items [1] - 6:12
itself [2] - 66:13, 108:9

**J**

James [2] - 53:20
Jeanne [3] - 1:14, 158:4, 158:12
Jessica [10] - 40:17, 42:22, 44:22, 45:11, 45:14, 45:16, 48:6, 49:5, 50:19, 86:3
Jimmy [1] - 86:11
job [3] - 18:21, 20:3, 51:5
Joel [14] - 2:11, 40:11, 41:23, 42:4, 48:6, 49:6, 50:12, 52:1, 86:3, 86:19, 143:1, 143:7, 143:9, 143:19
JOEL [1] - 1:8
Johnson [1] - 2:9
judge [7] - 9:14, 28:4, 28:6, 47:20, 47:21, 49:9, 49:10
July [3] - 42:20, 44:21, 122:21
jumps [2] - 133:11, 133:14
June [3] - 93:21, 93:23
jury [27] - 6:8, 6:16, 8:4, 21:23, 22:4, 22:10, 22:13, 26:9,

34:19, 45:3, 45:7, 45:8, 45:10, 80:19, 87:5, 89:19, 90:2, 90:10, 90:11, 91:16, 91:19, 96:19, 122:1, 122:3, 122:7, 122:18

**K**

Kearse [2] - 134:15, 134:17
keep [2] - 17:20, 114:15
ketoacidosis [1] - 30:18
key [4] - 27:8, 34:15, 112:2, 133:17
kidneys [1] - 108:3
kill [2] - 76:13, 131:11
killed [2] - 70:10, 131:12
kind [13] - 38:16, 43:15, 66:20, 107:13, 109:5, 116:2, 125:5, 130:12, 133:10, 133:14, 150:2, 154:4, 155:15
kindergarten [2] - 154:8, 154:10
KLEIN [99] - 4:5, 9:11, 9:20, 13:22, 16:10, 19:1, 20:11, 21:11, 24:19, 25:6, 26:18, 31:2, 31:16, 32:18, 34:1, 34:3, 34:12, 34:13, 38:7, 40:10, 41:11, 43:3, 43:12, 44:3, 44:13, 46:3, 47:18, 48:19, 50:4, 51:10, 57:7, 57:13, 57:23, 59:2, 59:11, 60:5, 60:14, 64:6, 65:22, 66:6, 73:17, 74:5, 74:18, 75:3, 75:6, 75:16, 76:4, 77:18, 79:16, 80:8, 83:12, 83:22, 85:15, 85:18, 88:13, 89:9, 89:17, 90:8, 90:19, 91:15, 92:15, 93:4, 93:9, 93:20, 94:7, 94:20, 96:1, 96:18, 97:10, 98:1, 98:8, 99:4, 100:8, 100:18, 101:19, 102:20, 108:22, 122:17, 123:15, 124:22, 132:13, 133:1, 133:12, 136:22,

137:4, 139:21, 140:1, 140:22, 141:23, 144:17, 144:21, 146:23, 148:3, 148:11, 148:15, 148:20, 149:4, 152:8, 155:21
**Klein** [3] - 2:2, 4:9, 20:18
**knee** [2] - 60:10, 60:12
**knowing** [1] - 140:5
**knowledge** [8] - 16:3, 21:3, 21:20, 29:8, 45:12, 51:5, 51:9, 115:6
**known** [1] - 142:16

### L

**lab** [2] - 35:20, 121:2
**label** [1] - 69:5
**lacerate** [1] - 61:17
**lacerated** [6] - 91:13, 92:3, 92:8, 108:1, 132:6, 137:23
**laceration** [7] - 61:18, 66:15, 91:20, 105:14, 105:18, 112:17, 127:20
**lacerations** [32] - 23:12, 23:22, 24:18, 28:19, 63:13, 65:4, 65:18, 66:11, 66:17, 66:19, 71:17, 72:9, 76:12, 76:16, 77:4, 78:22, 79:1, 79:4, 85:4, 91:23, 93:3, 112:14, 112:20, 113:7, 113:11, 114:5, 127:7, 132:4, 132:20, 137:20, 138:18, 138:21
**lack** [1] - 97:2
**Lansingburgh** [1] - 52:6
**large** [13] - 79:2, 79:5, 85:3, 85:8, 85:9, 89:20, 90:11, 99:7, 99:15, 99:21, 101:2, 124:2, 126:2
**largely** [1] - 127:20
**last** [7] - 15:8, 20:16, 21:21, 37:6, 44:14, 45:1, 92:1
**lateral** [1] - 64:1
**law** [15] - 20:23, 21:7, 88:14, 92:5, 92:6, 94:23, 134:9, 135:5, 135:6, 135:7, 135:16, 136:1,

136:6, 148:10, 151:19
**Lawrence** [1] - 15:20
**lead** [9] - 12:2, 80:10, 92:18, 140:3, 140:5, 140:14, 145:6, 146:17, 148:7
**leading** [3] - 98:15, 98:16, 145:1
**learn** [3] - 54:1, 94:21, 105:8
**learned** [1] - 117:16
**learning** [1] - 152:3
**least** [10] - 7:12, 25:7, 26:14, 27:2, 41:7, 61:4, 92:2, 105:19, 119:8, 125:19
**leave** [5] - 12:16, 13:1, 43:14, 72:2, 97:12
**leaving** [1] - 13:15
**led** [1] - 10:23, 37:20, 88:16
**left** [13] - 12:19, 13:4, 13:11, 13:17, 14:11, 18:10, 43:23, 47:23, 62:23, 112:15, 112:18, 128:5, 135:21
**legal** [3] - 83:23, 115:19, 153:15
**legitimate** [1] - 30:13
**lesion** [1] - 31:11
**less** [4] - 44:17, 58:11, 58:13, 150:9
**lethargic** [1] - 79:21
**level** [2] - 30:20, 38:10
**license** [1] - 17:6
**licensed** [1] - 17:4
**lied** [1] - 95:12
**lieutenant** [1] - 53:20
**life** [6] - 20:12, 20:14, 72:7, 82:12, 133:3, 133:8
**light** [1] - 121:9
**likely** [8] - 30:21, 57:3, 111:17, 125:2, 131:7, 131:23, 149:10, 150:9
**likewise** [1] - 101:2
**limited** [1] - 69:6
**line** [2] - 41:22, 86:6
**lines** [1] - 87:12
**lining** [2] - 79:18, 126:7
**linkage** [1] - 84:11
**linked** [3] - 84:4, 84:7, 84:10
**linking** [2] - 99:7, 99:10
**liquid** [1] - 112:8

**list** [2] - 123:16, 150:10
**listed** [2] - 35:14, 37:16
**listing** [1] - 116:21
**lists** [1] - 116:6
**literally** [2] - 57:9, 120:13
**literature** [10] - 29:6, 57:14, 59:4, 59:13, 59:20, 60:21, 65:2, 66:14, 102:11, 105:6
**liver** [85] - 23:12, 24:17, 28:18, 61:8, 61:17, 61:20, 61:22, 62:23, 63:13, 65:4, 65:18, 66:11, 66:12, 66:15, 66:17, 71:16, 72:9, 73:3, 73:20, 74:17, 76:8, 76:10, 76:12, 77:4, 78:18, 78:22, 79:5, 81:1, 85:4, 91:13, 91:19, 91:21, 91:23, 92:3, 92:8, 100:21, 103:5, 104:13, 105:16, 105:17, 106:13, 106:15, 106:16, 106:17, 106:21, 107:1, 107:12, 108:1, 108:5, 108:9, 108:21, 108:23, 109:2, 109:5, 109:7, 112:3, 112:15, 113:4, 113:8, 113:9, 113:12, 114:11, 114:17, 117:4, 117:8, 117:13, 117:22, 118:3, 125:21, 127:1, 127:6, 127:20, 127:22, 131:20, 132:5, 132:20, 132:22, 137:20, 137:23, 138:7, 138:14, 138:18, 138:20, 147:10
**livers** [3] - 60:22, 62:12, 132:6
**living** [2] - 103:9, 103:18
**lobe** [5] - 112:15, 112:18, 112:20, 112:23, 117:7
**lobes** [2] - 62:23, 113:3
**localized** [1] - 108:17
**location** [1] - 105:15
**logic** [2] - 29:5, 81:8
**look** [23] - 29:9, 44:20,

50:14, 81:14, 81:16, 81:17, 88:3, 103:4, 104:4, 105:8, 106:3, 110:9, 110:14, 110:16, 136:1, 137:6, 144:18, 145:13, 145:21, 149:21
**looked** [13] - 6:18, 6:21, 8:2, 24:12, 83:13, 110:23, 119:2, 119:6, 125:15, 139:3, 145:11, 145:12, 145:16
**looking** [15] - 19:22, 23:5, 39:3, 42:15, 42:17, 44:19, 52:8, 84:3, 85:2, 116:1, 125:7, 136:8, 146:6, 151:8
**looks** [3] - 36:5, 44:18, 121:4
**loss** [3] - 80:7, 98:15, 111:6
**lost** [2] - 47:12, 97:14
**low** [2] - 62:17, 124:18
**lower** [3] - 91:17, 106:1, 117:9
**Lucey** [1] - 53:20
**lung** [1] - 112:22
**LYSE** [1] - 104:7
**lyse** [3] - 104:7, 104:9, 104:16

### M

**mails** [1] - 86:14
**major** [3] - 10:13, 24:17, 145:22
**majority** [1] - 91:12
**male** [1] - 124:2
**man** [2] - 74:6, 133:8
**manifest** [1] - 111:15
**manner** [4] - 43:5, 88:12, 147:11, 155:1
**March** [7] - 25:22, 26:1, 26:2, 83:16, 118:16, 118:19, 154:18
**mark** [2] - 25:6, 25:10
**Marked** [1] - 156:2
**marked** [3] - 25:11, 32:20, 51:14
**Mary's** [1] - 55:9
**MASON** [1] - 1:7
**Mason** [3] - 2:8, 93:14, 152:16
**mass** [1] - 31:13
**massive** [3] - 65:7,

65:10, 138:19
**material** [3] - 6:23, 15:7, 22:13
**math** [1] - 56:4
**matter** [3] - 94:23, 110:16, 155:9
**matters** [2] - 22:9, 23:2
**mayoral** [1] - 95:17
**McDonald** [4] - 1:6, 2:7, 120:2, 152:16
**McNally** [1] - 143:7
**ME** [1] - 10:7
**mean** [13] - 17:1, 39:9, 49:18, 80:21, 104:8, 122:14, 124:14, 124:16, 136:15, 145:19, 146:1, 150:3, 154:8
**meaning** [1] - 58:22
**means** [1] - 104:9
**meant** [1] - 70:4
**measured** [1] - 113:16
**measurements** [1] - 116:12
**measuring** [4] - 90:20, 112:18, 112:23, 114:1
**mechanism** [1] - 136:19
**mechanisms** [1] - 66:1
**Med** [1] - 118:9
**medial** [1] - 112:18
**medic** [1] - 53:21
**Medical** [4] - 16:11, 16:16, 17:10, 36:12
**medical** [40] - 10:5, 10:17, 11:1, 12:7, 12:13, 12:14, 18:3, 21:14, 43:2, 44:9, 57:8, 58:23, 59:5, 59:14, 59:22, 61:1, 62:1, 62:14, 72:19, 74:22, 97:22, 115:19, 115:22, 116:13, 121:4, 125:19, 126:10, 127:23, 128:3, 132:2, 132:3, 134:6, 134:8, 136:2, 150:1, 150:12, 153:13, 153:15, 154:13, 155:2
**medical-legal** [1] - 115:19
**medical/burial** [1] - 115:10
**medium** [2] - 99:21, 105:19

**meet** [4] - 18:9, 26:21, 53:15, 63:1

**meeting** [63] - 27:3, 27:5, 34:21, 34:23, 35:5, 35:6, 35:7, 35:10, 35:14, 40:6, 40:18, 40:20, 40:21, 41:4, 41:14, 41:16, 41:21, 41:22, 42:1, 42:2, 42:7, 42:19, 42:21, 43:15, 43:18, 43:20, 44:14, 44:18, 44:20, 45:1, 45:4, 45:14, 45:22, 45:23, 48:6, 48:13, 49:3, 49:5, 49:6, 49:13, 50:2, 50:20, 50:22, 51:2, 86:2, 86:15, 86:21, 118:16, 118:21, 118:22, 119:1, 119:9, 119:12, 119:13, 140:13, 144:4, 144:11, 144:14, 151:21, 151:22, 154:20

**meetings** [11] - 25:20, 26:19, 27:6, 45:21, 46:5, 46:21, 143:22, 144:13, 151:21, 154:17, 154:22

**member** [8] - 16:15, 16:22, 16:23, 17:3, 154:23, 155:5, 155:9, 155:14

**memoranda** [1] - 86:14

**men** [1] - 54:22

**mention** [4] - 90:9, 99:11, 105:21, 106:2

**mentioned** [6] - 12:19, 29:17, 90:6, 90:7, 106:5, 147:16

**MEs** [1] - 20:1

**mesenteric** [1] - 105:21

**message** [2] - 48:14, 48:22

**met** [8] - 4:9, 26:6, 26:13, 32:3, 122:20, 144:1, 144:3, 144:15

**metabolic** [2] - 36:7, 81:19

**MICHAEL** [6] - 1:3, 1:8, 1:12, 4:1, 157:4, 157:13

**Michael** [30] - 2:11, 4:12, 14:12, 24:21, 33:12, 40:3, 53:9, 53:16, 65:12, 65:21,

66:23, 67:6, 78:1, 92:4, 94:17, 95:19, 96:10, 98:20, 99:8, 99:17, 100:16, 117:17, 124:23, 128:1, 128:4, 128:14, 129:15, 130:9, 131:8, 140:14

**Michael's** [1] - 130:17

**microscope** [6] - 7:14, 103:11, 104:5, 104:23, 139:9, 139:14

**microscopes** [2] - 139:3, 139:5

**microscopic** [8] - 7:2, 7:4, 7:6, 29:3, 29:10, 103:6, 104:1, 145:12

**microscopically** [1] - 145:16

**microscopy** [1] - 139:9

**mid** [1] - 25:22

**mid-March** [1] - 25:22

**middle** [1] - 35:1

**might** [2] - 35:14, 136:20

**Mike** [1] - 136:3

**mind** [5] - 25:3, 109:23, 117:20, 133:4, 133:6

**mine** [1] - 7:11

**minor** [1] - 138:15

**minute** [4] - 54:5, 54:10, 54:17, 54:20, 56:2, 71:5, 71:12, 139:22

**minutes** [15] - 35:2, 46:23, 49:10, 54:3, 54:8, 54:21, 54:22, 56:3, 56:17, 56:18, 56:19, 58:11, 58:13, 64:8, 64:16

**misconduct** [1] - 136:16

**misdiagnosed** [2] - 127:9, 127:11

**misdiagnosing** [1] - 127:13

**misinterpretation** [2] - 29:12, 92:20

**misinterpreting** [1] - 93:6

**misleading** [3] - 90:10, 90:15, 90:17

**misrepresenting** [1] - 93:6

**missed** [2] - 26:19, 109:21

**mistakes** [2] - 63:18,

72:18

**ML** [1] - 77:7

**MLs** [2] - 77:6, 112:8

**moment** [4] - 137:5, 144:17, 150:17, 150:19

**moments** [1] - 111:4

**monitor** [2] - 109:7, 109:11

**Montgomery** [1] - 15:19

**month** [1] - 13:14

**months** [4] - 48:9, 89:3, 94:9

**Morgan** [1] - 86:11

**morgue** [1] - 18:5

**morning** [4] - 4:6, 34:11, 82:19, 85:19

**most** [12] - 30:21, 58:12, 65:18, 82:10, 82:15, 82:22, 84:8, 84:9, 110:6, 122:5, 131:23, 145:14

**motion** [1] - 129:3

**mouth** [1] - 24:16

**moving** [1] - 105:1

**MR** [99] - 4:5, 9:11, 9:20, 13:22, 16:10, 19:1, 20:11, 21:11, 24:19, 25:6, 26:18, 31:2, 31:16, 32:18, 34:1, 34:3, 34:12, 34:13, 38:7, 40:10, 41:11, 43:3, 43:12, 44:3, 44:13, 46:3, 47:18, 48:19, 50:4, 51:10, 57:7, 57:13, 57:23, 59:2, 59:11, 60:5, 60:14, 64:6, 65:22, 66:6, 73:17, 74:5, 74:18, 75:3, 75:6, 75:16, 76:4, 77:18, 79:16, 80:8, 83:12, 83:22, 85:15, 85:18, 88:13, 89:9, 89:17, 90:8, 90:19, 91:15, 92:15, 93:4, 93:9, 93:20, 94:7, 94:20, 96:1, 96:18, 97:10, 98:1, 98:8, 99:4, 100:8, 100:18, 101:19, 102:20, 108:22, 122:17, 123:15, 124:22, 132:13, 133:1, 133:12, 136:22, 137:4, 139:21, 140:1, 140:22, 141:23, 144:17, 144:21, 146:23,

148:3, 148:11, 148:15, 148:20, 149:4, 152:8, 155:21

**MS** [102] - 9:2, 9:18, 13:21, 16:7, 18:22, 20:7, 21:10, 24:8, 24:9, 26:15, 30:12, 31:7, 33:21, 34:10, 38:1, 38:2, 40:4, 41:2, 41:3, 42:11, 43:9, 43:19, 44:6, 46:2, 47:13, 47:14, 48:16, 48:17, 50:3, 51:8, 57:6, 57:11, 57:20, 59:1, 59:7, 59:23, 60:8, 63:20, 65:15, 65:16, 66:4, 66:8, 73:13, 73:22, 74:10, 74:23, 75:14, 75:21, 77:14, 79:12, 80:4, 81:5, 83:1, 83:20, 84:6, 85:13, 88:5, 88:21, 89:15, 90:4, 90:13, 91:9, 92:9, 92:10, 93:1, 93:7, 93:15, 93:16, 94:4, 94:13, 94:14, 95:8, 95:21, 96:16, 97:4, 97:20, 98:5, 98:22, 100:2, 100:14, 101:9, 102:16, 108:19, 122:11, 123:4, 124:20, 132:12, 132:19, 133:9, 136:14, 136:18, 140:16, 140:17, 141:19, 146:20, 148:2, 148:8, 148:13, 148:16, 149:2, 152:12, 155:17

**multiple** [3] - 19:10, 74:20, 85:4

**municipalities** [2] - 15:21, 18:1

**municipality** [2] - 13:18, 14:1

**murder** [4] - 82:12, 83:19, 83:21, 137:13

**must** [2] - 78:6, 148:6

**mutual** [1] - 14:3

**mysterious** [1] - 82:3

**N**

**name** [6] - 42:8, 96:12, 99:11, 135:1, 143:8, 152:13

**NAME** [12] - 14:16,

16:2, 16:9, 16:21, 17:10, 17:13, 17:21, 18:8, 18:12, 18:15, 20:15, 32:10

**named** [2] - 53:3, 152:17

**narrative** [3] - 21:8, 87:22, 88:1

**national** [1] - 142:14

**National** [5] - 16:11, 16:15, 17:9, 21:13, 21:18

**natural** [3] - 82:7, 134:1, 147:12

**naturally** [1] - 88:1

**nature** [7] - 11:20, 54:12, 70:15, 75:8, 105:3, 141:6, 141:11

**nearby** [2] - 108:2, 108:13

**necessarily** [3] - 9:9, 146:10, 151:6

**necessary** [3] - 11:3, 109:10, 123:13

**necrosis** [2] - 104:23, 105:3

**need** [9] - 5:15, 10:16, 33:4, 48:21, 106:17, 150:10, 151:9, 154:8, 154:10

**needed** [4] - 15:17, 47:11, 123:1, 148:18

**neighbors** [1] - 80:2

**Neogen** [1] - 33:9

**neuropathologist** [1] - 110:13

**never** [32] - 29:5, 29:6, 32:3, 51:13, 52:20, 66:15, 66:16, 71:1, 72:8, 73:4, 73:12, 74:19, 74:20, 81:6, 83:21, 91:22, 92:11, 96:17, 105:5, 105:12, 122:13, 125:9, 133:6, 134:19, 141:21, 142:1, 142:22, 146:5, 151:7, 154:5, 155:7

**NEW** [2] - 1:1, 157:1

**new** [2] - 105:8, 143:7

**New** [10] - 1:15, 2:3, 2:6, 2:10, 3:5, 6:7, 134:14, 134:22, 158:5

**news** [2] - 70:13, 142:7

**next** [10] - 26:3, 33:11, 36:2, 36:8, 36:11, 44:20, 46:18,

114:15, 119:22
**nice** [1] - 143:9
**night** [1] - 80:17
**ninth** [2] - 60:19, 112:11
**non** [1] - 116:16
**non-incident** [1] - 116:16
**none** [5] - 24:13, 24:17, 99:18, 108:12
**nonsignificant** [1] - 118:13
**normal** [2] - 114:18, 119:16
**normally** [2] - 89:21, 121:11
**north** [2] - 10:10, 135:20
**NORTHERN** [1] - 1:1
**Notary** [3] - 1:15, 3:5, 158:5
**notation** [1] - 121:18
**notations** [1] - 34:8
**note** [3] - 77:19, 80:3, 115:2
**noted** [2] - 25:2, 157:6
**notes** [12] - 6:10, 27:3, 27:4, 34:4, 86:14, 86:18, 117:1, 117:3, 119:17, 119:18, 144:18, 158:7
**nothing** [7] - 30:19, 86:22, 87:1, 123:13, 127:4, 127:5, 146:18
**Notice** [1] - 3:16
**notice** [3] - 13:14, 13:15, 113:8
**notified** [1] - 39:22
**notify** [1] - 42:4
**nucleus** [1] - 104:14
**number** [19] - 15:5, 15:17, 16:1, 16:2, 17:20, 18:9, 18:20, 20:1, 32:22, 32:23, 53:10, 55:16, 71:5, 71:16, 76:1, 114:1, 114:5, 117:11, 142:11
**numbers** [2] - 15:6, 15:11

## O

**O'Connell** [3] - 1:14, 158:4, 158:12
**oath** [1] - 3:18
**object** [24] - 20:7, 21:10, 24:8, 31:7, 38:2, 40:4, 41:2, 41:3, 43:9, 48:17,

57:6, 59:23, 75:3, 85:13, 93:15, 95:8, 95:21, 96:16, 97:20, 98:5, 100:2, 140:16, 140:17, 141:19
**objection** [69] - 13:21, 16:7, 18:22, 24:9, 26:15, 30:12, 38:1, 43:19, 44:6, 44:11, 47:13, 47:14, 48:16, 50:3, 51:8, 57:11, 57:20, 59:1, 59:7, 60:8, 63:20, 65:15, 65:16, 66:4, 66:8, 73:13, 73:22, 74:10, 74:23, 75:14, 75:21, 77:14, 79:12, 80:4, 81:5, 83:1, 83:20, 84:6, 88:5, 88:21, 89:15, 90:4, 90:13, 91:9, 92:9, 92:10, 93:1, 93:7, 93:16, 94:4, 94:13, 94:14, 97:4, 98:22, 100:14, 101:9, 102:16, 108:19, 122:11, 123:4, 124:20, 132:12, 132:19, 133:9, 136:14, 136:18, 146:20, 148:2, 149:2
**objections** [2] - 3:11, 3:16
**objective** [1] - 149:7
**objectively** [1] - 21:9
**observe** [2] - 87:17, 114:22
**observed** [3] - 27:20, 114:21, 147:9
**obstructive** [1] - 11:5
**obtained** [2] - 6:22, 7:7
**occasion** [1] - 11:18
**occasions** [2] - 61:3, 134:10
**occur** [13] - 24:15, 62:7, 62:16, 68:15, 70:4, 70:17, 72:5, 72:21, 86:3, 102:12, 107:21, 111:15, 145:15
**occurred** [14] - 29:11, 30:22, 62:13, 86:5, 95:18, 97:7, 98:3, 98:11, 110:4, 117:22, 126:18, 133:16, 136:20, 149:8
**occurring** [1] - 103:2
**occurs** [1] - 154:20

**OF** [5] - 1:1, 1:6, 156:1, 157:1, 157:2
**offered** [1] - 95:3
**offhand** [2] - 24:10, 25:5
**office** [31] - 10:18, 11:1, 25:22, 26:7, 35:2, 38:8, 39:17, 39:21, 40:1, 40:9, 40:13, 46:5, 47:3, 48:13, 48:23, 50:8, 52:19, 84:14, 84:16, 84:19, 86:19, 115:23, 119:7, 120:10, 122:6, 141:14, 143:15, 151:1, 151:8, 152:23, 153:14
**officers** [4] - 20:20, 37:21, 88:14, 120:4
**offices** [2] - 16:20, 18:4
**officials** [1] - 120:12
**often** [6] - 71:6, 88:8, 151:7, 153:3, 153:5, 153:8
**old** [3] - 69:15, 71:21, 154:9
**older** [2] - 61:15, 61:16
**olds** [2] - 145:3, 145:5
**Olympus** [1] - 139:14
**on..** [1] - 46:1
**once** [3] - 26:14, 33:23, 96:2
**one** [40] - 8:2, 9:3, 12:10, 24:11, 27:2, 33:8, 35:14, 40:11, 44:15, 45:8, 48:11, 52:12, 62:6, 62:8, 66:15, 68:15, 69:10, 69:21, 69:22, 71:11, 71:16, 72:12, 78:6, 78:9, 78:10, 79:2, 79:3, 81:4, 87:12, 125:13, 129:6, 133:17, 135:20, 135:22, 140:6, 143:23, 144:17, 146:19, 149:16
**Oneida** [3] - 13:6, 13:7, 14:5
**ones** [4] - 15:18, 61:14, 121:15, 154:18
**Onondaga** [2] - 134:20, 134:21
**oozing** [1] - 89:20
**open** [1] - 119:3
**opened** [2] - 112:8,

148:18
**opine** [2] - 29:18, 149:9
**opined** [2] - 98:3, 98:10
**opining** [1] - 71:11
**opinion** [18] - 19:15, 19:22, 31:23, 32:4, 32:6, 32:8, 49:9, 63:16, 65:10, 65:14, 69:16, 76:3, 129:22, 131:14, 132:2, 142:16, 150:9
**opinions** [4] - 23:7, 24:6, 32:15, 57:2
**opportunity** [3] - 27:12, 31:6, 31:18
**opposed** [1] - 29:4
**order** [1] - 118:10
**organ** [6] - 62:20, 76:14, 103:12, 109:8, 111:13, 111:14
**organization** [1] - 18:19
**organs** [4] - 108:2, 112:10, 116:20, 149:21
**origin** [1] - 28:18
**original** [1] - 6:10
**originally** [1] - 8:2
**otherwise** [5] - 5:12, 23:7, 31:23
**outcome** [1] - 40:22
**outside** [1] - 69:18
**oversight** [1] - 101:7
**overturned** [1] - 93:18
**own** [5] - 7:10, 7:15, 84:15, 95:7, 105:7
**oxygen** [2] - 111:13, 111:14

## P

**P.C** [1] - 2:9
**p.m** [1] - 155:22
**packet** [1] - 52:9
**page** [29] - 33:11, 34:18, 35:16, 35:22, 36:2, 36:3, 36:8, 36:11, 37:6, 37:7, 37:8, 44:19, 51:21, 51:22, 52:8, 55:12, 85:2, 87:12, 113:19, 114:15, 115:9, 115:17, 116:10, 116:23, 117:1, 118:15, 119:22, 121:7, 121:13
**pages** [4] - 33:18,

36:11, 36:17, 121:1
**pain** [1] - 97:3
**painful** [2] - 79:10, 79:15
**painful"** [2] - 79:14, 96:20
**pancreas** [1] - 108:3
**panic** [1] - 83:7
**panicked** [1] - 124:11
**paper** [2] - 24:11, 87:1
**part** [33] - 6:13, 6:14, 6:19, 6:20, 8:7, 12:14, 33:10, 33:13, 35:19, 35:23, 36:1, 36:2, 36:9, 36:12, 36:18, 36:21, 37:1, 37:4, 37:10, 37:11, 37:12, 37:13, 83:14, 85:9, 104:14, 115:18, 147:17, 148:16, 148:17, 153:12, 153:22, 154:16
**part-time** [1] - 12:14
**partially** [2] - 14:6
**particular** [2] - 28:12, 77:21
**particularly** [1] - 61:15
**parties** [1] - 3:4
**parts** [4] - 7:21, 33:7, 34:15, 112:2
**pass** [2] - 80:9, 80:10
**passed** [2] - 80:6, 80:11, 97:7
**past** [1] - 21:15
**pathologist** [4] - 10:9, 17:19, 19:17, 110:14
**pathologists** [3] - 12:11, 18:9, 145:20
**pathology** [1] - 153:15
**patrol** [1] - 134:18
**pattern** [1] - 84:7
**Pattison** [2] - 2:5, 152:14
**pay** [1] - 17:2
**paying** [2] - 17:5, 17:8
**PD** [10] - 25:21, 37:21, 38:8, 119:3, 120:4, 141:8, 141:9, 142:3, 150:23, 154:1
**PECK** [75] - 9:2, 9:18, 16:7, 18:22, 20:7, 24:9, 26:15, 30:12, 33:21, 34:10, 38:1, 40:4, 41:2, 42:11, 43:9, 43:19, 44:6, 46:2, 47:13, 48:16, 50:3, 51:8, 57:11, 57:20, 59:1, 59:7, 59:23, 60:8, 63:20,

65:15, 66:4, 66:8, 73:13, 73:22, 74:10, 74:23, 75:14, 75:21, 77:14, 79:12, 80:4, 81:5, 83:1, 83:20, 84:6, 85:13, 88:5, 88:21, 89:15, 90:4, 90:13, 91:9, 92:9, 93:16, 94:14, 97:4, 100:2, 100:14, 101:9, 102:16, 108:19, 122:11, 123:4, 124:20, 132:12, 132:19, 136:14, 136:18, 140:16, 146:20, 148:2, 148:8, 148:13, 148:16, 149:2

**Peck** [4] - 2:9, 2:11, 4:22, 6:15

**pediatric** [1] - 6:7

**pediatrician** [2] - 121:5, 121:8

**peer** [3] - 21:5, 23:13, 24:2

**pended** [2] - 89:1, 125:6

**pending** [3] - 5:16, 37:16, 115:16

**people** [12] - 70:3, 71:6, 72:18, 74:20, 75:5, 76:13, 87:9, 96:7, 101:12, 146:15, 153:6, 154:9

**per** [12] - 14:16, 14:20, 15:4, 16:1, 17:15, 18:20, 20:2, 54:10, 54:16, 54:20, 56:2, 142:12

**percentage** [1] - 71:2

**perforates** [1] - 112:22

**perform** [3] - 60:4, 60:11, 142:11

**performance** [4] - 41:6, 50:18, 87:1, 120:22

**performed** [5] - 7:2, 58:10, 101:11, 101:17, 137:22

**performing** [1] - 14:14

**perfuse** [1] - 106:16

**perhaps** [5] - 70:5, 109:11, 130:5, 139:17, 154:11

**period** [3] - 54:6, 54:8, 54:18

**PerkinElmer** [2] - 35:22, 36:4

**permission** [1] - 28:6

**permitted** [1] - 29:20

**person** [7] - 30:15, 50:10, 66:16, 81:10, 137:12, 141:8, 153:4

**personal** [5] - 20:12, 20:13, 20:14, 61:19, 62:13

**personally** [3] - 32:2, 42:5, 61:2

**personnel** [7] - 72:13, 73:16, 74:22, 127:23, 128:3, 136:2

**perspective** [1] - 11:2

**phase** [1] - 140:12

**phenomenon** [1] - 144:23

**phone** [1] - 109:20

**photos** [8] - 34:7, 37:10, 37:13, 39:4, 113:18, 113:22, 121:21, 137:7

**physicians** [3] - 12:11, 98:21, 109:6

**physiological** [3] - 31:11, 145:14, 145:17

**picked** [1] - 107:7

**picking** [1] - 43:22

**pictures** [1] - 114:11

**pieces** [2] - 107:1, 107:3

**Pine** [1] - 2:9

**pink** [2] - 33:9, 104:14

**place** [4] - 47:2, 113:16, 157:6

**placement** [4] - 58:22, 59:15, 60:22, 61:22

**places** [2] - 21:3, 21:4

**Plaintiff** [1] - 1:4

**Plaintiff's** [1] - 51:19

**Plaintiff/Claimant** [1] - 2:4

**planned** [2] - 28:13, 31:5

**play** [1] - 103:23

**Player** [1] - 52:5

**Plaza** [1] - 2:9

**pleasant** [1] - 43:21

**PLLC** [1] - 2:5

**plus** [1] - 140:13

**pneumonia** [3] - 81:11, 148:7, 148:22

**point** [18] - 23:10, 24:6, 28:13, 30:6, 30:10, 30:14, 31:3, 31:4, 42:22, 43:8, 47:9, 47:19, 48:2, 58:5, 89:1, 113:21, 117:18, 117:20

**points** [4] - 28:13,

31:4, 31:17, 102:22

**police** [31] - 6:5, 11:7, 20:20, 21:14, 38:5, 40:2, 84:13, 84:22, 85:11, 87:7, 87:9, 88:8, 88:14, 89:6, 95:12, 117:15, 121:19, 136:9, 140:8, 141:2, 151:11, 152:18, 152:22, 153:14, 153:16, 153:23, 154:11, 154:23, 155:5, 155:10, 155:13

**politely** [1] - 43:23

**political** [2] - 14:9, 95:16

**politics** [2] - 11:5, 142:3

**polydipsia** [1] - 30:1

**polyphagia** [1] - 30:2

**polyuria** [1] - 30:1

**poor** [1] - 41:5

**population** [1] - 11:3

**portal** [1] - 106:18

**portion** [6] - 66:12, 79:5, 88:9, 90:11, 112:22, 132:22

**portions** [2] - 63:10

**position** [2] - 10:14, 64:4

**positioning** [3] - 62:16, 62:17, 63:18

**positions** [3] - 16:20, 25:4, 59:9

**possibility** [7] - 97:17, 129:2, 129:14, 146:19, 146:22, 147:1

**possible** [7] - 58:14, 76:9, 82:5, 111:16, 117:21, 131:23, 147:5

**possibly** [6] - 65:12, 66:22, 78:18, 92:20

**post** [4] - 72:15, 118:15, 119:13, 151:21

**post-autopsy** [2] - 118:15, 119:13

**posterior** [12] - 60:19, 63:7, 63:10, 64:13, 64:18, 64:19, 102:21, 112:11, 112:15, 112:23, 117:7, 117:9

**postmortem** [3] - 23:12, 23:13, 29:4, 30:22, 40:19, 67:5,

72:15, 76:19, 76:21, 111:18, 125:22, 126:11, 147:10

**potential** [2] - 101:23, 150:8

**potentially** [1] - 99:21

**power** [4] - 105:10, 107:15, 139:4, 139:8

**powered** [1] - 104:23

**Practice** [1] - 139:1

**practice** [2] - 100:4, 147:23

**practices** [4] - 21:2, 21:20, 150:7, 153:13

**pre** [2] - 121:15

**pre-autopsy** [1] - 121:15

**pre-cutting** [1] - 121:15

**preceded** [1] - 128:23

**precinct** [1] - 95:18

**preclude** [1] - 82:23

**preliminary** [1] - 11:10

**premise** [1] - 92:17

**premortem** [4] - 72:15, 103:19, 103:22, 125:22

**prep** [4] - 45:3, 45:22, 45:23, 151:21

**preparation** [1] - 8:8

**prepare** [4] - 4:19, 26:13, 41:12, 46:21

**prepared** [3] - 28:22, 150:16, 155:9

**prepped** [2] - 45:7, 45:8

**preps** [1] - 151:22

**prerogative** [1] - 133:15

**presence** [1] - 104:23

**present** [10] - 15:3, 37:21, 38:6, 45:15, 49:4, 51:2, 77:11, 108:12, 113:7, 153:1

**presented** [2] - 32:7, 45:10, 46:8

**press** [3] - 51:16, 52:1, 156:4

**pressed** [1] - 131:17

**pressing** [3] - 129:5, 132:8, 132:11

**pressure** [6] - 62:18, 94:18, 94:19, 99:2, 106:1, 135:23

**presumably** [1] - 26:13

**preteen** [1] - 70:20

**pretrial** [1] - 41:13

**pretty** [4] - 71:23, 104:12, 119:16,

142:23

**prevent** [1] - 59:10

**previously** [3] - 11:23, 12:19, 53:6

**primary** [3] - 41:19, 143:19, 143:21

**prison** [2] - 82:12, 133:8

**probable** [1] - 134:1

**problem** [3] - 9:9, 9:18, 9:19

**procedure** [2] - 116:5, 122:3

**procedures** [1] - 20:16

**proceeding** [2] - 148:12, 148:13

**proceedings** [3] - 4:20, 142:1, 158:8

**process** [4] - 29:7, 30:18, 107:14, 128:12

**Production** [1] - 51:20

**Professional** [3] - 1:14, 52:5, 158:4

**professional** [2] - 18:18, 142:17

**professionally** [2] - 18:12, 143:13

**professionals** [2] - 18:11, 72:20

**profusely** [3] - 79:4, 126:19, 126:20

**programs** [1] - 119:3

**prolong** [1] - 72:7

**prolonged** [5] - 57:17, 58:12, 71:22, 72:1, 76:1

**prompt** [1] - 50:1

**pronounced** [2] - 101:13, 101:18

**proper** [3] - 13:14, 21:7, 56:1

**properly** [5] - 9:8, 72:17, 73:5, 73:15

**prosecute** [1] - 83:8

**prosecuted** [2] - 52:10, 141:16

**prosecution** [11] - 21:15, 22:12, 22:17, 28:5, 45:22, 46:21, 49:7, 82:23, 83:3, 137:10, 140:15

**prosecution's** [1] - 86:6

**prosecutor** [7] - 41:5, 41:9, 41:15, 41:19, 41:23, 44:2, 82:16

**prosecutor's** [1] - 50:8

**protest** [2] - 12:17,

# APPENDIX

13:16
**protuberating** [1] - 92:13
**proven** [1] - 60:2
**provide** [3] - 15:16, 91:22, 153:19
**provided** [2] - 6:15, 154:2
**providers** [1] - 59:14
**providing** [1] - 12:11
**public** [2] - 35:2, 35:8
**Public** [3] - 1:15, 3:5, 158:5
**publicized** [1] - 96:12
**publicly** [1] - 134:13
**published** [1] - 29:7
**pull** [1] - 88:2
**pulled** [1] - 104:5
**pump** [2] - 57:10, 76:7
**pumped** [1] - 77:13
**pumping** [1] - 76:7, 76:9
**pumps** [1] - 54:16
**pun** [1] - 40:19
**puppies** [1] - 49:17
**purpose** [1] - 45:4
**pursue** [2] - 83:5, 88:2
**pursuing** [1] - 52:12
**push** [1] - 49:15
**pushback** [1] - 18:17
**pushing** [1] - 43:4
**put** [17] - 16:8, 20:5, 54:7, 60:3, 81:15, 87:1, 99:5, 99:22, 101:4, 101:6, 101:8, 123:9, 124:10, 127:18, 154:14, 155:10, 155:14

## Q

**quad** [1] - 117:8
**quadrate** [1] - 113:3
**qualifications** [2] - 3:17, 142:18
**qualify** [3] - 68:22, 102:5, 145:18
**quality** [1] - 20:9
**qualms** [1] - 142:18
**quantity** [2] - 66:18
**quarter** [1] - 146:15
**questioning** [3] - 49:8, 86:7, 92:17
**questions** [9] - 3:12, 4:13, 4:17, 5:5, 87:11, 126:12, 137:5, 152:19, 155:17
**quicker** [1] - 106:11
**quickly** [5] - 60:17,

76:13, 97:7, 106:9, 127:2
**quite** [4] - 13:10, 59:17, 141:4, 153:10
**quote** [4] - 87:6, 87:8, 96:21, 142:15

## R

**race** [1] - 95:17
**radiological** [1] - 118:10
**raised** [2] - 19:11, 19:12
**ramifications** [1] - 18:11
**rare** [6] - 71:12, 80:13, 81:3, 110:20, 110:22, 150:9
**rarely** [2] - 102:23, 103:3
**rather** [7] - 38:10, 78:15, 81:9, 82:10, 84:3, 128:3, 136:6
**ray** [1] - 114:22
**rays** [1] - 81:22
**reach** [2] - 48:5, 123:17
**reaction** [1] - 30:5
**read** [11] - 21:5, 21:15, 24:3, 27:12, 32:10, 55:22, 67:8, 101:15, 117:5, 142:21, 157:4
**real** [4] - 11:8, 15:11, 73:8, 144:10
**realized** [1] - 13:15
**really** [14] - 15:9, 18:6, 38:3, 42:23, 43:1, 62:5, 70:7, 74:7, 89:6, 92:14, 129:4, 139:10, 143:10, 155:19
**realtime** [2] - 27:15, 27:17
**rear** [1] - 102:23
**reason** [18] - 5:19, 40:20, 58:1, 67:7, 73:1, 74:7, 77:21, 81:23, 82:2, 94:2, 95:3, 95:10, 99:22, 118:7, 125:7, 125:9, 127:6, 128:14
**reasonable** [8] - 97:22, 104:6, 132:3, 134:6, 134:7, 145:21, 149:23, 154:7
**reasons** [9] - 12:5, 14:2, 14:9, 70:5, 70:22, 70:23, 97:19,

118:7, 118:8
**rebut** [1] - 47:8
**rebuttal** [5] - 27:23, 28:4, 28:9, 28:14, 29:19, 86:10
**rebutted** [2] - 31:5, 31:18
**recalled** [1] - 54:21
**receipt** [1] - 33:10
**receive** [3] - 75:23, 88:22, 89:2
**received** [5] - 18:17, 25:7, 54:13, 84:17, 116:7
**receiving** [2] - 53:14, 53:18
**recent** [2] - 22:7, 27:19
**Recess** [3] - 34:2, 85:17, 139:23
**recess** [1] - 144:20
**recognizable** [1] - 104:16
**recognize** [2] - 104:13, 104:20
**recollection** [10] - 6:1, 27:19, 39:1, 39:5, 42:7, 46:7, 137:18, 141:15, 142:6, 144:11
**recommendations** [5] - 16:5, 16:12, 17:13, 17:16, 59:9
**recommended** [6] - 14:16, 16:2, 18:15, 21:7, 50:17, 142:13
**record** [10] - 8:23, 16:8, 33:11, 37:19, 42:19, 68:3, 116:23, 144:19, 154:8, 157:5
**Record** [1] - 52:4
**recorded** [1] - 80:17
**recordings** [1] - 5:23
**records** [8] - 6:6, 42:9, 42:15, 101:16, 121:4, 121:8, 153:20
**recovered** [1] - 114:2
**recuts** [1] - 7:8
**red** [1] - 104:11
**reevaluated** [1] - 139:20
**reexamined** [1] - 139:20
**refer** [3] - 17:9, 63:8, 99:12
**reference** [1] - 9:21
**referenced** [2] - 142:7, 154:22
**referring** [1] - 67:16
**refresh** [2] - 6:1, 27:19

**regard** [5] - 16:1, 17:13, 86:2, 87:6, 139:6
**regarding** [1] - 9:6
**regards** [1] - 29:9
**region** [1] - 10:17
**regional** [1] - 11:1
**Registered** [2] - 1:14, 158:4
**regret** [1] - 52:12
**regulations** [2] - 21:2, 150:6
**relate** [1] - 112:3
**related** [9] - 57:14, 62:8, 62:11, 100:21, 101:23, 102:3, 116:2, 116:16, 132:23
**relates** [1] - 18:20
**relationship** [4] - 14:9, 153:22, 154:16, 154:19
**relatively** [1] - 64:22
**release** [1] - 156:4
**released** [1] - 9:7
**relevant** [2] - 101:22, 155:11
**rely** [2] - 9:5, 153:16
**relying** [1] - 9:10
**remained** [2] - 10:4, 16:6
**remember** [19] - 24:11, 25:5, 39:8, 39:12, 39:13, 39:14, 46:17, 46:18, 96:6, 96:7, 119:1, 119:20, 120:2, 120:8, 120:20, 120:21, 143:8, 143:18, 144:16
**remote** [6] - 33:22, 97:17, 146:22, 147:2, 147:3, 147:5
**removed** [2] - 112:10, 113:9, 114:12
**rendered** [1] - 57:2
**rendering** [1] - 155:8
**rendition** [1] - 131:1
**Rensselaer** [7] - 10:5, 10:7, 10:19, 11:14, 11:22, 12:3, 15:14
**RENSSELAER** [1] - 1:7
**reparative** [1] - 103:23, 107:14
**repeat** [3] - 59:18, 98:7, 109:21
**reperfusion** [2] - 111:8, 111:17
**rephrase** [2] - 5:10,

64:14
**replace** [1] - 14:7
**replicating** [1] - 94:18
**report** [47] - 6:5, 26:4, 34:5, 35:17, 35:20, 36:1, 36:5, 36:6, 36:23, 37:8, 37:12, 37:14, 37:17, 39:3, 55:2, 60:17, 77:19, 77:23, 79:20, 85:1, 89:5, 89:7, 89:12, 94:17, 97:3, 99:12, 100:1, 101:6, 101:8, 101:15, 102:14, 106:5, 111:23, 112:3, 115:5, 115:10, 134:14, 136:17, 150:16, 150:17, 151:8, 151:9, 154:11, 154:15, 155:8, 155:10
**reported** [8] - 85:7, 99:14, 99:16, 102:6, 102:7, 126:6, 126:8
**reportedly** [2] - 85:6, 99:13
**Reporter** [2] - 1:15, 158:4
**reporter** [3] - 3:17, 5:5, 25:10
**reports** [7] - 20:10, 35:20, 37:7, 60:21, 79:19, 151:11, 153:23
**represent** [2] - 70:4, 152:15
**representatives** [2] - 25:21, 40:7
**representing** [2] - 4:12, 4:23
**represents** [1] - 33:6
**Request** [2] - 51:19, 51:20
**request** [5] - 41:1, 118:11, 121:1, 153:1, 154:2
**requested** [5] - 7:8, 40:21, 41:4, 41:15, 41:21
**requesting** [1] - 87:20
**require** [2] - 39:11, 122:5
**required** [1] - 153:20
**research** [1] - 23:11
**reserved** [1] - 3:12
**resigning** [1] - 12:20
**resist** [1] - 122:6
**resistant** [1] - 122:2
**respect** [1] - 32:5

**respective** [1] - 3:3
**respond** [1] - 122:3
**responding** [1] - 53:2
**response** [3] - 50:12, 95:1, 95:5
**Response** [1] - 51:19
**responsibilities** [1] - 10:1
**responsibility** [1] - 136:2
**responsible** [2] - 135:7, 136:21
**responsive** [1] - 79:18
**rest** [1] - 114:18
**resulting** [1] - 59:15
**results** [2] - 110:18, 118:13
**resuscitation** [5] - 54:14, 71:18, 71:19, 85:8, 99:15
**resuscitative** [1] - 128:12
**retrial** [2] - 93:23, 94:3
**retrieved** [1] - 139:19
**retrospect** [1] - 75:12
**return** [2] - 41:16, 44:1
**review** [10] - 5:23, 21:5, 22:6, 22:23, 23:14, 24:3, 24:4, 37:17, 102:11, 139:12
**reviewed** [4] - 6:4, 6:5, 7:11, 65:21
**reviewing** [5] - 27:18, 39:4, 39:14, 153:23, 154:1
**revisit** [1] - 8:23
**Rhiannon** [2] - 2:6, 152:13
**rib** [25] - 57:18, 58:16, 58:21, 59:5, 59:10, 59:16, 59:21, 60:20, 61:21, 63:10, 64:12, 64:13, 64:18, 64:20, 73:20, 85:5, 114:20, 117:4, 126:11, 127:22, 131:20, 132:5, 138:11, 138:14, 147:10
**ribs** [34] - 60:15, 61:16, 62:7, 63:3, 63:5, 63:8, 63:9, 63:11, 63:23, 64:2, 64:23, 65:1, 74:16, 79:10, 79:15, 91:17, 92:3, 92:7, 92:12, 93:3, 100:21, 102:21, 102:23, 103:1, 112:4, 112:12, 117:10,

125:21, 125:23, 126:2, 131:20, 132:6
**ride** [1] - 56:18
**rising** [1] - 38:10
**risk** [3] - 60:4, 60:7, 60:13
**rock** [1] - 43:11
**Ron** [5] - 96:2, 140:13, 140:23, 141:12, 141:16
**Ronald** [6] - 2:7, 92:16, 94:11, 96:15, 120:3, 152:15
**RONALD** [1] - 1:6
**room** [10] - 4:22, 30:4, 54:15, 63:17, 72:13, 98:21, 109:6, 120:15, 120:17, 124:2
**round** [1] - 56:21
**rounded** [1] - 104:12
**routine** [1] - 18:13
**rule** [9] - 72:14, 81:6, 81:15, 81:23, 102:14, 127:17, 130:3, 155:5
**ruled** [1] - 135:9
**rules** [5] - 5:2, 21:2, 21:19, 150:6, 152:19
**ruling** [5] - 44:11, 82:10, 83:9, 150:11
**rumors** [1] - 141:20
**run** [1] - 124:7
**rupture** [2] - 61:22, 138:7
**ruptured** [7] - 60:22, 61:8, 62:12, 106:6, 106:8, 106:12, 106:13
**Rutty** [1] - 139:1

**S**

**sacrificed** [1] - 20:13
**Samaritan** [1] - 6:6
**samples** [1] - 116:7
**Sampson** [2] - 2:5, 152:14
**Saratoga** [1] - 15:15
**satisfied** [1] - 142:15
**save** [2] - 72:6, 133:3
**saw** [11] - 83:18, 85:11, 96:2, 96:8, 113:15, 122:13, 125:3, 128:21, 129:19, 129:20, 130:1
**scarring** [1] - 149:14
**scenario** [1] - 128:7
**scenarios** [2] -

152:22, 154:4
**scene** [4] - 54:14, 72:2, 124:1, 154:12
**schedule** [1] - 42:7
**Schenectady** [7] - 10:18, 11:16, 11:18, 11:22, 12:4, 12:13, 12:15
**Schoharie** [1] - 15:20
**school** [1] - 70:14
**Science** [1] - 21:18
**science** [6] - 29:8, 29:13, 92:19, 110:21, 126:10, 152:2
**Sciences** [1] - 21:13
**Scoharie** [1] - 137:14
**scope** [2] - 71:17, 71:18
**screaming** [4] - 79:11, 79:19, 80:1, 97:3
**screen** [7] - 25:9, 32:19, 33:1, 33:7, 36:7, 44:19, 112:1
**screening** [1] - 81:19
**scroll** [3] - 33:20, 51:21, 85:1
**scrolling** [1] - 114:16
**sealed** [1] - 148:13
**search** [1] - 23:17
**searched** [1] - 23:19
**seat** [1] - 46:11
**second** [5] - 9:3, 41:16, 41:21, 46:10, 46:11
**secondary** [2] - 115:6, 150:8
**seconds** [1] - 5:4
**secretarial** [1] - 123:7
**see** [52] - 23:10, 32:20, 33:1, 33:5, 33:7, 33:8, 33:9, 34:9, 42:17, 46:15, 48:21, 49:1, 51:17, 51:23, 55:21, 63:22, 77:1, 77:23, 80:23, 86:12, 89:21, 96:7, 104:11, 105:7, 105:11, 107:1, 107:6, 107:10, 107:11, 107:13, 107:15, 107:17, 107:20, 108:7, 108:8, 109:5, 109:16, 113:21, 114:4, 114:9, 114:10, 121:17, 137:5, 137:7, 139:15, 146:10, 146:13, 152:21
**seeing** [7] - 77:5, 77:9,

86:7, 96:5, 96:6, 98:23, 105:2
**seeking** [1] - 50:1
**seem** [1] - 102:6
**seemingly** [1] - 70:13
**seizure** [15] - 31:9, 109:14, 110:2, 110:5, 110:11, 110:15, 110:18, 110:19, 111:2, 146:10, 146:11, 146:13, 146:14, 147:1, 149:6
**seizures** [2] - 31:14, 110:7
**send** [6] - 25:9, 122:15, 123:6, 123:12, 150:23, 151:2
**senior** [1] - 42:1
**sense** [2] - 37:22, 132:14
**sent** [3] - 33:10, 36:7, 81:19
**separate** [2] - 39:3, 62:6
**separately** [2] - 5:6, 12:8
**September** [7] - 8:11, 8:17, 9:22, 15:3, 20:17, 22:1, 22:4
**series** [1] - 82:8
**seriously** [1] - 83:6
**services** [5] - 10:10, 10:20, 10:22, 12:12, 15:16
**set** [4] - 7:10, 12:9, 48:6, 155:20
**sets** [1] - 16:12
**several** [9] - 13:14, 14:8, 14:23, 38:14, 94:8, 94:9, 139:22, 143:5, 144:10
**severe** [7] - 66:12, 71:16, 74:3, 74:14, 102:19, 117:12, 132:4
**severely** [1] - 91:13
**severity** [1] - 76:15
**shall** [2] - 3:9, 3:12
**shaped** [1] - 89:19
**share** [2] - 25:8, 32:18, 49:14
**shed** [1] - 121:9
**sheering** [1] - 132:22
**sheet** [4] - 35:1, 37:3, 119:22, 122:22
**sheets** [1] - 35:14
**shock** [1] - 85:3
**short** [1] - 41:15

**shortly** [2] - 40:6, 48:10
**show** [8] - 17:3, 112:1, 112:12, 113:18, 114:11, 114:18, 131:14
**showed** [6] - 7:12, 65:21, 105:10, 127:4, 127:5, 146:18
**showing** [7] - 44:19, 51:17, 55:12, 113:19, 114:19, 129:16, 129:18
**shows** [1] - 116:10
**shredded** [1] - 131:19
**Shumaker** [1] - 53:21
**side** [3] - 103:1, 112:12, 135:22
**SIDS** [9] - 67:16, 67:20, 67:21, 68:14, 69:8, 69:21, 70:2, 70:3
**sign** [4] - 37:3, 116:17, 119:22, 122:22
**sign-in** [1] - 37:3, 119:22
**signed** [2] - 3:4, 150:21
**significance** [7] - 80:2, 108:16, 121:20, 123:21, 124:4, 124:6, 145:9
**significant** [19] - 24:14, 26:19, 77:12, 80:7, 90:2, 90:9, 101:6, 103:6, 107:11, 107:12, 107:13, 112:4, 112:22, 113:6, 113:23, 115:1, 144:11, 151:15, 151:20
**significantly** [3] - 19:20, 57:18, 126:23
**signs** [1] - 30:2
**Sikirica** [3] - 2:11, 33:12, 51:14
**SIKIRICA** [5] - 1:8, 1:12, 4:1, 157:4, 157:13
**Sikirika** [23] - 4:6, 8:10, 9:21, 16:13, 25:8, 25:11, 25:13, 32:20, 32:21, 34:14, 49:21, 51:18, 63:12, 63:16, 85:19, 111:23, 113:19, 131:6, 140:2, 142:16, 152:13, 156:2, 156:3

**similar** [4] - 13:5, 13:9, 65:20, 146:9

**similarly** [2] - 60:6, 149:5

**simple** [2] - 56:23, 101:5

**simply** [12] - 13:4, 17:7, 45:8, 75:10, 77:22, 101:10, 101:16, 104:9, 122:6, 123:8, 127:14, 150:11

**simultaneously** [1] - 65:20

**single** [1] - 61:18

**situ** [1] - 113:15

**situation** [6] - 66:20, 67:17, 68:1, 74:2, 89:12, 123:3

**situation"** [1] - 87:11

**situations** [2] - 81:4, 148:21

**size** [7] - 71:21, 73:10, 104:3, 105:19, 113:5, 113:17, 116:13

**sizes** [1] - 116:21

**skeletal** [2] - 36:8, 118:11

**skeptical** [2] - 44:4, 44:10

**skin** [1] - 111:6

**sleeping** [1] - 70:5

**slides** [8] - 7:8, 7:10, 7:21, 29:10, 104:10, 105:10, 139:12, 145:20

**slight** [2] - 113:2, 117:11

**slow** [1] - 76:13

**slowly** [3] - 33:20, 78:23, 79:3

**sluggish** [1] - 82:19

**small** [13] - 56:10, 61:17, 61:18, 71:1, 78:14, 79:1, 79:3, 99:21, 104:3, 107:9, 109:1, 112:9, 117:7

**smaller** [1] - 33:4

**smothered** [1] - 97:8

**soft** [4] - 60:6, 60:10, 64:22, 113:5

**someone** [12] - 25:21, 40:16, 42:1, 42:5, 70:19, 74:14, 74:19, 82:9, 82:11, 110:17, 136:3, 148:22

**sometime** [2] - 25:22, 26:4

**sometimes** [10] -

**58**:16, 89:3, 115:15, 119:3, 122:14, 122:15, 123:5, 123:7, 123:12, 153:18

**somewhat** [1] - 12:14

**somewhere** [1] - 39:18

**son** [1] - 137:21

**soon** [2] - 86:9, 107:14

**sore** [1] - 49:21

**sorry** [9] - 64:14, 77:6, 78:20, 109:20, 134:19, 135:4, 138:8, 138:18, 146:9

**sort** [3] - 18:18, 30:5, 38:5

**sought** [1] - 28:6

**sound** [4] - 7:15, 8:12, 22:1, 25:18

**sounded** [1] - 7:2

**sounds** [1] - 76:1

**source** [1] - 145:12

**space** [1] - 5:4

**span** [1] - 107:9

**spanked** [1] - 49:17

**speaking** [1] - 72:12

**spearhead** [1] - 18:7

**specific** [2] - 43:7, 152:22

**specifically** [10] - 40:18, 74:20, 84:23, 85:10, 92:6, 95:4, 99:7, 99:10, 130:9, 141:5

**specifics** [3] - 39:13, 120:11, 120:21

**specimens** [2] - 7:19, 116:5

**speculating** [3] - 124:14, 124:18, 131:22

**speculation** [2] - 126:4, 131:3

**speed** [1] - 20:10

**SPENCER** [26] - 13:21, 21:10, 24:8, 31:7, 38:2, 47:14, 48:17, 57:6, 65:16, 92:10, 93:1, 93:7, 93:15, 94:4, 94:13, 95:8, 95:21, 96:16, 97:20, 98:5, 98:22, 133:9, 140:17, 141:19, 152:12, 155:17

**sPENCER** [1] - 41:3

**Spencer** [2] - 2:6, 152:13

**spend** [1] - 9:16

**spent** [1] - 11:6

**spike** [2] - 15:6, 15:9

**splenic** [1] - 108:7

**spoken** [1] - 16:3

**squeeze** [1] - 130:5

**squeezed** [2] - 74:6, 125:2

**squeezing** [3] - 130:7, 131:2, 131:13

**squishing** [1] - 57:9

**St** [2] - 15:20, 55:9

**staff** [16] - 20:1, 55:17, 56:9, 57:4, 57:8, 58:23, 59:6, 59:22, 61:1, 62:1, 84:4, 84:15, 99:22, 123:7, 136:7, 143:23

**stand** [2] - 87:15, 151:19

**standard** [5] - 56:1, 100:4, 116:11, 116:15, 122:3

**standards** [1] - 153:12

**standing** [1] - 120:13

**start** [2] - 68:16, 111:15

**started** [2] - 15:10, 54:5

**starting** [4] - 13:8, 32:21, 35:16, 143:6

**starts** [2] - 51:21, 69:12

**starved** [1] - 111:13

**State** [5] - 1:15, 3:5, 134:14, 134:22, 158:5

**state** [6] - 11:7, 15:21, 20:1, 28:16, 81:15, 125:5

**STATE** [1] - 157:1

**statement** [10] - 51:16, 52:7, 52:17, 53:5, 53:10, 53:12, 53:14, 58:17, 84:1, 142:20

**statements** [3] - 52:1, 131:8, 154:1

**STATES** [1] - 1:1

**static** [1] - 16:6

**stature** [1] - 73:11

**steered** [2] - 88:16, 136:5

**steering** [1] - 136:9

**stenographic** [1] - 158:7

**sternum** [3] - 61:12, 62:23, 63:14

**sternums** [1] - 63:22

**stick** [1] - 30:8

**still** [14] - 10:7, 11:14,

13:10, 14:23, 15:5, 16:16, 17:20, 69:23, 71:12, 88:23, 104:19, 110:20, 142:15, 150:9

**stipulated** [4] - 3:2, 3:8, 3:11, 3:15

**stomach** [2] - 132:8, 132:11

**stop** [3] - 13:1, 13:3, 33:18

**stopped** [1] - 105:1

**stops** [1] - 149:17

**storage** [1] - 139:18

**stories** [1] - 70:12

**story** [2] - 90:15, 124:23

**Street** [1] - 2:5

**stress** [1] - 102:22

**stroke** [1] - 146:9

**strong** [2] - 52:12, 52:15

**structural** [1] - 145:15

**structure** [2] - 103:19, 103:21

**stuck** [1] - 107:1

**studies** [12] - 7:2, 7:4, 35:18, 35:19, 57:21, 58:3, 58:21, 60:2, 138:17, 138:19, 138:22

**study** [4] - 58:7, 71:4, 154:7

**stuff** [2] - 106:3, 136:16

**subdued** [1] - 135:12

**subject** [2] - 28:9, 146:12

**submit** [1] - 17:4

**subordinates** [2] - 143:16, 143:17

**subpoena** [10] - 9:13, 121:23, 122:4, 122:5, 122:8, 122:14, 122:18, 122:19, 123:6, 123:12

**subpoenaed** [1] - 123:2

**subpoenas** [1] - 153:19

**Subscribed** [1] - 157:15

**subscribing** [1] - 16:21

**subsequent** [6] - 25:20, 39:6, 80:18, 118:22, 147:9, 147:21

**subsequently** [1] -

**141**:16

**substance** [3] - 8:7, 21:12, 54:11

**substandard** [1] - 32:8

**substantial** [3] - 91:6, 91:11, 91:12

**suction** [2] - 76:23, 77:3

**sudden** [12] - 67:9, 67:14, 68:4, 68:12, 71:2, 82:3, 127:8, 127:11, 127:13, 127:14, 145:1, 145:6

**SUDI** [17] - 67:16, 67:17, 67:23, 68:9, 68:13, 68:16, 68:21, 68:22, 69:12, 69:16, 69:18, 69:19, 69:21, 70:1, 70:3, 70:7, 71:9

**suffered** [2] - 29:22, 31:9

**suffering** [3] - 28:20, 29:17, 66:16

**sufficient** [3] - 4:19, 18:9, 130:2

**sugar's** [1] - 30:16

**suggest** [2] - 104:2, 105:6

**suggested** [1] - 57:21

**suggesting** [1] - 133:23

**Suite** [1] - 2:3

**sum** [2] - 21:12, 54:11

**summary** [1] - 130:14

**support** [4] - 12:3, 12:4, 24:6, 25:3

**supported** [1] - 92:18

**supporting** [1] - 123:20, 123:21

**suppose** [1] - 72:23

**supposedly** [1] - 82:1

**surface** [4] - 60:6, 60:10, 64:15, 64:22

**surgery** [1] - 109:10

**surprised** [1] - 75:19

**survey** [3] - 11:10, 36:8, 118:11

**suspect** [2] - 38:19, 133:19

**suspicious** [4] - 11:20, 38:9, 153:4, 153:5

**switch** [1] - 56:15

**switching** [2] - 54:23, 56:9

**sworn** [3] - 3:5, 4:2, 157:15

**symptoms** [3] - 29:23,

# APPENDIX

71:6, 82:4
**syndrome** [2] - 68:12, 69:5
**Syracuse** [1] - 134:15
**system** [3] - 12:10, 12:13, 73:8
**systematically** [1] - 18:13

## T

**table** [3] - 88:10, 120:14, 120:18
**tactics** [1] - 93:13
**tandem** [1] - 141:2
**task** [1] - 88:4
**teach** [1] - 139:17
**tear** [2] - 61:18, 117:8
**tearing** [4] - 112:21, 113:2, 118:2, 130:13
**Teas** [23] - 6:9, 6:13, 27:16, 27:23, 29:2, 29:18, 29:21, 31:23, 46:16, 46:22, 47:5, 47:10, 49:8, 67:23, 71:9, 86:6, 86:9, 103:5, 106:23, 111:20, 142:10, 142:12
**Teas'** [8] - 6:14, 6:17, 7:1, 23:6, 41:8, 49:11, 67:8, 152:3
**technically** [2] - 37:11, 148:10
**techniques** [1] - 139:20
**technology** [2] - 139:6, 139:7
**teenage** [1] - 70:21
**telephone** [3] - 124:7, 124:8, 124:9
**tend** [4] - 61:11, 77:22, 120:18, 135:5
**tended** [1] - 24:15
**tends** [1] - 30:23
**tens** [2] - 145:19, 145:20
**tension** [2] - 122:9, 122:12
**tenth** [2] - 60:20, 112:12
**term** [2] - 111:8, 149:19
**terminate** [2] - 10:14, 11:21
**terminated** [1] - 10:8
**terms** [13] - 8:6, 9:14, 13:4, 13:11, 13:13, 13:18, 13:19, 21:19, 27:8, 32:4, 43:17,

76:5, 109:14
**testified** [23] - 4:2, 6:9, 8:10, 26:9, 26:11, 27:11, 27:14, 27:23, 46:1, 46:20, 47:5, 47:7, 54:2, 55:20, 67:23, 75:17, 79:9, 93:22, 96:19, 98:11, 137:10, 137:12, 144:14
**testifies** [1] - 141:8
**testify** [7] - 5:19, 22:4, 27:20, 39:9, 134:5, 141:8, 141:9
**testifying** [5] - 8:16, 14:13, 87:5, 122:2, 122:6
**testimonies** [1] - 6:19
**testimony** [59] - 4:15, 6:8, 6:9, 6:12, 6:14, 6:16, 6:17, 7:1, 7:12, 8:21, 9:1, 9:6, 21:23, 22:13, 22:18, 22:21, 23:5, 23:6, 23:8, 27:12, 27:14, 27:16, 27:18, 27:23, 28:11, 39:14, 41:9, 46:8, 46:15, 46:19, 47:8, 47:10, 47:16, 49:11, 53:2, 53:5, 54:12, 55:21, 67:9, 80:20, 85:22, 86:6, 86:9, 87:13, 87:22, 104:22, 107:4, 110:1, 129:11, 138:2, 140:12, 140:13, 140:20, 141:1, 151:23, 152:3, 157:5
**testing** [2] - 110:11, 121:2
**tests** [1] - 121:3
**THE** [73] - 18:23, 20:8, 24:10, 26:17, 30:13, 31:8, 38:3, 40:5, 41:4, 42:18, 43:10, 43:20, 44:7, 47:15, 48:18, 51:9, 57:12, 57:21, 59:8, 60:1, 60:9, 63:21, 65:17, 66:5, 66:9, 73:14, 73:23, 74:11, 75:4, 75:15, 75:22, 77:15, 79:13, 80:5, 81:6, 83:2, 83:21, 84:7, 85:14, 88:6, 88:22, 89:16, 90:5, 90:14, 91:10, 92:11, 93:2, 93:8, 93:17, 94:5, 94:15, 95:9, 95:22,

96:17, 97:5, 97:21, 98:6, 98:23, 100:3, 100:15, 101:10, 102:17, 108:20, 122:12, 123:5, 124:21, 132:20, 133:10, 136:19, 140:18, 141:20, 146:21, 149:3
**theory** [1] - 74:6
**therapeutic** [1] - 72:4
**thereafter** [2] - 26:6, 48:2
**thereof** [1] - 157:8
**thinks** [1] - 83:6
**this..** [1] - 68:20
**Thomas** [14] - 4:10, 8:10, 8:13, 8:18, 9:7, 14:23, 19:5, 20:19, 49:23, 94:21, 94:22, 96:10, 136:13, 148:4
**Thomas's** [1] - 93:12
**thorax** [1] - 62:17
**thorough** [2] - 125:6, 142:18
**thoroughly** [1] - 125:15
**thoughts** [2] - 74:11, 123:14
**thousand** [1] - 11:11
**thousands** [4] - 38:15, 38:21, 55:4, 145:20
**thread** [2] - 88:2
**three** [4] - 20:6, 36:11, 54:22, 115:18
**three-part** [1] - 115:18
**throughout** [3] - 76:10, 108:11, 140:8
**throwing** [1] - 94:22
**thrown** [1] - 93:12
**thumbnails** [1] - 113:21
**thumbs** [2] - 130:6, 130:7
**tie** [1] - 125:20
**TIM** [1] - 1:7
**Tim** [3] - 2:7, 120:3, 152:16
**timing** [1] - 28:19
**tiring** [2] - 56:11, 56:15
**tissue** [5] - 103:10, 103:22, 111:13, 112:22, 113:5
**tissues** [8] - 7:7, 7:19, 29:3, 103:10, 103:18, 108:2, 108:4, 108:13
**Titans** [1] - 53:20
**titles** [1] - 16:20

**today** [16] - 4:7, 4:12, 4:17, 5:20, 9:16, 9:23, 17:11, 22:6, 32:16, 34:9, 51:12, 85:23, 87:15, 96:8, 115:5, 129:21
**today's** [2] - 4:20, 5:22
**toddler** [12] - 68:7, 68:8, 68:12, 68:19, 69:1, 69:7, 69:20, 70:19, 109:1, 116:11, 121:12
**Toddler's** [1] - 52:6
**toddlers** [3] - 69:14, 70:10, 70:11
**toenail** [1] - 116:17
**together** [1] - 154:14
**tone** [2] - 43:18, 49:13
**tongue** [2] - 146:12, 146:16
**took** [4] - 7:13, 13:20, 81:22, 85:19
**top** [4] - 66:17, 105:14, 121:18, 129:6
**topic** [1] - 12:6
**torn** [6] - 61:21, 66:12, 79:6, 106:6, 106:8, 106:12
**totally** [2] - 29:23, 49:19
**touched** [1] - 111:5
**towards** [1] - 88:17
**toxicology** [3] - 36:23, 37:7, 121:3
**trace** [1] - 105:17
**traffic** [1] - 81:8
**trailer** [1] - 137:9
**trained** [9] - 58:23, 59:14, 72:16, 73:5, 73:15, 100:19, 100:20, 100:22
**training** [1] - 102:10
**transcript** [3] - 8:20, 27:18, 157:7
**transcription** [1] - 158:7
**transfer** [1] - 51:6
**transparency** [1] - 150:10
**transport** [1] - 54:14
**trauma** [10] - 57:15, 85:5, 107:19, 108:1, 108:5, 108:6, 116:17, 135:14, 137:11, 150:18
**traumatic** [1] - 88:18
**treat** [1] - 109:6
**treatise** [1] - 138:23
**treatises** [2] - 23:14,

24:2
**tri** [1] - 11:2
**tri-county** [1] - 11:2
**trial** [57] - 3:13, 4:15, 6:8, 6:10, 7:4, 7:16, 7:20, 14:12, 19:2, 19:11, 22:21, 23:15, 24:21, 24:22, 24:23, 26:11, 26:14, 27:11, 27:13, 32:8, 32:15, 39:8, 39:11, 39:12, 39:15, 41:6, 41:12, 45:4, 45:21, 46:8, 46:11, 52:23, 53:1, 54:1, 54:2, 55:20, 70:12, 75:17, 75:19, 79:9, 80:20, 90:11, 91:23, 93:21, 94:3, 94:9, 95:11, 104:11, 105:11, 122:18, 123:1, 123:2, 123:8, 129:22, 141:3, 148:11, 151:23
**Trial** [1] - 3:16
**trials** [1] - 39:9
**tried** [3] - 40:15, 124:17, 129:15
**trip** [2] - 13:8, 13:10
**Trish** [1] - 143:7
**TROY** [1] - 1:6
**Troy** [22] - 2:6, 2:7, 25:21, 37:21, 38:8, 52:4, 53:9, 96:12, 119:3, 120:4, 140:3, 140:8, 141:2, 141:13, 150:23, 152:15, 152:17, 154:1, 154:23, 155:5, 155:9, 155:13
**true** [8] - 21:15, 38:22, 87:18, 97:16, 125:1, 125:2, 157:7, 158:6
**trusted** [1] - 73:4
**truth** [2] - 22:9, 23:2
**try** [9] - 9:5, 34:16, 60:4, 60:11, 70:10, 133:16, 149:21
**trying** [3] - 7:23, 131:1, 133:3
**tumors** [1] - 139:19
**turgor** [1] - 111:6
**turned** [1] - 22:12
**two** [23] - 8:17, 13:8, 19:9, 20:6, 21:16, 40:7, 62:5, 68:7, 68:18, 69:8, 69:14, 69:22, 70:7, 70:21, 71:21, 74:16, 118:7, 122:23, 126:12, 129:6, 145:3, 145:5

**two-hour** [1] - 13:8
**two-year-old** [1] - 71:21
**two-year-olds** [2] - 145:3, 145:5
**type** [10] - 43:13, 48:21, 65:11, 79:3, 88:17, 95:16, 110:11, 132:4, 144:22
**typed** [2] - 53:15, 53:18
**types** [2] - 102:12, 152:22
**typical** [3] - 141:4, 141:5, 154:19
**typically** [7] - 30:16, 58:10, 76:12, 78:22, 108:1, 119:10, 119:13

**U**

**Ulster** [6] - 12:20, 13:2, 13:3, 13:9, 13:11
**ultimate** [1] - 154:14
**umbrella** [1] - 61:5
**unable** [1] - 119:2
**uncommon** [1] - 38:4
**unconscious** [1] - 125:5
**unconsciousness** [1] - 81:16
**under** [13] - 7:14, 12:14, 13:18, 16:2, 18:15, 61:5, 95:11, 103:10, 104:5, 105:10, 107:15, 129:6, 148:10
**undergone** [1] - 24:13
**understandable** [1] - 146:2
**understandably** [1] - 153:7
**understood** [3] - 5:13, 43:2, 49:20
**undetected** [2] - 109:14, 110:2
**undetermined** [9] - 69:3, 82:11, 82:15, 82:22, 125:11, 125:12, 128:5, 135:21, 147:12
**undiagnosed** [4] - 28:21, 29:22, 31:3, 81:12
**undue** [1] - 155:1
**unexplained** [21] - 38:11, 67:9, 67:14,

68:4, 69:1, 70:1, 70:6, 70:9, 70:22, 70:23, 71:12, 80:13, 81:3, 88:17, 97:18, 125:13, 127:8, 127:11, 127:14, 149:9
**unintended** [1] - 128:8
**UNITED** [1] - 1:1
**University** [1] - 24:11
**unknown** [3] - 12:5, 125:17, 153:11
**unless** [4] - 31:10, 31:11, 31:12, 127:8
**unlikely** [1] - 82:6
**unpend** [1] - 115:16
**unrecognized** [1] - 71:7
**unresponsive** [16] - 66:22, 80:22, 81:2, 82:20, 85:6, 99:13, 124:2, 125:1, 125:8, 125:10, 126:6, 126:9, 127:3, 127:5, 127:6, 137:19
**untrained** [1] - 73:23
**unusual** [2] - 119:14, 153:11
**up** [38] - 8:1, 9:23, 10:10, 12:9, 15:3, 16:5, 27:22, 32:16, 42:16, 43:22, 45:20, 46:13, 48:6, 51:11, 68:18, 69:8, 79:22, 82:19, 83:10, 96:12, 96:13, 103:12, 107:7, 111:23, 112:8, 121:7, 123:10, 129:3, 135:20, 137:8, 141:21, 142:1, 142:4, 142:5, 144:12, 146:18, 150:2, 151:3
**upper** [1] - 112:20
**ups** [1] - 114:20
**upset** [3] - 13:19, 40:22, 48:15
**Utica** [1] - 13:7
**utmost** [1] - 142:9

**V**

**vacuum** [1] - 154:5
**vastly** [1] - 102:18
**vein** [1] - 105:21
**veins** [2] - 106:1, 106:18
**vena** [1] - 105:19
**venting** [1] - 49:14

**veracity** [1] - 128:15
**verdict** [3] - 86:4, 87:3, 93:18
**versa** [1] - 130:7
**versus** [4] - 98:21, 105:2, 126:11, 135:15
**vessels** [1] - 105:15
**via** [1] - 1:13
**vice** [1] - 130:7
**video** [25] - 65:20, 67:1, 83:13, 83:15, 84:12, 84:22, 85:11, 88:15, 94:17, 98:2, 98:9, 98:17, 98:19, 98:23, 118:19, 119:8, 125:3, 128:21, 129:5, 129:19, 130:2, 130:17, 131:15, 133:5, 137:3
**videos** [3] - 5:23, 88:23, 154:12
**view** [9] - 67:15, 103:17, 127:9, 129:19, 131:19, 132:9, 139:12, 147:2, 152:3
**views** [3] - 7:13, 138:4, 152:6
**vigorous** [1] - 62:14
**vigorously** [5] - 60:23, 61:7, 61:23, 62:1, ▓▓▓ [33] - 4:14, 6:1, 6:7, 7:19, 8:15, 25:14, 29:16, 35:17, 39:2, 54:3, 66:21, 69:15, 71:15, 76:18, 77:11, 79:10, 84:10, 94:9, 94:19, 100:6, 108:13, 109:1, 115:20, 116:12, 125:20, 129:15, 144:22, 147:8, 149:20, 150:1, 151:14, 155:4
▓▓▓ [4] - 69:1, 71:10, 73:10, 116:6
**violent** [1] - 62:18
**viral** [2] - 36:16, 81:17
**virtue** [1] - 128:9
**vitreous** [1] - 30:15
**voided** [1] - 58:18
**volume** [1] - 15:4

**W**

**wager** [1] - 120:22
**waited** [1] - 39:20
**waived** [1] - 3:9

**wake** [1] - 79:21
**Wake** [4] - 24:11, 25:1, 58:7
**walk** [4] - 10:4, 34:14, 49:2, 112:2
**wall** [3] - 61:12, 114:10, 120:19
**wants** [2] - 83:4, 83:5
**Warren** [2] - 10:11, 15:16
**Washington** [3] - 2:10, 10:11, 15:15
**watch** [3] - 84:13, 84:14, 109:6
**watched** [4] - 84:12, 84:16, 84:20, 119:8
**waterford** [1] - 40:14
**Watertown** [1] - 40:13
**weak** [1] - 52:18
**wear** [1] - 13:8
**week** [2] - 92:1, 151:5
**weeks** [4] - 48:8, 89:3, 119:14, 122:23
**weights** [1] - 116:21
**well-intentioned** [1] - 72:19
**Wentley** [1] - 137:11
**West** [1] - 2:9
**whatsoever** [1] - 142:19
**whole** [4] - 50:6, 77:10, 90:15, 157:7
**wife** [2] - 82:18, 95:3
**window** [1] - 120:15
**wire** [1] - 146:6
**wish** [3] - 23:8, 72:2, 85:21
**withdrawn** [3] - 17:14, 79:8, 144:22
**witness** [10] - 27:12, 27:14, 41:8, 53:1, 53:3, 80:1, 92:18, 99:19, 124:11, 126:8
**WITNESS** [73] - 18:23, 20:8, 24:10, 26:17, 30:13, 31:8, 38:3, 40:5, 41:4, 42:18, 43:10, 43:20, 44:7, 47:15, 48:18, 51:9, 57:12, 57:21, 59:8, 60:1, 60:9, 63:21, 65:17, 66:5, 66:9, 73:14, 73:23, 74:11, 75:4, 75:15, 75:22, 77:15, 79:13, 80:5, 81:6, 83:2, 83:21, 84:7, 85:14, 88:6, 88:22, 89:16, 90:5, 90:14, 91:10, 92:11, 93:2, 93:8, 93:17,

94:5, 94:15, 95:9, 95:22, 96:17, 97:5, 97:21, 98:6, 98:23, 100:3, 100:15, 101:10, 102:17, 108:20, 122:12, 123:5, 124:21, 132:20, 133:10, 136:19, 140:18, 141:20, 146:21, 149:3
**witnessed** [3] - 27:16, 41:7, 86:5
**witnesses** [5] - 27:13, 99:17, 131:5, 133:17, 141:8
**woman** [2] - 50:10, 137:18
**woodpile** [1] - 150:15
**word** [1] - 104:7
**words** [12] - 13:23, 20:4, 48:21, 79:14, 99:5, 110:9, 113:10, 118:20, 125:20, 126:5, 136:5, 148:4
**workload** [1] - 10:2
**works** [1] - 18:2
**workup** [1] - 81:22
**worth** [1] - 124:12
**wrapping** [1] - 137:8
**writing** [2] - 86:20, 86:21
**writings** [1] - 86:15
**written** [4] - 53:15, 53:18, 55:13, 86:22
**wrote** [1] - 117:12

**X**

**x-ray** [1] - 114:22
**x-rays** [1] - 81:22

**Y**

**Y-shaped** [1] - 89:19
**year** [18] - 14:14, 14:16, 14:20, 15:1, 15:4, 15:8, 16:2, 17:2, 17:15, 18:20, 20:2, 38:15, 49:22, 68:15, 71:21, 142:12, 145:3, 145:5
**years** [16] - 14:6, 14:8, 15:8, 19:16, 21:21, 70:20, 70:21, 137:9, 139:10, 142:17, 143:2, 143:3, 143:5, 144:10, 154:9
**yesterday** [1] - 22:7
**YORK** [2] - 1:1, 157:1

**York** [10] - 1:16, 2:3, 2:6, 2:10, 3:6, 6:7, 134:14, 134:22, 158:5
**you..** [1] - 44:16
**young** [3] - 121:11, 153:4, 153:6
**yourself** [3] - 18:12, 41:1, 44:21

## Z

**zoom** [1] - 7:20
**ZOOM** [1] - 1:13