# 23-589

IN THE

# United States Court of Appeals
# for the Second Circuit

MICHAEL DAVIS-GUIDER,
*Plaintiff-Counter-Defendant-Appellant,*

— v. —

CITY OF TROY, RONALD FOUNTAIN, INDIVIDUALLY,
DANIELLE COONRADT, INDIVIDUALLY,
CHARLES MCDONALD, INDIVIDUALLY,
TIM COLANERI, INDIVIDUALLY,
*Defendants-Cross-Claimants-Counter-Claimants-Appellees,*

RENSSELAER COUNTY,
MICHAEL SIKIRICA, INDIVIDUALLY,
*Defendants-Cross-Defendants-Counter-Claimants-Appellees,*

ADAM R. MASON, INDIVIDUALLY
*Defendant-Cross-Claimant-Counter-Claimant,*

JOEL ABELOVE, INDIVIDUALLY,
*Defendant-Cross-Defendant-Counter-Claimant,*

JOHN AND JANE DOES 1-10, INDIVIDUALLY,
MICHAEL E. PARROW, ANDRA ACKERMAN,
*Defendants.*

On Appeal from the United States District Court
for the Northern District of New York
Case No. 1:17-cv-1290 (FJS/DJS)

## BRIEF AND SPECIAL APPENDIX
## FOR APPELLANT MICHAEL DAVIS-GUIDER

*(Counsel of Record on Next Page)*

Max Rodriguez
POLLOCK COHEN LLP
111 Broadway, Suite 1804
New York, NY 10006
(646) 290-7509

Brett H. Klein
BRETT H. KLEIN, ESQ. PLLC
305 Broadway, Suite 600
New York, NY 10007
(212) 335-0132

*Counsel for the Appellant,*
*Michael Davis-Guider*

## **TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT ......................................................... 1

ISSUES PRESENTED FOR REVIEW ................................................... 1

STATEMENT OF THE CASE ............................................................... 2

    A.  Nature of the Case .................................................................. 2

    B.  Relevant Facts and Procedural History............................... 5

    C.  Decisions Below....................................................................20

SUMMARY OF THE ARGUMENT .......................................................23

STANDARD OF REVIEW ...................................................................24

ARGUMENT .......................................................................................26

  I.  Malicious Prosecution ............................................................26

    A.  Appellant raised at least a triable disputed question of fact as to initiation of prosecution. ........................................27

    B.  Appellant raised at least a triable disputed question of fact that there was not probable cause to indict him. ..........30

    C.  Appellant raised at least a triable disputed question of fact that Defendants acted with malice. ...............................34

  II.  Fair Trial ...............................................................................35

    A.  Appellant presented sufficient evidence to raise a question of disputed fact over whether defendants fabricated evidence...................................................................................36

      1.  Sikirica........................................................................36

      2.  Coonradt and Fountain..............................................38

  III. Defendants are not entitled to qualified immunity.................40

CONCLUSION....................................................................................42

# TABLE OF AUTHORITIES

## Cases

*Ashley v. City of New York,*
   992 F.3d 128 (2d Cir. 2021) ................................................................35

*Coggins v. Buonora,*
   776 F.3d 108 (2d Cir. 2015) ...............................................................33

*Cornelio v. Connecticut,*
   32 F.4th 160 (2d Cir. 2022).................................................................26

*Dufort v. City of N.Y.,*
   874 F.3d 338 (2d Cir. 2017) ..........................................................32, 33

*Ekukpe v. Santiago,*
   823 Fed. Appx. 25 (2d Cir. 2020) .......................................................29

*Frost v. N.Y.C. Police Dep't,*
   980 F.3d 231 (2d Cir. 2020) ...............................................................24

*Galbraith v. Cnty of Santa Clara,*
   307 F.3d 1119 (9th Cir. 2002) ............................................................35

*Green v. Montgomery,*
   219 F.3d 52 (2d Cir. 2000) ...........................................................40, 41

*Hamilton v. City of New York,*
   2019 WL 1452013 (E.D.N.Y. Mar. 19, 2019) ...............................38, 39

*Hayes v. N.Y.C. Dep't of Corr.,*
   84 F.3d 614 (2d Cir. 1996) ...........................................................25, 40

*Jeffreys v. City of N.Y.,*
   426 F.3d 549 (2d Cir. 2005) ...............................................................25

*Jorgensen v. Cnty of Suffolk,*
   558 F. Supp. 3d 51 (E.D.N.Y. 2021)........................................32, 34, 35

*Kee v. City of New York,*
   12 F.4th 150 (2d Cir. 2021)................................................................26

*Kinzer v. Jackson*,
316 F.3d 139 (2d Cir. 2003) .................................................. 40

*Morse v. Fusto*,
804 F.3d 538 (2d Cir. 2015) ............................................ 36, 38

*Rehberg v. Paulk*,
566 U.S. 356 (2012) .............................................................. 32

*Ricciuti v. New York City Transit Auth.*,
124 F.3d 123 (2d Cir. 1997) .......................................... 27, 29

*Rohman v. New York City Transit Auth.*,
215 F.3d 208 (2d Cir. 2000) ................................................. 27

*Rothstein v. Carriere*,
373 F.3d 275 (2d Cir. 2004) ................................................. 34

*Rule v. Brine, Inc.*,
85 F.3d 1002 (2d Cir. 1996) ................................................. 39

*Savino v. City of New York*,
331 F.3d 63 (2d Cir. 2003) ................................................... 30

*SCR Joint Venture L.P. v. Warshawsky*,
559 F.3d 133 (2d Cir. 2009) ................................................. 25

*Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*,
391 F.3d 77 (2d Cir. 2004) ................................................... 25

*U.S. v. Rem*,
38 F.3d 634 (2d Cir. 1994) ................................................... 40

*Zahrey v. City of New York*,
2009 WL 54495 (S.D.N.Y. 2009) .................................... 30, 40

**Statutes**

28 U.S.C. § 1291 .................................................................... 1

28 U.S.C. § 1331 .................................................................... 1

28 U.S.C. § 1367........................................................................... 1

42 U.S.C. § 1983.......................................................................1, 21

## JURISDICTIONAL STATEMENT

The District Court below had federal question jurisdiction pursuant to 28 U.S.C. § 1331 because the action asserted claims under 42 U.S.C. § 1983. The District Court had supplemental jurisdiction over Appellant's state-law claims under 28 U.S.C. § 1367. On March 29, 2023, the District Court granted summary judgment for all Defendants. The judgment was entered the same day. A timely notice of appeal from the order granting summary judgment and the judgment itself was filed on April 28, 2023. Accordingly, this court now has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.     Whether the District Court erred in granting summary judgment as to Appellant's claim for malicious prosecution against Fountain, Sikirica, and Coonrandt.

2.     Whether the District Court erred in granting summary judgment as to Appellant's claim for fabrication of evidence against Fountain, Sikirica, and Coonrandt.

3.     Whether the District Court erred in finding Fountain, Sikirica, and Coonrandt were entitled to qualified immunity.

- 1 -

4.     Whether the District Court erred in granting summary judgment on Appellant's other supplemental claims, including *Monell* claims, conspiracy, and state-law claims, on the same basis as granting summary judgment for his malicious prosecution and fabrication of evidence claims.

## STATEMENT OF THE CASE

### A.     Nature of the Case

The claims in this case arise from a tragic infant death and a miscarriage of justice in its wake. Appellant Michael Davis-Guider lived with his girlfriend and her two-and-a-half-year-old daughter, identified as "V.D." (App'x 1467, 1519). Even though she was not his child, Appellant loved V.D. and cared for her as if she was his own. (App'x 1467, 1519–1520). When Appellant woke up one fateful morning to find V.D. unresponsive, his whole life was turned upside down (App'x 1468, 1532–1533).

Appellant's life was impacted first by her death and then by a grasping-at-straws investigation and prosecution to blame him for it. The Troy Police Department ("TPD"), including Defendant-Appellees Ronald

Fountain, Danielle Coonradt, and others,[1] could not cobble together the evidence necessary to arrest Appellant, and admitted there was not probable cause. They then turned to Defendant-Appellee Michael Sikirica, who serves as Rensselaer County's medical examiner, to provide the answer they wanted and needed on V.D.'s autopsy. (App'x 1471–1472, 1701–1702, 1765). They provided him with, among other things, Coonradt's report as the first officer responding to the 911 call, and a video recording of an interview of Appellant by Fountain and others. (App'x 1473, 1933–1934).

With this information, Sikirica knew that Appellant was alone with V.D. and had wrongly performed CPR on her by compressing her abdomen with his other hand under her back. (App'x 1472–1474, 1728–1729, 1921–1922, 1933–1934). He concluded the cause of death was homicide based on a "[h]istory of [being] reportedly found unresponsive

---

[1] This appeal only concerns Appellant's claims against Ronald Fountain, Danielle Coonradt, the City of Troy, Michael Sikirica, and Rensselaer County. The other defendants at issue below on summary judgment — Charles McDonald, Tim Colaneri, and Adam Mason — are not at issue in this appeal. They are only referenced as a part of the record and factual summary for context.

with reported history of attempted cardiopulmonary resuscitation by a large adult" and that she had died of "[h]ypovolemic shock due to a large hemoperitoneum due to multiple lacerations of the liver with right rib fractures due to blunt force trauma…." (App'x 1474, 1780, 1789). He did not mention that medical personnel had performed over 6,000 two-handed CPR compressions on V.D. on a soft surface. (App'x 1474–1475, 1538, 1541–1542, 1572–1573, 1576, 1617–1618, 1660, 1780, 1789, 1931–1932).

He attributed the death to someone with large hands and that it was a homicide, even though he later admitted in his deposition that he would not have ruled it a homicide if he had attributed the harm to V.D.'s body to medical personnel during CPR (nor did he know the size of their hands, because he did not interview them or further investigate how they did CPR). (App'x 1474–1475, 1928–1929, 1935–1936).

The prosecution of Appellant rushed forward, based on two witnesses (Fountain and Sikirica) in the grand jury.

To be sure, law enforcement is entitled (and indeed, encouraged) to investigate potential crimes based on their suspicions. But to manufacture support for a hunch is a different matter altogether that the

Constitution's rights to a fair trial and against arrest without probable cause cannot bear. Among other consequences suffered from this ramshackle prosecution, Appellant spent about a year in custody before being acquitted at trial.

The District Court compounded Defendant-Appellees' rush to judgment of Appellant by improperly weighing facts in their favor, determining that valid disputes were not sufficient to survive summary judgment.

For the reasons laid out below, the District Court erred in granting summary judgment as to Fountain, Sikirica, Coonradt, the City of Troy, and Rensselaer County. A reasonable jury could find these defendants liable for federal and state violations of Appellant's civil rights as he was prosecuted in a slap-dash attempt to find an easy target to blame for this tragic death. This Court should vacate the judgment below and remand for further proceedings as to these defendants, including a trial.

### B.    Relevant Facts and Procedural History

In February 2015, Appellant lived in Troy, New York with his girlfriend and her two-and-a-half-year-old daughter, "V.D." The night before V.D.'s tragic death, Appellant watched basketball with a friend

across the street, while V.D. was home with her mother. (App'x 1468, 1524–1528). V.D. was already asleep when Appellant came home. (App'x 1468, 1524–1528).

V.D. had been sick about a week before her death, and suffered from low iron, chronic bronchial inflammation, and metabolic symptoms consistent with hypothyroidism. (App'x 1467–1468, 1522–1533, 1652). The morning of February 26, 2015, Appellant was home with V.D. Around 7:00 that morning, V.D. woke up and appeared low energy sluggish, and unusual. (App'x 1468, 1530–1531, 1669). Appellant helped V.D. use the bathroom, changed her diaper, offered her food and water — which she declined — and put her back to sleep. (App'x 1468, 1530–1531). Afterwards Appellant also fell asleep. (App'x 1468, 1530–1531). A few hours later after waking, Appellant found V.D. unresponsive in her bed. (App'x 1468, 1532–1534). After V.D. did not respond to Appellant's calls to wake her, he attempted CPR. (App'x 1469, 1534–1540, 1676). Appellant's CPR attempts included a few compressions pressing down on V.D.'s stomach with his hand behind her back. (App'x 1469, 1534–1540, 1676). V.D. remained unresponsive.

After he was unable to find a working phone in the apartment, Appellant called 911 at 1:09 pm from a restaurant across the street. (App'x 1469, 1534–1540, 1676). Emergency medical services ("EMS") personnel immediately started CPR upon arriving. (App'x 1469, 1538, 1541–1542, 1572–1573, 1576, 1617–1618).

EMS personnel performed between 2,000 and 2,400 chest compressions on V.D. over twenty minutes, both in the home and on the way to the hospital. (App'x 1469, 1586–1587). While at the home, EMS personnel performed CPR on V.D. using two hands pressing hard on her chest while she was on a soft futon. (App'x 1469, 1538, 1541–1542, 1572–1573, 1576, 1617–1618). An expert at Appellant's criminal trial testified that this was improper. (App'x 1469, 1660). After they arrived at the hospital, several thousand more chest compressions were performed on V.D., in total approximately 6,000. (App'x 1470, 1594–1595, 1683).

Sadly, these resuscitation efforts did not revive V.D. She was already in cardiac arrest, was not breathing, had no pulse, no heart activity, and was warm to the touch. (App'x 1594). At no time did she regain a pulse or start breathing. V.D. was pronounced dead at 2:10 pm

after another 30 minutes of CPR at the hospital. (App'x 1470, 1594–1595, 1683).

Defendant-Appellee Troy Police Department ("TPD") Officer Danielle Coonradt was the first officer to respond to the scene. (App'x 1470, 1542–1544). Despite there being no evidence (as confirmed by EMS personnel) of V.D. having visible injuries, Coonradt searched the home in a manner suggesting she was suspicious, opening cupboards and looking in high places. (App'x 1470, 1542–1544, 1559–1560, 1562–1566, 1592–1593). After questioning Appellant, Coonradt prepared a report of her conversation with him that included multiple false factual claims, including that Appellant told Coonradt he had tried to wake V.D. at 11:00 am. Coonradt also claimed that Appellant told her "time must be flying" after Coonradt said it was 1:30 pm. (App'x 1470, 1546–1548, 1557–1558, 1686–1690).

Davis denied making either of these statements, and instead recalled only telling Coonradt he did not know the time because there was not a clock in the house and his phone was not working. (App'x 1470, 1546–1548). Defendants-Appellees TPD Detective Ronald Fountain, Detective Charles McDonald, and Sergeant Tim Colaneri joined the

investigation into the death of V.D. (App'x 1470, 1692, 1695–1696, 1733–1735). McDonald interviewed Appellant at the house, Fountain went to the house but then went to the hospital to gather more information. Fountain and Colaneri assisted in executing a search warrant at the house, canvassing the neighborhood, and speaking to witnesses. (App'x 1471, 1751–1760, 1764). McDonald and Fountain took Appellant to the police precinct from the house.[2]

Colaneri, Fountain, and McDonald interrogated Appellant at the precinct. (App'x 1471, 1738–1739, 1759–1760). Colaneri was the primary questioner during the first interrogation, part of which was recorded on his cell phone. (App'x 1471, 1693–1694, 1759–1760, 1946). Appellant did not make any incriminating statements in that interrogation. (App'x 1471, 1694, 1761). Fountain and Colaneri admit that probable cause to arrest Appellant did not exist based on the known information at that time. (App'x 1471, 1694, 1761).

---

[2] When taking Appellant to the precinct, McDonald and Fountain claimed they were taking him to the hospital before he got in their car. (App'x 1471, 1559–1561).

On February 27, 2015, Defendant-Appellee Michael Sikirica, the Rensselaer County medical examiner, conducted an autopsy of V.D. (App'x 1471, 1701–1702, 1765). The autopsy was attended by McDonald, Fountain, Colaneri, an evidence technician, and an Assistant District Attorney from the Rensselaer County DA's Office. (App'x 1471–1472, 1701–1702, 1765). Sikirica said the officers and prosecutor were there to "feed" him "some information" about what they knew about the investigation at that time. (App'x 1472, 1873). Fountain and others did just that. Fountain said at his deposition that he would have told Sikirica "we had a house with a dead person, and he [Davis] was the only one home and we don't know anything." (App'x 1472, 1728–1729).

Lacking any other pathway to charge Appellant with a crime they had no evidence for, the officers were dependent on Sikirica, and he delivered. Sikirica ordered tests relevant to determining whether V.D. died of natural causes, but he told Fountain that he planned to rule the death a homicide, without waiting for those test results. (App'x 1472, 1681–1682).

The same day — February 27 — Mason and TPD Sergeant Parrow questioned Appellant again with V.D.'s mother. (App'x 1473, 1549–1551,

1771–1773). On March 2, 2015, Fountain conducted another video-recorded interview of Appellant at TPD headquarters for two hours. (App'x 1473, 1705–1707). There was still no additional information sufficient to support probable cause to arrest Appellant, and TPD still did not know what caused V.D.'s death. (App'x 1473, 1707–1711).

On March 12, 2015, Sikirica again met with Fountain, Colaneri, Mason, the ADA, and TPD Sergeant Parrow to discuss the case. (App'x 1473, 1712–1713, 1778).

Around that time, Sikirica received a video of Appellant's March 2 interrogation. (App'x 1473, 1933–1934). During that interview, Appellant demonstrated how he had attempted to perform CPR on V.D. after he found her unresponsive. (App'x 1473, 1933–1934).

Fountain and McDonald questioned Appellant at least two more times by approaching him while he was out walking in public. (App'x 1474, 1552–1556, 1567–1568). Fountain told Appellant, in sum and substance, he needed to tell the truth and that Fountain's boss was pressuring him to close the case. (App'x 1474, 1552–1556, 1567–1568). Nevertheless, despite searches, interviews, and canvassing, the only evidence connecting Davis to V.D.'s death was that he was in the house

when she died. (App'x 1474, 1708, 1725–1727). Fountain understood that was not enough evidence to charge Appellant with murdering V.D. (App'x 1474, 1708, 1725–1727).

On August 14, 2015, Sikirica issued his final autopsy report delivering on his prior statement to Fountain, concluding that the cause of V.D.'s death was homicide. (App'x 1474, 1780). The report claimed that V.D. had a "[h]istory of [being] reportedly found unresponsive with reported history of attempted cardiopulmonary resuscitation by a large adult" and that she had died of "[h]ypovolemic shock due to a large hemoperitoneum due to multiple lacerations of the liver with right rib fractures due to blunt force trauma…." (App'x 1474, 1780, 1789).

Sikirica made these determinations after watching the video of Appellant's March 2, 2015 interview. (App'x 1474, 1921–1922). Appellant is a large man — at the time, he was 6' 10" tall and approximately 240 to 250 pounds with very big hands. (App'x 1475, 1535–1536). But as Appellant's medical expert noted, no correlation can be drawn between the size of an individual's hand and CPR-related injury. (App'x 1475, 1953). Nevertheless, this was the only potential human act listed under the cause of death. (App'x 1474, 1780).

Sikirica also failed to note the additional 6,000 chest compressions done by EMS and hospital personnel after Appellant called 911. (App'x 1474–1475, 1779–1793, 1931–1932). Sikirica knew that V.D. had undergone prolonged CPR by EMS and hospital personnel. (App'x 1474–1475, 1931–1932). Nevertheless, he never spoke to these personnel to determine who performed CPR or how, instead assuming these compressions were done correctly (i.e., in a manner that would not have caused damage to V.D.'s liver). (App'x 1475, 1901–1904, 1910–1916). Sikirica's assumption was mistaken. (App'x 1475, 1538, 1541–1542, 1572–1573, 1576, 1617–1618, 1660). Appellant testified in his deposition that the compressions he observed by EMS personnel were "extremely hard almost like banging her body into the futon…." (App'x 1541). As a medical expert explained at Appellant's criminal trial, CPR on a child should only be performed with "two fingers or use the thumbs" and should not be done on a soft surface like a futon. (App'x 1660).

Sikirica's final autopsy report further stacked the deck against Appellant by reaching the homicide conclusion in the first place. (App'x 1474, 1780). Noting only the "history of attempted cardiopulmonary resuscitation" he attributed to a "large adult," Sikirica concluded the

cause of death was homicide. (App'x 1474, 1780, 1789). However, Sikirica later admitted in his deposition that had he concluded that EMS or hospital personnel's CPR attempts had caused the "blunt force trauma" identified in the autopsy report, he would not have concluded it was a homicide. (App'x 1935–1936).

Sikirica later implied in his trial testimony and said in his deposition that he was not relying on the recorded March 2 interview of Appellant, and actually thought (with no basis reflected in the autopsy report or elsewhere in the record) Appellant had somehow caused blunt force trauma that damaged V.D.'s liver at some other time (i.e., not by performing CPR) but caused no bruising on her skin. (App'x 1480, 1614, 1831–1832).

But his autopsy report and grand jury testimony show that theory was a *post hoc* rationalization to cover for the fact that he had been caught applying a conclusory double standard to declare V.D.'s death a homicide.

After the autopsy report was issued, Fountain and McDonald interviewed Appellant a third time. (App'x 1476, 1717–1719, 1743–1744). Again, no new information was learned that would support an arrest.

(App'x 1476, 1717–1719, 1743–1744). McDonald admitted that without Sikirica's autopsy report linking the death to "resuscitation by a large adult" there would not have been probable cause to arrest Appellant for V.D.'s death. (App'x 1476, 1745).

On September 29, 2015, the Rensselaer County DA's Office presented the case against Appellant to a grand jury. Fountain testified in the grand jury proceedings, making numerous false statements.[3] (App'x 1477). First, Fountain testified that it was normal for V.D. to wake up tired. (App'x 1477, 1672–1673, 1669, 1850–1851). But both Appellant and V.D.'s mother had said to Fountain that her tiredness that morning was unusual. (App'x 1468, 1530–1531, 1669).

---

[3] These false statements, and others referenced in this brief, may be reasonably inferred to have been presented to the prosecutors separately from and prior to the testimony. Reference to the testimony, though illustrative, does not mean that Appellant's claims rely on that testimony. In particular, the record reflects multiple meetings between the defendants and the DA's office about the investigation and prosecution of Appellant, including an ADA's attendance of the autopsy. (App'x 1471–1474, 1476–1477, 1481, 1697–1698, 1701–1702, 1712–1716, 1730–1731, 1746–1749, 1765, 1774–1776, 1777–1778, 1896–1900, 1923–1925).

Second, Fountain testified that V.D.'s bed was neat and made up, in particular that the sheet was perfect, and the blanket was neat. (App'x 1477, 1794, 1853–1854). Fountain testified that this was inconsistent with Appellant having attempted CPR. (App'x 1477, 1853–1854). A photograph from the home the night of V.D.'s death showed that neither the sheet nor the blanket was neat or perfect. (App'x 1477, 1794). Fountain did not reference any other evidence that would support his testimony.

Third, Fountain testified that Appellant was calm, subdued, even keeled, and not acting like one would act if a two and a half year old in their care was not breathing. (App'x 1477, 1848). But McDonald, Coonradt, and others testified at a suppression hearing on May 3, 2016 that Appellant was upset, sniffling, on the verge of tears, and repeatedly expressed that he did not know what happened and was trying to figure out what happened. (App'x 1477, 1946–1947).

Sikirica also testified in the grand jury proceedings and made several false statements. (App'x 1477). First, Sikirica testified that he had ruled out any natural cause of death or other explanation for V.D.'s unconsciousness, even though he had declared his intention to rule the

death a homicide before tests for alternative causes of death had come back, and without examining the role of 6,000 CPR compressions by EMS and hospital personnel in V.D.'s internal bleeding and liver laceration. (App'x 1477, 1883–1884, 1889, 1908–1909, 1917–1920). This testimony was especially salient because the DA's Office placed into evidence photos of V.D.'s lacerated liver and the death certificate.[4] (App'x 1478, 1867–1889).

Second, Sikirica testified to the grand jury that the amount of blood in V.D.'s abdomen was not caused by Appellant's CPR attempts because it could not have been caused by the five compressions he attempted, and indeed claimed it could not have been caused by CPR at all. (App'x 1478, 1833–1834). Again, Sikirica failed to mention the 6,000 chest compressions performed by EMS and hospital personnel. (App'x 1478, 1825–1836, 1915, 1962). He also failed to mention that it is common for the deceased to bleed substantially in the abdomen during autopsies, as

---

[4] When recalled for testimony and questioned by a grand juror, Sikirica conceded that Appellant's CPR attempts could have caused rib fractures and liver lacerations. This testimony was later disclosed as exculpatory evidence under *Brady*. (App'x 1478, 1799, 1825–1834).

is documented in medical examiner literature, making the presence of that amount of blood after V.D.'s death possible. (App'x 1479, 1652–1655, 1962). A medical expert testified to these facts at Appellant's criminal trial. (App'x 1479, 1652–1655). Appellant's medical expert in this case agreed that the amount of blood in the abdomen was consistent with CPR after lacerations to the liver. (App'x 1479, 1962). EMS personnel also reported that V.D.'s stomach was not distended upon arrival, meaning the amount of blood later reported was not there at the time they arrived. (App'x 1479, 1962).

Third, Sikirica testified that V.D. had electrical activity in her heart when EMS personnel arrived at the house. (App'x 1479, 1588–1592, 1679–1680, 1825). Based on this representation, Sikirica testified that V.D.'s injuries occurred 15 to 20 minutes before the ambulance arrived. (App'x 1479, 1835–1836). But EMS personnel testified that V.D. had no electrical activity in her heart until en route to the hospital. (App'x 1479, 1680). Based on the testimony of Fountain and Sikirica, the grand jury indicted Appellant, who was then arrested and jailed. (App'x 1479, 1517–1518, 1663–1667, 1699–1700, 1804–1807, 1809–1811, 1825–1894).

At trial (and at a prior suppression hearing), Coonradt repeated the falsities included in her report, including testifying that Appellant had told her he woke up at 11:00 am and that "time must be flying" after she told him the time. (App'x 1480, 1598–1599).

Sikirica also testified at the trial. (App'x 1480). Among other things, he did not tell the jury his conclusion about correlating V.D.'s injuries to a person with large hands, instead claiming her death was caused by blunt force trauma to the liver with equivalent force to a motor vehicle accident. (App'x 1480, 1602–1603, 1789). But as mentioned above, trial testimony by medical experts explained that CPR (especially improper CPR like Appellant's and potentially EMS and hospital personnel) can cause lacerations to the liver and rib fractures, and that subsequent prolonged CPR can exacerbate those injuries. (App'x 1481, 1627–1632, 1661, 1930, 1962). Sikirica also denied that his medical opinion was based on the video he had seen of Appellant describing how he performed CPR, even though he referenced large hands in his autopsy report and based that on seeing the interrogation. (App'x 1480, 1614, 1789).

Defendant-Appellee and former TPD Officer Fountain revealed the conclusion-oriented approach to the investigation and prosecution of

Appellant when he said in his deposition that "the basis of [his] belief" that Appellant had killed V.D. was that — without any other corroborating evidence — he believed "something suspicious happened to the child" and Appellant "was alone with her for a few hours." (App'x 1474, 1727).

On August 25, 2016, after a jury trial in which he testified in his own defense, Appellant was acquitted. (App'x 1479, 1811).

## C.    Decisions Below

On November 22, 2017, the original complaint was filed. (App'x 11). On March 8, 2019, the District Court granted in part and denied in part a motion to dismiss the original complaint. (App'x 14). On August 24, 2019, an amended complaint was filed. (App'x 17). On December 12, 2019, the District Court granted Appellant's motion to amend the complaint. (App'x 18). On February 28, 2020, the second amended complaint was filed. (App'x 19). On April 1, 2020, the third amended complaint was filed. (App'x 19). On February 4, 2022, defendants filed motions for summary judgment. (App'x 23). On April 1, 2022, Appellant filed materials in opposition to the defendants' motions. (App'x 24–5). On May 13 and 18, 2022, defendants filed reply briefs in support of their

motions for summary judgment. (App'x 25). On December 5, 2022, the District Court held oral argument on the motions for summary judgment.

On March 29, 2023, the District Court issued a memorandum decision and order granting both motions for summary judgment. (App'x 26, 2278–2307). After reciting the procedural history, the District Court noted that Appellant had seven remaining claims: (1) false arrest and/or false imprisonment under 42 U.S.C. § 1983 against defendants Coonradt, Fountain, McDonald, and Sikirica; (2) malicious prosecution under 42 U.S.C. § 1983 against defendants Coonradt, Fountain, McDonald, Colaneri, and Sikirica; (3) denial of right to fair trial under 42 U.S.C. § 1983 against defendants Coonradt, Fountain, McDonald, Colaneri, and Sikirica; (4) failure to intervene under 42 U.S.C. § 1983 against defendants Coonradt, Fountain, McDonald, and Colaneri; (5) conspiracy under 42 U.S.C. § 1983 arising from Appellant's false arrest, malicious prosecution, and fair trial claims; (6) *Monell* municipal liability claims against defendants City of Troy and County of Rensselaer; and (7) state-law malicious prosecution claims against all defendants. (App'x 2279–80).

The District Court granted summary judgment on all claims. For Appellant's malicious prosecution claim, the court found that neither Coonradt nor Colaneri initiated the prosecution. (App'x 2284–87). For the remaining defendants, the court found that Appellant had not raised a sufficient dispute of fact concerning the probable cause and actual malice elements. (App'x 2287–92).

For Appellant's denial of the right to fair trial claim, the District Court found that Appellant had not raised a disputed question of fact about whether defendants had fabricated evidence. (App'x 2292–2302).

In the alternative, the District Court concluded that the defendants were entitled to qualified immunity. (App'x 2302–05).

The District Court granted summary judgment on the remaining claims because they were "dependent upon the existence of a violation of a constitutional right." (App'x 2305). Because the court had granted summary judgment on the malicious prosecution and fair trial federal claims, the court held that no violation had occurred, and followed suit with the other claims. (App'x 2305–06).

## SUMMARY OF THE ARGUMENT

1.    The District Court erred by granting summary judgment on Appellant's malicious prosecution claim against Fountain, Coonradt, and Sikirica. Appellant satisfied the initiation element for each of these defendants because they were involved in the response to the scene and/or investigation. Their importance in that process was reflected by the fact that each of them was one of the few witnesses to testify for the prosecution in the grand jury and/or at Appellant's criminal trial. Appellant also satisfied the probable cause element — overcoming the presumption created by the indictment — because the indictment was obtained based on two witnesses, both of whom directly and by omission failed to make a complete and accurate statement of facts to the DA and/or the grand jury. At a minimum, the disputed facts on these points made summary judgment inappropriate.

2.    The District Court erred by granting summary judgment on Appellant's denial of right to fair trial claim against Fountain, Coonradt, and Sikirica. Each of these individuals participated in Appellant's criminal trial, repeating the same falsehoods as before. These statements satisfied the fabrication element and were likely to influence a jury

because they again were among only a handful of witnesses for the prosecution's (ultimately unsuccessful) case. At a minimum, the disputed facts on these points made summary judgment inappropriate.

3.     The District Court erred by finding that qualified immunity applied in the alternative. The rights in question were clearly established. Given the number of factual disputes, it was error to determine as a matter of law that Fountain, Coonradt, and Sikirica's conduct was objectively reasonable.

4.     The District Court erred by granting summary judgment on Appellant's other claims, including *Monell* liability for the City of Troy and Rensselaer County, conspiracy liability for Fountain, Coonradt, and Sikirica, and state-law liability for Fountain, Coonradt, and Sikirica, based on the underlying factual determinations the District Court made.

## <u>STANDARD OF REVIEW</u>

This Court reviews orders granting summary judgment *de novo* "and focus[es] on whether the district court correctly concluded that there was no genuine dispute as to any material fact and that the moving party was entitled to judgment as a matter of law." *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 241 (2d Cir. 2020) (quoting *Chunn v. Amtrak*, 916 F.3d 204,

207 (2d Cir. 2019)). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009).

The burden of showing that there is no genuine factual dispute is on "the party seeking summary judgment, and in assessing the record to determine whether there is a genuine issue as to a material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). "At the summary judgment stage, a nonmoving party 'must offer some hard evidence showing that its version of the events is not wholly fanciful.'" *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998)). But that is all that is required. "In applying this standard, the court should not weigh evidence or assess the credibility of witnesses. These determinations are within the sole province of the jury." *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

## ARGUMENT

### I.  Malicious Prosecution

"To state a § 1983 malicious prosecution claim a plaintiff 'must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law.'" *Cornelio v. Connecticut*, 32 F.4th 160, 178 (2d Cir. 2022) (quoting *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010)). Under New York law, a malicious prosecution claim requires (1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused,[5] (3) the absence of probable cause for the criminal proceeding and (4) actual malice. *Kee v. City of New York*, 12 F.4th 150, 161–62 (2d Cir. 2021) (quoting *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 195 (2000)). A reasonable jury could conclude that Appellant's evidence — with all inferences and ambiguities evaluated in his favor — was sufficient to hold

---

[5] The "termination of proceedings" element of the claim is satisfied here by Appellant's acquittal. Neither the parties nor the District Court argued or concluded otherwise.

Defendant-Appellees liable for malicious prosecution and thus precluding summary judgment.[6]

### A. Appellant raised at least a triable disputed question of fact as to initiation of prosecution.

Initiating a prosecution requires the defendant to "play[] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000) (internal quotation marks omitted). Among other things, "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors … the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997).

---

[6] Because the elements are overlapping, Appellant also asserts that the District Court erred by granting summary judgment as to his conspiracy, *Monell*, and state-law claims. Appellant relies on the arguments herein and in his briefing and materials in opposition to summary judgment below, which is incorporated into the record.

In this case, Fountain, Sikirica, and Coonradt each participated in the initiation of the prosecution.[7] As to Fountain, a reasonable jury could find that he met with Sikirica, telling him that Appellant was the only person home when V.D. died, met with other TPD detectives and the assigned ADA multiple times, and interviewed Appellant multiple times. Indeed, the record reflects that one of these interviews occurred when Fountain and McDonald approached Appellant in public to pressure him to say what they wanted to hear ("tell the truth"), because they were being pressured to close the case. (App'x 1474, 1552–1556, 1567–1568). Sikirica, for his part, participated in these same meetings reflected in the record, saw the interrogation video where Appellant demonstrated his CPR attempt, and included the inference about the effect of large hands in his autopsy report, while simultaneously omitting any reference to CPR attempts by EMS personnel and hospital staff. (App'x 1473–1475, 1712–1713, 1778–1793, 1931–1934).

---

[7] The District Court did not conclude otherwise as to Sikirica, Fountain, or McDonald, instead granting summary judgment on other elements of the claim.

For Coonradt, the District Court erred by concluding that her conduct did not satisfy the initiation element. The record reflects a factual dispute over whether Coonradt included false information in her report of her interview with Appellant the night of V.D.'s death. The falsities in this report were "likely to influence a jury's decision" because the DA's Office called Coonradt as a witness to testify to the same at Appellant's trial. *Ricciuti*, 124 F.3d at 130. (App'x 1480, 1598–1599). These falsities painted Appellant as someone who had more time awake with V.D. before her death and was looking to cover his tracks.[8] (App'x 1480, 1598–1599).

Whether the District Court found — or a jury would find — Appellant's recollection more persuasive is not the inquiry. *See Ekukpe v. Santiago*, 823 Fed. Appx. 25, 29–30 (2d Cir. 2020) (affirming denial of

---

[8] The District Court wrongly minimized Coonradt's role in initiation because she was limited to responding to the scene the night of V.D.'s death. In addition to impermissibly weighing and evaluating what is fundamentally a factual question for the jury to decide (i.e., was Coonradt's representation of the timeline important), this conclusion is also at odds with the fact that Coonradt was called as a witness at Appellant's criminal trial by the DA's Office. (App'x 1480, 1598–1599). This hardly implies the insignificance attributed to her by the District Court.

summary judgment where law enforcement officer and plaintiff's recollections differed "when viewing the evidence in the light most favorable to [plaintiff]").

### B. Appellant raised at least a triable disputed question of fact that there was not probable cause to indict him.

For the lack of probable cause element, "indictment by grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (emphasis in original) (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983)). This bad faith showing can be satisfied by introducing "evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." *Zahrey v. City of New York*, 2009 WL 54495, at *9 (S.D.N.Y. 2009) (quoting *Colon*, 60 N.Y.2d at 1250–51).

As to Sikirica, the record includes several ways his work on the autopsy, eventual report, and homicide conclusion were prepared and reached in bad faith. Among other things, Sikirica told law enforcement he would rule the death a homicide before he had excluded other possible explanations. He knowingly omitted consideration of and reference to over 6,000 CPR compressions by EMS and hospital personnel as potentially contributing to V.D.'s blood pooling and liver lacerations. He also relied on Appellant's police interview to associate the alleged blunt force trauma with CPR by someone with large hands, when he later admitted in his deposition that he would not have ruled it a homicide if he thought EMS personnel caused the blunt force trauma with CPR. (App'x 1472, 1474–1475, 1477, 1480, 1602–1603, 1681–1682, 1789, 1883–1884, 1889, 1908–1909, 1917–1920, 1928–1929, 1935–1936).

The autopsy report was central to the case against Appellant. Indeed, although they already knew what it would say, other defendants admitted that probable cause did not exist — and Appellant could not be arrested — until the final report was issued. (App'x 1471, 1476, 1694, 1745, 1761). Sikirica also likely knew that, as he had met with detectives and prosecutors about this case.

By manufacturing a homicide conclusion, Sikirica made the difference between prosecution and no prosecution. *See Dufort v. City of N.Y.*, 874 F.3d 338, 353 (2d Cir. 2017) (finding no probable cause where grand jury's indictment relied on limited and "invalid" evidence "critical" to the case that "easily could have affected the grand jury's decision"); *Jorgensen v. Cnty of Suffolk*, 558 F. Supp. 3d 51, 63–64 (E.D.N.Y. 2021) (finding presumption of probable cause was overcome for malicious prosecution claim against crime lab employees who falsified test results (citing *Manganiello*, 612 F.3d at 163)).

The essential role played by Sikirica's autopsy report is further illustrated by his testimony in the grand jury as one of only two witnesses, and at trial, to speak to most of the same conclusions (and omissions) reflected by his autopsy report. (App'x 1477–1480). The District Court erred by treating the numerous falsities in Sikirica's grand jury testimony as the exclusive basis for Appellant's malicious prosecution claim against him, and thereby applying the rule of absolute immunity for grand jury testimony reached in *Rehberg v. Paulk*, 566 U.S. 356 (2012). But this Court, applying *Rehberg*, found that the absolute immunity did not apply to malicious prosecution claims "based on []

conduct that laid the groundwork for [the] indictment" even if the "grand jury testimony paralleled information [defendant] gave in other contexts…." *Coggins v. Buonora*, 776 F.3d 108, 113 (2d Cir. 2015). Although Sikirica's grand jury testimony is valuable context, it is not necessary to establish an independent malicious prosecution claim arising from his autopsy conclusion and autopsy report.

As to Coonradt and Fountain, each of them fabricated statements that were sufficiently important to the case to be introduced through testimony before the grand jury and/or in the trial against Appellant.[9] (App'x 1477, 1480, 1598–1599). These statements were also asserted in bad faith because they were not predicated on any supporting evidence — indeed, there was contrary evidence — but instead showed their motivation to paint Appellant as more suspicious than he was because they lacked any credible evidence against him. *See Dufort*, 874 F.3d at 353 (finding plaintiff "raised a genuine issue of material fact regarding

---

[9] Coonradt's statements were separately memorialized in her report of the interview. (App'x 1470, 1546–1548, 1557–1558, 1686–1688).

whether Defendants' conduct rose to the requisite level of bad faith");
*Jorgensen*, 558 F. Supp. 3d at 63–64.

These statements, both in their direct falsity and their falsity by omission, help to "establish[] that the police witnesses have not made a complete and full statement of facts … that they have misrepresented or falsified evidence, [and] that they have withheld evidence or otherwise acted in bad faith" in a manner that overcomes the probable cause presumption. *Rothstein v. Carriere*, 373 F.3d 275, 283 (2d Cir. 2004) (quoting *Colon*, 60 N.Y.2d at 82–83).[10]

### C. Appellant raised at least a triable disputed question of fact that Defendants acted with malice.

Finally, it is well established in this Circuit (and the District Court erred in finding otherwise) that "[m]alice may be inferred from the

---

[10] Beyond the grand jury testimony itself (and omissions from it), it is reasonable to infer that for prosecutors to have elicited these statements in testimony, they must have been presented to prosecutors previously, raising a separate basis to find there is a disputed question of fact concerning bad faith in procuring the indictment. In particular, the record reflects multiple meetings between the defendants and the DA's office about the investigation and prosecution of Appellant including an ADA's attendance of the autopsy. (App'x 1471–1474, 1476–1477, 1481, 1697–1698, 1701–1702, 1712–1716, 1730–1731, 1746–1749, 1765, 1774–1776, 1777–1778, 1896–1900, 1923–1925).

absence of probable cause." *Jorgensen*, 558 F. Supp. 3d at 63 (citing *Dufort*, 874 F.3d at 353)).

Accordingly, the District Court erred in granting summary judgment on the malicious prosecution claim as to Fountain, Coonradt, and Sikirica.[11]

## II. Fair Trial

To state a claim for denial of a fair trial due to the creation of fabricated evidence, "a plaintiff must establish that an (1) investigating official (2) fabricated information (3) that is likely to influence a jury's verdict, (4) forwarded that information to prosecutors, and (5) the plaintiff suffered a deprivation of life, liberty, or property as a result." *Ashley v. City of New York*, 992 F.3d 128, 139 (2d Cir. 2021). Investigating officials "may be held liable for fabricating evidence through false statements or omissions that are … made knowingly." *Morse v. Fusto*, 804 F.3d 538, 547 (2d Cir. 2015). The District Court assumed, as does Appellant, that the first, fourth, and fifth elements are not in dispute.

---

[11] For Sikirica, it is worth noting that a reasonable jury could find that his "reckless or intentional falsification of an autopsy report [] play[ed] a material role in the false arrest and prosecution of" Appellant. *Galbraith v. Cnty of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002).

**A.   Appellant presented sufficient evidence to raise a question of disputed fact over whether defendants fabricated evidence.**

### 1.   Sikirica

Appellant presented evidence in the record before the District Court that would allow a reasonable jury to find that Sikirica's conclusion about cause of death and elements of his autopsy report were fabricated. As mentioned above, that conclusion and the report relied on Appellant's interview with TPD to conclude that the cause of death ("hypovolemic shock due to large hemoperitoneum due to multiple lacerations of the liver … due to blunt force trauma") was related to attempted CPR "by a large adult" because Appellant had demonstrated his attempted CPR during that recorded interview. (App'x 1474, 1780, 1789, 1921–1922).

Sikirica then confirmed in questioning by grand jurors that the CPR he confirmed he "observe[d] on a video" could have "caused the injuries…." (App'x 1800). When testifying at trial, he then confirmed that "the type of mechanism" Appellant had demonstrated in the March 2 video "could have caused the injuries that we were seeing…." (App'x 1615). The jury did not agree, and Appellant was acquitted.

Sikirica's conclusion failed to disclose or consider the thousands of CPR compressions by EMS and hospital personnel. (App'x 1474–1475, 1538, 1541–1542, 1572–1573, 1576, 1617–1618, 1660, 1780, 1789, 1931–1932). He also admitted in his deposition that if someone performed CPR "of another during resuscitative process" when the person "is already in extremis," he would "not call that a homicide." (App'x 1482, 1935–1936). But that — and only that — was exactly what Appellant had admitted to in the March 2 interrogation. (App'x 1473, 1933–1934). Sikirica speculated in his deposition in this case that perhaps Appellant "attempted CPR after he did something that's not CPR, crushing her abdomen," but he had no basis to make that conclusion, and most importantly, did not make it in the autopsy report. (App'x 1936).

In other words, a reasonable jury could conclude that Sikirica's autopsy report determined that V.D.'s death was a homicide based on activity he later admitted in his deposition would not lead him to declare a homicide had someone else done the same thing as Appellant. Omissions like these are "false if material omissions render an otherwise true statement false." *Morse v. Fusto*, 804 F.3d 538, 548 (2d Cir. 2015). Due to its "self-contradictory" nature, Sikirica's reliance on a basis for

V.D.'s death he later said wouldn't be homicide could permit a reasonable jury to conclude the autopsy was fabricated. *Hamilton v. City of New York*, 2019 WL 1452013, at \*18 (E.D.N.Y. Mar. 19, 2019).

As to whether it would influence a jury, Sikirica's homicide conclusion and autopsy report was the linchpin of moving forward to indict and prosecute Appellant. He was one of two witnesses in the grand jury, one of a handful of witnesses called by the DA's Office at trial, and Fountain and others admitted there was no probable cause to arrest Appellant until the autopsy report was finalized and issued.

### 2. Coonradt and Fountain

As to Coonradt and Fountain, each of them fabricated statements that were sufficiently important to the case to be introduced through testimony before the grand jury and/or in the trial against Appellant. But it is reasonable to infer that for prosecutors to elicit them in testimony, they must have been presented to prosecutors previously. These statements served to paint Appellant as having something to hide, as having been awake with V.D. for longer than he purportedly wished to admit (or so they implied), and that perhaps Appellant didn't attempt CPR at all. (App'x 1480, 1598–1599).

A reasonable jury could find that each of them was a fabrication because they were contradicted by other evidence in the record: at a minimum, a denial by Appellant (whose consistent story through multiple interviews and testimony in his own defense lend him substantial credibility), and beyond that, witness statements, photographs, and other evidence laid out above. *See Hamilton v. City of N.Y.*, 2019 WL 1452013, at *18 (E.D.N.Y. Mar. 19, 2019) ("This is not the 'rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete,' rendering summary judgment appropriate." (quoting *Jeffreys*, 426 F.3d at 554)).

Whether the Defendant-Appellees have a contrary view of the record is not the point. The District Court erred when it took up and resolved a litany of well-founded factual disputes to conclude that summary judgment should be granted. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."); *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment]

standard, the court should not weigh evidence or assess the credibility of witnesses."); *U.S. v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994) (same).

## III. Defendants are not entitled to qualified immunity.

The District Court separately erred in finding the Defendant-Appellees were entitled to qualified immunity in the alternative. "A qualified immunity defense is established only if (1) the officers' actions did not violate clearly established law, or (2) it was objectively reasonable for the officers to believe that their actions did not violate such law." *Green v. Montgomery*, 219 F.3d 52, 59 (2d Cir. 2000) (citing *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996)). As the District Court noted, the right to be free from both malicious prosecution and the fabrication of evidence were clearly established at the time of Appellant's prosecution. *See Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003); *Zahrey*, 221 F.3d at 357.

The Court overstepped by weighing the facts in Defendant-Appellees' favor to find that their conduct was objectively reasonable. But this Court has held that where a plaintiff "raises a genuine issue of material fact as to" a clearly-established constitutional violation, "it would follow that he has raised a valid issue of fact with respect to the

first branch of the qualified immunity defense." *Green*, 219 F.3d at 59. Accordingly, because "there is a genuine issue of material fact" as to whether a clearly-established right has been violated, "then there is a genuine issue of material fact as to whether officers of reasonable competence could disagree as to the legality of the defendants' actions." *Id.*

In this case, because a reasonable jury could find that the falsities and fabrications created by the defendants — and emphasized to the grand jury and trial jury by the DA's Office — were indeed false, made in bad faith, and/or capable of influencing a jury, there was no basis for the District Court to conclude as a matter of law that the conduct at issue was objectively reasonable.

## <u>CONCLUSION</u>

For these reasons, this Court should vacate the judgment and remand the case for further proceedings in the district court.


Dated: January 16, 2024
New York, NY

Respectfully submitted,


By:   */s/ Max Rodriguez*

Max Rodriguez
POLLOCK COHEN LLP
111 Broadway, Suite 1804
New York, NY 10006
Tel: (646) 290-7509
Max@pollockcohen.com

Brett H. Klein
BRETT H. KLEIN, ESQ. PLLC
305 Broadway, Suite 600
New York, NY 10007
(212) 335-0132
bklein@kleincivilrights.com

*Counsel for the Appellant,*
*Michael Davis-Guider*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii), as modified by Local Rule 32.1(4)(B), because this brief contains 7,934 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Century Schoolbook style.

Dated: January 16, 2024

By:   */s/ Max Rodriguez*

Max E. Rodriguez
111 Broadway, Suite 1804
New York, NY 10006
Tel: (646) 290-7509
max@pollockcohen.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

MICHAEL DAVIS-GUIDER,

Plaintiff,

v.

1:17-CV-1290
(DJS)

CITY OF TROY, RONALD FOUNTAIN, DANIELLE
COONRADT, CHARLES McDONALD, RENSSELAER
COUNTY, MICHAEL SIKIRICA, and TIM COLANERI,

Defendants.

**APPEARANCES:**                    **OF COUNSEL:**

OFFICE OF BRETT H. KLEIN, PLLC      BRETT H. KLEIN, ESQ.
Attorney for Plaintiff
305 Broadway
Suite 600
New York, New York 10007

PATTISON, SAMPSON, GINSBERG,        RHIANNON I. GIFFORD, ESQ.
& GRIFFIN, PLLC
Attorney for City of Troy Defendants
22 First Street
P.O. Box 208
Troy, New York 12181-0208

BAILEY, JOHNSON, & PECK, P.C.       CRYSTAL R. PECK, ESQ.
Attorney for Rensselaer County Defendants   JOHN W. BAILEY, ESQ.
5 Pine West Plaza                   WILLIAM C. FIRTH, ESQ.
Suite 507
Albany, New York 12205

**DANIEL J. STEWART**
**United States Magistrate Judge**

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

This case began on February 26, 2015 with the death of two year old "V.D.," the daughter of Plaintiff's girlfriend. On October 2, 2015, Plaintiff was arrested in connection with the death, following his indictment by a Rensselaer County Grand Jury. Plaintiff has long maintained his innocence and was acquitted by a jury in Rensselaer County Court in August 2016. In 2017, Plaintiff filed this action alleging violations of his rights under 42 U.S.C. § 1983 and state law. Dkt. No. 1. The operative pleading before the Court is Plaintiff's Third Amended Complaint. Dkt. No. 77, Third Am. Compl. As a result of the decision on a motion to dismiss filed by the County Defendants, Dkt. No. 35, the following causes of action remain in this litigation:

1) false arrest/false imprisonment under 42 U.S.C. § 1983, asserted against Defendants Coonradt, Fountain, McDonald, and Sikirica,[1] Third Am. Compl. at ¶¶ 64-66;

2) malicious prosecution under 42 U.S.C. § 1983, asserted against Defendants Coonradt, Fountain, McDonald, Colaneri, and Sikirica, *id.* at ¶¶ 67-76;

3) denial of the right to a fair trial under 42 U.S.C. § 1983, asserted against Defendants Coonradt, Fountain, McDonald, Colaneri, and Sikirica, *id.* at ¶¶ 77-81;

4) failure to intervene under 42 U.S.C. § 1983, asserted against Defendants Coonradt, Fountain, McDonald, and Colaneri, *id.* at ¶¶ 82-86;

---

[1] Plaintiff has now abandoned this claim. *See* Dkt. No. 125, Pl.'s Mem. of Law at p. 18 (noting that "plaintiff has withdrawn his false arrest claim"); *see also id.* at p. 12 n.2.

1

5) section 1983 conspiracy claims related to Plaintiff's false arrest, malicious prosecution, and fair trial claims, *id.* at ¶¶ 87-90;[2]

6) *Monell* municipal liability claims against the City of Troy and County of Rensselaer, *id.* at ¶¶ 91-113; and

7) a state law claim for malicious prosecution against all Defendants, *id.* at ¶¶ 114-124.

The parties proceeded through discovery and presently pending are Motions for Summary Judgment on behalf of Defendants Sikirica and Rensselaer County, Dkt. No. 115, and Defendants City of Troy, Colaneri, Coonradt, Fountain, and McDonald. Dkt. No. 116.[3] Plaintiff opposes the Motions. Dkt. Nos. 121-125. Defendants filed replies. Dkt. Nos. 129-130. The Court heard oral arguments on the Motions in December 2022 and now grants each Motion for the reasons set forth below.

## II. FACTUAL BACKGROUND

In February 2015, Plaintiff was living in Troy, New York with his girlfriend Rebecca Parker and Ms. Parker's two and a half year old daughter, V.D. Dkt. No. 115-4 at pp. 22-23 & 33. On the morning of February 26, 2015, after Ms. Parker went to work, Plaintiff was home alone with V.D. Dkt. No. 123-1 at pp. 56-67. At some point around 7:00 that morning, Plaintiff helped V.D. go to the bathroom and put her back to sleep. *Id.* at pp. 56-57. Plaintiff also fell asleep. *Id.* at p. 59. Later that morning or in the early

---

[2] Given Plaintiff's withdrawal of his false arrest claim, the related conspiracy claim is dismissed.

[3] The respective motions were also originally made on behalf of Joel Abelove and Adam Mason, who by stipulation of the parties have since been dismissed from the case. Dkt. No. 131.

afternoon, Plaintiff discovered V.D. unresponsive in her bed. *Id.* at p. 60; Dkt. No. 115-4 at p. 54. When she did not respond to his calls, he attempted CPR. Dkt. No. 123-1 at p. 61. Unable to find a working phone in his apartment, Plaintiff went across the street to call 911. *Id.* at p. 66-67. Emergency personnel arrived at Plaintiff's apartment as did officials from the Troy Police Department. Dkt. No. 115-4 at p. 72. V.D. was transported to St. Mary's Hospital and was in cardiac arrest when she arrived at the hospital. Dkt. No. 116-3 at p. 20. V.D. was pronounced dead soon after the ambulance arrived at the hospital. *Id.*

Troy Police officials began an investigation into the circumstances of V.D.'s death, which included interviewing Plaintiff on February 26 and on several subsequent occasions. *See* Dkt. No. 116-1 at ¶¶ 6, 34, 38, & 70. On February 27, 2015, Dr. Sikirica conducted an autopsy on V.D. Dkt. No. 115-9 at p. 25. The investigation into V.D.'s death continued for several months without an arrest. Dr. Sikirica issued a final autopsy report on August 14, 2015. Dkt. No. 123-28. The report concluded that there was "[n]o evidence of significant natural disease," but found "multiple lacerations of the liver with right rib fractures due to blunt force trauma." *Id.* at p. 11.

Defendants Fountain and Sikirica testified before a Rensselaer County Grand Jury investigating V.D.'s death. Dkt. No. 123-9. The Grand Jury returned an indictment charging Plaintiff with two counts of manslaughter and endangering the welfare of a child. Dkt. No. 115-18. Plaintiff was acquitted following a jury trial. Third Am. Compl. at ¶ 45.

### III. LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. at 323. To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc*., 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully

limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV. DISCUSSION

### A. Malicious Prosecution

"To state a § 1983 malicious prosecution claim a plaintiff 'must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law.'" *Cornelio v. Connecticut*, 32 F.4th 160, 178 (2d Cir. 2022) (quoting *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010)). In New York, that substantive showing requires Plaintiff to prove "(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding and (4) actual malice." *Kee v. City of New York*, 12 F.4th 150, 161–62 (2d Cir. 2021) (quoting *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 195 (2000)). No party contests that Plaintiff, given his acquittal, satisfies the favorable termination element. Defendants do, however, maintain that summary judgment is appropriate as to the remaining elements.

### 1. Initiation of the Criminal Prosecution

Defendants Coonradt and Colaneri seek summary judgment on the ground that they did not initiate Plaintiff's prosecution. Dkt. No. 116-9 at pp. 8-10.

"To initiate a prosecution, a defendant must do more than report the crime or give testimony. He must 'play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.'" *Manganiello v. City of New York*, 612 F.3d at 163 (quoting *Rohman v. New York City Transit Authority*, 215 F.3d 208, 217 (2d Cir. 2000)) (alteration in the original). "Initiation in this context is a term of art." *Sotak v. Bertoni*, 501 F. Supp. 3d 59, 83 (N.D.N.Y. 2020) (internal quotation and citation omitted). By that, courts look not to whether a party had any role in events leading to the prosecution, but whether a party had an active or significant role in bringing it about. *Tretola v. Cnty. of Nassau*, 14 F. Supp. 3d 58, 76 (E.D.N.Y. 2014); *Mitchell v. Victoria Home*, 434 F. Supp. 2d 219, 227 (S.D.N.Y. 2006).

### a. Defendant Coonradt

The undisputed record establishes that Coonradt played a limited role in the investigation of V.D.'s death. The only substantive factual dispute between the parties about her role is whether a particular statement attributed to Plaintiff and recorded by Coonradt in her police report was false. Coonradt was the first police officer on the scene. Dkt. No. 116-2 at ¶ 4. She filed a report recounting that Plaintiff told her that he had gone to wake up V.D. at "1100 and she wouldn't wake up. When I told Michael it was 1:30, he didn't seem to understand and said 'time must be flying.'" *Id.* at Ex. B. Plaintiff disputes the accuracy of the timing reported by Coonradt. *See* Dkt. No. 123-1 at pp. 79-81. Specifically, Plaintiff claims that he did not tell Coonradt what time he attempted to wake V.D. *Id.* at p. 80. While Plaintiff disputes the reported timing, the record reflects that V.D.'s mother later gave police a statement in which she reported that Plaintiff had

6

told her he went to wake V.D. at 11 a.m. or 12 p.m. Dkt. No. 123-8 at p. 2. While a dispute of fact may exist about statements reportedly made by Plaintiff, the Court does not find that dispute material to a determination regarding the extent of Coonradt's role in the investigation.

Coonradt had no other role in the investigation of V.D.'s death beyond her initial interactions with Plaintiff. Dkt. No. 116-2 at ¶ 26. She did not testify before the Grand Jury and was not present when Plaintiff was arrested. *Id.* at ¶¶ 29 & 30. "Clearly, these allegations - involving the taking of a statement and the drafting of a police report - are insufficient to constitute the requisite personal involvement of Defendants in initiating Plaintiff's prosecution." *Melendez v. City of New York*, 2017 WL 4221083, at *4 (S.D.N.Y. Sept. 20, 2017). Merely furnishing information to those investigating a crime is insufficient to establish an individual's role in initiating a prosecution. *Jiang v. Corpuz*, 2020 WL 5517237, at *4 (E.D.N.Y. Sept. 13, 2020). And even assuming that Coonradt was mistaken, "a mistake does not support liability for malicious prosecution." *Bornschein v. Herman*, 304 F. Supp. 3d 296, 302 (N.D.N.Y. 2018).

Plaintiff nonetheless argues that Coonradt played a role in initiating the criminal prosecution against him because her purportedly inaccurate statement "created an inference that there was two hours of essentially 'lost time' between when plaintiff woke up and when he called police." Dkt. No. 125, Pl.'s Mem. of Law at p. 15. In Plaintiff's view, because a reasonable jury could find that this "created a gap in plaintiff's story," it may have contributed to the initiation of Plaintiff's prosecution. *Id.* This view of the initiation element has no limiting principle. Under it, any investigating officer who makes

any report which a plaintiff later alleges was inaccurate or untrue could be said to have initiated a prosecution. The Court declines to adopt such a sweeping theory of what it means to initiate a prosecution.

Coonradt's Motion for Summary Judgment, therefore, is granted.

### b. Defendant Colaneri

The Court reaches the same conclusion with respect to Defendant Colaneri. There is no meaningful dispute among the parties regarding his role in the investigation. He was present during an early interview with Plaintiff and asked questions, but all agree that Plaintiff did not incriminate himself during that interview, it did not lead to Plaintiff's arrest at that time, and no claim of misconduct during the interview has been made against Colaneri. He also attended V.D.'s autopsy and a meeting of people involved in the investigation. Dkt. No. 116-5 at ¶¶ 12 & 24. Unlike even Defendant Coonradt, however, there is no allegation that Colaneri authored any false investigative reports. He was present when Plaintiff was arrested following his indictment, but Colaneri testified neither before the Grand Jury nor at Plaintiff's trial. Dkt. No. 116-5 at ¶¶ 28, 30, & 32. None of those undisputed facts suggest an active role in the investigation or initiation of the criminal charges against Plaintiff. Initiation requires specific actions on the part of the Defendant that Plaintiff has failed to sufficiently allege here. *Keller v. Vill. of Hempstead*, 2014 WL 2718573, at *3 (E.D.N.Y. June 12, 2014) (dismissing claim in absence of "specific" allegation of role in initiating prosecution); *Roper v. Hynes*, 2006 WL 2773032, at *9 (S.D.N.Y. Sept. 27, 2006) (same).

SPECIAL APPENDIX                                                                    SPA52

In opposing the Motion, Plaintiff says of Colaneri only that he was "directly involved in nearly every step of the investigation that ultimately led to Sikirica determining V.D.'s death was a purported homicide." Pl.'s Mem. of Law at pp. 15-16. Plaintiff offers no evidence to support that assertion, however, and "Plaintiff's conclusory allegations do not satisfy the initiation prong of a malicious prosecution claim." *Salim v. City of New York*, 2017 WL 946345, at *2 (S.D.N.Y. Feb. 28, 2017); *see also Rys v. Grimm*, 2021 WL 827671, at *6 (N.D.N.Y. Mar. 4, 2021).

Defendant Colaneri's Motion for Summary Judgment, therefore, is granted.

### 2. Probable Cause

"[U]nder New York law, indictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983)). "[I]t is the plaintiff who bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment." *Id.* at 73; *see also Dufort v. City of New York*, 874 F.3d 338, 352 (2d Cir. 2017); *Bernard v. United States*, 25 F.3d 98, 104 (2d Cir. 1994). That burden has been characterized as "heavy." *Cunny v. City of New York*, 2001 WL 863431, at *5 (S.D.N.Y. July 31, 2001) (citing *Simms v. Village of Albion*, 115 F.3d 1098, 1107 (2d Cir. 1997)).

Plaintiff was arrested after the Grand Jury returned an indictment charging him with manslaughter in the second degree. Dkt. No. 115-18. Plaintiff recognizes that the Indictment created a presumption of probable cause. Pl.'s Mem. of Law at p. 19.

9

However, he makes several arguments regarding the evidence presented, or not presented, to the Grand Jury to overcome that presumption. These arguments fail to satisfy Plaintiff's heavy burden. Summary judgment for all Defendants, therefore, is warranted.

Plaintiff contends that the District Attorney's Office "presented extremely limited evidence to the grand jury . . . which appeared to intentionally omit" evidence Plaintiff believes is exculpatory, including findings in the autopsy report. Pl.'s Mem. of Law at pp. 19 & 22. First, the District Attorney has been dismissed from this case in large part based on Plaintiff's concession that the DA is "absolutely immune" from suit for his role in prosecuting the case. *Id.* at p. 18. In light of that and on the facts of this case, Plaintiff cannot hold the remaining parties liable for the evidence the District Attorney's Office failed to present to the Grand Jury. *Burgess v. DeJoseph*, 2017 WL 1066662, at *7 (N.D.N.Y. Mar. 21, 2017), *aff'd*, 725 F. App'x 36 (2d Cir. 2018) ("it was the prosecutor, not the Defendant officers, who had the discretion and authority to decide what evidence to present to the grand jury") (internal quotations omitted). Second, "[t]he People maintain broad discretion in presenting their case to the Grand Jury and need not seek evidence favorable to the defendant or present all of their evidence tending to exculpate the accused." *Williams v. City of New York*, 2003 WL 22434151, at *7 (S.D.N.Y. Oct. 23, 2003), *aff'd*, 120 F. App'x 388 (2d Cir. 2005) (quoting *People v. Mitchell*, 82 N.Y.2d 509, 515 (1993)); *see also United States v. Regan*, 103 F.3d 1072, 1081 (2d Cir. 1997) ("The government had no obligation to present exculpatory material to a grand jury.") (citing *United States v. Williams*, 504 U.S. 36, 51-52 (1992)). Given the lack of a duty to do so, the failure to present exculpatory evidence is not evidence of bad faith. *Savino v.*

10

*City of New York*, 331 F.3d at 73; *Battisti v. Rice*, 2017 WL 78891, at *11 (E.D.N.Y. Jan. 9, 2017) (citing cases). As a result, the purported limited nature of the evidence presented by the District Attorney's Office is not a basis for finding the presumption of probable cause overcome.

Plaintiff also relies extensively on his view that Defendants Fountain and Sikirica testified falsely at the Grand Jury. This, he claims, is evidence of bad faith sufficient to rebut the presumption. *See* Pl.'s Mem. of Law at pp. 20-21. For reasons outlined below in Section IV(B) of this opinion, the Court disagrees with Plaintiff's characterization of much of the testimony he relies on as false. But in the first instance, this argument runs headlong against the decision in *Rehberg v. Paulk*, 566 U.S. 356 (2012) which affords absolute immunity from section 1983 liability for testimony presented to a Grand Jury.

Historically, witnesses who testified at a trial were afforded absolute immunity for that testimony. *Briscoe v. LaHue*, 460 U.S. 325, 330 (1983). In *Rehberg*, the Court considered the extent of immunity a witness testifying before a Grand Jury should receive. The Court concluded that "grand jury witnesses should enjoy the same immunity as witnesses at trial." *Rehberg v. Paulk*, 566 U.S. at 369. By its express terms, that immunity extends to law enforcement personnel testifying before a Grand Jury. *Id.* at 368-369; *Coggins v. Buonora*, 776 F.3d 108, 112 (2d Cir. 2015); *Boyde v. Barnes*, 2022 WL 11765034, at *5 (N.D.N.Y. Oct. 20, 2022) (Report-Recommendation and Order) ("This immunity attaches even if the testimony is false and given by a police officer."). "Following *Rehberg*, a plaintiff may not be able to rebut the presumption of probable cause by relying on a police officer's perjurious testimony before the grand jury."

11

*Adamou v. Doyle*, 2017 WL 1230541, at *3 (S.D.N.Y. Jan. 12, 2017); *see also Crespo v. Rivera*, 2018 WL 4500868, at *12 (S.D.N.Y. Sept. 19, 2018) (collecting cases). Under these standards, the allegedly false evidence relied upon by Plaintiff to rebut the presumption of probable cause is immunized under *Rehberg* to the extent it is the result of testimony offered to the Grand Jury and cannot be used for that purpose by Plaintiff. *Appling v. City of New York*, 2021 WL 695061, at *6 (E.D.N.Y. Feb. 23, 2021) ("Plaintiff cannot, in light of *Rehberg*, rely on grand jury testimony to rebut the presumption of probable cause created by his indictment.").[4]

Citing no other evidence of bad faith, Plaintiff is unable to overcome the presumption of probable cause and his malicious prosecution claim, therefore, must be dismissed.

### 3. Actual Malice

Nor has Plaintiff shown any evidence to suggest actual malice existed here. "As for actual malice, plaintiff[] must show that the defendant 'commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" *LaFontaine v. City of New York*, 2009 WL 3335362, at *9 (S.D.N.Y. Oct. 14, 2009) (quoting *Rounseville v. Zahl*, 13 F.3d 625, 630 (2d Cir. 1994)). Plaintiff's opposition papers rely almost exclusively on his view that questions of fact exist regarding probable cause which would then carry over to the actual malice element. Pl.'s Mem. of Law at pp. 23-24. For the reasons set forth above, Plaintiff has not

---

[4] Nor can a plaintiff attempt an end run around this immunity by alleging a conspiracy with other individuals to present false testimony. *Rehberg v. Paulk*, 566 U.S. at 369.

12

established questions of fact on the probable cause element. "Therefore, the [P]laintiff's argument that malice may be inferred by a lack of probable cause fails." *McGee v. Dunn*, 940 F. Supp. 2d 93, 102 (S.D.N.Y. 2013).

Plaintiff also briefly alleges that malice is shown by what Plaintiff considers Defendants' "myopic focus" on him as a suspect. Dkt. No. 125 at p. 24. He, however, offers nothing more than this conclusory statement to support this assertion, which is insufficient to establish malice. *Fowler v. Kingston City Police Dep't*, 2009 WL 3064775, at *8 (N.D.N.Y. Sept. 22, 2009). *Manganiello v. City of N.Y.*, on which Plaintiff relies, also does not support his position. Plaintiff takes the Second Circuit's reference to myopic focus as a basis for inferring actual malice out of context because it was just one of several factors identified by the Circuit in making an inference of malice. 612 F.3d at 164. The other cited grounds for inferring malice were the defendant's "otherwise seemingly inexplicable false statements about [plaintiff's] conduct that were contrary to the reported first-hand knowledge of others; [defendant's] willingness to coerce an inculpatory statement from one unwilling person in exchange for not reporting that person's known criminal activities; and his willingness to have [plaintiff] indicted on the basis of testimony of another person who was known to have lied to [defendant] at least once in this very matter and who was evidently willing to intimidate others into falsely providing the evidence [defendant] sought." *Id.* There is no claim of coercion here, nor any claim that Defendants knowingly relied on false testimony of third parties. And while Plaintiff claims that Defendants falsified statements, he offers no evidence that Defendants were aware of any third party who supported Plaintiff's version of the

13

particular statements at issue here. Those factors, present in *Manganiello* are, therefore, absent here. Moreover, there is no dispute that Plaintiff was alone with V.D. when she was found unresponsive. Given that fact, police officials certainly had a reasonable basis to examine Plaintiff's role in her death. For all these reasons, *Manganiello* is inapposite.

The Court, therefore, grants Defendants' Motions for Summary Judgment as to Plaintiff's section 1983 malicious prosecution claim.[5]

### B. Right to a Fair Trial

Plaintiff's claim regarding the denial of a fair trial relates to the alleged "creation, forwarding to prosecutors and use of false, fabricated evidence." Third. Am. Compl. at ¶ 80. The Third Amended Complaint asserts this claim against all "individually named defendants." *Id.* at ¶ 78. Plaintiff now appears to pursue this claim only against Defendants Fountain, Coonradt, and Sikirica. *See* Pl.'s Mem. of Law at pp. 26 (discussing City Defendants' Motion and noting that this claim should "proceed to trial as to Fountain and Coonradt") & 28 (asserting issues of fact as to Dr. Sikirica on this claim). Because there are no specific allegations of fabrication on the part of Colaneri and McDonald, the fair trial claim against them is dismissed.

"To succeed on a fabricated-evidence claim, a plaintiff must establish that an (1) investigating official (2) fabricated information (3) that is likely to influence a jury's verdict, (4) forwarded that information to prosecutors, and (5) the plaintiff suffered a deprivation of life, liberty, or property as a result." *Jeanty v. Cerminaro*, 2023 WL

---

[5] Given that "the state and the federal claims [are] identical," *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003), Plaintiff's state law malicious prosecution claim is also dismissed.

325012, at *5 (2d Cir. Jan. 20, 2023) (quoting *Ashley v. City of New York*, 992 F.3d 128, 139 (2d Cir. 2021)).

The Court assumes for purposes of these Motions that Plaintiff has established, or at least raised a question of fact, as to the first, fourth, and fifth elements identified above. The Court, therefore, focuses its analysis specifically on whether Plaintiff has raised a question of fact about the existence of fabricated evidence that was likely to influence a jury's verdict.[6]

As U.S. District Court Judge Mae D'Agostino recently noted, "there is a notable bar for evidence to be considered 'fabricated.'" *McDonough v. Smith*, 2022 WL 3279348, at *24 (N.D.N.Y. Aug. 11, 2022). Courts across the country have recognized that "testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong." *Halsey v. Pfeiffer*, 750 F.3d 273, 295 (3d Cir. 2014); *see also Richards v. Cnty. of San Bernardino*, 2022 WL 2292830, at *1 (9th Cir. June 24, 2022); *Johnson v. City of New York*, 2020 WL 2192830, at *5 (S.D.N.Y. May 5, 2020). This imposes a high burden on a civil plaintiff. *See Black v. Montgomery Cnty.*, 835 F.3d 358, 372 (3d Cir. 2016)(quoting *Halsey v. Pfeiffer*, 750 F.3d at 295) ("we expect that it will be an unusual case in which a police officer cannot obtain a summary judgment in a civil action charging him with having fabricated evidence used in an earlier criminal case.").

---

[6] The Court also assumes for purposes of this Motion, that *Rehberg* does not preclude Plaintiff from relying on the objected to statements for purposes of his fair trial claim. *See Rucks v. City of New York*, 96 F. Supp. 3d 138, 149 (S.D.N.Y. 2015).

With respect to alleged fabrication, a plaintiff cannot survive summary judgment simply by raising a question of fact as to the truth of the information that is forwarded to prosecutors. *Bennett v. Vidal*, 267 F. Supp. 3d 487, 498 (S.D.N.Y. 2017) ("[A] mere difference in testimony between the defendant [officer], the plaintiff, and the plaintiff's mother of what occurred on the day of the arrest is not sufficient evidence to create a genuine dispute of material fact as to whether [the officer] intentionally falsified information or fabricated evidence."); s*ee also Hewitt v. City of New York*, 2012 WL 4503277, at *6 & 11 (E.D.N.Y. Sept. 28, 2012), *aff'd*, 544 F. App'x 24 (2d Cir. 2013). Despite Plaintiff's assertion that facts relied upon by officers are fabrications, "summary judgment is appropriate where a plaintiff has failed to present evidence indicating that an officer falsified information or fabricated evidence." *Johnson v. McMorrow*, 2023 WL 1797063, at *7 (S.D.N.Y. Feb. 7, 2023) (internal quotations and alteration omitted) (citing cases).

Plaintiff alleges that Defendants Coonradt, Fountain, and Sikirica each fabricated evidence, either by falsely reporting statements made by Plaintiff or by misrepresenting the evidence collected. As discussed more fully below, as to none has Plaintiff raised a question of fact as to fabrication or materiality of the evidence at issue. What the record shows is not that the evidence which Plaintiff characterizes as "false and misleading," Pl.'s Mem. of Law at p. 19, was in fact fabricated, but simply that Plaintiff has a different view of that evidence. Each Defendant, therefore, is entitled to summary judgment.

*1. The City Defendants*

As discussed above, Coonradt allegedly fabricated a report following her initial arrival at Plaintiff's residence. Plaintiff alleges Coonradt fabricated a statement suggesting "lost time between when plaintiff woke up and when he called police." Pl.'s Mem. of Law at p. 15. Plaintiff also alleges that Coonradt falsely testified that on the morning of V.D.'s death, Plaintiff told police that he put V.D. back in bed because he was tired, while Plaintiff claims he did so because she seemed tired. Plaintiff's only evidence that Coonradt fabricated the first of the two statements is his denial that he made the statements. *See* Dkt. No. 122-1 at ¶ 26. The record, however, demonstrates that he made a similar, if not verbatim, statement to others. Fountain testified that Plaintiff had told him he woke up sometime between 11 a.m. and noon and could not explain the gap in time between waking up and calling 911. Dkt. No. 123-9 at p. 26. Plaintiff's girlfriend also reported to police that Plaintiff had told her that he had awakened between 11 a.m. and noon. Dkt. No. 123-8 at p. 2. As such, this is not a case where there is a stark conflict between the plaintiff and one defendant about what was said, *see Bellamy v. City of N.Y.*, 914 F.3d 727, 746 (2d Cir. 2019), but one where multiple sources report the same or similar evidence. *See Isaac v. City of New York*, 2020 WL 1694300, at *9 (E.D.N.Y. Apr. 6, 2020) ("Plaintiff claims that the testimony of four witnesses and [the] defendant . . . was false, but offers no evidence in support, other than his own testimony."). Given the record evidence that Plaintiff made this statement to multiple people, he cannot meet his burden to establish that Coonradt "created false information." *Garnett v. Undercover Officer C0039*, 839 F.3d 265, 280 (2d Cir. 2016). Nor, in any event, could a reasonable

SPECIAL APPENDIX                                                                SPA61

jury conclude that this one comment was likely to influence the ultimate verdict of the criminal jury, or that the inclusion of the statement in a single police report, months before Plaintiff was indicted had any role at all in Plaintiff being deprived of his liberty. As to the second alleged fabrication, Plainiff cites to Coonradt's testimony during Plaintiff's criminal case, but does not cite to any evidence at all from any source suggesting that the statement was untrue. *See* Dkt. No. 122-1 at ¶ 92.

Consider next the testimony offered by Defendant Fountain that Plaintiff now claims was false or misleading. According to Plaintiff:

> These false facts include Fountain's testimony to the grand jury that Davis said it was a normal occurrence for V.D. to wake up tired, that V.D.'s bed was really neat and made up, and not fussed or messed up at all, and therefore inconsistent with someone performing CPR on the bed as Davis claimed he did, that Davis and Parker were not prevented from going in the ambulance to the hospital, and that Davis was calm, subdued, even keeled, and not acting like you would think somebody would if they had found a two-and-a-half-year-old who wasn't breathing.

Pl.'s Mem. of Law at p. 20.

Plaintiff has offered no independent evidence to suggest fabrication. *See Demosthene v. City of New York*, 2018 WL 10072931, at *7 (E.D.N.Y. July 20, 2018), *report and recommendation adopted*, 2019 WL 3992868 (E.D.N.Y. Aug. 16, 2019), *aff'd*, 831 F. App'x 530 (2d Cir. 2020). What the record establishes at most regarding this testimony is that Plaintiff disagrees with the statements made by Fountain to the Grand Jury. That, however, as just noted falls far short of his burden on the Motion for Summary Judgment because "a plaintiff cannot survive summary judgment merely by establishing a genuine issue of fact as to the veracity of the information that the officer forwarded to

18

prosecutors." *Steinbergin v. City of New York*, 2021 WL 396690, at *6 (S.D.N.Y. Feb. 4, 2021), *aff'd*, 2022 WL 1231709 (2d Cir. Apr. 27, 2022); *see also Lauderdale v. City of New York*, 2018 WL 1413066, at *8 (S.D.N.Y. Mar. 19, 2018).

Fountain testified that Plaintiff commented to him that it was a "normal occurrence for [V.D.] to be a little tired" and go back to bed in the morning. Dkt. No. 123-9 at pp. 56-57. While Plaintiff cites to several other statements in the record as evidence that this statement was false, none establishes the falsity of Fountain's testimony. Plaintiff cites, for example, to a statement from V.D.'s mother that she observed V.D. to be "a little sluggish." Dkt. No. 123-8. While speaking to police, Plaintiff advised that V.D. "seemed extremely tired" the morning of her death. Dkt. No. 123-10 at p. 3. These statements, which are consistent with Fountain's testimony, simply fail to demonstrate the falsity of, let alone the fabrication of, Fountain's testimony.

During his deposition, Plaintiff testified that he attempted CPR on V.D. in the bedroom. Specifically, he testified:

Q. So, how did you -- describe for me how you gave CPR when she was in the bed?

A. I blew into her mouth and I pushed down a little bit on her chest area and I blew into her mouth again and it seemed like her stomach would like stay full. So, I tried to push it down a little bit. I put no pressure on her at all because I was very nervous and scared. And I tried that twice. Nothing happened. So, I took her into the living room and I tried to like use these phones that were on the table.

Dkt. No. 123-1 at p. 19; *see also* Dkt. No. 115-4 at p. 38 ("I tried two times on the bed."). Fountain testified to the Grand Jury about the condition of V.D.'s bedroom that V.D.'s bed "looked like made." Dkt. No. 123 at p. 29. He further told the Grand Jury that it did

19

SPECIAL APPENDIX                                                                                    SPA63

not appear that the bed was "messed up." *Id.* According to Plaintiff this testimony gave the false impression to the jury that Plaintiff had not been truthful regarding statements he made about conducting CPR on the bed. Dkt. No. 125 at p. 20. The record of Fountain's Grand Jury testimony belies this claim because, despite his testimony about the condition of the bed, Fountain testified very clearly that he did not know whether or not CPR had been performed. Dkt. No. 123-9 at p. 30.

Nor does Plaintiff's claim that Fountain falsely testified that no one prevented Plaintiff or V.D.'s mother from riding in the ambulance with her, undercut the presumption of probable cause. Neither Plaintiff nor Ms. Parker ever specifically stated that any Defendant or any member of the Troy Police Department prevented them from riding in the ambulance. Ms. Parker stated only that "they" would not let her ride in the ambulance, but it is unclear whether she was referring to police or EMS officials. *See* Dkt. No. 123-8. Plaintiff's deposition contained similar testimony indicating "[t]hey just drove off without either of us in the ambulance." Dkt. No. 123-1 at p. 30. In fact, he testified that there was "no" conversation about either of them going in the ambulance because when he raised the issue "they" just drove off. *Id.* In this context, "they" rather clearly refers to EMS personnel. *See id.* Fountain testified that neither Troy Police nor emergency services personnel would have prevented Plaintiff or Ms. Parker from riding in the ambulance. Dkt. No. 123-9 at pp. 16-17. At most, Plaintiff's deposition can be read to suggest that Coonradt intimidated Plaintiff into not riding in the ambulance. *See* Dkt. No. 123-1 at p. 44. But nothing suggests that, even if true, Fountain was aware of this when he testified. *Id.* (noting Fountain arrived after Coonradt told Plaintiff to sit

20

down). Plaintiff's evidence does not provide any basis for concluding that this statement was false.

Finally, Plaintiff cites Fountain's testimony before the Grand Jury that Plaintiff was "calm" and had a "very even keel about everything" when questioned by police. Dkt. No. 123-9 at p. 24. The record demonstrates that those who interacted with Plaintiff found him to be experiencing, not surprisingly, a range of emotions. One of the emergency services personnel who responded to the initial 911 call stated that "did not . . . act upset," while another described Plaintiff as "calm." Dkt. No. 116-3 at pp. 16 & 18. Others variously described Plaintiff as "upset," Dkt. No. 123-21 at p. 4, crying at times, *id.* at p. 8, and "distraught." *Id.* at p. 12. Fountain was describing Plaintiff's demeanor at the police station after he was taken there for questioning. The other individuals observed Plaintiff at different times. It is certainly possible, and would not be unexpected, that Plaintiff's demeanor would be different at different times. There is simply no evidence in this record that even raises a factual question about the accuracy of Defendant Fountain's observations at the moment in time that he testified before the Grand Jury. The citations to the record on which Plaintiff relies all appear to be from times at which Defendant Fountain was not present. *See* Dkt. No. 130-5 at ¶ 73. In any event, "[v]ariations in one's testimony or with other witnesses' testimony do not mean that testimony is untrustworthy." *Thorpe v. Duve*, 2022 WL 332804, at *3 (2d Cir. Feb. 4, 2022).

Nor has Plaintiff satisfied his burden of establishing a question of fact on the materiality of the fabrications alleged by the City Defendants. "[A] civil plaintiff alleging

that . . . the prosecutor used fabricated evidence should not be permitted to survive a motion for summary judgment . . . unless he can demonstrate that the record supports a conclusion that the allegedly fabricated evidence was so significant that it could have affected the outcome of the criminal case." *Halsey v. Pfeiffer*, 750 F.3d at 295; *see also Appling v. City of New York*, 2021 WL 695061, at *8 (E.D.N.Y. Feb. 23, 2021) (citing *Garnett v. Undercover Officer C0039*, 838 F.3d at 277). The testimony that Plaintiff alleges was fabricated here falls far short of reaching this standard. Plaintiff's sole argument in this regard is that the alleged fabrications were material because they "served to undermine [his] consistent explanation of the incident." Pl.'s Mem. of Law at p. 26. There is no evidence to suggest that Grand Jurors were made aware of Plaintiff's version of events, however, and so no way Coonradt's report or Fountain's testimony could undermine that narrative.

### 2. Defendant Sikirica

Plaintiff also cites several alleged fabrications on the part of Defendant Sikirica that purportedly denied him the right to a fair trial. The Court finds that Plaintiff has similarly failed to raise a triable issue of fact as to fabrication regarding the objected to statements by Dr. Sikirica and, he too, is entitled to summary judgment.

Plaintiff first argues that Sikirica falsely testified to the Grand Jury that there was no natural cause of death possible and cites as evidence his later "concession" that it was possible the child had died of a natural event. Pl.'s Mem. of Law at pp. 20-21. Plaintiff makes more of the purported concession than the record will bear. At his deposition Dr. Sikirica stated "[i]t's possible, I will not say it's impossible, but it's very, very highly

SPECIAL APPENDIX                                                                    SPA66

unlikely that she died from a natural event before this series of events." Dkt. No. 123-15 at p. 82. He made this statement only after outlining his findings and why he did not view the death as resulting from natural causes. Dr. Sikirica's testimony that essentially anything is theoretically possible is hardly a concession demonstrating perjured testimony.

Plaintiff next relies on Dr. Sikirica's testimony regarding particular autopsy report findings, the performance of CPR, and V.D.'s injuries. Plaintiff's objection that Sikirica "did not inform" the jury of certain findings, Pl.'s Mem. of Law at p. 21, again goes to what evidence a prosecutor chooses to present to a Grand Jury and is no basis for finding fabrication. *Burgess v. DeJoseph*, 2017 WL 1066662, at * 7.

Plaintiff also makes much of Dr. Sikirica's allegedly false statements about the amount of blood present in V.D.'s abdomen, including the purported medical and legal significance of that testimony, the timing of V.D.'s injuries and potential blood loss, her condition when emergency personnel responded to the home, and the alleged correlation of Sikirica's findings with Plaintiff's statements to police. According to Plaintiff, those statements were all false. Pl.'s Mem. of Law at pp. 21-22 & 27-28. Plaintiff, however, offers no evidence of falsity, let alone fabrication. The only evidence on these points is that Plaintiff's criminal trial expert and the retained expert in this case disagree with Dr. Sikirica's statements and opinions. Dkt. Nos. 123-6 (trial testimony of Dr. Teas) & 124-2 (expert report of Dr. Maloney). Plaintiff offers no evidence to suggest that Dr. Sikirica did not actually hold the medical opinions to which he testified. Neither of the doctors

upon whom Plaintiff relies specifically state an opinion that Dr. Sikirica fabricated his findings.

That these medical professionals disagree about the relevant medical findings regarding V.D. "evinces nothing more than a professional disagreement over what conclusions can properly be drawn from the medical evidence; what the evidence does not do is support the assertion that Defendant[] fabricated evidence." *Ferris v. City of Cadillac, Mich.*, 726 F. App'x 473, 483 (6th Cir. 2018); *see also Caminata v. Cnty. of Wexford*, 664 F. App'x 496, 501 (6th Cir. 2016) ("Although this testimony impugns the quality of [defendant's] investigation, it is insufficient to establish knowing fabrication or deliberate or reckless falsehoods, rather than mere negligence."). At best, Plaintiff has raised questions of fact about the correctness of statements or medical conclusions reached by Sikirica. That Plaintiff, and some of his witnesses, disagree with Sikirica does not make those statements or conclusions fabricated.

### C. Qualified Immunity

The doctrine of qualified immunity provides an immunity from suit, and thus liability, for public officials acting reasonably under the circumstances presented. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78-79 (2017) (internal quotation and citation omitted); *see also Behrens v. Pelletier*, 516 U.S. 299, 305 (1996). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal

24

quotation omitted); *see also Reichle v. Howards*, 566 U.S. 658, 664 (2012) ("To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right.") (internal quotations and citations omitted). "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009).

The rights to be free from malicious prosecution and the fabrication of evidence were clearly established at the time of Plaintiff's prosecution. *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003); *Zahrey v. Coffey*, 221 F.3d 342, 357 (2d Cir. 2000). Conduct of a defendant, however, is judged by a standard of objective reasonableness. *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). The appropriate standard for reviewing, then, is whether, despite these clearly established rights, a reasonable police officer under the circumstances then presented to Defendants could have known that their actions violated those rights. *Id.* at 227. Here, because the answer to that question is no, the individual police officers are each entitled to qualified immunity.

Defendants Coonradt and Fountain are accused of fabricating evidence about Plaintiff's conduct and statements on the day of V.D.'s death. Viewed in the light most favorable to Plaintiff, the record might, at best, raise questions about the accuracy of some of those statements. Others, on the contrary, are clearly supported by contemporary statements of others. Rebecca Parker, V.D.'s mother, for example, made statements at or near the time of V.D.'s death that corroborate statements about the way V.D. was acting on the day of her death and the timeline of her being found unresponsive which Plaintiff

now alleges are false. These differing opinions about facts, none of which directly implicate or exculpate Plaintiff, provide no direct evidence of the fabrication underlying Plaintiff's claims against these Defendants. Given that, and the corroboration of at least some of the statements attributed to Defendants, no reasonable police official could have known that reporting or testifying as to them violated any of Plaintiff's clearly established rights.

Finally, the record reveals no specific claim of misconduct regarding either Colaneri or McDonald, other than being a part of the overall investigation of V.D.'s death. Given the lack of specific allegations of misconduct qualified immunity is appropriate as to them. *See*, *e.g.*, *Gallagher v. Town of Fairfield*, 2011 WL 3563160, at *6 (D. Conn. Aug. 15, 2011)

Dr. Sikirica also is entitled to qualified immunity.[7] Plaintiff's malicious prosecution and fair trial claims accuse Dr. Sikirica of the same misconduct – that he fabricated evidence. This allegation is largely based on conclusory assertions of a conspiracy among Defendants. What the record evidence establishes, however, is only that several different medical professionals have different views of the medical evidence. In light of that evidence, Dr. Sikirica is clearly entitled to qualified immunity. To hold otherwise, based on a purely conclusory claim of misconduct, would "open the floodgates

---

[7] The Court has considered Sikirica's claim of entitlement to absolute immunity and the arguments advanced by the parties on this question. Though ultimately not necessary to resolution of the Motion, the Court finds that absolute immunity is not proper here. *Newton v. City of New York*, 738 F. Supp.2d 397 (S.D.N.Y. 2010), on which Sikirica relies, is readily distinguishable since that case involved a lab technician, not a coroner, and in any event the Court is persuaded here by the cases cited by Plaintiff more closely analogizing the role of a medical examiner to that of an investigating police officer. *See*, *e.g.*, *Kompare v. Stein*, 801 F.2d 883, 887 (7th Cir. 1986). Here, in particular, Sikirica's role was closely tied to the investigation of V.D.'s death.

SPECIAL APPENDIX                                                        SPA70

for civil rights claims against coroners by acquitted criminal defendants who believe a coroner made a mistake in performing an autopsy or in reaching a conclusion about the cause or causes of death of a victim." *Storey v. Chelan Cty.*, 2011 WL 1575506, at *9 (E.D. Wash. Apr. 26, 2011); *see also Laurent v. Edwin*, 528 F. Supp. 3d 69, 92 (E.D.N.Y. 2021).

### D. Plaintiff's Remaining Claims

Each of Plaintiff's remaining claims is dependent upon the existence of a violation of a constitutional right. Because Plaintiff has raised no triable question of fact as to the claims discussed above, the remaining claims must also be dismissed.

Plaintiff alleges that individual Defendants witnessed the violation of his rights by other Defendants, but failed to intervene. Third Am. Compl. at ¶¶ 83-86. Such a claim "is contingent upon the disposition of the primary claims underlying the failure to a intervene claim." *Matthews v. City of New York*, 889 F. Supp. 2d 418, 443-44 (E.D.N.Y. 2012). "Since all of plaintiff's other claims have been dismissed, no predicate constitutional violation remains to support a failure-to-intervene claim. This claim is therefore dismissed as well." *Grinols v. Beers*, 532 F. Supp. 3d 95, 108-09 (W.D.N.Y. 2021).

Plaintiff also alleges the existence of a conspiracy to "undermine" Plaintiff's right to be free from malicious prosecution and the fabrication of evidence. Third Am. Compl. at ¶ 88. Because Plaintiff has failed to establish any underlying constitutional violation, his related conspiracy claim necessarily fails. *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001); *Mitchell v. Cnty. of Nassau*, 786 F. Supp. 2d 545, 564 (E.D.N.Y. 2011)

(citing cases) ("a § 1983 conspiracy claim fails as a matter of law where there is no underlying constitutional violation.").

Finally, Plaintiff's Sixth and Seventh causes of action assert *Monell* municipal liability claims against the City of Troy and County of Rensselaer. Third. Am. Compl. at ¶¶ 91-113. *Monell* liability requires the existence of an "underlying constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006); *see also Claudio v. Sawyer*, 675 F. Supp. 2d 403, 408 (S.D.N.Y. 2009), *aff'd*, 409 F. App'x 464 (2d Cir. 2011) ("Under Second Circuit case law, however, a prerequisite to municipal liability under *Monell* is an underlying constitutional violation by a state actor."). Dismissal of the substantive claims against the individual actors mandates dismissal of Plaintiff's *Monell* claim. *Demosthene v. City of New York*, 831 F. App'x 530, 534 n.3 (2d Cir. Oct. 9, 2020) ("[I]n light of the absence of an underlying constitutional violation, the district court correctly dismissed the claim against the [c]ity pursuant to *Monell*."); *Morales v. City of New York*, 752 F.3d 234, 238 (2d Cir. 2014) (similar).

## V. CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED**, that the Motions for Summary Judgment (Dkt. Nos. 115 & 116) are **GRANTED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-

Decision and Order upon the parties to this action.

Dated:   March 29, 2023
          Albany, New York

Daniel J. Stewart
U.S. Magistrate Judge