# 23-589

IN THE

# United States Court of Appeals
# for the Second Circuit

---

MICHAEL DAVIS-GUIDER,

*Plaintiff-Counter-Defendant-Appellant,*

— v. —

CITY OF TROY, RONALD FOUNTAIN, INDIVIDUALLY,
DANIELLE COONRADT, INDIVIDUALLY,
CHARLES MCDONALD, INDIVIDUALLY,
TIM COLANERI, INDIVIDUALLY,
*Defendants-Cross-Claimants-Counter-Claimants-Appellees,*

RENSSELAER COUNTY,
MICHAEL SIKIRICA, INDIVIDUALLY,
*Defendants-Cross-Defendants-Counter-Claimants-Appellees,*

ADAM R. MASON, INDIVIDUALLY
*Defendant-Cross-Claimant-Counter-Claimant,*

JOEL ABELOVE, INDIVIDUALLY,
*Defendant-Cross-Defendant-Counter-Claimant,*

JOHN AND JANE DOES 1-10, INDIVIDUALLY,
MICHAEL E. PARROW, ANDRA ACKERMAN,
*Defendants.*

---

On Appeal from the United States District Court
for the Northern District of New York
Case No. 1:17-cv-1290 (FJS/DJS)

---

## APPENDIX VOLUME 1 OF 11

## <u>APPENDIX VOLUME 1 TABLE OF CONTENTS</u>

Docket ............................................................................... 1

ECF 115-1: William C. Firth Attorney Affidavit ........................... 28

ECF 115-3: County Defendants' Statement of Material Facts ..... 31

ECF 115-4: Exhibit "A" ................................................... 48

ECF 115-5: Exhibit "B" ................................................. 153

# APPENDIX

**Query    Reports    Utilities    Help    Log Out**

RECAP Actions

APPEAL,CLOSED,CONSENT

## U.S. District Court
## Northern District of New York - Main Office (Syracuse) [NextGen CM/ECF Release 1.7 (Revision 1.7.1.2)] (Albany)
## CIVIL DOCKET FOR CASE #: 1:17-cv-01290-DJS

Davis-Guider v. City of Troy et al
Assigned to: Magistrate Judge Daniel J. Stewart
Case in other court: 2nd Circuit, 23-00589
Cause: 42:1983 Civil Rights Act

Date Filed: 11/22/2017
Date Terminated: 03/29/2023
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Michael Davis-Guider**

represented by **Brett H. Klein**
Office of Brett H. Klein, Esq. PLLC
305 Broadway
Suite 600
New York, NY 10007
212-335-0132
Email: bklein@kleincivilrights.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**City of Troy**

represented by **Donald J. Shanley**
Pattison, Sampson Law Firm
22 First Street
P.O. Box 208
Troy, NY 12181-0208
518-266-1029
Fax: 518-274-6034
Email: yantz@psgglaw.com
*TERMINATED: 11/15/2019*
*LEAD ATTORNEY*

**Joseph T. Perkins**
O'Connor First
20 Corporate Woods Blvd.
P.O. Box 208
Albany, NY 12211
518-465-0400
Fax: 518-465-0015
Email: perkins@oobf.com
*LEAD ATTORNEY*

Case 23-589, Document 86, 04/18/2024, 3604728, Page4 of 178

# APPENDIX

**Rhiannon Ineva Gifford**
Pattison Sampson Ginsberg & Griffin PLLC
P.O. Box 208
22 First Street
Troy, NY 12180
518-266-1001
Fax: 518-274-6034
Email: gifford@psgglaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ronald Fountain**
*Individually*

represented by **Donald J. Shanley**
(See above for address)
*TERMINATED: 11/15/2019*
*LEAD ATTORNEY*

**Joseph T. Perkins**
(See above for address)
*LEAD ATTORNEY*

**Rhiannon Ineva Gifford**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Danielle Coonradt**
*Individually*

represented by **Joseph T. Perkins**
(See above for address)
*LEAD ATTORNEY*

**Rhiannon Ineva Gifford**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald J. Shanley**
(See above for address)
*TERMINATED: 11/15/2019*

**Defendant**

**Charles McDonald**
*Individually*

represented by **Donald J. Shanley**
(See above for address)
*TERMINATED: 11/15/2019*
*LEAD ATTORNEY*

**Joseph T. Perkins**
(See above for address)
*LEAD ATTORNEY*

**Rhiannon Ineva Gifford**
(See above for address)

Case 23-589, Document 86, 01/18/2024, 3604728, Page5 of 178

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Rensselaer County**                    represented by **Crystal R. Peck**
Bailey, Johnson & Peck, P.C.
5 Pine West Plaza, Suite 507
Washington Avenue Extension
Albany, NY 12205
518-456-0082
Fax: 518-456-4767
Email: crpeck@baileyjohnson.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John W. Bailey**
Bailey, Johnson & Peck, P.C.
5 Pine West Plaza, Suite 507
Washington Avenue Extension
Albany, NY 12205
518-456-0082
Email: jwbailey@baileyjohnson.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William C. Firth**
Bailey, Johnson & Peck, P.C.
5 Pine West Plaza
Washington Avenue Extension
Ste 507
Albany, NY 12205
518-456-0082
Email: wcfirth@baileyjohnson.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Michael Sikirica**                     represented by **Crystal R. Peck**
*Individually*                           (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John W. Bailey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William C. Firth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**John and Jane Doe 1-10**
*Individually, (the names John and Jane Doe*
*being fictitious, as the true names are*

Case 23-589, Document 86, 04/18/2024, 3604728, Page6 of 178

# APPENDIX

*presently unknown)*
*TERMINATED: 04/01/2020*

**Defendant**

**Tim Colaneri**
*Individually*

represented by **Rhiannon Ineva Gifford**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Adam R. Mason**
*Individually*
*TERMINATED: 05/18/2022*

represented by **Rhiannon Ineva Gifford**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Michael E. Parrow**
*TERMINATED: 04/01/2020*

represented by **Rhiannon Ineva Gifford**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Joel Abelove**
*Individually*
*TERMINATED: 05/18/2022*

represented by **William C. Firth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Crystal R. Peck**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Andra Ackerman**
*TERMINATED: 12/12/2019*

**Cross Claimant**

**City of Troy**

represented by **Donald J. Shanley**
(See above for address)
*TERMINATED: 11/15/2019*
*LEAD ATTORNEY*

**Rhiannon Ineva Gifford**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Cross Defendant**

**Rensselaer County**

represented by **Crystal R. Peck**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cross Defendant**

Case 23-589, Document 86, 01/18/2024, 3604728, Page7 of 178

# APPENDIX

**Michael Sikirica**
*Individually*

represented by **Crystal R. Peck**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**City of Troy**

represented by **Donald J. Shanley**
(See above for address)
*TERMINATED: 11/15/2019*
*LEAD ATTORNEY*

**Rhiannon Ineva Gifford**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Michael Davis-Guider**

represented by **Brett H. Klein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cross Claimant**

**Ronald Fountain**
*Individually*

represented by **Donald J. Shanley**
(See above for address)
*TERMINATED: 11/15/2019*
*LEAD ATTORNEY*

V.

**Cross Defendant**

**Rensselaer County**

represented by **Crystal R. Peck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John W. Bailey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cross Defendant**

**Michael Sikirica**
*Individually*

represented by **Crystal R. Peck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John W. Bailey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Ronald Fountain**
*Individually*

represented by **Donald J. Shanley**
(See above for address)
*TERMINATED: 11/15/2019*
*LEAD ATTORNEY*

V.

**Counter Defendant**

**Michael Davis-Guider**

represented by **Brett H. Klein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cross Claimant**

**Charles McDonald**
*Individually*

represented by **Donald J. Shanley**
(See above for address)
*TERMINATED: 11/15/2019*
*LEAD ATTORNEY*

V.

**Cross Defendant**

**Rensselaer County**

represented by **Crystal R. Peck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John W. Bailey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cross Defendant**

**Michael Sikirica**
*Individually*

represented by **Crystal R. Peck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John W. Bailey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Charles McDonald**
*Individually*

represented by **Donald J. Shanley**
(See above for address)
*TERMINATED: 11/15/2019*
*LEAD ATTORNEY*

V.

**Counter Defendant**

Case 23-589, Document 86, 01/18/2024, 3604728, Page9 of 178

# APPENDIX

**7**

**Michael Davis-Guider**                          represented by   **Brett H. Klein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cross Claimant**

**Danielle Coonradt**                             represented by   **Donald J. Shanley**
*Individually*                                    (See above for address)
*TERMINATED: 11/15/2019*


V.

**Cross Defendant**

**Rensselaer County**                             represented by   **Crystal R. Peck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John W. Bailey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cross Defendant**

**Michael Sikirica**                              represented by   **Crystal R. Peck**
*Individually*                                    (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John W. Bailey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Danielle Coonradt**                             represented by   **Donald J. Shanley**
*Individually*                                    (See above for address)
*TERMINATED: 11/15/2019*


V.

**Counter Defendant**

**Michael Davis-Guider**                          represented by   **Brett H. Klein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Rensselaer County**                             represented by   **Crystal R. Peck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Case 23-589, Document 86, 04/19/2024, 3604728, Page10 of 178

# APPENDIX

**8**

**John W. Bailey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Michael Sikirica**                    represented by    **Crystal R. Peck**
*Individually*                                            (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **John W. Bailey**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Michael Davis-Guider**               represented by    **Brett H. Klein**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Cross Claimant**

**City of Troy**                       represented by    **Rhiannon Ineva Gifford**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

V.

**Cross Defendant**

**Joel Abelove**
*Individually*

**Cross Claimant**

**Tim Colaneri**                       represented by    **Rhiannon Ineva Gifford**
*Individually*                                           (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

V.

**Cross Defendant**

**Joel Abelove**
*Individually*

**Counter Claimant**

**Tim Colaneri**                       represented by    **Rhiannon Ineva Gifford**
*Individually*                                           (See above for address)

Case 23-589, Document 86, 04/18/2024, 3604728, Page11 of 178

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Michael Davis-Guider**      represented by    **Brett H. Klein**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

**Cross Claimant**

**Danielle Coonradt**      represented by    **Joseph T. Perkins**
*Individually*                                       (See above for address)
                                                  *LEAD ATTORNEY*

                                                **Rhiannon Ineva Gifford**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Donald J. Shanley**
                                                (See above for address)
                                                *TERMINATED: 11/15/2019*

V.

**Cross Defendant**

**Joel Abelove**
*Individually*

**Cross Claimant**

**Ronald Fountain**      represented by    **Donald J. Shanley**
*Individually*                                       (See above for address)
                                                  *TERMINATED: 11/15/2019*
                                                *LEAD ATTORNEY*

                                                **Joseph T. Perkins**
                                                (See above for address)
                                                *LEAD ATTORNEY*

                                                **Rhiannon Ineva Gifford**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

V.

**Cross Defendant**

**Joel Abelove**
*Individually*

Case 23-589, Document 86, 04/18/2024, 3604728, Page12 of 178
APPENDIX

**Cross Claimant**

**Adam R. Mason**                              represented by   **Rhiannon Ineva Gifford**
*Individually*                                                 (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*


V.

**Cross Defendant**

**Joel Abelove**
*Individually*

**Counter Claimant**

**Adam R. Mason**                              represented by   **Rhiannon Ineva Gifford**
*Individually*                                                 (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*


V.

**Counter Defendant**

**Michael Davis-Guider**                       represented by   **Brett H. Klein**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*


**Cross Claimant**

**Charles McDonald**                           represented by   **Donald J. Shanley**
*Individually*                                                 (See above for address)
                                                              *TERMINATED: 11/15/2019*
                                                              *LEAD ATTORNEY*

                                                              **Joseph T. Perkins**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*

                                                              **Rhiannon Ineva Gifford**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*


V.

**Cross Defendant**

**Joel Abelove**
*Individually*

**Counter Claimant**

**Rensselaer County**                          represented by   **Crystal R. Peck**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*

Case 23-589, Document 86, 01/18/2024, 3604728, Page13 of 178

# APPENDIX

**11**

*ATTORNEY TO BE NOTICED*

**John W. Bailey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Joel Abelove**                                 represented by   **Crystal R. Peck**
*Individually*                                                   (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Michael Sikirica**                             represented by   **Crystal R. Peck**
*Individually*                                                   (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

**John W. Bailey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Michael Davis-Guider**                         represented by   **Brett H. Klein**
                                                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/22/2017 | 1 R | COMPLAINT WITH JURY DEMAND: against City of Troy, Ronald Fountain, Danielle Coonradt, Charles McDonald, Rensselaer County, Michael Sikirica and John and Jane Doe 1-10, (Filing fee $400 receipt number 0206-4205725) filed by Michael Davis-Guider. (Attachments: # 1 Civil Cover Sheet) (jmb) (Entered: 11/27/2017) |
| 11/27/2017 | 2 | Summons Issued as to City of Troy. (Attachments: # 1 Summons issued for Danielle Coonradt, # 2 Summons issued for Ronald Fountain, # 3 Summons issued for Charles McDonald, # 4 Summons issued for Rensselaer County, and # 5 Summons issued for Michael Sikirica) (jmb) (Entered: 11/27/2017) |
| 11/27/2017 |  | TEXT NOTICE: Although the plaintiff herein has named John and Jane Doe 1-10 in the # 1 R Complaint, the Clerk's Office will not issue summonses for service of process on a "John Doe" defendant at this time. In the event plaintiff wishes to pursue the claims against those defendants, plaintiff shall take reasonable steps to ascertain their identities. When plaintiff determines the identity of the "John Doe" defendants, plaintiff may seek to amend the pleading to add the properly named defendants pursuant to FED. R. CIV. P. 15 and summons will be issued at that time. (jmb) (Entered: 11/27/2017) |
| 11/27/2017 | 3 | G.O. 25 FILING ORDER ISSUED: Initial Rule 16 Conference set for 2/26/2018 at 9:00 AM in Albany before Magistrate Judge Daniel J. Stewart. Civil Case |

| | | Management Plan must be filed and Mandatory Disclosures are to be exchanged by the parties on or before 2/20/2018. (Pursuant to Local Rule 26.2, mandatory disclosures are to be exchanged among the parties but are NOT to be filed with the Court.) (jmb) (Entered: 11/27/2017) |
|---|---|---|
| 12/22/2017 | 4 | ANSWER to 1 R Complaint, , CROSSCLAIM against Rensselaer County, Michael Sikirica, COUNTERCLAIM against Michael Davis-Guider by City of Troy. (Attachments: # 1 Certificate of Service)(Shanley, Donald) (Entered: 12/22/2017) |
| 12/28/2017 | 5 | NOTICE of Appearance by Crystal R. Peck on behalf of Rensselaer County, Michael Sikirica (Peck, Crystal) (Entered: 12/28/2017) |
| 12/28/2017 | 6 | Letter Motion from Crystal R. Peck, Esq. for Rensselaer County, Michael Sikirica requesting an extension of time to respond to Complaint submitted to Judge Daniel J. Stewart . (Peck, Crystal) (Entered: 12/28/2017) |
| 12/28/2017 | 7 | NOTICE of Appearance by John W. Bailey on behalf of Rensselaer County, Michael Sikirica (Bailey, John) (Entered: 12/28/2017) |
| 12/29/2017 | 8 | SUMMONS Returned Executed by Michael Davis-Guider. Rensselaer County served on 12/11/2017, answer due 1/2/2018. (Klein, Brett) (Entered: 12/29/2017) |
| 12/29/2017 | 9 | SUMMONS Returned Executed by Michael Davis-Guider. Michael Sikirica served on 12/11/2017, answer due 1/2/2018. (Klein, Brett) (Entered: 12/29/2017) |
| 12/29/2017 | 10 | SUMMONS Returned Executed by Michael Davis-Guider. City of Troy served on 12/11/2017, answer due 1/2/2018. (Klein, Brett) (Entered: 12/29/2017) |
| 12/29/2017 | 11 | SUMMONS Returned Executed by Michael Davis-Guider. Ronald Fountain served on 12/13/2017, answer due 1/3/2018. (Klein, Brett) (Entered: 12/29/2017) |
| 01/02/2018 | 12 | ANSWER to 1 R Complaint, , CROSSCLAIM against Rensselaer County, Michael Sikirica, COUNTERCLAIM against Michael Davis-Guider by Ronald Fountain. (Attachments: # 1 Certificate of Service)(Shanley, Donald) (Entered: 01/02/2018) |
| 01/02/2018 | 13 | TEXT ORDER granting 6 Letter Request. Answer deadline for Defendants County of Rensselaer and Dr. Sikirica is extended until 1/5/2018. SO ORDERED by Magistrate Judge Daniel J. Stewart on 1/2/2018. (dpk) (Entered: 01/04/2018) |
| 01/04/2018 | | ***Answer due date updated for Rensselaer County answer due 1/5/2018; Michael Sikirica(Individually) answer due 1/5/2018. (dpk) (Entered: 01/04/2018) |
| 01/05/2018 | 14 | MOTION to Dismiss for Failure to State a Claim Motion Hearing set for 2/23/2018 09:00 AM in Albany before Senior Judge Frederick J. Scullin Jr. Response to Motion due by 2/6/2018 Reply to Response to Motion due by 2/12/2018. filed by Rensselaer County, Michael Sikirica(Individually). (Attachments: # 1 Memorandum of Law, # 2 Certificate of Service) (Peck, Crystal) (Entered: 01/05/2018) |
| 01/08/2018 | | MOTION SCHEDULING NOTICE as to 14 MOTION to Dismiss for Failure to State a Claim . Motion Hearing set for 2/23/2018 before Senior Judge Frederick J. Scullin Jr. will be taken on submit. No oral argument will be held unless otherwise notified by the Court. (bjw, ) (Entered: 01/08/2018) |
| 01/19/2018 | 15 | Letter Motion from Brett H. Klein for Michael Davis-Guider requesting An Extension Of Time To Serve Defendant McDonald submitted to Judge Frederick J. Scullin, Jr. . (Klein, Brett) (Entered: 01/19/2018) |
| 01/24/2018 | 16 | TEXT ORDER granting 15 Letter Request. Time to serve defendant Charles McDonald is extended until February 18, 2018. SO ORDERED by Magistrate Judge Daniel J. Stewart on January 24, 2018. (dpk) (Entered: 01/24/2018) |

Case 23-589, Document 86, 04/19/2024, 3604728, Page15 of 178

| 02/06/2018 | 17 | MEMORANDUM OF LAW in opposition to the # 14 Motion to Dismiss filed by City of Troy, Danielle Coonradt, Ronald Fountain, John and Jane Doe 1-10, Charles McDonald. (Attachments: # 1 Certificate of Service)(Shanley, Donald) Modified on 2/7/2018 to correct docket text. (jmb) (Entered: 02/06/2018) |
| 02/06/2018 | 18 | TEXT NOTICE: The Rule 16 Initial Conference scheduled for February 26, 2018 at 9:00 a.m. before Magistrate Judge Daniel J. Stewart and the deadline to submit a proposed Civil Case Management Plan and exchange Mandatory Disclosures are ADJOURNED without date pending a decision on the dispositive motion. (dpk) (Entered: 02/06/2018) |
| 02/06/2018 | 19 | RESPONSE in Opposition re 14 MOTION to Dismiss for Failure to State a Claim filed by Michael Davis-Guider. (Klein, Brett) (Entered: 02/06/2018) |
| 02/08/2018 | 20 | ANSWER to 1 R Complaint, , CROSSCLAIM against Rensselaer County, Michael Sikirica, COUNTERCLAIM against Michael Davis-Guider by Charles McDonald. (Attachments: # 1 Certificate of Service)(Shanley, Donald) (Entered: 02/08/2018) |
| 02/12/2018 | 21 | SUMMONS Returned Executed by Michael Davis-Guider. Danielle Coonradt served on 1/12/2018, answer due 2/2/2018. (Klein, Brett) (Entered: 02/12/2018) |
| 02/12/2018 | 22 | SUMMONS Returned Executed by Michael Davis-Guider. Charles McDonald served on 1/31/2018, answer due 2/21/2018. (Klein, Brett) (Entered: 02/12/2018) |
| 02/12/2018 | 23 | REPLY to Response to Motion re 14 MOTION to Dismiss for Failure to State a Claim filed by Rensselaer County, Michael Sikirica(Individually). (Peck, Crystal) (Entered: 02/12/2018) |
| 02/14/2018 | 24 | Letter Motion from Donald J. Shanley, Esq. for City of Troy, Danielle Coonradt, Ronald Fountain, Charles McDonald requesting to submit a further Memorandum of Law submitted to Judge Frederick J. Scullin, Jr. . (Shanley, Donald) (Entered: 02/14/2018) |
| 02/14/2018 | 25 | RESPONSE TO LETTER BRIEF filed by Rensselaer County, Michael Sikirica as to 24 Letter Request/Motion filed by City of Troy, Danielle Coonradt, Ronald Fountain, Charles McDonald . (Peck, Crystal) (Entered: 02/14/2018) |
| 02/14/2018 | 26 | Letter from Donald J. Shanley, Esq. for City of Troy, Danielle Coonradt, Ronald Fountain, Charles McDonald requesting file a reply Memorandum of Law submitted to Judge Frederick J. Scullin, Jr. . (Shanley, Donald) Modified on 2/15/2018 (bjw, ). (Entered: 02/14/2018) |
| 02/15/2018 | 27 | TEXT ORDER granting 24 Letter Request to file a further memorandum of law in opposition to 14 Motion to Dismiss. The memo shall be no longer than 5 pages in length...IT IS SO ORDERED by Senior Judge Frederick J. Scullin, Jr on 2/15/2018. (bjw, ) (Entered: 02/15/2018) |
| 02/15/2018 | 28 | ANSWER to 1 R Complaint, , CROSSCLAIM against Rensselaer County, Michael Sikirica, COUNTERCLAIM against All Plaintiffs by Danielle Coonradt. (Attachments: # 1 Certificate of Service)(Shanley, Donald) (Entered: 02/15/2018) |
| 02/16/2018 | 29 | MEMORANDUM OF LAW re 17 Memorandum of Law, filed by City of Troy, Danielle Coonradt, Ronald Fountain, Charles McDonald. (Attachments: # 1 Certificate of Service)(Shanley, Donald) (Entered: 02/16/2018) |
| 03/20/2018 | 30 | LETTER BRIEF by City of Troy, Danielle Coonradt, Ronald Fountain, Charles McDonald. (Shanley, Donald) (Entered: 03/20/2018) |

| 03/26/2018 | 31 | TEXT ORDER: On March 20, 2018, Defendants, City of Troy and Ronald Fountain, filed a Letter Brief seeking permission to file an Amended Answer in this matter. Dkt. No. 30 . Defendants advise that Plaintiff has consented to such request. Based upon the consent of the parties, Defendants, City of Troy and Ronald Fountain, are permitted to file and serve an Amended Answer. SO ORDERED by Magistrate Judge Daniel J. Stewart on 3/26/2018. (mab) (Entered: 03/26/2018) |
|---|---|---|
| 03/26/2018 | 32 | AMENDED ANSWER to , CROSSCLAIM against Rensselaer County, Michael Sikirica, COUNTERCLAIM against Michael Davis-Guider by City of Troy. (Attachments: # 1 Certificate of Service)(Shanley, Donald) (Entered: 03/26/2018) |
| 03/26/2018 | 33 | AMENDED ANSWER to , CROSSCLAIM against Rensselaer County, Michael Sikirica, COUNTERCLAIM against Michael Davis-Guider by Ronald Fountain. (Attachments: # 1 Certificate of Service)(Shanley, Donald) (Entered: 03/26/2018) |
| 04/16/2018 | 34 R | ANSWER to 32 Amended Answer to Complaint, Crossclaim, Counterclaim, 28 Answer to Complaint, Crossclaim, Counterclaim, 33 Amended Answer to Complaint, Crossclaim, Counterclaim, 20 Answer to Complaint,, Crossclaim,, Counterclaim, , ANSWER to 32 Amended Answer to Complaint, Crossclaim, Counterclaim, 28 Answer to Complaint, Crossclaim, Counterclaim, 33 Amended Answer to Complaint, Crossclaim, Counterclaim, 20 Answer to Complaint,, Crossclaim,, Counterclaim, , ANSWER to 32 Amended Answer to Complaint, Crossclaim, Counterclaim, 28 Answer to Complaint, Crossclaim, Counterclaim, 33 Amended Answer to Complaint, Crossclaim, Counterclaim, 20 Answer to Complaint,, Crossclaim,, Counterclaim, , ANSWER to 32 Amended Answer to Complaint, Crossclaim, Counterclaim, 28 Answer to Complaint, Crossclaim, Counterclaim, 33 Amended Answer to Complaint, Crossclaim, Counterclaim, 20 Answer to Complaint,, Crossclaim,, Counterclaim, by Michael Davis-Guider.(Klein, Brett) (Entered: 04/16/2018) |
| 03/08/2019 | 35 R | MEMORANDUM-DECISION and ORDER granting in part and denying in part 14 Motion to Dismiss for Failure to State a Claim; County Defendants motion to dismiss Plaintiffs § 1983 failure to intervene claim against Defendant Sikirica is GRANTED; County Defendants motion to dismiss Plaintiffs § 1983 false arrest, malicious prosecution(see footnote in decision) violation of his right to a fair trial, and conspiracy claims against Defendant Sikirica, is DENIED; County Defendants motion to dismiss Plaintiffs § 1983 claim for municipal liability against Defendant County of Rensselaer, is DENIED; County Defendants motion to dismiss Plaintiffs claims against Defendant Sikirica based on the defenses of absolute and qualified immunity, is DENIED; Plaintiffs § 1985 conspiracy claim against all the individual Defendants is DISMISSED in light of Plaintiffs withdrawal of this claim and the County Defendants' motion to dismiss the City Defendants' cross-motion is GRANTED. This case is referred to Magistrate Judge Stewart for all further pretrial proceedings.. Signed by Senior Judge Frederick J. Scullin, Jr on 3/8/2019. (bjw, ) (Entered: 03/08/2019) |
| 04/09/2019 | 36 | TEXT ORDER: The Rule 16 Initial Conference in this matter is scheduled for May 7, 2019 at 10:00 AM before the undersigned. Counsel are directed to appear IN PERSON at the James T. Foley US Courthouse, 445 Broadway, 4th Floor, Room 409, Albany, NY on the scheduled date and time. Counsel are also directed to submit a proposed Civil Case Management Plan and exchange Mandatory Disclosures on or before April 30, 2019. Pursuant to Local Rule 26.2, Mandatory Disclosures are to be exchanged among the parties but are NOT to be filed with the Court. SO ORDERED by Magistrate Judge Daniel J. Stewart on 4/9/2019. (mab) (Entered: 04/09/2019) |
| 04/11/2019 | 37 R | LETTER MOTION to adjourn the Rule 16 Initial Conference by City of Troy. (Ginsberg, Michael) Modified on 4/16/2019 to reflect that a request to reschedule the conference is included in the letter. (mab). (Entered: 04/11/2019) |

| | | |
|---|---|---|
| 04/16/2019 | 38 | TEXT ORDER granting Defendants' 37 Ⓡ Letter Request seeking an adjournment of the Rule 16 Initial Conference in this matter. The Rule 16 Initial Conference is RESCHEDULED for May 20, 2019 at 10:00 AM before the undersigned. Counsel are directed to appear IN PERSON at the James T. Foley US Courthouse, 445 Broadway, 4th Floor, Room 409, Albany, NY on the scheduled date and time. Counsel are also directed to submit a proposed Civil Case Management Plan and exchange Mandatory Disclosures on or before May 13, 2019. Pursuant to Local Rule 26.2, Mandatory Disclosures are to be exchanged among the parties but are NOT to be filed with the Court. SO ORDERED by Magistrate Judge Daniel J. Stewart on 4/16/2019. (mab) (Entered: 04/16/2019) |
| 04/18/2019 | 39 | ANSWER to 1 Ⓡ Complaint, , COUNTERCLAIM against Michael Davis-Guider by Rensselaer County, Michael Sikirica. (Attachments: # 1 Certificate of Service)(Peck, Crystal) (Entered: 04/18/2019) |
| 05/07/2019 | 40 Ⓡ | CIVIL CASE MANAGEMENT PLAN by City of Troy, Danielle Coonradt, Ronald Fountain, Charles McDonald. (Shanley, Donald) (Entered: 05/07/2019) |
| 05/16/2019 | 41 Ⓡ | CIVIL CASE MANAGEMENT PLAN *(Proposed Amended CCMP Respectfully Submitted by the Parties)* by Michael Davis-Guider. (Klein, Brett) (Entered: 05/16/2019) |
| 05/20/2019 | | Text Minute Entry for proceedings held before Magistrate Judge Daniel J. Stewart: Rule 16 Initial Pretrial Conference held on 5/20/2019. Appearances: Brett Klein, Esq. for Plaintiff; Donald Shanley, Esq. and Crystal Peck, Esq. for Defendants. The Court hears from counsel as to their positions and how they intend to proceed in this matter. Mandatory Disclosures have been exchanged. Counsel will make a motion with this Court to unseal Grand Jury Minutes. Counsel agree to do expert disclosures after the close of discovery. The Court will hold a conference after the close of discovery to set forth deadlines with regard to experts. Scheduling Order deadlines set. A Uniform Pretrial Order will be issued. This matter is OPTED OUT of the Court's Mandatory Mediation Program. (TIME: 10:02AM-10:38AM). (mab) (Entered: 05/23/2019) |
| 05/23/2019 | 42 | UNIFORM PRETRIAL SCHEDULING ORDER: Anticipated length of trial: 5-10 Days. Preferred Trial Location: Albany, NY. Joinder of Parties due by 7/9/2019. Amended Pleadings due by 7/9/2019. Discovery due by 2/28/2020. Motions to be filed by 5/11/2020. Status Report due by 8/30/2019. This case has been exempt from the Court's Mandatory Mediation Program. Signed by Magistrate Judge Daniel J. Stewart on 5/23/2019. (mab) (Entered: 05/23/2019) |
| 05/23/2019 | 43 | ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT OBTAIN SEPARATE COUNSEL as to Defendants City of Troy, Ronald Fountain, Danielle Coonradt and Charles McDonald. Signed by Magistrate Judge Daniel J. Stewart on 5/23/2019. (mab) (Entered: 05/23/2019) |
| 05/23/2019 | 44 | ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT OBTAIN SEPARATE COUNSEL as to Defendants Rensselaer County and Michael Sikirica. Signed by Magistrate Judge Daniel J. Stewart on 5/23/2019. (mab) (Entered: 05/23/2019) |
| 05/23/2019 | | Set Deadlines: Defendants to respond to Order to Show Cause by 7/22/2019. (mab) (Entered: 05/23/2019) |
| 05/23/2019 | 45 | TEXT ORDER: The Court held a Rule 16 Initial Conference with the parties on May 20, 2019. The Court, *sua sponte*, exempts this matter from the Mandatory Mediation Program. SO ORDERED by Magistrate Judge Daniel J. Stewart on 5/23/2019. (mab) (Entered: 05/23/2019) |

Case 23-589, Document 86, 04/18/2024, 3604728, Page18 of 178
**APPENDIX**

**16**

| | | |
|---|---|---|
| 07/19/2019 | 47 | NOTICE by Rensselaer County, Michael Sikirica re 44 Order (Peck, Crystal) (Entered: 07/19/2019) |
| 07/25/2019 | 48 | ORDER re 43 Order to Show Cause regarding joint representation. IT IS ORDERED that Defendants, City of Troy, Ronald Fountain, Danielle Coonradt and Charles McDonald, shall be permitted to proceed with joint representation but have not waived their right to retain separate counsel in the future. IT IS FURTHER ORDERED that the documents provided by Defendants as discussed herein shall be filed under seal. Signed by Magistrate Judge Daniel J. Stewart on 7/25/2019. (mab) (Entered: 07/25/2019) |
| 07/25/2019 | 49 | ORDER re 44 Order to Show Cause regarding joint representation. IT IS ORDERED that Defendants, Rensselaer County and Michael Sikirica, shall be permitted to proceed with joint representation but have not waived their right to retain separate counsel in the future. IT IS FURTHER ORDERED that the documents provided by Defendants as discussed herein shall be filed under seal. Signed by Magistrate Judge Daniel J. Stewart on 7/25/2019. (mab) (Entered: 07/25/2019) |
| 07/25/2019 | 50 | ***SEALED DOCUMENT: filed under seal pursuant to 49 Order. (mab) (Entered: 07/25/2019) |
| 07/25/2019 | 51 | NOTICE of Appearance by Joseph T. Perkins on behalf of City of Troy, Danielle Coonradt, Ronald Fountain, Charles McDonald (Perkins, Joseph) (Entered: 07/25/2019) |
| 07/26/2019 | 52 | TEXT ORDER: A Status Telephone Conference in this matter is scheduled for July 30, 2019 at 11:00 AM before the undersigned. A separate notice setting forth the instructions to connect to the conference call will be issued. Counsel for the Rensselaer County Defendants is directed to advise the Rensselaer County Attorney, Carl Kempf, that his appearance is requested at such conference and to provide him with the instructions to connect to the conference call. SO ORDERED by Magistrate Judge Daniel J. Stewart on 7/26/2019. (mab) (Entered: 07/26/2019) |
| 07/29/2019 | 53 | *Consent* Letter Motion from Brett H. Klein for Michael Davis-Guider requesting an Adjournment of the July 30, 2019 Telephone Conference . (Klein, Brett) (Entered: 07/29/2019) |
| 07/29/2019 | 54 | TEXT ORDER granting Plaintiff's 53 Letter Request seeking to reschedule the Status Telephone Conference in this matter. The Status Telephone Conference is RESCHEDULED for August 9, 2019 at 10:00 AM. Counsel are directed to use the instructions to connect to the conference call previously issued by the Court on July 26, 2019. SO ORDERED Magistrate Judge Daniel J. Stewart on 7/29/2019. (mab) (Entered: 07/29/2019) |
| 08/09/2019 | | Text Minute Entry for proceedings held before Magistrate Judge Daniel J. Stewart: Telephone Status Conference held on 8/9/2019. Appearances: Brett Klein, Esq. for Plaintiff; Joseph Perkins, Esq. and Crystal Peck, Esq. for Defendants; Carl Kempf, Esq., Renss. County Attorney. The Court held a conference to address the status of this matter. The Court first addresses the production of CPS documents. The Court grants the production of CPS documents, but requires that they be subject to a protective order. Defendants advise the Court that the District Attorney does not have the Grand Jury Minutes and are in possession of the County Court. The parties are to make a motion to the County Court for release of the Grand Jury materials. Counsel is permitted to request a Judicial Subpoena for the medical examiner file. Plaintiff requests and extension of the joinder of parties and amendment of pleadings deadline. The Court grants the request and extends the deadline to 8/26/2019. Plaintiff to file a |

Case 23-589, Document 86-1, 04/19/2024, 3604728, Page19 of 178 ndsd.uscourts.gov, NYNSD

# APPENDIX

**17**

| | | |
|---|---|---|
| | | Status Report by 11/22/2019. All other deadlines remain in effect. (TIME: 10:03AM-1038AM). (Court Reporter: Jacqueline Stroffolino) (mab) (Entered: 08/09/2019) |
| 08/09/2019 | 55 | TEXT ORDER. On August 8, 2019, a telephone conference was held with counsel and the Court to discuss outstanding discovery issues and deadlines. With regard to the CPS documents in question, and for the reasons set forth during the conference, the Court grants the parties request for production of those records, but because of their sensitive nature, the Court requires that the records only be provided pursuant to a protective order, and that any subsequent filing of the CPS records in connection with a motion be done, at least preliminarily, under seal. Signed by Magistrate Judge Daniel J. Stewart on 8/9/2019. (Stewart, Daniel) (Entered: 08/09/2019) |
| 08/24/2019 | 56 | AMENDED COMPLAINT against City of Troy, Danielle Coonradt, Ronald Fountain, John and Jane Doe 1-10, Charles McDonald, Rensselaer County, Michael Sikirica, Tim Colaneri, Adam R. Mason, Michael E. Parrow, Joel Abelove, Andra Ackerman filed by Michael Davis-Guider.(Klein, Brett) (Entered: 08/24/2019) |
| 08/30/2019 | 57 | TEXT ORDER: On August 24, 2019, Plaintiff filed an Amended Complaint in this matter. Dkt. No. 56 . Pursuant to Federal Rule of Civil Procedure 15, a party may amend its pleading once as a matter of course within a certain time-frame, either 21 days after serving it or 21 days after the responsive pleading is served. Fed. R. Civ. P. 15(a)(1). Otherwise, a party may only amend its pleading with the opposing party's written consent or the Court's leave. Fed. R. Civ. P. 15(a)(2). In filing the Amended Complaint, Plaintiff did not submit proof that the Defendants consent to the amendment, nor did he seek leave of the Court in accordance with the Local Rules. The Court will address the filing of the Amended Complaint with counsel during a Telephone Conference scheduled for September 4, 2019 at 10:00 AM. Counsel have been previously provided with instructions to connect to the conference call. SO ORDERED by Magistrate Judge Daniel J. Stewart on 8/30/2019. (mab) (Entered: 08/30/2019) |
| 09/04/2019 | 58 | TEXT ORDER. Plaintiff has filed an Amended Complaint on the Court's Docket. Dkt. No. 56. Defense counsel confirmed that they have not consented to the filing of such an Amended Complaint. In light of this fact, it will be necessary for the Plaintiff to file a formal motion to amend. Plaintiff's counsel is granted until October 4, 2019, to file such a motion. Any response to the motion is due on or before October 18, 2019. Plaintiffs counsel is reminded that, pursuant to Local Rule 7.1(a)(4), a red-lined version of the proposed Amended Complaint must be provided to the Court as part of the motion papers. SO ORDERED. Signed by Magistrate Judge Daniel J. Stewart on 9/4/2019. (Stewart, Daniel) (Entered: 09/04/2019) |
| 09/04/2019 | | Text Minute Entry for proceedings held before Magistrate Judge Daniel J. Stewart: Telephone Conference held on 9/4/2019. Appearances: Brett Klein, Esq. for Plaintiff; Joseph Perkins, Esq. and Crystal Peck, Esq. for Defendants. The Court held a conference to address the filing of Plaintiff's Amended Complaint. Atty Klein explains the newly added Defendants and the amendments. Defendants do not consent to the amended pleading. At this time, the Court will not strike the Amended Complaint, however, Plaintiff needs to make the proper Motion for Leave to Amend in accordance with the local rules. Plaintiff to file such motion by 10/4/2019. Defendants to respond to the motion by 10/18/2019. (TIME: 10:11AM-10:23AM). (mab) (Entered: 09/05/2019) |
| 10/04/2019 | 59 | MOTION to Amend/Correct 1 [R] Complaint, filed by Michael Davis-Guider. (Attachments: # 1 Memorandum of Law, # 2 Declaration, # 3 Exhibit(s), # 4 Exhibit(s), # 5 Exhibit(s), # 6 Exhibit(s), # 7 Exhibit(s), # 8 Exhibit(s), # 9 Exhibit(s)) Motions referred to Daniel J. Stewart. (Klein, Brett) (Entered: 10/04/2019) |

| 10/11/2019 | [60](#) | AFFIDAVIT in Opposition re [59](#) MOTION to Amend/Correct [1](#) R Complaint, filed by City of Troy, Danielle Coonradt, Ronald Fountain, Adam R. Mason, Charles McDonald. (Attachments: # [1](#) Memorandum of Law, # [2](#) Certificate of Service) (Perkins, Joseph) (Entered: 10/11/2019) |
| 10/18/2019 | [61](#) | Letter Motion from Crystal R. Peck for Rensselaer County, Michael Sikirica requesting extension to respond to motion submitted to Judge Stewart . (Peck, Crystal) (Entered: 10/18/2019) |
| 10/18/2019 | 62 | TEXT ORDER granting the Rensselaer County Defendants' [61](#) Letter Request seeking an extension of time to file a response to Plaintiff's [59](#) MOTION to Amend the Complaint in this matter. Defendants shall file their response by October 21, 2019. SO ORDERED by Magistrate Judge Daniel J. Stewart on 10/18/2019. (mab) (Entered: 10/18/2019) |
| 10/21/2019 | [63](#) | RESPONSE in Opposition re [59](#) MOTION to Amend/Correct [1](#) R Complaint, filed by Joel Abelove, Andra Ackerman, Rensselaer County, Michael Sikirica. (Attachments: # [1](#) Exhibit(s), # [2](#) Exhibit(s), # [3](#) Exhibit(s), # [4](#) Memorandum of Law)(Rock, Crystal) Modified on 10/24/2019 to list the correct filing attorney. (jmb) (Entered: 10/21/2019) |
| 12/12/2019 | [64](#) | DECISION & ORDER: It is Ordered that Plaintiffs # [59](#) Motion to Amend is GRANTED to the extent that it adds Troy Police Officers Tim Colaneri, Adam Mason, Michael Parrow and former District Attorney Joel Abelove as Defendants to the § 1983 claims of malicious prosecution and denial of a fair trial, as well as the associated conspiracy and failure to intervene claims and it is DENIED in all other respects. Signed by Magistrate Judge Daniel J. Stewart on 12/12/2019. (jmb) (Entered: 12/12/2019) |
| 01/21/2020 | [65](#) | NOTICE by Michael Davis-Guider *(Notice, Consent, and Reference of a Civil Action to a Magistrate Judge)* (Klein, Brett) (Entered: 01/21/2020) |
| 01/22/2020 | [66](#) | *Joint* Letter Motion from Brett H. Klein for Michael Davis-Guider requesting Extension of Time to Complete Discovery and other relief regarding filing of a Second Amended Complaint submitted to Judge Daniel J. Stewart . (Klein, Brett) (Entered: 01/22/2020) |
| 02/05/2020 | [67](#) | NOTICE of Appearance by Rhiannon Ineva Spencer on behalf of City of Troy, Tim Colaneri, Danielle Coonradt, Ronald Fountain, Adam R. Mason, Charles McDonald, Michael E. Parrow (Spencer, Rhiannon) (Entered: 02/05/2020) |
| 02/05/2020 | 68 | TEXT ORDER: On January 22, 2020, Plaintiff filed a Letter Request, with the consent of all parties, seeking an extension of the deadlines in this matter. Dkt. No. [66](#) . The Court is taking this request under advisement and directs counsel to appear for Telephone Conference on February 13, 2020 at 11:00 AM before the undersigned. The Court will issue a separate notice setting forth the instruction to connect to the conference call. SO ORDERED by Magistrate Judge Daniel J. Stewart on 2/5/2020. (mab) (Entered: 02/05/2020) |
| 02/13/2020 | | Text Minute Entry for proceedings held before Magistrate Judge Daniel J. Stewart: Telephone Status Conference held on 2/13/2020. Appearances: Brett Klein, Esq. for Plaintiff; Rhiannon Spencer, Esq. and William Firth, Esq. for Defendants. The Court held a conference to address the status of this matter. After hearing from counsel on the record, the Court grants the request to extend deadlines. Discovery to be completed by 8/28/2020. Dispositive motions to be filed by 11/30/2020. Expert Disclosures due by 11/30/2020. Plaintiff to file a cleaned-up Amended Complaint by 2/28/2020. Counsel to advise by 3/6/2020 as to whether or not they would accept service of the Amended Complaint. Defendants to respond by 3/31/2020. Once all newly added Defendants |

Case 23-589, Document 86, 04/19/2024, 3604728, Page21 of 178

| | | |
|---|---|---|
| | | have appeared in this matter, the parties may sign a revised consent form to submit to the District Court Judge. (TIME: 11:06AM-11:23AM). (Court Reporter: Jacqueline Stroffolino). (mab) (Entered: 02/18/2020) |
| 02/18/2020 | 69 | TEXT ORDER: On February 13, 2020, the Court held a conference with all counsel to address the parties' 66 request to extend the deadlines in this matter. After hearing from all counsel as to the status of the case, the Court grants the request and the Scheduling Order is amended as follows: 1) Plaintiff to file a Second Amended Complaint on consent by February 28, 2020; 2) Counsel to advise as to whether or not they would accept service of the Second Amended Complaint by March 6, 2020; 3) Defendants to respond to the Second Amended Complaint by March 31, 2020; 4) Discovery to be completed by August 28, 2020; 5) Dispositive motions to be filed by November 30, 2020; 6) Expert discovery to be completed by November 30, 2020; and 7) All other provisions and deadlines previously set forth in the Uniform Pretrial Scheduling Order remain in effect. SO ORDERED by Magistrate Judge Daniel J. Stewart on 2/18/2020. (mab) (Entered: 02/18/2020) |
| 02/28/2020 | 70 | AMENDED COMPLAINT *(Second Amended Complaint filed on Consent Per Text Order of Magistrate Judge Stewart on 2/18/20)* against Joel Abelove, City of Troy, Tim Colaneri, Danielle Coonradt, Ronald Fountain, John and Jane Doe 1-10, Adam R. Mason, Charles McDonald, Rensselaer County, Michael Sikirica filed by Michael Davis-Guider. (Attachments: # 1 Proposed Summons, # 2 Proposed Summons, # 3 Proposed Summons)(Klein, Brett) (Entered: 02/28/2020) |
| 03/02/2020 | 71 | Summons Issued as to Adam R. Mason. (Attachments: # 1 Summons issued for Tim Colaneri, # 2 Summons issued for Joel Abelove) (jmb) (Entered: 03/02/2020) |
| 03/03/2020 | | ***Answer deadline set for City of Troy; Danielle Coonradt; Donald Fountain; Charles McDonald; Rensselaer County; and Michael Sikirica to 3/31/2020. (jmb) (Entered: 03/03/2020) |
| 03/03/2020 | 72 | WAIVER OF SERVICE Returned Executed by Joel Abelove. Joel Abelove waiver sent on 3/3/2020, answer due 5/4/2020. (Peck, Crystal) (Entered: 03/03/2020) |
| 03/04/2020 | 73 | WAIVER OF SERVICE Returned Executed by Adam R. Mason. (Spencer, Rhiannon) (Entered: 03/04/2020) |
| 03/04/2020 | 74 | WAIVER OF SERVICE Returned Executed by Tim Colaneri. (Spencer, Rhiannon) (Entered: 03/04/2020) |
| 03/04/2020 | | ***Answer deadline set for Joel Abelove; Tim Colaneri; and Adam R. Mason to 3/31/2020 per Court Order. (jmb) (Entered: 03/04/2020) |
| 03/25/2020 | 75 | *Joint* Letter Motion from Crystal R. Peck for Rensselaer County, Michael Sikirica requesting Plaintiff be allowed to file a third Amended Complaint submitted to Judge Stewart . (Peck, Crystal) (Entered: 03/25/2020) |
| 03/27/2020 | 76 | TEXT ORDER granting the parties' joint 75 Letter Request seeking permission for Plaintiff to file a Third Amended Complaint in this matter. Based upon the reasons set forth in the parties' submission, the request is GRANTED and Plaintiff is permitted to file a Third Amended Complaint by April 1, 2020. Defendants are to file an Answer to the Third Amended Complaint by April 15, 2020. SO ORDERED by Magistrate Judge Daniel J. Stewart on 3/27/2020. (mab) (Entered: 03/27/2020) |
| 04/01/2020 | 77 R | AMENDED COMPLAINT *(THIRD AMENDED COMPLAINT)(filed per the Court's Order dated 3/27/2020)* against Joel Abelove, City of Troy, Tim Colaneri, Danielle Coonradt, Ronald Fountain, Adam R. Mason, Charles McDonald, Rensselaer County, Michael Sikirica filed by Michael Davis-Guider.(Klein, Brett) (Entered: 04/01/2020) |

| 04/06/2020 | | ***Answer due date updated for City of Troy answer due 4/15/2020; Tim Colaneri answer due 4/15/2020; Danielle Coonradt answer due 4/15/2020; Ronald Fountain answer due 4/15/2020; Adam R. Mason answer due 4/15/2020; Charles McDonald answer due 4/15/2020; Rensselaer County answer due 4/15/2020; Michael Sikirica answer due 4/15/2020. (see) (Entered: 04/06/2020) |
|---|---|---|
| 04/14/2020 | 78 R | ANSWER to 77 R Amended Complaint, , CROSSCLAIM *against County of Rensselaer, Michael Sikirica and* against Joel Abelove, COUNTERCLAIM against All Plaintiffs by City of Troy.(Spencer, Rhiannon) (Entered: 04/14/2020) |
| 04/14/2020 | 79 R | ANSWER to 77 R Amended Complaint, , CROSSCLAIM *against County of Rensselaer, Michael Sikirica and* against Joel Abelove, COUNTERCLAIM against All Plaintiffs by Tim Colaneri.(Spencer, Rhiannon) (Entered: 04/14/2020) |
| 04/14/2020 | 80 R | ANSWER to 77 R Amended Complaint, , CROSSCLAIM *against County of Rensselaer, Michael Sikirica and* against Joel Abelove(Individually), COUNTERCLAIM against All Plaintiffs by Danielle Coonradt.(Spencer, Rhiannon) (Entered: 04/14/2020) |
| 04/14/2020 | 81 R | ANSWER to 77 R Amended Complaint, , CROSSCLAIM *against County of Rensselaer, Michael Sikirica and* against Joel Abelove, COUNTERCLAIM against All Plaintiffs by Ronald Fountain.(Spencer, Rhiannon) (Entered: 04/14/2020) |
| 04/14/2020 | 82 R | ANSWER to 77 R Amended Complaint, , CROSSCLAIM *against County of Rensselaer, Michael Sikirica and* against Joel Abelove, COUNTERCLAIM against All Plaintiffs by Adam R. Mason.(Spencer, Rhiannon) (Entered: 04/14/2020) |
| 04/14/2020 | 83 R | ANSWER to 77 R Amended Complaint, , CROSSCLAIM *against County of Rensselaer, Michael Sikirica and* against Joel Abelove, COUNTERCLAIM against All Plaintiffs by Charles McDonald.(Spencer, Rhiannon) (Entered: 04/14/2020) |
| 04/15/2020 | 84 | ANSWER to 77 R Amended Complaint, , COUNTERCLAIM against Michael Davis-Guider by Rensselaer County, Joel Abelove, Michael Sikirica. (Attachments: # 1 Certificate of Service)(Peck, Crystal) (Entered: 04/15/2020) |
| 05/05/2020 | 85 | ANSWER to 78 R Answer to Amended Complaint, Crossclaim, Counterclaim by Michael Davis-Guider.(Klein, Brett) (Entered: 05/05/2020) |
| 05/05/2020 | 86 | ANSWER to 79 R Answer to Amended Complaint, Crossclaim, Counterclaim by Michael Davis-Guider.(Klein, Brett) (Entered: 05/05/2020) |
| 05/05/2020 | 87 | ANSWER to 80 R Answer to Amended Complaint,, Crossclaim,, Counterclaim, by Michael Davis-Guider.(Klein, Brett) (Entered: 05/05/2020) |
| 05/05/2020 | 88 | ANSWER to 81 R Answer to Amended Complaint, Crossclaim, Counterclaim by Michael Davis-Guider.(Klein, Brett) (Entered: 05/05/2020) |
| 05/05/2020 | 89 | ANSWER to 82 R Answer to Amended Complaint, Crossclaim, Counterclaim by Michael Davis-Guider.(Klein, Brett) (Entered: 05/05/2020) |
| 05/05/2020 | 90 | ANSWER to 83 R Answer to Amended Complaint, Crossclaim, Counterclaim by Michael Davis-Guider.(Klein, Brett) (Entered: 05/05/2020) |
| 05/05/2020 | 91 | ANSWER to 84 Answer to Amended Complaint, Counterclaim by Michael Davis-Guider.(Klein, Brett) (Entered: 05/05/2020) |
| 08/13/2020 | 92 | Letter Motion from Crystal R. Peck for Rensselaer County, Michael Sikilaer requesting extension of deadlines submitted to Judge Stewart . (Peck, Crystal) (Entered: 08/13/2020) |

Case 23-589, Document 86, 04/19/2024, 3604728, Page23 of 178

**APPENDIX**

| | | |
|---|---|---|
| 08/14/2020 | 93 | TEXT ORDER: On August 13, 2020, the parties jointly filed a Letter Request seeking an extension of the deadlines in this matter. Dkt. No. 92 . Based upon the consent of the parties, the request is GRANTED and the Scheduling Order is amended as follows: 1) Fact Discovery to be completed by March 1, 2021; 2) Plaintiff to serve expert disclosures by March 1, 2021; 3) Defendants to serve expert disclosures by April 15, 2021; 4) All expert discovery to be completed by June 1, 2021; and 5) Dispositive motions to be filed by July 16, 2021. Counsel are advised that there will be no further extension of the deadlines in this matter. SO ORDERED by Magistrate Judge Daniel J. Stewart on 8/14/2020. (mab) (Entered: 08/14/2020) |
| 10/14/2020 | 94 | STIPULATION *Consent and Reference of a Civil Action to a Magistrate Judge* by Joel Abelove, Rensselaer County, Michael Sikirica submitted to Judge Stewart. (Peck, Crystal) (Entered: 10/14/2020) |
| 10/15/2020 | 95 | CONSENT TO JURISDICTION by US Magistrate Judge filed by Michael Davis-Guider, City of Troy, Ronald Fountain, Danielle Coonradt, Charles McDonald, Tim Colaneri, Adam R. Mason, Rensselaer County, Michael Sikirica and Joel Abelove. Case reassigned to Magistrate Judge Daniel J. Stewart for all further proceedings. Signed and Approved by District Judge Frederick J. Scullin, Jr. (jmb) (Entered: 10/15/2020) |
| 10/15/2020 | 96 | Letter Motion from Crystal R. Peck for Joel Abelove, Rensselaer County, Michael Sikirica requesting signing of Stipulated Protective Order submitted to Judge Stewart . (Attachments: # 1 Proposed Stipulated Protective Order)(Peck, Crystal) (Entered: 10/15/2020) |
| 10/16/2020 | 97 | STIPULATED PROTECTIVE ORDER. Signed by Magistrate Judge Daniel J. Stewart on 10/16/2020. (mab) (Entered: 10/16/2020) |
| 11/18/2020 | 98 | Letter Motion from Brett H. Klein for Michael Davis-Guider requesting That the Court So Order a Subpoena for Production of the Medical Examiner's File on Consent submitted to Judge Daniel J. Stewart . (Attachments: # 1 Exhibit(s) (Proposed Subpoena))(Klein, Brett) (Entered: 11/18/2020) |
| 11/20/2020 | 99 | TEXT ORDER granting 98 Letter Request. Judicial Subpoena issued as to Rensselaer County Medical Examiner's Office. Signed by Magistrate Judge Daniel J. Stewart on 11/18/2020. (dpk) (Entered: 11/20/2020) |
| 03/01/2021 | 100 | *Joint* Letter Motion from Brett H. Klein for Michael Davis-Guider requesting Enlargment of the Current Scheduling Order submitted to Judge Daniel J. Stewart *Submitted On Behalf Of All Parties*. (Klein, Brett) (Entered: 03/01/2021) |
| 03/02/2021 | 101 | TEXT ORDER: On March 1, 2021, the parties filed a Letter Request seeking an extension of the deadlines in this matter. Dkt. No. 100 . The Court is taking this request under advisement and directs counsel to appear for a Discovery Telephone Conference on March 12, 2021 at 10:00 AM before the undersigned. The Court will issue a separate notice setting forth the instructions to connect to the conference call. SO ORDERED by Magistrate Judge Daniel J. Stewart on 3/2/2021. (mab) (Entered: 03/02/2021) |
| 03/12/2021 | | Text Minute Entry for proceedings held before Magistrate Judge Daniel J. Stewart: Discovery Telephone Conference held on 3/12/2021. Appearances: Brett Klein, Esq. for Plaintiff; Crystal Peck, Esq. and Rhiannon Spencer, Esq. for Defendants. The Court held a conference to address the parties' request to extend the deadlines in this matter. The Court hears from counsel as to the status of discovery. After hearing from counsel, the Court reserves on a decision and will issue a Text Order accordingly. (TIME: |

| | | |
|---|---|---|
| | | 10:03AM-10:32AM). (Court Reporter: Jacqueline Stroffolino) (mab) (Entered: 03/17/2021) |
| 03/17/2021 | 102 | TEXT ORDER: On March 12, 2021, the Court held a telephone conference to address the parties' request to extend the deadlines in this matter. Dkt. No. 100 . Based upon the discussions held on the record, the Court amends the Scheduling Order as follows: 1) All fact discovery to be completed by June 1, 2021; 2) Plaintiff to serve expert disclosures by July 15, 2021; 3) Defendant to serve expert disclosures by August 15, 2021; 4) Rebuttals to be served by August 31, 2021; and 5) Any dispositive motion is to be filed by September 30, 2021. There will be no further extensions absent a showing of extraordinary circumstances. SO ORDERED by Magistrate Judge Daniel J. Stewart on 3/17/2021. (mab) (Entered: 03/17/2021) |
| 04/13/2021 | 103 | NOTICE of Appearance by William C. Firth on behalf of Joel Abelove, Rensselaer County, Michael Sikirica (Firth, William) (Entered: 04/13/2021) |
| 06/01/2021 | 104 | *Joint* Letter Motion from Brett H. Klein for Michael Davis-Guider requesting An Enlargement of the Scheduling Order submitted to Judge Daniel J. Stewart . (Klein, Brett) (Entered: 06/01/2021) |
| 06/04/2021 | 105 | TEXT ORDER: On June 1, 2021, Plaintiff filed a Letter Request, with the consent of all parties, seeking a ninety (90) day extension of the deadlines in this matter. The request is granted in part and denied in part. The Court extends the deadlines by forty-five (45) days and amends the Scheduling Order as follows: 1) All fact discovery to be completed by July 16, 2021; 2) Plaintiff to serve expert disclosures by August 30, 2021; 3) Defendants to serve expert disclosures by September 29, 2021; 4) Rebuttals to be served by October 15, 2021; and 5) Any dispositive motion is to be filed by November 15, 2021. Plaintiff is directed to file a Letter Brief outlining any remaining discovery issues by June 11, 2021. Defendants are directed to file a Letter Brief in response to Plaintiff's submission by June 18, 2021. SO ORDERED by Magistrate Judge Daniel J. Stewart on 6/4/2021. (mab) (Entered: 06/04/2021) |
| 07/08/2021 | 106 | ORDER: The Court directs that Defendants' Counsel immediately retrieve from the Court's Courtroom Deputy, Maria Blunt, select personnel files. Signed by Magistrate Judge Daniel J. Stewart on 7/8/2021. (pjh, ) (Entered: 07/08/2021) |
| 07/08/2021 | 107 | *Joint* Letter Motion from Brett H. Klein for Michael Davis-Guider requesting An Enlargement of the Scheduling Order submitted to Judge Daniel J. Stewart *On Behalf of All Parties*. (Klein, Brett) (Entered: 07/08/2021) |
| 07/13/2021 | 108 | TEXT ORDER: On July 8, 2021, Plaintiff filed a Letter Request, with the consent of all parties, seeking an extension of the deadlines in this matter. Dkt. No. 107 . Based upon the reasons set forth in Plaintiff's submission and upon the consent of the parties, the request is GRANTED and the Scheduling Order is amended as follows: 1) All fact discovery to be completed by September 15, 2021; 2) Plaintiff to serve expert disclosures by November 1, 2021; 3) Defendants to serve expert disclosures by November 30, 2021; 4) Rebuttals to be served by December 15, 2021; and 5) Any dispositive motion is to be filed by January 14, 2022. SO ORDERED by Magistrate Judge Daniel J. Stewart on 7/13/2021. (mab) (Entered: 07/13/2021) |
| 08/02/2021 | 109 **R** | ORDER The Court directs that Defendants' Counsel immediately retrieve from the Court's Courtroom Deputy, Maria Blunt, referenced files. Signed by Magistrate Judge Daniel J. Stewart on August 2, 2021. (gmd) (Entered: 08/02/2021) |
| 08/19/2021 | 110 | AFFIDAVIT re 109 **R** Order by City of Troy. (Attachments: # 1 Affidavit)(Spencer, Rhiannon) (Entered: 08/19/2021) |

Case 23-589, Document 86, 04/19/2024, 3604728, Page25 of 178
APPENDIX **23**

| | | |
|---|---|---|
| 09/15/2021 | [111](#) | Letter Motion from Brett H. Klein for Michael Davis-Guider requesting An Enlargement of the Scheduling Order submitted to Judge Daniel J. Stewart . (Klein, Brett) (Entered: 09/15/2021) |
| 09/16/2021 | 112 | TEXT ORDER granting in part and denying in part [111](#) Letter Request. The Parties have jointly requested an extension of all the deadlines in this case. This civil rights action was filed nearly four years ago, and the Court has already granted multiple extensions. *See* Dkt. Nos. 69, 93, 102, 105, & 108. With reluctance, the Court agrees to counsels' request to extend the discovery deadline to November 1, 2021. The request for an extension of the remaining deadlines, including the expert deadline and the motion filing deadline, is DENIED, and those deadlines shall be complied with. SO ORDERED.Signed by Magistrate Judge Daniel J. Stewart on 9/16/2021. (Stewart, Daniel) (Entered: 09/16/2021) |
| 01/03/2022 | [113](#) | Letter Motion from William C. Firth for Joel Abelove, Rensselaer County, Michael Sikirica requesting extension to file dispositive motions submitted to Judge Daniel Stewart . (Firth, William) (Entered: 01/03/2022) |
| 01/06/2022 | 114 | TEXT ORDER granting Defendants' [113](#) Letter Request, filed on consent, seeking an extension of time to file dispositive motions in this matter. Defendants shall file dispositive motions on or before February 4, 2022. Plaintiff to file an opposition to the motions by March 4, 2022. Any reply to the motion shall be filed by March 25, 2022. SO ORDERED by Magistrate Judge Daniel J. Stewart on 1/6/2022. (mab) (Entered: 01/06/2022) |
| 02/04/2022 | [115](#) | MOTION for Summary Judgment filed by Joel Abelove, Rensselaer County, Michael Sikirica. Motion returnable before Judge Stewart. Response to Motion due by 2/25/2022. Reply to Response to Motion due by 3/4/2022 (Attachments: # [1](#) Affidavit, # [2](#) Memorandum of Law, # [3](#) Statement of Material Facts, # [4](#) Exhibit(s), # [5](#) Exhibit(s), # [6](#) Exhibit(s), # [7](#) Exhibit(s), # [8](#) Exhibit(s), # [9](#) Exhibit(s), # [10](#) Exhibit(s), # [11](#) Exhibit(s), # [12](#) Exhibit(s), # [13](#) Exhibit(s), # [14](#) Exhibit(s), # [15](#) Exhibit(s), # [16](#) Exhibit(s), # [17](#) Exhibit(s), # [18](#) Exhibit(s), # [19](#) Certificate of Service) (Firth, William) (Attachment 4 replaced on 2/7/2022) (gmd, ). (Attachment 7 replaced on 2/7/2022) (gmd, ). (Attachment 15 replaced on 2/7/2022) (gmd, ). (Entered: 02/04/2022) |
| 02/04/2022 | [116](#) | First MOTION for Summary Judgment filed by City of Troy, Tim Colaneri, Danielle Coonradt, Ronald Fountain, Adam R. Mason, Charles McDonald. Motion returnable before Judge Stewart. Response to Motion due by 2/25/2022. Reply to Response to Motion due by 3/4/2022 (Attachments: # [1](#) Affidavit with Exhibits, # [2](#) Affidavit with Exhibits, # [3](#) Affidavit with Exhibits, # [4](#) Affidavit, # [5](#) Affidavit, # [6](#) Affidavit, # [7](#) Affirmation with Exhibits, # [8](#) Statement of Material Facts, # [9](#) Memorandum of Law) (Spencer, Rhiannon) (Attachment 1 replaced on 2/7/2022) (gmd, ). (Attachment 7 replaced on 2/7/2022) (gmd, ). (Entered: 02/04/2022) |
| 02/07/2022 | | Set/Reset Deadlines as to # [115](#) MOTION for Summary Judgment and # [116](#) First MOTION for Summary Judgment pursuant to DKT # 114. Motion returnable before Judge Stewart. Response to Motion due by 3/4/2022. Reply to Response to Motion due by 3/25/2022 (gmd, ) (Entered: 02/07/2022) |
| 02/07/2022 | | CLERK'S CORRECTION OF DOCKET ENTRY re [115](#) Motion for Summary Judgment: Clerk replaced attachments 4, 7, and 15 to redact personal identifiers pursuant to L.R.5.2. (gmd, ) (Entered: 02/07/2022) |
| 03/01/2022 | [117](#) | *Consent* Letter Motion from Brett H. Klein for Michael Davis-Guider requesting Enlargement of Summary Judgment Briefing Schedule submitted to Judge Daniel J. Stewart . (Klein, Brett) (Entered: 03/01/2022) |

| 03/07/2022 | 118 | TEXT ORDER granting Plaintiff's 117 Letter Request, filed on consent, seeking an extension of the briefing schedule with regard to Defendants' 116 First MOTION for Summary Judgment in this matter. Plaintiff is to file a response to the motion by April 1, 2022. Defendants are to file their reply to the response on or before April 29, 2022. SO ORDERED by Magistrate Judge Daniel J. Stewart on 3/7/2022. (mab) (Entered: 03/07/2022) |
|---|---|---|
| 03/30/2022 | 119 | *Consent* Letter Motion from Brett H. Klein for Michael Davis-Guider requesting Leave to File a Consolidated 40-Page Brief in Response to the City and County Defendants' Pending Summary Judgment Motions submitted to Judge Daniel J. Stewart . (Klein, Brett) (Entered: 03/30/2022) |
| 03/31/2022 | 120 | TEXT ORDER granting Plaintiff's 119 Letter Request, filed on consent, seeking permission to file a single consolidated brief of up to forty (40) pages in length in response to both pending Motions for Summary Judgment in this matter. SO ORDERED by Magistrate Judge Daniel J. Stewart on 3/31/2022. (mab) (Entered: 03/31/2022) |
| 04/01/2022 | 121 | STATEMENT OF MATERIAL FACTS re 115 MOTION for Summary Judgment filed by Joel Abelove, Rensselaer County, Michael Sikirica. Motion returnable before Judge Stewart. filed by Michael Davis-Guider. (Attachments: # 1 Statement of Material Facts (Plaintiff's Local Rule 56.1 Counter-Statement))(Klein, Brett) (Entered: 04/01/2022) |
| 04/01/2022 | 122 | STATEMENT OF MATERIAL FACTS re 116 First MOTION for Summary Judgment filed by City of Troy, Tim Colaneri, Danielle Coonradt, Ronald Fountain, Adam R. Mason, Charles McDonald. Motion returnable before Judge Stewart. filed by Michael Davis-Guider. (Attachments: # 1 Statement of Material Facts (Plaintiff's Local Rule 56.1 Counter-Statement))(Klein, Brett) (Entered: 04/01/2022) |
| 04/01/2022 | 123 | AFFIDAVIT in Opposition re 116 First MOTION for Summary Judgment filed by City of Troy, Tim Colaneri, Danielle Coonradt, Ronald Fountain, Adam R. Mason, Charles McDonald. Motion returnable before Judge Stewart., 115 MOTION for Summary Judgment filed by Joel Abelove, Rensselaer County, Michael Sikirica. Motion returnable before Judge Stewart. *(Declaration of Brett H. Klein dated April 1, 2022)* filed by Michael Davis-Guider. (Attachments: # 1 Exhibit(s) 1, # 2 Exhibit(s) 2, # 3 Exhibit(s) 3, # 4 Exhibit(s) 4, # 5 Exhibit(s) 5, # 6 Exhibit(s) 6, # 7 Exhibit(s) 7, # 8 Exhibit(s) 8, # 9 Exhibit(s) 9, # 10 Exhibit(s) 10, # 11 Exhibit(s) 11, # 12 Exhibit(s) 12, # 13 Exhibit(s) 13, # 14 Exhibit(s) 14, # 15 Exhibit(s) 15, # 16 Exhibit(s) 16, # 17 Exhibit(s) 17, # 18 Exhibit(s) 18, # 19 Exhibit(s) 19, # 20 Exhibit(s) 20, # 21 Exhibit(s) 21, # 22 Exhibit(s) 22, # 23 Exhibit(s) 23, # 24 Exhibit(s) 24, # 25 Exhibit(s) 25, # 26 Exhibit(s) 26, # 27 Exhibit(s) 27, # 28 Exhibit(s) 28, # 29 Exhibit(s) 29, # 30 Exhibit(s) 30, # 31 Exhibit(s) 31, # 32 Exhibit(s) 32, # 33 Exhibit(s) 33, # 34 Exhibit(s) 34, # 35 Exhibit(s) 35, # 36 Exhibit(s) 36, # 37 Exhibit(s) 37, # 38 Exhibit(s) 38, # 39 Exhibit(s) 39)(Klein, Brett) (Additional attachment(s) added on 4/5/2022: # 40 Redacted Exhibit 9, # 41 Redacted Exhibit 15, # 42 redacted exhibit 21) (gmd, ). (Entered: 04/01/2022) |
| 04/01/2022 | 124 | AFFIDAVIT in Opposition re 116 First MOTION for Summary Judgment filed by City of Troy, Tim Colaneri, Danielle Coonradt, Ronald Fountain, Adam R. Mason, Charles McDonald. Motion returnable before Judge Stewart., 115 MOTION for Summary Judgment filed by Joel Abelove, Rensselaer County, Michael Sikirica. Motion returnable before Judge Stewart. *(Declaration of Katherine F. Maloney, M.D.)* filed by Michael Davis-Guider. (Attachments: # 1 Exhibit(s) 1, # 2 Exhibit(s) 2)(Klein, Brett) (Entered: 04/01/2022) |

| 04/01/2022 | 125 R | MEMORANDUM OF LAW re 116 Motion for Summary Judgment,, 115 Motion for Summary Judgment,,, *(Plaintiff's Memorandum of Law in Opposition to the City and County Defendants' Motions for Summary Judgment)* filed by Michael Davis-Guider. (Klein, Brett) (Entered: 04/01/2022) |
|---|---|---|
| 04/04/2022 | | TEXT NOTICE OF FILING DEFICIENCY regarding the the Dkt. # 123 Affidavit in Opposition to Motion, **NOTICE IS HEREBY GIVEN** of the following Filing Deficiency: Counsel has submitted documents that are not in compliance with redaction requirements pursuant to Federal and NYND Local Rules 5.2 Personal Privacy Protection and General Order 22, Section 11.2. Docket 123 attachment 9, pages 6, 30, 46, and 62 contain the unredacted minors name. Docket 123 attachment 15 page 33 and Docket 123 attachment 21 page 12 also contain the unredacted minors name. This document has been TEMPORARILY RESTRICTED. Counsel is directed to make the appropriate redactions to the above referenced document and electronically file the redacted document within 3 days of this notice in **SHELL CASE # 00-DC-55555 using the event CORRECTED DOCUMENT(S).** Failure to file a redacted document by the deadline will result in the unredacted document referenced above being unrestricted. Counsel and the parties are cautioned that failure to redact these personal identifiers may subject them to the Courts full disciplinary power pursuant to NYND Local Rule 5.2.<br><br>Notice of Filing Deficiency Deadline 4/6/2022 (gmd, ) (Entered: 04/04/2022) |
| 04/05/2022 | | CLERK'S CORRECTION OF DOCKET ENTRY re Text Notice of Filing Deficiency 123 Affidavit in Opposition to Motion; Redacted copies of attachments # 9 Exhibit 9, # 15 Exhibit 15, and # 21 Exhibit 21 have been uploaded and attached to Docket # 123 . The unredacted copies of Exhibits 9, 15 and 21 are now permanently restricted pursuant to Fed. R. Civ. P. Rule 5.2 and NYND Local Rule 5.2. (gmd, ) (Entered: 04/05/2022) |
| 04/26/2022 | 126 | Letter Motion from William C. Firth for Joel Abelove, Rensselaer County, Michael Sikirica requesting Extension to file reply papers submitted to Judge Daniel Stewart . (Firth, William) (Entered: 04/26/2022) |
| 04/27/2022 | 127 | TEXT ORDER granting Defendants' 126 Letter Request, filed on consent, seeking an extension of time to file a reply to the response to the pending motions for summary judgment in this matter. All Defendants are to file their reply on or before May 13, 2022. SO ORDERED by Magistrate Judge Daniel J. Stewart on 4/27/2022. (mab) (Entered: 04/27/2022) |
| 05/11/2022 | 128 | STIPULATION of Dismissal *of Joel Abelove and Adam R. Mason, only* by Adam R. Mason submitted to Judge Stewart. (Spencer, Rhiannon) (Entered: 05/11/2022) |
| 05/12/2022 | 129 | REPLY to Response to Motion re 115 MOTION for Summary Judgment filed by Joel Abelove, Rensselaer County, Michael Sikirica. Motion returnable before Judge Stewart. filed by Joel Abelove, Rensselaer County, Michael Sikirica. (Attachments: # 1 Response to Plaintiff's Counter-Statement of Material Facts)(Firth, William) (Entered: 05/12/2022) |
| 05/13/2022 | 130 | REPLY to Response to Motion re 116 First MOTION for Summary Judgment filed by City of Troy, Tim Colaneri, Danielle Coonradt, Ronald Fountain, Adam R. Mason, Charles McDonald. Motion returnable before Judge Stewart. filed by City of Troy, Tim Colaneri, Danielle Coonradt, Ronald Fountain, Adam R. Mason, Charles McDonald. (Attachments: # 1 Declaration, # 2 Exhibit(s), # 3 Exhibit(s), # 4 Exhibit(s), # 5 Statement of Material Facts Reply to Plaintiff's)(Spencer, Rhiannon) (Entered: 05/13/2022) |

| 05/18/2022 | 131 | STIPULATION and ORDER OF PARTIAL DISMISSAL as to Defendants Joel Abelove and Adam R. Mason only. Signed by Magistrate Judge Daniel J. Stewart on 5/18/2022. (mab) (Entered: 05/18/2022) |
|---|---|---|
| 09/29/2022 | 132 | TEXT ORDER STAYING CASE. This matter is stayed pending further briefing or the scheduling of oral argument on the pending motions. Signed by Magistrate Judge Daniel J. Stewart on 9/29/2022. (gjr) (Entered: 09/29/2022) |
| 11/07/2022 | 133 | TEXT ORDER: The STAY previously issued in this matter is lifted. Oral Argument on the pending Motions for Summary Judgment is set for December 5, 2022 at 11:00 AM before the undersigned. Counsel are directed to appear IN-PERSON at the James T. Foley US Courthouse, 445 Broadway, 4th Floor, Courtroom No. 2, Albany, NY on the scheduled date and time. SO ORDERED by Magistrate Judge Daniel J. Stewart on 11/7/2022. (mab) (Entered: 11/07/2022) |
| 12/05/2022 | | Text Minute Entry for proceedings held before Magistrate Judge Daniel J. Stewart: Oral Argument held on 12/5/2022. Appearances: Brett Klein, Esq. for Plaintiff; Rhiannon Gifford, Esq., Michael Ginsberg, Esq. and William Firth, Esq. for Defendants. The Court heard oral argument from counsel with regard to Defendants' pending Motions for Summary Judgment. The Court reserves on a decision. A written order will be issued in due course. (TIME: 12:11PM-12:41PM) (Court Reporter: Lisa Tennyson). (mab) (Entered: 12/07/2022) |
| 03/29/2023 | 134 R | MEMORANDUM-DECISION AND ORDER: It is hereby ORDERED, that the Motions for Summary Judgment (Dkt. Nos. 115 & 116 ) are GRANTED; and it is further ORDERED, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order upon the parties to this action. Signed by U.S. Magistrate Judge Daniel J. Stewart on 3/29/2023. (map) (Entered: 03/29/2023) |
| 03/29/2023 | 135 | JUDGMENT in favor of Defendants City of Troy, Rensselaer County, Charles McDonald, Danielle Coonradt, Michael Sikirica, Ronald Fountain, Tim Colaneri against Plaintiff Michael Davis-Guider. Motions for Summary Judgment (Dkt. Nos. 115 & 116 ) are GRANTED. Judgment is hereby entered. (map) (Entered: 03/29/2023) |
| 04/28/2023 | 136 | NOTICE OF APPEAL as to 135 Judgment, 134 R Order on Motion for Summary Judgment,,, by Michael Davis-Guider. Filing fee $ 505, receipt number ANYNDC-6279129. (Klein, Brett) (Entered: 04/28/2023) |
| 05/01/2023 | 137 | ELECTRONIC NOTICE AND CERTIFICATION sent to US Court of Appeals regarding the # 136 Notice of Appeal. (jmb) (Entered: 05/01/2023) |
| 05/12/2023 | | USCA Case Number 23-589 for 136 Notice of Appeal filed by Michael Davis-Guider. (nas ) (Entered: 05/12/2023) |
| 06/05/2023 | 138 | TRANSCRIPT REQUEST by Michael Davis-Guider for proceedings held on December 5, 2022 before Judge Daniel J. Stewart.. (Klein, Brett) (Entered: 06/05/2023) |
| 07/13/2023 | 139 | TRANSCRIPT of Proceedings: Oral Argument held on December 5, 2022, before Judge Daniel J. Stewart, Court Reporter: Lisa L. Tennyson, Telephone number: (518) 257-1823. IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS: In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court |

Case 23-589, Document 86, 04/19/2024, 3604728, Page29 of 178

# APPENDIX

**27**

public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/3/2023. Redacted Transcript Deadline set for 8/14/2023. Release of Transcript Restriction set for 10/11/2023. Notice of Intent to Redact due by 7/18/2023 (lt, ) (Entered: 07/13/2023)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/04/2023 16:38:13 | | | |
| **PACER Login:** | jbmarcus | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:17-cv-01290-DJS |
| **Billable Pages:** | 25 | **Cost:** | 2.50 |

**APPENDIX**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MICHAEL DAVIS-GUIDER,

            Plaintiff,

   -against-

       **ATTORNEY AFFIDAVIT**
       Civil Case No.: 1:17-cv-01290
       (FJS/DJS)

CITY OF TROY, RONALD FOUNTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES
MCDONALD, Individually, TIM COLANERI, Individually,
ADAM R. MASON, Individually, RENSSELAER COUNTY,
MICHAEL SIKIRICA, Individually, and JOEL ABELOVE,
Individually,

            Defendants.

STATE OF NEW YORK   )
                   )s.s.:
COUNTY OF ALBANY    )

**WILLIAM C. FIRTH, ESQ.**, being duly sworn, deposes and says:

    1.    I am a member of the law firm of Bailey, Kelleher and Johnson, P.C.,

attorneys for Defendants Rensselaer County, Michael Sikirica, and Joel Abelove

(collectively "County" or "County defendants"). As such, I am fully familiar with the facts

and circumstances set forth herein by way of my review of the file maintained by this

office.

    2.    I submit this affidavit in support of the County's motion for summary

judgment—pursuant to Rule 56 of the Federal Rules of Civil Procedure—seeking

dismissal of the third amended complaint filed by Plaintiff Michael Davis-Guider

("Davis") in its entirety, as a matter of law.

    3.    The following exhibits are annexed to the accompanying statement of

material facts in support of the County's Rule 56 motion:

# APPENDIX

**Exhibit "A"**: Transcript of testimony provided by Davis at General Municipal Law § 50-h hearing on March 30, 2017;

**Exhibit "B"**: Davis's third amended complaint;

**Exhibit "C"**: County defendants' answer to third amended complaint;

**Exhibit "D"**: Transcript of testimony provided by Davis at deposition on May 19, 2021;

**Exhibit "E"**: Transcript of testimony provided by Joel Abelove at deposition on May 28, 2021;

**Exhibit "F"**: Transcript of testimony provided by Dr. Michael Sikirica at deposition on May 24, 2021;

**Exhibit "G"**: Transcript of testimony provided by Ronald Fountain at deposition on May 21, 2021;

**Exhibit "H"**: Transcript of testimony provided by Charles McDonald at deposition on May 26, 2021;

**Exhibit "I"**: Transcript of testimony provided by Timothy Colaneri at deposition on May 26, 2021;

**Exhibit "J"**: Transcript of testimony provided by Adam Mason at deposition on May 21, 2021;

**Exhibit "K"**: Transcript of testimony provided by Danielle Coonradt at deposition on May 28, 2021;

**Exhibit "L"**: Final autopsy report issued by Dr. Sikirica on August 14, 2015;

**Exhibit "M"**: Transcript of testimony provided by Dr. Sikirica at Davis's criminal trial on August 22, 2016;

**Exhibit "N"**: Transcript of testimony provided by Dr. Sikirica to the grand jury on September 29, 2015; and

**Exhibit "O"**: Indictment accusing Davis of manslaughter in the first degree.

**W H E R E F O R E**, Defendants Rensselaer County, Michael Sikirica, and Joel Abelove respectfully request that the Court issue an order, pursuant to Rule 56 of the Federal Rules of Civil Procedure, granting their motion for summary judgment and dismissing plaintiff's third amended complaint in its entirety, together with such other, further, and different relief as the Court deems just and proper.

William C. Firth
Bar Roll No.: 513832

Sworn to before me this
4th day of February, 2022.

Notary Public - State of New York

MAUREEN FOO VANNATTEN
Notary Public, State of New York
No. 01FO6293246
Qualified in Schenectady County
Commission Expires 12/09/20

3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MICHAEL DAVIS-GUIDER,

                                                    **STATEMENT OF**
                                                    **MATERIAL FACTS**
                              Plaintiff,              Civil Case No.: 1:17-cv-01290
                                                     (FJS/DJS)

        -against-

CITY OF TROY, RONALD FOUNTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES
MCDONALD, Individually, TIM COLANERI, Individually,
ADAM R. MASON, Individually, RENSSELAER COUNTY,
MICHAEL SIKIRICA, Individually, and JOEL ABELOVE,
Individually,

                              Defendants.

_____

        Pursuant to Local Rule 7.1(a)(3) of the United States District Court for the Northern

District of New York, Defendants RENSSELAER COUNTY, MICHAEL SIKIRICA, and

JOEL ABELOVE (collectively, "County defendants"), by and through their attorneys,

Bailey, Johnson & Peck, P.C., hereby submit the following statement of material facts, as

to which they contend there is no genuine issue to be tried:

*i.*     *Background*

        1.      Plaintiff Michael Davis-Guider ("Davis") alleges in his first cause of action—

brought pursuant to 42 U.S.C. § 1983—that Defendants Ronald Fountain ("Fountain"),

Danielle Coonradt ("Coonradt"), Charles McDonald ("McDonald"), and Michael Sikirica

("Dr. Sikirica") subjected him to false arrest/unlawful imprisonment. *Exhibit "B," ¶¶ 65-66*.

        2.      Davis's second cause of action asserts a Section 1983 claim for malicious

prosecution against all individually named defendants. *Exhibit "B," ¶¶ 68-75*.

# APPENDIX

3.　　In his third cause of action, also pursuant to Section 1983, Davis asserts that his right to a fair trial was violated by all individually named defendants. *Exhibit "B," ¶¶ 78-80*.

4.　　Davis's fourth cause of action sets forth a Section 1983 claim for failure to intervene against Defendants Joel Abelove ("Abelove"), Timothy Colaneri ("Colaneri"), Adam Mason ("Mason"), Fountain, Coonradt, and McDonald. *Exhibit "B," ¶¶ 83-85*.

5.　　Davis's fifth cause of action sets forth a Section 1983 and 1985 conspiracy claim against all individually named defendants. *Exhibit "B," ¶¶ 88-89*.

6.　　Davis's sixth cause of action is brought pursuant to Section 1983 for municipal liability as against City of Troy. *Exhibit "B," ¶¶ 92-102*.

7.　　Davis's seventh cause of action is brought pursuant to Section 1983 for municipal liability as against County of Rensselaer. *Exhibit "B," ¶¶ 105-112*.

8.　　Finally, in his eighth cause of action, Davis alleges a pendent state-law claim for malicious prosecution against Fountain, Coonradt, McDonald, Dr. Sikirica, City of Troy, and County of Rensselaer. *Exhibit "B," ¶¶ 121-23*.

9.　　Davis and his then-girlfriend, Rebecca Parker, were living together at 856 ████th ██████████ █████ in Lansingburgh on February 26, 2015. *Exhibit "A," p. 23*.

10.　　Ms. Parker's daughter, V.D., who at the time was about two-and-a-half years old, also lived with them. *Exhibit "A," p. 19; exhibit "D," pp. 40-41*.

11.　　Davis's cousin was the father of V.D. *Exhibit "D," p. 41*.

*ii.　　Incident and incident scene*

12.　　That morning—February 26, 2015—V.D. awoke around 7:00 a.m., at which time Parker was dressed and ready to leave for work. *Exhibit "D," pp. 55-56*.

13.     Davis was not employed at that time, and accordingly, stayed home to care for V.D. *Exhibit "D," p. 41*.

14.     After V.D. was awake, Davis noticed that she had soiled her diaper, and after changing it, he took her back to bed. *Exhibit "D," pp. 56-57*.

15.     Davis then turned on a movie, and fell asleep. *Exhibit "D," p. 57*.

16.     When Davis woke up, he called to V.D. to let her know her breakfast was ready, but she did not respond. *Exhibit "A," p. 38; exhibit "D," p. 60*.

17.     Davis then went to her bedroom, called to her again, and observed her lying in her bed; she was not moving and did not respond. *Exhibit "A," p. 38; exhibit "D," p. 60*.

18.     While V.D. was still lying in her bed, Davis claims that he attempted to perform CPR twice. *Exhibit "A," p. 38; exhibit "D," pp. 61-62*.

19.     He claims that he pushed down on her chest area very lightly with one hand, breathed into her mouth, and also pushed on her stomach, but "put no pressure on her at all because [he] was very nervous and scared." *Exhibit "D," pp. 61-62*.

20.     As his resuscitation efforts were not successful, he claims that he then removed V.D. from her bed, brought her into the living room, placed her on a futon, and tried CPR one more time. *Exhibit "D," pp. 61, 65*.

21.     Davis claims that after trying CPR while V.D. was on the futon, he attempted to call 911, but two cell phones accessible to him in the house were "extremely dead"; there was no landline. *Exhibit "D," pp. 61, 65-66*.

22.     Accordingly, Davis ran across the street to a neighbor's house in an effort to find help, but no one was home. *Exhibit "D," p. 62*.

3

23.     Davis then ran back to his house to check the status of V.D., which had not changed; he did not attempt CPR again. *Exhibit "D," pp. 62, 66-67*.

24.     Davis then ran out of the house again, this time to a pizza shop across the street, where he called 911 from a patron's phone. *Exhibit "D," pp. 62, 67*.

25.     After calling 911, he ran back to his house, where he encountered Parker who had returned from work. *Exhibit "D," p. 69*.

26.     Parker entered the house, observed V.D., and then called 911, but EMTs or paramedics were already coming into the house. *Exhibit "D," pp. 69-70*.

27.     Davis was inside while medical personnel performed CPR on V.D. *Exhibit "D," p. 70-71*.

28.     Coonradt of the Troy Police Department ("TPD") was the first patrol officer to arrive; two additional patrol officers arrived next: Fountain and McDonald, who were partners. *Exhibit "G," pp. 34-35*; e*xhibit "K," pp. 9, 15*.

29.     Coonradt controlled the scene per her supervisor's instruction, while awaiting a search warrant. *Exhibit "K," p. 18*.

30.     Coonradt also contacted CPS, prepared a mandatory CPS form, and started a crime-scene log; she had no further involvement that day. *Exhibit "K," pp. 18-19*.

31.     Detective-sergeant Colaneri of the TPD also responded to the scene that day after talking with Parker, V.D.'s mother, at the hospital. *Exhibit "I," pp. 14, 19, 23-24*.

32.     After being briefed by officers at the scene, Colaneri canvassed the neighborhood to talk with any potential witnesses to anything related to the incident; he interviewed four or five people. *Exhibit "I," pp. 19-20*.

33.     First responders eventually placed V.D. in an ambulance; Davis did not accompany her to the hospital, and he did not know which hospital she was being transported to. *Exhibit "D," pp. 77, 90*.

34.     Unfortunately, V.D. passed away that day. *Exhibit "F," p. 25*.

*iii.     Police questioning and investigation*

35.     Davis accompanied Patrolmen Fountain and McDonald that day to the TPD from the scene, per their request. *Exhibit "D," p. 81; exhibit "H," p. 28*.

36.     Davis was not in custody, and was free to leave. *Exhibit "I," p. 29; exhibit "G," p. 47*.

37.     Davis was interviewed by Fountain and McDonald in Fountain's office; Fountain directed the course of the interview. *Exhibit "G," pp. 36, 63*.

38.     Fountain was the lead detective in terms of the overall investigation into the death of V.D. *Exhibit "G," pp. 39-40*.

39.     Colaneri recorded part of the interview using his cell phone, as there were no other cameras in the room. *Exhibit "I," pp. 24-25*.

40.     Davis returned home after the interview, and officers questioned him again at his house the following day. *Exhibit "D," pp. 90-91*.

41.     Davis returned to the station voluntarily for further questioning on March 2, 2015. *Exhibit "D," pp. 86, 89; exhibit "G," p. 60*.

42.     Fountain obtained supporting depositions from fire-department employees who performed CPR on V.D., and was aware of the number of chest compressions applied. *Exhibit "G," pp. 79-80*.

# APPENDIX

43.     Dr. Sikirica, the medical examiner for Rensselaer County, attended a meeting with Fountain, Colaneri, Mason, Sergeant Parrow, and Andra Ackerman on March 12, 2015. *Exhibit "J," p. 40*.

44.     Dr. Sikirica attended the March 12, 2015 meeting only to provide medical information and expertise; he was not involved in determining potential charges to be brought. *Exhibit "J," pp. 43-44*.

45.     At that meeting, Dr. Sikirica advised that V.D.'s injuries could not have been caused by CPR. *Exhibit "J," pp. 49-50*.

*iv.*    <u>*Autopsy*</u>

46.     Dr. Sikirica is a forensic pathologist and neuropathologist, and has been practicing as such since the early 1990s, having performed over 10,000 autopsies. *Exhibit "F," pp. 19, 110*.

47.     Dr. Sikirica performed the autopsy of V.D. on February 27, 2015 at Albany Medical Center. *Exhibit "F," pp. 10, 36*.

48.     Assistant District Attorney Andra Ackerman attended the autopsy, as well as McDonald, Fountain, Colaneri, and evidence-technician Buttafuoco. *Exhibit "F," pp. 20, 120*.

49.     There are no guidelines, rules, or best practices governing law-enforcement attendance at autopsies; sometimes they attend, sometimes they do not. *Exhibit "F," p. 21*.

50.     It is not uncommon in childhood death cases for police to attend autopsies; they are there to offer information about the case. *Exhibit "F," pp. 38, 87, 153*.

51.     In fact, Colaneri has attended over 200 autopsies during the span of his career, and attends most autopsies on cases that he is investigating. *Exhibit "I," pp. 30-31*.

52.     It would also have been customary for Andra Ackerman to have been present for the autopsy, given that V.D. was a toddler. *Exhibit "I," p. 32.*

53.     As a part of the autopsy, Dr. Sikirica performed a microscopic examination of the tissues obtained. *Exhibit "F," p. 7*.

54.     As part of the autopsy, and in addition to the physical dissection and full workup, he also: (1) conducted a metabolic screening to rule out an inherited disease otherwise undetectable; (2) did a full skeletal survey; (3) obtained blood and viral cultures; (4) performed toxicology testing; and (5) reviewed records from V.D.'s pediatrician *Exhibit "F," pp. 36, 81, 118, 121; exhibit "L."*

55.     Before she died, V.D. was a healthy, normally developed toddler with no prior symptoms. *Exhibit "F," pp. 82, 121; exhibit "A," pp. 33-34*.

56.     To a reasonable degree of medical certainty, there was no evidence of any sickness or illness on autopsy. *Exhibit "N," p. 31*.

57.     Dr. Sikirica was familiar with literature on CPR-related trauma as of the date of V.D.'s autopsy. *Exhibit "F," p. 57*.

58.     At the time that he conducted the autopsy, Dr. Sikirica was aware that V.D. received CPR at the scene and during transport to the hospital, and that CPR had been performed over a long period. *Exhibit "F," p. 54*.

59.     Dr. Sikirica was aware that CPR in children can last a considerable amount of time, and sometimes rib fractures cannot be avoided. *Exhibit "F," p. 58*.

7

60.     At time he issued his report, Dr. Sikirica was aware that there were thousands of chest compressions done by EMTs before V.D. arrived at the hospital. *Exhibit "F," pp. 55, 57*.

61.     The application of thousands of chest compressions is very common in children. *Exhibit "F," pp. 71-72, 75-76*.

62.     Dr. Sikirica has personally observed ruptured livers attributed to placement of the hands or compressions that are too vigorously applied. *Exhibit "F," pp. 60-61*.

63.     But, ruptured livers are associated with fractures to the anterior chest wall and the sternum, most of which involve calcified bones in older adults. *Exhibit "F," p. 61*.

64.     V.D. did not sustain fractures to the anterior chest wall or sternum, but rather to the posterior aspects of the ninth and tenth ribs. *Exhibit "F," p. 60*.

65.     In the case of V.D., her fractures were to the *back* of the ribs, not the costal portions of the rib. *Exhibit "F," p. 63*.

66.     The injuries to her ribs were antemortem—conclusively or to a reasonable degree of medical certainty—and were caused by blunt-force trauma. *Exhibit "F," pp. 33, 125, 132*.

67.     Dr. Sikirica opined that CPR performed by EMTs on V.D. inside the home on the futon for 16 minutes did not contribute to her rib factures. *Exhibit "F," p. 64*.

68.     Even with improperly performed CPR, V.D.'s injuries are beyond what would be expected in any CPR situation; these were blunt force, severe, compressive injuries to the abdomen. *Exhibit "F," pp. 73-74, 100.*

69.     Also, on autopsy, V.D. exhibited massive abdominal hemorrhaging, which was caused by five lacerations to her liver. *Exhibit "F," p. 65*.

70. The lacerations were observed before the liver was removed during the autopsy. *Exhibit "F," p. 113*.

71. V.D.'s fractured ribs did not lacerate her liver. *Exhibit "F," pp. 91-93*.

72. The autopsy report does not indicate that V.D.'s fractured ribs lacerated her liver. *Exhibit "L."*

73. 40 percent of V.D.'s overall blood volume had leaked into her abdominal cavity. *Exhibit "M," p. 11*.

74. Dr. Sikirica testified before the grand jury that 40 percent of V.D.'s overall blood volume had leaked into her abdominal cavity. *Exhibit "N," p. 24*.

75. The liver lacerations were extremely severe, and would have bled profusely because they were very large and a portion of the liver had actually been torn away. *Exhibit "F," pp. 66, 79, 100*.

76. Dr. Sikirica did not note in his autopsy report that some of V.D.'s abdominal bleeding may have been from CPR, as that would be an assumption, and he reports what he observes; the majority of the blood came from the severely lacerated liver, independent of CPR. *Exhibit "F," pp. 77, 91, 100*.

77. Dr. Sikirica opined that the liver lacerations were most consistent with force applied to V.D.'s abdomen and the back simultaneously, similar to what Davis portrayed in the video of his questioning by Fountain and McDonald. *Exhibit "F," p. 65*.

78. He linked the pattern of injuries to be most consistent—"the far most consistent"—with what Davis demonstrated doing to V.D. on the police video, which Dr. Sikirica viewed outside of police presence after he had performed the autopsy. *Exhibit "F," pp. 84, 88-89*.

79.     In his autopsy report, the notation that V.D. exhibited "severe compressive injury to liver" was not based upon anything he learned from the police; they had not imparted any information bearing on that injury at that point. *Exhibit "F," p. 117*.

80.     Had Dr. Sikirica not seen the video of Fountain's interview—wherein Davis portrayed squeezing V.D.—he still would have opined that the severe compressive injury to her liver occurred due to compression of her abdominal cavity. *Exhibit "F," pp. 98, 117*.

81.     As of the conclusion of the autopsy, Dr. Sikirica pended V.D.'s cause of death while awaiting further review and analysis, and issuance of the final report. *Exhibit "F," p. 37*.

82.     He ultimately concluded that V.D.'s cause of death was hypovolemic shock due to multiple lacerations of the liver with right rib fractures due to blunt-force trauma. *Exhibit "L," p. 1*.

83.     There was no other possible cause of death in Dr. Sikirica's mind, given the extent of liver tearing and amount of blood in the abdominal cavity. *Exhibit "F," pp. 117-18*.

84.     Her injuries were not CPR-related injuries; instead, they were caused by blunt-force compression to the abdomen which does not qualify as CPR; they were "vastly more severe than anything [Dr. Sikirica has] seen in CPR." *Exhibit "F," pp. 102, 132*.

85.     V.D.'s injuries could not have been the result of CPR, which Dr. Sikirica expressed to the grand jury. *Exhibit "N," p. 34*.

86.     On autopsy, to a reasonable degree of medical certainty, there was no evidence of any sickness or illness on the part of V.D. *Exhibit "N," p. 31*.

10

87.     Dr. Sikirica testified before the grand jury that, to a reasonable degree of medical certainty, there was no evidence of any sickness or illness on the part of V.D. *Exhibit "N," p. 31*.

88.     Dr. Sikirica ruled out any natural cause of death before issuing his final autopsy report. *Exhibit "N," p. 32*.

89.     Dr. Sikirica testified before the grand jury that he ruled out any natural cause of death before issuing his final autopsy report. *Exhibit "N," p. 32*.

90.     V.D.'s fractured ribs—even if caused through CPR, which they were not—could not have caused the subject damage to her liver. *Exhibit "N," p. 29*.

91.     Dr. Sikirica testified before the grand jury that V.D.'s fractured ribs could not have caused the subject damage to her liver. *Exhibit "N," p. 29*.

92.     The trauma to V.D.'s interior organs could not have been caused by accident. *Exhibit "N," p. 33*.

93.     Dr. Sikirica testified before the grand jury that the trauma to V.D.'s interior organs could not have been caused by accident. *Exhibit "N," p. 33*.

94.     Ultimately, V.D. lost consciousness due to bleeding into her abdominal cavity from the liver lacerations; there was no other explanation. *Exhibit "N," p. 37; exhibit "F," p. 127*.

95.     Dr. Sikirica concluded that V.D.'s cause of death was severe liver lacerations beyond the scope of cardiopulmonary resuscitation. *Exhibit "F," p. 71*.

96.     Dr. Sikirica testified that "it's very, very highly unlikely that [V.D.] had died from a natural event before this series of events." *Exhibit "F," p. 82*.

11

97.     He has seen articles on hemorrhage from hepatic lacerations after CPR; none changed or impacted his review of the V.D. case. *Exhibit "F, pp. 23-24*.

98.     In fact, there is a Wake Forest University paper that supports his opinions in this case, which was published in 2010. *Exhibit "F," p. 24*.

99.     That study revealed that close to 400 children who underwent CPR had no significant injuries; injuries, if any, were only to the airway around the mouth, with no deaths, and no major liver lacerations. *Exhibit "F," p. 24*.

100.     In the case of V.D., her liver lacerations "went way beyond anything described in the literature or in [Dr. Sikirica's] experience. [He has] never seen more than one laceration of the liver with any person suffering from CPR, and [he's] never seen lacerations over the top of the liver like that. These were a question of quantity. The quantity of the lacerations, the five of them, are way beyond what would be expected in any kind of CPR situation." *Exhibit "F," p. 66*.

101.     Indeed, Dr. Sikirica had never encountered anything like V.D.'s liver lacerations at any time in his career, and in his performance of over 10,000 autopsies. *Exhibit "F," p. 72.*

102.     Dr. Sikirica classified the manner of death as homicide. *Exhibit "L," p. 1; exhibit "F," p. 33*.

103.     Dr. Sikirica worked in cooperation with TPD and Rensselaer County District Attorney's Office ("DA's office") in this case, which is an expected standard and customary practice. *Exhibit "F," pp. 140, 153*.

104.     Dr. Sikirica factored in information that was conveyed to him by law enforcement—in accord with County Law § 674—but only information that he deemed

relevant; he has to rely on law enforcement for information that he does not have access to. *Exhibit "F," pp. 153-55*.

105.    TPD did not influence Dr. Sikirica's autopsy report in any way, and they did not attempt to exert undue influence on his medical determinations; certainly, no one told him to rule V.D.'s death a homicide. *Exhibit "F," pp. 89, 154-55*.

106.    As of the date of the autopsy, law enforcement did not advise Dr. Sikirica that the death was suspicious or rose to the level of criminality. *Exhibit "F," p. 38*.

107.    Dr. Sikirica was not aware, at any time before issuing his autopsy report, that Fountain had been indicted. *Exhibit "F," p. 95*.

108.    If he were preparing the report today, Dr. Sikirica would not include any additional information. *Exhibit "F," p. 115*.

109.    Dr. Sikirica did not send out a "draft" autopsy report to TPD; his reports are submitted to the health department. *Exhibit "F," p. 151*.

*v.*    *Post-autopsy events*

110.    After the autopsy report was issued, Fountain interviewed Davis a third time on September 9, 2015. *Exhibit "G," pp. 75-76*.

111.    Fountain met with an assistant district attorney on a few occasions before trial to discuss the case and prepare for trial. *Exhibit "G," p. 94*.

112.    Fountain did not express a concern to the assistant district attorney about whether criminality existed in this case. *Exhibit "G," pp. 95-96*.

113.    Abelove served as the district attorney for Rensselaer County during the investigation and through completion of Davis's criminal trial. *Exhibit "E," p. 6*.

114.   Andra Ackerman is the former assistant district attorney who was assigned as the liaison between the DA's office and TPD. *Exhibit "E," p. 30*.

115.   The role of the DA's office in this case was advisory in nature; it did not direct TPD in terms of how to conduct its investigation. *Exhibit "E," p. 33*.

116.   Sometimes the DA's office will make suggestions to TPD if officers request assistance, such as preparing search-warrant applications, preparing and issuing subpoenas, and evaluating whether a particular legal standard is met. *Exhibit "E," pp. 32-33*.

117.   Neither Dr. Sikirica nor Abelove personally met Davis. *Exhibit "D," p. 107*.

118.   Abelove did not attend any meetings with TPD or Dr. Sikirica in this case. *Exhibit "E," p. 47*.

119.   Abelove did not meet or talk with any defendant officers in connection with subject investigation. *Exhibit "E," pp. 98-99; exhibit "K," p. 36; exhibit "G," p. 92; exhibit "H," p. 93*.

120.   Abelove did not see the video of Davis's interrogation by TPD. *Exhibit "E," p. 47*.

121.   Abelove did not have any personal involvement in the direction or handling of any aspect of the subject investigation. *Exhibit "G," p. 43; exhibit "D," pp. 165-66; exhibit "E," p. 50; exhibit "I," pp. 56-57*.

122.   Abelove was not involved in the trial preparation of any witness, and was not involved in trial preparation with any assistant district attorney. *Exhibit "E," p. 69*.

123.   Dr. Sikirica testified before the grand jury on September 29, 2015 relative to V.D.'s homicide. *Exhibit "N."*

14

124.    The DA's office did not prepare Dr. Sikirica for his grand-jury testimony; only instructed him to be there. *Exhibit "F," p. 45*.

125.    Abelove never questioned Dr. Sikirica's judgment or opinions on any case, and he never had any reason to doubt his professionalism or competence. *Exhibit "E," pp. 17-18, 87*.

126.    Abelove is not aware of any instance when Dr. Sikirica aligned his opinions with a police investigation without looking at the full picture of a case. *Exhibit "E," p. 20*.

127.    During the course of the subject investigation, and after he issued his autopsy report, Dr. Sikirica met with an assistant district attorney, Davis's criminal-defense attorney (Office of the Public Defender), and on one occasion, met with both of them at the same time. *Exhibit "M," p. 71; exhibit "F," p. 26*.

128.    During Dr. Sikirica's discussions with the assistant district attorney relative to this investigation, she was not skeptical about whether there was criminality on the part of Davis. *Exhibit "F," p. 44*.

129.    The grand jury issued an indictment following the presentation of evidence, accusing Davis of manslaughter in the first and second degrees, and endangering the welfare of a child. *Exhibit "O."*

130.    As a result of the indictment, a warrant was issued for Davis's arrest, and he was arrested pursuant to that warrant on October 2, 2015. *Exhibit "D," p. 101; exhibit "G," pp. 46-47; exhibit "E," p. 53*.

131.    Davis was arraigned and held without bail until the time of his trial. *Exhibit "D," p. 81*.

132.   Dr. Sikirica testified for the prosecution on August 22, 2016 during the criminal trial relative to Davis. *Exhibit "F," p. 46*.

133.   Davis's defense pathologist, Dr. Teas, also testified at the criminal trial. *Exhibit "F," p. 27*.

134.   Dr. Sikirica disagreed with Dr. Teas's testimony, to wit: Dr. Teas made assumptions that the microscopic appearance of tissues can indicate whether her liver injuries were sustained either postmortem or antemortem; Dr. Sikirica's opinion is that this not backed by medical literature. *Exhibit "F," pp. 28-29*.

135.   Dr. Teas also testified that V.D. could have suffered from undiagnosed diabetes; Dr. Sikirica disagreed, as there were no signs of that disease whatsoever, and V.D.'s emergency-room glucose analysis indicated no diabetic reaction. *Exhibit "F," pp. 29-30*.

136.   Dr. Teas further testified that V.D. could have suffered from a seizure, but Dr. Sikirica opined that this theory "is also erroneous. Children, unless they have some physiological defect, unless there is a lesion in the brain, unless there is something that causes a mass effect in the brain, they do not die from seizures when you're a child (sic). It just doesn't happen." *Exhibit "F," p. 31*.

137.   Dr. Teas also opined that V.D.'s death was alternatively under the category of Sudden Unexplained Death in Infancy ("SUDI"). *Exhibit "F," p. 67*.

138.   Dr. Sikirica disagrees with Dr. Teas's SUDI theory of death, as  V.D. was not an infant, and it only applies up to the age of two. *Exhibit "F," pp. 68-70*.

139.   SUDI is inclusive of Sudden Infant Death Syndrome ("SIDS")—which does not occur after age one—and is meant to represent deaths that occur for other reasons, like co-sleeping or something that is unexplained by the autopsy. *Exhibit "F," pp. 68-70*.

140.   There is no category for unexplained deaths in toddlers like V.D. *Exhibit "F," p. 70*.

141.   Furthermore, V.D. has a cause of death: severe liver lacerations beyond the scope of CPR. *Exhibit "F," p. 71*.

142.   The judge presiding over Davis's criminal trial did not allow Dr. Sikirica to rebut the testimony of Dr. Teas, despite the prosecution's request to allow his rebuttal testimony. *Exhibit "F," p. 28*.

143.   Plaintiff was ultimately acquitted of the charges at trial in August 2016. *Exhibit "A," p. 81*.

DATED:  February 4, 2022

_____

William C. Firth

# EXHIBIT "A"

# APPENDIX

In the Matter of the Claim of:

MICHAEL L. DAVIS, Claimant

- against -

CITY OF TROY and COUNTY OF RENSSELAER

-------------------------------------------------------

    EXAMINATION UNDER OATH of the Claimant, MICHAEL

L. DAVIS, held pursuant to the provisions of Section

50-h of the General Municipal Law on March 30, 2017

at the Law Offices of Bailey, Johnson, DeLeonardis &

Peck, PC, 5 Pine West Plaza, Suite 507, Albany, New

York, commencing at 2:00 p.m; before DOROTHEA

MULLEN, A Notary Public in and for the State of New

York.

APPEARANCES:

BRETT H. KLEIN, ESQ., PLLC
Attorney for Claimant
305 Broadway - Suite 600
New York, New York  10007
BY:  BRETT H. KLEIN, ESQ.

BAILEY, JOHNSON, DeLEONARDIS & PECK, PC
Attorneys for Respondent County of Rensselaer
5 Pine West Plaza - Suite 507
Albany, New York  12205
BY:  JOHN W. BAILEY, ESQ.

ORIGINAL

```
1                P R O C E E D I N G S

2           (Exhibit Number 1 was marked for

3        identification.)

4                MICHAEL L. DAVIS,

5        called herein as a witness, having been first

6        duly sworn by the Notary Public, was examined

7        and testified as follows:

8    BY MR. BAILEY:

9        Q    All right.  Michael Davis; is that

10   correct?  Is that your name?

11       A    Michael Davis.

12       Q    All right.  My name is John Bailey,

13   Mr. Davis.  I represent Rensselaer County.  You

14   filed a Notice of Claim against them and so I'm

15   going to ask you some questions today about this.

16            If you don't understand my question,

17   please tell me you don't and I'll try to rephrase it

18   so that you do.  We lawyers don't always ask good,

19   clear questions, so tell me if you don't understand;

20   all right?

21       A    Okay.

22            MR. KLEIN:  Keep that voice up.

23   BY MR. BAILEY:
```

```
 1        Q    Keep your voice up.  And you do have to
 2   answer with a "yes" or a "no," or if it calls for a
 3   longer answer, a longer answer, because nods of the
 4   head or the common things, "yup," "okay," things
 5   like that, can be misunderstood.  I know it's hard
 6   to do because we're asking you to speak in a way
 7   that none of us normally speak but we need to do
 8   that to make a record here; okay?
 9        A    Yes.
10        Q    And finally, I'm going to ask you some
11   very personal, probing questions.  I am not doing so
12   to hurt your feelings or to upset you.  It's
13   information I think I need to have to evaluate my
14   client's position in this lawsuit.  Do you
15   understand that?
16        A    Yes.
17        Q    Okay.  So, Mr. Davis, what is your current
18   address?
19        A    I don't have a current address.  I'm
20   staying with a friend in Brooklyn, New York.
21        Q    All right.  Who is the friend and what is
22   that address?
23        A    He's a friend that I pretty much grew up
```

```
 1    with and it's --

 2             MR. KLEIN:  Counsel, if you're asking him

 3        for a way to reach him, you could reach him

 4        through my office.

 5             MR. BAILEY:  Okay.

 6             MR. KLEIN:  My understanding is that he is

 7        un-domiciled.  He has no address at this point.

 8        He is technically homeless.

 9             MR. BAILEY:  All right.  Then that's all I

10        need to know.

11    BY MR. BAILEY:

12        Q    So, at the moment you have no home

13    address?

14        A    Yes.

15        Q    When is the last time you did have a home

16    address?

17        A    When I first came home.

18        Q    Home from where?  I'm sorry.

19        A    When I first came home from jail.

20        Q    All right.  When was that?  How long ago

21    was that?

22        A    Roughly six months, seven months ago.

23        Q    All right.  So, if we're -- March,
```

```
 1    February, January, December, November -- October of
 2    2016 thereabouts?
 3         A    Around -- I guess it was closer to that.
 4         Q    All right.  Do you remember when you got
 5    out of jail?
 6         A    Yes.
 7         Q    When was that?
 8         A    It was the middle of August I would say.
 9         Q    Of 2016?
10         A    Yes.
11         Q    All right.  So, when you got out of
12    jail -- and by the way, just for the record, for how
13    long were you in jail?
14         A    Roughly eleven months.
15         Q    When you got out of jail, where did you go
16    to live?
17         A    I lived with --
18              MR. KLEIN:  Where?  What address?
19    BY MR. BAILEY:
20         Q    Was it in Brooklyn?
21         A    Yes, it was in Brooklyn.
22              MR. KLEIN:  Off the record.
23              (A brief discussion off the record.)
```

```
 1   BY MR. BAILEY:

 2        Q    I'm just trying to get a sense of where

 3   you've lived, and if you've had no addresses, just

 4   tell me that.

 5             If I'm understanding what you're

 6   testifying to, is that from the time you left jail

 7   you have lived with different people from time to

 8   time.

 9        A    Yes.

10        Q    Is that accurate?

11        A    Yes.

12        Q    And you've actually not had an address

13   that you would call your home; is that fair to say?

14        A    Yes.

15        Q    From the time you got out of jail to the

16   present, have you worked anywhere?

17        A    Yes.

18        Q    Where have you worked?

19        A    I worked at Planet Hollywood in Manhattan.

20        Q    Anywhere else that you can think of?

21        A    No.

22        Q    For how long did you work at Planet

23   Hollywood?
```

```
 1        A    Roughly six months.

 2        Q    And what did you do there?

 3        A    I was a door hostess.

 4        Q    When did you stop working there?

 5        A    Roughly, about a week ago?

 6        Q    And why did you stop working there?

 7        A    Just not being able to show up on time, I

 8   would say, because of my situation.

 9        Q    All right.  Again, remember, I told you

10   I'm going to ask you some personal questions.

11             Were you terminated?

12        A    Yes.

13        Q    Are you currently ready to start

14   employment?  Do you have a job lined up?  Are you

15   looking for a job?  Where are you in that part of

16   your life?

17        A    I actually put in applications for

18   different jobs.  I'm just waiting to hear back from

19   them.

20        Q    Okay.  Now, I'd like to get some

21   background information.

22             What is your date of birth, please?

23        A    ████, 1986.
```

```
 1        Q    And where were you born; in Brooklyn?

 2        A    I believe it was in the Bronx but...

 3        Q    Is it fair to say you don't actually

 4   remember where you were born?

 5        A    No.

 6        Q    All right.  Mr. Davis, I don't know you.

 7   I don't know anything about you, so I apologize.

 8   I'm not trying to ask hurtful questions.

 9             Has a family member ever told you where

10   you were born, or haven't you had contact with

11   family?  Just fill that part of your life out for me

12   so I can understand it and move on to the next

13   question.

14             Most people know where they were born,

15   okay, because their mother, father or somebody told

16   them.

17             MR. KLEIN:  Objection.

18             You could answer the question.  He's just

19        trying to get an understanding of where you

20        were born and if you know.  Do you know what

21        hospital you were born in or what part of the

22        city you were born in or where you were first

23        raised as a baby?
```

```
 1        A    From my knowledge, I was born in the Bronx

 2   but raised from when I was born to when I was seven

 3   in South Carolina.

 4   BY MR. BAILEY:

 5        Q    And who were you with in South Carolina;

 6   family?

 7        A    That was my family but that was foster

 8   care, but it was foster care with my actual family.

 9        Q    Were you placed in foster care shortly

10   after you were born?

11        A    Yes.

12        Q    You may not be able to answer this.   I

13   just need to try to find out.

14             Normally, if the State of New York places

15   somebody in foster care, they place them in a

16   facility that they can monitor, meaning a facility

17   or a foster care family in New York.  Do you know

18   how it is you came to be in South Carolina?

19        A    I don't.

20        Q    Okay.  Now, I'm sure you have -- and most

21   of us don't remember anything before we started

22   school.  I know I have very few memories.  But do

23   you remember -- you mentioned the age of seven.  Is
```

```
 1    that when you returned to New York?

 2         A    Yes, that's with my mother.

 3              MR. KLEIN:   Is it when you returned to New

 4         York.   Just answer "yes" or "no."

 5         A    Yes.

 6    BY MR. BAILEY:

 7         Q    And how is it that you returned to New

 8    York when you were seven?   You mentioned your

 9    mother.   Was it that your mother acquired custody of

10    you when you were seven?

11         A    Yes.

12         Q    What is your mother's name, please?

13         A    Sabrina Davis.

14         Q    So, when you were seven, you were living

15    in South Carolina.   Your mother, Sabrina, obtained

16    custody of you and you were brought back to New

17    York; is that a fair way to put it?

18         A    Yes.

19         Q    Now, what type of contact did you have

20    with your mother, if you remember, from the time you

21    were born until the time she took custody of you

22    when you were seven?

23              MR. KLEIN:   I'm just going to -- before
```

# APPENDIX

```
 1        you answer, I'm going to note an objection.

 2            Mr. Bailey, I would just state that I

 3        think we all know it's a very limited hearing.

 4        The statute prescribes just questions that

 5        relate to the claim and it's a very narrow

 6        statutory hearing.

 7            All that being said, I'm getting that this

 8        is background information.  I'm hoping we can

 9        move on soon but --

10            MR. BAILEY:  Yes.  No, I'm just trying to

11        get a better sense of a few things so I

12        understand it.

13            MR. KLEIN:  Okay.  So, subject to all

14        rights, you could answer the question or have

15        it read back if you don't remember what he

16        asked you.

17            MR. BAILEY:  I can reask it.

18            MR. KLEIN:  Okay.

19   BY MR. BAILEY:

20        Q    I'm just trying to find out what kind of

21   contact you had with your mother, Sabrina, between

22   the time you were born and the time you moved back

23   to Brooklyn when you were about seven years old.
```

Case 1:17-cv-01290-DJS Document 89-1 Filed 02/04/22 Page 13 of 105

```
 1        A    When I came -- when my mother obtained me,
 2   we moved to the Bronx.  We didn't move to Brooklyn.
 3        Q    Okay.
 4        A    And I hadn't -- I thought my grandmother
 5   was my mother, so, when I first initially saw my
 6   mother again, I didn't know who she was.
 7        Q    Now, were you educated in the New York
 8   City school system?
 9        A    I'll say yes.
10        Q    I mean, did you go to grade school, middle
11   school, high school somewhere in the Bronx or
12   Brooklyn?
13        A    Yes.
14        Q    Where did you go, if you remember?
15        A    I don't really recall what school I went
16   to when I was in the Bronx with my mother.  Junior
17   high school was in Brooklyn and high school was in
18   Brooklyn and college was in Jersey.
19        Q    All right.  Well, one of the things I've
20   heard about you is that you were a very talented
21   basketball player; is that true?
22        A    Yes, sir.
23             MR. KLEIN:  Still is.
```

```
 1   BY MR. BAILEY:
 2        Q    Do you still play basketball?
 3        A    I still play.
 4        Q    All right.  I know you were playing
 5   professionally for a while.  Do you still play
 6   professionally?
 7        A    No.
 8        Q    Where did you go to college, please?
 9        A    Seton Hall University.
10        Q    Did you play for Seton Hall?
11        A    Yes.
12        Q    Did you play all four years for Seton
13   Hall?
14        A    No.
15        Q    Did you finish Seton Hall?
16        A    No.
17        Q    Did you drop out at some point?
18             MR. KLEIN:  Objection to "drop out."
19             Did you drop out at some point?
20        A    No, I transferred.
21   BY MR. BAILEY:
22        Q    Okay.  Where did you transfer to?
23        A    To St. Francis.
```

```
 1        Q     That's in Brooklyn?

 2        A     Yes, sir.

 3        Q     Did you play basketball for St. Francis?

 4        A     No, I left my sit-out year.

 5        Q     I know a little bit about college

 6   basketball.  For how many years did you play

 7   basketball for Seton Hall?

 8        A     I played two years.

 9        Q     What position did you play?

10        A     I was a power forward and a center, a four

11   and a five.

12              MR. KLEIN:  You're just speaking very

13         softly, and that's okay, but just try to talk a

14         little louder so she can -- or look in her

15         direction; okay?

16              THE WITNESS:  Okay.

17   BY MR. BAILEY:

18        Q     Now, did you obtain a degree from

19   St. Francis?

20        A     No.

21        Q     So, if I understand it, you have three

22   plus years of college; is that correct?

23        A     Yes.
```

```
 1        Q     How close are you to obtaining a
 2   Bachelor's degree?  Are you 20 credits, 15 credits,
 3   18 credits?  If you know.
 4        A     I'm not sure at this point right now.
 5        Q     Just a little bit more history and I'm
 6   going to get to the events that bring us here.
 7              You had a career in professional
 8   basketball; correct?
 9        A     Yes.
10        Q     For how many years was that?
11        A     I would say a good five years.
12        Q     What teams did you play for
13   professionally?
14        A     I played for two D league teams -- that's
15   a developmental league for the NBA -- the Texas
16   Legends and the Mexican Thunderbirds -- and just a
17   bunch of overseas teams.
18        Q     The Texas Legends and the --
19        A     New Mexican Thunderbirds.
20        Q     And you played some basketball overseas;
21   is that correct?  In Europe or where?
22        A     Yeah, in different parts of Europe.
23        Q     And your career lasted approximately five
```

1  years?

2      A      Give or take.  It should have lasted

3  longer but, yes, approximately.

4      Q      Did it end because of injuries or --

5      A      It ended because I got locked up.

6      Q      Well, when was the last time before you

7  were arrested that you played professional

8  basketball?  Was it a few months before, a week

9  before, the year before?

10     A      Oh, probably the year before.

11     Q      Now, at some point in your life you moved

12  to Troy, New York; is that accurate?

13     A      Yes.

14     Q      When was that?

15     A      I don't recall, but it had to be at the

16  end of 2013, around the end.

17     Q      Who did you move there with or to be with,

18  if anyone?

19     A      I didn't really move there.  I was coming

20  back and forth, staying with my cousins that lived

21  in the Kings, but I was coming back and forth at

22  first.  I never really like permanently stayed out

23  here until coming into 2014.

```
 1        Q    So, in 2013 you were back and forth
 2   between New York and here to visit with cousins?
 3        A    Yes.
 4        Q    And who were your cousins?
 5        A    They live in --
 6             MR. KLEIN:  Who were they, not where do
 7        they live.
 8        A    My oldest cousin's name is Terence Davis
 9   and I was staying with his wife and five kids.
10   BY MR. BAILEY:
11        Q    Do they live in Troy?
12        A    They live in Troy.
13        Q    So, you would visit your cousin, Terence
14   Davis, from time to time.  Terence Davis lives in
15   Troy.  Do you recall his address?
16        A    15 Eddys Lane.
17        Q    Now, when you visited your cousin, Terence
18   Davis, was that for maybe a long weekend?  Was it
19   weeks at a time?
20        A    It would be maybe three or four days at a
21   time.  He would pretty much ask me to watch his kids
22   and stuff while he had made trips and stuff to New
23   York.
```

1    Q    When you visited him, did you work or did

2  you take a part-time job, for example, in Troy

3  somewhere or did you just stay at his house and

4  watch his children as you indicated?

5    A    Yes, just watched the children.  I never

6  had a chance actually --

7        MR. KLEIN:  He's not asking you about a

8    chance.  What did you do?  Did you just watch

9    his kids?

10        THE WITNESS:  Yeah.

11        MR. KLEIN:  Just try to answer the

12    question.

13    A    Yes.

14  BY MR. BAILEY:

15    Q    Now, at some point you moved to Troy on a

16  more permanent basis; is that correct?

17    A    Yes.

18    Q    And I think you indicated that was some

19  time in 2014?

20    A    Yes.

21    Q    Can you give me a little more of

22  specifics?  Can you give me the month or if not, the

23  time of the year?

```
 1        A     It was early 2014, in the first few
 2   months.
 3        Q     What was the reason you moved to Troy
 4   permanently at that time?
 5        A     Just to change the scenery.
 6        Q     When you moved to Troy, did you start work
 7   anywhere?
 8        A     Not right away.
 9        Q     At any point while you were living in
10   Troy, did you work anywhere?
11        A     I -- I didn't have no actual job in Troy.
12        Q     At some point you met and became familiar
13   with a lady whose name is Rebecca Parker; correct?
14        A     Yes.
15        Q     All right.  Who is Rebecca Parker?
16        A     She is the mother of          .
17        Q     Now,             shares the same last name
18   as you.        was not your daughter, correct, or
19   was she?
20        A     No, she was not my daughter.
21        Q     Do you know whose daughter        was?
22   Obviously, Rebecca's.  Do you know who her father
23   is?
```

```
 1        A     Yes.

 2        Q     And who is that?

 3        A     Clarence Davis.

 4        Q     That would be your cousin?

 5        A     Yes.

 6        Q     So, your cousin Clarence and Rebecca had a

 7   child whose name is         ; correct?

 8        A     Yes.

 9        Q     Was there another child as well?   Did

10   Clarence and Rebecca have a second child?

11        A     No.

12        Q     Okay.   At some point you met Rebecca

13   Parker; correct?

14        A     Yes.

15        Q     When did you first meet her?

16        A     It had to be in New York.

17              MR. KLEIN:   That's not -- that's where.

18        He's asking when.   Please listen to the

19        question.

20        A     It had to be before her daughter was born.

21   BY MR. BAILEY:

22        Q     Well, I was going to ask you whether you

23   knew her before         was born.
```

```
1        A     Yes.

2        Q     And you met her in New York; is that

3   correct?

4        A     Yes.

5        Q     At one point Rebecca, herself, lived in

6   New York; is that accurate?

7        A     Yes.

8        Q     And then did she move to Troy and did you

9   follow her, or did you move to Troy and did she

10   follow you?

11             MR. KLEIN:   Or none of the above.

12   BY MR. BAILEY:

13        Q     Or none of the above?

14        A     Yes, none of the above.

15        Q     Well, there came a point when she moved to

16   Troy; right?

17        A     Yes.

18        Q     Do you know when that was?

19        A     I don't recall the exact time.

20        Q     Do you know why she moved to Troy?

21        A     To start her life over and get away from

22   Clarence.

23        Q     But Clarence was living in Troy; right?
```

```
 1       A     No.

 2       Q     Did he move to Troy after she did?

 3       A     No.

 4       Q     Okay.  Clarence still lives Downstate?

 5             MR. KLEIN:  If you know.

 6       A     Yes.

 7  BY MR. BAILEY:

 8       Q     Did Rebecca move to Troy before you did?

 9       A     No.

10       Q     You moved before she did?

11       A     Yes.

12       Q     Now, when she moved to Troy, did she move

13  to be with you?

14       A     No.

15       Q     When she moved to Troy, did she live with

16  you from the beginning?

17             Well, let me ask you this.  Let me strike

18  that.

19             There came a time when you and Rebecca

20  started living together; is that accurate?

21       A     Yes.

22       Q     How long after she moved to Troy did the

23  two of you start living together?
```

APPENDIX

```
 1        A     Roughly five months or so.

 2        Q     Where did she live before she started

 3   living with you or where did you live before you

 4   started living with her?

 5        A     She moved up with my cousin's family where

 6   I was staying at the time watching his kids, and she

 7   came back with him, with my cousin and his wife,

 8   with her daughter.

 9        Q     When you and Rebecca started living

10   together, what was the address?

11        A     ███████████████████ Avenue, I believe.

12              MR. KLEIN:  It's hard to hear you.

13        A     ███████████████████ Avenue in

14   Lansingburgh.

15   BY MR. BAILEY:

16        Q     And when did you two start living at that

17   address?

18        A     I don't remember the exact date.

19        Q     Did anyone else live at that address other

20   than you and Rebecca?

21        A     ████.

22        Q     Was ████ born before Rebecca moved

23   Upstate or was she born after Rebecca moved to Troy?
```

```
1        A     Before.

2        Q     So, ███ was born somewhere in

3    Metropolitan New York?

4        A     Yes.

5        Q     Do you remember where?

6        A     No.

7        Q     Was it the Bronx or Brooklyn?

8        A     Most likely, Manhattan.

9              MR. KLEIN:  Well, we don't want you to

10       speculate.  Do you know for certain?

11       A     That's where she mostly was.  That's where

12   she was born at.

13             MR. KLEIN:  Just say what you know.

14       That's all he wants you to do.

15   BY MR. BAILEY:

16       Q     So, let me just try to pin this down, and

17   if you can't, just tell me you can't; okay?

18             Give me a date, a month if you can and a

19   day if you can, when you started living at ███████

20   ████████████████████ n Troy.

21       A     I would say around June 2014.

22       Q     And who leased -- that was an apartment;

23   correct?
```

```
 1      A    It was an apartment within a house.

 2      Q    Who leased it?  Was it you or was it

 3  Rebecca or both of you?

 4      A    It was her mother actually who actually

 5  got the apartment.

 6      Q    So, the apartment at ▮▮▮▮▮▮▮▮▮▮▮

 7  was leased by Rebecca's mother?

 8      A    Her mother is who paid pretty much.

 9      Q    Well, do you know --was there a written

10  lease signed?

11      A    Yes.

12      Q    Who signed the lease on your side of it?

13  There was a landlord obviously.

14      A    Yes.

15      Q    But who signed it?  Was it you, Rebecca or

16  Rebecca's mother?

17      A    Me and Rebecca.

18      Q    And you're saying that Rebecca's mother

19  helped you with the rent?

20      A    Yes.

21      Q    What is Rebecca's mother's name, please?

22      A    Nancy Parker.

23      Q    And where does Nancy Parker live?
```

```
 1       A     In Manhattan.

 2       Q     Can you tell me where in Manhattan?

 3       A          ████████     on the west end.

 4       Q     Now, did you live at any other address in

 5   Troy other than     ████████████████?

 6       A     Yes, when I first stayed with my cousin.

 7             MR. KLEIN:  It's yes or no.  Just did you,

 8       yes or no.

 9       A     Yes.

10   BY MR. BAILEY:

11       Q     Now, you mentioned your cousin and I think

12   you said that was Eddy's Lane; is that correct?

13       A     Yes.

14       Q     So, you lived on Eddy's Lane.  You lived

15   on     ████████████████.     Did you have any other

16   addresses?

17       A     The address I was locked up at.

18             MR. KLEIN:  I think he means prior to

19       being arrested in Troy.

20             THE WITNESS:  Yeah, but we were staying

21       with --

22             MR. KLEIN:  Oh, you were at a different

23       location when you were arrested?
```

```
 1              THE WITNESS:  Yes.
 2              MR. KLEIN:  Okay.  So what is that
 3      address?
 4      A    I forget the exact number but it was on
 5  Glen Ave., right around the corner from Stewart's.
 6  BY MR. BAILEY:
 7      Q    All you need to do, Mr. Davis, is speak up
 8  and tell me.  If you want a glass of water, I'll be
 9  happy to get you one.  If you need a break to go to
10  the men's room, you certainly --
11      A    This is a little overwhelming being up
12  here.
13              MR. KLEIN:  And for that reason, if you
14      need a break, let us know; okay?  Any time.
15  BY MR. BAILEY:
16      Q    While you were living with Rebecca and
17      ███ at ███████████████, did you work at any
18  time between when you started living there and the
19  day ███ died?
20      A    No.  I was a stay-at-home dad pretty much.
21      Q    Did Rebecca work?
22      A    Yes.
23      Q    Where did she work?
```

1    A    Stewart's.

2    Q    Do you know the location of the Stewart's

3  she worked at?

4    A    She worked at two different locations but

5  yes.

6    Q    So, she might work at one Stewart's

7  location on one day or one week and then another

8  Stewart's on another time?

9    A    Yes.

10    Q    Did she have full-time work at Stewart's?

11    A    No.

12    Q    Now, I'm going to call your attention to

13  February 26, 2015.  Where were you living on that

14  day?

15    A    In Lansingburgh.

16    Q    At the address that we've been talking

17  about?

18    A    Yes.

19        MR. KLEIN:  Counsel, I would just say if

20    you have any documents related to the incident

21    that are going to be used as a basis for

22    questioning or for any reason, we would just

23    ask that we get a copy if we can.

```
 1              I would just note that any -- it looks
 2         like you have maybe an incident report -- any
 3         documents related to this arrest and
 4         prosecution would be sealed under New York
 5         Criminal Procedure Law 160.50, so even the
 6         county shouldn't access the sealed records of
 7         this arrest, and I would just say that
 8         without -- I'm not saying we're going to stop
 9         the hearing but I just think we should be privy
10         to any documents you have as it's his right
11         under 160.50 to --
12              MR. BAILEY:  All right.  I hear your
13         objection.  I'm going to continue with my
14         questioning; okay?
15              MR. KLEIN:  I would just ask if you -- I
16         mean if there's a memo or documents that you
17         have that relate to the incident, before we go
18         further, we need to get copies of them.
19              MR. BAILEY:  No, I'm not going to provide
20         you with anything from my file.
21              MR. KLEIN:  Well, I don't know what's in
22         your file but certainly on the table there is a
23         record that I think might be sealed.  If it's a
```

```
 1        record from the prosecution, it would be sealed

 2        pursuant to 160.50.  So, we would just note an

 3        objection on the record and reserve all rights.

 4              MR. BAILEY:  Okay.  Fair enough.

 5              MR. KLEIN:  Is that what that is?  Is that

 6        a --

 7              MR. BAILEY:  No, I'm not here to answer

 8        your questions.  I'm not hear to have a fight

 9        with you either but I'm not here to --

10              MR. KLEIN:  No one is fighting.  I just

11        think --

12              MR. BAILEY:  No, I'm not here to answer

13        your questions.

14              MR. KLEIN:  We just have a right to know

15        if there's sealed documents that have been

16        obtained without the permission of the accused

17        or a court order, and if so --

18              MR. BAILEY:  Well, clearly -- I mean,

19        let's cut to the chase.

20              There has been a Notice of Claim filed and

21        it would be a simple matter to unseal all the

22        records.

23              MR. KLEIN:  Certainly, but there's no
```

```
 1          provision under 160 under the General Municipal

 2          Law we all know for any releases or discovery

 3          or anything.  It's just there's a right to an

 4          examination under oath and that's it.

 5               So, I just wanted to be on the same page

 6          with you about any documents you might have

 7          that --

 8               MR. BAILEY:  Well, I might have documents

 9          and who knows how I got them; right?  And where

10          I got them.

11               MR. KLEIN:  Okay.  And we're just noting

12          our --we're reserving our rights that the next

13          time that counsel has sealed records that are

14          being used to --

15               MR. BAILEY:  Well, that's your opinion of

16          what I have.  It's certainly not my opinion of

17          what I have.

18               MR. KLEIN:  It's certainly an opinion but

19          if you have documents related to the arrest and

20          prosecution, they would be covered by the CPL

21          160.50 provision.

22               MR. BAILEY:  Now, are you going to

23          continue to interfere with my examination of
```

```
 1        the Witness?  If you are, then we're going to

 2        stop and I'm going to reserve all of my rights.

 3             MR. KLEIN:  I have not interfered

 4        whatsoever.  I just noted that you have a

 5        document that appears to be a document from the

 6        prosecution, and you have every right to go

 7        forward.  As I said, I'm noting a request on

 8        the record that we be given what you're using

 9        in the hearing.

10             MR. BAILEY:  It's a 50-h hearing.  It's

11        not discovery.  There's no lawsuit.  And what I

12        have is confidential, privileged information

13        work product in my file.

14             MR. KLEIN:  Sure, but no one is stopping

15        you from proceeding, so --

16             MR. BAILEY:  Okay.  Then I'm going to ask

17        you not to say anything to your client by way

18        of coaching him even though sometimes it's

19        helpful in terms of picking his voice up or

20        something like that, but, you know, I'm going

21        to ask questions and whatever answer he gives,

22        he gives.

23             MR. KLEIN:  As is the practice, and I
```

```
 1        don't know why it would be otherwise, but

 2        certainly we have no objection to that

 3        whatsoever.

 4             MR. BAILEY:  All right.

 5   BY MR. BAILEY:

 6        Q    In the two or three weeks before ████

 7   died, did she have any medical problems?

 8        A    Just like a cold.

 9        Q    Was she taken to a doctor for that cold?

10        A    No.

11        Q    What was her health status on February 26,

12   2015?  Was she a healthy baby?

13        A    Yes.

14        Q    How old was she?

15        A    Approximately two and a half.

16        Q    Tell me about ████.  At that age was she

17   talking?

18        A    Yes.

19        Q    I'm sure she was walking; correct?

20        A    Yes.

21             MR. KLEIN:  Objection.

22   BY MR. BAILEY:

23        Q    Was she potty-trained?
```

```
 1        A    Yes.

 2        Q    Would you describe her as a normal,

 3   healthy two and a half year old child?

 4        A    Yes.

 5        Q    To your knowledge did she have any health

 6   problems that were in any way or could in any way be

 7   described as serious?

 8             MR. KLEIN:  Do you mean prior to the

 9        incident?

10             MR. BAILEY:  Yes.

11        A    I had no knowledge of her medical history.

12   Her mother had no knowledge of her own medical

13   history.  She told me that her daughter, ████

14   ████, had serious problems when she was born and

15   that a pediatrician said that she had asthma and to

16   watch out for it.  So, at times that she played in

17   the house I would have to like stop her at times

18   because she would be short of breath and I would do

19   breathing exercises with her or tell her mother,

20   "You need to take her to the doctor up here."

21   BY MR. BAILEY:

22        Q    Was she under the care of a pediatrician

23   for her asthma?
```

```
1         A      No.

2         Q      Was she ever diagnosed with having asthma?

3         A      From what her mother told me, when she was

4   born she was, and she took her back, and they said

5   just to watch out for it, that they had little

6   concerns but to watch out, but she did have it when

7   she was born.

8         Q      So, Rebecca told you that she was

9   diagnosed with asthma when she was born?

10        A      Yes.

11        Q      Would you describe the relationship

12  between Rebecca and ▮▮▮▮?

13               MR. KLEIN:  Objection.

14               You can answer.

15        A      Could have been better.

16  BY MR. BAILEY:

17        Q      Please explain your answer to me.

18        A      Rebecca was relatively young, early

19  twenties.  She, I guess, wanted to do more in -- at

20  her age that the kids was doing at her age, and

21  having a baby at such a young age she, besides

22  working, pretty much wanted to just listen to her

23  music and stuff, so...
```

```
 1        Q    Was she an attentive mother?  Did she look
 2   out for        ?
 3             MR. KLEIN:  Objection.  And I'm just going
 4        to note that this is beyond the scope of the
 5        hearing I believe that's permissible, but I'll
 6        allow the Witness to answer it assuming it's
 7        still background stuff.
 8        A    She could have been more attentive.
 9   BY MR. BAILEY:
10        Q    Do you know, was Rebecca ever hot lined --
11   if you know what that means -- for the way she
12   interacted with her daughter,        ?
13             MR. KLEIN:  Objection.
14        A    I don't know what that means.
15   BY MR. BAILEY:
16        Q    Do you know -- was Child Protective
17   Services ever involved with        ?
18        A    Not to my knowledge.  Prior to this
19   incident?
20        Q    Yes.
21        A    No, not to my knowledge.
22        Q    At any point before February 26, 2015 were
23   you ever accused, yourself, of being inappropriate
```

```
 1   with a child?

 2        A    No.

 3        Q    On the morning of February 26, 2015 do you

 4   recall the events generally?

 5        A    Yes.

 6        Q    I would like you to tell me what you

 7   recall about that morning, and then I'm probably

 8   going to follow up with some specific questions, but

 9   what do you recall about that day?

10        A    Waking up, Rebecca pretty much putting on

11   her coat getting ready to go to work.  I kind of

12   smelled a little bit of poop, so I called to ████ and

13   she came in the room to me but she didn't seem

14   herself.  She seemed very down and just out of

15   energy which was unlike her.  You know, she could

16   sleep for an hour and have all the energy in the

17   world.

18             I figured maybe she was just getting sick

19   again.  She was probably up for like five minutes

20   that morning.  I changed her Pamper.  I asked her if

21   she wanted something to eat or drink.  She said no.

22   She just shook her head no.  I said, "Okay.  It's

23   pretty early in the morning."  I took her back to
```

```
 1   her room, let her get in the bed, pretty much put on

 2   a movie.  I guess I ended up dozing off to it.

 3          When I realized I was dozing off, I jumped

 4   out of my sleep and I called for her to tell her

 5   that I was going to make breakfast for her.  She

 6   didn't answer.  I went to the door and called for

 7   her again.  She didn't answer or move, so I went to

 8   the bed to just like give her a little nudge, saying

 9   it was time to wake up.  She didn't wake up.  I

10   tried again.  She didn't wake up.  I just started

11   panicking.  I tried to do CPR to the best of my

12   knowledge, which I wasn't very knowledgeable on it.

13   I tried two times on the bed and nothing worked, so

14   I took her into the living room and put her on the

15   futon.

16          The first thing I did was try to look for

17   the phone that was there.  It was the only phone

18   there, so I tried looking for it.  I couldn't find

19   it.  The two other phones that was actually on the

20   table was completely dead.  I tried to plug those

21   up.  They didn't work at all.  So, I ran out of the

22   house to my friend's house across the street, Willy

23   Robinson.
```

```
 1        Q    Willy Robinson?

 2        A    Yes.

 3             I knocked on his door, banging on his door

 4   to just get somebody to open the door.  Nobody

 5   answered.  I tried upstairs.  Nobody answered.  I

 6   ran back across the street to see if anything had

 7   changed with her, and nothing had changed, so, I

 8   pretty much ran across to Testo's and just --

 9        Q    To Testo's?

10        A    To Testo's.

11        Q    That's a restaurant, Testo's?

12        A    Yes, it's a restaurant.

13             I asked to use a land line and they didn't

14   have one, so I pretty much asked somebody that

15   worked there to use their phone.  They let me use

16   it.  I called 911.  I said, "My daughter is

17   unresponsive.  She's not waking up.  Can you please

18   send somebody?"  It was pretty much like that.

19        Q    Okay.  Now, I just want to go back and ask

20   you some specific questions.

21             When you said earlier in the morning

22   Rebecca got up and got ready for work -- I'm

23   assuming the two of you shared the same bed; is that
```

```
 1    correct?

 2         A    Yes.

 3         Q    Did you wake up at that time?

 4         A    I didn't wake up when she had got out of

 5    the bed.  I didn't even notice she got out of the

 6    bed.

 7         Q    Did you wake up before Rebecca left the

 8    house?

 9         A    Yes.

10         Q    And you said you thought you smelled

11    something like maybe ███ had messed her diaper; is

12    that what you were saying?

13         A    Yes.

14         Q    And when you had that smell, where was

15    ███? Was she near you?  Was she in her room?

16         A    She was in her room.

17              MR. KLEIN:  Let him finish, please.

18    BY MR. BAILEY:

19         Q    So, were you laying in bed when you

20    smelled that or did you get up?  Were you walking

21    around the apartment?

22              MR. KLEIN:  Objection.

23              You can answer.
```

SUSAN FLORIO, RPR
Professional Reporting Service
(518) 887-2733

```
 1        A    I was in bed.

 2   BY MR. BAILEY:

 3        Q    And you smelled something and you thought

 4   maybe ████ has messed her diaper; correct?

 5        A    Yes.

 6        Q    Did you go check on her?

 7        A    No, I called her in to me.

 8        Q    Did Rebecca check her?

 9        A    No.

10        Q    Do you know why Rebecca didn't check her?

11        A    No.

12        Q    So you called out to -- you called her

13   "████;" is that correct?

14        A    Yes.

15        Q    And is that the name she responded to,

16   "████"?

17        A    Yes.

18        Q    So, you called for ████, and did she get

19   out of her bed and come into the living room area?

20        A    Yes.

21        Q    Is that where she came to?

22        A    Yes.

23        Q    Or did she come to your bedroom?
```

```
 1        A      The living room was the bedroom.

 2        Q      Were you still in bed when she came to

 3   you?

 4        A      Yes.

 5        Q      And is that when you had this discussion

 6   with her about, "Are you okay, do you need to use

 7   the bathroom," that type of thing?

 8        A      Yes.

 9        Q      Can you tell me specifically what you said

10   to her and what [REDACTED] said to you?

11        A      She didn't really say anything, and she

12   was usually very talkative.  She just nodded her

13   head.  I said, "Are you okay?"  She had her head

14   down.  She just nodded her head "yes," so I said,

15   "Did you poop?" and she just nodded her head, "yes."

16   So, I said, "Okay," and I got out off the bed.  She

17   started walking towards the bathroom, I started

18   walking behind her, and her mother left at that

19   time.

20        Q      So, Rebecca left as you were, in effect,

21   taking [REDACTED] to use the bathroom; is that correct?

22        A      Yes.

23        Q      And do you know -- was Rebecca out of the
```

```
 1   house by the time you and        got to the bathroom?

 2        A    Yes.

 3        Q    And I'm assuming -- and if I'm wrong, you

 4   tell me I am wrong, but I'm assuming that you would

 5   change        's diaper from time to time?

 6        A    I was the only person changing her diaper.

 7        Q    So, she used the bathroom.  You cleaned

 8   her up and put a new diaper on her; is that fair to

 9   say?

10        A    Yes.

11        Q    And did she want breakfast that morning?

12        A    No.

13        Q    Did you offer her breakfast?

14        A    Yes.

15        Q    And what did she say?

16        A    She just shook her head, "no" when I

17   offered it to her.

18        Q    Now, at two and a half years old -- I

19   assume she was eating solid food at that time.

20        A    Yes.

21        Q    Did she still use a bottle?

22        A    Sippy cup.

23        Q    But she would normally eat just sort of
```

```
 1   normal food?  Whatever you guys were eating, she
 2   would eat the same thing; is that fair to say?
 3              MR. KLEIN:  Objection.
 4   BY MR. BAILEY:
 5        Q    Or did she have a special diet?
 6        A    Yeah, she really didn't eat what we ate.
 7        Q    I'm sorry.  I didn't hear that.
 8              MR. KLEIN:  He's asking what she ate.
 9        A    We had separate food for her than what we
10   ate ourselves.
11   BY MR. BAILEY:
12        Q    Is that because she was fussy or because
13   she had a special diet?
14        A    She just didn't like eating certain foods.
15        Q    Okay.  What types of food did she like to
16   eat?
17        A    Chicken nuggets, certain type of ravioli
18   and stuff like that.
19        Q    All right.  But your memory is, at least
20   on that morning, she didn't want any breakfast or
21   anything to eat?  She didn't say, "I'm hungry," or
22   anything of that type?
23        A    No.  When I offered it, she said, "No."
```

APPENDIX

```
 1        Q      About what time of the morning was that?

 2        A      I don't know.  I just assumed it was

 3   around 8:00 because that's usually --

 4        Q      What time did Rebecca leave for work?

 5        A      Once again, I don't know.

 6        Q      Was there a normal time she left?

 7               MR. KLEIN:  He's asking a yes or no

 8        question.

 9        A      I would say yes.

10   BY MR. BAILEY:

11        Q      What was the normal time?

12        A      Around 8:15, I guess.

13        Q      What time did she have to be at work?

14        A      Around 8:30 to 9:00.

15        Q      Am I correct then it would take

16   approximately fifteen or twenty minutes to get from

17   where you lived to the Stewart's depending on which

18   Stewart's it was that she worked at?

19        A      Yes.

20        Q      One might take longer than the other; fair

21   to say?

22        A      Yes.

23               MR. KLEIN:  Objection to form.
```

APPENDIX

```
1    BY MR. BAILEY:
2         Q    Do you know which Stewart's she was
3    working at on February 26, 2015?
4         A    Yes.
5         Q    What Stewart's was that?
6         A    Stewart's on Glen Ave.
7         Q    Now, between eight o'clock and noontime,
8    where was        ?
9         A    Pretty much after she went back to bed and
10   I pretty much lay down and put the movie on, she was
11   in her bed.
12        Q    When you say you lay down, was that in the
13   living room area?
14        A    Yes.
15        Q    So, there was a television and chairs and
16   so forth, a couch and whatever in the living room;
17   is that correct?
18        A    Yes.
19        Q    So you sat there in one of the chairs,
20   turned a movie on and watched a movie; is that
21   correct?
22        A    No.
23        Q    All right.  Then tell me what you did.
```

```
 1        A      I was -- I laid back on my bed.

 2        Q      All right.  So you laid on your bed and

 3   you were watching a movie while laying on your bed?

 4        A      Yes.

 5        Q      Do you remember what movie if was?

 6        A      National Treasure 2.

 7        Q      Was that a DVD or a movie you had or was

 8   that on television or was it on one of these --

 9        A      A DVD.

10               MR. KLEIN:  Let him finish the question,

11        please.

12   BY MR. BAILEY:

13        Q      National Treasure 2 -- what is that movie

14   about?

15        A      Just about different secrets of the

16   government.

17        Q      Do you know who any of the actors or

18   actresses are in that movie?

19        A      Nicholas Cage, I believe, is the star.

20               MR. KLEIN:  I'm just going to note another

21        objection, a continuing objection.  This is not

22        related to the claim as far as I can tell and

23        outside of the scope of the permissible hearing
```

```
 1          testimony that's allowable under municipal law.
 2               MR. BAILEY:  Well, I disagree.
 3    BY MR. BAILEY:
 4      Q    Can you tell me what the plot of the movie
 5    was?
 6               MR. KLEIN:  Rather than objecting to every
 7          question, I'm going give a standing objection
 8          to this line of questioning about the movie so
 9          I don't interrupt Counsel.
10      A    Just finding treasure.
11    BY MR. BAILEY:
12      Q    Finding treasure?
13      A    Yes.
14      Q    How many phones did you have in your
15    house?
16      A    Roughly three, no land line.
17      Q    Now, did Rebecca have a phone?
18      A    Yes.
19      Q    A cellphone?
20      A    Yes.
21      Q    Do you know what type of cellphone?
22      A    It's an iPhone.
23      Q    An iPhone?
```

```
 1        A    Yes.

 2        Q    Do you know whether it was a 4, 5, 6?

 3        A    First generation iPhone.

 4        Q    And there were two other or three other

 5    phones aside from Rebecca's?

 6        A    Two.

 7        Q    Were one of those phones yours?

 8        A    Yes.

 9        Q    And what type of phone was yours?

10        A    It was like a flip Nextel, very old.

11        Q    Who was your cell provider?

12        A    My uncle.

13             MR. KLEIN:  No, who was the carrier, I

14        think -- I believe if I'm right, Counsel.

15             MR. BAILEY:  Yes.

16             MR. KLEIN:  Sprint, Verizon?

17    BY MR. BAILEY:

18        Q    Do you know?

19        A    It was Sprint, I believe.

20        Q    Who was Rebecca's provider, cell provider?

21        A    I think it was like a net spend card.

22        Q    All right.  So she had cards that she

23    would buy on her phone?
```

SUSAN FLORIO, RPR
Professional Reporting Service
(518) 887-2733

```
1       A    Yes.

2       Q    What was your cellphone number?

3       A    I don't remember.

4       Q    There was a third cellphone in the house.

5   Whose was that?

6       A    It was kind of both of ours.  We found it.

7       Q    You found it?

8       A    Yes.

9       Q    What type of phone was it?

10      A    Don't recall.

11      Q    Where is that phone today?

12      A    As far as I know, I gave it to the

13  detective before I was arrested.

14      Q    How about your phone, the phone that you

15  had on that day?  Where is that?

16      A    Rebecca would have had it.

17      Q    And do you know where Rebecca's phone is

18  as we speak?

19      A    No.

20      Q    When is the last time you saw Rebecca?

21      A    When I got out of jail.

22      Q    What were the circumstances of you seeing

23  her?
```

```
 1        A      She didn't want to give my passport to my
 2   lawyer.  She wanted to give it to me personally and
 3   say how sorry she was about the whole situation.
 4        Q      Where did this meeting occur?
 5        A      At the courthouse.
 6        Q      In Troy?
 7        A      Yes.
 8        Q      All right.  So, when you were released
 9   from jail, was that officially done when you
10   appeared in Troy county court?
11        A      Yes.
12        Q      And she was present in the courtroom?
13        A      It wasn't in a courtroom.  It was in the
14   lobby.
15        Q      All right.  I assume this occurred after
16   you were released, ordered released by the judge?
17        A      Yes.
18        Q      And at that point she approached you in
19   the lobby and said, "I want to give you your
20   passport"?
21        A      No.
22        Q      All right.  Explain that to me then.  What
23   happened?
```

```
1        A    She wanted to give me my passport.  They

2   wouldn't let her come near me, so she stood on one

3   side and she tried to talk to me but I didn't say

4   nothing to her.  I told her -- I told my lawyer for

5   her to give it to him to give it to me, and she just

6   kept on at that point trying to talk to me, so, the

7   police officer told her, "You have to just give the

8   passport up."  She wanted to hand it to me

9   personally from her hand to mine.  They wasn't going

10  to let that happen, so, she ended up after a while

11  giving it to them and I received it.

12       Q    All right.  She gave it to the officers

13  who gave it to you?

14       A    Yes.

15       Q    Who was your lawyer by the way?

16       A    Bill Roberts was my lawyer and Jessica

17  Wicklebauer.

18       Q    For how long on the morning of

19  February 26, 2015 do you think you fell asleep while

20  watching National Treasure?

21       A    I don't know.

22       Q    Or Finding Treasure rather.

23       A    I don't know.
```

1      Q    Can you give me your best sense of when

2    you fell asleep?  Was it 8:30, nine o'clock, 9:30?

3      A    No, it was probably fifteen -- I was into

4    the movie.  I don't have a set time.

5      Q    Well, in terms of when &#9608;&#9608;&#9608; went back to

6    bed, I think we've established that was somewhere

7    around eight o'clock.  I know you don't know

8    exactly.  But in terms of when &#9608;&#9608;&#9608; went back to

9    her bedroom, can you tell me how long after that you

10    fell asleep?

11      A    Like fifteen, twenty minutes?

12      Q    And before you went to bed, did you check

13    on &#9608;&#9608;&#9608; to see where she was?

14      A    Yes.

15      Q    Where was she when you went to bed?

16      A    In her bed.

17      Q    For how long did you sleep?

18      A    I'm not sure when I woke up.  The

19    beginning of the movie was like on again so it was

20    like the beginning screen, so I'm not sure.

21      Q    So, however long the movie is -- in other

22    words, the movie had actually run through and was

23    running through again; is that fair to say?

SUSAN FLORIO, RPR
Professional Reporting Service
(518) 887-2733

```
 1        A    No.

 2             MR. KLEIN:  Objection.

 3   BY MR. BAILEY:

 4        Q    All right.  Then I misunderstood your

 5   answer.  Would you try to explain your answer to me,

 6   please?

 7        A    When you have an official movie, it don't

 8   run through over again as if it was a bootleg movie.

 9   It would go right back to the front screen and just

10   stay on the front screen until you play it again.

11        Q    Okay.  So, I did misunderstand.

12             So, the movie had played through and it

13   had gone back to the front screen and you woke up at

14   that -- somewhere at that -- when that happened?

15        A    Yes.

16        Q    Do you know in relation to noontime when

17   you woke up?  Was it 11:30, quarter to 12:00, 10:30?

18   Can you give me any sense of that?

19        A    No.

20        Q    When you did wake up, what did you do?

21        A    I noticed I initially dozed off when I

22   woke up.  I initially dozed off, so I noticed that

23   when I woke up.  So, the first thing I did was call
```

```
 1   for ███ and she didn't answer me.  I called her

 2   again as I was getting up to go towards her door.

 3   She didn't answer me.  So when I went to her door, I

 4   called her again.  She didn't answer.  I went to

 5   like kind of nudge her a little bit and tell her it

 6   was time for breakfast, time to wake up.  When she

 7   wouldn't move, I tried it again.  She didn't move.

 8   I just started doing -- trying to do CPR as best as

 9   I could.  I was panicking.

10        Q    Can you tell me what time?  Was that

11   before or after --

12        A    I can't tell you --

13             MR. KLEIN:  You have to let him finish;

14        okay?

15   BY MR. BAILEY:

16        Q    Was that before or after noon?

17        A    I can't tell you an exact time.  I had no

18   knowledge of it.

19        Q    All right.  You called from -- you noticed

20   when you got up, she wasn't up.  You called for her

21   and she didn't answer.  You called for her a second

22   time; correct?

23        A    As I'm getting up.
```

Case 1:17-cv-01290-DJS Document 66-1 Filed 02/04/22 Page 57 of 105

```
 1        Q    And then did you immediately walk to her
 2   bedroom?
 3        A    Yes.
 4        Q    How long did it take you to get from your
 5   bed to her bedroom?
 6        A    Two steps.
 7        Q    Did her bedroom have a door on it?
 8        A    Yes.
 9        Q    Was the door open or closed?
10        A    Open.
11        Q    When you looked into the door, what did
12   you see?
13        A    She was laying on the bed.
14        Q    In what position was she laying on the
15   bed?  On her belly, on her side, on her back?
16        A    She was on her back.
17        Q    Did she have a blanket on her?
18        A    Yes.
19        Q    What type of blanket?
20        A    Her -- a Frozen blanket?
21        Q    A frozen blanket?
22        A    It's one of her favorite cartoons that was
23   out that was called "Frozen."
```

```
 1        Q     Okay.  She had a diaper on; correct?

 2        A     Yes.

 3        Q     Did she have any other clothes on?

 4        A     She had on these soft like -- I don't know

 5   what to say -- like stretchy pants, I would say, for

 6   her age, a pink -- a purple tee-shirt with like

 7   butterflies on it.

 8        Q     Now, when you noticed her when you looked

 9   into the room and saw her laying on her back, what,

10   if anything, did you see about her?

11        A     Nothing I didn't see that really jumped

12   out at me, just like maybe she's just not hearing

13   me, and so I kind of came through, but I was --

14        Q     So there was nothing odd about her

15   appearance when you looked through the door?

16        A     No.

17        Q     Did she appear to be sleeping?

18        A     Yes.

19        Q     And why do you say that?  What about her

20   made you think she was sleeping?

21        A     Just how she was laying.  I don't know.

22   Sometimes she usually sleeps wild and sometimes she

23   doesn't move at all when she sleeps, so it's very
```

1    random.

2        Q    Well, could you see -- was she breathing?

3        A    No, just waking up, that was something I

4    could not see.

5        Q    Did you approach her after you made that

6    observation from the door?

7            MR. KLEIN:  I'm going to object to this.

8        This has been asked and answered a couple of

9        times.

10           But you can answer the question.

11           MR. BAILEY:  I don't think I asked that.

12           MR. KLEIN:  You said it before.

13       A    You did, but you asked if I approached

14   her.

15   BY MR. BAILEY:

16       Q    And how far away from the door was she?

17       A    As close as we are.

18       Q    A couple feet?

19       A    Yes.

20       Q    And when you approached her, did you

21   approach her from your point of view at the foot of

22   her bed, to the left side of her bed, to the right

23   side of her bed or the head of her bed?

```
1        A     It would be her left because the bed was
2    initially at -- against the wall.
3             MR. KLEIN:  He's just asking what side did
4        you approach on.
5        A     It would be the left.
6             MR. KLEIN:  Her left?
7             THE WITNESS:  Yes.
8             MR. KLEIN:  When she's laying on her back?
9             THE WITNESS:  Yes.
10   BY MR. BAILEY:
11       Q     So, as you approached her, just so we're
12   clear, it would have been -- if she was on her back,
13   it would have been her left arm, left shoulder that
14   would have been closest to you; correct?
15       A     Yes.
16       Q     And when you got right next to her, what
17   did you see about her?
18       A     She just wasn't moving.
19       Q     Did you call her name?
20       A     Yes.
21       Q     Can you describe for me how you did that?
22       A     I was just like, "███," just trying to
23   wake her up, and I nudged her like a few times to
```

1   see if she would wake up and she wouldn't move or

2   wake up.  I did it again.  She didn't move or wake

3   up.

4        Q    All right.  What did you do when you

5   nudged her -- as you've said, you called her name

6   and you nudged her -- and she didn't wake up?

7        A    After the second time of me nudging her

8   and she didn't wake up, I started panicking, like,

9   what's going on?  Why is she not waking up?  Trying

10  to do CPR.

11       Q    Is there some reason that you didn't

12  immediately go for emergency help?

13       A    Well, being her father, my initial

14  reaction would be to try to save her life.  I would

15  try my best to do so as a father.

16       Q    Well, did you have any medical training of

17  any type?

18       A    Never had no medical training.

19       Q    Well, you had two phones in the house;

20  correct?

21       A    Yes.

22       Q    Did you use either of those phones to call

23  for help?

```
 1        A    When I brought her into the living room
 2   and laid her on the futon, initially it was to go
 3   for one phone that was working.  That's what my
 4   initial reaction was, to go for that phone, and it
 5   wasn't there, so --
 6        Q    When you say it wasn't there, what do you
 7   mean by that?
 8        A    It wasn't on the table where it usually
 9   was.
10        Q    Well, did you find it?
11        A    No.
12        Q    Do you know where it was?
13        A    Her mother had it.
14        Q    All right.  Well, her mother had her own
15   phone; correct?
16        A    Yes.
17        Q    Where was that phone?
18        A    With --
19             MR. KLEIN:  Objection.  What phone?
20             MR. BAILEY:  Her mother's phone.
21             MR. KLEIN:  You said, "Her mother had the
22        phone", "Yes," and then, "Where was that
23        phone?"
```

```
 1    BY MR. BAILEY:
 2         Q    You testified earlier that Rebecca had her
 3    own phone, an iPhone; correct?
 4         A    Yes.
 5         Q    Did she have that with her on the morning
 6    of February 26, 2015?
 7         A    I didn't notice because she never said
 8    nothing to me about it.
 9         Q    Well, you went to use a phone after you
10    put          on the futon.  What phone did you go to
11    use?
12         A    One of the two phones that was on the
13    table.
14         Q    And which phone was that?
15         A    Initially, it was my actual phone, the old
16    phone that I had that had been cut off for like a
17    month, but I figured if I can get it to come on, I
18    could at least dial 911 because you don't need
19    minutes for that.  So, I tried that.  It was
20    severely dead.  It would just blink red.  So, I
21    tried the one that was found.  That was also
22    severely dead.  So, I ran out of the apartment.
23         Q    Let me ask you about these phones.
```

1    For how long did you try to activate what
2  we're going to call "your phone"?
3    A    Roughly, a few seconds.  I would say no
4  more than ten.
5    Q    What did you have to do to activate that
6  phone?
7    A    I was not activating it; just getting it
8  to come on because it had been dead for so long.
9    Q    Did you have to push a button to turn it
10  on?
11    A    Oh, once you plug a phone up, it will
12  automatically come on itself.
13        MR. KLEIN:  That's what he's asking you.
14    Did you have to plug it in?
15    A    Yes, I had to plug the phone in.
16  BY MR. BAILEY:
17    Q    So, did you have a plug and did you plug
18  that phone in?
19    A    Yes.
20    Q    And then you tried to turn the phone on?
21    A    Yes.
22    Q    How long did that take you?
23    A    Between both phones, it was roughly maybe

Case 1:17-cv-01290-DJS Document 84-1 Filed 02/04/22 Page 65 of 105

64

```
 1   twenty seconds, thirty seconds like.
 2        Q    Now, is there any reason you didn't leave
 3   your apartment immediately when         didn't
 4   respond, to go for help?
 5        A    I can't say the reason.  There was a lot
 6   going on.  Like her being unresponsive, my initial
 7   thought wasn't to run out of the house.  It was to
 8   try and do CPR, if not, trying to find a phone or
 9   something to call for help, not to just run out of
10   the house and leave her there.  That was the last
11   thing that I was even thinking about doing, so --
12        Q    Did you ever have any training in CPR?
13             MR. KLEIN:  Asked and answered.
14             You can answer.
15        A    No.
16   BY MR. BAILEY:
17        Q    Did you attempt to perform CPR on        ?
18        A    Yes.
19        Q    Tell us what you did.
20        A    I blew into her mouth.  I put both my
21   hands on her chest and I pushed very lightly down on
22   her chest.  It seemed as if she wasn't breathing.
23             When I was on her mouth again, her stomach
```

SUSAN FLORIO, RPR
Professional Reporting Service
(518) 887-2733

Case 1:17-cv-01290-DJS Document 114-24 Filed 02/04/22 Page 66 of 105

```
 1   seemed as if it wouldn't go down, so I put my hand

 2   under her back to level her.  I slowly pushed very

 3   gently and lightly to let the air out.  I tried that

 4   twice and nothing worked.

 5        Q     Which hand did you put behind her back?

 6        A     My left hand.

 7        Q     And what did you --

 8        A     My right hand.  Excuse me.

 9        Q     Your right hand.

10              What did you do with your left hand?

11        A     I put it on her stomach and lightly pushed

12   down slowly.

13        Q     Why did you push on her stomach?

14        A     Because it seemed as if the air didn't

15   release back out of her when I pushed air into her.

16   It seemed like her stomach kind of got full and sort

17   of stayed there, so I didn't want to just push on

18   her stomach.

19        Q     Now, did you try CPR while she was laying

20   in her bed?

21        A     Yes.

22        Q     And then you moved her to the futon and

23   tried CPR there?
```

```
 1       A     Yes.

 2       Q     When the CPR didn't work on the bed, why

 3  didn't you go for help?

 4             MR. KLEIN:  Objection.

 5       A     I wouldn't know how to explain that to

 6  you.  It's when you're put in that situation, you

 7  don't have a logical explanation for why you didn't

 8  go and do something.  It's just what's thrown at you

 9  at that time.

10  BY MR. BAILEY:

11       Q     Well, why did you move ████ from her bed

12  to the futon?

13       A     Because I wanted her in my sight while I

14  would call the ambulance because if they were on the

15  phone, maybe they could tell me something to do

16  while I'm right there, more than her being in the

17  room when I'm in a different room.  So, I just

18  wanted her in my sight.

19       Q     How much time elapsed between when you

20  were at ████'s side by her bed and when you left

21  the house to look for help?

22       A     Roughly minutes.  It had to be minutes.

23  I'm not sure of the time once again.
```

```
 1        Q    And the first thing you did was run to a
 2   friend's house?
 3        A    Yes, where I was at the night before.
 4        Q    And that friend was Willy Robinson?
 5        A    Yes.
 6        Q    Did he live in the same building or
 7   another building?
 8        A    What do you mean?
 9             MR. KLEIN:  Where did he live?
10        A    He lived across the street from me.
11   BY MR. BAILEY:
12        Q    Across 6th Avenue?  Or 4th Avenue rather?
13        A    Yeah, it was on 4th.
14        Q    Fourth Avenue?
15             Do you remember his address?
16        A    No.
17        Q    When you say you were there the night
18   before, tell me what you mean by that.
19        A    I went over there the night before to
20   watch a basketball game with him.
21        Q    And who was Willy Robinson; a friend?
22        A    Yes, somebody who looked at me as a son.
23   Me and his son was around the same age.
```

```
 1        Q      And when you went to his house the night
 2   before, he was there.  Anybody else there?
 3        A      His girlfriend was there.  Her grandkids
 4   was there.
 5        Q      Now, were there any other people -- were
 6   there any other tenants who lived in the building
 7   you lived in?
 8        A      Yes, but they lived on the other side of
 9   the building.
10        Q      All right.  So, was Robinson's house
11   directly across 4th Avenue from your house?
12        A      Not directly.  It was slightly to an
13   angle.
14        Q      About how far away was his house from your
15   house?
16        A      I would say roughly ten, fifteen feet
17   maybe?
18        Q      You went over there and what, knocked on
19   the door?
20        A      Banged on the door.
21        Q      And nobody answered?
22        A      No.
23        Q      For how long did you bang on the door?
```

```
1        A    I'm not sure of the time but I know I

2    tried not to spend a lot of time over there.  I

3    knocked on her door --

4             MR. KLEIN:  He's just asking how long.

5        A    I'm not sure.

6    BY MR. BAILEY:

7        Q    Can you give us any sense of when this

8    was?  Was it before or after noon?

9        A    I couldn't because I had no knowledge of

10   time.  My mind was completely on what was going on

11   with          .

12       Q    When nobody answered the Robinson door,

13   what did you do?

14       A    I went upstairs to his neighbor.

15       Q    And what is his neighbor's name?

16       A    I don't remember.  I can't say.  I really

17   didn't know her like that.

18       Q    There was a female neighbor who lived

19   upstairs?

20       A    Yes.

21       Q    And so you had to climb a flight of stairs

22   to go up and, what, knock on her door?

23       A    Yes.
```

Case 1:17-cv-01290-DJS Document 87-1 Filed 02/04/22 Page 71 of 105

```
 1        Q     And you don't remember her name?

 2        A     No.

 3        Q     And did you knock on her door?

 4        A     Banged on her door, yes.

 5        Q     Was there an answer?

 6        A     No.

 7        Q     What did you do after that?

 8        A     I ran back downstairs and I ran back

 9   across the street to see maybe if anything had

10   changed, maybe I was in a nightmare and it's -- you

11   know, this can't be happening.

12              When I went back across the street, she

13   was still laying on the futon.  I tried CPR one more

14   time and nothing worked.  Then I initially ran back

15   out of the house to Testo's to use the phone to make

16   a phone call.

17        Q     And were you familiar with Testo's?  Have

18   you ever eaten dinner there?

19              MR. KLEIN:  Objection.

20        A     Once in a while, but it's an expensive

21   place.

22   BY MR. BAILEY:

23        Q     Do you know who owned it?
```

```
 1        A     No.

 2        Q     Did you know anybody there when you went

 3   over to the restaurant to look for help?

 4        A     No.

 5        Q     Did you find somebody?

 6        A     Yes.

 7        Q     Who did you find?

 8        A     A worker that was sitting on the chair

 9   next to the window.

10        Q     And what did you say to this person?

11        A     That, "I need to use your phone.  My

12   daughter didn't wake up.  She's not breathing.  Can

13   I use your phone?"

14        Q     And I assume he let you use his phone?

15        A     Yes.

16        Q     And what did you do with it?

17        A     I called 911.

18        Q     And what did you say to them?

19        A     I pretty much said, "My daughter just woke

20   up" -- you know, I mean, "When I went to wake her

21   up, she's not breathing.  Can you please send help?"

22              He was asking me if I was in my own house.

23   I was like, "Yes, at the time."  And he was staying
```

```
 1    very calm.  I wasn't as calm as he was.  So, I felt
 2    like he wasn't being very rushitive (phonetic) as I
 3    was.  All I can really remember him saying is that
 4    he's sending help and for me to try and stay there,
 5    and I told him that she was the only one in the
 6    apartment and I left the door open and I have to get
 7    back to her, and then I hung the phone up.
 8         Q    How long after you made that call did help
 9    arrive?
10         A    Roughly a few minutes.
11         Q    And do you recall who arrived?
12         A    First, a fire department ambulance arrived
13    and they were the first on the scene.  They went to
14    the house.  They told the driver to back up.
15              MR. KLEIN:  He's asking who arrived, not
16         what they said.  He wants to know if anybody
17         else arrived.
18         A    The two police officers arrived.
19    BY MR. BAILEY:
20         Q    Now, I think you said it was the fire
21    ambulance people that arrived first; is that
22    correct?
23         A    Yes.
```

```
 1        Q    When they arrived, were you still outside
 2   or were you back inside your house?
 3        A    I was inside the house.
 4        Q    And how do you know they arrived?  Could
 5   you hear them?
 6        A    As Rebecca was getting on the phone to
 7   call the police, is when they came rushing into the
 8   apartment.
 9        Q    Now, at some point during what you've just
10   described to me, did Rebecca come home?
11        A    Yes.
12        Q    And were you aware she was home?
13        A    Yes.
14        Q    When did she come home?
15        A    I'm not sure exactly when she came home,
16   but when I was -- when I hung up the phone and I was
17   leaving out the restaurant, she was outside talking
18   to Mr. Brown, the person who dropped her off.
19        Q    Do you know, at that time had she been
20   into the house?
21        A    I didn't know at that time if the door was
22   the same way I left it.
23        Q    At any point between then and today, did
```

1    Rebecca ever tell you whether she had entered the

2    house before you first saw her on the street?

3         A    Yes.

4         Q    What did she tell you?

5         A    She told me that she had went into the

6    house and walked right past ▮▮▮ laying on the futon.

7    I have no idea how she did that, but first she went

8    to the kitchen and grabbed the paperwork because she

9    was having some credit card fraud and Mr. Brown was

10   doing the same, so, she grabbed it and went to walk

11   back out the house.

12        Q    All right.  So, you come out of Testo's

13   and you see Rebecca standing out on the street with

14   a gentleman named Brown; is that correct?

15        A    Yes.

16        Q    Was Mr. Brown standing?  Was he outside a

17   car?  Was he inside a car?

18        A    Outside, leaning against his car.

19        Q    And do you know how it is that this

20   gentleman, Brown, was with Rebecca?

21        A    He usually drives her or drops her off

22   from work.

23        Q    So, you saw Rebecca talking to this

```
 1   gentleman, Brown; is that correct?
 2        A    Yes.
 3        Q    And what, if anything, did you do or say
 4   when you saw that?
 5        A    As I was running across the street from
 6   Testo's, I was screaming, "Call an ambulance,
 7   Rebecca.  ████  not breathing.  Call an ambulance,"
 8   because I was running across the street.
 9        Q    But you had already called the ambulance;
10   right?
11        A    Yes.
12        Q    Why were you screaming, "Call the
13   ambulance"?
14        A    Because I didn't know if they actually was
15   going to send them or not.  The guy on the phone
16   didn't seem like he -- I guess that was his job was
17   to try to calm me down, but I just needed them to
18   hurry up and come, so I asked her to call them again
19   just in case or anything.
20        Q    And what did Rebecca do, if anything, in
21   response to you yelling, "Call the ambulance.  Call
22   the ambulance"?
23        A    She just kind of like turned around and
```

```
 1    went back up the stairs and got on the phone as she

 2    went to ███ to call an ambulance.

 3         Q    Did she say to you, in sum or substance,

 4    "Mike, what are you talking about?  Why am I calling

 5    an ambulance?"

 6         A    No.

 7         Q    You rushed back into the house; correct?

 8         A    Yes.

 9         Q    Were you ahead of Rebecca or was she ahead

10    of you?

11         A    She was ahead of me.

12         Q    Was she a few feet ahead of you,

13    twenty feet ahead of you?

14         A    I don't recall.

15         Q    Now, the house -- was this a first-floor

16    apartment?

17         A    Yes.

18         Q    So, when you opened the front door, where

19    would Rebecca and ███ -- well, where would ███

20    have been when you opened the front door and walked

21    through the front door?

22         A    On the futon to the left.

23         Q    About how far away?
```

```
1        A     Two steps.

2        Q     And when you rushed back into the door

3    after leaving Testo's, where was Rebecca?

4        A     She was right in front talking to Mr.

5    Brown as I was leaving Testo's.

6        Q     Well, all right.  My question was

7    confusing, and I apologize.

8              When you walked back into your apartment

9    door after leaving Testo's, where was Rebecca?

10             MR. KLEIN:  I believe it's been asked and

11        answered but you can go ahead.

12        A     She was -- had been already in the house.

13   BY MR. BAILEY:

14        Q     Can you tell me where she was with respect

15   to        ?  Was she near her or was she some distance

16   away?

17        A     No, she walked right up to her.

18        Q     Was she touching her?

19        A     Yes, like tapping her on her cheek.

20        Q     Now, how long did it take -- how much time

21   did it take from when that occurred that as you two

22   were in your house, she was tapping        's cheek

23   and you were standing there -- how long did it take
```

```
 1    before emergency help came?
 2         A    She didn't get a chance to even make the
 3    call.  They came that fast.
 4         Q    So, is it fair to say that the fire and
 5    ambulance people got to the door almost at the same
 6    time that you and Rebecca did?
 7         A    Yes.
 8              MR. KLEIN:  Objection.
 9    BY MR. BAILEY:
10         Q    What did you see the fire and ambulance
11    people do?
12         A    They just told me to back up, and they
13    started cutting her clothes off and was working on
14    her right away.
15         Q    And at some point they left with        ?
16         A    Yes.
17         Q    And at some point not too long after that,
18    did you learn that        was pronounced dead?
19         A    At the precinct.
20              MR. KLEIN:  The answer is "yes"?
21         A    Yes.
22              MR. KLEIN:  He's not asking you where.
23         Just listen to the question.
```

```
 1   BY MR. BAILEY:

 2        Q    Now, were you taken to the precinct or did

 3   you go to the precinct?

 4        A    Obviously, I went to the precinct.

 5        Q    And why did you do that?

 6        A    Because they pretty much asked me to go

 7   with them.

 8        Q    And are we talking about the Troy Police

 9   Department precinct?

10        A    Yes.

11        Q    Do you remember who you spoke with when

12   you got there?

13        A    Detective Ron Fountain and his partner.

14        Q    Do you remember his partner's name?

15        A    McDowell or McDonald -- something like

16   that.

17        Q    And where did you speak to them?

18        A    Downstairs in his partner's office,

19   McDowell's office.

20        Q    Do you know, was your interview with them

21   tape recorded?

22             MR. KLEIN:  Yes or no.

23        A    I really don't know how to answer that
```

```
 1   question.
 2   BY MR. BAILEY:
 3        Q    For how long did your meeting with them
 4   last?
 5        A    It had to be hours.
 6        Q    Did you give a statement of some kind
 7   during or at the end of that meeting?
 8             MR. KLEIN:  Objection.  Do you mean a
 9        written statement or an oral statement?
10             MR. BAILEY:  Yes, a written statement.
11             MR. KLEIN:  A written statement.
12        A    I believe I gave an oral statement.
13             MR. KLEIN:  So he's asking if you gave a
14        written statement.  Is the answer "no"?
15        A    "No."
16   BY MR. BAILEY:
17        Q    You did give an oral statement?
18        A    Yes.
19        Q    Can you tell me what you said in that
20   statement?
21        A    Just pretty much what happened from that
22   morning.
23        Q    Did you describe for the officers what
```

```
 1    happened that morning?

 2         A    Yes.

 3              MR. KLEIN:  Objection.

 4    BY MR. BAILEY:

 5         Q    Did you describe it accurately?

 6         A    As accurately as I could have at that

 7    point.

 8         Q    At any point did you admit killing       ?

 9         A    No.

10         Q    Now, at some point you were arrested;

11    correct?

12         A    Yes.

13         Q    And you were charged with killing      ?

14         A    Yes.

15         Q    Were you convicted?

16         A    No.

17         Q    All right.  You were found not guilty?

18         A    Yes.

19         Q    The time that you spent in jail -- was

20    that because you were there and couldn't make bail

21    or bail was not set?

22         A    No bail was set.

23         Q    And I assume your attorney did apply for
```

1  bail?

2      A     Yes.

3      Q     And the judge refused to set bail?

4      A     Yes.

5      Q     Now, you've filed a Notice of Claim

6  against my client, Rensselaer County.  Can you tell

7  me why?

8      A     Pretty much because they, Rensselaer

9  County, along with other people incarcerated me for

10  something that I did not do.  I spent eleven months

11  in jail.  My career was not only put on hold but it

12  was completely destroyed.  I just want justice.

13     Q     Well, I understand that, but what I'm

14  trying to find out is, why are you claiming that

15  Rensselaer County had anything to do with that?  I

16  would like you to be specific, please.

17         MR. KLEIN:  I'm just going to note an

18      objection that all questions of law are

19      certainly reserved for the court.

20         But he's asking -- you can answer his

21      question if you understand it.

22         THE WITNESS:  I don't.

23         MR. KLEIN:  Anything that you attribute to

SUSAN FLORIO, RPR
Professional Reporting Service
(518) 887-2733

```
 1          the county that you think the county did wrong,
 2       if you know.
 3       A     The process of trying, I guess, or
 4    prosecuting me for something that I did not do,
 5    something that they had no knowledge of me doing.
 6    BY MR. BAILEY:
 7       Q     All right.  Are you saying that you're
 8    blaming the district attorney?
 9       A     I would say I'm blaming not only the
10    district attorney but the detectives that lied.
11       Q     Are you talking about the Troy police
12    detectives?
13       A     Yes.
14       Q     I understand that, and I understand you
15    may not completely understand the difference between
16    county and city.  Sometimes it's not that easy.
17          I'm representing the county, not the city,
18    and so, I'm interested in why you filed a claim
19    against the county, and if you could tell me why you
20    have, I would like to know.
21       A     The county along with the city
22    incarcerated me in jail for something that I did not
23    do.
```

```
 1      Q    All right.  Does the name, Dr. Sikirica
 2   mean anything to you?
 3      A    Yes.
 4      Q    And who is that, if you know?
 5      A    He's a medical physician I would say who
 6   works for the county who said in his conclusion that
 7   I did something that I did not do.  He did not fully
 8   go over everything that he needed to.
 9      Q    Specifically, tell me what it is that he
10   didn't go over that he needed to.
11          MR. KLEIN:  If you know.  And I'm just
12      going to note an objection to the extent
13      that --
14      A    I'm not a --
15          MR. KLEIN:  Hold on.  Let me just note an
16      objection that this is a lay witness, not an
17      expert, but notwithstanding all objections, you
18      can answer if you understand his question if
19      you know.
20      A    He lied to the grand jury.
21   BY MR. BAILEY:
22      Q    About what?
23      A    About the extent of       damages to her
```

```
 1    body and who caused them.  This is something that he
 2    had no knowledge of, who caused the injuries that he
 3    claimed I did.  He had no knowledge of exactly who
 4    caused them or how they was actually caused or where
 5    they was caused.  He had no knowledge of that.
 6         Q    Well, do you know what caused        to
 7    die?
 8         A    No.
 9         Q    Were you ever told that it was massive
10    lacerations to her liver that caused her to die?
11              MR. KLEIN:  I'm going to object.
12              Counsel, I'm sure, doesn't want you to
13         divulge anything that you were advised by an
14         attorney, so, outside of any conversations with
15         an attorney, which I would direct you not to
16         answer, did anyone not an attorney ever tell
17         you --
18              MR. BAILEY:  Well, I disagree with that.
19         He has filed a Notice of Claim, and I think --
20              MR. KLEIN:  The attorney-client privilege
21         doesn't apply?  I'm going to direct him not to
22         answer anything about attorney-client
23         privilege.
```

```
 1   BY MR. BAILEY:

 2        Q    You were in court, right, during your

 3   trial?

 4        A    Yes.

 5        Q    And did you hear Dr. Sikirica talk about

 6   ███'s liver being lacerated?

 7        A    Yes.

 8        Q    You know she bled to death; right?

 9        A    No.

10        Q    You don't understand that ███ bled to

11   death?

12             MR. KLEIN:  Objection.  That's asked and

13        answered.

14   BY MR. BAILEY:

15        Q    Well, what is it that you say Dr. Sikirica

16   did wrong?

17        A    Not having no knowledge of ███ medical

18   history nor her mother's, just looking at the

19   surface and not actually figuring out why or what

20   exactly happened, him doing over four autopsies or

21   five a day.

22        Q    I'm sorry.  I didn't quite catch the last

23   thing.
```

```
1          A     I said him doing over four or five
2     autopsies a day, meaning he never actually took his
3     time with not one of them.
4          Q     Do you know how many autopsies Dr.
5     Sikirica did on the day he did      ████'s?
6          A     Not exactly, but in court his number was
7     roughly four or five, I believe, and he said it
8     would take a certain amount of hours for each
9     autopsy, so he was pretty much rushing through
10    everything.
11         Q     Now, you had an expert testify on your
12    behalf at your criminal trial; correct?
13         A     Yes.
14         Q     Who was that?
15         A     I don't recall her name.
16         Q     Do you know where she was from?
17         A     I don't recall.
18         Q     Do you know what her qualifications were?
19         A     I'm not an expert.  I couldn't really say
20    what her qualifications were.
21         Q     Do you know who paid her fee?
22         A     No.
23         Q     Do you know how much she was paid?
```

```
1        A     No.

2        Q     What opinions did she express?

3        A     That there was way more to it than what

4   Sikirica initially said.  She actually went into the

5   cells and the nucleus of her body to determine if

6   those injuries was caused prior to her passing or

7   after, and the determination was that the injuries

8   was caused after her passing.  That was her

9   determination.  But nobody not knowing -- Sikirica,

10  not knowing the medical history or anything like

11  that of the mother or the daughter, there's a few

12  things that he left out coming to his conclusion.

13  He didn't --

14       Q     Well, did your expert express an opinion

15  as to what caused      ██     to die?

16            MR. KLEIN:  If you know.

17            Objection.

18       A     I don't recall.

19            MR. BAILEY:  Now, I do object to you

20       interrupting.  It clearly is coaching the

21       Witness.

22            MR. KLEIN:  Coaching the Witness to say,

23       "Only answer if you know?"  That's not coaching
```

```
 1        either way.
 2             MR. BAILEY:   That's a clear signal, "Don't
 3        answer that question."
 4             MR. KLEIN:   So the record is clear, I
 5        would never coach a witness to -- and I did not
 6        say, "Don't answer the question."   It's "Answer
 7        if you know."   It applies --
 8             MR. BAILEY:   And we've been doing this a
 9        long time.   That's a way to alert a witness,
10        "Just say you don't know."
11             MR. KLEIN:   Who is "we've been doing this
12        a long time," sir?
13             MR. BAILEY:   You and I have.
14             MR. KLEIN:   We've been at this deposition
15        for maybe an hour and, so, I take offense to
16        what you just said.
17             MR. BAILEY:   Well, good for you.   Take
18        offense if you want.
19             MR. KLEIN:   It's inappropriate.
20             MR. BAILEY:   There's nothing inappropriate
21        about it.
22   BY MR. BAILEY:
23        Q    Do you know what caused ████ to die?
```

```
 1        A     No.

 2        Q     This is a little girl that you considered

 3   your daughter; correct?

 4        A     Yes.

 5        Q     And you still don't know what caused her

 6   to die?

 7             MR. KLEIN:  Objection.  That's asked and

 8        answered and argumentative.

 9             I don't think you have to answer that

10        question.

11   BY MR. BAILEY:

12        Q     Do you have any contact with Rebecca

13   Parker at this point in time?

14        A     No.

15             MR. BAILEY:  Okay.  That's all I have.

16        Thank you very much.  I appreciate it.

17             MR. KLEIN:   Thank you.

18             (Whereupon, the examination of Michael L.

19        Davis was concluded at 3:45 p.m.)

20                    * * * * * * *

21

22

23
```

```
 1

 2    STATE OF NEW YORK      )
                                    ss:
 3    COUNTY OF              )

 4

 5

 6          I have read the foregoing record of my

 7    testimony taken at the time and place noted in the

 8    heading hereof, and I do hereby acknowledge it to be

 9    a true and accurate transcript of same.

10

11

12                                _____

13                                MICHAEL L. DAVIS

14    Sworn to before me this

15    _____ day of_____2017.

16

17    _____

18          Notary Public

19

20

21

22

23
```

```
 1

 2

 3

 4

 5

 6              C E R T I F I C A T I O N

 7

                    I, DOROTHEA MULLEN, a Shorthand Reporter
 8
        and Notary Public in and for the State of New York,
 9
        do hereby certify that the foregoing record taken by
10
        me at the time and place as noted in the heading
11
        hereof is a true and an accurate transcript of the
12
        same, to the best of my ability and belief.
13

14

15        4-3-17                    Dorothea Mullen
            Date                      DOROTHEA MULLEN
16

17

18

19

20

21

22

23
```

**BY MR. BAILEY: [61]** 2/7 2/22 4/10 5/18 5/23 9/3 10/5 11/18 12/23 13/20 14/16 17/9 18/13 20/20 21/11 22/6 23/14 24/14 26/9 27/5 27/14 33/4 33/21 34/20 35/15 36/8 36/14 40/17 41/14 41/3 44/10 45/9 45/23 47/11 48/2 48/10 49/16 54/2 55/18 58/14 59/9 61/23 63/15 64/15 66/9 67/10 69/5 70/21 72/18 77/12 78/8 78/23 80/1 80/15 81/3 83/5 84/20 85/23 86/13 89/21 90/10

**MR. BAILEY: [30]** 4/4 4/8 11/9 11/16 29/11 29/18 30/3 30/6 30/11 30/17 31/7 31/14 31/21 32/9 32/15 33/3 34/9 48/1 49/14 58/10 61/19 80/9 85/17 88/18 89/1 89/7 89/12 89/16 89/19 90/14

**MR. KLEIN: [95]**

**THE WITNESS: [7]** 14/15 18/9 26/19 26/23 59/6 59/8 82/21

## 1

**10007 [1]** 1/18
**104th [1]** 24/19
**10:30 [1]** 54/17
**11:30 [1]** 54/17
**12205 [1]** 1/21
**124th [6]** 23/11 23/13 25/6 26/5 26/15 27/17
**12:00 [1]** 54/17
**15 [2]** 15/2 17/16
**160 [1]** 31/1
**160.50 [4]** 29/5 29/11 30/2 31/21
**18 [1]** 15/3
**1986 [1]** 7/23

## 2

**20 [1]** 15/2
**2013 [2]** 16/16 17/1
**2014 [4]** 16/23 18/19 19/1 24/21
**2015 [7]** 28/13 33/12 36/22 37/3 46/3 52/19 62/6
**2016 [2]** 5/2 5/9
**2017 [2]** 1/9 91/15
**26 [7]** 28/13 33/11 36/22 37/3 46/3 52/19 62/6
**29 [1]** 7/23
**2:00 [1]** 1/12

## 3

**30 [1]** 1/9
**305[1]** 1/17
**3:45[1]** 90/19

## 4

**4th [3]** 67/12 67/13 68/11

## 5

**50-h [2]** 1/9 32/10
**507 [2]** 1/11 1/20

## 6

**600 [1]** 1/17
**6th [1]** 67/12

## 8

**856 [7]** 23/11 23/13 24/19 25/6 26/5 26/15 27/17
**86th [1]** 26/3
**8:00 [1]** 45/3
**8:15 [1]** 45/12
**8:30 [2]** 45/14 53/2

## 9

**911 [3]** 39/16 62/18 71/17
**9:00 [1]** 45/14
**9:30 [1]** 53/2

## A

**ability [1]** 92/12
**able [2]** 7/7 9/12
**about [36]** 2/15 7/5 8/7 11/23 12/20 14/5 18/7 28/17 31/6 33/16 37/7 37/9 42/6 45/1 47/14 47/15 48/8 50/14 51/3 57/10 57/14 57/19 59/17 62/8 62/23 64/11 68/14 76/4 76/23 79/8 83/11 84/22 84/23 85/22 86/5 89/21
**above [3]** 21/11 21/13 21/14
**access [1]** 29/6
**accurate [6]** 6/10 16/12 21/6 22/20 91/9 92/11
**accurately [2]** 81/5 81/6
**accused [2]** 30/16 36/23
**acknowledge [1]** 91/8
**acquired [1]** 10/9
**across [10]** 38/22 39/6 39/8 67/10 67/12 68/11 70/9 70/12 75/5 75/8
**activate [2]** 63/1 63/5
**activating [1]** 63/7
**actors[1]** 47/17
**actresses [1]** 47/18
**actual [3]** 9/8 19/11

**actually [13]** 6/12 7/17 8/3 18/6 25/4 25/4 38/19 53/22 75/14 85/4 86/19 87/2 88/4
**address [17]** 3/18 3/19 3/22 4/7 4/13 4/16 5/18 6/12 17/15 23/10 23/17 23/19 26/4 26/17 27/3 28/16 67/15
**addresses [2]** 6/3 26/16
**admit [1]** 81/8
**advised [1]** 85/13
**after [21]** 9/10 22/2 22/22 23/3 46/9 51/15 52/10 53/9 55/11 55/16 58/5 60/7 62/9 69/8 70/7 72/8 77/3 77/9 78/17 88/7 88/8
**again [17]** 7/9 12/6 37/19 38/7 38/10 45/5 53/19 53/23 54/8 54/10 55/2 55/4 55/7 60/2 64/23 66/23 75/18
**against [6]** 1/3 2/14 59/2 74/18 82/6 83/19
**age [7]** 9/23 33/16 35/20 35/20 35/21 57/6 67/23
**ago [3]** 4/20 4/227/5
**ahead [6]** 76/9 76/9 76/11 76/12 76/13 77/11
**air [3]** 65/3 65/14 65/15
**Albany [2]** 1/11 1/21
**alert [1]** 89/9
**all [52]** 2/9 2/12 2/20 3/21 4/9 4/9 4/20 4/23 5/4 5/117/98/6 11/3 11/7 11/13 12/19 13/4 13/12 19/15 24/14 27/7 29/12 30/3 30/21 31/2 32/2 33/4 37/16 38/2144/1946/23 47/2 49/22 51/8 51/15 51/22 52/12 54/4 55/19 57/23 60/4 61/14 68/10 72/3 74/12 77/6 81/17 82/18 83/7 84/1 84/17 90/15
**allow [1]** 36/6
**allowable [1]** 48/1
**almost [1]** 78/5
**along [2]** 82/9 83/21
**already [2]** 75/9 77/12
**also [1]** 62/21
**always [1]** 2/18
**am [4]** 3/11 43/4 45/15 76/4
**ambulance [13]** 66/14 72/12 72/21 75/6 75/7

**75/9 75/13 75/21 75/22 76/2 76/5 78/5 78/10
**amount [1]** 87/8
**angle [1]** 68/13
**another [5]** 20/9 28/7 28/8 47/20 67/7
**answer [39]** 3/2 3/3 3/3 8/18 9/12 10/4 11/1 11/14 18/11 30/7 30/12 32/21 35/14 35/17 36/6 38/6 38/7 40/23 54/5 54/5 55/1 55/3 55/4 55/21 58/10 64/14 70/5 78/20 79/23 80/14 82/20 84/18 85/16 85/22 88/23 89/3 89/6 89/6 90/9
**answered [9]** 39/5 39/5 58/8 64/13 68/21 69/12 77/11 86/13 90/8
**any [32]** 19/9 26/4 26/15 27/14 27/17 28/20 28/22 29/1 29/2 29/10 31/2 31/6 33/7 34/5 34/6 34/6 36/22 44/20 47/17 54/18 57/3 60/16 60/17 64/2 64/12 68/5 68/6 69/7 73/23 81/8 85/14 90/12
**anybody [3]** 68/2 71/2 72/16
**anyone [3]** 16/18 23/19 85/16
**anything [20]** 8/7 9/21 29/20 31/3 32/17 39/6 42/11 44/21 44/22 57/10 70/9 75/3 75/19 75/20 82/15 82/23 84/2 85/13 85/22 88/10
**anywhere [4]** 6/16 6/20 19/7 19/10
**apartment [11]** 24/22 25/1 25/5 25/6 40/21 62/22 64/3 72/6 73/8 76/16 77/8
**apologize [2]** 8/7 77/7
**appear[1]** 57/17
**appearance [1]** 57/15
**APPEARANCES [1]** 1/15
**appeared [1]** 51/10
**appears [1]** 32/5
**applications [1]** 7/17
**applies [1]** 89/7
**apply [2]** 81/23 85/21
**appreciate [1]** 90/16
**approach [3]** 58/5 58/21 59/4
**approached [4]** 51/18 58/13 58/20 59/11
**approximately [4]** 15/23 16/3 33/15

**45/14 142
**are [19]** 7/13 7/14 7/15 15/1 15/2 28/21 31/13 31/22 32/142/642/13 47/18 58/17 76/4 79/8 82/14 82/18 83/7 83/11
**area [2]** 41/19 46/13
**argumentative [1]** 90/8
**arm [1]** 59/13
**around [11]** 5/3 16/16 24/21 27/5 40/21 45/3 45/12 45/14 53/7 67/23 75/23
**arrest [3]** 29/3 29/7 31/19
**arrested [5]** 16/7 26/19 26/23 50/13 81/10
**arrive [1]** 72/9
**arrived [8]** 72/11 72/12 72/15 72/17 72/18 72/21 73/1 73/4 as [44] 2/5 2/7 8/23 18/4 19/18 20/9 28/21 29/10 32/7 32/23 34/2 34/7 42/20 47/22 47/22 50/12 50/12 50/18 54/8 55/2 55/8 55/8 55/23 58/17 58/17 59/11 60/5 60/15 64/22 65/1 65/14 67/22 72/1 72/1 72/2 73/6 75/5 76/1 77/5 77/21 81/6 81/6 88/15 92/10
**aside [1]** 49/5
**ask [14]** 2/15 2/18 3/10 7/10 8/8 17/21 20/22 22/17 28/23 29/15 32/16 32/21 39/19 62/23
**asked [13]** 11/16 37/20 39/13 39/14 58/8 58/11 58/13 64/13 75/18 77/10 79/6 86/12 90/7
**asking [14]** 3/6 4/2 18/7 20/18 44/8 45/7 59/3 63/13 69/4 71/22 72/15 78/22 80/13 82/20
**asleep [3]** 52/19 53/2 53/10
**assume [4]** 43/19 51/15 71/14 81/23
**assumed [1]** 45/2
**assuming [4]** 36/6 39/23 43/3 43/4
**asthma [4]** 34/15 34/23 35/2 35/9
**ate [3]** 44/6 44/8 44/10
**attempt [1]** 64/17
**attention [1]** 28/12
**attentive [2]** 36/1 36/8
**attorney [9]** 1/17

# APPENDIX

## A

**attorney... [8]** 81/23 83/8 83/10 85/14 85/15 85/16 85/20 85/22

**attorney-client [2]** 85/20 85/22

**Attorneys [1]** 1/20

**attribute [1]** 82/23

**August [1]** 5/8

**automatically [1]** 63/12

**autopsies [3]** 86/20 87/2 87/4

**autopsy [1]** 87/9

**Ave [2]** 27/5 46/6

**Avenue [7]** 23/11 23/13 24/20 67/12 67/12 67/14 68/11

**aware [1]** 73/12

**away [7]** 19/8 21/21 58/16 68/14 76/23 77/16 78/14

## B

**baby [3]** 8/23 33/12 35/21

**Bachelor's [1]** 15/2

**back [39]** 7/18 10/16 11/15 11/22 16/20 16/21 17/1 23/7 35/4 37/23 39/6 39/19 46/9 47/1 53/5 53/8 54/9 54/13 56/15 56/16 57/9 59/8 59/12 65/2 65/5 65/15 70/8 70/8 70/12 70/14 72/7 72/14 73/2 74/11 76/1 76/7 77/2 77/8 78/12

**background [3]** 7/21 11/8 36/7

**bail [5]** 81/20 81/21 81/22 82/1 82/3

**Bailey [5]** 1/10 1/19 1/21 2/12 11/2

**bang [1]** 68/23

**Banged [2]** 68/20 70/4

**banging [1]** 39/3

**basis [2]** 18/16 28/21

**basketball [9]** 12/21 13/2 14/3 14/6 14/7 15/8 15/20 16/8 67/20

**bathroom [5]** 42/7 42/17 42/21 43/1 43/7

**be [34]** 3/5 9/12 9/18 16/15 16/17 17/20 20/4 20/16 20/20 22/13 27/8 28/21 29/4 29/9 29/23 30/1 30/21 31/5 31/20 32/5 32/8 33/1 34/6 34/18 45/13 57/17 59/1 59/5 60/14 66/22 70/11 80/5 82/16 91/8

**became [1]** 73/6

**because [24]** 3/3 3/6 7/8 8/15 16/4 16/5

34/18 44/12 44/13 45/3 59/1 62/7 62/18 63/8 65/14 66/13 66/14 69/9 74/8 75/8 75/14 79/6 81/20 82/8

**bed [32]** 38/1 38/8 38/13 39/23 40/5 40/6 40/19 41/14 19 42/2 42/16 46/9 46/11 47/1 47/2 47/3 53/6 53/12 53/15 53/16 56/5 56/13 56/15 58/22 58/22 58/23 58/23 59/1 65/20 66/2 66/11 66/20

**bedroom [6]** 41/23 42/1 53/9 56/2 56/5 56/7

**been [19]** 2/5 28/16 30/15 30/20 35/15 36/8 58/8 59/12 59/13 59/14 62/16 63/8 73/19 76/20 77/10 77/12 89/8 89/11 89/14

**before [33]** 1/12 9/21 10/23 16/6 16/8 16/9 16/9 16/10 20/20 20/23 22/8 22/10 23/2 23/3 23/22 24/1 29/17 33/6 36/22 40/7 50/13 53/12 55/11 55/16 58/12 67/3 67/18 67/19 68/2 69/8 74/2 78/1 91/14

**beginning [3]** 22/16 53/19 53/20

**behalf [1]** 87/12

**behind [2]** 42/18 65/5

**being [11]** 7/7 11/7 26/19 27/11 31/14 36/23 60/13 64/6 66/16 72/2 86/6

**belief [1]** 92/12

**believe [9]** 8/2 23/11 36/5 47/19 49/14 49/19 77/10 80/12 87/7

**belly [1]** 56/15

**besides [1]** 35/21

**best [5]** 38/11 53/1 55/8 60/15 92/12

**better [2]** 11/11 35/15

**between [9]** 11/21 17/2 27/18 35/12 46/7 63/23 66/19 73/23 83/15

**beyond [1]** 36/4

**Bill [1]** 52/16

**birth [1]** 7/22

**bit [4]** 14/5 15/5 37/12 55/5

**blaming [2]** 83/8 83/9

**blanket [4]** 56/17 56/19 56/20 56/21

**bled [2]** 86/8 86/10

**blew [1]** 64/20

**body [2]** 85/1 88/5

**bootleg [1]** 54/8

**born [22]** 8/1 8/4 8/10 8/14 8/20 8/21 8/22 9/1 9/2 9/10 10/21 11/22 20/20 20/23 23/22 23/23 24/2 24/12 34/14 35/4 35/7 35/9

**both [4]** 25/3 50/6 63/23 64/20

**bottle [1]** 43/21

**break [2]** 27/9 27/14

**breakfast [5]** 38/5 43/11 43/13 44/20 55/6

**breath [1]** 34/18

**breathing [6]** 34/19 58/2 64/22 71/12 71/21 75/7

**BRETT [2]** 1/16 1/18

**brief [1]** 5/23

**bring [1]** 15/6

**Broadway [1]** 1/17

**Bronx [6]** 8/2 9/1 12/2 12/11 12/16 24/7

**Brooklyn [11]** 3/20 5/20 5/21 8/1 11/23 12/2 12/12 12/17 12/18 14/1 24/7

**brought [2]** 10/16 61/1

**Brown [7]** 73/18 74/9 74/14 74/16 74/20 75/1 77/5

**building [4]** 67/6 67/7 68/6 68/9

**bunch [1]** 15/17

**but I [1]** 57/13

**butterflies [1]** 57/7

**button [1]** 63/9

**buy [1]** 49/23

## C

**Cage [1]** 47/19

**call [19]** 6/13 28/12 54/23 59/19 60/22 63/2 64/9 66/14 70/16 72/8 73/7 75/6 75/7 75/12 75/18 75/21 75/21 76/2 78/3

**called [18]** 2/5 37/12 38/4 38/6 39/16 41/7 41/12 41/12 41/18 55/1 55/4 55/19 55/20 55/21 56/22 60/5 71/17 75/9

**calling [1]** 76/4

**calls [1]** 3/2

**calm [3]** 72/1 72/1 75/17

**came [15]** 4/17 4/19 9/18 12/1 21/15 22/19 23/7 37/13 41/21 42/2 57/13 73/7 73/15 78/1 78/3

can [37] 3/5 6/20 8/12 9/16 11/8 11/17 14/14 18/21 18/22 24/18 24/19 26/2 28/23 35/14 39/17 40/23 42/9 47/22 48/4 53/1 53/9 54/18 55/10 58/10 59/21 62/17 64/14 69/7 71/12 71/21 72/3 77/11 77/14 80/19 82/6 82/20 84/18

**can't [7]** 24/17 24/17 55/12 55/17 64/5 69/16 70/11

**car [3]** 74/17 74/17 74/18

**card [2]** 49/21 74/9

**cards [1]** 49/22

**care [6]** 9/8 9/8 9/9 9/15 9/17 34/22

**career [3]** 15/7 15/23 82/11

**Carolina [4]** 9/3 9/5 9/18 10/15

**carrier [1]** 49/13

**cartoons [1]** 56/22

**case [1]** 75/19

**catch [1]** 86/22

**caused [12]** 85/1 85/2 85/4 85/4 85/5 85/6 85/10 88/6 88/8 88/15 89/23 90/5

**cell [2]** 49/11 49/20

**cellphone [4]** 48/19 48/21 50/2 50/4

**cells [1]** 88/5

**center [1]** 14/10

**certain [4]** 24/10 44/14 44/17 87/8

**certainly [7]** 27/10 29/22 30/23 31/16 31/18 33/2 82/19

**certify [1]** 92/9

**chair [1]** 71/8

**chairs [2]** 46/15 46/19

**chance [3]** 18/6 18/8 78/2

**change [2]** 19/5 43/5

**changed [4]** 37/20 39/7 39/7 70/10

**changing [1]** 43/6

**charged [1]** 81/13

**chase [1]** 30/19

**check [4]** 41/6 41/8 41/10 53/12

**cheek [2]** 77/19 77/22

**chest [2]** 64/21 64/22

**Chicken [1]** 44/17

**child [6]** 20/7 20/9 20/10 34/3 36/16 37/1

**children [2]** 18/4 18/5

**circumstances [1]** 50/22

**city [6]** 1/4 8/22 12/8 83/16 83/17 83/21

**claim [8]** 1/1 2/14 11/5

30/20 143 32 82/5 83/18 85/19

**Claimant [3]** 1/2 1/7 1/17

**claimed [1]** 85/3

**claiming [1]** 82/14

**Clarence [6]** 20/3 20/6 20/10 21/22 21/23 22/4

**cleaned [1]** 43/7

**clear [4]** 2/19 59/12 89/2 89/4

**clearly [2]** 30/18 88/20

**client [4]** 32/17 82/6 85/20 85/22

**client's [1]** 3/14

**climb [1]** 69/21

**close [2]** 15/1 58/17

**closed [1]** 56/9

**closer [1]** 5/3

**closest [1]** 59/14

**clothes [2]** 57/3 78/13

**coach [1]** 89/5

**coaching [4]** 32/18 88/20 88/22 88/23

**coat [1]** 37/11

**cold [2]** 33/8 33/9

**college [4]** 12/18 13/8 14/5 14/22

**come [10]** 41/19 41/23 52/2 62/17 63/8 63/12 73/10 73/14 74/12 75/18

**coming [1]** 16/19 16/21 16/23 88/12

**commencing [1]** 1/12

**common [1]** 3/4

**completely [4]** 38/20 69/10 82/12 83/15

**concerns [1]** 35/6

**concluded [1]** 90/19

**conclusion [2]** 84/6 88/12

**confidential [1]** 32/12

**confusing [1]** 77/7

**considered [1]** 90/2

**contact [4]** 8/10 10/19 11/21 90/12

**continue [2]** 29/13 31/23

**continuing [1]** 47/21

**conversations [1]** 85/14

**convicted [1]** 81/15

**copies [1]** 29/18

**copy [1]** 28/23

**corner [1]** 27/5

**correct [33]** 2/10 14/22 15/8 15/21 18/16 19/13 19/18 20/7 20/13 21/3 24/23 26/12 33/19 40/1 41/4 41/13 42/21 45/15 46/17 46/21 55/22 57/1 59/14 60/20 61/15 62/3 72/22 74/14 75/1 76/7 81/11

**144**

## C

correct... [2] 87/12 90/3
couch [1] 46/16
could [15] 4/3 8/18 11/14 34/6 35/15 36/8 37/15 55/9 58/2 58/4 62/18 66/15 73/4 81/6 83/19
couldn't [4] 38/18 69/9 81/20 87/19
counsel [6] 4/2 28/19 31/13 48/9 49/14 85/12
county [16] 1/4 1/20 2/13 29/6 51/10 82/6 82/9 82/15 83/18 3/1 83/16 83/17 83/19 83/21 84/6 91/3
couple [4] 58/8 58/18
court [5] 30/17 51/10 82/19 86/2 87/6
courthouse [1] 51/5
courtroom [2] 51/12 51/13
cousin [7] 17/13 17/17 20/4 20/6 23/7 26/6 26/11
cousin's [2] 17/8 23/5
cousins [3] 16/20 17/2 17/4
covered [1] 31/20
CPL [1] 31/20
CPR [10] 38/11 55/8 60/10 64/8 64/12 64/17 65/19 65/23 66/2 70/13
credit [1] 74/9
credits [3] 15/2 15/2 15/3
criminal [2] 29/5 87/12
cup [1] 43/22
current [2] 3/17 3/19
currently [1] 7/13
custody [3] 10/9 10/16 10/21
cut [2] 30/19 62/16
cutting [1] 78/13

## D

dad [1] 27/20
damages [1] 84/23
date [4] 7/22 23/18 24/18 92/15
daughter [12] 19/18 19/20 19/21 20/20 23/8 34/13 36/12 39/16 71/12 71/19 88/11 90/3
DAVIS [20] 1/2 1/8 2/4 2/9 2/11 2/13 3/17 8/6 10/13 17/8 17/14 17/14 17/18 19/16 19/17 20/3 27/7 34/14 90/19 91/12
day [10] 24/19 27/19

28/7 28/14 37/9 57/15 86/21 87/2 87/5 91/15
days [1] 17/20
dead [5] 38/20 62/20 62/22 63/8 78/18
death [2] 86/8 86/11
December [1] 5/1
degree [2] 14/18 15/2
DeLeonardis [2] 1/10 1/19
department [2] 72/12 79/9
depending [1] 45/17
deposition [1] 89/14
describe [5] 34/2 35/1 59/2 180/23 81/5
described [2] 34/7 73/10
destroyed [1] 82/12
detective [2] 50/13 79/13
detectives [2] 83/10 83/12
determination [2] 88/7 88/9
determine [1] 88/5
developmental [1] 15/15
diagnosed [2] 35/2 35/9
dial [1] 62/18
diaper [6] 40/11 41/4 43/5 43/6 43/8 57/1
did [178]
didn't [49] 12/2 12/6 16/19 19/1 37/13 38/6 38/7 38/9 38/10 38/21 39/13 40/4 40/5 41/10 42/11 44/6 44/7 44/14 44/20 44/21 51/1 52/3 55/1 55/3 55/4 55/7 55/21 57/11 60/2 60/6 60/8 60/11 62/7 64/2 64/3 65/14 65/17 66/2 66/3 66/7 69/17 71/12 73/21 75/14 75/16 78/2 84/10 86/22 88/13 88/15 89/23 90/6
died [2] 27/19 33/7
diet [2] 44/5 44/13
difference [1] 83/15
different [7] 6/7 7/18 15/22 26/22 28/4 47/15 66/17
dinner [1] 70/18
direct [2] 85/15 85/21
direction [1] 14/15
directly [2] 68/11 68/12
disagree [2] 48/2 85/18
discovery [2] 31/2 32/11
discussion [2] 5/23

distance [1] 77/15
district [2] 83/8 83/10
divulge [1] 85/13
do [94]
doctor [2] 33/9 34/20
document [2] 32/5 32/5
documents [8] 28/20 29/3 29/10 29/16 30/15 31/6 31/8 31/19 does [2] 25/23 84/1
doesn't [1] 57/23
doing [10] 3/11 35/20 55/8 64/11 74/10 83/5 86/20 87/11 89/8
domiciled [1] 4/7
don't [48] 2/16 2/17 2/18 2/19 3/19 8/3 8/6 8/7 9/19 9/21 11/1 12/15 16/15 21/19 23/18 24/9 29/21 33/1 36/14 45/2 45/1 48/9 50/3 50/10 52/2 52/23 53/4 53/7 54/7 57/4 57/21 58/11 62/18 66/7 69/16 70/1 76/14 79/23 82/6 86/10 87/15 87/17 88/18 89/2 89/7 89/10 90/5 90/9
done [1] 51/9
door [29] 7/3 38/6 39/3 39/3 39/4 55/2 55/3 56/7 56/9 56/11 57/15 58/6 58/16 68/19 68/20 68/23 69/3 69/12 69/22 70/3 70/4 72/6 73/21 76/18 76/20 76/21 77/2 77/9 78/5
DOROTHEA [3] 1/12 92/7 92/15
down [9] 24/16 37/14 42/14 46/10 46/12 64/21 65/1 65/12 75/17
downstairs [2] 70/8 79/18
Downstate [1] 22/4
dozed [2] 54/21 5
dozing [2] 38/2 38/3
Dr [4] 84/1 86/5 86/7 87/4
drink [1] 37/21
driver [1] 72/14
drives [1] 74/21
drop [3] 13/17 13/18 13/19
dropped [1] 73/18
drops [1] 74/21
duly [1] 2/6
during [3] 73/9 80/7 86/2
DVD [2] 47/7 47/9

## E

each [1] 87/8
earlier [2] 39/21 62/2
early [3] 19/1 35/18 37/23
easy [1] 83/16
eat [2] 37/21 43/23 44/2 44/6 44/16 44/21
eaten [1] 70/18
eating [3] 43/19 44/1 44/14
Eddy's [2] 26/12 26/14
Eddys [1] 17/16
educated [1] 12/7
effect [1] 42/20
eight [2] 46/7 53/7
either [3] 30/9 60/22 89/1
elapsed [1] 66/19
eleven [2] 5/14 82/10
else [4] 6/20 23/19 68/2 72/17
emergency [2] 60/12 78/1
employment [1] 7/14
end [5] 16/4 16/16 16/16 26/3 80/7
ended [3] 16/5 38/2 52/10
energy [2] 37/15 37/16
enough [1] 30/4
entered [1] 74/1
ESQ [3] 1/16 1/18 1/21
established [1] 53/6
Europe [2] 15/21 15/22
evaluate [1] 3/13
even [5] 29/5 32/18 40/5 64/11 78/2
events [2] 15/6 37/4
ever [10] 8/9 35/2 36/10 36/17 36/23 64/12 70/18 74/1 85/9 85/16
every [2] 32/6 48/6
everything [2] 84/8 87/10
exact [4] 21/19 23/18 27/4 55/17
exactly [5] 53/8 73/15 85/3 86/20 87/6
examination [1] 1/7 31/4 31/23 90/18
examined [1] 2/6
example [1] 18/2
Excuse [1] 65/8
exercises [1] 34/19
Exhibit [1] 2/2
expensive [1] 70/20
expert [5] 84/17 87/11 87/19 88/14
explain [4] 35/17 51/22 54/5 66/5
explanation [1] 66/7

## E (cont.)

expressed [1] 88/2
88/14
extent [2] 84/12 84/23

## F

facility [2] 9/16 9/16
fair [9] 6/13 8/3 10/17 30/4 43/8 44/2 45/20 53/23 58/4
familiar [2] 19/12 70/17
family [7] 8/9 8/11 9/6 9/7 9/8 9/17 23/5
far [5] 4/22 50/12 58/16 68/14 76/23
fast [1] 78/3
father [8] 8/15 19/22 60/13 60/15
favorite [1] 56/22
February [8] 5/1 28/13 33/11 36/22 37/3 46/3 52/19 62/6
February 26 [1] 28/13 33/11 36/22 37/3 46/3 52/19 62/6
fee [1] 87/21
feelings [1] 3/12
feet [4] 58/18 68/16 76/12 76/13
fell [1] 52/19 53/2 53/10
felt [1] 72/1
female [1] 69/18
few [9] 9/22 11/11 16/8 19/11 59/23 63/3 72/10 76/12 88/11
fifteen [4] 45/16 53/3 53/11 68/16
fight [1] 30/8
fighting [1] 30/10
figured [1] 37/18 62/17
figuring [1] 86/19
file [3] 29/20 29/22 32/13
filed [5] 2/14 30/20 82/5 83/18 85/19
fill [1] 8/11
finally [1] 3/10
find [8] 9/13 11/20 38/18 61/10 64/8 71/5 71/7 82/14
finding [3] 48/10 48/12 52/22
finish [4] 13/15 40/17 47/10 55/13
fire [4] 72/12 72/20 78/4 78/10
first [19] 2/5 4/17 4/19 8/22 12/5 16/22 19/1 20/15 26/6 38/16 49/3 54/23 6/1 72/12 72/13 72/21 74/2 74/7 76/15
first-floor [1] 76/15
five [9] 14/11 15/11 15/23 17/9 23/1 37/19

**F**

five... [3] 86/21 87/1 87/7
flight [1] 69/21
flip [1] 49/10
floor [1] 76/15
follow [3] 21/9 21/10 37/8
follows [1] 2/7
food [3] 44/1 44/9 44/15
foods [1] 44/14
foot [2] 43/19 58/21
foregoing [1] 91/6 92/9
forget [1] 27/4
form [1] 45/23
forth [4] 16/20 16/21 17/1 46/16
forward [2] 14/10 32/7
foster [5] 9/7 9/8 9/9 9/15 9/17
found [4] 50/6 50/7 62/21 81/17
Fountain [1] 79/13
four [6] 13/12 14/10 17/20 86/20 87/1 87/7
Fourth [8] 23/11 23/13 24/20 25/6 26/5 26/15 27/17 67/14
Francis [3] 13/23 14/3 14/19
fraud [1] 74/9
friend [5] 3/20 3/21 3/23 67/4 67/21
friend's [2] 38/22 67/2
front [7] 54/9 54/10 54/13 76/18 76/20 76/21 77/4
frozen [1] 56/20 56/21 56/23
full [2] 28/10 65/16
full-time [1] 28/10
fully [1] 84/7
further [1] 29/18
fussy [1] 44/12
futon [8] 38/15 61/2 62/10 65/22 66/12 70/13 74/6 76/22

**G**

game [1] 67/20
gave [5] 50/12 52/12 52/13 80/12 80/13
General [2] 1/9 31/1
generally [1] 37/4
generation [1] 49/3
gentleman [3] 74/14 74/20 75/1
gently [1] 65/3
get [18] 6/2 7/20 8/19 11/11 15/6 21/21 27/9 28/23 29/18 38/1 39/4 40/20 41/18 45/16 56/4 62/17 72/8 76/2
getting [7] 11/7 37/11 37/18 55/2 55/23 63/7

73/6
girl [1] 90/2
girlfriend [2] 68/3
give [46] 16/2 18/21 18/22 24/18 38/8 48/7 51/1 51/2 51/19 52/1 52/5 52/5 52/7 53/1 54/18 69/7 80/6 80/17
given [1] 32/8
gives [2] 32/21 32/22
giving [1] 52/11
glass [1] 27/8
Glen [2] 27/5 46/6
go [26] 5/15 12/10 12/14 13/8 27/9 29/17 32/6 37/11 39/19 41/6 54/9 55/2 60/12 61/2 61/4 62/10 64/4 65/1 66/3 66/8 69/22 77/11 79/3 79/6 84/8 84/10
going [33] 2/15 3/10 7/1010/2311/115/6 20/22 28/12 28/21 29/8 29/13 29/19 31/22 32/1 32/2 32/6 32/20 36/3 37/8 38/5 47/20 48/7 52/9 58/7 60/9 63/2 64/6 69/10 75/15 82/17 84/12 85/11 85/21
gone [1] 54/13
good [3] 2/18 15/11 89/17
got [21] 5/4 5/11 5/15 6/15 16/5 25/5 31/9 31/10 39/22 39/22 40/4 40/5 42/16 43/1 50/21 55/20 59/16 65/16 76/1 78/5 79/12
government [1] 47/16
grabbed [2] 74/8 74/10
grade [1] 12/10
grand [1] 84/20
grandkids [1] 68/3
grandmother [1] 12/4
grew [1] 3/23
guess [6] 5/3 35/19 38/2 45/12 75/16 83/3
guilty [1] 81/17
guy [1] 75/15
guys [1] 44/1

**H**

had [61] 6/3 6/12 8/10 11/21 15/7 16/15 17/22 18/6 20/6 20/16 20/20 34/11 34/12 34/14 34/15 35/5 39/6 39/7 40/4 40/11 40/14 42/5 42/13 44/9 44/13 47/7 49/22 50/15 50/16 53/22 54/12 54/13 55/17 57/1 57/4 60/18 60/19 61/13 61/14 61/21 62/2 62/16 62/16 63/8

69/21 70/9 73/19 74/1 74/5 75/9 77/12 80/5 82/15 83/5 85/2 85/3 85/5 87/11
hadn't [1] 12/4
half [3] 33/15 34/3 43/18
Hall [3] 13/9 13/10 13/13 13/15 14/7
hand [8] 52/8 52/9 65/1 65/5 65/6 65/8 65/9 65/10
hands [1] 64/21
happen [1] 52/10
happened [5] 51/23 54/14 80/21 81/1 86/20
happening [1] 70/11
happy [1] 27/9
hard [2] 3/5 23/12
has [78] 4/7 8/9 10/20 31/13 41/4 58/8 85/19
have [78] 3/1 3/13 3/19 4/12 4/15 6/7 6/16 6/18 7/14 9/20 9/22 10/19 11/14 14/21 16/2 19/11 20/10 26/15 28/10 28/20 29/2 29/10 29/17 30/8 30/14 30/15 31/6 31/8 31/16 31/17 31/19 32/3 32/4 32/6 32/12 33/2 33/7 34/5 34/17 35/6 35/15 36/8 37/16 39/14 44/5 45/13 48/14 49/1 50/16 52/7 53/4 54/7 55/13 56/7 56/17 57/3 59/12 59/13 59/14 60/16 62/5 63/5 63/9 63/14 63/17 64/12 66/7 70/17 72/6 74/7 76/20 81/6 83/20 89/13 90/9 90/12 90/15 91/6
haven't [1] 8/10
having [5] 2/5 35/2 35/21 74/9 86/17
he [41] 4/6 4/7 4/8 11/15 17/21 17/22 22/2 24/14 26/18 32/21 32/22 67/6 67/9 67/10 68/2 71/14 71/22 71/23 72/1 72/2 72/16 74/16 74/17 74/21 75/16 84/7 84/8 84/9 84/10 84/20 85/1 85/2 85/3 85/5 85/19 87/2 87/5 87/7 87/9 88/12 88/13
he's [15] 3/23 8/18 18/7 20/18 44/8 45/7 59/3 63/13 69/4 72/4 72/15 78/22 80/13 82/20 84/5
head [8] 3/4 37/22

42/13 42/13 42/14
42/15 43/16 58/23
heading [2] 91/8 92/10
health [2] 33/11 34/5
healthy [2] 33/12 34/3
hear [7] 7/18 23/12 29/12 30/8 44/7 73/5 86/5
heard [1] 12/20
hearing [8] 11/3 11/6 29/9 32/9 32/10 36/5 47/23 57/12
held [1] 1/8
help [11] 60/12 60/23 64/4 64/9 66/3 66/21 71/3 71/21 72/4 72/8 78/1
helped [1] 25/19
helpful [1] 32/19
her [197]
here [9] 3/8 15/6 16/23 17/2 27/12 30/7 30/9 30/12 34/20
hereby [1] 91/8 92/9
herein [1] 2/5
hereof [2] 91/8 92/11
herself [2] 21/5 37/14
high [3] 12/11 12/17 12/17
him [16] 4/2 4/3 4/3 18/1 23/7 32/18 40/17 47/10 52/5 55/13 67/20 72/3 72/5 85/21 86/20 87/1
his [31] 17/9 17/15 17/21 18/3 18/4 18/9 23/6 23/7 29/10 32/19 39/3 39/3 67/15 67/23 68/1 68/3 68/14 69/14 69/15 71/14 74/18 75/16 79/13 79/14 79/18 82/20 84/6 84/18 87/2 87/6 88/12
history [5] 15/5 34/11 34/13 86/18 88/10
hold [2] 82/11 84/15
Hollywood [2] 6/19 6/23
home [11] 4/12 4/15 4/17 4/18 4/19 6/13 27/20 73/10 73/12 73/14 73/15
homeless [1] 4/8
hoping [1] 11/8
hospital [1] 8/21
hostess [1] 7/3
hot [1] 36/10
hour [2] 37/16 89/15
hours [2] 80/5 87/8
house [32] 18/3 25/1 34/17 38/22 38/22 40/8 43/1 48/15 50/4 60/19 64/7 64/10 66/21 67/2 68/1 68/10 68/11 68/14 68/15 70/15 71/22 72/14

73/21 74/2 73/20 74/2
74/6 74/1176/7 76/15
77/12 77/22
how [41] 4/20 5/12 6/22 9/18 10/7 14/6 15/1 15/10 22/22 31/9 33/14 48/14 50/14 51/3 52/18 53/9 53/17 56/4 57/21 58/16 59/21 63/1 63/22 66/5 66/19 68/14 68/23 69/4 72/8 73/4 74/7 74/19 76/23 77/20 77/20 77/23 79/23 80/3 85/4 87/4 87/23
however [1] 53/21
hung [2] 72/7 73/16
hungry [1] 44/21
hurry [1] 75/18
hurt [1] 3/12
hurtful [1] 8/8

**I**

I'd [1] 7/20
I'll [4] 2/17 12/9 27/8 36/5
I'm [64] 2/14 3/10 3/19 4/18 6/2 6/5 7/10 7/18 8/8 9/20 10/23 11/1 11/7 11/8 11/10 11/20 15/4 15/5 28/12 29/8 29/13 29/19 30/7 30/8 30/9 30/12 32/2 32/7 32/16 32/20 33/19 36/3 37/7 39/22 43/3 43/3 43/4 44/7 44/21 47/20 48/7 49/14 53/18 53/20 55/23 58/7 66/16 66/17 66/23 69/1 69/5 73/15 82/13 82/17 83/9 83/17 83/18 84/11 84/14 85/11 85/12 85/2186/2287/19
I've [1] 12/19
idea [1] 74/7
identification [1] 2/3
immediately [3] 56/1 60/12 64/3
inappropriate [3] 36/23 89/19 89/20
incarcerated [2] 82/9 83/22
incident [5] 28/20 29/2 29/17 34/9 36/19
indicated [2] 18/4 18/18
information [4] 3/13 7/21 11/8 32/12
initial [3] 60/13 61/4 64/6
initially [8] 12/5 54/21 54/22 59/2 61/2 62/15 70/14 88/4
injuries [4] 16/4 85/2 88/6 88/7
inside [3] 73/2 73/3

**I**

inside... [1] 74/17
interacted [1] 36/12
interested [1] 83/18
interfere [1] 31/23
interfered [1] 32/3
interrupt [1] 48/9
interrupting [1] 88/20
interview [1] 79/20
involved [1] 36/17
iPhone [4] 48/22
 48/23 49/3 62/3
is [101]
it [157]
it's [29] 3/5 3/12 4/1
 11/3 11/5 23/12 26/7
 29/10 29/23 31/3
 31/16 31/18 32/10
 32/10 32/18 36/6
 37/22 39/12 48/22
 56/22 57/23 66/6 66/8
 70/10 70/20 77/10
 83/16 89/6 89/19
itself [1] 63/12

**J**

jail [12] 4/19 5/5 5/12
 5/13 5/15 6/6 6/15
 50/2151/981/19
 82/11 83/22
January [1] 5/1
Jersey [1] 12/18
Jessica [1] 52/16
job [5] 7/14 7/15 18/2
 19/11 75/16
jobs [1] 7/18
JOHN [2] 1/21 2/12
Johnson [2] 1/10 1/19
judge [2] 51/16 82/3
jumped [2] 38/3 57/11
June [1] 24/21
June 2014 [1] 24/21
Junior [1] 12/16
jury [1] 84/20
just [97]
justice [1] 82/12

**K**

Keep [2] 2/22 3/1
kept [1] 52/6
kids [5] 17/9 17/21
 18/9 23/6 35/20
killing [2] 81/8 81/13
kind [8] 11/20 37/11
 50/6 55/5 57/13 65/16
 75/23 80/6
Kings [1] 16/21
kitchen [1] 74/8
KLEIN [2] 1/16 1/18
knew [1] 20/23
knock [2] 69/22 70/3
knocked [3] 39/3
 68/18 69/3
know [86] 3/5 4/10 8/6
 8/7 8/14 8/20 8/20
 9/17 9/22 11/3 12/6
 13/4 14/5 15/3 19/21

19/22 21/18 21/21
 22/5 24/10 24/13 25/9
 27/14 28/2 29/21
 30/14 31/2 32/20 33/1
 36/10 36/11 36/14
 36/16 37/15 41/10
 42/23 45/2 45/5 46/2
 47/17 48/21 49/2
 49/18 50/12 50/17
 52/21 52/23 53/7 53/7
 54/16 57/4 57/21
 61/12 66/5 69/1 69/17
 70/11 70/23 71/2
 71/20 72/16 73/4
 73/19 73/21 74/19
 75/14 79/20 79/23
 83/2 83/20 84/4 84/11
 84/19 85/6 86/8 87/4
 87/16 87/18 87/21
 87/23 88/16 88/23
 89/7 89/10 89/23 90/5
knowing [2] 88/9
 88/10
knowledge [14] 9/1
 34/5 34/11 34/12
 36/18 36/21 38/12
 55/18 69/9 83/5 85/2
 85/3 85/5 86/17
knowledgeable [1]
 38/12
knows [1] 31/9

**L**

lacerated [1] 86/6
lacerations [1] 85/10
lady [1] 19/13
laid [3] 47/1 47/2 61/2
land [2] 39/13 48/16
landlord [1] 25/13
Lane [3] 17/16 26/12
 26/14
Lansingburgh [2]
 23/14 28/15
last [7] 4/15 16/6
 19/17 50/20 64/10
 80/4 86/22
lasted [2] 15/23 16/2
law [6] 1/9 1/10 29/5
 31/2 48/1 82/18
lawsuit [2] 3/14 32/11
lawyer [4] 51/2 52/4
 52/15 52/16
lawyers [1] 2/18
lay [3] 46/10 46/12
 84/16
laying [10] 40/19 47/3
 56/13 56/14 57/9
 57/2159/865/19
 70/13 74/6
league [2] 15/14 15/15
leaning [1] 74/18
learn [1] 78/18
lease [2] 25/10 25/12
leased [3] 24/22 25/2
 25/7
least [2] 44/19 62/18
leave [3] 45/4 64/2

61/10
leaving [4] 73/17 77/3
 77/5 77/9
left [20] 6/6 14/4 40/7
 42/18 42/20 45/6
 58/22 59/1 59/5 59/6
 59/13 59/13 65/6
 65/10 66/20 72/6
 73/22 76/22 78/15
 88/12
Legends [2] 15/16
 15/18
let [15] 22/17 22/17
 24/16 27/14 38/1
 39/15 40/17 47/10
 52/2 52/10 55/13
 62/23 65/3 71/14
 84/15
let's [1] 30/19
level [1] 65/2
lied [2] 83/10 84/20
life [5] 7/16 8/11 16/11
 21/21 60/14
lightly [1] 64/21 65/3
 65/11
like [42] 3/5 7/20
 16/22 29/2 32/20 33/8
 34/17 37/6 37/19 38/8
 39/18 40/11 44/14
 44/15 44/18 49/10
 49/21 53/11 53/19
 53/20 55/5 57/4 57/5
 57/6 57/12 59/22
 59/23 60/8 62/16 64/1
 64/6 65/16 69/17
 71/23 72/2 75/16
 75/23 77/19 79/15
 82/16 83/20 88/10
Like her [1] 64/6
likely [1] 24/8
limited [1] 11/3
line [3] 39/13 48/8
 48/16
lined [2] 7/14 36/10
listen [3] 20/18 35/22
 78/23
little [10] 14/5 14/14
 15/5 18/21 27/11 35/5
 37/12 38/8 55/5 90/2
live [13] 5/16 17/5
 17/7 17/11 17/12
 22/15 23/2 23/3 23/19
 25/23 26/4 67/6 67/9
lived [13] 5/17 6/3 6/7
 16/20 21/5 26/14
 26/14 45/17 67/10
 68/6 68/7 68/8 69/18
liver [2] 85/10 86/6
lives [2] 17/14 22/4
living [19] 10/14 19/9
 21/23 22/20 22/23
 23/3 23/4 23/9 23/16
 24/19 27/16 27/18
 28/13 38/14 41/19
 42/146/1346/16 61/1
lobby [2] 51/14 51/19
location [3] 26/23

locations [1] 28/4
locked [2] 16/5 26/17
logical [1] 66/7
long [22] 4/20 5/13
 6/22 17/18 22/22
 52/18 53/9 53/17
 53/21 56/4 63/1 63/8
 63/22 68/23 69/4 72/8
 77/20 77/23 78/17
 80/3 89/9 89/12
longer [4] 3/3 3/3 16/3
 45/20
look [5] 14/14 36/1
 38/16 66/21 71/3
looked [4] 56/11 57/8
 57/15 67/22
looking [3] 7/15 38/18
 86/18
looks [1] 29/1
lot [2] 64/5 69/2
louder [1] 14/14

**M**

made [4] 17/22 57/20
 58/5 72/8
make [5] 3/8 38/5
 70/15 78/2 81/20
Manhattan [4] 6/19
 24/8 26/1 26/2
many [4] 14/6 15/10
 48/14 87/4
March [2] 1/9 4/23
marked [1] 2/2
massive [1] 85/9
matter [2] 1/1 30/21
may [3] 7/23 9/12
 83/15
maybe [13] 17/18
 17/20 29/2 37/18
 40/11 41/4 57/12
 63/23 66/15 68/17
 70/9 70/10 89/15
McDonald [1] 79/15
McDowell [1] 79/15
McDowell's [1] 79/19
me [75] 2/17 2/19 6/4
 8/11 12/1 17/21 18/21
 18/22 22/17 22/17
 24/16 24/17 24/18
 25/17 26/2 27/8 33/16
 34/13 35/3 35/17 37/6
 37/13 39/15 41/7 42/9
 43/4 46/23 48/4 51/2
 51/22 52/1 52/2 52/3
 52/5 52/6 52/8 53/1
 53/9 54/5 54/18 55/1
 55/3 55/10 57/12
 57/13 59/2160/762/8
 62/23 65/8 66/15
 67/10 67/18 67/22
 67/23 71/22 72/4
 73/10 74/5 75/17
 76/11 77/14 78/12
 79/6 80/19 82/7 82/9
 83/4 83/5 83/19 83/22
 84/9 84/15 91/14

mean [10] 12/10 29/16
 30/18 34/8 61/7 67/8
 67/18 71/20 80/8 84/2
meaning [2] 9/16 87/2
means [3] 26/18 36/11
 36/14
medical [8] 33/7 34/11
 34/12 60/16 60/18
 84/5 86/17 88/10
meet [1] 20/15
meeting [3] 51/4 80/3
 80/7
member [1] 8/9
memo [1] 29/16
memories [1] 9/22
memory [1] 44/19
men's [1] 27/10
mentioned [3] 9/23
 10/8 26/11
messed [2] 40/11 41/4
met [3] 19/12 20/12
 21/2
Metropolitan [1] 24/3
Mexican [2] 15/16
 15/19
MICHAEL [7] 1/2 1/7
 2/4 2/9 2/11 90/18
 91/12
middle [2] 5/8 12/10
might [5] 28/6 29/23
 31/6 31/8 45/20
Mike [1] 76/4
mind [1] 69/10
mine [1] 52/9
minutes [7] 37/19
 45/16 53/11 62/19
 66/22 66/22 72/10
misunderstand [1]
 54/11
misunderstood [2]
 3/5 54/4
moment [1] 4/12
monitor [1] 9/16
month [3] 18/22 24/18
 62/17
months [8] 4/22 4/22
 5/14 7/1 16/8 19/2
 23/1 82/10
more [9] 15/5 18/16
 18/21 15/19 36/8 63/4
 66/16 70/13 88/3
morning [12] 37/3
 37/7 37/20 37/23
 39/21 43/11 44/20
 45/1 52/18 62/5 80/22
 81/1
most [3] 8/14 9/20
 24/8
mostly [1] 24/11
mother [26] 8/15 10/2
 10/9 10/9 10/15 10/20
 11/21 12/1 12/5 12/6
 12/16 19/16 25/4 25/7
 25/8 25/16 25/18
 34/12 34/19 35/3 36/1
 42/18 61/13 61/14

**M**

mother... [2] 61/21
88/11
mother's [4] 10/12
25/21 61/20 86/18
mouth [2] 64/20 64/23
move [17] 8/12 11/9
12/2 16/17 16/19 21/8
21/9 22/2 22/8 22/12
38/7 55/7 55/7 57/23
60/1 60/2 66/11
moved [16] 11/22
12/2 16/11 18/15 19/3
19/6 21/15 21/20
22/10 22/12 22/15
22/22 23/5 23/22
23/23 65/22
movie [18] 38/2 46/10
46/20 46/20 47/3 47/5
47/7 47/13 47/18 48/4
48/8 53/4 53/19 53/21
53/22 54/7 54/8 54/12
moving [1] 59/18
Mr [4] 8/6 27/7 74/9
77/4
Mr. [5] 2/13 3/17 11/2
73/18 74/16
Mr. Bailey [1] 11/2
Mr. Brown [2] 73/18
74/16
Mr. Davis [2] 2/13
3/17
much [21] 3/23 17/21
25/8 27/20 35/22
37/10 38/1 39/8 39/14
39/18 46/9 46/10
66/19 71/19 77/20
79/6 80/21 82/8 87/9
87/23 90/16
MULLEN [3] 1/13 92/7
92/15
municipal [3] 1/9 31/1
48/1
music [1] 35/23
my [61] 2/12 2/16 3/13
4/4 4/6 7/8 9/1 9/7 9/8
10/2 12/1 12/4 12/5
12/5 12/16 14/4 16/20
17/8 19/20 23/5 23/7
26/6 29/13 29/20
31/16 31/23 32/2
32/13 36/18 36/21
38/4 38/11 38/22
39/16 47/1 49/12 51/1
51/1 52/1 52/4 52/16
60/13 60/15 61/3
62/15 64/6 64/20 65/1
65/6 65/8 66/13 66/18
69/10 71/11 71/19
71/22 77/6 82/6 82/11
91/6 92/12

**N**

name [16] 2/10 2/12
10/12 17/8 19/13
19/17 20/7 25/21
41/15 59/19 60/5
69/15 70/1 79/14 84/1
87/15
named [1] 74/14
Nancy [2] 25/22 25/23
narrow [1] 11/5
National [3] 47/6
47/13 52/20
NBA [1] 15/15
near [3] 40/15 52/2
77/15
need [12] 3/7 3/13
4/10 9/13 27/7 27/9
27/14 29/18 34/20
42/6 62/18 71/11
needed [3] 75/17 84/8
84/10
neighbor [2] 69/14
69/18
neighbor's [1] 69/15
net [1] 49/21
never [6] 16/22 18/5
60/18 62/7 87/2 89/5
new [25] 1/11 1/13
1/18 1/18 1/21 3/20
9/14 9/17 10/1 10/3
10/7 10/16 12/7 15/19
16/12 17/2 17/22
20/16 21/2 21/6 24/3
29/4 43/8 91/2 92/8
next [4] 8/12 31/12
59/16 71/9
Nextel [1] 49/10
Nicholas [1] 47/19
night [4] 67/3 67/17
67/19 68/1
nightmare [1] 70/10
nine [1] 53/2
no [92] 3/2 4/7 4/12
6/3 6/21 8/5 10/4
11/10 13/7 13/14
13/16 13/20 14/4
14/20 19/11 19/20
20/11 22/1 22/3 22/9
22/14 24/6 26/7 26/8
27/20 28/11 29/19
30/7 30/10 30/12
30/23 32/11 32/14
33/2 33/10 34/11
34/12 35/1 36/21 37/2
37/21 37/22 41/7 41/9
41/11 43/12 43/16
44/23 44/23 45/7
46/22 48/16 49/13
50/19 51/21 53/3 54/1
54/19 55/17 57/16
58/3 60/18 61/11 63/3
64/15 67/16 68/22
69/9 70/2 70/6 71/1
71/4 74/7 76/6 77/17
79/22 80/14 80/15
81/9 81/16 81/22 83/5
85/2 85/3 85/5 85/8
86/9 86/17 87/22 88/1
90/1 90/14
nobody [5] 39/4 39/5
68/21 69/12 88/9
nodded [3] 42/12

nods [1] 3/3
none [4] 3/7 21/11
21/13 21/14
noon [2] 55/16 69/8
noontime [2] 46/7
54/16
normal [4] 34/2 44/1
45/6 45/11
normally [3] 3/7 9/14
43/23
normally eat [1] 43/23
not [74] 3/11 6/12 7/7
8/8 9/12 15/4 17/6
18/7 18/22 19/8 19/18
19/20 20/17 29/8
29/19 30/7 30/8 30/9
30/12 31/16 32/3
32/11 32/17 36/18
36/21 39/17 47/21
53/18 53/20 57/12
58/4 60/9 63/7 64/8
64/9 66/23 68/12 69/1
69/2 69/5 71/12 71/21
72/15 73/15 75/7
75/15 78/17 78/22
81/17 81/21 82/10
82/11 83/4 83/9 83/15
83/16 83/17 83/22
84/7 84/7 84/14 84/16
85/15 85/16 85/21
86/17 86/19 87/3 87/6
87/19 88/9 88/10
88/23 89/5
Notary [4] 1/13 2/6
91/17 92/8
note [8] 11/1 29/1
30/2 36/4 47/20 82/17
84/12 84/15
noted [3] 32/4 91/7
92/10
nothing [9] 38/13 39/7
52/4 57/11 57/14 62/8
65/4 70/14 89/20
notice [6] 2/14 30/20
40/5 62/7 82/5 85/19
noticed [4] 54/21
54/22 55/19 57/8
noticed I [1] 54/21
noting [2] 31/11 32/7
notwithstanding [1]
84/17
November [1] 5/1
now [32] 7/20 9/20
10/19 12/7 14/18 15/4
16/11 17/17 18/15
19/17 22/12 26/4
26/11 28/12 31/22
39/19 43/18 46/7
48/17 57/8 64/2 65/19
68/5 72/20 73/9 76/15
77/20 79/2 81/10 82/5
87/11 88/19
nucleus [1] 88/5
nudge [2] 38/8 55/5
nudged [2] 59/23 60/5
60/6

nudging [1] 60/7
nuggets [1] 44/17
number [4] 2/2 27/4
50/2 87/6

**O**

o'clock [3] 46/7 53/2
53/7
oath [2] 1/7 31/4
object [3] 58/7 85/11
88/19
objecting [1] 48/6
objection [29] 8/17
11/1 13/1 18 29/13 30/3
33/2 33/21 35/13 36/3
36/13 40/22 44/3
45/23 47/21 47/21
48/7 54/2 61/19 66/4
70/19 78/8 80/8 81/3
82/18 84/12 84/16
86/12 88/17 90/7
objections [1] 84/17
observation [1] 58/6
obtain [1] 14/18
obtained [3] 10/15
12/1 30/16
obtaining [1] 15/1
obviously [3] 19/22
25/13 79/4
occur [1] 51/4
occurred [2] 51/15
77/21
October [1] 5/1
odd [1] 57/14
off [11] 5/22 5/23 38/2
38/3 42/16 54/21
54/22 62/16 73/18
74/21 78/13
offense [2] 89/15
89/18
offer [1] 43/13
offered [2] 43/17
44/23
office [3] 4/4 79/18
79/19
officer [1] 52/7
officers [3] 52/12
72/18 80/23
Offices [1] 1/10
official [1] 54/7
officially [1] 51/9
Oh [3] 16/10 26/22
63/11
okay [34] 2/21 3/4 3/8
3/17 4/5 7/20 8/15
9/20 11/13 11/18 12/3
13/22 14/13 14/15
14/16 20/12 22/4
24/17 27/2 27/14
29/14 30/4 31/11
32/16 37/22 39/19
42/6 42/13 42/16
44/15 54/11 55/14
57/1 90/15
[8] 37/12 41/13
41/16 41/18 55/1
59/22 74/6 76/2

[?] 75/7 84/23
86/17
old [6] 11/23 33/14
34/3 43/18 49/10
62/15
oldest [1] 17/8
once [4] 45/5 63/11
66/23 70/20
one[21] 12/19 21/5
27/9 28/6 28/7 28/7
30/10 32/14 39/14
45/20 46/19 47/8 49/7
52/2 56/22 61/3 62/12
62/21 70/13 72/5 87/3
only [6] 38/17 43/6
72/5 82/11 83/9 88/23
open [4] 39/4 56/9
56/10 72/6
opened [2] 76/18
76/20
opinion [4] 31/15
31/16 31/18 88/14
opinions [1] 88/2
oral [3] 80/9 80/12
80/17
order [1] 30/17
ordered [1] 51/16
other [14] 23/19 26/4
26/5 26/15 38/19
45/20 49/4 49/4 53/21
57/3 68/5 68/6 68/8
82/9
otherwise [1] 33/1
our [2] 31/12 31/12
ours [1] 50/6
ourselves [1] 44/10
out [41] 5/5 5/11 5/15
6/15 8/11 9/13 11/20
13/17 13/18 13/19
14/4 16/22 34/16 35/5
35/6 36/2 37/14 38/4
38/21 40/4 40/5 41/12
41/19 42/16 42/23
50/21 56/23 57/12
62/22 64/7 64/9 65/3
65/15 70/15 73/17
74/11 74/12 74/13
82/14 86/19 88/12
outside [6] 47/23 73/1
73/17 74/16 74/18
85/14
over [10] 21/21 54/8
67/19 68/18 69/2 71/3
84/8 84/10 86/20 87/1
overseas [2] 15/17
15/20
overwhelming [1]
27/11
own [4] 34/12 61/14
62/3 71/22
owned [1] 70/23

**P**

p.m[2] 1/12 90/19
page [1] 31/5
paid [3] 25/8 87/21
87/23

**P**

Pamper [1] 37/20
panicking [3] 38/11 55/9 60/8
pants [1] 57/5
paperwork [1] 74/8
Parker [6] 19/13 19/15 20/13 25/22 25/23 90/13
part [4] 7/15 8/11 8/21 18/2
part-time [1] 18/2
partner [1] 79/11
partner's [2] 79/14 79/18
parts [1] 15/22
passing [2] 88/6 88/8
passport [4] 51/1 51/20 52/1 52/8
past [1] 74/6
PC [2] 1/11 1/19
Peck [2] 1/11 1/19
pediatrician [2] 34/15 34/22
people [7] 6/7 8/14 68/5 72/21 78/5 78/11 82/9
perform [1] 64/17
permanent [1] 18/16
permanently [2] 16/22 19/4
permissible [2] 36/5 47/23
permission [1] 30/16
person [3] 43/6 71/10 73/18
personal [2] 3/11 7/10
personally [2] 51/2 52/9
phone [43] 38/17 38/17 39/15 48/17 49/9 49/23 50/9 50/11 50/14 50/14 50/17 61/3 61/4 61/15 61/17 61/19 61/20 61/22 61/23 62/3 62/9 62/10 62/14 62/15 62/16 63/2 63/6 63/11 63/15 63/18 63/20 64/8 66/15 70/15 70/16 71/11 71/13 71/14 72/7 73/6 73/16 75/15 76/1
phones [9] 38/19 48/14 49/5 49/7 60/19 60/22 62/12 62/23 63/23
phonetic [1] 72/2
physician [1] 84/5
picking [1] 32/19
pin [1] 24/16
Pine [2] 1/11 1/20
pink [1] 57/6
place [4] 9/15 70/21 91/7 92/10
placed [1] 9/9
places [1] 9/14

**Planet [2]** 6/19 92/4
play [10] 13/2 13/3 13/5 13/10 13/12 14/3 14/6 14/9 15/12 54/10
played [6] 14/8 15/14 15/20 16/7 34/16 54/12
player [1] 12/21
playing [1] 13/4
Plaza [2] 1/11 1/20
please [13] 2/17 7/22 10/12 13/8 20/18 25/21 35/17 39/17 40/17 47/11 54/6 71/21 82/16
PLLC [1] 1/16
plot [1] 48/4
plug [6] 38/20 63/11 63/14 63/15 63/17 63/17
plus [1] 14/22
point [23] 4/7 13/17 13/19 15/4 16/11 18/15 19/9 19/12 20/12 21/5 21/15 36/22 51/18 52/6 58/21 73/9 73/23 78/15 78/17 81/7 81/8 81/10 90/13
police [5] 52/7 72/18 73/7 79/8 83/11
poop [2] 37/12 42/15
position [3] 3/14 14/9 56/14
potty [1] 33/23
potty-trained [1] 33/23
power [1] 14/10
practice [1] 32/23
precinct [5] 78/19 79/2 79/3 79/4 79/9
prescribes [1] 11/4
present [2] 6/16 51/12
pretty [18] 3/23 17/21 25/8 27/20 35/22 37/10 37/23 38/1 39/8 39/14 39/18 46/9 46/10 71/19 79/6 80/21 82/8 87/9
prior [4] 26/18 34/8 36/18 88/6
privilege [2] 85/20 85/23
privileged [1] 32/12
privy [1] 29/9
probably [4] 16/10 37/7 37/19 53/3
probing [1] 3/11
problems [3] 33/7 34/6 34/14
Procedure [1] 29/5
proceeding [2] 32/15
process [1] 83/3
product [1] 32/13
professional [2] 15/7 16/7
professionally [3]

pronounced [1] 78/18
prosecuting [1] 83/4
prosecution [4] 29/4 30/1 31/20 32/6
Protective [1] 36/16
provide [1] 77/12
provider [3] 49/11 49/20 49/20
provision [2] 31/1 31/21
provisions [1] 1/8
Public [4] 1/13 2/6 91/17 92/8
purple [1] 57/6
pursuant [2] 1/8 30/2
push [2] 63/9 65/13
pushed [4] 64/21 65/2 65/11 65/15
put [13] 7/17 10/17 38/1 38/14 43/8 46/10 62/10 64/20 65/1 65/5 65/11 66/6 82/11
putting [1] 37/10

**Q**

qualifications [2] 87/18 87/20
quarter [1] 54/17
question [18] 2/16 8/13 8/18 11/14 18/12 20/19 45/8 47/10 48/7 58/10 77/6 78/23 80/1 82/21 84/18 89/3 89/6 90/10
questioning [3] 28/22 29/14 48/8
questions [12] 2/15 2/19 3/11 7/10 8/8 11/4 30/8 30/13 32/21 37/8 39/20 82/18
quite [1] 86/22

**R**

raised [2] 8/23 9/2
ran [7] 38/21 39/6 39/8 62/22 70/8 70/8 70/14
random [1] 58/1
rather [3] 48/6 52/22 67/12
ravioli [1] 44/17
reach [2] 4/3 4/3
reaction [2] 60/14 61/4
read [2] 11/15 91/6
ready [3] 7/13 37/11 39/22
realized [1] 38/3
really [10] 12/15 16/19 16/22 42/11 44/6 57/11 69/16 72/3 79/23 87/19
reask [1] 11/17
reason [6] 19/3 27/15 28/22 60/11 64/2 64/5

**Rebecca [47]** 19/13 19/15 20/6 20/10 20/12 21/5 22/8 22/19 23/9 23/20 23/22 23/23 25/3 25/15 25/17 27/16 27/21 35/8 35/12 35/18 36/10 37/10 39/22 40/7 41/8 41/10 42/20 42/23 45/4 48/17 50/16 50/20 62/2 73/6 73/10 74/1 74/13 74/20 74/23 75/7 75/20 76/9 76/19 77/3 77/9 78/6 90/12
Rebecca's [8] 19/22 25/7 25/16 25/18 25/21 49/5 49/20 50/17
recall [13] 12/15 16/15 17/15 21/19 37/4 37/7 37/9 50/10 72/11 76/14 87/15 87/17 88/18
received [1] 52/11
record [11] 3/8 5/12 5/22 5/23 29/23 30/11 30/3 32/8 89/4 91/6 92/9
recorded [1] 79/21
records [3] 29/6 30/22 31/13
red [1] 62/20
refused [1] 82/3
relate [2] 11/5 29/17
related [4] 28/20 29/3 31/19 47/22
relation [1] 54/16
relationship [1] 35/11
relatively [1] 35/18
release [1] 65/15
released [3] 51/8 51/16 51/16
releases [1] 31/2
remember [18] 5/4 7/9 8/4 9/21 9/23 10/20 11/15 12/14 23/18 24/5 47/5 50/3 67/15 69/16 70/1 72/3 79/11 79/14
RENSSELAER [6] 1/4 1/20 2/13 82/6 82/8 82/15
rent [1] 25/19
rephrase [1] 2/17
report [1] 29/2
Reporter [1] 92/7
represent [1] 2/13
representing [1] 83/17
request [1] 32/7
reserve [2] 30/3 32/2
reserved [1] 82/19
reserving [1] 31/12
respect [1] 77/14
respond [1] 64/4
responded [1] 41/15

**Respondent [1]** 1/20
response [1] 75/21
restaurant [4] 39/11 39/12 71/3 73/17
returned [1] 10/1 10/3 10/7
right [58] 2/9 2/12 2/20 3/21 4/9 4/20 4/23 5/4 5/11 7/9 8/6 12/19 13/4 15/4 19/8 19/15 21/16 21/23 27/5 29/10 29/12 30/14 31/3 31/9 32/6 33/4 44/19 46/23 47/2 49/14 49/22 51/8 51/15 51/22 52/12 54/4 54/9 55/19 58/22 59/16 60/4 61/14 65/8 65/9 66/16 68/10 74/6 74/12 75/10 77/4 77/6 77/17 78/14 81/17 83/7 84/1 86/2 86/8
rights [4] 11/14 30/3 31/12 32/2
Roberts [1] 52/16
Robinson [5] 38/23 39/16 7/4 67/21 69/12
Robinson's [1] 68/10
Ron [1] 79/13
room [14] 27/10 37/13 38/1 38/14 40/15 40/16 41/19 42/1 46/13 46/16 57/9 61/1 66/17 66/17
roughly [12] 4/22 5/14 7/1 7/5 23/1 48/16 63/3 63/23 66/22 68/16 72/10 87/7
run [5] 53/22 54/8 64/7 64/9 67/1
running [3] 53/23 75/5 75/8
rushed [1] 76/7 77/2
rushing [2] 73/7 87/9
rushitive [1] 72/2

**S**

Sabrina [3] 10/13 10/15 11/21
said [30] 11/7 26/12 32/7 34/15 35/4 37/21 37/22 39/16 39/21 40/10 42/9 42/10 42/13 42/14 42/16 44/23 51/19 58/12 60/1 56/1 62/1 62/1 71/19 72/16 72/20 80/19 84/6 87/1 87/7 88/4 89/16
same [11] 19/17 31/5 39/23 44/2 67/6 67/23 73/22 74/10 78/5 91/9 92/12
sat [1] 46/19
save [1] 60/14
saw [6] 12/5 50/20 57/9 74/2 74/23 75/4

**S**

say [43]  5/8 6/13 7/8 8/3 12/9 15/11 24/13 24/21 28/19 29/7 32/17 42/11 43/9 43/15 44/2 44/21 45/9 45/21 46/12 51/3 52/3 53/23 57/5 57/5 57/19 61/6 63/3 64/5 67/17 68/16 69/16 71/10 71/18 75/3 76/3 78/4 83/9 84/5 86/15 87/19 88/22 89/6 89/10

saying [6]  25/18 29/8 38/8 40/12 72/3 83/7

scene [1]  72/13

scenery [1]  19/5

school [8]  9/22 12/8 12/10 12/11 12/11 12/15 12/17 12/17

scope [2]  36/4 47/23

screaming [2]  75/6 75/12

screen [4]  53/20 54/9 54/10 54/13

sealed [6]  29/4 29/6 29/23 30/1 30/15 31/13

second [3]  20/10 55/21 60/7

seconds [3]  63/3 64/1 64/1

secrets [1]  47/15

Section [1]  1/8

see [12]  39/6 53/13 56/12 57/10 57/11 58/2 58/4 59/17 60/1 70/9 74/13 78/10

seeing [1]  50/22

seem [2]  37/13 75/16

seemed [5]  37/14 64/22 65/1 65/14 65/16

send [3]  39/18 71/21 75/15

sending [1]  72/4

sense [5]  6/2 11/11 53/1 54/18 69/7

separate [1]  44/9

serious [2]  34/7 34/14

Services [1]  36/17

set [4]  53/4 81/21 81/22 82/3

Seton [5]  13/9 13/10 13/12 13/15 14/7

seven [8]  4/22 9/2 9/23 10/8 10/10 10/14 10/22 11/23

severely [2]  62/20 62/22

shared [1]  39/23

shares [1]  19/17

she [196]

she's [5]  39/17 57/12 59/8 71/12 71/21

shirt [1]  57/6

shook [2]  37/22 43/16

short [1]  34/18

Shorthand [1]  92/7

shortly [1]  9/9

should [2]  16/2 29/9

shoulder [1]  59/13

shouldn't [1]  29/6

show [1]  7/7

sick [1]  37/18

side [8]  25/12 52/3 56/15 58/22 58/23 59/3 66/20 68/8

sight [2]  66/13 66/18

signal [1]  89/2

signed [3]  25/10 25/12 25/15

Sikirica [6]  84/1 86/5 86/15 87/5 88/4 88/9

simple [1]  30/21

Sippy [1]  43/22

sir [3]  12/22 14/2 89/12

sit [1]  14/4

sit-out [1]  14/4

sitting [1]  71/8

situation [3]  7/8 51/3 66/6

six [2]  4/22 7/1

sleep [3]  37/16 38/4 53/17

sleeping [2]  57/17 57/20

sleeps [2]  57/22 57/23

slightly [1]  68/12

slowly [2]  65/2 65/12

smell [1]  40/14

smelled [4]  37/12 40/10 40/20 41/3

so [97]

soft [1]  57/4

softly [1]  14/13

solid [1]  43/19

some [22]  2/15 3/10 7/10 7/20 13/17 13/19 15/20 16/11 18/15 18/18 19/12 20/12 37/8 39/20 60/1 73/9 74/9 77/15 78/15 78/17 80/6 81/10

somebody [7]  8/15 9/15 39/4 39/14 39/18 67/22 71/5

something [15]  32/20 37/21 40/11 41/3 58/3 64/9 66/8 66/15 79/15 82/10 83/4 83/5 83/22 84/7 85/1

sometimes [4]  32/18 57/22 57/22 83/16

somewhere [5]  12/11 18/3 24/2 53/6 54/14

son [2]  67/22 67/23

soon [1]  11/9

sorry [4]  4/18 44/7 51/3 86/22

sort [2]  43/23 65/16

South [4]  9/3 9/5 9/18 10/15

speak [1]  1/8 8/7 27/7 50/18 79/17

speaking [1]  14/12

special [2]  44/5 44/13

specific [3]  37/8 39/20 82/16

specifically [2]  42/9 84/9

specifics [1]  18/22

speculate [1]  24/10

spend [2]  49/21 69/2

spent [2]  81/19 82/10

spoke [1]  79/11

Sprint [2]  49/16 49/19

ss [1]  91/2

St. [3]  13/23 14/3 14/19

St. Francis [3]  13/23 14/3 14/19

stairs [2]  69/21 76/1

standing [4]  48/7 74/13 74/16 77/23

star [1]  47/19

start [5]  7/13 19/6 21/2122/2323/16

started [13]  9/21 22/20 23/2 23/4 23/9 24/19 27/18 38/10 42/17 42/17 55/8 60/8 78/13

state [5]  1/13 9/14 11/2 91/2 92/8

statement [9]  80/6 80/9 80/9 80/10 80/11 80/12 80/14 80/17 80/20

status [1]  33/11

statute [1]  11/4

statutory [1]  11/6

stay [4]  18/3 27/20 54/10 72/4

stay-at-home [1]  27/20

stayed [3]  16/22 26/6 65/17

staying [6]  3/20 16/20 17/9 23/6 26/20 71/23

steps [2]  56/6 77/1

Stewart's [11]  27/5 28/1 28/2 28/6 28/8 28/10 45/17 45/18 46/2 46/5 46/6

still [11]  12/23 13/2 13/3 13/5 22/4 36/7 42/2 43/21 70/13 73/1 90/5

stomach [5]  64/23 65/11 65/13 65/16 65/18

stood [1]  52/2

stop [5]  7/4 7/6 29/8 32/2 34/17

stopping [1]  32/14

street [11]  24/20 26/3 38/22 39/6 67/10 70/9 70/12 74/2 74/13 75/5 75/8

stretchy [1]  57/5

strike [1]  22/17

stuff [5]  17/22 17/22 35/23 36/7 44/18

subject [1]  11/13

substance [1]  76/3

such [1]  35/21

Suite [3]  1/11 1/17 1/20

sum [1]  76/3

sure [11]  9/20 15/4 32/14 33/19 53/18 53/20 66/23 69/1 69/5 73/15 85/12

surface [1]  86/19

sworn [2]  2/6 91/14

system [1]  12/8

**T**

table [4]  29/22 38/20 61/8 62/13

take [13]  16/2 18/2 34/20 45/15 45/20 56/4 63/22 77/20 77/21 77/23 87/8 89/15 89/17

taken [4]  33/9 79/2 91/7 92/9

taking [1]  42/21

talented [1]  12/20

talk [4]  14/13 52/3 52/6 86/5

talkative [1]  42/12

talking [8]  28/16 33/17 73/17 74/23 76/4 77/4 79/8 83/11

tape [1]  79/21

tapping [2]  77/19 77/22

teams [3]  15/12 15/14 15/17

technically [1]  4/8

tee [1]  57/6

tee-shirt [1]  57/6

television [2]  46/15 47/8

tell [31]  2/17 2/19 6/4 24/17 26/2 27/8 33/16 34/19 37/6 38/4 42/9 43/4 46/23 47/22 48/4 53/9 55/5 55/10 55/12 55/17 64/19 66/15 67/18 74/1 74/4 77/14 80/19 82/6 83/19 84/9 85/16

ten [2]  63/4 68/16

tenants [1]  65/17

Terence [4]  17/8 17/13 17/14 17/17

terminated [1]  7/11

terms [3]  32/19 53/5 53/8

testified [2]  2/7 62/2

testify [1]  87/11

testifying [1]  6/6

testimony [2]  48/1 91/7

Testosil [1]  39/8 39/9 39/10 39/11 70/15 70/17 74/12 75/6 77/3 77/5 77/9

Texas [2]  15/15 15/18

than [8]  23/20 26/5 44/9 45/20 48/6 63/4 66/16 88/3

Thank [2]  90/16 90/17

that [271]

that's [24]  4/9 10/2 14/1 14/13 15/14 20/17 20/17 24/11 24/11 24/14 31/4 31/15 36/5 39/1145/3 48/1 61/3 63/13 86/12 88/23 89/2 89/9 90/7 90/15

their [2]  8/15 39/15

them [20]  2/14 7/19 8/16 9/15 29/18 31/9 31/10 52/11 71/18 73/5 75/15 75/17 75/18 79/7 79/17 79/20 80/3 85/1 85/4 87/3

then [17]  4/9 21/8 28/7 32/1 32/16 37/7 45/15 46/23 51/22 54/4 56/1 61/22 63/20 65/22 70/14 72/7 73/23

there [50]  7/2 7/4 7/6 16/17 16/19 20/9 21/15 22/19 25/9 25/13 27/18 29/22 30/20 38/17 38/18 39/15 45/6 46/15 46/19 49/4 50/4 57/14 60/11 61/5 61/6 64/2 64/5 64/10 65/17 65/23 66/16 67/17 67/19 68/2 68/2 68/3 68/4 68/5 68/6 68/18 69/2 69/18 70/5 70/18 71/2 72/4 77/23 79/12 81/20 88/3

there's [7]  29/16 30/15 30/23 31/3 32/11 88/11 89/20

thereabouts [1]  5/2

these [3]  47/8 57/4 62/23

they [36]  8/14 9/15 9/16 17/5 17/6 17/7 17/11 17/12 31/20 35/4 35/5 38/21 39/13 39/15 52/1 52/9 66/14 66/15 68/8 72/13 72/13 72/14 72/16 73/1 73/4 73/7 75/14 78/3 78/12 78/12 78/15 79/6 82/8 83/5 85/4 85/5

thing [7]  38/16 42/7 44/2 54/23 64/11 67/1 86/23

**T**

things [5] 3/4 3/4 11/11 12/19 88/12
think [19] 3/13 6/20 11/3 18/18 26/11 26/18 29/9 29/23 30/11 49/14 49/21 52/19 53/6 57/20 58/11 72/20 83/1 85/19 90/9
thinking [1] 64/11
third [1] 50/4
thirty [1] 64/1
this [34] 2/15 3/14 4/7 9/12 11/7 15/4 22/17 24/16 27/11 29/3 29/7 36/4 36/18 42/5 47/21 48/8 51/4 51/15 58/7 58/8 69/7 70/11 71/10 74/19 74/23 76/15 84/16 85/1 89/8 89/11 89/14 90/2 90/13 91/14
those [4] 38/20 49/7 60/22 88/6
though [1] 32/18
thought [4] 12/4 40/10 41/3 64/7
three [5] 14/21 17/20 33/6 48/16 49/4
through [9] 4/4 53/22 53/23 54/8 54/12 57/13 57/15 76/21 87/9
thrown [1] 66/8
Thunderbirds [2] 15/16 15/19
time [66] 4/15 6/6 6/7 6/8 6/15 7/7 10/20 10/21 11/22 11/22 16/6 17/14 17/14 17/19 17/21 18/2 18/19 18/23 19/4 21/19 22/19 23/6 27/14 27/18 28/8 28/10 31/13 38/9 40/3 42/19 43/1 43/5 43/5 43/19 45/1 45/4 45/6 45/11 45/13 50/20 53/4 55/6 55/6 55/10 55/17 55/22 60/7 66/9 66/19 66/23 69/1 69/2 69/10 70/14 71/23 73/19 73/21 77/20 78/6 81/19 87/3 89/9 89/12 90/13 91/7 92/10
times [5] 34/16 34/17 38/13 58/9 59/23
today [3] 2/15 50/11 73/23
together [3] 22/20 22/23 23/10
told [14] 7/9 8/9 8/15 34/13 35/3 35/8 52/4 52/4 52/7 72/5 72/14 74/5 78/12 85/9

too [1] 78/17
took [5] 10/21 35/4 37/23 38/14 87/2
touching [1] 77/17
towards [2] 42/17 55/2
trained [1] 33/23
training [3] 60/16 60/18 64/12
transcript [2] 91/9 92/11
transfer [1] 13/22
transferred [1] 13/20
treasure [6] 47/6 47/13 48/10 48/12 52/20 52/22
trial [2] 86/3 87/12
tried [15] 38/10 38/11 38/13 38/18 38/20 39/5 52/3 55/7 62/19 62/21 63/20 65/3 65/23 69/2 70/13
trips [1] 17/22
TROY [29] 1/4 16/12 17/11 17/12 17/15 18/2 18/15 19/3 19/6 19/10 19/11 21/8 21/9 21/16 21/20 21/23 22/2 22/8 22/12 22/15 22/22 23/23 24/20 26/5 26/19 51/6 51/10 79/8 83/11
true [3] 12/21 91/9 92/11
try [14] 2/179/13 14/13 18/11 24/16 38/16 54/5 60/14 60/15 63/1 64/8 65/19 72/4 75/17
trying [12] 6/2 8/8 8/19 11/10 11/20 52/6 55/8 59/22 60/9 64/8 82/14 83/3
turn [2] 63/9 63/20
turned [2] 46/20 75/23
twenties [1] 35/19
twenty [4] 45/16 53/11 64/1 76/13
twenty feet [1] 76/13
twice [1] 65/4
two [20] 14/8 15/14 22/23 23/16 28/4 33/6 33/15 34/3 38/13 38/19 39/23 43/18 49/4 49/6 56/6 60/19 62/12 72/18 77/1 77/21
type [9] 10/19 42/7 44/17 44/22 48/21 49/9 50/9 56/19 60/17
types [1] 44/15

**U**

un [1] 4/7
un-domiciled [1] 4/7
uncle [1] 49/12
under [9] 1/7 29/4

24/12 48/1 65/2
34/22 48/1 65/2
understand [13] 2/16 2/19 3/15 8/12 11/12 14/21 82/13 82/21 83/14 83/14 83/15 84/18 86/10
understanding [3] 4/6 6/5 8/19
University [1] 13/9
unlike [1] 37/15
unresponsive [2] 39/17 64/6
unseal [1] 30/21
until [3] 10/21 16/23 54/10
up [60] 2/22 3/1 3/23 7/7 7/14 16/5 23/5 26/17 27/7 27/11 32/19 34/20 37/8 37/10 37/19 38/2 38/9 38/9 38/10 38/21 39/17 39/22 40/3 40/4 40/7 40/20 43/8 52/8 52/10 53/18 54/13 54/17 54/20 54/22 54/23 55/2 55/6 55/20 55/20 55/23 58/3 59/23 60/1 60/2 60/3 60/6 60/8 60/9 63/11 69/22 71/12 71/20 71/21 72/7 72/14 73/16 75/18 76/1 77/17 78/12
upset [1] 3/12
upstairs [3] 39/5 69/14 69/19
Upstate [1] 23/23
us [6] 3/7 9/21 15/6 27/14 64/19 69/7
use [13] 39/13 39/15 39/15 42/6 42/21 43/21 60/22 62/9 62/11 70/15 71/11 71/13 71/14
used [3] 28/21 31/14 43/7
using [1] 32/8
usually [5] 42/12 45/3 57/22 61/8 74/21

**V**

Verizon [1] 49/16
very [16] 3/11 9/22 11/3 11/5 12/20 14/12 37/14 38/12 42/12 49/10 57/23 64/21 65/2 72/1 72/2 90/16
view [1] 58/21
[44] 19/16 19/17 19/18 19/21 20/7 20/23 23/21 23/22 24/2 27/17 27/19 33/6 33/16 34/13 35/12 36/2 36/12 36/17 40/11 40/15 41/4 42/10 42/21 43/1 46/8

53/5 53/8 53/13 62/10
64/3 64/17 66/11
69/11 76/19 76/19
77/15 78/15 78/18
81/8 81/13 85/6 86/10
88/15 89/23
's [5] 43/5 66/20
77/22 86/6 87/5
visit [2] 17/2 17/13
visited [2] 17/17 18/1
voice [3] 2/22 3/1 32/19

**W**

waiting [1] 7/18
wake [16] 38/9 38/9 38/10 40/3 40/4 40/7 54/20 55/6 59/23 60/1 60/2 60/2 60/6 60/8 71/12 71/20
waking [4] 37/10 39/17 58/3 60/9
walk [2] 56/1 74/10
walked [4] 74/6 76/20 77/8 77/17
walking [4] 33/19 40/20 42/17 42/18
wall [1] 59/2
want [11] 24/9 27/8 39/19 43/11 44/20 51/1 51/19 65/17 82/12 85/12 89/18
wanted [9] 31/5 35/19 35/22 37/21 51/2 52/1 52/8 66/13 66/18
wants [2] 24/14 72/16
was [287]
was asking [1] 71/22
wasn't [12] 38/12 51/13 52/9 55/20 59/18 61/5 61/6 61/8 64/7 64/22 72/1 72/2
watch [7] 17/21 18/4 18/8 34/16 35/5 35/6 67/20
watched [2] 18/5 46/20
watching [3] 23/6 47/3 52/20
water [1] 27/8
way [13] 3/6 4/3 5/12 10/17 32/17 34/6 34/6 36/11 52/15 73/22 88/3 89/1 89/9
we [27] 2/18 3/7 9/21 11/3 11/8 12/2 12/2 24/9 26/20 28/22 28/23 28/23 29/9 29/17 29/18 30/2 30/14 31/2 32/8 33/2 44/6 44/9 44/9 50/6 50/18 58/17 79/8
we're [8] 3/6 4/23 29/8 31/11 31/12 32/1 59/11 63/2
we've [5] 28/16 53/6 89/8 89/11 89/14

week [1] 50 15/5 16/8 28/7
weekend [1] 17/18
weeks [2] 17/19 33/6
well [30] 12/19 16/6 20/9 20/22 21/15 22/17 24/9 25/9 29/21 30/18 31/8 31/15 48/2 53/5 58/2 60/13 60/16 60/19 61/10 61/14 62/9 66/11 76/19 77/6 82/13 85/6 85/18 86/15 88/14 89/17
went [26] 12/15 38/6 38/7 46/9 53/5 53/8 53/12 53/15 55/3 55/4 62/9 67/19 68/1 68/18 69/14 70/12 71/2 71/20 72/13 74/5 74/7 74/10 76/1 76/2 79/4 88/4
were [74] 5/13 7/11 8/1 8/4 8/10 8/14 8/20 8/21 8/22 8/22 9/5 9/9 9/10 10/8 10/10 10/14 10/14 10/16 10/21 10/22 11/22 11/23 12/7 12/20 13/4 16/7 17/1 17/4 17/6 19/9 26/20 26/22 26/23 27/16 28/13 34/6 36/22 40/12 40/19 40/20 42/2 42/20 44/1 47/3 49/4 49/7 50/22 51/8 51/16 66/14 66/20 67/17 68/5 68/5 70/17 72/13 73/1 73/2 73/12 75/12 76/9 77/22 77/23 79/2 81/10 81/13 81/15 81/17 81/20 85/9 85/13 86/2 87/18 87/20
west [3] 1/11 1/20 26/3
what [111]
what's [3] 29/21 60/9 66/8
whatever [3] 32/21 44/1 46/16
whatsoever [2] 32/4 33/3
when [111]
where [54] 4/18 5/15 5/18 6/2 6/18 7/15 8/1 8/4 8/9 8/14 8/19 8/22 12/14 13/8 13/22 15/21 17/6 20/17 23/2 23/3 23/5 24/5 24/11 24/11 25/23 26/2 27/23 28/13 31/9 40/14 41/21 45/17 46/8 50/11 50/15 50/17 51/4 53/13 53/15 61/8 61/12 61/17 61/22 67/3 67/9 76/18 76/19 77/3 77/9 77/14 78/22 79/17

# W

**where...** [2] 85/4 87/16

**Whereupon** [1] 90/18

**whether** [3] 20/22 49/2 74/1

**which** [7] 37/15 38/12 45/17 46/2 62/14 65/5 85/15

**while** [11] 13/5 17/22 19/9 27/16 47/3 52/10 52/19 65/19 66/13 66/16 70/20

**who** [41] 3/21 9/5 12/6 16/17 17/4 17/6 19/15 19/22 20/2 24/22 25/2 25/4 25/8 25/12 25/15 31/9 47/17 49/11 49/13 49/20 52/13 52/15 67/21 67/22 68/6 69/18 70/23 71/7 72/11 72/15 73/18 79/11 84/4 84/5 84/6 85/1 85/2 85/3 87/14 87/21 89/11

**whole** [1] 51/3

**whose** [4] 19/13 19/21 20/7 50/5

**why** [18] 7/6 21/20 33/1 41/10 57/19 60/9 65/13 66/2 66/7 66/11 75/12 76/4 79/5 82/7 82/14 83/18 83/19 86/19

**Wicklebauer** [1] 52/17

**wife** [2] 17/9 23/7

**wild** [1] 57/22

**will** [1] 63/11

**Willy** [4] 38/22 39/1 67/4 67/21

**window** [1] 71/9

**within** [1] 25/1

**without** [2] 29/8 30/16

**witness** [8] 2/5 32/1 36/6 84/16 88/21 88/22 89/5 89/9

**woke** [6] 53/18 54/13 54/17 54/22 54/23 71/19

**words** [1] 53/22

**work** [17] 6/22 18/1 19/6 19/10 27/17 27/21 27/23 28/6 28/10 32/13 37/11 38/21 39/22 45/4 45/13 66/2 74/22

**worked** [10] 6/16 6/18 6/19 28/3 28/4 38/13 39/15 45/18 65/4 70/14

**worker** [1] 71/8

**working** [6] 7/4 7/6 35/22 46/3 61/3 78/13

**works** [1] 84/6

**world** [1] 37/17

**would** [58] 5/8 6/13 7/8 11/2 15/11 17/13

17/20 17/21 20/4 24/21 28/19 28/22 29/1 29/4 29/7 29/15 30/1 30/2 30/21 31/20 33/1 34/2 34/17 34/18 34/18 35/11 37/6 43/4 43/23 44/2 45/9 45/15 49/23 50/16 54/5 54/9 57/5 59/1 59/5 59/12 59/13 59/14 60/1 60/14 60/14 62/20 63/3 66/14 68/16 76/19 76/19 82/16 83/9 83/20 84/5 85/1 87/8 89/5

**wouldn't** [5] 52/2 55/7 60/1 65/1 66/5

**written** [5] 25/9 80/9 80/10 80/11 80/14

**wrong** [4] 43/3 43/4 83/1 86/16

# Y

**Yeah** [5] 15/22 18/10 26/20 44/6 67/13

**year** [5] 14/4 16/9 16/10 18/23 34/3

**years** [9] 11/23 13/12 14/6 14/8 14/22 15/10 15/11 16/1 43/18

**yelling** [1] 75/21

**yes** [170]

**York** [23] 1/12 1/14 1/18 1/18 1/21 3/20 9/14 9/17 10/1 10/4 10/8 10/17 12/7 16/12 17/2 17/23 20/16 21/2 21/6 24/3 29/4 91/2 92/8

**you** [556]

**you're** [7] 4/2 6/5 14/12 25/18 32/8 66/6 83/7

**you've** [6] 6/3 6/3 6/12 60/5 73/9 82/5

**young** [2] 35/18 35/21

**your** [67] 2/10 3/1 3/12 3/17 6/13 7/16 7/22 8/11 10/8 10/9 10/12 10/15 10/20 11/21 15/23 16/11 17/4 17/13 17/17 19/18 20/4 20/6 25/12 26/11 28/12 29/12 29/22 30/8 30/13 31/15 32/17 34/5 35/17 41/23 44/19 47/2 47/3 48/14 49/11 50/2 50/14 51/19 52/15 53/1 54/4 54/5 56/4 58/21 63/2 64/3 65/9 65/10 68/11 68/14 71/11 71/13 73/2 77/8 77/22 79/20 80/3 81/23 86/2 87/11 87/12 88/14 90/3

**yours** [2] 49/7 49/9

**yourself** [1] 86/23

**yup** [1] 3/4

# APPENDIX

# ERRATA SHEET

I,_____ , have read the transcript of my testimony and would like the following changes:
   (Print Name)

| PAGE | LINE | CHANGE FROM: | CHANGE TO: |
|------|------|--------------|------------|
|      |      |              |            |
|      |      |              |            |
|      |      |              |            |
|      |      |              |            |
|      |      |              |            |
|      |      |              |            |
|      |      |              |            |
|      |      |              |            |
|      |      |              |            |
|      |      |              |            |
|      |      |              |            |
|      |      |              |            |
|      |      |              |            |
|      |      |              |            |
|      |      |              |            |
|      |      |              |            |
|      |      |              |            |
|      |      |              |            |
|      |      |              |            |
|      |      |              |            |

Subscribed and sworn to before me
this                day of                 ,

_____          _____
        Notary Public                              Signature

# EXHIBIT "B"

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X

MICHAEL DAVIS-GUIDER,

                             Plaintiff,

       -against-

CITY OF TROY, RONALD FOUNTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES MCDONALD,
Individually, TIM COLANERI, Individually, ADAM R. MASON,
Individually, RENSSELAER COUNTY, MICHAEL SIKIRICA,
Individually, and JOEL ABELOVE, Individually,

                             Defendants.

--------------------------------------------------------------------------------X

**THIRD
AMENDED
COMPLAINT**

17 CV 1290
(FJS) (DJS)

<u>Jury Trial Demanded</u>

      Plaintiff MICHAEL DAVIS-GUIDER, by his attorneys, Brett H. Klein, Esq., PLLC,

complaining of the defendants, respectfully alleges as follows:

**<u>Preliminary Statement</u>**

      1.    Plaintiff brings this action for compensatory damages, punitive damages and

attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of his civil rights, as such

rights are secured by said statutes and the Constitution of the United States.  Plaintiff also brings

a related supplemental state law claim.

**<u>JURISDICTION</u>**

      2.    This action is brought pursuant to 42 U.S.C. §§ 1983, 1985 and 1988, and the

Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

      3.    Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and 1367.

**<u>VENUE</u>**

      4.    Venue is properly laid in the Northern District of New York under 28 U.S.C. §

1391(b) in that this is the District in which the claims arose.

Case 1:17-cv-01290-DJS Document 61-1 Filed 04/01/21 Page 2 of 24

### JURY DEMAND

5.      Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

### PARTIES

6.      Plaintiff MICHAEL DAVIS-GUIDER is a thirty-three-year-old African American man who presently resides in New York City.

7.      Defendant CITY OF TROY was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

8.      Defendant CITY OF TROY is a municipal corporation existing by virtue of the laws of the State of New York.  At all relevant times, defendant CITY OF TROY maintained its own police force, the City of Troy Police Department (hereinafter referred to as "TPD"), whose principal function was to enforce criminal and administrative laws and rules in and about the City of Troy.

9.      At all relevant times herein, defendants RONALD FOUNTAIN, DANIELLE COONRADT, CHARLES MCDONALD, TIM COLANERI, and ADAM R. MASON, were duly sworn police officers and/or detectives and/or supervisors of the TPD.  Said defendants are sued herein in their individual capacities.

10.     Defendant RENSSELAER COUNTY was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

11.     Defendant RENSSELAER COUNTY, as part of its Department of Health, employed, managed, and was otherwise responsible for the Rensselaer County Medical Examiner, which contracted with its employee and/or agent, defendant MICHAEL SIKIRICA, to, *inter alia,* conduct forensic investigations and to prepare autopsy reports.

2

Case 1:17-cv-01290-FJS-DJS Document 66-1 Filed 04/01/20 Page 8 of 24

12. Defendant MICHAEL SIKIRICA was and is a medical doctor who conducts autopsies for defendant RENSSELAER COUNTY, in so doing, acts under color of law. He is being sued in his individual capacity.

13. At all relevant times herein, defendant JOEL ABELOVE was the Rensselaer County District Attorney (hereinafter "DA" or "DA ABELOVE") for the Rensselaer County District Attorney's Office (hereinafter "RCDAO"). He is sued herein in his individual capacity.

## FACTS

14. On February 26, 2015, Mr. Davis-Guider was home with his girlfriend's daughter, V.D., who at the time was two years and seven months of age.

15. When V.D. woke up that day, she was acting tired and low energy, so V.D. went back to sleep.

16. Mr. Davis-Guider started to watch a movie, and then also fell asleep.

17. A couple of hours later, Mr. Davis-Guider awoke and went to check on V.D.

18. He found V.D. unresponsive in her bed.

19. Mr. Davis-Guider immediately tried to administer C.P.R. and called 911.

20. Emergency personnel arrived, and among other interventions, also administered C.P.R.

21. V.D. remained unresponsive.

22. V.D. was transported to St. Mary's Hospital – Seton Health.

23. At Seton Health, C.P.R. was continued, however, V.D. remained unresponsive and was pronounced dead in the emergency room.

24.     Later, on February 26, 2015, Mr. Davis-Guider was questioned by and/or in the presence of defendant TPD officers and detectives RONALD FOUNTAIN, CHARLES MCDONALD, and DANIELLE COONRADT, and TPD detective sergeant TIM COLANERI.

25.     Mr. Davis-Guider reiterated the same chain of events as described above and at all times denied having engaged in any acts which caused or could have contributed to V.D.'s unresponsive state or to her tragic death.

26.     On February 27, 2015, the Rensselaer County medical examiner, defendant SIKIRICA performed the autopsy of V.D.

27.     Defendant SIKIRICA performed the autopsy in the presence of defendant TPD defendant officers FOUNTAIN, MCDONALD, and COLANERI, and after reviewing a number of police generated materials, including the February 26, 2015 interrogation, during which Mr. Davis-Davis-Guider reported that he had tried to administer C.P.R. after finding V.D. unresponsive.  Defendant SIKIRICA also discussed his findings with defendant TPD officers during and after the autopsy,

28.     Defendant SIKIRICA also reviewed the emergency room records which confirmed that after Mr. Davis-Guider administered C.P.R., emergency medical technicians ("EMTs") and hospital staff continued to administer C.P.R. for a significant period of time thereafter.

29.     After speaking with defendant SIKIRICA and observing the autopsy, defendant FOUNTAIN requested that Mr. Davis-Guider come to the station house for further questioning.

30.     Mr. Davis-Guider voluntarily did so, and again reiterated the same chain of events as described above, and at all times denied having engaged in any acts which caused or could have contributed to V.D.'s unresponsive state or to her death.

31.    As early as March 1, 2015, defendant JOEL ABELOVE was actively involved in requesting and reviewing documents, communicating with the TPD defendants, and otherwise actively participating in, overseeing, or otherwise involved in the investigation and conspiracy leading to and otherwise forming the basis of plaintiff's malicious prosecution and the deprivation of his right to fair trial.

32.    Defendants FOUNTAIN, MCDONALD, COLANERI, and ADAM R. MASON, were also actively involved in the investigation and conspiracy leading to or otherwise forming the basis of plaintiff's malicious prosecution and deprivation of his right to fair trial.

33.    On March 12, 2015, a subsequent meeting was held at the medical examiners' office regarding the autopsy of V.D.   Defendants SIKIRICA, FOUNTAIN, MCDONALD, COLANERI, and MASON, were all present at this meeting.

34.    On August 15, 2015, defendant SIKIRICA issued his autopsy report ruling the manner of death to be a homicide, and the cause of death to be hypovolemic shock due to large hemoperitoneum due to multiple lacerations of the liver with right rib fractures due to blunt force trauma.

35.    Defendant SIKIRICA apparently made this determination based on his finding that V.D. had fractures of her 9th and 10th ribs, which had resulted in lacerations to V.D.'s liver, and noted the following: "History of decedent reportedly found unresponsive with reported history of attempted cardiopulmonary resuscitation by a large adult."

36.    Defendant SIKIRICA omitted from his report that in addition to the "large adult", presumably meaning Mr. Davis-Guider, EMTs and hospital staff had also administered C.P.R. for a prolonged period of time after plaintiff's very brief attempt.

37. Furthermore, defendant SIKIRICA ruled V.D.'s death a homicide, even though he lacked any evidence to support the conclusion that any rib fractures caused V.D.'s death, insofar as he was aware that V.D. was found unresponsive prior to C.P.R. ever being administered by Mr. Davis-Guider or by multiple health professionals.

38. After defendant SIKIRICA issued his report, defendant FOUNTAIN again requested that Mr. Davis-Guider report to the station house for further questioning on September 9, 2015.

39. Mr. Davis-Guider voluntarily did so, and again reiterated the same chain of events as described above, and at all times denied having engaged in any acts which caused or could have contributed to V.D.'s unresponsive state or to her death.

40. Thereafter, based solely on defendant SIKIRICA's unsupported medical opinion, which was rendered in conspiracy with the defendant TPD officers, and ignoring clear facts which contradicted defendant SIKIRICA's findings, including that V.D. was already unresponsive when C.P.R. was first administered and that multiple people administered C.P.R., including approximately thousands of chest compressions administered by EMTs and/or hospital staff after plaintiff's brief and limited attempts to help V.D., defendant TPD officers arrested Mr. Davis-Guider on October 2, 2015, several months after V.D.'s tragic passing.

41. There was no reason to believe that Mr. Davis-Guider was responsible in any way for V.D.'s death  Defendant SIKIRICA's unsupported autopsy report, which was, upon information and belief, created in conspiracy with the TPD defendants and defendant ABELOVE, and in furtherance of the TPD defendant officers' false arrest plaintiff, gave the defendant TPD officers and DA ABELOVE a fabricated cover for Mr. Davis-Guider's arrest and ensuing malicious prosecution.

6

42.     As a result of the false allegations levied against him by the defendant TPD officers arising from the joint investigation and conspiracy with defendants SIKIRICA and DA ABELOVE, plaintiff was arraigned on false manslaughter charges, and thereafter remanded to the Rensselaer County Jail, where he remained through the malicious prosecution against him and his criminal trial.

43.     Mr. Davis-Guider's criminal case proceeded to trial in August 2016, under Rensselaer County Case Number 15-1094.

44.     Defendants FOUNTAIN, COONRADT, MCDONALD, and SIKIRICA testified at plaintiff's trial.

45.     Mr. Davis-Guider was thereafter acquitted by a jury of all charges on August 25, 2016.

46.     Defendants FOUNTAIN, COONRADT, MCDONALD, COLANERI, MASON, and ABELOVE either directly participated in the above-described illegal acts, failed to intervene in them despite a meaningful opportunity to do so, or supervised and approved of, oversaw, and otherwise conspired or participated in the aforementioned misconduct.

47.     All of the above occurred as a direct result of the unconstitutional policies, customs or practices of defendants CITY OF TROY and RENSSELAER COUNTY, including, without limitation, the inadequate screening, hiring, retaining, training and supervising its employees, and the City of Troy's *de facto* policy of engaging in unlawful collusion with the Rensselaer Medical Examiner and the RCDAO, including the DA and ADA's in said office, to create and/or manufacture false medical evidence in support of the false arrests, fabrication of evidence and malicious prosecutions of innocent individuals being charged with crimes.

48.     The aforesaid event is not an isolated incident.  Defendant CITY OF TROY is aware from sources that include lawsuits, notices of claims, complaints, news reports, internal investigations, and failed prosecutions, that many TPD officers, including the defendants, engage in misconduct, and that they otherwise engage in unlawful collusion with the Rensselaer Medical Examiner and the RCDAO, including the DA and ADA's in said office.

49.     Defendant CITY OF TROY is further aware that such improper training has often resulted in a deprivation of civil rights.  Despite such notice, defendant CITY OF TROY has failed to take corrective action.  This failure caused the officers in the present case to violate the plaintiff's civil rights.

50.     Moreover, upon information and belief, defendant CITY OF TROY was aware prior to the incident, that the individual defendants lacked the objectivity, temperament, maturity, discretion, and disposition to be employed as police officers.  Despite such notice, defendant CITY OF TROY has retained these officers, and failed to adequately train and supervise them.

51.     Defendant RENSSELAER COUNTY is likewise aware from lawsuits, notices of claims, complaints, news reports, and failed prosecutions, that its medical examiner, Defendant SIKIRICA, was *inter alia,* not acting independently, was overworked and not careful in his work, did not adequately investigate the prior medical history of decedents, and had on other occasions similarly offered faulty diagnoses and cause of death determinations, which ignored obvious medical evidence, in an effort to ultimately aid in the false arrest, fabrication of evidence and malicious prosecutions of innocent individuals being charged with crimes by law enforcement agencies in Rensselaer County and by the RCDAO, including the DA and ADA's in said office.

52.     For example, defendants RENSSELAER COUNTY and the CITY OF TROY were aware from the trial of Joseph McElheny, who was similarly arrested by TPD officers, prosecuted

by the RCDAO, and in 2011, acquitted of murdering his four-month-old daughter, that defendant SIKIRICA had similarly ignored extensive medical evidence which supported a finding that the child had died of natural causes, and provided a cause of death and medical diagnosis consistent with the urging of investigating police and prosecutors who were seeking a homicide conviction.[1]

53.     Despite knowing this, defendant RENSSELAER COUNTY again relied on defendant SIKIRICA's services in this case.

54.     Defendant RENSSELAER COUNTY is further aware of problems with defendant SIKIRICA from the trials of Adrian Thomas, who was also similarly arrested by TPD officers, prosecuted by the Rensselaer County District Attorney's Office, and in 2015, acquitted of charges including murder arising from the death of his four-month-old son after his initial conviction was overturned by the Court of Appeals. In Thomas, defendant SIKIRICA, *inter alia,* ignored medical evidence that Thomas' son had died of natural causes from sepsis, and provided a diagnosis consistent with the urging of police and prosecutors who were seeking a murder conviction against Thomas. Defendants FOUNTAIN, MASON and COLANERI were likewise involved in Thomas' case.

55.     Furthermore, testimony at Mr. Davis-Guider's trial confirmed that defendant SIKIRICA was overworked, handling more cases than a medical examiner should and could at any given time, resulting in defendant SIKIRICA executing his duties without the level of care and diligence required of a person with his authority and influence over serious criminal prosecutions, including cases involving alleged homicides.

56.     Based on the foregoing, defendant RENSSELAER COUNTY was aware that defendant SIKIRICA lacked the objectivity, temperament, discretion, and disposition to be

---

[1] *See e.g.* http://www.troyrecord.com/article/TR/20111012/NEWS/310129978.

employed as County's medical examiner, and to otherwise competently provide evidence and testify against criminal defendants in homicide and other serious felony prosecutions.

57.    The wife of Mr. McElheny aptly described this pattern and practice in a written statement released after her husband's acquittal:

> Parents are being targeted, often at the worst moments in their lives, by overzealous police and child protective investigators . . .. These investigators use the parents' grief and the memories of their children to coerce them into making statements of self-implication. Most often, the parents want answers even more than authorities do. Instead, what they get are accusations and blame. None of this would be possible without the medical establishment standing by and doing nothing. This is a discussion we all should be having as a society. . . .We need to shine a light on child abuse, but not at the expense of tearing apart innocent families, and not with a blind eye toward the injustice that results from jumping to conclusions. *See* http://www.troyrecord.com/article/TR/20111012/NEWS/31012997 8.

58.    Despite such notice, defendant RENSSELAER COUNTY continued to allow these malicious and unsupported prosecutions to proceed, and it continued to retain defendant SIKIRICA and to proffer his reports and otherwise utilize his services in furtherance of said prosecutions, and it failed to adequately train, supervise and properly discipline the RCDAO, including the DA and ADA's in said office, and defendant SIKIRICA, or to take any steps whatsoever to avoid tragic miscarriages of justice such as the wrongful prosecution of Mr. Davis-Guider.

59.    All of the aforementioned acts of defendants, their agents, servants and employees were carried out under the color of state law.

60.    All of the aforementioned acts deprived plaintiff MICHAEL DAVIS-GUIDER of the rights, privileges and immunities guaranteed to citizens of the United States by the Constitution of the United States of America, and in violation of 42 U.S.C. §1983.

61.     The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and/or as the county's medical examiner, with the entire actual and/or apparent authority attendant thereto.

62.     Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

63.     As a result of the foregoing, plaintiff MICHAEL DAVIS-GUIDER sustained, *inter alia*, physical injuries, emotional distress, embarrassment, and humiliation, and deprivation of his constitutional rights.

### AS AND FOR A FIRST CAUSE OF ACTION
(False Arrest/Unlawful Imprisonment under 42 U.S.C. § 1983)

64.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs numbered "1" through "63" with the same force and effect as if fully set forth herein.

65.     Defendants FOUNTAIN, COONRADT, MCDONALD, and SIKIRICA caused MICHAEL DAVIS-GUIDER to be arrested without probable cause, causing him to be detained against his will for an extended period of time and subjected to physical restraints from his arrest through his arraignment.

66.     As a result of the foregoing, plaintiff MICHAEL DAVIS-GUIDER is entitled to compensatory damages in an amount to be fixed by a jury, and is further entitled to punitive damages against the individually named defendants in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

APPENDIX **165**

Case 1:17-cv-01290-DLS-DJS Document 81-1 Filed 04/04/20 Page 12 of 24
Case 1:17-cv-01290-DLS-DJS Document 81-1 Filed 04/04/20 Page 12 of 24

## AS AND FOR A SECOND CAUSE OF ACTION
(Malicious Prosecution under 42 U.S.C. § 1983)

67.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "66" with the same force and effect as if fully set forth herein.

68.     The individually named defendants initiated commenced and continued a malicious prosecution against plaintiff MICHAEL DAVIS-GUIDER.

69.     The individually named defendants were directly and actively involved in the initiation of criminal proceedings against plaintiff MICHAEL DAVIS-GUIDER.

70.     The individually named defendants lacked probable cause to initiate criminal proceedings against plaintiff MICHAEL DAVIS-GUIDER.

71.     The individually named defendants acted with malice in initiating criminal proceedings against plaintiff MICHAEL DAVIS-GUIDER.

72.     The individually named defendants were directly and actively involved in the continuation of criminal proceedings against plaintiff MICHAEL DAVIS-GUIDER.

73.     The individually named defendants lacked probable cause to continue criminal proceedings against plaintiff MICHAEL DAVIS-GUIDER.

74.     The individually named defendants acted with malice in continuing criminal proceedings against plaintiff MICHAEL DAVIS-GUIDER.

75.     The prosecution terminated in plaintiff MICHAEL DAVIS-GUIDER's favor.

76.     As a result of the foregoing, plaintiff MICHAEL DAVIS-GUIDER is entitled to compensatory damages in an amount to be fixed by a jury, and is further entitled to punitive damages against the individually named defendants in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

Case 1:17-cv-01290-DJS Document 81-31 Filed 03/04/20 Page 13 of 23
Case 1:17-cv-01290-DJS Document 81-31 Filed 03/04/20 Page 13 of 23

## AS AND FOR A THIRD CAUSE OF ACTION
(Violation of Right to Fair Trial under 42 U.S.C. § 1983)

77.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs numbered "1" through "76" with the same force and effect as if fully set forth herein.

78.     The individually named defendants created false evidence against plaintiff MICHAEL DAVIS-GUIDER and forwarded that false evidence to the RCDAO.

79.     Defendants used false evidence against plaintiff MICHAEL DAVIS-GUIDER in legal proceedings.

80.     As a result of defendants' creation, forwarding to prosecutors, and use of false, fabricated evidence, plaintiff MICHAEL DAVIS-GUIDER suffered a violation of his constitutional rights to a fair trial and to due process, as guaranteed by the Fourth, Fifth, Sixth and/or Fourteenth Amendments of the United States Constitution.

81.     As a result of the foregoing, plaintiff MICHAEL DAVIS-GUIDER is entitled to compensatory damages in an amount to be fixed by a jury, and is further entitled to punitive damages against the individually named defendants in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

## AS AND FOR A FOURTH CAUSE OF ACTION
(Failure to Intervene under 42 U.S.C. § 1983)

82.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs numbered "1" through "81" with the same force and effect as if fully set forth herein.

83.     Defendants FOUNTAIN, COONRADT, MCDONALD, COLANERI, MASON, and ABELOVE had an affirmative duty to intervene on behalf of plaintiff MICHAEL DAVIS-GUIDER, whose constitutional rights were being violated in their presence by other officers and/or the RCDAO and/or defendant Sikirica.

Case 1:17-cv-01290-DJS Document 84-1 Filed 04/01/20 Page 126 of 24
Case 1:17-cv-01290-DJS Document 84-1 Filed 04/01/20 Page 124 of 23
APPENDIX                                                           167

84.     Defendants FOUNTAIN, COONRADT, MCDONALD, COLANERI, MASON, and ABELOVE failed to intervene to prevent the unlawful conduct described herein.

85.     As a result of the foregoing, plaintiff MICHAEL DAVIS-GUIDER was falsely arrested as to defendants FOUNTAIN, COONRADT and MCDONALD, and maliciously prosecuted, subjected to deprivation of his right to a fair trial, and to conspiracy by defendants FOUNTAIN, COONRADT, MCDONALD, COLANERI, MASON and ABELOVE.

86.     As a result of the foregoing, plaintiff MICHAEL DAVIS-GUIDER is entitled to compensatory damages in an amount to be fixed by a jury, and is further entitled to punitive damages against the individually named defendants in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Conspiracy under 42 U.S.C. § 1983 and 1985)

87.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs numbered "1" through "86" with the same force and effect as if fully set forth herein.

88.     Defendant MICHAEL SIKIRICA and TPD defendants FOUNTAIN, COONRADT, and MCDONALD conspired to undermine MICHAEL DAVIS-GUIDER's rights to be free from false arrest, and along with TPD defendants COLANERI and MASON, and DA ABELOVE, to be free from malicious prosecution and fabrication of evidence and/or deprivation of his right to a fair trial.

89.     As a result of the foregoing, plaintiff MICHAEL DAVIS-GUIDER was falsely arrested, maliciously prosecuted and/or subjected to deprivation of his right to a fair trial.

90.     As a result of the foregoing, plaintiff MICHAEL DAVIS-GUIDER is entitled to compensatory damages in an amount to be fixed by a jury, and is further entitled to punitive

damages against the individually named defendants in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

## AS AND FOR A SIXTH CAUSE OF ACTION
(Municipal Liability under 42 U.S.C. § 1983 against Defendant City of Troy)

91.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs numbered "1" through "90" with the same force and effect as if fully set forth herein.

92.     The foregoing violations of plaintiff's federal constitutional rights and injuries were further directly, foreseeably, proximately, and substantially caused by conduct chargeable to defendant CITY OF TROY, amounting to deliberate indifference to the constitutional rights of persons, including plaintiff, who were investigated, arrested, or prosecuted for alleged criminal activities.

93.     Prior to plaintiff's arrest, policymaking officials of the CITY OF TROY, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of arresting, prosecuting and convicting innocent people, and to the right of all criminal suspects and defendants to due process and a fair trial, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning:

a. the manufacturing of probable cause to make an arrest, and initiate and continue a prosecution, and the avoidance of arrests and prosecutions based upon falsely manufactured or unreliable or false "evidence" created with the assistance of the Rensselaer County Medical Examiner; and

b. the duty to intervene to report misconduct committed by other officers.

94.     The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline

Case 1:17-cv-01290-DJS Document 84-1 Filed 02/04/22 Page 178 of 24    **169**
APPENDIX
Case 1:17-cv-01290-FJS-DJS   Document 77   Filed 04/01/20   Page 16 of 23

employees with regard thereto) were implemented or tolerated by policymaking officials for the defendant CITY OF TROY, including but not limited to, the TPD Chief of Police, who knew (or should have known):

> a.  to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;
>
> b.  that such issues either present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision, and/or discipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and
>
> c.  that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

95.     Under the principles of municipal liability for federal civil rights violations, TPD's Chief of Police (or his/her authorized delegate) had final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters and lawful interrogation techniques.

96.     The TPD Chief of Police, personally and/or through his/her authorized delegates, at all relevant times had final authority, and constituted a policymaker for whom the TPD is liable, with respect to compliance by TPD employees with the above-mentioned constitutional requirements.

97.     During all times material to this complaint, the TPD Chief of Police owed a duty to the public at large and to plaintiff, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices, training and discipline sufficient to prevent or deter conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

98.     The aforesaid policies, procedures, regulations, practices and/or customs of the TPD were collectively and individually a substantial factor in bringing about the aforesaid violations by the TPD defendants of plaintiff's rights under the Constitution and the laws of the United States.

99.     The foregoing customs, policies, usages, practices, procedures and rules of the TPD were the direct and proximate cause of the constitutional violations suffered by plaintiff MICHAEL DAVIS-GUIDER as alleged herein.

100.     The foregoing customs, policies, usages, practices, procedures and rules of the TPD were the moving force behind the constitutional violations suffered by plaintiff MICHAEL DAVIS-GUIDER as alleged herein.

101.     As a result of the foregoing customs, policies, usages, practices, procedures and rules of the TPD, plaintiff MICHAEL DAVIS-GUIDER was deprived of his to be free from malicious prosecution and denial of his right to a fair trial and due process of law.

102.     Defendants, collectively and individually, while acting under color of state law, were directly and actively involved in violating plaintiff MICHAEL DAVIS-GUIDER's constitutional rights.

103.     As a result of the foregoing, plaintiff MICHAEL DAVIS-GUIDER is entitled to compensatory damages in an amount to be fixed by a jury, and is further entitled to punitive

damages against the individually named defendants in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

## AS AND FOR A SEVENTH CAUSE OF ACTION
(Municipal Liability under 42 U.S.C. § 1983 Against Defendant Rensselaer County)

104.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs numbered "1" through "103" with the same force and effect as if fully set forth herein.

105.    Defendant MICHAEL SIKIRICA, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, RENSSELAER COUNTY, which is forbidden by the Constitution of the United States.

106.    The aforementioned customs, policies, usages, practices, procedures and rules of RENSSELAER COUNTY included, but were not limited to, inadequate screening, hiring, retaining, training and supervising its forensic pathologist, MICHAEL SIKIRICA and the RCDAO, including the DA and ADA's in said office, which conspired with defendant SIKIRICA to offer false diagnoses leading to the wrongful arrests and prosecutions of innocent individuals, and which was the moving force behind the violation of plaintiff MICHAEL DAVIS-GUIDER's rights as described herein.  As a result of the failure of defendant RENSSELAER COUNTY to properly recruit, screen, train, discipline, and supervise its medical examiners and their relationship with law enforcement agencies and as well as with its DA and ADAs, including the individual defendants MICHAEL SIKIRICA and JOEL ABELOVE, defendant RENSSELAER COUNTY has tacitly authorized, ratified, and has been deliberately indifferent to, the acts and conduct complained of herein.

107. The foregoing customs, policies, usages, practices, procedures and rules of defendant RENSSELAER COUNTY constituted deliberate indifference to the safety, well-being and constitutional rights of plaintiff MICHAEL DAVIS-GUIDER.

108. The foregoing customs, policies, usages, practices, procedures and rules of defendant RENSSELAER COUNTY and its medical examiner's office and the RCDAO were the direct and proximate cause of the constitutional violations suffered by plaintiff MICHAEL DAVIS-GUIDER as alleged herein.

109. The foregoing customs, policies, usages, practices, procedures and rules of defendant RENSSELAER COUNTY were the moving force behind the constitutional violations suffered by plaintiff MICHAEL DAVIS-GUIDER as alleged herein.

110. As a result of the foregoing customs, policies, usages, practices, procedures and rules of defendant RENSSELAER COUNTY, plaintiff MICHAEL DAVIS-GUIDER was subjected to a conspiracy to maliciously prosecute him, and to deprive him of his right to fair trial.

111. Defendants, collectively and individually, while acting under color of state law, were directly and actively involved in violating plaintiff MICHAEL DAVIS-GUIDER's constitutional rights.

112. All of the foregoing acts by defendants deprived plaintiff MICHAEL DAVIS-GUIDER of federally protected rights, including, but not limited to, the right:

      A.     To be free from false arrest

      B.     To be free from malicious prosecution;

      C.     To be free from deprivation of the right to a fair trial;

      D.     To be free from conspiracy; and

      E.     To be free from the failure to intervene.

113. As a result of the foregoing, plaintiff MICHAEL DAVIS-GUIDER is entitled to compensatory damages in an amount to be fixed by a jury, and is further entitled to punitive damages against the individually named defendants in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

**Supplemental State Law Claims**

114. Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs numbered "1" through "113" with the same force and effect as if fully set forth herein.

115. Within ninety (90) days after the claim herein accrued, plaintiff duly served upon, presented to and filed with, the CITY OF TROY and RENSSELAER COUNTY, Notices of Claim setting forth all facts and information required under the General Municipal Law 50-e.

116. The CITY OF TROY and RENSSELAER COUNTY have wholly neglected or refused to make an adjustment or payment thereof and more than thirty (30) days have elapsed since the presentation of such claim as aforesaid.

117. This action was commenced within one (1) year and ninety (90) days after the cause of action herein accrued.

118. Plaintiff has complied with all conditions precedent to maintaining the instant action.

119. This action falls within one or more of the exceptions as outlined in C.P.L.R. 1602.

**AS AND FOR AN EIGHTH CAUSE OF ACTION**
(Malicious Prosecution under the laws of the State of New York)

120. Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "119" with the same force and effect as if fully set forth herein.

Case 1:17-cv-01290-DJS Document 94-1 Filed 02/04/22 Page 22 of 24
**APPENDIX**
**174**
Case 1:17-cv-01290-FJS-DJS   Document 77   Filed 04/01/20   Page 21 of 23

121. TPD defendants FOUNTAIN, COONRADT, and MCDONALD, and defendant SIKIRICA, initiated, commenced and continued a malicious prosecution against plaintiff MICHAEL DAVIS-GUIDER.

122. Defendants CITY OF TROY, as employer of the individually named defendant officers FOUNTAIN, COONRADT, and MCDONALD, and defendant RENSSELAER COUNTY, as employer of defendant SIKIRICA, are responsible for their wrongdoing, as well as the wrongdoing of any of their employees found to be involved in the malicious prosecution, under the doctrine of *respondeat superior.*

123. The aforementioned defendants caused plaintiff MICHAEL DAVIS-GUIDER to be prosecuted without probable cause until the charges were dismissed on or about August 25, 2016, after a jury acquitted plaintiff at trial.

124. As a result of the foregoing, plaintiff MICHAEL DAVIS-GUIDER is entitled to compensatory damages in an amount to be fixed by a jury, and is further entitled to punitive damages against the individually named defendants in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

**WHEREFORE**, plaintiff MICHAEL DAVIS-GUIDER demands judgment and prays for

the following relief, jointly and severally, against the defendants:

    (A)    full and fair compensatory damages in an amount to be determined by a jury;

    (B)    punitive damages against the individually named defendants in an amount to be

        determined by a jury;

    (C)    reasonable attorney's fees and the costs and disbursements of this action; and

    (D)    such other and further relief as appears just and proper

Dated: New York, New York
       April 1, 2020

                        BRETT H. KLEIN, ESQ., PLLC
                        Attorneys for the Plaintiff
                        305 Broadway, Suite 600
                        New York, New York 10007
                        (212) 335-0132

               By:     *Brett Klein*

                      BRETT H. KLEIN (BK4744)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------------X

MICHAEL DAVIS-GUIDER,

                                        Plaintiff,               17 CV 1290

            -against-                                            (FJS) (DJS)

CITY OF TROY, RONALD FOUNTAIN, Individually,          <u>Jury Trial Demanded</u>
DANIELLE COONRADT, Individually, CHARLES MCDONALD,
Individually, TIM COLANERI, Individually, ADAM R. MASON,
Individually, RENSSELAER COUNTY, MICHAEL SIKIRICA,
Individually, and JOEL ABELOVE, Individually, and JOHN and
JANE DOE 1-10, Individually,

                                        Defendants.

-----------------------------------------------------------------------------------X

**THIRD AMENDED COMPLAINT**

**BRETT H. KLEIN, ESQ., PLLC**
Attorneys for the Plaintiff MICHAEL DAVIS-GUIDER
305 Broadway, Suite 600
New York, New York 10007
(212) 335-0132