# 23-589

---

IN THE

# United States Court of Appeals for the Second Circuit

---

MICHAEL DAVIS-GUIDER,
*Plaintiff-Counter-Defendant-Appellant,*

— v. —

CITY OF TROY, RONALD FOUNTAIN, INDIVIDUALLY,
DANIELLE COONRADT, INDIVIDUALLY,
CHARLES MCDONALD, INDIVIDUALLY,
TIM COLANERI, INDIVIDUALLY,
*Defendants-Cross-Claimants-Counter-Claimants-Appellees,*

RENSSELAER COUNTY,
MICHAEL SIKIRICA, INDIVIDUALLY,
*Defendants-Cross-Defendants-Counter-Claimants-Appellees,*

ADAM R. MASON, INDIVIDUALLY
*Defendant-Cross-Claimant-Counter-Claimant,*

JOEL ABELOVE, INDIVIDUALLY,
*Defendant-Cross-Defendant-Counter-Claimant,*

JOHN AND JANE DOES 1-10, INDIVIDUALLY,
MICHAEL E. PARROW, ANDRA ACKERMAN,
*Defendants.*

---

On Appeal from the United States District Court
for the Northern District of New York
Case No. 1:17-cv-1290 (FJS/DJS)

---

## APPENDIX VOLUME 3 OF 11

# APPENDIX VOLUME 3 TABLE OF CONTENTS

ECF 115-8: Exhibit "E" .................................................................. 376

ECF 115-9: Exhibit "F" .................................................................. 493

# EXHIBIT "E"

1

1

2                        **DEPOSITION of JOEL ABELOVE**

3

4   UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF NEW YORK
5   --------------------------------------------X
    MICHAEL DAVIS-GUIDER,
6
                           Plaintiff,
7
    -against-            Civil Case No.: 1:17-cv-01290
8                        (FJS/DJS)

9   CITY OF TROY, RONALD FOUNTAIN, Individually,
    DANIELLE COONRADT, Individually, CHARLES
10  MCDONALD, Individually, TIM COLANERI,
    Individually, ADAM R. MASON, Individually,
11  RENSSELAER COUNTY, MICHAEL SIKIRICA,
    Individually, and JOEL ABELOVE,
12  Individually,

13                         Defendants.
    --------------------------------------------X

14

15       DEPOSITION of the Defendant, **JOEL ABELOVE,**

16  held on May 28, 2021, commencing at 9:35 a.m.,

17  being held virtually by Zoom, pursuant to Notice;

18  before Susan Florio, a Registered Professional

19  Reporter and Notary Public in and for the State of

20  New York.

21

22

23

```
 1

 2
       APPEARANCES:
 3

 4            BRETT H. KLEIN, ESQ., P.C.
              Attorneys for Plaintiff
 5            305 Broadway, Suite 600
              New York, New York 10007
 6            BY:  BRETT H. KLEIN, ESQ.

 7
              BAILEY, JOHNSON & PECK, P.C.
 8            Attorneys for Defendants Rensselaer
                County, Michael Sikirica, and
 9              Joel Abelove
              Pine West Plaza 5, Suite 507
10            Washington Avenue Extension
              Albany, New York 12205
11            BY:  CRYSTAL R. PECK, ESQ.

12
              PATTISON, SAMPSON, GINSBERG & GRIFFIN, P.C.
13            Attorneys for Defendant City of Troy,
                Ronald Fountain, Danielle Coonradt,
14              Charles McDonald, Tim Colaneri, and
                Adam R. Mason
15            22 First Street, P.O. Box 208
              Troy, New York 12181-0208
16            BY:  RHIANNON I. SPENCER, ESQ.

17

18

19

20

21

22

23     Indexes........................... Pg. 104
```

# APPENDIX

```
 1

 2               S T I P U L A T I O N S

 3   IT IS HEREBY STIPULATED AND AGREED by and between

 4   the parties hereto, that all rights provided by the

 5   F.R.C.P. including the right to object to any

 6   question except as to the form, or to move to

 7   strike any testimony at this examination, are

 8   reserved, and, in addition, the failure to object

 9   to any question or move to strike testimony at this

10   examination shall not be a bar or waiver to make

11   such motion at, and is reserved for, the trial of

12   this action;

13   It is further stipulated and agreed that this

14   examination may be sworn to by the witness being

15   examined before a Notary Public other than the

16   Notary Public before whom this examination was

17   begun;

18   It is further stipulated and agreed that the filing

19   and certification of the original of this

20   examination are waived;

21           It is further stipulated and agreed that

22    the examining party will furnish the examined

23    party with a copy of the transcript free of charge.
```

4

```
 1
 2                    JOEL ABELOVE,
 3   having been first duly sworn/affirmed remotely by
 4   the notary public, was examined and testified as
 5   follows:
 6
 7   BY MR. KLEIN:
 8       Q.   Good morning, Mr. Abelove.  I'm Brett
 9   Klein.  I represent Mike Davis in a lawsuit
10   pending in the Northern District.  We are here
11   today to ask you questions about your knowledge
12   of the facts and circumstances of his prosecution
13   for the, involving the death of V.D.
14           Do you understand that's why you are here
15   today generally?
16       A.   Yes.
17       Q.   Is there any reason why you can't testify
18   fully and accurately today?
19       A.   No.
20       Q.   Have you had sufficient time to prepare
21   with your attorney, Ms. Peck?
22       A.   Yes.
23       Q.   Have you ever been deposed before?
```

1    **[JOEL ABELOVE - By Mr. Klein]**

2        A.   I don't believe so.  No.

3        Q.   I mean, you are -- are you familiar with

4    the rules of depositions?  Have you conducted

5    depositions?

6        A.   I've conducted one since I've been in

7    private practice.

8        Q.   I'll just go over them.  Presuming you

9    know them, but just for the record.  Let me

10   finish my question even if you know the answer so

11   the reporter can take a clean record.  Okay?

12       A.   Sure.

13       Q.   And if you don't understand a question as

14   I phrase it, which sometimes I need some help,

15   let me know and I'll be happy to rephrase it for

16   you.  Otherwise, we'll assume you understood a

17   question if you answer as asked.  Okay?

18       A.   Yes.

19       Q.   And if you need a break no problem.

20   We'll ask you answer any pending question before

21   you take a break.  Okay?

22       A.   Okay.

23       Q.   Okay.  So, in connection with today's

1    **[JOEL ABELOVE - By Mr. Klein]**

2    deposition have you reviewed any documents,

3    videos, photos, or anything else to refresh your

4    recollection of the case People versus Michael

5    Davis?

6        A.   Yes.

7        Q.   What have you reviewed?

8        A.   I reviewed a copy of an e-mail dated

9    March 1st from that year of the incident and a

10   news article that was printed out.

11       Q.   Anything else?

12       A.   No.

13       Q.   Do you recall the case?

14       A.   Vaguely I do.

15       Q.   Were you the elected and serving district

16   attorney from the time this case came into the

17   D.A.'s Office in Rensselaer until the time it was

18   through the acquittal after trial?

19       A.   That's correct.  Yes.

20       Q.   Okay.  Before we get into the case I just

21   want to go over your background.  Can you just

22   walk us through your education and legal career

23   experience?

1   **[JOEL ABELOVE - By Mr. Klein]**

2       A.   Sure.  Do you want me to start with law

3   school?

4       Q.   Where did you go to undergrad?

5       A.   I attended Tufts University in Medford,

6   Massachusetts, and following my graduation from

7   Tufts I attended Albany Law School.  I've had a

8   couple different career paths.  I had a civilian

9   career path in the military, career path as well.

10          So, after college, right before I started

11  law school, I enlisted in the United States Army.

12  So, I completed my first year of law school and

13  then I shipped out to Fort McClellan, Alabama,

14  for 17 weeks or so for basic training and

15  military police school.  Completed that, came

16  back, started law school again, a semester late

17  because I had to take a semester off for the

18  military.  So, I continued in the New York Army

19  National Guard with my career there while I was

20  in law school.  Got done with law school in

21  December of 1994 and then started working in the

22  Rensselaer County District Attorney's Office in

23  June of 1995 and I spent ten years as an

1    **[JOEL ABELOVE - By Mr. Klein]**

2    Assistant DA in that office and left I think

3    around August 12th of 2005 and then I became a

4    prosecutor for the New York State Department of

5    Health for the Bureau of Professional Medical

6    Conduct where I spent nine years.  My military

7    career, I had done my eight-year enlistment from

8    '91-99.  I had a break in service and then after

9    9/11 I decided to get back into the military.  I

10   received a commission in the Judge Advocate

11   General's Corps in July of 2003.  I ended up

12   spending 15 more years in the Army National Guard

13   as a judge advocate and serving in various

14   capacities in different units, deploying overseas

15   and such and I retired from that about three

16   years ago.  I spent nine years total at the

17   health department and then I got elected as

18   district attorney in 2014 and served for four

19   years as the Rensselaer County District Attorney

20   and then for the past couple of years plus I've

21   been in private practice owning my own practice.

22       Q.    Doing criminal defense?

23       A.    Amongst some other things but, yes, I

1   [JOEL ABELOVE - By Mr. Klein]

2   certainly do criminal defense.

3       Q.   What other types of matters do you

4   handle?

5       A.   I've handled a couple of matrimonials, a

6   couple of real estate closings, Article 81s out

7   of surrogate court.  A lot of Second Amendment

8   issue, helping individuals, to help with their

9   Second Amendment rights.

10      Q.   Got you.  Is it a solo practice or do you

11  have any partners or associates?

12      A.   It's a solo practice.

13      Q.   Okay.  Do you have any plans to run for

14  office in the future?

15      A.   Not currently.

16      Q.   Okay.  Have you ever been disciplined by

17  the bar?

18      A.   No.

19      Q.   Other than the case which obviously

20  highly publicized with the AG's Office, have you

21  ever been indicted or convicted of a crime?

22      A.   No.

23      Q.   When you were an ADA with the Rensselaer

1    **[JOEL ABELOVE - By Mr. Klein]**

2    County D.A.'s Office for ten years were you in a

3    variety of different bureaus or was there just

4    one general crimes assignment and you get

5    different, more complex cases as you get

6    experience?  Can you just describe your

7    experience there?

8        A.    Certainly.  When I joined the D.A.'s

9    Office in June of 1995 there were only

10   approximately, I think I was one of eight

11   Assistant DAs.  So, part of my duties initially

12   were to handle local criminal courts.  I think I

13   had about seven local criminal courts throughout

14   the county of which there were approximately 19

15   at the time.  Shortly thereafter I started

16   working on felony cases because when I was hired

17   by the then district attorney, Mary Donohue, she

18   hired me with the understanding that I was going

19   to have to learn how to do special victims cases.

20   She only had one Assistant DA in the office who

21   specialized in those and she wanted somebody else

22   to be trained in that area in case that person

23   ever left or went on vacation or what have you.

1  **[JOEL ABELOVE - By Mr. Klein]**

2  And, in fact, that person did leave in January of

3  1996 to become the first chairperson of the Board

4  of Examiners of Sex Offenders for New York State

5  once Megan's Law was passed.  So, I had been in

6  the office maybe seven months and I was suddenly

7  in charge of every felony sex crime case in the

8  office, child abuse cases.  I did my first felony

9  trial, five months in there they gave me a

10  robbery first case.  So, you very quickly got

11  into doing felony work because of the necessity,

12  the size of the office, and the limited number of

13  ADAs that they had at the time.  So, I got into

14  doing special victims cases.  I ended up becoming

15  the bureau chief of the special victims bureau

16  that ended up being created and I oversaw not

17  only adult and child sex crimes but child

18  physical abuse and domestic violence cases as

19  well.  I had a variety of experiences not just

20  with special victims cases, but I tried just

21  about every type of case from drugs, robbery,

22  burglary to homicide.  Pretty much the whole

23  gamut of the Penal Law during my career during

1    **[JOEL ABELOVE - By Mr. Klein]**

2    that time.

3         Q.   And then --

4         A.   And I also became the Chief Assistant DA

5    at one point while I was there.

6         Q.   Towards the end or at some other point?

7         A.   Yes.  Towards the end.  Yes.

8         Q.   And why did you leave?

9         A.   Well, ten years is a long time to do that

10   kind of work and I had an opportunity to go to

11   the state health department.  It's the same

12   retirement system and broaden my experiences a

13   little bit and still be a prosecutor but just

14   handle different types of cases so I was able to

15   do that.

16        Q.   And so did you litigate at the State

17   Department of Health or were you a supervisor or

18   both?

19        A.   No.  I wasn't a supervisor.  I was a line

20   associate counsel for Bureau of Professional

21   Medical Conduct.  So, we would handle the

22   administrative hearings for physician discipline.

23        Q.   Okay.  You now represent individuals

1   **[JOEL ABELOVE - By Mr. Klein]**

2   defending charges against that bureau?

3       A.   No.  No.  No.  We brought the charges

4   against the physicians to discipline their

5   medical licenses.

6       Q.   Do you now represent physicians on the

7   defense side?

8       A.   Oh, do I now?  No.  I do not.  I would,

9   but I haven't had the opportunity to do that.

10      Q.   Okay.  And then when you got elected DA

11  in 2014 you became the chief law enforcement

12  officer for Rensselaer County, is that fair?

13      A.   Yes.

14      Q.   And what were your duties and

15  responsibilities as the elected DA for Rensselaer

16  County?

17      A.   Well, we were the offices charged with

18  prosecuting all offenses within the county.  So,

19  setting policy for the office, the hiring,

20  managing all the personnel in the office, whether

21  it's Assistant DAs or victim advocates or other

22  staff, investigators, working on our budget and

23  had to be submitted to the county every year,

1  **[JOEL ABELOVE - By Mr. Klein]**

2  appearing before members of the county

3  legislature to discuss your budget, coordinating

4  all matters of local law enforcement, state law

5  enforcement, sometime federal.  So, you are in

6  charge of --

7      Q.    Just a few things.

8      A.    Yeah.  Just a few things.  You are in

9  charge of the entire office.  That's correct.

10      Q.    Were you the policy maker for that

11  office?

12      A.    Yes.

13      Q.    Okay.  Did you work through your career

14  as an ADA and then as the DA with the Rensselaer

15  County medical examiner's office?

16      A.    Well, yes.  I don't know if it's called

17  the Rensselaer County medical examiner's office.

18  The county, my understanding was, contracts with

19  various individuals to provide those services.

20      Q.    Okay.  Including Dr. Sikirica?

21      A.    Correct.

22      Q.    And was Dr. Sikirica, from around 2001

23  through and including your time as DA, was he the

1    **[JOEL ABELOVE - By Mr. Klein]**

2    chief medical examiner for Rensselaer County to

3    your knowledge?

4        A.    I couldn't tell you when he started, but

5    I know he's been there for a long time.  I've

6    dealt with him a long time.

7        Q.    And was he, to your knowledge, the policy

8    maker for that office?

9            MS. PECK:  Objection.  You can

10           answer.

11       A.    I don't know.

12       Q.    Okay.  Well, was there anyone above him

13   or to your knowledge was he the chief executive

14   of that office?

15       A.    I don't know.

16       Q.    Did you work with Dr. Sikirica on

17   homicides or other matters involving deaths in

18   your capacity as an ADA?

19       A.    Yes.

20           MS. PECK:  Form.

21       Q.    And did you work with him directly

22   involving cases as a DA or indirectly as a

23   supervisor in that office?

1    **[JOEL ABELOVE - By Mr. Klein]**

2         A.   Yes.

3         Q.   Okay.  In the article that you looked at,

4    is it the article that was published after the

5    acquittal where you made some comments about Dr.

6    Sikirica?

7         A.   I believe so.

8                   MS. PECK:  Just for the --

9         A.   I'm not sure if it's the same one you are

10   referring to though.

11        Q.   Well, I'll pull it up and ask you about

12   it.  It's the article in the Troy Record from

13   August 25th, 2016, former professional basketball

14   player acquitted in Lansingburgh, daughter's

15   death.

16                   MS.  PECK:  Just for the record,

17              Brett.  I've got a copy of it here.  So,

18              he's looking at something.  I want to

19              make sure it's the same as represented on

20              the record.  It's the same article in our

21              disclosure.

22                   MR. KLEIN:  Exhibit C.

23                   MS. PECK:  To you.  So, I just want

1  **[JOEL ABELOVE - By Mr. Klein]**

2  to make sure.  So, if you see him looking

3  at something, that's what it is.

4  MR. KLEIN:  Okay.  And it's Exhibit

5  C in your disclosure dated May 21st,

6  2021, correct?

7  MS. PECK:  Yes.

8  MR. KLEIN:  Okay.

9  Q.  So, in that article you say, there's

10  reference to, that you continue to have the most

11  confidence in Sikirica despite concerns expressed

12  by Dr. Teas about the number of autopsies he

13  performs, which he estimated at more than 700 per

14  year, which Teas said is more than double the

15  recommended amount.  And you, attributed to you,

16  "I'm still very satisfied with his opinion.  I've

17  known Dr. Sikirica for many years and I find him

18  entirely professional, very thorough, and have no

19  qualms about his qualifications or his abilities

20  whatsoever."

21  Have you ever questioned Dr. Sikirica's

22  judgment or professional opinions on any case for

23  any reason whether it's because he, you know, was

1   **[JOEL ABELOVE - By Mr. Klein]**

2   doing too many autopsies per year or for any

3   other reason?

4       A.   No.

5       Q.   Had you ever met him personally?

6               MS. PECK:  Objection.  You can

7           answer.

8       A.   I certainly met him many times.  I don't

9   know what you mean by personally.  I mean,

10  I've --

11      Q.   Have you ever like spoken with him,

12  interacted with him other than knowing he worked

13  on cases in your office, have you ever personally

14  interacted with him?

15              MS. PECK:  Objection.  Just to -- I

16          think there's some confusion as to what

17          you mean by personally.  Do you mean

18          outside his capacity as district attorney

19          or an ADA?

20              MR. KLEIN:  No.

21      Q.   Have you ever spoken with him with regard

22  to any -- in your capacity as a DA or ADA?

23      A.   Absolutely, yes.

1  **[JOEL ABELOVE - By Mr. Klein]**

2      Q.   Okay.

3      A.   He's testified for me before in cases.

4      Q.   Okay.  And this idea, this fact that came

5  out at trial that he did over 700 autopsies a

6  year in 2015, is that something that was known to

7  you before this trial?

8      A.   I don't recall.  I know I knew it at some

9  point.  I don't know when I knew that number.

10      Q.   Okay.  Were you aware of the volume of

11  autopsies he had performed per year during the

12  years that you were an ADA in the office, had it

13  ever come up?

14      A.   I don't believe so.

15      Q.   When did you take office?

16      A.   January 1st, 2015.

17      Q.   Okay.  You came in after the Adrian

18  Thomas trial, but were you familiar with the

19  outcome of that trial, the Court of Appeals

20  decision and then the outcome of that trial?

21      A.   I think at some point I was made aware of

22  it or I became aware of it.  I don't recall how.

23      Q.   Did it ever come to your attention that

Case 1:17-cv-01290-DJS Document 84-11 Filed 07/04/22 Page 297 of 117

# APPENDIX

1   **[JOEL ABELOVE - By Mr. Klein]**

2   in that case Dr. Sikirica, that there was an

3   acquittal when the testimony was premised mainly

4   on his opinions in that case?

5            MS. PECK:  Objection.

6       A.   I don't recall that.  No.

7       Q.   Okay.  Did it ever come to your attention

8   that there was an issue with Dr. Sikirica

9   aligning his opinions with the police

10  investigation rather than looking at the full

11  picture of the child's health including

12  pre-existing conditions or other natural causes

13  of death?

14           MS. PECK:  Objection.

15      A.   Which case are you referring to?

16           MS. SPENCER:  Objection.

17      Q.   Generally had that ever come to your

18  attention?

19      A.   No.

20      Q.   The death of V.D. occurred on February

21  26, 2015.  Do you recall that either specifically

22  or at least generally it was around that time?

23      A.   I don't.  I've been told that.  I don't

1    **[JOEL ABELOVE - By Mr. Klein]**

2    recall the date.

3         Q.   Okay.   And Mr. Davis was, I believe he

4    surrendered on the indictment on October 2nd of

5    2015.   Do you recall that general time frame of

6    the arrest, of being taken into custody?

7         A.   I do not.

8         Q.   Okay.   Well, around that time was around

9    the time of the incident where Detective Fountain

10   was alleged to have been involved in that 911

11   recording incident involving Mayor Gordon.   Do

12   you recall that incident?

13        A.   I do.

14        Q.   And so after the time that Mr. Davis was

15   indicted and during the pendency of the

16   prosecution -- well, withdrawn.

17             Do you also recall that Detective

18   Fountain was the lead detective or the assigned

19   detective in People versus Davis for the Troy PD?

20        A.   I do not.

21        Q.   Okay.   Fair to say that during the

22   pendency of the Michael Davis prosecution you

23   indicted and were prosecuting for a period of

# APPENDIX 398

22

1    **[JOEL ABELOVE - By Mr. Klein]**

2    time Detective Fountain?

3

4         *COUNSEL REQUESTS COURT RULING*

5

6         MS. PECK:  Objection.  Wait.

7         Pause.  Brett, those records, if my

8         recollection is correct, are sealed and

9         he as a DA cannot talk about a matter

10        that was sealed unless you have an

11        unsealing order.  I cannot let him talk

12        about any indictment he may have

13        participated in for Fountain or any of

14        that criminal trial.

15        MR. KLEIN:  Okay.  Well, there's

16        certainly a lot of public information

17        about it so that's what I'm referring to.

18        I'll mark it for a ruling.

19        MS. PECK:  Okay.

20        MR. KLEIN:  And I'll determine how

21        I'm going to proceed with it.

22        MS. PECK:  Okay.

23        MR. KLEIN:  I'm going to ask the

1   **[JOEL ABELOVE - By Mr. Klein]**

2           following question, Crystal.  If you have

3           the same objection then we'll mark it.

4           But if the question, if you think the

5           question can go, that would be helpful.

6   Q.    Mr. Abelove, did the circumstances of

7   your office's case with Ron Fountain, without

8   getting into the merit, the details of it,

9   because I understand it was ultimately dismissed

10  and without prejudice being represented, did that

11  impact your offices dealings with him in People

12  versus Davis?

13          MS. SPENCER:  Object to form.

14          MS. PECK:  Object to form.  But you

15          can testify to that.

16  A.    Okay.  I'm sure it did not.  I don't --

17  because as I sit here today I don't even recall

18  Detective Fountain being the lead investigator in

19  the Davis case, you know, I'm sure it did not.

20  Q.    Did you create any kind of wall, you

21  know, between you and/or the assistants involved

22  in People versus Fountain, again without getting

23  into the merits of that case, and those that were

1    **[JOEL ABELOVE - By Mr. Klein]**

2    dealing with Fountain in People versus Davis?

3        A.   I don't recall establishing any type of a

4    wall in that regard.

5        Q.   Who was the assigned -- based on my

6    understanding you personally appeared in court on

7    People versus Fountain.  Were you personally

8    handling that or did you have an assistant that

9    was lead in that?

10               MS. PECK:  Objection.  I'm not

11               going to let him talk about --

12               MR. KLEIN:  I'm not asking about

13               the merits.  I'm just asking about

14               personnel.

15               MS. PECK:  You can testify about

16               personnel.  You can testify to if it

17               was --

18       A.   No.  No one else was assigned to it.

19       Q.   Okay.  You personally handled it?

20       A.   Correct.

21       Q.   Okay.  Were there certain matters during

22    your tenure as DA that you personally handled and

23    if you could describe them and what was your

1    [JOEL ABELOVE - By Mr. Klein]

2    criteria for you taking on cases personally

3    versus delegating them to assistants or other

4    staff?

5        A.   The answer to the first part of your

6    question is yes, there were cases I handled

7    personally.  The second part of your question, I

8    didn't ask specific criteria.  They were often

9    homicide cases or very serious cases, perhaps an

10   arson, sometimes factors that may weigh into that

11   decision included how tasked out other individuals

12   were at that time, how many cases were pending,

13   workloads and, you know, the severity of the

14   alleged offense.  Since I was a DA who had fairly

15   considerable experience litigating or handling

16   some cases I felt very comfortable handling some

17   cases myself.  There were notably some homicides

18   I handled.

19       Q.   Okay.  How many cases other than People

20   versus Fountain did you personally prosecute?

21       A.   I don't recall the number off the top of

22   my head.

23       Q.   Was it like under ten or could it have

1    [JOEL ABELOVE - By Mr. Klein]

2    been fifteen or just roughly?

3        A.    I think it's certainly under ten.

4        Q.    Did you have any type of working

5    relationship with Ron Fountain either from your

6    experience as an ADA, because I believe he was

7    with Troy PD through those years and/or through

8    your experience as DA?

9        A.    Yes.

10       Q.    Can you describe it?

11       A.    He was a police officer with the City of

12   Troy Police Department.  I'm sure I had

13   interactions with him at various times over the

14   years with cases that he was involved in that I

15   prosecuted.  He surely testified for me as a

16   witness on occasion on a case I was assigned to

17   prosecute.

18       Q.    Did you ever have any experience,

19   interactions with him either personally or that

20   came to your attention that called into question

21   his veracity?

22                MS. SPENCER:  Object to form.

23                MS. PECK:  Object to form.  You can

1   [JOEL ABELOVE - By Mr. Klein]

2           answer generally, but you just have to be

3           mindful if there's any statements sealed

4           you have to be cautious about that.

5      Q.   Separate and apart from People versus

6   Fountain, which I'm not going to get to the

7   details given the objections but I reserve the

8   right to subject to a court ruling, have you had

9   any dealings, interactions or come to learn any

10  information that called into question Detective

11  Fountain's veracity?

12     A.   No.

13     Q.   When did you officially take office in

14  2015?

15     A.   Technically I guess just after midnight

16  on January 1st.

17     Q.   Okay.  And directing your attention to

18  February 26th, which I'll represent to you was

19  the day that V was -- 911 was called and she was

20  found, declared deceased.

21          How did you become aware -- well, did you

22  become aware of this incident and, if so, under

23  what circumstances?

1    **[JOEL ABELOVE - By Mr. Klein]**

2        A.    I don't recall.

3        Q.    At that time were you notified of any

4    deaths or other types or categories of incidents

5    whether they were determined to be criminal in

6    nature yet or not?

7        A.    Yes.

8        Q.    Is this the type of incident where you

9    would have been notified, but you just don't

10   recall the circumstances?

11       A.    Yes.

12       Q.    Okay.  And what was your -- what do you

13   recall learning about the incident when you first

14   became aware of it?

15       A.    I do not.

16       Q.    Okay.  What do you recall about the

17   incident in terms of in sequence?

18       A.    Very little.  I recall that there was an

19   incident.  I recall that the police were

20   investigating.  I recall that members of my

21   office, as we always do, make ourselves available

22   to assist the police with any questions that they

23   may have, or to get the subpoenas for them that

1    **[JOEL ABELOVE - By Mr. Klein]**

2    they may need or, you know, whether it's a grand

3    jury subpoena or a judicial subpoena, have our

4    office assist them in any way that they need for

5    their investigation.  That's about it.

6        Q.   The autopsy was conducted the day after

7    the death, which was February 27th, 2015.  Are

8    you aware of that from looking at notes or just

9    generally does that sound right?

10       A.   Well, I'm not aware of it from looking at

11   any type of notes but generally that does sound

12   right.  The autopsy is often the following day.

13       Q.   And there's a sign-in sheet from that

14   autopsy where Andra Ackerman is there together

15   with a number of Troy PD officers and I believe

16   an evidence tech and someone from the Rensselaer

17   medical examiner's office.

18            But generally do you recall that Andra

19   Ackerman was assigned to work, that she otherwise

20   attended the autopsy?

21            MS. PECK:  Object to form.

22            MS. SPENCER:  Object to form.

23       A.   I don't recall that she attended the

1  **[JOEL ABELOVE - By Mr. Klein]**

2  autopsy.  I know she was assigned to be the

3  person from my office who was the liaison with

4  the Troy Police Department to help them with

5  their case.

6      Q.  And is her name Andra, not Andrea,

7  A-n-d-r-a?

8      A.  Correct.  Andra.

9      Q.  And what was her job or role in your

10  office at that time?

11      A.  She was an assistant district attorney.

12      Q.  Did she have a supervisory role or was

13  she like a line assistant?

14      A.  Her immediate supervisor would have been

15  my Chief Assistant District Attorney Jessica Hall

16  who then reports to me.

17      Q.  And Jessica Hall remained your chief

18  assistant through conclusion of the Davis trial,

19  is that fair?

20      A.  Yes.

21      Q.  Okay.  So, would you have been involved

22  in assigning Andra Ackerman to attend the autopsy

23  or was Jessica Hall involved in that or it could

1    **[JOEL ABELOVE - By Mr. Klein]**

2    have been either of you?

3        A.    I don't recall.

4                MS. PECK:  Objection.

5        Q.    Typically who would assign an ADA to

6    attend an autopsy during your time in the office?

7                MS. PECK:  Objection.

8        A.    It wouldn't be a matter of assigning an

9    ADA to an autopsy, it would be assigning an ADA

10   to be the person who's assigned to that case,

11   assuming it's -- anticipating it may become a

12   case and part of their involvement with that

13   incident may be to attend the autopsy.

14       Q.    Okay.  So, was your office typically

15   involved in the investigatory phases of cases

16   such as this investigation into the death of

17   V.D.?

18                MS. PECK:  Object to form.

19       A.    I guess I'm -- it depends on what you

20   mean by involved in the investigatory phase.  We

21   certainly are made aware of it and we make

22   ourselves available to law enforcement to assist

23   them in any way that they need our help.  Again,

1    **[JOEL ABELOVE - By Mr. Klein]**

2    as I alluded to earlier, sometimes they need

3    subpoenas for various types of information to

4    assist with their investigations that they are

5    not able to obtain on their own.  That only we

6    can assist --

7        Q.   Hold on one second.  I'm going to ask you

8    to repeat what you said if that's okay?  Oh, hold

9    on one second.

10       A.   Sure.  That's no problem.

11            MR. KLEIN:  So, my phone gets a

12            call and the Bluetooth goes into the

13            Zoom.  Other than that it's moot.

14       Q.   Can we repeat the answer or if we need it

15    read back maybe but can you --

16       A.   Sure.  I recall what I said.

17            We very often are involved while the

18    investigation is occurring because we assist law

19    enforcement with various matters to include

20    applying for, helping apply for search warrants,

21    drafting subpoenas that may need to be issued and

22    serve upon various parties for all manner of

23    records or video footage and such.  We often

1  [JOEL ABELOVE - By Mr. Klein]

2  assist them in helping them to evaluate whether

3  something meets a legal standard under the law,

4  if they have questions about that.  But we don't

5  direct them to do their investigation.  They

6  don't work for me as the DA, I'm not their boss.

7  So, sometimes I make suggestions if they ask for

8  help, but I don't direct them on how to conduct

9  an investigation.

10     Q.   So, would you describe the D.A.'s Office

11  role in the investigation of the Michael Davis

12  case as advisory or was it collaborative or some

13  combination?

14     A.   Well, since I don't really have -- I

15  mean, the person to ask about their direct

16  involvement with the police would be now Judge

17  Ackerman.  However, I mean, generally speaking

18  our role is advisory to assist them with certain

19  advice, but it can be collaborative if you are

20  talking about assisting them with obtaining or

21  applying for search warrants if they want us to

22  review before it's submitted to a court, or

23  obtaining subpoenas or things like cell phone

Case 1:17-cv-01290-DJS   Document 91-24   Filed 07/04/22   Page 37 of 117

1   [JOEL ABELOVE - By Mr. Klein]

2   records or medical records.  It depends on -- I

3   would define it as somewhat collaborative because

4   you are rendering a certain level of assistance

5   in the investigation that they can't do on their

6   own.

7       Q.   How about working up a theory of criminal

8   liability in a case where there's a potential

9   noncriminal cause of death?  In this case the

10  child was described as nonresponsive before

11  Mr. Davis even interacted with her and then there

12  was extensive resuscitating efforts to save her

13  life which were unsuccessful.

14          Was there any discussion that you were

15  aware of or consultation with your office about

16  charging this criminally versus the possibility

17  that this was a -- that any injuries from

18  resuscitation occurred post a natural death?

19      A.   I don't recall.

20              MS. PECK:  Objection.

21              MS. SPENCER:  Object to form.

22      Q.   Okay.  Would you have been involved in

23  those discussions or would that have been -- like

1    **[JOEL ABELOVE - By Mr. Klein]**

2    if those discussions occurred among Andra

3    Ackerman and the police, would those have been

4    shared with you necessarily in your experience

5    dealing with Andra Ackerman or could they have

6    just been dealt with, worked on by her at a

7    supervisory level?

8                    MS. PECK:  Objection.

9                    MS. SPENCER:  Object to form.

10    A.    Either one.

11    Q.    Do you have any notes, e-mails, or

12    anything else relating to the Davis case other

13    than that e-mail that you looked at that you were

14    cc'd on March 1st, 2015?

15    A.    I don't have any possession of any

16    e-mails.

17    Q.    Okay.  From the office?

18    A.    Right.  I don't have any -- I don't

19    possess any e-mails related to this case.

20    Q.    Okay.  There was an article in the Times

21    Union last year that said you took a bunch of

22    files to your Gmail account before, in the days

23    before you left office after your reelection was

1    **[JOEL ABELOVE - By Mr. Klein]**

2    not successful.  Did you send yourself all files

3    from the office, including Davis files, or were

4    they just particular files or is that reporting

5    not true?

6                    MS. PECK:  Objection.

7                    MR. KLEIN:  You can answer.

8                    MS. PECK:  In what context did that

9            come up?  I haven't seen the article,

10           Brett.  I --

11    Q.    Mr. Abelove, are you familiar with the

12    article from February 1st, 2020, Abelove sends

13    sealed court files to his private e-mail account?

14    A.    Yes.  I am.

15    Q.    Okay.  So, I'm not asking you about any

16    sealed records from the Fountain case, but I want

17    to know if you sent files or e-mails from any

18    other matters to yourself?

19                    MS. PECK:  Brett, I'm going to

20           direct him not to answer that question.

21           I need to look at that issue.

22                    MR. KLEIN:  I'll send it to you.

23                    MS. PECK:  You can mark it for a

1    **[JOEL ABELOVE - By Mr. Klein]**

2           ruling, that's fine, and we can readdress

3           it.

4                  MR. KLEIN:  Okay.  I can send you

5           the article during the break.

6    Q.    Let me ask you this way.  I know you

7    don't have access to the DA's files, e-mail

8    system, but do you have any records from People

9    versus Davis in your possession?

10   A.    No.

11   Q.    The other officers involved -- two of the

12   other officers involved in this case and some

13   parts of the investigation were Tim Colaneri and

14   Adam Mason.  You are familiar with them?

15   A.    I am.

16   Q.    And they were given immunity by you in

17   the case with Fountain.  And I'm not getting into

18   the merits of it, but I want to know from a

19   personnel standpoint were there any concerns

20   raised with regard to that as to the -- as it

21   related to the viability of the Mike Davis case?

22                  MS. SPENCER:  Object to form.

23                  MS. PECK:  Object to form.

1    [JOEL ABELOVE - By Mr. Klein]

2        A.   I don't understand your question.

3        Q.   Well, was there any concern that there

4    was a conflict among the involved investigators

5    from the Troy PD who gathered evidence that was

6    going to be used in the indictment and

7    prosecution.  Was there any concern about the

8    conflict between themselves or between them and

9    you with regard to the viability of this case

10   going to trial -- bringing this case to trial?

11       A.   Not to my knowledge.

12            MS. SPENCER:  Object to form.

13       Q.   So, when Andra Ackerman attended the

14   autopsy did she report back to you either in real

15   time from the autopsy, in a meeting subsequent to

16   it or in some other way, in any way?

17       A.   I don't recall.

18       Q.   Would it have been your -- would it have

19   been a practice in your office for her to have

20   done so in such a matter involving a child, death

21   of a child?

22       A.   Not necessarily.  She may have.  She may

23   not have.  There wasn't a policy on that.  She

1    **[JOEL ABELOVE - By Mr. Klein]**

2    could have reported back to my chief assistant or

3    not at all.  I don't recall.

4        Q.   Okay.  What, if any -- so, when you

5    received that e-mail on March 1st, 2015, it was

6    an e-mail from Andra thanking the police

7    generally for including her and indicating what

8    things she would do to help gather records

9    generally.  Is that a fair summary?

10                   MS. SPENCER:  Object to form.

11                   MS. PECK:  Brett, just for the

12              record I'm going to say I got that e-mail

13              that has been disclosed and I'm going to

14              just put it in front of Mr. Abelove for

15              the discussion.

16                   MR. KLEIN:  Sure.

17        Q.   It's an e-mail dated March 1st, 2015, and

18    it was part of I believe the Troy PD -- it's an

19    e-mail from -- it says Ron Fountain at the top.

20    Do you see that?

21        A.   Yeah.  I'm looking at it.

22        Q.   And March 1st, 2015, at 11:38 a.m. to Ron

23    Fountain, Tim Colaneri, cc'd to you.  Is that

1    **[JOEL ABELOVE - By Mr. Klein]**

2    what you are looking at, one page?

3        A.    Yes.

4        Q.    Okay.  Under what circumstances were you

5    cc'd on this, does this indicate that you were

6    personally involved in discussing the

7    investigatory steps with Andra or was it a

8    courtesy to keep you in the loop or something

9    else?

10       A.    I don't know.  The document itself just

11   indicates that I was cc'd on this e-mail.

12       Q.    Okay.  Well, what recollection do you

13   have about the circumstances surrounding around

14   you being included in this e-mail?

15       A.    I have none.

16       Q.    Have you called Andra Ackerman or anyone

17   else to try to refresh your recollection?

18       A.    I have not talked to Andra Ackerman.  I

19   have talked to Jessica Hall to try to refresh my

20   recollection about it.  My recollection has not

21   been refreshed at all.

22       Q.    Okay.  What did Andra -- I'm sorry, what

23   is Ms. Hall's first name?

1    **[JOEL ABELOVE - By Mr. Klein]**

2        A.    Jessica.

3        Q.    What did Jessica Hall tell you about the

4    incident?

5        A.    She remembered very little as well.

6        Q.    What did she remember, even if it was a

7    little bit?

8        A.    Just that there was the incident, Andra

9    Ackerman was the assigned ADA as we've discussed

10   to handle the matter.  She doesn't remember time

11   frames.  She doesn't remember when the incident

12   occurred.  She didn't remember when it went to

13   the grand jury or when he was arrested.  It was a

14   very brief conversation, but she had almost as

15   little recollection as I did as far as details.

16       Q.    Was there anything else that she did

17   recall?

18       A.    Not that I remember.  No.

19       Q.    Did you guys discuss the circumstances of

20   Mike Davis getting acquitted and whether either

21   of you had any recollection of how that -- how he

22   was found not guilty or things that contributed

23   to him being found not guilty?

1  **[JOEL ABELOVE - By Mr. Klein]**

2      A.   Can you break that up?  There were like

3  three different --

4      Q.   Yes.  Did your conversations with her

5  address jogging one another's memory about why it

6  was believed or theorized that Mike Davis was

7  found not guilty?

8      A.   I don't believe that was part of our

9  conversation.

10     Q.   Okay.  In the article that we discussed

11 earlier that was produced on May 21st, 2021, by

12 Ms. Peck, on Page 2 of 5 of the article it says,

13 "Rensselaer County District Attorney Joel Abelove

14 admitted the case against Davis, prosecuted by

15 Assistant District Attorney Cindy Chavkin was not

16 a strong one but he added that he did not regret

17 pursuing it."

18          Did you make that comment to the press or

19 to someone else and they reported it?  Who did

20 you make that comment to?

21     A.   I don't recall.

22     Q.   Okay.  Do you agree that it was not a

23 strong case?

1    [JOEL ABELOVE - By Mr. Klein]

2       A.   Well, if I said that then I must have

3    believed that.

4       Q.   What was the basis for that belief?

5       A.   Well, I mean, I've dealt with lots of

6    cases over the years and different cases have

7    different strengths.  Some cases are much

8    stronger than others.  Some cases you have

9    confessions.  Sometimes that confession is in

10   writing.  Sometimes that written confession is

11   also video and audiotaped.  Sometimes there are

12   eyewitness accounts to a crime.  Sometimes

13   there's video evidence showing a crime happening.

14   So, from that standpoint we did not have in this

15   case, my recollection, is an eyewitness to the

16   alleged crime.  We did not have it caught on

17   tape.  We did not have a traditional confession

18   in the sense that people think of confessions

19   when somebody admits fully their culpability.

20   So, compared to other cases that may have those

21   elements to them this case did not.

22      Q.   Were there any other reasons why this was

23   not a strong case in your opinion?

1    **[JOEL ABELOVE - By Mr. Klein]**

2        A.    No.

3        Q.    At trial there was testimony by Dr. Teas

4    that's referenced in this article where she

5    opined that and demonstrated to the jury that,

6    that the child more likely than not died and was

7    deceased when Mr. Davis found her and made his

8    resuscitation efforts, just a few, and then his

9    efforts were followed by over a thousand attempts

10   at CPR, a thousand chest compressions by fire

11   department and hospital staff, and that more

12   likely than not caused injuries to her liver and

13   ribs after she had already been dead.

14           Do you recall that to be the general

15   theme of the defense at the trial?

16                MS. PECK:  Objection.  And, Brett,

17           you are referring to this article a lot.

18           Can we have it a marked as an exhibit to

19           the deposition?

20                MR. KLEIN:  Yeah.

21                (Abelove Exhibit No. 1, Article,

22           marked this date for identification.)

23       Q.    But you can answer the question.

1    **[JOEL ABELOVE - By Mr. Klein]**

2        A.    So, I think the question, can you repeat

3    the question for me?

4        Q.    Yes.  The defense, do you understand the

5    defense at trial to be in substance, sum and

6    substance, that V tragically passed for maybe

7    unexplained reasons, whether a sudden unexplained

8    death, arrhythmia or something like that,

9    seizure, and that any injuries to her liver and

10   ribs occurred due to resuscitative efforts but

11   she had already been deceased when those efforts

12   were made?  Do you recall that to be generally

13   the theory of the defense?

14                MS. PECK:  Objection to form.

15       A.    No.  I read that in the article now.  But

16   if you were to ask me that a week or two ago, you

17   know, before whenever I read it, I didn't recall

18   exactly what the theory of the defense was.

19       Q.    If I asked you a week or two before you

20   read it, what do you recall the defense being in

21   this case or did you not recall it?

22       A.    I didn't have a great recollection of it.

23   I know that they, I believe I recall that the

1    **[JOEL ABELOVE - By Mr. Klein]**

2    defense was challenging the conclusions that Dr.

3    Sikirica had made.

4        Q.   Okay.  Well, did this article refresh

5    your recollection as to the defense theory

6    insofar as it states it or summarizes Dr. Teas'

7    testimony?

8        A.   No.

9        Q.   Okay.  So, with regard to the e-mail on

10   March 1st, which we'll also mark this as Abelove

11   2.

12       A.   Mr. Klein, just so you know, it's

13   pronounced Abelove.

14       Q.   Abelove.  I'm sorry.

15       A.   Not Abelove.

16       Q.   Okay.

17            (Abelove Exhibit No. 2, 3/1/15

18            E-mail, marked this date for

19            identification.)

20       Q.   What's been marked as Abelove 2, did you

21   take any action in response to that e-mail or was

22   it --

23       A.   Not that I recall.

1    **[JOEL ABELOVE - By Mr. Klein]**

2        Q.    Okay.  Did you have any meetings with --

3    internal meetings in the office or involving

4    anyone from Troy PD and/or the medical examiner

5    that you attended?

6        A.    Not that I recall.

7        Q.    On March 2nd, 2015, Mike Davis was

8    brought into Troy headquarters and he was

9    interrogated on video.  Had you ever seen that

10   video any time from then up until today?

11       A.    I don't believe I have.

12               MS. SPENCER:  Object to form.

13       Q.    Okay.  And then after that video was

14   taken there was a meeting with a sign-in sheet

15   indicating Andra Ackerman, some Troy police

16   officers and Michael Sikirica had a meeting on

17   March 12th.

18            Were you involved in that meeting even if

19   you didn't personally attend it, did you attend

20   by phone, were you briefed on it after or

21   anything else?

22       A.    Not --

23               MS. PECK:  Objection to form.

**APPENDIX**

424

48

1    [JOEL ABELOVE - By Mr. Klein]

2        A.    Not that I recall.

3        Q.    Was this case being handled by your

4    office as a criminal investigation or was it

5    just -- or was your office involved just

6    monitoring it in the event it became criminal?

7    Like what was, how was this investigation viewed

8    by your office in the weeks after your office was

9    involved in these meetings, the autopsy, and the

10   March 12th meeting?

11               MS. SPENCER:  Object to form.

12               MS. PECK:  Objection to form.

13       A.    I don't recall my office being involved

14   in the investigation unless we thought there was

15   a, potentially criminal investigation.  And some

16   may turn out not to be criminal, but you don't

17   always know that right away.  So, my office was

18   involved in matters of potential criminal

19   liability.

20       Q.    Do you recall any meetings that you had

21   with Andra Ackerman relating to the investigation

22   of V.D.'s death?

23       A.    I do not recall.

1  **[JOEL ABELOVE - By Mr. Klein]**

2      Q.   Were there any, even if you don't recall

3  them?  In other words, you know that you had them

4  but you don't recall what was discussed?

5      A.   I don't recall.

6      Q.   Do you know if Andra Ackerman met with

7  Jessica Hall in regards to this and you may have

8  been briefed on those but you weren't at the

9  meetings?

10      A.   I don't know.  I don't recall.

11      Q.   What do you believe, how do you believe

12  this was handled in your office given that you

13  don't remember it, given how these types of

14  matters were handled, how do you believe it was

15  handled?

16              MS. SPENCER:  Object to form.

17              MS. PECK:  Objection.

18      A.   How do I believe it was handled?

19      Q.   Yes.  In the months before the

20  indictment.

21              MS. PECK:  Objection.

22      A.   I believe that Ms. Ackerman was the

23  assigned ADA to work with the police department,

1    [JOEL ABELOVE - By Mr. Klein]

2    that she developed information based upon their

3    investigation and that that information was

4    ultimately compiled within our office to the

5    point where the matter was presented to a grand

6    jury.

7        Q.    Did you have personal involvement in any

8    aspects of the investigation, the pre-indictment

9    phase of the case?

10       A.    Not that I recall.

11       Q.    Did Andra Ackerman leave the office in or

12   around May of 2015?

13       A.    Somewhere around there.  I think she was

14   there no longer than the first six months into my

15   first year of my term.

16       Q.    So, who took over the handling of this

17   case in your office after she left?

18       A.    I don't recall.

19       Q.    I believe Jessica Hall presented it to

20   the grand jury.  Does that suggest she was lead

21   on it after Andra Ackerman left or does it not

22   necessarily mean --

23       A.    It may, but it doesn't necessarily mean

```
 1    [JOEL ABELOVE - By Mr. Klein]

 2   that.

 3             MS. PECK:  Objection to form.

 4        Q.   So, we'd have to talk to Jessica Hall to

 5   find out?

 6        A.   She might know that, yes.

 7        Q.   Where does she work now?

 8        A.   She works for the New York State

 9   Department of Health.

10        Q.   In Albany?

11        A.   Yes.

12        Q.   Did you know Detective Sergeant Michael

13   Parrow, P-a-r-r-o-w?

14        A.   Yes.

15        Q.   He's since deceased, correct?

16        A.   That is correct.

17        Q.   Were you aware of his involvement in this

18   investigation?

19        A.   Was I aware?

20        Q.   Yes.

21        A.   I don't recall that he was involved, but

22   he may have been.  He was a medicolegal death

23   investigator for the county.
```

1   **[JOEL ABELOVE - By Mr. Klein]**

2        Q.   Okay.

3        A.   As well as member of the Troy Police

4   Department.

5        Q.   Okay.  I believe around August 2015 Dr.

6   Sikirica issued his autopsy.  Did you become

7   aware of that, would you necessarily have been

8   given a copy of it or would it have been

9   transmitted to your staff and they'd share it

10  with you or anything else?  Did it come to your

11  attention?

12       A.   I don't recall if it came to my

13  attention.

14       Q.   Is it more likely than not that it did,

15  you just don't recall today?

16       A.   It may have.

17       Q.   Okay.  Was this considered a high profile

18  case in your office?

19       A.   Again, certainly any potential homicide

20  is considered a high profile case.  I would

21  certainly categorize homicides as high profile

22  cases.

23       Q.   Were there any homicides handled by your

1   **[JOEL ABELOVE - By Mr. Klein]**

office where you didn't look at an autopsy?

3       A.   Me personally?

4       Q.   Yes.

5       A.   Yeah.  I think there were some.

6       Q.   Okay.  As DA?

7       A.   Yes.

8       Q.   Now, in this case there was a grand jury

9   presentation pre-arrest.  Do you recall that,

10  that that was the sequence?  Some cases there can

11  be post-arrest, grand jury presentation, some

12  cases there's pre-arrests, indictments, is that

13  accurate?

14      A.   That is accurate.  You can have

15  indictments, post-arrests or pre-arrests.

16      Q.   So, in this case whose determination was

17  it to seek a pre-arrest indictment?

18      A.   I don't recall.

19      Q.   Is that ultimately your call as the chief

20  executive in the office at that time and you just

21  don't recall making it or could it have been

22  Jessica Hall's call or someone else's strategic

23  decision?

1   [JOEL ABELOVE - By Mr. Klein]

2       A.   I mean, ultimately I have the authority

3   to tell anybody working for me that the case is

4   not going to be presented if they want to present

5   a case.  I don't recall in this instance who made

6   the decision to present the case to the grand

7   jury.  You know, if Jessica Hall presented it and

8   said this is what we have and it's ready to go,

9   I'd like to put it into the grand jury.

10  Obviously that's what happened in this case.  I

11  just don't have a recollection of sequence of

12  events or how the decision was made.

13      Q.   In your experience generally is there a

14  difference in the notice or rights of the accused

15  in doing a pre-indictment, a pre-arrest

16  indictment versus post-arrest?  Are there any

17  differences?

18      A.   Yeah.

19      Q.   Can you explain that, what those

20  differences are?

21      A.   Certainly.  If an individual is arrested

22  via a summary arrest by a police agency prior to

23  any type of indictment being issued by a superior

1  [JOEL ABELOVE - By Mr. Klein]

2  court judge and the criminal procedure law grants

3  certain rights to that defendant with regard to

4  notice of a presentation of their case to a grand

5  jury.  If the suspect or individual has not been

6  arrested but their case is being presented to a

7  grand jury what's called a sealed indictment,

8  they have different rights with respect to

9  whether or not they can appear and testify before

10  that grand jury.  Generally speaking they do not

11  get told about the fact that it's going to be

12  presented.  However, if they are aware of an

13  investigation and they provide notice to the

14  district attorney that they wish to appear before

15  the grand jury in the event the case is going to

16  be presented to the grand jury then the

17  prosecutor is required to give them that notice

18  and the opportunity to testify.

19      Q.    To your knowledge was Michael Davis given

20  any type of notice of the grand jury proceedings?

21      A.    I do not recall.

22      Q.    Okay.  And you agree that the district

23  attorney's obligation under the law is to do

1    **[JOEL ABELOVE - By Mr. Klein]**

2    justice, correct, not to seek a conviction?

3        A.    That's correct.

4        Q.    And that means you had an obligation as

5    the chief law enforcement officer to protect

6    innocent people from being wrongfully convicted

7    or wrongfully maligned in a grand jury

8    proceeding, correct?

9        A.    Yes.

10       Q.    And that's -- so your job as DA wasn't to

11   seek a conviction at all costs, it was to seek

12   justice, correct?

13                    MS. PECK:   Objection.

14       Q.    And avoid wrongful prosecutions and

15   convictions to the extent that you were able to?

16                    MS. PECK:   Objection.

17       Q.    Correct?

18       A.    Yes.   That's what we --

19       Q.    And you took those obligation seriously,

20   I'm sure, right?

21       A.    Correct.

22       Q.    So, in this case Michael Davis had a

23   defense that ultimately -- withdrawn.

1  **[JOEL ABELOVE - By Mr. Klein]**

2        In this case you felt it wasn't a strong

3  case.  We've talked about that before.  But

4  that's fair, correct?

5              MS. PECK:  Objection.

6    A.   In the context of other cases it

7  wasn't as strong as some other cases.

8    Q.   And we know from trial that at least from

9  the article, even if you don't remember it, there

10  was a very powerful defense that Michael Davis

11  didn't cause the death that was ultimately

12  credited by the jury.

13        Would it have been, do you think that in

14  this case in your experience that had this case

15  been presented to the grand jury with Michael

16  Davis' side of it, that it may not have resulted

17  in an indictment?

18              MS. PECK:  Objection.

19    A.   I have no way of knowing that.  That's

20  entirely speculative.

21              (Whereupon, a discussion was held

22        off the record.)

23    Q.   Do you recall whether you were involved

1    **[JOEL ABELOVE - By Mr. Klein]**

2    in the grand jury presentation, whether it was

3    strategic meetings, witness prep or anything

4    else?

5        A.    I don't recall.

6        Q.    Would you have been involved given your

7    experience, your interest in these cases and that

8    this was a high profile case because it was a

9    potential homicide -- it was a death case, a

10    manslaughter case, do you believe that you more

11    likely than not would have been involved in some

12    aspects of the grand jury preparation?

13                    MS. SPENCER:  Object to form.

14                    MS. PECK:  Object to form.

15        A.    No.  I don't believe I was involved in

16    the grand jury preparation.  It's more likely

17    that somebody is just keeping me apprised of the

18    status of what was going on.

19        Q.    Okay.  In your experience in the D.A.'s

20    Office, whether as an ADA and including as a

21    district attorney, has your office ever declined

22    or exercised discretion not to prosecute a death

23    as criminally notwithstanding an autopsy finding

1  **[JOEL ABELOVE - By Mr. Klein]**

2  from Dr. Sikirica that suggested it could be

3  criminal?

4              MS. PECK:  Objection to form.

5      A.    I'm aware of declinations to prosecute.

6  I don't know if the second half of your

7  question -- it's a little confusing because when

8  you say notwithstanding the finding from Dr.

9  Sikirica that something may be criminal, Dr.

10  Sikirica isn't the one who makes that

11  determination as to whether or not a case is

12  prosecutable or not.  That's a legal

13  determination not a medical one.  So, it's not

14  very often Dr. Sikirica's opinion is something

15  that's factored into the decision-making process

16  by the district attorney's office.

17      Q.    Well, Dr. Sikirica in this case looked at

18  the video of Michael Davis demonstrating how he

19  made resuscitation efforts and factored that into

20  his autopsy.  Are you aware of that or do you

21  recall that?

22      A.    I do not.

23              MS. SPENCER:  Object to form.

1    **[JOEL ABELOVE - By Mr. Klein]**

2              MS. PECK:  Objection to form.

3      Q.   He talked about an injury caused by a

4    large hand or a large person.  And do you recall

5    Michael Davis being a large man, was a basketball

6    player?

7              MS. PECK:  Object to form.

8              MS. SPENCER:  Objection.

9      Q.   Do you recall that?

10     A.   I recall being told that he was a large

11   man.

12     Q.   Okay.  Did you ever vet the statements of

13   fire department and/or emergency room staff with

14   regard to the nature and extent and duration of

15   their resuscitation efforts in this case?

16              MS. SPENCER:  Object to form.

17     A.   I did not personally.  No.

18     Q.   Okay.  Do you know if anyone did in your

19   office?

20     A.   I don't recall.

21     Q.   Did that come up in your discussions with

22   Jessica when you recently spoke with her?

23     A.   I don't believe it did.  No.

1    [JOEL ABELOVE - By Mr. Klein]

2        Q.   Okay.  At trial, I believe I touched on

3    this earlier, fire department staff testified

4    that 16 minutes of CPR was done in the home, 20

5    minutes in the ambulance at approximately 100

6    chest compressions per minute.  Did you know that

7    before trial?

8                    MS. PECK:  Objection to form.

9        A.   I don't recall.

10       Q.   Do you know if that was ever disclosed to

11   you by the Troy Police Department?

12       A.   I don't recall.

13       Q.   And at trail, Dr. Crisafulli, the doctor

14   from St. Mary's ER, do you know her?

15       A.   I don't think I do.

16       Q.   Okay.  She testified that among three or

17   so staff at the ER, because there's a lot of

18   exertion involved in doing CPR, even on a

19   two-year-old, that there were 30 minutes of chest

20   compressions at about a hundred per minute.  Were

21   you aware of that testimony at trial?

22                   MS. PECK:  Objection to form.

23       A.   I don't recall being aware of that

1    **[JOEL ABELOVE - By Mr. Klein]**

2    testimony.

3         Q.   Okay.  Do you recall anyone from the Troy

4    Police Department informing you or anyone in your

5    office of this, the nature and extent of the

6    resuscitation efforts at the hospital?

7                   MS. SPENCER:  Object to form.

8         A.   No.  I don't recall that.

9                   MS. PECK:  Brett, can we take a

10             quick minute?

11                  MR. KLEIN:  Yeah.  Do you want to

12             take -- up to everyone else?  10 minutes?

13                  (Recess taken at 10:35 a.m.;

14             proceedings resumed at 10:45 a.m.)

15                  (Whereupon, the question was read

16             back.)

17                  (Whereupon, the answer was read

18             back.)

19         Q.   So, Mr. Abelove, do you recall that in

20    the course of this case there was a Brady

21    disclosure at least one or two?

22         A.   No.  I do not.

23         Q.   One of them was that Ron Fountain was the

1    [JOEL ABELOVE - By Mr. Klein]

2    subject of charges in the 911 case.  Is that the

3    type of thing that would have been disclosed as a

4    Brady disclosure?

5       A.   Anything that fits the definition of a

6    Brady disclosure would have been made as a Brady

7    disclosure.

8       Q.   Well, that one was in a cover letter by

9    Jessica Hall in the disclosure of Rosario

10   materials as a Brady disclosure.  Does that fit

11   the definition?

12      A.   I'm sure it does if she disclosed it as

13   such.

14      Q.   I believe there was testimony of Dr.

15   Sikirica that was disclosed as a Brady, disclosed

16   under Brady.  Do you recall that?

17      A.   I do not.

18      Q.   If you had known what came out at trial

19   in the prosecution's case -- withdrawn.

20           Is it your understanding, do you recall

21   that the prosecution called a firefighter who did

22   resuscitation efforts, Bayly, B-a-y-l-y, on its

23   direct case?

1    **[JOEL ABELOVE - By Mr. Klein]**

2        A.    No.

3        Q.    Do you recall that the prosecution called

4    the ER doctor, Crisafulli, on its direct case?

5        A.    No.

6        Q.    It came out at trial, I'll represent to

7    you that what I said earlier that there were

8    collectively over 6,000 chest compressions over

9    the course of more than an hour after Mike Davis

10   said he tried, you know, a few times to press the

11   chest in sum and substance.

12            If you had known that there were upwards

13   of 6,000 chest compressions by emergency medical

14   staff in the field and in the hospital, is that

15   something you would have disclosed under Brady

16   had you known it before trial?

17                    MS. PECK:  Object to form.

18                    MS. SPENCER:  Object to form.

19       Q.    Under the circumstances of this case?

20                    MS. PECK:  Objection to form.

21                    MS. SPENCER:  Object to form.

22       A.    I would have disclosed anything that we

23   would have determined would have been potentially

1    **[JOEL ABELOVE - By Mr. Klein]**

2    exculpatory or would have affected the

3    credibility of a witness.

4       Q.   Right.  So now let's -- generally I agree

5    with that proposition.  Now let's drill down to

6    the 6,000 chest compressions or evidence

7    surrounding the nature and extent of the

8    resuscitation efforts.

9          Given that testimony, had you been aware

10   of it before trial would it have probably been --

11   should it have been the subject of a Brady

12   disclosure had it been known to your office?

13          MS. PECK:  Objection.

14      A.   I don't know.  It depends on how somebody

15   would have -- I'm certain -- I would certainly

16   imagine that that would be something we'd inquire

17   about with the medical professionals and if it

18   was determined that those actions represented

19   potentially exculpatory information or would have

20   affected the credibility of a prosecutorial

21   witness then it would then of course have to be

22   disclosed under Brady, but if not, then no it

23   would not.

1    [JOEL ABELOVE - By Mr. Klein]

2        Q.   Well, from this case, what you know about

3    the case, is it the type of thing that in your

4    opinion and based on what you know about this

5    case and also from your training, education, and

6    experience that you would have disclosed had you

7    been aware of it?

8                 MS. PECK:  Objection to form.

9                 MS. SPENCER:  Objection.

10       A.   I can't say.  Like I just said, I

11   wouldn't have been able to make that

12   determination on my own.  I'd have to find out

13   more information about it.

14       Q.   Well, there's research in the file and

15   the Rosario material about CPR-related liver

16   lacerations and rib fractures.  I mean, are you

17   familiar with any literature on that, whether

18   from this file or just generally?

19       A.   No.

20       Q.   In the Rosario material, and I'll mark

21   all this, I'm just asking generally if you are

22   aware of it.  There's notes about -- the manual

23   for police section that says that make note of

1    **[JOEL ABELOVE - By Mr. Klein]**

2    any resuscitative techniques used in an attempt

3    to revive the victim.  Some of these techniques

4    may cause postmortem injuries, such as fractured

5    ribs, lacerated liver and the like.  And the two

6    injuries in this case were fractured ribs and

7    lacerated liver.

8              Were you aware of these issues being

9    potential Brady concerns in this case, whether or

10   not they were -- there were any Brady disclosures

11   made?

12                   MS. PECK:  Objection.

13                   MS. SPENCER:  Object to form.

14       A.   Not that I recall.

15       Q.   Is Chief McAvoy, is he the chief of the

16   Troy PD?

17       A.   No.  He's now retired, but he was not the

18   chief.  He was an assistant or a deputy chief.

19       Q.   Okay.  Was he the deputy chief in

20   approximately 2015 to 2016?

21       A.   He may have been.

22       Q.   Okay.  Do you recall ever having any

23   discussions with him about any of the issues in

1    **[JOEL ABELOVE - By Mr. Klein]**

2    this investigation?

3        A.   I do not recall.

4                MS. SPENCER:  Object to form.

5        Q.   When it came down to trial it looks like

6    Cindy Chavkin was the assistant who prosecuted

7    this case at trial.  Is that your understanding?

8        A.   Yes.

9        Q.   Did you assign her to the role of lead

10   prosecutor in this case or did someone else

11   delegate this to her or how did that happen?

12       A.   I don't recall exactly.

13       Q.   Okay.  And did she handle the case

14   properly in your estimation from what you know?

15       A.   What do you mean by properly?

16       Q.   Well, were there any concerns with her,

17   with how she handled the case, either

18   strategically, ethically, or from any other

19   perspective that you had as DA?

20       A.   Well, I didn't watch the trial so it's

21   hard for me to comment on her performance in the

22   courtroom or her dealings with witnesses, you

23   know, in her preparation of them.  So it's hard

69

1   **[JOEL ABELOVE - By Mr. Klein]**

2   for me to answer your question accurately.

3       Q.   Were you involved in trial prep for any

4   witnesses?

5       A.   No.  I don't believe I was.

6       Q.   Were you involved in trial prep just with

7   her and/or with Jessica Hall or anyone else

8   supervising her?

9       A.   I don't believe I was.

10      Q.   Do you recall Dr. Sikirica calling you to

11  his office along with Jessica Hall after he

12  testified on the day of his testimony?

13            MS. PECK:  Objection.

14      A.   I don't recall when it was but I recall

15  that, that occurring.

16      Q.   Had that ever occurred in your career,

17  either where you were called to Dr. Sikirica's

18  office because -- well, withdrawn.

19            Did he call you because he was frustrated

20  or upset with the situation, how the case was

21  handled?

22            MS. PECK:  Objection.

23      A.   He called me because he was not happy

1    **[JOEL ABELOVE - By Mr. Klein]**

2    with how the examination went when he testified.

3        Q.    Had that ever happened in your career

4    either as a DA or did you ever hear of that

5    happening when you were an ADA, Dr. Sikirica

6    seeking a meeting because he wasn't happy with

7    the way an assistant handled the case?

8        A.    Not that I can recall.

9        Q.    And so when he called you do you recall

10   what he said?  Did he call you personally or did

11   he call someone to reach out to you to notify you

12   that he wanted a meeting?

13       A.    I don't recall that.

14       Q.    What do you recall about what he said,

15   either -- whether it was conveyed to you and then

16   including in the meeting?

17       A.    My recollection of the meeting was that

18   he was dissatisfied with the ADA's lack of

19   redirect or insufficiency with which she was --

20   or had elicited testimony I think on redirect

21   examination to try to get him to clarify some of

22   the issues that were brought up on cross.  That's

23   my recollection.

1    **[JOEL ABELOVE - By Mr. Klein]**

2        Q.    He testified last week.  I think he said

3    she was inept, he said some pretty harsh words.

4    He'll never work with her again.  Do you remember

5    like him being angry during the meeting?

6                    MS. PECK:  Objection.

7        A.    I do recall him not being happy with her

8    at all.

9        Q.    Right.  So, how did he express it, what

10   was his demeanor?  Was he raising his voice?  Was

11   he just pissed off?  Was he --

12       A.    I don't recall if he raised his voice.

13   It was very clear to me that he was not happy

14   with the way she conducted the examination.

15       Q.    Did he express his concern that there

16   would be an acquittal or the case was going to go

17   south because of the way she was handling the

18   case?

19       A.    That I don't recall.

20       Q.    He watched -- he testified that he

21   observed Dr. Teas' testimony and that part of his

22   frustration was that he wanted to go up and do a

23   rebuttal and that he was -- the court didn't

1    **[JOEL ABELOVE - By Mr. Klein]**

2    allow him to do that.  Do you recall that in sum

3    and substance?

4        A.   I don't.

5        Q.   Do you recall in -- even if it's not

6    specifically in sum and substance, that he wanted

7    to do a rebuttal because the defense presentation

8    was damaging?

9             MS. PECK:  Objection.

10       Q.   It was indicative of innocence?

11            MS. PECK:  Objection.

12       A.   I don't recall that.

13       Q.   What do you recall then?  Just so we have

14   a clear record.  Just for the record what do you

15   recall about your meeting with Dr. Sikirica from

16   start to finish?

17       A.   Sure.  It's just what I said a moment

18   ago.  That's all I recall.

19       Q.   Okay.  Did that meeting come up in your

20   recent conversation with Jessica Hall, did either

21   of you discuss or refresh one another's

22   recollection of what was discussed at the meeting

23   with Dr. Sikirica?

Case 1:17-cv-01290-DjS  Document 91-2  Filed 07/04/22  Page 747 of 117

1    [JOEL ABELOVE - By Mr. Klein]

2        A.    I don't believe we talked about that.  I

3    don't think so.  We were more focused on, I was

4    trying to recall the timeline, when did this

5    incident occur, when did it go to the grand jury,

6    do you recall presenting it to the grand jury,

7    that sort of thing.  And she had very little

8    recollection as well.

9        Q.    Do you recall Dr. Sikirica calling you in

10   for the meeting prior to the jury's verdict in

11   the case?

12       A.    I don't recall when it was.

13       Q.    Do you recall taking a more active role

14   or directing anyone else to take a more active

15   role in monitoring the trial after Dr. Sikirica

16   met with you?

17       A.    No.

18       Q.    Did you take any action in response to

19   what Dr. Sikirica said to you, did you speak to

20   Cindy Chavkin, did you get her side of it or

21   anything else?

22       A.    I don't recall what I did after that

23   meeting in regard to taking any action.

1    [JOEL ABELOVE - By Mr. Klein]

2        Q.    Did anyone else take any action in

3    response to that meeting even if you didn't?

4        A.    I don't recall.

5                MR. KLEIN:  Just off the record.

6                (Whereupon, a discussion was held

7            off the record.)

8                MR. KLEIN:  Exhibit 3 is going to

9            the Rosario material, one of two, 7/2/19

10           with Bates numbers.  It's a 316-page

11           document.  I'm just going to refer to

12           some Bates numbers on it.

13               (Abelove Exhibit No. 3, Supporting

14           Deposition of Kathleen Crisafulli, Bates

15           495, marked this date for identification.)

16       Q.    So, I'm showing you what's Exhibit 3,

17   Bates No. 495, produced by I believe Ms. Peck.

18   This is a supporting dep from Kathleen Crisafulli

19   that I mentioned earlier.  She's the ER physician.

20           Had you ever seen this?  Do you know if

21   you saw this during the pendency of the case or

22   any time since?

23       A.    I don't recall ever seeing that.

Case 1:17-cv-01290-DJS   Document 89-4   Filed 07/04/22   Page 207 of 117

1  **[JOEL ABELOVE - By Mr. Klein]**

2      Q.   Okay.  When a supporting deposition like

3  this, this was drafted on March 5th, several days

4  after the death, are these types of supporting

5  depositions in this kind of case, were they just

6  given to your office by the police or did your

7  office have a policy of undertaking to

8  independently interview all such witnesses before

9  trial?

10     A.   That question assumes that it's either

11  one or the other.  It can often be both.

12     Q.   Okay.

13     A.   I would expect that in all cases the

14  police provide us with a copy of all depositions

15  of witnesses that they've taken and we also

16  frequently, if not always, speak with witnesses

17  before they testify.

18     Q.   Okay.  In this supporting deposition,

19  among other things, I just want to point to a

20  relevant part that I want to ask you about.  It

21  says I, along with staff, worked to resuscitate

22  the child.  We were unable and I pronounced the

23  death of the child.  It doesn't go into the

1    **[JOEL ABELOVE - By Mr. Klein]**

2    testimony at trial which was that it was three

3    individuals strenuously attempting to resuscitate

4    the child at 100 compressions per minute for a

5    30-minute period of time.

6            Do you know if that detail was known or

7    communicated to your office by the Troy PD?

8        A.    I don't know.

9        Q.    Do you know if when it came out at trial

10   on the direct case presented by your office if it

11   was a surprise or if it was something that was

12   known to Cindy Chavkin or anyone else in your

13   office?

14       A.    I'm unaware of what came out during the

15   trial.

16       Q.    You never reviewed the transcript

17   afterwards to do like a post-trial review of what

18   happened there, did you ever look at the

19   transcripts?

20       A.    I've never looked at the transcript of

21   the trial.

22       Q.    Did you ever have a meeting with Cindy or

23   Jessica or both or anyone else to do a, for lack

1    [JOEL ABELOVE - By Mr. Klein]

2    of a better word, term postmortem to try to

3    figure out what went wrong?

4        A.   I don't recall.

5        Q.   Is that something you would have done as

6    a matter of practice?

7        A.   It might have happened.  It might not.

8    There's not a standard practice for that sort of

9    thing.

10       Q.   Well, when you had to like comment to the

11   press that this was a weak, not a strong case,

12   did you just kind of come up with that or did you

13   confer with your staff?

14       A.   As I indicated earlier, I made that

15   statement based upon my understanding of certain

16   types of evidence that were not present in this

17   case.

18       Q.   Okay.  So, I'm going to flip forward to

19   what we'll call the next page, Exhibit 4, and

20   this is Bates No. 496.  This is the supporting

21   deposition of Michael Bayly, B-a-y-l-y.  Did you

22   know Michael Bayly or did you ever know who he

23   is?

1    **[JOEL ABELOVE - By Mr. Klein]**

2        A.   I don't think I do.

3             (Abelove Exhibit No. 4, Supporting

4             Deposition of Michael Bayly, Bates 496,

5             marked this date for identification.)

6        Q.   In this supporting dep it just says that,

7    relevant to CPR in the middle, I then continued

8    CPR with members of my unit and talks about other

9    life saving efforts.  But it doesn't talk about

10   there were 16 minutes of CPR at the home and 20

11   minutes in the ambulance at 100 plus compressions

12   per minute as he testified at trial.

13        Do you know if that information was known

14   to Troy PD but not communicated to your office in

15   advance of trial?

16             MS. PECK:  Objection to form.

17             MS. SPENCER:  Form.

18        A.   I do not know.

19        Q.   Had you known that information would you

20   have disclosed it under Brady, the nature and

21   extent of the CPR efforts beyond that it was just

22   done?

23        A.   I don't know.  It depends as I indicated

1    **[JOEL ABELOVE - By Mr. Klein]**

2    earlier.

3        Q.   Do we need to talk to Jessica about that,

4    Jessica Hall, would she be more aware of the

5    circumstances of this case and whether that would

6    be a Brady issue?

7        A.   I don't know what you need to do.  When

8    you just said do we need to talk to her --

9        Q.   Well, who would have the knowledge, the

10   information about that?  Who would have been in a

11   position to know the facts and circumstances of

12   this case and whether those facts, had they been

13   known would have constituted Brady?

14       A.   You can certainly speak with Andra

15   Ackerman.  You could speak with Cindy Chavkin.

16   You can speak with Jessica Hall.  Any of them may

17   know but I don't know that they do.

18       Q.   Okay.  Now, I'm going to show you

19   what's -- we'll call this Exhibit 5, Bates No.

20   94.  This is a note.  "Adam, Manual For Police,

21   relevant but not exculpating (completely) DC

22   McAvoy."

23            Does that appear to be Deputy Chief

1    **[JOEL ABELOVE - By Mr. Klein]**

2    McAvoy's note?

3        A.    I have no idea.  I --

4        Q.    I know you don't know.  Sitting here you

5    are not a handwriting expert, but DC McAvoy, does

6    this suggest that this is DC McAvoy even though

7    you can't vouch for who wrote this?

8        A.    I don't know.  It may be.

9        Q.    Okay.

10       A.    I can't make that conclusion.

11       Q.    Okay.

12       A.    I don't know who wrote it.

13       Q.    Okay.  So, this is produced as part of

14   the Rosario material to us.  So presuming it was

15   the Rosario produced in your file in trial.  And

16   it says what I read to you earlier.  Make note of

17   any resuscitative techniques to revive the

18   victim.  Some of these techniques may cause

19   postmortem injuries such as fractured ribs,

20   lacerated liver and the like.

21            Does this jog your memory as to whether

22   this was any -- an issue to any extent, whether

23   it was a concern or not a concern, just that it

1    [JOEL ABELOVE - By Mr. Klein]

2    came up as an issue at trial that the supporting

3    depositions didn't talk about the specifics of

4    the resuscitative techniques as set forth in this

5    manual?

6        A.   No.  It does not jog my memory in that

7    regard.

8        Q.   Okay.  In this packet of Rosario material

9    are a number of, looks like peer review articles,

10   CPR may lead to severe injuries of internal

11   organs.  This is Page 99.  We'll call this

12   Exhibit 6.  That CPR, trauma related to CPR is

13   rare, but it may lead to severe injuries of the

14   organs.  And there's other articles in here about

15   injuries resulting from resuscitation procedures.

16   Do you know who pulled these articles?

17       A.   Do I know what?

18       Q.   Do you know who pulled these articles?

19       A.   Who pulled them?

20       Q.   Yes.  Were they collected by the police

21   department or by your office?

22       A.   I have no idea.  I don't even know where

23   these articles are located.

1  **[JOEL ABELOVE - By Mr. Klein]**

2    Q.   Okay.  Well, it's part of the Rosario

3  material and I believe one of them says with --

4  well, withdrawn.  I'll find it.

5        There are articles, these articles are in

6  the file.  Here's another article, Bates 84,

7  we'll call them Exhibit 7 -- Exhibit 6.  "Liver

8  rupture caused by isolated blunt force impact:

9  The result of a blow, a kick or fall?"

10        So, is it your testimony that you have no

11  recollection of anyone researching or having,

12  otherwise having any concern about their being a

13  viable defense here of postmortem CPR injuries

14  being present but that didn't cause the death?

15    A.   Correct.

16    Q.   You don't recall that?

17    A.   Correct.

18        MS. PECK:  Objection.  Brett, just

19        so that we have a clean record, can we

20        get just a range of Bates stamp numbers

21        for --

22        MR. KLEIN:  Yes.  This was produced

23        in discovery.  Pages 84 through 108.

1    **[JOEL ABELOVE - By Mr. Klein]**

2            We'll just call this Exhibit 5.  Instead

3            of 5 and 6.  We'll call this whole --

4                    MS. PECK:  Because you had Exhibit

5            5 as Page 94.

6                    MR. KLEIN:  Right.  So, we're just

7            going to call this entire document, as it

8            was produced in discovery, we'll mark

9            this one thing, the whole thing, 84

10           through 108.  We'll mark this as Exhibit

11           5 to avoid any confusion.

12                   MS. PECK:  Okay.

13                   MR. KLEIN:  So, 1 is the article.

14           2 is the e-mail.  3 is 495.  4 is 496.  5

15           is 84 through 108.

16                   MS. PECK:  Okay.

17                   (Abelove Exhibit No. 5, Packet of

18           Bates Pages 84-108, marked this date for

19           identification.)

20       Q.   Have you ever worked with Dr. Teas in

21    your career, whether in the D.A.'s Office or in

22    private practice?

23       A.   No.

1    **[JOEL ABELOVE - By Mr. Klein]**

2        Q.   Did Dr. Sikirica express to you his views

3    or any other statements about Dr. Teas' testimony

4    in your meeting with him?

5        A.   I don't recall.

6        Q.   Did you or Jessica Hall or anyone else

7    take notes during that meeting?

8        A.   I don't recall taking any notes.  I don't

9    recall Ms. Hall taking any notes.

10       Q.   Okay.  Whether or not you recall it, is

11   it the type of meeting where you would have

12   necessarily taken notes or recorded it?

13       A.   No.

14       Q.   Had a record of it?  No?

15       A.   No.

16       Q.   Okay.  As the district attorney you had a

17   discretion to not pursue charges, even after they

18   were presented to a grand jury that were

19   indicting if you didn't support those charges,

20   correct?

21       A.   Yes.

22       Q.   And certainly you had discretion not to

23   present a case to a grand jury if you felt there

1    **[JOEL ABELOVE - By Mr. Klein]**

2    was a viable or valid defense, correct?

3              MS. SPENCER:  Object to form.

4        A.    The district attorney always have

5    discretion whether or not to present a case to a

6    grand jury for a number of reasons.

7        Q.    And that was your duty, your duty was to

8    ensure justice is done not to pursue charges at

9    all costs, correct?

10              MS. PECK:  Objection.

11        A.    As I stated earlier, that's correct.

12    Yes.

13        Q.    This is not like a trick question.  I

14    just want to know from what you've learned about

15    this case would you have -- would you still

16    pursue this case if you were the district

17    attorney today if you knew the details about the

18    injuries more likely than not being postmortem

19    injuries?

20              MS. PECK:  Objection.

21              MS. SPENCER:  Object to form.

22        A.    It's impossible for me to answer that

23    question because I don't have enough familiarity

1  [JOEL ABELOVE - By Mr. Klein]

2  with all of the facts of the case in order to

3  make a determination.

4      Q.   And you didn't brush up on that, on the

5  case for today's deposition?

6      A.   Nor would I have been able to.  I don't

7  have access to the case file.

8      Q.   Okay.  Who from the District Attorney's

9  Office would have the most knowledge of this

10  case?  Would it be Jessica Hall?

11      A.   I don't know who has the most knowledge.

12  It depends on what they recall.  It may be Ms.

13  Hall.  It may be Ms. Ackerman.  It may be Ms.

14  Chavkin.

15      Q.   Okay.  What was the basis of your

16  statement in the article, Exhibit 1, that I'm

17  still very satisfied with his opinion, if you

18  weren't versed in the details, the facts and

19  circumstances of the case?

20          MS. PECK:  Objection.

21      A.   Well, at the time I'm sure I had a better

22  recollection of what he testified to and knowing

23  my -- knowing his history and having dealt with

Case 1:17-cv-01290-DJS Document 89-4 Filed 07/04/22 Page 88 of 117

1  **[JOEL ABELOVE - By Mr. Klein]**

2  him on numerous occasions I never had any reason

3  to doubt his professionalism or his competence.

4  So, I'm sure at the time I made the statement it

5  was based on what I knew at that time not what I

6  recall now.

7      Q.   Well, were you aware, not from public

8  reporting because you weren't in the office at

9  the time, that he was wrong about Adrian Thomas

10  that there were, that there were from public

11  reporting that there were -- that this was a

12  child homicide charge that resulted in a not

13  guilty verdict?

14                  MS. PECK:  Objection.

15                  MS. SPENCER:  Form.

16      A.   No.  I don't believe I was aware of that.

17  But certainly a not guilty verdict doesn't mean

18  that somebody is wrong about a professional

19  opinion that they give.

20      Q.   Well, without discussing the

21  circumstances of it did you ever look into them,

22  of whatever happened in that case?

23      A.   No.

1    **[JOEL ABELOVE - By Mr. Klein]**

2    Q.    Were you ever briefed on it?

3    A.    No.

4    Q.    So, you don't know whether or not in

5    other cases that were prosecuted when you were

6    not in the office whether he had failed to

7    overlook congenital or natural causes of deaths

8    in cases that were charged as homicide, you don't

9    know either way; do you?

10   A.    Where he failed to overlook something?

11   Q.    Where he failed to look at or overlooked

12   potential other causes of death like natural

13   causes of death?

14            MS. PECK:  Objection.

15   A.    I'm not aware of that.  No.

16   Q.    Were there any other homicide cases

17   prosecuted during your tenure as DA involving

18   Michael Sikirica giving his testimony as medical

19   examiner that resulted in acquittals other than

20   Michael Davis?

21            MS. PECK:  Objection.  And, Brett,

22            if they resulted in acquittals they would

23            be sealed and he as a district attorney

1    [JOEL ABELOVE - By Mr. Klein]

2              would not be able to speak about them.

3                    MR. KLEIN:  He can say yes or no.

4              He doesn't have to say name of the case.

5              He's not divulging any records of the

6              prosecution.

7    A.    Not that I know.  Not that I can recall.

8    Q.    This is the only one that you can recall?

9    A.    Yes.

10   Q.    Has any legal disciplinary or any other

11   proceedings been alleged or brought against you

12   with regard to sending yourself copies of e-mails

13   to your private e-mail from the office from the

14   DA's office?

15                   MS. PECK:  Objection.  And, Brett,

16             I'm going to direct him not to answer

17             that question.

18                   MR. KLEIN:  Okay.  So, I think we

19             are going to call the court on that one.

20             I'm just going to see if I have any other

21             issues and then -- I have a list here.  I

22             think there were some other issues.  Hold

23             on.

1   **[JOEL ABELOVE - By Mr. Klein]**

2          MS. PECK:  And you were going to

3          send me over that article.

4          MR. KLEIN:  Sure.  Yup.  Can I ask

5          a few more questions and then we'll call

6          the court?

7          MS. PECK:  Sure.

8   Q.   Mr. Abelove, are you aware of any

9   exculpatory information as it pertains to Michael

10  Davis, whether you learned it since the trial or

11  any time from the death of V.D. up until today,

12  are you aware of anything that you've learned to

13  be exculpatory?

14  A.   Not independently, no.

15  Q.   Well, how about through other sources

16  other than counsel representing you?

17  A.   Just what you've told me today.

18  Q.   Okay.  And were aware of it before I told

19  you today?  You became aware of it through the

20  course of the trial or through the press or other

21  sources?

22  A.   I don't recall becoming aware of it

23  before today, but if I knew it at the time I just

1    [JOEL ABELOVE - By Mr. Klein]

2    don't recall it now.

3        Q.   Okay.  And is the information about 6,000

4    plus chest compressions, are you -- I just want

5    to be clear.  Are you testifying that you can't

6    say whether it's exculpatory in this case or you

7    just don't know enough or is it your testimony

8    that it would have been exculpatory, you just

9    don't know whether it was known or not?

10       A.   I believe my testimony is that I don't

11   know as I sit here today what that -- whether or

12   not that would constitute Brady material, that I

13   would have to learn more information about it,

14   speak to medical professionals and assess it in

15   the context of the case to know whether or not it

16   constitutes Brady material.

17       Q.   Okay.  Do you know whether that

18   information was discussed and assessed whether

19   with medical professionals or any other experts

20   or in-house or otherwise?

21       A.   I don't.

22       Q.   You don't know?

23       A.   I do not know.

1    [JOEL ABELOVE - By Mr. Klein]

2        Q.   Upon completion of the autopsy that

3    seemed to -- that was followed by a chain of

4    events that I'm aware of that included an

5    interview of Mike Davis on video at Troy PD

6    headquarters and then the indictment and then

7    Mike Davis surrendering and being arraigned.

8            Whose determination was it to present the

9    case to the grand jury upon receipt of the

10   autopsy?  Was there a meeting with Dr. Sikirica

11   and your office?

12       A.   I don't know the answer to that question.

13            MS. SPENCER:  Object to form.

14       Q.   Okay.  Is it because you have no

15   knowledge of it or you just don't recall it?

16       A.   I don't recall.

17       Q.   What is the universe of individuals who

18   would have been in a position to decide to

19   proceed with the grand jury upon receipt of the

20   autopsy?  Is that you, Jessica Hall and anyone

21   else or?

22       A.   Certainly that universe includes myself

23   and Jessica Hall.  Others may have had input into

1    **[JOEL ABELOVE - By Mr. Klein]**

2    that decision, but ultimately that universe is

3    fairly small.

4        Q.    Okay.

5                MR. KLEIN:  Can we call the judge

6                and excuse the witness while we call the

7                judge?

8                MS. PECK:  Can you give me a minute

9                to talk to my client?  Because this is

10               all new to me.

11               MR. KLEIN:  Yeah.  Of course.

12               MS. PECK:  All right.  So, give me

13               ten minutes and then we can hop back on.

14               MR. KLEIN:  You got it.

15               (Recess taken at 11:25 a.m.;

16               proceedings resumed at 11:40 a.m.)

17               (Whereupon, there was a pause in

18               the proceedings to call the Judge

19               Stewart.  Transcription will be bound

20               separately from deposition.)

21               MS. PECK:  Give me one second and

22               I'll get Joel back in here.

23

1    **[JOEL ABELOVE - By Mr. Klein]**

2    BY MR. KLEIN:

3        Q.   Mr. Abelove, are you aware of any other

4    matters relating to the grounds for this

5    prosecution that we haven't discussed today,

6    whether there were concerns that have not been

7    addressed in your testimony so far today?

8                    MS. SPENCER:  Object to form.

9                    MS. PECK:  Object to form.

10       A.   I don't understand your question.  Could

11   you ask again?

12       Q.   Well, other than this not being a strong

13   case for the reasons you said, other than issues

14   that I raised that were set forth in the article

15   about what happened at trial, Dr. Teas'

16   testimony, et cetera, are there any other facts

17   or information that you are aware of that relate

18   to this case and the merits of the prosecution in

19   your view?

20       A.   Not that I can recall.

21                   MS. SPENCER:  Object to form.

22       Q.   Have you ever personally handled any case

23   where there were CPR-related injuries whether

1    **[JOEL ABELOVE - By Mr. Klein]**

2    presented as part of the prosecution or defense?

3              MS. SPENCER:  Object to form.

4        A.   I don't believe so.

5        Q.   Are you aware, and I believe this is set

6    forth in one of the articles in Exhibit 5, that

7    medical staff can be prosecuted for CPR-related

8    injury under some circumstances?  Have you ever

9    been involved in any such case or heard of such

10   case?

11             MS. PECK:  Objection to form.

12       A.   No.

13       Q.   No?

14       A.   No.  I have not.

15       Q.   Okay.  Do you have an understanding from

16   any source as to whether V.D. may have been or

17   was believed to be unresponsive before Michael

18   Davis interacted with her in a physical manner

19   trying to resuscitate her on the date of her

20   death?

21             MS. SPENCER:  Object to form.

22             MS. PECK:  Objection to form.

23       A.   No.

1    [JOEL ABELOVE - By Mr. Klein]

2        Q.    Okay.  I'm sorry.  I saw the lips move

3    but the answer is no?

4        A.    No.

5        Q.    Okay.  In your career have you ever been

6    involved in a case whether on the prosecution or

7    defense side of a case involving CPR-related

8    injuries?

9                    MS. SPENCER:  Object to form.

10       A.    I can't recall.  It's possible.  I just

11   can't recall right now.

12       Q.    I believe Dr. Sikirica was involved in a

13   case, I'm not sure if -- well, withdrawn.

14             I believe Dr. Sikirica testified he had a

15   case where Dr. Rutley (phonetic) was an opposing

16   expert where there was a homicide prosecution and

17   there was a defense that injuries were caused by

18   CPR.  The individual's convicted.  It was in the

19   early to mid 2000s.  Do you have any recollection

20   of that matter?

21                   MS. PECK:  Objection to form.

22       A.    With doctor who?

23       Q.    Sikirica.

1    [JOEL ABELOVE - By Ms. Spencer]

2        A.   No.  No.

3        Q.   Dr. Rutley (phonetic) was the defense

4    expert.

5        A.   No.  I don't.  I don't know the case that

6    you are referring to.

7                MR. KLEIN:  All right.  I'm going

8                to reserve the right to hold the

9                deposition open pending further rulings

10               by the court that may be relevant and

11               want to thank you for your time and

12               cooperation, Mr. Abelove.  I appreciate

13               it.

14               THE WITNESS:  You're welcome.

15               Thank you.

16   BY MS. SPENCER:

17       Q.   Hello, Mr. Abelove.  My name is Rhiannon

18   Spencer.  I am the attorney for the City of Troy,

19   Ronald Fountain, Danielle Coonradt, Charles

20   McDonald, Tim Colaneri and Adam Mason in this

21   matter.

22       A.   Good afternoon.

23       Q.   Good afternoon.  I just have hopefully a

1    **[JOEL ABELOVE - By Ms. Spencer]**

2    couple questions, very brief.

3           With regards to the investigation of the

4    death of V.D., did you ever personally meet with

5    Ronald Fountain?

6       A.   Not that I recall.

7       Q.   Did you ever personally meet with

8    Danielle Coonradt with regards to the

9    investigation of the death of V.D.?

10      A.   Not that I recall.

11      Q.   Charles McDonald, did you ever meet with

12   him with regards to the investigation of the

13   death of V.D.?

14      A.   Not that I recall.

15      Q.   Tim Colaneri, did you ever meet with him

16   with regards to the investigation of V.D.?

17      A.   Not that I recall.

18      Q.   And did you ever meet with Adam Mason

19   with regards to the investigation of V.D.'s

20   death?

21      A.   Not that I recall.

22      Q.   Did you have any conversations with those

23   same individuals either by phone or by e-mail or

Case 1:17-cv-01290-DJS Document 118-4 Filed 02/04/22 Page 100 of 117

1    **[JOEL ABELOVE - By Mr. Klein]**

by letter with regards to the investigation of

V.D.?

4       A.   No.  Not that I recall.

5              MS. SPENCER:  All right.  That is

6           all my questions.

7              THE WITNESS:  Thank you.

8    BY MR. KLEIN:

9       Q.   Just because you don't -- the fact that

10   you don't recall doesn't mean you didn't have any

11   such conversations, is that accurate, you just

12   don't recall whether or not you did?

13      A.   I don't believe I did because I don't

14   know -- I think I'd recall that.  I had such

15   little involvement with this case that my lack of

16   recollection leads me to believe that I did not.

17             MR. KLEIN:  Okay.  I'm just going

18          to continue to reserve because the next

19          question has to do with the circumstances

20          of Mr. Fountain's case at the time.

21             So, with that said, thank for your

22          time today.  Maybe we'll see you again

23          down the road but stay well.  Thank you.

1  **[JOEL ABELOVE - By Mr. Klein]**

2                    THE WITNESS:  Thank you.  You as

3           well.  Take care.

4                    (Whereupon, the testimony of JOEL

5           ABELOVE concluded at 12:10 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1

2

3    STATE OF NEW YORK

4    COUNTY OF _____

5

6

7        I have read the foregoing record of my

8    testimony taken at the time and place noted in the

9    heading hereof, and I do hereby acknowledge it to

10    be a true and correct transcript of same.

11

12

13

14         _____

15         JOEL ABELOVE

16

17

18    Sworn to before me this

19    _____ day of _____, 20__.

20    _____

21    NOTARY PUBLIC

22

23

```
 1

 2          DEPOSITION TRANSCRIPT ERRATA SHEET
            ERRATA SHEET FOR TRANSCRIPT OF:
 3          JOEL ABELOVE - May 28, 2021

 4     PAGE/LINE                  CORRECTION

 5

 6     ___ ___   _____

 7     ___ ___   _____

 8     ___ ___   _____

 9     ___ ___   _____

10     ___ ___   _____

11     ___ ___   _____

12     ___ ___   _____

13     ___ ___   _____

14     ___ ___   _____

15     ___ ___   _____

16     ___ ___   _____

17     ___ ___   _____

18     ___ ___   _____

19     ___ ___   _____

20     ___ ___   _____

21     ___ ___   _____

22     ___ ___   _____

23     ___ ___   _____
```

1

2                    C E R T I F I C A T I O N

3

4          I, SUSAN FLORIO, Registered Professional

5   Reporter and Notary Public in and for the State of

6   New York, do hereby certify that the foregoing is a

7   true, complete and accurate transcript to the best

8   of my knowledge, skill and ability on the date and

9   place hereinbefore set forth.

10          I FURTHER CERTIFY that I am not related

11  to or employed by any of the parties to the action

12  in which the proceedings were taken, or any

13  attorney or counsel employed in this action, nor am

14  I financially interested in the case.

15          IN WITNESS WHEREOF, I have hereunto set

16  my hand this 22nd day of June, 2021.

17

18

19          _____

20                    SUSAN FLORIO, RPR

21              (The foregoing certification of
            this transcript does not apply to any
22          reproduction of the same by any means
            unless under the direct control and/or
23          supervision of the certifying reporter.)

1

2    INDEX TO EXAMINATION:                        PAGE
     ------------------------------------------------
3
     BY MR. KLEIN:                                4; 99
4
     BY MS. SPENCER:                              97
5

6

7

8    INDEX TO ABELOVE EXHIBITS:                   PAGE
     ------------------------------------------------
9
     1, Article                                   44
10
     2, 3/1/15 E-mail                             46
11
     3, Supporting Deposition of Kathleen         74
12       Crisafulli, Bates 495

13   4, Supporting Deposition of Michael Bayly,   78
         Bates 496
14
     5, Packet of Bates Pages 84-108              83
15

16

17   INDEX TO CERTIFIED QUESTIONS:                PAGE
     ------------------------------------------------
18
     Fair to say that during the pendency of the  22
19   Michael Davis prosecution you indicted and
     were prosecuting for a period of time
20   Detective Fountain?

21

22

23

# APPENDIX

**'**

**'91-99** [1] - 8:8

## 1

**1** [4] - 44:21, 83:13, 86:16, 104:9
**10** [1] - 62:12
**100** [3] - 61:5, 76:4, 78:11
**10007** [1] - 2:5
**104** [1] - 2:23
**108** [3] - 82:23, 83:10, 83:15
**10:35** [1] - 62:13
**10:45** [1] - 62:14
**11:25** [1] - 93:15
**11:38** [1] - 39:22
**11:40** [1] - 93:16
**12181-0208** [1] - 2:15
**12205** [1] - 2:10
**12:10** [1] - 100:5
**12th** [3] - 8:3, 47:17, 48:10
**15** [1] - 8:12
**16** [2] - 61:4, 78:10
**17** [1] - 7:14
**19** [1] - 10:14
**1994** [1] - 7:21
**1995** [2] - 7:23, 10:9
**1996** [1] - 11:3
**1:17-cv-01290** [1] - 1:7
**1st** [8] - 6:9, 19:16, 27:16, 35:14, 36:12, 39:5, 39:17, 39:22, 46:10

## 2

**2** [6] - 42:12, 46:11, 46:17, 46:20, 83:14, 104:10
**20** [2] - 61:4, 78:10
**2000s** [1] - 96:19
**2001** [1] - 14:22
**2003** [1] - 8:11
**2005** [1] - 8:3
**2014** [2] - 8:18, 13:11
**2015** [14] - 19:6, 19:16, 20:21, 21:5, 27:14, 29:7, 35:14, 39:5, 39:17, 39:22, 47:7, 50:12, 52:5, 67:20
**2016** [2] - 16:13, 67:20
**2020** [1] - 36:12
**2021** [5] - 1:16, 17:6,

42:11, 102:3, 103:16
**208** [1] - 2:15
**20___** [1] - 101:19
**21st** [2] - 17:5, 42:11
**22** [2] - 2:15, 104:18
**22nd** [1] - 103:16
**25th** [1] - 16:13
**26** [1] - 20:21
**26th** [1] - 27:18
**27th** [1] - 29:7
**28** [2] - 1:16, 102:3
**2nd** [2] - 21:4, 47:7

## 3

**3** [5] - 74:8, 74:13, 74:16, 83:14, 104:11
**3/1/15** [2] - 46:17, 104:10
**30** [1] - 61:19
**30-minute** [1] - 76:5
**305** [1] - 2:5
**316-page** [1] - 74:10

## 4

**4** [5] - 77:19, 78:3, 83:14, 104:3, 104:13
**44** [1] - 104:9
**46** [1] - 104:10
**495** [4] - 74:15, 74:17, 83:14, 104:12
**496** [1] - 77:20, 78:4, 83:14, 104:13

## 5

**5** [11] - 2:9, 42:12, 79:19, 83:2, 83:3, 83:5, 83:11, 83:14, 83:17, 95:6, 104:14
**507** [1] - 2:9
**5th** [1] - 75:3

## 6

**6** [3] - 81:12, 82:7, 83:3
**6,000** [4] - 64:8, 64:13, 65:6, 91:3
**600** [1] - 2:5

## 7

**7** [1] - 82:7
**7/2/19** [1] - 74:9

**700** [2] - 17:13, 19:5
**74** [1] - 104:11
**78** [1] - 104:13

## 8

**81s** [1] - 9:6
**83** [1] - 104:14
**84** [4] - 82:6, 82:23, 83:9, 83:15
**84-108** [2] - 83:18, 104:14

## 9

**9/11** [1] - 8:9
**911** [3] - 21:10, 27:19, 63:2
**94** [2] - 79:20, 83:5
**97** [1] - 104:4
**99** [2] - 81:11, 104:3
**9:35** [1] - 1:16

## A

**a.m** [6] - 1:16, 39:22, 62:13, 62:14, 93:15, 93:16
**Abelove** [22] - 2:9, 4:8, 23:6, 36:11, 36:12, 39:14, 42:13, 44:21, 46:10, 46:13, 46:14, 46:15, 46:17, 46:20, 62:19, 74:13, 78:3, 83:17, 90:8, 94:3, 97:12, 97:17
**ABELOVE** [8] - 1:2, 1:11, 1:15, 4:2, 100:5, 101:15, 102:3, 104:8
**abilities** [1] - 17:19
**ability** [1] - 103:8
**able** [6] - 12:14, 32:5, 56:15, 66:11, 86:6, 89:2
**absolutely** [1] - 18:23
**abuse** [2] - 11:8, 11:18
**access** [2] - 37:7, 86:7
**account** [2] - 35:22, 36:13
**accounts** [1] - 43:12
**accurate** [4] - 53:13, 53:14, 99:11, 103:7
**accurately** [2] - 4:18, 69:2
**accused** [1] - 54:14
**Ackerman** [18] - 29:14, 29:19, 30:22,

33:17, 35:3, 35:5, 38:13, 40:16, 40:18, 41:9, 47:15, 48:21, 49:6, 49:22, 50:11, 50:21, 79:15, 86:13
**acknowledge** [1] - 101:9
**acquittal** [4] - 6:18, 16:5, 20:3, 71:16
**acquittals** [2] - 88:19, 88:22
**acquitted** [2] - 16:14, 41:20
**action** [7] - 3:12, 46:21, 73:18, 73:23, 74:2, 103:11, 103:13
**actions** [1] - 65:18
**active** [2] - 73:13, 73:14
**ADA** [14] - 9:23, 14:14, 15:18, 18:19, 18:22, 19:12, 26:6, 31:5, 31:9, 41:9, 49:23, 58:20, 70:5
**ADA's** [1] - 70:18
**Adam** [5] - 2:14, 37:14, 79:20, 97:20, 98:18
**ADAM** [1] - 1:10
**ADAs** [1] - 11:13
**added** [1] - 42:16
**addition** [1] - 3:8
**address** [1] - 42:5
**addressed** [1] - 94:7
**administrative** [1] - 12:22
**admits** [1] - 43:19
**admitted** [1] - 42:14
**Adrian** [2] - 19:17, 87:9
**adult** [1] - 11:17
**advance** [1] - 78:15
**advice** [1] - 33:19
**advisory** [2] - 33:12, 33:18
**Advocate** [1] - 8:10
**advocate** [1] - 8:13
**advocates** [1] - 13:21
**affected** [2] - 65:2, 65:20
**afternoon** [2] - 97:22, 97:23
**afterwards** [1] - 76:17
**AG's** [1] - 9:20
**agency** [1] - 54:22
**ago** [3] - 8:16, 45:16, 72:18
**agree** [3] - 42:22, 55:22, 65:4
**AGREED** [1] - 3:3

**agreed** [3] - 3:13, 3:18, 3:21
**Alabama** [1] - 7:13
**Albany** [3] - 2:10, 7:7, 51:10
**aligning** [1] - 20:9
**alleged** [4] - 21:10, 25:14, 43:16, 89:11
**allow** [1] - 72:2
**alluded** [1] - 32:2
**almost** [1] - 41:14
**ambulance** [2] - 61:5, 78:11
**Amendment** [2] - 9:7, 9:9
**amount** [1] - 17:15
**AND** [1] - 3:3
**Andra** [20] - 29:14, 29:18, 30:6, 30:8, 30:22, 35:2, 35:5, 38:13, 39:6, 40:7, 40:16, 40:18, 40:22, 41:8, 47:15, 48:21, 49:6, 50:11, 50:21, 79:14
**ANDRA** [1] - 30:7
**Andrea** [1] - 30:6
**angry** [1] - 71:5
**another's** [2] - 42:5, 72:21
**answer** [17] - 5:10, 5:17, 5:20, 15:10, 18:7, 25:5, 27:2, 32:14, 36:7, 36:20, 44:23, 62:17, 69:2, 85:22, 89:16, 92:12, 96:3
**anticipating** [1] - 31:11
**apart** [1] - 27:5
**Appeals** [1] - 19:19
**appear** [2] - 55:9, 55:14, 79:23
**APPEARANCES** [1] - 2:2
**appeared** [1] - 24:6
**appearing** [1] - 14:2
**apply** [2] - 32:20, 103:21
**applying** [2] - 32:20, 33:21
**appreciate** [1] - 97:12
**apprised** [1] - 58:17
**area** [1] - 10:22
**Army** [3] - 7:11, 7:18, 8:12
**arraigned** [1] - 92:7
**arrest** [7] - 21:6, 53:9, 53:11, 53:17, 54:15, 54:16, 54:22

# APPENDIX

**arrested** [3] - 41:13, 54:21, 55:6
**arrests** [3] - 53:12, 53:15
**arrhythmia** [1] - 45:8
**arson** [1] - 25:10
**Article** [3] - 9:6, 44:21, 104:9
**article** [22] - 6:10, 16:3, 16:4, 16:12, 16:20, 17:9, 35:20, 36:9, 36:12, 37:5, 42:10, 42:12, 44:4, 44:17, 45:15, 46:4, 57:9, 82:6, 83:13, 86:16, 90:3, 94:14
**articles** [8] - 81:9, 81:14, 81:16, 81:18, 81:23, 82:5, 95:6
**aspects** [2] - 50:8, 58:12
**assess** [1] - 91:14
**assessed** [1] - 91:18
**assign** [2] - 31:5, 68:9
**assigned** [9] - 21:18, 24:5, 24:18, 26:16, 29:19, 30:2, 31:10, 41:9, 49:23
**assigning** [3] - 30:22, 31:8, 31:9
**assignment** [1] - 10:4
**assist** [8] - 28:22, 29:4, 31:22, 32:4, 32:6, 32:18, 33:2, 33:18
**assistance** [1] - 34:4
**Assistant** [7] - 8:2, 10:11, 10:20, 12:4, 13:21, 30:15, 42:15
**assistant** [8] - 24:8, 30:11, 30:13, 30:18, 39:2, 67:18, 68:6, 70:7
**assistants** [2] - 23:21, 25:3
**assisting** [1] - 33:20
**associate** [1] - 12:20
**associates** [1] - 1:20
**assume** [1] - 5:16
**assumes** [1] - 75:10
**assuming** [1] - 31:11
**attempt** [1] - 67:2
**attempting** [1] - 76:3
**attempts** [1] - 44:9
**attend** [5] - 30:22, 31:6, 31:13, 47:19
**attended** [6] - 7:5, 7:7, 29:20, 29:23, 38:13, 47:5
**attention** [7] - 19:23,

20:7, 20:18, 26:20, 27:17, 52:11, 52:13
**attorney** [14] - 4:21, 6:16, 8:18, 10:17, 18:18, 30:11, 55:14, 58:21, 84:16, 85:4, 85:17, 88:23, 97:18, 103:13
**Attorney** [4] - 8:19, 30:15, 42:13, 42:15
**attorney's** [1] - 55:23, 59:16
**Attorney's** [2] - 7:22, 86:8
**Attorneys** [3] - 2:4, 2:8, 2:13
**attributed** [1] - 17:15
**audiotaped** [1] - 43:11
**August** [3] - 8:3, 16:13, 52:5
**authority** [1] - 54:2
**autopsies** [4] - 17:12, 18:2, 19:5, 19:11
**autopsy** [19] - 29:6, 29:12, 29:14, 29:20, 30:2, 30:22, 31:6, 31:9, 31:13, 38:14, 38:15, 48:9, 52:6, 53:2, 58:23, 59:20, 92:2, 92:10, 92:20
**available** [2] - 28:21, 31:22
**Avenue** [1] - 2:10
**avoid** [2] - 56:14, 83:11
**aware** [35] - 19:10, 19:21, 19:22, 27:21, 27:22, 28:14, 29:8, 29:10, 31:21, 34:15, 51:17, 51:19, 52:7, 55:12, 59:5, 59:20, 61:21, 61:23, 65:9, 66:7, 66:22, 67:8, 79:4, 87:7, 87:16, 88:15, 90:8, 90:12, 90:18, 90:19, 90:22, 92:4, 94:3, 94:17, 95:5

## B

**B-a-y-l-y** [1] - 77:21
**background** [1] - 6:21
**BAILEY** [1] - 2:7
**bar** [2] - 3:10, 9:17
**based** [5] - 24:5, 50:2, 66:4, 77:15, 87:5
**basic** [1] - 7:14
**basis** [2] - 43:4, 86:15

**basketball** [2] - 16:13, 60:5
**Bates** [13] - 74:10, 74:12, 74:14, 74:17, 77:20, 78:4, 79:19, 82:6, 82:20, 83:18, 104:12, 104:13, 104:14
**Bayly** [5] - 63:22, 77:21, 77:22, 78:4, 84:13
**BAYLY** [1] - 63:22
**became** [7] - 8:3, 12:4, 13:11, 19:22, 28:14, 48:6, 90:19
**become** [5] - 11:3, 27:21, 27:22, 31:11, 52:6
**becoming** [2] - 11:14, 90:22
**begun** [1] - 3:17
**belief** [1] - 43:4
**best** [1] - 103:7
**better** [2] - 77:2, 86:21
**between** [4] - 3:3, 23:21, 38:8
**beyond** [1] - 78:21
**bit** [2] - 12:13, 41:7
**blow** [1] - 82:9
**Bluetooth** [1] - 32:12
**blunt** [1] - 82:8
**Board** [1] - 11:3
**boss** [1] - 33:6
**bound** [1] - 93:19
**Box** [1] - 2:15
**Brady** [17] - 62:20, 63:4, 63:6, 63:10, 63:15, 63:16, 64:15, 65:11, 65:22, 67:9, 67:10, 78:20, 79:6, 79:13, 91:12, 91:16
**break** [5] - 5:19, 5:21, 8:8, 37:5, 42:2
**brett** [1] - 22:7
**BRETT** [2] - 2:4, 2:6
**Brett** [10] - 4:8, 16:17, 36:10, 36:19, 39:11, 44:16, 62:9, 82:18, 88:21, 89:15
**brief** [2] - 41:14, 98:2
**briefed** [2] - 47:20, 49:8, 88:2
**bringing** [1] - 38:10
**broaden** [1] - 12:12
**Broadway** [1] - 2:5
**brought** [4] - 13:3, 47:8, 70:22, 89:11
**brush** [1] - 86:4
**budget** [2] - 13:22, 14:3

**bunch** [1] - 35:21
**Bureau** [2] - 8:5, 12:20
**bureau** [3] - 11:15, 13:2
**bureaus** [1] - 10:3
**burglary** [1] - 11:22
**BY** [8] - 2:6, 2:16, 4:7, 94:2, 97:16, 99:8, 104:3, 104:4

## C

**cannot** [2] - 22:9, 22:11
**capacities** [1] - 8:14
**capacity** [2] - 15:18, 18:18, 18:22
**care** [1] - 100:3
**career** [12] - 6:22, 7:8, 7:9, 7:19, 8:7, 11:23, 14:13, 69:16, 70:3, 83:21, 96:5
**case** [116] - 6:4, 6:13, 6:16, 6:20, 9:19, 10:22, 11:7, 11:10, 11:21, 17:22, 20:2, 20:4, 20:15, 23:7, 23:19, 23:23, 26:16, 30:5, 31:10, 31:12, 33:12, 34:8, 34:9, 35:12, 35:19, 36:16, 37:12, 37:17, 37:21, 38:9, 38:10, 42:14, 42:23, 43:15, 43:21, 43:23, 45:21, 48:3, 50:9, 50:17, 52:18, 52:20, 53:8, 53:16, 54:3, 54:5, 54:6, 54:10, 55:4, 55:6, 55:15, 56:22, 57:2, 57:3, 57:14, 58:8, 58:9, 58:10, 59:11, 59:17, 60:15, 62:20, 63:2, 63:19, 63:23, 64:4, 64:19, 66:2, 66:3, 66:5, 67:6, 67:9, 68:7, 68:10, 68:13, 68:17, 69:20, 70:7, 71:16, 71:18, 73:11, 74:21, 75:5, 76:10, 77:11, 77:17, 79:5, 79:12, 84:23, 85:5, 85:15, 85:16, 86:2, 86:5, 86:7, 86:10, 86:19, 87:22, 89:4, 91:6, 91:15, 92:9, 94:13, 94:18, 94:22, 95:9, 95:10, 96:6, 96:7, 96:13, 96:15, 97:5, 99:15,

99:20, 103:14
**Case** [1] - 1:7
**cases** [36] - 10:5, 10:16, 10:19, 11:8, 11:14, 11:18, 11:20, 12:14, 15:22, 18:13, 19:3, 25:2, 25:6, 25:9, 25:12, 25:16, 25:17, 25:19, 26:14, 31:15, 43:6, 43:7, 43:8, 43:20, 52:22, 53:10, 53:12, 57:6, 57:7, 58:7, 75:13, 88:5, 88:8, 88:16
**categories** [1] - 28:4
**categorize** [1] - 52:21
**caught** [1] - 43:16
**caused** [4] - 44:12, 60:3, 82:8, 96:17
**causes** [4] - 20:12, 88:7, 88:12, 88:13
**cautious** [1] - 27:4
**cc'd** [4] - 35:14, 39:23, 40:5, 40:11
**cell** [1] - 33:23
**certain** [6] - 24:21, 33:18, 34:4, 55:3, 65:15, 77:15
**certainly** [1] - 9:2, 10:8, 18:8, 22:16, 26:3, 31:21, 52:19, 52:21, 54:21, 65:15, 79:14, 84:22, 87:17, 92:22
**certification** [2] - 3:19, 103:21
**CERTIFIED** [1] - 104:17
**certify** [1] - 103:6
**CERTIFY** [1] - 103:10
**certifying** [1] - 103:23
**cetera** [1] - 94:16
**chain** [1] - 92:3
**chairperson** [1] - 11:3
**challenging** [1] - 46:2
**charge** [5] - 3:23, 11:7, 14:6, 14:9, 87:12
**charged** [2] - 13:17, 88:8
**charges** [6] - 13:2, 13:3, 63:2, 84:17, 84:19, 85:8
**charging** [1] - 34:16
**Charles** [3] - 2:14, 97:19, 98:11
**CHARLES** [1] - 1:9
**Chavkin** [6] - 42:15, 68:6, 73:20, 76:12, 79:15, 86:14

**chest** [8] - 44:10, 61:6, 61:19, 64:8, 64:11, 64:13, 65:6, 91:4
**chief** [12] - 11:15, 13:11, 15:2, 15:13, 30:17, 39:2, 53:19, 56:5, 67:15, 67:18, 67:19
**Chief** [4] - 12:4, 30:15, 67:15, 79:23
**child** [11] - 11:8, 11:17, 34:10, 38:20, 38:21, 44:6, 75:22, 75:23, 76:4, 87:12
**child's** [1] - 20:11
**Cindy** [6] - 42:15, 68:6, 73:20, 76:12, 76:22, 79:15
**circumstances** [14] - 4:12, 23:6, 27:23, 28:10, 40:4, 40:13, 41:19, 64:19, 79:5, 79:11, 86:19, 87:21, 95:8, 99:19
**CITY** [1] - 1:9
**City** [3] - 2:13, 26:11, 97:18
**Civil** [1] - 1:7
**civilian** [1] - 7:8
**clarify** [1] - 70:21
**clean** [2] - 5:11, 82:19
**clear** [3] - 71:13, 72:14, 91:5
**client** [1] - 93:9
**closings** [1] - 9:6
**COLANERI** [1] - 1:10
**Colaneri** [5] - 2:14, 37:13, 39:23, 97:20, 98:15
**collaborative** [3] - 33:12, 33:19, 34:3
**collected** [1] - 81:20
**collectively** [1] - 64:8
**college** [1] - 7:10
**combination** [1] - 33:13
**comfortable** [1] - 25:16
**commencing** [1] - 1:16
**comment** [4] - 42:18, 42:20, 68:21, 77:10
**comments** [1] - 16:5
**commission** [1] - 8:10
**communicated** [2] - 76:7, 78:14
**compared** [1] - 43:20
**competence** [1] - 87:3
**compiled** [1] - 50:4
**complete** [1] - 103:7

**completed** [2] - 7:12, 7:15
**completely** [1] - 79:21
**completion** [1] - 92:2
**complex** [1] - 10:5
**compressions** [9] - 44:10, 61:6, 61:20, 64:8, 64:13, 65:6, 76:4, 78:11, 91:4
**concern** [6] - 38:3, 38:7, 71:15, 80:23, 82:12
**concerns** [5] - 17:11, 37:19, 67:9, 68:16, 94:6
**concluded** [1] - 100:5
**conclusion** [2] - 30:18, 80:10
**conclusions** [1] - 46:2
**conditions** [1] - 20:12
**conduct** [1] - 33:8
**Conduct** [2] - 8:6, 12:21
**conducted** [4] - 5:4, 5:6, 29:6, 71:14
**confer** [1] - 77:13
**confession** [3] - 43:9, 43:10, 43:17
**confessions** [2] - 43:9, 43:18
**confidence** [1] - 17:11
**conflict** [2] - 38:4, 38:8
**confusing** [1] - 59:7
**confusion** [2] - 18:16, 83:11
**congenital** [1] - 88:7
**connection** [1] - 5:23
**considerable** [1] - 25:15
**considered** [2] - 52:17, 52:20
**constitute** [1] - 91:12
**constituted** [1] - 79:13
**constitutes** [1] - 91:16
**consultation** [1] - 34:15
**context** [2] - 36:8, 57:6, 91:15
**continue** [2] - 17:10, 99:18
**continued** [2] - 7:18, 78:7
**contracts** [1] - 14:18
**contributed** [1] - 41:22
**control** [1] - 103:22
**conversation** [3] - 41:14, 42:9, 72:20
**conversations** [3] -

42:4, 98:22, 99:11
**conveyed** [1] - 70:15
**convicted** [3] - 9:21, 56:6, 96:18
**conviction** [2] - 56:2, 56:11
**convictions** [1] - 56:15
**Coonradt** [3] - 2:13, 97:19, 98:8
**COONRADT** [1] - 1:9
**cooperation** [1] - 97:12
**coordinating** [1] - 14:3
**copies** [1] - 89:12
**copy** [5] - 3:23, 6:8, 16:17, 52:8, 75:14
**Corps** [1] - 8:11
**correct** [23] - 6:19, 14:9, 14:21, 17:6, 22:8, 24:20, 30:8, 51:15, 51:16, 56:2, 56:3, 56:8, 56:12, 56:17, 56:21, 57:4, 82:15, 82:17, 84:20, 85:2, 85:9, 85:11, 101:10
**CORRECTION** [1] - 102:4
**costs** [2] - 56:11, 85:9
**COUNSEL** [1] - 22:4
**counsel** [2] - 12:20, 90:16, 103:13
**county** [6] - 10:14, 13:18, 13:23, 14:2, 14:18, 51:23
**COUNTY** [2] - 1:11, 101:4
**County** [10] - 2:8, 7:22, 8:19, 10:2, 13:12, 13:16, 14:15, 14:17, 15:2, 42:13
**couple** [5] - 7:8, 8:20, 9:5, 9:6, 98:2
**course** [5] - 62:20, 64:9, 65:21, 90:20, 93:11
**court** [10] - 9:7, 24:6, 27:8, 33:22, 36:13, 55:2, 71:23, 89:19, 90:6, 97:10
**Court** [1] - 19:19
**COURT** [2] - 1:4, 22:4
**courtesy** [1] - 40:8
**courtroom** [1] - 68:22
**courts** [2] - 10:12, 10:13
**cover** [1] - 63:8
**CPR** [16] - 44:10, 61:4,

61:18, 66:15, 78:7, 78:8, 78:10, 78:21, 81:10, 81:12, 82:13, 94:23, 95:7, 96:7, 96:18
**CPR-related** [4] - 66:15, 94:23, 95:7, 96:7
**create** [1] - 23:20
**created** [1] - 11:16
**credibility** [2] - 65:3, 65:20
**credited** [1] - 57:12
**crime** [5] - 9:21, 11:7, 43:12, 43:13, 43:16
**crimes** [2] - 10:4, 11:17
**criminal** [15] - 8:22, 9:2, 10:12, 10:13, 22:14, 28:5, 34:7, 48:4, 48:6, 48:15, 48:16, 48:18, 55:2, 59:3, 59:9
**criminally** [2] - 34:16, 58:23
**Crisafulli** [5] - 61:13, 64:4, 74:14, 74:18, 104:12
**criteria** [2] - 25:2, 25:8
**cross** [1] - 70:22
**CRYSTAL** [1] - 2:11
**Crystal** [1] - 23:2
**culpability** [1] - 43:19
**custody** [1] - 21:6

**D**

**D.A.'s** [6] - 6:17, 10:2, 10:8, 33:10, 58:19, 83:21
**DA** [19] - 8:2, 10:20, 12:4, 13:10, 13:15, 14:14, 14:23, 15:22, 18:22, 22:9, 24:22, 25:14, 26:8, 33:6, 53:6, 56:10, 68:19, 70:4, 88:17
**DA's** [2] - 37:7, 89:14
**damaging** [1] - 72:8
**Danielle** [3] - 2:13, 97:19, 98:8
**DANIELLE** [1] - 1:9
**DAs** [2] - 10:11, 13:21
**date** [8] - 21:2, 44:22, 46:18, 74:15, 78:5, 83:18, 95:19, 103:8
**dated** [3] - 6:8, 17:5, 39:17
**daughter's** [1] - 16:14

**Davis** [33] - 4:9, 6:5, 21:3, 21:14, 21:19, 21:22, 23:12, 23:19, 24:2, 30:18, 33:11, 34:11, 35:12, 36:3, 37:9, 37:21, 41:20, 42:6, 42:14, 44:7, 47:7, 55:19, 56:22, 57:10, 59:18, 60:5, 64:9, 88:20, 90:10, 92:5, 92:7, 95:18, 104:19
**DAVIS** [1] - 1:5
**Davis'** [1] - 57:16
**DAVIS-GUIDER** [1] - 1:5
**days** [2] - 35:22, 75:3
**DC** [3] - 79:21, 80:5, 80:6
**dead** [1] - 44:13
**dealing** [1] - 24:2, 35:5
**dealings** [3] - 23:11, 27:9, 68:22
**dealt** [4] - 15:6, 35:6, 43:5, 86:23
**death** [26] - 4:13, 16:15, 20:13, 20:20, 29:7, 31:16, 34:9, 34:18, 38:20, 45:8, 48:22, 51:22, 57:11, 58:9, 58:22, 75:4, 75:23, 82:14, 88:12, 88:13, 90:11, 95:20, 98:4, 98:9, 98:13, 98:20
**deaths** [3] - 15:17, 28:4, 88:7
**deceased** [4] - 27:20, 44:7, 45:11, 51:15
**December** [1] - 7:21
**decide** [1] - 92:18
**decided** [1] - 8:9
**decision** [7] - 19:20, 25:11, 53:23, 54:6, 54:12, 59:15, 93:2
**decision-making** [1] - 59:15
**declared** [1] - 27:20
**declinations** [1] - 59:5
**declined** [1] - 58:21
**Defendant** [2] - 1:15, 2:13
**defendant** [1] - 55:3
**Defendants** [2] - 1:13, 2:8
**defending** [1] - 13:2
**defense** [20] - 8:22, 9:2, 13:7, 44:15, 45:4, 45:5, 45:13,

**difference** [1] - 54:14
**differences** [2] - 54:17, 54:20
**different** [9] - 7:8, 8:14, 10:3, 10:5, 12:14, 42:3, 43:6, 43:7, 55:8
**direct** [9] - 33:5, 33:8, 33:15, 36:20, 63:23, 64:4, 76:10, 89:16, 103:22
**directing** [2] - 27:17, 73:14
**directly** [1] - 15:21
**disciplinary** [1] - 89:10
**discipline** [2] - 12:22, 13:4
**disciplined** [1] - 9:16
**disclosed** [11] - 39:13, 61:10, 63:3, 63:12, 63:15, 64:15, 64:22, 65:22, 66:6, 78:20
**disclosure** [1] - 16:21, 17:5, 62:21, 63:4, 63:6, 63:7, 63:9, 63:10, 65:12
**disclosures** [1] - 67:10
**discovery** [2] - 82:23, 83:8
**discretion** [1] - 58:22, 84:17, 84:22, 85:5
**discuss** [1] - 14:3, 41:19, 72:21
**discussed** [6] - 41:9, 42:10, 49:4, 72:22, 91:18, 94:5
**discussing** [2] - 40:6, 87:20
**discussion** [4] - 34:14, 39:15, 57:21, 74:6
**discussions** [4] - 34:23, 35:2, 60:21, 67:23
**dismissed** [1] - 23:9
**dissatisfied** [1] - 70:18
**district** [13] - 6:15, 8:18, 10:17, 18:18, 30:11, 55:14, 55:22, 58:21, 59:16, 84:16, 85:4, 85:16, 88:23
**District** [7] - 4:10, 7:22, 8:19, 30:15, 42:13, 42:15, 86:8
**DISTRICT** [2] - 1:4, 1:4
**divulging** [1] - 89:5
**doctor** [1] - 61:13,

difference [1] - 54:14
64:4, 96:22
**document** [3] - 40:10, 74:11, 83:7
**documents** [1] - 6:2
**domestic** [1] - 11:18
**done** [7] - 7:20, 8:7, 38:20, 61:4, 77:5, 78:22, 85:8
**Donohue** [1] - 10:17
**double** [1] - 17:14
**doubt** [1] - 87:3
**down** [3] - 65:5, 68:5, 99:23
**Dr** [38] - 14:20, 14:22, 15:16, 16:5, 17:12, 17:17, 17:21, 20:2, 20:8, 44:3, 46:2, 46:6, 52:5, 59:2, 59:8, 59:9, 59:14, 59:17, 61:13, 63:14, 69:10, 69:17, 70:5, 71:21, 72:15, 72:23, 73:9, 73:15, 73:19, 83:20, 84:2, 84:3, 92:10, 94:15, 96:12, 96:14, 96:15, 97:3
**drafted** [1] - 75:3
**drafting** [1] - 32:21
**drill** [1] - 65:5
**drugs** [1] - 11:21
**due** [1] - 45:10
**duly** [1] - 4:3
**duration** [1] - 60:14
**during** [14] - 11:23, 19:11, 21:15, 21:21, 24:21, 31:6, 37:5, 71:5, 74:21, 76:14, 84:7, 88:17, 104:18
**duties** [2] - 10:11, 13:14
**duty** [1] - 85:7

**E**

**e-mail** [16] - 6:8, 35:13, 36:13, 37:7, 39:5, 39:6, 39:12, 39:17, 39:19, 40:11, 40:14, 46:9, 46:21, 83:14, 89:13, 98:23
**E-mail** [2] - 46:18, 104:10
**e-mails** [5] - 35:11, 35:16, 35:19, 36:17, 89:12
**early** [1] - 96:19
**education** [2] - 6:22, 66:5
**efforts** [12] - 34:12,

**define** [1] - 34:3
**definition** [2] - 63:5, 63:11
**delegate** [1] - 68:11
**delegating** [1] - 25:3
**demeanor** [1] - 71:10
**demonstrated** [1] - 44:5
**demonstrating** [1] - 59:18
**dep** [2] - 74:18, 78:6
**Department** [8] - 8:4, 12:17, 26:12, 30:4, 51:9, 52:4, 61:11, 62:4
**department** [7] - 8:17, 12:11, 44:11, 49:23, 60:13, 61:3, 81:21
**deploying** [1] - 8:14
**deposed** [1] - 4:23
**DEPOSITION** [3] - 1:2, 1:15, 102:2
**Deposition** [4] - 74:14, 78:4, 104:11, 104:13
**deposition** [8] - 6:2, 44:19, 75:2, 75:18, 77:21, 86:5, 93:20, 97:9
**depositions** [5] - 5:4, 5:5, 75:5, 75:14, 81:3
**deputy** [2] - 67:18, 67:19
**Deputy** [1] - 79:23
**describe** [4] - 10:6, 24:23, 26:10, 33:10
**described** [1] - 34:10
**despite** [1] - 17:11
**detail** [1] - 76:6
**details** [5] - 23:8, 27:7, 41:15, 85:17, 86:18
**Detective** [7] - 21:9, 21:17, 22:2, 23:18, 27:10, 51:12, 104:20
**detective** [2] - 21:18, 21:19
**determination** [6] - 53:16, 59:11, 59:13, 66:12, 86:3, 92:8
**determine** [1] - 22:20
**determined** [3] - 28:5, 64:23, 65:18
**developed** [1] - 50:2
**died** [1] - 44:6

45:18, 45:20, 46:2, 46:5, 56:23, 57:10, 72:7, 82:13, 85:2, 95:2, 96:7, 96:17, 97:3

44:8, 44:9, 45:10, 45:11, 59:19, 60:15, 62:6, 63:22, 65:8, 78:9, 78:21
**eight** [2] - 8:7, 10:10
**eight-year** [1] - 8:7
**either** [15] - 20:21, 26:5, 26:19, 31:2, 35:10, 38:14, 41:20, 68:17, 69:17, 70:4, 70:15, 72:20, 75:10, 88:9, 98:23
**elected** [4] - 6:15, 8:17, 13:10, 13:15
**elements** [1] - 43:21
**elicited** [1] - 70:20
**emergency** [2] - 60:13, 64:13
**employed** [2] - 103:11, 103:13
**end** [2] - 12:6, 12:7
**ended** [3] - 8:11, 11:14, 11:16
**enforcement** [6] - 13:11, 14:4, 14:5, 31:22, 32:19, 56:5
**enlisted** [1] - 7:11
**enlistment** [1] - 8:7
**ensure** [1] - 85:8
**entire** [2] - 14:9, 83:7
**entirely** [2] - 17:18, 57:20
**ER** [4] - 61:14, 61:17, 64:4, 74:19
**ERRATA** [2] - 102:2, 102:2
**ESQ** [4] - 2:4, 2:6, 2:11, 2:16
**establishing** [1] - 24:3
**estate** [1] - 9:6
**estimated** [1] - 17:13
**estimation** [1] - 68:14
**et** [1] - 94:16
**ethically** [1] - 68:18
**evaluate** [1] - 33:2
**event** [2] - 48:6, 55:15
**events** [2] - 54:12, 92:4
**evidence** [5] - 29:16, 38:5, 43:13, 65:6, 77:16
**exactly** [2] - 45:18, 68:12
**examination** [8] - 3:7, 3:10, 3:14, 3:16, 3:20, 70:2, 70:21, 71:14
**EXAMINATION** [1] - 104:2
**examined** [3] - 3:15,

3:22, 4:4
**examiner** [3] - 15:2, 47:4, 88:19
**examiner's** [3] - 14:15, 14:17, 29:17
**Examiners** [1] - 11:4
**examining** [1] - 3:22
**except** [1] - 3:6
**exculpating** [1] - 79:21
**exculpatory** [6] - 65:2, 65:19, 90:9, 90:13, 91:6, 91:8
**excuse** [1] - 93:6
**executive** [2] - 15:13, 53:20
**exercised** [1] - 58:22
**exertion** [1] - 61:18
**exhibit** [1] - 44:18
**Exhibit** [19] - 16:22, 17:4, 44:21, 46:17, 74:8, 74:13, 74:16, 77:19, 78:3, 79:19, 81:12, 82:7, 83:2, 83:4, 83:10, 83:17, 86:16, 95:6
**EXHIBITS** [1] - 104:8
**existing** [1] - 20:12
**expect** [1] - 75:13
**experience** [13] - 6:23, 10:6, 10:7, 25:15, 26:6, 26:8, 26:18, 35:4, 54:13, 57:14, 58:7, 58:19, 66:6
**experiences** [2] - 11:19, 12:12
**expert** [3] - 80:5, 96:16, 97:4
**experts** [1] - 91:19
**explain** [1] - 54:19
**express** [3] - 71:9, 71:15, 84:2
**expressed** [1] - 17:11
**Extension** [1] - 2:10
**extensive** [1] - 34:12
**extent** [6] - 56:15, 60:14, 62:5, 65:7, 78:21, 80:22
**eyewitness** [2] - 43:12, 43:15

**F**

**F.R.C.P** [1] - 3:5
**fact** [4] - 11:2, 19:4, 55:11, 99:9
**factored** [2] - 59:15, 59:19
**factors** [1] - 25:10

**facts** [6] - 4:12, 79:11, 79:12, 86:2, 86:18, 94:16
**failed** [3] - 88:6, 88:10, 88:11
**failure** [1] - 3:8
**Fair** [1] - 104:18
**fair** [5] - 13:12, 21:21, 30:19, 39:9, 57:4
**fairly** [2] - 25:14, 93:3
**fall** [1] - 82:9
**familiar** [5] - 5:3, 19:18, 36:11, 37:14, 66:17
**familiarity** [1] - 85:23
**far** [2] - 41:15, 94:7
**February** [4] - 20:20, 27:18, 29:7, 36:12
**federal** [1] - 14:5
**felony** [4] - 10:16, 11:7, 11:8, 11:11
**felt** [3] - 25:16, 57:2, 84:23
**few** [5] - 14:7, 14:8, 44:8, 64:10, 90:5
**field** [1] - 64:14
**fifteen** [1] - 26:2
**figure** [1] - 77:3
**file** [5] - 66:14, 66:18, 80:15, 82:6, 86:7
**files** [7] - 35:22, 36:2, 36:3, 36:4, 36:13, 36:17, 37:7
**filing** [1] - 3:18
**financially** [1] - 103:14
**fine** [1] - 37:2
**finish** [2] - 5:10, 72:16
**fire** [3] - 44:10, 60:13, 61:3
**firefighter** [1] - 63:21
**First** [1] - 2:15
**first** [10] - 4:3, 7:12, 11:3, 11:8, 11:10, 25:5, 28:13, 40:23, 50:14, 50:15
**fit** [1] - 63:10
**fits** [1] - 63:5
**five** [1] - 11:9
**FJS/DJS** [1] - 1:8
**flip** [1] - 77:18
**Florio** [1] - 1:18
**FLORIO** [2] - 103:4, 103:20
**focused** [1] - 73:3
**followed** [2] - 44:9, 92:3
**following** [3] - 7:6, 23:2, 29:12
**follows** [1] - 4:5
**footage** [1] - 32:23

**FOR** [1] - 102:2
**force** [1] - 82:8
**foregoing** [3] - 101:7, 103:6, 103:21
**form** [54] - 3:6, 15:20, 23:13, 23:14, 26:22, 26:23, 29:21, 29:22, 31:18, 34:21, 35:9, 37:22, 37:23, 38:12, 39:10, 45:14, 47:12, 47:23, 48:11, 48:12, 49:16, 51:3, 58:13, 58:14, 59:4, 59:23, 60:2, 60:7, 60:16, 61:8, 61:22, 62:7, 64:17, 64:18, 64:20, 64:21, 66:8, 67:13, 68:4, 78:16, 78:17, 85:3, 85:21, 87:15, 92:13, 94:8, 94:9, 94:21, 95:3, 95:11, 95:21, 95:22, 96:9, 96:21
**former** [1] - 16:13
**Fort** [1] - 7:13
**forth** [4] - 81:4, 94:14, 95:6, 103:9
**forward** [1] - 77:18
**Fountain** [21] - 2:13, 21:9, 21:18, 22:2, 22:13, 23:7, 23:18, 23:22, 24:2, 24:7, 25:20, 26:5, 27:6, 36:16, 37:17, 39:19, 39:23, 62:23, 97:19, 98:5, 104:20
**FOUNTAIN** [1] - 1:9
**Fountain's** [2] - 27:11, 99:20
**four** [1] - 8:18
**fractured** [3] - 67:4, 67:6, 80:19
**fractures** [1] - 66:16
**frame** [1] - 21:5
**frames** [1] - 41:11
**free** [1] - 3:23
**frequently** [1] - 75:16
**front** [1] - 39:14
**frustrated** [1] - 69:19
**frustration** [1] - 71:22
**full** [1] - 20:10
**fully** [2] - 4:18, 43:19
**furnish** [1] - 3:22
**FURTHER** [1] - 103:10
**future** [1] - 9:14

**G**

**gamut** [1] - 11:23

**gather** [1] - 39:8
**gathered** [1] - 38:5
**general** [3] - 10:4, 21:5, 44:14
**General's** [1] - 8:11
**generally** [16] - 4:15, 10:17, 20:22, 27:2, 29:9, 29:11, 29:18, 33:17, 39:7, 39:9, 45:12, 54:13, 55:10, 65:4, 66:18, 66:21
**GINSBERG** [1] - 2:12
**given** [9] - 27:7, 37:16, 49:12, 49:13, 52:8, 55:19, 58:6, 65:9, 75:6
**Gmail** [1] - 35:22
**Gordon** [1] - 21:11
**graduation** [1] - 7:6
**grand** [26] - 29:2, 41:13, 50:5, 50:20, 53:8, 53:11, 54:6, 54:9, 55:4, 55:7, 55:10, 55:15, 55:16, 55:20, 56:7, 57:15, 58:2, 58:12, 58:16, 73:5, 73:6, 84:18, 84:23, 85:6, 92:9, 92:19
**grants** [1] - 55:2
**great** [1] - 45:22
**GRIFFIN** [1] - 2:12
**grounds** [1] - 94:4
**Guard** [2] - 7:19, 8:12
**guess** [2] - 27:15, 31:19
**GUIDER** [1] - 1:5
**guilty** [5] - 41:22, 41:23, 42:7, 87:13, 87:17
**guys** [1] - 41:19

**H**

**half** [1] - 59:6
**Hall** [19] - 30:15, 30:17, 30:23, 40:19, 41:3, 49:7, 50:19, 51:4, 54:7, 63:9, 69:7, 69:11, 72:20, 79:4, 79:16, 84:6, 86:10, 92:20, 92:23
**hall** [2] - 84:9, 86:13
**Hall's** [1] - 53:22
**hall's** [1] - 40:23
**hand** [2] - 60:4, 103:16
**handle** [6] - 9:4, 10:12, 12:14, 12:21,

41:10, 68:13
**handled** [15] - 9:5, 24:19, 24:22, 25:6, 25:18, 48:3, 49:12, 49:14, 49:15, 49:18, 52:23, 68:17, 69:21, 70:7, 94:22
**handling** [5] - 24:8, 25:15, 25:16, 50:16, 71:17
**handwriting** [1] - 80:5
**happy** [5] - 5:15, 69:23, 70:6, 71:7, 71:13
**hard** [2] - 68:21, 68:23
**harsh** [1] - 71:3
**head** [1] - 25:22
**heading** [1] - 101:9
**headquarters** [2] - 47:8, 92:6
**Health** [3] - 8:5, 12:17, 51:9
**health** [3] - 8:17, 12:11, 20:11
**hear** [1] - 70:4
**heard** [1] - 95:9
**hearings** [1] - 12:22
**held** [4] - 1:16, 1:17, 57:21, 74:6
**hello** [1] - 97:17
**help** [5] - 5:14, 9:8, 30:4, 31:23, 33:8, 39:8
**helpful** [1] - 23:5
**helping** [3] - 9:8, 32:20, 33:2
**HEREBY** [1] - 3:3
**hereby** [2] - 101:9, 103:6
**hereinbefore** [1] - 103:9
**hereof** [1] - 101:9
**hereto** [1] - 3:4
**hereunto** [1] - 103:15
**high** [4] - 52:17, 52:20, 52:21, 58:8
**highly** [1] - 9:20
**hired** [2] - 10:16, 10:18
**hiring** [1] - 13:19
**history** [1] - 86:23
**hold** [4] - 32:7, 32:8, 89:22, 97:8
**home** [2] - 61:4, 78:10
**homicide** [8] - 11:22, 25:9, 52:19, 58:9, 87:12, 88:8, 88:16, 96:16
**homicides** [4] - 15:17, 25:17, 52:21, 52:23

**hop** [1] - 93:13
**hopefully** [1] - 97:23
**hospital** [3] - 44:11, 62:6, 64:14
**hour** [1] - 64:9
**house** [1] - 91:20
**hundred** [1] - 61:20

**I**

**idea** [3] - 19:4, 80:3, 81:22
**identification** [5] - 44:22, 46:19, 74:15, 78:5, 83:19
**imagine** [1] - 65:16
**immediate** [1] - 30:14
**immunity** [1] - 37:16
**impact** [2] - 23:11, 82:8
**impossible** [1] - 85:22
**IN** [1] - 103:15
**in-house** [1] - 91:20
**incident** [14] - 6:9, 21:9, 21:11, 21:12, 27:22, 28:8, 28:13, 28:17, 28:19, 31:13, 41:4, 41:8, 41:11, 73:5
**incidents** [1] - 28:4
**include** [1] - 32:19
**included** [3] - 25:11, 40:14, 92:4
**includes** [1] - 92:22
**including** [8] - 3:5, 14:20, 14:23, 20:11, 36:3, 39:7, 58:20, 70:16
**independently** [2] - 75:8, 90:14
**INDEX** [3] - 104:2, 104:8, 104:17
**Indexes**....................
........ [1] - 2:23
**indicate** [1] - 40:5
**indicated** [2] - 77:14, 78:23
**indicates** [1] - 40:11
**indicating** [2] - 39:7, 47:15
**indicative** [1] - 72:10
**indicted** [4] - 9:21, 21:15, 21:23, 104:19
**indicting** [1] - 84:19
**indictment** [12] - 21:4, 22:12, 38:6, 49:20, 50:8, 53:17, 54:15, 54:16, 54:23, 55:7, 57:17, 92:6

**indictments** [2] - 53:12, 53:15

**indirectly** [1] - 15:22

**individual** [2] - 54:21, 55:5

**individual's** [1] - 96:18

**Individually** [7] - 1:9, 1:9, 1:10, 1:10, 1:11, 1:12

**individuals** [7] - 9:8, 12:23, 14:19, 25:11, 76:3, 92:17, 98:23

**inept** [1] - 71:3

**information** [15] - 22:16, 27:10, 32:3, 50:2, 50:3, 65:19, 66:13, 78:13, 78:19, 79:10, 90:9, 91:3, 91:13, 91:18, 94:17

**informing** [1] - 62:4

**injuries** [15] - 34:17, 44:12, 45:9, 67:4, 67:6, 80:19, 81:10, 81:13, 81:15, 82:13, 85:18, 85:19, 94:23, 96:8, 96:17

**injury** [2] - 60:3, 95:8

**innocence** [1] - 72:10

**innocent** [1] - 56:6

**input** [1] - 92:23

**inquire** [1] - 65:16

**insofar** [1] - 46:6

**instance** [1] - 54:5

**instead** [1] - 83:2

**insufficiency** [1] - 70:19

**interacted** [4] - 18:12, 18:14, 34:11, 95:18

**interactions** [3] - 26:13, 26:19, 27:9

**interest** [1] - 58:7

**interested** [1] - 103:14

**internal** [2] - 47:3, 81:10

**interrogated** [1] - 47:9

**interview** [2] - 75:8, 92:5

**investigating** [1] - 28:20

**investigation** [25] - 20:10, 29:5, 31:16, 32:18, 33:5, 33:9, 33:11, 34:5, 37:13, 48:4, 48:7, 48:14, 48:15, 48:21, 50:3, 50:8, 51:18, 55:13, 68:2, 98:3, 98:9, 98:12, 98:16, 98:19, 99:2

**investigations** [1] - 32:4

**investigator** [2] - 23:18, 51:23

**investigators** [2] - 13:22, 38:4

**investigatory** [3] - 31:15, 31:20, 40:7

**involved** [29] - 21:10, 23:21, 26:14, 30:21, 30:23, 31:15, 31:20, 32:17, 34:22, 37:11, 37:12, 38:4, 40:6, 47:18, 48:5, 48:9, 48:13, 48:18, 51:21, 57:23, 58:6, 58:11, 58:15, 61:18, 69:3, 69:6, 95:9, 96:6, 96:12

**involvement** [5] - 31:12, 33:16, 50:7, 51:17, 99:15

**involving** [8] - 4:13, 15:17, 15:22, 21:11, 38:20, 47:3, 88:17, 96:7

**IS** [1] - 3:3

**isolated** [1] - 82:8

**issue** [6] - 9:8, 20:8, 36:21, 79:6, 80:22, 81:2

**issued** [3] - 32:21, 52:6, 54:23

**issues** [6] - 67:8, 67:23, 70:22, 89:21, 89:22, 94:13

**IT** [1] - 3:3

**itself** [1] - 40:10

**J**

**January** [3] - 11:2, 19:16, 27:16

**Jessica** [24] - 30:15, 30:17, 30:23, 40:19, 41:2, 41:3, 49:7, 50:19, 51:4, 53:22, 54:7, 60:22, 63:9, 69:7, 69:11, 72:20, 76:23, 79:3, 79:4, 79:16, 84:6, 86:10, 92:20, 92:23

**job** [2] - 30:9, 56:10

**JOEL** [7] - 1:2, 1:11, 1:15, 4:2, 100:4, 101:15, 102:3

**Joel** [2] - 2:9, 42:13, 93:22

**jog** [2] - 80:21, 81:6

**jogging** [1] - 42:5

**JOHNSON** [1] - 2:7

**joined** [1] - 10:8

**Judge** [3] - 8:10, 33:16, 93:18

**judge** [4] - 8:13, 55:2, 93:5, 93:7

**judgment** [1] - 17:22

**judicial** [1] - 29:3

**July** [1] - 8:11

**June** [3] - 7:23, 10:9, 103:16

**jury** [28] - 29:3, 41:13, 44:5, 50:6, 50:20, 53:8, 53:11, 54:7, 54:9, 55:5, 55:7, 55:10, 55:15, 55:16, 55:20, 56:7, 57:12, 57:15, 58:2, 58:12, 58:16, 73:5, 73:6, 84:18, 84:23, 85:6, 92:9, 92:19

**jury's** [1] - 73:10

**justice** [3] - 56:2, 56:12, 85:8

**K**

**Kathleen** [3] - 74:14, 74:18, 104:11

**keep** [1] - 40:8

**keeping** [1] - 58:17

**kick** [1] - 82:9

**kind** [4] - 12:10, 13:20, 75:5, 77:12

**Klein** [2] - 4:9, 46:12

**KLEIN** [34] - 2:4, 2:6, 4:7, 16:22, 17:4, 17:8, 18:20, 22:15, 22:20, 22:23, 24:12, 32:11, 36:7, 36:22, 37:4, 39:16, 44:20, 62:11, 74:5, 74:8, 82:22, 83:6, 83:13, 89:3, 89:18, 90:4, 93:5, 93:11, 93:14, 94:2, 97:7, 99:8, 99:17, 104:3

**knowing** [4] - 18:12, 57:19, 86:22, 86:23

**knowledge** [11] - 4:11, 15:3, 15:7, 15:13, 38:11, 55:19, 79:9, 86:9, 86:11, 92:15, 103:8

**known** [12] - 17:17, 19:6, 63:18, 64:12, 64:16, 65:12, 76:6, 76:12, 78:13, 78:19,

79:13, 91:9

**L**

**lacerated** [3] - 67:5, 67:7, 80:20

**lacerations** [1] - 66:16

**lack** [3] - 70:18, 76:23, 99:15

**Lansingburgh** [1] - 16:14

**large** [4] - 60:4, 60:5, 60:10

**last** [2] - 35:21, 71:2

**late** [1] - 7:16

**law** [15] - 7:2, 7:11, 7:12, 7:16, 7:20, 13:11, 14:4, 31:22, 32:18, 33:3, 55:2, 55:23, 56:5

**Law** [3] - 7:7, 11:5, 11:23

**lawsuit** [1] - 4:9

**lead** [7] - 21:18, 23:18, 24:9, 50:20, 68:9, 81:10, 81:13

**leads** [1] - 99:16

**learn** [3] - 10:19, 27:9, 91:13

**learned** [3] - 85:14, 90:10, 90:12

**learning** [1] - 28:13

**least** [3] - 20:22, 57:8, 62:21

**leave** [3] - 11:2, 12:8, 50:11

**left** [5] - 8:2, 10:23, 35:23, 50:17, 50:21

**legal** [4] - 6:22, 33:3, 59:12, 89:10

**legislature** [1] - 14:3

**letter** [2] - 63:8, 99:2

**level** [2] - 34:4, 35:7

**liability** [2] - 34:8, 48:19

**liaison** [1] - 30:3

**licenses** [1] - 13:5

**life** [2] - 34:13, 78:9

**likely** [4] - 44:6, 44:12, 52:14, 58:11, 58:16, 85:18

**limited** [1] - 11:12

**line** [2] - 12:19, 30:13

**lips** [1] - 96:2

**list** [1] - 89:21

**literature** [1] - 66:17

**litigate** [1] - 12:16

**litigating** [1] - 25:15

**liver** [7] - 44:12, 45:9,

66:15, 67:5, 67:7, 80:20, 82:7

**local** [3] - 10:12, 10:13, 14:4

**located** [1] - 81:23

**look** [5] - 36:21, 53:2, 76:18, 87:21, 88:11

**looked** [4] - 16:3, 35:13, 59:17, 76:20

**looking** [7] - 16:18, 17:2, 20:10, 29:8, 29:10, 39:21, 40:2

**looks** [2] - 68:5, 81:9

**loop** [1] - 40:8

**M**

**mail** [18] - 6:8, 35:13, 36:13, 37:7, 39:5, 39:6, 39:12, 39:17, 39:19, 40:11, 40:14, 46:9, 46:18, 46:21, 83:14, 89:13, 98:23, 104:10

**mails** [5] - 35:11, 35:16, 35:19, 36:17, 89:12

**maker** [2] - 14:10, 15:8

**maligned** [1] - 56:7

**man** [2] - 60:5, 60:11

**managing** [1] - 13:20

**manner** [2] - 32:22, 95:18

**manslaughter** [1] - 58:10

**manual** [2] - 66:22, 81:5

**Manual** [1] - 79:20

**March** [10] - 6:9, 35:14, 39:5, 39:17, 39:22, 46:10, 47:7, 47:17, 48:10, 75:3

**mark** [7] - 22:18, 23:3, 36:23, 46:10, 66:20, 83:8, 83:10

**marked** [7] - 44:18, 44:22, 46:18, 46:20, 74:15, 78:5, 83:18

**Mary** [1] - 10:17

**Mary's** [1] - 61:14

**Mason** [4] - 2:14, 37:14, 97:20, 98:18

**MASON** [1] - 1:10

**Massachusetts** [1] - 7:6

**material** [6] - 66:15, 66:20, 74:9, 80:14, 81:8, 82:3, 91:12, 91:16

materials [1] - 63:10
matrimonials [1] - 9:5
matter [8] - 22:9, 31:8, 38:20, 41:10, 50:5, 77:6, 96:20, 97:21
matters [9] - 9:3, 14:4, 15:17, 24:21, 32:19, 36:18, 48:18, 49:14, 94:4
Mayor [1] - 21:11
McAvoy [4] - 67:15, 79:22, 80:5, 80:6
McAvoy's [1] - 80:2
McClellan [1] - 7:13
McDonald [3] - 2:14, 97:20, 98:11
MCDONALD [1] - 1:10
mean [16] - 5:3, 18:9, 18:17, 31:20, 33:15, 33:17, 43:5, 50:22, 50:23, 54:2, 66:16, 68:15, 87:17, 99:10
means [2] - 56:4, 103:22
Medford [1] - 7:5
medical [14] - 13:5, 14:15, 14:17, 15:2, 29:17, 34:2, 47:4, 59:13, 64:13, 65:17, 88:18, 91:14, 91:19, 95:7
Medical [2] - 8:5, 12:21
medicolegal [1] - 51:22
meet [5] - 98:4, 98:7, 98:11, 98:15, 98:18
meeting [21] - 38:15, 47:14, 47:16, 47:18, 48:10, 70:6, 70:12, 70:16, 70:17, 71:5, 72:15, 72:19, 72:22, 73:10, 73:23, 74:3, 76:22, 84:4, 84:7, 84:11, 92:10
meetings [6] - 47:2, 47:3, 48:9, 48:20, 49:9, 58:3
meets [1] - 33:3
Megan's [1] - 11:5
member [1] - 52:3
members [3] - 14:2, 28:20, 78:8
memory [3] - 42:5, 80:21, 81:6
mentioned [1] - 74:19
merit [1] - 23:8
merits [4] - 23:23, 24:13, 37:18, 94:18
met [4] - 18:5, 18:8,

49:6, 73:16
MICHAEL [2] - 1:5, 1:11
Michael [21] - 2:8, 6:4, 21:22, 33:11, 47:16, 51:12, 55:19, 56:22, 57:10, 57:15, 59:18, 60:5, 77:21, 77:22, 78:4, 88:18, 88:20, 90:9, 95:17, 104:13, 104:19
mid [1] - 96:19
middle [1] - 78:7
midnight [1] - 27:15
might [3] - 51:6, 77:7
Mike [8] - 4:9, 37:21, 41:20, 42:6, 47:7, 64:9, 92:5, 92:7
military [5] - 7:9, 7:15, 7:18, 8:6, 8:9
mindful [1] - 27:3
minute [6] - 61:6, 61:20, 62:10, 76:4, 78:12, 93:8
minutes [7] - 61:4, 61:5, 61:19, 62:12, 78:10, 78:11, 93:13
moment [1] - 72:17
monitoring [2] - 48:6, 73:15
months [4] - 11:6, 11:9, 49:19, 50:14
moot [1] - 32:13
morning [1] - 4:8
most [3] - 17:10, 86:9, 86:11
motion [1] - 3:11
move [3] - 3:6, 3:9, 96:2
MR [32] - 4:7, 16:22, 17:4, 17:8, 18:20, 22:15, 22:20, 22:23, 24:12, 32:11, 36:7, 36:22, 37:4, 39:16, 44:20, 62:11, 74:5, 74:8, 82:22, 83:6, 83:13, 89:3, 89:18, 90:4, 93:5, 93:11, 93:14, 94:2, 97:7, 99:8, 99:17, 104:3
MS [113] - 15:9, 15:20, 16:8, 16:16, 16:23, 17:7, 18:6, 18:15, 20:5, 20:14, 20:16, 22:6, 22:19, 22:22, 23:13, 23:14, 24:10, 24:15, 26:22, 26:23, 29:21, 29:22, 31:4, 31:7, 31:18, 34:20, 34:21, 35:8, 35:9,

36:6, 36:8, 36:19, 36:23, 37:22, 37:23, 38:12, 39:10, 39:11, 44:16, 45:14, 47:12, 47:23, 48:11, 48:12, 49:16, 49:17, 49:21, 51:3, 56:13, 56:16, 57:5, 57:18, 58:13, 58:14, 59:4, 59:23, 60:2, 60:7, 60:8, 60:16, 61:8, 61:22, 62:7, 62:9, 64:17, 64:18, 64:20, 64:21, 65:13, 66:8, 66:9, 67:12, 67:13, 68:4, 69:13, 69:22, 71:6, 72:9, 72:11, 78:16, 78:17, 82:18, 83:4, 83:12, 83:16, 85:3, 85:10, 85:20, 85:21, 86:20, 87:14, 87:15, 88:14, 88:21, 89:15, 90:2, 90:7, 92:13, 93:8, 93:12, 93:21, 94:8, 94:9, 94:21, 95:3, 95:11, 95:21, 95:22, 96:9, 96:21, 97:16, 99:5, 104:4
must [1] - 43:2

## N

name [4] - 30:6, 40:23, 89:4, 97:17
National [2] - 7:19, 8:12
natural [4] - 20:12, 34:18, 88:7, 88:12
nature [5] - 28:6, 60:14, 62:5, 65:7, 78:20
necessarily [6] - 35:4, 38:22, 50:22, 50:23, 52:7, 84:12
necessity [1] - 11:11
need [12] - 5:14, 5:19, 29:2, 29:4, 31:23, 32:2, 32:14, 32:21, 36:21, 79:3, 79:7, 79:8
never [4] - 71:4, 76:16, 76:20, 87:2
NEW [2] - 1:4, 101:3
new [1] - 93:10
New [10] - 1:20, 2:5, 2:10, 2:15, 7:18, 8:4, 11:4, 51:8, 103:6
news [1] - 6:10
next [2] - 77:19, 99:18
nine [2] - 8:6, 8:16

noncriminal [1] - 34:9
none [1] - 40:15
nonresponsive [1] - 34:10
NORTHERN [1] - 1:4
Northern [1] - 4:10
notably [1] - 25:17
notary [1] - 4:4
NOTARY [1] - 101:21
Notary [4] - 1:19, 3:15, 3:16, 103:5
note [4] - 66:23, 79:20, 80:2, 80:16
noted [1] - 101:8
notes [8] - 29:8, 29:11, 35:11, 66:22, 84:7, 84:8, 84:9, 84:12
notice [5] - 54:14, 55:4, 55:13, 55:17, 55:20
Notice [1] - 1:17
notified [2] - 28:3, 28:9
notify [1] - 70:11
notwithstanding [2] - 58:23, 59:8
number [7] - 11:12, 17:12, 19:9, 25:21, 29:15, 81:9, 85:6
numbers [3] - 74:10, 74:12, 82:20
numerous [1] - 87:2

## O

Object [22] - 29:22, 35:9, 37:22, 38:12, 39:10, 47:12, 48:11, 49:16, 58:13, 59:23, 60:16, 62:7, 64:18, 64:21, 67:13, 68:4, 85:3, 85:21, 92:13, 94:21, 95:3, 95:21
object [16] - 3:5, 3:8, 23:13, 23:14, 26:22, 26:23, 29:21, 31:18, 34:21, 37:23, 58:14, 60:7, 64:17, 94:8, 94:9, 96:9
objection [52] - 15:9, 18:6, 18:15, 20:5, 20:14, 20:16, 22:6, 23:3, 24:10, 31:4, 31:7, 34:20, 35:8, 36:6, 44:16, 45:14, 47:23, 48:12, 49:17, 49:21, 51:3, 56:13, 56:16, 57:5, 57:18,

59:4, 60:2, 60:8, 61:8, 61:22, 64:20, 65:13, 66:8, 66:9, 67:12, 69:13, 69:22, 71:6, 72:9, 72:11, 78:16, 82:18, 85:10, 85:20, 86:20, 87:14, 88:14, 88:21, 89:15, 95:11, 95:22, 96:21
objections [1] - 27:7
obligation [3] - 55:23, 56:4, 56:19
observed [1] - 71:21
obtain [1] - 32:5
obtaining [2] - 33:20, 33:23
obviously [2] - 9:19, 54:10
occasion [1] - 26:16
occasions [1] - 87:2
occur [1] - 73:5
occurred [6] - 20:20, 34:18, 35:2, 41:12, 45:10, 69:16
occurring [2] - 32:18, 69:15
October [1] - 21:4
OF [5] - 1:4, 1:9, 101:3, 101:4, 102:2
Offenders [1] - 11:4
offense [1] - 25:14
offenses [1] - 13:18
office [64] - 8:2, 9:14, 10:20, 11:6, 11:8, 11:12, 13:19, 13:20, 14:9, 14:11, 14:15, 14:17, 15:8, 15:14, 15:23, 18:13, 19:12, 19:15, 27:13, 28:21, 29:4, 29:17, 30:3, 30:10, 31:6, 31:14, 34:15, 35:17, 35:23, 36:3, 38:19, 47:3, 48:4, 48:5, 48:8, 48:13, 48:17, 49:12, 50:4, 50:11, 50:17, 52:18, 53:2, 53:20, 58:21, 59:16, 60:19, 62:5, 65:12, 69:11, 69:18, 75:6, 75:7, 76:7, 76:10, 76:13, 78:14, 81:21, 87:8, 88:6, 89:13, 89:14, 92:11
Office [9] - 6:17, 7:22, 9:20, 10:2, 10:9, 33:10, 58:20, 83:21, 86:9
office's [1] - 23:7
officer [3] - 13:12,

26:11, 56:5
**officers** [4] - 29:15, 37:11, 37:12, 47:16
**offices** [2] - 13:17, 23:11
**officially** [1] - 27:13
**often** [6] - 25:8, 29:12, 32:17, 32:23, 59:14, 75:11
**old** [1] - 61:19
**once** [1] - 11:5
**one** [27] - 5:6, 10:4, 10:10, 10:20, 12:5, 16:9, 24:18, 32:7, 32:9, 35:10, 40:2, 42:5, 42:16, 59:10, 59:13, 62:21, 62:23, 63:8, 72:21, 74:9, 75:11, 82:3, 83:9, 89:8, 89:19, 93:21, 95:6
**open** [1] - 97:9
**opined** [1] - 44:5
**opinion** [6] - 17:16, 43:23, 59:14, 66:4, 86:17, 87:19
**opinions** [3] - 17:22, 20:4, 20:9
**opportunity** [3] - 12:10, 13:9, 55:18
**opposing** [1] - 96:15
**order** [2] - 22:11, 86:2
**organs** [2] - 81:11, 81:14
**original** [1] - 3:19
**otherwise** [4] - 5:16, 29:19, 82:12, 91:20
**ourselves** [2] - 28:21, 31:22
**outcome** [2] - 19:19, 19:20
**outside** [1] - 18:18
**overlook** [2] - 88:7, 88:10
**overlooked** [1] - 88:11
**oversaw** [1] - 11:16
**overseas** [1] - 8:14
**own** [4] - 8:21, 32:5, 34:6, 66:12
**owning** [1] - 8:21

**P**

**P.C** [3] - 2:4, 2:7, 2:12
**p.m** [1] - 100:5
**P.O** [1] - 2:15
**packet** [1] - 81:8
**Packet** [2] - 83:17, 104:14

**page** [3] - 40:2, 77:19, 104:2
**Page** [2] - 42:12, 81:11, 83:5
**PAGE** [2] - 104:8, 104:17
**PAGE/LINE** [1] - 102:4
**pages** [1] - 82:23
**Pages** [2] - 83:18, 104:14
**Parrow** [1] - 51:13
**PARROW** [1] - 51:13
**part** [11] - 10:11, 25:5, 25:7, 31:12, 39:18, 42:8, 71:21, 75:20, 80:13, 82:2, 95:2
**participated** [1] - 22:13
**particular** [1] - 36:4
**parties** [3] - 3:4, 32:22, 103:11
**partners** [1] - 9:11
**parts** [1] - 37:13
**party** [2] - 3:22, 3:23
**passed** [2] - 11:5, 45:6
**past** [1] - 8:20
**path** [2] - 7:9
**paths** [1] - 7:8
**PATTISON** [1] - 2:12
**pause** [2] - 22:7, 93:17
**PD** [10] - 21:19, 26:7, 29:15, 38:5, 39:18, 47:4, 67:16, 76:7, 78:14, 92:5
**peck** [3] - 4:21, 42:12, 74:17
**PECK** [80] - 2:7, 2:11, 15:9, 15:20, 16:8, 16:16, 16:23, 17:7, 18:6, 18:15, 20:5, 20:14, 22:6, 22:19, 22:22, 23:14, 24:10, 24:15, 26:23, 29:21, 31:4, 31:7, 31:18, 34:20, 35:8, 36:6, 36:8, 36:19, 36:23, 37:23, 39:11, 44:16, 45:14, 47:23, 48:12, 49:17, 49:21, 51:3, 56:13, 56:16, 57:5, 57:18, 58:14, 59:4, 60:2, 60:7, 61:8, 61:22, 62:9, 64:17, 64:20, 65:13, 66:8, 67:12, 69:13, 69:22, 71:6, 72:9, 72:11, 78:16, 82:18, 83:4, 83:12, 83:16, 85:10, 85:20, 86:20, 87:14, 88:14, 88:21, 89:15,

90:2, 90:7, 93:8, 93:12, 93:21, 94:9, 95:11, 95:22, 96:21
**peer** [1] - 81:9
**Penal** [1] - 11:23
**pendency** [4] - 21:15, 21:22, 74:21, 104:18
**pending** [4] - 4:10, 5:20, 25:12, 97:9
**People** [9] - 6:4, 21:19, 23:11, 23:22, 24:2, 24:7, 25:19, 27:5, 37:8
**people** [2] - 43:18, 56:6
**per** [7] - 17:13, 18:2, 19:11, 61:6, 61:20, 76:4, 78:12
**performance** [1] - 68:21
**performed** [1] - 19:11
**performs** [1] - 17:13
**perhaps** [1] - 11:23
**period** [3] - 21:23, 76:5, 104:19
**person** [6] - 10:22, 11:2, 30:3, 31:10, 33:15, 60:4
**personal** [1] - 50:7
**personally** [20] - 18:5, 18:9, 18:13, 18:17, 24:6, 24:7, 24:19, 24:22, 25:2, 25:7, 25:20, 26:19, 40:6, 47:19, 53:3, 60:17, 70:10, 94:22, 98:4, 98:7
**personnel** [4] - 13:20, 24:14, 24:16, 37:19
**perspective** [1] - 68:19
**pertains** [1] - 90:9
**Pg** [1] - 2:23
**phase** [2] - 31:20, 50:9
**phases** [1] - 31:15
**phone** [4] - 32:11, 33:23, 47:20, 98:23
**phonetic** [2] - 96:15, 97:3
**photos** [1] - 6:3
**phrase** [1] - 5:14
**physical** [2] - 11:18, 95:18
**physician** [2] - 12:22, 74:19
**physicians** [2] - 13:4, 13:6
**picture** [1] - 20:11
**Pine** [1] - 2:9
**pissed** [1] - 71:11

**place** [2] - 101:8, 103:9
**Plaintiff** [2] - 1:6, 2:4
**plans** [1] - 9:13
**player** [2] - 16:14, 60:6
**Plaza** [1] - 2:9
**plus** [3] - 8:20, 78:11, 91:4
**point** [6] - 12:5, 12:6, 19:9, 19:21, 50:5, 75:19
**police** [15] - 7:15, 20:9, 26:11, 28:19, 28:22, 33:16, 35:3, 39:6, 47:15, 49:23, 54:22, 66:23, 75:6, 75:14, 81:20
**Police** [6] - 26:12, 30:4, 52:3, 61:11, 62:4, 79:20
**policy** [5] - 13:19, 14:10, 15:7, 38:23, 75:7
**position** [2] - 79:11, 92:18
**possess** [1] - 35:19
**possession** [2] - 35:15, 37:9
**possibility** [1] - 34:16
**possible** [1] - 96:10
**post** [5] - 34:18, 53:11, 53:15, 54:16, 76:17
**post-arrest** [2] - 53:11, 54:16
**post-arrests** [1] - 53:15
**post-trial** [1] - 76:17
**postmortem** [5] - 67:4, 77:2, 80:19, 82:13, 85:18
**potential** [6] - 34:8, 48:18, 52:19, 58:9, 67:9, 88:12
**potentially** [3] - 48:15, 64:23, 65:19
**powerful** [1] - 57:10
**practice** [5] - 5:7, 8:21, 9:10, 9:12, 38:19, 77:6, 77:8, 83:22
**pre** [8] - 20:12, 50:8, 53:9, 53:12, 53:15, 53:17, 54:15
**pre-arrest** [3] - 53:9, 53:17, 54:15
**pre-arrests** [2] - 53:12, 53:15
**pre-existing** [1] - 20:12

**pre-indictment** [2] - 50:8, 54:15
**prejudice** [1] - 23:10
**premised** [1] - 20:3
**prep** [3] - 58:3, 69:3, 69:6
**preparation** [3] - 58:12, 58:16, 68:23
**prepare** [1] - 4:20
**present** [7] - 54:4, 54:6, 77:16, 82:14, 84:23, 85:5, 92:8
**presentation** [5] - 53:9, 53:11, 55:4, 58:2, 72:7
**presented** [11] - 50:5, 50:19, 54:4, 54:7, 55:6, 55:12, 55:16, 57:15, 76:10, 84:18, 95:2
**presenting** [1] - 73:6
**press** [4] - 42:18, 64:10, 77:11, 90:20
**presuming** [2] - 5:8, 80:14
**pretty** [2] - 11:22, 71:3
**printed** [1] - 6:10
**private** [5] - 5:7, 8:21, 36:13, 83:22, 89:13
**problem** [2] - 5:19, 32:10
**procedure** [1] - 55:2
**procedures** [1] - 81:15
**proceed** [2] - 22:21, 92:19
**proceeding** [1] - 56:8
**proceedings** [6] - 55:20, 62:14, 89:11, 93:16, 93:18, 103:12
**process** [1] - 59:15
**produced** [6] - 42:11, 74:17, 80:13, 80:15, 82:22, 83:8
**Professional** [4] - 1:18, 8:5, 12:20, 103:4
**professional** [4] - 16:13, 17:18, 17:22, 87:18
**professionalism** [1] - 87:3
**professionals** [3] - 65:17, 91:14, 91:19
**profile** [4] - 52:17, 52:20, 52:21, 58:8
**pronounced** [2] - 46:13, 75:22
**properly** [2] - 68:14, 68:15
**proposition** [1] - 65:5

prosecutable [1] - 59:12
prosecute [4] - 25:20, 26:17, 58:22, 59:5
prosecuted [6] - 26:15, 42:14, 68:6, 88:5, 88:17, 95:7
prosecuting [3] - 13:18, 21:23, 104:19
prosecution [13] - 4:12, 21:16, 21:22, 38:7, 63:21, 64:3, 89:6, 94:5, 94:18, 95:2, 96:6, 96:16, 104:19
prosecution's [1] - 63:19
prosecutions [1] - 56:14
prosecutor [4] - 8:4, 12:13, 55:17, 68:10
prosecutorial [1] - 65:20
protect [1] - 56:5
provide [3] - 14:19, 55:13, 75:14
provided [1] - 3:4
PUBLIC [1] - 101:21
public [4] - 4:4, 22:16, 87:7, 87:10
Public [4] - 1:19, 3:15, 3:16, 103:5
publicized [1] - 9:20
published [1] - 16:4
pull [1] - 16:11
pulled [3] - 81:16, 81:18, 81:19
pursuant [1] - 1:17
pursue [3] - 84:17, 85:8, 85:16
pursuing [1] - 42:17
put [2] - 39:14, 54:9

**Q**

qualifications [1] - 17:19
qualms [1] - 17:19
questioned [1] - 17:21
QUESTIONS [1] - 104:17
questions [6] - 4:11, 28:22, 33:4, 90:5, 98:2, 99:6
quick [1] - 62:10
quickly [1] - 11:10

**R**

raised [3] - 37:20, 71:12, 94:14
raising [1] - 71:10
range [1] - 82:20
rare [1] - 81:13
rather [1] - 20:10
reach [1] - 70:11
read [8] - 32:15, 45:15, 45:17, 45:20, 62:15, 62:17, 80:16, 101:7
readdress [1] - 37:2
ready [1] - 54:8
real [2] - 9:6, 38:14
really [1] - 33:14
reason [4] - 4:17, 17:23, 18:3, 87:2
reasons [4] - 43:22, 45:7, 85:6, 94:13
rebuttal [2] - 71:23, 72:7
receipt [2] - 92:9, 92:19
received [2] - 8:10, 39:5
recent [1] - 72:20
recently [1] - 60:22
Recess [2] - 62:13, 93:15
recollection [20] - 6:4, 22:8, 40:12, 40:17, 40:20, 41:15, 41:21, 43:15, 45:22, 46:5, 54:11, 70:17, 70:23, 72:22, 73:8, 82:11, 86:22, 96:19, 99:16
recommended [1] - 17:15
Record [1] - 16:12
record [13] - 5:9, 5:11, 16:16, 16:20, 39:12, 57:22, 72:14, 74:5, 74:7, 82:19, 84:14, 101:7
recorded [1] - 84:12
recording [1] - 21:11
records [8] - 22:7, 32:23, 34:2, 36:16, 37:8, 39:8, 89:5
redirect [2] - 70:19, 70:20
reelection [1] - 35:23
refer [1] - 74:11
reference [1] - 17:10
referenced [1] - 44:4
referring [5] - 16:10, 20:15, 22:17, 44:17, 97:6
refresh [5] - 6:3, 40:17, 40:19, 46:4, 72:21
refreshed [1] - 40:21
regard [10] - 18:21, 24:4, 37:20, 38:9, 46:9, 55:3, 60:14, 73:23, 81:7, 89:12
regards [7] - 49:7, 98:3, 98:8, 98:12, 98:16, 98:19, 99:2
Registered [2] - 1:18, 103:4
regret [1] - 42:16
relate [1] - 94:17
related [8] - 35:19, 37:21, 66:15, 81:12, 94:23, 95:7, 96:7, 103:10
relating [3] - 35:12, 48:21, 94:4
relationship [1] - 26:5
relevant [4] - 75:20, 78:7, 79:21, 97:10
remained [1] - 30:17
remember [8] - 41:6, 41:10, 41:11, 41:12, 41:18, 49:13, 57:9, 71:4
remembered [1] - 41:5
remotely [1] - 4:3
rendering [1] - 34:4
Rensselaer [12] - 2:8, 6:17, 7:22, 8:19, 9:23, 13:12, 13:15, 14:14, 14:17, 15:2, 29:16, 42:13
RENSSELAER [1] - 1:11
repeat [3] - 32:8, 32:14, 45:2
rephrase [1] - 5:15
report [1] - 38:14
reported [2] - 39:2, 42:19
reporter [2] - 5:11, 103:23
Reporter [1] - 1:19, 103:5
reporting [3] - 36:4, 87:8, 87:11
reports [1] - 30:16
represent [4] - 4:9, 12:23, 13:6, 27:18, 64:6
represented [3] - 16:19, 23:10, 65:18
representing [1] - 90:16
reproduction [1] - 103:22
REQUESTS [1] - 22:4
required [1] - 55:17
research [1] - 66:14
researching [1] - 82:11
reserve [3] - 27:7, 97:8, 99:18
reserved [2] - 3:8, 3:11
respect [1] - 55:8
response [4] - 46:21, 73:18, 74:3
responsibilities [1] - 13:15
result [1] - 82:9
resulted [4] - 57:16, 87:12, 88:19, 88:22
resulting [1] - 81:15
resumed [2] - 62:14, 93:16
resuscitate [3] - 75:21, 76:3, 95:19
resuscitating [1] - 34:12
resuscitation [8] - 34:18, 44:8, 59:19, 60:15, 62:6, 63:22, 65:8, 81:15
resuscitative [4] - 45:10, 67:2, 80:17, 81:4
retired [2] - 8:15, 67:17
retirement [1] - 12:12
review [3] - 33:22, 76:17, 81:9
reviewed [4] - 6:2, 6:7, 6:8, 76:16
revive [2] - 67:3, 80:17
RHIANNON [1] - 2:16
Rhiannon [1] - 97:17
rib [1] - 66:16
ribs [5] - 44:13, 45:10, 67:5, 67:6, 80:19
rights [5] - 3:4, 9:9, 54:14, 55:3, 55:8
road [1] - 99:23
robbery [2] - 11:10, 11:21
role [7] - 30:9, 30:12, 33:11, 33:18, 68:9, 73:13, 73:15
Ron [5] - 23:7, 26:5, 39:19, 39:22, 62:23
RONALD [1] - 1:9
Ronald [3] - 2:13, 97:19, 98:5
room [1] - 60:13
Rosario [8] - 63:9, 66:15, 66:20, 74:9, 80:14, 80:15, 81:8, 82:2
roughly [1] - 26:2
RPR [1] - 103:20
rules [1] - 5:4
RULING [1] - 22:4
ruling [3] - 22:18, 27:8, 37:2
rulings [1] - 97:9
run [1] - 9:13
rupture [1] - 82:8
Rutley [2] - 96:15, 97:3

**S**

SAMPSON [1] - 2:12
satisfied [2] - 17:16, 86:17
save [1] - 34:12
saving [1] - 78:9
saw [2] - 74:21, 96:2
school [7] - 7:3, 7:11, 7:12, 7:15, 7:16, 7:20
School [1] - 7:7
sealed [7] - 22:8, 22:10, 27:3, 36:13, 36:16, 55:7, 88:23
search [2] - 32:20, 33:21
second [5] - 25:7, 32:7, 32:9, 59:6, 93:21
Second [2] - 9:7, 9:9
section [1] - 66:23
see [4] - 17:2, 39:20, 89:20, 99:22
seeing [1] - 74:23
seek [4] - 53:17, 56:2, 56:11
seeking [1] - 70:6
seizure [1] - 45:9
semester [2] - 7:16, 7:17
send [4] - 36:2, 36:22, 37:4, 90:3
sending [1] - 89:12
sends [1] - 36:12
sense [1] - 43:18
sent [1] - 36:17
separate [1] - 27:5
separately [1] - 93:20
sequence [3] - 28:17, 53:10, 54:11
Sergeant [1] - 51:12
serious [1] - 25:9

Case 1:17-cv-01290-DJS Document 68-11 Filed 02/04/22 Page 117 of 117

# APPENDIX

**seriously** [1] - 56:19
**serve** [1] - 32:22
**served** [1] - 8:18
**service** [1] - 8:8
**services** [1] - 14:19
**serving** [2] - 6:15, 8:13
**set** [5] - 81:4, 94:14, 95:5, 103:9, 103:15
**setting** - 13:19
**seven** [2] - 10:13, 11:6
**several** [1] - 75:3
**severe** [2] - 81:10, 81:13
**severity** [1] - 25:13
**sex** [2] - 11:7, 11:17
**Sex** [1] - 11:4
**shall** [1] - 3:10
**share** [1] - 52:9
**shared** [1] - 35:4
**sheet** [2] - 29:13, 47:14
**SHEET** [2] - 102:2, 102:2
**shipped** [1] - 7:13
**shortly** [1] - 10:15
**show** [1] - 79:18
**showing** [2] - 43:13, 74:16
**side** [4] - 13:7, 57:16, 73:20, 96:7
**sign** [2] - 29:13, 47:14
**sign-in** [2] - 29:13, 47:14
**SIKIRICA** [1] - 1:11
**Sikirica** [30] - 2:8, 14:20, 14:22, 15:16, 16:6, 17:11, 17:17, 20:2, 20:8, 46:3, 47:16, 52:6, 59:2, 59:9, 59:10, 59:17, 63:15, 69:10, 70:5, 72:15, 72:23, 73:9, 73:15, 73:19, 84:2, 88:18, 92:10, 96:12, 96:14, 96:23
**Sikirica's** [3] - 17:21, 59:14, 69:17
**sit** [2] - 23:17, 91:11
**sitting** [1] - 80:4
**situation** [1] - 69:20
**six** [1] - 50:14
**size** [1] - 11:12
**skill** [1] - 103:8
**small** [1] - 93:3
**solo** [2] - 9:10, 9:12
**someone** [5] - 29:16, 42:19, 53:22, 68:10, 70:11
**sometime** [1] - 14:5

**sometimes** [8] - 5:14, 25:10, 32:2, 33:7, 43:9, 43:10, 43:11, 43:12
**somewhat** [1] - 34:3
**somewhere** [1] - 50:13
**sorry** [3] - 40:22, 46:14, 96:2
**sort** [2] - 73:7, 77:8
**sound** [2] - 29:9, 29:11
**source** [1] - 95:16
**sources** [2] - 90:15, 90:21
**south** [1] - 71:17
**speaking** [2] - 33:17, 55:10
**special** [4] - 10:19, 11:14, 11:15, 11:20
**specialized** [1] - 10:21
**specific** [1] - 25:8
**specifically** [2] - 20:21, 72:6
**specifics** [1] - 81:3
**speculative** [1] - 57:20
**SPENCER** [36] - 2:16, 20:16, 23:13, 26:22, 29:22, 34:21, 35:9, 37:22, 38:12, 39:10, 47:12, 48:11, 49:16, 58:13, 59:23, 60:8, 60:16, 62:7, 64:18, 64:21, 66:9, 67:13, 68:4, 78:17, 85:3, 85:21, 87:15, 92:13, 94:8, 94:21, 95:3, 95:21, 96:9, 97:16, 99:5, 104:4
**Spencer** [1] - 97:18
**spending** [1] - 8:12
**spent** [3] - 7:23, 8:6, 8:16
**spoken** [2] - 18:11, 18:21
**St** [1] - 61:14
**staff** [11] - 13:22, 25:4, 44:11, 52:9, 60:13, 61:3, 61:17, 64:14, 75:21, 77:13, 95:7
**stamp** [1] - 82:20
**standard** [2] - 33:3, 77:8
**standpoint** [2] - 37:19, 43:14
**start** [2] - 7:2, 72:16
**started** [5] - 7:10, 7:16, 7:21, 10:15, 15:4
**state** [2] - 12:11, 14:4

**STATE** [1] - 101:3
**State** [6] - 1:19, 8:4, 11:4, 12:16, 51:8, 103:5
**statement** [3] - 77:15, 86:16, 87:4
**statements** [3] - 27:3, 60:12, 84:3
**states** [1] - 46:6
**States** [1] - 7:11
**STATES** [1] - 1:4
**status** [1] - 58:18
**stay** [1] - 99:23
**steps** [1] - 40:7
**Stewart** [1] - 93:19
**still** [4] - 12:13, 17:16, 85:15, 86:17
**stipulated** [3] - 3:13, 3:18, 3:21
**STIPULATED** [1] - 3:3
**strategic** [2] - 53:22, 58:3
**strategically** [1] - 68:18
**Street** [2] - 2:15
**strengths** [1] - 43:7
**strenuously** [1] - 76:3
**strike** [2] - 3:7, 3:9
**strong** [7] - 42:16, 42:23, 43:23, 57:2, 57:7, 77:11, 94:12
**stronger** [1] - 43:8
**subject** [3] - 27:8, 63:2, 65:11
**submitted** [2] - 13:23, 33:22
**subpoena** [2] - 29:3
**subpoenas** [4] - 28:23, 32:3, 32:21, 33:23
**subsequent** [1] - 38:15
**substance** [5] - 45:5, 45:6, 64:11, 72:3, 72:6
**successful** [1] - 36:2
**sudden** [1] - 45:7
**suddenly** [1] - 11:6
**sufficient** [1] - 4:20
**suggest** [2] - 50:20, 80:6
**suggested** [1] - 59:2
**suggestions** [1] - 33:7
**Suite** [2] - 2:5, 2:9
**sum** [4] - 45:5, 64:11, 72:2, 72:6
**summarizes** [1] - 46:6
**summary** [2] - 39:9, 54:22
**superior** [1] - 54:23

**supervising** [1] - 69:8
**supervision** [1] - 103:23
**supervisor** [4] - 12:17, 12:19, 15:23, 30:14
**supervisory** [2] - 30:12, 35:7
**support** [1] - 84:19
**Supporting** [4] - 74:13, 78:3, 104:11, 104:13
**supporting** [7] - 74:18, 75:2, 75:4, 75:18, 77:20, 78:6, 81:2
**surely** [1] - 26:15
**surprise** [1] - 76:11
**surrendered** [1] - 21:4
**surrendering** [1] - 92:7
**surrogate** [1] - 9:7
**surrounding** [2] - 40:13, 65:7
**SUSAN** [2] - 103:4, 103:20
**Susan** [1] - 1:18
**suspect** [1] - 55:5
**Sworn** [1] - 101:18
**sworn** [1] - 3:14
**sworn/affirmed** [1] - 4:3
**system** [2] - 12:12, 37:8

## T

**talks** [1] - 78:8
**tape** [1] - 43:17
**tasked** [1] - 25:11
**Teas** [3] - 17:12, 17:14, 44:3
**teas** [1] - 83:20
**Teas'** [4] - 46:6, 71:21, 84:3, 94:15
**tech** [1] - 29:16
**technically** [1] - 27:15
**techniques** [5] - 67:2, 67:3, 80:17, 80:18, 81:4
**ten** [6] - 7:23, 10:2, 12:9, 25:23, 26:3, 93:13
**tenure** [2] - 24:22, 88:17
**term** [2] - 50:15, 77:2
**terms** [1] - 28:17
**testified** [12] - 4:4, 19:3, 26:15, 61:3, 61:16, 69:12, 70:2,

71:2, 71:20, 78:12, 86:22, 96:14
**testify** [4] - 4:17, 23:15, 24:15, 24:16, 55:9, 55:18, 75:17
**testifying** [1] - 91:5
**testimony** [22] - 3:7, 3:9, 20:3, 44:3, 46:7, 61:21, 62:2, 63:14, 65:9, 69:12, 70:20, 71:21, 76:2, 82:10, 84:3, 88:18, 91:7, 91:10, 94:7, 94:16, 100:4, 101:8
**thanking** [1] - 39:6
**THE** [2] - 97:14, 99:7, 100:2
**theme** [1] - 44:15
**themselves** [1] - 38:8
**theorized** [1] - 42:6
**theory** [4] - 34:7, 45:13, 45:18, 46:5
**thereafter** [1] - 10:15
**they've** [1] - 75:15
**Thomas** [2] - 19:18, 87:9
**thorough** [1] - 17:18
**thousand** [2] - 44:9, 44:10
**three** [4] - 8:15, 42:3, 61:16, 76:2
**throughout** [1] - 10:13
**Tim** [5] - 2:14, 37:13, 39:23, 97:20, 98:15
**TIM** [1] - 1:10
**timeline** [1] - 73:4
**TO** [3] - 104:2, 104:8, 104:17
**today** [15] - 4:11, 4:15, 4:18, 23:17, 47:10, 52:15, 85:17, 90:11, 90:17, 90:19, 90:23, 91:11, 94:5, 94:7, 99:22
**today's** [2] - 5:23, 86:5
**together** [1] - 29:14
**took** [3] - 35:21, 50:16, 56:19
**top** [2] - 25:21, 39:19
**total** [1] - 8:16
**touched** [1] - 61:2
**towards** [2] - 12:6, 12:7
**traditional** [1] - 43:17
**tragically** [1] - 45:6
**trail** [1] - 61:13
**trained** [1] - 10:22
**training** [2] - 7:14, 66:5
**transcript** [6] - 3:23,

76:16, 76:20,
101:10, 103:7,
103:21
**TRANSCRIPT** [2] -
102:2, 102:2
**Transcription** [1] -
93:19
**transcripts** [1] - 76:19
**transmitted** [1] - 52:9
**trauma** [1] - 81:12
**trial** [42] - 3:11, 6:18,
11:9, 19:5, 19:7,
19:18, 19:19, 19:20,
22:14, 30:18, 38:10,
44:3, 44:15, 45:5,
57:8, 61:2, 61:7,
61:21, 63:18, 64:6,
64:16, 65:10, 68:5,
68:7, 68:20, 69:3,
69:6, 73:15, 75:9,
76:2, 76:9, 76:15,
76:17, 76:21, 78:12,
78:15, 80:15, 81:2,
90:10, 90:20, 94:15
**trick** [1] - 85:13
**tried** [2] - 11:20, 64:10
**TROY** [1] - 1:9
**Troy** [21] - 2:13, 2:15,
16:12, 21:19, 26:7,
26:12, 29:15, 30:4,
38:5, 39:18, 47:4,
47:8, 47:15, 52:3,
61:11, 62:3, 67:16,
76:7, 78:14, 92:5,
97:18
**true** [3] - 36:5, 101:10,
103:7
**try** [4] - 40:17, 40:19,
70:21, 77:2
**trying** [2] - 73:4, 95:19
**Tufts** [2] - 7:5, 7:7
**turn** [1] - 48:16
**two** [7] - 37:11, 45:16,
45:19, 61:19, 62:21,
67:5, 74:9
**two-year-old** [1] -
61:19
**type** [10] - 11:21, 24:3,
26:4, 28:8, 29:11,
54:23, 55:20, 63:3,
66:3, 84:11
**types** [7] - 9:3, 12:14,
28:4, 32:3, 49:13,
75:4, 77:16
**typically** [2] - 31:5,
31:14

## U

**ultimately** [7] - 23:9,
50:4, 53:19, 54:2,
56:23, 57:11, 93:2
**unable** [1] - 75:22
**unaware** [1] - 76:14
**under** [13] - 25:23,
26:3, 27:22, 33:3,
40:4, 55:23, 63:16,
64:15, 64:19, 65:22,
78:20, 95:8, 103:22
**undergrad** [1] - 7:4
**understood** [1] - 5:16
**undertaking** [1] - 75:7
**unexplained** [2] - 45:7
**Union** [1] - 35:21
**unit** [1] - 78:8
**United** [1] - 7:11
**UNITED** [1] - 1:4
**units** [1] - 8:14
**universe** [3] - 92:17,
92:22, 93:2
**University** [1] - 7:5
**unless** [3] - 22:10,
48:14, 103:22
**unresponsive** [1] -
95:17
**unsealing** [1] - 22:11
**unsuccessful** [1] -
34:13
**up** [18] - 8:11, 11:14,
11:16, 16:11, 19:13,
34:7, 36:9, 42:2,
47:10, 60:21, 62:12,
70:22, 71:22, 72:19,
77:12, 81:2, 86:4,
90:11
**upset** [1] - 69:20
**upwards** [1] - 64:12

## V

**V.D** [10] - 4:13, 20:20,
31:17, 90:11, 95:16,
98:4, 98:9, 98:13,
98:16, 99:3
**V.D.'s** [2] - 48:22,
98:19
**vacation** [1] - 10:23
**vaguely** [1] - 6:14
**valid** [1] - 85:2
**variety** [2] - 10:3,
11:19
**various** [6] - 8:13,
14:19, 26:13, 32:3,
32:19, 32:22
**veracity** [2] - 26:21,

27:11
**verdict** [3] - 73:10,
87:13, 87:17
**versed** [1] - 86:18
**versus** [12] - 6:4,
21:19, 23:12, 23:22,
24:2, 24:7, 25:3,
25:20, 27:5, 34:16,
37:9, 54:16
**vet** [1] - 60:12
**via** [1] - 54:22
**viability** [2] - 37:21,
38:9
**viable** [2] - 82:13, 85:2
**victim** [3] - 13:21,
67:3, 80:18
**victims** [4] - 10:19,
11:14, 11:15, 11:20
**video** [8] - 32:23,
43:11, 43:13, 47:9,
47:10, 47:13, 59:18,
92:5
**videos** [1] - 6:3
**view** [1] - 94:19
**viewed** [1] - 48:7
**views** [1] - 84:2
**violence** [1] - 11:18
**virtually** [1] - 1:17
**voice** [2] - 71:10,
71:12
**volume** [1] - 19:10
**vouch** [1] - 80:7

## W

**wait** [1] - 22:6
**waived** [1] - 3:20
**waiver** [1] - 3:10
**walk** [1] - 6:22
**wall** [2] - 23:20, 24:4
**warrants** [2] - 32:20,
33:21
**Washington** [1] - 2:10
**watch** [1] - 68:20
**watched** [1] - 71:20
**weak** [1] - 77:11
**week** [3] - 45:16,
45:19, 71:2
**weeks** [2] - 7:14, 48:8
**weigh** [1] - 25:10
**welcome** [1] - 97:14
**West** [1] - 2:9
**whatsoever** [1] -
17:20
**WHEREOF** [1] -
103:15
**whole** [3] - 11:22,
83:3, 83:9
**wish** [1] - 55:14

**withdrawn** [6] - 21:16,
56:23, 63:19, 69:18,
82:4, 96:13
**witness** [6] - 3:14,
26:16, 58:3, 65:3,
65:21, 93:6
**WITNESS** [4] - 97:14,
99:7, 100:2, 103:15
**witnesses** [5] - 68:22,
69:4, 75:8, 75:15,
75:16
**word** [1] - 77:2
**words** [2] - 49:3, 71:3
**workloads** [1] - 25:13
**works** [1] - 51:8
**writing** [1] - 43:10
**written** [1] - 43:10
**wrongful** [1] - 56:14
**wrongfully** [2] - 56:6,
56:7
**wrote** [2] - 80:7, 80:12

## Y

**year** [11] - 6:9, 7:12,
8:7, 13:23, 17:14,
18:2, 19:6, 19:11,
35:21, 50:15, 61:19
**years** [14] - 7:23, 8:6,
8:12, 8:16, 8:19,
8:20, 10:2, 12:9,
17:17, 19:12, 26:7,
26:14, 43:6
**YORK** [2] - 1:4, 101:3
**York** [10] - 1:20, 2:5,
2:10, 2:15, 7:18, 8:4,
11:4, 51:8, 103:6
**yourself** [2] - 36:2,
36:18, 89:12
**yup** [1] - 90:4

## Z

**Zoom** [2] - 1:17, 32:13

103

1

2                   C E R T I F I C A T I O N

3

4          I, SUSAN FLORIO, Registered Professional

5   Reporter and Notary Public in and for the State of

6   New York, do hereby certify that the foregoing is a

7   true, complete and accurate transcript to the best

8   of my knowledge, skill and ability on the date and

9   place hereinbefore set forth.

10          I FURTHER CERTIFY that I am not related

11  to or employed by any of the parties to the action

12  in which the proceedings were taken, or any

13  attorney or counsel employed in this action, nor am

14  I financially interested in the case.

15          IN WITNESS WHEREOF, I have hereunto set

16  my hand this 22nd day of June, 2021.

17

18

19                    _Susan_____

20                    SUSAN FLORIO, RPR

21              (The foregoing certification of
                this transcript does not apply to any
22              reproduction of the same by any means
                unless under the direct control and/or
23              supervision of the certifying reporter.)

*Susan Florio, RPR - Professional Reporting Service - (518)887-2733*

# EXHIBIT "F"

1   UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF NEW YORK
2   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

3   MICHAEL DAVIS-GUIDER,

4                               Plaintiff,

5           - against -        CV:  1:17-cv-01290

6   CITY OF TROY, RONALD FOUNTAIN, Individually,
    DANIELLE COONRADT, Individually, CHARLES McDONALD,
7   Individually, TIM COLANERI, Individually,
    ADAM R. MASON, Individually, RENSSELAER COUNTY,
8   MICHAEL SIKIRICA, Individually, and JOEL ABELOVE,
    Individually,
9
                                Defendants.
10  - - - - - - - - - - - - - - - - - - - - - - - - - - - -

11

12          DEPOSITION of MICHAEL SIKIRICA, held on the 24th

13  day of May 2021, commencing at 9:33 a.m., via ZOOM,

14  before Jeanne O'Connell, Registered Professional

15  Reporter and Notary Public in and for the State of New

16  York.

17

18

19

20

21

22

23

Case 1:17-cv-01290-DJS Document 89-34 18-3331, Filed 07/04/22 Page 3 of 178

```
 1   APPEARANCES:

 2   Brett H. Klein, Esq.
     305 Broadway
 3   Suite 600
     New York, New York 10007
 4   Attorney for Plaintiff/Claimant

 5   Pattison Sampson Ginsberg & Griffin, PLLC
     22 First Street
 6   Troy, New York 12180
     By: Rhiannon I. Spencer, Esq.
 7   Attorneys for City of Troy, Ronald Fountain, Danielle
     Coonradt, Charles McDonald, Tim Colaneri and
 8   Adam R. Mason

 9   Bailey, Johnson & Peck, P.C.
     5 Pine West Plaza
10   Washington Avenue Extension
     Albany, New York 12205
11   By: Crystal R. Peck, Esq.
     Attorneys for Michael Sikirica and Joel Abelove

12

13

14

15

16

17

18

19

20

21

22

23
```

```
 1              S T I P U L A T I O N S
 2    It is hereby stipulated and agreed by
 3    and between the attorneys for the respective
 4    parties hereto that, this examination may be signed and
 5    sworn to before any Notary Public of the State of New
 6    York.
 7
 8    It is further stipulated and agreed that the filing and
 9    certification of the said examination shall be waived.
10
11    It is further stipulated and agreed that all objections
12    to questions, except as to form, shall be reserved for
13    the trial of this action.
14
15    It is further stipulated and agreed that there are no
16    objections to Notice of this Examination Before Trial
17    and the qualifications of the court reporter to take
18    this deposition and administer an oath or affirmation.
19
20
21
22
23
```

```
 1              MICHAEL SIKIRICA, after first having been
 2        duly sworn, was examined and testified as
 3        follows:
 4    EXAMINATION
 5    BY MR. KLEIN:
 6        Q.  Good morning, Dr. Sikirika.
 7            How are you today?
 8        A.  Very good.  Thank you.
 9        Q.  As you know, I'm Brett Klein.  We met before at
10    the Adrian Thomas case, correct?
11        A.  Yes.
12        Q.  I'm here today representing Michael Davis, and
13    we're here to ask you questions about your involvement
14    in the autopsy of ████████ in or around 2015 and your
15    testimony at trial in around 2016.
16            Do you understand that generally that's why we're
17    here today, to ask you questions about that?
18        A.  Yes.
19        Q.  Have you had sufficient time to prepare for
20    today's proceedings?
21        A.  Yes.
22        Q.  Ms. Peck is your attorney in the room with you?
23            She's representing you in this case?
```

1    A.   Yes.

2    Q.   And the rules of a deposition, just want to go

3  over them briefly.  Even if you know the answer, just

4  give me a couple of seconds of space before you answer

5  so the court reporter can get all the questions and

6  answers down separately, okay?

7    A.   Yes.

8    Q.   If you don't understand a question I ask, which

9  is going to be my fault and not yours, let me know and

10  I'll be happy to rephrase it, okay?

11   A.   Yes.

12   Q.   Otherwise, if you don't, and you go ahead and

13  answer a question, it will be assumed you understood the

14  question.

15        Further, if you need a break, let us know.  We'll

16  just ask that you answer any pending question before we

17  take a break, okay?

18   A.   All right.

19   Q.   Any reason why you can't testify fully and

20  accurately today?

21   A.   No.

22   Q.   In connection with today's deposition, did you

23  review documents, recordings, videos or anything else,

6

1   to refresh your recollection of the case involving ▮▮▮▮

2   ▮▮▮▮?

3       A.   Yes.

4       Q.   What have you reviewed?

5       A.   I reviewed my autopsy report, the police report,

6   records from Samaritan Hospital, records from a

7   pediatric facility where ▮▮▮ was seen in New York

8   City, testimony from the grand jury, testimony at trial,

9   and testimony by Dr. Teas, who testified for the defense

10  at the trial, and my original notes from the time of the

11  autopsy.

12      Q.   Are all of these items, other than the testimony

13  of Dr. Teas, are they part of your file?  Or is Dr.

14  Teas' testimony part of your file as well?

15      A.   It was given to me by Ms. Peck, who provided

16  copies of my testimony, the grand jury testimony, and

17  Dr. Teas' testimony.

18      Q.   Was everything else that you looked at other than

19  the testimonies part of your file, or is there anything

20  that was not part of your file that was additional that

21  you looked at?

22          Just so I know where it was obtained.

23      A.   No.  There was no additional material.

 1      Q.   In Dr. Teas' testimony, she talked about

 2  microscopic studies that she performed that sounded like

 3  she did that that maybe you did not; is that fair, that

 4  she did some microscopic studies for trial?

 5      A.   I can explain that.

 6           I did the first microscopic examination of the

 7  tissues that I obtained at the autopsy, and she

 8  requested recuts of the blocks that those slides were

 9  made from.

10           So, she got her own set of slides, a duplicate of

11  mine, that she reviewed at her discretion.

12      Q.   But she showed -- at least her testimony that she

13  discussed blowups, you know, certain views that she took

14  under the microscope.

15           Does that sound right that she had her own

16  exhibits for trial?

17      A.   Yes.  She had some exhibits from other cases that

18  she had worked on, but she did not have any more

19  additional tissues or specimens from ████.

20      Q.   But, at trial, did she apparently enlarge or zoom

21  in on certain parts of the slides in a way that she

22  distinguished from the way you did it?

23           I'm just trying to ascertain whether she had

1    exhibits from this case that were enlarged or blown up

2    or looked different than the one that you had originally

3    used.

4        A.   Yes.  She had enlargements for the jury to

5    understand the histology, yes.

6        Q.   So, just in terms of the documents, not getting

7    into the substance yet, have you seen those as part of

8    your preparation for this deposition?

9        A.   No.

10       Q.   Dr. Sikirika, you testified in the Thomas case.

11            It was September 5th and 6th of 2019.  Does that

12   sound right to you?

13       A.   The Thomas case?

14       Q.   Yeah, the date of your deposition?

15       A.   We're talking about ███████████.

16       Q.   Do you recall testifying at a deposition that

17   went over two days on September 5th and 6th of 2019 in

18   the Thomas case?

19       A.   Yes, I recall that.

20       Q.   So, because we have a very extensive transcript

21   of your -- not only your testimony in that case but

22   information about your background, I'm not going to

23   revisit each and every thing because we have a record of

1   your testimony from there.

2           MS. PECK:  Brett, if I can just interject

3       one second.

4           The only concerns I have with this is

5       that, if you're going to try to rely on his

6       testimony regarding an autopsy he did in the

7       Thomas case, without having that being released

8       properly, I think there could be concerns.

9           I don't have necessarily a problem

10      relying on his background information.

11          MR. KLEIN:  I'm talking about background

12      for now.  If we determine that other issue,

13      Crystal, we'll issue a subpoena or we'll deal

14      with that in terms of discovery with the judge.

15      But I'm talking about his background, so we don't

16      have to spend an hour today on his CV and his

17      experience.

18          MS. PECK:  That's not a problem.  That's

19      fine.  I don't have a problem with that.

20  BY MR. KLEIN:

21    Q.  So, Dr. Sikirika, with that frame of reference,

22  that date of September 5th and 6th of 2019, just wanted

23  to ask you about from then up until today what have you

1    been doing, your duties and responsibilities and

2    workload, what have they been like since that time, and

3    so forth.

4         Can you walk us through?  Have you remained the

5    medical examiner for Rensselaer County and also contract

6    with other counties as you had at that time?

7    A.   Yes.  I am still the Rensselaer County ME.  I

8    have terminated my employment as an Albany County

9    coroner's pathologist, but I've also extended my

10   services up north.

11        I now cover Warren and Washington County

12   exclusively.  I no longer cover Albany County.  So, that

13   is about the only major change.

14   Q.   Why did you terminate your position with Albany

15   County?

16   A.   It's a complicated issue that deals with the need

17   for this region to establish a medical examiner's

18   office, and I felt frustrated that Albany, Schenectady

19   and Rensselaer are not basically coming on board to

20   assure we have good services in the future.

21   Q.   In what way weren't they coming on board to

22   ensure good services for the future?

23   A.   They led me to believe that they were interested

Case 1:17-cv-01290-DJS   Document 141-1   Filed 02/04/22   Page 131 of 178

1    in establishing a regional medical examiner's office

2    from a tri-county perspective, which I think is very

3    necessary.  There's enough of a population to do that

4    here.

5           But politics, I guess, were obstructive to them,

6    and over time I became frustrated.  I spent time working

7    on the idea.  I approached the state police about some

8    real estate that could be used.

9           They decided they didn't even want to do a

10   preliminary survey, which would probably cost them a few

11   thousand dollars, so I eventually became frustrated and

12   just decided I didn't want to deal with Albany County

13   anymore.

14   Q.  You still deal with Rensselaer?

15   A.  Yes, I do.

16   Q.  Have you worked with Schenectady?  I don't

17   recall.

18   A.  Yes.  I do work with Schenectady on occasion.  I

19   cover their homicides and any cases that are of a

20   suspicious nature.

21   Q.  So, why did you terminate Albany but not

22   Schenectady or Rensselaer, given your frustrations that

23   you indicated previously?

1    A.  Well, Albany, being the biggest county, had to

2    take the lead, and the other counties would follow

3    along.  I had support from Rensselaer County and I had

4    support from Schenectady County, but Albany County, for

5    reasons unknown to me, decided they wanted me to avoid

6    the topic.

7    Q.  Were you the medical examiner for Albany County

8    or do they have a coroner separately?

9        How is it set up there?

10    A.  Albany County has a coroner system, and I was one

11    of the physicians, pathologists, providing autopsy

12    services for that county.

13        Schenectady has a medical examiner system, and

14    I'm also the medical examiner under somewhat part-time

15    basis for Schenectady.

16    Q.  So, did you leave Albany, in essence, in an act

17    of protest?

18    A.  Yes.

19    Q.  I know you mentioned previously that you had left

20    Ulster or you were resigning from Ulster or

21    discontinuing that contract.

22        Do you recall that?

23    A.  Yes.

Case 1:17-cv-08290-DJS Document 145-4 Filed 02/04/22 Page 133 of 178

1    Q.  Did that happen?  Did you leave?  Did you stop

2  working with Ulster?

3    A.  Yes, I did.  I did stop working with Ulster, and

4  that was left in good terms.  I simply decided it was

5  just too much driving to go back and forth, similar to

6  what I had done in Oneida County.

7       I used to cover Oneida County way out to Utica,

8  but it was a two-hour trip and it was starting to wear

9  on me.  Similar to Ulster County, which was a little

10  closer, but still quite a trip.

11    Q.  You say you left there on good terms, Ulster.

12       Albany it's fair to characterize as not great --

13  not good terms, correct?

14    A.  Well, I gave them proper notice, several month

15  notice, but I think they realized that I was leaving in

16  a protest.

17    Q.  Have you left any other work with any other

18  county or municipality under terms that you can say were

19  not good terms either because you were upset or they

20  took issue with any of your conduct?

21       MS. SPENCER:  Objection to form.

22  BY MR. KLEIN:

23    Q.  In other words, have you discontinued working

1    with any other municipality or entity or has an entity

2    discontinued work with you for reasons that were not

3    mutual?

4        A.   No entity has discontinued any work with me.   No

5    entity has.  I did disconnect from Oneida County many

6    years ago, partially because of the drive and partially

7    because they decided to replace their coroners, who I

8    worked for several years with and had a good

9    relationship with, and for political reasons they

10   decided that they didn't like coroners anymore.  So, I

11   left when the coroners did.

12       Q.   At the time of the Michael Davis trial in

13   2015-2016, do you recall testifying that you were

14   performing approximately 600 autopsies a year?

15       A.   Yes.

16       Q.   And that the NAME recommended amount per year was

17   250; is that fair?

18       A.   Yes.

19       Q.   And that at the ceiling they didn't want you

20   doing more than 360 per year?

21       A.   Correct.

22       Q.   I believe, as of 2019, when you were deposed in

23   the Thomas deposition, you were still doing several

1    hundred a year, approximately; is that fair?

2        A.   Yes.

3        Q.   From September of 2019 up until the present, what

4    volume of autopsies have you been doing per year?

5        A.   It would be still around the number of 600.

6        Q.   Did the numbers spike or get impacted in any

7    material way due to Covid, or did you find your caseload

8    last year was comparable to other years?

9        A.   The caseload did not really spike, but different

10   cases started to be more frequent due to Covid, but

11   there was no real increase in the actual numbers.

12       Q.   And currently, what counties are you employed by

13   or contract with to do autopsies?

14       A.   Well, I have full coverage of Rensselaer County,

15   Herkimer County, Saratoga County, Washington County and

16   Warren County, and then I also provide services as

17   needed for a number of other counties.

18       Q.   Including which ones?

19       A.   It would be Montgomery, Fulton, Hamilton,

20   Schoharie, Essex, St. Lawrence, Franklin and Clinton.

21       Q.   Are there any municipalities, state or federal

22   entities, that you work with as well?

23       A.   No.

Case 1:17-cv-08290-DJS Document 141-1 Filed 02/04/22 Page 179 of 178

1    Q.  Now, with regard to the number of autopsies per

2    year recommended under NAME guidelines, has that number

3    changed, to your knowledge, since we've spoken to you in

4    2019?

5         Have the recommendations gone up or down or have

6    they remained static?

7              MS. PECK:  Objection.  Brent, just to

8         clarify for the record, can we just put out there

9         what NAME is.

10   BY MR. KLEIN:

11   Q.  National Association of Medical Examiners, is

12   that the board that sets the recommendations, Dr.

13   Sikirika?

14   A.  Yes.

15   Q.  Are you a member of the National Association of

16   Medical Examiners still?

17   A.  Yes.

18   Q.  You were back in 2019 as well, correct?

19   A.  Yes.

20   Q.  Do you hold any positions, offices, titles or

21   anything else with NAME, or are you just a subscribing,

22   accredited member?

23   A.  I'm just an associate member.

Case 1:17-cv-01290-DJS Document 112-4 Filed 02/04/22 Page 137 of 178

1    Q.  What does that mean?

2        Do you pay dues each year and you're an associate

3  member?  Do you have to do anything else, like show that

4  you're licensed or submit any other credentials to them,

5  or is it just paying dues?

6    A.  No.  You have to apply with your license

7  initially and your certification, but now it's simply a

8  question of paying your dues.

9    Q.  So, we'll refer to the National Association of

10  Medical Examiners as NAME.

11        Is that okay for today?

12    A.  Yes.

13    Q.  Have the NAME recommendations with regard to --

14  withdrawn.

15        This guideline of 250 autopsies per year with a

16  ceiling of 360, are these guidelines or recommendations?

17    A.  Well, they're guidelines for accreditation of

18  facilities.

19        So, a facility cannot employ a pathologist who

20  does more than that number and still keep their

21  accreditation if they're NAME accredited.

22    Q.  So, how do the facilities that you contract with

23  get around that, or are they not facilities, they're

1  municipalities or counties?

2      Can you explain how that works?

3    A.  Yes.  I don't work actually at any medical

4  examiner's offices.  I work in different hospitals using

5  their morgue facilities.

6      That was the issue with Albany, that I really

7  wanted to spearhead an effort to build the facility in

8  Albany that could be NAME accredited eventually, and

9  hire a sufficient number of pathologists to meet the

10  accreditation, but that wasn't forthcoming, so I left.

11    Q.  Are there any ramifications for professionals

12  like yourself for professionally, whether from NAME or

13  any other entity, for routine, you know, systematically

14  engaging in autopsies that greatly exceed the

15  recommended amount under NAME guidelines?

16    A.  No.

17    Q.  Have you received any critique, pushback or

18  criticism of any sort from any professional hospital,

19  organization, county employer or anyone else, about the

20  number of autopsies you do per year as it relates to

21  your ability to effectively do your job?

22          MS. PECK:  Objection.

23          THE WITNESS:  No.

1  BY MR. KLEIN:

2     Q.  You were cross-examined about it at trial in the

3  Davis case, correct?

4     A.  Correct.

5     Q.  I think in the Thomas case as well, correct?

6     A.  Yes.

7     Q.  So, other than being -- so, have you been

8  cross-examined about it in the other cases that you can

9  recall or just those two?

10    A.  Multiple times.

11    Q.  So, it's been an issue raised at trial, but

12 beyond that it hasn't been raised -- it hasn't impacted

13 your employment at all.

14    A.  Correct.

15    Q.  In your opinion -- you've been doing this for how

16 many years, sir?  How long have you been a forensic

17 pathologist?

18    A.  Since it would be early '90s, early '90s.

19    Q.  You've done well over 10,000 autopsies, right,

20 and maybe significantly more?

21    A.  Yes.

22    Q.  In your opinion, looking back and looking at

23 these issues you have with Albany and wanting to have a

Case 1:17-cv-08290-DJS Document 114-4 Filed 02/04/22 Page 219 of 178

1  full staff of MEs, can you state now that the number of

2  autopsies you've done per year has impacted your ability

3  to do your job to the fullest?

4        In other words, has it impacted your ability to

5  put enough time and focus into each autopsy given you're

6  doing two or three a day.

7             MS. PECK:  Object to form.

8             THE WITNESS:  It has not affected the

9  quality of my work.  The only thing it has affected is

10  the speed of getting out my reports.

11  BY MR. KLEIN:

12     Q.  I think you said your personal life, you

13  sacrificed personal time for this as well, correct?

14     A.  Yes.  I have no personal life.

15     Q.  So, have there been any changes in the NAME

16  guidelines or procedures since we last spoke in

17  September 2019 that you're aware of?

18     A.  Not that I am aware of, Mr. Klein, no.

19     Q.  In Thomas and in this case there were district

20  attorney and police officers attending your autopsy; is

21  that correct?

22     A.  Yes.

23     Q.  So this idea of law enforcement attending an

1    autopsy, have any of the -- are there any guidelines or

2    rules or regulations or best practices that govern that?

3        A.   Not to my knowledge.  They attend in some places

4    and some places they don't.

5        Q.   Have you read any peer review articles from

6    colleagues or, you know, in your field who have said

7    that it's not proper or not recommended to have law

8    enforcement influence or give a narrative before you

9    objectively conduct your autopsy?

10              MS. SPENCER:  Object to form.

11   BY MR. KLEIN:

12       Q.   In sum and substance.

13       A.   The National Academy of Sciences said that the

14   medical examiners should not be influenced by police or

15   prosecution.  That's true.  I've read that in the past.

16   But influence and attending are two different things.

17       Q.   Has there been any evolution of that -- other

18   than National Academy of Science, has there been any

19   evolution of that in terms of rules, guidelines or best

20   practices in the field, or not to your knowledge, in the

21   last couple of years?

22       A.   Not on influence.

23       Q.   Now, your grand jury testimony in this case, that

```
 1   was on September 29th of 2015.  Does that date sound

 2   about right?

 3         I don't know if you have it in front of you, but

 4   did you testify in the grand jury in September of 2015?

 5     A.  Yes.

 6     Q.  You've had a chance to review it either today or

 7   yesterday, recent days?

 8     A.  Yes.

 9     Q.  Did you tell the truth as to all matters in the

10   grand jury?

11     A.  Yes.

12     Q.  Now, the prosecution turned over some of your

13   grand jury testimony as Brady material to Mr. Davis's

14   attorneys.

15         Were you aware of that?

16     A.  I wasn't aware of that, no.

17     Q.  Did anyone from the prosecution ever discuss with

18   you that they felt some of your testimony may have been

19   exculpatory?

20     A.  No.

21     Q.  Now, your trial testimony was on -- just getting

22   the date -- August 22nd of 2016.

23         You've had a chance to review it in full?
```

1    A.  Yes.

2    Q.  Did you tell the truth as to all matters in that

3 court?

4    A.  Yes.

5    Q.  Looking back at your testimony now, having

6 considered Dr. Teas' testimony and anything else, is

7 there anything about your opinions and otherwise about

8 your testimony that you would wish to change or amend in

9 this case?

10   A.  Not that I could see at this point, no.

11   Q.  Has there been any -- have you done any research

12 on postmortem liver lacerations or CPR injuries,

13 postmortem CPR injuries, or are you aware of any peer

14 review articles or authoritative treatises on this issue

15 that have come out since this trial?

16   A.  No.

17   Q.  Have you attempted to search for any or you just

18 don't know either way?

19   A.  I have searched for those and I haven't found

20 any.

21   Q.  You have seen some articles on hemorrhage from

22 hepatic lacerations after CPR.  Have you seen articles

23 about issues like that?

1    A.  Yes.

2    Q.  Have any of the articles or treatises or peer

3  review articles that you've read, have any of them

4  impacted or changed your review of this case in any way?

5    A.  No.

6    Q.  Can you point to any that support your opinions

7  in this case?

8            MS. SPENCER:  Object to form.

9            MS. PECK:  Objection to form.

10           THE WITNESS:  Yes.  Offhand, I can

11    remember one paper from Wake Forest University.

12    It was probably about 2010.  They looked at close

13    to 400 children who had undergone CPR, and none

14    of them had any significant injuries.

15        The only injuries that tended to occur

16    were injuries to the airway around the mouth.

17    None of them died.  None of them had major liver

18    lacerations.

19  BY MR. KLEIN:

20    Q.  Was that an article you were aware of as of the

21  time of the Michael Davis trial in 2016, or is that

22  something you've become aware of since the trial?

23    A.  I was aware of that at the trial.

1    Q.   Other than that Wake Forest article, are there

2    any others that either you have in your file noted or

3    that come to mind that you believe support your

4    positions in this case?

5    A.   Not offhand I can remember.

6              MR. KLEIN:  I'm going to ask that we mark

7         your file, at least as I believe I received it.

8         We'll call it Sikirika 1, and I'll share the

9         screen and then I'll send it to the court

10        reporter after I guess to mark it.

11             (Sikirika Exhibit 1 marked for

12        identification.)

13   Q.   Let me ask you this, Dr. Sikirika:  In this case,

14   ███████████ died in February of 2016, about February

15   26th, correct?

16   A.   Yes.

17   Q.   You did an autopsy on February 27th.

18        Does that sound right?

19   A.   Yes.

20   Q.   There was subsequent meetings with

21   representatives from the Troy PD and someone from the

22   DA's office sometime around mid-March.

23        Do you recall that?

Case 1:17-cv-08290-DJS Document 141-3 Filed 02/04/22 Page 27 of 178

```
 1      A.   I think it was early March, yes.

 2      Q.   Early March.

 3           And then was the next thing you issued your

 4   report sometime in August or so?

 5      A.   Yes.

 6      Q.   And then you, thereafter, met with the DA's

 7   office after that?

 8      A.   Yes.

 9      Q.   And then you testified in the grand jury?

10      A.   Correct.

11      Q.   And then you testified at trial?

12      A.   Correct.

13      Q.   Presumably, you met with the DA to prepare for

14   trial at least once or a few times, correct?

15           MS. PECK:  Objection to form.

16           You can answer.

17           THE WITNESS:  Yes.

18   BY MR. KLEIN:

19      Q.   Have I missed any significant meetings in this

20   case, or events?

21      A.   I did meet with the defense attorneys as well,

22   yes.

23      Q.   And was it just -- how many defense attorneys
```

1    were there?

2        A.   I can't recall.  At least one.

3        Q.   Would you have taken notes at a meeting like that

4    or just no notes?

5        A.   No.  It was an informal meeting.

6        Q.   And we'll go through the meetings, but have I

7    covered all of the events that you can recall in this

8    case in terms of key events in this case that you were

9    involved in?

10       A.   Yes.

11       Q.   Now, when you testified at trial in 2016, did you

12   witness or have an opportunity to read the testimony of

13   any other witnesses during the trial, either after they

14   testified or did you witness their testimony in

15   realtime?

16       A.   I witnessed the testimony of Dr. Teas in

17   realtime, yes.

18       Q.   So, did reviewing the testimony transcript in

19   recent days, did that refresh your recollection of what

20   you observed her testify to in court?

21       A.   Yes.

22       Q.   Was there any discussion of you going up to do

23   rebuttal testimony after Dr. Teas testified?

Case 1:17-cv-08290-DLS Document 141-1 Filed 02/04/22 Page 290 of 178

1    A.   Yes, there was.

2    Q.   Was a determination made that you would not do

3    that?

4    A.   Well, the judge didn't allow rebuttal.

5    Q.   Is it your understanding that the prosecution

6    sought permission to do it but the judge wouldn't allow

7    it?

8    A.   Correct.

9    Q.   Do you recall what the subject of your rebuttal

10   was going to be?

11   A.   It would be her testimony.

12   Q.   Anything in particular, though, that you recall

13   that was point or points that you planned to address on

14   rebuttal?

15   A.   Yes.

16   Q.   Can you state them now?

17   A.   The idea that the histology would be an important

18   factor in determining the origin of these liver

19   lacerations and the timing of them.

20        The idea that the child was suffering from

21   diabetes, was undiagnosed.  They were all issues that I

22   was prepared to contend with.

23   Q.   The histology being important, how would you have

Case 1:17-cv-08290-DJS-ene Document 34-1 Filed 02/04/22 Page 307 of 178

1    addressed that?

2    A.  I think Dr. Teas made assumptions that the

3    microscopic appearance of the tissues would indicate

4    that they were postmortem as opposed to antemortem, and

5    I think that was flawed logic.  I think that was never

6    been established in any literature and she never

7    published any discovery of that process or that

8    knowledge by herself.  I think it was faulty science.

9         In regards to the ability to look at the

10   microscopic slides and say that you could differentiate

11   when that occurred to that degree of certainty is very

12   flawed, and I think that's a misinterpretation of

13   science.

14   Q.  That has to do with the histology aspect of it?

15   A.  Yes.

16   Q.  What about the idea that          may have been

17   suffering from diabetes, you mentioned that.

18        What did Dr. Teas opine about that and what was

19   your rebuttal -- what would it have been if you were

20   permitted to give it?

21   A.  Well, that Dr. Teas said the child could have

22   suffered from undiagnosed diabetes when the child was

23   totally asymptomatic for the symptoms of diabetes.

```
1              She had no polyuria, no polydipsia, no
2       polyphagia.  Those are signs of diabetes.
3              And when the child had made it to the emergency
4       room, a fingerstick glucose was not indicative of any
5       sort of diabetic reaction.
6    Q.  She had a point about that, though, that you
7       could tell from the fluid in the eye but that other
8       blood inter stick would not have been accurate at that
9       time.
10             Do you recall that point that she made about
11      that?
12                  MS. PECK:  Objection to form.
13                  THE WITNESS:  Yes.  She made a legitimate
14        point that diabetes can be detected in the
15        vitreous fluid if the person is hyperglycemic, if
16        their sugar's very high.  Typically it's above
17        500 that we would expect in a diabetic to die
18        from this in a process called ketoacidosis.
19             But this child had nothing close to that
20        level in the bloodstream, and she had a glucose
21        that was actually diminished, most likely due to
22        the postmortem changes that occurred in the blood
23        after death.  Glucose tends to fall.  There was
```

1          no evidence of any hyperglycemia.

2     BY MR. KLEIN:

3          Q.   Other than the histology point, the undiagnosed

4     diabetes point, were there any other points that you

5     planned or hoped or would have liked to have rebutted if

6     you had the opportunity to?

7                    MS. SPENCER:  Object to form.

8                    THE WITNESS:  Well, the idea that the

9          child suffered from death due to a seizure is

10         also erroneous.  Children, unless they have some

11         physiological defect, unless there is a lesion in

12         the brain, unless there is something that causes

13         a mass effect in the brain, they do not die from

14         seizures when you're a child.  It just doesn't

15         happen.

16    BY MR. KLEIN:

17         Q.   Any other points that you would have liked to

18    have rebutted had you been given the opportunity to do

19    so?

20         A.   That's all I can think of right now.

21         Q.   If you think of any others, let me know.

22         A.   Yeah.

23         Q.   Do you have an opinion about Dr. Teas otherwise?

1      Did you know of her before this?  Have you had

2  any dealings with her personally in your career?

3      A.  No, never.  I never met her before.

4      Q.  Do you have any opinion about her in terms of

5  respect for her as a colleague?  Have you ever formed an

6  opinion about her work?

7      A.  I can only address what she presented at the time

8  of the trial.  And that was, in my opinion, substandard.

9      Q.  Have you dealt with her in the context of your

10  dealings with NAME, or read about her work in any other

11  cases, or have colleagues that have dealt with her

12  before, other than your dealings with her in this case?

13      A.  No.

14      Q.  Did you ever have a chance to speak with her

15  about her opinions in this case since the time of trial

16  up until today?

17      A.  No.

18          MR. KLEIN:  I'm now going to share a

19       screen.  Hopefully I'll do this right.

20      Q.  Do you see, Dr. Sikirika, what's been marked as

21  Sikirika 1?  It's 121-page document, starting with Bates

22  number 1585 at the bottom and it goes consecutively

23  through Bates number 1705.

1          Do you see the screen?  Do you see these

2     documents?

3     A.   Yes.

4     Q.   Do I need to enlarge it or make it smaller?

5          Can you see it clearly?

6     A.   No.  It represents my case file.

7     Q.   Do you see any other parts of my screen or do you

8     just see this one document?

9     A.   I see -- right now I see a pink form from Neogen

10    Corporation, which is a part of the receipt that I sent.

11    Q.   And the next page is a record of court appearance

12    made by Michael Sikirica.

13         Is this part of your file?

14    A.   Yes.

15    Q.   So, I just want to know, generally, if this

16    appears to be your complete file.  Can I just flip

17    through it and you can let me know if it appears to be

18    your file and then we'll stop at certain pages?

19    A.   Yes.

20    Q.   I'm just going to slowly scroll through it.

21         MS. PECK:  Brett, I think we may be able

22       to give him remote control of it to allow him to

23       go through it once to make sure it's all there.

```
 1              MR. KLEIN:  Let's do that.

 2              (Recess taken.)

 3  BY MR. KLEIN:

 4     Q.   That appears to be all your file notes, your

 5  report, etc., correct?

 6     A.   Yes.

 7     Q.   Other than with the exception of the photos that

 8  have some notations on them that we'll hopefully be able

 9  to see today?

10              MS. PECK:  Yes.  With the exception of

11     the CDs that we discussed this morning.

12              MR. KLEIN:  Got it.

13  BY MR. KLEIN:

14     Q.   So, Dr. Sikirika, I just want to walk through

15  some key parts of your file that we want to ask you

16  about it and try to get you out of here at a decent

17  time.

18          This date appeared on page 1586.  Is this your

19  grand jury appearance?

20     A.   Yes.

21     Q.   It says below at the bottom "meeting 4/10/16" or

22  is that some other date?

23     A.   It seems to say "meeting 8/1/16".
```

 1     Q.  Well, above that, in the middle of the sheet,

 2  says, "20 minutes 9 a.m. DA office with public defender

 3  and ADA Hall"?

 4     A.  Yes.

 5     Q.  Is that a prior meeting?

 6     A.  That is -- I think that is the meeting, yes.

 7     Q.  You believe that's the meeting you had with the

 8  public defender?

 9     A.  Yes.

10     Q.  And then it says there's another meeting at the

11  bottom on 8/1/16.

12     A.  Yes.

13     Q.  Do you recall who that was with?

14     A.  It might be listed in one of my meeting sheets,

15  but I don't recall that.

16     Q.  Now, starting on page 1587 through 1597, is this

17  your autopsy report for ████████?

18     A.  Yes.  Not including the other studies, correct.

19     Q.  Are the other studies considered part of the

20  report, such as the lab reports?

21     A.  Yes.

22     Q.  So 1598, this page, PerkinElmer Genetics.

23         Is this part of the autopsy?

1    A.  It would be part of the autopsy report, yes.

2    Q.  The next page, 1599, is this part of the autopsy?

3    A.  What does that page say?

4    Q.  It's also PerkinElmer Genetics.

5        Looks like a report --

6    A.  Yeah.  That would be the report from the

7 metabolic screen that I sent out.

8    Q.  And the next page is a skeletal survey.

9        Is that part of the autopsy?

10    A.  Yes.

11    Q.  And then the next page to -- next three pages,

12 are these part of the autopsy from the Albany Medical

13 Center?

14    A.  Yes.

15    Q.  Cultures?

16    A.  Blood and viral cultures, yes.

17    Q.  That's pages 1601, 1602, 1603.

18        Then, 1604, is this part of the autopsy, this

19 growth chart?

20    A.  Yes.

21    Q.  1605, that's part of the autopsy?

22    A.  Yes.

23    Q.  And then we have a forensic toxicology report,

1    1606, is that part of the autopsy?

2        A.   Yes.

3        Q.   And then we have a sign-in sheet, so this would

4    not be part of the autopsy.

5        A.   Correct.

6        Q.   So the autopsy, is the last page of the autopsy

7    inclusive of reports, this page, forensic toxicology

8    report, page 1606?

9        A.   Yes.

10       Q.   Are the photos considered part of the autopsy or

11   those are just part of your file but technically not

12   part of the report?

13       A.   The photos are not given out as a part of the

14   report, correct.

15       Q.   So, I believe that, as of February 27, 2015, you

16   listed the cause of death as pending until you completed

17   your review and analysis and issued a report, correct?

18       A.   Yes.

19       Q.   So, can you just describe for the record what

20   were the circumstances here that led to the district

21   attorney and Troy PD officers being present at the

22   autopsy on the 27th before there was any sense of

23   whether there was criminality or not?

1          MS. PECK:  Objection to form.

2          MS. SPENCER:  Object to form.

3          THE WITNESS:  I really can't speak for

4     them, but it's not uncommon, in a childhood death

5     of any sort, that the police are going to be

6     present.

7   BY MR. KLEIN:

8     Q.  Well, did anyone from Troy PD or the DA's office

9   inform you that they were suspicious of this death as

10  being -- rising to the level of criminal rather than

11  accidental or some other unexplained cause, as of the

12  date of your autopsy?

13    A.  No, not that I recall.

14    Q.  Would you recall that?  I know you do several

15  hundred a year.  You've done thousands since then.

16        Is that the kind of thing that you would recall

17  or you just don't recall either way?

18    A.  I'm not sure I would recall it, but would not be

19  common for them to come and tell me that they suspect

20  something.

21    Q.  You have done thousands of autopsies since

22  February 26, 2015; is that true?

23    A.  Correct.

1    Q.   And do you have any independent recollection of

2    working on this case, working on ▓▓▓▓▓▓▓▓▓▓?

3         Separate and apart from looking at your report

4    and reviewing the photos, do you have an independent

5    recollection of your dealings with the autopsy or anyone

6    subsequent to that in this case?

7    A.   No.  I don't, no.

8    Q.   Do you remember the trial generally?

9         I mean, you don't testify at trials all the time,

10   do you?

11   A.   No.  Many of my cases don't require a trial.

12   Q.   So, do you remember the trial even if you don't

13   remember the specifics of it?

14        Without reviewing your testimony, do you remember

15   going to trial?

16   A.   Yes, I do.

17   Q.   Were you in court or with the DA's office at the

18   time of the acquittal or were you somewhere else when

19   the acquittal became -- was handed down?

20   A.   I would not have waited around at the DA's

21   office.  I would be back doing something else.

22   Q.   Who notified you of the acquittal, if anyone?

23   A.   I don't recall.

 1     Q.  Did anyone ever give you -- from the DA's office

 2   or the police department -- ever discuss with you why

 3   they thought Michael Davis was acquitted in this case?

 4            MS. PECK:  Object to form.

 5            THE WITNESS:  I don't recall, but I did

 6       have a meeting shortly afterwards, after the

 7       acquittal, with two representatives, the district

 8       attorney and the assistant district attorney, in

 9       my office.

10   BY MR. KLEIN:

11     Q.  Joel Abelove, was he one of them?

12     A.  Yes.

13     Q.  He came to your office in Watertown?

14     A.  Waterford.

15     Q.  Who did he come with?  Was it ADA Hall, who tried

16   the case, or someone else?

17     A.  It was Jessica Hall.

18     Q.  Was the meeting specifically to do like a --

19   excuse the pun -- a postmortem for this case?

20        What was the reason for this meeting?

21     A.  I requested a meeting myself.

22     Q.  Were you upset about the outcome and wanted to

23   discuss what happened in this case?

```
 1        What was the -- why did you request it yourself?

 2              MS. PECK:  Object to form.

 3              MS. SPENCER:  Object to the form.

 4              THE WITNESS:  I requested the meeting

 5        because I thought the prosecutor had very poor

 6        performance in her duty during this trial, at

 7        least what I witnessed of it.

 8              Because I was able to witness Dr. Teas'

 9        testimony, and I thought the prosecutor, frankly,

10        was inept.

11   BY MR. KLEIN:

12     Q.  Did you prepare with her for trial alone with her

13   or with anyone else pretrial?

14     A.  Well, the first meeting I had with the

15   prosecutor, it was very short, and I requested that she

16   return for a second meeting with Assistant District

17   Attorney Hall, which she did.

18        I was able to explain the case to them, but I'm

19   not sure the primary prosecutor ever had a good handle

20   on what this case was about.

21     Q.  So, when you requested the second meeting with

22   ADA Hall after the first meeting with just the line

23   prosecutor, did you let ADA Hall or Joel Abelove know
```

1  that you wanted a meeting with someone senior because of

2  your concerns about the first meeting?

3      A.  Yes.

4      Q.  Who did you notify?  Was it Joel Abelove

5  personally or someone else?

6      A.  I had my assistant -- to the best of my

7  recollection, I had my assistant schedule a meeting.  I

8  told -- believe her name was Cindy, if I could check my

9  records.

10     Q.  Sure.

11          MS. PECK:  Brett, just so you know, he's

12      got a hard copy of his file in front of him.  So,

13      that's what he's checking.

14          The only thing I'd ask, Doc, is whatever

15      you're looking at to check your records, if you

16      could just hold it up to the computer so that

17      Brett can see what you're looking at.

18          THE WITNESS:  Yes.

19          The first record I had of the meeting

20      with Cindy Chavkin was on the 28th of July of

21      2016, and then we had a meeting again with her,

22      and at this point Jessica Hall and myself, so I

23      could really explain the case details to them.

1      I don't think Ms. Chavkin really

2      understood the medical aspects in this case.

3  BY MR. KLEIN:

4      Q.  In what way?  Was she pushing back on your cause

5  -- your determinations of cause of death or manner of

6  death or anything else?

7      Was it just she wasn't grasping -- what specific

8  can you point to?

9          MS. PECK:  Object to form.

10          THE WITNESS:  It was like talking to a

11      rock.

12  BY MR. KLEIN:

13      Q.  Was there any type of, just if you know, argument

14  you had with her about this or did you leave -- did you

15  kind of end the meeting early, your first meeting with

16  Cindy Chavkin?

17      How did that go in terms of the demeanor of the

18  meeting, the tone of the meeting, and how it ended?

19          MS. PECK:  Objection to form.

20          THE WITNESS:  No.  The first meeting was

21      very pleasant.  I just got the feeling that she

22      was not picking up on the issues here.

23          We left on very politely, and I said, I

1       think it's important that you return with a more

2       experienced prosecutor to go over this.

3   BY MR. KLEIN:

4       Q.  Was she skeptical about whether there was

5   criminality in this case?

6               MS. PECK:  Objection.

7               THE WITNESS:  Not at all.  She did not

8       understand any of the case.  She did not

9       understand the medical issues of this case.

10              She wasn't skeptical of anything.  She

11      made no objection to my ruling.  She didn't

12      contest it.  She just didn't understand it.

13  BY MR. KLEIN:

14      Q.  And then, how long did that meeting last, the

15  initial one with Cindy Chavkin?  Was it brief?  Was it

16  an hour?  How would you...

17      A.  It would have been less than an hour.

18      Q.  It looks like you had a meeting on 8/1/16.  So

19  I'm looking -- I'm showing you on the screen page 1607.

20      Does this look like it was the next meeting that

21  you had after July 28th with Cindy Chavkin, yourself and

22  Jessica Hall?

23      A.  Yes.

1    Q.  And how long did this meeting last?

2    A.  It would have probably been about an hour.

3    Q.  Was this prep for grand jury or what was the

4    purpose of this meeting -- this was trial, actually,

5    right?

6    A.  Yes.

7    Q.  Who prepped you for grand jury?

8    A.  No one prepped me for grand jury.  They simply

9    instructed me to be there.

10    Q.  Who presented it to the grand jury?

11        Was it Jessica Hall or do you recall?

12    A.  To the best of my knowledge, I can't recall.

13    Q.  I'll check it out.

14        How did the meeting go on August 1st with Jessica

15    Hall present?  Did she understand the case?

16    A.  Jessica had a much better understanding of the

17    case, and I thought that she would be able to

18    communicate her understanding to Ms. Chavkin in a way

19    that I couldn't.

20    Q.  And then, after that, from that date up until

21    trial, did you have any other meetings with the

22    prosecution, or was that your prep meeting?

23    A.  That would have been the prep meeting.

```
 1      Q.   Then I believe we said you testified on...

 2             MS. PECK:   August 22nd.

 3  BY MR. KLEIN:

 4      Q.   From August 21st through August 22nd, you didn't

 5  have any further meetings with the DA's office about

 6  this case?

 7      A.   Not to my recollection.

 8      Q.   Cindy Chavkin presented your testimony at trial?

 9      A.   Yes.

10      Q.   And did she have a second chair or was she a

11  second seat to another attorney at trial?

12      A.   No.  She was not.

13      Q.   She was alone up there.

14      A.   Completely alone.

15      Q.   So, when your testimony ended, did you see Dr.

16  Teas the same day or was Dr. Teas another day?

17      A.   I can't remember if it was the same day or if it

18  was the next day.  I can't remember.  I was there for

19  her testimony.

20      Q.   After you testified, did you have any further

21  meetings with the prosecution to help them prepare for

22  Dr. Teas?

23      A.   I had 15 minutes to talk to Ms. Chavkin.
```

1    Q.  Did you do that in the courthouse hallway or

2  where did that take place?

3    A.  We went down to the office of the district

4  attorney.

5    Q.  Was that on the day that Dr. Teas testified or

6  some other time?

7    A.  That was after she testified and before we asked

8  for a chance to rebut her testimony.

9    Q.  So, were you concerned at that point that,

10  between the way your testimony went and the way Dr. Teas

11  went, that you needed to get back in there or this case

12  could be lost?

13          MS. PECK:  Objection.

14          MS. SPENCER:  Objection.

15          THE WITNESS:  I thought I had to get back

16    in there to explain her testimony and her

17    conclusions.  I had to counter her conclusions.

18  BY MR. KLEIN:

19    Q.  And then, at some point, did Cindy Chavkin let

20  you know that the judge disallowed it?

21    A.  I was in the courtroom when the judge disallowed

22  it.

23    Q.  And then you left?

1    A.   Yes.

2    Q.   Then at some point thereafter you heard about the

3  acquittal?

4    A.   Yes.

5    Q.   And then, how long after that did you reach out

6  to set up this meeting with Joel Abelove and Jessica

7  Hall?

8         Was it upon hearing about the acquittal or weeks

9  or months later, if you know?

10   A.   It would have been very shortly afterwards, maybe

11 the same day.  I instructed one of the investigators

12 that I had to talk to them immediately, and we had the

13 meeting at my office.

14   Q.   Did you convey that message through your

15 assistant that you were upset about how the case went?

16             MS. PECK:  Objection.

17             MS. SPENCER:  Object to form.

18             THE WITNESS:  Yes.

19 BY MR. KLEIN:

20   Q.   How did you communicate that?  Let them know I

21 need to see them right away, or what type of words or

22 message was communicated?

23   A.   Well, I told the investigator for the office that

1    I wanted to see them immediately, and they came.

2        Q.   And can you describe, walk us through that

3    meeting?

4            Who was present for it and what was discussed?

5        A.   Well, this is the meeting with Jessica Hall and

6    Joel Abelove.  That was the meeting.  And we discussed

7    the -- we discussed the prosecution ineptness at

8    following through on questioning Dr. Teas.

9            Also, the judge had not given -- in my opinion,

10   the judge had not given me enough time, for 15 minutes,

11   to go over the flaws I found in Dr. Teas' testimony, and

12   I was very frustrated.

13       Q.   So, what was the tone of the meeting?  Was it

14   just you venting or was it -- did they share your

15   concerns, or did they push back on it, or something

16   else?

17       A.   They were like spanked puppies.

18       Q.   What do you mean by that?

19       A.   They were very apologetic and they totally

20   understood where I was coming from.

21       Q.   Dr. Sikirika, were you a little sore, so to

22   speak, from the experience you had the year before on

23   the Adrian Thomas acquittal?

1        Did that prompt some of your feelings in seeking

2   a meeting with the DA directly after this?

3              MS. PECK:  Objection.

4   BY MR. KLEIN:

5      Q.  You can answer.

6      A.  No.  This was a whole different animal.

7        This was my frustration with an attorney that I

8   did not think belonged in a prosecutor's office.  That

9   was the extent of my frustration.

10        This woman may be a fine person, I'm sure she

11   was, but she did not belong in the courtroom.

12      Q.  What did Joel Abelove say in response that you

13   can recall?

14        Did he agree?  Did he say he would look into it

15   or anything else?

16      A.  He did.  He basically said, I understand where

17   you're coming from.  She came highly recommended and I'm

18   very disappointed in her performance.

19      Q.  What about Jessica Hall, what if anything do you

20   recall her saying at the meeting?

21      A.  Basically the same thing.

22      Q.  What else was said at the meeting that you can

23   recall?

```
 1      A.   That was about it.

 2      Q.   Was anyone else present at the meeting other than

 3  you, DA Abelove, and ADA Hall?

 4      A.   No.

 5      Q.   To your knowledge, did they take any job action

 6  against ADA Chavkin, whether a transfer, demotion or

 7  anything else, because of this case?

 8            MS. PECK:  Objection.

 9            THE WITNESS:  Not to my knowledge.

10  BY MR. KLEIN:

11      Q.   Have you dealt with her again since that case up

12  until today?

13      A.   No, and I never will.

14            (Sikirica Exhibit 2 marked for

15      identification.)

16      Q.   Now, DA Abelove issued a statement to the press.

17  I'm showing it to you now.  Do you guys see this?  We'll

18  call this Exhibit 2, Sikirika 2 -- this is Defendant's

19  Response to Plaintiff's Request for Interrogatories and

20  Request for Production of Documents.

21        I will scroll down to page Exhibit C which starts

22  at page 53.

23        Did you ever see or were you aware of the
```

1   statements that Joel Abelove made to the press about

2   this case?

3      A.   No, I was not.

4      Q.   In this article in the Troy Record entitled

5   "Former Professional Basketball Player Acquitted in

6   Lansingburgh Toddler's Death", dated August 25, 2016,

7   Abelove says -- there's a statement attributed to him

8   admitting -- the bottom of the page we're looking at

9   now, which is 54 in this packet.

10          Admitted the case against Davis prosecuted by

11  Assistant District Attorney Cindy Chavkin was not a

12  strong one, but he added that he did not regret pursuing

13  it.

14          Did he ever indicate to you that this was not a

15  strong case?

16     A.   No.

17     Q.   Did you ever hear any statement that the case was

18  weak attributed to Abelove, or anyone in the DA's

19  office, prior to me just telling you about this article?

20     A.   Never did.

21     Q.   Now, going back to Exhibit 1.  I want to go back

22  to your -- well, let's just continue to talk about the

23  trial and then we'll talk about your autopsy.

1        At the trial, did you witness or were you made

2    aware of the testimony of the responding fire department

3    witness named Bayly?

4        A.  Well, I was not aware or -- I was not made aware

5    of his testimony, but I did have the copy of a statement

6    that he had previously made.

7        Q.  Right.  I'm going to flip to that right now on

8    Exhibit 1.

9        Michael Bayly, from the City of Troy Fire

10   Department, issued a statement.  The Bates number in

11   Exhibit 1 is 1682.

12       Is this the statement that was in your file?

13       A.  Yes.

14       Q.  So, in this statement, other than receiving this

15   written typed out deposition, did you ever meet or speak

16   with Michael Bayly?

17       A.  No.

18       Q.  Other than receiving written or typed out

19   depositions from other fire department employees, like

20   James Titans, lieutenant, James Lucey, firefighter

21   medic, Frank Shumaker, captain, and maybe others, did

22   you ever speak with any of them?

23       A.  No.

**547**

54

1    Q.   Did you come to learn, either during trial or

2    since trial, that Firefighter Bayly testified that they

3    were working on ██████ for about 20 minutes, doing I

4    believe as many -- approximately a hundred chest

5    compressions a minute from the time they started working

6    on her in the home.  There was a period of time until

7    they put her in an ambulance, maybe about 10, 15

8    minutes.  And there was another 20-minute period of time

9    where they continued working on her a hundred chest

10   compressions per minute to the hospital.

11       Were you aware of that, of in sum and substance

12   testimony of that nature by Firefighter Bayly?

13   A.   I knew that the child had received CPR

14   resuscitation at the scene and during transport and in

15   the emergency room.

16       I'm not sure I could imagine 100 pumps per

17   minute, but I was aware that CPR had been given to her

18   over a long period, yes.

19   Q.   Actually, I have the details here.

20       Bayly, who was the EMT, said 120 per minute is

21   what he recalled.  16 minutes at home and then 20

22   minutes on the way to the hospital, with three or so men

23   switching because of exertion, to avoid being exerted.

1      Are those facts that you were aware of when you

2  issued your report?

3    A.  Yes.

4    Q.  You knew that there were thousands of chest

5  compressions just done by EMTs alone before she even got

6  to the hospital?

7    A.  Yes.

8    Q.  And then there was a Dr. Crisafulli, an ER

9  doctor, from St. Mary's.

10      Did you have a deposition from her?

11    A.  Yes.

12    Q.  And I'm showing you that, page 1689.

13      This deposition, other than this written

14  deposition, did you ever speak with her?

15    A.  No.

16    Q.  This doesn't say anything about the number of

17  chest compressions that were done by hospital staff,

18  does it?

19    A.  No.

20    Q.  She testified at trial.  Did you know that?

21      Did you see her testimony or did you ever get to

22  read it?

23    A.  No.

1    Q.  She said that the standard, or the proper amount,

2  is a hundred compressions per minute and that that was

3  done for 30 minutes at the hospital.

4      So, doing the math, that's another 3,000

5  compressions; am I right on that?

6    A.  Yes.

7    Q.  Approximately?

8    A.  Yes.

9    Q.  She also described different staff switching

10  because of -- to avoid exertion.  Even with a small

11  child, it's tiring for adults to do that many

12  compressions.

13      Is that your understanding of the way CPR is

14  conducted even with children, that even adults would

15  have to switch because it's tiring?

16    A.  Yes.

17    Q.  So, if we have approximately 36 minutes between

18  the home and the ride to the hospital, and 30 minutes at

19  the hospital, we have approximately 66 minutes of CPR,

20  of compressions.

21      If you round it down to a hundred, that's 6600

22  compressions?

23    A.  Make it simple, yes.

1     Q.  Did you have an understanding of that when you

2  rendered your opinions in this case, that there were,

3  more likely than not, 6,000 chest compressions done by

4  fire department and hospital staff?

5     A.  Yes.

6          MS. SPENCER:  Object to form.

7  BY MR. KLEIN:

8     Q.  When medical, EMTs and hospital staff do chest

9  compressions, they are literally squishing the heart so

10  that the blood will pump through it, correct?

11          MS. PECK:  Objection to form.

12          THE WITNESS:  Correct.

13  BY MR. KLEIN:

14     Q.  Were you familiar with literature on CPR-related

15  trauma as of 2015?

16     A.  Yes.

17     Q.  Were you aware that prolonged CPR was

18  significantly associated with a higher incidence of rib

19  fractures?

20          MS. PECK:  Objection to form.

21          THE WITNESS:  Some studies have suggested

22    that, yes.

23  BY MR. KLEIN:

**APPENDIX** **551**

1    Q.  Any reason that you discount those or think that

2  those are not right?

3    A.  Other studies have disclaimed that, have

4  countered that.

5    Q.  Can you point to any of them?

6      Do you have them?

7    A.  The Wake Forest study.  The Wake Forest study.

8    Q.  For 2010?

9    A.  Yes.

10    Q.  Do you agree that CPR typically is performed for

11  less than 30 minutes?

12    A.  In children, it can be prolonged, yes.  Most of

13  the time it's less than 30 minutes, but in children, you

14  want to do as much as possible, and it can go on for a

15  considerable amount of time.

16    Q.  And during CPR sometimes rib fractures can't be

17  avoided.  Is that a fair statement?

18    A.  Can be voided?

19    Q.  Can't be avoided.

20    A.  Can't be avoided, that's correct, yes.

21    Q.  There are studies that document avoidable rib

22  fractures, meaning that hand placement may have been

23  incorrect by trained medical staff, right?

1          MS. PECK:  Objection to form.

2     BY MR. KLEIN:

3        Q.  Are you aware of that?

4           Are you aware of any literature where there were

5     avoidable rib fractures at the hands of EMTs or medical

6     staff?

7          MS. PECK:  Objection.

8          THE WITNESS:  Yes.  There's

9      recommendations that certain positions in the

10      hands be avoided to prevent rib fractures.

11     BY MR. KLEIN:

12        Q.  But even -- so is it your understanding, just

13     from the literature and your experience, that even

14     trained EMTs and medical providers trained in CPR can

15     get the hand placement wrong and resulting in avoidable

16     hand fractures -- avoidable rib fractures?

17        A.  I don't quite understand the question.

18           Could you repeat it, please.

19        Q.  Are there incidents that you're aware of either

20     anecdotally, through literature, or through colleagues,

21     of avoidable rib fractures at the hands of well

22     intending EMTs and medical staff?

23          MS. PECK:  Object to form.

60

```
 1              THE WITNESS:  I'm not aware of those

 2       studies, but I know studies have proven that, if

 3       you put your hands behind the decedent and you

 4       try to perform CPR, you do risk fractures.

 5  BY MR. KLEIN:

 6     Q.  Similarly, if you do it on a soft surface you

 7  risk fracturing as well, correct?

 8              MS. PECK:  Objection to form.

 9              THE WITNESS:  Not so much fracturing on a

10       soft surface, but if you do it on your knee.

11              If you take a child and try and perform

12       CPR with the child's back against your knee, you

13       do risk fracture.

14  BY MR. KLEIN:

15     Q.  What were the ribs that were fractured in this

16  case?

17     A.  I believe -- if I can check my report quickly.

18     Q.  Yeah.

19     A.  They were the posterior aspects of the ninth and

20  tenth rib.

21     Q.  Are you aware of the literature or other reports

22  of ruptured livers attributed to placement of the hands

23  or compressions that are too vigorously applied by
```

1    medical staff, including EMTs?

2        A.   Yes.  I've personally seen that.

3        Q.   On how many occasions?

4        A.   At least half a dozen anecdotally.

5        Q.   Can you describe them under an umbrella of facts,

6    or are they each different, or is just EMTs or doctors

7    vigorously applied CPR and they did it too vigorously

8    such that the liver ruptured?

9             Or how would you describe?  Can you describe

10   these in some consistent way or are they all different?

11       A.   Well, they all tend to be associated with the

12   fractures to the anterior chest wall and the sternum.

13   These are anterior fractures.

14            The ones I have seen have been in adults, in

15   older adults particularly, when bones have calcified and

16   it's very easy to fracture ribs in an older adult.  And

17   it's not impossible to lacerate the liver with a small

18   single laceration or a small tear.  That's what I've

19   seen in my personal experience.

20       Q.   But the liver -- you're not saying the liver is

21   torn by the rib.  Right?

22            I'm talking about liver rupture due to placement

23   of hands during cardiac compression vigorously applied,

1  too vigorously applied by medical staff.

2      A.   Yes.

3      Q.   Have you seen those in your experience?

4      A.   Yes.

5      Q.   So, am I correct that these are really two

6  separate things.  One, there are incidents or cases of

7  fractured ribs that occur during CPR.

8          That's one aspect of CPR-related injuries,

9  correct?

10     A.   Yes.

11     Q.   And then there's another aspect of CPR-related

12 injuries that include ruptured livers that you've seen

13 in your personal experience that occurred due to the

14 vigorous application of CPR by medical or EMTs.

15     A.   Yes.

16     Q.   Does this occur due to positioning that's too

17 low, positioning of the thorax compression at the costal

18 arch, in conjunction with violent pressure application?

19         Is this considered to be the cause of abdominal

20 organ contusions?

21     A.   Yes.

22     Q.   And the costal arch, that's the area just below

23 the sternum where the right and left lobes of the liver

Case 1:17-cv-01290-DJS Document 141-1 Filed 02/04/22 Page 63 of 178

1    meet, right?

2        A.   Yes.

3        Q.   The arch is bordered by the ribs, 7 through 10.

4        A.   Yes.

5        Q.   And those are the ribs that were fractured in

6    this case?

7        A.   Well, these were the posterior aspects of the

8    ribs.   Again, let me refer to this.

9            These were the back of the ribs, not the costal

10   portions of the rib.   These were the posterior portions

11   of the ribs 9 and 10.

12       Q.   So, in your experience, Dr. Sikirika, do

13   lacerations of the liver, are they usually caused by

14   compressing the abdomen below the sternum?

15       A.   Yes.

16       Q.   So, is it your opinion, Dr. Sikirika, that every

17   EMT and emergency room doctor, that they always get the

18   hand positioning right on CPR, or do they make mistakes

19   as well in your experience?

20            MS. PECK:   Objection to form.

21            THE WITNESS:   Well, in my experience, I

22       can only tell you that I see broken sternums and

23       ribs in many, many cases, and these are always

```
 1          broken along the anterior and lateral aspects of

 2          the ribs, whether it's done by EMS, or firemen or

 3          doctors.

 4                  I can't tell you the position of the

 5          hand.

 6   BY MR. KLEIN:

 7      Q.  Did you ever inspect the futon where the EMTs did

 8   CPR for 16 minutes in the house?

 9          Did you ever inspect that futon?

10      A.  No.

11      Q.  Do you know whether that contributed to the

12   anterior rib fractures?

13      A.  They were posterior rib fractures.

14      Q.  I'm sorry.  Let me rephrase that.

15          Do you know whether the surface of the futon,

16   where CPR was administered for 16 minutes inside the

17   home, do you know whether that contributed to the

18   posterior rib fractures?

19      A.  It would not have contributed to the posterior

20   rib fractures.

21      Q.  Why not?

22      A.  Because it's a relatively soft surface.

23      Q.  The futon is, or the ribs?
```

1    A.   The ribs and the futon.

2    Q.   Are you aware of literature or other data

3  documenting abdominal hemorrhaging due to CPR-caused

4  liver lacerations?

5    A.   Yes.  It's been described.

6    Q.   So, here we have -- would you call the abdominal

7  hemorrhaging in this case, would you say it was massive

8  hemorrhaging?

9    A.   Yes.

10    Q.   It's your opinion that the massive hemorrhaging

11  was due to what you believe it was due to some type of

12  compression only by Michael Davis, not possibly by

13  anybody else?

14       Is that your opinion in this case?

15          MS. PECK:  Objection to form.

16          MS. SPENCER:  Objection.

17          THE WITNESS:  It was due to five

18    lacerations in the liver that are most consistent

19    with force applied to the abdomen and the back

20    simultaneously, similar to what the video I

21    reviewed showed Michael Davis doing.

22  BY MR. KLEIN:

23    Q.   Are they also consistent with CPR-caused

**APPENDIX**

1    mechanisms that could be from the I think we said 6,000

2    compressions?

3         Could they be caused by that?

4              MS. PECK:  Objection.

5              THE WITNESS:  No.

6    BY MR. KLEIN:

7      Q.  No?  Not at all?  No way?

8              MS. PECK:  Objection to form.

9              THE WITNESS:  Correct.  No way.

10     Q.  Why no way?

11     A.  Because these liver lacerations were extremely

12   severe.  Actually, a portion of the liver had been torn

13   away from itself.  These went way beyond anything

14   described in the literature or in my experience.  I have

15   never seen more than one laceration of the liver with

16   any person suffering from CPR, and I've never seen

17   lacerations over the top of the liver like that.

18         These were a question of quantity.  The quantity

19   of the lacerations, the five of them, are way beyond

20   what would be expected in any kind of CPR situation.

21     Q.  So, do you dispute that ████ Davis was found

22   unresponsive, possibly in cardiac arrest, before any

23   compressive compression was done to her by Michael Davis

1    as described in the video?

2        A.   I can't dispute that, but I can't confirm it

3    either.  I can't confirm she was in cardiac arrest.

4        Q.   If you can't dispute it, how do you know she

5    hadn't already -- she wasn't already postmortem when

6    Michael Davis attempted just a few efforts at CPR?

7        A.   Well, I found no reason for her to be dead.

8        Q.   You heard or -- you heard and you read Dr. Teas'

9    testimony about sudden unexplained death, right?

10       A.   Yes.

11       Q.   Is that something that you credit as a cause of

12   death?

13       A.   No.

14       Q.   What is sudden unexplained death and can you tell

15   us what your view on that is as a diagnosis?

16       A.   Are you referring to SUDI or SIDS?

17       Q.   Well, this would be a SUDI situation because of

18   her age, right?

19       A.   No, it wouldn't be.

20       Q.   It would be a SIDS?

21       A.   No.  It wouldn't be a SIDS at all.  It would be

22   neither.

23       Q.   Well, Dr. Teas testified that it was a SUDI

Case 1:17-cv-08290-DJS Document 41-1 Filed 02/04/22 Page 69 of 178

1   situation, correct?

2       A.  Yes.

3       Q.  For the record, that acronym is what?

4       A.  Sudden unexplained death in infancy.

5       Q.  What is it and why is it not applicable here?

6       A.  Well, first of all, this is not an infant.  This

7   is a toddler.  Toddler definition is of age two.  That

8   is the definition of a toddler.

9           This is not a SUDI death because this is not an

10  infant, to begin with.  We should be able to find out

11  something that caused this child's death.  So, there is

12  no syndrome of sudden toddler death that is described.

13          So, she is out of the category here of SUDI and

14  she's well out of the category of SIDS.  SIDS does not

15  occur after one year.

16      Q.  When does SUDI start?  What age?

17      A.  It's an infant, a death in an infant, and by

18  definition, an infant is up to the age of two.  Then you

19  become a toddler.

20      Q.  Right, so this...

21      A.  She assigned SUDI inappropriately to this case.

22  That does not qualify as a SUDI death.

23      Q.  What age -- what would the diagnosis be if there

```
 1    was an unexplained death of a toddler of        age?

 2       A.   Well, you'd have to find something, or you just

 3    call it a cardiac arrythmia of undetermined etiology if

 4    you could not find anything else.

 5            But you can't label it with a syndrome that is

 6    limited to infants.  She is not an infant anymore.  She

 7    is a toddler.

 8       Q.   So, SIDS goes up to age two.

 9       A.   No.

10       Q.   Age one.

11       A.   Correct.

12       Q.   And SUDI starts at what age?

13       A.   It would be in infancy, which infants are called

14    toddlers after two.

15       Q.   So,        was old enough to be -- for her death

16    to be characterized as a SUDI death but in your opinion

17    it was not; is that correct?

18       A.   No.  She's beyond a SUDI death.  She's outside

19    the category of a SUDI because she's no longer an

20    infant.  She's a toddler.

21       Q.   So, SIDS is from birth to age one.  SUDI is from

22    age one to age two?

23       A.   It would be -- no.  It could still be used --
```

Case 1:17-cv-01290-DJS Document 114-1 Filed 02/04/22 Page 71 of 178

1    SUDI is just a classification of a death, unexplained

2    death in infancy, and that would include SIDS.

3         Some people use that to include SIDS.  But SUDI

4    is meant to represent deaths that occur from other

5    reasons, perhaps things like co-sleeping or something

6    that's unexplained by the autopsy in the investigation.

7         After the age of two, SUDI doesn't really apply

8    anymore because the child is no longer an infant.  So,

9    we don't have a category for unexplained deaths in

10   toddlers.  We just try and find out what killed these

11   toddlers, what caused their death.

12   Q.   There was discussion at trial about these stories

13   we hear about in the news about like seemingly healthy

14   high school athletes would just drop dead and things of

15   that nature.

16        Do you recall that?

17   A.   Yes.  That can occur and I have seen those cases,

18   yes.

19   Q.   Whether it's a toddler, or someone in their

20   preteen years, or adolescence, other instances where

21   children from two through teenage years died for

22   unexplained reasons in your experience.

23   A.   Yes.  They do die of unexplained reasons and we

1    never are able to find out.  There's always a small

2    percentage of sudden death, either in adults or

3    children, that we cannot determine from a gross

4    histologic study.

5         But that is a minute number, and that these

6    people often do have some symptoms beforehand, but they

7    go unrecognized.

8    Q.  Well, given that, whether we -- even if we don't

9    call it SUDI and Dr. Teas did and you disagree with

10   that, the applicability of that based on ████████age,

11   what is your basis for opining that this is not one of

12   those minute, rare, but still a case of an unexplained

13   death?

14   A.  Well, I can't -- I can't use that explanation to

15   describe ██████ because ██████ has a cause of death,

16   number one.  She has a cause of death of severe liver

17   lacerations beyond the scope of cardiopulmonary

18   resuscitation, beyond the scope of anything I've ever

19   seen in cardiopulmonary resuscitation.

20   Q.  Have you ever seen 6,000 chest compressions on a

21   two-year-old of her size?

22   A.  I'm sure I have.  I'm sure I've had prolonged

23   CPR.  Every child pretty much that makes it to the

1    hospital has prolonged CPR.  It's very, very common.

2         I wish the EMTs would leave them at the scene,

3    actually, when they know they're dead, because now you

4    complicate it with all the therapeutic changes that are

5    going to occur.

6         They do what they have to do to save the child's

7    life, so they do prolong CPR all the time.  It's very,

8    very common.  And I've never in my career seen anything

9    like these liver lacerations from CPR.

10   Q.  Well, do you think it would have been important

11   to know how the fire department employees actually did

12   the CPR by speaking with each one of them?

13        Same with the emergency room personnel.  Was that

14   something that would have been helpful for you to rule

15   out CPR post injuries as being postmortem or premortem?

16   A.  No, because they are trained how to do the CPR

17   properly and I assume they would do it properly.

18   Q.  Right, but we all know that people make mistakes

19   or, you know, even well-intentioned medical

20   professionals could get it wrong, which is why there are

21   CPR injuries that are not intended but may occur; is

22   that fair?

23   A.  I suppose that's fair.

1      Q.   So, what would be the reason to not interview the

2    fire department?  In a case like this where there's such

3    extreme injury as you described to the liver, that

4    you've never seen before, why make the assumption that

5    they did it properly or they were well trained?

6           What if they weren't?  What if you could have

7    helped expose that they weren't and maybe they had a

8    real system failure here in how they do CPR in infants?

9           Maybe they knew how to do adults well but they

10   didn't know how to adjust it to this size to ████████

11   stature?

12          You just never evaluated any of that, did you?

13              MS. PECK:  Objection.

14              THE WITNESS:  No, I did not.  I trusted

15       the CPR was done properly by the trained

16        personnel.

17   BY MR. KLEIN:

18      Q.   If it was not, and we don't know whether it was

19   or was not because you didn't speak with them, that

20   could be a contributing cause to the rib and liver

21   injuries, whether or not that caused the death, correct?

22              MS. PECK:  Objection to form.

23              THE WITNESS:  Even with an untrained --

1    even with improper CPR, these injuries are beyond

2    what would be expected in any CPR situation.  The

3    injuries are blunt force, severe, compressive

4    injuries to the abdomen.

5 BY MR. KLEIN:

6   Q.  So, the theory is that this man just squeezed a

7 baby for no reason to do CPR but it was really an act of

8 abuse?

9    What is your thought about why this happened?

10    MS. PECK:  Objection to form.

11    THE WITNESS:  I have no thoughts about

12    why it happened.  I don't make that assumption

13    why it happened, but I can tell you that it

14    happened because someone applied very severe

15    compressive injuries to that child's abdomen,

16    crushing two breaks -- breaking two ribs and

17    crushing the liver.

18 BY MR. KLEIN:

19   Q.  But you would never know if it's someone or if it

20 was multiple people because you never specifically

21 inquired with Bayly or any of these other fire

22 department personnel or medical, ER personnel, correct?

23    MS. PECK:  Objection.

```
 1              Brett, you're asking and answering the
 2       same question over and over again.
 3              MR. KLEIN:  You can object to form.
 4              THE WITNESS:  So, you're asking me why I
 5       didn't interrogate the EMS people?
 6  BY MR. KLEIN:
 7     Q.  Not interrogate, more just interview them so that
 8  you were -- had clear understanding of the nature of the
 9  CPR intervention in this case.
10     A.  I simply assumed they knew how to do it in
11  children.
12     Q.  Is that an assumption that in retrospect would
13  have been better not to assume in a case like this?
14              MS. PECK:  Objection.
15              THE WITNESS:  No.
16  BY MR. KLEIN:
17     Q.  When they testified at trial to collectively
18  6,000 chest compressions, is that something that you
19  fully expected at trial, or were you surprised that it
20  was that long?
21              MS. PECK:  Objection.
22              THE WITNESS:  No.  Again, Brett, as I've
23       said, you know, these children receive very
```

1    prolonged CPR.  So, the number is -- sounds like

2    a lot, but it's common.  It's very common in my

3    opinion.

4  BY MR. KLEIN:

5    Q.  In terms of the fluid in the abdominal cavity,

6  the bleeding, the internal bleeding, every time there

7  was a pump of the heart that's pumping blood through the

8  heart to the liver?

9    A.  As effectively as possible, yes, but it's pumping

10  actually blood to the liver but throughout the entire

11  body as well.

12    Q.  Do you agree that liver lacerations typically do

13  not kill people instantly or quickly, that it's a slow

14  bleeding organ?

15    A.  It would depend on the severity of the

16  lacerations, definitely.

17    Q.  Do you agree that each chest compression was a --

18  do you agree that a human like _____ can bleed

19  postmortem, that she could continue to bleed after her

20  -- after she was in cardiac arrest and dead?

21    A.  There may be postmortem bleeding.  I agree with

22  that, yes.

23    Q.  You have cases where you have to use suction and

1    you see bleeding as much as a day after a death?

2         Have you had that experience?

3     A.   Yes.  I've used suction after cases of CPR with

4    liver lacerations.

5     Q.   So, when you're seeing 350 or 400 CCs of blood or

6    is it MLs or CCs?  I'm sorry.

7     A.   ML is equivalent to a CC.  They're basically the

8    same thing.

9     Q.   So, when you're seeing that much blood in an

10   abdominal cavity, are you correct in assuming the whole

11   amount was present in a case like this when ▉▉▉▉ died,

12   or do you assume that there was a significant amount of

13   blood pumped in through extensive CPR efforts?

14              MS. PECK:  Objection.

15              THE WITNESS:  Well, I would always assume

16       that some of it could be accounted for by CPR.  I

17       would, yes.

18   BY MR. KLEIN:

19    Q.   Do you note that in your report anywhere?

20    A.   No.

21    Q.   Any particular reason why not?

22    A.   Because it's simply an assumption.  I tend to

23   report what I see.

1  Q.  Well, wasn't it an assumption that it was Michael

2  Davis that did the compression but not the EMTs that

3  caused the injuries, whether or not they caused the

4  death?

5       Didn't you make an assumption there that they

6  just did it right so he must have been the one who did

7  it wrong?

8  A.  Well, he illustrated doing something to the

9  child.  So, he's the one who did the compression of the

10  abdomen.  So, I assumed that he is the one who did it.

11  Q.  Well, when they did CPR, they would have done

12  compression of the abdomen as well; would they not?

13  A.  No.  They would have been working on the chest.

14  Q.  But with such a small body, the hand would have

15  -- if they used the hand rather than fingers, they would

16  have been in the area of the chest cavity, correct?

17  A.  Well, they would have been in the area of the

18  liver possibly, yes, but they would have concentrated on

19  the chest.

20  Q.  So, I'm sorry if you asked and answered this, but

21  I don't recall.

22       Do you agree that liver lacerations typically

23  bleed slowly?

1    A.   I would agree if they're small lacerations, yes.

2    Q.   So, in this case, was it a large one or was it a

3  small one that would be the type that bleeds slowly?

4    A.   These lacerations would have bled profusely,

5  because they were very large and a portion of the liver

6  had actually been torn away.

7    Q.   Did you consider, in your evaluation in this

8  case, that -- withdrawn.

9         You testified at trial that this would have been

10  very painful for ████████ that just the broken ribs alone

11  she would have been screaming and crying, correct?

12            MS. PECK:  Objection.

13            THE WITNESS:  I don't recall if I used

14     the words "very painful".  I may have.  But the

15      ribs would have been painful, yes.

16  BY MR. KLEIN:

17    Q.  So, what do you make of the fact that she was not

18  responsive and flat lining asystole when they got there?

19  There was no reports of her screaming, crying or

20  anything like that, and the only report was from the

21  father that she just was lethargic and then didn't wake

22  up.

23         Would you expect that there would have been a

1    witness to her screaming, whether by EMS, by EMTs or by

2    neighbors or anyone else, and is there any significance

3    if there is no note of that in this case?

4              MS. PECK:  Objection to form.

5              THE WITNESS:  No, I don't.

6              I think she had already passed out from a

7        significant loss of blood.  That's my assumption.

8    BY MR. KLEIN:

9        Q.  How do you know she didn't pass out from whatever

10   caused her to pass out which lead to Mr. Davis being

11   concerned that she was passed out?

12             How do you know that?  Other than that it's

13   unexplained, which is rare but it happens.

14       A.  You're asking me to chase gremlins.

15       Q.  No.  I'm asking you -- this is what Mr. Davis,

16   who has been found not guilty, said from his first

17   interview on the night of the incident, to his recorded

18   interview that you were given, to a subsequent interview

19   that he did right before the grand jury, to his

20   testimony at trial, and he was consistent about that.

21   Doesn't mean, you know, and so, he -- there's no other

22   account other than that she was unresponsive.

23             We may assume she was because you see this

1   damaged her liver, but crediting that she was

2   unresponsive, how do you know that there was not some

3   unexplained cause of death, even if it's extremely rare,

4   that this was not one of those situations?

5          MS. PECK:  Objection to form.

6          THE WITNESS:  You could never, ever rule

7      out that in any circumstances if you wanted to

8      use that logic, because even a traffic accident

9      could have been caused by some arrythmia rather

10     than a drunk driver.  Even a person who dies of

11     pneumonia may have some cardiac arrythmia that

12     went undiagnosed.

13          That's why we do a complete autopsy on

14     these children.  We look for anything that we can

15     rule out that would put her in a state of

16     unconsciousness or cardiac arrest.  We look for

17     bacterial infections.  We look for viral

18     infections.

19          I sent out a metabolic screening to make

20     sure she didn't have an inherited disease that we

21     could not detect.

22          We took x-rays.  We did a full workup on

23     this child to rule out any reason that she would

Case 1:17-cv-01290-DJS Document 114-4 Filed 02/04/22 Page 83 of 178

1     be deceased that could explain why he supposedly

2     did this.  I could find no reason, other than

3     this mysterious sudden death, which she had no

4     symptoms of prior.

5          It's possible, I will not say it's

6     impossible, but it's very, very highly unlikely

7     that she had died from a natural event before

8     this series of events.

9     Q.  When you're charging someone -- when you're

10    ruling this a homicide rather than, at most,

11    undetermined, it's foreseeable to you that someone is

12    going to be charged with murder and face life in prison;

13    is that fair?

14    A.  I would assume that, yes.

15    Q.  So, why not call this at most undetermined and

16    let the prosecutor decide if there's criminality?

17         If that's something you can't exclude, and the

18    only firsthand account, corroborated by his wife, that

19    she was up that morning but sluggish and then went back

20    to bed and then was unresponsive before any chest

21    compressions, and before 6,000 compressions by EMS, why

22    not say this is at most undetermined?  It didn't

23    preclude a prosecution, did it?

1          MS. PECK:  Objection.

2          THE WITNESS:  Well, even by calling it a

3     homicide does not guarantee a prosecution.  The

4     district attorney can do whatever he wants to do

5     or she wants to do to pursue this.

6          If the district attorney seriously thinks

7     that Mr. Davis did this in a flurry of panic or

8     whatever, he's free not to prosecute this.  My

9     homicide ruling is only my ruling for the death

10    certificate.  Whatever they do with it is up to

11    them.

12  BY MR. KLEIN:

13    Q.  You looked at the video -- well, apparently it's

14  part of your file but we don't have it here.

15         Is that the video from Mr. Davis's interview with

16  Detective Fountain on March, I believe, 2nd of 2015?

17    A.  Yes.

18    Q.  So, you saw his interview and you determined that

19  he committed a murder; is that fair?

20          MS. PECK:  Objection.

21          THE WITNESS:  I never determined murder.

22  BY MR. KLEIN:

23    Q.  I'm not saying you made a legal determination,

**APPENDIX**    **577**

1    but you determined -- his statement and demonstration of

2    compression, you determined that to be the cause of

3    death rather than looking at -- and you assumed that the

4    EMTs and hospital staff acted appropriately, you linked

5    it to him based on the interview; did you not?

6                    MS. PECK:  Objection.

7                    THE WITNESS:  Well, I linked the pattern

8        of injuries to be the most consistent, the far

9        most consistent, with what he demonstrated doing

10       to██████.  That's what I linked him to.  That's

11       the only linkage I made.

12    Q.  Well, when you watched that video, did you ever

13    watch it with anyone from the police department and/or

14    the DA's office or did you watch it either alone or with

15    your own staff?

16    A.  I watched it in my office later on after I

17    received it, by myself.

18    Q.  Did you then speak with Detective Fountain,

19    anyone from the DA's office, or anyone else, after you

20    watched it?

21    A.  No.

22    Q.  Did the police department video inform your

23    findings in this case about specifically -- let me

1    scroll to the autopsy report.

2         So, looking at the anatomic diagnoses on page

3    1596 of Exhibit 1, hypovolemic shock due to large

4    hemoperitoneum due to multiple lacerations of the liver

5    with right rib fractures due to blunt force trauma, A,

6    history of decedent reportedly found unresponsive with

7    reported history of attempted CPR, cardiopulmonary

8    resuscitation, by a large adult.

9         So, this part about a large adult, you

10   specifically incorporated what you were informed by the

11   police and what you saw in the video in this autopsy

12   diagnosis, correct?

13              MS. PECK:  Object to form.

14              THE WITNESS:  Yes.

15              MR. KLEIN:  Why don't we take a break

16       now.

17              (Recess taken.)

18   BY MR. KLEIN:

19     Q.  Good morning, Dr. Sikirika.  We just took about a

20   20-minute break.

21         Given the break, is there anything you wish to

22   clarify, change or correct with your testimony so far

23   today?

1      A.   Yes, please.

2           With regard to the meeting that I had with

3    Jessica Hall and Joel Abelove, that didn't occur after

4    the verdict.

5           That actually occurred after I witnessed the

6    testimony of Dr. Teas and the prosecution's line of

7    questioning.  That's the day that I insisted on seeing

8    them.

9           As soon as that testimony of Dr. Teas was done

10   and I wasn't allowed a chance to give a rebuttal,

11   through the investigator, Jimmy Morgan, I told them that

12   I had to see them ASAP, and they came over that

13   afternoon.

14     Q.   Do you have any e-mails, notes, memoranda, or any

15   other writings, that document this meeting?

16     A.   No.

17     Q.   Either --

18     A.   Didn't have notes on that.

19     Q.   Did Joel Abelove or anyone in his office ever

20   correspond you with in writing, even if you didn't with

21   them in writing, about the meeting?

22     A.   No.  Nothing ever written down.  They were, you

23   know, very attentive and apologetic about the way -- the

Case 1:17-cv-08290-DJS Document 41-294 Filed 02/04/22 Page 89 of 178 87

1  performance, but nothing was ever put on paper.

2    Q.  Did you ever speak with either or both of them

3  after the acquittal, the not guilty verdict?

4    A.  Not that I recall, no.

5    Q.  Do you recall testifying at the grand jury,

6  quote, with regard to the -- you were asked about

7  district attorneys and police being at the autopsy, that

8  quote, "they are there to feed me information about what

9  the police or other people may know about the case, so

10  they are there to feed me information.  I'm there to ask

11  them questions.  It's a give and take situation".

12        You said that on page one, lines 12 to 21.

13        Do you recall giving that testimony?

14    A.  Yes.

15    Q.  Is that accurate?  You stand by that today?

16    A.  Yes.

17    Q.  So, they're not just there to observe, they're

18  there to feed you information true, correct?

19    A.  Yes.  They're there to give me the information

20  that I'm requesting about the case and let me know about

21  it.

22    Q.  And is it your testimony that their narrative

23  does not influence you in any way, or are you maybe

1  naturally influenced by the narrative they give you?

2      Do you pursue the thread, pull on the thread that

3  they give you when you look at an autopsy, when you look

4  at your task before you?

5      MS. PECK:  Objection to form.

6      THE WITNESS:  Well, I wouldn't say I'm

7     influenced by it, but I consider what they tell

8     me.  The police often have information that I'm

9     not aware of, so they bring their portion of the

10     information to the table, and I work with that,

11     as well as the autopsy findings and any inquiry

12     findings, to determine the cause or manner.

13  BY MR. KLEIN:

14  Q.  Well, did the police officers, law enforcement

15  information to you, including the video, do you think

16  that steered you in a direction that led you away from

17  the unexplained death and more towards some type of

18  traumatic conduct caused by Mr. Davis?

19      Do you think that contributed to that direction

20  your autopsy went in?

21      MS. PECK:  Objection to form.

22      THE WITNESS:  Well, I didn't receive the

23     videos until after the autopsy and I had still

1    pended the case at that point.

2            So, it is very common I receive things

3    sometimes weeks or months after the autopsy, and

4    I eventually consolidate all those into my

5    report.

6            But the police really didn't influence my

7    report in any way, either -- whatever they

8    wanted.

9    BY MR. KLEIN:

10    Q.  Well, it did influence it.  You used their

11   interview and you used information in this give and take

12   situation, right, to factor into your report.

13        Whether you call that influenced or factoring in,

14   you factored it in.

15            MS. PECK:  Objection.

16            THE WITNESS:  Yes.  I factored it in.

17   BY MR. KLEIN:

18    Q.  Now, you talked about how when you did the

19   Y-shaped incision -- in the grand jury -- there was

20   large amount of blood oozing from the abdominal cavity

21   and you normally don't see free blood circulating.

22        Do you recall that?

23    A.  Yes.

1    Q.  Would that have been a good time to tell the

2  grand jury that there's going to be a significant amount

3  of blood just from an hour of chest compressions?

4              MS. PECK:  Objection.

5              THE WITNESS:  I don't know if I would

6       have mentioned that.  I don't think I would have

7       mentioned it.

8  BY MR. KLEIN:

9    Q.  Would that have been significant to mention?

10             Was it misleading to not to tell the jury, the

11  grand jury and the jury at trial, a large portion of the

12  blood may have been from chest compressions?

13             MS. PECK:  Objection.

14             THE WITNESS:  I don't think it's

15      misleading.  I didn't know what the whole story

16       was at that time.

17             No.  I don't think it's misleading to

18       think that.

19  BY MR. KLEIN:

20    Q.  Well, you had that measuring cup --

21    A.  Yes.

22    Q.  -- with the -- as an exhibit with the blood in

23  it.

1      Do you recall that?

2    A.  Yes.

3    Q.  You gave the impression, would you agree, that

4  all of that blood was due to internal bleeding.

5    A.  Yes.  It was all due to internal bleeding.

6    Q.  But a substantial amount of it, you would agree,

7  was there accumulated due to CPR efforts.

8    A.  No.

9         MS. PECK:  Objection.

10         THE WITNESS:  I would not say a

11     substantial amount was there due to CPR efforts.

12     I would say a substantial amount, the majority,

13      that came from the severely lacerated liver,

14      which is independent of the CPR.

15  BY MR. KLEIN:

16    Q.  In the grand jury, do you think you were clear

17  enough that the ribs along the back of the lower right

18  chest -- when you said they were in the area of the

19  liver, do you think you gave the grand jury the

20  impression that they were the cause of the laceration of

21  the liver?

22    A.  I hope I did not provide that.  I never said in

23  the trial that it was a cause of the liver lacerations.

1    Q.   We spoke with Detective Fountain last week, and

2   he says that you told him, or at least it was his

3   impression, that the ribs lacerated the liver and that's

4   what he told Michael Davis when he interviewed him.

5        Did you ever tell law enforcement, whether

6   Fountain specifically or law enforcement generally,

7   maybe even initially, that you believe the ribs

8   lacerated the liver?

9              MS. PECK:  Objection.

10             MS. SPENCER:  Objection.

11             THE WITNESS:  No.  I never would have

12       said that, because the ribs were not

13       protuberating into the chest cavity.  They were

14       really displaced.

15   BY MR. KLEIN:

16    Q.   So, if Ronald -- if Detective Fountain made that

17   conclusion as a premise in his questioning of the

18   witness, is that a lead that was not supported by the

19   science?

20    A.   It's possibly a misinterpretation of what I was

21   explaining to him.

22    Q.   Or it could be a fabrication.  You don't know

23   either way, though, right?

```
1                    MS. SPENCER:  Objection.

2                    THE WITNESS:  Yes.  I would not have said

3         that the lacerations came from broken ribs.

4    BY MR. KLEIN:

5       Q.  So, if Detective Fountain said that you said that

6    he's misinterpreting or misrepresenting what you said.

7                    MS. SPENCER:  Objection.

8                    THE WITNESS:  Yes.

9    BY MR. KLEIN:

10      Q.  Now, did you recall -- as of February 2015 when

11   you did the autopsy in this case, did you know that the

12   Court of Appeals had thrown out Adrian Thomas's

13   confession due to the tactics used by Detective Fountain

14   and Detective Mason in that case?

15                   MS. SPENCER:  Object to form.

16                   MS. PECK:  Objection.

17                   THE WITNESS:  I don't recall when I was

18        aware that verdict had been overturned.  I'm not

19         sure when it was.

20   BY MR. KLEIN:

21      Q.  I'll tell you the trial was the June before, June

22   of 2014.  So, you knew by the time that you testified at

23   the retrial in June of 2014 that their conduct was
```

```
 1    called into question.
 2          There was a reason why the confession didn't come
 3    into trial at the retrial, right?
 4                MS. SPENCER:  Objection.
 5                THE WITNESS:  Yes, I would have been
 6       aware of that, yes.
 7    BY MR. KLEIN:
 8       Q.  So, given that I'll tell you it was about several
 9    months before that trial, several months before ████
10    Davis's death, did you factor in any question about
11    Ronald Fountain's credibility when you used evidence
12    that he gave you to factor into your autopsy?
13                MS. SPENCER:  Objection to form.
14                MS. PECK:  Objection.
15                THE WITNESS:  Well, the only evidence
16       that I factored into the autopsy finding on the
17       final report was the video of Michael Davis
18       applying pressure or replicating applying
19       pressure to ████.
20    BY MR. KLEIN:
21       Q.  Did you come to learn that in the Thomas case
22    that anytime Adrian Thomas was throwing the briefcase on
23    the floor the court determined, as a matter of law, it
```

**APPENDIX**

1   was only in response to the detective demonstrating it

2   to him to do it, so that he could help his child or help

3   his wife or for whatever reason they offered?

4        Did you know that generally or specifically that

5   whenever he demonstrated something it was in response to

6   the detectives telling him to and not because he did it

7   on his own?

8            MS. SPENCER:  Object to form.

9            THE WITNESS:  I wasn't aware of all the

10           grounds for the reason that the case went back to

11           trial.  I just knew that -- I was under the

12           impression that the police had lied to him in

13           some way, whether in fact or not I don't know,

14           but it didn't have anything to do with this case.

15   Q.  Did you know that Detective Fountain got indicted

16   for some type of political corruption type of case

17   involving the mayoral race, taking evidence from the

18   precinct, that occurred around the time of the

19   indictments in this case for Michael Davis?

20        Did you know about that?

21           MS. SPENCER:  Object to form.

22           THE WITNESS:  No.  I didn't know anything

23           about that, no.

1   BY MR. KLEIN:

2       Q.  Ron Fountain said he saw you once in a diner

3   since then.

4           Have you seen him since the incident?  Do you

5   recall seeing him any time?

6       A.  I can't even remember seeing him at a diner, but

7   if he does.  I see so many people, I can't even remember

8   the -- I wouldn't know if I saw him today.  If he said

9   hello to me, he would have to tell me who he is.

10      Q.  Between the Adrian Thomas case, before Michael

11  Davis, and then this criminal issue, which was very

12  publicized up in the Troy area, did his name ever come

13  up in your conversations with Abelove and Hall?

14          Just like you discussed Chavkin, did anyone ever

15  discuss Ronald Fountain's credibility or fitness?

16              MS. SPENCER:  Object to form.

17              THE WITNESS:  No, never.

18  BY MR. KLEIN:

19      Q.  Now, when you testified at the grand jury, you

20  said "the fractures would have been very painful".

21  That's a quote.

22          You don't doubt that you said something like

23  that, do you?

1    A.  Correct.

2    Q.  So, how -- what do you attribute the lack of any

3  report of her screaming and crying in pain?

4           MS. PECK:  Objection.

5           THE WITNESS:  I don't attribute it to

6     anything other than the fact that she probably

7     passed out very quickly as they occurred.  And

8     she may have been -- she may have been smothered,

9     even.  I can't tell you.

10  BY MR. KLEIN:

11    Q.  There's no evidence of that here, though, right?

12    A.  Well, there isn't any, but it doesn't leave any

13  evidence.

14    Q.  And you said conclusively that she lost

15  consciousness because of the bleeding in her abdominal

16  cavity, but as you said earlier, isn't it true that

17  there is a remote possibility, but a possibility that

18  you can't discount, that she died before for unexplained

19  reasons?

20           MS. SPENCER:  Object to form.

21           THE WITNESS:  I would say that it's not

22     impossible, but it's beyond a reasonable medical

23     certainty that she died of something else.

1  BY MR. KLEIN:

2    Q.  If you had not seen the video, would you have

3  opined that the injury occurred due to compression of

4  the abdominal cavity?

5         MS. SPENCER:  Object to form.

6         THE WITNESS:  No.  I would have -- could

7    you repeat that question, please.

8  BY MR. KLEIN:

9    Q.  Had you not seen the video of Detective

10 Fountain's interview, would you have opined and

11 testified that the injury occurred due to compression of

12 the abdominal cavity?

13   A.  Yes.

14   Q.  So, you would have found that there was blunt

15 force compressive injury leading to the loss of blood,

16 leading to the blood in the cavity, even if you had not

17 seen the video?

18   A.  Yes.

19   Q.  Now, if you had not seen the video, would you

20 have been able to conclude that it was Michael Davis

21 versus EMTs or emergency room physicians?

22         MS. SPENCER:  Objection.

23         THE WITNESS:  Without seeing the video, I

1       would not know who did it, who applied the

2       pressure, but I would not assume that it was EMS

3       or done by CPR.

4   BY MR. KLEIN:

5       Q.  When you put in the words that we've discussed

6   before the break in your anatomic diagnoses, attempted

7   CPR by a large adult, you were specifically linking

8   Michael Davis to the injuries in this case in your

9   autopsy, correct?

10      A.  Not specifically linking him to it.  I didn't

11  mention his name.

12          It said -- if I could refer to my report.  It

13  said, history of decedent, reportedly found unresponsive

14  with reported history, reported history of attempted

15  cardiopulmonary resuscitation by a large adult.

16          He reported that he did this.  There are no

17  witnesses that Michael Davis ever did CPR to this child.

18  None.

19      Q.  Well, he's a witness.

20          What about the 6,000 compressions of attempted

21  CPR by potentially small, medium and large other adults,

22  EMTs and ER staff, what was the reason you didn't put

23  that in here, or did not know of it at the time you did

1    your report?

2              MS. PECK:  Object to form.

3              THE WITNESS:  I knew about it.  It's

4         standard practice to do CPR to a child brought

5         into the hospital.  And the extent of the

6         injuries on ▆▆▆▆ were far beyond anything

7         applicable to -- attributable to CPR.

8    BY MR. KLEIN:

9      Q.  Well, as you said earlier, you assume they did it

10   right, but if they didn't, it could be attributable to

11   some or many of the 6,000 compressions.

12        You just don't know either way because you

13   assumed.  Is that fair?

14             MS. PECK:  Objection.

15             THE WITNESS:  It's fair to say that

16        whatever Michael Davis was doing to her abdomen

17        was not CPR.

18   BY MR. KLEIN:

19     Q.  It's also fair that trained -- individuals

20   trained in CPR are -- it's documented that they can

21   cause injuries to ribs and liver related even if they're

22   trained in CPR, correct?

23     A.  That is correct.

Case 1:17-cv-01290-DJS   Document 119-34   Filed 02/04/22   Page 102 of 178

1    Q.  So, when you say there's a history here of

2  attempted CPR by a large adult, there's likewise a

3  history of CPR over the course of over an hour by other

4  adults that you don't put in here.

5      I guess my question is just simple.  Why was that

6  history not significant enough to put in your report?

7      Was it an oversight?  Would it have been more

8  complete to put that in your report?

9         MS. PECK:  Objection.

10        THE WITNESS:  It was simply assumed that

11    CPR would have been performed all the way into

12    the hospital.  I just assumed that people would

13    understand that she was pronounced in the

14    hospital.

15        If you read the entire report, there are

16    hospital records.  I simply assumed that CPR

17    would have been performed all the way until the

18    time she was pronounced.

19  BY MR. KLEIN:

20    Q.  Right, but it's not -- my question is different.

21      You may assume that, maybe anybody would have

22  assumed that, but isn't it relevant history here, when

23  you have potential CPR related injuries, isn't it

1  important history so that you could explain why they

2  were not causative of the injuries or death?

3      A.  Well, this is not CPR-related injury.  This is

4  blunt force, compressive injury to the abdomen which

5  does not qualify as CPR.

6      Q.  Well, you seem to document it as a reported

7  history of attempted CPR.  So, you just reported it but

8  you don't believe that's what it was?

9      A.  No.

10      Q.  But when you know, based on your training and

11  extensive experience, and review of the literature, that

12  these types of injuries could be -- could occur due to

13  CPR, even if you don't believe that happened here, isn't

14  it important to document that in your report and rule it

15  out?

16              MS. PECK:  Objection.

17              THE WITNESS:  No.  You said that -- these

18       are not consistent with CPR.  They're vastly more

19       severe than anything that's been seen in CPR.

20  BY MR. KLEIN:

21      Q.  Do you agree the ribs, even the posterior ribs,

22  are stress points that can fracture during CPR, even if

23  the rear ribs are more rarely fractured than the front

1  ribs and side ribs?

2      A.  Yes.  They have been described as occurring

3  rarely in CPR in adults.

4      Q.  Now, did you ever look into or analyze what Dr.

5  Teas discussed as the gross liver injuries and the

6  microscopic findings that she thought were significant

7  in this case?

8      A.  Yes.

9      Q.  So, she said that, when there's injury to living

10  tissues, such as crushing of the tissue, such that under

11  a microscope there will not only be bleeding, but there

12  will be destruction of the cells that make up the organ;

13  is that accurate?

14      A.  No.

15      Q.  That's inaccurate?

16      A.  Yes.

17      Q.  What is your view of that?

18          When there's injury to living tissues, is there

19  no change in the structure, whether it's premortem or

20  antemortem?

21      A.  There are always changes in the structure if the

22  tissue is damaged premortem, before death, and those are

23  reparative changes that come into play, but you cannot

1  detect with microscopic findings any cellular image that

2  would suggest crushing or anything else like that.

3        The size of the cells are very, very, very small,

4  and you cannot look at these cells and say they were

5  crushed or pulled or whatever under the microscope to

6  any reasonable degree of certainty.

7    Q.  What is the word l-y-s-e, lyse, what does that

8  mean?

9    A.  Lyse simply means breaking down.

10   Q.  So, in this case, on the slides that she

11 discussed at trial, she described that you could see red

12 blood cells that are pretty rounded.  You could

13 recognize the cell, the liver cell or hepatocyte.  The

14 blue part is the nucleus.  The pink part is the

15 cytoplasm.  And that if this was a crush injury those

16 cells would not be recognizable.  They would lyse.

17       Do you disagree with that?

18   A.  I disagree with that.

19   Q.  So, you believe you would still be able to

20 recognize?

21   A.  Absolutely.

22   Q.  What about, do you recall the testimony about on

23 a high-powered microscope that the presence of necrosis

1    or comparisons where blood is stopped and not moving

2    versus seeing the cell intact, do you agree that there

3    is a distinction in that nature where there is necrosis

4    in certain cases and others there is not?

5        A.   Well, there may be to her, but I've never seen

6    any literature or anything to suggest that.  I can't, in

7    my own capacity, see it.

8        Q.   Well, look.  We all learn something new every

9    day.

10       When she showed those slides under high power at

11   trial, did you see what she was talking about even if

12   you had never thought about it that way before?

13       A.   No.

14       Q.   Now, the top laceration, do you agree that that

15   was not in a location where the big blood vessels come

16   from the liver and that the artery was intact?

17       A.   I didn't trace every artery in that liver, but

18   the laceration was such that it would have involved at

19   least medium size cells, but I believe the vena cava and

20   the hepatic artery were intact.

21       Q.   You didn't mention the inferior mesenteric vein,

22   correct?

23       A.   Correct.

# APPENDIX

1    Q.   And the pressure in the veins being lower.

2         You didn't mention any of that.  You don't know

3   -- you didn't look for any of that stuff, right?

4    A.   No.

5    Q.   Now, arteries were not mentioned in your report

6   as being torn or ruptured, correct?

7    A.   Correct.

8    Q.   Torn or ruptured arteries, would you agree, would

9   cause extensive bleeding very quickly.

10   A.   Yes.

11   Q.   And that would bleed much quicker -- you would

12  bleed out from a torn or ruptured artery much faster

13  than you would from a ruptured liver.

14        Would you agree with that?

15   A.   Well, there are arteries in the liver.  There are

16  hepatic arteries that perfuse the entire liver.  So,

17  damage to the liver is going to need to bleed from those

18  arteries and portal veins.

19   Q.   Right, but those arteries didn't cause the bleed

20  out here, correct?

21   A.   The arteries in the liver is what caused the

22  bleeding out, yes.

23   Q.   Now, Dr. Teas talked about her assessment that

1  you didn't see pieces of blood clots stuck in the liver,

2  I believe where in other comparison cases there were

3  pieces of clumpy blood or blood clots.

4      Do you recall that testimony?  Do you disagree

5  with those distinctions?

6  A.  I didn't see them and I wouldn't be expecting in

7  that interval of time.  The child is only picked up at

8  -- the EMS got there at 1:14.  He died at 2:08.

9      So, in that span of time and the small time

10  before 911 was called, you're not going to see

11  significant clotting.  You're not going to see

12  significant fiber and deposition on the liver.  And

13  you're not going to see any kind of significant

14  reparative process.  It's too soon.

15  Q.  Do you believe that under high power you can see

16  whether cells are intact or not?

17  A.  You can see if they're intact.  You can see, yes,

18  you can -- but you can't tell if they're intact or

19  damaged because of trauma.

20      You can see cells that are damaged, but again,

21  that takes time.  Cellular changes don't occur

22  immediately.

23  Q.  Now, do you agree that, when there's cases of

 1   trauma with a lacerated liver, there is -- typically the

 2   nearby organs or tissues will be affected, like

 3   pancreas, adrenals, kidneys, that there will be

 4   hemorrhage among these tissues as well if you have

 5   trauma in the liver?

 6      A.   It would depend on how focused the trauma was.

 7   You may not see splenic injuries, you may not see

 8   hepatic injuries, you may not see intestinal injuries,

 9   if the force is applied to the liver itself.

10         If it's a broader force, you may find all the

11   damage throughout the abdomen.

12      Q.   But here, none of this was present here with

13   ████, no damage to the nearby other tissues, right, the

14   adrenal?

15      A.   Correct.

16      Q.   So, what is the significance of that, of it being

17   so localized, the injury in this case?

18         That it was from CPR?

19            MS. PECK:  Objection.

20            THE WITNESS:  No.  That was from

21       compression over the liver.

22   BY MR. KLEIN:

23      Q.   You can have compression over the liver when CPR

1   is done on a very small toddler like ███ correct?

2       A.  You can have damage to the liver if CPR is done

3   improperly on anyone, child or adult, correct.

4       Q.  Do you agree, when there's bleeding from the

5   liver, it's the kind of thing that you could see on a CT

6   and that emergency room physicians will watch or treat

7   or monitor if there's just liver bleeding and not other

8   organ damage?

9       A.  Yes.  I would agree that the clinicians may

10  determine that it's not necessary to do surgery, that

11  they could monitor perhaps in a hospital environment to

12  make sure your hematocrit and hemoglobin doesn't drop,

13  correct.  I would agree to that.

14      Q.  In terms of the idea of an undetected seizure,

15  you're not saying that it's impossible, are you?

16          You're just saying that you see no evidence of

17  it; is that fair?

18      A.  Correct, and I would not expect to find any

19  evidence.

20      Q.  I'm sorry.  My phone cut into my bluetooth and I

21  missed the answer, if you gave it.  Could you repeat

22  that if you said anything, or I could ask again.

23      A.  If you wouldn't mind asking again.  Thank you.

1    Q.   Is it your testimony that there was not --

2  there's no way that an undetected seizure happened here

3  or just that there's no evidence of it so you don't

4  believe it occurred?

5    A.   There's no clinical history of a seizure disorder

6  and there is no anatomic finding associated with most

7  seizures.

8    Q.   Well, does there have to be a clinical finding?

9  Like, in other words, would you have to like look at the

10  brain more in depth like you did to know if there was

11  seizure activity, or do some other type of testing that

12  was not done here to confirm conclusively?

13    A.   Well, as a neuropathologist, as well as a

14  forensic pathologist, I look at the brain especially.

15  And you may not ever, ever find the focus of a seizure

16  no matter how hard you look.

17    Q.   Right, and there are instances where someone has

18  a seizure that results in death without any history of

19  seizure.

20         Isn't that rare but still something that happens

21  in science?

22    A.   That would be extremely rare and it doesn't

23  happen in children without some brain defect.  I looked

Case 1:17-cv-03290-DJS Document 19-21 Filed 02/04/22 Page 1227 of 178

1    carefully at her brain, and there were no defects in the

2    brain that would cause a seizure.

3        Q.  Do you know if she was dehydrated before at the

4    time in the moments, hours, before she died?

5        A.  She did not appear dehydrated.  I touched her

6    skin.  She did not have any loss of turgor.  She was not

7    dehydrated.

8        Q.  Are you familiar with the term reperfusion

9    injuries?

10       A.  Yes.

11       Q.  What are those?

12       A.  Those are injuries that become apparent after a

13   tissue or organ had been starved of blood and oxygen.

14   As the blood comes back into the organ with oxygen, the

15   injuries start to occur and become manifest.

16       Q.  So, is it possible, even if you don't think it's

17   likely, that her injuries were reperfusion injuries

18   after she was already postmortem?

19       A.  No.  No.

20       Q.  That's essentially what Dr. Teas said and you

21   disagree with that; is that fair?

22       A.  Yes.

23       Q.  Dr. Sikirika, I have your report up, I don't have

1  to show it on the screen if you have it in front of you.

2       Can you just walk us through the key parts of

3  your finding in this report that relate to the liver and

4  the ribs and anything else that you think is significant

5  to the death in this case.

6    A.   Yes.

7       At the time of autopsy, of course, we did detect,

8  as we opened up the abdomen, 350 MLs of liquid blood and

9  a small amount of blood clot in the abdominal cavity.

10       As we removed the organs, there were fractures

11  along the back with the posterior aspect of the ninth

12  and tenth ribs on the right side.  They did show

13  evidence of hemorrhage around them.

14       There was also evidence of the lacerations to the

15  liver along the posterior aspect of the left lobe.  That

16  was about 5 by 5 by 0.5 centimeters.

17       An additional laceration along the anterior

18  aspect of the medial left lobe measuring 2.5 by 1.4

19  centimeters.

20       The lacerations along the upper right lobe, which

21  is 7.5 by 0.5 centimeters, with tearing off a

22  significant portion of lung tissue.  It perforates along

23  the posterior right lobe, measuring 1.8 by 0.4

Case 1:17-cv-03809-DJS Document 13-34 Filed 02/04/22 Page 124 of 178

1    centimeters and 1 by 0.3 centimeters.

2         There was additional slight tearing along the

3    caudate and the quadrate lobes.  And there was a

4    hemorrhage behind the liver 18 by 30 centimeters in

5    size.  This was in the soft tissue.

6         Those were the significant anatomic findings.

7    Q.  The lacerations, were they all present when the

8    liver was intact in the body, or did you notice them

9    after you removed the liver?

10        In other words, is there any chance that the

11   lacerations either were created or became bigger due to

12   handling of the liver, which I know can be dented and

13   damaged very easily just by handling it with a glove on.

14   A.  No.  These were all there at the time of the

15   examination in situ.  I saw these while they were in

16   place, and then I measured them when they came out.

17   They appeared to be the exact same size.

18   Q.  I want to just show you the photos.

19        Dr. Sikirika, I'm showing you page 1612 of

20   Exhibit 1, which is your file.  These are the

21   thumbnails.  Can you see them well enough to just point

22   out which photos you think are -- we should focus on as

23   significant in this case?

1    A.   Number 7442 is a measuring cup with the blood

2    that was recovered.

3    Q.   Got it.

4    A.   Then, if we go further downstream, we can see

5    that there are lacerations on number 7445.

6    Q.   Got it.

7    A.   And 46.

8    Q.   Okay.

9    A.   And then 49 and 50 and then 51.  And we can see

10   the chest wall hemorrhage in 7452.  And we can see --

11   all those pictures at the bottom show the liver after it

12   had been removed.

13   Q.   61, 62, 63, 64, 65, as well as 60?

14   A.   Yes.

15   Q.   I'm going to go to the next page or keep

16   scrolling down actually.

17       And then 66 and 67, are those the liver as well?

18   A.   Yes.  And the rest of them just show the normal

19   features showing that there was no head damage.

20       And I believe 86 and 87 are close ups of the rib.

21   Q.   The fractures that you observed at autopsy but

22   didn't observe on x-ray.

23   A.   Correct.

APPENDIX

1    Q.   Are there any other significant clinical findings

2    of note or have you covered them all?

3    A.   No.  I've covered them all.

4    Q.   Are there any additional findings that, if you

5    were doing your report today, you would add in given

6    your knowledge of the case or other secondary diagnoses

7    or causes or anything else?

8    A.   No.

9    Q.   1614 is a page -- a document entitled

10   "medical/burial death correction report"?

11   A.   Yes.

12   Q.   What is this about?

13        What is this for, this document?

14   A.   Well, this is a form that we use if we have to

15   amend or correct the death certificate.  Sometimes used

16   for when a case is pending to unpend the case.

17   Q.   What is page 1616?  What is this document?

18   A.   This is a copy of a three-part form that is

19   filled out by the medical-legal death investigator who

20   handled the case on ▮▮▮▮▮▮▮.

21   Q.   It's like an intake form?

22   A.   Yes.  It's an intake form for the medical

23   examiner's office.

1       Q.   I'm looking at 16, 17, 18, 19, 20, 21.

2            Are those all kind of related?

3       A.   Yes.

4       Q.   What are these documents?

5       A.   That first document, procedure and specimens,

6  lists the details of ▮▮▮▮▮▮ -- the way she was

7  received, and what samples were taken, and also how she

8  was identified, and the time they gave the autopsy.

9            Would you like me to continue?

10      Q.   Please tell us what page 1618 shows.

11      A.   Yes.  This is a standard toddler diagram that I

12  filled out for ▮▮▮▮, including some measurements of her

13  size and characteristics, and of course the medical

14  intervention.

15           It's a very standard form.

16      Q.   Other than some non-incident related damage to

17  her toenail, there was no sign of trauma on her body,

18  correct?

19      A.   Correct.

20           This is a diagram of her internal organs and

21  listing the weights of the features and sizes of the

22  injuries and the features of the heart.

23      Q.   For the record, this is page 1619.

Case 1:17-cv-01290-DJS   Document 119-34   Filed 02/04/22   Page 237 of 178

1          And then what are the notes on page 1620?  What

2     does it say?

3        A.  Those were additional notes that were describing

4     the initial injuries to the liver and the rib.

5        Q.  So, can you read what it says?

6        A.  Yes.

7          Posterior right lobe, 1.8 by .4, 1 by .3, small

8     tear quad and caud.  The compression injury of liver.

9     Posterior lower anterior, 18 by 30.  Break with

10    hemorrhage.  Ribs 9 and 10 with hemorrhage and fracture.

11    Slight hemorrhage number 8.

12       Q.  When you wrote "severe compressive injury to

13    liver", was that after the give and take discussion that

14    you discussed earlier, the back and forth with the

15    police?

16         Did they tell you what they had learned from

17    Michael Davis?

18       A.  No.  They hadn't told me anything at that point.

19    That was my conclusion.

20       Q.  Now at that point wasn't it, in your mind, a

21    possible cause of death, that compression to injury --

22    compressive injury to the liver that occurred during

23    CPR?

**APPENDIX**

```
 1        A.   No.

 2        Q.   That's because of the extent of the tearing to

 3   the liver that you described earlier?

 4        A.   Yeah.

 5        Q.   And the amount of blood?

 6        A.   Correct.

 7        Q.   Any other reason or those are the two reasons?

 8        A.   Those are the reasons.

 9        Q.   Then we have the Albany Med file.  So that's just

10   an order for radiological consult.

11             Did you request the full skeletal survey?

12        A.   Yes.

13        Q.   Those results were nonsignificant, correct?

14        A.   Correct.

15        Q.   So, this is -- page 1624 is the post-autopsy

16   meeting on March 12, 2015?

17        A.   Yes.

18        Q.   Do you recall when you got the interview, a copy

19   of the video, from March 2nd?

20             In other words, would it have been at this

21   meeting that they brought you a copy of it, or did you

22   have it in advance of this meeting, or subsequent, or

23   something else?
```

```
 1     A.  I can't remember if I got it at this meeting or I

 2  may have looked at the -- at this myself and been unable

 3  to open it.  Sometimes the Troy PD programs I can't open

 4  on my computer --

 5     Q.  Same here.

 6     A.  -- and we looked at it here, but it was done at

 7  my office.

 8     Q.  Do you know if it was a video watched or at least

 9  given to you during this meeting?

10         Is that typically what happens?

11     A.  I don't recall if it was given prior or after

12  this meeting.

13     Q.  Is there typically a post-autopsy meeting like

14  this a few weeks after the autopsy, or was this unusual

15  in this case?

16     A.  In a child it's pretty normal.

17     Q.  Do you have any notes of the agenda from that day

18  or any notes of what was discussed?

19     A.  No.

20     Q.  Do you remember?

21     A.  No.

22     Q.  The next page, 1625, is the sign-in sheet for the

23  autopsy?
```

Case 1:17-cv-01290-DJS Document 135-4 Filed 02/04/22 Page 121 of 178

1    A.  Yes.

2    Q.  Do you remember anything that Charles McDonald,

3  Ronald Fountain, Anthony Buttofucco, Tim Colineri,

4  anything that any Troy PD officers said or did during

5  this autopsy?

6    A.  No, I don't.

7    Q.  How about Andra Ackerman, was she -- do you

8  remember anything she said or did at the autopsy?

9    A.  No, I don't.

10       She was working for the DA's office at that time,

11  but I don't recall any specifics.

12    Q.  When these officials are at these autopsies with

13  you in a case like this, are they literally standing

14  around the decedent at the table with you or are they

15  like in some room behind the window without -- out of

16  earshot from you?

17    A.  They're usually in the autopsy room.  They don't

18  tend to get too close to the table.  They're usually

19  over by the wall, maybe 15 feet away.

20    Q.  In this case, do you remember where they were?

21    A.  I don't remember the specifics, but I would

22  wager, based on their performance, that they don't get

23  too close.

**APPENDIX** **614**

1  Q.  Pages 1626 and 1627, is this a request for, what,

2  for lab -- for testing?

3  A.  Yes.  Those are the toxicology tests.

4  Q.  Looks like you have medical records from the

5  child's pediatrician; is that right?

6  A.  Yes.

7  Q.  And then we come up to a page -- and so, were the

8  pediatrician records helpful in any way or did they not

9  shed any light at all on the death?

10  A.  Well, they were helpful to tell me that she

11  appeared to be a healthy, normally developed young

12  child, toddler.

13  Q.  There's another page, 1638 and 1639 and 1640.

14  Were these taken at the autopsy at the same time

15  as those other ones?  Are these pre-autopsy, pre-cutting

16  of the child?  Like when were these taken?

17  A.  These were taken at the hospital.  We can see a

18  notation at the top "hospital".  These were taken by

19  police at the hospital.

20  Q.  Okay.  Is there any significance to your findings

21  of any of these photos?

22  A.  No.

23  Q.  There's a subpoena here, 1641, for the grand

Case 1:17-cv-03809-DLI-SMG Document 18-5 Filed 02/04/22 Page 1297 of 178

1    jury.

2         Were you resistant to testifying in the grand

3    jury, or is it standard procedure for you to respond to

4    a subpoena?

5       A.  No.  Most of the time I don't require a subpoena.

6    They simply call my office.  I don't resist testifying

7    in the grand jury.

8       Q.  In this case, did the issuance of a subpoena on

9    August 15th of 2016 have to do with some of the tension

10   you had with Cindy Chavkin?

11             MS. PECK:  Objection.

12             THE WITNESS:  No.  There was no tension

13        with Cindy.  I never saw Cindy again.  The

14        subpoena doesn't mean anything to me.  Sometimes

15        they send it.  Sometimes they don't.  I can't

16        explain why.

17   BY MR. KLEIN:

18      Q.  This was a trial subpoena, not a grand jury

19   subpoena.  It's from August of 2016, August 15th.

20        I think earlier you said you met with Cindy on

21   the 20th of July or 29th, and then August 1st there's a

22   sign in sheet with you, ADA Hall and Cindy.

23        This is about two weeks after that, right before

1   the trial.  So, do you recall why you needed to be

2   subpoenaed for trial in this case and did it have to do

3   with the situation with your comments about Cindy?

4              MS. PECK:  Objection.

5              THE WITNESS:  No.  Sometimes they will

6        send me a subpoena.  It depends on the

7        secretarial staff.  Sometimes I don't.  It's

8        simply a call, you know, Doc, we have a trial

9        going on.  This is when we want to put you on.

10        And then we'll follow up, you know, the day

11        before or something.

12              Sometimes they'll send a subpoena.  It's

13        not necessary in my county.  It has nothing to do

14        with my thoughts on Cindy.

15   BY MR. KLEIN:

16     Q.  In your file is a list of all the fire and EMTs.

17          Was that -- do you in some cases reach out to

18   them to interview them?

19     A.  No.

20     Q.  I think we discussed the supporting depositions.

21          Was there any significance of these supporting

22   depositions to your case other than background

23   information?

Case 1:17-cv-01290-DDS Document 183-4 Filed 02/04/22 Page 125 of 178

1  A.  Well, they did say that in the scene was found

2  unresponsive, that there was a large male in the room

3  and no CPR was being done when they arrived.

4  Q.  What is the significance of that, that no CPR was

5  being done when they arrived?

6  A.  Well, I don't know the significance.  I

7  understand there was a telephone issue and had to run

8  out to get the telephone.  So, we didn't have a

9  telephone that worked.

10  I don't put much on that other than the fact that

11  there is no witness to CPR.  He may have been panicked.

12  He may have decided it's not worth it, the baby's

13  already dead.

14  Q.  I mean, you're speculating there, right?

15  A.  Yes.

16  Q.  I mean, the baby may have been dead, as you said,

17  before he even tried CPR, but you think it's just a very

18  low chance, but you'd be speculating as to any of that,

19  correct?

20  MS. PECK:  Objection.

21  THE WITNESS:  Correct.

22  BY MR. KLEIN:

23  Q.  The story that Michael Davis told of the baby

1   being unresponsive was not impossible to be true, right?

2   You just felt it was more likely true that he squeezed

3   in the way that you saw him on the video; is that fair?

4      A.   At the time, I didn't know what could have caused

5   any kind of unconscious state in this child, so that's

6   why I pended the case and did a more thorough

7   examination looking for some reason that she could be

8   unresponsive.

9         I never found a reason that she could be

10  unresponsive.

11     Q.   Have you ever concluded that there's undetermined

12  cause of -- that the cause of death is undetermined

13  because it's one of these unexplained deaths?

14     A.   Well, I've concluded, yes, I have, but there are

15  cases that I've looked very thoroughly, and based on the

16  circumstances I find no cause of death, and I have

17  called them cardiac arrythmia unknown etiology.

18     Q.   Are you aware of any way to conclusively, or at

19  least to a degree of medical certainty, to determine

20  whether ██████ was -- to tie her death, in other words,

21  whether the injuries to her liver or ribs were

22  postmortem or premortem, antemortem?

23     A.   The injuries to her ribs would have been

1    antemortem injuries.  That would be extensive bleeding

2    around the ribs, a large amount of hemorrhage in the

3    back of the chest.

4        Q.  Other than your speculation, how do you know --

5    in other words, you have no explanation for why she

6    would have been unresponsive, but it was reported that

7    she was, and EMS gets there and she was flat lining, and

8    it's reported by the firsthand witness that she was

9    unresponsive, whether you believe it or not.

10           So, what is the science, the medical basis to say

11   that the rib fracture was antemortem versus postmortem?

12       A.  Well, there's two questions in there that I don't

13   understand.

14           Are you telling me how do I know she was not

15   already dead?

16       Q.  Yeah.  I think you said you don't.  You just --

17   you think she probably wasn't?

18       A.  She wasn't dead when all this occurred, but she

19   bled out profusely.

20       Q.  But she could bleed profusely after she's dead,

21   right?

22           We talked about that.

23       A.  She could bleed significantly after she was dead,

1  but these injuries to the liver would have bled her out

2  very quickly and that would explain why she is

3  unresponsive.

4      Nothing else I did in her examination showed me

5  why she was unresponsive.  Nothing showed why she had

6  any reason to be unresponsive other than these liver

7  lacerations.

8      Q.  Unless it was a sudden, unexplained death that

9  you misdiagnosed, but in your view you correctly

10  diagnosed it, but that would be fair, right?

11      If you misdiagnosed a sudden, unexplained death,

12  that would be an explanation for it.

13      A.  There is no such thing as misdiagnosing a sudden,

14  unexplained death.  It's simply a sudden, unexplained

15  death.

16      Q.  Right.

17      A.  Rule out everything else, and if you have no

18  other cause of death that's what you would put, but

19  there is no cause of death on her other than bleeding

20  from liver laceration as largely appeared to me.

21      Q.  If it was -- assume hypothetically for this

22  question that if the rib injuries and liver injuries

23  were caused by EMS and medical ER personnel, not by

Case 1:17-cv-01290-DJS-mdCaDocument 18-93424 Filed 03/04/22 Page 129 of 178

1  Michael Davis, and those injuries caused the death,

2  would it be considered a homicide because it was at the

3  hands of another just medical personnel rather than

4  Michael Davis?

5     A.  It would have probably been left undetermined or

6  accidental.

7     Q.  So, explain why in that scenario, if CPR caused,

8  even if unintended, caused her death, why that would not

9  be a homicide just by virtue of it being at the hands of

10  another.

11     A.  Well, it's at the hands of another during

12  resuscitative process, which she is already in extremis.

13  So, I would not call that a homicide.

14     Q.  So, if Michael Davis -- you have no reason to

15  question his veracity that he was attempting CPR.

16       You just think he did it wrong, correct?

17     A.  No.  I don't think he ever -- he may have

18  attempted CPR after he did something that's not CPR,

19  crushing her abdomen.

20     Q.  So, just to be clear:  The demonstration that you

21  saw on the video that you determined to be attempted

22  CPR, is that the crushing?  Or do you think there was

23  something that he didn't demonstrate that preceded the

**APPENDIX**

1  attempted CPR?

2     A.   I think there's a good possibility that he did

3  something and is making this motion to cover up what he

4  really did.

5     Q.   So, what he did on the video, the pressing with

6  two hands and then one hand on top, one hand under the

7  back -- do you agree with that description generally?

8     A.   Yes.

9     Q.   Is that the acts that you say were the

10 compression that caused the injuries, or is it your

11 testimony that you believe he did something prior to

12 those acts which can be characterized as attempted CPR?

13    A.   I cannot say what he did prior to that, but I'm

14 saying that there is a possibility that something else

15 was done to ███, and then Michael Davis tried to

16 explain what he had done by showing you what he had done

17 and calling it CPR.

18    Q.   So, showing the attempted CPR and calling it CPR,

19 you know, what you saw on the video, is it your view

20 that that, just what you saw, could have caused the

21 death, or are you saying here today, and was it your

22 opinion at trial, that there had to have been more than

23 that that caused the death that he's not telling us?

1    A.  No.  I think what he explained and what we saw in

2  the video would be sufficient to cause the injury, but I

3  cannot rule out that something else was done prior to

4  that, or something else was done differently.

5      Perhaps it was a double handed squeeze with

6  thumbs behind the back and the fingers over the chest,

7  or vice versa, the thumbs in the front and squeezing

8  from the back.  I can't say he did this.

9    Q.  You don't know what specifically Michael Davis

10  did that could have caused this child's death.  You just

11  believe something happened at or around that time

12  because you wouldn't have this kind of bleeding and

13  tearing.

14      Is that a fair summary?

15    A.  That would be fair, yes.

16    Q.  So there is some inference drawing here that

17  Michael's conduct that he described on the video

18  contributed to it.  If not, he said he did more than

19  what he said.

20      Right?  Is there some inference drawing here that

21  you do?

22    A.  He may -- if I could clarify.

23      He may have done something else to this child

Case 1:17-cv-03290-DJS Document 119-4 Filed 02/04/22 Page 132 of 178

1    that he is trying to explain away with his rendition of

2    CPR, which involves squeezing the child.

3           That's all I can say and that is speculation.  I

4    can't say that it was done because I wasn't there and

5    there are no witnesses.

6       Q.  Dr. Sikirika, do you not know exactly how this

7    child died?  You just believe it's more likely than not

8    that Michael did it because of his statements that he

9    did some compression on -- four or five compressions of

10   the chest?

11      A.  Well, the chest compressions did not kill this

12   child.  The compressions that killed her were the

13   compressions and the squeezing of the abdomen.

14      Q.  Does he show that?  In your opinion, did he show

15   that during the video?

16      A.  Yes.

17      Q.  It was filled with air so he pressed it down?

18      A.  Yes.

19      Q.  So, in your view, that had to have shredded her

20   liver and broken her rib, broken ribs?

21      A.  Yes.

22      Q.  And are you speculating that that happened as the

23   most -- as the only likely possible cause, but you don't

Case 1:17-cv-01290-DDD Document 19-34 Filed 02/04/22 Page 133 of 178

1    know for sure?

2        A.   No.   It's my opinion, my medical opinion, to a

3    reasonable degree of medical certainty, is that that

4    type of action is what caused the severe lacerations of

5    the liver and the broken rib.

6        Q.   So, even though lacerated livers and broken ribs

7    happen during CPR, am I correct in understanding that in

8    this case you believe it was the pressing of the stomach

9    and the back, which is not, in your view, considered

10   CPR, that caused -- injuries that could happen during

11   CPR but here they happened from stomach pressing?

12               MS. PECK:   Objection.

13   BY MR. KLEIN:

14       Q.   Does that make sense?

15       A.   Yes.   The injuries would not have happened during

16   CPR.

17       Q.   Even though they're consistent with CPR

18   generally.

19               MS. PECK:   Objection.

20               THE WITNESS:   Liver lacerations may be

21        consistent with CPR, but not five of them

22        sheering away a portion of the liver.   That is

23        not a CPR-related injury.

1  BY MR. KLEIN:

2     Q.  Now, if he did this in the course of believing he

3  did CPR trying to save the child's life, you don't know

4  what was in his mind when he did what he described in

5  the video, did you?

6     A.  No.  I never know what's in anybody's mind.

7     Q.  But you knew that, by drawing the conclusions

8  that you did, this man was going to face life in prison.

9              MS. SPENCER:  Objection.

10             THE WITNESS:  I don't make those kind of

11      jumps.

12  BY MR. KLEIN:

13     Q.  You don't make what?

14     A.  I don't make those kind of jumps.  It's not my

15  prerogative.  I don't consider guilt or anything else.

16  I just try to explain how things occurred.

17     Q.  You know as you're one of the key witnesses in a

18  criminal case like this, right, when there's only a body

19  and a suspect, correct?

20     A.  Yes.

21     Q.  And so, whether you make the decision of what to

22  charge or what the consequences or not, I'm not

23  suggesting that, but what I'm saying is you're aware of

Case 1:17-cv-01290-DJS Document 18-3 Filed 02/04/22 Page 135 of 178

1    the natural and probable consequences of you making a

2    decision like this?

3        A.   I am very aware everything I do, and I understand

4    that it's very important to make the right decisions and

5    not to over describe or over testify to things that are

6    not based on a reasonable degree of medical certainty.

7            I feel all my findings are to a reasonable degree

8    of medical certainty.

9        Q.   You have cases where you have law enforcement

10   involved in in-custody deaths on many occasions,

11   correct?

12       A.   Yes.

13       Q.   It's publicly available, your autopsy and the

14   report of the New York State Attorney General for the

15   Andrew Kearse case in Syracuse.

16           Do you recall that case?

17       A.   Kearse.

18       Q.   I believe died in a patrol car?  Cardiac arrest?

19       A.   I'm sorry.  I don't recall that case.  I never

20   did anything in Onondaga County.

21       Q.   It may not be Onondaga, but do you recall that

22   case that was investigated by the New York State

23   Attorney General?

Case 1:17-cv-01290-DJS    Document 119-34    Filed 02/04/22    Page 137 of 178

1    A.  It could be, but I don't recall the name.

2    Q.  That individual had CPR injuries.

3      You don't recall that incident?

4    A.  No, sorry.

5    Q.  Do you tend to find that with law -- have you

6 ever found that in a case involving law enforcement, a

7 death in custody, that law enforcement was responsible

8 for a homicide?

9    A.  Well, I have ruled deaths in custody as

10 homicides.

11    Q.  That's because like, you know, someone's being

12 subdued but they may have had a heart attack.

13      Have you ever found that it was due to blunt

14 force trauma or some, you know, culpable conduct even

15 though you're not charging the conduct in court, versus

16 like an accidental death during a homicide, as to law

17 enforcement?

18    A.  I don't ever recall that.

19      I do recall a case where I did not have enough

20 information to call a case one way or the other up north

21 in a case, but I believe I left that undetermined

22 because no one would talk from either side.

23    Q.  Were you hesitant, or is there any pressure on

1    you working with law enforcement to not look to fire

2    department or medical personnel responsibility for death

3    in a case like this, when you have someone like Mike

4    Davis who was involved?

5          In other words, do you -- are you steered in a

6    direction of the civilian rather than law enforcement,

7    fire department or hospital staff, when you should be

8    looking at all of them in a case like this?

9     A.   No.   Police don't do much steering in my

10    direction.

11    Q.   Okay.

12    A.   They know better.

13    Q.   Well, they did with Adrian Thomas, right?

14          MS. PECK:   Objection.

15    Q.   I mean, well, you found out that they committed

16    misconduct, they were getting Adrian to say stuff that

17    you factored into your report, right?

18          MS. PECK:   Objection.

19          THE WITNESS:   Only to the mechanism of

20      how the injuries occurred and who might be

21       responsible for it, yes.

22    BY MR. KLEIN:

23    Q.   So, and here you describe the back and forth that

Case 1:17-cv-01290-DJS Document 118-4 Filed 02/04/22 Page 137 of 178

1 in every case that you have with them, and they came in

2 here, having interviewed him on the date of the

3 incident, you do your autopsy, they give you the video.

4     MR. KLEIN:  I'm just going to take a

5   moment to see if I have any other questions about

6   this file.  And I think I want to take a look at

7   your photos, Crystal, and then see if we can get

8   close to wrapping it up.

9  Q.  Were you involved in a case 10, 15 years ago, a

10 criminal case, where you testified for the prosecution

11 that there was blunt force trauma and Dr. Wentley

12 testified that there was CPR injuries and the person was

13 convicted of murder?

14  A.  Would that be in Scoharie County?

15  Q.  I believe so.

16  A.  Yes.  Yes.

17  Q.  What happened in that case?

18  A.  The best of my recollection was a woman with a

19 history of alcoholism who was found unresponsive in a

20 trailer with lacerations of the liver, and the argument

21 was made that her son could come in to find her

22 afterwards and then performed CPR, and they had

23 accidentally lacerated the liver because they didn't

1    know what they were doing.

2        The gentleman was convicted based on my testimony

3    and other things.

4    Q.  And have your views on that case changed or

5    evolved over time?

6    A.  No.

7    Q.  In that case, was there a liver rupture or

8    injury?  I'm sorry if you said that.  I just don't

9    recall.

10    A.  There was.

11    Q.  There were rib fractures.

12    A.  Yes.

13    Q.  Were there other injuries as well, if you know,

14    or just liver or rib?

15    A.  I believe there were some other minor injuries,

16    but I can't exactly recall what they were.

17    Q.  Are you aware of studies that document CPR-caused

18    liver lacerations?  I'm sorry.

19        Are you aware of studies that document massive

20    abdominal hemorrhaging due to CPR-caused liver

21    lacerations?

22    A.  I have heard of studies, yes.

23    Q.  Are you familiar with a treatise "Essentials of

**APPENDIX**                                   **632**

```
 1   Autopsy Practice", Rutty, Edition 2001?

 2      A.  No.

 3      Q.  Have you looked at the -- have microscopes

 4   evolved since this incident?  Do you have higher power

 5   microscopes now than you did in 2015 or has the

 6   technology changed in that regard?

 7      A.  Well, the technology has improved, but it

 8   wouldn't be higher power.  It would be more of a digital

 9   microscopy that's being done now.  The microscope hasn't

10   really changed much in 50 years except that now it's

11   much more digitally.

12      Q.  Did you do a digital view or review of the slides

13   in this case back in 2015?

14      A.  No.  I just used my Olympus microscope.

15      Q.  What would be -- would you expect to see more or

16   anything different with a digital instrument?

17      A.  No.  It would just allow you to teach and perhaps

18   the storage is better in a way that they could be

19   retrieved in the future, tumors and such that can be

20   reexamined or reevaluated with different techniques.

21              MR. KLEIN:  So, can we just take a

22       several minute break.

23              (Recess taken.)
```

**APPENDIX** **633**

1    BY MR. KLEIN:

2       Q.  So, Dr. Sikirika, in this case, were you aware

3    that Detective Fountain was the lead Troy investigator

4    in this case?

5       A.  I don't recall ever knowing that he was the lead,

6    but I knew he was one of the investigators.

7       Q.  Were you aware -- were you working in cooperation

8    with the Troy police department throughout the

9    investigation of this case before it was indicted?

10      A.  Yes.  We cooperated with each other, yes.

11      Q.  Did you have an understanding, during the

12   investigatory phase of this case, that your testimony,

13   plus Ron Fountain's testimony at this meeting with

14   Michael Davis, formed the evidence that would lead to a

15   prosecution in this case?

16              MS. PECK:  Object to form.

17              MS. SPENCER:  Object to form.

18              THE WITNESS:  I didn't know how much

19        Detective Fountain was involved in the case, but

20        I knew that my testimony would be important in

21        the case.  That's all I can tell you.

22   BY MR. KLEIN:

23      Q.  Even though you didn't know it was Ron Fountain,

1   was it your understanding that it was your testimony, in

2   tandem with Troy police department, that was going to be

3   making out a case or not at trial in this case?

4      A.  Yes.  That's quite typical.  Yes.

5      Q.  It's typical generally but you knew specifically

6   in this case as well based on the nature of this?

7      A.  I know it in every case.  Every case I'm not the

8   only person who testifies.  PD testify, witnesses

9   testify.  So, it's just -- I just assume that PD would

10  be involved.

11     Q.  In the nature of your conversation with DA

12  Abelove and ADA Hall, did you ever speak with Ron

13  Fountain or anyone from Troy about the way this case was

14  handled by the DA's office or by anyone else?

15     A.  Not to my recollection, no.

16     Q.  DA Abelove subsequently prosecuted Ron Fountain

17  in a criminal case.

18         Did you know about that?

19            MS. SPENCER:  Object to form.

20            THE WITNESS:  I heard rumors about that

21     but I never followed up on it.  I didn't get any

22      of the details.  I don't know.

23  BY MR. KLEIN:

Case 1:17-cv-03290-DLI-SMG Document 18-5 Filed 02/04/22 Page 143 of 178

1    Q.  So, that never came up during these proceedings

2  or any of your conversations in this case?

3    A.  No.  I don't involve myself in PD or DA politics.

4    Q.  Whether you do or don't, it may have come up, so

5  I just want to know either way whether it came up.

6    A.  Not to my recollection, no.

7    Q.  In the news article that I referenced earlier, DA

8  Abelove said the following about you.

9       He said that he continues to have the utmost

10  confidence in you despite concerns expressed by Dr. Teas

11  about the number of autopsies you perform, which you

12  estimated at more than 700 per year, which Dr. Teas said

13  is more than double the recommended amount by the

14  national academy.

15       He said, quote, I'm still very satisfied with his

16  opinion.  Abelove said, I've known Dr. Sikirika for many

17  years and I find him entirely professional, very

18  thorough, and I have no qualms about his qualifications

19  or his abilities whatsoever.

20       Did you know about that statement before I just

21  read it to you?

22    A.  No, I never heard that.

23    Q.  Pretty complimentary.

1    So, did you -- in what way did you know Joel

2    Abelove for many years before this?  Because I don't

3    think he was DA -- how many years was he DA for, if you

4    know?

5    A.  Oh God.  Several years.

6    I've been through so many DAs, starting with

7    Trish Deangelis, McNally, Joel, the new DA.  I can't

8    even remember her name, you know.

9    That was nice of Joel to say, but I didn't know

10   him before this really.

11   Q.  So anything you knew about him was in the course

12   of your dealings.

13   Did you have any dealings with him professionally

14   in any other cases like you did in this case, or just

15   with his office through, like, you know, his

16   subordinates?

17   A.  Yes.  I worked with a lot of his subordinates on

18   cases, different cases.  I can't remember another case

19   where Joel was the primary, but it could have been

20   another case.

21   Q.  Even not as a primary, did you have any other

22   cases where you had meetings with him or his inner, you

23   know, his executive staff, other than like the one in

1    this case where you met with him directly?

2       A.   I'm sure I have.  I would guarantee you I have.

3       Q.   Have you ever met him before other than that

4    meeting that you had with him?

5       A.   Yes.

6       Q.   You have?

7       A.   Yes.

8       Q.   How many times?

9       A.   I don't know.  I probably was introduced to him

10   several years before.  I don't have any real

11   recollection of any significant meeting with him, no.

12      Q.   So, just to button that up.

13           You don't recall any meetings with him prior to

14   your meeting with him after you testified in this case?

15      A.   No.  I would have met him prior to this case I'm

16   sure, but I can't remember any individual cases.

17               MR. KLEIN:  Just one moment here.  I'm

18       just going to look at some other notes.

19                   Off the record.

20                   (Brief recess.)

21   BY MR. KLEIN:

22      Q.   If        had some type of arrythmia -- withdrawn.

23           Are you familiar with the phenomenon of

Case 1:17-cv-03290-DLC Document 48 Filed 02/04/22 Page 146 of 178

1    arrythmias leading to sudden death?

2      A.  Yes.

3      Q.  Can two-year-olds have arrythmias?

4      A.  Yes.

5      Q.  Can two-year-olds have arrythmias, cardiac

6    arrythmias, that lead to death, sudden death?

7      A.  Yes.

8      Q.  Is that something that you considered in this

9    case?  If so, did you -- what significance did that

10   factor in here?

11      A.  Well, I looked for -- during the gross and

12   microscopic examination, I looked for any source of

13   arrythmia.  I look for what could cause arrythmia.

14        Most of them are caused by physiological changes

15   or structural changes in the heart that occur.  And I

16   looked at that grossly and microscopically and

17   determined that there was no physiological evidence of

18   arrythmia, but I will qualify that, to be honest.

19        I mean, to examine the heart would take tens and

20   tens of thousands of slides.  So we, as pathologists,

21   only look at what we can look at to a reasonable degree

22   of certainty, and there was no major arrhythmogenic

23   focus into her heart.

Case 1:17-cv-01290-DjS Document 18-34 Filed 02/04/22 Page 147 of 178

1    Q.  Doesn't mean it didn't happen.  You just didn't

2  do the deep analysis, which is maybe understandable, but

3  you didn't do that to confirm conclusively; is that

4  right?

5    A.  Well, you may never find arrythmia.  Arrythmia is

6  electrophysiological.  It's like looking at a wire and

7  saying is there a current in it or not.  You may not

8  find the current.

9    Q.  Is that similar to the stroke -- I'm sorry -- the

10  seizure?  You may not necessarily see the focus of a

11  seizure.  You may or may not.  There may be, you know --

12  the subject may bite their tongue.  They may not.

13        There could be a seizure even if you don't see

14  evidence of a seizure, correct?

15    A.  Yes.  Only a quarter of the people bite their

16  tongue.

17    Q.  So, there could an arrythmia that lead to this,

18  which would explain why nothing showed up, right?  Is

19  that one possibility?

20        MS. PECK:  Objection.

21        THE WITNESS:  Arrythmia out of the blue

22    would be a very, very remote possibility, yes.

23  BY MR. KLEIN:

1    Q.   And a seizure would also be a possibility but, in

2    your view, very remote; is that fair?

3    A.   Very, very remote, yes.

4    Q.   Are there any other causes of her death that,

5    while remote, are possible in this -- given the facts

6    that you know in this case?

7    A.   Not that I'm aware of, no.

8    Q.   If ████ had died of an arrythmia and any

9    subsequent injuries that you observed on autopsy to the

10   liver and rib were postmortem, would you have -- what

11   would the manner of death have been?

12        Would it have been natural causes or undetermined

13   or what would you say there?

14   A.   If I had -- if she had died from arrythmia, her

15   cause of death would be arrythmia.  That would not be

16   included in the finding.  It would be mentioned in the

17   final anatomic diagnosis, but they would not be part of

18   the cause of death.

19   Q.   There are times, Doctor, that you make

20   assumptions or you assume something happened if there's

21   no other way to explain the subsequent event.

22        Isn't that something that you do in your

23   practice?

```
 1      A.  Yes.

 2              MS. PECK:  Objection.

 3   BY MR. KLEIN:

 4      Q.  Like, in other words, with Adrian Thomas, with

 5   that infant, there was no evidence of congestion, but

 6   you found that there must have been congestion which

 7   lead to pneumonia.

 8              MS. PECK:  He does not have the ability

 9         to talk about his autopsy findings or his autopsy

10         in this case, technically under law --

11              MR. KLEIN:  He talked about it at trial

12         in a proceeding.

13              MS. PECK:  The proceeding is sealed

14         because he was acquitted.

15              MR. KLEIN:  Right.

16              MS. PECK:  It can't be a part of this

17         discussion, Brett.  If you wanted it to be a part

18         of this discussion it needed to be opened for

19         this case.

20              MR. KLEIN:  Okay.

21      Q.  Are there -- hypothetically, are there situations

22   where you have someone who develops pneumonia, and you

23   assume that there was congestion, there was aspiration,
```

```
 1   even if there's no evidence of aspiration?

 2                MS. PECK:  Objection.

 3                THE WITNESS:  Yes.

 4   BY MR. KLEIN:

 5     Q.  Similarly, you could assume there was an

 6   arrythmia or a seizure given -- in certain

 7   circumstances, even if you have no objective evidence

 8   that it occurred, right?

 9          You could opine that there's an unexplained

10   death, more likely than not due to an arrythmia or

11   something like that, can't you?

12     A.  You'd have to attribute the arrythmia to

13   something, and that would have to be cardiovascular

14   disease or scarring of the heart or infection of the

15   heart.  We all die from a cardiac arrythmia.

16          Cardiac arrythmia, one form of cardiac arrythmia

17   is asystole.  Basically your heart stops.  That is

18   classified as arrythmia.  Arrythmia is very, very

19   general term.

20          That's why, when we do an autopsy like ████, we

21   look at the heart.  We look at other organs.  We try to

22   determine is there something that could cause an

23   arrythmia to death, and to a reasonable degree of
```

1   medical certainty, I did not find anything in ▮▮▮.

2     Q. Right. Just to kind of close that up.

3       The absence of not finding it doesn't mean it

4   didn't happen. You just didn't find it affirmatively.

5     A. Correct.

6     Q. Are there rules, regulations or guidelines or

7   best practices that dictate that, that if there are

8   secondary potential causes of death, even if they're

9   rare or not, less likely in your opinion, that you still

10   need to list them for full transparency?

11     A. No. There's no ruling on that. It's simply

12   assumed that, you know, to the best of our medical

13   ability, we have found a cause of death.

14       And there could always be something hidden in the

15   woodpile, I guess.

16     Q. When you prepared your autopsy report, your final

17   report, did you -- what was the moment where you

18   classified this as a, you know, blunt force trauma?

19       What was the moment that you determined the cause

20   of death?

21     A. Well, that would have been when I finally signed

22   off on the change form. That would have been the time.

23     Q. Did you send your draft autopsy to Troy PD and/or

1    the DA's office before finalizing it?

2        A.   I don't send out draft autopsies.

3        Q.   Do you give them a heads up before you finalize

4    it to say, hey, this is coming your way, you'll have it

5    within a week, and this is what I'm going to find?

6        A.   They may beg for it, but I don't necessarily -- I

7    never call them and tell them it's coming.  Often

8    they're looking for a report and they call my office.

9            Doc, we need a report.  What are you doing?  And

10   I will say, it's coming, and eventually it does make it

11   to them.  But my reports don't go to the police.  They

12   only go to the health department.

13       Q.   Doctor, are there any other facts or

14   circumstances involving ███████████ death that are

15   significant in this case that we haven't discussed?

16       A.   Not that I'm aware of, Brett.  I think we covered

17   everything.

18       Q.   Are there any other conversations or involvements

19   with any law enforcement in this case that stand out as

20   significant that you haven't already discussed, other

21   than your prep meetings, your autopsy meeting, your post

22   autopsy meeting, your DA preps, your critique of

23   Chavkin, your trial testimony, anything else?

1    A.  No.  No.  That's about it.

2    Q.  Is there anything about the way the science has

3    evolved, your view of Dr. Teas' testimony, learning your

4    about the details of the 6,000 compressions by Fireman

5    Bayly and Dr. Crisafulli, anything else that impacts

6    your views in this case?

7    A.  No.  Not at this time, no.

8         MR. KLEIN:  Well, thanks for this time.

9    You've been very generous with it.  We appreciate

10    it.

11  EXAMINATION

12  BY MS. SPENCER:

13    Q.  Dr. Sikirika, my name is Rhiannon Spencer.  I'm

14  an attorney for Pattison Sampson Ginsberg and Griffin.

15  I represent the City of Troy, Ronald Fountain, Danielle

16  Coonradt, Charles McDonald, Tim Colaneri and Adam Mason,

17  I believe are all the individuals named from the Troy

18  police department.

19         I just have a few questions for you.  Same rules

20  as with Brett.

21         Let's see.  So, in your experience, are there

22  certain or specific types of scenarios when the police

23  or the ADA or the district attorney's office would

1 request to be present during an autopsy?

2   A.  Yes.  If they know that it is a homicide from the

3 beginning, they're often there.  If there's anything

4 suspicious about a death in a young person, they're

5 often there, even if it's not suspicious.

6       Young people generate more interest,

7 understandably, whenever they die, especially children.

8 Even if the child is in an accident, they may often be

9 there.

10       So, they are there quite a bit if there's

11 anything unusual about a case or unknown.

12   Q.  And is it part of the expected standards or

13 customary practices for medical examiners to work

14 cooperatively with the police and the ADA's office?

15   A.  Yes.  Forensic pathology is a medical legal

16 investigation of death.  So, we have to rely on police

17 many times for things that we don't have access to.

18       Sometimes the DAs have to give us things that we

19 don't have access to.  They may provide subpoenas and

20 get us records if required, but it's a cooperative

21 effort and we all function independently of each other.

22   Q.  And part of that cooperative relationship would

23 include, you know, reviewing the police reports from the

Case 1:17-cv-01290-DDD Document 19-34 Filed 02/04/22 Page 157 of 178

1  Troy PD, or reviewing statements made by individuals

2  that provided that information to you upon your request,

3  or if they find that maybe it would be of interest.

4      Is that kind of those scenarios?

5  A.  Yes.  An autopsy never exists in a vacuum.  We

6  have to have circumstances and a background, a

7  reasonable degree of study.

8      I mean, I don't need a kindergarten record on

9  some people.  You know, if you're 20 years old and died

10  of a gunshot, I don't need your kindergarten grades, but

11  I'd like to know the police report, perhaps what was

12  found at the scene, are there any videos of what went

13  down, what was the general medical condition.  And then

14  we all put it together and, you know, I do the ultimate

15  condensation of this in my report.

16  Q.  And as part of that cooperative relationship,

17  those meetings that we discussed, for instance, in this

18  case on February 27th and March 12th and any other ones,

19  that would be a typical cooperative relationship and

20  meeting that occurs, correct?

21  A.  Yes.

22  Q.  During any of those meetings referenced, did any

23  member of the Troy police department attempt in any

1  manner to exert what you would consider as undue

2  influence on your medical determinations?

3      A.  Absolutely not.

4      Q.  And during the autopsy of ▮▮▮▮▮▮▮▮, did any

5  member of the Troy police department tell you to rule

6  this death a homicide?

7      A.  Never, no.

8      Q.  In rendering the final autopsy report that you

9  prepared in this matter, did any member of the Troy

10  police department tell you what to put in the report or

11  what they believed was relevant information?

12      A.  No, absolutely not.

13      Q.  For instance, did any Troy police department

14  member tell you to put in anatomic diagnosis, the

15  history, or any of those kind of findings?

16      A.  No.

17          MS. SPENCER:  That is all the questions

18      that I have for you, Doctor.  Thank you very

19      much.  I really appreciate it.

20          Are you all set, Brett?

21          MR. KLEIN:  I am.

22          (Deposition concluded at 1:37 p.m.)

23

1          INDEX OF EXHIBITS

2   Sikirika                                    Marked

3       1    Sikirika file                      25

4       2    Abelove press release              51

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

```
1   STATE OF NEW YORK     )

2   COUNTY OF

3

4   I, MICHAEL SIKIRICA, do hereby certify that I have read

5   the foregoing record of my testimony taken at the time

6   and place noted in the heading hereof and that it is

7   a true and correct transcript of the same and the whole

8   thereof.

9

10

11

12

13                                  MICHAEL SIKIRICA

14

15  Subscribed and sworn to

16  before me this        day

17  of _____, 2021

18

19

20

21

22  _____

23
```

Case 1:17-cv-01290-DJS Document 193-4 Filed 02/04/22 Page 159 of 178

1                    C E R T I F I C A T I O N

2

3

4    I, Jeanne O'Connell, Registered Professional Reporter

5    and Notary Public in and for the State of New York, do

6    hereby certify that the foregoing to be a true and

7    accurate transcription of the stenographic notes as

8    taken by me of the aforesaid proceedings.

9

10

11

12   _____           _____

13      Date                                 Jeanne O'Connell

14

15

16

17

18

19

20

21

22

23

**'**

**'90s** [2] - 19:18

**0**

**0.3** [1] - 113:1
**0.4** [1] - 112:23
**0.5** [2] - 112:16, 112:21

**1**

**1** [11] - 25:8, 25:11, 32:21, 52:21, 53:8, 53:11, 85:3, 113:1, 113:20, 117:7, 156:3
**1.4** [1] - 112:18
**1.8** [2] - 112:23, 117:7
**10** [5] - 54:7, 63:3, 63:11, 117:10, 137:9
**10,000** [1] - 19:19
**100** [1] - 54:16
**10007** [1] - 2:3
**12** [2] - 87:12, 118:16
**120** [1] - 54:20
**121-page** [1] - 32:21
**12180** [1] - 2:6
**12205** [1] - 2:10
**12th** [1] - 154:18
**15** [5] - 46:23, 49:10, 54:7, 120:19, 137:9
**1585** [1] - 32:22
**1586** [1] - 34:18
**1587** [1] - 35:16
**1596** [1] - 85:3
**1597** [1] - 35:16
**1598** [1] - 35:22
**1599** [1] - 36:2
**15th** [2] - 122:9, 122:19
**16** [4] - 54:21, 64:8, 64:16, 116:1
**1601** [1] - 36:17
**1602** [1] - 36:17
**1603** [1] - 36:17
**1604** [1] - 36:18
**1605** [1] - 36:21
**1606** [2] - 37:1, 37:8
**1607** [1] - 44:19
**1612** [1] - 113:19
**1614** [1] - 115:9
**1616** [1] - 115:17
**1618** [1] - 116:10
**1619** [1] - 116:23
**1620** [1] - 117:1
**1624** [1] - 118:15
**1625** [1] - 119:22
**1626** [1] - 121:1
**1627** [1] - 121:1

**1638** [1] - 121:13
**1639** [1] - 121:13
**1640** [1] - 121:13
**1641** [1] - 121:23
**1682** [1] - 53:11
**1689** [1] - 55:12
**17** [1] - 116:1
**1705** [1] - 32:23
**18** [3] - 113:4, 116:1, 117:9
**19** [1] - 116:1
**1:14** [1] - 107:8
**1:17-cv-01290** [1] - 1:5
**1:37** [1] - 155:22
**1st** [2] - 45:14, 122:21

**2**

**2** [4] - 51:14, 51:18, 156:4
**2.5** [1] - 112:18
**20** [5] - 35:2, 54:3, 54:21, 116:1, 154:9
**20-minute** [2] - 54:8, 85:20
**2001** [1] - 139:1
**2010** [2] - 24:12, 58:8
**2014** [2] - 93:22, 93:23
**2015** [4] - 4:14, 22:1, 22:4, 37:15, 38:22, 57:15, 83:16, 93:10, 118:16, 139:5, 139:13
**2015-2016** [1] - 14:13
**2016** [9] - 4:15, 22:22, 24:21, 25:14, 27:11, 42:21, 52:6, 122:9, 122:19
**2019** [8] - 8:11, 8:17, 9:22, 14:22, 15:3, 16:4, 16:18, 20:17
**2021** [2] - 1:13, 157:17
**20th** [1] - 122:21
**21** [2] - 87:12, 116:1
**21st** [1] - 46:4
**22** [1] - 2:5
**22nd** [3] - 22:22, 46:2, 46:4
**24th** [1] - 1:12
**25** [2] - 52:6, 156:3
**250** [2] - 14:17, 17:15
**26** [1] - 38:22
**26th** [1] - 25:15
**27** [1] - 37:15
**27th** [3] - 25:17, 37:22, 154:18
**28th** [2] - 42:20, 44:21
**29th** [2] - 22:1, 122:21
**2:08** [1] - 107:8
**2nd** [2] - 83:16, 118:19

**3**

**3** [1] - 117:7
**3,000** [1] - 56:4
**30** [6] - 56:3, 56:18, 58:11, 58:13, 113:4, 117:9
**305** [1] - 2:2
**350** [2] - 77:5, 112:8
**36** [1] - 56:17
**360** [2] - 14:20, 17:16

**4**

**4** [1] - 117:7
**4/10/16** [1] - 34:21
**400** [2] - 24:13, 77:5
**46** [1] - 114:7
**49** [1] - 114:9

**5**

**5** [3] - 2:9, 112:16
**50** [2] - 114:9, 139:10
**500** [1] - 30:17
**51** [2] - 114:9, 156:4
**53** [1] - 51:22
**54** [1] - 52:9
**5th** [2] - 8:11, 8:17, 9:22

**6**

**6,000** [8] - 57:3, 66:1, 71:20, 75:18, 82:21, 99:20, 100:11, 152:4
**60** [1] - 114:13
**600** [3] - 2:3, 14:14, 15:5
**61** [1] - 114:13
**62** [1] - 114:13
**63** [1] - 114:13
**64** [1] - 114:13
**65** [1] - 114:13
**66** [2] - 56:19, 114:17
**6600** [1] - 56:21
**67** [1] - 114:17
**6th** [3] - 8:11, 8:17, 9:22

**7**

**7** [1] - 63:3
**7.5** [1] - 112:21
**700** [1] - 142:12
**7442** [1] - 114:1
**7445** [1] - 114:5
**7452** [1] - 114:10

**8**

**8** [1] - 117:11
**8/1/16** [2] - 35:11, 44:18
**8/1/16"** [1] - 34:23
**86** [1] - 114:20
**87** [1] - 114:20

**9**

**9** [3] - 35:2, 63:11, 117:10
**911** [1] - 107:10
**9:33** [1] - 1:13

**A**

**a.m** [1] - 1:13, 35:2
**abdomen** [12] - 63:14, 65:19, 74:4, 74:15, 78:10, 78:12, 100:16, 102:4, 108:11, 112:8, 128:19, 131:13
**abdominal** [11] - 62:19, 65:3, 65:6, 76:5, 77:10, 89:20, 97:15, 98:4, 98:12, 112:9, 138:20
**ABELOVE** [1] - 1:8
**Abelove** [21] - 2:11, 40:11, 41:23, 42:4, 48:6, 49:6, 50:12, 51:3, 51:16, 52:1, 52:7, 52:18, 86:3, 86:19, 96:13, 141:12, 141:16, 142:8, 142:16, 143:2, 156:4
**abilities** [1] - 142:19
**ability** [6] - 18:21, 20:2, 20:4, 29:9, 148:8, 150:13
**able** [9] - 33:21, 34:8, 41:8, 41:18, 45:17, 68:10, 71:1, 98:20, 104:19
**absence** [1] - 150:3
**absolutely** [3] - 104:21, 155:3, 155:12
**abuse** [1] - 74:8
**Academy** [2] - 21:13, 21:18
**academy** [1] - 142:14
**access** [2] - 153:17, 153:19
**accident** [2] - 81:8, 153:8

**accidental** [3] - 38:11, 128:6, 135:16
**accidentally** [1] - 137:23
**account** [2] - 80:22, 82:18
**accounted** [1] - 77:16
**accreditation** [3] - 17:17, 17:21, 18:10
**accredited** [3] - 16:22, 17:21, 18:8
**accumulated** [1] - 91:7
**accurate** [4] - 30:8, 87:15, 103:13, 158:7
**accurately** [1] - 5:20
**Ackerman** [1] - 120:7
**acquittal** [8] - 39:18, 39:19, 39:22, 40:7, 48:3, 48:8, 49:23, 87:3
**Acquitted** [1] - 52:5
**acquitted** [2] - 40:3, 148:14
**acronym** [1] - 68:3
**act** [2] - 12:16, 74:7
**acted** [1] - 84:4
**action** [3] - 3:13, 51:5, 132:4
**activity** [1] - 110:11
**acts** [2] - 129:9, 129:12
**actual** [1] - 15:11
**ADA** [9] - 35:3, 40:15, 41:22, 41:23, 51:3, 51:6, 122:22, 141:12, 152:23
**ADA's** [1] - 153:14
**ADAM** [1] - 1:7
**Adam** [2] - 2:8, 152:16
**add** [1] - 115:5
**added** [1] - 52:12
**additional** [7] - 6:20, 6:23, 7:19, 112:17, 113:2, 115:4, 117:3
**address** [2] - 28:13, 32:7
**addressed** [1] - 29:1
**adjust** [1] - 73:10
**administer** [1] - 3:18
**administered** [1] - 64:16
**admitted** [1] - 52:10
**admitting** [1] - 52:8
**adolescence** [1] - 70:20
**adrenal** [1] - 108:14
**adrenals** [1] - 108:3
**Adrian** [8] - 4:10, 49:23, 93:12, 94:22,

# APPENDIX

96:10, 136:13,
136:16, 148:4
**adult** [7] - 61:16, 85:8,
85:9, 99:7, 99:15,
101:2, 109:3
**adults** [9] - 56:11,
56:14, 61:14, 61:15,
71:2, 73:9, 99:21,
101:4, 103:3
**advance** [1] - 118:22
**affected** [3] - 20:8,
20:9, 108:2
**affirmation** [1] - 3:18
**affirmatively** [1] -
150:4
**aforesaid** [1] - 158:8
**afternoon** [1] - 86:13
**afterwards** [3] - 40:6,
48:10, 137:22
**age** [14] - 67:18, 68:7,
68:16, 68:18, 68:23,
69:1, 69:8, 69:10,
69:12, 69:21, 69:22,
70:7, 71:10
**agenda** [1] - 119:17
**ago** [2] - 14:6, 137:9
**agree** [20] - 50:14,
58:10, 76:12, 76:17,
76:18, 76:21, 78:22,
79:1, 91:3, 91:6,
102:21, 105:2,
105:14, 106:8,
106:14, 107:23,
109:4, 109:9,
109:13, 129:7
**agreed** [4] - 3:2, 3:8,
3:11, 3:15
**ahead** [1] - 5:12
**air** [1] - 131:17
**airway** [1] - 24:16
**Albany** [18] - 2:10,
10:8, 10:12, 10:14,
10:18, 11:12, 11:21,
12:1, 12:4, 12:7,
12:10, 12:16, 13:12,
18:6, 18:8, 19:23,
36:12, 118:9
**alcoholism** [1] -
137:19
**allow** [4] - 28:4, 28:6,
33:22, 139:17
**allowed** [1] - 86:10
**alone** [6] - 41:12,
46:13, 46:14, 55:5,
79:10, 84:14
**ambulance** [1] - 54:7
**amend** [2] - 23:8,
115:15
**amount** [15] - 14:16,
18:15, 56:1, 58:15,

77:11, 77:12, 89:20,
90:2, 91:6, 91:11,
91:12, 112:9, 118:5,
126:2, 142:13
**analysis** [2] - 37:17,
146:2
**analyze** [1] - 103:4
**anatomic** [6] - 85:2,
99:6, 110:6, 113:6,
147:17, 155:14
**Andra** [1] - 120:7
**Andrew** [1] - 134:15
**anecdotally** [2] -
59:20, 61:4
**animal** [1] - 50:6
**answer** [7] - 5:3, 5:4,
5:13, 5:16, 26:16,
50:5, 109:21
**answered** [1] - 78:20
**answering** [1] - 75:1
**answers** [1] - 5:6
**antemortem** [5] - 29:4,
103:20, 125:22,
126:1, 126:11
**anterior** [6] - 61:12,
61:13, 64:1, 64:12,
112:17, 117:9
**Anthony** [1] - 120:3
**anytime** [1] - 94:22
**apart** [1] - 39:3
**apologetic** [2] - 49:19,
86:23
**apparent** [1] - 111:12
**Appeals** [1] - 93:12
**appear** [1] - 111:5
**appearance** [3] - 29:3,
33:11, 34:19
**APPEARANCES** [1] -
2:1
**appeared** [4] - 34:18,
113:17, 121:11,
127:20
**applicability** [1] -
71:10
**applicable** [2] - 68:5,
100:7
**application** [2] -
62:14, 62:18
**applied** [8] - 60:23,
61:7, 61:23, 62:1,
65:19, 74:14, 99:1,
108:9
**apply** [2] - 17:6, 70:7
**applying** [2] - 94:18
**appreciate** [2] - 152:9,
155:19
**approached** [1] - 11:7
**appropriately** [1] -
84:4
**arch** [3] - 62:18,

62:22, 63:3
**area** [5] - 62:22, 78:16,
78:17, 91:18, 96:12
**argument** [1] - 43:13,
137:20
**arrest** [5] - 66:22,
67:3, 76:20, 81:16,
134:18
**arrhythmogenic** [1] -
145:22
**arrived** [2] - 124:3,
124:5
**arrhythmia** [24] - 69:3,
81:9, 81:11, 125:17,
144:22, 145:13,
145:18, 146:5,
146:17, 146:21,
147:8, 147:14,
147:15, 149:6,
149:10, 149:12,
149:15, 149:16,
149:18, 149:23
**arrhythmias** [4] - 145:1,
145:3, 145:5, 145:6
**arteries** [7] - 106:5,
106:8, 106:15,
106:16, 106:18,
106:19, 106:21
**artery** [4] - 105:16,
105:17, 105:20,
106:12
**article** [5] - 24:20,
25:1, 52:4, 52:19,
142:7
**articles** [6] - 21:5,
23:14, 23:21, 23:22,
24:2, 24:3
**ASAP** [1] - 86:12
**ascertain** [1] - 7:23
**aspect** [6] - 29:14,
62:8, 62:11, 112:11,
112:15, 112:18
**aspects** [4] - 43:2,
60:19, 63:7, 64:1
**aspiration** [2] -
148:23, 149:1
**assessment** [1] -
106:23
**assigned** [1] - 68:21
**Assistant** [2] - 41:16,
52:11
**assistant** [4] - 40:8,
42:6, 42:7, 48:15
**associate** [2] - 16:23,
17:2
**associated** [3] -
57:18, 61:11, 110:6
**Association** [3] -
16:11, 16:15, 17:9
**assume** [14] - 72:17,

75:13, 77:12, 77:15,
80:23, 82:14, 99:2,
100:9, 101:21,
127:21, 141:9,
147:20, 148:23,
149:5
**assumed** [10] - 5:13,
75:10, 78:10, 84:3,
100:13, 101:10,
101:12, 101:16,
101:22, 150:12
**assuming** [1] - 77:10
**assumption** [7] - 73:4,
74:12, 75:12, 77:22,
78:1, 78:5, 80:7
**assumptions** [2] -
29:2, 147:20
**assure** [1] - 10:20
**asymptomatic** [1] -
29:23
**asystole** [2] - 79:18,
149:17
**athletes** [1] - 70:14
**attack** [1] - 135:12
**attempt** [1] - 154:23
**attempted** [13] -
23:17, 67:6, 85:7,
99:6, 99:14, 99:20,
101:2, 102:7,
128:18, 128:21,
129:1, 129:12,
129:18
**attempting** [1] -
128:15
**attend** [1] - 21:3
**attending** [3] - 20:20,
20:23, 21:16
**attentive** [1] - 86:23
**attorney** [11] - 4:22,
20:20, 37:21, 40:8,
46:11, 47:4, 50:7,
83:4, 83:6, 152:14
**Attorney** [5] - 2:4,
41:17, 52:11,
134:14, 134:23
**attorney's** [1] - 152:23
**Attorneys** [2] - 2:7,
2:11
**attorneys** [5] - 3:3,
22:14, 26:21, 26:23,
87:7
**attributable** [2] -
100:7, 100:10
**attribute** [3] - 97:2,
97:5, 149:12
**attributed** [3] - 52:7,
52:18, 60:22
**August** [11] - 22:22,
26:4, 45:14, 46:2,
46:4, 52:6, 122:9,

122:19, 122:21
**authoritative** [1] -
23:14
**autopsies** [13] - 14:14,
15:4, 15:13, 16:1,
17:15, 18:14, 18:20,
19:19, 20:2, 38:21,
120:12, 142:11,
151:2
**autopsy** [68] - 4:14,
6:5, 6:11, 7:7, 9:6,
12:11, 20:5, 20:20,
21:1, 21:9, 25:17,
35:17, 35:23, 36:1,
36:2, 36:9, 36:12,
36:18, 36:21, 37:1,
37:4, 37:6, 37:10,
37:22, 38:12, 39:5,
52:23, 70:6, 81:13,
85:1, 85:11, 87:7,
88:3, 88:11, 88:20,
88:23, 89:3, 93:11,
94:12, 94:16, 99:9,
112:7, 114:21,
116:8, 116:15,
119:13, 119:14,
119:23, 120:5,
120:8, 120:17,
121:14, 121:15,
134:13, 137:3,
147:9, 148:9,
149:20, 150:16,
150:23, 151:21,
151:22, 153:1,
154:5, 155:4, 155:8
**Autopsy** [1] - 139:1
**available** [1] - 134:13
**Avenue** [1] - 2:10
**avoid** [3] - 12:5, 54:23,
56:10
**avoidable** [5] - 58:21,
59:5, 59:15, 59:16,
59:21
**avoided** [4] - 58:17,
58:19, 58:20, 59:10
**aware** [35] - 20:17,
20:18, 22:15, 22:16,
23:13, 24:20, 24:22,
24:23, 51:23, 53:2,
53:4, 54:11, 54:17,
55:1, 57:17, 59:3,
59:4, 59:19, 60:1,
60:21, 65:2, 88:9,
93:18, 94:6, 95:9,
125:18, 133:23,
134:3, 138:17,
138:19, 140:2,
140:7, 147:7, 151:16

**B**

**baby** [3] - 74:7, 124:16, 124:23
**baby's** [1] - 124:12
**background** [6] - 8:22, 9:10, 9:11, 9:15, 123:22, 154:6
**bacterial** [1] - 81:17
**Bailey** [1] - 2:9
**based** [4] - 71:10, 84:5, 102:10, 120:22, 125:15, 134:6, 138:2, 141:6
**basis** [3] - 12:15, 71:11, 126:10
**Basketball** [1] - 52:5
**Bates** [3] - 32:21, 32:23, 53:10
**Bayly** [8] - 53:3, 53:9, 53:16, 54:2, 54:12, 54:20, 74:21, 152:5
**became** [4] - 11:6, 11:11, 39:19, 113:11
**become** [4] - 24:22, 68:19, 111:12, 111:15
**bed** [1] - 82:20
**beforehand** [1] - 71:6
**beg** [1] - 151:6
**begin** [1] - 68:10
**beginning** [1] - 153:3
**behind** [4] - 60:3, 113:4, 120:15, 130:6
**belong** [1] - 50:11
**belonged** [1] - 50:8
**below** [3] - 34:21, 62:22, 63:14
**best** [7] - 21:2, 21:19, 42:6, 45:12, 137:18, 150:7, 150:12
**better** [4] - 45:16, 75:13, 136:12, 139:18
**between** [4] - 3:3, 47:10, 56:17, 96:10
**beyond** [9] - 19:12, 66:13, 66:19, 69:18, 71:17, 71:18, 74:1, 97:22, 100:6
**big** [1] - 105:15
**bigger** [1] - 113:11
**biggest** [1] - 12:1
**birth** [1] - 69:21
**bit** [1] - 153:10
**bite** [2] - 146:12, 146:15
**bled** [3] - 79:4, 126:19, 127:1
**bleed** [9] - 76:18,

76:19, 78:23, 106:11, 106:12, 106:17, 106:19, 126:20, 126:23
**bleeding** [16] - 76:6, 76:14, 76:21, 77:1, 91:4, 91:5, 97:15, 103:11, 106:9, 106:22, 109:4, 109:7, 126:1, 127:19, 130:12
**bleeds** [1] - 79:3
**blocks** [1] - 7:8
**blood** [30] - 30:8, 30:22, 36:16, 57:10, 76:7, 76:10, 77:5, 77:9, 77:13, 80:7, 89:20, 89:21, 90:3, 90:12, 90:22, 91:4, 98:15, 98:16, 104:12, 105:1, 105:15, 107:1, 107:3, 111:13, 111:14, 112:8, 112:9, 114:1, 118:5
**bloodstream** [1] - 30:20
**blown** [1] - 8:1
**blowups** [1] - 7:13
**blue** [2] - 104:14, 146:21
**bluetooth** [1] - 109:20
**blunt** [7] - 74:3, 85:5, 98:14, 102:4, 135:13, 137:11, 150:18
**board** [3] - 10:19, 10:21, 16:12
**body** [5] - 76:11, 78:14, 113:8, 116:17, 133:18
**bones** [1] - 61:15
**bordered** [1] - 63:3
**bottom** [5] - 32:22, 34:21, 35:11, 52:8, 114:11
**Brady** [1] - 22:13
**brain** [7] - 31:12, 31:13, 110:10, 110:14, 110:23, 111:1, 111:2
**break** [8] - 5:15, 5:17, 85:15, 85:20, 85:21, 99:6, 117:9, 139:22
**breaking** [2] - 74:16, 104:9
**breaks** [1] - 74:16
**Brent** [1] - 16:7
**brett** [1] - 42:11
**Brett** [11] - 2:2, 4:9,

9:2, 33:21, 42:17, 75:1, 75:22, 148:17, 151:16, 152:20, 155:20
**Brief** [1] - 144:20
**brief** [1] - 44:15
**briefcase** [1] - 94:22
**briefly** [1] - 5:3
**bring** [1] - 88:9
**broader** [1] - 108:10
**Broadway** [1] - 2:2
**broken** [8] - 63:22, 64:1, 79:10, 93:3, 131:20, 132:5, 132:6
**brought** [2] - 100:4, 118:21
**build** [1] - 18:7
**Buttofucco** [1] - 120:3
**button** [1] - 144:12
**BY** [85] - 4:5, 9:20, 13:22, 16:10, 19:1, 20:11, 21:11, 24:19, 26:18, 31:2, 31:16, 34:3, 34:13, 38:7, 40:10, 41:11, 43:3, 43:12, 44:3, 44:13, 46:3, 47:18, 48:19, 50:4, 51:10, 57:7, 57:13, 57:23, 59:2, 59:11, 60:5, 60:14, 64:6, 65:22, 66:6, 73:17, 74:5, 74:18, 75:6, 75:16, 76:4, 77:18, 79:16, 80:8, 83:12, 83:22, 85:18, 88:13, 89:9, 89:17, 90:8, 90:19, 91:15, 92:15, 93:4, 93:9, 93:20, 94:7, 94:20, 96:1, 96:18, 97:10, 98:1, 98:8, 99:4, 100:8, 100:18, 101:19, 102:20, 108:22, 122:17, 123:15, 124:22, 132:13, 133:1, 133:12, 136:22, 140:1, 140:22, 141:23, 144:21, 146:23, 148:3, 149:4, 152:12

**C**

**calcified** [1] - 61:15
**cannot** [6] - 17:19, 71:3, 103:23, 104:4, 129:13, 130:3
**capacity** [1] - 105:7
**captain** [1] - 53:21

**car** [1] - 134:18
**cardiac** [13] - 61:23, 66:22, 67:3, 69:3, 76:20, 81:11, 81:16, 125:17, 134:18, 145:5, 149:15, 149:16
**cardiopulmonary** [4] - 71:17, 71:19, 85:7, 99:15
**cardiovascular** [1] - 149:13
**career** [2] - 32:2, 72:8
**carefully** [1] - 111:1
**case** [140] - 4:10, 4:23, 6:1, 8:1, 8:10, 8:13, 8:18, 8:21, 9:7, 19:3, 19:5, 20:19, 21:23, 23:9, 24:4, 24:7, 25:4, 25:13, 26:20, 27:8, 32:12, 32:15, 33:6, 39:2, 39:6, 40:3, 40:16, 40:19, 40:23, 41:18, 41:20, 42:23, 43:2, 44:5, 44:8, 44:9, 45:15, 45:17, 46:6, 47:11, 48:15, 51:7, 51:11, 52:2, 52:10, 52:15, 52:17, 57:2, 60:16, 63:6, 65:7, 65:14, 68:21, 71:12, 73:2, 75:9, 75:13, 77:11, 79:2, 79:8, 80:3, 84:23, 87:9, 87:20, 89:1, 93:11, 93:14, 94:21, 95:10, 95:14, 95:16, 95:19, 96:10, 99:8, 103:7, 104:10, 108:17, 112:5, 113:23, 115:6, 115:16, 115:20, 119:15, 120:13, 120:20, 122:8, 123:2, 123:22, 125:6, 132:8, 133:18, 134:15, 134:16, 134:19, 134:22, 135:6, 135:19, 135:20, 135:21, 136:3, 136:8, 137:1, 137:9, 137:10, 137:17, 138:4, 138:7, 139:13, 140:2, 140:4, 140:9, 140:12, 140:15, 140:19, 140:21, 141:3, 141:6, 141:7, 141:13, 141:17,

142:2, 143:14, 143:18, 143:20, 144:1, 144:14, 144:15, 145:9, 147:6, 148:10, 151:11, 151:15, 151:19, 152:6, 153:11, 154:18
**caseload** [2] - 15:7, 15:9
**cases** [22] - 7:17, 11:19, 15:10, 19:8, 32:11, 39:11, 62:6, 63:23, 70:17, 76:23, 77:3, 105:4, 107:2, 107:23, 123:17, 125:15, 134:9, 143:14, 143:18, 143:22, 144:16
**category** [4] - 68:13, 68:14, 69:19, 70:9
**caud** [1] - 117:8
**caudate** [1] - 113:3
**causative** [1] - 102:2
**caused** [27] - 63:13, 65:3, 65:23, 66:3, 68:11, 70:11, 73:21, 78:3, 80:10, 81:9, 88:18, 106:21, 125:4, 127:23, 128:1, 128:7, 128:8, 129:10, 129:20, 129:23, 130:10, 132:4, 132:10, 138:17, 138:20, 145:14
**causes** [5] - 31:12, 115:7, 147:4, 147:12, 150:8
**cava** [1] - 105:19
**cavity** [10] - 76:5, 77:10, 78:16, 89:20, 92:13, 97:16, 98:4, 98:12, 98:16, 112:9
**CC** [1] - 77:7
**CCs** [2] - 77:5, 77:6
**CDs** [1] - 34:11
**ceiling** [2] - 14:19, 17:16
**cell** [3] - 104:13, 105:2
**cells** [8] - 103:12, 104:3, 104:4, 104:12, 104:16, 105:19, 107:16, 107:20
**cellular** [2] - 104:1, 107:21
**Center** [1] - 36:13
**centimeters** [6] - 112:16, 112:19,

112:21, 113:1, 113:4
**certain** [7] - 7:13, 7:21, 33:18, 59:9, 105:4, 149:6, 152:22
**certainty** [9] - 29:11, 97:23, 104:6, 125:19, 132:3, 134:6, 134:8, 145:22, 150:1
**certificate** [2] - 83:10, 115:15
**certification** - 3:9, 17:7
**certify** [2] - 157:4, 158:6
**chair** [1] - 46:10
**chance** [7] - 22:6, 22:23, 32:14, 47:8, 86:10, 113:10, 124:18
**change** [5] - 10:13, 23:8, 85:22, 103:19, 150:22
**changed** [5] - 16:3, 24:4, 138:4, 139:6, 139:10
**changes** [8] - 20:15, 30:22, 72:4, 103:21, 103:23, 107:21, 145:14, 145:15
**characteristics** [1] - 116:13
**characterize** [1] - 13:12
**characterized** [2] - 69:16, 129:12
**charge** [1] - 133:22
**charged** [1] - 82:12
**charging** [2] - 82:9, 135:15
**Charles** [3] - 2:7, 120:2, 152:16
**CHARLES** [1] - 1:6
**chart** [1] - 36:19
**chase** [1] - 80:14
**Chavkin** [14] - 42:20, 43:1, 43:16, 44:15, 44:21, 45:18, 46:8, 46:23, 47:19, 51:6, 52:11, 96:14, 122:10, 151:23
**check** [4] - 42:8, 42:15, 45:13, 60:17
**checking** [1] - 42:13
**chest** [23] - 54:4, 54:9, 55:4, 55:17, 57:3, 57:8, 61:12, 71:20, 75:18, 76:17, 78:13, 78:16, 78:19, 82:20, 90:3, 90:12, 91:18,

92:13, 114:10, 126:3, 130:6, 131:10, 131:11
**child** [28] - 28:20, 29:21, 29:22, 30:3, 30:19, 31:9, 31:14, 54:13, 56:11, 60:11, 70:8, 71:23, 78:9, 81:23, 95:2, 99:17, 100:4, 107:7, 109:3, 119:16, 121:12, 121:16, 125:5, 130:23, 131:2, 131:7, 131:12, 153:8
**child's** [7] - 60:12, 68:11, 72:6, 74:15, 121:5, 130:10, 133:3
**childhood** [1] - 38:4
**children** [12] - 24:13, 31:10, 56:14, 58:12, 58:13, 70:21, 71:3, 75:11, 75:23, 81:14, 110:23, 153:7
**Cindy** [15] - 42:8, 42:20, 43:16, 44:15, 44:21, 46:8, 47:19, 52:11, 122:10, 122:13, 122:20, 122:22, 123:3, 123:14
**circulating** [1] - 89:21
**circumstances** [6] - 37:20, 81:7, 125:16, 149:7, 151:14, 154:6
**CITY** [1] - 1:6
**City** [4] - 2:7, 6:8, 53:9, 152:15
**civilian** [1] - 136:6
**clarify** [3] - 16:8, 85:22, 130:22
**classification** [1] - 70:1
**classified** [2] - 149:18, 150:18
**clear** [3] - 75:8, 91:16, 128:20
**clearly** [1] - 33:5
**clinical** [3] - 110:5, 110:8, 115:1
**clinicians** [1] - 109:9
**Clinton** [1] - 15:20
**close** [7] - 24:12, 30:19, 114:20, 120:18, 120:23, 137:8, 150:2
**closer** [1] - 13:10
**clot** [1] - 112:9
**clots** [2] - 107:1, 107:3
**clotting** [1] - 107:11
**clumpy** [1] - 107:3

**co** [1] - 70:5
**co-sleeping** [1] - 70:5
**COLANERI** [1] - 1:7
**Colaneri** [2] - 2:7, 152:16
**Colineri** [1] - 120:3
**colleague** [1] - 32:5
**colleagues** [3] - 21:6, 32:11, 59:20
**collectively** [1] - 75:17
**coming** [7] - 10:19, 10:21, 49:20, 50:17, 151:4, 151:7, 151:10
**commencing** [1] - 1:13
**comments** [1] - 123:3
**committed** [2] - 83:19, 136:15
**common** [6] - 38:19, 72:1, 72:8, 76:2, 89:2
**communicate** [2] - 45:18, 48:20
**communicated** [1] - 48:22
**comparable** [1] - 15:8
**comparison** [1] - 107:2
**comparisons** [1] - 105:1
**complete** [3] - 33:16, 81:13, 101:8
**completed** [1] - 37:16
**completely** [1] - 46:14
**complicate** [1] - 72:4
**complicated** [1] - 10:16
**complimentary** [1] - 142:23
**compressing** [1] - 63:14
**compression** [17] - 61:23, 62:17, 65:12, 66:23, 76:17, 78:2, 78:9, 78:12, 84:2, 98:3, 98:11, 108:21, 108:23, 117:8, 117:21, 129:10, 131:9
**compressions** [26] - 54:5, 54:10, 55:5, 55:17, 56:2, 56:5, 56:12, 56:20, 56:22, 57:3, 57:9, 60:23, 66:2, 71:20, 75:18, 82:21, 90:3, 90:12, 99:20, 100:11, 131:9, 131:11, 131:12, 131:13, 152:4

**compressive** [7] - 66:23, 74:3, 74:15, 98:15, 102:4, 117:12, 117:22
**computer** [2] - 42:16, 119:4
**concentrated** [1] - 78:18
**concerned** [2] - 47:9, 80:11
**concerns** [5] - 9:4, 9:8, 42:2, 49:15, 142:10
**conclude** [1] - 98:20
**concluded** [3] - 125:11, 125:14, 155:22
**conclusion** [2] - 92:17, 117:19
**conclusions** [3] - 47:17, 133:7
**conclusively** [4] - 97:14, 110:12, 125:18, 146:3
**condensation** [1] - 154:15
**condition** [1] - 154:13
**conduct** [7] - 13:20, 21:9, 88:18, 93:23, 130:17, 135:14, 135:15
**conducted** [1] - 56:14
**confession** [2] - 93:13, 94:2
**confidence** [1] - 142:10
**confirm** [4] - 67:2, 67:3, 110:12, 146:3
**congestion** [3] - 148:5, 148:6, 148:23
**conjunction** [1] - 62:18
**connection** [1] - 5:22
**consciousness** [1] - 97:15
**consecutively** [1] - 32:22
**consequences** [2] - 133:22, 134:1
**consider** [4] - 79:7, 88:7, 133:15, 155:1
**considerable** [1] - 58:15
**considered** [7] - 23:6, 35:19, 37:10, 62:19, 128:2, 132:9, 145:8
**consistent** [9] - 61:10, 65:18, 65:23, 80:20, 84:8, 84:9, 102:18, 132:17, 132:21

**consolidate** [1] - 89:4
**consult** [1] - 118:10
**contend** [1] - 28:22
**contest** [1] - 44:12
**context** [1] - 32:9
**continue** [3] - 52:22, 76:19, 116:9
**continued** [1] - 54:9
**continues** [1] - 142:9
**contract** [4] - 10:5, 12:21, 15:13, 17:22
**contributed** [5] - 64:11, 64:17, 64:19, 88:19, 130:18
**contributing** [1] - 73:20
**control** [1] - 33:22
**contusions** [1] - 62:20
**conversation** [1] - 141:11
**conversations** [3] - 96:13, 142:2, 151:18
**convey** [1] - 48:14
**convicted** [2] - 137:13, 138:2
**Coonradt** [2] - 2:7, 152:16
**COONRADT** [1] - 1:6
**cooperated** [1] - 140:10
**cooperation** [1] - 140:7
**cooperative** [4] - 153:20, 153:22, 154:16, 154:19
**cooperatively** [1] - 153:14
**copies** [1] - 6:16
**copy** [5] - 42:12, 53:5, 115:18, 118:18, 118:21
**coroner** [2] - 12:8, 12:10
**coroner's** [1] - 10:9
**coroners** [3] - 14:7, 14:10, 14:11
**Corporation** [1] - 33:10
**correct** [70] - 4:10, 13:13, 14:21, 16:18, 19:3, 19:4, 19:5, 19:14, 20:13, 20:21, 25:15, 26:10, 26:12, 26:14, 28:8, 34:5, 35:18, 37:5, 37:14, 37:17, 38:23, 57:10, 57:12, 58:20, 60:7, 62:5, 62:9, 66:9, 68:1, 69:11, 69:17, 73:21, 74:22, 77:10,

78:16, 79:11, 85:12, 85:22, 87:18, 97:1, 99:9, 100:22, 100:23, 105:22, 105:23, 106:6, 106:7, 106:20, 108:15, 109:1, 109:3, 109:13, 109:18, 114:23, 115:15, 116:18, 116:19, 118:6, 118:13, 118:14, 124:19, 124:21, 128:16, 132:7, 133:19, 134:11, 146:14, 150:5, 154:20, 157:7
**correction** [1] - 115:10
**correctly** [1] - 127:9
**correspond** [1] - 86:20
**corroborated** [1] - 82:18
**corruption** [1] - 95:16
**cost** [1] - 11:10
**costal** [3] - 62:17, 62:22, 63:9
**counter** [1] - 47:17
**countered** [1] - 58:4
**counties** [5] - 10:6, 12:2, 15:12, 15:17, 18:1
**COUNTY** [2] - 1:7, 157:2
**County** [23] - 10:5, 10:7, 10:8, 10:11, 10:12, 10:15, 11:12, 12:3, 12:4, 12:7, 12:10, 13:6, 13:7, 13:9, 14:5, 15:14, 15:15, 15:16, 134:20, 137:14
**county** [6] - 11:2, 12:1, 12:12, 13:18, 18:19, 123:13
**couple** [2] - 5:4, 21:21
**course** [5] - 101:3, 112:7, 116:13, 133:2, 143:11
**COURT** [1] - 1:1
**Court** [1] - 93:12
**court** [9] - 3:17, 5:5, 23:3, 25:9, 27:20, 33:11, 39:17, 94:23, 135:15
**courthouse** [1] - 47:1
**courtroom** [2] - 47:21, 50:11
**cover** [5] - 10:11, 10:12, 11:19, 13:7,

129:3
**coverage** [1] - 15:14
**covered** [4] - 27:7, 115:2, 115:3, 151:16
**Covid** [2] - 15:7, 15:10
**CPR** [105] - 23:12, 23:13, 23:22, 24:13, 54:13, 54:17, 56:13, 56:19, 57:14, 57:17, 58:10, 58:16, 59:14, 60:4, 60:12, 61:7, 62:7, 62:8, 62:11, 62:14, 63:18, 64:8, 64:16, 65:3, 65:23, 66:16, 66:20, 67:6, 71:23, 72:1, 72:7, 72:9, 72:12, 72:15, 72:16, 72:21, 73:8, 73:15, 74:1, 74:2, 74:7, 75:9, 76:1, 77:3, 77:13, 77:16, 78:11, 85:7, 91:7, 91:11, 91:14, 99:7, 99:7, 99:17, 99:21, 100:4, 100:7, 100:17, 100:20, 100:22, 101:2, 101:3, 101:11, 101:16, 101:23, 102:3, 102:5, 102:7, 102:13, 102:18, 102:19, 102:22, 103:3, 108:18, 108:23, 109:2, 117:23, 124:3, 124:4, 124:11, 124:17, 128:7, 128:15, 128:18, 128:22, 129:1, 129:12, 129:17, 129:18, 131:2, 132:7, 132:10, 132:11, 132:16, 132:17, 132:21, 132:23, 133:3, 135:2, 137:12, 137:22, 138:17, 138:20
**CPR-caused** [4] - 65:3, 65:23, 138:17, 138:20
**CPR-related** [5] - 57:14, 62:8, 62:11, 102:3, 132:23
**created** [1] - 113:11
**credentials** [1] - 17:4
**credibility** [2] - 94:11, 96:15
**credit** [1] - 67:11
**crediting** [1] - 81:1

**criminal** [5] - 38:10, 96:11, 133:18, 137:10, 141:17
**criminality** [3] - 37:23, 44:5, 82:16
**Crisafulli** [2] - 55:8, 152:5
**criticism** [1] - 18:18
**critique** [2] - 18:17, 151:22
**cross** [2] - 19:2, 19:8
**cross-examined** [2] - 19:2, 19:8
**crush** [1] - 104:15
**crushed** [1] - 104:5
**crushing** [6] - 74:16, 74:17, 103:10, 104:2, 128:19, 128:22
**crying** [3] - 79:11, 79:19, 97:3
**Crystal** [3] - 2:11, 9:13, 137:7
**CT** [1] - 109:5
**culpable** [1] - 135:14
**cultures** [2] - 36:15, 36:16
**cup** [2] - 90:20, 114:1
**current** [2] - 146:7, 146:8
**custody** [3] - 134:10, 135:7, 135:9
**customary** [1] - 153:13
**cut** [1] - 109:20
**cutting** [1] - 121:15
**CV** [2] - 1:5, 9:16
**cytoplasm** [1] - 104:15

## D

**DA** [13] - 26:13, 35:2, 50:2, 51:3, 51:16, 141:11, 141:16, 142:3, 142:7, 143:3, 143:7, 151:22
**DA's** [13] - 25:22, 26:6, 38:8, 39:17, 39:20, 40:1, 46:5, 52:18, 84:14, 84:19, 120:10, 141:14, 151:1
**damage** [7] - 106:17, 108:11, 108:13, 109:2, 109:8, 114:19, 116:16
**damaged** [5] - 81:1, 103:22, 107:19, 107:20, 113:13

**Danielle** [2] - 2:7, 152:15
**DANIELLE** [1] - 1:6
**DAs** [2] - 143:6, 153:18
**data** [1] - 65:2
**date** [9] - 8:14, 9:22, 22:1, 22:22, 34:18, 34:22, 38:12, 45:20, 137:2
**Date** [1] - 158:12
**dated** [1] - 52:6
**Davis** [41] - 4:12, 4:14, 6:2, 8:15, 14:12, 19:3, 24:21, 25:14, 35:17, 39:2, 40:3, 52:10, 65:12, 65:21, 66:21, 66:23, 67:6, 76:18, 78:2, 80:10, 80:15, 83:7, 88:18, 92:4, 94:17, 95:19, 96:11, 98:20, 99:8, 99:17, 100:16, 117:17, 124:23, 128:1, 128:4, 128:14, 129:15, 130:9, 136:4, 140:14, 155:4
**DAVIS** [1] - 1:3
**Davis's** [4] - 22:13, 83:15, 94:10, 151:14
**DAVIS-GUIDER** [1] - 1:3
**days** [3] - 8:17, 22:7, 27:19
**dead** [10] - 67:7, 70:14, 72:3, 76:20, 124:13, 124:16, 126:15, 126:18, 126:20, 126:23
**deal** [3] - 9:13, 11:12, 11:14
**dealings** [6] - 32:2, 32:10, 32:12, 39:5, 143:12, 143:13
**deals** [1] - 10:16
**dealt** [3] - 32:9, 32:11, 51:11
**Deangelis** [1] - 143:7
**Death** [1] - 52:6
**death** [78] - 30:23, 31:9, 37:16, 38:4, 38:9, 43:5, 43:6, 67:9, 67:12, 67:14, 68:4, 68:9, 68:11, 68:12, 68:17, 68:22, 69:1, 69:15, 69:16, 69:18, 70:1, 70:2, 70:11, 71:2, 71:13, 71:15, 71:16, 73:21,

77:1, 78:4, 81:3, 82:3, 83:9, 84:3, 88:17, 94:10, 102:2, 103:22, 110:18, 112:5, 115:10, 115:15, 115:19, 117:21, 121:9, 125:12, 125:16, 125:20, 127:8, 127:11, 127:14, 127:15, 127:18, 127:19, 128:1, 129:8, 129:21, 129:23, 130:10, 135:7, 135:16, 136:2, 145:1, 145:6, 147:4, 147:11, 147:15, 147:18, 149:10, 149:23, 150:8, 150:13, 150:20, 151:14, 153:4, 153:16, 155:6
**deaths** [5] - 70:4, 70:9, 125:13, 134:10, 135:9
**deceased** [1] - 82:1
**decedent** [4] - 60:3, 85:6, 99:13, 120:14
**decent** [1] - 34:16
**decide** [1] - 82:16
**decided** [7] - 11:9, 11:12, 12:5, 13:4, 14:7, 14:10, 124:12
**decision** [2] - 133:21, 134:2
**decisions** [1] - 134:4
**deep** [1] - 146:2
**defect** [2] - 31:11, 110:23
**defects** [1] - 111:1
**Defendant's** [1] - 51:18
**Defendants** [1] - 1:9
**defender** [2] - 35:2, 35:8
**defense** [3] - 6:9, 26:21, 26:23
**definitely** [1] - 76:16
**definition** [3] - 68:7, 68:8, 68:18
**degree** [9] - 29:11, 104:6, 125:19, 132:3, 134:6, 134:7, 145:21, 149:23, 154:7
**dehydrated** [3] - 111:3, 111:5, 111:7
**demeanor** [1] - 43:17
**demonstrate** [1] - 128:23

demonstrated [2] - 84:9, 95:5

demonstrating [1] - 95:1

demonstration [2] - 84:1, 128:20

demotion [1] - 51:6

dented [1] - 113:12

department [19] - 40:2, 53:2, 53:19, 57:4, 72:11, 73:2, 74:22, 84:13, 84:22, 136:2, 136:7, 140:8, 141:2, 151:12, 152:18, 154:23, 155:5, 155:10, 155:13

Department [1] - 53:10

deposed [1] - 14:22

Deposition [1] - 155:22

DEPOSITION [1] - 1:12

deposition [12] - 3:18, 5:2, 5:22, 8:8, 8:14, 8:16, 14:23, 53:15, 55:10, 55:13, 55:14, 107:12

depositions [3] - 53:19, 123:20, 123:22

depth [1] - 110:10

describe [8] - 37:19, 49:2, 61:5, 61:9, 71:15, 134:5, 136:23

described [11] - 56:9, 65:5, 66:14, 67:1, 68:12, 73:3, 103:2, 104:11, 118:3, 130:17, 133:4

describing [1] - 117:3

description [1] - 129:7

despite [1] - 142:10

destruction [1] - 103:12

details [5] - 42:23, 54:19, 116:6, 141:22, 152:4

detect [3] - 81:21, 104:1, 112:7

detected [1] - 30:14

detective [1] - 95:1

Detective [11] - 83:16, 84:18, 92:1, 92:16, 93:5, 93:13, 93:14, 95:15, 98:9, 140:3, 140:19

detectives [1] - 95:6

determination [2] -

28:2, 83:23

determinations [2] - 43:5, 155:2

determine [6] - 9:12, 71:3, 88:12, 109:10, 125:19, 149:22

determined [8] - 83:18, 83:21, 84:1, 84:2, 94:23, 128:21, 145:17, 150:19

determining [1] - 28:18

developed [1] - 121:11

develops [1] - 148:22

diabetes [7] - 28:21, 29:17, 29:22, 29:23, 30:2, 30:14, 31:4

diabetic [2] - 30:5, 30:17

diagnosed [1] - 127:10

diagnoses [3] - 85:2, 99:6, 115:6

diagnosis [5] - 67:15, 68:23, 85:12, 147:17, 155:14

diagram [2] - 116:11, 116:20

dictate [1] - 150:7

die [3] - 30:17, 31:13, 70:23, 149:15, 153:7

died [14] - 24:17, 25:14, 70:21, 77:11, 82:7, 97:18, 97:23, 107:8, 111:4, 131:7, 134:18, 147:8, 147:14, 154:9

dies [1] - 81:10

different [12] - 8:2, 15:9, 18:4, 21:16, 50:6, 56:9, 61:6, 61:10, 101:20, 139:16, 139:20, 143:18

differentiate [1] - 29:10

differently [1] - 130:4

digital [3] - 139:8, 139:12, 139:16

digitally [1] - 139:11

diminished [1] - 30:21

diner [2] - 96:2, 96:6

direction [4] - 88:16, 88:19, 136:6, 136:10

directly [2] - 50:2, 144:1

disagree [5] - 71:9, 104:17, 104:18, 107:4, 111:21

disallowed [2] - 47:20, 47:21

disappointed [1] - 50:18

disclaimed [1] - 58:3

disconnect [1] - 14:5

discontinued [3] - 13:23, 14:2, 14:4

discontinuing [1] - 12:21

discount [2] - 58:1, 97:18

discovery [2] - 9:14, 29:7

discretion [1] - 7:11

discuss [4] - 22:17, 40:2, 40:23, 96:15

discussed [15] - 7:13, 34:11, 49:4, 49:6, 49:7, 96:14, 99:5, 103:5, 104:11, 117:14, 119:18, 123:20, 151:15, 151:20, 154:17

discussion [5] - 27:22, 70:12, 117:13, 148:17, 148:18

disease [2] - 81:20, 149:14

disorder [1] - 110:5

displaced [1] - 92:14

dispute [3] - 66:21, 67:2, 67:4

distinction [1] - 105:3

distinctions [1] - 107:5

distinguished [1] - 7:22

district [9] - 20:19, 37:20, 40:7, 40:8, 47:3, 83:4, 83:6, 87:7, 152:23

District [2] - 41:16, 52:11

DISTRICT [2] - 1:1, 1:1

Doc [3] - 42:14, 123:8, 151:9

Doctor [2] - 147:19, 155:18

doctor [3] - 55:9, 63:17, 151:13

doctors [2] - 61:6, 64:3

document [12] - 32:21, 33:8, 58:21, 86:15, 102:6, 102:14, 115:9, 115:13, 115:17, 116:5, 138:17,

138:19

documented [1] - 100:20

documenting [1] - 65:3

Documents [1] - 51:20

documents [4] - 5:23, 8:6, 33:2, 116:4

dollars [1] - 11:11

done [30] - 13:6, 19:19, 20:2, 23:11, 38:15, 38:21, 55:5, 55:17, 56:3, 57:3, 64:2, 66:23, 73:15, 78:11, 86:9, 99:3, 109:1, 109:2, 110:12, 119:6, 124:3, 124:5, 129:15, 129:16, 130:3, 130:4, 130:23, 131:4, 139:9

double [2] - 130:5, 142:13

doubt [1] - 96:22

down [11] - 5:6, 16:5, 39:19, 47:3, 51:21, 56:21, 86:22, 104:9, 114:16, 131:17, 154:13

downstream [1] - 114:4

dozen [1] - 61:4

Dr [51] - 4:6, 6:9, 6:13, 6:17, 7:1, 8:10, 9:21, 16:12, 23:6, 25:13, 27:16, 27:23, 29:2, 29:18, 29:21, 31:23, 32:20, 34:14, 41:8, 46:15, 46:16, 46:22, 47:5, 47:10, 49:8, 49:11, 49:21, 55:8, 63:12, 63:16, 67:8, 67:23, 71:9, 85:19, 86:6, 86:9, 103:4, 106:23, 111:20, 111:23, 113:19, 131:6, 137:11, 140:2, 142:10, 142:12, 142:16, 152:3, 152:5, 152:13

draft [2] - 150:23, 151:2

drawing [3] - 130:16, 130:20, 133:7

drive [1] - 14:6

driver [1] - 81:10

driving [1] - 13:5

drop [2] - 70:14, 109:12

drunk [1] - 81:10

due [26] - 15:7, 15:10, 30:21, 31:9, 61:22, 62:13, 62:16, 65:3, 65:11, 65:17, 85:3, 85:4, 85:5, 91:4, 91:5, 91:7, 91:11, 93:13, 98:3, 98:11, 102:12, 113:11, 135:13, 138:20, 149:10

dues [3] - 17:2, 17:5, 17:8

duly [1] - 4:2

duplicate [1] - 7:10

during [23] - 27:13, 41:6, 54:1, 54:14, 58:16, 61:23, 62:7, 102:22, 117:22, 119:9, 120:4, 128:11, 131:15, 132:7, 132:10, 132:15, 135:16, 140:11, 142:1, 145:11, 153:1, 154:22, 155:4

duties [1] - 10:1

duty [1] - 41:6

## E

e-mails [1] - 86:14

early [5] - 19:18, 26:1, 26:2, 43:15

earshot [1] - 120:16

easily [1] - 113:13

easy [1] - 61:16

Edition [1] - 139:1

effect [1] - 31:13

effectively [2] - 18:21, 76:9

effort [2] - 18:7, 153:21

efforts [4] - 67:6, 77:13, 91:7, 91:11

either [19] - 13:19, 22:6, 23:18, 25:2, 27:13, 38:17, 54:1, 59:19, 67:3, 71:2, 84:14, 86:17, 87:2, 89:7, 92:23, 100:12, 113:11, 135:22, 142:5

electrophysiological [1] - 146:6

emergency [6] - 30:3, 54:15, 63:17, 72:13, 98:21, 109:6

employ [1] - 17:19

employed [1] - 15:12

**employees** [2] - 53:19, 72:11
**employer** [1] - 18:19
**employment** [2] - 10:8, 19:13
**EMS** [8] - 64:2, 75:5, 80:1, 82:21, 99:2, 107:8, 126:7, 127:23
**EMT** [2] - 54:20, 63:17
**EMTs** [16] - 55:5, 57:8, 59:5, 59:14, 59:22, 61:1, 61:6, 62:14, 64:7, 72:2, 78:2, 80:1, 84:4, 98:21, 99:22, 123:16
**end** [1] - 43:15
**ended** [2] - 43:18, 46:15
**enforcement** [12] - 20:23, 21:8, 88:14, 92:5, 92:6, 134:9, 135:6, 135:7, 135:17, 136:1, 136:6, 151:19
**engaging** [1] - 18:14
**enlarge** [2] - 7:20, 33:4
**enlarged** [1] - 8:1
**enlargements** [1] - 8:4
**ensure** [1] - 10:22
**entire** [3] - 76:10, 101:15, 106:16
**entirely** [1] - 142:17
**entities** [1] - 15:22
**entitled** [2] - 52:4, 115:9
**entity** [5] - 14:1, 14:4, 14:5, 18:13
**environment** [1] - 109:11
**equivalent** [1] - 77:7
**ER** [4] - 55:8, 74:22, 99:22, 127:23
**erroneous** [1] - 31:10
**especially** [2] - 110:14, 153:7
**Esq** [3] - 2:2, 2:6, 2:11
**essence** [1] - 12:16
**essentially** [1] - 111:20
**Essentials** [1] - 138:23
**Essex** [1] - 15:20
**establish** [1] - 10:17
**established** [1] - 29:6
**establishing** [1] - 11:1
**estate** [1] - 11:8
**estimated** [1] - 142:12
**etc** [1] - 34:5
**etiology** [2] - 69:3,

125:17
**evaluated** [1] - 73:12
**evaluation** [1] - 79:7
**event** [2] - 82:7, 147:21
**events** [4] - 26:20, 27:7, 27:8, 82:8
**eventually** [4] - 11:11, 18:8, 89:4, 151:10
**evidence** [17] - 31:1, 94:11, 94:15, 95:17, 97:11, 97:13, 109:16, 109:19, 110:3, 112:13, 112:14, 140:14, 145:17, 146:14, 148:5, 149:1, 149:7
**evolution** [2] - 21:17, 21:19
**evolved** [3] - 138:5, 139:4, 152:3
**exact** [1] - 113:17
**exactly** [2] - 131:6, 138:16
**Examination** [1] - 3:16
**examination** [7] - 3:4, 3:9, 7:6, 113:15, 125:7, 127:4, 145:12
**EXAMINATION** [2] - 4:4, 152:11
**examine** [1] - 145:19
**examined** [3] - 4:2, 19:2, 19:8
**examiner** [4] - 10:5, 12:7, 12:13, 12:14
**examiner's** [4] - 10:17, 11:1, 18:4, 115:23
**Examiners** [3] - 16:11, 16:16, 17:10
**examiners** [2] - 21:14, 153:13
**exceed** [1] - 18:14
**except** [2] - 3:12, 139:10
**exception** [2] - 34:7, 34:10
**exclude** [1] - 82:17
**exclusively** [1] - 10:12
**exculpatory** [1] - 22:19
**excuse** [1] - 40:19
**executive** [1] - 143:23
**exert** [1] - 155:1
**exerted** [1] - 54:23
**exertion** [2] - 54:23, 56:10
**exhibit** [1] - 90:22
**Exhibit** [9] - 25:11, 51:14, 51:18, 51:21,

52:21, 53:8, 53:11, 85:3, 113:20
**exhibits** [3] - 7:16, 7:17, 8:1
**EXHIBITS** [1] - 156:1
**exists** [1] - 154:5
**expect** [4] - 30:17, 79:23, 109:18, 139:15
**expected** [4] - 66:20, 74:2, 75:19, 153:12
**expecting** [1] - 107:6
**experience** [14] - 9:17, 49:22, 59:13, 61:19, 62:3, 62:13, 63:12, 63:19, 63:21, 66:14, 70:22, 77:2, 102:11, 152:21
**experienced** [1] - 44:2
**explain** [15] - 7:5, 18:2, 41:18, 42:23, 47:16, 82:1, 102:1, 122:16, 127:2, 128:7, 129:16, 131:1, 133:16, 146:18, 147:21
**explained** [1] - 130:1
**explaining** [1] - 92:21
**explanation** [3] - 71:14, 126:5, 127:12
**expose** [1] - 73:7
**expressed** [1] - 142:10
**extended** [1] - 10:9
**Extension** [1] - 2:10
**extensive** [5] - 8:20, 77:13, 102:11, 106:9, 126:1
**extent** [3] - 50:9, 100:5, 118:2
**extreme** [1] - 73:3
**extremely** [3] - 66:11, 81:3, 110:22
**extremis** [1] - 128:12
**eye** [1] - 30:7

**F**

**fabrication** [1] - 92:22
**face** [2] - 82:12, 133:8
**facilities** [4] - 17:18, 17:22, 17:23, 18:5
**facility** [3] - 6:7, 17:19, 18:7
**fact** [4] - 79:17, 95:13, 97:6, 124:10
**factor** [5] - 28:18, 89:12, 94:10, 94:12, 145:10
**factored** [4] - 89:14,

89:16, 94:16, 136:17
**factoring** [1] - 89:13
**facts** [4] - 55:1, 61:5, 147:5, 151:13
**failure** [1] - 73:8
**fair** [9] - 7:3, 13:12, 14:17, 15:1, 58:17, 72:22, 72:23, 82:13, 83:19, 100:13, 100:15, 100:19, 109:17, 111:21, 125:3, 127:10, 130:14, 130:15, 147:2
**fall** [1] - 30:23
**familiar** [4] - 57:14, 111:8, 138:23, 144:23
**far** [3] - 84:8, 85:22, 100:6
**faster** [1] - 106:12
**father** [1] - 79:21
**fault** [1] - 5:9
**faulty** [1] - 29:8
**features** [3] - 114:19, 116:21, 116:22
**February** [7] - 25:14, 25:17, 37:15, 38:22, 93:10, 154:18
**federal** [1] - 15:21
**feed** [3] - 87:8, 87:10, 87:18
**feelings** [1] - 50:1
**feet** [1] - 120:19
**felt** [3] - 10:18, 22:18, 100:6
**few** [5] - 11:10, 26:14, 67:6, 119:14, 152:19
**fiber** [1] - 107:12
**field** [2] - 21:6, 21:20
**file** [21] - 6:13, 6:14, 6:19, 6:20, 25:2, 25:7, 33:6, 33:13, 33:16, 33:18, 34:4, 34:15, 37:11, 42:12, 53:12, 83:14, 113:20, 118:9, 123:16, 137:6, 156:3
**filing** [1] - 3:8
**filled** [3] - 115:19, 116:12, 131:17
**final** [4] - 94:17, 147:17, 150:16, 155:8
**finalize** [1] - 151:3
**finalizing** [1] - 151:1
**finally** [1] - 150:21
**findings** [12] - 84:23, 88:11, 88:12, 103:6, 104:1, 113:6, 115:1,

115:4, 121:20, 134:7, 148:9, 155:15
**fine** [2] - 9:19, 50:10
**fingers** [2] - 78:15, 130:6
**fingerstick** [1] - 30:4
**fire** [9] - 53:2, 53:19, 57:4, 72:11, 73:2, 74:21, 123:16, 136:1, 136:7
**Fire** [1] - 53:9
**firefighter** [1] - 53:20
**Firefighter** [2] - 54:2, 54:12
**Fireman** [1] - 152:4
**firemen** [1] - 64:2
**first** [11] - 4:1, 7:6, 41:14, 41:22, 42:2, 42:19, 43:15, 43:20, 68:6, 80:16, 116:5
**First** [1] - 2:5
**firsthand** [2] - 82:18, 126:8
**fitness** [1] - 96:15
**five** [4] - 65:17, 66:19, 131:9, 132:21
**flat** [2] - 79:18, 126:7
**flawed** [2] - 29:5, 29:12
**flaws** [1] - 49:11
**flip** [2] - 33:16, 53:7
**floor** [1] - 94:23
**fluid** [3] - 30:7, 30:15, 76:5
**flurry** [1] - 83:7
**focus** [5] - 20:5, 110:15, 113:22, 145:23, 146:10
**focused** [1] - 108:6
**follow** [2] - 12:2, 123:10
**followed** [1] - 141:21
**following** [2] - 49:8, 142:8
**follows** [1] - 4:3
**force** [10] - 65:19, 74:3, 85:5, 98:15, 102:4, 108:9, 108:10, 135:14, 137:11, 150:18
**foregoing** [2] - 157:5, 158:6
**forensic** [5] - 19:16, 36:23, 37:7, 110:14, 153:15
**foreseeable** [1] - 82:11
**Forest** [4] - 24:11, 25:1, 58:7
**form** [53] - 3:12, 13:21,

# APPENDIX

20:7, 21:10, 24:8, 24:9, 26:15, 30:12, 31:7, 33:9, 38:1, 38:2, 40:4, 41:2, 41:3, 43:9, 43:19, 48:17, 57:6, 57:11, 57:20, 59:1, 59:23, 60:8, 63:20, 65:15, 66:8, 73:22, 74:10, 75:3, 80:4, 81:5, 85:13, 88:5, 88:21, 93:15, 94:13, 95:8, 95:21, 96:16, 97:20, 98:5, 100:2, 115:14, 115:18, 115:21, 115:22, 116:15, 140:16, 140:17, 141:19, 149:16, 150:22

**formed** [2] - 32:5, 140:14

**Former** [1] - 52:5

**forth** [4] - 10:3, 13:5, 117:14, 136:23

**forthcoming** [1] - 18:10

**FOUNTAIN** [1] - 1:6

**Fountain** [17] - 2:7, 83:16, 84:18, 92:1, 92:6, 92:16, 93:5, 93:13, 95:15, 96:2, 120:3, 140:3, 140:19, 140:23, 141:13, 141:16, 152:15

**Fountain's** [4] - 94:11, 96:15, 98:10, 140:13

**four** [1] - 131:9

**fracture** [5] - 60:13, 61:16, 102:22, 117:10, 126:11

**fractured** [4] - 60:15, 62:7, 63:5, 102:23

**fractures** [20] - 57:19, 58:16, 58:22, 59:5, 59:10, 59:16, 59:21, 60:4, 61:12, 61:13, 64:12, 64:13, 64:18, 64:20, 85:5, 96:20, 112:10, 114:21, 138:11

**fracturing** [2] - 60:7, 60:9

**frame** [1] - 9:21

**Frank** [1] - 53:21

**Franklin** [1] - 15:20

**frankly** [1] - 41:9

**free** [2] - 83:8, 89:21

**frequent** [1] - 15:10

**front** [5] - 22:3, 42:12,

---

102:23, 112:1, 130:7

**frustrated** [4] - 10:18, 11:6, 11:11, 49:12

**frustration** [2] - 50:7, 50:9

**frustrations** [1] - 11:22

**full** [6] - 15:14, 20:1, 22:23, 81:22, 118:11, 150:10

**fullest** [1] - 20:3

**fully** [2] - 5:19, 75:19

**Fulton** [1] - 15:19

**function** [1] - 153:21

**futon** [2] - 64:7, 64:9, 64:15, 64:23, 65:1

**future** [2] - 10:20, 10:22, 139:19

## G

**general** [2] - 149:19, 154:13

**General** [2] - 134:14, 134:23

**generally** [8] - 4:16, 33:15, 39:8, 92:6, 95:4, 129:7, 132:18, 141:5

**generate** [1] - 153:6

**generous** [1] - 152:9

**Genetics** [2] - 35:22, 36:4

**gentleman** [1] - 138:2

**Ginsberg** [2] - 2:5, 152:14

**given** [17] - 6:15, 11:22, 20:5, 31:18, 37:13, 49:9, 49:10, 54:17, 71:8, 80:18, 85:21, 94:8, 115:5, 119:9, 119:11, 147:5, 149:6

**glove** [1] - 113:13

**glucose** [3] - 30:4, 30:20, 30:23

**God** [1] - 143:5

**govern** [1] - 21:2

**grades** [1] - 154:10

**grand** [24] - 6:8, 6:16, 21:23, 22:4, 22:10, 22:13, 26:9, 34:19, 45:3, 45:7, 45:8, 45:10, 80:19, 87:5, 89:19, 90:2, 90:11, 91:16, 91:19, 96:19, 121:23, 122:2, 122:7, 122:18

**grasping** [1] - 43:7

**great** [1] - 13:12

---

**greatly** [1] - 18:14

**gremlins** [1] - 80:14

**Griffin** [2] - 2:5, 152:14

**gross** [3] - 71:3, 103:5, 145:11

**grossly** [1] - 145:16

**grounds** [1] - 95:10

**growth** [1] - 36:19

**guarantee** [2] - 83:3, 144:2

**guess** [4] - 11:5, 25:10, 101:5, 150:15

**guideline** [1] - 17:15

**guidelines** [8] - 16:2, 17:16, 17:17, 18:15, 20:16, 21:1, 21:19, 150:6

**GUIDER** [1] - 1:3

**guilt** [1] - 133:15

**guilty** [2] - 80:16, 87:3

**gunshot** [1] - 154:10

**guys** [1] - 51:17

## H

**half** [1] - 61:4

**Hall** [18] - 35:3, 40:15, 40:17, 41:17, 41:22, 41:23, 42:22, 44:22, 45:11, 45:15, 48:7, 49:5, 50:19, 51:3, 86:3, 96:13, 122:22, 141:12

**hallway** [1] - 47:1

**Hamilton** [1] - 15:19

**hand** [9] - 58:22, 59:15, 59:16, 63:18, 64:5, 78:14, 78:15, 129:6

**handed** [2] - 39:19, 130:5

**handle** [1] - 41:19

**handled** [2] - 115:20, 141:14

**handling** [2] - 113:12, 113:13

**hands** [10] - 59:5, 59:10, 59:21, 60:3, 60:22, 61:23, 128:3, 128:9, 128:11, 129:6

**happy** [1] - 5:10

**hard** [2] - 42:12, 110:16

**head** [1] - 114:19

**heading** [1] - 157:6

**heads** [1] - 151:3

**health** [1] - 151:12

**healthy** [2] - 70:13, 121:11

---

**hear** [2] - 52:17, 70:13

**heard** [6] - 48:2, 67:8, 138:22, 141:20, 142:22

**hearing** [1] - 48:8

**heart** [12] - 57:9, 76:7, 76:8, 116:22, 135:12, 145:15, 145:19, 145:23, 149:14, 149:15, 149:17, 149:21

**held** [1] - 1:12

**hello** [1] - 96:9

**help** [3] - 46:21, 95:2

**helped** [1] - 73:7

**helpful** [3] - 72:14, 121:8, 121:10

**hematocrit** [1] - 109:12

**hemoglobin** [1] - 109:12

**hemoperitoneum** [1] - 85:4

**hemorrhage** [9] - 23:21, 108:4, 112:13, 113:4, 114:10, 117:10, 117:11, 126:2

**hemorrhaging** [5] - 65:3, 65:7, 65:8, 65:10, 138:20

**hepatic** [4] - 23:22, 105:20, 106:16, 108:8

**hepatocyte** [1] - 104:13

**hereby** [3] - 3:2, 157:4, 158:6

**hereof** [1] - 157:6

**hereto** [1] - 3:4

**Herkimer** [1] - 15:15

**herself** [1] - 29:8

**hesitant** [1] - 135:23

**hidden** [1] - 150:14

**high** [5] - 30:16, 70:14, 104:23, 105:10, 107:15

**high-powered** [1] - 104:23

**higher** [3] - 57:18, 139:4, 139:8

**highly** [2] - 50:17, 82:6

**hire** [1] - 18:9

**histologic** [1] - 71:4

**histology** [5] - 8:5, 28:17, 28:23, 29:14, 31:3

**history** [15] - 85:6, 85:7, 99:13, 99:14,

---

101:1, 101:3, 101:6, 101:22, 102:1, 102:7, 110:5, 110:18, 137:19, 155:15

**hold** [2] - 16:20, 42:16

**home** [4] - 54:6, 54:21, 56:18, 64:17

**homicide** [10] - 82:10, 83:3, 83:9, 128:2, 128:9, 128:13, 135:8, 135:16, 153:2, 155:6

**homicides** [2] - 11:19, 135:10

**honest** [1] - 145:18

**hope** [1] - 91:22

**hoped** [1] - 31:5

**hopefully** [2] - 32:19, 34:8

**hospital** [20] - 18:18, 54:10, 54:22, 55:6, 55:17, 56:3, 56:18, 56:19, 57:4, 57:8, 72:1, 84:4, 100:5, 101:12, 101:14, 101:16, 109:11, 121:17, 121:19, 136:7

**Hospital** [1] - 6:6

**hospital"** [1] - 121:18

**hospitals** [1] - 18:4

**hour** [7] - 9:16, 13:8, 44:16, 44:17, 45:2, 90:3, 101:3

**hours** [1] - 111:4

**house** [1] - 64:8

**human** [1] - 76:18

**hundred** [6] - 15:1, 38:15, 54:4, 54:9, 56:2, 56:21

**hyperglycemia** [1] - 31:1

**hyperglycemic** [1] - 30:15

**hypothetically** [2] - 127:21, 148:21

**hypovolemic** [1] - 85:3

## I

**idea** [7] - 11:7, 20:23, 28:17, 28:20, 29:16, 31:8, 109:14

**identification** [2] - 25:12, 51:15

**identified** [1] - 116:8

**illustrated** [1] - 78:8

**image** [1] - 104:1

**imagine** [1] - 54:16
**immediately** [3] - 48:12, 49:1, 107:22
**impacted** [5] - 15:6, 19:12, 20:2, 20:4, 24:4
**impacts** [1] - 152:5
**important** [8] - 28:17, 28:23, 44:1, 72:10, 102:1, 102:14, 134:4, 140:20
**impossible** [5] - 61:17, 82:6, 97:22, 109:15, 125:1
**impression** [4] - 91:3, 91:20, 92:3, 95:12
**improper** [1] - 74:1
**improperly** [1] - 109:3
**improved** [1] - 139:7
**in-custody** [1] - 134:10
**inaccurate** [1] - 103:15
**inappropriately** [1] - 68:21
**incidence** [1] - 57:18
**incident** [6] - 80:17, 96:4, 116:16, 135:3, 137:3, 139:4
**incidents** [2] - 59:19, 62:6
**incision** [1] - 89:19
**include** [4] - 62:12, 70:2, 70:3, 153:23
**included** [1] - 147:16
**including** [5] - 15:18, 35:18, 61:1, 88:15, 116:12
**inclusive** [1] - 37:7
**incorporated** [1] - 85:10
**incorrect** [1] - 58:23
**increase** [1] - 15:11
**independent** [3] - 39:1, 39:4, 91:14
**independently** [1] - 153:21
**INDEX** [1] - 156:1
**indicate** [2] - 29:3, 52:14
**indicated** [1] - 11:23
**indicative** [1] - 30:4
**indicted** [2] - 95:15, 140:9
**indictments** [1] - 95:19
**individual** [2] - 135:2, 144:16
**Individually** [7] - 1:6, 1:6, 1:7, 1:7, 1:8, 1:8

**individuals** [3] - 100:19, 152:17, 154:1
**inept** [1] - 41:10
**ineptness** [1] - 49:7
**infancy** [3] - 68:4, 69:13, 70:2
**infant** [9] - 68:6, 68:10, 68:17, 68:18, 69:6, 69:20, 70:8, 148:5
**infants** [3] - 69:6, 69:13, 73:8
**infection** [1] - 149:14
**infections** [2] - 81:17, 81:18
**inference** [2] - 130:16, 130:20
**inferior** [1] - 105:21
**influence** [7] - 21:8, 21:16, 21:22, 87:23, 89:6, 89:10, 155:2
**influenced** [4] - 21:14, 88:1, 88:7, 89:13
**inform** [2] - 38:9, 84:22
**informal** [1] - 27:5
**information** [14] - 8:22, 9:10, 87:8, 87:10, 87:18, 87:19, 88:8, 88:10, 88:15, 89:11, 123:23, 135:20, 154:2, 155:11
**informed** [1] - 85:10
**inherited** [1] - 81:20
**initial** [2] - 44:15, 117:4
**injuries** [49] - 23:12, 23:13, 24:14, 24:15, 24:16, 62:8, 62:12, 72:15, 72:21, 73:21, 74:1, 74:3, 74:4, 74:15, 78:3, 84:8, 99:8, 100:6, 100:21, 101:23, 102:2, 102:12, 103:5, 108:7, 108:8, 111:9, 111:12, 111:15, 111:17, 116:22, 117:4, 125:21, 125:23, 126:1, 127:1, 127:22, 128:1, 129:10, 132:10, 132:15, 135:2, 136:20, 137:12, 138:13, 138:15, 147:9
**injury** [17] - 73:3, 98:3, 98:11, 98:15, 102:3,

102:4, 103:9, 103:18, 104:15, 108:17, 117:8, 117:12, 117:21, 117:22, 130:2, 132:23, 138:8
**inner** [1] - 143:22
**inquired** [1] - 74:21
**inquiry** [1] - 88:11
**inside** [1] - 64:16
**insisted** [1] - 86:7
**inspect** [2] - 64:7, 64:9
**instance** [2] - 154:17, 155:13
**instances** [2] - 70:20, 110:17
**instantly** [1] - 76:13
**instructed** [2] - 45:9, 48:11
**instrument** [1] - 139:16
**intact** [7] - 105:2, 105:16, 105:20, 107:16, 107:17, 107:18, 113:8
**intake** [2] - 115:21, 115:22
**intended** [1] - 72:21
**intending** [1] - 59:22
**intentioned** [1] - 72:19
**inter** [1] - 30:8
**interest** [2] - 153:6, 154:3
**interested** [1] - 10:23
**interject** [1] - 9:2
**internal** [4] - 76:6, 91:4, 91:5, 116:20
**interrogate** [2] - 75:5, 75:7
**Interrogatories** [1] - 51:19
**interval** [1] - 107:7
**intervention** [2] - 75:9, 116:14
**interview** [12] - 73:1, 75:7, 80:17, 80:18, 83:15, 83:18, 84:5, 89:11, 98:10, 118:18, 123:18
**interviewed** [2] - 92:4, 137:2
**intestinal** [1] - 108:8
**introduced** [1] - 144:9
**investigated** [1] - 134:22
**investigation** [3] - 70:6, 140:9, 153:16
**investigator** [4] - 48:23, 86:11,

115:19, 140:3
**investigators** [2] - 48:11, 140:6
**investigatory** [1] - 140:12
**involve** [1] - 142:3
**involved** [7] - 27:9, 105:18, 134:10, 136:4, 137:9, 140:19, 141:10
**involvement** [1] - 4:13
**involvements** [1] - 151:18
**involves** [1] - 131:2
**involving** [4] - 6:1, 95:17, 135:6, 151:14
**issuance** [1] - 122:8
**issue** [9] - 9:12, 9:13, 10:16, 13:20, 18:6, 19:11, 23:14, 96:11, 124:7
**issued** [5] - 26:3, 37:17, 51:16, 53:10, 55:2
**issues** [5] - 19:23, 23:23, 28:21, 43:22, 44:9
**items** [1] - 6:12
**itself** [2] - 66:13, 108:9

**J**

**James** [2] - 53:20
**Jeanne** [3] - 1:14, 158:4, 158:12
**Jessica** [10] - 40:17, 42:22, 44:22, 45:11, 45:14, 45:16, 48:6, 49:5, 50:19, 86:3
**Jimmy** [1] - 86:11
**job** [3] - 18:21, 20:3, 51:5
**Joel** [14] - 2:11, 40:11, 41:23, 42:4, 48:6, 49:6, 50:12, 52:1, 86:3, 86:19, 143:1, 143:7, 143:9, 143:19
**JOEL** [1] - 1:8
**Johnson** [1] - 2:9
**judge** [7] - 9:14, 28:4, 28:6, 47:20, 47:21, 49:9, 49:10
**July** [3] - 42:20, 44:21, 122:21
**jumps** [2] - 133:11, 133:14
**June** [3] - 93:21, 93:23
**jury** [27] - 6:8, 6:16, 8:4, 21:23, 22:4, 22:10, 22:13, 26:9,

34:19, 45:3, 45:7, 45:8, 45:10, 80:19, 87:5, 89:19, 90:2, 90:10, 90:11, 91:16, 91:19, 96:19, 122:1, 122:3, 122:7, 122:18

**K**

**Kearse** [2] - 134:15, 134:17
**keep** [2] - 17:20, 114:15
**ketoacidosis** [1] - 30:18
**key** [4] - 27:8, 34:15, 112:2, 133:17
**kidneys** [1] - 108:3
**kill** [2] - 76:13, 131:11
**killed** [2] - 70:10, 131:12
**kind** [13] - 38:16, 43:15, 66:20, 107:13, 109:5, 116:2, 125:5, 130:12, 133:10, 133:14, 150:2, 154:4, 155:15
**kindergarten** [2] - 154:8, 154:10
**KLEIN** [99] - 4:5, 9:11, 9:20, 13:22, 16:10, 19:1, 20:11, 21:11, 24:19, 25:6, 26:18, 31:2, 31:16, 32:18, 34:1, 34:3, 34:12, 34:13, 38:7, 40:10, 41:11, 43:3, 43:12, 44:3, 44:13, 46:3, 47:18, 48:19, 50:4, 51:10, 57:7, 57:13, 57:23, 59:2, 59:11, 60:5, 60:14, 64:6, 65:22, 66:6, 73:17, 74:5, 74:18, 75:3, 75:6, 75:16, 76:4, 77:18, 79:16, 80:8, 83:12, 83:22, 85:15, 85:18, 88:13, 89:9, 89:17, 90:8, 90:19, 91:15, 92:15, 93:4, 93:9, 93:20, 94:7, 94:20, 96:1, 96:18, 97:10, 98:1, 98:8, 99:4, 100:8, 100:18, 101:19, 102:20, 108:22, 122:17, 123:15, 124:22, 132:13, 133:1, 133:12, 136:22,

137:4, 139:21, 140:1, 140:22, 141:23, 144:17, 144:21, 146:23, 148:3, 148:11, 148:15, 148:20, 149:4, 152:8, 155:21
**Klein** [3] - 2:2, 4:9, 20:18
**knee** [2] - 60:10, 60:12
**knowing** [1] - 140:5
**knowledge** [8] - 16:3, 21:3, 21:20, 29:8, 45:12, 51:5, 51:9, 115:6
**known** [1] - 142:16

## L

**lab** [2] - 35:20, 121:2
**label** [1] - 69:5
**lacerate** [1] - 61:17
**lacerated** [6] - 91:13, 92:3, 92:8, 108:1, 132:6, 137:23
**laceration** [7] - 61:18, 66:15, 91:20, 105:14, 105:18, 112:17, 127:20
**lacerations** [32] - 23:12, 23:22, 24:18, 28:19, 63:13, 65:4, 65:18, 66:11, 66:17, 66:19, 71:17, 72:9, 76:12, 76:16, 77:4, 78:22, 79:1, 79:4, 85:4, 91:23, 93:3, 112:14, 112:20, 113:7, 113:11, 114:5, 127:7, 132:4, 132:20, 137:20, 138:18, 138:21
**lack** [1] - 97:2
**Lansingburgh** [1] - 52:6
**large** [13] - 79:2, 79:5, 85:3, 85:8, 85:9, 89:20, 90:11, 99:7, 99:15, 99:21, 101:2, 124:2, 126:2
**largely** [1] - 127:20
**last** [7] - 15:8, 20:16, 21:21, 37:6, 44:14, 45:1, 92:1
**lateral** [1] - 64:1
**law** [15] - 20:23, 21:7, 88:14, 92:5, 92:6, 94:23, 134:9, 135:5, 135:6, 135:7, 135:16, 136:1,

136:6, 148:10, 151:19
**Lawrence** [1] - 15:20
**lead** [9] - 12:2, 80:10, 92:18, 140:3, 140:5, 140:14, 145:6, 146:17, 148:7
**leading** [3] - 98:15, 98:16, 145:1
**learn** [3] - 54:1, 94:21, 105:8
**learned** [1] - 117:16
**learning** [1] - 152:3
**least** [10] - 7:12, 25:7, 26:14, 27:2, 41:7, 61:4, 92:2, 105:19, 119:8, 125:19
**leave** [5] - 12:16, 13:1, 43:14, 72:2, 97:12
**leaving** [1] - 13:15
**led** [1] - 10:23, 37:20, 88:16
**left** [13] - 12:19, 13:4, 13:11, 13:17, 14:11, 18:10, 43:23, 47:23, 62:23, 112:15, 112:18, 128:5, 135:21
**legal** [3] - 83:23, 115:19, 153:15
**legitimate** [1] - 30:13
**lesion** [1] - 31:11
**less** [4] - 44:17, 58:11, 58:13, 150:9
**lethargic** [1] - 79:21
**level** [2] - 30:20, 38:10
**license** [1] - 17:6
**licensed** [1] - 17:4
**lied** [1] - 95:12
**lieutenant** [1] - 53:20
**life** [6] - 20:12, 20:14, 72:7, 82:12, 133:3, 133:8
**light** [1] - 121:9
**likely** [8] - 30:21, 57:3, 111:17, 125:2, 131:7, 131:23, 149:10, 150:9
**likewise** [1] - 101:2
**limited** [1] - 69:6
**line** [2] - 41:22, 86:6
**lines** [1] - 87:12
**lining** [2] - 79:18, 126:7
**linkage** [1] - 84:11
**linked** [3] - 84:4, 84:7, 84:10
**linking** [2] - 99:7, 99:10
**liquid** [1] - 112:8

**list** [2] - 123:16, 150:10
**listed** [2] - 35:14, 37:16
**listing** [1] - 116:21
**lists** [1] - 116:6
**literally** [2] - 57:9, 120:13
**literature** [10] - 29:6, 57:14, 59:4, 59:13, 59:20, 60:21, 65:2, 66:14, 102:11, 105:6
**liver** [85] - 23:12, 24:17, 28:18, 61:8, 61:17, 61:20, 61:22, 62:23, 63:13, 65:4, 65:18, 66:11, 66:12, 66:15, 66:17, 71:16, 72:9, 73:3, 73:20, 74:17, 76:8, 76:10, 76:12, 77:4, 78:18, 78:22, 79:5, 81:1, 85:4, 91:13, 91:19, 91:21, 91:23, 92:3, 92:8, 100:21, 103:5, 104:13, 105:16, 105:17, 106:13, 106:15, 106:16, 106:17, 106:21, 107:1, 107:12, 108:1, 108:5, 108:9, 108:21, 108:23, 109:2, 109:5, 109:7, 112:3, 112:15, 113:4, 113:8, 113:9, 113:12, 114:11, 114:17, 117:4, 117:8, 117:13, 117:22, 118:3, 125:21, 127:1, 127:6, 127:20, 127:22, 131:20, 132:5, 132:20, 132:22, 137:20, 137:23, 138:7, 138:14, 138:18, 138:20, 147:10
**livers** [1] - 60:22, 62:12, 132:6
**living** [2] - 103:9, 103:18
**lobe** [5] - 112:15, 112:18, 112:20, 112:23, 117:7
**lobes** [2] - 62:23, 113:3
**localized** [1] - 108:17
**location** [1] - 105:15
**logic** [2] - 29:5, 81:8
**look** [23] - 29:9, 44:20,

50:14, 81:14, 81:16, 81:17, 88:3, 103:4, 104:4, 105:8, 106:3, 110:9, 110:14, 110:16, 136:1, 137:6, 144:18, 145:13, 145:21, 149:21
**looked** [13] - 6:18, 6:21, 8:2, 24:12, 83:13, 110:23, 119:2, 119:6, 125:15, 139:3, 145:11, 145:12, 145:16
**looking** [15] - 19:22, 23:5, 39:3, 42:15, 42:17, 44:19, 52:8, 84:3, 85:2, 116:1, 125:7, 136:8, 146:6, 151:8
**looks** [3] - 36:5, 44:18, 121:4
**loss** [3] - 80:7, 98:15, 111:6
**lost** [2] - 47:12, 97:14
**low** [2] - 62:17, 124:18
**lower** [3] - 91:17, 106:1, 117:9
**Lucey** [1] - 53:20
**lung** [1] - 112:22
**LYSE** [1] - 104:7
**lyse** [3] - 104:7, 104:9, 104:16

## M

**mails** [1] - 86:14
**major** [3] - 10:13, 24:17, 145:22
**majority** [1] - 91:12
**male** [1] - 124:2
**man** [2] - 74:6, 133:8
**manifest** [1] - 111:15
**manner** [4] - 43:5, 88:12, 147:11, 155:1
**March** [7] - 25:22, 26:1, 26:2, 83:16, 118:16, 118:19, 154:18
**mark** [2] - 25:6, 25:10
**Marked** [1] - 156:2
**marked** [3] - 25:11, 32:20, 51:14
**Mary's** [1] - 55:9
**MASON** [1] - 1:7
**Mason** [3] - 2:8, 93:14, 152:16
**mass** [1] - 31:13
**massive** [3] - 65:7,

65:10, 138:19
**material** [3] - 6:23, 15:7, 22:13
**math** [1] - 56:4
**matter** [3] - 94:23, 110:16, 155:9
**matters** [2] - 22:9, 23:2
**mayoral** [1] - 95:17
**McDonald** [4] - 1:6, 2:7, 120:2, 152:16
**McNally** [1] - 143:7
**ME** [1] - 10:7
**mean** [13] - 17:1, 39:9, 49:18, 80:21, 104:8, 122:14, 124:14, 124:16, 136:15, 145:19, 146:1, 150:3, 154:8
**meaning** [1] - 58:22
**means** [1] - 104:9
**meant** [1] - 70:4
**measured** [1] - 113:16
**measurements** [1] - 116:12
**measuring** [4] - 90:20, 112:18, 112:23, 114:1
**mechanism** [1] - 136:19
**mechanisms** [1] - 66:1
**Med** [1] - 118:9
**medial** [1] - 112:18
**medic** [1] - 53:21
**Medical** [4] - 16:11, 16:16, 17:10, 36:12
**medical** [40] - 10:5, 10:17, 11:1, 12:7, 12:13, 12:14, 18:3, 21:14, 43:2, 44:9, 57:8, 58:23, 59:5, 59:14, 59:22, 61:1, 62:1, 62:14, 72:19, 74:22, 97:22, 115:19, 115:22, 116:13, 121:4, 125:19, 126:10, 127:23, 128:3, 132:2, 132:3, 134:6, 134:8, 136:2, 150:1, 150:12, 153:13, 153:15, 154:13, 155:2
**medical-legal** [1] - 115:19
**medical/burial** [1] - 115:10
**medium** [2] - 99:21, 105:19

**meet** [4] - 18:9, 26:21, 53:15, 63:1

**meeting** [63] - 27:3, 27:5, 34:21, 34:23, 35:5, 35:6, 35:7, 35:10, 35:14, 40:6, 40:18, 40:20, 40:21, 41:4, 41:14, 41:16, 41:21, 41:22, 42:1, 42:2, 42:7, 42:19, 42:21, 43:15, 43:18, 43:20, 44:14, 44:18, 44:20, 45:1, 45:4, 45:14, 45:22, 45:23, 48:6, 48:13, 49:3, 49:5, 49:6, 49:13, 50:2, 50:20, 50:22, 51:2, 86:2, 86:15, 86:21, 118:16, 118:21, 118:22, 119:1, 119:9, 119:12, 119:13, 140:13, 144:4, 144:11, 144:14, 151:21, 151:22, 154:20

**meetings** [11] - 25:20, 26:19, 27:6, 45:21, 46:5, 46:21, 143:22, 144:13, 151:21, 154:17, 154:22

**member** [8] - 16:15, 16:22, 16:23, 17:3, 154:23, 155:5, 155:9, 155:14

**memoranda** [1] - 86:14

**men** [1] - 54:22

**mention** [4] - 90:9, 99:11, 105:21, 106:2

**mentioned** [6] - 12:19, 29:17, 90:6, 90:7, 106:5, 147:16

**MEs** [1] - 20:1

**mesenteric** [1] - 105:21

**message** [2] - 48:14, 48:22

**met** [8] - 4:9, 26:6, 26:13, 32:3, 122:20, 144:1, 144:3, 144:15

**metabolic** [2] - 36:7, 81:19

**MICHAEL** [6] - 1:3, 1:8, 1:12, 4:1, 157:4, 157:13

**Michael** [30] - 2:11, 4:12, 14:12, 24:21, 33:12, 40:3, 53:9, 53:16, 65:12, 65:21,

66:23, 67:6, 78:1, 92:4, 94:17, 95:19, 96:10, 98:20, 99:8, 99:17, 100:16, 117:17, 124:23, 128:1, 128:4, 128:14, 129:15, 130:9, 131:8, 140:14

**Michael's** [1] - 130:17

**microscope** [6] - 7:14, 103:11, 104:5, 104:23, 139:9, 139:14

**microscopes** [2] - 139:3, 139:5

**microscopic** [8] - 7:2, 7:4, 7:6, 29:3, 29:10, 103:6, 104:1, 145:12

**microscopically** [1] - 145:16

**microscopy** [1] - 139:9

**mid** [1] - 25:22

**mid-March** [1] - 25:22

**middle** [1] - 35:1

**might** [2] - 35:14, 136:20

**Mike** [1] - 136:3

**mind** [5] - 25:3, 109:23, 117:20, 133:4, 133:6

**mine** [1] - 7:11

**minor** [1] - 138:15

**minute** [8] - 54:5, 54:10, 54:17, 54:20, 56:2, 71:5, 71:12, 139:22

**minutes** [15] - 35:2, 46:23, 49:10, 54:3, 54:8, 54:21, 54:22, 56:3, 56:17, 56:18, 56:19, 58:11, 58:13, 64:8, 64:16

**misconduct** [1] - 136:16

**misdiagnosed** [2] - 127:9, 127:11

**misdiagnosing** [1] - 127:13

**misinterpretation** [2] - 29:12, 92:20

**misinterpreting** [1] - 93:6

**misleading** [3] - 90:10, 90:15, 90:17

**misrepresenting** [1] - 93:6

**missed** [2] - 26:19, 109:21

**mistakes** [2] - 63:18,

72:18

**ML** [1] - 77:7

**MLs** [2] - 77:6, 112:8

**moment** [4] - 137:5, 144:17, 150:17, 150:19

**moments** [1] - 111:4

**monitor** [2] - 109:7, 109:11

**Montgomery** [1] - 15:19

**month** [1] - 13:14

**months** [4] - 48:9, 89:3, 94:9

**Morgan** [1] - 86:11

**morgue** [1] - 18:5

**morning** [4] - 4:6, 34:11, 82:19, 85:19

**most** [12] - 30:21, 58:12, 65:18, 82:10, 82:15, 82:22, 84:8, 84:9, 110:6, 122:5, 131:23, 145:14

**motion** [1] - 129:3

**mouth** [1] - 24:16

**moving** [1] - 105:1

**MR** [99] - 4:5, 9:11, 9:20, 13:22, 16:10, 19:1, 20:11, 21:11, 24:19, 25:6, 26:18, 31:2, 31:16, 32:18, 34:1, 34:3, 34:12, 34:13, 38:7, 40:10, 41:11, 43:3, 43:12, 44:3, 44:13, 46:3, 47:18, 48:19, 50:4, 51:10, 57:7, 57:13, 57:23, 59:2, 59:11, 60:5, 60:14, 64:6, 65:22, 66:6, 73:17, 74:5, 74:18, 75:3, 75:6, 75:16, 76:4, 77:18, 79:16, 80:8, 83:12, 83:22, 85:15, 85:18, 88:13, 89:9, 89:17, 90:8, 90:19, 91:15, 92:15, 93:4, 93:9, 93:20, 94:7, 94:20, 96:1, 96:18, 97:10, 98:1, 98:8, 99:4, 100:8, 100:18, 101:19, 102:20, 108:22, 122:17, 123:15, 124:22, 132:13, 133:1, 133:12, 136:22, 137:4, 139:21, 140:1, 140:22, 141:23, 144:17, 144:21, 146:23,

148:3, 148:11, 148:15, 148:20, 149:4, 152:8, 155:21

**MS** [102] - 9:2, 9:18, 13:21, 16:7, 18:22, 20:7, 21:10, 24:8, 24:9, 26:15, 30:12, 31:7, 33:21, 34:10, 38:1, 38:2, 40:4, 41:2, 41:3, 42:11, 43:9, 43:19, 44:6, 46:2, 47:13, 47:14, 48:16, 48:17, 50:3, 51:8, 57:6, 57:11, 57:20, 59:1, 59:7, 59:23, 60:8, 63:20, 65:15, 65:16, 66:4, 66:8, 73:13, 73:22, 74:10, 74:23, 75:14, 75:21, 77:14, 79:12, 80:4, 81:5, 83:1, 83:20, 84:6, 85:13, 88:5, 88:21, 89:15, 90:4, 90:13, 91:9, 92:9, 92:10, 93:1, 93:7, 93:15, 93:16, 94:4, 94:13, 94:14, 95:8, 95:21, 96:16, 97:4, 97:20, 98:5, 98:22, 100:2, 100:14, 101:9, 102:16, 108:19, 122:11, 123:4, 124:20, 132:12, 132:19, 133:9, 136:14, 136:18, 140:16, 140:17, 141:19, 146:20, 148:2, 148:8, 148:13, 148:16, 149:2, 152:12, 155:17

**multiple** [3] - 19:10, 74:20, 85:4

**municipalities** [2] - 15:21, 18:1

**municipality** [2] - 13:18, 14:1

**murder** [4] - 82:12, 83:19, 83:21, 137:13

**must** [2] - 78:6, 148:6

**mutual** [1] - 14:3

**mysterious** [1] - 82:3

**N**

**name** [6] - 42:8, 96:12, 99:11, 135:1, 143:8, 152:13

**NAME** [12] - 14:16,

16:2, 16:9, 16:21, 17:10, 17:13, 17:21, 18:8, 18:12, 18:15, 20:15, 32:10

**named** [2] - 53:3, 152:17

**narrative** [3] - 21:8, 87:22, 88:1

**national** [1] - 142:14

**National** [5] - 16:11, 16:15, 17:9, 21:13, 21:18

**natural** [3] - 82:7, 134:1, 147:12

**naturally** [1] - 88:1

**nature** [7] - 11:20, 54:12, 70:15, 75:8, 105:3, 141:6, 141:11

**nearby** [2] - 108:2, 108:13

**necessarily** [3] - 9:9, 146:10, 151:6

**necessary** [3] - 11:3, 109:10, 123:13

**necrosis** [2] - 104:23, 105:3

**need** [9] - 5:15, 10:16, 33:4, 48:21, 106:17, 150:10, 151:9, 154:8, 154:10

**needed** [4] - 15:17, 47:11, 123:1, 148:18

**neighbors** [1] - 80:2

**Neogen** [1] - 33:9

**neuropathologist** [1] - 110:13

**never** [32] - 29:5, 29:6, 32:3, 51:13, 52:20, 66:15, 66:16, 71:1, 72:8, 73:4, 73:12, 74:19, 74:20, 81:6, 83:21, 91:22, 92:11, 96:17, 105:5, 105:12, 122:13, 125:9, 133:6, 134:19, 141:21, 142:1, 142:22, 146:5, 151:7, 154:5, 155:7

**NEW** [2] - 1:1, 157:1

**new** [2] - 105:8, 143:7

**New** [10] - 1:15, 2:3, 2:6, 2:10, 3:5, 6:7, 134:14, 134:22, 158:5

**news** [2] - 70:13, 142:7

**next** [10] - 26:3, 33:11, 36:2, 36:8, 36:11, 44:20, 46:18,

114:15, 119:22
**nice** [1] - 143:9
**night** [1] - 80:17
**ninth** [2] - 60:19, 112:11
**non** [1] - 116:16
**non-incident** [1] - 116:16
**none** [5] - 24:13, 24:17, 99:18, 108:12
**nonsignificant** [1] - 118:13
**normal** [2] - 114:18, 119:16
**normally** [2] - 89:21, 121:11
**north** [2] - 10:10, 135:20
**NORTHERN** [1] - 1:1
**Notary** [3] - 1:15, 3:5, 158:5
**notation** [1] - 121:18
**notations** [1] - 34:8
**note** [3] - 77:19, 80:3, 115:2
**noted** [2] - 25:2, 157:6
**notes** [12] - 6:10, 27:3, 27:4, 34:4, 86:14, 86:18, 117:1, 117:3, 119:17, 119:18, 144:18, 158:7
**nothing** [7] - 30:19, 86:22, 87:1, 123:13, 127:4, 127:5, 146:18
**Notice** [1] - 3:16
**notice** [3] - 13:14, 13:15, 113:8
**notified** [1] - 39:22
**notify** [1] - 42:4
**nucleus** [1] - 104:14
**number** [19] - 15:5, 15:17, 16:1, 16:2, 17:20, 18:9, 18:20, 20:1, 32:22, 32:23, 53:10, 55:16, 71:5, 71:16, 76:1, 114:1, 114:5, 117:11, 142:11
**numbers** [2] - 15:6, 15:11

## O

**O'Connell** [3] - 1:14, 158:4, 158:12
**oath** [1] - 3:18
**object** [24] - 20:7, 21:10, 24:8, 31:7, 38:2, 40:4, 41:2, 41:3, 43:9, 48:17,

57:6, 59:23, 75:3, 85:13, 93:15, 95:8, 95:21, 96:16, 97:20, 98:5, 100:2, 140:16, 140:17, 141:19
**objection** [69] - 13:21, 16:7, 18:22, 24:9, 26:15, 30:12, 38:1, 43:19, 44:6, 44:11, 47:13, 47:14, 48:16, 50:3, 51:8, 57:11, 57:20, 59:1, 59:7, 60:8, 63:20, 65:15, 65:16, 66:4, 66:8, 73:13, 73:22, 74:10, 74:23, 75:14, 75:21, 77:14, 79:12, 80:4, 81:5, 83:1, 83:20, 84:6, 88:5, 88:21, 89:15, 90:4, 90:13, 91:9, 92:9, 92:10, 93:1, 93:7, 93:16, 94:4, 94:13, 94:14, 97:4, 98:22, 100:14, 101:9, 102:16, 108:19, 122:11, 123:4, 124:20, 132:12, 132:19, 133:9, 136:14, 136:18, 146:20, 148:2, 149:2
**objections** [2] - 3:11, 3:16
**objective** [1] - 149:7
**objectively** [1] - 21:9
**observe** [2] - 87:17, 114:22
**observed** [3] - 27:20, 114:21, 147:9
**obstructive** [1] - 11:5
**obtained** [2] - 6:22, 7:7
**occasion** [1] - 11:18
**occasions** [2] - 61:3, 134:10
**occur** [13] - 24:15, 62:7, 62:16, 68:15, 70:4, 70:17, 72:5, 72:21, 86:3, 102:12, 107:21, 111:15, 145:15
**occurred** [14] - 29:11, 30:22, 62:13, 86:5, 95:18, 97:7, 98:3, 98:11, 110:4, 117:22, 126:18, 133:16, 136:20, 149:8
**occurring** [1] - 103:2
**occurs** [1] - 154:20

**OF** [5] - 1:1, 1:6, 156:1, 157:1, 157:2
**offered** [1] - 95:3
**offhand** [2] - 24:10, 25:5
**office** [31] - 10:18, 11:1, 25:22, 26:7, 35:2, 38:8, 39:17, 39:21, 40:1, 40:9, 40:13, 46:5, 47:3, 48:13, 48:23, 52:8, 52:19, 84:14, 84:16, 84:19, 86:19, 115:23, 119:7, 120:10, 122:6, 141:14, 143:15, 151:1, 151:8, 152:23, 153:14
**officers** [4] - 20:20, 37:21, 88:14, 120:4
**offices** [1] - 16:20, 18:4
**officials** [1] - 120:12
**often** [6] - 71:6, 88:8, 151:7, 153:3, 153:5, 153:8
**old** [3] - 69:15, 71:21, 154:9
**older** [2] - 61:15, 61:16
**olds** [2] - 145:3, 145:5
**Olympus** [1] - 139:14
**on..** [1] - 46:1
**once** [3] - 26:14, 33:23, 96:2
**one** [40] - 8:2, 9:3, 12:10, 24:11, 27:2, 33:8, 35:14, 40:11, 44:15, 45:8, 48:11, 52:12, 62:6, 62:8, 66:15, 68:15, 69:10, 69:21, 69:22, 71:11, 71:16, 72:12, 78:6, 78:9, 78:10, 79:2, 79:3, 81:4, 87:12, 125:13, 129:6, 133:17, 135:20, 135:22, 140:6, 143:23, 144:17, 149:16
**Oneida** [3] - 13:6, 13:7, 14:5
**ones** [4] - 15:18, 61:14, 121:15, 154:18
**Onondaga** [2] - 134:20, 134:21
**oozing** [1] - 89:20
**open** [1] - 119:3
**opened** [2] - 112:8,

148:18
**opine** [2] - 29:18, 149:9
**opined** [2] - 98:3, 98:10
**opining** [1] - 71:11
**opinion** [18] - 19:15, 19:22, 31:23, 32:4, 32:6, 32:8, 49:9, 63:16, 65:10, 65:14, 69:16, 76:3, 129:22, 131:14, 132:2, 142:16, 150:9
**opinions** [4] - 23:7, 24:6, 32:15, 57:2
**opportunity** [3] - 27:12, 31:6, 31:18
**opposed** [1] - 29:4
**order** [1] - 118:10
**organ** [6] - 62:20, 76:14, 103:12, 109:8, 111:13, 111:14
**organization** [1] - 18:19
**organs** [4] - 108:2, 112:10, 116:20, 149:21
**origin** [1] - 28:18
**original** [1] - 6:10
**originally** [1] - 8:2
**otherwise** [5] - 5:12, 23:7, 31:23
**outcome** [1] - 40:22
**outside** [1] - 69:18
**oversight** [1] - 101:7
**overturned** [1] - 93:18
**own** [5] - 7:10, 7:15, 84:15, 95:7, 105:7
**oxygen** [2] - 111:13, 111:14

## P

**P.C** [1] - 2:9
**p.m** [1] - 155:22
**packet** [1] - 52:9
**page** [29] - 33:11, 34:18, 35:16, 35:22, 36:2, 36:3, 36:8, 36:11, 37:6, 37:7, 37:8, 44:19, 51:21, 51:22, 52:8, 55:12, 85:2, 87:12, 113:19, 114:15, 115:9, 115:17, 116:10, 116:23, 117:1, 118:15, 119:22, 121:7, 121:13
**pages** [4] - 33:18,

36:11, 36:17, 121:1
**pain** [1] - 97:3
**painful** [2] - 79:10, 79:15
**painful"** [2] - 79:14, 96:20
**pancreas** [1] - 108:3
**panic** [1] - 83:7
**panicked** [1] - 124:11
**paper** [2] - 24:11, 87:1
**part** [33] - 6:13, 6:14, 6:19, 6:20, 8:7, 12:14, 33:10, 33:13, 35:19, 35:23, 36:1, 36:2, 36:9, 36:12, 36:18, 36:21, 37:1, 37:4, 37:10, 37:11, 37:12, 37:13, 83:14, 85:9, 104:14, 115:18, 147:17, 148:16, 148:17, 153:12, 153:22, 154:16
**part-time** [1] - 12:14
**partially** [1] - 14:6
**particular** [2] - 28:12, 77:21
**particularly** [1] - 61:15
**parties** [1] - 3:4
**parts** [4] - 7:21, 33:7, 34:15, 112:2
**pass** [2] - 80:9, 80:10
**passed** [2] - 80:6, 80:11, 97:7
**past** [1] - 21:15
**pathologist** [4] - 10:9, 17:19, 19:17, 110:14
**pathologists** [3] - 12:11, 18:9, 145:20
**pathology** [1] - 153:15
**patrol** [1] - 134:18
**pattern** [1] - 84:7
**Pattison** [2] - 2:5, 152:14
**pay** [1] - 17:2
**paying** [2] - 17:5, 17:8
**PD** [10] - 25:21, 37:21, 38:8, 119:3, 120:4, 141:8, 141:9, 142:3, 150:23, 154:1
**PECK** [75] - 9:2, 9:18, 16:7, 18:22, 20:7, 24:9, 26:15, 30:12, 33:21, 34:10, 38:1, 40:4, 41:2, 42:11, 43:9, 43:19, 44:6, 46:2, 47:13, 48:16, 50:3, 51:8, 57:11, 57:20, 59:1, 59:7, 59:23, 60:8, 63:20,

65:15, 66:4, 66:8, 73:13, 73:22, 74:10, 74:23, 75:14, 75:21, 77:14, 79:12, 80:4, 81:5, 83:1, 83:20, 84:6, 85:13, 88:5, 88:21, 89:15, 90:4, 90:13, 91:9, 92:9, 93:16, 94:14, 97:4, 100:2, 100:14, 101:9, 102:16, 108:19, 122:11, 123:4, 124:20, 132:12, 132:19, 136:14, 136:18, 140:16, 146:20, 148:2, 148:8, 148:13, 148:16, 149:2

**Peck** [4] - 2:9, 2:11, 4:22, 6:15
**pediatric** [1] - 6:7
**pediatrician** [2] - 121:5, 121:8
**peer** [3] - 21:5, 23:13, 24:2
**pended** [2] - 89:1, 125:6
**pending** [3] - 5:16, 37:16, 115:16
**people** [12] - 70:3, 71:6, 72:18, 74:20, 75:5, 76:13, 87:9, 96:7, 101:12, 146:15, 153:6, 154:9
**per** [12] - 14:16, 14:20, 15:4, 16:1, 17:15, 18:20, 20:2, 54:10, 54:16, 54:20, 56:2, 142:12
**percentage** [1] - 71:2
**perforates** [1] - 112:22
**perform** [3] - 60:4, 60:11, 142:11
**performance** [4] - 41:6, 50:18, 87:1, 120:22
**performed** [5] - 7:2, 58:10, 101:11, 101:17, 137:22
**performing** [1] - 14:14
**perfuse** [1] - 106:16
**perhaps** [5] - 70:5, 109:11, 130:5, 139:17, 154:11
**period** [3] - 54:6, 54:8, 54:18
**PerkinElmer** [2] - 35:22, 36:4
**permission** [1] - 28:6

**permitted** [1] - 29:20
**person** [7] - 30:15, 50:10, 66:16, 81:10, 137:12, 141:8, 153:4
**personal** [5] - 20:12, 20:13, 20:14, 61:19, 62:13
**personally** [3] - 32:2, 42:5, 61:2
**personnel** [7] - 72:13, 73:16, 74:22, 127:23, 128:3, 136:2
**perspective** [1] - 11:2
**phase** [1] - 140:12
**phenomenon** [1] - 144:23
**phone** [1] - 109:20
**photos** [8] - 34:7, 37:10, 37:13, 39:4, 113:18, 113:22, 121:21, 137:7
**physicians** [3] - 12:11, 98:21, 109:6
**physiological** [3] - 31:11, 145:14, 145:17
**picked** [1] - 107:7
**picking** [1] - 43:22
**pictures** [1] - 114:11
**pieces** [2] - 107:1, 107:3
**Pine** [1] - 2:9
**pink** [2] - 33:9, 104:14
**place** [3] - 47:2, 113:16, 157:6
**placement** [4] - 58:22, 59:15, 60:22, 61:22
**places** [2] - 21:3, 21:4
**Plaintiff** [1] - 1:4
**Plaintiff's** [1] - 51:19
**Plaintiff/Claimant** [1] - 2:4
**planned** [2] - 28:13, 31:5
**play** [1] - 103:23
**Player** [1] - 52:5
**Plaza** [1] - 2:9
**pleasant** [1] - 43:21
**PLLC** [1] - 2:5
**plus** [1] - 140:13
**pneumonia** [3] - 81:11, 148:7, 148:22
**point** [18] - 23:10, 24:6, 28:13, 30:6, 30:10, 30:14, 31:3, 31:4, 42:22, 43:8, 47:9, 47:19, 48:2, 58:5, 89:1, 113:21, 117:18, 117:20
**points** [4] - 28:13,

31:4, 31:17, 102:22
**police** [31] - 6:5, 11:7, 20:20, 21:14, 38:5, 40:2, 84:13, 84:22, 85:11, 87:7, 87:9, 88:8, 88:14, 89:6, 95:12, 117:15, 121:19, 136:9, 140:8, 141:2, 151:11, 152:18, 152:22, 153:14, 153:16, 153:23, 154:11, 154:23, 155:5, 155:10, 155:13
**politely** [1] - 43:23
**political** [2] - 14:9, 95:16
**politics** [2] - 11:5, 142:3
**polydipsia** [1] - 30:1
**polyphagia** [1] - 30:2
**polyuria** [1] - 30:1
**poor** [1] - 41:5
**population** [1] - 11:3
**portal** [1] - 106:18
**portion** [6] - 66:12, 79:5, 88:9, 90:11, 112:22, 132:22
**portions** [2] - 63:10
**position** [2] - 10:14, 64:4
**positioning** [3] - 62:16, 62:17, 63:18
**positions** [3] - 16:20, 25:4, 59:9
**possibility** [7] - 97:17, 129:2, 129:14, 146:19, 146:22, 147:1
**possible** [7] - 58:14, 76:9, 82:5, 111:16, 117:21, 131:23, 147:5
**possibly** [4] - 65:12, 66:22, 78:18, 92:20
**post** [4] - 72:15, 118:15, 119:13, 151:21
**post-autopsy** [2] - 118:15, 119:13
**posterior** [12] - 60:19, 63:7, 63:10, 64:13, 64:18, 64:19, 102:21, 112:11, 112:15, 112:23, 117:7, 117:9
**postmortem** [3] - 23:12, 23:13, 29:4, 30:22, 40:19, 67:5,

72:15, 76:19, 76:21, 111:18, 125:22, 126:11, 147:10
**potential** [2] - 101:23, 150:8
**potentially** [1] - 99:21
**power** [4] - 105:10, 107:15, 139:4, 139:8
**powered** [1] - 104:23
**Practice** [1] - 139:1
**practice** [2] - 100:4, 147:23
**practices** [4] - 21:2, 21:20, 150:7, 153:13
**pre** [2] - 121:15
**pre-autopsy** [1] - 121:15
**pre-cutting** [1] - 121:15
**preceded** [1] - 128:23
**precinct** [1] - 95:18
**preclude** [1] - 82:23
**preliminary** [1] - 11:10
**premise** [1] - 92:17
**premortem** [4] - 72:15, 103:19, 103:22, 125:22
**prep** [4] - 45:3, 45:22, 45:23, 151:21
**preparation** [1] - 8:8
**prepare** [4] - 4:19, 26:13, 41:12, 46:21
**prepared** [3] - 28:22, 150:16, 155:9
**prepped** [2] - 45:7, 45:8
**preps** [1] - 151:22
**prerogative** [1] - 133:15
**presence** [1] - 104:23
**present** [10] - 15:3, 37:21, 38:6, 45:15, 49:4, 51:2, 77:11, 108:12, 113:7, 153:1
**presented** [2] - 32:7, 45:10, 46:8
**press** [3] - 51:16, 52:1, 156:4
**pressed** [1] - 131:17
**pressing** [3] - 129:5, 132:8, 132:11
**pressure** [6] - 62:18, 94:18, 94:19, 99:2, 106:1, 135:23
**presumably** [1] - 26:13
**preteen** [1] - 70:20
**pretrial** [1] - 41:13
**pretty** [4] - 71:23, 104:12, 119:16,

142:23
**prevent** [1] - 59:10
**previously** [3] - 11:23, 12:19, 53:6
**primary** [3] - 41:19, 143:19, 143:21
**prison** [2] - 82:12, 133:8
**probable** [1] - 134:1
**problem** [3] - 9:9, 9:18, 9:19
**procedure** [2] - 116:5, 122:3
**procedures** [1] - 20:16
**proceeding** [2] - 148:12, 148:13
**proceedings** [3] - 4:20, 142:1, 158:8
**process** [4] - 29:7, 30:18, 107:14, 128:12
**Production** [1] - 51:20
**Professional** [3] - 1:14, 52:5, 158:8
**professional** [2] - 18:18, 142:17
**professionally** [2] - 18:12, 143:13
**professionals** [2] - 18:11, 72:20
**profusely** [3] - 79:4, 126:19, 126:20
**programs** [1] - 119:3
**prolong** [1] - 72:7
**prolonged** [5] - 57:17, 58:12, 71:22, 72:1, 76:1
**prompt** [1] - 50:1
**pronounced** [2] - 101:13, 101:18
**proper** [3] - 13:14, 21:7, 56:1
**properly** [5] - 9:8, 72:17, 73:5, 73:15
**prosecute** [1] - 83:8
**prosecuted** [2] - 52:10, 141:16
**prosecution** [11] - 21:15, 22:12, 22:17, 28:5, 45:22, 46:21, 49:7, 82:23, 83:3, 137:10, 140:15
**prosecution's** [1] - 86:6
**prosecutor** [7] - 41:5, 41:9, 41:15, 41:19, 41:23, 44:2, 82:16
**prosecutor's** [1] - 50:8
**protest** [2] - 12:17,

13:16
**protuberating** [1] - 92:13
**proven** [1] - 60:2
**provide** [3] - 15:16, 91:22, 153:19
**provided** [2] - 6:15, 154:2
**providers** [1] - 59:14
**providing** [1] - 12:11
**public** [2] - 35:2, 35:8
**Public** [3] - 1:15, 3:5, 158:5
**publicized** [1] - 96:12
**publicly** [1] - 134:13
**published** [1] - 29:7
**pull** [1] - 88:2
**pulled** [1] - 104:5
**pump** [2] - 57:10, 76:7
**pumped** [1] - 77:13
**pumping** [1] - 76:7, 76:9
**pumps** [1] - 54:16
**pun** [1] - 40:19
**puppies** [1] - 49:17
**purpose** [1] - 45:4
**pursue** [2] - 83:5, 88:2
**pursuing** [1] - 52:12
**push** [1] - 49:15
**pushback** [1] - 18:17
**pushing** [1] - 43:4
**put** [17] - 16:8, 20:5, 54:7, 60:3, 81:15, 87:1, 99:5, 99:22, 101:4, 101:6, 101:8, 123:9, 124:10, 127:18, 154:14, 155:10, 155:14

## Q

**quad** [1] - 117:8
**quadrate** [1] - 113:3
**qualifications** [2] - 3:17, 142:18
**qualify** [3] - 68:22, 102:5, 145:18
**quality** [1] - 20:9
**qualms** [1] - 142:18
**quantity** [2] - 66:18
**quarter** [1] - 146:15
**questioning** [3] - 49:8, 86:7, 92:17
**questions** [9] - 3:12, 4:13, 4:17, 5:5, 87:11, 126:12, 137:5, 152:19, 155:17
**quicker** [1] - 106:11
**quickly** [5] - 60:17,

76:13, 97:7, 106:9, 127:2
**quite** [4] - 13:10, 59:17, 141:4, 153:10
**quote** [4] - 87:6, 87:8, 96:21, 142:15

## R

**race** [1] - 95:17
**radiological** [1] - 118:10
**raised** [2] - 19:11, 19:12
**ramifications** [1] - 18:11
**rare** [6] - 71:12, 80:13, 81:3, 110:20, 110:22, 150:9
**rarely** [2] - 102:23, 103:3
**rather** [7] - 38:10, 78:15, 81:9, 82:10, 84:3, 128:3, 136:6
**ray** [1] - 114:22
**rays** [1] - 81:22
**reach** [2] - 48:5, 123:17
**reaction** [1] - 30:5
**read** [11] - 21:5, 21:15, 24:3, 27:12, 32:10, 55:22, 67:8, 101:15, 117:5, 142:21, 157:4
**real** [4] - 11:8, 15:11, 73:8, 144:10
**realized** [1] - 13:15
**really** [14] - 15:9, 18:6, 38:3, 42:23, 43:1, 62:5, 70:7, 74:7, 89:6, 92:14, 129:4, 139:10, 143:10, 155:19
**realtime** [2] - 27:15, 27:17
**rear** [1] - 102:23
**reason** [18] - 5:19, 40:20, 58:1, 67:7, 73:1, 74:7, 77:21, 81:23, 82:2, 94:2, 95:3, 95:10, 99:22, 118:7, 125:7, 125:9, 127:6, 128:14
**reasonable** [8] - 97:22, 104:6, 132:3, 134:6, 134:7, 145:21, 149:23, 154:7
**reasons** [9] - 12:5, 14:2, 14:9, 70:5, 70:22, 70:23, 97:19,

118:7, 118:8
**rebut** [1] - 47:8
**rebuttal** [6] - 27:23, 28:4, 28:9, 28:14, 29:19, 86:10
**rebutted** [2] - 31:5, 31:18
**recalled** [1] - 54:21
**receipt** [1] - 33:10
**receive** [3] - 75:23, 88:22, 89:2
**received** [5] - 18:17, 25:7, 54:13, 84:17, 116:7
**receiving** [2] - 53:14, 53:18
**recent** [2] - 22:7, 27:19
**Recess** [3] - 34:2, 85:17, 139:23
**recess** [1] - 144:20
**recognizable** [1] - 104:16
**recognize** [2] - 104:13, 104:20
**recollection** [10] - 6:1, 27:19, 39:1, 39:5, 42:7, 46:7, 137:18, 141:15, 142:6, 144:11
**recommendations** [5] - 16:5, 16:12, 17:13, 17:16, 59:9
**recommended** [6] - 14:16, 16:2, 18:15, 21:7, 50:17, 142:13
**record** [10] - 8:23, 16:8, 33:11, 37:19, 42:19, 68:3, 116:23, 144:19, 154:8, 157:5
**Record** [1] - 52:4
**recorded** [1] - 80:17
**recordings** [1] - 5:23
**records** [8] - 6:6, 42:9, 42:15, 101:16, 121:4, 121:8, 153:20
**recovered** [1] - 114:2
**recuts** [1] - 7:8
**red** [1] - 104:11
**reevaluated** [1] - 139:20
**reexamined** [1] - 139:20
**refer** [3] - 17:9, 63:8, 99:12
**reference** [1] - 9:21
**referenced** [2] - 142:7, 154:22
**referring** [1] - 67:16
**refresh** [2] - 6:1, 27:19

**regard** [5] - 16:1, 17:13, 86:2, 87:6, 139:6
**regarding** [1] - 9:6
**regards** [1] - 29:9
**region** [1] - 10:17
**regional** [1] - 11:1
**Registered** [2] - 1:14, 158:4
**regret** [1] - 52:12
**regulations** [2] - 21:2, 150:6
**relate** [1] - 112:3
**related** [9] - 57:14, 62:8, 62:11, 100:21, 101:23, 102:3, 116:2, 116:16, 132:23
**relates** [1] - 18:20
**relationship** [4] - 14:9, 153:22, 154:16, 154:19
**relatively** [1] - 64:22
**release** [1] - 156:4
**released** [1] - 9:7
**relevant** [2] - 101:22, 155:11
**rely** [2] - 9:5, 153:16
**relying** [1] - 9:10
**remained** [2] - 10:4, 16:6
**remember** [19] - 24:11, 25:5, 39:8, 39:12, 39:13, 39:14, 46:17, 46:18, 96:6, 96:7, 119:1, 119:20, 120:2, 120:8, 120:20, 120:21, 143:8, 143:18, 144:16
**remote** [6] - 33:22, 97:17, 146:22, 147:2, 147:3, 147:5
**removed** [2] - 112:10, 113:9, 114:12
**rendered** [1] - 57:2
**rendering** [1] - 155:8
**rendition** [1] - 131:1
**Rensselaer** [7] - 10:5, 10:7, 10:19, 11:14, 11:22, 12:3, 15:14
**RENSSELAER** [1] - 1:7
**reparative** [1] - 103:23, 107:14
**repeat** [3] - 59:18, 98:7, 109:21
**reperfusion** [2] - 111:8, 111:17
**rephrase** [2] - 5:10,

64:14
**replace** [1] - 14:7
**replicating** [1] - 94:18
**report** [47] - 6:5, 26:4, 34:5, 35:17, 35:20, 36:1, 36:5, 36:6, 36:23, 37:8, 37:12, 37:14, 37:17, 39:3, 55:2, 60:17, 77:19, 77:23, 79:20, 85:1, 89:5, 89:7, 89:12, 94:17, 97:3, 99:12, 100:1, 101:6, 101:8, 101:15, 102:14, 106:5, 111:23, 112:3, 115:5, 115:10, 134:14, 136:17, 150:16, 150:17, 151:8, 151:9, 154:11, 154:15, 155:8, 155:10
**reported** [8] - 85:7, 99:14, 99:16, 102:6, 102:7, 126:6, 126:8
**reportedly** [2] - 85:6, 99:13
**Reporter** [2] - 1:15, 158:4
**reporter** [3] - 3:17, 5:5, 25:10
**reports** [7] - 20:10, 35:20, 37:7, 60:21, 79:19, 151:11, 153:23
**represent** [2] - 70:4, 152:15
**representatives** [2] - 25:21, 40:7
**representing** [2] - 4:12, 4:23
**represents** [1] - 33:6
**Request** [2] - 51:19, 51:20
**request** [5] - 41:1, 118:11, 121:1, 153:1, 154:2
**requested** [5] - 7:8, 40:21, 41:4, 41:15, 41:21
**requesting** [1] - 87:20
**require** [2] - 39:11, 122:5
**required** [1] - 153:20
**research** [1] - 23:11
**reserved** [1] - 3:12
**resigning** [1] - 12:20
**resist** [1] - 122:6
**resistant** [1] - 122:2
**respect** [1] - 32:5

# APPENDIX

respective [1] - 3:3
respond [1] - 122:3
responding [1] - 53:2
response [3] - 50:12, 95:1, 95:5
Response [1] - 51:19
responsibilities [1] - 10:1
responsibility [1] - 136:2
responsible [2] - 135:7, 136:21
responsive [1] - 79:18
rest [1] - 114:18
resulting [1] - 59:15
results [2] - 110:18, 118:13
resuscitation [5] - 54:14, 71:18, 71:19, 85:8, 99:15
resuscitative [1] - 128:12
retrial [2] - 93:23, 94:3
retrieved [1] - 139:19
retrospect [1] - 75:12
return [2] - 41:16, 44:1
review [10] - 5:23, 21:5, 22:6, 22:23, 23:14, 24:3, 24:4, 37:17, 102:11, 139:12
reviewed [4] - 6:4, 6:5, 7:11, 65:21
reviewing [5] - 27:18, 39:4, 39:14, 153:23, 154:1
revisit [1] - 8:23
Rhiannon [2] - 2:6, 152:13
rib [25] - 57:18, 58:16, 58:21, 59:5, 59:10, 59:16, 59:21, 60:20, 61:21, 63:10, 64:12, 64:13, 64:18, 64:20, 73:20, 85:5, 114:20, 117:4, 126:11, 127:22, 131:20, 132:5, 138:11, 138:14, 147:10
ribs [34] - 60:15, 61:16, 62:7, 63:3, 63:5, 63:8, 63:9, 63:11, 63:23, 64:2, 64:23, 65:1, 74:16, 79:10, 79:15, 91:17, 92:3, 92:7, 92:12, 93:3, 100:21, 102:21, 102:23, 103:1, 112:4, 112:12, 117:10,

125:21, 125:23, 126:2, 131:20, 132:6
ride [1] - 56:18
rising [1] - 38:10
risk [3] - 60:4, 60:7, 60:13
rock [1] - 43:11
Ron [5] - 96:2, 140:13, 140:23, 141:12, 141:16
Ronald [6] - 2:7, 92:16, 94:11, 96:15, 120:3, 152:15
RONALD [1] - 1:6
room [10] - 4:22, 30:4, 54:15, 63:17, 72:13, 98:21, 109:6, 120:15, 120:17, 124:2
round [1] - 56:21
rounded [1] - 104:12
routine [1] - 18:13
rule [6] - 72:14, 81:6, 81:15, 81:23, 102:14, 127:17, 130:3, 155:5
ruled [1] - 135:9
rules [5] - 5:2, 21:2, 21:19, 150:6, 152:19
ruling [5] - 44:11, 82:10, 83:9, 150:11
rumors [1] - 141:20
run [1] - 124:7
rupture [2] - 61:22, 138:7
ruptured [7] - 60:22, 61:8, 62:12, 106:6, 106:8, 106:12, 106:13
Rutty [1] - 139:1

## S

sacrificed [1] - 20:13
Samaritan [1] - 6:6
samples [1] - 116:7
Sampson [2] - 2:5, 152:14
Saratoga [1] - 15:15
satisfied [1] - 142:15
save [2] - 72:6, 133:3
saw [11] - 83:18, 85:11, 96:2, 96:8, 113:15, 122:13, 125:3, 128:21, 129:19, 129:20, 130:1
scarring [1] - 149:14
scenario [1] - 128:7
scenarios [2] -

152:22, 154:4
scene [4] - 54:14, 72:2, 124:1, 154:12
schedule [1] - 42:7
Schenectady [7] - 10:18, 11:16, 11:18, 11:22, 12:4, 12:13, 12:15
Schoharie [1] - 15:20
school [1] - 70:14
Science [1] - 21:18
science [6] - 29:8, 29:13, 92:19, 110:21, 126:10, 152:2
Sciences [1] - 21:13
Scoharie [1] - 137:14
scope [2] - 71:17, 71:18
screaming [4] - 79:11, 79:19, 80:1, 97:3
screen [7] - 25:9, 32:19, 33:1, 33:7, 36:7, 44:19, 112:1
screening [1] - 81:19
scroll [3] - 33:20, 51:21, 85:1
scrolling [1] - 114:16
sealed [1] - 148:13
search [1] - 23:17
searched [1] - 23:19
seat [1] - 46:11
second [5] - 9:3, 41:16, 41:21, 46:10, 46:11
secondary [2] - 115:6, 150:8
seconds [1] - 5:4
secretarial [1] - 123:7
see [52] - 23:10, 32:20, 33:1, 33:5, 33:7, 33:8, 33:9, 34:9, 42:17, 46:15, 48:21, 49:1, 51:17, 51:23, 55:21, 63:22, 77:1, 77:23, 80:23, 86:12, 89:21, 96:7, 104:11, 105:7, 105:11, 107:1, 107:6, 107:10, 107:11, 107:13, 107:15, 107:17, 107:20, 108:7, 108:8, 109:5, 109:16, 113:21, 114:4, 114:9, 114:10, 121:17, 137:5, 137:7, 139:15, 146:10, 146:13, 152:21
seeing [7] - 77:5, 77:9,

86:7, 96:5, 96:6, 98:23, 105:2
seeking [1] - 50:1
seem [1] - 102:6
seemingly [1] - 70:13
seizure [15] - 31:9, 109:14, 110:2, 110:5, 110:11, 110:15, 110:18, 110:19, 111:2, 146:10, 146:11, 146:13, 146:14, 147:1, 149:6
seizures [2] - 31:14, 110:7
send [6] - 25:9, 122:15, 123:6, 123:12, 150:23, 151:2
senior [1] - 42:1
sense [2] - 37:22, 132:14
sent [3] - 33:10, 36:7, 81:19
separate [2] - 39:3, 62:6
separately [2] - 5:6, 12:8
September [7] - 8:11, 8:17, 9:22, 15:3, 20:17, 22:1, 22:4
series [1] - 82:8
seriously [1] - 83:6
services [5] - 10:10, 10:20, 10:22, 12:12, 15:16
set [4] - 7:10, 12:9, 48:6, 155:20
sets [1] - 16:12
several [9] - 13:14, 14:8, 14:23, 38:14, 94:8, 94:9, 139:22, 143:5, 144:10
severe [7] - 66:12, 71:16, 74:3, 74:14, 102:19, 117:12, 132:4
severely [1] - 91:13
severity [1] - 76:15
shall [2] - 3:9, 3:12
shaped [1] - 89:19
share [2] - 25:8, 32:18, 49:14
shed [1] - 121:9
sheering [1] - 132:22
sheet [4] - 35:1, 37:3, 119:22, 122:22
sheets [1] - 35:14
shock [1] - 85:3
short [1] - 41:15

shortly [2] - 40:6, 48:10
show [8] - 17:3, 112:1, 112:12, 113:18, 114:11, 114:18, 131:14
showed [6] - 7:12, 65:21, 105:10, 127:4, 127:5, 146:18
showing [7] - 44:19, 51:17, 55:12, 113:19, 114:19, 129:16, 129:18
shows [1] - 116:10
shredded [1] - 131:19
Shumaker [1] - 53:21
side [1] - 103:1, 112:12, 135:22
SIDS [9] - 67:16, 67:20, 67:21, 68:14, 69:8, 69:21, 70:2, 70:3
sign [4] - 37:3, 116:17, 119:22, 122:22
sign-in [1] - 37:3, 119:22
signed [2] - 3:4, 150:21
significance [7] - 80:2, 108:16, 121:20, 123:21, 124:4, 124:6, 145:9
significant [19] - 24:14, 26:19, 77:12, 80:7, 90:2, 90:9, 101:6, 103:6, 107:11, 107:12, 107:13, 112:4, 112:22, 113:6, 113:23, 115:1, 144:11, 151:15, 151:20
significantly [3] - 19:20, 57:18, 126:23
signs [1] - 30:2
Sikirica [3] - 2:11, 33:12, 51:14
SIKIRICA [5] - 1:8, 1:12, 4:1, 157:4, 157:13
Sikirika [23] - 4:6, 8:10, 9:21, 16:13, 25:8, 25:11, 25:13, 32:20, 32:21, 34:14, 49:21, 51:18, 63:12, 63:16, 85:19, 111:23, 113:19, 131:6, 140:2, 142:16, 152:13, 156:2, 156:3

**similar** [4] - 13:5, 13:9, 65:20, 146:9

**similarly** [2] - 60:6, 149:5

**simple** [1] - 56:23, 101:5

**simply** [12] - 13:4, 17:7, 45:8, 75:10, 77:22, 101:10, 101:16, 104:9, 122:6, 123:8, 127:14, 150:11

**simultaneously** [1] - 65:20

**single** [1] - 61:18

**situ** [1] - 113:15

**situation** [6] - 66:20, 67:17, 68:1, 74:2, 89:12, 123:3

**situation"** [1] - 87:11

**situations** [2] - 81:4, 148:21

**size** [7] - 71:21, 73:10, 104:3, 105:19, 113:5, 113:17, 116:13

**sizes** [1] - 116:21

**skeletal** [2] - 36:8, 118:11

**skeptical** [2] - 44:4, 44:10

**skin** [1] - 111:6

**sleeping** [1] - 70:5

**slides** [8] - 7:8, 7:10, 7:21, 29:10, 104:10, 105:10, 139:12, 145:20

**slight** [2] - 113:2, 117:11

**slow** [1] - 76:13

**slowly** [3] - 33:20, 78:23, 79:3

**sluggish** [1] - 82:19

**small** [13] - 56:10, 61:17, 61:18, 71:1, 78:14, 79:1, 79:3, 99:21, 104:3, 107:9, 109:1, 112:9, 117:7

**smaller** [1] - 33:4

**smothered** [1] - 97:8

**soft** [4] - 60:6, 60:10, 64:22, 113:5

**someone** [12] - 25:21, 40:16, 42:1, 42:5, 70:19, 74:14, 74:19, 82:9, 82:11, 110:17, 136:3, 148:22

**sometime** [2] - 25:22, 26:4

**sometimes** [10] -

**58**:16, 89:3, 115:15, 119:3, 122:14, 122:15, 123:5, 123:7, 123:12, 153:18

**somewhat** [1] - 12:14

**somewhere** [1] - 39:18

**son** [1] - 137:21

**soon** [2] - 86:9, 107:14

**sore** [1] - 49:21

**sorry** [4] - 64:14, 77:6, 78:20, 109:20, 134:19, 135:4, 138:8, 138:18, 146:9

**sort** [3] - 18:18, 30:5, 38:5

**sought** [1] - 28:6

**sound** [4] - 7:15, 8:12, 22:1, 25:18

**sounded** [1] - 7:2

**sounds** [1] - 76:1

**source** [1] - 145:12

**space** [1] - 5:4

**span** [1] - 107:9

**spanked** [1] - 49:17

**speaking** [1] - 72:12

**spearhead** [1] - 18:7

**specific** [2] - 43:7, 152:22

**specifically** [10] - 40:18, 74:20, 84:23, 85:10, 92:6, 95:4, 99:7, 99:10, 130:9, 141:5

**specifics** [3] - 39:13, 120:11, 120:21

**specimens** [2] - 7:19, 116:5

**speculating** [3] - 124:14, 124:18, 131:22

**speculation** [2] - 126:4, 131:3

**speed** [1] - 20:10

**SPENCER** [26] - 13:21, 21:10, 24:8, 31:7, 38:2, 47:14, 48:17, 57:6, 65:16, 92:10, 93:1, 93:7, 93:15, 94:4, 94:13, 95:8, 95:21, 96:16, 97:20, 98:5, 98:22, 133:9, 140:17, 141:19, 152:12, 155:17

**sPENCER** [1] - 41:3

**Spencer** [2] - 2:6, 152:13

**spend** [1] - 9:16

**spent** [1] - 11:6

**spike** [2] - 15:6, 15:9

**splenic** [1] - 108:7

**spoken** [1] - 16:3

**squeeze** [1] - 130:5

**squeezed** [2] - 74:6, 125:2

**squeezing** [3] - 130:7, 131:2, 131:13

**squishing** [1] - 57:9

**St** [2] - 15:20, 55:9

**staff** [16] - 20:1, 55:17, 56:9, 57:4, 57:8, 58:23, 59:6, 59:22, 61:1, 62:1, 84:4, 84:15, 99:22, 123:7, 136:7, 143:23

**stand** [2] - 87:15, 151:19

**standard** [5] - 56:1, 100:4, 116:11, 116:15, 122:3

**standards** [1] - 153:12

**standing** [1] - 120:13

**start** [2] - 68:16, 111:15

**started** [2] - 15:10, 54:5

**starting** [4] - 13:8, 32:21, 35:16, 143:6

**starts** [2] - 51:21, 69:12

**starved** [1] - 111:13

**State** [5] - 1:15, 3:5, 134:14, 134:22, 158:5

**state** [6] - 11:7, 15:21, 20:1, 28:16, 81:15, 125:5

**STATE** [1] - 157:1

**statement** [10] - 51:16, 52:7, 52:17, 53:5, 53:10, 53:12, 53:14, 58:17, 84:1, 142:20

**statements** [3] - 52:1, 131:8, 154:1

**STATES** [1] - 1:1

**static** [1] - 16:6

**stature** [1] - 73:11

**steered** [2] - 88:16, 136:5

**steering** [1] - 136:9

**stenographic** [1] - 158:7

**sternum** [3] - 61:12, 62:23, 63:14

**sternums** [1] - 63:22

**stick** [1] - 30:8

**still** [14] - 10:7, 11:14,

**13**:10, 14:23, 15:5, 16:16, 17:20, 69:23, 71:12, 88:23, 104:19, 110:20, 142:15, 150:9

**stipulated** [4] - 3:2, 3:8, 3:11, 3:15

**stomach** [2] - 132:8, 132:11

**stop** [3] - 13:1, 13:3, 33:18

**stopped** [1] - 105:1

**stops** [1] - 149:17

**storage** [1] - 139:18

**stories** [1] - 70:12

**story** [2] - 90:15, 124:23

**Street** [1] - 2:5

**stress** [1] - 102:22

**stroke** [1] - 146:9

**strong** [2] - 52:12, 52:15

**structural** [1] - 145:15

**structure** [2] - 103:19, 103:21

**stuck** [1] - 107:1

**studies** [12] - 7:2, 7:4, 35:18, 35:19, 57:21, 58:3, 58:21, 60:2, 138:17, 138:19, 138:22

**study** [4] - 58:7, 71:4, 154:7

**stuff** [2] - 106:3, 136:16

**subdued** [1] - 135:12

**subject** [2] - 28:9, 146:12

**submit** [1] - 17:4

**subordinates** [2] - 143:16, 143:17

**subpoena** [10] - 9:13, 121:23, 122:4, 122:5, 122:8, 122:14, 122:18, 122:19, 123:6, 123:12

**subpoenaed** [1] - 123:2

**subpoenas** [1] - 153:19

**Subscribed** [1] - 157:15

**subscribing** [1] - 16:21

**subsequent** [6] - 25:20, 39:6, 80:18, 118:22, 147:9, 147:21

**subsequently** [1] -

**141**:16

**substance** [3] - 8:7, 21:12, 54:11

**substandard** [1] - 32:8

**substantial** [3] - 91:6, 91:11, 91:12

**suction** [2] - 76:23, 77:3

**sudden** [12] - 67:9, 67:14, 68:4, 68:12, 71:2, 82:3, 127:8, 127:11, 127:13, 127:14, 145:1, 145:6

**SUDI** [17] - 67:16, 67:17, 67:23, 68:9, 68:13, 68:16, 68:21, 68:22, 69:12, 69:16, 69:18, 69:19, 69:21, 70:1, 70:3, 70:7, 71:9

**suffered** [2] - 29:22, 31:9

**suffering** [3] - 28:20, 29:17, 66:16

**sufficient** [3] - 4:19, 18:9, 130:2

**sugar's** [1] - 30:16

**suggest** [2] - 104:2, 105:6

**suggested** [1] - 57:21

**suggesting** [1] - 133:23

**Suite** [1] - 2:3

**sum** [2] - 21:12, 54:11

**summary** [1] - 130:14

**support** [4] - 12:3, 12:4, 24:6, 25:3

**supported** [1] - 92:18

**supporting** [2] - 123:20, 123:21

**suppose** [1] - 72:23

**supposedly** [1] - 82:1

**surface** [4] - 60:6, 60:10, 64:15, 64:22

**surgery** [1] - 109:10

**surprised** [1] - 75:19

**survey** [3] - 11:10, 36:8, 118:11

**suspect** [2] - 38:19, 133:19

**suspicious** [4] - 11:20, 38:9, 153:4, 153:5

**switch** [1] - 56:15

**switching** [2] - 54:23, 56:9

**sworn** [3] - 3:5, 4:2, 157:15

**symptoms** [3] - 29:23,

71:6, 82:4
**syndrome** [2] - 68:12, 69:5
**Syracuse** [1] - 134:15
**system** [3] - 12:10, 12:13, 73:8
**systematically** [1] - 18:13

## T

**table** [3] - 88:10, 120:14, 120:18
**tactics** [1] - 93:13
**tandem** [1] - 141:2
**task** [1] - 88:4
**teach** [1] - 139:17
**tear** [2] - 61:18, 117:8
**tearing** [4] - 112:21, 113:2, 118:2, 130:13
**Teas** [23] - 6:9, 6:13, 27:16, 27:23, 29:2, 29:18, 29:21, 31:23, 46:16, 46:22, 47:5, 47:10, 49:8, 67:23, 71:9, 86:6, 86:9, 103:5, 106:23, 111:20, 142:10, 142:12
**Teas'** [8] - 6:14, 6:17, 7:1, 23:6, 41:8, 49:11, 67:8, 152:3
**technically** [2] - 37:11, 148:10
**techniques** [1] - 139:20
**technology** [2] - 139:6, 139:7
**teenage** [1] - 70:21
**telephone** [3] - 124:7, 124:8, 124:9
**tend** [4] - 61:11, 77:22, 120:18, 135:5
**tended** [1] - 24:15
**tends** [1] - 30:23
**tens** [2] - 145:19, 145:20
**tension** [2] - 122:9, 122:12
**tenth** [2] - 60:20, 112:12
**term** [2] - 111:8, 149:19
**terminate** [2] - 10:14, 11:21
**terminated** [1] - 10:8
**terms** [13] - 8:6, 9:14, 13:4, 13:11, 13:13, 13:18, 13:19, 21:19, 27:8, 32:4, 43:17,

76:5, 109:14
**testified** [23] - 4:2, 6:9, 8:10, 26:9, 26:11, 27:11, 27:14, 27:23, 46:1, 46:20, 47:5, 47:7, 54:2, 55:20, 67:23, 75:17, 79:9, 93:22, 96:19, 98:11, 137:10, 137:12, 144:14
**testifies** [1] - 141:8
**testify** [7] - 5:19, 22:4, 27:20, 39:9, 134:5, 141:8, 141:9
**testifying** [5] - 8:16, 14:13, 87:5, 122:2, 122:6
**testimonies** [1] - 6:19
**testimony** [59] - 4:15, 6:8, 6:9, 6:12, 6:14, 6:16, 6:17, 7:1, 7:12, 8:21, 9:1, 9:6, 21:23, 22:13, 22:18, 22:21, 23:5, 23:6, 23:8, 27:12, 27:14, 27:16, 27:18, 27:23, 28:11, 39:14, 41:9, 46:8, 46:15, 46:19, 47:8, 47:10, 47:16, 49:11, 53:2, 53:5, 54:12, 55:21, 67:9, 80:20, 85:22, 86:6, 86:9, 87:13, 87:22, 104:22, 107:4, 110:1, 129:11, 138:2, 140:12, 140:13, 140:20, 141:1, 151:23, 152:3, 157:5
**testing** [2] - 110:11, 121:2
**tests** [1] - 121:3
**THE** [73] - 18:23, 20:8, 24:10, 26:17, 30:13, 31:8, 38:3, 40:5, 41:4, 42:18, 43:10, 43:20, 44:7, 47:15, 48:18, 51:9, 57:12, 57:21, 59:8, 60:1, 60:9, 63:21, 65:17, 66:5, 66:9, 73:14, 73:23, 74:11, 75:4, 75:15, 75:22, 77:15, 79:13, 80:5, 81:6, 83:2, 83:21, 84:7, 85:14, 88:6, 88:22, 89:16, 90:5, 90:14, 91:10, 92:11, 93:2, 93:8, 93:17, 94:5, 94:15, 95:9, 95:22,

96:17, 97:5, 97:21, 98:6, 98:23, 100:3, 100:15, 101:10, 102:17, 108:20, 122:12, 123:5, 124:21, 132:20, 133:10, 136:19, 140:18, 141:20, 146:21, 149:3
**theory** [1] - 74:6
**therapeutic** [1] - 72:4
**thereafter** [2] - 26:6, 48:2
**thereof** [1] - 157:8
**thinks** [1] - 83:6
**this..** [1] - 68:20
**Thomas** [14] - 4:10, 8:10, 8:13, 8:18, 9:7, 14:23, 19:5, 20:19, 49:23, 94:21, 94:22, 96:10, 136:13, 148:4
**Thomas's** [1] - 93:12
**thorax** [1] - 62:17
**thorough** [2] - 125:6, 142:18
**thoroughly** [1] - 125:15
**thoughts** [2] - 74:11, 123:14
**thousand** [1] - 11:11
**thousands** [4] - 38:15, 38:21, 55:4, 145:20
**thread** [2] - 88:2
**three** [4] - 20:6, 36:11, 54:22, 115:18
**three-part** [1] - 115:18
**throughout** [3] - 76:10, 108:11, 140:8
**throwing** [1] - 94:22
**thrown** [1] - 93:12
**thumbnails** [1] - 113:21
**thumbs** [2] - 130:6, 130:7
**tie** [1] - 125:20
**TIM** [1] - 1:7
**Tim** [3] - 2:7, 120:3, 152:16
**timing** [1] - 28:19
**tiring** [1] - 56:11, 56:15
**tissue** [5] - 103:10, 103:22, 111:13, 112:22, 113:5
**tissues** [8] - 7:7, 7:19, 29:3, 103:10, 103:18, 108:2, 108:4, 108:13
**Titans** [1] - 53:20
**titles** [1] - 16:20

**today** [16] - 4:7, 4:12, 4:17, 5:20, 9:16, 9:23, 17:11, 22:6, 32:16, 34:9, 51:12, 85:23, 87:15, 96:8, 115:5, 129:21
**today's** [2] - 4:20, 5:22
**toddler** [12] - 68:7, 68:8, 68:12, 68:19, 69:1, 69:7, 69:20, 70:19, 109:1, 116:11, 121:12
**Toddler's** [1] - 52:6
**toddlers** [3] - 69:14, 70:10, 70:11
**toenail** [1] - 116:17
**together** [1] - 154:14
**tone** [2] - 43:18, 49:13
**tongue** [2] - 146:12, 146:16
**took** [4] - 7:13, 13:20, 81:22, 85:19
**top** [4] - 66:17, 105:14, 121:18, 129:6
**topic** [1] - 12:6
**torn** [6] - 61:21, 66:12, 79:6, 106:6, 106:8, 106:12
**totally** [2] - 29:23, 49:19
**touched** [1] - 111:5
**towards** [1] - 88:17
**toxicology** [3] - 36:23, 37:7, 121:3
**trace** [1] - 105:17
**traffic** [1] - 81:8
**trailer** [1] - 137:20
**trained** [9] - 58:23, 59:14, 72:16, 73:5, 73:15, 100:19, 100:20, 100:22
**training** [1] - 102:10
**transcript** [3] - 8:20, 27:18, 157:7
**transcription** [1] - 158:7
**transfer** [1] - 51:6
**transparency** [1] - 150:10
**transport** [1] - 54:14
**trauma** [10] - 57:15, 85:5, 107:19, 108:1, 108:5, 108:6, 116:17, 135:14, 137:11, 150:18
**traumatic** [1] - 88:18
**treat** [1] - 109:6
**treatise** [1] - 138:23
**treatises** [2] - 23:14,

24:2
**tri** [1] - 11:2
**tri-county** [1] - 11:2
**trial** [57] - 3:13, 4:15, 6:8, 6:10, 7:4, 7:16, 7:20, 14:12, 19:2, 19:11, 22:21, 23:15, 24:21, 24:22, 24:23, 26:11, 26:14, 27:11, 27:13, 32:8, 32:15, 39:8, 39:11, 39:12, 39:15, 41:6, 41:12, 45:4, 45:21, 46:8, 46:11, 52:23, 53:1, 54:1, 54:2, 55:20, 70:12, 75:17, 75:19, 79:9, 80:20, 90:11, 91:23, 93:21, 94:3, 94:9, 95:11, 104:11, 105:11, 122:18, 123:1, 123:2, 123:8, 129:22, 141:3, 148:11, 151:23
**Trial** [1] - 3:16
**trials** [1] - 39:9
**tried** [3] - 40:15, 124:17, 129:15
**trip** [2] - 13:8, 13:10
**Trish** [1] - 143:7
**TROY** [1] - 1:6
**Troy** [22] - 2:6, 2:7, 25:21, 37:21, 38:8, 52:4, 53:9, 96:12, 119:3, 120:4, 140:3, 140:8, 141:2, 141:13, 150:23, 152:15, 152:17, 154:1, 154:23, 155:5, 155:9, 155:13
**true** [8] - 21:15, 38:22, 87:18, 97:16, 125:1, 125:2, 157:7, 158:6
**trusted** [1] - 73:3
**truth** [2] - 22:9, 23:2
**try** [7] - 9:5, 34:16, 60:4, 60:11, 70:10, 133:16, 149:21
**trying** [3] - 7:23, 131:1, 133:3
**tumors** [1] - 139:19
**turgor** [1] - 111:6
**turned** [1] - 22:12
**two** [23] - 8:17, 13:8, 19:9, 20:6, 21:16, 40:7, 62:5, 68:7, 68:18, 69:8, 69:14, 69:22, 70:7, 70:21, 71:21, 74:16, 118:7, 122:23, 126:12, 129:6, 145:3, 145:5

**two-hour** [1] - 13:8
**two-year-old** [1] - 71:21
**two-year-olds** [2] - 145:3, 145:5
**type** [10] - 43:13, 48:21, 65:11, 79:3, 88:17, 95:16, 110:11, 132:4, 144:22
**typed** [2] - 53:15, 53:18
**types** [2] - 102:12, 152:22
**typical** [3] - 141:4, 141:5, 154:19
**typically** [7] - 30:16, 58:10, 76:12, 78:22, 108:1, 119:10, 119:13

## U

**Ulster** [6] - 12:20, 13:2, 13:3, 13:9, 13:11
**ultimate** [1] - 154:14
**umbrella** [1] - 61:5
**unable** [1] - 119:2
**uncommon** [1] - 38:4
**unconscious** [1] - 125:5
**unconsciousness** [1] - 81:16
**under** [13] - 7:14, 12:14, 13:18, 16:2, 18:15, 61:5, 95:11, 103:10, 104:5, 105:10, 107:15, 129:6, 148:10
**undergone** [1] - 24:13
**understandable** [1] - 146:2
**understandably** [1] - 153:7
**understood** [3] - 5:13, 43:2, 49:20
**undetected** [2] - 109:14, 110:2
**undetermined** [9] - 69:3, 82:11, 82:15, 82:22, 125:11, 125:12, 128:5, 135:21, 147:12
**undiagnosed** [4] - 28:21, 29:22, 31:3, 81:12
**undue** [1] - 155:1
**unexplained** [21] - 38:11, 67:9, 67:14,

**68:4, 69:1, 70:1, 70:6, 70:9, 70:22, 70:23, 71:12, 80:13, 81:3, 88:17, 97:18, 125:13, 127:8, 127:11, 127:14, 149:9
**unintended** [1] - 128:8
**UNITED** [1] - 1:1
**University** [1] - 24:11
**unknown** [3] - 12:5, 125:17, 153:11
**unless** [4] - 31:10, 31:11, 31:12, 127:8
**unlikely** [1] - 82:6
**unpend** [1] - 115:16
**unrecognized** [1] - 71:7
**unresponsive** [16] - 66:22, 80:22, 81:2, 82:20, 85:6, 99:13, 124:2, 125:1, 125:8, 125:10, 126:6, 126:9, 127:3, 127:5, 127:6, 137:19
**untrained** [1] - 73:23
**unusual** [2] - 119:14, 153:11
**up** [38] - 8:1, 9:23, 10:10, 12:9, 15:3, 16:5, 27:22, 32:16, 42:16, 43:22, 45:20, 46:13, 48:6, 51:11, 68:18, 69:8, 79:22, 82:19, 83:10, 96:12, 96:13, 103:12, 107:7, 111:23, 112:8, 121:7, 123:10, 129:3, 135:20, 137:8, 141:21, 142:1, 142:4, 142:5, 144:12, 146:18, 150:2, 151:3
**upper** [1] - 112:20
**ups** [1] - 114:20
**upset** [3] - 13:19, 40:22, 48:15
**Utica** [1] - 13:7
**utmost** [1] - 142:9

## V

**vacuum** [1] - 154:5
**vastly** [1] - 102:18
**vein** [1] - 105:21
**veins** [2] - 106:1, 106:18
**vena** [1] - 105:19
**venting** [1] - 49:14

**veracity** [1] - 128:15
**verdict** [3] - 86:4, 87:3, 93:18
**versa** [1] - 130:7
**versus** [4] - 98:21, 105:2, 126:11, 135:15
**vessels** [1] - 105:15
**via** [1] - 1:13
**vice** [1] - 130:7
**video** [25] - 65:20, 67:1, 83:13, 83:15, 84:12, 84:22, 85:11, 88:15, 94:17, 98:2, 98:9, 98:17, 98:19, 98:23, 118:19, 119:8, 125:3, 128:21, 129:5, 129:19, 130:2, 130:17, 131:15, 135:3, 137:3
**videos** [3] - 5:23, 88:23, 154:12
**view** [9] - 67:15, 103:17, 127:9, 129:19, 131:19, 132:9, 139:12, 147:2, 152:3
**views** [3] - 7:13, 138:4, 152:6
**vigorous** [1] - 62:14
**vigorously** [5] - 60:23, 61:7, 61:23, 62:1, [33] - 4:14, 6:1, 6:7, 7:19, 8:15, 25:14, 29:16, 35:17, 39:2, 54:3, 66:21, 69:15, 71:15, 76:18, 77:11, 79:10, 84:10, 94:9, 94:19, 100:6, 108:13, 109:1, 115:20, 116:12, 125:20, 129:15, 144:22, 147:8, 149:20, 150:1, 151:14, 155:4 ▮▮▮ [4] - 69:1, 71:10, 73:10, 116:6
**violent** [1] - 62:18
**viral** [2] - 36:16, 81:17
**virtue** [1] - 128:9
**vitreous** [1] - 30:15
**voided** [1] - 58:18
**volume** [1] - 15:4

## W

**wager** [1] - 120:22
**waited** [1] - 39:20
**waived** [1] - 3:9

**wake** [1] - 79:21
**Wake** [4] - 24:11, 25:1, 58:7
**walk** [4] - 10:4, 34:14, 49:2, 112:2
**wall** [3] - 61:12, 114:10, 120:19
**wants** [2] - 83:4, 83:5
**Warren** [2] - 10:11, 15:16
**Washington** [3] - 2:10, 10:11, 15:15
**watch** [3] - 84:13, 84:14, 109:6
**watched** [4] - 84:12, 84:16, 84:20, 119:8
**waterford** [1] - 40:14
**Watertown** [1] - 40:13
**weak** [1] - 52:18
**wear** [1] - 13:8
**week** [2] - 92:1, 151:5
**weeks** [4] - 48:8, 89:3, 119:14, 122:23
**weights** [1] - 116:21
**well-intentioned** [1] - 72:19
**Wentley** [1] - 137:11
**West** [1] - 2:9
**whatsoever** [1] - 142:19
**whole** [4] - 50:6, 77:10, 90:15, 157:7
**wife** [2] - 82:18, 95:3
**window** [1] - 120:15
**wire** [1] - 146:6
**wish** [3] - 23:8, 72:2, 85:21
**withdrawn** [3] - 17:14, 79:8, 144:22
**witness** [10] - 27:12, 27:14, 41:8, 53:1, 53:3, 80:1, 92:18, 99:19, 124:11, 126:8
**WITNESS** [73] - 18:23, 20:8, 24:10, 26:17, 30:13, 31:8, 38:3, 40:5, 41:4, 42:18, 43:10, 43:20, 44:7, 47:15, 48:18, 51:9, 57:12, 57:21, 59:8, 60:1, 60:9, 63:21, 65:17, 66:5, 66:9, 73:14, 73:23, 74:11, 75:4, 75:15, 75:22, 77:15, 79:13, 80:5, 81:6, 83:23, 84:7, 85:14, 88:6, 88:22, 89:16, 90:5, 90:14, 91:10, 92:11, 93:2, 93:8, 93:17,

**94:5, 94:15, 95:9, 95:22, 96:17, 97:5, 97:21, 98:6, 98:23, 100:3, 100:15, 101:10, 102:17, 108:20, 122:12, 123:5, 124:21, 132:20, 133:10, 136:19, 140:18, 141:20, 146:21, 149:3
**witnessed** [3] - 27:16, 41:7, 86:5
**witnesses** [5] - 27:13, 99:17, 131:5, 133:17, 141:8
**woman** [2] - 50:10, 137:18
**woodpile** [1] - 150:15
**word** [1] - 104:7
**words** [12] - 13:23, 20:4, 48:21, 79:14, 99:5, 110:9, 113:10, 118:20, 125:20, 126:5, 136:5, 148:4
**workload** [1] - 10:2
**works** [1] - 18:2
**workup** [1] - 81:22
**worth** [1] - 124:12
**wrapping** [1] - 137:8
**writing** [2] - 86:20, 86:21
**writings** [1] - 86:15
**written** [4] - 53:15, 53:18, 55:13, 86:22
**wrote** [1] - 117:12

## X

**x-ray** [1] - 114:22
**x-rays** [1] - 81:22

## Y

**Y-shaped** [1] - 89:19
**year** [18] - 14:14, 14:16, 14:20, 15:1, 15:4, 15:8, 16:2, 17:2, 17:15, 18:20, 20:2, 38:15, 49:22, 68:15, 71:21, 142:12, 145:3, 145:5
**years** [14] - 14:6, 14:8, 15:8, 19:16, 21:21, 70:20, 70:21, 137:9, 139:10, 142:17, 143:2, 143:3, 143:5, 144:10, 154:9
**yesterday** [1] - 22:7
**YORK** [2] - 1:1, 157:1

Case 1:17-cv-01290-DJS Document 18/593-4 Filed 02/04/22 Page 1287 of 178

**York** [10] - 1:16, 2:3, 2:6, 2:10, 3:6, 6:7, 134:14, 134:22, 158:5
**you..** [1] - 44:16
**young** [3] - 121:11, 153:4, 153:6
**yourself** [3] - 18:12, 41:1, 44:21

## Z

**zoom** [1] - 7:20
**ZOOM** [1] - 1:13