# 23-589

IN THE

# United States Court of Appeals
# for the Second Circuit

---

MICHAEL DAVIS-GUIDER,
*Plaintiff-Counter-Defendant-Appellant,*

— v. —

CITY OF TROY, RONALD FOUNTAIN, INDIVIDUALLY,
DANIELLE COONRADT, INDIVIDUALLY,
CHARLES MCDONALD, INDIVIDUALLY,
TIM COLANERI, INDIVIDUALLY,
*Defendants-Cross-Claimants-Counter-Claimants-Appellees,*

RENSSELAER COUNTY,
MICHAEL SIKIRICA, INDIVIDUALLY,
*Defendants-Cross-Defendants-Counter-Claimants-Appellees,*

ADAM R. MASON, INDIVIDUALLY
*Defendant-Cross-Claimant-Counter-Claimant,*

JOEL ABELOVE, INDIVIDUALLY,
*Defendant-Cross-Defendant-Counter-Claimant,*

JOHN AND JANE DOES 1-10, INDIVIDUALLY,
MICHAEL E. PARROW, ANDRA ACKERMAN,
*Defendants.*

---

On Appeal from the United States District Court
for the Northern District of New York
Case No. 1:17-cv-1290 (FJS/DJS)

---

## APPENDIX VOLUME 6 OF 11

# APPENDIX VOLUME 6 TABLE OF CONTENTS

ECF 115-14: Exhibit "K" ............................................................ 1086

ECF 115-15: Exhibit "L" ............................................................ 1133

ECF 115-16: Exhibit "M" ........................................................... 1145

ECF 115-17: Exhibit "N" ............................................................ 1221

ECF 115-18: Exhibit "O" ............................................................ 1250

# EXHIBIT "K"

# APPENDIX 1087

1

**DEPOSITION of DANIELLE COONRADT**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
----------------------------------------------X
MICHAEL DAVIS-GUIDER,

                              Plaintiff,

-against-          Civil Case No.: 1:17-cv-01290
                   (FJS/DJS)

CITY OF TROY, RONALD FOUNTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES
MCDONALD, Individually, TIM COLANERI,
Individually, ADAM R. MASON, Individually,
RENSSELAER COUNTY, MICHAEL SIKIRICA,
Individually, and JOEL ABELOVE,
Individually,

                              Defendants.
----------------------------------------------X

     DEPOSITION of the Defendant, **DANIELLE COONRADT,**

held on May 28, 2021, commencing at 1:00 p.m.,

being held virtually by Zoom, pursuant to Notice;

before Susan Florio, a Registered Professional

Reporter and Notary Public in and for the State of

New York.

2

1

2

APPEARANCES:

3

4          BRETT H. KLEIN, ESQ., P.C.
           Attorneys for Plaintiff
5          305 Broadway, Suite 600
           New York, New York 10007
6          BY:  BRETT H. KLEIN, ESQ.

7

           BAILEY, JOHNSON & PECK, P.C.
8          Attorneys for Defendants Rensselaer
             County, Michael Sikirica, and
9            Joel Abelove
           Pine West Plaza 5, Suite 507
10         Washington Avenue Extension
           Albany, New York 12205
11         BY:  CRYSTAL R. PECK, ESQ.

12

           PATTISON, SAMPSON, GINSBERG & GRIFFIN, P.C.
13         Attorneys for Defendant City of Troy,
             Ronald Fountain, Danielle Coonradt,
14           Charles McDonald, Tim Colaneri, and
             Adam R. Mason
15         22 First Street, P.O. Box 208
           Troy, New York 12181-0208
16         BY:  RHIANNON I. SPENCER, ESQ.

17

18

19

20

21

22

23    Indexes........................... Pg. 41

# APPENDIX 1089

3

1

2              S T I P U L A T I O N S

3  IT IS HEREBY STIPULATED AND AGREED by and between

4  the parties hereto, that all rights provided by the

5  F.R.C.P. including the right to object to any

6  question except as to the form, or to move to

7  strike any testimony at this examination, are

8  reserved, and, in addition, the failure to object

9  to any question or move to strike testimony at this

10  examination shall not be a bar or waiver to make

11  such motion at, and is reserved for, the trial of

12  this action;

13  It is further stipulated and agreed that this

14  examination may be sworn to by the witness being

15  examined before a Notary Public other than the

16  Notary Public before whom this examination was

17  begun;

18  It is further stipulated and agreed that the filing

19  and certification of the original of this

20  examination are waived;

21          It is further stipulated and agreed that

22  the examining party will furnish the examined

23  party with a copy of the transcript free of charge.

**APPENDIX**

4

```
1

2                DANIELLE COONRADT,

3    having been first duly sworn/affirmed remotely by

4    the notary public, was examined and testified as

5    follows:

6

7    BY MR. KLEIN:

8        Q.   Hi, Ms. Coonradt.  My name is Brett Klein

9    and I represent Michael Davis in a lawsuit

10   pending in the Northern District of New York.  It

11   concerns the circumstances surrounding his

12   prosecution for the death of V.D. that resulted

13   in an acquittal.

14            Do you understand that you are here today

15   to answer questions under oath about your

16   knowledge of any of the circumstances of this

17   matter?

18       A.   Yes.

19       Q.   Any reason why you can't testify fully

20   and accurately today?

21       A.   No.

22       Q.   You've had sufficient time to prepare

23   with Ms. Spencer, your attorney?
```

5

1    [DANIELLE COONRADT - By Mr. Klein]

2        A.   Yes.

3        Q.   Other than today is it fair that you

4    testified in a suppression hearing related to

5    this case involving V.D.?

6        A.   Yes.

7        Q.   Other than that and today have you

8    testified or given official statements in any

9    other -- to anyone else regarding this matter

10   other statements than to your lawyer?

11       A.   Official statements?  Can you repeat

12   that?

13       Q.   Have you given testimony?  Let's start

14   with that.

15       A.   Yes.

16       Q.   Related to this case or other cases?

17       A.   To this case as well as other cases.

18       Q.   Okay.  Other than today and other than

19   the suppression hearing have you testified at any

20   other time in this case?

21       A.   Yes.

22       Q.   What was that?  Trial?

23       A.   Trial.  Yes.  I can't be sure of the

1    [DANIELLE COONRADT - By Mr. Klein]

2    exact date.

3        Q.   Other than today, suppression hearing and

4    trial have you given any other sworn testimony in

5    this case?

6        A.   No.

7        Q.   Okay.  I'm aware of a report that you did

8    in this case like a supporting deposition.  We'll

9    show it to you.  Do you recall that you did one

10   in this case?

11       A.   Yes.  A supplemental.

12       Q.   Okay.  You call it a supplemental?

13       A.   Yes, sir.

14       Q.   Okay.  What other paperwork did you

15   prepare, if any, other than the supplemental in

16   this case?

17       A.   I did the incident report, the DCJS 3205

18   form, as well as a CPS referral.  And I believe

19   that's the extent.

20       Q.   Did you have a memo book or other type of

21   notes that you would keep at that time as well?

22       A.   I can't be sure if I did at that time.

23       Q.   Okay.  At some point -- well, generally

1    [DANIELLE COONRADT - By Mr. Klein]

2    in 2015 did you maintain a memo book?

3        A.   Usually, yes.

4        Q.   But were you required to have it at all

5    times or you just -- it was up to you if you used

6    it or not?

7        A.   We were not required to have it and I

8    didn't use it consistently.

9        Q.   Okay.  Are you still with the Troy PD?

10       A.   No, sir.

11       Q.   When did you leave?

12       A.   January of 2016.

13       Q.   Okay.  When did you join the department?

14       A.   January of 2008.

15       Q.   Okay.  And prior to the Troy PD did you

16   have any law enforcement experience?

17       A.   No, sir.

18       Q.   What is your highest level of education?

19       A.   Some college.

20       Q.   Okay.  And did you have any employment

21   between college and Troy PD or did you go right

22   to Troy PD?

23       A.   I had employment.  Yes.

[DANIELLE COONRADT - By Mr. Klein]

1

2    Q.   What did you do?

3    A.   I was on active duty orders for the Air

4    National Guard so I was full time at my Air Force

5    Base.

6    Q.   And for how long did you have those

7    duties?

8    A.   From the age of 19 until 21 when I got

9    hired for Troy.

10   Q.   Okay.  And when you joined Troy did you

11   go through the police academy for about six

12   months?

13   A.   Yes, sir.

14   Q.   And did you pass everything successfully

15   or did you have to retake anything?

16   A.   I passed everything successfully.

17   Q.   And what were your duties and

18   responsibilities once you concluded the academy

19   starting with earliest time of your career up

20   until when you left in 2016?

21   A.   I was a street cop the entire time, a

22   patrolman, if you will, responding to calls,

23   vehicle and traffic, things of that nature.

1    [DANIELLE COONRADT - By Mr. Klein]

2        Q.   And you remained in the rank of patrol

3    officer through the time that you left?

4        A.   Yes, sir.

5        Q.   And under what circumstances did you

6    leave in 2016?

7        A.   I left to move closer to my parents up in

8    the Adirondacks.

9        Q.   Okay.  And are you still a police

10   officer?

11       A.   No, sir.

12       Q.   Okay.  Have you been employed since you

13   left the Troy PD?

14       A.   Yes.

15       Q.   And what have you been doing?

16       A.   I was a police officer in Lake Placid,

17   New York, and then I transferred to Clinton

18   County Sheriff's and I left Clinton County

19   Sheriff's in November --

20       Q.   Why did you leave?

21       A.   -- of 2020.  It was time.  I wasn't

22   wanting to be a police officer anymore, didn't

23   enjoy it.

1    [DANIELLE COONRADT - By Mr. Klein]

2      Q.    And when you left the Troy PD, was it a

3    voluntary decision to leave or did you have any

4    charges pending or was there any other negative

5    reason why you left?

6      A.    No.  I left.  My mom was having health

7    issues and I wanted to be closer.

8      Q.    Okay.  Other than today have you ever

9    testified in any civil case?

10     A.    Yes, sir.

11     Q.    How many times?

12     A.    I was deposed one time.  That's the

13   extent of it.

14     Q.    Was it in a case against or involving

15   Troy PD or was it involving some other entity or

16   matter?

17     A.    It was Troy police.

18     Q.    Okay.  And did the case go to trial or do

19   you know -- withdrawn.

20           What was the disposition of the case, if

21   you know?

22     A.    I believe it was settled.  I'm not sure

23   the extent of it now or.

1   **[DANIELLE COONRADT - By Mr. Klein]**

2       Q.   Were you represented by Ms. Spencer's

3   firm in that case?

4       A.   I don't recall.

5       Q.   When did you give that testimony was it

6   within the last year or several years ago or

7   something else?

8       A.   Probably six years ago if I'm going to

9   estimate.

10      Q.   Okay.  And were you a defendant in the

11  case?

12              MS. SPENCER:  She just wants to

13          clarify.

14      A.   I want to clarify.  Six years prior to

15  this incident.

16      Q.   Got it.

17      A.   It was very early on.

18      Q.   Okay.  Were you a defendant in the case

19  or a witness?

20      A.   Defendant.

21      Q.   What were the allegations in the case,

22  whether specifically or, if you don't remember

23  specifics, in sum or substance?

1  [DANIELLE COONRADT - By Mr. Klein]

2      A.   I don't recall honestly.  I don't recall

3  the exact allegations.

4      Q.   Well, was it like a motor vehicle

5  accident with a department vehicle or did someone

6  claim false arrest or did someone allege that

7  they were subjected to excessive force or

8  something else?

9      A.   I believe it was excessive force.

10     Q.   Was it alleged that you used excessive

11  force or someone else did?

12     A.   Me.

13     Q.   Okay.  And can you describe the force

14  that you used in that case?

15     A.   I don't recall.

16     Q.   Okay.  Did the person sustain any

17  injuries, fractures, stitches or anything else

18  that you can recall?

19     A.   I don't recall.

20     Q.   Do you know if that case was pending in

21  state court or federal court?

22     A.   I don't recall.

23     Q.   Other than that case and your involvement

1   **[DANIELLE COONRADT - By Mr. Klein]**

2   in this case have you been named as a defendant

3   in any other civil case?

4      A.   No.

5      Q.   Have you ever sued the Troy PD or any

6   other law enforcement agency?

7      A.   No.

8      Q.   Did you ever file any complaints

9   regarding your treatment at the Troy PD, EEO

10  complaints or anything else?

11     A.   No.

12     Q.   Directing your attention to February

13  26th, 2015, did you respond to the location at

14  ███████████   where V.D. was, passed away?

15          MS. SPENCER:   Object to form.

16     A.   Yes.

17     Q.   Okay.   Can you describe how you became

18  involved in the incident?

19     A.   I answered a -- I was sent via dispatch

20  to a call for a cardiac arrest of a one-year-old.

21     Q.   Okay.   Was there any other information

22  that you recall or is that essentially it?

23     A.   That's what I recall.

Case 1:17-cv-01290-DJS Document 94-1 Filed 02/04/22 Page 15 of 47

14

1    [DANIELLE COONRADT - By Mr. Klein]

2        Q.   Okay.  Were you alone or with someone

3    when you got the call?

4        A.   I was in the patrol car by myself.

5        Q.   Okay.  And did you respond?  Where were

6    you when you got the call?

7        A.   I don't recall that.

8        Q.   And did you respond to the location?

9        A.   Yes.

10       Q.   Okay.  And what did you observe upon

11   arrival at Fourth Avenue?

12       A.   I observed Mr. Davis outside.  I don't

13   recall specifically what he was doing.

14       Q.   Had you ever seen him before that date?

15       A.   No.

16       Q.   No.  And had you had any dealings with

17   him since other than in connection with this

18   arrest and prosecution?

19       A.   No.

20       Q.   At some point did Rebecca Parker, the

21   mother of V.D., did she arrive at the scene or

22   was she there when you got there?

23       A.   I don't recall if she was there when I

Case 1:17-cv-01290-DJS    Document 94-1    Filed 02/04/22    Page 16 of 47

1    [DANIELLE COONRADT - By Mr. Klein]

2    got there.  I do remember her being there though.

3        Q.    Had you ever seen her before?

4        A.    No.

5        Q.    Okay.  Have you had any dealings with her

6    since this incident other than as it relates to

7    this case?

8        A.    No.

9        Q.    Okay.  Were any other members of the

10   service there other than yourself or were you the

11   first to arrive on scene?

12       A.    I was the first officer on scene.

13       Q.    Okay.  So, when you saw Mr. Davis can you

14   describe his demeanor, anything he said, or

15   anything else that you observed?

16       A.    I recall asking him what happened and him

17   saying that -- to paraphrase, because I don't

18   have my paperwork in front of me, him saying she

19   woke me up at -- she woke me up at 8:00.  I told

20   her it was too early, to go back to bed, and then

21   I went to wake her up at 11 and she wouldn't wake

22   up, something to that effect.

23       Q.    Okay.  Did he tell you anything else or

**APPENDIX** **1102**

16

1    **[DANIELLE COONRADT - By Mr. Klein]**

2    he may have, but you don't remember without

3    looking at your paperwork?

4        A.    I believe I said it's 1:30 or something

5    along those lines and he said time must be flying

6    and that was the extent of my conversation with

7    him.

8        Q.    Do you recall what time it was, was it

9    1:30 or --

10        A.    Yes.

11        Q.    How long had you been there when you were

12    speaking with him, was it instantaneous or were

13    you there for some time before you spoke with

14    him?

15        A.    I don't recall how long I was there

16    prior.

17        Q.    When you spoke with him were any members

18    of the service or EMS at the scene or was it just

19    you and him?

20        A.    EMS was inside.  I was outside with him.

21        Q.    Okay.  And what happened next?

22        A.    I went inside, took a look around the

23    apartment without touching anything or opening

1   [DANIELLE COONRADT - By Mr. Klein]

2   anything to see if what I saw in plain view that

3   V could have gotten into.  And then saw, I

4   believe I saw a bottle of pills, some sort of

5   narcotic pills on a table in the living room.  I

6   asked the fire department, one of the members of

7   the fire department, "Hey, what's that?"

8   Thinking maybe she had gotten into those.  And

9   she told me they were some sort of narcotic and

10  that was the extent of what I did in there.

11      Q.   Okay.  And how about after that?  What

12  did you do, if anything, related to this

13  incident?

14      A.   I believe I went back outside and waited

15  for direction from my supervisor.

16      Q.   Okay.  And who was your supervisor?

17      A.   I believe it was Sergeant Kiley.

18      Q.   K-y-l-i-e?

19      A.   K-i-l-y -- or K-i-l-e-y.

20      Q.   Okay.  And what is Sergeant's Kiley's

21  first name?

22      A.   Shane.

23      Q.   S-h-a-n-e?

1  [DANIELLE COONRADT - By Mr. Klein]

2      A.   I believe so.

3      Q.   And did you get directions from your

4  sergeant at some point?

5      A.   At some point after V had left for the

6  hospital I was told to hold the scene and I

7  started a crime scene log and waited for my

8  relief to get there.

9      Q.   Okay.  And what, if anything, did you do?

10     A.   As I was holding the scene, I called CPS,

11  did a CPS form and made notification to them.

12     Q.   Whose determination was it to call CPS?

13  Were you told to do so by Sergeant Kiley or

14  anyone else or was it your own decision?

15     A.   It wouldn't have been a decision.  It

16  would have been mandatory.  So, whether he told

17  me to or I just did it I don't recall.

18     Q.   Okay.  And why is it mandatory?  Whenever

19  there's an injury -- did you know there was a

20  death at that point when you called it in or?

21     A.   No.  I did not know.  Oh, I'm not sure

22  actually.  I'd have to refer to my paperwork.  I

23  don't remember.

1    [DANIELLE COONRADT - By Mr. Klein]

2    Q.   So, what is your understanding of the

3    reason why it's mandatory?

4    A.   Any kind of injury to a child we will

5    notify CPS regardless of the circumstances.

6    Q.   Holding the scene for the search warrant,

7    what did that involve other than just making sure

8    there were no intruders or anyone tampering with

9    the scene, did it involve anything else?

10   A.   Nope.

11   Q.   Okay.  Did you have any other involvement

12   that day in this incident?

13   A.   No.

14   Q.   Were you relieved at 1:30?

15   A.   I'd have to look at my paperwork.

16   Q.   I'm sorry.  Not at 1:30.  Were you

17   relieved at some point?

18   A.   Yes.

19   Q.   By whom?

20   A.   Another patrolman.  Probably an afternoon

21   shift guy.

22   Q.   And were you end of tour at that time or

23   did you go on to other duties?

1    **[DANIELLE COONRADT - By Mr. Klein]**

2        A.    I was end of tour.

3        Q.    Okay.  After you went on end of tour on

4    February 26, 2015, did you have any further

5    involvement in the investigation of the death of

6    V.D.?

7        A.    No.

8        Q.    Your supplemental, did you prepare that

9    on the date of the incident?

10        A.    Yes.  I did that in the car while I

11    waited.

12        Q.    Okay.  So, based on that -- did you work

13    off of any notes or did you write directly onto

14    the supplemental?

15        A.    I don't recall.

16        Q.    Okay.  And what was the next thing you

17    heard about this case?  Did anyone, you know, any

18    of the assigned detectives consult with you about

19    your statement?

20        A.    Not that I recall.

21        Q.    Were you part of any meetings or anything

22    else?

23        A.    I -- my -- the only further involvement I

1    [DANIELLE COONRADT - By Mr. Klein]

2    had was when we were getting ready for trial.

3       Q.   Okay.  And you were notified that you

4    needed to go to the D.A.'s Office to prepare for

5    hearings and trial?

6       A.   Yes.

7       Q.   Okay.  And did you go down alone or did

8    anyone from the detectives squad or anyone else

9    from Troy PD go with you for those meetings?

10      A.   I believe I went alone.

11      Q.   Okay.  Were you aware at that time -- was

12   that in 2016?

13      A.   I'm not sure when the pretrial stuff was.

14   It was a while ago so it's hard to remember.

15      Q.   Were you aware of the basis for the

16   charges when you went down for the hearing?  In

17   other words, did anyone ever brief you on the

18   basis for the indictment or anything else related

19   to V's death?

20           MS. SPENCER:  Object to form.  You

21        can answer.

22      A.   No.  Not that I recall.

23      Q.   Did you ever sit down with Ron Fountain,

1  **[DANIELLE COONRADT - By Mr. Klein]**

2  Sergeant Parrow, Sergeant Colaneri or anyone else

3  from the squad that was involved in investigating

4  the death?

5           MS. SPENCER:  Object to form.

6      A.   No.

7      Q.   When you went to the D.A.'s Office do you

8  remember who you met with?

9      A.   I don't recall which prosecutor it was.

10     Q.   It looks like there was a Cindy Chavkin

11  (phonetic) who handled the hearings and trial, or

12  at least trial?  Do you know who Cindy Chavkin

13  is?

14     A.   Yes.  I remember Cindy.

15     Q.   And I believe Jessica Hall may have dealt

16  with the hearings.  Do you know Jessica Hall?

17     A.   Yes.

18     Q.   Did either or both of them explain to you

19  the theory of the prosecution?

20           MS. SPENCER:  Object to form.

21     A.   No.

22     Q.   Okay.  Sitting here today do you know

23  what the theory of the case was for the

1    [DANIELLE COONRADT - By Mr. Klein]

2    prosecution?

3        A.    No.

4        Q.    Sitting here today do you know -- did you

5    know that Michael Davis was found not guilty,

6    other than what you may have heard or read in

7    this lawsuit?

8        A.    Yes.

9        Q.    Okay.  How did you know?  How did you

10   find out?

11       A.    Cindy told me.

12       Q.    Okay.  Did she give you a call after the

13   case was over?

14       A.    Yes.

15       Q.    And under what circumstances did she call

16   you, was she -- were you guys friendly from the

17   job, friendly off the job or was it a courtesy

18   that she seemed to do to all the witnesses, to

19   give them a call?

20       A.    I had left for vacation the day after and

21   I wanted -- I had asked her to call me and let me

22   know the outcome.

23       Q.    Okay.  And what did she tell you?

1    [DANIELLE COONRADT - By Mr. Klein]

2        A.   She said it was not guilty.

3        Q.   And did she say anything else, like why

4    she believed the case was unsuccessful or

5    anything related to that?

6        A.   No.

7        Q.   Did she express that she was upset or let

8    down or anything like that?

9              MS. PECK:   Objection to form.

10       A.   No.

11       Q.   Okay.  What else was said during that

12   phone call, if anything?

13       A.   That was it.

14       Q.   Okay.  You've reviewed your testimony

15   from the hearings and the trial?

16       A.   Yes, sir.

17       Q.   Was everything that you -- were all the

18   answers that you gave true and correct?

19       A.   Yes.

20       Q.   Okay.  Do you see the supplemental

21   report?  I don't.  Oh, maybe I do.  Do you see

22   your supplemental on the screen?

23       A.   Yes.

1    [DANIELLE COONRADT - By Mr. Klein]

2              MR. KLEIN:  We'll mark this as

3         Coonradt 1.

4              (Coonradt Exhibit No. 1,

5         Supplemental Report, marked this date for

6         identification.)

7    Q.   This is a supplemental that's on two

8    pages.  Is this the full copy of the supplemental

9    that you did in this case?

10   A.   I believe there's a third page.

11   Q.   You are right.  Is this three-page

12   document the full supplemental in this case?

13   A.   Yes.

14   Q.   In the middle of the first page towards

15   the bottom it says, "I didn't see anything

16   obvious.  The fire department was still working

17   on V throughout this time."  I want to talk to

18   you about that.

19        When you say they were working on her,

20   were they engaged in resuscitation efforts?

21   A.   That's what I believed them to be doing.

22   I'm not a medical personnel and I wasn't staring

23   at them, so I couldn't be sure what efforts were

1    [DANIELLE COONRADT - By Mr. Klein]

2    being used on her.

3        Q.   Have you ever been trained in CPR?

4        A.   Yes.

5        Q.   Okay.  And have you ever witnessed the

6    fire department or EMTs or both doing CPR in the

7    course of your job?

8        A.   Yes.

9        Q.   So, did it appear from your own

10   experience and from your experience on the job

11   that they were doing CPR?

12       A.   Yes.

13       Q.   Okay.  And what did you see them doing,

14   chest compressions?

15       A.   I don't recall what they were doing.

16       Q.   Okay.  Where were they doing it?  Were

17   you outside looking in and they were in the

18   apartment or where were they, where were you?

19       A.   They were in the living room.  I was --

20   in my peripheral when I was looking around the

21   house and then I exited the apartment and didn't

22   go back in.

23       Q.   Okay.  How many fire department personnel

1    **[DANIELLE COONRADT - By Mr. Klein]**

2    were working on V throughout that time?

3                    MS. SPENCER:  Object to form.  If

4            you know.

5        A.   I don't recall.

6        Q.   Do you recall more than one?

7        A.   Yes.

8        Q.   Okay.  Was there a succession of fire

9    department personnel taking turns over a period

10   of time --

11                   MS. SPENCER:  Objection.

12       Q.   -- working on her?

13                   MS. SPENCER:  Object to form.

14       A.   I don't recall.

15       Q.   Okay.  What do you recall, if anything

16   else?  I just want to know for the record in the

17   greatest detail you can tell us of what you

18   remember.

19       A.   Honestly, sir, with all due respect I

20   didn't want to see a one-year-old getting worked

21   on so I did my thing and bounced so.

22       Q.   Okay.  Understandable.  But you still may

23   have seen things even though it was horrific.

1   [DANIELLE COONRADT - By Mr. Klein]

2   So, I just wanted to know either way what you

3   saw.  So, is it that you just kind of looked away

4   because people were dealing with it and so you

5   really didn't see, or at some point did you see a

6   male EMT doing chest compressions?  I just want

7   to know what you did see even if you didn't want

8   to see it.

9       A.   I really don't recall.  Whatever I saw

10  was in passing through the apartment.

11      Q.   Okay.  What period of time were they

12  working on her inside the apartment; 15 minutes,

13  20 minutes, half-hour?

14      A.   I couldn't be sure.

15      Q.   At trial I believe Firefighter Bayly

16  testified, B-a-y-l-y.  Do you know who that is?

17      A.   No, sir.

18      Q.   He testified I believe to the best of my

19  recollection that it was 16 minutes of work

20  inside the apartment and then 20 minutes of work

21  on V in the ambulance.  Does 16 minutes sound

22  approximately correct even if you don't remember

23  exactly?

1    **[DANIELLE COONRADT - By Mr. Klein]**

2                    MS. PECK:  Objection to form.

3                    MS. SPENCER:  Object to form.

4        A.   I couldn't be sure.

5        Q.   Okay.  I know you can't be sure, but if

6    it was an hour you would think 16 minutes would

7    be -- would sound a little bit too short.  So, do

8    you have any idea?

9                    MS. PECK:  Object to form.

10       A.   No.

11       Q.   Okay.  And then they -- it says the fire

12   department cleared and brought V to St. Mary's.

13   Officer Bristol followed them.  Did you -- you

14   didn't go to the hospital?

15       A.   No, sir.  I held the scene.

16       Q.   Okay.  I'm going to show you what we are

17   going to call Coonradt 2.  This is the crime

18   scene attendance log dated 2/26/15.

19                    (Coonradt Exhibit No. 2, Crime

20                    Scene Attendance Log, 2/26/15, marked

21                    this date for identification.)

22       Q.   Is this the log that you said you started

23   given that you were asked to hold the scene?

1    [DANIELLE COONRADT - By Mr. Klein]

2        A.   Yes, sir.

3        Q.   Do you see your handwriting on here?

4        A.   Yes, sir.

5        Q.   Can you tell me what you wrote?

6        A.   From Captain Shoemaker down to Ed

7    Cummings is my handwriting.  Troy Fire, the

8    dates, that block, minus the date in top left is

9    my writing.

10       Q.   Okay.  Do you know any of those

11   individuals other than from being present that

12   day?

13       A.   No.  I don't know them.  I had called

14   down to dispatch and asked them to give me the

15   names of the fire department that were there on

16   scene.

17       Q.   So, you didn't ask them personally, you

18   inquired through dispatch?

19       A.   Yes, sir.

20       Q.   Okay.  Did you speak with any of them

21   while they were at the scene?

22       A.   Other than whoever I had asked about the

23   narcotics, no.

1   [DANIELLE COONRADT - By Mr. Klein]

2   Q.  Okay.  And then the handwriting below Ed

3   Cummings, the handwriting changes.  Was that

4   officer, presumably Officer Balarin's

5   handwriting?

6   A.  Yes.  He must have relieved me.

7   Q.  Okay.  I'm going to show you what we'll

8   call Coonradt 3, which is the incident report,

9   New York State Incident Report.  Is this one of

10  the documents that you mentioned earlier that you

11  prepared?

12  A.  Yes, sir.

13  Q.  And what did you refer to this as?

14  A.  DCJS 3205.

15  Q.  Okay.

16          (Coonradt Exhibit No. 3, DCJS 3205,

17          NYS Incident Report, marked this date for

18          identification.)

19  Q.  Okay.  And was this filled out because it

20  involved a child death?  So, was this related to

21  those obligations to report to CPS or was this

22  another form that would have been filled out in

23  any event?

1    [DANIELLE COONRADT - By Mr. Klein]

2       A.    This is a form that we would have used

3    for anything from a petit larceny to a house

4    fire.

5       Q.    Okay.  It says in the narrative Captain

6    DeWolf, D-e-W-o-l-f, notified.  Who was Captain

7    DeWolf?

8       A.    At that point he was the day shift

9    captain.

10      Q.    Okay.  Did he respond to the incident?

11      A.    I don't believe so.

12      Q.    I'm going to show you what's been marked

13   as -- what we'll call Coonradt 4.

14                  (Coonradt Exhibit No. 4, Report of

15                  Suspected Child Abuse or Maltreatment,

16                  marked this date for identification.)

17      Q.    Is this the Report of Suspected Child

18   Abuse or Maltreatment that you prepared?

19      A.    Yes, sir.

20      Q.    And it says the name Cairy Britton on

21   top, C-a-i-r-y B-r-i-t-t-o-n.  Do you know who

22   that is?

23      A.    I don't know her personally.  That's

1    [DANIELLE COONRADT - By Mr. Klein]

2    usually where I jot down the name of the call

3    taker.

4        Q.   Okay.  So you prepared this document and

5    you called it in?

6        A.   Yes, sir.

7        Q.   Okay.  Other than that did you have any

8    involvement in any CPS investigation?

9        A.   No, sir.

10       Q.   In the middle of the form it says

11   juvenile cardiac arrest.  What was the source of

12   that information, if you know?

13       A.   Dispatch.  That's how it came in through

14   dispatch.

15       Q.   Okay.  Is this the entire document or are

16   there additional pages?  This is all I have.

17       A.   That's the entire document.

18       Q.   Okay.  And to answer your question from

19   before.  The suppression hearing was on May 3rd,

20   2016, and the trial was in August of 2016.  Does

21   that refresh your recollection of the time of the

22   testimony, the date?

23       A.   Yes.

1    [DANIELLE COONRADT - By Mr. Klein]

2        Q.    Okay.  So you had already retired or

3    resigned from the department as of the date of

4    the hearing on May 3rd, 2016?

5        A.    Yes, sir.  I was working in Lake Placid

6    PD at that time.

7        Q.    Okay.  Did you ever spend any time with

8    anyone in the squad, Ron Fountain, Adam Mason,

9    Tim Colaneri, Sergeant Parrow, or anyone else,

10   whether in the squad or not who discussed the

11   development of the investigation as -- after

12   February 26, 2015?

13               MS. SPENCER:  Object to form.

14       A.    No.

15       Q.    Did you ever inquire about it?

16       A.    No.

17               MR. KLEIN:  Okay.  I would propose

18            we take a five-minute break.

19               (Recess taken at 1:40 p.m.;

20            proceedings resumed at 1:50 p.m.)

21               MR. KLEIN:  Back on the record.

22       Q.    Ms. Coonradt, do you have any other

23   knowledge of the events involving V.D. other than

1    **[DANIELLE COONRADT - By Ms. Peck]**

2    what you've said today on the record?

3                    MS. SPENCER:  Object to form.  You

4            can answer.

5        A.    No, sir.

6                    MR. KLEIN:  Okay.  Based on that

7            I'm going to say thank you for your time

8            today and that's all the questions I have

9            right now.

10                   THE WITNESS:  Thank you.

11   BY MS. PECK:

12       Q.    Ms. Coonradt, my name is Crystal Peck.  I

13   represent Rensselaer County, Defendant Joel

14   Abelove and Defendant Michael Sikirica in this

15   matter.  I would say all the rules that Mr. Klein

16   went over with you for the deposition would apply

17   equally here.  I only have a couple quick

18   questions for you.

19           You stated that you recall or that you

20   are familiar with ADA Jessica Hall or former ADA

21   Jessica Hall.  Did you meet with her -- do you

22   have a specific recollection of meeting with her

23   with respect to the Michael Davis prosecution?

1  **[DANIELLE COONRADT - By Ms. Peck]**

2      A.    Honestly, I can't remember if it was her

3  or Cindy because I don't know them to see.  So, I

4  don't recall which one it was.

5      Q.    Okay.  Because I was going to ask you the

6  same question with respect to Cindy Chavkin.  So,

7  just to be clear, you don't have a specific

8  memory as to whether you met with Ms. Chavkin or

9  Ms. Hall; is that accurate?

10     A.    That's accurate.

11     Q.    Are you sure that you met with one of

12  them or could it have been another person that

13  you met with?

14     A.    I know it was one of them.  I just

15  know -- I'm just not sure which one it was.

16  Sorry.

17     Q.    No.  No.  That's fine.  And your meeting,

18  was in preparation of the criminal trial?  Is

19  that accurate?

20     A.    Yes, ma'am.

21     Q.    Did you ever meet with District Attorney

22  Joel Abelove about the Michael Davis matter?

23     A.    No, ma'am.

1   **[DANIELLE COONRADT - By Ms. Peck]**

2       Q.   Did you ever meet with Dr. Sikirica about

3   his autopsy of V.D. or the Michael Davis criminal

4   prosecution?

5       A.   No, ma'am.

6       Q.   And did you have any discussions with

7   Dr. Sikirica about his autopsy concerning V.D.?

8       A.   No, ma'am.

9       Q.   Did you ever meet with Andra Ackerman

10  regarding the Michael Davis investigation or the

11  death of V.D.?

12      A.   No.  I don't even know who that is.

13              MS. PECK:  Okay.  I have no further

14          questions.

15              MR. KLEIN:  Nor do I.  Thank you.

16              (Whereupon, the testimony of

17          DANIELLE COONRADT concluded at 1:55 p.m.)

18

19

20

21

22

23

Case 1:17-cv-01290-DJS Document 94 Filed 07/04/22 Page 39 of 47

1

2

3      STATE OF NEW YORK

4      COUNTY OF _____

5

6

7           I have read the foregoing record of my

8    testimony taken at the time and place noted in the

9    heading hereof, and I do hereby acknowledge it to

10   be a true and correct transcript of same.

11

12

13

14          _____

15                   DANIELLE COONRADT

16

17

18   Sworn to before me this

19   _____ day of _____, 20__.

20   _____

21   NOTARY PUBLIC

22

23

Case 1:17-cv-01290-DJS Document 94-11/19/2021 Filed 02/04/22 Page 40 of 47

```
 1

 2          DEPOSITION TRANSCRIPT ERRATA SHEET
            ERRATA SHEET FOR TRANSCRIPT OF:
 3          DANIELLE COONRADT - May 28, 2021

 4   PAGE/LINE                    CORRECTION

 5

 6   ___ ___    _____

 7   ___ ___    _____

 8   ___ ___    _____

 9   ___ ___    _____

10   ___ ___    _____

11   ___ ___    _____

12   ___ ___    _____

13   ___ ___    _____

14   ___ ___    _____

15   ___ ___    _____

16   ___ ___    _____

17   ___ ___    _____

18   ___ ___    _____

19   ___ ___    _____

20   ___ ___    _____

21   ___ ___    _____

22   ___ ___    _____

23   ___ ___    _____
```

C E R T I F I C A T I O N

    I, SUSAN FLORIO, Registered Professional Reporter and Notary Public in and for the State of New York, do hereby certify that the foregoing is a true, complete and accurate transcript to the best of my knowledge, skill and ability on the date and place hereinbefore set forth.

    I FURTHER CERTIFY that I am not related to or employed by any of the parties to the action in which the proceedings were taken, or any attorney or counsel employed in this action, nor am I financially interested in the case.

    IN WITNESS WHEREOF, I have hereunto set my hand this 22nd day of June, 2021.



_____

SUSAN FLORIO, RPR

    (The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

1

2    INDEX TO EXAMINATION:                          PAGE
     -------------------------------------------------
3
     BY MR. KLEIN:                                     4
4
     BY MS. PECK:                                     35
5

6

7

8
     INDEX TO COONRADT EXHIBITS:                   PAGE
9    -------------------------------------------------

10   1, Supplemental Report                          25

11   2, Crime Scene Attendance Log, 2/26/15          29

12   3, DCJS 3205, NYS Incident Report               31

13   4, Report of Suspected Child Abuse or           32
          Maltreatment
14

15

16

17
     INDEX TO COUNSEL REQUESTS:                    PAGE
18   -------------------------------------------------

19   (None)

20

21

22

23

**1**

**1** [3] - 25:3, 25:4, 41:10
**10007** [1] - 2:5
**11** [1] - 15:21
**12181-0208** [1] - 2:15
**12205** [1] - 2:10
**15** [1] - 28:12
**16** [3] - 28:19, 28:21, 29:6
**19** [1] - 8:8
**1:00** [1] - 1:16
**1:17-cv-01290** [1] - 1:7
**1:30** [4] - 16:4, 16:9, 19:14, 19:16
**1:40** [1] - 34:19
**1:50** [1] - 34:20
**1:55** [1] - 37:17

**2**

**2** [3] - 29:17, 29:19, 41:11
**2/26/15** [3] - 29:18, 29:20, 41:11
**20** [2] - 28:13, 28:20
**2008** [1] - 7:14
**2015** [4] - 7:2, 13:13, 20:4, 34:12
**2016** [7] - 7:12, 8:20, 9:6, 21:12, 33:20, 34:4
**2020** [1] - 9:21
**2021** [3] - 1:16, 39:3, 40:16
**208** [1] - 2:15
**20___** [1] - 38:19
**21** [1] - 8:8
**22** [1] - 2:15
**22nd** [1] - 40:16
**25** [1] - 41:10
**26** [2] - 20:4, 34:12
**26th** [1] - 13:13
**28** [2] - 1:16, 39:3
**29** [1] - 41:11

**3**

**3** [3] - 31:8, 31:16, 41:12
**305** [1] - 2:5
**31** [1] - 41:12
**32** [1] - 41:13
**3205** [4] - 6:17, 31:14, 31:16, 41:12
**35** [1] - 41:4

**3rd** [2] - 33:19, 34:4

**4**

**4** [4] - 32:13, 32:14, 41:3, 41:13
**41** [1] - 2:23

**5**

**5** [1] - 2:9
**507** [1] - 2:9

**6**

**600** [1] - 2:5

**8**

**856** [1] - 13:14
**8:00** [1] - 15:19

**A**

**ABELOVE** [1] - 1:11
**Abelove** [3] - 2:9, 35:14, 36:22
**ability** [1] - 40:8
**Abuse** [3] - 32:15, 32:18, 41:13
**academy** [2] - 8:11, 8:18
**accident** [1] - 12:5
**accurate** [4] - 36:9, 36:10, 36:19, 40:7
**accurately** [1] - 4:20
**Ackerman** [1] - 37:9
**acknowledge** [1] - 38:9
**acquittal** [1] - 4:13
**action** [3] - 3:12, 40:11, 40:13
**active** [1] - 8:3
**ADA** [1] - 35:20
**ADAM** [1] - 1:10
**Adam** [2] - 2:14, 34:8
**addition** [1] - 3:8
**additional** [1] - 33:16
**Adirondacks** [1] - 9:8
**afternoon** [1] - 19:20
**age** [1] - 8:8
**agency** [1] - 13:6
**ago** [3] - 11:6, 11:8, 21:14
**AGREED** [1] - 3:3
**agreed** [3] - 3:13,

**3:18**, 3:21
**Air** [2] - 8:3, 8:4
**Albany** [1] - 2:10
**allegations** [2] - 11:21, 12:3
**allege** [1] - 12:6
**alleged** [1] - 12:10
**alone** [3] - 14:2, 21:7, 21:10
**ambulance** [1] - 28:21
**AND** [1] - 3:3
**Andra** [1] - 37:9
**answer** [4] - 4:15, 21:21, 33:18, 35:4
**answered** [1] - 13:19
**answers** [1] - 24:18
**apartment** [6] - 16:23, 26:18, 26:21, 28:10, 28:12, 28:20
**appear** [1] - 26:9
**APPEARANCES** [1] - 2:2
**apply** [2] - 35:16, 40:21
**arrest** [4] - 12:6, 13:20, 14:18, 33:11
**arrival** [1] - 14:11
**arrive** [2] - 14:21, 15:11
**assigned** [1] - 20:18
**attendance** [1] - 29:18
**Attendance** [2] - 29:20, 41:11
**attention** [1] - 13:12
**Attorney** [1] - 36:21
**attorney** [2] - 4:23, 40:13
**Attorneys** [3] - 2:4, 2:8, 2:13
**August** [1] - 33:20
**autopsy** [2] - 37:3, 37:7
**Avenue** [3] - 2:10, 13:14, 14:11
**aware** [3] - 6:7, 21:11, 21:15

**B**

**B-a-y-l-y** [1] - 28:16
**B-r-i-t-t-o-n** [1] - 32:21
**BAILEY** [1] - 2:7
**Balarin's** [1] - 31:4
**bar** [1] - 3:10
**Base** [1] - 8:5
**based** [2] - 20:12, 35:6
**basis** [2] - 21:15, 21:18
**Bayly** [1] - 28:15

**became** [1] - 13:17
**bed** [1] - 15:20
**begun** [1] - 3:17
**below** [1] - 31:2
**best** [2] - 28:18, 40:7
**between** [2] - 3:3, 7:21
**bit** [1] - 29:7
**block** [1] - 30:8
**book** [2] - 6:20, 7:2
**bottle** [1] - 17:4
**bottom** [1] - 25:15
**bounced** [1] - 27:21
**Box** [1] - 2:15
**break** [1] - 34:18
**BRETT** [2] - 2:4, 2:6
**Brett** [1] - 4:8
**brief** [1] - 21:17
**Bristol** [1] - 29:13
**Britton** [1] - 32:20
**Broadway** [1] - 2:5
**brought** [1] - 17:7
**BY** [6] - 2:6, 2:16, 4:7, 35:11, 41:3, 41:4

**C**

**Cairy** [1] - 32:20
**CAIRY** [1] - 32:21
**Captain** [3] - 30:6, 32:5, 32:6
**captain** [1] - 32:9
**car** [2] - 14:4, 20:10
**cardiac** [2] - 13:20, 33:11
**career** [1] - 8:19
**case** [29] - 5:5, 5:16, 5:17, 5:20, 6:5, 6:8, 6:10, 6:16, 10:9, 10:14, 10:18, 10:20, 11:3, 11:11, 11:18, 11:21, 12:14, 12:20, 12:23, 13:2, 13:3, 15:7, 20:17, 22:23, 23:13, 24:4, 25:9, 25:12, 40:14
**Case** [1] - 1:7
**cases** [2] - 5:16, 5:17
**certification** [2] - 3:19, 40:21
**certify** [1] - 40:6
**CERTIFY** [1] - 40:10
**certifying** [1] - 40:23
**changes** [1] - 31:3
**charge** [1] - 3:23
**charges** [2] - 10:4, 21:16
**CHARLES** [1] - 1:9
**Charles** [1] - 2:14
**Chavkin** [2] - 22:10,

22:12, 36:6, 36:8
**chest** [2] - 26:14, 28:6
**child** [2] - 19:4, 31:20
**Child** [3] - 32:15, 32:17, 41:13
**Cindy** [6] - 22:10, 22:12, 22:14, 23:11, 36:3, 36:6
**circumstances** [5] - 4:11, 4:16, 9:5, 19:5, 23:15
**CITY** [1] - 1:9
**City** [1] - 2:13
**civil** [2] - 10:9, 13:3
**Civil** [1] - 1:7
**claim** [1] - 12:6
**clarify** [2] - 11:13, 11:14
**clear** [1] - 36:7
**cleared** [1] - 29:12
**Clinton** [2] - 9:17, 9:18
**closer** [2] - 9:7, 10:7
**Colaneri** [3] - 2:14, 22:2, 34:9
**COLANERI** [1] - 1:10
**college** [2] - 7:19, 7:21
**commencing** [1] - 1:16
**complaints** [2] - 13:8, 13:10
**complete** [1] - 40:7
**compressions** [2] - 26:14, 28:6
**concerning** [1] - 37:7
**concerns** [1] - 4:11
**concluded** [2] - 8:18, 37:17
**connection** [1] - 14:17
**consistently** [1] - 7:8
**consult** [1] - 20:18
**control** [1] - 40:22
**conversation** [1] - 16:6
**COONRADT** [8] - 1:2, 1:9, 1:15, 4:2, 37:17, 38:15, 39:3, 41:8
**Coonradt** [12] - 2:13, 4:8, 25:3, 25:4, 29:17, 29:19, 31:8, 31:16, 32:13, 32:14, 34:22, 35:12
**cop** [1] - 8:21
**copy** [2] - 3:23, 25:8
**correct** [3] - 24:18, 28:22, 38:10
**CORRECTION** [1] - 39:4
**counsel** [1] - 40:13
**COUNSEL** [1] - 41:17
**County** [4] - 2:8, 9:18,

35:13
**COUNTY** [2] - 1:11, 38:4
**couple** [1] - 35:17
**course** [1] - 26:7
**court** [2] - 12:21
**COURT** [1] - 1:4
**courtesy** [1] - 23:17
**CPR** [3] - 26:3, 26:6, 26:11
**CPS** [7] - 6:18, 18:10, 18:11, 18:12, 19:5, 31:21, 33:8
**crime** [2] - 18:7, 29:17
**Crime** [2] - 29:19, 41:11
**criminal** [2] - 36:18, 37:3
**CRYSTAL** [1] - 2:11
**Crystal** [1] - 35:12
**Cummings** [2] - 30:7, 31:3

### D

**D.A.'s** [2] - 21:4, 22:7
**DANIELLE** [7] - 1:2, 1:9, 1:15, 4:2, 37:17, 38:15, 39:3
**Danielle** [1] - 2:13
**date** [11] - 6:2, 14:14, 20:9, 25:5, 29:21, 30:8, 31:17, 32:16, 33:22, 34:3, 40:8
**dated** [1] - 29:18
**dates** [1] - 30:8
**Davis** [8] - 4:9, 14:12, 15:13, 23:5, 35:23, 36:22, 37:3, 37:10
**DAVIS** [1] - 1:5
**DAVIS-GUIDER** [1] - 1:5
**DCJS** [4] - 6:17, 31:14, 31:16, 41:12
**dealing** [1] - 28:4
**dealings** [2] - 14:16, 15:5
**dealt** [1] - 22:15
**death** [7] - 4:12, 18:20, 20:5, 21:19, 22:4, 31:20, 37:11
**decision** [3] - 10:3, 18:14, 18:15
**defendant** [4] - 11:10, 11:18, 11:20, 13:2
**Defendant** [4] - 1:15, 2:13, 35:13, 35:14
**Defendants** [2] - 1:13, 2:8

**demeanor** [1] - 15:14
**department** [11] - 7:13, 12:5, 17:6, 17:7, 25:16, 26:6, 26:23, 27:9, 29:12, 30:15, 34:3
**deposed** [1] - 10:12
**DEPOSITION** [3] - 1:2, 1:15, 39:2
**deposition** [2] - 6:8, 35:16
**describe** [2] - 12:13, 13:17, 15:14
**detail** [1] - 27:17
**detectives** [2] - 20:18, 21:8
**determination** [1] - 18:12
**development** [1] - 34:11
**DeWolf** [2] - 32:6, 32:7
**DEWOLF** [1] - 32:6
**direct** [1] - 40:22
**directing** [1] - 13:12
**direction** [1] - 17:15
**directions** [1] - 18:3
**directly** [1] - 20:13
**discussed** [1] - 34:10
**discussions** [1] - 37:6
**dispatch** [5] - 13:19, 30:14, 30:18, 33:13, 33:14
**disposition** [1] - 10:20
**District** [2] - 4:10, 36:21
**DISTRICT** [2] - 1:4, 1:4
**document** [4] - 25:12, 33:4, 33:15, 33:17
**documents** [1] - 31:10
**down** [7] - 21:7, 21:16, 21:23, 24:8, 30:6, 30:14, 33:2
**Dr** [2] - 37:2, 37:7
**due** [1] - 27:19
**duly** [1] - 4:3
**during** [1] - 24:11
**duties** [3] - 8:7, 8:17, 19:23
**duty** [1] - 8:3

### E

**earliest** [1] - 8:19
**early** [2] - 11:17, 15:20
**Ed** [2] - 30:6, 31:2
**education** [1] - 7:18
**EEO** [1] - 13:9
**effect** [1] - 15:22
**efforts** [2] - 25:20,

25:23
**either** [2] - 22:18, 28:2
**employed** [3] - 9:12, 40:11, 40:13
**employment** [2] - 7:20, 7:23
**EMS** [2] - 16:18, 16:20
**EMT** [1] - 28:6
**EMTs** [1] - 26:6
**end** [3] - 19:22, 20:2, 20:3
**enforcement** [2] - 7:16, 13:6
**engaged** [1] - 25:20
**enjoy** [1] - 9:23
**entire** [3] - 8:21, 33:15, 33:17
**entity** [1] - 10:15
**equally** [1] - 35:17
**ERRATA** [2] - 39:2, 39:4
**ESQ** [4] - 2:4, 2:6, 2:11, 2:16
**essentially** [1] - 13:22
**estimate** [1] - 11:9
**event** [1] - 31:23
**events** [1] - 34:23
**exact** [2] - 6:2, 12:3
**exactly** [1] - 28:23
**EXAMINATION** [1] - 41:2
**examination** [5] - 3:7, 3:10, 3:14, 3:16, 3:20
**examined** [3] - 3:15, 3:22, 4:4
**examining** [1] - 3:22
**except** [1] - 3:6
**excessive** [2] - 12:7, 12:9, 12:10
**Exhibit** [4] - 25:4, 29:19, 31:16, 32:14
**EXHIBITS** [1] - 41:8
**exited** [1] - 26:21
**experience** [3] - 7:16, 26:10
**explain** [1] - 22:18
**express** [1] - 24:7
**Extension** [1] - 2:10
**extent** [5] - 6:19, 10:13, 10:23, 16:6, 17:10

### F

**F.R.C.P** [1] - 3:5
**failure** [1] - 3:8
**fair** [1] - 5:3
**false** [1] - 12:6

**familiar** [1] - 35:20
**February** [3] - 13:12, 20:4, 34:12
**federal** [1] - 12:21
**file** [1] - 13:8
**filing** [1] - 3:18
**filled** [2] - 31:19, 31:22
**financially** [1] - 40:14
**fine** [1] - 36:17
**Fire** [1] - 30:7
**fire** [9] - 17:6, 17:7, 25:16, 26:6, 26:23, 27:8, 29:11, 30:15, 32:4
**Firefighter** [1] - 28:15
**firm** [1] - 11:3
**first** [5] - 4:3, 15:11, 15:12, 17:21, 25:14
**First** [1] - 2:15
**five** [1] - 34:18
**five-minute** [1] - 34:18
**FJS/DJS** [1] - 1:8
**FLORIO** [2] - 40:4, 40:20
**Florio** [1] - 1:18
**flying** [1] - 16:5
**followed** [1] - 29:13
**follows** [1] - 4:5
**FOR** [1] - 39:2
**Force** [1] - 8:4
**force** [4] - 12:7, 12:9, 12:11, 12:13
**foregoing** [1] - 38:7
**foregoing** [2] - 38:7, 40:6, 40:21
**form** [18] - 3:6, 6:18, 13:15, 18:11, 21:20, 22:5, 22:20, 24:9, 27:3, 27:13, 29:2, 29:3, 29:9, 31:22, 32:2, 33:10, 34:13, 35:3
**former** [1] - 35:20
**forth** [1] - 40:9
**Fountain** [3] - 2:13, 21:23, 34:8
**FOUNTAIN** [1] - 1:9
**Fourth** [2] - 13:14, 14:11
**fractures** [1] - 12:17
**free** [1] - 3:23
**friendly** [2] - 23:16, 23:17
**front** [1] - 15:18
**full** [3] - 8:4, 25:8, 25:12
**fully** [1] - 4:19
**furnish** [1] - 3:22
**FURTHER** [1] - 40:10

### G

**generally** [1] - 6:23
**GINSBERG** [1] - 2:12
**given** [4] - 5:8, 5:13, 6:4, 29:23
**greatest** [1] - 27:17
**GRIFFIN** [1] - 2:12
**Guard** [1] - 8:4
**GUIDER** [1] - 1:5
**guilty** [2] - 23:5, 24:2
**guy** [1] - 19:21
**guys** [1] - 23:16

### H

**half** [1] - 28:13
**half-hour** [1] - 28:13
**hall** [1] - 36:9
**Hall** [4] - 22:15, 22:16, 35:20, 35:21
**hand** [1] - 40:16
**handled** [1] - 22:11
**handwriting** [5] - 30:3, 30:7, 31:2, 31:3, 31:5
**hard** [1] - 21:14
**heading** [1] - 38:9
**health** [1] - 10:6
**heard** [2] - 20:17, 23:6
**hearing** [6] - 5:4, 5:19, 6:3, 21:16, 33:19, 34:4
**hearings** [4] - 21:5, 22:11, 22:16, 24:15
**held** [3] - 1:16, 1:17, 29:15
**hereby** [2] - 38:9, 40:6
**HEREBY** [1] - 3:3
**hereinbefore** [1] - 40:9
**hereof** [1] - 38:9
**hereto** [1] - 3:4
**hereunto** [1] - 40:15
**hi** [1] - 4:8
**highest** [1] - 7:18
**hired** [1] - 8:9
**hold** [2] - 18:6, 29:23
**holding** [2] - 18:10, 19:6
**honestly** [3] - 12:2, 27:19, 36:2
**horrific** [1] - 27:23
**hospital** [2] - 18:6, 29:14
**hour** [2] - 28:13, 29:6
**house** [2] - 26:21, 32:3

## I

idea [1] - 29:8
identification [4] - 25:6, 29:21, 31:18, 32:16
IN [1] - 40:15
Incident [3] - 31:9, 31:17, 41:12
incident [9] - 6:17, 11:15, 13:18, 15:6, 17:13, 19:12, 20:9, 31:8, 32:10
including [1] - 3:5
INDEX [3] - 41:2, 41:8, 41:17
Indexes.................... ....... [1] - 2:23
indictment [1] - 21:18
Individually [7] - 1:9, 1:9, 1:10, 1:10, 1:11, 1:12
individuals [1] - 30:11
information [2] - 13:21, 33:12
injuries [1] - 12:17
injury [2] - 18:19, 19:4
inquire [1] - 34:15
inquired [1] - 30:18
inside [4] - 16:20, 16:22, 28:12, 28:20
instantaneous [1] - 16:12
interested [1] - 40:14
intruders [1] - 19:8
investigating [1] - 22:3
investigation [4] - 20:5, 33:8, 34:11, 37:10
involve [2] - 19:7, 19:9
involved [3] - 13:18, 22:3, 31:20
involvement [5] - 12:23, 19:11, 20:5, 20:23, 33:8
involving [4] - 5:5, 10:14, 10:15, 34:23
IS [1] - 3:3
issues [1] - 10:7
IT [1] - 3:3

## J

January [2] - 7:12, 7:14
Jessica [4] - 22:15, 22:16, 35:20, 35:21

job [4] - 23:17, 26:7, 26:10
Joel [3] - 2:9, 35:13, 36:22
JOEL [1] - 1:11
JOHNSON [1] - 2:7
join [1] - 7:13
joined [1] - 8:10
jot [1] - 33:2
June [1] - 40:16
juvenile [1] - 33:11

## K

K-i-l-e-y [1] - 17:19
keep [1] - 6:21
Kiley [2] - 17:17, 18:13
Kiley's [1] - 17:20
KILY [1] - 17:19
kind [2] - 19:4, 28:3
Klein [2] - 4:8, 35:15
KLEIN [9] - 2:4, 2:6, 4:7, 25:2, 34:17, 34:21, 35:6, 37:15, 41:3
knowledge [4] - 4:16, 34:23, 40:8
KYLIE [1] - 17:18

## L

Lake [2] - 9:16, 34:5
larceny [1] - 32:3
last [1] - 11:6
law [2] - 7:16, 13:6
lawsuit [2] - 4:9, 23:7
lawyer [1] - 5:10
least [1] - 22:12
leave [4] - 7:11, 9:6, 9:20, 10:3
left [1] - 8:20, 9:3, 9:7, 9:13, 9:18, 10:2, 10:5, 10:6, 18:5, 23:20, 30:8
level [1] - 7:18
lines [1] - 16:5
living [2] - 17:5, 26:19
location [2] - 13:13, 14:8
log [3] - 18:7, 29:18, 29:22
Log [2] - 29:20, 41:11
look [2] - 16:22, 19:15
looked [1] - 28:3
looking [3] - 16:3, 26:17, 26:20
looks [1] - 22:10

## M

ma'am [4] - 36:20, 36:23, 37:5, 37:8
maintain [1] - 7:2
male [1] - 28:6
Maltreatment [2] - 32:15, 32:18, 41:13
mandatory [3] - 18:16, 18:18, 19:3
mark [1] - 25:2
marked [5] - 25:5, 29:20, 31:17, 32:12, 32:16
Mary's [1] - 29:12
Mason [2] - 2:14, 34:8
MASON [1] - 1:1
matter [5] - 4:17, 5:9, 10:16, 35:15, 36:22
McDonald [1] - 2:14
MCDONALD [1] - 1:10
means [1] - 40:22
medical [1] - 25:22
meet [4] - 35:21, 36:21, 37:2, 37:9
meeting [2] - 35:22, 36:17
meetings [2] - 20:21, 21:9
members [3] - 15:9, 16:17, 17:6
memo [1] - 6:20, 7:2
memory [1] - 36:8
mentioned [1] - 31:10
met [4] - 22:8, 36:8, 36:11, 36:13
MICHAEL [1] - 1:5, 1:11
Michael [8] - 2:8, 4:9, 23:5, 35:14, 35:23, 36:22, 37:3, 37:10
middle [2] - 25:14, 33:10
minus [1] - 30:8
minute [1] - 34:18
minutes [6] - 28:12, 28:13, 28:19, 28:20, 28:21, 29:6
mom [1] - 10:6
months [1] - 8:12
mother [1] - 14:21
motion [1] - 3:11
motor [1] - 12:4
move [3] - 3:6, 3:9, 9:7
MR [7] - 4:7, 25:2, 34:17, 34:21, 35:6, 37:15, 41:3
MS [17] - 11:12, 13:15, 21:20, 22:5, 22:20,

24:9, 27:3, 27:11, 27:13, 29:2, 29:3, 29:9, 34:13, 35:3, 35:11, 37:13, 41:4
must [2] - 16:5, 31:6

## N

name [5] - 4:8, 17:21, 32:20, 33:2, 35:12
named [1] - 13:2
names [1] - 30:5
narcotic [2] - 17:5, 17:9
narcotics [1] - 30:23
narrative [1] - 32:5
National [1] - 8:4
nature [1] - 8:23
needed [1] - 21:4
negative [1] - 10:4
NEW [2] - 1:4, 38:3
New [9] - 1:20, 2:5, 2:10, 2:15, 4:10, 9:17, 31:9, 40:6
next [2] - 16:21, 20:16
none [1] - 41:19
NORTHERN [1] - 1:4
Northern [1] - 4:10
Notary [4] - 1:19, 3:15, 3:16, 40:5
notary [1] - 4:4
NOTARY [1] - 38:21
noted [1] - 38:8
notes [2] - 6:21, 20:13
Notice [1] - 1:17
notification [1] - 18:11
notified [2] - 21:3, 32:6
notify [1] - 19:5
November [1] - 9:19
NYS [2] - 31:17, 41:12

## O

oath [1] - 4:15
Object [4] - 13:15, 22:5, 22:20, 29:3
object [8] - 3:5, 3:8, 21:20, 27:3, 27:13, 29:9, 34:13, 35:3
objection [2] - 24:9, 27:11, 29:2
obligations [1] - 31:21
observe [1] - 14:10
observed [2] - 14:12, 15:15
obvious [1] - 25:16
OF [5] - 1:4, 1:9, 38:3,

38:4, 39:2
Office [2] - 21:4, 22:7
officer [7] - 9:3, 9:10, 9:16, 9:22, 15:12, 29:13, 31:4
Officer [1] - 31:4
official [2] - 5:8, 5:11
old [2] - 13:20, 27:20
once [1] - 8:18
one [11] - 6:9, 10:12, 13:20, 17:6, 27:6, 27:20, 31:9, 36:4, 36:11, 36:14, 36:15
one-year-old [2] - 13:20, 27:20
opening [1] - 16:23
orders [1] - 8:3
original [1] - 3:19
outcome [1] - 23:22
outside [4] - 14:12, 16:20, 17:14, 26:17
own [2] - 18:14, 26:9

## P

P.C [3] - 2:4, 2:7, 2:12
p.m [4] - 1:16, 34:19, 34:20, 37:17
P.O [1] - 2:15
PAGE [2] - 41:8, 41:17
page [4] - 25:10, 25:11, 25:14, 41:2
PAGE/LINE [1] - 39:4
pages [2] - 25:8, 33:16
paperwork [5] - 6:14, 15:18, 16:3, 18:22, 19:15
paraphrase [1] - 15:17
parents [1] - 9:7
Parker [1] - 14:20
Parrow [2] - 22:2, 34:9
part [1] - 20:21
parties [3] - 3:4, 40:11
party [2] - 3:22, 3:23
pass [1] - 8:14
passed [2] - 8:16, 13:14
passing [1] - 28:10
patrol [2] - 9:2, 14:4
patrolman [2] - 8:22, 19:20
PATTISON [1] - 2:12
PD [11] - 7:9, 7:15, 7:21, 7:22, 9:13, 10:2, 10:15, 13:5, 13:9, 21:9, 34:6
Peck [1] - 35:12
PECK [8] - 2:7, 2:11, 24:9, 29:2, 29:2, 29:9,

# APPENDIX

35:11, 37:13, 41:4
**pending** [3] - 4:10, 10:4, 12:20
**people** [1] - 28:4
**period** [2] - 27:9, 28:11
**peripheral** [1] - 26:20
**person** [2] - 12:16, 36:12
**personally** [2] - 30:17, 32:23
**personnel** [3] - 25:22, 26:23, 27:9
**petit** [1] - 32:3
**Pg** [1] - 2:23
**phone** [1] - 24:12
**phonetic** [1] - 22:11
**pills** [2] - 17:4, 17:5
**Pine** [1] - 2:9
**place** [2] - 38:8, 40:9
**Placid** [2] - 9:16, 34:5
**plain** [1] - 17:2
**Plaintiff** [2] - 1:6, 2:4
**Plaza** [1] - 2:9
**point** [8] - 6:23, 14:20, 18:4, 18:5, 18:20, 19:17, 28:5, 32:8
**police** [5] - 8:11, 9:9, 9:16, 9:22, 10:17
**preparation** [1] - 36:18
**prepare** [4] - 4:22, 6:15, 20:8, 21:4
**prepared** [3] - 31:11, 32:18, 33:4
**present** [1] - 30:11
**presumably** [1] - 31:4
**pretrial** [1] - 21:13
**proceedings** [2] - 34:20, 40:12
**Professional** [2] - 1:18, 40:4
**propose** [1] - 34:17
**prosecution** [6] - 4:12, 14:18, 22:19, 23:2, 35:23, 37:4
**prosecutor** [1] - 22:9
**provided** [1] - 3:4
**Public** [4] - 1:19, 3:15, 3:16, 40:5
**PUBLIC** [1] - 38:21
**public** [1] - 4:4
**pursuant** [1] - 1:17

## Q

**questions** [4] - 4:15, 35:8, 35:18, 37:14
**quick** [1] - 35:17

## R

**rank** [1] - 9:2
**read** [2] - 23:6, 38:7
**ready** [1] - 21:2
**really** [2] - 28:5, 28:9
**reason** [3] - 4:19, 10:5, 19:3
**Rebecca** [1] - 14:20
**Recess** [1] - 34:19
**recollection** [3] - 28:19, 33:21, 35:22
**record** [4] - 27:16, 34:21, 35:2, 38:7
**refer** [2] - 18:22, 31:13
**referral** [1] - 6:18
**refresh** [1] - 33:21
**regarding** [3] - 5:9, 13:9, 37:10
**regardless** [1] - 19:5
**Registered** [2] - 1:18, 40:4
**related** [7] - 5:4, 5:16, 17:12, 21:18, 24:5, 31:20, 40:10
**relates** [1] - 15:6
**relief** [1] - 18:8
**relieved** [2] - 19:14, 19:17, 31:6
**remained** [1] - 9:2
**remember** [10] - 11:22, 15:2, 16:2, 18:23, 21:14, 22:8, 22:14, 27:18, 28:22, 36:2
**remotely** [1] - 4:3
**Rensselaer** [2] - 2:8, 35:13
**RENSSELAER** [1] - 1:11
**repeat** [1] - 5:11
**Report** [8] - 25:5, 31:9, 31:17, 32:14, 32:17, 41:10, 41:12, 41:13
**report** [5] - 6:7, 6:17, 24:21, 31:8, 31:21
**reporter** [1] - 40:23
**Reporter** [2] - 1:19, 40:5
**represent** [2] - 4:9, 35:13
**represented** [1] - 11:2
**reproduction** [1] - 40:22
**REQUESTS** [1] - 41:17
**required** [2] - 7:4, 7:7
**reserved** [2] - 3:8,

3:11
**resigned** [1] - 34:3
**respect** [3] - 27:19, 35:23, 36:6
**respond** [4] - 13:13, 14:5, 14:8, 32:10
**responding** [1] - 8:22
**responsibilities** [1] - 8:18
**resulted** [1] - 4:12
**resumed** [1] - 34:20
**resuscitation** [1] - 25:20
**retake** [1] - 8:15
**retired** [1] - 34:2
**reviewed** [1] - 24:14
**RHIANNON** [1] - 2:16
**rights** [1] - 3:4
**Ron** [2] - 21:23, 34:8
**RONALD** [1] - 1:9
**Ronald** [2] - 2:13
**room** [2] - 17:5, 26:19
**RPR** [1] - 40:20
**rules** [1] - 35:15

## S

**SAMPSON** [1] - 2:12
**saw** [6] - 15:13, 17:2, 17:3, 17:4, 28:3, 28:9
**Scene** [2] - 29:20, 41:11
**scene** [14] - 14:21, 15:11, 15:12, 16:18, 18:6, 18:7, 18:10, 19:6, 19:9, 29:15, 29:18, 29:23, 30:16, 30:21
**screen** [1] - 24:22
**search** [1] - 19:6
**see** [12] - 17:2, 24:20, 24:21, 25:15, 26:13, 27:20, 28:5, 28:7, 28:8, 30:3, 36:3
**sent** [1] - 13:19
**Sergeant** [5] - 17:17, 18:13, 22:2, 34:9
**sergeant** [1] - 18:4
**Sergeant's** [1] - 17:20
**service** [2] - 15:10, 16:18
**set** [2] - 40:9, 40:15
**settled** [1] - 10:22
**several** [1] - 11:6
**shall** [1] - 3:10
**Shane** [1] - 17:22
**SHANE** [1] - 17:23
**SHEET** [2] - 39:2, 39:2

**Sheriff's** [2] - 9:18, 9:19
**shift** [2] - 19:21, 32:8
**Shoemaker** [1] - 30:6
**short** [1] - 29:7
**show** [4] - 6:9, 29:16, 31:7, 32:12
**Sikirica** [4] - 2:8, 35:14, 37:2, 37:7
**SIKIRICA** [1] - 1:11
**sit** [1] - 21:23
**sitting** [2] - 22:22, 23:4
**six** [3] - 8:11, 11:8, 11:14
**skill** [1] - 40:8
**someone** [4] - 12:5, 12:6, 12:11, 14:2
**sorry** [2] - 19:16, 36:16
**sort** [2] - 17:4, 17:9
**sound** [2] - 28:21, 29:7
**source** [1] - 33:11
**speaking** [1] - 16:12
**specific** [2] - 35:22, 36:7
**specifically** [2] - 11:22, 14:13
**specifics** [1] - 11:23
**Spencer** [1] - 4:23
**SPENCER** [12] - 2:16, 11:12, 13:15, 21:20, 22:5, 22:20, 27:3, 27:11, 27:13, 29:3, 34:13, 35:3
**Spencer's** [1] - 11:2
**spend** [1] - 34:7
**squad** [4] - 21:8, 22:3, 34:8, 34:10
**St** [1] - 29:12
**staring** [1] - 25:22
**start** [1] - 5:13
**started** [2] - 18:7, 29:22
**starting** [1] - 8:19
**state** [1] - 12:21
**STATE** [1] - 38:3
**State** [3] - 1:19, 31:9, 40:5
**statement** [1] - 20:19
**statements** [3] - 5:8, 5:10, 5:11
**STATES** [1] - 1:4
**still** [4] - 7:9, 9:9, 25:16, 27:22
**STIPULATED** [1] - 3:3
**stipulated** [3] - 3:13, 3:18, 3:21
**stitches** [1] - 12:17

**Street** [1] - 2:15
**street** [1] - 8:21
**strike** [2] - 3:7, 3:9
**stuff** [1] - 21:13
**subjected** [1] - 12:7
**substance** [1] - 11:23
**successfully** [2] - 8:14, 8:16
**succession** [1] - 27:8
**sued** [1] - 13:5
**sufficient** [1] - 4:22
**Suite** [2] - 2:5, 2:9
**sum** [1] - 11:23
**supervision** [1] - 40:23
**supervisor** [2] - 17:15, 17:16
**Supplemental** [2] - 25:5, 41:10
**supplemental** [10] - 6:11, 6:12, 6:15, 20:8, 20:14, 24:20, 24:22, 25:7, 25:8, 25:12
**supporting** [1] - 6:8
**suppression** [4] - 5:4, 5:19, 6:3, 33:19
**surrounding** [1] - 4:11
**SUSAN** [2] - 40:4, 40:20
**Susan** [1] - 1:18
**Suspected** [3] - 32:15, 32:17, 41:13
**sustain** [1] - 12:16
**sworn** [2] - 3:14, 6:4
**Sworn** [1] - 38:18
**sworn/affirmed** [1] - 4:3

## T

**table** [1] - 17:5
**taker** [1] - 33:3
**tampering** [1] - 19:8
**testified** [7] - 4:4, 5:4, 5:8, 5:19, 10:9, 28:16, 28:18
**testify** [1] - 4:19
**testimony** [9] - 3:7, 3:9, 5:13, 6:4, 11:5, 24:14, 33:22, 37:16, 38:8
**THE** [1] - 35:10
**theory** [2] - 22:19, 22:23
**thinking** [1] - 17:8
**third** [1] - 25:10
**three** [1] - 25:11
**three-page** [1] - 25:11

**throughout** [2] - 25:17, 27:2
**TIM** [1] - 1:10
**Tim** [2] - 2:14, 34:9
**TO** [3] - 41:2, 41:8, 41:17
**today** [11] - 4:14, 4:20, 5:3, 5:7, 5:18, 6:3, 10:8, 22:22, 23:4, 35:2, 35:8
**took** [1] - 16:22
**top** [2] - 30:8, 32:21
**touching** [1] - 16:23
**tour** [3] - 19:22, 20:2, 20:3
**towards** [1] - 25:14
**traffic** [1] - 8:23
**trained** [1] - 26:3
**transcript** [4] - 3:23, 38:10, 40:7, 40:21
**TRANSCRIPT** [2] - 39:2, 39:2
**transferred** [1] - 9:17
**treatment** [1] - 13:9
**trial** [13] - 3:11, 5:22, 5:23, 6:4, 10:18, 21:2, 21:5, 22:11, 22:12, 24:15, 28:15, 33:20, 36:18
**TROY** [1] - 1:9
**Troy** [16] - 2:13, 2:15, 7:9, 7:15, 7:21, 7:22, 8:9, 8:10, 9:13, 10:2, 10:15, 10:17, 13:5, 13:9, 21:9, 30:7
**true** [3] - 24:18, 38:10, 40:7
**turns** [1] - 27:9
**two** [1] - 25:7
**type** [1] - 6:20

## U

**under** [4] - 4:15, 9:5, 23:15, 40:22
**understandable** [1] - 27:22
**UNITED** [1] - 1:4
**unless** [1] - 40:22
**unsuccessful** [1] - 24:4
**up** [7] - 7:5, 8:19, 9:7, 15:19, 15:21, 15:22
**upset** [1] - 24:7

## V

**V's** [1] - 21:19

**V.D** [9] - 4:12, 5:5, 13:14, 14:21, 20:6, 34:23, 37:3, 37:7, 37:11
**vacation** [1] - 23:20
**vehicle** [3] - 8:23, 12:4, 12:5
**via** [1] - 13:19
**view** [1] - 17:2
**virtually** [1] - 1:17
**voluntary** [1] - 10:3

## W

**waited** [3] - 17:14, 18:7, 20:11
**waived** [1] - 3:20
**waiver** [1] - 3:10
**wake** [2] - 15:21
**wants** [1] - 11:12
**warrant** [1] - 19:6
**Washington** [1] - 2:10
**West** [1] - 2:9
**WHEREOF** [1] - 40:15
**withdrawn** [1] - 10:19
**WITNESS** [2] - 35:10, 40:15
**witness** [2] - 3:14, 11:19
**witnessed** [1] - 26:5
**witnesses** [1] - 23:18
**woke** [2] - 15:19
**words** [1] - 21:17
**write** [1] - 20:13
**writing** [1] - 30:9
**wrote** [1] - 30:5

## Y

**year** [3] - 11:6, 13:20, 27:20
**years** [3] - 11:6, 11:8, 11:14
**YORK** [2] - 1:4, 38:3
**York** [9] - 1:20, 2:5, 2:10, 2:15, 4:10, 9:17, 31:9, 40:6
**yourself** [1] - 15:10

## Z

**Zoom** [1] - 1:17

# EXHIBIT "L"

FINAL AUTOPSY REPORT

CASE #:                         MS-15-120
                                OCA-15-46 (Albany Medical Center)
                                15-02-092 (RCME)

DECEDENT:

DATE OF BIRTH:              █ 2012

PRONOUNCEMENT DATE:         February 26, 2015

PRONOUNCEMENT TIME:         2:08 PM

DATE OF AUTOPSY:            February 27, 2015, 9:30 AM

PLACE OF AUTOPSY:           Albany Medical Center, Albany, NY

PROSECTOR:                  Michael Sikirica M.D.

ASSISTING:                  Mrs. Sarah Bourdon

INVESTIGATOR:               Mr. Michael Ziegler, Rensselaer County

MEDICAL EXAMINER:           Michael Sikirica, M.D., Rensselaer County


Cause of Death:             Hypovolemic shock due to large hemoperitoneum due to
                            multiple lacerations of the liver with right rib fractures due to
                            blunt force trauma

Manner of Death:            Homicide

Michael Sikirica, M.D./nw
DATE: 5-14-2015

## External Description

The body is received in a small white plastic body pouch. There is a medical examiner's tag attached to the pouch listing the decedent's name and date of ▮▮▮ 12 with the date and time of death listed. The tag also lists the names of Investigator Ziegler and Rensselaer County and case number 15-2-92 with lock number 406847 listed. The pouch is secured with a blue plastic lock number 406847 and the lock is in place and intact. The body is that of an 86 cm, 27 pound normally-developed, well nourished black female toddler appearing the reported age of 2 to 3 years with moderate rigor mortis and slight posterior fixed livor mortis. The body temperature is cool to the touch after refrigeration. The general appearance of the body is of good health and hygiene.

The body is received wrapped in a white sheet. The body is received unclothed. There is no jewelry present on the body or included with it. The following measurements are obtained:

> Head circumference: 49.5 cm
> Chest circumference: 48.5 cm
> Abdominal circumference: 46.5 cm
> Crown to rump length: 55 cm
> Distance between inner canthi: 2.7 cm
> Distance between outer canthi: 8.5 cm
> Distance between nipples: 11 cm
> Length of the right foot: 13 cm
> Length of the left foot: 12.8 cm.

The scalp hair is black and arranged into small braids. The irides are brown. The right and left pupils each measure 3 to 4 mm in diameter. The corneas are clear and the sclerae and conjunctivae are unremarkable. The face is symmetric and the

facial bones are intact to palpation. There are no materials in the mouth, nose or the ears. The teeth are natural and in good condition and consistent with age. There is no injury to the lips, teeth or gums. The neck is free from masses. There are no unusual marks or lesions on the skin of the neck. The larynx is midline and the thyroid not palpable. The chest is of normal contour. The breasts are those of a toddler female. The abdomen is mildly protuberant and firm. The posterior torso shows no significant abnormalities. The upper extremities are symmetric, and the fingernails are intact and show no foreign material. No clubbing or cyanosis is noted. The external genitalia are those of an immature female. There is no evidence of injury or abnormal secretions. The hymen is intact. The buttocks and anus are unremarkable. The skin is black in color and smooth. There is a very small scar beneath the lateral right eyebrow. There are no additional scars noted. Passive motion of the head, neck and extremities reveals no abnormal mobility or crepitus. There is no unusual odor about the body.

### Evidence of Recent Medical Therapy

There are square EKG pads present along the upper anterior left shoulder and the distal medial portion of each calf. There are circular impressions consistent with adhesive pad type residue along the left upper chest, right upper chest and the lateral right shoulder. There is a hospital identification bracelet around the right wrist listing the decedent's name and date of birth with a medical record number 521200. There is an intraosseous port inserted into the upper portion of each calf with a large bandage covering the left port and smaller bandage over the right port.

## Evidence of Injury

There is slight lifting along the toenail of the right great toe without evidence of significant bruising or hemorrhage.

## Procedure and Specimens

The organs are exposed utilizing the standard Y-shaped thoracoabdominal and posterior scalp incisions. Cardiac blood, vitreous fluid, and blood from the abdominal cavity are taken for toxicologic evaluation and submitted to the Forensic Toxicology Laboratory at the Albany Medical Center. An additional lavender top blood sample tube is retained for further testing if needed. Prior to removing the decedent from the body pouch and cleaning multiple additional samples are obtained. Samples are obtained including swabs from the right upper thigh, swabs from the left upper thigh, nail scrapings, pulled head hair, swabs of the anterior left and right neck, vulvar swabs and smears, anal swabs and smears, perianal swabs, oral swabs and smears and an additional buccal reference sample. All the swabs and smears are transferred to the officers present from the Troy Police Department. Representative portions of the major viscera are retained in formalin and appropriate sections processed for microscopic slides. Present at the autopsy are Evidence Technician Anthony Buttofucco along with Detectives Charles McDonald, Ronald Fountain and Tim Colaneri. Assistant District Attorney Andra Acherman is also present at the examination along with Rensselaer County Medicolegal Death Investigator Mr. Michael Ziegler. The autopsy is assisted by

autopsy assistant Mrs. Sarah Bourdon. Prior to toxicology sampling blood cultures are obtained from the inferior vena cava for bacterial studies. Tissues are obtained from each lung for viral and bacterial studies using sterile technique. Multiple skeletal x-rays are obtained and evaluated. An additional dried blood sample is submitted for metabolic screening. A copy of the decedent's recent emergency room records from Seton Health Services/St. Mary's Hospital is also received and evaluated with the decedent's name and medical record number M000521200. Additional records for the decedent from the West Care Medial Associated are also received and evaluated. A sketch of the scene where the decedent was living is also received from the officers in the report material. Photographs of the decedent taken at the emergency room are also obtained. A disc of a video interview taken by the Troy Police Department from Michael Davis on March 2nd, 2015 is also later received and reviewed. Copies of additional depositions are also received from Rebecca A. Parker (DOB ▮▮▮ 1992), Russell E. Brown (DOB ▮▮▮/1928), Michael Bayly (DOB ▮▮▮71), James D. Tidings (DOB ▮▮▮1985), Jason S. Lucey (DOB ▮▮▮/1984), Frank H. Shoemaker III (DOB ▮▮▮1971), Michael I. Rustin (DOB ▮▮▮1975) and Kathleen Crisafulli (DOB ▮▮▮/1963). A copy of a Troy Police Department Incident Report for the decedent is also later received and evaluated with incident number 20320.

## Internal Examination

Thoracoabdominal incision reveals approximately 1 cm of normal appearing abdominal panniculus. The thoracic and abdominal viscera have normal anatomic relationships with evidence of injury to be described.

### Body Cavities

There are no significant fluids in the pleural or peritoneal cavities. There are approximately 350 mls of liquid blood (measured) and a slight amount of blood clot in the abdominal cavity. There are no significant adhesions.

### Musculoskeletal System

The skeletal muscles are firm and normally developed. There are fractures along the posterior aspects of the right 9th and 10th ribs with associated hemorrhage and slight hemorrhage but without fracturing along the posterior right 8th rib.

### Neck Organs

The larynx and thyroid gland are unremarkable. The thyroid is homogeneously tan/brown without nodularity. The laryngeal cartilages and hyoid bone are intact. There are no laryngeal hemorrhages or hemorrhages in the soft tissues of the neck. The carotid arteries and jugular veins are intact. The cervical spine is intact.

### Respiratory System

The right lung weighs 95 grams, the left 104 grams. The pleural surfaces are smooth and glistening. There is no significant anthracotic pigmentation and there is only mild diffuse vascular congestion. Upon sectioning there are no focal lesions. The

tracheobronchial and arterial trees are unremarkable. No aspirated material or thromboemboli are found.

## Cardiovascular System

The pericardial sac is intact and contains a few mls of normal serous pericardial fluid. The heart weighs 61 grams and has a normal external configuration with a glistening epicardial surface and a normal amount of epicardial fat. The myocardium is firm and red/brown and shows no focal lesions. The cardiac chambers are of normal size and contain clotted blood. The right ventricle measures 2 mm and the left ventricle 6 mm in maximum thickness. The cardiac valves are normally formed and appear in good functional condition with thin pliable valve leaflets and thin discrete tendineae chordae. The mitral valve measures 52 mm, the tricuspid 75 mm, the pulmonary 35 mm and the aortic 35 mm in circumference. The endocardium is smooth and glistening without fibrosis or petechiae. The coronary arteries arise normally through unobstructed ostia and pursue their usual anatomic course. Serial cross sections at 2 mm intervals reveal no significant anomalies. The atria and appendages are normal. The aorta is of normal caliber and branching distribution and is intact with no anomalies. The vena cavae is intact and unremarkable.

## Liver and Biliary Tree

The liver weighs 327 grams and has a smooth capsule and normal brown coloration and soft lobular architecture. There is a jagged laceration along the posterior aspect of the left lobe measuring 5 x 5 x 0.5 cm in size and an additional laceration along the anterior aspect of the medial left lobe measuring 2.5 x 1.4 cm. There is an additional laceration along the upper right lobe measuring 7.5 x 0.5 cm with tearing off a

significant portion of liver tissues and a perforation along the posterior right lobe measuring 1.8 x 0.4 cm with a second measuring 1 x 0.3 cm in size. There is additional slight tearing along the caudate and quadrate lobes. There is a zone of posterior chest wall hemorrhage behind the liver measuring approximately 18 x 30 cm in size. The gallbladder is flat appearing. The remainder of the extrahepatic biliary system is unremarkable.

## Spleen

The spleen weighs 19 grams and has a smooth intact capsule and normal purple coloration with an indistinct white pulp. There is no evidence of traumatic injury.

## Pancreas

Firm lobulated tan parenchyma

## Adrenals

Thin bright yellow/orange cortical ribbons and tan medullae

## Genitourinary System

The right kidney weighs 51 grams, the left 48 grams. The capsules strip easily to reveal slightly pale cortical surfaces with a normal persistent fetal lobulation pattern. There are no parenchymal lesions. The ureters are patent into the bladder, which is empty and is otherwise unremarkable. The internal reproductive organs are present and normal for age without disease or injury.

## Gastrointestinal System

The esophagus is unremarkable. The stomach contains a trace of brown fluid without identifiable digestate. There are no recognizable fragments of tablets or capsules. The mucosa and rugae are flat and slightly autolyzed but otherwise

unremarkable. The small and large intestines and appendix have a normal configuration and show no evidence of significant traumatic injury and the appendix is unremarkable.

Brain

The scalp is retracted by an intermastoidal incision. There are no subgaleal hemorrhages. The bones of the calvarium and base of the skull are intact. The fresh brain weighs 1129 grams. The cerebral hemispheres are symmetric with a normally developed gyral pattern. There is no evidence of epidural, subdural or subarachnoid hemorrhage. The meninges are clear. The cerebral vasculature is intact with no significant anomalies. Serial coronal sections through the cerebrum, cerebellum and brainstem reveal a myelination pattern consistent with age without focal lesions. Stripping the dura reveals no fractures. The pituitary gland is not enlarged.

## Microscopic Examination (slides 1-25)

Portions of the major internal organs are examined microscopically including sections of brain, heart, lungs, liver, kidneys and additional tissues and organs as required. Sections of the lungs reveal patchy areas of acute congestion and slight atelectasis but no evidence of significant acute or chronic inflammation. There is patchy hemorrhage in the alveolar spaces. Sections of the kidneys are unremarkable and no significant crystals are noted in the kidney parenchyma under polarized light examination. Sections of the adrenal glands are unremarkable. Sections of the myocardium show no significant pathologic abnormalities. A section of trachea is

unremarkable. A section of thymus reveals evidence of focal petechial formation without evidence of a significant ongoing stress reaction. Sections of the spleen are unremarkable. A section of thyroid gland shows no significant pathologic abnormalities. A section of pancreas is unremarkable with no evidence of hemorrhage, necrosis or inflammation. Sections of the liver reveal acute congestion and foci of intraparenchymal hemorrhage without other significant pathologic abnormalities. Sections of the brain are unremarkable.

## Anatomic Diagnoses

I. Hypovolemic shock due to large hemoperitoneum due to multiple lacerations of the liver with right rib fractures due to blunt force trauma.

   a. History of decedent reportedly found unresponsive with reported history of attempted cardiopulmonary resuscitation by a large adult.

   b. Approximately 350 mls of bloody fluid and a small amount of blood clot in the abdominal cavity.

   c. Multiple lacerations of the left and right lobes of the liver.

   d. Fractures along the posterior aspects of the right 9th and 10th ribs with hemorrhage in the surrounding muscular and soft tissue.

II. No evidence of significant natural disease.

III. No evidence of significant infection noted in the lungs by bacterial and viral culture analysis.

IV. No evidence of significant sepsis or bacteriemia by blood culture analysis.

V. No significant findings by noted by toxicology evaluation.

VI. Elevated level of Thyroid Stimulating Hormone (TSH) detected in metabolic
screen consistent with hypothyroidism.

# EXHIBIT "M"

# APPENDIX

4

M. Sikirica - Direct Examination by Ms. Chavkin

1

2          There was an issue that the Court needed to

3          resolve and I believe that issue has now

4          been resolved.

5               So we're prepared, as I said, to go

6          forward at this time.

7               I would allow the People to call their

8          next witness.

9               MS. CHAVKIN:  The People call Michael

10         Sikirica.

11                    **MICHAEL SIKIRICA,**

12   the witness hereinbefore named, being first duly

13   cautioned and sworn or affirmed to tell the truth, the

14   whole truth, and nothing but the truth, was examined

15   and testified as follows:

16               CLERK OF THE COURT:  The sworn witness

17         is Dr. Michael Sikirica, S-I-K-I-R-I-C-A.

18               THE COURT:  The People may proceed.

19         _**Direct Examination by Ms. Chavkin**_

20     Q    Good morning, Dr. Sikirica.

21     A    Good morning.

22     Q    What is your current occupation?

23     A    I'm employed as the Rensselaer County

24   Medical Examiner.

25     Q    And are you employed by Rensselaer County?

**Cheryl M. Moore, Senior Court Reporter**

**M. Sikirica - Direct Examination by Ms. Chavkin**

1

2    A    Yes.

3    Q    And how long have you been employed by

4 Rensselaer County as the Medical Examiner?

5    A    Since September 1, 2001.

6    Q    Do you have a title within the field of

7 medicine?

8    A    Well, I'm a physician and practice primarily

9 in forensic pathology.

10    Q    What's forensic pathology?

11    A    Forensic pathology is a subspecialty of

12 pathology that deals with the medical/legal

13 investigation of death.

14    Q    How long have you been a forensic

15 pathologist?

16    A    Since the early '90s.

17    Q    Can you please tell the jury what licenses

18 you hold in your capacity as a Medical Examiner?

19    A    Well, I have a New York State license to

20 practice medicine and I have an inactive license in the

21 state of Rhode Island.

22    Q    Do you have any other certifications besides

23 that?

24    A    Yes.  I'm board certified in anatomic

25 pathology, clinical pathology, forensic pathology and

**M. Sikirica - Direct Examination by Ms. Chavkin**

1
2  neuropathology.

3      Q     What does it mean to be board certified?

4      A     It means that you have taken the accredited

5  training program, be it a residency or fellowship, and

6  you passed the examination afterwards.

7      Q     Can you please tell the jury about your

8  educational background?

9      A     Yes.  I graduated from the State University

10  of New York at Buffalo in 1989.  I did a general

11  pathology residency at the Berkshire Medical Center,

12  Pittsfield, Massachusetts, did a fellowship in forensic

13  pathology in San Antonio, Texas and fellowship in

14  neuropathology at Brown University in Rhode Island

15  Hospital before eventually going to work.

16      Q     Can you tell the jury what your

17  responsibilities are as the Rensselaer County Medical

18  Examiner?

19      A     Well, I mean, I have four scene

20  investigators.  These are investigators that go to the

21  scene and act as the eyes for the Medical Examiner.

22  They're the ones who determine largely if there has to

23  be an autopsy, if it merits our criteria for an

24  autopsy, then I do the autopsy when required.

25      Q     What would meet a criteria for an autopsy?

**M. Sikirica - Direct Examination by Ms. Chavkin**

 1

 2       A      Well, a suspicious death of any sort, an

 3   unexpected death in a young person, a suicide, a

 4   homicide, an accident, or just not knowing what was

 5   going on.

 6       Q      And how many autopsies have you performed

 7   over the course of your career?

 8       A      I've done over 10,000 now.

 9       Q      How many last year for example?

10       A      A little over 600.

11       Q      Can you please tell the jury what an autopsy

12   is as it is defined in the medical community?

13       A      Yes.   An autopsy is an internal and external

14   examination of the decedent combined with analysis of

15   other things that could be important.   These could be

16   things like medical records, depositions of witnesses,

17   microscopic slides, toxicology reports, hospital

18   records, photographs, x-rays to eventually determine

19   the cause and manner of death.

20       Q      Have you testified in courts of the state in

21   the field of forensic pathology?

22       A      Yes.

23       Q      About how many times would you estimate?

24       A      Oh, several hundred times.

25       Q      Have you ever been qualified as an expert in

1 | **M. Sikirica - Direct Examination by Ms. Chavkin**

2 the field of forensic pathology in court?

3      A     Yes.

4      Q     Doctor, directing your attention to February

5 27, 2015, do you recall that date?

6      A     Yes.

7      Q     Were you working in your capacity as a

8 forensic pathologist on that date?

9      A     Yes, I was.

10      Q     And on February 27, 2015, did you conduct an

11 autopsy?

12      A     Yes, I did.

13      Q     On who did you conduct the autopsy?

14      A     I did an autopsy on a little girl, ███

15 ███.

16      Q     Where did you conduct that autopsy?

17      A     That was done at Albany Medical Center.

18      Q     Who was present for the autopsy that you

19 performed on ███ ███?

20      A     Well, the evidence tech was Officer

21 Buttafucco, and we had Detectives Ron Fountain,

22 Detective Colaneri and Detective MacDonald, as well as

23 my assistants.

24      Q     What did you examine first?

25      A     Well, ███ came to us in a locked body

**M. Sikirica - Direct Examination by Ms. Chavkin**

1
2 pouch, so we recorded the lock, we recorded the
3 hospital information that accompanied her.  We removed
4 the lock.  We recorded her weight and her height.  She
5 was about 88 centimeters high, about 27 pounds, well
6 developed, two to three year old black female child.
7 There was some evidence -- if I could refer to my
8 report?  I brought a copy with me.

9     Q    Well, let me have it marked.

10           (Autopsy Report was marked People's

11           Exhibit 22 for identification.)

12     Q    Would reviewing your -- your record refresh

13 your recollection, Doctor?

14     A    Yes, it would.

15     Q    You're now being showed what has been marked

16 as People's 22 for identification purposes.  Do you

17 recognize it?

18     A    Yes, I do.

19     Q    What is it?

20     A    This is a copy of the final autopsy report

21 that I produced in the normal course of business on

22 ████████  ████████

23     Q    I would ask you to read that record and let

24 me know if it refreshes your recollection.

25     A    Yes, it does.

**M. Sikirica - Direct Examination by Ms. Chavkin**

1

2    Q    When you're done put it down.

3    A    Yes.

4    Q    Okay.  Are you done with it?

5    A    Yes.

6    Q    Hand it back to me.  So what were -- were

7    your initial findings?

8    A    Well, she had received medical attention in

9    the emergency room.  There were EKG pads present on

10   her.  There were IV lines inserted into her legs.  And

11   there was an identification bracelet around one of her

12   wrists.

13   Q    Did you find any injuries on her exterior?

14   A    Not any significant injuries.

15   Q    Okay.  What did you examine next?

16   A    Well, we called for x-rays.  We took full

17   body x-rays.  Did not see any fractures.  We did a

18   sexual assault kit.  We swabbed different portions of

19   her body and preserved that evidence.  We took

20   photographs.  That was done by the investigator

21   present.  And then I went ahead and did the internal

22   examination.

23   Q    What, if any, findings did you make on her

24   internal examination?

25   A    Well, upon opening the chest and the abdomen

APPENDIX   **1153**

| | |
|---|---|
| 1 | **M. Sikirica - Direct Examination by Ms. Chavkin** |
| 2 | there was a large amount of blood in the abdominal |
| 3 | cavity.  That was a very unusual finding. |
| 4 | Q    Okay.  Do you -- did you measure the |
| 5 | blood? |
| 6 | A    Yes, I did. |
| 7 | Q    Do you recall how much blood there was in |
| 8 | her abdominal cavity? |
| 9 | A    There was approximately 350 mls of liquid |
| 10 | blood and 50 mls of blood clot. |
| 11 | Q    Do you know what percentage of her overall |
| 12 | blood that is? |
| 13 | A    That would be in the range of 40 percent of |
| 14 | her overall blood volume. |
| 15 | Q    Were you able to determine where the blood |
| 16 | came from? |
| 17 | A    Yes. |
| 18 | Q    Where did it come from? |
| 19 | A    It came from multiple lacerations of the |
| 20 | liver. |
| 21 | Q    Did you see these lacerations? |
| 22 | A    Yes. |
| 23 | Q    Can you please describe what portion of her |
| 24 | liver was lacerated?  Was it the front or the back? |
| 25 | A    Well, it was the front and the back of both |

**Cheryl M. Moore, Senior Court Reporter**

1  **M. Sikirica - Direct Examination by Ms. Chavkin**

2  lobes.   There was a total of five lacerations.   The

3  longest was about three inches long and it actually --

4  a portion of her liver had been ripped away.   This

5  fragment had actually separated from the liver due to

6  one of the large lacerations along the top of the right

7  lobe.

8      Q    Have you ever seen injuries like that before

9  in the liver?

10     A    Yes.

11     Q    Can you please describe the circumstances

12 under which you see these kind of injuries?

13     A    You can see these --

14          MR. ROBERTS:  Objection.

15          THE COURT:  What basis?

16          MR. ROBERTS:  Relevance.

17          THE COURT:  Overruled.

18     A    You can see these injuries in things like

19 motor vehicle accidents, severe blunt force trauma to

20 the abdomen, if someone's hit by an object or ran into

21 an object.   The liver tears fairly easily and bleeds

22 after it tears.

23     Q    So what would be the force necessary to

24 lacerate a liver like that?

25          MR. ROBERTS:  Objection.   Foundation.

**Cheryl M. Moore, Senior Court Reporter**

**M. Sikirica - Direct Examination by Ms. Chavkin**

1

2                 THE COURT:  Sustained.

3      Q     Did you discover any other injuries?

4      A     Yes.

5      Q     What other injuries did you discover?

6      A     There were fractures of two ribs in the back

7 of the right chest.  The ninth and tenth rib were

8 fractured.  And this was a fresh fracturing.  And there

9 was a significant note of hemorrhage around those

10 fractures in the muscle and soft tissue on the back of

11 the right rib cage.

12      Q     Doctor, you're now being shown what's been

13 marked as People's Exhibit 5 for identification

14 purposes.  Do you recognize it?

15      A     Yes.

16      Q     What is it?

17      A     This is the large laceration of the right

18 lobe of the liver.  To the left of the laceration is

19 the piece that has actually been torn off of it.

20      Q     Is that photograph from the autopsy that you

21 performed on ███████ █████ on February 27, 2015?

22      A     Yes.

23      Q     And does this accurately reflect what the

24 liver looked like on that day?

25      A     Yes.

# APPENDIX
## 1156

| | |
|---|---|
| 1 | **M. Sikirica - Direct Examination by Ms. Chavkin** |
| 2 | Q    Have there been any additions or deletions |
| 3 | to this picture? |
| 4 | A    No. |
| 5 | Q    Doctor, you're now being shown what's been |
| 6 | marked People's Exhibit 7 for identification purposes. |
| 7 | Do you recognize it? |
| 8 | A    Yes. |
| 9 | Q    What is it? |
| 10 | A    These are sections of the two ribs that were |
| 11 | removed showing the fractures and portions of the |
| 12 | hemorrhage around it. |
| 13 | Q    Okay.  And is that an accurate photo of what |
| 14 | you observed on that day? |
| 15 | A    Yes. |
| 16 | Q    Okay.  No additions or deletions? |
| 17 | A    No. |
| 18 | Q    Doctor, you're now being shown what is |
| 19 | marked as Exhibit 4 for identification purposes.  Do |
| 20 | you recognize it? |
| 21 | A    Yes. |
| 22 | Q    What is it? |
| 23 | A    This is the measuring cup we used at the |
| 24 | morgue when we measured the volume of blood that we |
| 25 | could remove from the abdomen. |

**Cheryl M. Moore, Senior Court Reporter**

**M. Sikirica - Direct Examination by Ms. Chavkin**

1

2      Q    And how do you recognize that to be the

3 photograph of that day?

4      A    I recognize the cup and the volume of blood

5 in it.

6      Q    And is that an accurate portrayal of what

7 you recall seeing on February 27, 2015?

8      A    Yes.

9      Q    One more.  Doctor, you're now being shown

10 what's been marked People's Exhibit 2 for

11 identification purposes.  Do you recognize it?

12      A    Yes.

13      Q    How do you recognize it?

14      A    Well, it is a picture of     taken during

15 the autopsy with her abdomen and a portion of the chest

16 exposed showing the large amount of blood in her

17 abdominal cavity.

18      Q    Does that accurately portray what you saw

19 during your autopsy on February 27, 2015?

20      A    Yes.

21            MS. CHAVKIN:  The People would offer

22            People's 2, 4, 7 and 5 in evidence.

23            MR. ROBERTS:  Can we approach before I

24            voir dire, your Honor?

25            THE COURT:  Sure.

# APPENDIX

**1158**

| | |
|---|---|
| 1 | **M. Sikirica - Direct Examination by Ms. Chavkin** |
| 2 | (Whereupon, a sidebar conference was |
| 3 | held as follows:) |
| 4 | MR. ROBERTS:  I think, primarily, |
| 5 | Judge, I'm going to have an issue with |
| 6 | People's 2. |
| 7 | What's depicted in People's 2 is highly |
| 8 | prejudicial and although it does have some |
| 9 | probative value related to the amount of |
| 10 | blood in the abdomen, the People are |
| 11 | offering People's 4, which is a measuring |
| 12 | cup that measures that liquid. |
| 13 | That photo depicts essentially an |
| 14 | infant that has been dissected.  You can see |
| 15 | her face laying in the upper right-hand |
| 16 | portion. |
| 17 | The sense of that photo inflames the |
| 18 | emotion and I'm concerned that by looking at |
| 19 | the child in this manner, essentially from |
| 20 | her naval to her forehead depicted with her |
| 21 | intestines pulling out of her stomach, that |
| 22 | it is highly prejudicial and there are other |
| 23 | less prejudicial manners that's already, |
| 24 | one, been testified to and it's duplicative |
| 25 | of the milliliters that are being measured |

**Cheryl M. Moore, Senior Court Reporter**

# APPENDIX

1  **M. Sikirica - Direct Examination by Ms. Chavkin**

2  here.

3      I object first on that basis.

4      THE COURT:  Okay.  With respect to

5  People's 4, 5 and 7 no objections to those?

6      MR. ROBERTS:  I'm going to ask a couple

7  foundation questions but I'm not going to

8  object to -- yes, I'm not going to object to

9  the other ones after some questioning.

10      THE COURT:  Okay.  Ms. Chavkin, do you

11  want to respond to the People's (sic)

12  argument with respect to People's 2?

13      MS. CHAVKIN:  Yes, your Honor.  I think

14  it is essential that the jury sees the

15  amount of blood that was pooled in the

16  child's abdomen.  It is one of our essential

17  arguments, that this was a severe blunt

18  force trauma that resulted in what you see

19  there.

20      Now, I have a black and white photo of

21  it and I also have one without her face.

22      THE COURT:  Okay.  Why don't you have

23  those two photos marked and then show those

24  to defense counsel and the Court and then I

25  will entertain any further arguments, okay?

**Cheryl M. Moore, Senior Court Reporter**

# APPENDIX

| | |
|---|---|
| 1 | **M. Sikirica - Direct Examination by Ms. Chavkin** |
| 2 | MS. CHAVKIN:  Okay. |
| 3 | (Photographs were marked People's |
| 4 | Exhibits 23 and 24 for identification.) |
| 5 | THE COURT:  Okay.  Marked for ID |
| 6 | purposes are People's 24, which is an exact |
| 7 | equivalent of People's 2, except it is in |
| 8 | black and white.  And also People's 23, |
| 9 | which appears to be an equivalent of |
| 10 | People's 2, except that it is in black and |
| 11 | white and it has been cropped such that the |
| 12 | decedent's head is no longer -- head and |
| 13 | face is no longer being shown. |
| 14 | Now, Ms. Chavkin, you presented these |
| 15 | two photographs to the Court.  Are you -- |
| 16 | are you withdrawing your offer of People's 2 |
| 17 | and offering one of those? |
| 18 | MS. CHAVKIN:  Yes, your Honor. |
| 19 | THE COURT:  Okay.  Which one are you -- |
| 20 | are you offering now? |
| 21 | MS. CHAVKIN:  I would offer -- which |
| 22 | number is that? |
| 23 | THE COURT:  This is 23 in my left |
| 24 | hand. |
| 25 | MS. CHAVKIN:  People's 23. |

# APPENDIX

**1161**

**M. Sikirica - Direct Examination by Ms. Chavkin**

1

2   THE COURT:  Okay.  All right.  The

3   Court will note that People's 2 has been

4   withdrawn and the People are not offering

5   People's 24, so I will hand those back to

6   the People.

7   Okay.  Mr. Roberts, now that the People

8   are offering People's 23, do you have an

9   objection to that?

10  MR. ROBERTS:  I also do have an

11  objection to that, your Honor.  It still

12  depicts the body of a toddler.  You can see

13  her little hands compared to that of the

14  medical examiner.

15  Her intestines are splayed out of the

16  the body, which is not relevant in this

17  particular case to see the intestines pulled

18  out in the manner that they are.  That's not

19  the normal view of a deceased's body.

20  And, again, you can see the cavity

21  where the blood -- blood is, but my position

22  is that with the testimony, as well as

23  People's 4 potentially going into evidence,

24  all we're talking about is blood volume and

25  that photo is still very extremely

**Cheryl M. Moore, Senior Court Reporter**

# APPENDIX
1162

20

| | |
|---|---|
| 1 | **M. Sikirica - Direct Examination by Ms. Chavkin** |
| 2 | prejudicial.  It plays to the emotion of -- |
| 3 | of this jury and obviously I think that this |
| 4 | is a less prejudicial photo, it is not as |
| 5 | prejudicial as the color photo that depicted |
| 6 | her face.  It does depict items that are not |
| 7 | relevant and its probative value is far |
| 8 | outweighed by its prejudice based upon the |
| 9 | intestines being, kind of, essentially |
| 10 | pulled out like, I don't know, like |
| 11 | spaghetti. |
| 12 | THE COURT:  Okay.  Ms. Chavkin, what's |
| 13 | your response to the People's (sic) |
| 14 | argument? |
| 15 | MS. CHAVKIN:  Again, your Honor, we're |
| 16 | trying to establish that this was a severe |
| 17 | blunt force trauma act and -- which resulted |
| 18 | in that.  The fact is that this is a dead |
| 19 | toddler and we think that the amount of |
| 20 | blood in the abdominal cavity goes to show |
| 21 | the amount of force that was used on this |
| 22 | child. |
| 23 | THE COURT:  Okay.  But what do you say |
| 24 | with respect to the argument that People's 4 |
| 25 | shows the amount of blood that was contained |

**M. Sikirica - Direct Examination by Ms. Chavkin**

1

2          in the child's abdomen -- abdominal area?

3                MS. CHAVKIN:   I don't think it's

4          equivalent, your Honor.

5                MR. ROBERTS:   I would also point out,

6          Judge, that the proposed exhibit only shows

7          a portion of the blood whereas what we're

8          looking at with the measuring cup is actual,

9          the measured blood quantified.  So as to the

10         People's argument that it shows the blood,

11         of course it shows blood, but the testimony

12         is essentially how it was measured and to

13         the extent that it -- it shows some blood,

14         it doesn't show the blood in its entirety,

15         where the People's other exhibit does.

16               THE COURT:   Okay.   The Court's ruling

17         is as follows:   With respect to People's 23,

18         the Court finds that this photo is not being

19         offered by the People solely to inflame the

20         jury or arouse any passion or sympathy or

21         prejudice.   Rather, this photo is material

22         and relevant in that it elucidates the

23         medical examiner's testimony.   It is

24         material and relevant to show the nature and

25         extent of the injuries, specifically the

# APPENDIX

**M. Sikirica - Direct Examination by Ms. Chavkin**

1  
2  internal bleeding and the specific location
3  of the internal bleeding, that being in the
4  abdomen of the child.  It is also material
5  and relevant in that these injuries go to
6  the cause of death as being offered by the
7  People.  It is also material and relevant in
8  that it demonstrates, as I already said, the
9  nature and extent of the injuries, which not
10  only goes to cause of death but also could
11  be argued to be relevant to the issue of
12  intent, which is an element of Count 1 of
13  the indictment.
14        Having found the foregoing to be
15  material and relevant for all those reasons,
16  the Court has carefully weighed the
17  probative value of this photo versus the
18  potential for unfair prejudice and the Court
19  finds that the probative value for all the
20  reasons just indicated by the Court does
21  outweigh the potential for any undue
22  prejudice.
23        Now, having made that determination,
24  the Court is mindful that the photo is
25  graphic and does show what appear to be the

**Cheryl M. Moore, Senior Court Reporter**

| | |
|---|---|
| 1 | **M. Sikirica - Direct Examination by Ms. Chavkin** |
| 2 | intestines and the torso area of the victim. |
| 3 | For all the reasons previously |
| 4 | indicated the Court finds that it is |
| 5 | material and relevant.  With respect to the |
| 6 | People's argument or -- excuse me, the |
| 7 | Defendant's argument that it is cumulative |
| 8 | or duplicative of People's Exhibit 4, the |
| 9 | Court rejects that argument in that while |
| 10 | People's Exhibit 4 does show the amount of |
| 11 | blood in a measuring cup such that the jury |
| 12 | would be able to determine the precise |
| 13 | amount of blood that was caused by way of |
| 14 | internal bleeding, People's Exhibit 23 shows |
| 15 | the specific location and area in the body |
| 16 | where the blood was alleged to have |
| 17 | accumulated. |
| 18 | The Court notes that when weighing |
| 19 | probative --undue prejudice, the People |
| 20 | withdrew the color photo and instead |
| 21 | submitted a black and white photo which |
| 22 | further minimizing any arguable prejudice. |
| 23 | In addition, the People have submitted |
| 24 | a photo which now does not depict the |
| 25 | victim's head as the first photo had done |

**Cheryl M. Moore, Senior Court Reporter**

**APPENDIX**

24

M. Sikirica - Direct Examination by Ms. Chavkin

1

2      and not being able to see the victim's head

3      and face further minimizing the prejudice.

4          In addition to that, the Court will

5      give the jury a cautionary instruction

6      explaining that the photo is not being

7      submitted to arouse any sympathy, prejudice

8      or passion, that the jury should view the

9      photo dispassionately and I will remind the

10     jury that they're not to consider passion,

11     prejudice or sympathy at any time.

12         Okay.  Now having ruled on that

13     argument, Mr. Roberts, do you -- do you have

14     further voir dire with respect to these four

15     photos?

16         MR. ROBERTS:  I would like to voir

17     dire, Judge.

18         Based upon the Court's ruling, I would

19     ask the Court to consider now the

20     evidentiary value of the measuring cup

21     before the jury.  Obviously now we're

22     talking about the blood, it is being

23     displayed for them, the measuring cup.

24         MS. CHAVKIN:  I will withdraw it.

25         MR. ROBERTS:  Okay.

# APPENDIX

**1167**

1   **M. Sikirica - Direct Examination by Ms. Chavkin**

2                    THE COURT:  You're withdrawing People's

3          4?

4                    MS. CHAVKIN:  Yes, your Honor.

5                    THE COURT:  Okay.  And the People's

6          withdrawal of People's 4 now eliminates any

7          argument that People's 23 is cumulative.

8                    Now, with that said, Mr. Roberts, that

9          leaves us with three photos.  Do you have

10         further questioning before they're admitted?

11                   MR. ROBERTS:  I do have further

12         questioning, Judge, essentially before the

13         jury.  I'm most likely going to consent to

14         the -- their admission, but I would like the

15         Court to note that my consenting to the

16         admission does not forego the arguments here

17         at the bench relative to the prejudicial

18         value of the photo.  I'm going to go to

19         foundational questions.

20                   THE COURT:  You have got your objection

21         as to undue prejudice on People's 23.  You

22         have not raised that objection with respect

23         to People's 5 and 7, correct?

24                   MR. ROBERTS:  That's correct, your

25         Honor.

**Cheryl M. Moore, Senior Court Reporter**

# APPENDIX                                                1168

| | |
|---|---|
| 1 | **M. Sikirica - Voir Dire Examination by Mr. Roberts** |
| 2 | THE COURT:  Okay.  All right.  Then do |
| 3 | you have foundational questions as they |
| 4 | pertain to 23? |
| 5 | MR. ROBERTS:  A couple. |
| 6 | THE COURT:  Then none of them will be |
| 7 | admitted at this time until you ask your |
| 8 | questions on voir dire. |
| 9 | MR. ROBERTS:  Thank you. |
| 10 | THE COURT:  Okay. |
| 11 | (In open court.) |
| 12 | THE COURT:  You may proceed, Mr. |
| 13 | Roberts. |
| 14 | *Voir Dire Examination by Mr. Roberts* |
| 15 | Q    Good morning, Doctor. |
| 16 | A    Good morning. |
| 17 | Q    How are you? |
| 18 | A    Good. |
| 19 | Q    Doctor, I will show you what we have |
| 20 | discussed with the prosecutor and I'm also going to |
| 21 | show you what's been marked as People's 23 for |
| 22 | identification purposes. |
| 23 | Now, People's 23, you would agree with me |
| 24 | that that is a black and white photo of People's 2, |
| 25 | which was showed to you by the prosecutor, correct? |

**Cheryl M. Moore, Senior Court Reporter**

# APPENDIX

---

1   **M. Sikirica - Voir Dire Examination by Mr. Roberts**

2        A      Yes.

3        Q      Okay.  Now, Doctor, these three photos

4   People's 23, 5 and 7, these were all taken on the 27th

5   of February, 2015?

6        A      Yes.

7        Q      And they were taken essentially at Albany

8   Med?

9        A      Yes.

10       Q      And they were taken during the autopsy,

11  itself?

12       A      Yes.

13       Q      And these photos were taken by the Troy

14  police officer?

15       A      Yes.

16       Q      And there's -- there's some hands displayed

17  in the photos.  Those are your hands?

18       A      Yes.

19       Q      So these all fairly and accurately depict

20  what you were seeing as you were moving forward with

21  the autopsy of Ola, correct?

22       A      Yes.

23       Q      Okay.

24              MR. ROBERTS:  No objection, your

25              Honor.

---

**Cheryl M. Moore, Senior Court Reporter**

# APPENDIX

**M. Sikirica - Voir Dire Examination by Mr. Roberts**

1

2      THE COURT:  Okay.  People's 5, 7 and 23

3  will be received at this time.  I would ask

4  that they be marked in, please.

5      (People's Exhibits 5, 7 and 23, having

6  been previously marked for identification,

7  were received into evidence.)

8      MS. CHAVKIN:  May I publish them to the

9  jury?

10      THE COURT:  Yes, you may.

11      Members of the Jury, before you view

12  these photos I want to advise you that these

13  photos are somewhat graphic in nature and I

14  want to remind you that -- I want to tell

15  you that these photos are not being

16  introduced to arouse any passion, sympathy

17  or prejudice from you.

18      I want to remind you that factors such

19  as sympathy, prejudice and punishment cannot

20  be considered by you at any time during this

21  case, including deliberations.

22      I want to caution you and advise you to

23  view these photos in a dispassionate manner.

24      Okay.  You may view these photos at

25  this time.

| | |
|---|---|
| 1 | **M. Sikirica - Cont'd Direct Examination by Ms. Chavkin** |
| 2 | MS. CHAVKIN:   Thank you, your Honor. |
| 3 | (People's Exhibits 5, 7 and 23 were |
| 4 | published to the jury, in open court.) |
| 5 | ***Continued Direct Examination by Ms. Chavkin*** |
| 6 | Q    Doctor, did -- in addition to your physical |
| 7 | exam, did you order any other tests be conducted? |
| 8 | A    Yes. |
| 9 | Q    And where were those tests conducted? |
| 10 | A    At Albany Medical Center. |
| 11 | Q    And, specifically, what part of Albany |
| 12 | Medical Center conducts those tests? |
| 13 | A    Well, portions of the testing was done in |
| 14 | the toxicology laboratory, portions were done in the |
| 15 | microbiology laboratory, and that was the extent of the |
| 16 | testing; microbiology testing and toxicology testing. |
| 17 | Q    Okay.  In your experience are those forensic |
| 18 | toxicology tests reliable as a basis for forming an |
| 19 | expert opinion in forensic pathology? |
| 20 | MR. ROBERTS:   Objection. |
| 21 | THE COURT:   Overruled. |
| 22 | A    Yes, they are, if they're done by a |
| 23 | certified laboratory. |
| 24 | Q    Are those labs accredited? |
| 25 | A    Yes. |

# APPENDIX

| | |
|---|---|
| 1 | **M. Sikirica - Cont'd Direct Examination by Ms. Chavkin** |
| 2 | MR. ROBERTS:  Objection.  Basis of |
| 3 | knowledge. |
| 4 | THE COURT:  Overruled. |
| 5 | Q    How many times have you relied on the |
| 6 | results of those forensic toxicology tests? |
| 7 | A    Hundreds and hundreds. |
| 8 | MR. ROBERTS:  Objection.  Relevance. |
| 9 | THE COURT:  Overruled. |
| 10 | Q    Have you found them to be accurate in the |
| 11 | past? |
| 12 | MR. ROBERTS:  Objection.  Relevance. |
| 13 | THE COURT:  Overruled. |
| 14 | MR. ROBERTS:  Bolstering. |
| 15 | THE COURT:  Overruled.  Laying the |
| 16 | foundation. |
| 17 | A    Yes. |
| 18 | Q    What were the results of the forensic |
| 19 | toxicology lab tests that you sent out, Doctor? |
| 20 | MR. ROBERTS:  Objection.  Hearsay. |
| 21 | Best evidence rule.  Confrontation. |
| 22 | THE COURT:  Attorneys approach, please. |
| 23 | (Whereupon, a sidebar conference was |
| 24 | held as follows:) |
| 25 | THE COURT:  Ms. Chavkin, do you want to |

**Cheryl M. Moore, Senior Court Reporter**

| 1 | **M. Sikirica - Cont'd Direct Examination by Ms. Chavkin** |

2    respond?

3        MS. CHAVKIN:  Yes, your Honor.

4        Under the professional reliability

5    exception, the professional reliability

6    exception to the hearsay rule permits an

7    expert witness to rely upon out-of-court

8    information that would otherwise be

9    inadmissible if it is of a kind accepted in

10   the profession as reliable in forming a

11   professional opinion.

12       This is the Third Department, 2015,

13   **People v. Howard.**  I have a copy for the

14   Court if your Honor wants it.

15       THE COURT:  I understand.  I understand

16   your argument.  And what is the relevance

17   and purpose for asking these questions

18   regarding the -- these reports?

19       MS. CHAVKIN:  Because we have to rule

20   out any other -- the Defendant claims that

21   he found the child unresponsive so we need

22   to rule out any other cause for her death

23   and these tests --

24       THE COURT:  What do these tests do in

25   that regard?

**Cheryl M. Moore, Senior Court Reporter**

Case 23-589, Document 91, 01/18/2024, 3604733, Page90 of 170

# APPENDIX 1174

**M. Sikirica - Cont'd Direct Examination by Ms. Chavkin**

1

2          MS. CHAVKIN:  They prove that she

3    didn't die from carbon monoxide.  They prove

4    that she didn't die from anemia.  They prove

5    that she didn't die from any natural

6    causes.

7          THE COURT:  Okay.  And those reports

8    and the findings in those reports were

9    relied upon by this witness in forming his

10   opinion as to cause of death?

11         MS. CHAVKIN:  They were, your Honor.

12         THE COURT:  Okay.  All right.  The

13   objections are overruled.  The Court will

14   allow the question to stand.

15         MR. ROBERTS:  Note my exception.

16         THE COURT:  Hold on one second.  Just

17   for the record, the objection is overruled.

18   The appropriate foundation has been laid for

19   that question, the Court finds.

20         Is there a pending question or do you

21   want to ask a new question?

22         MS. CHAVKIN:  There is a pending

23   question, I believe, your Honor.

24         (In open court.)

25         THE COURT:  We'll have that last

**Cheryl M. Moore, Senior Court Reporter**

| | | |
|---|---|---|
| 1 | **M. Sikirica - Cont'd Direct Examination by Ms. Chavkin** | |
| 2 | | question read back for the witness, please. |
| 3 | | (Whereupon, the pending question was |
| 4 | | read back in open court.) |
| 5 | A | They showed no significant findings. |
| 6 | Q | What does that mean, please? |
| 7 | A | There was no drugs of abuse or significant |
| 8 | pharmaceutical drugs in the system. | |
| 9 | Q | Did you test for bacterial infections? |
| 10 | A | Yes. |
| 11 | Q | What did you find with respect to that? |
| 12 | A | Again, there was no significant evidence of |
| 13 | infection in the blood or the lungs. | |
| 14 | Q | Did the toxicology results give you any |
| 15 | information with respect to the cause of death? | |
| 16 | A | No. |
| 17 | Q | Doctor, based on the autopsy you conducted |
| 18 | and the toxicology results, to a reasonable degree of | |
| 19 | medical certainty, have you formed an opinion | |
| 20 | concerning the cause of ████ ████'s death? | |
| 21 | A | Yes, I have. |
| 22 | Q | What is that? |
| 23 | A | ████ died as a result of a large |
| 24 | hemoperitoneum. This is blood in the abdominal cavity | |
| 25 | due to lacerations of the liver with right rib | |

34

1  **M. Sikirica - Cont'd Direct Examination by Ms. Chavkin**

2  fractures.

3      Q      And could ▮▮▮▮ have done this to herself?

4      A      No.

5      Q      Would ▮▮▮▮ have experienced pain as a

6  result of her injuries?

7                  MR. ROBERTS:  Objection.  Foundation.

8                  THE COURT:  Overruled.

9      A      Yes.  The rib fractures would have been

10  painful.

11      Q      Doctor, have you reviewed literature about

12  the force it takes to fracture a two and a half year

13  old's ribs?

14                  MR. ROBERTS:  Objection.  Foundation.

15                  THE COURT:  Well, the question is just

16              whether he's reviewed literature, so I will

17              allow that question.

18                  MR. ROBERTS:  Objection.  Relevance.

19                  THE COURT:  Overruled, but you can

20              object moving forward if you believe the

21              question is inappropriate.

22                  I will overrule that objection.

23      A      Yes.  I reviewed a number of papers written

24  over the last 20 years about injuries to children's

25  ribs associated with CPR.

# APPENDIX

**1177**

35

| | |
|---|---|
| 1 | **M. Sikirica - Cross Examination by Mr. Roberts** |
| 2 | Q     What does that indicate to you? |
| 3 |          MR. ROBERTS:  Objection. |
| 4 |          THE COURT:  Sustained. |
| 5 |          MS. CHAVKIN:  No further questions on |
| 6 | direct, your Honor. |
| 7 |          THE COURT:  Okay.  Mr. Roberts? |
| 8 |          MR. ROBERTS:  Could I have a minute, |
| 9 | Judge? |
| 10 |          THE COURT:  You may. |
| 11 |          (Whereupon, a brief moment was taken.) |
| 12 |          (In open court.) |
| 13 |          MR. ROBERTS:  Thank you, your Honor. |
| 14 |          ***Cross Examination by Mr. Roberts*** |
| 15 | Q     Good morning, Doctor. |
| 16 | A     Good morning again. |
| 17 | Q     How are you? |
| 18 | A     Very good. |
| 19 | Q     Now, Doctor, you had talked a little bit |
| 20 | about your qualifications, and you have been |
| 21 | practicing -- do you practice medicine? |
| 22 | A     I practice forensic medicine. |
| 23 | Q     What's the difference between practicing |
| 24 | medicine and forensic medicine? |
| 25 | A     Well, forensic medicine typically deals with |

**Cheryl M. Moore, Senior Court Reporter**

**M. Sikirica - Cross Examination by Mr. Roberts**

1

2   autopsy and decedents.

3        Q      Okay.  Has that been the extent of your

4   medical practice, essentially, working with

5   decedents?

6        A      Well, I did a fellowship in neuropathology

7   and that was -- you know, that was more hospital based,

8   analysis of the brain and the muscles and the skin,

9   reading biopsies and such, but...

10       Q      When was that?

11       A      Early '90s.  Early '90s.

12       Q      How many years was your fellow?

13       A      Twenty-nine years ago.

14       Q      How much time did you -- how much hands-on

15   experience did you have with live patients?

16       A      Since medical school, very little.

17       Q      Okay.  So essentially you work with dead

18   people?

19       A      Yes.

20       Q      Okay.  You had talked a little bit about

21   your experience, as well as your accreditation.  What's

22   The National Board of Medical Examiners?

23       A      It is an organization that I belong to that

24   publishes a journal and also has a yearly meeting and

25   publishing some guidelines.

| | |
|---|---|
| 1 | M. Sikirica - Cross Examination by Mr. Roberts |
| 2 | Q    When you say you're a member of it, what |
| 3 | does that mean? |
| 4 | A    That means that I apply for position and was |
| 5 | accepted as a member. |
| 6 | Q    Okay.  And they also have certain |
| 7 | recommendations on how to perform autopsies, do they |
| 8 | not? |
| 9 | A    They do, yes. |
| 10 | Q    They go through the criteria related to |
| 11 | autopsies, correct? |
| 12 | A    Yes. |
| 13 | Q    All right.  And you do autopsies here in |
| 14 | Rensselaer County, correct? |
| 15 | A    No, I do the autopsies at Albany Med, but I |
| 16 | do them for Rensselaer County, yes. |
| 17 | Q    Bad question on my part.  You perform the |
| 18 | autopsies here for Rensselaer County, correct? |
| 19 | A    I perform them at Albany Med for Rensselaer |
| 20 | County. |
| 21 | Q    Essentially individuals who die in |
| 22 | Rensselaer County, they are transported over to Albany |
| 23 | County and then you perform your medical procedures on |
| 24 | them, correct? |
| 25 | A    Yes. |

**Cheryl M. Moore, Senior Court Reporter**

M. Sikirica- Cross Examination by Mr. Roberts

Q      Okay.  Medical procedures, you do the autopsy?

A      Correct.

Q      And you also work for a number of other counties, correct?

A      Yes, I do.

Q      What other counties do you work for?

A       Well, exclusively I work for Saratoga County, Hamilton County.  I have worked for Ulster County, but I'm dropping that in the middle of October. And then I worked for other counties on an as needed basis.  When there are cases that need to be done they will contact my office and I will perform the autopsy, if required.

Q      Your termination with Ulster County, is that just based upon the volume of autopsies?

A      Yeah, volume and the idea that it is quite a trip to go to Kingston to do autopsies, they're not brought here, so I don't like to say it, but I waste a lot of time in the car.

Q      So you testified on direct that you perform -- performed about six hundred autopsies.  Was that last year?  Was that the calendar year of 2015?

A      Yes.

**Cheryl M. Moore, Senior Court Reporter**

1  **M. Sikirica - Cross Examination by Mr. Roberts**

2       Q       And obviously how many days in a year are

3  there, Doctor?

4       A       Three hundred sixty-five.

5       Q       And do you take any vacations or holidays?

6       A       I have had a couple of days off last year

7  but I haven't had a vacation in fifteen years.

8       Q       So of 365 days you are not working maybe two

9  days, three days a year?

10      A       Well, I work -- when I do autopsies

11  sometimes I might have two autopsies in a day,

12  sometimes I might have three.  And the next day I might

13  not have any, so it varies quite a bit.

14      Q       Okay.  And you would agree with me that the

15  National Board of Medical Examiners indicates that

16  the -- 250 is the recommended amount of autopsies that

17  you should do in a year, correct?

18      A       That's correct.

19      Q       And they say you should do no more, absolute

20  ceiling, of about 360, correct?

21      A       That is correct.

22      Q       Okay.  So you were performing almost double

23  of their red line limit, correct?

24      A       Correct.

25      Q       And you would agree with me by doing as many

1    **M. Sikirica - Cross Examination by Mr. Roberts**

2    autopsies that you do, you do have some time

3    constraints relative to how much time you can spend on

4    any one individual autopsy, correct?

5        A    I wouldn't say that, no.  My time

6    constraints are affecting my own life.  I don't cut

7    back time just because I have a lot of autopsies.    I

8    cut back my own personal life.

9        Q    On February 27, 2015, how many autopsies did

10   you do on that day?

11       A    I don't recall.

12       Q    Could it be two or three?

13       A    It could be.

14       Q    Could it be four?

15       A    It could be.

16       Q    And what time of day did you perform the

17   autopsy on ████    ████?

18       A    It was about 9:30 in the morning.

19       Q    And you would agree with me that performing

20   an autopsy isn't necessarily done in one particular --

21   withdrawn.  Bad question.

22            There's a process involved in coming to an

23   ultimate determination for an autopsy, correct?

24       A    Yes, there is.

25       Q    So the day that you actually examined an

**M. Sikirica - Cross Examination by Mr. Roberts**

1 individual may not be the day that the autopsy is

2 concluded, correct?

3     A    Well, the physical autopsy would be

4 concluded, you know, the work on the decedent, but

5 there's a lot of other things that have to be evaluated

6 many times.  I have to look at witness statements,

7 medical records, wait for toxicology, look at the

8 microscopic slides, so it may take months before the

9 final thing is done.

10     Q    And in completing your final autopsy report,

11 as well as opinion, do you take live notes or do you

12 dictate?

13     A    What I do is I take notes at the time of the

14 autopsy and then later in my office I will dictate the

15 report from those notes.

16     Q    And that dictation is recorded on a digital

17 device or, I'll say, old school, like, a tape?

18     A    We moved from the old school probably five

19 years ago, so it is a digital device.

20     Q    And is that recording preserved?

21     A    No, it is written over for the next time.

22     Q    And you work as an employee of Rensselaer

23 County, correct?

24     A    Correct.

| | M. Sikirica - Cross Examination by Mr. Roberts |
|---|---|
| 1 | M. Sikirica - Cross Examination by Mr. Roberts |
| 2 | Q      Are you able to save those recordings? |
| 3 | A      I haven't checked on saving those |
| 4 | recordings. |
| 5 | Q      Okay.  Is this a specific device that you |
| 6 | use, a hand-held device, recording device? |
| 7 | A      Yes.  Yes, it is. |
| 8 | Q      Do you have the ability to upload that to a |
| 9 | computer and save it? |
| 10 | A      It gets uploaded and then my girls will type |
| 11 | off my dictation, but I don't save the dictation.  We |
| 12 | don't save the dictation sound. |
| 13 | Q      So you're saying your girls will type off. |
| 14 | You have some assistants that will help you complete |
| 15 | your work product? |
| 16 | A      Yes.  I have two ladies that will help me do |
| 17 | that. |
| 18 | Q      So they will take your impressions off of |
| 19 | the recording and formalize them in the form of a |
| 20 | report, a written report? |
| 21 | A      Yes, which I go on to review. |
| 22 | Q      Then you review that report and sign off on |
| 23 | it? |
| 24 | A      Correct. |
| 25 | Q      When you review that report do you look at |

**M. Sikirica- Cross Examination by Mr. Roberts**

the written hard copy and then go back and listen to

your dictation to make sure it is accurate?

A      No.   Why would I do that?

Q      Well, you would agree with me that in the

normal course of events, in any human's life,

individuals can make mistakes, correct?

A      That would be correct.

Q      Okay.   So, it is possible for you to take

your written report and go back and compare it from

your actual recorded notes, but you rely on the

transcription services of your assistants, correct?

A      But I record those notes and then I compare

them to my written notes, so I record my dictation and

then at my discretion I basically look at what they

have typed and I compare it to my original notes.   So

if there is a number that is wrong that comes through

I'm always looking down at the notes and then the notes

have all the numbers and all my findings.   Whatever is

in my notes is in that dictation.   There is no sense

for me to listen to a dictation that I've already done.

Q      Well, you would agree with me that the

dictation is a more thorough recitation of events than

your notes, correct?

A      It is -- it is more -- not more thorough, it

**M. Sikirica - Cross Examination by Mr. Roberts**

1
2  is just more understandable because I put things in
3  sentence structure.  My notes basically have diagrams
4  and such and numbers.  So I -- if I mention the weight
5  of the liver I will say the liver weighs such and such
6  weight.  My notes simply have a diagram of a liver with
7  a weight next to it.  So it doesn't really make any
8  sense to listen to my dictation when I have my notes,
9  which is where the dictation actually came from.
10      Q    You would agree with me that, say, in an
11  important matter such as this we all don't have the
12  benefit of listening to your dictated notes because
13  they've been destroyed, correct?
14      A    Correct.
15      Q    Okay.  So if there was an error, you perform
16  upwards of double the red line limit of autopsies that
17  are recommended, you wouldn't necessarily recall if the
18  report is -- accurately reflects from what your
19  dictation says, correct?
20      A    Well, I would because I would compare it to
21  my notes and what is in my notes is in my dictation.
22      Q    Okay.  Now, you also indicated that when you
23  performed the autopsy there was a number of individuals
24  present with you?
25      A    Yes.

**M. Sikirica - Cross Examination by Mr. Roberts**

1

2      Q      Okay.  You would agree with me that the

3  National Board of Medical Examiners, they speak to

4  having members of the police and prosecutors in with

5  you when performing an autopsy, correct?

6      A      They might, yes.

7      Q      Okay.  In fact, that Board recommends that

8  you not have members of law enforcement and the

9  prosecutor in while performing your autopsy, correct?

10     A      I don't know about that.

11     Q      Okay.  Well, you would agree with me that

12  when you performed the autopsy of ████  ████  there was

13  a member of the Rensselaer County District Attorney's

14  Office present, correct?

15     A      Yes.

16     Q      And she was there for how long?

17     A      I don't recall, but she was there for a

18  significant portion of the autopsy.

19     Q      Would that be contained within your

20  dictation?

21     A      Yes.

22     Q      So the time that she was there would be

23  included in your dictation?

24     A      Not the time, just the presence of her.

25     Q      Okay.  And there was how many law

# APPENDIX

**1188**

46

| | |
|---|---|
| 1 | M. Sikirica - Cross Examination by Mr. Roberts |
| 2 | enforcement personnel available? |
| 3 | A    There were a total of four. |
| 4 | Q    Detective Fountain was there? |
| 5 | A    Yes. |
| 6 | Q    Detective Colaneri? |
| 7 | A    Yes. |
| 8 | Q    Detective McDonald? |
| 9 | A    I believe that was his name, yes. |
| 10 | Q    And then there was an individual with a |
| 11 | camera, correct? |
| 12 | A    That was Officer Buttofucco. |
| 13 | Q    Okay.  And how long did the autopsy take |
| 14 | from beginning to end? |
| 15 | A    I couldn't tell, probably two to three |
| 16 | hours. |
| 17 | Q    And were all of these individuals in there |
| 18 | for two to three hours? |
| 19 | A    I don't recall. |
| 20 | Q    Well, how long were they there? |
| 21 | A    If I said I don't recall, I don't recall. |
| 22 | Q    Let's talk about Detective Fountain.  What |
| 23 | is your specific recollection as to how long Detective |
| 24 | Fountain was there? |
| 25 | A    Again, I don't recall. |

**Cheryl M. Moore, Senior Court Reporter**

| | |
|---|---|
| 1 | M. Sikirica - Cross Examination by Mr. Roberts |
| 2 | Q    Do you recall, Doctor, if Detective Fountain |
| 3 | got there at the beginning of the autopsy, the middle |
| 4 | or the end? |
| 5 | A    I don't recall. |
| 6 | Q    Do you recall having interactions with |
| 7 | Detective Fountain? |
| 8 | A    I would -- I would estimate that I did, but |
| 9 | I don't recall any specifics. |
| 10 | Q    So you don't recall what you said to |
| 11 | Detective Fountain? |
| 12 | A    No. |
| 13 | Q    And you don't recall what Detective Fountain |
| 14 | would have asked you? |
| 15 | A    Correct. |
| 16 | Q    What about Detective Colaneri and McDonald, |
| 17 | same response? |
| 18 | A    Same response. |
| 19 | Q    As well as the prosecutor? |
| 20 | A    Correct. |
| 21 | Q    You would agree with me that in performing |
| 22 | your autopsy, your visual examination of the decedent, |
| 23 | those five individuals don't help you in any manner, |
| 24 | correct? |
| 25 | A    No, they don't. |

**Cheryl M. Moore, Senior Court Reporter**

# APPENDIX

# 1190

1  **M. Sikirica - Cross Examination by Mr. Roberts**

2      Q     So you can perform this autopsy without them

3  physically being there, correct?

4      A     Well, except for the photographer.   He has

5  to be there because I don't take photographs in

6  homicide cases.

7      Q     So you would agree with me that -- well,

8  withdrawn.

9          Of the 600 autopsies that you performed in

10  2015, how many involved law enforcement personnel?

11      A     Oh, I would probably say 60 percent.

12      Q     Okay.   So 40 percent of your autopsies you

13  don't have anyone there, correct, other than your lab

14  personnel?

15      A     Yes.

16      Q     So that's a few hundred that you're unaided

17  by law enforcement, correct?

18      A     Yes.

19      Q     And the only -- so you would agree with me

20  that of the 40 percent of autopsies you're not taking

21  photos?

22      A     I take them myself.

23      Q     So you do have the capabilities to take

24  photos?

25      A     Yes, I do.

**Cheryl M. Moore, Senior Court Reporter**

**M. Sikirica - Cross Examination by Mr. Roberts**

1      Q      Is that camera provided to you by the

2 facility that you are using for the dissection or do

3 you bring that with you?

4      A      I bring it with me.

5      Q      Okay. So when we were talking about ▮,

6 you didn't need any of those personnel there to perform

7 the autopsy, correct?

8      A      Well, I did. As I said, I don't take

9 photographs in homicide cases.

10      Q      Well, you would agree with me that when you

11 initially began the -- withdrawn.

12      You would agree with me that homicide is a

13 determination by you, correct?

14      A      Yes, it is part of the death certificate,

15 yes.

16      Q      You would agree with me that when you are

17 performing the autopsy you haven't made a determination

18 yet, correct?

19      A      That's correct.

20      Q      So you would agree with me that when you

21 started the examination of ▮ the police were there

22 because they believed they had a homicide, correct?

23      A      I don't know if they believed it. I can't

24 say what they believed. But it was a suspicious death

# APPENDIX

**1192**

1   M. Sikirica - Cross Examination by Mr. Roberts

2   in a young child that had had no reason to be dead.

3       Q    Well, you would agree with me that there

4   was -- withdrawn.

5            Did you ask -- did you -- how long did you

6   spend speaking with law enforcement before beginning

7   the examination?

8       A    This was a year and a half ago, I cannot

9   remember.

10      Q    You don't remember?

11      A    No.

12      Q    Well, how long -- do you recall being in the

13  presence of law enforcement before you started your

14  examination?

15      A    Again, I don't remember.

16      Q    Had you worked with Detective Fountain in

17  the past?

18      A    Yes.

19      Q    So you have a cordial relationship with

20  him?

21      A    Yes, I would say that, sure.

22      Q    For instance, if he walked up on the street

23  and he said hello, Doctor, how are you, you would

24  recognize him as Detective Fountain from the Troy

25  Police Department?

**Cheryl M. Moore, Senior Court Reporter**

**M. Sikirica - Cross Examination by Mr. Roberts**

1

2     A     I would recognize him as someone I know.

3  I'm not sure that I would recognize him as Detective

4  Fountain.  I would say many times I recognize people

5  but I can't put a name on them.

6     Q     So you would agree with me that before you

7  even began to examine ████ there were five onlookers

8  from law enforcement who was very interested in seeing

9  what you were doing, correct?

10    A     Correct.

11    Q     You would agree with me it would be better

12  practice to not allow law enforcement to watch you

13  perform an autopsy, correct?

14              MS. CHAVKIN:  Objection.  Relevance.

15              THE COURT:  Overruled.

16    A     No, I wouldn't agree with that.

17    Q     Okay.  So when you walked into the room --

18  excuse me.  When you walked in the room did you invite

19  law enforcement in or were they already there when you

20  got there?

21    A     Again, I can't remember at this point in

22  time.

23    Q     So it may be possible when you began to walk

24  into the room to see ████ that law enforcement was

25  already there with her?

| | |
|---|---|
| 1 | **M. Sikirica - Cross Examination by Mr. Roberts** |
| 2 | A     They may have been, yes. |
| 3 | Q     You indicated that you had observed some |
| 4 | depositions in the case, is that correct? |
| 5 | A     Yes. |
| 6 | Q     That obviously didn't happen when you did |
| 7 | the physical examination, correct? |
| 8 | A     Correct. |
| 9 | Q     Fair to say that when you did the physical |
| 10 | examination you did not have an opinion as to the cause |
| 11 | of death, correct? |
| 12 | A     I had -- |
| 13 | Q     Yes or no? |
| 14 | A     Can you repeat the question? |
| 15 | Q     Sure.  Fair to say that when you examined |
| 16 | ████ you hadn't determined that it was a homicide yet, |
| 17 | correct? |
| 18 | A     Correct. |
| 19 | Q     How long after you performed the autopsy did |
| 20 | you again work on ████  ████'s findings? |
| 21 | A     It might have been one to two months later I |
| 22 | started working on it again. |
| 23 | Q     One to two months later? |
| 24 | A     Yes. |
| 25 | Q     So, for one to two months you had performed |

**APPENDIX** **1195**

1  M. Sikirica - Cross Examination by Mr. Roberts

2  the physical examination and then when it came time to

3  make a determination as to your findings you had done

4  some work in between those times, correct?

5      A    Yes.

6      Q    And that would be looking at some witness

7  depositions?

8      A    Yes.

9      Q    Some lab work?

10     A    Yes.

11     Q    Did you view a video?

12     A    Yes.

13     Q    Anything else I'm missing?

14     A    Microscopic slides.

15     Q    Slides.   Okay.

16     A    We also sent out a dry blood sample for

17  testing.

18     Q    How many -- do you recall how many witness

19  depositions you looked at?

20     A    If I could refer to my report, they're all

21  listed by name.

22     Q    Okay.  So as you sit here today you don't

23  recall, correct?

24     A    No.

25     Q    And the video that you looked at, you would

**Cheryl M. Moore, Senior Court Reporter**

M. Sikirica - Cross Examination by Mr. Roberts

2  agree with me the final report in this case, based

3  upon -- with your determinations, was actually

4  generated six months later?

5       A    The final report was, yes.

6       Q    And the video that you viewed, did you watch

7  all three plus hours of video?

8       A    No, I did not.

9       Q    How much video did you look at?

10      A    I can't recall.

11      Q    Well, do you recall expending a large

12 portion of time viewing the video?

13      A    I would say at least an hour.

14      Q    At least an hour.  And part of that video

15 was an individual -- withdrawn.

16           On that video you had -- withdrawn.

17           Based upon your opinion here today, in part,

18 is on that video, correct?

19      A    Not really, no.

20      Q    Now, you testified on direct that there was

21 350 milliliters of blood and 50 milliliters clot?

22      A    Approximately 50 mls of clot, yes.

23      Q    That was discovered in the cavity of the

24 decedent, correct?

25      A    In the abdominal cavity, yes.

**M. Sikirica - Cross Examination by Mr. Roberts**

1

2    Q    And that's important because in the

3    abdominal cavity is where the liver is, correct?

4    A    Correct.

5    Q    And the liver is -- how would you

6    describe -- withdrawn.

7         If you were to describe the liver as a

8    fruit, what type of fruit would you equate it to?

9    A    Oh, I don't know, maybe something like a

10   peach or a pear.

11   Q    Okay.  So if we used the pear for an

12   example, you would agree with me that's because the

13   liver has essentially an exterior coating similar to

14   the skin that the pear would have, correct?

15   A    Yes.

16   Q    And that once you go underneath the skin

17   then you have very soft pliable tissue, correct?

18   A    Yes.  It is sort of crumbly.

19   Q    Crumbly.  Okay.  So a pear is, at times,

20   more crumbly than, say, a nectarine or something, it is

21   a little gritty, correct?

22   A    Correct.

23   Q    And if you push on your thumb with a pear --

24   are we saying a ripe pear or a relatively firm pear?

25   A    I would say firm pear.

**M. Sikirica - Cross Examination by Mr. Roberts**

1

2    Q    So we're talking about a firm pear.  Once

3 you push into the tissue, being the interior of the

4 pear, once you make an initial laceration then the

5 interior kind of crumbles, correct?

6    A    Yes.

7    Q    And that's what we're talking about here

8 with ██████ 's liver, correct?

9    A    Well, we're talking about lacerations,

10 correct, yes.

11    Q    And you testified -- withdrawn.

12    You also saw two fractured ribs, correct?

13    A    Yes.

14    Q    And by fracture you mean that there was a --

15 a break in the rib, correct?

16    A    Yes.

17    Q    And this fracture was such that you couldn't

18 see it actually on an x-ray, correct?

19    A    Correct.

20    Q    But upon a physical examination you were

21 able to discern that there was a fracture?

22    A    Yes.

23    Q    Now, it is not a displaced fracture,

24 correct?

25    A    Correct.

**M. Sikirica - Cross Examination by Mr. Roberts**

1

2       Q       Essentially meaning it's all aligned with

3   all of the tissue and it has not broken free,

4   correct?

5       A       Correct.

6       Q       And this was a -- a fracture of the

7   posterior ribs?

8       A       Yes.

9       Q       And those fractures don't necessarily line

10  up with where the liver is, correct?

11      A       Well, they were behind the liver.

12      Q       Okay.  And those -- you would agree with me,

13  as you testified here today, that the fractured ribs

14  did not puncture the liver, correct?

15      A       Correct.

16      Q       And, frankly, the fractured ribs are

17  unrelated to the liver injury based upon your

18  testimony, correct?

19      A       Well, the same mechanism would have caused

20  the fractured ribs.

21      Q       But relative to the interplay between the

22  liver and the ribs the two injuries are unrelated

23  causally -- well, withdrawn.  That's a bad question.

24          You would agree with me that the fractured

25  ribs are unrelated to the direct cause of injury to the

**Cheryl M. Moore, Senior Court Reporter**

# APPENDIX

# 1200

**M. Sikirica - Cross Examination by Mr. Roberts**

1 liver, correct?

2     A     No, I couldn't say that.  I mean they're

3 both caused by a compressive blunt force trauma so

4 they're both caused by the same thing.

5     Q     Well, you would agree with me that you --

6 you can't associate in space and time to the broken

7 liver occurring -- excuse me, the fractured ribs

8 occurring at the same time that the liver injury

9 occurred, correct?

10     A     They might be seconds or minutes apart.

11     Q     Okay.  Now, you testified that this is a

12 compressive injury, correct?

13     A     Yes.

14     Q     And you indicated that you observed a video

15 of Michael Davis, correct?

16     A     Correct.

17     Q     And on that video he indicated -- well, he

18 demonstrated to you a -- a type of compressive

19 exertion, correct?

20     A     Yes.

21     Q     And you indicated that that type of

22 mechanism could have caused the injuries that we were

23 seeing, correct?

24     A     Yes.

| | |
|---|---|
| 1 | **M. Sikirica - Cross Examination by Mr. Roberts** |
| 2 | MR. ROBERTS:  May I have a moment? |
| 3 | THE COURT:  You may. |
| 4 | (Whereupon, a brief moment was taken.) |
| 5 | (In open court.) |
| 6 | Q    Now, Doctor, when -- back to photoing, you |
| 7 | took the photos -- withdrawn. |
| 8 | You allowed Troy Police Department to take |
| 9 | the photos to preserve what we were looking at, |
| 10 | correct? |
| 11 | A    Yes. |
| 12 | Q    Who determined what --h o w to photograph |
| 13 | what? |
| 14 | A    Well, I determined what to photograph.  I |
| 15 | tell them what needs photographing. |
| 16 | Q    So you have the capability to photograph |
| 17 | every organ we see in the body, correct? |
| 18 | A    If need be, correct. |
| 19 | Q    Okay.  And the if need be is up to you? |
| 20 | A    Portions of it are.  They're free to take |
| 21 | any photographs as well while the autopsy is in |
| 22 | process. |
| 23 | Q    Did you direct them to take any specific |
| 24 | photos? |
| 25 | A    I directed them to take photos of the ribs |

**Cheryl M. Moore, Senior Court Reporter**

**APPENDIX** **1202**

1   **M. Sikirica - Cross Examination by Mr. Roberts**

2   and the liver.

3       Q    So you were focusing on the ribs and the

4   liver, correct?

5       A    Correct.

6       Q    So, for instance, you didn't take any photos

7   of the heart or the brain or the lungs, correct?  Yes

8   or no?

9       A    I would have to look at my photograph log.

10  I have that with me.

11      Q    You have that with you?

12      A    Yes.

13      Q    Is it contained within the document that's

14  before you?

15      A    Yes, it is.

16      Q    Okay.  Please, if that would refresh your

17  recollection and let me know.

18      A    We did -- we did take pictures of the brain

19  and the skull and the chest wall, but no other organs

20  were photographed.

21      Q    When you took a picture of the brain, that

22  was a photo of it -- well, withdrawn.

23           Did you dissect the brain in any manner?

24      A    Yes, after we removed it, yes.

25      Q    There was no photos of the dissection,

**Cheryl M. Moore, Senior Court Reporter**

# APPENDIX

# 1203

**M. Sikirica - Cross Examination by Mr. Roberts**

1    correct?

2        A    Correct.

3        Q    As well as with the heart, did you dissect

4    the heart?

5        A    Yes.

6        Q    Were there any photos of the heart

7    dissection?

8        A    No.

9        Q    What about the lungs?

10       A    No.

11       Q    So, when we're talking about the heart, the

12   lungs and the brain, we have to rely upon your

13   recollection, correct?

14       A    Yes, we do.

15       Q    And you took photos of the liver so that we

16   could fairly say -- withdrawn.  Bad question.

17             Photos of the liver were taken particularly

18   because it supported your position, correct?

19       A    No, it is not supporting my position, it

20   simply recorded the evidence.

21       Q    Documented the findings, right?

22       A    Correct, yes.

23       Q    You talked on direct about a bacteria

24   finding.  Withdrawn.

**Cheryl M. Moore, Senior Court Reporter**

**APPENDIX** **1204**

**M. Sikirica - Cross Examination by Mr. Roberts**

1  You indicated there wasn't anything of

2  concern relative to any bacteria, correct?

3  A    Correct.

4  Q    There was, however, a finding, correct?

5  A    Yes.

6  Q    And what was that finding?

7  A    I would have to look at my report to go over

8  that.

9  Q    So fair to say that there was a bacterial

10  finding but your memory, as you sit here today, is not

11  sufficiently refreshed relative to that?

12  A    Correct.

13  Q    Okay.  And do you recall finding congestion

14  in the lungs?

15  A    Yes.

16  Q    Okay.  What type of congestion did you find?

17  What was that attributed to?

18  A    Vascular congestion.  It is commonly seen in

19  resuscitation and slow death.

20  Q    Okay.  Now, you indicate that you reviewed

21  some witness statements, correct?

22  A    Yes.

23  Q    Did you speak with Rebecca Parker?

24  A    No, I did not.

**Cheryl M. Moore, Senior Court Reporter**

**M. Sikirica - Cross Examination by Mr. Roberts**

1

2    Q    You would agree with me that it is important

3    to have as much information at your fingertips relative

4    to a medical history, correct?

5    A    It is important.  It can be important, yes,

6    depending on the circumstances.

7    Q    And you would agree with me that in this

8    specific case you did not have a medical history of the

9    child, correct?

10   A    I had a medical history by the pediatric

11   group that was taking care of the child.

12   Q    But you never actually spoke to Rebecca

13   Parker?

14   A    Correct.

15   Q    And you would agree with me that her, being

16   adopted, limits her familial medical history,

17   correct?

18   A    Yes.

19   Q    And you would agree we me it is important to

20   have at your fingertips and at your disposal a basis of

21   knowledge as to any genetic issues that may be found in

22   the child, correct?

23   A    It may be, yes.

24   Q    So, for instance, in this specific case you

25   don't know if the child's mother had a history of

**M. Sikirica - Cross Examination by Mr. Roberts**

1

2  seizures in her family, correct?

3      A    I wouldn't know that, no.

4      Q    Okay.  And you indicated on direct that you

5  had reviewed some toxicology reports, correct?

6      A    Yes.

7      Q    And did you ever speak with the lab?

8      A    No.

9      Q    So as you sit here today you didn't do any

10 independent -- withdrawn.

11          Yes or no, as you sit here today, you didn't

12 do any independent investigation into the lab's

13 findings, correct?

14     A    There were no findings.

15     Q    Okay.  You would agree with me that you

16 didn't speak to the lab concerning their tests,

17 correct?

18     A    Well, I ordered the tests, but that was all

19 I did.

20     Q    Well, you ordered the tests and you didn't

21 speak to anybody at the lab, correct?

22     A    Correct.

23     Q    So, as you sit here today, you do not have

24 any -- withdrawn.

25          Yes or no, as you sit here today, you cannot

# APPENDIX

1   **M. Sikirica - Cross Examination by Mr. Roberts**

2   speak to the validity of those lab reports, correct?

3        A      I don't quite understand the question.

4        Q      Sure.  You don't work for the lab, right?

5        A      Correct.

6        Q      Have you ever been to the laboratory?

7        A      Oh, yes.

8        Q      Have you ever worked in the lab?

9        A      Not in toxicology laboratory, no.

10       Q      Did you ever meet the person who did the lab

11  work that day?

12       A      No.

13       Q      And do you know if that person was having a

14  good day or a bad day when they performed the

15  reports?

16       A      No, I don't.

17       Q      Okay.  So, it's fair to say, as you sit here

18  today, you look at a lab report and accept it at its

19  face value, correct?

20       A      Most doctors do, yes.

21       Q      And you didn't make any specific inquiry

22  relative to those findings, correct?

23       A      Again, there were no findings, correct.

24       Q      Well, for instance, you indicated -- well,

25  you were -- you spoke with the police regarding the --

# APPENDIX 1208

**M. Sikirica - Cross Examination by Mr. Roberts**

1

2 withdrawn.

3          You reviewed the Albany Medical lab records,

4 correct?

5     A    I reviewed the report they sent me, correct.

6     Q    Okay.  One of those indicators is that there

7 was Narcan used?

8     A    Yes.

9     Q    Okay.  Do you recall, as you sit here today,

10 whether or not that specific substance was found in the

11 toxicology report, yes or no?

12    A    I would have to look at the report.

13    Q    Okay.  As you sit here today, you don't

14 know, correct?

15    A    Not without the report in front of me, no.

16    Q    Doctor, were you aware you were going to be

17 testifying in a case today?

18    A    Yes.

19    Q    Were you aware that this case had some

20 importance based upon why you're here today?

21    A    Yes.  That's why I brought my report to

22 review, please.

23    Q    Doctor, are you testifying relative to your

24 recollection or are you testifying as to what you may

25 have put on a report?

# APPENDIX

**M. Sikirica - Cross Examination by Mr. Roberts**

1

2      A      A combination of both.

3      Q      The compressive force that you viewed on the

4  video was my client with one hand behind the child as

5  well as one hand on the top of the child, correct?

6      A      Yes.

7      Q      And that's the compressive force that we're

8  talking about here, correct?

9      A      Yes.

10      Q      And the broken rib was on the posterior,

11  meaning the back, correct?

12      A      Yes.

13      Q      And the liver in the body essentially is

14  stacked below your heart, correct?

15      A      Yes, it is below the diaphragm, correct.

16      Q      Okay.  So, obviously you're the doctor, so

17  if I were to take a side section of me dissected from

18  my chin to my naval, you would see the heart, the

19  diaphragm and then the liver, correct?

20      A      Correct.

21      Q      And does the liver sit to any specific side

22  of your body, left side or the right side?

23      A      Well, the majority of it sits to your right

24  side, but there's a left lobe that goes to the left

25  side.

**APPENDIX** **1210**

1  **M. Sikirica - Cross Examination by Mr. Roberts**

2      Q     Now, you indicated that you had the

3  opportunity to observe the overall physical condition

4  of the child, correct?

5      A     Yes.

6      Q     And you would agree with me that there was

7  no significant -- well, withdrawn.

8            You would agree with me there was no bruises

9  on the child?

10     A     I would agree with you, yes.

11     Q     You would agree with me there were no

12  scrapes on the child?

13     A     Yes.

14     Q     You would agree with me there was no

15  bruising on her arms?

16     A     Correct.

17     Q     Her legs?

18     A     Correct.

19     Q     Or her abdomen, correct?

20     A     Correct.

21     Q     You also would agree with me that once you

22  performed the autopsy you were able to look at the

23  tissue, the underside of the tissue, we'll say?

24     A     Well, the organs.  I removed all of the

25  organs from the body cavity and look at each one

**Cheryl M. Moore, Senior Court Reporter**

# APPENDIX

**M. Sikirica - Cross Examination by Mr. Roberts**

1

2    individually, front and back.

3        Q    You would also agree with me when you

4    performed the autopsy, once you were inside the body,

5    you also didn't observe any bruising, correct?

6        A    I did on the back of the right chest wall.

7    I observed bruising on the back of the right chest

8    wall.

9        Q    That's where the ribs were fractured,

10   correct?

11       A    Yes.

12       Q    But you would agree with me that you -- you

13   said that you noticed -- that you had taken an x-ray,

14   correct?

15       A    I didn't personally take them.  I requested

16   that they be taken, yes.

17       Q    Okay.  And you would agree with me that on

18   those x-rays the fractures weren't visible, correct?

19       A    Correct.

20       Q    In fact, there was no fractures throughout

21   any of the rib structures at all, correct, other than

22   what you -- withdrawn.

23            Other than what your visual inspection

24   showed you, on the x-rays there was no other fractures,

25   correct?

| | | |
|---|---|---|
| 1 | **M. Sikirica - Redirect Examination by Ms. Chavkin** | |
| 2 | A | No other fractures. |
| 3 | Q | There was no evidence of old fractures, |
| 4 | correct? | |
| 5 | A | Correct. |
| 6 | Q | No evidence of healed fractures, correct? |
| 7 | A | Well, those would be old fractures, correct. |
| 8 | Q | There was no evidence of fractures in the |
| 9 | the hips, the legs, the arms? | |
| 10 | A | No fractures. |
| 11 | | MR. ROBERTS: I don't think I have |
| 12 | | anything further. |
| 13 | | Thank you, Doctor. |
| 14 | | THE WITNESS: You're welcome. |
| 15 | | THE COURT: Any redirect? |
| 16 | | MS. CHAVKIN: Yes, your Honor. |
| 17 | | *Redirect Examination by Ms. Chavkin* |
| 18 | Q | Doctor, you were asked if any opiates were |
| 19 | found in ████'s system and you said you couldn't | |
| 20 | recall. | |
| 21 | | MR. ROBERTS: Objection. I didn't ask |
| 22 | | that question, Judge. I asked about the use |
| 23 | | of Narcan. |
| 24 | | THE COURT: Okay. Well, I will -- |
| 25 | | MS. CHAVKIN: I will withdraw the |

**M. Sikirica - Redirect Examination by Ms. Chavkin**

2          question.

3               THE COURT:   Okay.

4     Q     Doctor, are you employed by the police?

5     A     No.

6     Q     Okay.  And have -- during the course of this

7  investigation, in the past year, have you met with the

8  Public Defender's Office?

9     A     Yes, I did.

10    Q     And have you even had a meeting with the

11 Public Defender's and the District Attorney's Office

12 together?

13    A     Yes.

14    Q     When you say -- when you're referring to

15 your reports from the lab and you say there were no

16 findings, what exactly does that mean?

17    A     Well, there were no significant findings, no

18 drugs of abuse in the toxicology screen, no significant

19 pharmaceuticals detected.  I can't recall off the top

20 of my head if there was anything given in the ER that

21 may have been detected.  If I could refer to the report

22 I would be happy to review it.

23    Q     You're now being shown what's been marked

24 People's Exhibit 22 for identification purposes.  Do

25 you recognize it?

| | |
|---|---|
| 1 | **M. Sikirica - Redirect Examination by Ms. Chavkin** |
| 2 | A    Yes.   22 is the copy of the autopsy on ▆▆▆ |
| 3 | ▆▆▆ that I brought with me today. |
| 4 | Q    I will ask you to look at your notes and let |
| 5 | me know if it refreshes your recollection. |
| 6 | MR. ROBERTS:   Judge, while that's |
| 7 | occurring can we approach? |
| 8 | THE COURT:   On-the-record or |
| 9 | off-the-record? |
| 10 | MR. ROBERTS:   On the record. |
| 11 | THE COURT:   Well, do you have an |
| 12 | objection to that question? |
| 13 | MR. ROBERTS:   I don't.   I have -- I |
| 14 | would like to approach. |
| 15 | THE COURT:   Okay.   You may approach. |
| 16 | (Whereupon, a sidebar conference was |
| 17 | held as follows:) |
| 18 | MR. ROBERTS:   Your Honor, the last |
| 19 | series of questions by the People indicated |
| 20 | that my client is represented by the Public |
| 21 | Defender's Office. |
| 22 | Obviously there's certain connotations |
| 23 | of having a defendant represented by the |
| 24 | Public Defender's Office.   It indicates that |
| 25 | he's indigent and is unable to afford his |

**M. Sikirica - Redirect Examination by Ms. Chavkin**

1

2          own attorney.

3               There may be a negative connotation to

4          it and I am concerned that my client, in

5          view of the fact we're here, there are two

6          attorneys representing my client, that he is

7          in a suit, that there is -- there may be a

8          belief by the jury that my client may be

9          prejudiced by the fact that he is

10         impoverished.

11              So I guess I would ask at this juncture

12         for a mistrial based upon information being

13         related to this jury that my client is a

14         poor individual.

15              THE COURT:  Okay.  First off, no timely

16         objection was made.  The objections that

17         you're making now are untimely and therefore

18         weren't made at a time when the Court, if it

19         deemed it appropriate, could have taken

20         corrective action.

21              So there's -- no timely objection has

22         been raised as is required.

23              Number two, even setting aside the

24         timeliness issue, the Court rejects the

25         Defendant's position as wholly speculative.

**Cheryl M. Moore, Senior Court Reporter**

# APPENDIX

**M. Sikirica - Redirect Examination by Ms. Chavkin**

1

2          I'm not sure what prejudice arises out of

3          somebody who is indigent and, therefore, has

4          counsel assigned to them.

5               I'm certainly not following your

6          argument he's prejudiced because he is

7          wearing a suit.

8               And to the extent that you're arguing

9          that because this jury knows that the

10         Defendant is represented by the Public

11         Defender's Office he has somehow been

12         prejudiced, the Court, again, rejects that

13         as wholly speculative.

14              I can't even follow a logic which would

15         indicate that that would be prejudicial, but

16         it is speculative.

17              Certainly nothing rises to the level of

18         having affected or prejudiced a substantial

19         right of the Defendant such that a mistrial

20         will be required.

21              So your objection is untimely and

22         without merit from the Court's perspective.

23              Now, with all that said, if you're

24         asking that the Court give the jury some

25         sort of cautionary instruction, I will be

**M. Sikirica - Redirect Examination by Ms. Chavkin**

2          happy to consider that, or if you don't want

3          a cautionary instruction, that's fine too.

4                What's your prerogative there?

5                MR. ROBERTS:  No, thank you, Judge.

6                Note my exception.

7                THE COURT:  Okay.  Thank you.

8                MR. ROBERTS:  Thank you.

9                THE COURT:  Sure.

10               (In open court.)

11               THE COURT:  Do you want the last

12         question read back?

13               MS. CHAVKIN:  Yes, please.

14               (Whereupon, the pending question was

15         read back in open court.)

16    A    Yes, it does.

17    Q    And what is your answer?

18    A    The only drug that was detected was

19    Atropine, and that's a common drug that's seen in

20    resuscitation, so that was given to her by the first

21    responders.

22    Q    So otherwise you would say she was a healthy

23    child?

24    A    Absolutely.

25               MS. CHAVKIN:  No further questions,

1    M. Sikirica - Recross Examination by Mr. Roberts

2              your Honor.

3                   THE COURT:  Mr. Roberts, any recross?

4                   MR. ROBERTS:  Yes, Judge.

5              *Recross Examination by Mr. Roberts*

6    Q      Doctor, the presence of Atropine was

7    indicated by a failed ratio, correct?  The lab work?

8    A      By a what?

9    Q      By a failed ratio.  That's how they

10   determine the presence of Atropine, correct?

11   A      I don't know how they determine the presence

12   of Atropine.

13   Q      Could you explain to me why there were other

14   failed ratios relative to opiate derivatives?

15   A      I don't know.

16   Q      You don't know?

17   A      Correct.

18   Q      Okay.  When you found out that there were

19   failed ratios based upon opiate derivatives, did you

20   contact the lab and speak with them about that, yes or

21   no?

22   A      First of all, I've never heard of this term

23   failed ratio until today.  I don't know what this is.

24   Q      Okay.  Would showing you a copy of page nine

25   of the summary report from the lab refresh your

**Cheryl M. Moore, Senior Court Reporter**

# APPENDIX 1219

**M. Sikirica - Recross Examination by Mr. Roberts**

1
2    recollection as to what a failed ratio is?

3        A    I've never seen that paper before.

4        Q    You never looked at the lab work-up?

5        A    I looked at the lab report.  I don't look at

6    the lab work-up.

7        Q    Okay.  So did you --

8        A    I'm not a toxicologist.

9        Q    So, fair to say after -- so you didn't

10   inquire about failed ratios for opiates, yes or no?

11       A    I've never heard the term before.

12       Q    Okay.

13       A    How could I inquire about it?

14       Q    You're familiar with the toxicology reports,

15   correct?

16       A    Correct.

17       Q    And those reports are based upon raw data,

18   correct?

19       A    Correct.

20       Q    So you looked at the face sheet of the

21   report but didn't examine the raw data, is that your

22   testimony?

23       A    That is my testimony.  I'm not a

24   toxicologist.

25                    MR. ROBERTS:  Thank you.

**Cheryl M. Moore, Senior Court Reporter**

# APPENDIX
**1220**

78

**People v. Michael Davis**

1

2          THE COURT:  Is that it, Mr. Roberts?

3          MR. ROBERTS:  One second, your Honor,

4      please.

5          THE COURT:  Okay.

6          (Whereupon, a brief moment was taken.)

7          (In open court.)

8          MR. ROBERTS:  Nothing further, thank

9      you.

10          THE COURT:  Okay.  Anything else from

11     the People?

12          MS. CHAVKIN:  No, your Honor.

13          THE COURT:  Okay.  Doctor, you may step

14     down.  Thank you.

15          THE WITNESS:  Thanks, Judge.

16          (Whereupon, the witness, Michael

17     Sikirica, was excused from the witness

18     stand.)

19          THE COURT:  All right.  Members of the

20     Jury, we'll take our mid-morning break at

21     this time.

22          During the course of this break please

23     don't discuss the case.

24          Don't read or listen to any media

25     accounts.

**Cheryl M. Moore, Senior Court Reporter**

# EXHIBIT "N"

SIKIRICA- INVESTIGATION- DAVIS, 9/29/15

1    having been duly sworn by The Foreperson of the

2    Grand Jury, was examined and testified as

3    follows:

4    EXAMINATION BY MS. HALL:

5         Q.    Good morning.  Would you state and

6    spell your name again for the record, please?

7         A.    Yes.  My name is Michael Sikirica,

8    S-I-K-I-R-I-C-A.

9         Q.    And, Dr. Sikirica, are you currently

10   employed?

11        A.    Yes.

12        Q.    And what is your employment?

13        A.    Well, I'm the medical examiner for

14   Rensselaer County, and I also have a private

15   business serving many other counties in the area.

16        Q.    And what is "medical examiner for

17   Rensselaer County" mean?  Can you describe that?

18        A.    Well, it's an appointed position.  I

19   was appointed by the director of the Health

20   Department.  I manage the death investigations in

21   this county, the medical/legal death

22   investigations, work with the police department.

23   We have four death scene investigators.  And I do

24   the autopsies that are required in this county.

SIKIRICA — INVESTIGATION — DAVIS, 9/29/15

1    Q    What are your -- well,  you said you

2    work in other counties with your  private business

3    as well?

4        A.    Yes.

5        Q.    Do you do those same responsibilities

6    in other counties?

7        A.    A little bit less.  Many counties in

8    New York State don't have medical examiners or --

9    they have a coroner system.  So they need someone

10    with the training to do the autopsies.  So I do

11    the autopsies for many counties.

12        Q.    And when you say "training", what is

13    your training?  What's your educational

14    background?

15        A.    Yes.  I graduated from med. school in

16    1989, State University of New York in Buffalo.  I

17    did a general pathology residency in Berkshire

18    Medical Center, Pittsfield, Massachusetts.  I did

19    a fellowship in forensic pathology in San

20    Antonio, Texas.  And a fellowship in

21    neuropathology at Brown University in Rhode

22    Island Hospital before I went to work.

23        Q.    And where did you first work, Doctor?

24        A.    I first began working as an assistant

**APPENDIX**

SIKIRICA ~ INVESTIGATION - DAVIS, 9/29/15

1  to the medical examiner for the State of Rhode

2  Island, and then I became the deputy chief for

3  the State of Rhode Island. And in 2001 I came

4  back to this area.

5       Q.    Doing the duties and responsibilities

6  you prescribed -- described previously?

7       A.    Yes.

8       Q.    Over the course of your career, how

9  many autopsies would you estimate that you've

10  performed?

11      A.    Well, I know I've done over ten

12  thousand.

13      Q.    And how many of those autopsies have

14  been on children or infants?

15      A.    It would have been at least several

16  hundred.

17      Q.    Do you hold any certificates?

18      A.    Yes.

19      Q.    And what would those be?

20      A.    I'm Board Certified in anatomic

21  pathology, clinical pathology, forensic pathology

22  and neuropathology.

23      Q.    And did there come a point in time

24  when you were asked to perform an autopsy on a

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15                    18

1    person by the name of ███████  ████████

2         A.    Yes.

3         Q.    And do you recall what date that was?

4         A.    I believe that was on the 27th of

5    February.

6         Q.    Of what year?

7         A.    This year.

8         Q.    2015?

9         A.    Yes.

10        Q.    Okay.  And do you recall ██████  ███████

11   date of birth?

12        A.    It was in July.  I'd have to look at a

13   copy of my record, if --

14        Q.    You have a copy of your report with

15   you, Doctor?

16        A.    Yes, I do.

17        Q.    And referring to that, will that help

18   refresh your recollection with respect to the

19   autopsy performed on ██████  ██████?

20        A.    Yes.

21        Q.    I'd ask you to refer to that.

22               (Whereupon, The Witness

23          complying with request.)

24        A.    Yes.  Her date of birth was ████  ████

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1   in 2012.

2   BY MS. HALL:   (Cont'g.)

3       Q.   At the time of -- when you performed

4   the autopsy on ██████ ██████  about how long had

5   she been deceased?

6       A.   She had been deceased about 20 hours

7   or so.

8       Q.   Do you know her time of death?

9       A.   It would have been around 2:00 in the

10  evening the day before.

11      Q.   February 26th of 2015?

12      A.   Yes.

13      Q.   And why were you asked to perform an

14  autopsy on ██████ ██████?

15      A.   Well, this was an unusual death in a

16  healthy 2-and-a-half to 3-year-old child, that we

17  didn't have a --we didn't have a reason for

18  ████  to be dead.  So, of course, she does need

19  an autopsy.

20      Q.   And what exactly is an autopsy?

21      A.   Well, an autopsy is an external

22  examination, combined with an internal

23  examination, and it also involves analysis of

24  other things that could be important.  Things

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1    like medical records, witness statements, police

2    reports, photographs, other kind of testing like

3    toxicology.  Other specific testing may be

4    X-rays, microbiology testing to see if a person

5    may have an infection.  So it's -- it's a

6    conglomeration of these modalities to determine

7    the cause and manner of death.

8         Q.    And in this particular case of █████

9    █████ can you describe the procedure that you

10   used with respect to the autopsy?

11        A.    Yes.  In -- in █████'s case, she came

12   to us in a -- in a body pouch.  It was locked up

13   from the hospital where she was pronounced.  We

14   open the pouch, we took some photographs.  We

15   took measurements of her body.  We look for any

16   evidence of trauma.  In her case, we also did a

17   sexual assault kit.  We arranged to have X-rays

18   taken.  X-rays were done in the morgue.  We

19   measured her height and her weight.  Just

20   recorded her general features.  And then we went

21   ahead and we did the internal examination.

22        Q.    Okay.  And with respect to the

23   external examination -- well, let me take a step

24   back.  Who was present doing this autopsy?  Do

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1    you know?

2        A.    The representatives from Troy P.D.

3    were present, including Troy -- Tim Colaneri,

4    Detective Fountain.  And there was another

5    detective, if I could refer here (indicating).

6                (Whereupon, The Witness

7        examining said document.)

8        A.    It was Charles McDonald.  And there

9    was also the Assistant District Attorney, at the

10   time was Andra Ackerman.

11   BY MS. HALL:  (Cont'g.)

12       Q.    And what is the purpose for Troy

13   Police being present for the autopsy?

14       A.    Well an autopsy can't occur in a

15   vacuum, so we have to have some information of

16   what the police or other people may know about

17   the case.  So they are there to feed me

18   information, I'm there to ask them questions.

19   It's a give and take situation.  And they're also

20   there to take photographs and to collect any

21   evidence that might need to be secured.

22       Q.    And did that occur in ████'s case?

23       A.    Yes.

24       Q.    And you then testified that you were

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1    doing observations of her external body?

2         A.    Yes.

3         Q.    What, if any, findings did you find or

4    meet --

5         A.    There is just a very slight lifting

6    of the -- of the toenail along the right great

7    toe.  So that was the extent of it.  It -- there

8    was no trauma -- no significant trauma.

9         Q.    Any bruising noted at all?

10        A.    No.

11        Q.    And then from that point did you begin

12   an internal examination?

13        A.    Yes, we did.

14        Q.    Could you describe that for the Grand

15   Jury, please?

16        A.    Well, the internal examination starts

17   with a "Y" shaped incision that goes down, cross

18   the chest and abdomen.  And then we also, later

19   on, do an incision of the scalp and remove the

20   brain.

21             But the remarkable thing, as doing the

22   "Y" shaped incision, as we cut into the abdominal

23   cavity, there was a large amount of blood that

24   started to ooze from the abdominal cavity.

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1    Q.    And is it normal to have blood -- is

2    that a finding you would normally see in the

3    abdomen cavity?

4    A.    No.

5    Q.    Okay.  And why not?

6    A.    Well, the -- there's no blood

7    circulating in the abdominal cavity.  Your

8    intestines are there, your liver or your spleen.

9    So you don't have free blood in the abdominal

10   cavity.

11   Q.    So it's not something you would see in

12   a normal child --

13   A.    No.

14   Q.    -- a healthy child?

15   A.    No.

16   Q.    Were you able to quantify or qualify

17   or measure that amount of blood in there?

18   A.    Yes, I was.

19   Q.    And what, if you recall, was the

20   measurement?

21   A.    We had about 350 M.L.s of liquid

22   blood, plus a small amount of blood clot, totally

23   and probably about 400 M.L.s.

24   Q.    And based on -- with respect to a

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1  child of ▓▓▓'s age, height and weight, that you

2  described taking earlier, how many blood is in

3  her body overall?  Or how much blood -- how much

4  blood flow -- for her age and size, how much

5  blood was in that abdominal cavity overall?

6  Meaning, compared to what her norm -- amount of

7  blood in her entire body is?  Do you follow that

8  question?

9       A.    Yes, I think so.

10              (Laughter.)

11       A.    The -- the blood volume on a child of

12  -- of ▓▓▓'s age would be somewhere between 800

13  and 1,000 milliliters.  So there was about 40

14  percent of her blood volume that had leaked into

15  her abdominal cavity.

16              And once it gets into the abdominal

17  cavity it's out of circulation.  So it's not

18  pumped anywhere, it's just internal bleeding.

19  BY MS. HALL:  (Cont'g.)

20       Q.    Can't go through the heart and to the

21  extremities or anywhere else?

22       A.    No.

23       Q.    Okay.  Were you able to determine, at

24  some point, where that came from?

**APPENDIX**     **1232**

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1      A.      Yes.

2      Q.      Would you describe that for the Grand

3  Jury, please?

4      A.      Well, it was fairly obvious that there

5  were very severe lacerations of the liver.  There

6  were lacerations to the effect that a large

7  portion of liver had actually been torn away.

8           And the liver is -- is an organ that

9  we describe as friable.  And -- and that means,

10  it doesn't have a thick capsule around it, it's

11  kind of crumbly.

12           So when blunt force trauma is applied

13  to the abdomen, we can see damage to the liver,

14  and the liver tears.  It lacerates.  Because

15  the -- it's a crumbly organ, with only a very

16  thin capsule around it.  It -- it's -- it's like

17  no other organ, really, in the body, in that

18  effect, that it is very friable.

19      Q.      And the encapsulation around the

20  liver, was that intact?

21      A.      No.  That was torn.

22           (Whereupon, Grand Jury            MK

23     Exhibits Number 2, 3 and 4 were

24     marked for identification.)

26

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1  BY MS. HALL:   (Cont'g.)

2      Q.    Doctor, I'm going to show you what's

3  been premarked as Grand Juror's Exhibit 2, 3 and

4  4 for identification.

5               I'm going to ask that you take a look

6  at those.  And if you would, tell me what is it

7  you're looking at here?

8                    (Whereupon, The Witness

9        complying with request.)

10     A.    Number -- Number 4 is a laceration on

11 the top surface of the liver.  Number 3 is a

12 closeup of a severe laceration to the top of the

13 liver.  And Number 4 is an additional picture,

14 pretty much the same -- excuse me.  Number -- it

15 would be Number -- looks like Number 4.

16 BY MS. HALL:   (Cont'g.)

17     Q.    And do those pictures fairly and

18 accurately depict ████  █████ liver?

19     A.    Yes.  This shows one of the

20 lacerations, it doesn't show them all.

21     Q.    But it -- just -- which laceration

22 does that show?

23     A.    This shows the one on the top, right

24 portion of the liver.

JOAN L. BURLEIGH (518) 767-3030

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1    Q.    Other than the exhibit stickers, has

2    that been changed or altered in any way from when

3    you viewed it at the time of the autopsy?

4         A.    No.

5              MS. HALL:    At this time

6         I'm going to ask that Grand Juror's

7         2, 3 and 4 be moved into evidence.

8              (Whereupon, Grand Jury         RCD

9         Exhibits Number 2, 3 and 4 were

10        received into evidence.)

11             MS. HALL:    I'm going to

12        leave up on the table for any of the

13        grand jurors who wish to review

14        those during their deliberation.

15   BY MS. HALL:   (Cont'g.)

16        Q.    Doctor, with respect to the injury,

17   what else did you observe during your internal

18   examination?

19        A.    There was evidence of fracturing of

20   two ribs along the back of the lower right chest.

21   Those ribs were number 9 and 10.

22        Q.    And are those ribs located in the area

23   of the heart?

24        A.    No.

Case 1:17-cv-01290-DJS Document 94-1 Filed 02/04/22 Page 15 of 29

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1    Q    Are those ribs located in the area of

2  the liver?

3    A.    Yes.

4    Q.    Okay.  Can you describe the ribs of a

5  2-year-old child, or a 2-and-a-half, 3-year-old

6  child?

7    A.    Well, at -- at that age of about

8  2-and-a-half or 3, they're very flexible yet.

9  They -- they're not calcified yet.  It's very

10  hard to detect a fracture by X-ray.

11    When we took the X-rays we did not see

12  a fracture, but it was quite obvious, when you

13  got in there, that the ribs were broken.  And

14  when the ribs broke, they torn some small blood

15  vessels in the area and there was actually

16  hemorrhage around the fracture site.

17    Q.    And you mentioned taking X-rays.  You

18  took X-rays with -- of          ?

19    A.    Yes.

20    Q.    And did they show anything?

21    A.    No.  No.

22    Q.    In addition to your internal

23  examination, with the injury to the liver and to

24  the ribs, did you make any other observations

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1    with respect to internal injury?

2        A.    There was no other internal injury.

3        Q.    Could the ribs, broken ribs, you said

4    they're in the area of the liver, is that

5    correct?

6        A.    They're behind the liver --

7        Q.    They're behind?  Could those ribs,

8    broken ribs, have caused damage to the liver?

9        A.    No.

10       Q.    In addition to doing the internal and

11   external examination of ████ ████ what other

12   tests did you run, if any?

13       A.    Well, we did a full toxicology screen

14   on -- on ████.  We draw -- we drew fluids for

15   toxicology testing.  Those were drugs of abuse

16   and any kind of pharmaceutical drugs.  That only

17   showed the presence of atropine, which is a

18   substance they would use in the emergency room to

19   try and revive her.

20            Oh.  I did cultures from her blood and

21   her lungs.  These are a small piece of tissue

22   that are taken to see if anything grows, any

23   bacteria or virus will grow, that she may have an

24   infection.  That was negative.

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1          I also took multiple -- I took 25

2     sections of various internal organs for

3     microscopic examination, and they didn't really

4     show any significance.

5          And I sent a dried blood sample out

6     for what we call a metabolic screening analysis.

7     These are -- this is a screening that's done

8     typically at birth in the hospital.  This is New

9     York State mandated law, that if you're born in

10    the hospital, a couple of drops of blood are

11    taken, then they're sent to the Health Department

12    Laboratory.  This detects undiag -- sort of

13    inborn errors of metabolism.  Things that could

14    lead to retardation and things that you may not

15    see initially on -- on a baby.

16         So I sent a sample of that out.  I did

17    detect -- they did detect a slightly elevated

18    thyroid stimulating hormone, but that can also be

19    elevated postmortem.  And it wasn't a significant

20    elevation.

21         So, really, the test showed no

22    evidence of any significant natural disease.

23    Q.    Out of any of the tests that you've

24    just described?

Case 1:17-cv-08290-DLC  Document 147-37  Filed 02/04/22  Page 18 of 29

SIKIRICA – INVESTIGATION – DAVIS, 9/29/15

1       A       Correct.

2       Q       If ███████████ was ill or sick in some

3   respect, or diseased in some represent prior to

4   death, would that have been revealed in some

5   capacity or some form based on the test that you

6   ran?

7       A.      Yeah.  To a medical -- a reasonable

8   degree of medical certainty, there was no

9   evidence of any sickness or illness.

10      Q.      So with respect to the toxicology, did

11  that give you any information with respect to the

12  cause of death?

13      A.      No.

14      Q.      With respect to the slides and the

15  sections you talked about, did that give you any

16  indication or help you contribute to the cause of

17  death?

18      A.      No.

19      Q.      And with respect to the microbiology

20  cultures and met -- or the metabolic screening,

21  did either of them give you any information to

22  help determine the cause of death?

23      A.      No.  They were -- they were all

24  negative.  And, I guess, a negative finding by

SIKIRICA – INVESTIGATION – DAVIS, 9/29/15

1    itself is significant to determine the cause of

2    death.

3         Q    And why is that?

4         A    Well, because we ruled out any natural

5    cause of death.  And this massive amount of blood

6    in the abdomen cavity would lead to shock and

7    death.

8         Q.   And about how much time would it take

9    after the initial injury to loss of

10   consciousness?

11        A.   Probably within ten minutes.

12        Q.   And how much time would it take from

13   the initial injury to death?

14        A.   Within about 15 minutes or so.

15        Q.   And in this particular case, Doctor,

16   were you able to ascertain to a reasonable degree

17   of medical certainty what caused the death of

18   ██████ ████?

19        A.   Yes.

20        Q.   And, if you would, describe what

21   caused her death to the Grand Jury.

22        A.   It would be hypovolemic shock due to

23   large hemoperitoneum, due to multiple lacerations

24   of the liver, with right rib fractures due to

SIKIRICA – INVESTIGATION – DAVIS, 9/29/15

1    blunt force trauma.

2          Q    And in English?

3                    (Laughter.)

4          A.    A large amount of internal bleeding

5    into the abdominal cavity due to the severe

6    lacerations of the liver, the tearing injury of

7    the liver, and also a presence of the right rib

8    fractures.

9          Q.    And that's the cause of death,

10    correct?

11          A.    Yes.

12          Q.    And were you able to make a

13    determination with respect to the manner of

14    death?

15          A.    Yes.

16          Q.    And what was that?

17          A.    The manner in this case is homicide.

18          Q.    And what exactly does "homicide" mean?

19          A.    Simply means death at the hands of

20    another individual.

21          Q.    Could this trauma to ████'s interior

22    organs have been caused by some sort of accident?

23          A.    No.

24          Q.    Could she have caused these injuries

34

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1  to her --

2      A.    Well, I -- I -- if I could qualify

3  myself.  It could be something like a car

4  accident.

5      Q.    Have you seen those types of

6  injuries --

7      A.    Yes.

8      Q.    -- previously?

9      A.    Yes.  I've seen those in car accidents

10  and severe trauma like that, but nothing that

11  ████ would have done to herself.

12      Q.    And with respect to the type of injury

13  you observed internally on ████, could that have

14  been as a result of C.P.R.?

15      A.    No.

16      Q.    With respect to the amount of pain,

17  would ████ -- ████ ████ have experienced pain

18  as a result of her injuries?

19      A.    Yes.

20      Q.    Could you describe that for the grand

21  jurors, please.

22      A.    Well, she had broken two ribs.  And

23  rib fractures can be very painful.  The liver

24  laceration, the liver doesn't have much in the

35

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1  way of a nervous innervation, but the ribs surely

2  do. So she would have been in pain from the rib

3  fractures.

4      Q.    Would you have expected her -- outward

5  signs of pain or seen outward signs of pain?

6      A.    Yes.

7      Q    And describe what you would expect to

8  see with those types of injuries.

9      A.    She would have been crying and she

10  would have had a tender spot along the back of

11  her right skin and soft tissue.

12     Q.    Would these injuries have caused her

13  to suffer?

14     A.    Yes.

15     Q.    As a result of the autopsy you

16  performed on February 27th of 2015 of ▇▇▇▇

17  ▇▇▇▇ did you fill out your portion of a Death

18  Certificate __

19     A.    Yes.

20     Q.    -- with respect to your findings?

21     A.    Yes.

22     Q.    I'm going to show you what's marked as

23  Grand Juror's 1, and just ask that you take a

24  look at your portion there.

36

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

 1                    (Whereupon, The Witness
 2          complying with report.)
 3          A.    Yes.
 4    BY MS. HALL:   (Cont'g.)
 5          Q.    And does that accurately reflect your
 6    finding?
 7          A.    Yes.
 8          Q.    Okay.
 9                    MS. HALL:   At this time
10          I'm going to ask that Grand Juror's
11          Exhibit 1 be moved in pursuant to
12          C.P.L.R. 4518 under business record.
13                    (Whereupon, Grand Jury          RCD
14          Exhibit Number 1 was received into
15          evidence.)
16                    MS. HALL:   I'm also going
17          to leave that on the table for any
18          of the grand jurors who wish to view
19          this document as part of their
20           deliberation.
21    BY MS. HALL:   (Cont'g.)
22          Q.    And, lastly, Doctor, is there anything
23    with respect to the pathology, as well as your
24    internal or external examination, that would

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1   account for why ████ ████ would have lost

2   consciousness?

3       A.   She lost consciousness because of the

4   bleeding into her abdominal cavity.  That's why

5   she lost her consciousness.

6       Q.   With respect to the pathology, the

7   toxicology and all the studies, aside from the

8   injury, is there anything else that would have

9   rendered her unconscious?

10      A.   No.

11      Q.   There's no explanation other than the

12  injury that would cause her to become unconscious

13  on February 26th of 2015?

14      A.   Correct.

15              MS. HALL:  I don't have

16          any further questions for this

17          witness.

18              Does anyone else have any

19          questions for this witness from the

20          Grand Jury?

21              Yes, ma'am.  I'd ask that

22          you direct it to me and --

23              GRAND JUROR:  Yes.  I just

24          heard, is it unusual to have no

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1          outer signs when there's an injury

2          to a rib or a fracture?

3                  You said there was no

4          outer signs, you know, that there

5          was an injury.  Is that --

6                  MS. HALL:  Doctor, I'll

7          ask that you -- do you ask -- answer

8          that question from grand juror.

9                  THE WITNESS:  Yes.  It's

10         not unusual.  This -- this injury

11         occurred due to compression of the

12         abdominal cavity, blunt force

13         compressive injury to the abdominal

14         cavity, leading to a lot of blood

15         into the abdominal cavity

16         (demonstrating.)  But it's not

17         necessarily going to bruise anything

18         because it's a soft part of the

19         body.  So you're not going to push

20         the skin or the soft tissue against

21         a bone or something where you're

22         going to really compress it.  It's

23         flexible, it's going to squeeze in.

24         And as it squeezes in, as the

SIKIRICA - INVESTIGATION ~ DAVIS, 9/29/15

1          abdomen squeezes in it tears the

2           liver.  It doesn't necessarily leave

3          any marks on the outside.

4    BY MS. HALL:  (Cont'g.)

5          Q.  And when you say "blunt force trauma,"

6    and you're indicating with your hand, as part of

7    your determination to the manner and cause of

8    death, could you describe for the Grand Jury the

9    mechanism that would have caused this injury?

10        A.   It would be a blunt force trauma of a

11   compressive nature, a squeezing nature to the

12   abdomen.

13                    MS. HALL:  Any further

14        questions from the Grand Jury?

15                    THE FOREPERSON:  What was

16        the result from her metabolic

17        screening?

18                    MS. HALL:  Doctor, if you

19        could, please.

20                    THE WITNESS:  Yes.  It

21        just showed a mildly elevated

22        thyroid stimulating hormone.  But

23        that's a -- could be easily

24        explained as a heart attack because

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1          that hormone elevates after death.

2          And it was only elevated a small

3          amount, and it would not have played

4          into her medical -- any medical

5          conditions or anything.

6     BY MS. HALL:  (Cont'g.)

7          Q.   Would it have caused her to lose

8     consciousness --

9          A.   No.

10         Q.   -- in any respect?

11         A.   No.

12              MS. HALL:  Any other

13         questions from Grand Jury?

14              THE FOREPERSON:  If I

15         could finish.  From -- at postpartum

16         (sic), that's performed after

17         metabolic screening in all of your

18         autopsies?

19              THE WITNESS:  I'm...

20              MS. HALL:  Let me -- I'll

21         direct the question.

22    BY MS. HALL:  (Cont'g.)

23         Q.   Doctor, with respect to the organ

24    sectioning, the metabolic screening, the

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

41

1   pathology that was run, this was all done

2   postmortem, correct?

3       A.    Yes.  Everything was done postmortem,

4   and everything was pended at the time.  On the

5   death certificate you'll see that the "pending"

6   is crossed out.  I didn't make the determination

7   of the cause of death until all the results came

8   back.  But that is -- these are typically all

9   tests that were done postmortem.

10         Now the metabolic screening is the

11   same type of test that's done on a newborn,

12   healthy child.  But I did it on ████ because I

13   didn't have much information about where ████

14   was born.  Occasionally children are born outside

15   of the hospital, things could be missed.  So we

16   decided to go ahead and do the -- the screening

17   tests.

18           MS. HALL:  Grand juror in

19       the back.

20           GRAND JUROR:  Yeah.  With

21       regard to the ribs being broken,

22       could they have been broken like a

23       couple of weeks before that?  Or is

24       this something that happened right

SIKIRICA – INVESTIGATION –   DAVIS, 9/29/15                    42

1          about the time of the death?

2                  MS. HALL:  Doctor, if you

3          could answer that question --

4                  THE WITNESS:  Yes.  These

5          were very fresh hemorrhages.  There

6          was no healing, there was no

7          discoloration of the blood around

8          them.  They occurred around the time

9          of the lacerations to the liver.

10                 MS. HALL:  Any other

11         questions from the grand jurors?

12                 (Whereupon, the Grand Jury

13         indicates in the negative.)

14                 MS. HALL:  I have no

15         further questions of The Witness.

16                 THE WITNESS:  Thank you.

17                 MS. HALL:  Thank you very

18         much, Doctor.

19                 (Whereupon, The Witness

20         was excused.)

21                 (Off the record.)

22                 (Whereupon, the People's

23         next witness entered the grand jury

24         room.)

# EXHIBIT "O"

**APPENDIX**

STATE OF NEW YORK
COUNTY COURT

COUNTY OF RENSSELAER

THE PEOPLE OF THE STATE OF NEW YORK

INDICTMENT NO.: 15-1094

-against-

**MICHAEL DAVIS** (DOB ████ /86),
                                    Defendant.

**COUNT ONE**

The Grand Jury of the County of Rensselaer and State of New York, by this Indictment, hereby accuses the above-named defendant of the crime of **MANSLAUGHTER IN THE FIRST DEGREE**, a class B felony, in violation of section 125.20, subdivision 4, of the Penal Law of the State of New York, committed as follows:

The defendant, on or about the 26th day of February, 2015, at ████████████ in the City of Troy, County of Rensselaer and State of New York, being eighteen years old or more and with intent to cause physical injury to a person less than eleven years old, the defendant recklessly engaged in conduct which created a grave risk of serious physical injury to such person and thereby caused the death of such person, **to wit:** at the aforementioned date and place, the defendant, being eighteen years old or more and with intent to cause physical injury to a person whose identity is known to the Grand Jury and having a date of birth of ██████ 2012, the defendant recklessly engaged in conduct which created a grave risk of serious physical injury to a person whose identity is known to the Grand Jury and having a date of birth of ██████, 2012 and thereby caused the death of a person whose identity is known to the Grand Jury and having a date of birth of ██████, 2012.

**99690992**
**SERIAL NUMBER**

**COUNT TWO**

The Grand Jury of the County of Rensselaer and State of New York, by this Indictment, hereby accuses the above-named defendant of the crime of **MANSLAUGHTER IN THE SECOND DEGREE,** a class C felony, in violation of Section 125.15, subdivision 1, of the Penal Law of the State of New York, committed as follows:

The defendant, on or about the 26th day of February, 2015, at ███████, in the City of Troy, County of Rensselaer and State of New York, recklessly caused the death of another person, **to wit**: at the aforementioned date and place, the defendant, recklessly caused the death of a person whose identity is known to the Grand Jury and having a date of birth of ████, 2012.

**COUNT THREE**

The Grand Jury of the County of Rensselaer and State of New York, by this Indictment, hereby accuses the above-named defendant of the crime of **ENDANGERING THE WELFARE OF A CHILD,** a class A misdemeanor, in violation of section 260.10, subdivision 1, of the Penal Law of the State of New York, committed as follows:

The defendant, on or about the 26th day of February 26, 2015, at ███████ in the City of Troy, County of Rensselaer and State of New York, did knowingly act in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old or directed or authorized such child to engage in an occupation involving substantial risk of danger to his life or health, **to wit**: on the aforementioned date and location the defendant did knowingly act in a manner likely to be injurious to the physical, mental or moral welfare of a person whose identity is known to the Grand Jury and having a date of birth of ████, 2012.

Dated: Troy, New York
     October 2, 2015

JOEL E. ABELOVE
Rensselaer County District Attorney

Denise Landy
Grand Jury Foreperson

P000033