# 23-589

IN THE

# United States Court of Appeals
# for the Second Circuit

MICHAEL DAVIS-GUIDER,

*Plaintiff-Counter-Defendant-Appellant,*

— v. —

CITY OF TROY, RONALD FOUNTAIN, INDIVIDUALLY,
DANIELLE COONRADT, INDIVIDUALLY,
CHARLES MCDONALD, INDIVIDUALLY,
TIM COLANERI, INDIVIDUALLY,
*Defendants-Cross-Claimants-Counter-Claimants-Appellees,*

RENSSELAER COUNTY,
MICHAEL SIKIRICA, INDIVIDUALLY,
*Defendants-Cross-Defendants-Counter-Claimants-Appellees,*

ADAM R. MASON, INDIVIDUALLY
*Defendant-Cross-Claimant-Counter-Claimant,*

JOEL ABELOVE, INDIVIDUALLY,
*Defendant-Cross-Defendant-Counter-Claimant,*

JOHN AND JANE DOES 1-10, INDIVIDUALLY,
MICHAEL E. PARROW, ANDRA ACKERMAN,
*Defendants.*

On Appeal from the United States District Court
for the Northern District of New York
Case No. 1:17-cv-1290 (FJS/DJS)

## APPENDIX VOLUME 7 OF 11

## APPENDIX VOLUME 7 TABLE OF CONTENTS

ECF 116-1: Ronald Fountain Affidavit with Exhibit "A",
Exhibit "B", Exhibit "C", and Exhibit "D" .................................. 1254

ECF 116-2: Danielle Coonradt Affidavit with Exhibit "A"
and Exhibit "B" ............................................................................ 1272

ECF 116-3: Jamshid Holehan Affidavit with Exhibit "A",
Exhibit "B", Exhibit "C", Exhibit "D", Exhibit "E", Exhibit "F",
Exhibit "G", Exhibit "H", Exhibit "I", and Exhibit "J" ............... 1283

ECF 116-4: Adam R. Mason Affidavit ....................................... 1310

ECF 116-5: Tim Colaneri Affidavit............................................. 1314

ECF 116-6: Charles McDonald Affidavit.................................... 1319

ECF 116-7: Rhiannon I. Spencer Attorney Declaration with
Exhibit "A", Exhibit "B", and Exhibit "C" ................................. 1325

ECF 116-8: City Defendants' Statement of Material Facts ...... 1443

ECF 121: Plaintiff's Response to the County Defendants'
Statement of Material Facts ....................................................... 1452

ECF 121-1: Plaintiff's Local Rule 56.1 Counter Statement ...... 1467

ECF 122: Plaintiff's Response to the City Defendants'
Statement of Material Facts ....................................................... 1485

ECF 122-1: Plaintiff's Local Rule 56.1 Counter Statement ...... 1492

ECF 123: Declaration of Brett H. Klein .................................... 1510

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MICHAEL DAVIS-GUIDER,

                                    Plaintiff,            **RONALD FOUNTAIN**
                                                          **AFFIDAVIT**
                        -against-                         Case No.:  1:17-cv-1290
                                                          (FJS/DJS)

CITY OF TROY, RONALD FOUNTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES
MCDONALD, Individually, TIM COLANERI, Individually,
ADAM R. MASON, Individually, RENSSELAER COUNTY,
MICHAEL SIKIRICA, Individually, and
JOEL ABELOVE, Individually,

                                    Defendants.

STATE OF NEW YORK            )
                             )ss.:
COUNTY OF RENSSELAER         )

       **RONALD FOUNTAIN**, being duly sworn deposes and says:

       1.     I am a defendant in the above-captioned matter and as such I am fully familiar with

the facts and circumstances herein. I make this Affidavit in support of my motion for summary

judgment as well as all City Defendants' motion for summary judgment.

       2.     In February 2015, I was employed by the Troy Police Department ("TPD") as a

patrolman assigned to the Detective Bureau, commonly referred to as a Detective-Sergeant.

       3.     I was on duty on February 26, 2015, when I received a directive from my supervisor

to report to an address for a juvenile cardiac arrest.

       4.     I responded to the scene with co-Defendant, Charles McDonald ("McDonald").

       5.     When I arrived on scene, V.D. was already in transport to the hospital and I

observed the Plaintiff standing outside with his girlfriend, Rebecca Parker who I learned was the

1

biological mother of V.D.

6.  I asked the Plaintiff and Ms. Parker if they would accompany us to TPD central station to provide additional information which both individuals voluntarily agreed to do.

7.  McDonald and I gave the Plaintiff a ride in an unmarked police car and Ms. Parker was provided a ride by Officer Rasmussen.

8.  At that point, we had no knowledge of V.D.'s status or what had happened.

9.  The Plaintiff was brought into McDonald's Office and Ms. Parker was brought to a different office.

10.  About the time we arrived at the police station, I was informed that V.D. had died.

11.  I then responded to the hospital where V.D. had been taken.

12.  The Plaintiff remained at the police station with McDonald.

13.  At the hospital, I was informed that V.D. had died under unknown circumstances.

14.  Co-Defendant Tim Colaneri ("Colaneri") and I returned to the police station where the Plaintiff was still waiting with McDonald.

15.  We asked the Plaintiff some questions regarding V.D.'s health and activities during the days and hours leading up to the Plaintiff finding her unresponsive.

16.  We asked the Plaintiff if he would consent to TPD searching his home, and he signed a TPD form document granting us permission. (Holehan Exhibit "B").

17.  I also applied for a search warrant which was granted.

18.  The Plaintiff remained at the police station, and I reported to his residence to execute the search warrant.

19.  After the search warrant was executed upon, the Plaintiff left the police station.

2

20.     To the best of my recollection, I spoke with the assigned Child Protective Service ("CPS") worker on the matter.

21.     To the best of my recollection, V.D.'s biological father was also informed that V.D. had passed.

22.     At that time, we had no idea what had happened to V.D. or what could have caused her sudden death.

23.     The following day, February 27, 2015, I attended V.D.'s autopsy that was conducted by co-Defendant Dr. Sikirica along with McDonald, Colaneri, TPD Evidence Technician Officer Buttofucco and Rensselaer County Assistant District Attorney Andra Ackerman.

24.     I have attended other autopsies conducted by Dr. Sikirica.

25.     It is not uncommon for the police or a member of the District Attorney's Office to attend an autopsy especially when a seemingly healthy child has died of unknown or suspicious circumstances.

26.     Based upon my training and experience, an investigator would attend an autopsy to obtain a preliminary understanding of the nature of the victim's injuries to further the investigation in the matter.

27.     Based upon my training and experience, an evidence technician would attend an autopsy to collect relevant evidence in order to maintain the chain of custody.

28.     During V.D.'s autopsy on February 27, 2015, I recall that Dr. Sikirica explained his preliminary medical observations which was that V.D. had broken ribs and a lacerated liver.

29.     I believe that during V.D.'s autopsy, Dr. Sikirica explained that such injuries were

3

very extensive and unlike anything that would be expected if her death was accidental.

30.     During V.D.'s autopsy, I never told or directed Dr. Sikirica how to perform his autopsy or what his results should be.

31.     Nor did I observe any other individual then present engage in such alleged conduct.

32.     We were all in attendance to try and understand how a seemingly healthy infant was suddenly found unresponsive and subsequently died.

33.     Based upon Dr. Sikirica's preliminary medical observations, it appeared that V.D.'s death was suspicious and required further investigation while Dr. Sikirica conducted additional medical testing.

34.     After the autopsy was completed, on February 27, 2015, McDonald and I went to the Plaintiff's house and spoke with him briefly.

35.     We asked the Plaintiff if he would agree to going to the police station for a follow-up interview.

36.     The Plaintiff agreed to an interview and went to the police station on March 2, 2015 for said interview.

37.     On or about March 1, 2015, I completed a TDP form document referred to as an Investigation Report which documented McDonald's and my actions in the investigation during the days leading up to the March 2, 2015 interview. (A true and accurate copy of said form document is attached hereto as Exhibit "A").

38.     On March 2, 2015, I interviewed the Plaintiff at the police station and said interview was recorded.

39.     The Plaintiff was read his rights and he voluntarily signed a Miranda waiver. (A

4

copy of the Plaintiff's Miranda Waiver is attached hereto as Exhibit "B").

40. During the interview, I asked the Plaintiff questions regarding his care of V.D.

41. In relevant part, the Plaintiff explained that he was the only individual, aside from Ms. Parker, who had been with V.D. during the days leading up to her death and that he was a primary caregiver for V.D. while Ms. Parker worked.

42. In relevant part, the Plaintiff explained that the week or two prior to V.D.'s death, she had been sick with cold symptoms.

43. In relevant part, the Plaintiff stated in sum and substance, that on the morning of February 26, 2015, V.D. had woken up around 8:00-8:30 a.m. and he had changed her diaper and gave her a bottle to go lay back down.

44. In relevant part, the Plaintiff stated he put a movie on and fell back to sleep himself.

45. In relevant part, the Plaintiff stated that he woke up and called out to get V.D.'s attention but she did not respond.

46. In relevant part, the Plaintiff stated that he then went into V.D's room and found her unresponsive in the bed and attempted to perform CPR.

47. In relevant part, the Plaintiff stated that CPR did not do anything, and he then brought her out to the living room and placed her on the futon and briefly attempted CPR again.

48. In relevant part, the Plaintiff stated that he tried to call 911 from the home but he did not have a working phone, so he ran outside to try and knock on the door of his neighbors, but nobody answered.

49. In relevant part, the Plaintiff stated he ran into Testo's Restaurant and borrowed an employee's phone to call 911.

5

50.     In relevant part, the Plaintiff stated that for over 20 minutes the 911 operator kept asking him questions and he eventually hung up on the operator and ran back to V.D.

51.     In relevant part, the Plaintiff stated that as he ran back to the house, Ms. Parker had arrived home from work and the Plaintiff told her to call 911.

52.     Shortly thereafter, the paramedics arrived and began working on V.D. while he stayed outside.

53.     I asked the Plaintiff to demonstrate on a doll how he performed CPR on V.D. which he did.

54.     Shortly thereafter, the interview concluded and the Plaintiff left the police station.

55.     To the best of my recollection, I provided a copy of the interview of the Plaintiff to Dr. Sikirica.

56.     During said March 2, 2015, the Plaintiff gave me the cell phone he had attempted to use to call 911 after he found the Plaintiff unresponsive.

57.     I maintained said cell phone in the case file for further investigation at some later time.

58.     Through the investigation, witness statements were also obtained from Ms. Parker, Mr. Brown who had driven Ms. Parker home from work on February 26, 2015, various responding paramedics and the emergency room doctor. (Statements attached to Holehan Affidavit).

59.     In Ms. Parker's March 2, 2015 statement, she confirmed that she left for work on February 26, 2015, around 8:00 a.m. and had seen V.D. in the hallway before she left. (*See* Exhibit "D" to Holehan Affidavit).

60.     Ms. Parker stated that she worked until approximately 1:00 p.m. and then received

6

a ride home from her friend Russell Brown.

61.    Ms. Parker stated that she arrived home at 1:23 p.m. and the Plaintiff was running from across the street telling her to call 911. (*See* Exhibit "D" to Holehan Affidavit).

62.    Through a search warrant, we obtained the register information from Ms. Parker's employer, and we confirmed that Ms. Parker was at work during the time she stated.

63.    During that time, I had spoken with other individuals in furtherance of the investigation including V.D.'s biological father and the mother of the Plaintiff's child.

64.    At that point in the investigation, we had obtained background information including criminal history and other CPS complaints regarding all relevant individuals involved.

65.    On March 12, 2015, I attended a meeting with Dr. Sikirica, Detective-Sergeant Parrow, Colaneri, co-Defendant Adam Mason ("Mason"), and Rensselaer County District Attorney Andra Ackerman.

66.    During said meeting, Dr. Sikirica further explained his preliminary medical findings.

67.    At that point, I believe Dr. Sikirica had stated that he found no basis for V.D. to have been found unresponsive and that the death was suspicious.

68.    In or about late August 2015, Dr. Sikirica provided his final autopsy report.

69.    Dr. Sikirica ruled V.D.'s death a homicide.

70.    On September 9, 2015, I interviewed the Plaintiff again.

71.    The Plaintiff was read his rights and voluntarily signed a Miranda Waiver. (A true and accurate copy of the 9/9/15 Miranda Waiver is attached hereto as Exhibit "C").

72.    During the September 9, 2015 interview, the Plaintiff did not provide any additional

7

information than what we already knew.

73. At various times throughout the investigation, I spoke with and provided the assigned Rensselaer County Assistant District Attorney a copy of the information and evidence obtained.

74. The Rensselaer County District Attorney's Office decided to present the case to a grand jury.

75. I never directed the Rensselaer County District Attorney's Office on whether the case should be presented to a grand jury or not.

76. I simply investigated the matter and provided all relevant information I had obtained to the District Attorney's Office for them to decided if they believed that there existed enough evidence to move forward with charges against any individual for V.D.'s death.

77. On September 29, 2015, I testified before the grand jury.

78. I testified truthfully and accurately as to the information I had obtained.

79. I did not testify before the grand jury regarding any medical findings or medical aspects of V.D.'s death.

80. To the best of my knowledge, Dr. Sikirica also testified before the grand jury as to the medical aspects of V.D.'s death.

81. Prior to testifying before the grand jury, I met with the assigned Rensselaer County Assistant District Attorney to prepare my testimony.

82. The grand jury ultimately handed down an indictment against the Plaintiff.

83. A warrant for the Plaintiff's arrest was obtained pursuant to said indictment.

84. On October 2, 2015, the arrest warrant for the Plaintiff was executed upon which I

**APPENDIX**

was present for. (A copy of the Arrest Report I created is attached hereto as Exhibit "D").

85.    I believe probable cause existed to arrest the Plaintiff based upon the arrest warrant.

86.    The Plaintiff was also arraigned on October 2, 2015 and held without bail.

87.    I retired from the TPD in or about March 2016.

88.    To the best of my recollection, I testified at a suppression hearing.

89.    Prior to testifying at the suppression hearing, I believe I met with the assigned Rensselaer County Assistant District Attorney to prepare my testimony.

90.    On or about June 8, 2016, Detective-Sergeant Parrow informed me that the TPD wanted to obtain a search warrant to search the cell phone that the Plaintiff had given to me during the March 2, 2015 meeting and I signed an Affidavit in furtherance of said application. (A copy of said search warrant is attached as Exhibit "J" to Holehan Affidavit).

91.    On August 22, 2016, I testified at the Plaintiff's criminal trial.

92.    Prior to testifying at the criminal trial, I met with the assigned Rensselaer County Assistant District Attorney to prepare my testimony.

93.    I again testified truthfully and honestly as to my activities throughout the investigation of V.D.'s death.

94.    I do not believe that I ever met with co-Defendant Joel Abelove at any point in time in connection with this investigation.

95.    I did not conspire with any individual to improperly influence V.D.'s death investigation.

96.    I had no reason to intervene to prevent any alleged constitutional deprivation as such never occurred.

9

**WHEREFORE**, Defendant prays for an Order granting the City Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56(a) together with such other and further relief as this Court deems just and proper.

Ronald Fountain

Sworn to before me this
31 day of JANUARY , 2022.

Notary Public, State of New York

ROBERT W. SPONZO, JR.
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01SP6408728
Qualified in Warren County
Commission Expires September 6, 20_24

# APPENDIX

# EXHIBIT "A"

# APPENDIX

**1265**



## TROY POLICE DEPARTMENT
### INVESTIGATION REPORT

| VICTIM'S NAME: | REPORT DATE: | INCIDENT NUMBER: | DB NUMBER: |
|---|---|---|---|
| Suspicious Death Inv | 03-01-15 | 20320-15 | |

## NARRATIVE

I/Os responded to 856 ▮▮▮▮ for a child death call. Upon arrival saw a Female and Male subject sitting on fron step of residence. I/O was briefed by Ptls Rasmussen and Coonradt to the specifics 2 ½ year old female vi transported to St Mary's hospital by TFD believed un responsive. I/Os spoke with subject sitting in front of residence both were very quiet when introduced to us by patrol. Subject one and caretaker of child during time of death was a Michael L Davis-Guider ▮▮▮▮▮ and Mother of Victim was Rebecca Parker ▮▮▮▮ . Both were asked to come to station and talk with I/Os. Both agreed Davis-Guider rode with I/Os in front seat due to his size. Female Parker was driven to CS by Ptl Rasmussen in front seat of his patrol car. Upon arrival at CS Davis-Guider was in Det CP Mcdonalds office and Parker was in 2nd floor DB office. I/O was then notified that 2 ½ year old Vi V▮▮▮ D▮▮▮ ▮▮▮▮ had passed. I/O then informed Parker who was brought to St Marys hospital. I/Os then spoke with Davis-Guider in McDonalds Office. Notes taken on Days events at 856 ▮▮▮▮. Only people at 856 ▮▮ ▮▮▮▮ Floor were Davis-Guider and V▮▮▮▮▮▮ from 0830 hours to aprox 1PM.

I/o then applied or a search warrant of residence 856 ▮▮▮▮▮ floor. Also permission to search apt. was granted and signed by Davis-Guider. Search warrant was executed ETs Buttafuoco and Marble processed scene. ET reports are available. I/O along with Sgt T Colaneri also at scene during ET processing. I/Os then again spoke with Davis-Guider who had been sitting with Mcdonald during search warrant execution. Davis-Guider then left station with [1]with Parker they were picked up by Russell Brown. 2-27-15 I/Os responded to AMC for Autopsy also present were Sgt T Colaneri ET Buttafuoco ADA A Ackerman. Dr M Sickirika performed Autopsy with his staff. Results to follow.

Aprox 1PM I/Os stopped at residence on ▮▮▮▮ to speak with Parker and Davis-Guider they were present also Parkers Mother Nancy Parker and Aunt Mercedes Hall-Chestaro were present. Again asked Davis-Guider a couple of questions and also answered questions pertaining to child and next steps in process. I/O advised family and Davis-Guider that we could meet Monday 3-2-15 and go over entire incident all agreed to meet at police station 3-2-15.

| DETECTIVE ASSIGNED | SUPERVISOR APPROVAL | PAGE NUMBER |
|---|---|---|
| Fountain/CP Mcdonald | | |
| **CASE STATUS:** | | |

# EXHIBIT "B"

# APPENDIX

**1267**

CITY OF TROY POLICE DEPARTMENT

Control # 20320

YOUR RIGHTS EXPLAINED

Place 1504 PD

Date 3-2-15

Time _____

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can and will be used against you in court.

You have a right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish.

If you decide to answer questions now without a lawyer present, you still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk with a lawyer.

## WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Signed: _____

Print Name: _____

Witness: Goldston, CJ

Witness: _____

Time: _____

Date: 3-2-15

## TROY POLICE DEPARTMENT

APPENDIX

# EXHIBIT "C"

# APPENDIX

**1269**

Control #: _____

## TROY POLICE DEPARTMENT



**YOUR RIGHTS EXPLAINED:**

Place: Troy PD

Date: 9-9-15

Time: 915A

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can and will be used against you in court.

Your have a right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish.

If you decide to answer questions now without a lawyer present, you still the right to stop answering at any time. You also have the right to stop answering at any time until you talk with a lawyer.

## WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Signed: _____

Print Name: Mike Davis

Witness: _____

Witness: _____

Time: 915A

Date: 9-9-15

# EXHIBIT "D"

| 1. NYSID No. | 2. OBTS No. | | New York State **ARREST REPORT** | | 3. Case No. 020320 | | 4. Ref. No. | |
|---|---|---|---|---|---|---|---|---|
| 5. FBI No. | 6. Arrest No. 138346 | 7. Agency Troy Police Bureau | | | 8. Division / Precinct | | 4a. | |

**DEFENDANT INFORMATION**

9. Name (Last, First, Middle)
Davis-Guider , Michael Leroy

10. Alias / Nickname / Maiden Name (Last, First, Middle)

11. Phone Number

12. Street Number and Name, Building No., Apt. No.

13. City, State, Zip (C ☒ T ☐ V ☐)
Troy Ny 12182

14. Residence Status ☐ Resident ☐ Foreign Non-Resident ☐ Non-Resident ☒ Unk

15. Place of Birth ☒

16. Date of Birth | 17. Age 28 YRS | 18. Sex ☒ M ☐ F ☐ U | 19. Race ☐ White ☒ Black ☐ Asian ☐ Indian ☐ Other ☐ Unknown | 20. Ethnic ☐ Hispanic ☒ Non-Hispanic ☐ Unknown | 21. Skin ☒ Dark ☐ Light ☐ Medium ☐ Other ☐ Unknown

22. Height 5' 10" | 23. Weight 275 | 24. Hair BLK | 25. Eyes BRO | 26. Glasses ☒ No ☐ Yes ☐ Contacts | 27. Build ☐ Small ☐ Med ☒ Large | 28. Marital Status ☐ Comm Law ☐ Married ☒ Single ☐ Separated ☐ Divorced ☐ Widowed ☐ Unk | 29. U.S. Citizen ☒ Yes ☐ No ☐ Unknown | 30. Citizen of USA

31. Social Security No. 12 | 32. Education None | 33. Religion | 34. Occupation | 35. Employed ☐ Yes ☒ No | 36. Scars / Marks / Tattoos (Describe)

**ARREST INFORMATION**

37. Arresting Officer
Fountain, Ronald J

38. ID No.
5838

39. Assisting Officer
Epstein, Ronald L
Millington, Mark S

40. ID No. 22 920 | 41. Arrest Date 10/02/2015 | 42. Time 15:20 | 43. Location of Arrest (C ☐ T ☐ V ☐)

44. Juvenile ☐ Juv. No ☐ Further Process ☐ Yes ☒ No | 45. Condition of Defendant at Arrest ☐ Impaired Drugs ☐ Mental Dis ☒ App Norm ☐ Impaired Alco ☐ Im/Ill | 46. Weapon(s) at Arrest | 47. Co-defendants Arrest No.

48. Miranda ☐ Yes ☒ No | 49. Miranda By | 50. Miranda Date | 51. Miranda Time | 52. Statements ☐ Written ☐ None ☐ Verbal | 53. Status ☐ Bail / ROR ☐ Parole ☐ Probation | 54. Search Warrant ☐ Yes ☐ No | 55. ID Procedure ☐ Line-Up ☐ None ☐ Show Up ☐ Photo

56. Arraignment Court
Rens. Co.

57. Arraignment Judge
Presiding

58. Date | 59. Time ☐ Yes ☒ No | 60. Property ☐ Yes ☒ No | 61. Evidence ☐ Yes ☒ No | 61a. Processed By | 61b. Disposition

62. Incident No. 1-15-6564 | 63. Arrestee Status ☐ ROR ☐ Police Bail ☑ Held ☐ Cash Bail ☐ Bail Bond ☐ App Tkt ☐ Rel to 3rd Party | 64. Bail Amount | 65. Bondsman | 66. Photo No.

67. Arrest Type ☐ PW ☐ JW ☐ SUM ☐ CIP ☐ COMP ☐ OP ☐ EC ☐ VOP ☐ RW ☐ AW ☐ OT | 68. Warrant No. 15-1094 | 69. Arrest FOA ☐ Yes ☒ No | 70. Other Agency | 71. F / P Taken ☒ Yes ☐ No

72. Location of Offense (C ☒ T ☐ V ☐) | 73. Offense Date 2/26/2015 | 74. No. Offenders | 75. No. Victims | 76. Return Court | 77. Return Judge | 78. Return Date | 79. Time

80. Defendant / Case TOT Agency | 80a. Officer's Name | | 80b. ID No. | 81. Time | 82. Date

**CHARGE INFORMATION**

| 83. LAW | Article & Section | SUB. | CL. | CAT. | DEG | ATT | NAME OF OFFENSE | CTS | NCIC code | VICTIM Age Sex | ASSOC. NO. | TYPE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PL | 125.20 | 04 | B | F | 1 | O | MANSLAUGHTER 1ST-18 Unde | 1 | 0 9 9 9 | | | ☐ APP ☐ UTT ☐ OTH |
| PL | 125.15 | 01 | C | F | 2 | O | MANSLAUGHTER 2ND-Reckles | 1 | 0 9 9 9 | | | ☐ APP ☐ UTT ☐ OTH |
| PL | 260.10 | 01 | A | M | 0 | O | END WEL CHILD-Under 17, | 1 | 3 8 0 1 | | | ☐ APP ☐ UTT ☐ OTH |
| | | | | | | | | | | | | ☐ APP ☐ UTT ☐ OTH |
| | | | | | | | | | | | | ☐ APP ☐ UTT ☐ OTH |
| | | | | | | | | | | | | ☐ APP ☐ UTT ☐ OTH |

**ASSOCIATED PERSONS INFORMATION**

84. Person Type
OT = Other  SF = Spouse  CD = Co-Defendant  SC = School  PO = Parole Officer  VI = Victim  RE = Relative  RP = Religious Person
EM = Employer  CH = Child  PA = Parent  AS = Associate  LA = Lawyer  PR = Probation Officer  WI = Witness  CO = Complainant  DR = Doctor

| TYPE | NAME (LAST, FIRST, MIDDLE, TITLE) | STREET-NAME & NUMBER | CITY/STATE/ZIP | TELEPHONE NO. |
|---|---|---|---|---|
| OT | Davis, Michael | | Troy NY 12182 | |
| OT | Davis, Viola | | Troy NY 12182 | |
| OT | Parker, Rebecca A | | Troy NY 12182 | |

**NARRATIVE**

85.
above subject arrested for above charges w/o incident (Rens. Co. Indictment #15-1094) by members of the TPD and USMS RFTF

neg wants  neg col

| 86. Arresting Officer's Signature Fountain, Ronald J | 87. ID No. 5838 | 88. Supervisor's Signature SGT. MALOY | 89. ID No. #30 | 94. 1 Page |
|---|---|---|---|---|
| 90. Arrest Made As A Result Of A SAFIS Latent Print Identification? ☐ Yes ☒ No ☒ Unknown | 91. | 92. | 93. | of 1 pages |

DC35 J303 (1/91 3/98)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MICHAEL DAVIS-GUIDER,

Plaintiff,

-against-

CITY OF TROY, RONALD FOUNTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES
MCDONALD, Individually, TIM COLANERI, Individually,
ADAM R. MASON, Individually, RENSSELAER COUNTY,
MICHAEL SIKIRICA, Individually, and
JOEL ABELOVE, Individually,

Defendants.

**DANIELLE COONRADT**
**AFFIDAVIT**
Case No.: 1:17-cv-1290
(FJS/DJS)

STATE OF IDAHO          )
                                       )ss.:
COUNTY OF CANYON   )

     **DANIELLE COONRADT**, being duly sworn deposes and says:

    1.   I am a defendant in the above-captioned matter and as such I am fully familiar with the facts and circumstances herein. I make this Affidavit in support of both mine and the Troy City Defendants' motion for summary judgment.

    2.   In February 2015, I was employed by the Troy Police Department ("TPD") as a patrol officer.

    3.   I was on duty on February 26, 2015, patrolling the City of Troy in a marked police car when I received a radio call regarding a juvenile cardiac arrest which I responded to.

    4.   I was the first responding officer on scene and, later that same day, I completed a New York State Incident Report and TPD form document referred to as a Supplemental. (A true and accurate copy of the New York State Incident Report and TPD Supplemental are attached

1

hereto as Exhibits "A" and "B" respectively).

5.     When I arrived on scene, the fire department and paramedics were inside the house performing CPR on the unresponsive infant. Outside the home, I observed the Plaintiff and Rebecca Parker, the mother of the unresponsive infant later identified as Viola Davis ("V.D.").

6.     I approached the Plaintiff and Ms. Parker and asked them what had happened.

7.     The Plaintiff stated, in sum and substance, that V.D. had woken up around 8:30 a.m. and the Plaintiff had told her to go back to bed because it was too early. The Plaintiff further stated that he then went to wake V.D. up around 11:00 a.m. and she would not wake up.

8.     I responded to the Plaintiff in sum and substance by telling him that it was 1:30 p.m.

9.     In response to my statement, the Plaintiff seemed confused and said, "time must be flying then." (*See*, Exhibit "B").

10.    After I spoke with the Plaintiff, I entered the apartment to see if I could observe anything in plain view that may have contributed to V.D. being unresponsive. (*See*, Exhibit "B").

11.    At this point, I had no idea what happened to V.D. and I was simply attempting to assist in providing any information that could further her treatment.

12.    At the time that I was walking around the apartment, the paramedics were still performing CPR on V.D.

13.    I observed a bottle of pills on a table in the living room and pointed them out to a paramedic as something that may have contributed to V.D. being unresponsive. (*See*, Exhibit "B").

14.    The paramedic stated that the bottle of pills was the narcotic, hydrocodone.

15.    Shortly after my arrival, the paramedics transported V.D. to the hospital and the

2

Plaintiff and Ms. Parker voluntarily went with detectives to TPD central station.

16.     At the directive of my supervisor, I remained on scene.

17.     While I remained on scene, I was informed that V.D.'s time of death was 1408 hours and to continue remaining on scene while a search warrant was obtained.

18.     While I held the scene for a search warrant, I prepared the TPD form document Crime Scene Attendance Log which contains the names of all individuals on scene.

19.     At that time, I contacted dispatch to obtain the names of the first responders to include them on the Crime Scene Attendance Log.

20.     Based upon the nature of the call, I was obligated by law to inform Child Protective Services ("CPS") which I did by calling the CPS hotline while at the scene.

21.     I also completed the mandatory New York State Report of Suspected Child Abuse or Maltreatment form.

22.     At 1600 hours my shift ended, and I was relieved by Officer Balarin who I provided the Crime Scene Attendance Log to.

23.     At the time of my relief, a search warrant was not yet being executed upon.

24.     I was not present when members of the TPD searched the home.

25.     I did not obtain any witness depositions or statements aside from the statement by the Plaintiff as contained on the Supplemental.

26.     I did not participate in any other aspect of the investigation into V.D.'s death.

27.     I did not attend V.D.'s autopsy nor did I have any knowledge about the autopsy.

28.     I never spoke to co-Defendant Dr. Sikirica about the autopsy, his results, or any aspect of the medical findings or TPD's investigation.

3

29.    I did not testify before the grand jury, nor did I have knowledge of the evidence presented to said grand jury.

30.    I was not present when the Plaintiff was arrested in October 2015.

31.    In or about February 2016, I transferred from the TPD to the Lake Placid Police Department to be closer to my family.

32.    On May 3, 2016, I testified at a suppression hearing in connection with the statement I obtained by the Plaintiff as contained on the Supplemental attached as Exhibit "B".

33.    To the best of my recollection, I either spoke or met with the prosecutor assigned to the matter to prepare my suppression hearing testimony.

34.    On August 19, 2016, I returned to Troy, New York to testify at the Plaintiff's criminal trial.

35.    I again testified in connection with the statement the Plaintiff made to me as contained on the Supplemental attached hereto as Exhibit "B".

36.    To the best of my recollection, I either spoke or met with the prosecutor assigned to the matter to prepare for my trial testimony.

37.    I never met with the Rensselaer County District Attorney at the time, co-Defendant Joel Abelove, to discuss the Plaintiff's criminal matter or my testimony.

38.    I did not observe or hear of any impropriety by any member of the TPD, by Dr. Sikirica, or by and member of the Rensselaer County District Attorney's Office in connection with the investigation into V.D.'s death nor the prosecution of the Plaintiff for the same.

39.    I had no reason to intervene to prevent any alleged constitutional deprivation as such never occurred.

4

**WHEREFORE**, Defendant prays for an Order granting all City Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56(a) together with such other and further relief as this Court deems just and proper.

Danielle Coonradt

Sworn to before me this
___3___ day of February, 2022.

Notary Public, State of ___Idaho___

Fanny Reyes
Notary Public
State of Idaho
Commission No. 50248

5

# EXHIBIT "A"

**New York State INCIDENT REPORT**

| 1. Agency | 2. Div/Precinct | 3. ORI | 4. Orig | 5. Case No. | 6. Incident No. |
|---|---|---|---|---|---|
| Troy PD | Patrol | NY0410200 | ☒ Orig ☐ Supp | | 203220 |

| 7. Report Day | 8. Date | 9. Report Time | Occurred On/From | 10. Day | 11. Date | 12. Time | Occurred To: | 13. Day | 14. Date | 15. Time |
|---|---|---|---|---|---|---|---|---|---|---|
| TH | 02 86 15 | 1400 | | TH | 02 86 15 | 13:09 | | TH | 02 26 15 | 1309 |

16. Incident Type: Death Investigation
17. Business Name
18. Weapon(s)

19. Incident Address (Street No., Street Name, Bldg. No., Apt. No.)
20. City, State, Zip ( ☐ C ☐ T ☐ V): Troy NY 12180
21. Location Code: 4202

| 22. OFF. NO. | LAW | SECTION | SUB | CL | CAT | DEG | ATT | NAME OF OFFENSE | CTS | 23. No. of Victims |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | |
| 2 | | | | | | | | | | 24. No. of Suspects |
| 3 | | | | | | | | | | 02 |

25. Pers. Type: CO = Complainant  OT = Other  PI = Person Interviewed  PR = Person Reporting  WI = Witness  NI = Not Interviewed  VI = Victim   26. Victim also complainant ☐ Y ☒ N

| TYPE/NO | NAME (LAST, FIRST, MIDDLE, TITLE) | Date of Birth | STREET NO., STREET NAME, BLDG. NO., APT. NO., CITY, STATE, ZIP | TELEPHONE NO. |
|---|---|---|---|---|
| CO | Davis, Michael | | ▓▓▓▓ Troy NY 12180 | |
| PI | Parker, Rebecca | | ▓▓▓▓ Troy NY 12182 | |
| OT | Davis, V▓▓▓ | | ▓▓▓▓ Troy NY 12182 | |

27. Date of Birth: Mo. ___ Day ___ Yr. ___
28. Age
29. Sex ☐ M ☐ F ☐ U
30. Race ☐ White ☐ Black ☐ Other ☐ Indian ☐ Asian ☐ Unk.
31. Ethnic ☐ Hispanic ☐ Unk. ☐ Non-Hispanic
32. Handicap ☐ Yes ☐ No
33. Residence Status ☐ Resident ☐ Tourist ☐ Student ☐ Commuter ☐ Military ☐ Homeless ☐ Temp. Res. Foreign Nat. ☐ Other ☐ Unk.

34. Victim DID receive information on Victim's Rights and Services pursuant to New York State Law   ☐ YES   ☐ NO

35. T, 2e/No.
36. Name (Last, First, Middle)
37. Alias/Nickname/Maiden Name (Last, First, Middle)
35. Apparent Condition ☐ Impaired Drugs ☐ Mental Dis ☐ Unk. ☐ Impaired Alco ☐ Inj/Ill ☐ App Norm

39. Address (Street No., Street Name, Bldg. No., Apt. No., City, State, Zip)
40. Phone No.   ☐ Home ☐ Work
41. Social Security No.

42. Date of Birth: Mo. ___ Day ___ Yr. ___
43. Age
44. Sex ☐ M ☐ F ☐ U
45. Race ☐ White ☐ Black ☐ Other ☐ Indian ☐ Asian ☐ Unk.
46. Ethnic ☐ Hispanic ☐ Unk. ☐ Non-Hispanic
47. Skin ☐ Light ☐ Dark ☐ Unk. ☐ Medium ☐ Other
48. Occupation

49. Height
50. Weight
51. Hair
52. Eyes
53. Glasses ☐ Yes ☐ Contacts ☐ No
54. Build ☐ Small ☐ Large ☐ Medium
55. Employer/School
56. Address

57. Scars/Marks/Tattoos (Describe)
58. Misc.

| 59. Item or Losjed No. | Property Status | Property Type | Quantity Measure | Make or Drug Type | Model | Serial No. | Description | Value |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | TOTAL |

| 60. Vehicle Status | 61. License Plate No. | Full ☐ Partial ☐ | 62. State | 63. Exp. Yr. | 64. Plate Type | 65. Value |
|---|---|---|---|---|---|---|
| 66. Veh. Yr. | 67. Make | | 68. Model | 69. Style | 70. VIN | |

71. Color(s)
72. Towed By: To:
73. Vehicle Notes

74. On the above date, time, & location, PO's responded for a
juvenile cardiac arrest. Upon arrival, TFD was working on
JI. CO & PI1 were on scene. CO had called 911 from
Testa's Restaurant because he did not have a phone.
OT was transported via TFD to 1082. CO & PI1 were
transported seperately to CS, CO with Inv. Fountain & Inv. McDoed
and PI1 with Officer Rasmussen. Officer Bristol followed TFD
to 1082. Sgt. Kiley on scene. Capt. DeWolf notified.
OT was pronounced dead at 1408 by staff at 1082.
Det. Butticca responded to 1082, as well as ME Sigler.

75. Inquiries (Check all that apply): ☐ DMV ☐ Want/Warrant ☐ Scofflaw ☐ Crim. History ☐ Stolen Property ☐ Other
76. NYSPIN Message No.
77. Complainant Signature: Unable to Sign

78. Reporting Officer Signature (Include Rank)
79. ID No. 7624
80. Supervisor's Signature (Include Rank)
81. ID No. 7462
85. (Use above sheet)
Page ___ of ___

82. Status: ☐ Open ☐ Closed (If Closed, check box below) ☐ Unfounded ☐ Victim Refused to Coop ☐ Arrest
☐ Proc Declined ☐ Warrant Advised ☐ CBI ☐ Juv. - No Custody ☐ Arrest - Juv ☐ Offender Dead ☐ Extrad. Declin ☐ Unk.
83. Status Date: 02.28.15
84. Notified/TOT
Pages ___

DCJS-3215 (11/06)  *FALSE STATEMENTS ARE PUNISHABLE AS A CRIME, PURSUANT TO THE NEW YORK STATE PENAL LAW.

# EXHIBIT "B"

| TYPE OF ORIGINAL REPORT | NAME OF SUBJECT (VICTIM, DEFENDANT) | DATE OF ORIGINAL REPORT | DATE OF THIS REPORT |
|---|---|---|---|
| 3205 | D████, V███ (DOB ████) | 02/26/15 | 02/26/15 |

On the above date, at 1309, I responded to ████ ████
ave for a report of a juvenile cardiac arrest. Upon
arrival, Michael Davis and Rebecca Parker were
standing outside. I asked Michael what happened.
he stated that at 0830, he told V███ to go back
to bed because it was too early. Then he said he
went to wake her up a 100 and she wouldn't wake
up. When I told Michael it was 1:30, he didn't
seem to understand and said "time must be flying"
When I went in the apartment, I saw a bottle
of pills on the table & asked a fireman what they
were. He checked & said they were hydro codiene.
I took a quick look around the apartment
without touching anything to see if there was
any thing visible that ████████ could have gotten
into. I didn't see anything obvious. The fire dept.
was still working on V███ throughout this time.
The fire dept. cleared & brought V███ to St. Marys.
Officer Bristol followed them. Inv. Fountain & Inv.
Mcdonald brought Michael Davis to CS, & PO
Rasmussen brought Rebecca Parker to CS. Officer
Bristol informed me that time of death would
be 1408. I held the scene for a search warrant
& also started completed a crime scene log. I cleared

| CASE STATUS: | ☐ unfounded | ☒ open/active | ☐ closed/not cleared |
|---|---|---|---|
| ☐ CLEARED AS FOLLOWS: | ☐ arrest | ☐ warrant obtained | ☐ compl. refused prosec. |
| | ☐ death of offender | ☐ outside prosecution | ☐ juvenile |

| REPORTING OFFICER | EMP. NO. | SECOND OFFICER | EMP. NO. | APPROVING OFFICER | EMP. NO. | PAGE NO. |
|---|---|---|---|---|---|---|
| ____onradt | 7624 | | | | 7462 | 1/3 |

ROY POLICE DEPARTMENT

T. P. D. — 120

| TYPE OF ORIGINAL REPORT | NAME OF SUBJECT (VICTIM, DEFENDANT) | DATE OF ORIGINAL REPORT | DATE OF THIS REPORT |
|---|---|---|---|
| 3205 | ▮▮▮▮, V▮▮▮▮ | 02/26/15 | 02/26/15 |

the scene at 1600 to relief.

CASE STATUS:  ☐ unfounded  ☒ open/active  ☐ closed/not cleared

☐ CLEARED AS FOLLOWS:  ☐ arrest  ☐ warrant obtained  ☐ compl. refused prosec.
☐ death of offender  ☐ outside prosecution  ☐ juvenile

| REPORTING OFFICER | EMP. NO. | SECOND OFFICER | EMP. NO. | APPROVING OFFICER | EMP. NO. | PAGE NO. |
|---|---|---|---|---|---|---|
| _onradt | 7624 | | | | 7462 | 3/3 |

ROY POLICE DEPARTMENT

T. P. D. — 120

1282

| CONTINUATION | FOLLOW-UP | SUPPLEMENTAL | CONTROL NUMBER 20320 |
|---|---|---|---|

| TYPE OF ORIGINAL REPORT | NAME OF SUBJECT (VICTIM, DEFENDANT) | DATE OF ORIGINAL REPORT | DATE OF THIS REPORT |
|---|---|---|---|
| 3205 | Davis, Michael, L | 2/26/15 | 9/26/15 |

Statements made by above subject

"I told her to go back to bed because
it was too early. Then I went to
get her up @ 11 + she wouldn't wake
up."

"Ok but it's 1:30 now." - PO Coonradt

"Time must be flying then"

CASE STATUS:  ☐ unfounded  ☒ open/active  ☐ closed/not cleared

☐ CLEARED AS FOLLOWS:  ☐ arrest  ☐ warrant obtained  ☐ compl. refused prosec.
☐ death of offender  ☐ outside prosecution  ☐ juvenile

| REPORTING OFFICER | EMP. NO. | SECOND OFFICER | EMP. NO. | APPROVING OFFICER | EMP. NO. | PAGE NO. |
|---|---|---|---|---|---|---|
| Coonradt | 266 | | | | 7462 | 3/3 |

TROY POLICE DEPARTMENT

T. P. D. — 120

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

MICHAEL DAVIS-GUIDER,

                                    Plaintiff,          **JAMSHID HOLEHAN**
                                                        **AFFIDAVIT**
        -against-                                       Case No.:  1:17-cv-1290
                                                        (FJS/DJS)

CITY OF TROY, RONALD FOUNTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES
MCDONALD, Individually, TIM COLANERI, Individually,
ADAM R. MASON, Individually, RENSSELAER COUNTY,
MICHAEL SIKIRICA, Individually, and JOEL ABELOVE, Individually
                                    Defendants.

_____

STATE OF NEW YORK          )
                           ) ss:
COUNTY OF RENSSELAER       )

        **JAMSHID HOLEHAN**, being duly sworn, deposes and says:

        1.      That I am one of the custodians of records for the Troy Police Department and I

submit this affidavit in support of a motion made on behalf of the defendants above named seeking

an order granting summary judgment in defendants' favor dismissing the complaint of the plaintiff

and the claims asserted therein.

        2.      I am a Sergeant with the Troy Police Department, and I am a custodian of records

therein.

        3.      The following relevant documents attached hereto are true and accurate copies of

documents kept by Troy Police Department in the regular course of business, and it is the Troy

Police Department's regular course of business for such documentation to be created or acquired

during an investigation:

        a.  Exhibit "A": Crime Scene Log dated February 26, 2015

# APPENDIX

b. Exhibit "B": "Davis Permission to Search Residence;

c. Exhibit "C": Deposition of a witness: Michael Bayly dated February 27, 2015;

d. Exhibit "D": Deposition of a witness, Rebecca Parker, dated March 2, 2015;

e. Exhibit "E": Deposition of a witness, Frank H. Shoemaker, III, dated March 2, 2015;

f. Exhibit "F": Deposition of a witness, James D. Tidings, dated March 2, 2015;

g. Exhibit "G": Deposition of a witness, Jason S. Lucey, dated March 2, 2015;

h. Exhibit "H": Deposition of a witness, Kathleen Crisafulli, dated March 5, 2015;

i. Exhibit "I": Deposition of a witness, Russell E. Brown, dated March 6, 2015;

j. Exhibit "J": Search Warrant Application dated June 27, 2016.

Date: February 3, 2022.

Jamshid Holehan

Sworn to before me this
3rd day of February, 2022.

Notary Public, State of New York

RHIANNON I. SPENCER
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02SP6393260
Qualified in Albany County
Commission Expires June 10, 2023

# EXHIBIT "A"



City of

## TR☮Y

Page 1 of

### Crime Scene Attendance Log

**CONTROL #** 20320

**DATE/TIME LOG STARTED** 2/26/15 / 1330

**INCIDENT LOCATION** _____ FL 1

**DATE/TIME LOG ENDED** 02/26/2015 / 1830

| DATE | NAME | AGENCY | TIME IN | TIME OUT | RECORDING OFFICER/DATE/TIME |
|------|------|--------|---------|----------|------------------------------|
| 2/26/15 | Capt F. Shoemaker | Troy Fire | 1314 | 1331 | Conradt / 2/26 / 1358 |
| | Dan Riley | EMS | 1314 | 1331 | |
| | Mike Bayly | | 1314 | 1331 | |
| | Jim Lidings | Medic | 1314 | 1331 | |
| | Jason Lecey | 1 | 1314 | 1331 | |
| | Jerry Jobe | Reckle | 1314 | 1331 | |
| | Frank Razzano | | 1314 | 1331 | |
| | Dave Judge | | 1314 | 1331 | |
| | Ed Cummings | | 1325 | 1335 | |
| 02/26/15 | Officer Marble | Troy Police Dept. | 1620 | 1735 | Balarin 02/26/15 - 1600 hours |
| | Officer Buttafucco | | 1620 | 1735 | |
| | Det. Fountain | | 1635 | 1700 | |
| | Sgt. Colaneri | | 1635 | 1700 | |
| | | | — | — | |
| | | AJB | — | — | |

TPD 156 – 01/15

# EXHIBIT "B"

**Department of Police**
CITY OF TROY
55 STATE ST,
TROY, N.Y. 12180

Control # 20720

## TROY POLICE DEPARTMENT

## PERMISSION TO SEARCH PREMISES

I, MICHAEL A DAVIS _____, having been informed of my

constitutional right not have a search made of my premises hereinafter mentioned without a

search warrant and of my right to refuse to consent to such a search, hereby

authorize MEMBERS of the Troy Police Dept.

MEMBERS OF THE TROY POLICE DEPARTMENT, to conduct a complete search of the

premises located at ▉▉▉▉▉▉▉ Troy NY 12182 /STFl,

The above named members of the Troy Police Department are authorized by me to take from

my premises any letters, papers, materials, or other property which they may require.

This written permission is being given by me to the above named members of the Troy Police

Department voluntarily and without threats or promises of any kind.


Signed: _____

Witnesses _____

Case 1:17-cv-01290-DJS Document 44-1 Filed 02/04/22 Page 274 of 27

# EXHIBIT "C"

# APPENDIX

Control #: __20320-15_____

**DEPOSITION OF A WITNESS**
STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

Phone:

Home: _____

Work: _____

Cell: ████████

**Name:** _ _Michael Bayly_____     **Date of birth:** ████████

**Residing at:** __City of Troy Fire Department_     **Age:** __████__

**Occupation:** Captain Troy Fire Department _____ _____

**Depose and say:** I would like to state that I was working Engine 1 Station City of Troy NY 12182 at about 1:11 P.M. on February 26th 2015. My station received a Medical call for ████████ Avenue 1st Floor Troy NY for 2 yr. old in Cardiac arrest. Upon arrival I enter the 1st floor residence and found on a black colored bench couch a small black female child. She was unresponsive but warm to touch. An evaluation showed she was not breathing. Her pupils were fixed and dilated. We began CPR protocol. I attempted to open the child jaw, it was slightly stiff. I bagged the child and began pushing air. Her jaw became more responsive. I then continued CPR with members of my unit. We administered 4 round of Epinephrine and we electro shocked her after she went into to shock able rhythm while enroute to St Mary's hospital. I stayed at the St Mary's hospital Emergency rooms and assisted in the treatment. After she was pronounced by ER Doctor we secured and returned to the Fire Station and prepared our report. On February 27th 2015 I was contacted by Captain Sprauge and requested to come to the Troy Police Station and tell them my initial findings. I came to the Police Station and met with Detective Sergeant Parrow and gave him this statement. End of Statement

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL LAW OF THE STATE OF NEW YORK.

**Date:** ____February 27th 2015_____     **Time:** _3:20P.M _____

**Signed:** _____     **Page:** 1

**Witness:** _____

Case 1:17-cv-01290-DJS Document 81-1 Filed 02/04/22 Page 204 of 27

# EXHIBIT "D"

**APPENDIX**

**1292**

WORK _____

**DEPOSITION OF A WITNESS**
STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

**COURT**

NAME _ Rebeccca A. Parker_____ DATE OF BIRTH ▓▓▓▓

RESIDING AT ▓▓▓▓ e Troy NY 12182 ____ AGE ▓▓

OCCUPATION ___Clerk ▓▓▓▓▓▓▓▓▓▓▓ ue Troy NY_____

DEPOSE AND SAY:

R.P. → I would like to state that I am the mother of V▓▓▓▓▓ her date of birth was ▓▓▓▓▓▓ I would like to state that I currently reside with my boyfriend Michael Davis ▓▓▓▓ s and my daughter. We have been here for approximately 9 months. We used to live in NYC. Viola father is Clarence Davis who resides in NYC presently. I was a victim of domestic violence from him and so was my daughter from him.

On February 26th 2015 I was home with my daughter and my boyfriend. I got up at about 7:45 A.M . I got ready for work. I work at ▓▓▓ at ▓▓▓ and ▓▓▓▓▓▓ ue in Troy New York. My boyfriend got up and went into my daughter's room. He went in to take her to the bathroom. I saw her in the hallway heading to the bathroom I told her I loved her and I see her when I came home from work. I left my house and took the bus to work. I worked to about 1 P.M. A friend of mine by the name of Russell Brown took me home. I just happen to look at my phone when we arrived at my apartment. It was 1:23 P.M I went into my apartment and saw my daughter lying face up on the black futon in my apartment She was lying on her back with what looked like to me to be her leg hanging off. I really wasn't to concerned She, V▓▓ sleeps in funny positions. I grabbed some checks to show Mr. Brown that had been cashed in my account that were fraudulent. I thought it was funny that Mike was not there. I walked outside and was talking to Mr. Brown when Mike came out of Testo Restaurant. He said to me "Call 911" He looked upset. He said 911 He said ▓▓▓ s not breathing. I ran into the apartment and went to my daughter I was calling 911. Mike was right behind me. He said he tried going to the neighbors but no one was home/. I was on phone when the Fire Department arrived. I told them to hurry up. So did Mike. Three or four of them came in and began working on my daughter. At one point one of them said they had something.. I saw a blip on one of the screen in a machine. They took ▓▓▓▓▓ ut to the ambulance. They wouldn't let me go to the hospital with my daughter. Mike told them I was her mother but they left without me. I went with the Police Officer to the Troy Police Station Mike came there to. At the Station I was told my daughter had passed away. I told the Detectives what I knew of what happened. I left and went to St Mary's Hospital. I then returned to the Police Department after I saw my daughter at the hospital
After a few hours, I left with Mike and went home.

Since that time Mike and I have talked. He told me he said after I left that morning He put Ola on the toilet. He told me he asked if she was hungry She told him no He told me

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR PURSUANT TO SECTION → R. P.
210.45 OF THE PENAL LAW OF THE STATE OF NEW YORK.

DATE 3/2/15 TIME: 2:08 SIGNED: _Rebecca Parker_

1 of 2

WITNESS: _____

_____ /S839

Case 1:17-cv-08290-DJS Document 115-1 Filed 02/04/22 Page 264 of 27

PHONE

CONTROL # ___020320-15___

HOME ▓▓▓▓▓

WORK _____

## DEPOSITION OF A WITNESS
STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

**COURT**

NAME _ Rebeccca A. Parker_____ DATE OF BIRTH ▓▓▓▓

RESIDING AT ▓▓▓▓▓▓▓ Troy NY 12182 ____ AGE ▓

OCCUPATION ___ Clerk ▓▓▓▓▓▓▓▓▓▓▓ Troy NY_____

R.P.

DEPOSE AND SAY:

he gave her bottle but she really wasn't drinking it He said he then sent her back to bed.
He told me he watched a movie. He told me he had fallen asleep. He woke up around
11:00 A.M. He told me it could have been 12 He didn't look at a clock. He called for her
but she didn't answer. He went into her bedroom. He said she was not moving in her bed.
He said he listen for breathing but didn't hear any. He began CPR. He told me he really
didn't know how but saw movies about it. He had some CPR training in college too. He
then took her to the living room and put her down on the black futon couch. The same
one I saw her on when I came home. He said he tried cpr again. He got no reaction. He
said he ran out after trying to get his phone to call 911. He couldn't get it working. He
went to the neighbor house and they were not home or didn't answer. Mike said he then
ran across the street to Testo's Restaurant and asked to call 911 centers. The 911 asked
him a lot of questions. He came outside and saw me and told me.

Mike and I have been crying over this all weekend, Mike told me he thought he might
have hurt V▓▓ trying to do cpr. We were told by Detective Fountain that V▓▓s ribs
were broke. Mike thought maybe his hands had done it because his hands were so big.

On March 3rd 2015 at about noon I came to the troy Police Department with Mike and
my mother Nancy Parker of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓ I met with Detectives Fountain and McDonald. I spoke to Detective Sergeant
Parrow at that time He asked my to recount my day of my daughters death and her
conditions prior to her death.

I told Sergeant Parrow my daughter was a health and active child. The day of the death
she was a little sluggish. I attributed this to her just getting up in the morning. I told
Sergeant Parrow that V▓▓ had a cold a couple of weeks prior and was treated with over
the counter medication. I had not given her any medince in a few days. I told him that
V▓▓ as a Nurse Practitioner in New York It is at Westside Pediatric Care ▓▓▓▓
▓▓▓▓▓ West New York NY. End of Statement. R.P.

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR PURSUANT TO SECTION
210.45 OF THE PENAL LAW OF THE STATE OF NEW YORK.

DATE _3/2/15_ , TIME: _2:05 PM_ SIGNED: _Rebecca Parker_

WITNESS _▓▓▓▓▓▓▓▓▓▓_
_PTLCPM ▓▓▓▓ 5839_

2 of 2

Case 1:17-cv-08290-DLC Document 115-4 Filed 02/04/22 Page 264 of 27

# EXHIBIT "E"

Case 1:17-cv-00290-DJS Document 181-1 Filed 02/04/22 Page 44 of 27

**1295**

CONTROL # 20320-15

HOME _____
WORK _____
PHONE _____

## DEPOSITION OF A WITNESS

COURT

STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

NAME Frank H. Shoemaker III.                    DATE OF BIRTH _____

RESIDING AT Troy Fire Dept Troy NY             AGE _____

OCCUPATION Captain Engine #1

DEPOSE AND SAY: On February 26th 2015 I was working FROM F45
8AM to 8AM on February 27th 2015. I call was recieved
for a 2yr child in Cardiac Arrest in Front of _____
_____ Avenue in Troy NY. Engine #1 Responded. This
include myself AND Captain Mike Bayly, FireFighter
Dan Riley. Also Dispatched RescueSquad MEDIC#1 AND
Car #4. On Arrival to Scene We saw noone outside.
I saw An older Black male standing in Doorway.
He waved to us to come in. Captain Bayly Entered
with me. The older Black male pointed to the
child. She was in the Room on a Black Futon.
Face up. Captain Bayly Checked Airway AND I
Checked For a Heart Beat. The Child was a Black
Female Approximately 2yrs of Age. She wore a
Diaper AND a Colored Shirt of some Type. I Noticed
That her ABDomen was Not Distented at this time
CPR was started. I don't Recall seeing Anyone
Else until Leaving Residence, I saw a Large
Black male standing off to side. I Never spoke
to him. I don't Recall see any Female There Either

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL
LAW OF THE STATE OF NEW YORK.                    F45

DATE 3/2/15          TIME 4:25 pm          SIGNED: _____

WITNESS: _____                              Page #1

APPENDIX

CONTROL # _20320-D_                                    PHONE _1296_
                                            HOME _____
                                            WORK _____

DEPOSITION OF A WITNESS                              COURT
STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

NAME _____                      DATE OF BIRTH _____

RESIDING AT _____                      AGE _____

OCCUPATION _____

DEPOSE AND SAY: I recall now, There was a Black female sitting
on The stairs to Residence. After child was in
Ambulance. No one was screaming or Appeared
Distraught That I could Tell. The Ambulance
Left I Began Cleaning Area of materials we
used During Treatment.
        On March 3 2015 I met with Detective.
Sgt Mike Parrow at The Fire house. I Told
him what I recalled of The incident. I marked
on A Sketch where we located The child The
Day of incident. I did Tell him I recalled
Smelling The Oder of what I thought was.
Mari huana when I was Bring Child out of
Residence, I told him, I did n't smell it inside
During The Treatment, End of Statement FAS
End of Statement FB

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL
LAW OF THE STATE OF NEW YORK.

DATE _3/2/15_        TIME _4:25 p_        SIGNED _____
                                            Page #2 of 2
WITNESS _____                                      TPD 118/82

# EXHIBIT "F"

**APPENDIX** 1298

CONTROL # _20320-1J_

HOME _____

WORK _____

**DEPOSITION OF A WITNESS**

COURT

STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

NAME _James D. Tidings_ DATE OF BIRTH _____

RESIDING AT _Troy Fire Department_ AGE _____

OCCUPATION _Fire Lt. Troy Fire Dept._

DEPOSE AND SAY: On February 26th 2012 I was working as the.
Lt. on Paramedic Ris. We worked out of Engine #1.
We recieved a call for 2yr old children Cardiac
Arrest at ____ Avenue. We responded and arrived
shortly after Engine #1 I entered the 1st Fl.
Apartment. I recall a large Black male standing
near Captain Baylx. He did not speak or act
upset. I moved closer to the Captain who was
Treating a small Black Female Lying on the
Black Foutor in room. We Transported The Child
While performing CPR. We maintain This
Through out The Tmp to St Mary's Hospital
Where The Child was Pronouced Dead After Awhile
at Emergency Room. I don't recall Anyone
Else at scene. I don't recall Anyone Being Really
Upset That This was happening. The Big Black Man
was I one point in my way But Just Moved without
Saying a word. I don't recall Anything Else
Except Treating The Child.

---

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL
LAW OF THE STATE OF NEW YORK.

DATE _2/2/15_ TIME: _____ SIGNED: _____

WITNESS: _____

TPD 118/82

# EXHIBIT "G"

**APPENDIX**

PHONE **1300**

CONTROL # 20320-15

HOME ▓▓▓▓
WORK ▓▓▓▓

DEPOSITION OF A WITNESS

COURT

STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

NAME JASON S Lucey          DATE OF BIRTH ▓▓▓▓

RESIDING AT Troy Fire Department TroyNY          AGE ▓▓

OCCUPATION Fire Fighter MEDIC #1

DEPOSE AND SAY: On February 26th 2014 I respond with medic #1 Engine 1 Rescue Squard and Car #4, On Arrival to ▓▓▓▓ Avenue. I Exited my Ambulance AN heard a Large Black male say "Can ya ll Hurry up Plese" He was Not Excited. He was very calm. The call was For A child in Cardiac Arrest. I Entered The Apartment. I SAW a Black Female stand Next to A Black Futon she Looked Like she was Crying. She Did Act Hysterical. The Big Black male walked in behind us But said Nothing, Mone. The child was lying on The Black Futon. We Transported the Small Black Female child to St Mary's Hospital Where she was pronouced After continued Attempt to Recide On March 3rd 2015 D/Sgt Parrow met me At Engine one station. He Asked me if I had Been at incineer AND What I SAW AND Heard I Told him. He showed Mc A sketch AND Asked me to point out The positions of The child, women in Apartment Wher I Entered. I Told him That Ngone seemed overly Distraught. END of STATEment.

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL LAW OF THE STATE OF NEW YORK.

DATE 3/2/15          TIME: 1710 hours          SIGNED: _____

WITNESS: _____

TPD 118/82

Case 1:17-cv-08290-DLC Document 145-1 Filed 02/04/22 Page 204 of 27

# EXHIBIT "H"

Case 1:17-cv-01290-DJS Document 91-18/2023-3504734 Filed 02/04/22 Page 51 of 264

APPENDIX **1302**

CONTROL # ____20320-15____

HOME _____
WORK _____

DEPOSITION OF A WITNESS

STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

COURT

NAME ___Kathleen CRisafulli___ DATE OF BIRTH _____

RESIDING AT ___St Mary's Hospital. Troy NY 12180___ AGE _____

OCCUPATION ___Emergency Room Doctor.___

DEPOSE AND SAY: On February 26th 2015 I was working the
Emergency Rm of ST Mary's Hospital Troy NY. A
Black Female child approximately 2yns of Age was
Brought in in Full Arrhest. I, Along with staff.
Worked To resuscitate the child, We were unable
AND I pronouced The Death of The child This was
Approximately 2:10 pm.
At About 2:30 pm The mother of The child
Rebecca Parker Arrived At The Hospital. I met
With Her, She said to me "Why is she Dead.
Babies Dont go to sleep AND Not Wake up". I Told
her I really Don't know. She said to me "Why is
my Baby Dead, Was she Strangled" I Told her
I did'nt Know.
On March 5 2015 I met with Detective SN
Pannow AND g Auchia This statement. kcmo

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL
LAW OF THE STATE OF NEW YORK.

DATE ___3/5/15___ TIME: ___11:30 am___ SIGNED: ___Kathleen Crisafulli. MD___

WITNESS: _____

TPD 118/82

Case 1:17-cv-01290-DJS Document 145-1 Filed 02/04/22 Page 254 of 27

# EXHIBIT "I"

**APPENDIX**   **1304**

PHONE

CONTROL # _20320_

HOME _____

WORK ███████████

**DEPOSITION OF A WITNESS**

COURT

STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

NAME _Russell E. Brown_ DATE OF BIRTH ███████████

RESIDING AT ███████ AVE ███ _Troy NY_ AGE _____

OCCUPATION _TPB Retired_

DEPOSE AND SAY: That on 2/26/15 at Approx. 9:00AM I went to the ~~Stew~~ ████████ at ████████ to get my coffee like I do every day. I was talking to Rebecca who works there & she asked me if I would give her a ride home today. I do this for her a couple times a week, I told her I would. I went back to ████████ about 12:50pm & I waited for her to finish working, we left Stewarts at about 5-7 minutes after 1:00pm & we got to Rebecca's house around 1:18-1:20pm, Rebecca had told me that someone had frauded her Checking Account & I told her someone had done that to me to so I asked her to see the checks to see if it was the same kind of check that was used to fraud me; when we pulled up to Rebecca's house she got out of my vehicle & went into the house & came out with the check & when she got to my car & handed me the check & at that time I saw & heard Rebecca's boyfriend Running across the street crying & yelling to call 911, that he couldn't get anyone to call 911 & that he was at the Restaurant for

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL LAW OF THE STATE OF NEW YORK.

DATE _3/6/15_ TIME: _1035_ SIGNED: _Russell Brown_

WITNESS: _PTL C Russell_ _5B39_

TPD 118/82

PHONE

CONTROL # 20320

HOME ▬▬▬▬

WORK ▬▬▬▬

**COURT**

## DEPOSITION OF A WITNESS

STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

NAME Russell E Brown                    DATE OF BIRTH ▬▬▬▬

RESIDING AT ▬▬▬▬ Troy NY          AGE ▬▬

OCCUPATION R Brown

DEPOSE AND SAY: 20 minutes with 911 but no one was coming
at that time Rebecca Ran ran into the house &
I got out of my car & ran in the house & at that
time it seemed like the Police & firemen All
showed up. & the firemen started doing CPR,
the baby was laying on the sofa when we got into
the apartment. After they put the baby in the
ambulance I stayed a couple minutes & then left.
                                                                    RB

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL
LAW OF THE STATE OF NEW YORK.

DATE 3/6/15          TIME 1035          SIGNED: Russell Brown

WITNESS: PO C Pha AM 5839                                    TPD 118/82

APPENDIX

# EXHIBIT "J"

**SEARCH WARRANT APPLICATION (C.P.L. 690.35)**

SECOND: THE FOLLOWING ALLEGATION OF FACTS ARE SUBMITTED IN SUPPORT OF THE ABOVE STATEMENT:

*(1)  Are based upon personal knowledge of the applicant

*(2)  Are based upon information and belief, the sources of such information and the grounds for such belief are as follows:

I, Michael E Parrow Sr., having been employed by the Troy Police Department for 33 years and currently holding the position of Detective Sergeant, have been recently assigned to the investigation of the crushing death of V██ D████ ,DOB 2█████.

On February 15th 2015 at 2p.M., members of the Troy Police Department were called to ████████ Avenue, in the City of Troy, for a report of an unresponsive 2yr old female child. Upon arrival Troy Fire Department they located the lifeless body of V██ D███ DOB ██████ on a couch in the 1st floor apartment of Rebecca Parker DOB ███████Mother and Michael Davis DOB ██████████Davis stated to responding Fire Personnel that the child had soiled her diaper earlier in morning. He brought her to the bathroom and then put her to bed. She was there since 8:30 9 A.M. when she went to her room for a nap. Davis stated that he slept and when he realized that he had not heard from V██ around Noon on the 15th, he went to wake her. He stated she was unresponsive. He started CPR. She didn't respond. He attempted to use cell phone to call for help and the battery was dead. He then ran outside looking for help He stated he found no one was around. He stated that he returned the apartment and began CPR again. He the crossed to the restaurant Testo's and asked that they call 911 for him. The mother returned to the residence as the Fire Department was administering CPR. Child was transported to St Mary's Hospital in Troy New York. She was treated and evaluated. V███ D███ was pronounced at the ER this date.

Autopsy revealed that the child, V███ D████ had sustained crush injuries which was inconsistent with the administration of the CPR by either Michael Davis or Troy Fire Department. After investigation, by Detective Fountain, Mr. Davis was charged with Manslaughter for his actions with V██ D█████ on February 15th 2016.  During the investigation Detective Fountain secured the cell phone Mr. Davis stated he attempted to use to call for help. After further investigation by Troy Police Detectives, we have reason to believe that this mobile cellular device belongs to the Michael Davis may contain evidence which would assist in the investigation of the death of V██ D███

The victim, V███ D████, was taken to St. Mary's Hospital in Troy, where she pronounced death after evaluation of ER Doctor Cristifulli.

This Detective was recently requested to assist in the investigation and secure a search warrant for the afore described Cell phone

The aforementioned mobile cellular device needs to be searched in order to discover if any evidence that tends to prove useful in the Manslaughter investigation of V███ D████.

Attached: TPD 3205
          Affidavit of Retired Detective Ronald Fountain .

Case 1:17-cv-01290-DJS Document 91-1 Filed 02/04/22 Page 26 of 27
Case 1:17-cv-01290-DJS Document 91-1 Filed 02/04/22 Page 57 of 264

**APPENDIX**

**1308**

<u>SEARCH WARRANT APPLICATION (C.P.L. 690.35)</u>

WHERETOFORE, the applicant requests that this Court issue a search warrant directing search for and a seizure of the above described property in or upon the above designated or described place, vehicle or person.
Current in Possession of the Troy Police Department
The electronic or digital contents of the Motorola Black in color, Cell Phone Model Number ~~██████████~~ — ~~██████~~3, MEID(HEX) ~~███████████~~ MEID(DEC) ~~███████████████~~

SUBSCRIBED and sworn to
before me this 27th day of June
2016

_____
JUDGE

D/Sgt Michael E. Parrow Sr.

# APPENDIX

## AFFIDAVIT

COUNTY OF RENSSELAER    )
                             ) SS:
STATE OF NEW YORK        )

I, Ron Fountain, a retired detective of the Troy Police Department, City of Troy, County of Rensselaer, State of New York, do hereby state under penalty of perjury that:

1. During the year 2015 I investigated a case involving the death of a child, V██ D███ who died on 2/26/15.

2. During said investigation I interviewed a Michael Davis (DOB ██████ on March 2, 2015 at the Troy Police Department in Troy, New York.

3. During said interview on March 2, 2015, at approximately 11:58 AM, Michael Davis gave your deponent a black Motorola cellular telephone model number ████████████ ███████ MEID(HEX)████████████ ██1, MEID(DEC) ████████ which I secured in my case file for further investigation at some later time.

Dated: 6.8.16

_____
Ron Fountain

Sworn to before me this ___8th___ day of June 2016

_____
Notary Public

CINDY B. MATTISON
Notary Public, State of New York
No. 01MA6171013
Qualified in Rensselaer County
Commission Expires July 16, 20__19

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

MICHAEL DAVIS-GUIDER,

                     Plaintiff,

          -against-

CITY OF TROY, RONALD FOUNTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES
MCDONALD, Individually, TIM COLANERI, Individually,
ADAM R. MASON, Individually, RENSSELAER COUNTY,
MICHAEL SIKIRICA, Individually, and
JOEL ABELOVE, Individually,

                     Defendants.

_____

**ADAM R. MASON**
**AFFIDAVIT**
Case No.: 1:17-cv-1290
(FJS/DJS)

STATE OF NEW YORK       )
                          )ss.:
COUNTY OF RENSSELAER  )

      **ADAM R. MASON**, being duly sworn deposes and says:

      1.      I am a defendant in the above-captioned matter and as such I am fully familiar with

the facts and circumstances herein. I make this Affidavit in support of both mine and the City

Defendants' motion for summary judgment.

      2.      In February 2015, I was employed by the Troy Police Department ("TPD") as a

sergeant assigned to the Detective Bureau, commonly referred to as a Detective-Sergeant.

      3.      I am currently a Captain with the TPD.

      4.      Through my employment as a Detective-Sergeant with TPD, on or about February

26, 2015, I became aware of the death of an infant named Viola Davis ("V.D.").

      5.      To the best of my recollection, co-Defendant, Ronald Fountain ("Fountain") was

the assigned lead investigator in the matter.

1

6. I had a very limited investigatory role in V.D.'s death investigation.

7. I never attended V.D.'s autopsy that was conducted by co-Defendant, Dr. Sikirica.

8. As some point in the early investigation, my Captain at the time, Captain Sprague, had requested that Detective-Sergeant Parrow and I go speak with the Plaintiff and V.D.'s mother, Rebecca Parker, because there was concern that TPD's relationship with the Plaintiff was deteriorating as a result of the investigation and we wanted to maintain a positive relationship.

9. Detective-Sergeant Parrow and I went to the home where the Plaintiff and Ms. Parker were staying, and Detective-Sergeant Parrow spoke with the Plaintiff away from me.

10. To the best of my recollection, I did not hear any of the conversation between Detective-Sergeant Parrow and the Plaintiff because I was speaking with the owner of the building where the Plaintiff was staying.

11. On March 12, 2015, I attended a meeting with Dr. Sikirica, Detective-Sergeant Parrow, Fountain, co-Defendant Tim Colaneri and Rensselaer County ADA Andra Ackerman.

12. I do not recall if Detective-Sergeant Parrow and I spoke with the Plaintiff prior to the March 12, 2015 meeting or after.

13. To the best of my recollection, during said March 12, 2015 meeting, we discussed Dr. Sikrica's preliminary autopsy results and the facts that had been collected at that juncture in the investigation.

14. To the best of my recollection, during said March 12, 2015, Dr. Sikirica informed us that V.D. had broken ribs and extensive internal damage to her liver.

15. During said March 12, 2015 meeting, we discussed whether the injuries V.D. sustained could have been the result of CPR and Dr. Sikirica's professional medical opinion was

2

that the injuries he observed were far more extensive than what would be expected from CPR.

16. Based upon Dr. Sikirica's observations during his autopsy, it appeared that V.D.'s death was not accidental.

17. To the best of my recollection, during said March 12, 2015 meeting, there was also a discussion regarding whether I would interview the Plaintiff in a formal setting.

18. Ultimately, I did not interview the Plaintiff.

19. I had no further involvement in the investigation of V.D.'s death.

20. Eventually, I came to learn that the Plaintiff was indicted by a grand jury and was arrested for the death of V.D. but I was not present for such arrest.

21. I did not testify before the grand jury nor did I have knowledge of what specific evidence was presented to the grand jury.

22. I did not prepare any charging instrument, nor did I arrest the Plaintiff.

23. I did not meet with any member of the Rensselaer County District Attorney's Office, including co-Defendant, Joel Abelove who was the Rensselaer County District Attorney at the time, to discuss any aspect of the Plaintiff's criminal court proceedings.

24. I was not involved in any trial preparation, nor did I testify at Plaintiff's trial.

25. I did not observe or hear of any impropriety by any member of the TPD, by Dr. Sikirica, or by and member of the Rensselaer County District Attorney's Office in connection with the investigation into V.D.'s death nor the prosecution of the Plaintiff for the same.

26. I had no reason to intervene to prevent any alleged constitutional deprivation as such never occurred.

3

**WHEREFORE**, Defendant prays for an Order granting the City Defendants' motions for summary judgment pursuant to Fed. R. Civ. P. 56(a) together with such other and further relief as this Court deems just and proper.

_____
Adam R. Mason

Sworn to before me this
3rd day of February, 2022.

_____
Notary Public, State of New York

RHIANNON I. SPENCER
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02SP6393260
Qualified in Albany County
Commission Expires June 10, 2023

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

———————————————————————

MICHAEL DAVIS-GUIDER,

Plaintiff,

-against-

CITY OF TROY, RONALD FOUNTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES
MCDONALD, Individually, TIM COLANERI, Individually,
ADAM R. MASON, Individually, RENSSELAER COUNTY,
MICHAEL SIKIRICA, Individually, and
JOEL ABELOVE, Individually,

Defendants.

———————————————————————

**TIM COLANERI
AFFIDAVIT**
Case No.: 1:17-cv-1290
(FJS/DJS)

STATE OF NEW YORK          )
                           )ss.:
COUNTY OF RENSSELAER       )

**TIM COLANERI**, being duly sworn deposes and says:

1. I am a defendant in the above-captioned matter and as such I am fully familiar with the

facts and circumstances herein. I make this Affidavit in support of both mine and the Troy City

Defendants' motion for summary judgment dismissing the complaint.

2. In February 2015, I was employed by the Troy Police Department ("TPD") as a patrol

officer assigned to the Detective Bureau and was commonly referred to as a Detective-Sergeant.

3. I am currently a Sergeant with the TPD.

4. I was on duty on February 26, 2015 and was informed that TPD had been dispatched for a

report of an unresponsive infant, later identified as Viola Davis. ("V.D.").

5. To the best of my recollection, I responded to the hospital that V.D. had been transported

to and was informed that she had passed away under unknown circumstances.

1

6. To the best of my recollection, after reporting to the hospital, I went to TPD headquarters and interviewed the Plaintiff, as an individual identified as a primary caregiver for V.D., in the presence of co-Defendant Ronald Fountain ("Fountain") and co-Defendant Charles McDonald ("McDonald").

7. Said conversation consisted of me asking questions to the Plaintiff regarding V.D.'s health and condition leading up to being found unresponsive and what, if anything, the Plaintiff did at the time.

8. I recorded the conversation we had with the Plaintiff on my cell phone.

9. After the conversation had ended, I responded to the scene where a search was being executed.

10. To the best of my recollection and upon reviewing relevant documentation, while at the scene when the search warrant was being executed, I conducted a canvass of the neighborhood where V.D. had resided with the Plaintiff and her mother, Rebecca Parker.

11. I interviewed the owner of Testo's Restaurant who confirmed what the Plaintiff had stated which was that the Plaintiff had gone inside the Restaurant to ask to use a phone to call 911.

12. On February 27, 2015, I attended V.D.'s autopsy, which was conducted by co-Defendant, Dr. Sikirica.

13. Also, in attendance at said autopsy was McDonald, Fountain, TPD Evidence Technician Officer Buttofucco, and Rensselaer County Assistant District Attorney Andra Ackerman.

14. I have attended many autopsies with Dr. Sikirica both before and after V.D.'s autopsy.

15. I have attended other autopsies where a member of the Rensselaer County District Attorney's Office was present.

2

16. It is not abnormal for the police or members of the Rensselaer County District Attorney's Office to attend an autopsy especially when a seemingly healthy juvenile victim has died under suspicious or unknown circumstances.

17. We may attend an autopsy to receive a preliminary understanding of the injuries the victim may have sustained to further our investigation.

18. It is typical for an evidence technician from the police department to attend an autopsy in the event an item of evidence needs to be documented to maintain the chain of custody.

19. I have never directed nor instructed Dr. Sikirica to make any specific medical finding or determination in his autopsy report.

20. In this case specifically, I never directed nor instructed Dr. Sikirica what his medical findings should be or what the contents of his autopsy report should be.

21. I did not observe, nor did I ever become aware of any individual involved in the investigation of V.D.'s death attempting to direct Dr. Sikirica to make any specific medical finding or to render any opinion that was not his own.

22. I never conspired with Dr. Sikirica to render a medical opinion or to falsify the contents of V.D.'s autopsy report.

23. To the best of my knowledge, Dr. Sikirica is a commensurate professional who rendered his medical opinion, and all of his medical opinions that I know of, based upon his professional opinion and in furtherance of the truth.

24. To the best of my recollection and based upon documentary evidence, my next relevant involvement in V.D.'s death investigation was on March 12, 2015 when I attended a meeting with Dr. Sikirica, Detective-Sergeant Parrow, Fountain, Mason and ADA Andra Ackerman.

3

25. To the best of my recollection, during said March 12, 2015, meeting, we discussed Dr. Sikirica's initial medical findings and opinions.

26. To the best of my recollection, either during the autopsy on February 27, 2015 or at the March 12, 2015 meeting, Dr. Sikirica expressed that V.D. had extensive trauma to her liver and had broken ribs which were beyond expected medical trauma.

27. At the time of said meeting, it appeared that V.D.'s death was not accidental due to said observed injuries.

28. To the best of my recollection, I had no further involvement in the investigation of V.D.'s death until October 2, 2015, when I was present when the warrant for the Plaintiff's arrest was executed pursuant to a grand jury indictment.

29. I believe probable cause existed to arrest the Plaintiff based upon the grand jury indictment and the warrant issued for his arrest.

30. I did not testify before the grand jury nor was informed what specific evidence the Rensselaer County District Attorney's Office would present to the grand jury.

31. I did not meet with any member of the Rensselaer County District Attorney's Office, including Joel Abelove, to prepare for the grand jury or the criminal trial.

32. I did not testify at trial.

33. I did not observe or hear of any impropriety by any member of the TPD, by Dr. Sikirica, or by and member of the Rensselaer County District Attorney's Office in connection with the investigation into V.D.'s death nor the prosecution of the Plaintiff for the same.

34. I had no reason to intervene to prevent any alleged constitutional deprivation as such never occurred.

4

**WHEREFORE**, Defendant prays for an Order granting the City Defendants' motions for summary judgment pursuant to Fed. R. Civ. P. 56(a) together with such other and further relief as this Court deems just and proper.

Tim Colaneri

Sworn to before me this
3rd day of February, 2022.

Notary Public, State of New York

RHIANNON I. SPENCER
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02SP6393260
Qualified in Albany County
Commission Expires June 10, 20 23

5

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

MICHAEL DAVIS-GUIDER,

                                        Plaintiff,          **CHARLES MCDONALD**
                                                            **AFFIDAVIT**
                    -against-                               Case No.: 1:17-cv-1290
                                                            (FJS/DJS)

CITY OF TROY, RONALD FOUNTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES
MCDONALD, Individually, TIM COLANERI, Individually,
ADAM R. MASON, Individually, RENSSELAER COUNTY,
MICHAEL SIKIRICA, Individually, and JOEL ABELOVE, Individually
                                        Defendants.

_____

STATE OF NEW YORK          )
                           )ss.:
COUNTY OF RENSSELAER       )

      **CHARLES MCDONALD**, being duly sworn deposes and says:

      1.    I am a defendant in the above-captioned matter and as such I am fully familiar with

the facts and circumstances herein. I make this Affidavit in support of both mine and the Troy

City Defendants' motion for summary judgment dismissing the complaint pursuant to Fed. R. Civ.

P. 56(a).

      2.    In February 2015, I was employed by the Troy Police Department ("TPD") as a

patrol officer assigned to the Juvenile Detective Bureau.

      3.    I was on duty on February 26, 2015, when I received a directive from my supervisor

to report to an address for a juvenile cardiac arrest.

      4.    I responded with co-Defendant, Ronald Fountain ("Fountain").

      5.    At some point, I learned that the child's name was Viola Davis ("V.D.").

      6.    When I arrived on scene, V.D. was already in transport to the hospital and I

1

observed the Plaintiff standing outside with his girlfriend, Rebecca Parker who I learned was the biological mother of V.D.

7.      The Plaintiff and Ms. Parker were asked to accompany the police to TPD central station to provide additional information.

8.      Both the Plaintiff and Ms. Parker voluntarily agreed to go to TPD central station to provide information.

9.      At that point, we had no knowledge of V.D.'s status or what had happened.

10.     The Plaintiff rode in an unmarked police vehicle with Fountain and me while Ms. Parker rode with another officer.

11.     Plaintiff was brought into my office and Ms. Parker was brought to a different office to provide information.

12.     Upon our arrival at TPD central station, Fountain reported to the hospital to obtain additional information about V.D.

13.     During that time, I stayed at TPD central station with the Plaintiff and engaged in small talk while additional information was obtained by Fountain.

14.     At some point, I was informed that V.D. had died under unknown circumstances.

15.     Shortly thereafter, Fountain and co-Defendant Tim Colaneri ("Colaneri") returned from the hospital and came to my office where the Plaintiff and I were still waiting.

16.     Colaneri asked the Plaintiff questions from a form document about V.D.'s activities and condition during the days leading up to her death.

17.     Thereafter, the Plaintiff consented to having his home searched and a search warrant was also obtained and executed upon. (TPD Permission to Search signed form attached to

2

Fountain Affidavit as Exhibit "B").

18.     To the best of my recollection and upon reviewing relevant documentation, I was not present for the warrant execution at the Plaintiff's residence.

19.     After the warrant was executed upon, the Plaintiff left police headquarters.

20.     On February 27, 2015, I attended V.D.'s autopsy that was conducted by co-Defendant Dr. Sikirica with Fountain, Colaneri, TPD Evidence Technician Officer Buttofucco and Rensselaer County Assistant District Attorney Andra Ackerman.

21.     To the best of my recollection, as we observed the autopsy, Dr. Sikirica discussed medical aspects of the autopsy and what he then observed.

22.     I never directed Dr. Sikirica on how to conduct the autopsy or what if any medical determinations he should make.

23.     Based upon my experience, it is not uncommon for the police or members of the District Attorney's Office to attend an autopsy.

24.     Based upon my review of the Investigation Report Narrative completed at or about the time of the incident, after the autopsy on February 27, 2015, Fountain and I went to the Plaintiff's residence and spoke with him, Ms. Parker and other family members then present. (*See*, Investigation Report Narrative attached to Fountain Affidavit as Exhibit "A").

25.     Further, based upon my review of the Investigation Report Narrative, Fountain and I asked the Plaintiff if he would agree to be interviewed a second time. (*See*, Id.).

26.     On March 2, 2015, the Plaintiff went to TPD central station for an interview which was recorded. (3/2/15 Miranda Waiver attached to Fountain Affidavit as Exhibit "C").

27.     Fountain conducted the interview with the Plaintiff.

3

28. To the best of my recollection, I was present for the interview but, I watched the interview from outside the room through a video recording system.

29. During the interview on or about March 2, 2015, the Plaintiff demonstrated how he allegedly performed CPR on V.D. when he found her unresponsive.

30. After the interview concluded, the Plaintiff left the police station.

31. I did not attend the meeting on March 12, 2015 that Colaneri, Fountain, co-Defendant Adam Mason, Detective-Sergeant Parrow, Rensselaer County Assistant District Attorney Andra Ackerman, and Dr. Sikirica attended.

32. At some time in or about August 2015 or September 2015, Dr. Sikirica released his final autopsy report.

33. Between the March 12, 2015 meeting and the release of Dr. Sikirica's autopsy report, Fountain and I continued to investigate additional reports.

34. Fountain was in communication with the Rensselaer County Child Protective Services who had contact with the mother of the Plaintiff's daughter who resided in New York City and V.D.'s father.

35. During the investigation, and based upon the Plaintiff's own statements, it was determined that the Plaintiff was the only person with V.D. during the days leading up to her death and immediately before her death.

36. During the investigation we had confirmed that Ms. Parker had been with V.D. the night before her death and Ms. Parker had stated to medical personnel that while V.D. had cold symptoms a couple weeks prior to her death, she was perfectly find the days leading up to her death including the night before. (Parker Statement attached to Holehan Aff. as Exhibit "B").

4

37.     Through the investigation and interviews, we confirmed that Ms. Parker had seen V.D. on the morning of her death and that Ms. Parker left for work around 7:45 a.m. on said day.

38.     On September 9, 2015, after the final autopsy results were released, the Plaintiff was interviewed again.

39.     To the best of my recollection, the Plaintiff did not provide any additional information than what we already had, and he left the station at the conclusion of his interview.

40.     At some point, the matter was presented to a grand jury.

41.     I did not testify before the grand jury.

42.     I learned that the Plaintiff was indicted by the grand jury and an arrest warrant was issued pursuant to said indictment.

43.     I do not believe I was present when the Plaintiff was arrested on October 2, 2015.

44.     In or about February 2016, I retired from the Troy Police Department.

45.     On or about May 3, 2016, I testified at a suppression hearing in connection with my observations and conversations with the Plaintiff in my office at the police station on 2/26/2015.

46.     I did not testify at the Plaintiff's criminal trial.

47.     I did not observe or hear of any impropriety by any member of the TPD, by Dr. Sikirica, or by and member of the Rensselaer County District Attorney's Office in connection with the investigation of V.D.'s or the prosecution of the Plaintiff for the same.

48.     I had no reason to intervene to prevent any alleged constitutional deprivation as such never occurred.

5

**WHEREFORE,** Defendant prays for an Order granting the City Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56(a) together with such other and further relief as this Court deems just and proper.

Charles McDonald

Sworn to before me this
4th day of February, 2022.

Notary Public, State of New York

RHIANNON I. SPENCER
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02SP6393260
Qualified in Albany County
Commission Expires June 10, 20____

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MICHAEL DAVIS-GUIDER,

Plaintiff,

-against-

CITY OF TROY, RONALD FOUNTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES
MCDONALD, Individually, TIM COLANERI, Individually,
ADAM R. MASON, Individually, RENSSELAER COUNTY,
MICHAEL SIKIRICA, Individually, and
JOEL ABELOVE, Individually,

Defendants.

**ATTORNEY
DECLARATION**
Case No.: 1:17-cv-1290
(FJS/DJS)

**RHIANNON I. SPENCER, ESQ.**, under penalty of perjury, sets forth the following:

1.      I am an attorney duly licensed and admitted to practice in all Courts of the State of

New York and I am admitted to practice in the United States District Court for the Northern District

of New York. I am employed by the law firm of Pattison, Sampson Ginsberg & Griffin, PLLC

who are the attorneys for the above-named defendants City of Troy, Ronald Fountain, Danielle

Coonradt, Charles McDonald, Adam R. Mason, and Tim Colaneri (hereinafter referred to as the

"City Defendants").

2.      I submit this Declaration, together with the accompanying Memorandum of Law in

support of said Defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal

Rules of Civil Procedure seeking dismissal of the Plaintiff's Third Amended Complaint in its

entirety against these moving defendants.

3.      As discussed in the accompanying Memorandum of Law, the City Defendants

(movants) seek a dismissal of Plaintiff's Third Amended Complaint on the grounds that there is

1

no question of material fact that a jury ought to consider or, in the alternative, because the City

Defendants are entitled to qualified immunity.

    4.    In furtherance of the City Defendants' motion, the following relevant exhibits are

attached here:

    A.  Exhibit "A": September 29, 2015 grand jury testimony of Defendant Fountain;

    B.  Exhibit "B": Excerpt from the Plaintiff's underlying criminal trial of the testimony of

        the Plaintiff's expert witness, Dr. Shaku Teas;

    C.  Exhibit "C": Plaintiff's Expert Witness Disclosure in the instant civil matter.

Dated: February 4, 2022.

Rhiannon I. Spencer, Esq.
**Pattison, Sampson, Ginsberg & Griffin, PLLC**
Bar Roll No. 102582
*Attorneys for Defendants, The City of Troy,*
*Danielle Coonradt, Charles McDonald,*
*Adam R. Mason, Ronald Fountain, and*
*Tim Colaneri*
22 First Street - P. O. Box 208
Troy, New York 12181-0208
(518) 266-1001

2

# APPENDIX

# EXHIBIT "A"

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                    43

1   Thereupon,

2                          RONALD FOUNTAIN,

3   having been duly sworn by The Foreperson of the

4   Grand Jury, was examined and testified as

5   follows:

6   EXAMINATION BY MS. HALL:

7        Q.    Again, if you would state your name

8   and spell it for the record, please?

9        A.    It's Ronald Fountain, F-O-U-N-T-A-I-N.

10       Q.    And where are you currently employed?

11       A.    Troy Police Department.

12       Q.    And how long have you been employed

13   there?

14       A.    Twenty-three years.

15       Q.    And in what capacity are you currently

16   working in?

17       A.    I am the juvenile investigator/sex

18   crimes for the City of Troy Police.

19       Q.    And what exactly do you do on a daily

20   basis?

21       A.    I am assigned every case in the City

22   of Troy, well, just about, regarding a sexual

23   assault, a child injury, a child fatality, an

24   adult sexual assault, all come to me.

Case 23-589, Document 93, 01/18/2024, 3604734, Page78 of 264

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15

44

```
 1        Q.    Do you have any specialized training

 2   with respect to those cases?

 3        A.    I do.  I've been to Dallas, Texas for

 4   the Crimes Against Children conference.  They

 5   sent me to Seattle, Washington for the Juveniles

 6   for Justice.  I've been to the New York State

 7   Best Practices, the Advanced Best Practices,

 8   investigator school, and probably a whole bunch

 9   of other little trainings every year to keep me

10   updated on all the laws.

11        Q.    And how long have you been in that

12   capacity?

13        A.    About eight years.

14        Q.    And were you working in that capacity

15   on February 26th of 2015?

16        A.    I was.

17        Q.    And did there come a point in time

18   when you were called to respond to 856 4th Ave.?

19        A.    Yes.

20        Q.    And where is that?

21        A.    It is in Lansingburgh, the northern

22   part of the city.

23        Q.    City of Troy?

24        A.    County of Rensselaer, State of New
```

JOAN L. BURLEIGH (518) 767-3030

P27
5/3/'16

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                          45

1    York.

2         Q.    And what was your purpose of going

3    there?

4         A.    There was a call for a child fatality

5    at the time.  They didn't know if the child was

6    going to make it or not, so they called -- my

7    Captain called myself and told me to respond to

8    the scene.

9         Q.    And you in fact did that?

10        A.    I did.

11        Q.    And describe what occurred when you

12   arrived.

13        A.    When we got there there was a couple

14   of patrol officers that were already at the

15   scene.  An ambulance had already left.  I think I

16   caught the tail end of the ambulance pulling

17   away.  And the mother of the child and the

18   boyfriend of the mother were both still at the

19   scene, outside, waiting.

20        Q.    And what was the mother's name, if you

21   recall?

22        A.    Her name is Rebecca Parker.

23        Q.    And what was the mother's boyfriend's

24   name?

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                    46

1      A.    Michael Davis Guider (phonetic
2  spelling).
3      Q.    And with respect to Michael Davis
4  Guider, do you know his date of birth?
5      A.    I'm going to go with ████ of '86.
6      Q.    Are you guessing?
7      A.    I'm pretty sure.  I know it's 1986.
8  That's for sure.
9      Q.    You said the ambulance had left.
10     A.    It did.
11     Q.    Who took her?  Who left in the
12  ambulance, if you know?
13     A.    The 2-and-a-half year old, V████
14  D████
15     Q.    And mom nor Michael Davis went in that
16  ambulance?
17     A.    Neither one of them went in the
18  ambulance.
19     Q.    Do the Troy Police prevent either
20  party from going in an ambulance?
21     A.    No, we would not.
22     Q.    Would the paramedics -- have you
23  worked with paramedics before?
24     A.    Twenty-six years.

P29
5/3/'16

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                    47

1       Q.    And do they prevent a parent or a

2   legal guardian to go with a child in an

3   ambulance?

4       A.    Absolutely they would let them go.

5       Q.    Would let me go?  They wouldn't

6   prevent them from going --

7       A.    They would not stop them.  No.

8       Q.    And once you arrived at this address,

9   February 26th, 2015, describe what you did.

10      A.    Well, we spoke to Michael and Rebecca

11  just briefly, and asked them if they would come

12  down to the police station and talk to us because

13  we didn't know what was going on yet.

14            So myself and my partner, Chuck

15  McDonald, asked Michael to go with us.  Michael

16  sat in the front see, because he's a very big

17  fellow, and Chuck sat in the backseat, and we

18  drove down to the police station.  Rebecca was

19  brought down by one of the patrol officers who

20  was there, and she was brought to the station.

21      Q.    And they both went voluntarily?

22      A.    They did.

23      Q.    And did there come a point in time on

24  February 26th when you had a conversation with

Case 23-589, Document 93, 01/18/2024, 3604734, Page82 of 264

P30
5/3/'16

48

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15

1    Michael Davis?

2         A.    There did.

3         Q.    Would you describe that for the grand

4    jurors, please.

5         A.    He was sitting downstairs in Chuck

6    McDonald's office, which is right next to mine.

7    We're in the juvenile section of the police

8    department, the back part of it.  And we asked

9    Michael -- well, we started off by asking him how

10   the day went.  Who was at the house.  What could

11   have happened.  And according to Michael, there

12   was nobody at the house but him from the time

13   Rebecca left for work in the morning at 8:30.

14   And when she returned home at 1 p.m., the only

15   person in that house was him and Viola Davis.

16        Q.    And did you at any point in time

17   verify that information?

18        A.    He did.  We got a statement from

19   Rebecca, we got a statement from an independent

20   witness that she was at work, and we got her

21   Stewart's work records for that day, that she was

22   using the -- the cash register at Stewart's

23   between the hours of 9 a.m. and 1 p.m.

24        Q.    So she was not with the child between

Case 23-589, Document 93, 01/18/2024, 3604734, Page83 of 264

P3I
5/3/'16

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                    49

1    9 and 1 -- at 9 a.m. and 1 p.m. on February 26th?

2         A.    That's correct.

3         Q.    And did Michael describe the day, or

4    how the day started?

5         A.    He did.

6         Q.    And could you describe that for the

7    Grand Jury, please.

8         A.    Michael said that he woke up to the

9    smell of V██████ pooping in her Pamper.  And

10   they're trying to potty train her, so he

11   immediately made her stop pooping in her Pamper

12   and he guided her towards the back bathroom.  The

13   bathroom was in the back part of the apartment.

14          At that same time Rebecca was leaving

15   and said, goodbye, I love you, to them and walked

16   out the door.  He continued to bring her back,

17   helped her get on the toilet, and I guess she

18   finished pooping, according to him, at 8:30 in

19   the morning.

20          Then after that he brought her back

21   into the living room where he sleeps.  He put a

22   new Pamper on her, he got her something to drink

23   and she didn't want it, and then she was tired at

24   8:30 in the morning and decided she wanted to go

JOAN L. BURLEIGH (518) 767-3030

001118

P32
5/3/'16

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15    50

1  back to bed.

2       Q.    Can you describe for the grand jurors

3  the layout of the apartment, the size of the

4  apartment?

5       A.    Sure. It's -- it's not huge, but it's

6  not tiny either. When you walk in the main entry

7  door you're in like a living room, that's

8  probably about, I don't know, 15, 20 feet by 15

9  feet. And that's where they have a couple of

10  mattresses and they sleep --

11       Q.    When you say "they" who are you

12  referring to?

13       A.    Oh. Rebecca and Michael have a

14  mattress and they sleep in there. There's a T.V.

15  with a -- with a D.V.D. player attached to it.

16  There's a futon to the left, that they can push

17  down into a bed, also. And then they have a

18  dresser in that room.

19       Immediately to the right of that room

20  is where V█████ slept. And there is a single bed,

21  a bunch of clothes and stuff like that. She has

22  a dresser, I believe. And then there's a space

23  heater on the ground to keep her warm because

24  they said that room kind of gets cold.

JOAN L. BURLEIGH (518) 767-3030

P33
5/3/'16

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15          51

1       The next room up is the kitchen, and

2    then after the kitchen is the bathroom.  And

3    that's the entire house.

4       Q.    The wall where Rebecca and Michael

5    sleep, is that a shared wall with V█████'s room?

6       A.    It is.

7       Q.    Okay.  From the room where V█████ --

8    where Michael and Rebecca sleep, can you see into

9    V████'s room?

10      A.    You can.

11      Q.    Describe what, if anything, he says

12   next.

13      A.    He told me that she went back to bed

14   because she was tired.  And he put a D.V.D. in

15   the recorder and he watched -- National Treasure

16   was the D.V.D. he told me he watched.  He watched

17   the D.V.D. and he fell asleep.

18      Q.    What's the next thing he told you.

19      A.    He told me that he awoke and the

20   credits were playing, and he decided to get up

21   and start making breakfast for him and V█████.  He

22   said he called in for V█████ a couple of times and

23   she didn't respond.  And we're assuming this is

24   around 12:30 p.m.  So about four hours later.

JOAN L. BURLEIGH (518) 767-3030

P34
5/3/'16

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15

1    Q.    Well, did the defendant at any point

2    in time tell you what time he woke up?

3    A.    He said he thought it was 11 or 12:00.

4    He wasn't sure.  He said he went in to see V████

5    she was lying in her bed.  He went to wake her up

6    and shake her, she wouldn't move.  At which time

7    he said that he started what he believed to be

8    C.P.R.  And he started compressions in the room.

9    Q.    Did he tell you how many times he did

10   that?

11   A.    He said in the room he did it once,

12   then he carried her out into the living room, put

13   her on the futon and there he again tried C.P.R.

14   When she didn't respond, he said he tried to get

15   a phone to work, but the phones weren't working,

16   his cell phones.  So he ran up to a neighbor's

17   house, and left V████ there.  He ran up about

18   five doors, knocked on a friend's house up the

19   street, nobody answered.  He went back again to

20   the house, checked on V████, who still wasn't

21   moving or breathing, again tried to give her

22   C.P.R.  She didn't respond.  He left the house

23   again, leaving V████ in the house, proceeded over

24   to the restaurant across the street.  It's

JOAN L. BURLEIGH (518) 767-3030

001121

P35
5/3/'16

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                    53

1    Testo's Restaurant in Troy, which is kitty-corner

2    to where they live.  He asked if he could use the

3    phone, one of the employees said, here.  You can

4    use my cell phone.  He then called for an

5    ambulance.  He called 9-1-1.  And I believe

6    within the next ten minutes the Fire Department

7    arrived at the scene.

8         Q.    Did he tell you what he did after

9    that?

10        A.    After he left Testo's, he was crossing

11   the street, at the same time the -- V█████ s

12   mother, Rebecca, was pulling in the house.  She

13   had gotten a ride from Mr. Brown, who was

14   dropping her off after her shift at Stewart's.

15   He went and said, she's not breathing.  She's not

16   breathing, to Rebecca.  And at the same time the

17   Fire Department was pulling in and the police

18   were pulling in.  And he said that was it.

19        Q.    Did -- at any point in time did he

20   describe how V████ was in the morning?

21        A.    He said she was a little slow to the

22   go.  I mean, he was -- she just wasn't, like, all

23   with it.  But she walked to the bathroom fine,

24   she wasn't thirsty.  He said she had had a cold,

JOAN L. BURLEIGH (518) 767-3030

P36
5/3/'16

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                    54

1    but that was about a week before.  She -- they

2    given her some over-the-counter Motrin from

3    Family Dollar.  She was fine.  She hadn't been

4    sick lately, not in the last few days.

5        Q.    Did he indicate when the last time he

6    had given her Motrin was, or Family Dollar

7    Ibuprofen?

8        A.    He said it was over a few days ago.

9    At least a few days ago.

10        Q.    Did he -- if you would, can you

11    describe what you observed as Michael Davis'

12    demeanor?

13        A.    Calm.  He wasn't running around or

14    screaming like you would think somebody would if

15    they had had a 2-and-a-half year old who wasn't

16    breathing.  And -- and he -- he was kind of

17    subdued.  He wasn't yelling.  He wasn't

18    screaming.  He wasn't claiming, I don't know what

19    happened.  He was just very even keel about

20    everything.

21        Q.    What is Michael Davis' relationship to

22    V&#9608;&#9608; D&#9608;&#9608;

23        A.    I think in a roundabout way, he might

24    be a cousin of hers.  He's not the biological

P37
5/3/'16

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                    55

1     father, but he might be a cousin of the

2     biological father.  And I'm not sure if there's

3     an actual blood relation or if it's an adoption

4     thing.

5          Q.    Okay.  But, suffice to say, Michael

6     Davis is cousins with V██████ D████' biological

7     father?

8          A.    Correct.

9          Q.    What, if anything, did he say after

10    that?

11         A.    Well, once we got to the police

12    station we spoke to him at length.  He told us

13    about his basketball career.  He told us about

14    how he got home the night before after going out

15    to a friend's house.  How V████ was already

16    asleep the night before when he got home around

17    ten.  She was already in bed.  It might have been

18    a little bit latter than that.  That she had

19    eaten SpaghettiOs, he thinks, the night before.

20    But besides that, he talked about himself a lot,

21    that he was the only person in the house.  There

22    was never anybody else in there.  He told me that

23    numerous times.

24               At subsequent interviews he told me he

P38
5/3/'16

56

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15

1    knew his own strength and he knew that he

2    couldn't harm a child.

3         Q.    Couldn't harm a child or --

4         A.    Well, he knew how to treat a child,

5    and that he had held many children and he knew

6    that he would not hurt them by holding them or

7    doing anything wrong.

8         Q.    Going back to that interview, did he

9    account for -- well, if you know, what time was

10   9-1-1 called?

11        A.    About 1:07 p.m., 1:05 p.m.

12        Q.    And you said he said he woke up

13   between 11 and 12?

14        A.    Yes.  But there was also no clocks,

15   and the phones weren't working, so he really

16   wasn't too sure of the time.

17        Q.    Did he have any explanation for a time

18   difference between 11 and 12 and when 9-1-1

19   arrived?

20        A.    He could not explain that.

21        Q.    Did he talk about V████ being injured

22   or hurt in any way that morning?

23        A.    He said there was nothing wrong with

24   her.  It's normal occurrence for her to be a

JOAN L. BURLEIGH (518) 767-3030

001125

Case 23-589, Document 93, 01/18/2024, 3604734, Page91 of 264

P39
5/3/'16

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                '57

1    little tired and sometimes go back to bed at 8:30

2    in the morning for a 2-and-a-half year old.

3         Q.    Did he indicate to you how C.P.R. was

4    performed?

5         A.    He did.  He --

6         Q.    Could you describe that, please.

7         A.    He explained to me in -- in -- he

8    would place his hand underneath her back and he

9    would push very gently on the front of her chest

10   and her stomach area, and then he would blow into

11   her mouth a few times.  And he said her chest

12   would rise and the air wouldn't come out.  So he

13   slowly, again, pushed the air out of her and

14   would try blowing in again, but the air wouldn't

15   come out, he'd have to push it out.

16        Q.    Did he tell you how many times he

17   tried that?

18        A.    At least three different times.

19        Q.    And you said that he went for help, he

20   left the child at the house?

21        A.    Twice.

22        Q.    Was anyone home with that child?

23        A.    No one.

24        Q.    With respect to V▋▋▋ D▋▋▋, do you

P40
5/3/'16

58

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15

1  know what she was wearing on February 26th of

2  2015?

3      A.    I believe she had on a -- some type of

4  nightshirt, with a flower on it, and a Pamper.

5      Q.    And was there any discussion with him

6  with respect to the Pamper?

7      A.    We asked him if he had changed it

8  recently.  We asked him if he changed it after he

9  gave her C.P.R.  We asked him about the one that

10  was on the floor.  And how he stopped her in mid

11  poop from pooping in the rest of it and then got

12  back to the toilet to continue pooping.  He --

13  he -- his explanation was, this is what -- how

14  they do it, and this is how they're potty

15  training her.

16          He stated he had not changed her

17  diaper after C.P.R.  And that was the way we

18  found her.

19      Q.    And with respect to the diaper, were

20  there any observations made at the time that the

21  child was found?

22      A.    I believe the diaper was clean.

23      Q.    When you say "clean," is that dry

24  and --

Case 23-589, Document 93, 01/18/2024, 3604734, Page93 of 264

P41
5/3/'16

(

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15          59

1          A.     Dry and no fecal matter.

2          Q.     Did you have an opportunity to walk

3     through the house?

4          A.     I did.

5          Q.     Did you make any observations with

6     respect to the apartment, and specifically

7     Viola's room?

8          A.     Her bedsheets, it -- it kind of looked

9     like made.  There was a little indentation on the

10    pillow where the head was, and then the sheet was

11    perfect, and the -- and the blanket over the

12    sheet was really neat.  It wasn't like fussed up

13    or messed up or anything.  It was all kind of

14    very neat, like somebody had just got out of bed

15    and pulled everything back up.

16         Q.     And is that the area where Michael

17    Davis described finding V███ D████ unresponsive?

18         A.     Yes.

19         Q.     Was the information -- what you were

20    seeing with your eyes consistent with the

21    information he was giving you?

22         A.     Yes.

23         Q.     It looked like C.P.R. had been

24    performed in that --

P42
5/3/'16

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                    60

1          A.     Oh, no.   It -- there was no messy

2     stuff.   He definitely wasn't moving her on top

3     and messing up the sheets.   It just didn't look

4     like it.   But could he have?   I don't know.

5          Q.     And you said with respect to a dirty

6     diaper, you observed a dirty diaper?

7          A.     It was sitting on (sic) the living, on

8     the floor next to a sippy cup.

9          Q.     With respect to Viola, did you have a

10    conversation with Michael Davis about her being

11    in any pain or expressing pain in any way?

12         A.     I did.   And I asked him if she cried

13    at all, if she screamed and yelled when she went

14    back to bed at 8:30 and he said, nope, she didn't

15    say a word.   She didn't yell.   She didn't say she

16    was hurt.   He actually said, usually if she's

17    hurt, she would tell me if something hurt.

18         Q.     And did she indicate to him in any way

19    that she was hurt?

20         A.     No, she did not.

21         Q.     With respect to -- during the course

22    of the conversation, did you ask him about him

23    touching her, or doing anything to her, injuring

24    her in any way?

P43
5/3/'16

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15          61

1   A.    I did.  I asked him if maybe by

2   chance, when he brought her back to the bathroom

3   to finish the morning poop, if he was upset again

4   about changing the child's diaper.  I asked him

5   if he had maybe picked her up or squeezed her and

6   said that this is where poop comes from.  Did you

7   actually give her a squeeze and tell her, this is

8   what it feels like and -- and that's how you know

9   when you have to go to the bathroom.  And, again,

10  he said he did not do that.

11       Q.    Did you discuss his size and his

12  strength?

13       A.    We did, at length.  I --

14       Q.    And what was discussed with respect to

15  that?

16       A.    I asked him if he knew that his size,

17  being one 6 foot 10 and 300 pounds, compared to

18  her size, being a tiny little girl, that he

19  wouldn't have to squeeze very hard to hurt her.

20  And he said he knows his own strength and he

21  knows that he would not hurt a child.  He knows

22  how to handle children.

23       Q.    Did there -- anything with respect to

24  the February 26th interview -- anything in the

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                    62

1    February 26th, 2015 interview that gave you any

2    sort of further information?

3        A.    I remember him telling us how he was

4    alone, how there was no one else there on the

5    February 26th, but that interview was very short

6    and brief, because we didn't even know at that

7    time how V█████ had passed.

8        Q.    Did there come a point in time when

9    you re-interviewed and met with Michael again?

10        A.    I met with him two other times.  I met

11    with him on February 2nd of 2015 and --

12        Q.    February 2nd?

13        A.    I'm sorry.  March 2nd of 2015 at the

14    police station, and I interviewed him on tape.

15    And then I met with him again on September 9th at

16    the police station.  Interviewed him a few weeks

17    ago.

18        Q.    Did you learn any other information

19    than that which you previously given to the grand

20    jurors?

21        A.    I believe I've said everything.  I

22    could be missing something.  It's been a while.

23        Q.    During the course of those interviews,

24    if you could recall what was said, in sum and

Case 23-589, Document 93, 01/18/2024, 3604734, Page97 of 264

P45
5/3/'16

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15

1  substance, with respect to that day and Viola's

2  injuries.

3      A.    I -- the last interview I had with him

4  on September 9th, I spoke at length, telling him

5  that we knew now the cause of death, how she had

6  died, and that there had to be somebody who did

7  this to her.  And he stated to me again that he

8  was the only person in the house, there was no

9  one else there the entire day.  He also stated

10 that he knew his own strength, and he knew that

11 he would not harm a child because he knew it was

12 like to use his strength, and he would not do

13 that.  I believe that's everything.

14                  (Pause.)

15                  MS. HALL:  I don't think I

16      have anything further from (sic)

17      this witness.

18                  Do any of the grand jurors

19      have any questions?

20                      Yes, ma'am.

21                  GRAND JUROR:  I'm

22      confused.  Where did she die?  In

23      the house or in the hospital or in

24      transport?

P46
5/3/'16

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                    64

1              MS. HALL:  Detective

2         Fountain?

3              THE WITNESS:  The easiest

4         way to answer that is, the hospital

5         has to pronounce deaths, whether

6         you're dead or not.  So --

7              GRAND JUROR:  No.  I know

8         that.  But where did -- where did

9         she expire?

10    BY MS. HALL:  (Cont'g.)

11         Q.    Do you recall V█████ -- or do you know

12    ████████'s condition at the house, at ████████ Ave.,

13    when 9-1-1 arrived, or the paramedics arrived?

14         A.    She was not breathing, and they were

15    doing everything they could to try and get her to

16    breathe.  She was -- there was no heartbeat and

17    there was no breath at that time.

18         Q.    So the child was in full cardiac

19    arrest?

20         A.    According to the medical people.  I'm

21    not medical people, though.

22              MS. HALL:  Did that answer

23         your question, ma'am?

24              GRAND JUROR:  Uh-huh.

P47
5/3/'16

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15          65

1          GRAND JUROR:  What time

2      was that?

3  BY MS. HALL:  (Cont'g.)

4      Q.    What time was 9-1-1 called?

5      A.    1:05 p.m.-ish, give or take a couple

6  of minutes.

7      Q.    And with respect to the earlier

8  question, so the actual death was pronounced...

9      A.    At St. Mary's Hospital by the

10 attending physician, whoever that was.

11     Q.    Do you know if they were ever able to

12 revive V▓▓▓▓ or get any life back to her?

13     A.    I heard there was some kind of rhythm

14 somewhere, but I don't know --

15     Q.    I want -- if you don't know, don't --

16     A.    I don't know.

17     Q.    Okay.

18          MS. HALL:  Any other

19      questions from the grand jurors?

20          GRAND JUROR:  What time

21      did the individual go over to the

22      restaurant to use the phone?

23          THE WITNESS:  About 1:05

24      p.m.  They were there within five

JOAN L. BURLEIGH (518) 767-3030

P48
5/3/'16

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15         66

1          minutes of him calling, the Fire

2          Department had showed up.

3     BY MS. HALL:  (Cont'g.)

4          Q.   And is the Fire Department who

5     appropriately responds in Troy when there's a

6     medical emergency?

7          A.   Yes.  They have -- we have our own

8     ambulance service.  So the Fire Department and

9     the ambulance from Troy go to every medical scene

10    in the city.

11                    GRAND JUROR:  Could the

12          damage have been caused by him

13          trying to do C.P.R.?

14                    MS. HALL:  I don't believe

15          that's an appropriate question for

16          this witness --

17                    GRAND JUROR:  It's the

18          other one.  I'm sorry.

19                    MS. HALL:  I --

20                    GRAND JUROR:  Because I

21          didn't know there was C.P.R.

22          involved before this.

23                    MS. HALL:  Well, your

24          recollection refresh -- you know,

JOAN L. BURLEIGH (518) 767-3030

001135

Case 23-589, Document 02, 01/18/3024, 3604734, Page101 of 264

P49
5/3/'16

1    your recollection recalls what the

2    testimony was.  If you want to call

3    that witness back, we can do that.

4    If you want to ask for a read back,

5    we can do that as well.

6            GRAND JUROR:  No.  He

7    didn't say anything about C.P.R.

8            GRAND JUROR:  Yes, he

9    did --

10            MS. HALL:  Your

11    recollection -- wait.  That's for

12    your deliberations --

13            GRAND JUROR:  Sorry.

14            MS. HALL:  Your

15    recollection re -- recalls.  So,

16    it's -- if the grand jurors want to

17    call back in that witness, we can do

18    that as well.

19            Any other questions for

20    this witness?

21            Oh.  I'm sorry.  Yes,

22    ma'am.

23            THE FOREPERSON:  Mr.

24    Davis, at the time of Mr. Davis

P50
5/3/'16

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                    68

1      spoke that he -- they have a way in

2      to change her diaper.  Was were they

3      have to -- a way to change -- change

4      her diaper?  Was there any kind of

5      noise she was making or any kind of

6      sound?

7                MS. HALL:  If you know the

8      answer to that?

9                THE WITNESS:  He said that

10     she had awoken and he had gotten up

11     because she was pooping in her

12     diaper.  How --

13                MS. HALL:  Not -- in the

14     morning.  At -- are you referring to

15     the afternoon?

16                THE FOREPERSON:  I'm

17     referring when he first spoke, that

18     he got up to change her --

19                MS. HALL:  Okay.

20                THE FOREPERSON:  -- to

21     change her diapers.

22                MS. HALL:  Okay.  Thank

23     you for clarifying.

24                THE WITNESS:  He had told

JOAN L. BURLEIGH (518) 767-3030

P51
5/3/'16

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                    69

1        me that he had heard her, and that's

2        when he woke up because he knew she

3        was pooping in her diaper.  How he

4        knew, I don't know --

5                    THE FOREPERSON:  Heard her

6        doing what?

7                    GRAND JUROR:  Pooping --

8                    MS. HALL:  He can only

9        answer the question as to what he

10       was -- what he told him --

11                   THE WITNESS:  He said he

12       knew she was pooping.

13                   MS. HALL:  And those are

14       Mr. Davis' words?

15                   THE WITNESS:  They are.

16   BY MS. HALL:  (Cont'g.)

17       Q.    And with respect to V██████'s activity

18   that morning, did he describe that to you?

19       A.    Just that she had awoken and she was

20   pooping.  And -- and I helped -- you know, I

21   started changing her and told her to stop and

22   brought her to the bathroom.  That's what he told

23   me.

24       Q.    Other than being tired, as you

JOAN L. BURLEIGH (518) 767-3030

001138

P52
5/3/'16

Case 23-589, Document 02, 01/18/2024, 3604734, Page104 of 264

APPENDIX

1355

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15

70

1   testified to earlier, did he mention that she

2   was --

3       A.   She wasn't thirsty.  She took the

4   sippy cup and she didn't take a drink.  She put

5   it to her mouth and tasted it and put it down.

6              THE FOREPERSON:  So he --

7           so he changed her and brought her

8           back into the area where she --

9           where he went to go change her?

10             MS. HALL:  Well, we can

11          re-ask that question, if you --

12  BY MS. HALL:  (Cont'g.)

13      Q.   If you would, Detective Fountain, what

14  did Michael Davis tell you he did after changing

15  her, or tell -- tell you what happened after

16  changing V█████?

17      A.   After he stopped her from pooping, he

18  guided her back to the bathroom in the back of

19  the house so she could finish going to the

20  bathroom on the toilet, then he brought her back

21  to the living room where he sleeps and he put a

22  new Pamper on her there, and then she went back

23  to bed in the bedroom right next to that room.

24      Q.   Did he put her to bed or did she put

Case 23-589, Document 03, 01/18/3924, 3604734, Page105 of 264

P53
5/3/'16

1    herself to bed --

2         A.    He said she puts herself to bed.  She

3    went in there and went back to sleep, were his

4    words.

5         Q.    And did you find the -- or where did

6    you find the sippy cup and the dirty diaper that

7    you testified to earlier?

8         A.    Right in the living room where Mr.

9    Davis sleeps.

10        Q.    In the area where he testified

11   changing her Pamper?

12        A.    Yes.  And that's between -- you know,

13   it's a common -- it's the living room, and then

14   her doorway into her bedroom.  And that -- it was

15   right before her doorway, in the living room.

16   Sitting on the floor was the crumpled up paper

17   and the sippy cup of water.

18                  MS. HALL:  Any other

19          questions from the Grand Jury for

20          this witness?

21                  (Whereupon, the Grand Jury

22          indicates in the negative.)

23                  MS. HALL:  Let the record

24          reflect in the negative.

JOAN L. BURLEIGH (518) 767-3030

# APPENDIX

# EXHIBIT "B"

```
 1

 2   STATE OF NEW YORK              COUNTY COURT
     COUNTY OF RENSSELAER           CRIMINAL TERM
 3   ************************************************
     THE PEOPLE OF THE STATE OF NEW YORK,
 4
     - against -                    15-1094
 5
     MICHAEL DAVIS,
 6
                     Defendant.
 7   ************************************************
                     Rensselaer County Courthouse
 8                   Congress and Second Streets
                     Troy, New York  12180
 9                   August 24, 2016

10              Trial - Volume 6

11   B e f o r e:

12        HONORABLE ANDREW G. CERESIA,
                          County Court Judge
13

14   A p p e a r a n c e s:

15   For  THE PEOPLE OF THE STATE OF NEW YORK:

16        JOEL E. ABELOVE, ESQ.
          Rensselaer County District Attorney
17        Rensselaer County Courthouse
          Congress and Second Streets
18        Troy, New York 12180

19        BY:  CINDY CHAVKIN, ESQ.
               Assistant District Attorney
20

21   For  DEFENDANT:

22        JOHN C. TURI, ESQ.
          Rensselaer County Public Defender
23        Congress and Second Streets
          Troy, New York 12180
24
          BY:  WILLIAM ROBERTS, ESQ. and
25               JESSICA ZWICKLBAUER, ESQ.
               Assistant Public Defenders
```

# APPENDIX

1    **People v. Michael Davis**

2

  Also Present:

3

      Michael Davis, Defendant

4       Clerk of the Court

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1 | People v. Michael Davis

2 | *INDEX TO PROCEEDINGS*

3 | FOR THE DEFENSE (Continued):

4 | DR. SHAKU TEAS
   | Direct Examination by Mr. Roberts.............10
5 | Cross Examination by Ms. Chavkin.............58
   | Redirect Examination by Mr. Roberts...........72
6 | Witness Excused................................77

7 |
   | Defense Rests.................................77
8 |

9 | Motions.......................................78

10 |
    | Pre-Summation Instructions....................86
11 |

12 | Defendant's Closing Statement.................90
    | People's Closing Statement...................119
13 |

14 | Court's Jury Charge..........................123

15 |
    | Alternate Jurors Discharged..................159
16 |

17 | Jury Deliberations Commenced.................159

18 |
    | Matter Adjourned.............................174
19 |

20 |

21 |

22 |

23 |

24 |

25 |

**Cheryl M. Moore, Senior Court Reporter**

| | |
|---|---|
| 1 | **Dr. S. Teas - Direct Examination by Mr. Roberts** |
| 2 | go forward at this time. |
| 3 | With that said, the defense may call |
| 4 | its next witness. |
| 5 | MR. ROBERTS:  Your Honor, at this |
| 6 | juncture the defense calls Dr. Shaku Teas. |
| 7 | **_DR. SHAKU TEAS,_** |
| 8 | the witness hereinbefore named, being first duly |
| 9 | cautioned and sworn or affirmed to tell the truth, the |
| 10 | whole truth, and nothing but the truth, was examined |
| 11 | and testified as follows: |
| 12 | CLERK OF THE COURT:  The sworn witness |
| 13 | is Dr. Shaku Teas.  First name, S-H-A-K-U. |
| 14 | Last name Teas, T-E-A-S. |
| 15 | THE COURT:  Okay.  Mr. Roberts, you may |
| 16 | proceed. |
| 17 | MR. ROBERTS:  Thank you. |
| 18 | **_Direct Examination by Mr. Roberts_** |
| 19 | Q    Good morning. |
| 20 | A    Good morning. |
| 21 | Q    Could you please introduce yourself to the |
| 22 | jury? |
| 23 | A    My name is Shaku Teas.  The first name is |
| 24 | spelled S-H-A-K-U.  It is actually an abbreviation of a |
| 25 | much longer name, but that's what I use professionally. |

| | |
|---|---|
| 1 | **Dr. S. Teas - Direct Examination by Mr. Roberts** |
| 2 | And the last name is Teas, T, as in Tom, E-A-S. |
| 3 | Q    And, Dr. Teas, what is your current |
| 4 | profession? |
| 5 | A    I'm a physician and I practice pathology, |
| 6 | mainly forensic pathology. |
| 7 | Q    And could you give the jury a basic run down |
| 8 | of your education? |
| 9 | A    I went to school and college and then |
| 10 | medical school in India, Bombay University and King |
| 11 | Edward Memorial Hospital.  I received my M.B., B.S. |
| 12 | degree which is the equivalent to the M.D. degree in |
| 13 | America in January of 1972.  Following that I worked |
| 14 | for five months in a small maternity home and then came |
| 15 | to America, to Chicago, did a year of rotating |
| 16 | internship at Saint Joseph's Hospital in Chicago. |
| 17 | Following that I did four years of residency training |
| 18 | in anatomic and clinical pathology at University of |
| 19 | Illinois Hospital in Chicago.  I finished that in June |
| 20 | of 1977.  And then joined the Cooke County Medical |
| 21 | Examiner's office which had been newly formed at that |
| 22 | time to do forensic pathology.  In Illinois Cooke |
| 23 | County is the largest county with about five to five |
| 24 | and a half million people and is the only county that |
| 25 | had a medical examiner's system as opposed to coroner's |

**Dr. S. Teas - Direct Examination by Mr. Roberts**

system. I was with the medical examiner's office from 1977 to the early part of 1991 when I left of my own accord and actually started doing contract autopsies for some of the coroners in the nearby counties, which I continued to do until about 2005 and a few into 2008. Then I also did autopsies for -- at the request of families and some lawyers and also did second autopsies and exhumation autopsies. I have -- I'm trying to -- I tried to quit doing autopsies since about 2008, 2009 but I will still occasionally do second autopsies and exhumation autopsies. I'm board certified in anatomic, clinical and forensic pathology. I've been board certified in anatomic and clinical pathology since 1977 and in forensic pathology in 1979.

    Q    And, Doctor, do you belong to any specific organizations?

    A    I do.

    Q    What are those organizations?

    A    I belong to the National Association of Medical Examiners, which is an organization that consists mainly of forensic pathologists and their investigators. I'm also a member of the American Academy of Forensic Pathology. Actually I'm a fellow in both of them. Which is an organization that

**Dr. S. Teas - Direct Examination by Mr. Roberts**

encompasses different sections like pathology, biology, which I'm a member.  Engineering, juris prudence, general section with biologists, psychiatry, et cetera. And I'm a member of the Chicago Pathology Society and I regularly attend their meetings and also a member of the United States and Canadian Academy of Pathology.

    Q    Okay.  Now rather than just being a member are you in any way specifically involved with the National Association of Medical Examiners?

    A    I am.  I am -- I sit on some of their committees.  I'm a member of what they call the I&A Committee, which is the Inspection and Accredidation Committee.  And also on their international committee. I've been on other committees too.

    Q    How long have you been specifically involved in those committees, how many years?

    A    A few years.  I don't remember exactly when.

    Q    Are you familiar with the National Association's guidelines relative to the number of autopsies one should be recommended to perform?

    A    Yes, because I do inspect offices so they -- they have a checklist and one of the things is that if -- if each pathologist -- or actually the average for the office is more than 250 they get -- they --

**APPENDIX**

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1 there's a phase one violation. If they -- if they do

2 more than 250 it is a phase one. But if they do more

3 than 325 then it is a phase two. That means they would

4 not get accredited. So if -- but it's a limit mainly

5 because if you do too many autopsies you have a tenancy

6 to make mistakes.

7     Q     Now, what does it mean to be board

8 certified?

9     A     So the American Board of Pathology is a

10 national board where once you have gone to medical

11 school and then you have done a specific identified

12 amount of training in a certain specialty; whether it

13 be pathology, surgery, internal medicine or a

14 subspecialty thereof, each of them have a separate

15 specified amount of training that you have to do, and

16 once you finish that training you take this national

17 board, which is an exam. And pathology it is like a

18 three day exam, depending on how many specialties --

19 subspecialties you're doing, and then once you pass

20 that exam you are said to be board certified. So the

21 two big branches of pathology, which is the study of

22 changes that occur in our body with any kind of disease

23 or injured state, is anatomic pathology and clinical

24 pathology. Anatomical pathology deals with the

**Dr. S. Teas - Direct Examination by Mr. Roberts**

morphological changes that you may see, either with the
naked eye or under the microscope and also as a
cellular level.  Clinical pathology deals with all the
lab work that they do in the hospital; be it blood,
urine or microglial studies.  So those are the two big
branches.  Then each of those -- each of those has
subspecialties too.  So with anatomical pathology you
can further specialize in forensic pathology, dermatol
pathology, hematoma pathology.  So different --
different sets.  But you have to first do anatomical
pathology.  For clinical pathology, again, you can
subspecialize in microbiology, which is looking at
cultures and things like that or infectious diseases.

    Q    What does it mean to be published?

    A    It just means that if you have done some
study or done case reports you publish them in a
journal or present them at a meeting that -- that is
accepted by others in your field.

    Q    Have you been published?

    A    I have published a few papers.

    Q    Okay.  Now, Doctor, obviously you're here
today to testify.  Where do you live?

    A    I live in River Forest, Illinois, which is
the suburb of Chicago.

**Dr. S. Teas - Direct Examination by Mr. Roberts**

Q    How did you get here today?

A    I flew in.

Q    Okay. Now, you flew in to testify on behalf
of Mr. Davis, correct?

A    Yes.

Q    Now, could you give me the brief version of
what an autopsy is?

A    So in anatomic pathology you can do
autopsies, you can do surgical pathology where you look
at pieces of tissue both grossly and under the
microscope to make a diagnosis in a patient who is
living and you can also look at the cells when you do
celology like PAP smears and aspirations. So all of
them are pretty anatomic. When you do autopsies what
you do is you review the records, you look at the body
outside, then you open the body up, you look at
everything while everything is in place and then you
remove everything and examine everything and then you
take little pieces of the pertinent tissues and examine
them under the microscope, which is exactly what you do
in surgical pathology too. So a forensic -- there are
slight differences between forensic autopsies and
hospital autopsies. You always try to correlate it
with the clinical history that you're getting. The

**Dr. S. Teas - Direct Examination by Mr. Roberts**

forensic pathologist give a lot more importance to

injuries and they're experts in mechanism of injuries

and looking and evaluating the injuries.  The hospital

pathologists do more of looking at every organ and

seeing how it correlates to the clinical history.

Forensic pathologists do that too.  So you're really

looking at the body, making a Y-shaped incision where

you open the body, you look inside, you document all

your findings and then you also open the head by making

a bi-parotide incision that goes from one ear to the

other and then taking the brain out and examining it.

Q     Now, you indicated there may be some

importance in having a history of the individual that

you are examining.  Why is that important?

A     Well, because you always want to correlate

with what were the circumstances surrounding the death

and so you want to -- there might be artifacts created

in a body after death and there are lots of things done

to the body when a person dies so you want to correlate

what was done and how it was done to what your findings

are.

Q     What about the prior medical history, is

that something that you need to know?

A     Yes, because you -- some things need

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1

2  targeted studies because death is not necessarily

3  always just anatomical, it be a functional death. So

4  there may be organs that may appear to be normal but

5  doesn't mean necessarily that they were functioning

6  correctly.

7      Q    And what do you do when you don't have a

8  medical history?

9      A    You do the autopsy. The autopsy process

10  itself is just document your findings. Then you go and

11  get other history and you do an investigation.

12      Q    Okay. So it is possible after you complete

13  your physical examination to then garner more

14  information from family history before making your

15  final determination?

16      A    Yes.

17      Q    If you don't get the family history

18  concerning medical history how does that affect your

19  final report?

20      A    Well, it all depends on what you find and

21  what you are looking for. If there is no medical

22  history that you can obtain, other medical history is

23  negative, you try to correlate it with your findings.

24  It all depends on what you find. If I -- if I have a

25  gunshot wound case, somebody shot in the chest or

**Dr. S. Teas - Direct Examination by Mr. Roberts**

there's a stab wound or if I do an autopsy and I find

an acute myocardial infarction, M-Y-O-C-A-R-D-I-A-L,

infarction, if I find evidence of a heart attack, clear

cut heart attack -- Heart attack is a layman's term.

It is not a medical term. -- then I may not need a

more detailed history. But if I don't find anything

that is just staring at me in the face then I would

want to know more about the circumstances and I would

want to know more about the history of the person who

is dead and also maybe a family history.

Q    Is it possible to see something staring you

in the face and neglect the need to see that medical

history?

A    No.  You always try to get it, try to get as

much information as you can and in a child there, I

would want to get all the history starting with the

birth and starting with the antenatal of the mother.

Q    What about the recitation of family history

from the mother, would that be helpful?

A    Yes.

Q    What about the father?

A    Yes.

Q    How can genetic traits of the mother and

father affect your ultimate findings?

# APPENDIX

**1371**

20

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1

2    A    So there is a certain percentage of our

3    cases that we don't find an obvious cause of death and

4    so in more recent years, since our geno has been

5    identified now, there are certain mutations in our

6    genes that are associated with -- with sudden death.

7    So it is helpful to get that information.  It is still

8    not routine because it is still expensive to do it but

9    sometimes in a young person that may have died and we

10   don't have something obvious you can pursue that,

11   depending on what the importance is.

12   Q    Now, Doctor, you performed autopsies?

13   A    I have.

14   Q    How many autopsies have you performed, not

15   just you directly but also been assisting?

16   A    So, I don't assist anybody usually.  I have

17   gone and observed some autopsies at the request of

18   attorneys on the opposite side, both in criminal and

19   civil cases.  I personally performed over 6,000

20   postmortem examinations.  But I worked in a very busy

21   office where there were five pathologists performing

22   autopsies and so we always looked at our own interest

23   in cases.  I try not to perform autopsies anymore but I

24   did perform one on Monday.  Main reason, I'm getting

25   old.  And so -- and it was no different.  It was easy.

**Cheryl M. Moore, Senior Court Reporter**

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1

2    So -- and now I just actually review cases both for

3    criminal and civil matters and I learn from one to the

4    other because the findings and the analysis of the

5    cases are -- cases are very similar.

6        Q    In the duration of your career have you had

7    the opportunity to view individuals who you have known

8    for a fact have been subject to CPR?

9        A    Yes.

10       Q    What is CPR?

11       A    Cardiopulmonary recessitation.  And when you

12   have somebody collapsing and not responding the idea is

13   that you try to get the heart moving in the person,

14   trying to resuscitate them.

15       Q    How does that work?  How do you get the

16   heart moving again?

17       A    Well, you can do a couple of things.  And

18   I'm not a cardiologist or an ER physician or anything.

19   But what you do is you try to pump the heart manually

20   by compressing the chest.  And the methods have changed

21   over the years.  And you also try to give rescue

22   breathing.  Then you can also apply electroid -- you

23   can apply electrical current that will stimulate the

24   heart.

25       Q    The autopsies that you performed relative to

**Dr. S. Teas - Direct Examination by Mr. Roberts**

2  individuals who had received CPR has that included both

3  adults as well as children?

4       A    Yes.

5       Q    Have you had the opportunity to personally

6  observe with your own eyes how CPR both performed

7  correctly and incorrectly can affect the systems of the

8  body?

9       A    What I do know from my own observation and

10  from reading the literature, that CPR can cause

11  injuries that can easily be misinterpreted as being

12  injuries that have either lead to death or been -- are

13  associated with death.  So, depending on the injuries

14  it is essential to look at other things to try and

15  differentiate whether these are injuries that occurred

16  during life or could they have been possibly been

17  occurred as a result of the CPR.  And so you go back to

18  get the history of exactly how CPR was performed, by

19  whom it was performed, what was their knowledge base.

20       Q    Okay.  Have you had an opportunity to

21  examine organs that have been affected by the effects

22  of CPR?

23       A    Yes.

24       Q    What type of organs are affected by CPR?

25       A    So CPR can cause a lot of injuries and there

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1

2 is literature where different offices have gone back

3 and looked at that. So whether you're looking at

4 children or adults, it can occur in both, usually you

5 can get fractures of the ribs, you can get fractures of

6 the sternum, which is the big breast bone that holds

7 the ribs together. You can get injuries to lungs. You

8 can get injuries to the liver. You can get injuries to

9 the kidneys. You can get injuries to the spleen. You

10 can get what we call retroperitoneal hemorrhage, which

11 is there is a hemorrhage behind the organs where our

12 organs sit. So you can get different kinds -- and of

13 course you can get facial injuries because when they

14 intubate, part of recessitation is to put a tube down

15 your throat so that you can send oxygen to the lungs.

16 So you can get a lot of oral injuries and facial

17 injuries.

18      Q     Are you familiar with the term of what a

19 laceration to the liver is?

20      A     Yes.

21      Q     What is a laceration to the liver?

22      A     So a laceration is a -- an injury that

23 quote, unquote you can say is caused by blunt trauma.

24 Where if it is in the skin the entire thickness of the

25 skin is broken. And as opposed to an abrasion which is

**Dr. S. Teas - Direct Examination by Mr. Roberts**

just on the surface. And the liver, it is the same

thing, that you get not only the capsule, the liver is

covered with a thin lawyer of fibrous tissue which we

call a capsule, but the peritoneal or the liver tissue

itself is damaged.

    Q    And in order to lacerate a liver do you need

something poking into it?

    A    No.

    Q    How do you form a laceration where you don't

have something jabbing into a liver?

    A    It is just blunt trauma because the liver

is --

    Q    Could you explain to me what blunt trauma

is? It sounds awful.

    A    So, the way forensic pathology describes

trauma is a sudden penetrating injury. Where the

bullet is passing through. You can have a stab wound

where the knife passes through. Blunt trauma is where

you can see abrasions, lacerations, et cetera. Where,

say, in a motor vehicle accident or somebody punches

you, the pushes compress you. So those are the

mechanisms that you look at. And so the liver is

relatively soft and pliable sometimes even when I'm

doing the autopsy and I go to pick up the liver my

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1

2   thumbs or my fingers will dig in and cause denting and

3   a laceration and then depending on -- on what was going

4   on.  So I can cause that by just picking it up and

5   pushing my fingers in it so that would all be

6   considered blunt trauma.  It is a big general category.

7       Q       So if I were to bump my arm on this table

8   and left a bruise is that considered blunt trauma?

9       A       Yes.

10      Q       Regardless of the amount of force the term

11  itself means just that?

12      A       Yes.

13      Q       Okay.  Now, with respect to the liver, how

14  is injury associated with CPR -- bad question.  How

15  does CPR cause the laceration to a liver?

16      A       So to understand what you need to know is

17  the anatomy and it is not -- the heart sits right here

18  in what we call our pericardium.  Then there is a thin

19  layer of muscular tissue that we call the diaphragm

20  that separates the thorax, the chest cavity, from the

21  abdominal cavity.  Right below that is the liver on the

22  right side, but it also extends a little bit to the

23  left of the midline because it has two major lobes and

24  then two smaller lobes.

25      Q       Doctor, I notice you're pointing a lot to

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1

2  your body.  In preparation of your testimony here did

3  you prepare a Power Point that relates the position of

4  the organs in the body?

5      A    Yes.

6      Q    And if I were to play that Power Point with

7  you would that assist you in your explanation of the

8  anatomy to this jury?

9      A    Yes.

10      Q    Okay.  Would it assist you in your testimony

11  in explaining the various relations of the organs,

12  their placement, as well as to CPR?

13      A    Yes.

14              MR. ROBERTS:  Your Honor, at this

15          opportunity I would ask permission to put up

16          on the screen, for demonstrative purposes,

17          some slides that the doctor can illustrate

18          what she is discussing with the jury.

19              THE COURT:  Any objection?

20              MS. CHAVKIN:  No objection.

21              THE COURT:  Okay.  You may proceed.

22              MR. ROBERTS:  Bear with me while we get

23          this up and running, Doctor.

24              THE WITNESS:  That's fine.

25              MS. ZWICKLBAUER:  Can I turn on the

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1
2      television?

3            THE COURT:  Of course.  Mr. Roberts,

4      are you going to have the witness step down?

5            MR. ROBERTS:  I think that would be

6      best, your Honor.  Ms. Zwicklbauer is going

7      to control the slides.  If I can ask Dr.

8      Teas to come down.

9            THE COURT:  You just have to make sure

10     that the jury can see the witness.  So if

11     she was going to remain on the stand --

12           MR. ROBERTS:  Yes, Judge.  I was going

13     ask permission for the witness to come down

14     so she can point out specifically what we're

15     talking about.  I was trying to position the

16     television.  I apologize.

17           THE COURT:  That's okay.  Doctor, you

18     may step down.

19           THE WITNESS:  Thank you.  Is this good?

20           MR. ROBERTS:  You tell me.

21     Q     Is that in a position that you're able to

22     talk about the relation of the organs as well as talk

23     to the jury?

24     A     Yes.

25     Q     You'll be able to keep your voice up loud

# APPENDIX

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1

2 enough?

3     A    I will. I will. Raise your hand if you

4 can't hear me or understand me.

5     Q    All right. Now, Doctor, what you were

6 discussing was the relationship of the liver to the

7 heart anatomically. Could you explain to the jury, now

8 that we have this diagram up, could you talk about what

9 you were talking about on the stand. Where is the

10 liver and how does it relate to other organs?

11     A    So looking at -- it doesn't want to shine

12 right there. I will just use the tip. So looking at

13 this figure that is on the left-hand side, it is just

14 actually showing you the blood vessels that come out of

15 the heart and the liver. And I have -- actually did

16 that from the internet, from a digital site. So what

17 you see here is the heart. And you are looking at it

18 at an angle, not head on, but just a little bit from

19 the right side. And this is the heart. These are the

20 blood vessels. This is the blood vessel right to the

21 blue, that's called the inferior vena cava that comes

22 out the liver and goes to the right side of the heart

23 taking in deoxygenated blood that goes to the right

24 side of the heart and then it goes to the lung, gets

25 oxygenated and comes back on the opposite side. But

1 | **Dr. S. Teas - Direct Examination by Mr. Roberts**
2 | this is the heart. This is the right side of the
3 | heart. And it is quite not that far to the left, but I
4 | think this is done just to show the relationship. And
5 | this is the liver. This is the right lobe of the
6 | liver. This small part is the left lobe. The heart
7 | actually sits at an angle and it rests on the diaphragm
8 | which is between the chest cavity and the abdominal
9 | cavity. And so it is sitting on it. This, the one to
10 | the -- to the right, or to the left, I don't know
11 | which, depending on the way you're looking, if you're
12 | facing it it would be to your left, is a head-on from a
13 | model of the human body. And so what you are seeing
14 | here that's marked in blue arrows is the heart. And I
15 | have color coded them both so that you are looking, you
16 | know, everything that is blue is the heart. And to the
17 | left is the right side of the heart and to the right is
18 | actually the left side of the heart. So this part is
19 | the right side and this, the one that is marked in a
20 | darker blue, is the diaphragm which is a thin lawyer of
21 | muscular tissue and fibrous tissue that separates the
22 | two cavities. And the liver just sits right underneath
23 | it. So the heart is actually almost resting on the
24 | liver so it's close proximity. So I guess the question
25 | was how does it cause damage --

**Cheryl M. Moore, Senior Court Reporter**

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1

2    Q    Yes.

3    A    -- doing compressions?  If you're doing

4  compressions, depending on how you're doing it, you're

5  essentially pushing the chest cavity with the ribs back

6  to your -- to the back.  And you are compressing what I

7  call the anterior to the posterior, front to back, and

8  the recommendations are that you push the sternum about

9  a third of -- a third of the way to half of the way so

10  there is a lot of force going on there that, because

11  they're so close, that you can cause injury to the

12  liver and also the chest cavity is such -- I mean, you

13  put the compressive force, the ribs can fracture either

14  in the front or the side and also in the back because

15  those are the stress points.

16    Q    Can the duration of the CPR affect the

17  injury?

18    A    So the procedure of doing CPR, especially in

19  children, has undergone changes over the years.  It

20  always used to be that you use two hands.  That they

21  recommended that you in children you use two fingers

22  and then they started saying it is better to hold the

23  chest cavity with your hands like this.  I don't know

24  how to describe it.  So you're doing two thumb pressure

25  and there are -- there is literature out there when

| | |
|---|---|
| 1 | **Dr. S. Teas - Direct Examination by Mr. Roberts** |
| 2 | they started using that, I think it was in 2005, that |
| 3 | they started seeing more rib fractures when they were |
| 4 | doing that kind of procedure, but it is effective in |
| 5 | getting the rhythm back.  So you have got to weigh the |
| 6 | bad effects and the good effects of it.  So that's how |
| 7 | it can cause damage to the liver and to the ribs. |
| 8 | Q    When you're performing CPR what's the |
| 9 | purpose of pushing on the heart?  What are you doing? |
| 10 | A    Because you're mechanically trying to push |
| 11 | blood and get it to -- to start beating on its own. |
| 12 | Q    So you're essentially applying force |
| 13 | squishing the heart? |
| 14 | A    Yes. |
| 15 | Q    And the heart is returning back to normal |
| 16 | size when you're squishing it again? |
| 17 | A    Correct. |
| 18 | Q    How does blood enter and leave the heart |
| 19 | when you're performing that procedure? |
| 20 | A    It is just mechanical.  It is like it is |
| 21 | sucking it in and then you're pushing it back. |
| 22 | Q    Okay.  Why don't you get back in your seat |
| 23 | for a little bit.  I will move this out of the way. |
| 24 | Doctor, have you had an opportunity to |
| 25 | review materials relative to the examination of V |

**Dr. S. Teas - Direct Examination by Mr. Roberts**

2  D███████?

3     A     I have.

4     Q     What materials have you reviewed?

5     A     So I reviewed the autopsy report by --

6  performed by Dr. Sikirica.  I reviewed the histology

7  slides that he took under the microscope.  I reviewed

8  the autopsy photographs taken at the time of autopsy

9  and also photographs of V███ taken the day before, I

10 think by the police.  I reviewed some scene

11 photographs.  I reviewed the medical records, I think

12 it was from Seton Hospital, on V███   And I also

13 reviewed some Well Baby or immunization records on

14 V███   I reviewed all the police reports.  And with

15 the autopsy was included the toxicology and the

16 ancillary studies that were done.  I also reviewed

17 three interrogation tapes where Mr. Davis was

18 interrogated by the police.

19     Q     Okay.  And, Doctor, are you aware of Dr.

20 Sikirica's opinion that V████ had ultimately died based

21 on blood loss?

22     A     Yes.

23     Q     Are you in agreement with that opinion?

24     A     No.

25     Q     Why not?

| | |
|---|---|
| 1 | **Dr. S. Teas - Direct Examination by Mr. Roberts** |
| 2 | A    So it's -- it's the appearance of the |
| 3 | injury, both grossly and also under the microscope, |
| 4 | correlated with the interrogation tapes where Mr. Davis |
| 5 | describes how and where he performed CPR.  So those are |
| 6 | the things that I took into -- into consideration and |
| 7 | also my knowledge that liver injuries do not bleed very |
| 8 | rapidly to cause death in minutes to 30 minutes. |
| 9 | Q    Okay.  Do you have an opinion within a |
| 10 | medical degree -- within a certainty of medical -- |
| 11 | withdrawn. |
| 12 | Do you have an opinion with a reasonable |
| 13 | degree of medical certainty as to if Viola Davis died |
| 14 | because she bled out? |
| 15 | A    I have no evidence to suggest that she bled |
| 16 | out.  And when you are looking at a case like this you |
| 17 | really need to analyze everything to either say that |
| 18 | she died because of bleeding or to say that she did not |
| 19 | die of bleeding.  And I have taken that into |
| 20 | consideration with my experience and my knowledge about |
| 21 | liver injuries.  I have a little interest in liver |
| 22 | injuries, so... |
| 23 | Q    Okay. |
| 24 | A    So my opinion is that these liver injuries |
| 25 | were actually caused by CPR. |

**Cheryl M. Moore, Senior Court Reporter**

| | |
|---|---|
| 1 | **Dr. S. Teas - Direct Examination by Mr. Roberts** |

2      Q      Okay.

3      A      And --

4      Q      Were these injuries caused when the child

5  was alive or are these injuries postmortem injuries?

6      A      When I say they were caused by CPR they're

7  postmortem.

8      Q      Why do you say that?

9      A      The reason I say that the liver injuries are

10  postmortem is the appearance of the gross liver

11  injuries and also the microscopic findings are

12  extremely important.  When you have an injury to any

13  living tissue, you have blunt trauma, what you're doing

14  is you're crushing the tissue so under the microscope

15  they will not only just be bleeding but there will be

16  destruction of the cells that make up the organ.  So if

17  you are looking at the liver it would be -- the cells

18  are called hepatocytes.  Hepato means liver, cytes

19  means cells of the liver.  So if you were to look at

20  them under the microscope you would see that the cell

21  structure is destroyed in the area where the laceration

22  or the blunt trauma has occurred.  The microscopic

23  appearance of -- of Viola's liver shows that the cells

24  are completely intact in the margins where the

25  lacerations occurred.  The gross gives you a clue to

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1

2 what you may find in the microscope but the microscope

3 beats it all. For example, say a woman has breast

4 cancer and the surgeon goes and then takes the lump out

5 and sends it to the pathology department. The

6 pathologist looks at it and may suspect that it is

7 cancerous but he or she cannot tell you by just looking

8 at it that it is cancerous or benign because there is a

9 marked overlap. It is only when he looks under the

10 microscope that he can say whether it is cancerous or

11 it's not or it's a benign condition. So then,

12 depending on that, the surgeon or the oncologist or the

13 breast doctor will take action as to what needs to be

14 done in that person. And then sometimes you have to do

15 other ancillary studies on this tissue that you get to,

16 you know, look at the origin because there are

17 different kinds of cancers to determine exactly what

18 kind of cancer it is.

19      Q     Doctor, did you perform -- did you perform

20 -- did you organize any slides that would assist you to

21 demonstrate to the jury just exactly what you're

22 talking about?

23      A     Yes.

24             MR. ROBERTS:  Your Honor, may I have

25             the witness come down again so we can

| | |
|---|---|
| 1 | **Dr. S. Teas - Direct Examination by Mr. Roberts** |
| 2 | discuss this? |
| 3 | THE COURT:  Yes, you may. |
| 4 | THE WITNESS:  I'm so sorry. |
| 5 | A    So these are actually pictures of V███'s |
| 6 | liver taken at autopsy by -- by Dr. Sikirica.  The top |
| 7 | one shows the front of the liver.  So as I'm standing |
| 8 | here this is the right lobe.  And you can see that the |
| 9 | laceration is on the top of the right lobe.  So it is |
| 10 | not where the ribs were fractured.  It is away from |
| 11 | there.  And that this is the whole laceration.  Then |
| 12 | the piece of the liver that overlines that has |
| 13 | separated.  I don't know whether it was completely |
| 14 | separated or got separated as you removed the liver |
| 15 | from the body.  And then on the back of the liver, the |
| 16 | left lobe showed another laceration and there was some |
| 17 | small lacerations on the back of the right lobe too. |
| 18 | But what's important is to look at this top laceration |
| 19 | and what you see is that -- first of all, it's not in |
| 20 | any position where the blood -- big blood vessels come |
| 21 | from the liver.  The artery was intact.  There's no |
| 22 | mention that the inferior mesenteric vein and the |
| 23 | pressure in the veins is much lower.  If you were to |
| 24 | bleed it would bleed pretty slowly.  But the arteries |
| 25 | were not mentioned or were not torn to cause a rupture |

**Dr. S. Teas - Direct Examination by Mr. Roberts**

of the arteries that would bleed extensively and very

soon.  But what's interesting is that when you look at

the way the tissue looks you're not seeing pieces of

blood clots stuck in there.  There is hardly any.  And

you really have to see a comparison on what -- the

ante-mortem liver laceration to make the comparison.

But when I looked at that grossly I knew I had to look

at the microscope to draw any kind of conclusions from

it.

    Q    Did you prepare a slide to compare and

contrast relative to what we're talking about?

    A    I did because I had cases of both that I

have called CPR when I did the autopsy and cases where

I have done a second autopsy I agreed that it was

ante-mortem.  The question with that was the timing of

injuries.

    Q    And this specific slide, does that speak to

what we're discussing?

    A    Yes.  So this is another case that I

actually did a second autopsy, that somebody else did

the autopsy and that's why it is cut in a different way

but what you do is this is all the laceration here and

this was similar, it had actually opened up on one

side.  So you can see the thick blood that's got --

**APPENDIX**

**Dr. S. Teas - Direct Examination by Mr. Roberts**

that is, like, embedded in the laceration itself. It
doesn't just fall off. And in contrast to -- this is
Viola's liver, where you see that there isn't that
necrotic, like, blood that is, you know, stuck there
for awhile, so...

Q    What does that tell you in layman's terms?

A    It just tells me that I need to look further
and rule out CPR may have caused that injury. I mean,
I looked at this right away and I said it is
antemortem. This is the trauma that was responsible
for the child's death.

Q    Is that present in Viola's liver?

A    No, it is not. And there are other things.
There are little subcapsular hemorrhages which is very
typical of what we see in CPR associated liver
injuries.

Q    Now, with respect to what you were
discussing on a cellular lever, do you have some slides
that you can demonstrate visually for the jury what
you're talking about? Do you know which one you need
here?

A    It is further forward. Right -- right after
the first liver that you showed. Further. Move
forward. Yeah, that's it. Maybe this -- maybe one

**Dr. S. Teas - Direct Examination by Mr. Roberts**

before that.  Yeah.  Okay.  I have two slides of that.

Q     What are we looking at here, Doctor?

A     So this is V████'s liver.  This is one of

the slides that I received from the autopsy that Dr.

Sikirica had performed.  So you can see all these red

blood cells that they're actually still pretty rounded.

They haven't -- the red blood cells after that just

fall apart.  That actually helps sometimes with the

timing.  But what you can see even in the area of

hemorrhage I can recognize each liver cell or

hepatocyte.  The blue part is what we call the nucleus

of the cell.  The pink part for each cell is the

cytoplasm.  That's the two main components of the cell.

You have the nucleus where DNA resides and then you

have the cytoplasm where there are other organs that

control our -- control your function.  These two are

the same slides.  This is a higher power.  And you can

recognize each cell separately.  If this was a crush

injury that occurred during death those cells would not

be recognizable.  They would be -- they would lyse,

they would be open, so I wouldn't be able to recognize

the structure.  Go to the next one.  And so this is

another area and here you can see that this is a

laceration that was recognized -- that was seen.  And

| | Dr. S. Teas - Direct Examination by Mr. Roberts |
|---|---|
| 1 | |
| 2 | then this blue line marks the edge of the laceration |
| 3 | and I can see the cells but what is more important is |
| 4 | as you go on the higher power you can literally see |
| 5 | this -- this is from the same area as that and you can |
| 6 | just recognize the entire cell separately.  It is |
| 7 | pretty intact.  It doesn't show what we call necrosis. |
| 8 | Necrosis is cell death during life.  If -- if a cell |
| 9 | dies after death, and it does, then you call that |
| 10 | lysis.  The cell is just splitting up because of the |
| 11 | time that's passed between -- between the time a person |
| 12 | passed and -- that's what happens when the body starts |
| 13 | to decompose.  So this is a comparison.  This is, |
| 14 | again, to contrast this, this is from the other liver |
| 15 | that I showed you so you can see how different it |
| 16 | looks.  The blood is stuck.  It is not moving away. |
| 17 | This -- this -- so you compare.  This is V████'s liver |
| 18 | and you can see the edge here and you can see the edge |
| 19 | there.  And you -- what has happened, not only is there |
| 20 | hemorrhage, this whole tissue, you can see little |
| 21 | specks of -- of nuclei but it is destroyed.  It's -- |
| 22 | it's necrotic. |
| 23 | Q    And all of these slides on the cellular |
| 24 | level point to whether or not V████ was alive or |
| 25 | deceased at the time of CPR? |

| | |
|---|---|
| 1 | **Dr. S. Teas - Direct Examination by Mr. Roberts** |

2     A     It points to -- to me that this is more

3  likely to be a CPR related injury.

4     Q     Okay.  Well --

5     A     I don't know if you want to go through the

6  others, but --

7     Q     Sure.  While you're down here let's talk

8  about the other ones.

9     A     The other thing that is important when you

10  have trauma that has occurred in life you just don't

11  get the liver lacerated, you get a lot -- everything is

12  just situated pretty tight; the pancreas is right

13  behind the liver, the adrenal glands are there, the

14  kidneys are there.  So you often get injuries to those

15  organs that you can see grossly or not under the

16  microscope.  And the hemorrhage will just spread

17  between those tissues.  So you need to look at all

18  that.  This is actually a section of the pancreas from

19  the other case that I told you and that it was my

20  opinion that this was antemortem, and that wasn't the

21  issue in that case at all, but you can see how the

22  blood has dissected into the connective tissue between

23  the pancreas.  These are little lobules of the

24  pancreas.  The pancreas is a gland that sits behind the

25  liver that produces enzymes and digests your food and

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1

2 also produces insulin. It is sitting right there. You

3 see the massive hemorrage it's caused. The adrenal

4 gland is a small gland that sits on top of the kidney,

5 controls a lot of functions and there is extensive

6 hemorrhage in the tissue surrounding it. And none of

7 that was present in V████ so that's another clue.

8     Q    What do you mean it's a clue?

9     A    It is a clue that you should look further

10 and inspect further as to why you are getting just an

11 isolated liver injury with a little hemorrhage in the

12 muscles of the diaphragm, that you should look more

13 closely at could this possibly be CPR related.

14     Q    Now if this was a blunt force trauma injury

15 to the abdomen that lacerated the liver, how would that

16 force affect surrounding organs?

17     A    It should -- it should affect them too.

18 With CPR, because the liver is more pliable and softer

19 than some of the other organs it is more likely to be

20 injured than some of the other organs.

21     Q    And did you -- what value, if any, did the

22 lack of bruising on the exterior of V████ play into

23 your determination?

24     A    I think that's another clue because the skin

25 is -- I think that's another clue to warn you to look

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1   further.  Though you may sometimes get intraabdominal

2   injuries without external injuries but if you -- if you

3   were seeing that you may not be able to see the skin

4   surface but you often see hemorrhages in the -- in the

5   connective tissue underneath the skin and none of that

6   was seen in this case either.

7        Q    Okay.  Are we all set with the slides,

8   Doctor?  Is there --

9        A    The only other slides I put in is of another

10  case that it was my opinion that it's CPR and I did the

11  autopsy and the lacerations were pretty extensive.

12  This is V█████'s liver.  This is another case that I had

13  that it was my opinion that this was CPR.  I did the

14  autopsy.  I raised the issue and investigated to see

15  how CPR had been done.

16       Q    Do you notice similarities?

17       A    Yes, I do.  As you can see, again, what you

18  are seeing the dark here is really not blood.  When

19  there is an opening and you take a photograph that area

20  appears to be dark rather than blood.  This is a little

21  bit of blood.  But, again, you see there is hardly any

22  blood stuck compared to the other ones.  This liver was

23  lacerated inside and then it was lacerated on the back

24  too and, again, you are seeing these little subcapsular

1  | **Dr. S. Teas - Direct Examination by Mr. Roberts**

2  hemorrhages which are more typical of CPR related liver

3  injury.

4      Q    Okay.  Why don't you shut that down.

5           Now, Doctor, are you familiar with the term

6  sudden unexpected death --

7      A    Yes.

8      Q    -- associated -- what is that?

9      A    So, sudden unexpected death is when somebody

10  dies without having a medical history and the person

11  just dies suddenly.  And different people define it

12  differently.  Some people say it's like they had no

13  symptoms for 24 hours.  Some people say they had no

14  symptoms ever.  So it varies.  But when somebody dies

15  but has no medical history.  So when a 16 year old

16  drops dead and there's no medical history then we call

17  that sudden unexpected death.

18      Q    So are you familiar with the term SIDS?

19      A    Yes.

20      Q    What is SIDS?

21      A    So SIDS, it stands for Sudden Infant Death

22  Syndrome.  And it was a term that was formed back in

23  1969 when the first definition of SIDS.  Since I'm

24  almost that old I have seen the changes that have

25  occurred.  So it was defined as the death of a kid who

**Dr. S. Teas - Direct Examination by Mr. Roberts**

was under two years of age and died suddenly. Then it was revised in the '80s to decrease the age to one year and with the caveat that you have to do a scene investigation to rule out environmental factors.

Q    Okay. Was there a cut-off period for when SIDS was related to age?

A    Yes. So originally the original definition from 1969 was two years and then I think it was '89 that they changed it to one year and then over -- since then the terminology has undergone a lot of changes where some people don't like to use the term SIDS because SIDS implies that it was definitely natural and they started using the term sudden unexplained infant death and so that it could include other things because they felt some of these cases where it may have been suffocation, either accidental or intentional, and with the back to sleep campaign where instead of putting the infant down -- face down with the -- the kid is on the back. They have changed some of the terminology. Unfortunately or fortunately the records department still codes them all as SIDS.

Q    Is there -- is there any difference with unexplained death as opposed to SIDS as to what you see in a two and a half year old?

1 | **Dr. S. Teas - Direct Examination by Mr. Roberts**

2      A      It is similar excepting sudden death in the

3 first year of life is more common than in a toddler.

4 However, you can get sudden death all the way going

5 into their 20s and 30s.  So, I mean, I have seen many

6 cases where a 16-year-old, 15-year-old just drops dead

7 with no medical history.  And actually no cause that I

8 find when I do the autopsy.  Or if I find a cause it is

9 a very subtle cause that the coronary arteries didn't

10 rise the same way, then you say could this possibly be

11 because of that.  And as they started to do more

12 studies, just metobolic studies with conduction studies

13 in the heart, they find at least maybe five to ten

14 percent of these cases do have a cause but you have to

15 do the extra studies to -- to find out what may have

16 caused the death.

17      Q      Is that what we're talking about, the geno?

18      A      Correct.

19      Q      Okay.  So it is necessary to rule out these

20 other issues to go into the geno?

21      A      Correct.  I mean it is like the condition

22 known as Long QT Syndrome because when you are looking

23 at the QRS complex it is the rhythm of the heart that

24 is the issue and so they're associated with certain

25 mutations and genes so you specifically look for those

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1
2  mutations.   They're pretty specialized studies, cost a
3  lot of money.   Few places do it at this time and it is
4  not routine.

5      Q     Now, with respect to V█████ the materials
6  that you reviewed, could you -- could you explain to me
7  what -- withdrawn.

8          Could you explain what a seizure is?

9      A     Okay.   A seizure is like having something in
10 the brain that causes a person to have convulsions.
11 And the theory, it is a theory, is that when you have a
12 seizure somehow it affects the rhythm of your heart.
13 Because we know as forensic pathologists that a certain
14 percentage of people who have a history of seizure just
15 die suddenly and we may not find anything in autopsy.
16 In Cooke County, when I worked there, we had about 50
17 cases a year that people had a history of seizure, or
18 there was a question that they may have had it, that
19 died suddenly and some of them we found a cause of the
20 seizure but in most of them we didn't find a cause for
21 the seizure.

22     Q     And if an individual passes without someone
23 seeing the symptoms before that individual was either
24 unconscious or resulted in their death, what would you
25 look for to determine -- or are you able to determine

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1
2  that there was a seizure without a first-hand
3  account?
4       A     It is very difficult.  Sometimes there may
5  be little tell-tale signs, like if you have an adult
6  you have tongue bites and then you wonder could the
7  person have had a seizure.  Or if you find a very
8  subtle change in the brain.  For example, I had one
9  case where the person had abnormal grey matter.  The
10 grey matter surrounds the brain but there was a little
11 bit of grey matter in the white matter where it
12 shouldn't have been and that could be a focus of a
13 seizure.  So if you find something subtle you might be
14 able to characterize that the person may have had a
15 seizure because of that.  But it requires real careful
16 looking.  It is easy to miss.
17      Q     And, Doctor, are you aware nationally what
18 percentage of autopsies result in an unexplained
19 death?
20      A     So it varies from office to office.
21 Anywhere from two to three percent to five percent that
22 you may not find a definite cause of death.
23 Sometimes -- I have personally had this, I have a
24 16-year-old who drops dead, and I happen to remember a
25 16-year-old, I will just -- and there is nothing else

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1  to suggest that they have any drugs involved or any

2  foul play involved, I would say the cause of death was

3  cardiac arrhythmia. What I'm saying is that it was a

4  functional death rather than an anatomical death.

5      Q     Now, in reviewing the materials provided by

6  Dr. Sikirica, as well as his opinions, did you see any

7  value that Dr. Sikirica associated with the first-hand

8  account of Viola's mother, as well as Mr. Davis, that

9  she was lethargic and didn't have an appetite the

10  morning before she received emergency services?

11     A     I mean, I don't know what you mean. I don't

12  know what Dr. Sikirica was thinking.

13     Q     Okay.

14     A     I can't fathom that.

15     Q     In this specific case, are you aware of the

16  fact that the child was lethargic and wasn't eating

17  that morning?

18     A     Yes. And there was also a history that she

19  complained of chest pain the week before.

20     Q     And did you see that specific event, the

21  lethargic child, was that taken into account in any of

22  the reports that you looked at from Dr. Sikirica?

23     A     Again, I don't know what you mean that he

24  took it into account. I don't know whether he assigned

**Dr. S. Teas - Direct Examination by Mr. Roberts**

any significance to it, whether he considered it or not.

Q     Is that -- is that specific first-hand account from witnesses related to moments before she receives treatment, is that significant?

A     It is.  You take everything into consideration that you wonder was something going on in this child.  And I thought the possible history of the chest pain in a two and a half year old is also important.

Q     So with that specific report, does it in any way relate that it is more important to then speak with the mother and get the history of both the child in addition to the mother's familial history?

A     It is always important when you have a death that you cannot figure out what happened.  The problem is if you decide that's the injury that caused the death then everything else comes to a screeching halt.

Q     Is that your opinion that occurred here?

A     Yes.

Q     What, if anything -- what, if any, significance did you put relative to -- well, what's vitreous fluid?

A     V-I-T-R-E-O-U-S.

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1

2      Q      Thank you.

3      A      It's the fluid in the eyeball.  So what

4  happens -- again, the liver is involved in this.  If

5  you are trying -- you can die of low blood sugar or you

6  can die of high blood sugar.  You cannot make a

7  diagnosis of dying of high blood sugar postmortem

8  because what happens is when you die and the liver

9  cells that contain glycogen, the glycogen turns into

10  gluclose and it releases into the bloodstream.  So the

11  blood sugar is always high after death depending on

12  when you're taking the blood.  So you cannot assign any

13  significance to it.  The vitreous fluid, the eyeball

14  fluid, is away from the blood.  So, in fact, in the

15  vitreous the blood sugar starts to fall after death.

16  So -- again, so if you get a blood sugar of 10 or 20 or

17  30 in the vitreous you cannot draw the conclusion that

18  the person died from low blood sugar.  But if it is

19  very high, actually if it's over 100, the person has

20  been dead 24 hours, you can sort of theorize that maybe

21  the blood sugar was much higher when the person died

22  and perhaps this is the cause of death.  So you -- you

23  have to look at -- you have to look at those results to

24  draw those conclusions.  And I don't think that was

25  done.  At least I didn't get any vitreous, either

1 | **Dr. S. Teas - Direct Examination by Mr. Roberts**

2 gluclose or electrolyte results to evaluate Viola for

3 dehydration, especially if she had a history of not

4 drinking and I don't know exactly whether she was

5 hydrated or not, and I don't have those results, I

6 cannot draw any conclusions about her electrolytes

7 being normal. And if your electrolytes are abnormal

8 that can affect the rhythm of the heart too.

9     Q    Doctor, did you note whether or not there

10 was any infection in V██████

11     A    So the -- there was a history that she

12 wasn't quite well the week before and the lungs

13 actually did show some chronic inflammation and I think

14 I had taken some sections and put it on the Power Point

15 too. So there are chronic inflamed cells around the

16 bronchi. The tracheal-bronchial tree is like a tree.

17 You get the trachea that then divides into two main

18 bronchi and then divides into smaller ones. And the

19 little bronchi under the microscope had evidence of

20 chronic inflammation cells around them.

21     Q    Now, Doctor, the one last thing I want to

22 talk to you about is the volume of blood in the

23 abdominal cavity of Viola. I think there are records

24 that indicate there was 350 milliliters and 50

25 milliliter clot. How would you explain how blood gets

**Dr. S. Teas - Direct Examination by Mr. Roberts**

into the abdominal cavity if the person is deceased?

    A    So we continue to bleed after death. When I do an autopsy, and sometimes it is 24 hours after that, and I cut a vessel it will just bleed all over. There have been cases where the organ transplant people have tried to put a needle and draw blood from a big vessel and then I open the chest cavity and there is a lot of blood, or they try to put a central line which they are trying to put a central line when they're trying to resuscitate or stabilize a person whose -- whose lost consciousness, they can tear the blood vessel and that will also produce blood. We know that you can bleed after death. We use suction all the time when we're doing an autopsy because blood leaking out of blood vessels obstruct our feel and we want to take that out. No pathologist should draw the conclusion that because you're seeing 350 or 400ccs of blood in the abdominal cavity that that whole amount was present when the person died. We don't know how much of it came before the person died and how much of it came after the person died. And it is mentioned in the bionetes textbooks, it is not just my experience. So we have no way of knowing exactly how much blood or if there was any blood in V████'s abdomen when she died. So I think

**Dr. S. Teas - Direct Examination by Mr. Roberts**

that should be taken with cautiousness. And so the
next thing you do is to try to calculate that the blood
volume that I'm seeing in this person is that
sufficient to be a cause of death, is it sufficient to
lead to shock for this person to collapse. And Viola
did have about 40 percent, 38 to 40 percent of her
blood volume in her abdominal cavity so it would be
sufficient for her to start going in shock. The
problem is that when you go into shock you just don't
die, bing, go suddenly, it is a process. It's -- so by
the time you have lost 40 percent you start to go in
shock, your heart rate beats faster, your respiration
gets faster, your blood pressure starts to fall. It
is -- it is not instantaneous. That kind of a death is
not instantaneous. And so you need to start looking at
that and realize that I really have no way of
estimating how much blood volume there was when this
person dropped. In the other case that I had with the
CPR she also had just barely enough blood to be a cause
of death. And that to a lay person and detectives
around is very hard to explain but that is the reality
when you see all the cases that you cannot estimate
that. And that I also take into fact that liver
lacerations do not kill instantaneously. There are

| | |
|---|---|
| 1 | **Dr. S. Teas - Direct Examination by Mr. Roberts** |
| 2 | cases where they go to the emergency room and they are |
| 3 | sent home.  In fact, Moritz, M-O-R-I-T-Z, is called, |
| 4 | like, the grandfather of forensic pathology.  He has a |
| 5 | book of trauma.  He mentions a case.  ER physicians |
| 6 | know that liver lacerations bleed slowly.  Surgeons |
| 7 | will not operate legitimately even on major |
| 8 | lacerations.  So it is a process.  It doesn't just |
| 9 | happen suddenly.  So that's -- those are the other |
| 10 | things that you need to take into consideration. |
| 11 |     Q    You mentioned briefly that you performed |
| 12 | autopsies with detectives around, correct? |
| 13 |     A    Yes. |
| 14 |     Q    Have you ever experienced situations where |
| 15 | law enforcement have a certain expectation when you're |
| 16 | performing the autopsy? |
| 17 |     A    I mean, I don't know if they are |
| 18 | expectations, but they are often there, sometimes more, |
| 19 | sometimes few.  Often times a prosecutor is there. |
| 20 | When I work in the medical examiner's office we tried |
| 21 | to keep them out because the medical examiner was in |
| 22 | charge.  All I had to do was tell my boss I don't want |
| 23 | them around, you tell them to go to the next room. |
| 24 | When I worked in another county they had a window, they |
| 25 | would be out and when I got done I would go and talk to |

**Dr. S. Teas - Direct Examination by Mr. Roberts**

them, but --

Q    Why didn't you want them in the room?

A    I -- personally, they just delay me and -- and make things difficult and draw conclusions that they shouldn't be drawing. And the NAS, National Academy of Science, actually came out in a report from 2009 that the law enforcement and the prosecutors shouldn't be influencing the forensic pathologist.

Q    Have you experienced an attempt to influence your determination?

A    Definitely on the case that I showed you in the liver they tried to influence me a great deal.

Q    Okay.

MR. ROBERTS:  Could I have a moment, your Honor?

THE COURT:  You may.

(Whereupon, a pause ensued.)

MR. ROBERTS:  I have no further questions.

Thank you, Dr. Teas.

THE WITNESS:  Thank you.

THE COURT:  Okay.  Members of the Jury, we're going to take a brief break at this time.  We'll break for about 15 minutes.

**Dr. S. Teas - Direct Examination by Mr. Roberts**

During the course of this break please
do not discuss this case, don't read or
listen to any media accounts, don't visit or
view any premises, do not conduct any
research about this case, do not request or
accept any payment in return for supplying
any information about this case. Please
don't form any judgements or opinions about
this case. If anyone attempts to improperly
influence you, please report that directly
to me.

We'll break for 15 minutes at this
time.

Thank you.

(Whereupon, the jury exited the
courtroom.)

THE COURT: Okay. Doctor, because
you're still giving sworn testimony I'm
going to direct that during the course of
this break you not discuss this case or your
testimony with anyone, and that includes the
attorneys involved in this case.

We're going to break for 15 minutes.
We'll see you back here at that time.

**APPENDIX** **1409**

**Dr. S. Teas - Cross Examination by Ms. Chavkin**

1

2          Thank you.  The Court will stand in

3     recess.

4          (Whereupon, a brief recess was taken.)

5          (In open court.)

6          THE COURT:  We'll bring the jury back

7     in, please.

8          (Whereupon, the jury entered the

9     courtroom.)

10          THE COURT:  Okay.  Please be seated.

11          Members of the Jury, the sworn witness

12     remains Shaku Teas.

13          Ma'am, I remind you that you're still

14     under oath.

15          And, Ms. Chavkin, you may proceed

16     whenever you're ready.

17          MS. CHAVKIN:  Thank you, your Honor.

18          *Cross Examination by Ms. Chavkin*

19     Q    Good morning, Doctor.

20     A    Good morning.

21     Q    Just a few questions on your background

22     before we start.  Are you licensed in the State of New

23     York?

24     A    No, I'm not.

25     Q    And do you do trials as an expert witness?

**Dr. S. Teas - Cross Examination by Ms. Chavkin**

1

2    A    I'm not quite sure what you mean.  I don't

3 do trials.  I testify in trials.

4    Q    Okay.  As an expert witness?

5    A    Yes.

6    Q    And how many per year do you do?

7    A    It varies.  Maybe 8 to 12, sometimes 15 to

8 18.  It depends.  I'm slowing down so it is less now.

9    Q    Okay.  Do you charge or bill for your

10 time?

11    A    I bill for my time.

12    Q    How much do you charge on average?

13    A    I have an hourly rate for criminal cases of

14 $375 per hour but a lot of times I spend a lot of hours

15 and I reduce the fees so it depends on the case and

16 then sometimes I actually just do cases pro bono.  I

17 work with The Innocence Project people.

18    Q    Okay.  And how much are you going to bill or

19 charge on this case?

20    A    So there's a contract.  For my pretrial I --

21 the max was $5,000.  And then for coming out here and

22 testifying it was another $5,000.

23    Q    Doctor, did you ever prepare a report for

24 Dr. Sikirica or anyone else?

25    A    Well, I had no communication with Dr.

**Dr. S. Teas - Cross Examination by Ms. Chavkin**

1  Sikirica. And the defense attorneys who retained me

2  did not ask me to produce a report.

3      Q      And you stated that you reviewed Dr.

4  Sikirica's autopsy report, correct?

5      A      I did.

6      Q      And you did not call Dr. Sikirica to discuss

7  your interpretations of the case?

8      A      No, I did not. I was asked not to.

9      Q      By who?

10     A      The attorneys who retained me.

11     Q      When did you receive his report?

12     A      I think it was sometime in July maybe or

13  late June sometime when I was contacted. I think that

14  was the first thing that I received.

15     Q      Okay. I believe it was your testimony that

16  you requested the materials that Dr. Sikirica based his

17  report on?

18     A      Yes. I requested additional material before

19  I gave an opinion, a global opinion.

20     Q      Doctor, what is toxicology?

21     A      Toxicology is when we do an autopsy we draw

22  different body fluids to send it out to the laboratory

23  to be tested for certain things that may be an issue.

24     Q      Did you review the toxicology reports in

**Dr. S. Teas - Cross Examination by Ms. Chavkin**

this case?

    A    I did.

    Q    And what significance, if any, was found in the toxicology testing of V█████ D█████?

    A    Well, in the results I found no significance that I would assign any whole lot of significance to. Though, if there was specific questions -- each laboratory reports results in a different way. They have different standards of the minimum that they would find. If there are issues raised I would go and have a talk with the toxicologist and I would have to know exactly how that laboratory reports certain levels.

    Q    Okay. So it is safe to say that you don't do your own toxicology testing, right?

    A    No, I'm not a toxicologist. I just interpret the results that come from the toxicology laboratory.

    Q    So you rely on the reports generated by the toxicology lab?

    A    As far as their methodology is concerned I do. And if I have questions about the methodology I talk to them. When I worked in the ME's office the toxicologist was there, we talked to them on every case that we thought drugs may be an issue. When I worked

1 **Dr. S. Teas - Cross Examination by Ms. Chavkin**

2 for the coroner's I had access to the labs that the --

3 that the samples went to.

4     Q    Doctor, have you ever heard the term ratio

5 failure?

6     A    I -- that's a toxicology issue. I do not

7 know anything about it and I have not discussed that

8 with any toxicologist.

9     Q    Just to be clear, Doctor, it is your

10 testimony that the liver injury was postmortem?

11     A    Yes, it was due to CPR.

12     Q    Okay. And that there is no explanation for

13 Viola's death at this point?

14     A    Correct. At this point I have no

15 explanation.

16     Q    You received some slides in this case,

17 correct?

18     A    I did.

19     Q    And do the slides assist you in coming to

20 your conclusion about the cause of death?

21     A    It came to my assistance to help me

22 understand the liver injuries were secondary to CPR.

23     Q    And did the slides explain why Viola needed

24 any attempts to be made to revive her?

25     A    I beg your pardon?

| | |
|---|---|
| 1 | **Dr. S. Teas - Cross Examination by Ms. Chavkin** |
| 2 | Q    Okay.  Did the slides explain why Viola |
| 3 | needed any attempts to be made to revive her? |
| 4 | A    I'm not sure that the slides would help me |
| 5 | in that case anyway, so... |
| 6 | Q    Okay.  Do they reveal any reason for her to |
| 7 | be unconscious? |
| 8 | A    No. |
| 9 | Q    Would the loss of 350 to 400 mls of blood |
| 10 | cause her to be unconscious? |
| 11 | A    It could lead to shock, yes. |
| 12 | Q    Have you seen injuries like this before? |
| 13 | A    I think I just demonstrated at least one |
| 14 | case and where they were very similar.  There are no |
| 15 | two cases that are identical in forensic pathology. |
| 16 | Every one is a little different, but there are |
| 17 | similarities. |
| 18 | Q    On your slide that you showed, Doctor, isn't |
| 19 | it true that comparing to V████'s liver you showed the |
| 20 | slide of an adult liver? |
| 21 | A    No.  What was -- it was the actual liver |
| 22 | from children.  The one that I said was due to CPR was |
| 23 | actually a seven month old and I think the other one |
| 24 | that I said was a real liver injury was a toddler.  I |
| 25 | don't remember the exact age. |

**Dr. S. Teas - Cross Examination by Ms. Chavkin**

Q    How does one perform CPR on a two and a half year old?

A    So I'm not an emergency room physician or cardiologist, but as I mentioned, that they have gone through changes.  The first thing you do with CPR, whether an adult or child, is to take and lay the person on a flat surface and not on a soft surface, not a bed, not a futon.  The other case that I showed CPR was also done on a bed to that child.  So that's the first thing that you do.  And then with an adult you actually use two hands, one hand over the other.  With a child you can either use the two fingers or use the thumbs.  But you're not suppose to put one hand behind and one hand in front and push.

Q    As you saw the Defendant do on video?

A    Yes.

Q    Does CPR involve pressure applied to the abdomen?

A    You should not, but a lot of procedures are done incorrectly, especially by lay people.  Just as you can do an incorrect Heimlich maneuver.  When you do a Heimlich maneuver you are supposed to push up.  If you bush back you cause a lot of damage.  And I've had cases where the Heimlich maneuver was performed

**APPENDIX**

1  **Dr. S. Teas - Cross Examination by Ms. Chavkin**

2  incorrectly and lead to ruptures of a viscous.

3      Q    So applying pressure to the abdomen is not

4  caused by CPR, correct?

5      A    It's not, but the heart, as I demonstrated

6  earlier, the heart and the liver are very close so even

7  if you're applying just pressure on the chest the liver

8  is right there.  The liver is really not in the

9  abdominal -- in the abdomen.  As you look at it

10  externally it's, it's -- depending on whether you are

11  inspiring or expiring in your respiration it moves up

12  and down.  So it can actually go all the way up to the

13  fifth rib.

14      Q    Well, are you aware of which of V█████'s ribs

15  were fractured?

16      A    Dr. Sikirica mentioned I think ninth and

17  tenth fracture posteriorly.

18      Q    Posteriorly.  If a person applies pressure

19  to the abdomen what risks are involved?

20      A    Depends on how you're applying the pressure.

21  You can cause rupture of the viscous or the liver, the

22  spleen, you know, different organs.  So the liver often

23  is the most common.  Again, it is because of its

24  structure.

25      Q    Have you ever heard of the term CPR

**Dr. S. Teas - Cross Examination by Ms. Chavkin**

2 defense?

3     A    I may have.

4     Q    What does that mean?

5     A    It just means that the defense is using CPR

6 as a defense. I am presuming it is more -- it is

7 something that lawyers use rather than doctors use.

8     Q    You mentioned that you are a member of the

9 National Association of Medical Examiners.

10     A    Yes.

11     Q    Do they publish a journal?

12     A    They do.

13     Q    Do you read that journal?

14     A    Yes, most of the time.

15     Q    What's the name of the journal?

16     A    We -- it is called the AJP. It used to be

17 the American Journal of Pathology and Medicine. Now

18 they just produce an online journal.

19     Q    Have you reviewed the articles related to

20 CPR injuries related to children?

21     A    I have reviewed some. If you tell me

22 exactly which one I can tell you. I've got a whole

23 bunch of them in my computer.

24         MS. CHAVKIN: Just one moment, your

25         Honor?

**Dr. S. Teas - Cross Examination by Ms. Chavkin**

2          THE COURT:  Sure.

3          (Whereupon, a pause ensued.)

4     Q     What other reasons could there be --

5 withdrawn.

6     A     I beg your pardon?  I didn't hear the last

7 part of your question.

8          THE COURT:  Doctor, there is no

9          question yet.

10          MS. CHAVKIN:  I didn't ask a question.

11    Q     What other reasons -- what other causes

12 could there be for a laceration of the liver?

13    A     So you could have trauma.  The question

14 is -- you can have a gunshot wound go through it, you

15 can have a stab wound go through it, you can have a

16 trauma that can cause laceration and then you can have

17 CPR.

18    Q     And could it also be a form of child

19 abuse?

20    A     So my opinion is that child abuse is

21 actually more a legal term rather than a medical term.

22 So if I'm going to say it is caused by blunt trauma

23 then you could -- you could possibly call it child

24 abuse.  But for me to label something as child abuse I

25 have to see other injuries.  Because child abuse, to

| 1 | **Dr. S. Teas - Cross Examination by Ms. Chavkin** |
|---|---|
| 2 | me, implies chronic mistreatment of children. |
| 3 |     Q    And are children particularly susceptible to |
| 4 | blunt force and compressive injuries to the abdomen? |
| 5 |     A    You know, I don't know if there is a -- if |
| 6 | there is any comparison done with -- you mean children |
| 7 | of certain age to adults of certain age? |
| 8 |     Q    A two and a half year old. |
| 9 |     A    Compared to who? |
| 10 |     Q    To adults. |
| 11 |     A    It depends on what injuries you're looking |
| 12 | at. |
| 13 |     Q    Is it fair to say that children and adults |
| 14 | are different anatomically? |
| 15 |     A    No.  Anatomically they're exactly the same. |
| 16 | It is the size of the -- the organs that are different. |
| 17 | All human beings are the same.  We have the same thing. |
| 18 | We have variations sometimes of how organs may be |
| 19 | situated but you can have situs inversus where your |
| 20 | left side is to the right side which is a rare |
| 21 | condition but we are all the same inside. |
| 22 |     Q    Do children break bones the same way as |
| 23 | adults do? |
| 24 |     A    The pliability of children may be different. |
| 25 | So since it is -- they have more cartilidge they have |

**Dr. S. Teas - Cross Examination by Ms. Chavkin**

1

2    more -- more give to them.

3        Q    Okay.

4        A    But children also can suffer from what we

5    call metobolic bone disease and that decreases the

6    strength of the bone.  And we cannot actually evaluate

7    metobolic bone disease by looking at x-rays just as we

8    get older we become more osteoperodic.  Children,

9    especially black children, can often have Rickets or

10   metobolic bone disease that makes their bones less

11   resistent, less pliable, easier to break.  So it is a

12   multitude of factors that you would have to take into

13   consideration.

14       Q    Have you ever studied child abuse?

15       A    Have I studied child abuse?

16            MR. ROBERTS:  Objection.  Relevance.

17            THE COURT:  Overruled.

18       A    I don't know what you mean by the question,

19   so perhaps you should ask me the question.  I have done

20   autopsies on cases that I have called blunt trauma and

21   calling it a homicide, and you could call that child

22   abuse.  So I don't know if there is a thing to study

23   child abuse, especially in forensic pathology.  So, I

24   have done a lot of autopsies on babies.  When I worked

25   at the medical examiner's office I did a lot of babies.

**Dr. S. Teas - Cross Examination by Ms. Chavkin**

And then after I left for certain counties I did all their baby autopsies.

    Q    Would you say that posterior rib fractures are a common type of rib fractures seen in the abuse of children?

    A    In abuse of children?  I -- here's the problem with rib fractures.  We don't have the basis of how many children really have fractures because nobody has studied systematically.  The child abuse pediatricians say sometimes that posterior rib fractures are due to child abuse but there is actually no literature that says that we have x-rayed "X" number of children and only what they would call child abuse shows posterior rib fractures.  The literature is rift with what I call circular reasoning.  They say because you have got posterior rib fractures that's why it is child abuse but nobody has studied the basis of it.  Like, what is the base rate of posterior rib fractures or any rib fractures in children?  There are reports that children who have never left the hospital have posterior rib fractures.  Patrick Lance, who is a professor at Wake Forest University, presented a paper at the academy meeting in 2008 where he described four children who had not left the hospital at all who had

**Dr. S. Teas - Cross Examination by Ms. Chavkin**

1

2 posterior rib fractures. So that means somebody at the

3 hospital caused them. All of those children had

4 metobolic bone disease and they sustained those

5 fractures with normal handling in the hospital.

6     Q    How many times have you personally seen

7 liver damage caused by CPR?

8     A    By CPR, I have seen it in adults a lot of

9 times. It is not extensive in children. It's more

10 rare. I would say just a few cases. And one of the

11 cases that were in my memory is when there is a

12 controversy about it and the case that I showed you was

13 a case that I autopsied and there was a controversy

14 about it.

15     Q    When you say they're rare, what do you

16 mean?

17     A    It is not common that every child who has

18 CPR is going to get lacerations -- liver lacerations.

19 You have to understand that CPR causes injuries

20 depending -- a lot of the literature looks at SIDS

21 cases and those are babies that have been dead for a

22 prolonged period of time before CPR is performed. So a

23 lot of the injuries that we see as a result of CPR are

24 what I call reperfusion injuries, that there is still

25 some blood flowing and then an injury occurs and

**Dr. S. Teas - Redirect Examination by Mr. Roberts**

1

2  then -- then you see the blood.  So there are lots of

3  important little factors that you have to consider

4  before drawing any conclusions.  In this case the most

5  important for me was the microscopic examination.

6                    MS. CHAVKIN:  I have no further

7            questions, your Honor.

8                    THE COURT:  Mr. Roberts, anything else?

9                    MR. ROBERTS:  Yes, your Honor.

10                *Redirect Examination by Mr. Roberts*

11      Q      Doctor, the prosecutor asked you some

12  questions about CPR and you discussed that you have to

13  do it on a hard surface.  Are you aware, based upon

14  your experience, the ramifications of performing CPR on

15  a soft surface?

16      A      Well, what happens when you perform CPR on a

17  soft surface, such as futon or a bed, like my other

18  case was performed on a -- on a bed too, is that you

19  really don't know how hard you're pushing because

20  there's so much give to a mattress.  So, I mean, that's

21  what I would say.  That's why they -- they say that you

22  should perform it on a flat hard surface, like the

23  floor is the best place, or a table.

24      Q      Can you testify as to what factors the soft

25  surface would have had on the fractures?  Is that known

**Dr. S. Teas - Redirect Examination by Mr. Roberts**

or is it unknown?

A     It is -- I really don't know because I really don't know the structure of the futon in this case. You know, all I know is that futons have wood slats and then you have a cushion over it, so...

Q     So if you performed CPR and there's a wood slat underneath there and it is pressing against the bone, could that affect the ability of that bone to be more or less susceptible to a fracture?

A     It could. I mean, I agree with Dr. Sikirica that the mechanism is the compression and that's what is happening with the CPR, the way it was demonstrated on the interrogation tapes.

Q     And you had discussed some questions regarding child abuse.

A     Yes.

Q     Okay. Have you had the opportunity in your experience to view children that have been exposed to, I guess, abuse?

A     Yes, if you call it abuse. In my case I wasn't allowed to use the term "abuse" because I think abuse is more a legal term rather than a medical term, which is fine, things have changed. And, in fact, the case that I showed you, the other case with the liver

**Dr. S. Teas - Redirect Examination by Mr. Roberts**

1 lacerations, that was a child abuse case and I agree it

2 was a child abuse case.

3     Q    What other factors did you look at to

4 determine that this was -- that that case you're

5 talking about is a homicide? What other injuries did

6 you see?

7     A    There was a lot of hemorrhage, as I showed,

8 in the pancreas. There was a hemorrhage -- a lot of

9 hemorrhage with the peritoneal hemorrhage. There was

10 hemorrhage of the adrenal glands. I don't remember the

11 other details. And microscopically the picture was

12 dramatically different.

13     Q    What about physically that that child -- how

14 did their skin appear?

15     A    That child had a lot of bruises on the front

16 and the side and on the back.

17     Q    Okay. And in V____'s case what significance

18 did you put on the lack of damage to any other organ or

19 surface of the body?

20     A    So by itself I wouldn't take one little

21 thing out. You look at the whole picture. I always

22 look at everything together. There are certain factors

23 that I give more importance to. The lack of necrosis

24 in the liver was very telling. And the absence of the

| | |
|---|---|
| 1 | **Dr. S. Teas - Redirect Examination by Mr. Roberts** |
| 2 | other injuries supports my conclusion. |
| 3 | Q     Okay.  And have you ever seen injuries -- |
| 4 | performed autopsies on individuals who had been |
| 5 | involved in car accidents? |
| 6 | A     Yes. |
| 7 | Q     And in any of those autopsies have you ever |
| 8 | seen an individual have just one injury to the liver as |
| 9 | opposed to all the body organs? |
| 10 | A     Often times they have many more injuries and |
| 11 | what they die of is the other injuries rather than the |
| 12 | liver injuries.  Like Dr. Moritz described MVA or a |
| 13 | motor vehicle accident where he went to the emergency |
| 14 | room, they sent him home, he was fine and the next |
| 15 | morning he was found dead from a liver laceration that |
| 16 | had bled because they didn't detect it.  That used to |
| 17 | happen a lot actually when I started because they |
| 18 | didn't have CTs.  Now they have CTs and when they do CT |
| 19 | and they find a liver laceration they actually observe. |
| 20 | In fact, trauma surgeons will tell you that.  And one |
| 21 | trauma surgeon, one of my colleagues, they had a case |
| 22 | where a piece of liver was floating loose.  They didn't |
| 23 | do anything, they just watched the person in the |
| 24 | hospital to make sure they had bed rest and then |
| 25 | they're not doing other things that will -- will lead |

**Dr. S. Teas - Redirect Examination by Mr. Roberts**

to bleeding.  So, I've had a case where a woman was a

passenger, in the hospital for 11 days and she had died

from head injuries.  And her liver -- the right lobe of

the liver was just a whole blob of blood.  She didn't

die from that, she died from head injuries.

Q   Okay.  And you were asked some questions

related to your opinions.  Can you rule out whether or

not Viola passed because of an undetected seizure

medically?

A   I can't rule it out.

Q   Okay.  And in your opinion, based upon your

medical review of all the materials in this case, do

you have an opinion as to whether or not what's

presented to you was a homicide?

A   No.  At the most I would call it

undetermined.  And -- because I don't have a cause of

death I would say the cause of death is undetermined

and the manner of death is undetermined.  That's

exactly what I did with the other case that I described

to you.

MR. ROBERTS:  Thank you, Doctor.

Nothing further, your Honor.

THE COURT:  Okay.  Anything else from

the People?

**People v. Michael Davis**

1

2                    MS. CHAVKIN:  No, your Honor.

3                    THE COURT:  Okay.  Doctor, you may step

4         down.  Thank you.

5                    THE WITNESS:  Thank you.

6                    (Whereupon, the witness, Shaku Teas,

7         was excused from the witness stand.)

8                    THE COURT:  Mr. Roberts?

9                    MR. ROBERTS:  Your Honor, at this

10        juncture defense rests.

11                   THE COURT:  Okay.  Attorneys approach

12        please off-the-record.

13                   (Whereupon, an off-the-record

14        discussion was held.)

15                   (In open court.)

16                   THE COURT:  Okay.  We'll go back on the

17        record.  All right.  Members of the Jury,

18        we're going to break at this time.  We're

19        going to take our lunch break at this time.

20        It is 12:30.  We'll take a little bit of an

21        extended lunch break.  We'll break until

22        2:00 and at 2:00 the trial will resume.

23                   I will remind during this break please

24        don't discuss this case, don't read or

25        listen to any media accounts, don't visit or

**APPENDIX** **1429**

# EXHIBIT "C"

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------X

MICHAEL DAVIS-GUIDER,

                                        Plaintiff,

                    -against-

CITY OF TROY, RONALD FOUNTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES MCDONALD,
Individually, TIM COLANERI, Individually, ADAM R. MASON,
Individually, MICHAEL E. PARROW, Individually,
RENSSELAER COUNTY, MICHAEL SIKIRICA, Individually,
JOEL ABELOVE, Individually, ANDRA ACKERMAN,
Individually, and JOHN and JANE DOE 1-10, Individually, (the
names John and Jane Doe being fictitious, as the true names are
presently unknown),

                                        Defendants.

--------------------------------------------------------------------------X

**PLAINTIFF'S
EXPERT
DISCLOSURE**

17 CV 1290
(FJS) (DJS)

      Plaintiff MICHAEL DAVIS-GUIDER, by his attorneys, Brett H. Klein, Esq., PLLC, as

and for his Expert Disclosure pursuant to Federal Rule 26(a)(2)(B), respectfully notifies

defendants that Katherine F. Maloney, M.D. will be called for the plaintiff at the time of trial,

and hereby discloses, and refers defendants to, the enclosed documents and information provided

pursuant to Rule 26, including Dr. Maloney's expert report, curriculum vitae, a list of all other

cases in which, during the previous 4 years, she has testified as an expert at trial or by deposition,

and her fee schedule.

Dated: New York, New York
      November 1, 2021

                                        BRETT H. KLEIN, ESQ., PLLC
                                        Attorneys for the Plaintiff MICHAEL DAVIS-
                                        GUIDER
                                        305 Broadway, Suite 600
                                        New York, New York 10007
                                        (212) 335-0132

                                        By: *Brett Klein*
                                              BRETT H. KLEIN

November 1, 2021

Katherine Maloney, M.D.
Nickel City Forensics, LLC
PO Box 114
Getzville, NY 14068

**Case information**
Decedent: V██ D███ DOB: ██████ DOD: 2/26/15
Postmortem case number: MS-15-120

**Items provided for review**
Autopsy report and medical examiner's office file
Autopsy photographs
Scene photographs
Pediatrician medical records
EMS report
Hospital records from terminal admission
Police reports and drawing of the scene
Police deposition of Russell Brown (friend)
Police deposition of Rebecca Parker (mother)
Police deposition of Michael Bayley (firefighter/EMS)
Police deposition of James Tidings (firefighter/EMS)
Police deposition of Jason Lucey (firefighter/EMS)
Police deposition of Frank Shoemaker III (firefighter/EMS)
Police deposition of Michael Rustin (restaurant employee)
Police deposition of Kathleen Crisafulli (ER doctor)
Grand jury testimony of Dr. Michael Sikirca 9/25/15
Deposition of Dr. Michael Sikirca 5/24/21
Deposition of Michael Davis 3/30/17, 5/19/21
Transcripts of trial testimony

**Facts of the incident**
Per report, the decedent seemed lethargic and tired on the morning of the day she died (2/26/15) as
noted by the decedent's mother and mother's boyfriend (Michael Davis). The decedent's mother

went to work and Mr. Davis was responsible for watching her during the day. The decedent was placed for a nap by Mr. Davis in the late morning who also took a nap at that time. When he awoke, he reported that the decedent was unresponsive. He attempted cardiopulmonary resuscitation (CPR) by pacing one hand on her back and one on her chest/stomach and compressing the decedent's torso. Mr. Davis did not have a phone, so after attempting CPR and getting no response, he went to a restaurant down the street to use their phone to call 911. When the decedent's mother arrived home from work, Mr. Davis was coming down the street back to the residence after having called 911 for assistance.

The ambulance arrived at 13:14 and CPR was initiated. In his deposition, firefighter/EMS personnel, Frank Shoemaker II stated that the decedent's abdomen was "not distended" when they arrived and CPR was initiated. The decedent arrived to the emergency room at 13:46 and was pronounced dead at 14:08. During this time, CPR was continued by medical personnel.

Autopsy photographs revealed lacerations of the anterior and posterior right and left lobes of the liver with pulpification of the intervening parenchyma of the right lobe, and approximately 350 ml of liquid blood in the peritoneal cavity. They also revealed fractures of the posterior right 9th and 10th ribs with surrounding hemorrhage in the soft tissue; no overlying skin hemorrhage (contusion) of the back was demonstrated. Postmortem metabolic screening detected a slightly elevated level of thyroid stimulation hormone (TSH) consistent with hypothyroidism.

#### Opinion

The injuries to the decedent's liver are consistent with CPR, as is the amount of blood in the peritoneal cavity. While CPR is being performed, the heart is kept artifactually "beating" allowing injuries, like liver lacerations, to continue oozing blood and bleeding into the surrounding soft tissue. Of note, one of the EMS personnel stated that her abdomen did not appear distended when they arrived to the residence, which suggests that additional blood accumulated while CPR was being performed by EMS and hospital staff.

It is not uncommon to see rib fractures during routine CPR. While routine CPR usually does not cause posterior rib fractures (as were seen in this case), Mr. Davis stated that when he performed CPR, he placed one of his hands on the decedent's back and one of his hands on the decedent's front. The hand placed on the back could have caused the posterior rib fractures identified in this case, and as such, they are not concerning for inflicted trauma. The nature and extent of the CPR related injuries would not have provided information about the size of Mr. Davis's hands, despite the size of his hands being specifically being listed in the autopsy report.

The autopsy and subsequent examination did not identify a cause of death. As such, the decedent's death would be classified as Sudden Unexplained Death in Childhood with Intrinsic Factors (hypothyroidism), using the latest recommendations of the National Association of Medical

Examiners. Deaths that fall into this category are often thought to be due to cardiac arrhythmias (when the heart beats irregularly or stops beating) or seizures. Further work-up of these diagnoses includes extensive review of brain and cardiac tissue, genetic testing, and referral to the Sudden Unexplained Death in Childhood Registry and Research Collaborative may be considered. It is possible that a thorough evaluation of the heart and brain could have provided information about the cause of death. Additionally further studies of the thyroid gland could have been considered given the decedent's abnormal thyroid metabolic screening. It is not clear if these studies were performed in this case, as all of the emphasis was placed on the non-fatal and non-contributory to death CPR related injuries.

To a reasonable degree of medical and scientific certainty, there is no evidence that the injuries to the decedent's liver and ribs were due to anything other than CPR, and they did not contribute to her death.

The facts and opinions above are based on the provided information, and may change should new information be provided. Please do not hesitate to contact me if there are further questions.

Katherine Maloney, M.D.
Nickel City Forensics, LLC

**APPENDIX**

# Katherine F. Maloney, M.D.

Nickel City Forensics, L.L.C.
P.O. Box 114
Getzville, NY 14068
(774) 249-8241
nickelcityforensics@gmail.com

## Professional Experience

| | |
|---|---|
| **Deputy Chief Medical Examiner**<br>**Erie County Medical Examiner's Office**<br>Buffalo, NY | 2016 – Present |
| **Associate Chief Medical Examiner**<br>**Erie County Medical Examiner's Office**<br>Buffalo, NY | 2013 – 2016 |
| **City Medical Examiner**<br>**Office of Chief Medical Examiner**<br>New York, NY | 2011 – 2013 |

## Education and Training

| | |
|---|---|
| **Fellow in Forensic Neuropathology and Cardiac Pathology**<br>**Office of Chief Medical Examiner**<br>New York, NY | 2012 – 2013 |
| **Fellow in Forensic Pathology**<br>**Office of Chief Medical Examiner**<br>New York, NY | 2011 – 2012 |
| **Resident in Anatomic and Clinical Pathology**<br>**New York Presbyterian Hospital - Weill Cornell Medical Center**<br>Department of Pathology and Laboratory Medicine<br>New York, NY | 2007 – 2011 |
| **Doctor of Medicine**<br>**University of Massachusetts Medical School**<br>Worcester, MA | 2003 – 2007 |
| **Bachelor of Science, Biology**<br>**Boston College, College of Arts & Sciences**<br>Chestnut Hill, MA | 1998 – 2002 |

Katherine F. Maloney, M.D.

## Academic Appointments

**Clinical Assistant Professor**                                                2014 – Present
**Pathology and Anatomical Sciences, University at Buffalo**
Buffalo, NY

**Clinical Instructor**                                                              2011 – 2013
**Department of Forensic Medicine, New York University**
New York, NY

## Medical Licensing and Examinations

Forensic Pathology Board Certified                            Certification Date 9/4/2012
Anatomic and Clinical Pathology Board Certified          Certification Date 7/29/2011
New York State Medical License – #250114                   Licensure Date 8/22/2008
United States Medical Licensing Examination, Steps 1-3

## Professional Organizations

American Academy of Forensic Sciences                                        2014 – Present
New York State Association of County Coroners & Medical Examiners  2014 – Present
National Association of Medical Examiners                                  2011 – Present
United States & Canadian Academy of Pathology                             2008 – Present
American Society for Clinical Pathology                                    2008 – Present
College of American Pathologists                                          2007 – Present

## Service to the Profession

**Forensic Pathology Section Editor**                                           2017 – Present
American Society for Clinical Pathology Forensic Pathology Case Reports

**National Association of Medical Examiners**                                    2016 – Present
Protocols for Interagency Interactions in Mass Fatality Incidents Committee

**National Association of Medical Examiners**                                    2016 – 2017
Forensic Pathology Fellowship Training Committee

**Forensic Pathology Case Reviewer**                                            2016 – Present
Sudden Unexpected Death in Childhood (SUDC) Registry and Research Collaborative

**Case Reviewer**                                                                2014 – Present
American Society for Clinical Pathology Forensic Pathology Check Samples

# APPENDIX

Katherine F. Maloney, M.D.

## Teaching Experience

| | |
|---|---|
| **CRJ303: Criminal Investigation I Lab**<br>Medaille College<br>Buffalo, NY | 2019 – Present |
| **Child Homicide Investigations**<br>National Criminal Justice Training Center<br>Fox Valley Technical College | 2018 – Present |
| **Forensic Lecture Series**<br>Jefferson Medical College, Lenox Hill Hospital, Albert Einstein College of Medicine, Weill Cornell Medical College | September 2017 |
| **Resident Lectures**<br>**Erie County Medical Examiner's Office**<br>Buffalo, NY | 2013 – Present |
| **Resident Lectures**<br>**Office of Chief Medical Examiner**<br>New York, NY | 2011 – 2013 |
| **Small Group Instructor**<br>**Weill Medical College of Cornell University**<br>New York, NY | 2007 – 2011 |
| **Teaching Assistant**<br>**Boston College**<br>Chestnut Hill, MA | 2000 – 2002 |

## Research Experience

**Graduate Research**        2008 – 2011
**New York-Presbyterian Hospital - Weill Cornell Medical Center**
Department of Pathology
New York, NY
    Mentor: Rebecca Baergen
    Project: Types of Maternal Hypertensive Disease and Their Association with
        Placental Pathologic Lesions and Clinical Factors

**Undergraduate Research Assistant**        2006-2007
**University of Massachusetts Medical School**
Department of Pathology
Worcester, MA
    Mentor: Dr. Ashraf Kahn

# APPENDIX

Katherine F. Maloney, M.D.

Senior Project: Expression of Vascular Endothelial Growth Factor Subtypes and
Their Relationship to Tumor Progression

**Research Assistant**                                                    June – August 2004
**University of Southern California**
Division of Research Immunology/Bone Marrow Transplantation
Los Angeles, CA

**Research Assistant**                                                    2002 – 2003
**Massachusetts General Hospital**
Department of Molecular Pathology and Neuro-Oncology
Boston, MA

**Undergraduate Research Assistant**                           2000 – 2002
**Boston College**
Department of Biology
Chestnut Hill, MA

**Research Assistant**                                                    1998 – 1999
**University of Massachusetts Medical School**
Department of Molecular Pathology
Worcester, MA

## Publications

**Maloney KF**, Webb M. "Overdose death associated with vaping designer fentanyl analogs." *Clinical and Forensic Toxicology News (Quarterly, AACC/CAP)*, 2019 December.

Miller AO, Buckwalter SP, Henry MW, Wu F, **Maloney KF**, Abraham BK, Hartman BJ, Brause BD, Whittier S, Walsh TJ, Schuetz AN. "*Globicatella sanguinis* Osteomyelitis and Bacteremia: Review of an Emerging Human Pathogen with an Expanding Spectrum of Disease." *Open Forum Infect Dis* 2017, 4(1): ofw277.

**Maloney KF**, Schoppe CS. "Obesity and non-atherosclerotic cardiovascular disease." *Academic Forensic Pathology* 2013 March, 3(1): 8-12.

Gill JG, **Maloney KF**, Hirsch CH. "The consistency and advantage of therapeutic complication as a manner of death." *Academic Forensic Pathology* 2012 June, 2(2): 176-182.

**Maloney KF**, Baergen RN. "Maternal floor infarction (Massive perivillous fibrin deposition)." *Pathology Case Reviews* 2010, 15(2):58-61.

**Maloney KF**, Heller DS, Baergen RN. "Types of Maternal Hypertensive Disease and Their Association with Pathologic Lesions and Clinical Factors." *Fetal and Pediatric Pathology* 2012 Oct;31(5):319-23.

## Abstracts and Poster Presentations

**Maloney KF** and Webb M. "An Overdose Death Associated with Vaping Designer Fentanyl Analogs." National Association of Medical Examiners (NAME) Annual Meeting; Virtual: October 16-17, 2020.

**Maloney KF**, Hart AM, Reed S, Mahar TJ. "Your patient is going to die I: A review of iatrogenic injuries." National Association of Medical Examiners (NAME) Annual Meeting; Virtual: October 16-17, 2020.

**Maloney KF**, Hart AM, Reed S, Mahar TJ. "Your patient is going to die II: A review of missed diagnoses." National Association of Medical Examiners (NAME) Annual Meeting; Virtual: October 16-17, 2020.

Hart AM, **Maloney KF**, Yarid NA, Mahar TJ. "Two dead bodies in a cemetery: An unexpected lightning strike." American Academy of Forensic Sciences (AAFS) Annual Meeting; Seattle, WA: February 19-24, 2018.

**Maloney KF**, Yarid NA, Giffin CR, Corcoran CM, Blank J, Mahar TJ. "U-47700: A synthetic opioid of unknown significance." American Academy of Forensic Sciences (AAFS) Annual Meeting; New Orleans, LA: February 13-18, 2017.

**Maloney KF**, Yarid NA, Giffin CR, Corcoran CM, Blank J, Mahar TJ. "Butyrylfentanyl and acetylfentanyl levels in driving under the influence and overdose cases." National Association of Medical Examiners (NAME) Annual Meeting; Minneapolis, MN: September 7-13, 2016.

**Maloney KF**, Yarid NA, Blank J, Mahar TJ. "Deaths associated with a November 2014 snowstorm ("Winter Storm Knife") in Erie County, New York." American Academy of Forensic Sciences (AAFS) Annual Meeting; Las Vegas, NV: February 22-27, 2016.

Gill JG, **Maloney KF**, Hirsch CH. "The consistency and advantage of therapeutic complication as a manner of death." National Association of Medical Examiners (NAME) Annual Meeting; Baltimore, MD: October 5-9, 2012.

**Maloney KF**, Heller DS, Baergen RN. "Types of Maternal Hypertensive Disease and Their Association with Pathologic Lesions and Clinical Factors." United States & Canadian Academy of Pathology (USCAP) Annual Meeting; Boston, MA: March 7-13, 2009.

**Maloney KF**, Savageau J, Pulver T, Prasad M, Quinlan R, Ashraf K. "Expression of Vascular Endothelial Growth Factor Subtypes and Their Relationship to Tumor Progression." College of American Pathologists (CAP) Annual Meeting; Chicago, IL: April 14-18, 2007.

**Maloney KF**, Petri WH. "The Utility of Eight Canine Microsatellite Markers for Determining Genetic Variation in the Eastern Coyote (*Canis latrans*)." 60th Annual Eastern New England Biological Research Conference; Boston, MA: April 2002.

## Media Appearances

| | |
|---|---|
| **Forensic Pathology Expert**<br>"Hell and Gone – The Mitrice Richardson Case"<br>School of Humans, Podcast | TBA |
| **Forensic Pathology Expert**<br>"Exhumed – The Stacey Caster Case"<br>Milojo Downtown LLC, Oxygen Network | TBA |
| **Forensic Pathology Expert**<br>"Crime Stories with Nancy Grace"<br>Crime Online, Podcast | 2019 – 2020 |
| **Forensic Pathology Expert**<br>"Wrong Man"<br>Radical Media, Starz | June 2019 |
| **Forensic Pathology Expert**<br>"Murder and Justice: The Case of Martha Moxley"<br>Jupiter Productions, Oxygen Network | June 2019 |
| **Forensic Pathology Expert**<br>"Deadly Intelligence"<br>Beyond Productions, Science Channel | April 2018 |
| **Forensic Pathology Expert**<br>"Final Appeal"<br>Peacock Productions, Oxygen Network | January 2018 |

| Date | Case | Type | Location |
|------|------|------|----------|
| 3/2/2017 | 1960-16 | Criminal | Chautauqua Co, NY |
| 3/14/2017 | 0621-16 | Criminal | Buffalo, NY |
| 3/16/2017 | M11-5917 | Criminal | New York, NY |
| 5/15/2017 | 0052-14 | Evidenciary Hearing | USDOJ, Buffalo, NY |
| 6/13/2017 | 2994-16 | Grand Jury | Buffalo, NY |
| 7/28/2017 | 0693-08 | Criminal | Buffalo, NY |
| 8/8/2017 | 0485-15 | Evidenciary Hearing | Buffalo, NY |
| 9/13/2017 | 1445-15 | Evidenciary Hearing | USDOJ, Buffalo, NY |
| 9/14/2017 | 0103-17, 0641-16, 0658-16, 1109-15, 0429-17 | Grand Jury | USDOJ, Buffalo, NY |
| 9/28/2017 | 1621-16 | Criminal | Buffalo, NY |
| 11/8/2017 | 1947-17 | Grand Jury | Buffalo, NY |
| 12/14/2017 | 2872-09 | Criminal | USDOJ, Buffalo, NY |
| 12/8/2017 | 2380-17 | Grand Jury | Buffalo, NY |
| 3/23/2018 | 1868-16 | Criminal | Buffalo, NY |
| 4/11/2018 | 0378-18 | Grand Jury | Buffalo, NY |
| 4/19/2018 | 1868-16 | Criminal | Buffalo, NY |
| 6/13/2018 | 1198-18 | Grand Jury | Niagara Co, NY |
| 11/29/2018 | 0728-18 | Grand Jury | USDOJ, Buffalo, NY |
| 12/6/2018 | 2200-17 | Criminal | Buffalo, NY |
| 12/14/2018 | 1232-17 | Criminal | Buffalo, NY |
| 1/24/2019 | 1825-17 | Criminal | Buffalo, NY |
| 2/1/2019 | 2661-17 | Criminal | Buffalo, NY |
| 2/13/2019 | 1684-18 | Criminal | Buffalo, NY |
| 3/6/2019 | 1616-18 | Criminal | Buffalo, NY |
| 3/22/2019 | 0378-18 | Criminal | Buffalo, NY |
| 4/30/2019 | 1684-18 | Criminal | Buffalo, NY |
| 5/1/2019 | 2422-17 | Grand Jury | Orleans Co, NY |
| 6/21/2019 | 18-2261 | Grand Jury | Niagara Co, NY |
| 7/2/2019 | 19-0238 | Grand Jury | USDOJ, Buffalo, NY |
| 7/29/2019 | 19-0222 | Grand Jury | Buffalo, NY |
| 9/4/2019 | 19-0982 | Grand Jury | Buffalo, NY |
| 10/15/2019 | 720-17, 1983-17 | Grand Jury | USDOJ, Buffalo, NY |
| 10/23/2019 | 19-0697 | Grand Jury | USDOJ, Buffalo, NY |
| 10/29/2019 | 19-0631 | Grand Jury | USDOJ, Buffalo, NY |
| 12/4/2019 | 19-0629 | Grand Jury | USDOJ, Buffalo, NY |
| 1/23/2020 | 20-0039 | Felony Hearing | Buffalo, NY |
| 7/28/2020 | 20-0039 | Grand Jury | Buffalo, NY |
| 10/18/2020 | 20-0192 | Grand Jury | Buffalo, NY |
| 10/15/2020 | 2525-17 | Criminal | USDOJ, Buffalo, NY |
| 3/12/2021 | 19-1149 | Grand Jury | Buffalo, NY |
| 3/24/2021 | 19-0009 | Grand Jury | Buffalo, NY |

Nickel City Forensics, L.L.C.
P.O. Box 114
Getzville, NY 14068
nickelcityforensics@gmail.com

2021 Fee Schedule

**Consultations $600.00/hr**
Review of documents, photographs or other materials
Examination of slides, radiographs or tissue
Writing reports, consultations and emails
Meetings, conferences and telephone contacts
Literature and medical research
Preparation for trial or deposition testimony

**Local Depositions and Meetings $300.00/hr**
Depositions (within Western New York/Buffalo region – travel time billed at local rate)
Local meetings (within Western New York/Buffalo region – travel time billed at local rate)

**Local Travel $300.00/hr plus mileage**
Western New York/Buffalo region and up to 250 miles
Mileage billed at IRS 2021 standard rate of 56 cents/mile

**Out-of-Town Meetings $5,000.00/day plus expenses**
Greater than 250 miles from Western New York/Buffalo region
Travel time included

**Out-of-Town Depositions or Trials $7,000.00/day plus expenses**
Greater than 250 miles from Western New York/Buffalo region
Travel time included

**Trials $600.00/hour plus expenses**
Trial testimony
Trials requiring an overnight stay will be charged an additional $600.00

**Notes**
This is the standard fee schedule; individual contract terms may vary
A $1,200.00 non-refundable retainer is required to initiate consultation; exception may be made for
court-appointed work
Minimum billing increment is 30 minutes
Expenses are billed in addition to consulting fees
Fees and expenses may be billed monthly for ongoing matters
Payment is due 30 days from Invoice date. Late payments are subject to interest charges
Cancellation of court appearances within one (1) calendar week of confirmed schedule date will be
charged a cancellation fee of $600.00 plus any expenses already incurred

# APPENDIX

**1442**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X

MICHAEL DAVIS-GUIDER,

                                        Plaintiff,

              -against-                                        17 CV 1290
                                                               (FJS) (DJS)
CITY OF TROY, RONALD FOUNTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES MCDONALD,
Individually, TIM COLANERI, Individually, ADAM R. MASON,
Individually, MICHAEL E. PARROW, Individually,
RENSSELAER COUNTY, MICHAEL SIKIRICA, Individually,
JOEL ABELOVE, Individually, ANDRA ACKERMAN,
Individually, and JOHN and JANE DOE 1-10, Individually, (the
names John and Jane Doe being fictitious, as the true names are
presently unknown),

                                        Defendants.

---------------------------------------------------------------------X


**PLAINTIFF'S EXPERT DISCLOSURE**


**BRETT H. KLEIN, ESQ., PLLC**
Attorneys for the Plaintiff
305 Broadway, Suite 600
New, New York 10007
(212) 335-0132

Case 1:17-cv-01290-DJS Document 96-1 Filed 02/04/22 Page 264 of 9

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MICHAEL DAVIS-GUIDER,

                                     Plaintiff,

            -against-

CITY OF TROY, RONALD FOUNTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES
MCDONALD, Individually, TIM COLANERI, Individually,
ADAM R. MASON, Individually, RENSSELAER COUNTY,
MICHAEL SIKIRICA, Individually, and
JOEL ABELOVE, Individually,

                                     Defendants.
_____

**CITY DEFENDANTS'
STATEMENT OF
MATERIAL FACTS**
Case No.:   1:17-cv-1290
(FJS/DJS)

Pursuant to Local Rule 56.1(a) of this Court, the above-named Defendants, the City of Troy

(the "City"), Ronald Fountain ("Fountain"), Danielle Coonradt ("Coonradt"), Charles McDonald

("McDonald"), Tim Colaneri ("Colaneri"), and Adam R. Mason ("Mason") (collectively referred

to as the "City Defendants"), contend that as to the following material facts, no genuine issue

exists:

1.      At all relevant times up until approximately March 2016, Fountain was a duly

sworn police officer/detective of the Troy Police Department ("TPD"). (Fountain Aff. ¶¶2, 87).

2.      At all relevant times up until February 2016, Coonradt was a duly sworn police

officer of the TPD. (Coonradt Aff. ¶¶ 2, 31).

3.      At all relevant times up until approximately February 2016, McDonald was a duly

sworn police officer/detective TPD. (McDonald Aff. ¶¶ 2,44).

4.      At all relevant times herein, defendant Tim Colaneri was a duly sworn police

officer/detective of the TPD. (Colaneri Aff. ¶2).

1

5.     At all relevant times herein, Mason was a duly sworn police officer/detective of the TPD. (Mason Aff. ¶2).

6.     On February 26, 2015, Plaintiff, Michael Davis-Guider was home with his girlfriend's daughter, Viola Davis ("V.D."). (Third Amended Complaint, E.C.F. Doc. No. 77, ¶ 14).

7.     V.D.'s mother, Plaintiff's girlfriend, Rebecca Parker ("Parker"), left for work on the morning of February 26, 2015 around 8:00am. (Exhibit "B" Holehan Aff.).

8.     V.D. was awake at the time Parker left for work on the morning of February 26, 2015. (Exhibit "B" to Holehan Aff.).

9.     According to the Plaintiff, after V.D. was awake, Plaintiff noticed that she had soiled her diaper, and after changing it, he sent her back to bed with a bottle. (Davis EBT attached to Firth Affidavit as Exhibit "D," pp. 56-57).

10.     According to the Plaintiff, after V.D. was sent back to bed, he turned on a movie and fell asleep. (Davis EBT attached to Firth Affidavit as Exhibit "D," p. 57).

11.     According to the Plaintiff, when he woke up, he called to V.D., but she did not respond. (E.C.F. Doc. No. 77, p. 38; Davis EBT attached to Firth Affidavit as Exhibit "D," p. 60).

12.     According to the Plaintiff, he then went to her bedroom, called to her again, and observed her lying in her bed; she was not moving and did not respond. (Davis EBT attached to Firth Affidavit as Exhibit "D," p. 60).

13.     According to the Plaintiff, he observed that V.D. was not breathing and he attempted to perform CPR twice. (Davis EBT attached to Firth Affidavit as Exhibit "D," pp. 61-62).

Case 1:17-cv-01290-DJS Document 126-3 Filed 02/04/22 Page 284 of 9

14.     According to the Plaintiff, his resuscitation efforts were not successful, and he then moved V.D. from her bed, brought her into the living room, placed her on a futon, and tried CPR one more time. (Davis EBT attached to Firth Affidavit as Exhibit "D," pp. 61, 65).

15.     According to the Plaintiff, after his resuscitation efforts were unsuccessful, he attempted to call 911 however, the two cell phones accessible to him in the house were "extremely dead" and there was no landline. (Davis EBT attached to Firth Affidavit as Exhibit "D," pp. 61, 65-66).

16.     According to the Plaintiff, he then ran across the street to his neighbor's house to try and find help, but nobody was home. (Davis EBT attached to Firth Affidavit as Exhibit "D," p. 62).

17.     According to the Plaintiff, when his neighbor did not answer their door, he ran back to the house to check on V.D. and her status had not changed, and he did not attempt CPR again. (Davis EBT attached to Firth Affidavit as Exhibit "D," p. 62, 66-67).

18.     According to the Plaintiff, he ran out of the house again and across the street to Testo's Restaurant to use a phone to call 911. (Davis EBT attached to Firth Affidavit as Exhibit "D," p. 62, 67).

19.     The Plaintiff was able to use an employee's phone to call 911. (Davis EBT attached to Firth Affidavit as Exhibit "D," p. 67).

20.     The Plaintiff hung up on the 911 operator, ran back to the house where V.D. was, and encountered Parker who was arriving home. (Davis EBT attached to Firth Affidavit as Exhibit "D," p. 69).

21.     On February 26, 2015, Coonradt was on duty patrolling the City of Troy in a

marked police car when she received a dispatch regarding a juvenile cardiac arrest. (Coonradt Aff. ℙ 3).

22.    Coonradt was the first responding TPD officer on scene. (Coonradt Aff. ℙ 4).

23.    When Coonradt arrived on scene, paramedics were already at the residence. (Coonradt Aff. ℙ 5).

24.    Coonradt observed the Plaintiff and V.D.'s mother outside the residence and approached them to ask what was going on. (Coonradt Aff. ℙℙ 5-6).

25.    The Plaintiff engaged in a brief conversation with Coonradt regarding V.D. being found unresponsive. (Exhibit "B" to Coonradt Aff.).

26.    Paramedics on scene were attempting to revive V.D. through administration of CPR. (E.C.F. Doc. #77, ℙ20).

27.    V.D. was transported to Saint Mary's Hospital in Troy, New York. (E.C.F. Doc. #77, ℙ22).

28.    After V.D. was transported to the hospital, Fountain and McDonald arrived on scene. (Fountain Aff. ℙ5).

29.    The Plaintiff was driven to TPD police station by Fountain and McDonald. (Fountain Aff. ℙℙ6-7).

30.    Coonradt remained on scene. (Coonradt Aff. ℙ17).

31.    V.D. was pronounced dead at the hospital. (E.C.F. Doc. #77, ℙ23).

32.    While on scene, Coonradt contacted Child Protective Services ("CPS") and completed relevant TPD form documents. (Exhibit "A" and Exhibit "B" to Coonradt Aff.).

33.    After V.D. was pronounced dead, Fountain was informed of such and responded to

the hospital. (Fountain Aff. ¶11).

34.     McDonald remained at the police station with the Plaintiff. (McDonald Aff. ¶13).

35.     Fountain returned to TPD central station and he, Colaneri and McDonald interviewed the Plaintiff. (McDonald Aff. ¶15).

36.     The Plaintiff consented to TPD searching the home. (Exhibit "B" to Holehan Aff.).

37.     Prior to TPD conducting a search of the Plaintiff's home, Coonradt was relieved from her position by Officer Balarin and was not present for said search. (Coonradt Aff. ¶22).

38.     TPD searched the Plaintiff's home on February 26, 2015, and secured evidence. (Fountain Aff. ¶

39.     After the search was completed, the Plaintiff left TPD central station. (McDonald Aff. ¶19).

40.     On February 27, 2015, Rensselaer County Medical Examiner, Defendant Michael Sikirica ("Sikirica") performed an autopsy of V.D. (Fountain Aff. ¶23).

41.     Present during said autopsy was Fountain, Colaneri, McDonald, TPD Detective-Sergeant Parrow, TPD Evidence Technician Anthony Buttufucco, Rensselaer County Assistant District Attorney ("ADA") Andra Ackerman and relevant employees of the Rensselaer County Medical Examiner Office including Sikirica. (Fountain Aff. ¶23).

42.     It is not uncommon for the police to attend an autopsy. (Plaintiff's Criminal Trial Expert Transcript, p. 55, L. 11; attached as Exhibit "B" to Spencer Affidavit).

43.     After the autopsy was completed, McDonald and Fountain went to the Plaintiff's residence to ask if he would agree to another interview. (Exhibit "A" to Fountain Aff.).

44.     The Plaintiff agreed and was interviewed at TPD central station on March 2, 2015.

(Fountain Aff. ¶38).

45.    Said March 2, 2015 interview was recorded. (Fountain Aff. ¶38).

46.    During said March 2, 2015 interview, the Plaintiff demonstrated how he performed CPR on V.D.. (Fountain Aff. ¶53).

47.    After the Plaintiff was interviewed, the Plaintiff left the police station. (Fountain Aff. ¶54).

48.    A copy of the interview recording was provided to Sikirica. (Fountain Aff. ¶55).

49.    TPD obtained a witness statement from paramedic Michael Bayly on February 27, 2015. (Exhibit "C" to Holehan Aff.).

50.    TPD obtained a witness statement from Parker on March 2, 2015. (Exhibit "D" to Holehan Aff.).

51.    TPD obtained a witness statement from paramedic Frank H. Shoemaker, III on March 2, 2015. (Exhibit "E" to Holehan Aff.).

52.    TPD obtained a witness statement from paramedic James D. Tidings on March 2, 2015. (Exhibit "F" to Holehan Aff.).

53.    TPD obtained a witness statement from emergency room doctor, Kathleen Crisafulli on March 5, 2015. (Exhibit "G" to Holehan Aff.).

54.    TPD obtained a witness statement from Russell E. Brown on March 5, 2015. (Exhibit "I" to Holehan Aff.).

55.    On March 12, 2015, Fountain, Colaneri, Mason, Detective-Sergeant Parrow, and ADA Andra Ackerman attended a meeting at the Rensselaer County Medical Examiner's Office with Sikirica. (Fountain Aff. ¶65).

56.     At the March 12, 2015 meeting, Sikirica advised that V.D.'s injuries could not have been caused by CPR. (Mason EBT attached to Firth Affidavit as Exhibit "J," p. 49-50).

57.     According to Sikirica, he has never encountered anything like V.D.'s liver lacerations at any time in his career, and in his performance of over 10,000 autopsies. (p. 72 of Sikirica EBT attached as Exhibit "F" to Firth Aff.).

58.     Sikirica issued his final autopsy report dated August 14, 2015. (Autopsy Report attached to Firth Affidavit as Exhibit "L").

59.     Sikirica concluded that V.D.'s cause of death was hypovolemic shock due to multiple lacerations of the liver with right rib fractures due to blunt-force trauma. (Exhibit "L" to Firth Aff., p. 1.).

60.     Sikirica concluded that the manner of V.D.'s death was homicide. (Exhibit "L" to Firth Aff., p. 1.).

61.     The Plaintiff was interviewed on September 9, 2015. (Fountain Aff. ¶70).

62.     The Plaintiff did not provide any additional information than what TPD already knew. (Fountain Aff. ¶72).

63.     The Plaintiff left the police station after his interview concluded. (Fountain Aff. ¶72).

64.     The Rensselaer County District Attorney's Office presented the case to the grand jury on September 29, 2015. (Fountain Aff. ¶¶74, 77).

65.     Fountain testified before the grand jury on September 29, 2015. (Exhibit "A" to Spencer Aff.).

66.     Sikirica also testified before the grand jury on September 29, 2015. (Exhibit "N" to

Case 1:17-cv-01290-DJS Document 106 Filed 02/04/21 Page 284 of 9

Firth Aff.).

67.    Coonradt did not testify before the grand jury. (Coonradt Aff. ¶29).

68.    Mason did not testify before the grand jury. (Mason Aff. ¶21).

69.    Colaneri did not testify before the grand jury. (Colaneri Aff. ¶30).

70.    McDonald did not testify before the grand jury. (McDonald Aff. ¶41).

71.    On or about October 2, 2015, the grand jury indicted the Plaintiff on the charges of: (1) manslaughter in the first degree; (2) manslaughter in the second degree; and (3) endangering the welfare of a child. (Exhibit "O" to Firth Aff.).

72.    As a result of the indictment, a warrant was issued for the Plaintiff's arrest and he was arrested pursuant to said warrant. (Exhibit "C" to Fountain Aff.).

73.    Coonradt did not assist in the Plaintiff's arrest. (¶30 of Coonradt Aff.).

74.    Mason did not assist in the Plaintiff's arrest. (¶20 of Mason Aff.).

75.    McDonald did not assist in the Plaintiff's arrest. (¶43 of McDonald Aff.).

76.    Plaintiff was arraigned and held without bail. (Exhibit "C" to Fountain Aff.).

77.    On May 3, 2014, Coonradt testified at a suppression hearing. (¶32 of Coonradt Aff.).

78.    Mason did not testify at the suppression hearing. (¶24 of Mason Aff.).

79.    Fountain did not testify at the suppression hearing. (¶88 of Fountain Aff.).

80.    McDonald did testify at the suppression hearing. (¶45 of McDonald Aff.).

81.    Fountain testified at the Plaintiff's criminal trial. (¶91 of Fountain Aff.).

82.    Coonradt testified at the Plaintiff's criminal trial. (¶34 of Coonradt Aff.).

83.    Mason did not testify at the Plaintiff's criminal trial. (¶24 of Mason Aff.).

# APPENDIX

84. Colaneri did not testify at the Plaintiff's criminal trial. (¶31 of Colaneri Aff.).

85. McDonald did not testify at the Plaintiff's criminal trial. (¶46 of McDonald Aff.).

86. Abelove did not attend any meetings with and City Defendant in this case. (p. 47 of Abelove EBT attached as Exhibit "E" to Firth Aff.).

87. The Plaintiff was acquitted on all charged. (E.C.F. Doc. No. 77, ¶45).

Dated: February 4, 2022.

*Rhiannon I. Spencer*

Rhiannon I. Spencer, Esq.
**PATTISON, SAMPSON, GINSBERG & GRIFFIN, PLLC**
*Attorneys for Defendants*
*Adam Mason, Ronald Fountain, & Tim Colaneri*
22 First Street, P.O. Box 208
Troy, New York 12181-0208
(518) 266-1001

# APPENDIX 1452

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------X

MICHAEL DAVIS-GUIDER,

                                            Plaintiff,

           -against-

CITY OF TROY, RONALD FOUNDTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES MCDONALD,
Individually, TIM COLANERI, Individually, ADAM R. MASON,
Individually, RENSSELAER COUNTY, MICHAEL SIKIRICA,
Individually, and JOEL ABELOVE, Individually,

                                         Defendants.

-------------------------------------------------------------------------------X

**PLAINTIFF'S RESPONSE TO THE COUNTY DEFENDANTS' STATEMENT OF MATERIAL FACTS**

17 CV 1290 (DJS)

Plaintiff respectfully submits this response to the County defendants' statement submitted

pursuant to Local Rule 7.1.

1.      Not disputed.

2.      Not disputed.

3.      Not disputed.

4.      Not disputed.

5.      Not disputed.

6.      Not disputed.

7.      Not disputed.

8.      Not disputed.

9.      Not disputed.

10.      Not disputed.

11.      Not disputed.

12.      Disputed.  Parker woke up around 7:45 to get ready for work and left for work

around 8:30 a.m.  Klein Decl. Ex. 2, Fountain Notes; Ex. 8, Parker Witness Dep.

13.     Not disputed.

14.     Disputed.  Davis smelled poop when he woke up and then called V.D. out of her room to where he was in the living room, and after helping V.D. finish in the bathroom and changing her diaper, Davis put her back to bed because she seemed tired and sluggish.  *Id.* at Ex. 1, Davis Dep. Tr. 55:23-57:11.

15.     Not disputed.

16.     Not disputed.

17.     Not disputed.

18.     Not disputed.

19.     Not disputed, that he so testified, but how hard Davis pushed during his CPR attempts remains a question of fact for the jury because Davis also informed the police that he thought he was doing it lightly, but was in a panic, and therefore was not sure how much pressure he actually used.  *Id.* at Ex. 10, Mar. 2, 2015, Interrogation Tr. page 13:2-11.

20.     Not disputed.

21.     Not disputed.

22.     Not disputed.

23.     Not disputed.

24.     Not disputed that he used a phone at Testo's Restaurant but disputed that the phone belonged to a patron.  *Id.* at Ex. 35, Davis 50-h by City 17:18-18:13.

25.     Not disputed.

26.     Not disputed.

27.     Not disputed that Davis was inside during while EMS was performing CPR but further asserts that Davis observed EMS doing CPR on the soft futon, with two hands, pressing

very hard on V.D. *Id.* at Ex. 1, Davis Dep. Tr. 65:10-12, 72:9-73:5; Ex. 3, Trial Tr. III 6:15-7:14, 15:22-24; Ex. 5, Trial Tr. V 52:5-53:17.

28.    Not disputed.

29.    Not disputed.

30.    Not disputed as to the facts asserted but disputed that this was all Coonradt did that day.  She also spoke to Davis, searched Davis' home, and prepared a false report misrepresenting what Davis told her.  *Id.* at Ex. 1, Davis Dep. Tr. 73:17-75:11, 79:16-81:4, 145:10-146:6, 152:4-153:6, 155:21-159:15; Ex. 3, Trial. Tr. III 42:22-43:6; Ex. 16, Coonradt Dep. Tr. 15:13-16:7; Ex. 17, Coonradt Supp. Rpt.

31.    Not disputed.

32.    Not disputed.

33.    Not disputed but state the reason that Davis and Parker did not accompany V.D. to the hospital was because they were not allowed to.  *Id.* at Ex. 1, Davis Dep. Tr. 77:9-17; Ex. 5, Trial Tr. V 54:17-55:18; Ex. 8, Parker Witness Dep.

34.    Not disputed.

35.    Not disputed.

36.    Not disputed.

37.    Disputed.  Defendant Colaneri was also present and was the primary interrogator. *Id.* at Ex. 18, Fountain Dep. Tr. 37:5-38:2; Ex. 29, Colaneri Dep. Tr. 24:4-25:17; Ex. 21, Suppression Hearing Tr. 115:8-14.

38.    Disputed.  Defendants Fountain and McDonald were jointly assigned to conduct the investigation.  *Id.* at Ex. 18, Fountain Dep. Tr. 34:12-20, 40:6-11, 41:3-20; Ex .19, McDonald Dep. Tr. 27:6-29:8.

39.    Not disputed.

40. Not disputed.

41. Not disputed.

42. Not disputed that prolonged CPR involving approximately 6,000 compressions was administered to V.D., none of which was mentioned or factored into Sikirica's autopsy report, despite that prolonged CPR is known to result more CPR-related injuries. *Id.* at Ex. 15, Sikirica Dep. Tr. 57:1-60:4. Maloney Decl. ¶ 9

43. Not disputed.

44. Not disputed that Sikirica does not ultimately determine criminal charges, but he is involved in deciding the cause of death and he was aware that his determination that V.D. had died of a homicide would lead to a criminal prosecution and that his testimony and determination would form the basis of and otherwise be important to the prosecution. Klein Decl. Ex. 15, Sikirica Dep. Tr. 82:9-14, 140:11-21. Further, whether Sikirica did more than provide information and expertise is a question of fact for the jury.

45. Disputed. Sikirica's autopsy report specifically references a "[h]istory of decedent reportedly found unresponsive with reported history of attempted cardiopulmonary resuscitation by a large adult" as contributing to the cause of death. *Id.* at Ex. 28, Autopsy Rpt. 000119.

46. Not disputed.

47. Not disputed.

48. Not disputed.

49. Disputed to the extent that the National Academy of Science recommends that law enforcement and prosecutors should not be present during autopsies because they may influence the medical examiner. *Id.* at Ex. 6, Trial Tr. VI 55:14-56:14

50. Move to strike insofar as what is commonly done is not relevant to the instant motion.

51.     Not disputed.

52.     Move to strike insofar as what is commonly done is not relevant to the instant motion.

53.     Not disputed.

54.     Not disputed that Sikirica did order tests relevant to determining whether V.D.'s death was due to natural causes, but disputed that Sikirica ruled out all potential natural causes including potential genetic mutations, or other issues involving the heart and brain that are associated with sudden unexplained death as occurred with V.D.  *Id.* at Ex. 6, Trial Tr. VI 19:19-20:11, 45:23-47:4; Maloney Decl. Ex. 2, Maloney Rpt. p. 2-3.

55.     Disputed.  Approximately one week before her death, V.D. was sick with a fever, coughing, and vomiting, and had complained of chest pains.  Klein Decl. Ex. 1, Davis Dep Tr. 47:9-48:7; Ex. 2, Fountain Notes 000424-25.  Further, when V.D. awoke on February 26, 2015, she appeared low energy, sluggish, and not her normal self.  *Id.* at Ex. 1, Davis Dep. Tr. 56:14-57:11. V.D. also suffered from low iron and a postmortem metabolic screening detected an elevated thyroid stimulation hormone consistent with hypothyroidism and chronic inflammation of the bronci.  *Id.* at Ex. 1, Davis Dep Tr. 46:21-47:5; Ex. 6, Trial Tr. VI 52:9-20.  Maloney Decl. Ex. 2, Maloney Rpt. p. 2.

56.     Disputed.  *See supra*, ¶ 55.

57.     Not disputed.

58.     Not disputed but disputed that Sikirica included this critical information in his final autopsy report.  Klein Decl. Ex. 28, Autopsy Rpt.

59.     Not disputed but note that Sikirica omitted this information from his final autopsy report. *Id.*

60.     Not disputed but note that Sikirica omitted this information in his final autopsy

# APPENDIX

report.  *Id.*

61.    Not disputed.

62.    Not disputed.

63.    Disputed that Sikirica testified to a correlation between ruptured livers and anterior rib fractures.  *Id.* at Ex. 15, Sikirica Dep. Tr. 60:21-62:15.

64.    Not disputed.

65.    Not disputed.

66.    Disputed.   The rib injuries were postmortem and consistent with Davis' description of having a hand on V.D.'s back while attempting CPR.  Maloney Decl. Ex. 2 Maloney Rpt. p. 2.  Klein Decl. Ex. 15, Sikirica Dep. Tr. 59:19-60:4.

67.    Not disputed that he so opined, but Sikirica admitted that his opinion in this regard was merely based on an assumption that CPR was done correctly and that he did not question any of the EMS personnel who performed CPR to inquire how CPR was done, despite that he should have.  *Id.* at Ex. 6, Trial Tr. VI 22:5-19, 64:2-15; Ex. 15, Sikirica Dep. Tr. 72:10-78:19. Moreover, Sikirica's assumption was wrong insofar as evidence supports that EMS incorrectly performed CPR with two hands on a soft futon.  *Id.* at Ex. 1, Davis Dep. Tr. 65:10-12, 72:9-73:5; Ex. 3, Trial Tr. III 6:15-7:14, 15:22-24; Ex. 5, Trial Tr. V 52:5-53:17.

68.    Disputed.  V.D.'s injuries were not beyond what would be expected in a CPR situation and were also concededly consistent with how Davis described his attempted CPR.  *Id.* at Ex. 4, Trial Tr. IV 58:15-25; Ex. 6, Trial Tr. VI 43:8-44:3, 63:12-64:15; Ex. 15, Sikirica Dep. Tr. Dep. 83:18-84:11; Ex. 32, Brady Disclosure; Maloney Decl. ¶ 8.

69.    Not disputed that V.D. had blood in her abdomen but disputed that it can be concluded that the volume of blood was from the lacerations rather than from prolonged CPR. Klein Decl. Ex. 6, Trial Tr. VI 52:21-55:10.  Maloney Decl. Ex. 2, Maloney Rpt. p. 2.

70.     Not disputed.

71.     Not disputed.

72.     Not disputed.

73.     Not disputed.

74.     Not disputed.

75.     Disputed.  The volume of blood was consistent with slow bleeding lacerations and the fact that while CPR is being performed the heart is kept artificially beating allowing injuries like liver lacerations to continue bleeding into the surrounding soft tissue.  Klein Decl. Ex. 6, Trial Tr. VI 52:21-55:10.  Maloney Decl. Ex. 2, Maloney Rpt. p. 2.

76.     Not disputed that Sikirica failed to note that some of the bleeding was from CPR despite acknowledging that CPR results in continued post-mortem bleeding.  Klein Decl. Ex. 15, Sikirica Dep. Tr. 75:17-77:17; Ex. 28, Autopsy Rpt.  Plaintiff further asserts that no medical examiner should ever draw the conclusion that the amount of blood seen on autopsy was present at the time of death because it is known that humans continue to bleed after death with CPR.  *Id.* at Ex. 6, Trial Tr. VI 52:21-55:10.

77.     Not disputed.

78.     Not disputed, but further note that Sikirica also based his conclusion on an incorrect assumption that all other medical personnel correctly did CPR.  *See supra*, ¶ 67.

79.     Disputed that Sikirica not learned anything from the police at the time he issued his autopsy report that bore on his findings insofar as he was aware that Davis was the only person with V.D. at the time of her death and appeared to have factored that into his determination at the outset that this was a homicide at the hands of a large adult.  Klein Decl. Ex. 13, CPS Records 000507, 000521; Ex. 18, Fountain Dep. Tr. 118:19-119:19; Ex. 28, Autopsy Rpt. 000119.

80.     Move to strike insofar as Sikirica's testimony as to what he would have done is

mere speculative.

81.    Not disputed that Sikirica officially pended his determination but asserted that he had already determined that the death was a homicide to the exclusion of potential natural causes of death while still awaiting relevant test results. *Id.* at Ex. 6, Trial Tr. VI 49:6-50:21; Ex. 13, CPS Records 000507, 000521.

82.    Not disputed that such was Sikirica's determination but disputed that his finding was correct insofar as the injuries Sikirica observed were due to CPR and did not contribute to V.D.'s death. Maloney Decl. Ex. 2, Maloney Rpt. p. 2-3.

83.    Disputed.  Sikirica's autopsy report on its face attributes the cause of V.D.'s injuries to Davis' attempted CPR and Sikirica concedes that he cannot dispute that V.D. was already unresponsive at the time Davis attempted CPR. Klein Decl. Ex. 15, Sikirica Dep. Tr. 66:21-67:3; Ex. 28, Autopsy Rpt.  000119.

84.    Disputed.  V.D.'s injuries were consistent with CPR and did not contribute to V.D.'s death, and Sikirica's autopsy report on its face attributes the cause of V.D.'s injuries to Davis' attempted CPR. *Id.* at Ex. 28, Autopsy Rpt. 000119.  Maloney Decl. Ex. 2, Maloney Rpt. p. 2-3.

85.    Disputed.  Sikirica conceded to the grand jury that Davis' attempt at CPR could have caused the injuries. Klein Decl. Ex. 9, Grand Jury Tr. 000853-000862.

86.    Disputed.  There was a reported history of illness and chest pain close in time to V.D.'s death and evidence on autopsy that V.D. had inflamed bronchi and hypothyroidism. *See supra*, ¶ 55.  Further, Sikirica did not rule out all potential natural causes including potential genetic mutations, or other issues involving the heart and brain that are associated with sudden death. Maloney Decl. Ex. 2, Maloney Rpt. p. 2-3

87.    Not disputed that Sikirica gave this false testimony despite that there was a history

and evidence of illness. *See supra*, ¶ 55.

88.     Disputed. Sikirica did not rule out all potential natural causes including potential genetic mutations, or other issues involving the heart and brain that are associated with sudden death and Sikirica admits that it is possible V.D. could have died of natural causes. Klein Decl. Ex. 6, Trial Tr. VI 19:19-20:11, 45:23-47:4; Ex. 15, Sikirica Dep. Tr. 66:21-67:3, 79:17-82:8. Maloney Decl. Ex. 2, Maloney Rpt. p. 2-3

89.     Not disputed that he so testified but disputed that his testimony was truthful insofar as he did not do testing necessary to rule out issues involving the heart and brain that are associated with sudden death, and Sikirica admits that it is possible V.D. could have died of natural causes. Klein Decl. Ex. 6, Trial Tr. VI 19:19-20:11, 45:23-47:4; Ex. 15, Sikirica Dep. Tr. 66:21-67:3, 79:17-82:8. Maloney Decl. Ex. 2, Maloney Rpt. p. 2-3.

90.     Not disputed that the rib fractures did not damage V.D.'s liver but disputed that V.D.'s fractures could not have been caused by CPR, when performed with a hand behind the back. Klein Decl. Ex. 15, Sikirica Dep. Tr. 59:19-60:4. Maloney Decl. Ex. 2, Maloney Rpt. p. 2.

91.     Not disputed.

92.     Disputed. Sikirica stated that V.D. could not have caused her own injuries by accident. Grand Jury Tr. 000913-000914. Further, accepting Sikirica's own autopsy finding that Davis alone caused the injuries while attempting CPR, even under Sikirica's flawed findings, this should have been ruled an accident not a homicide. Klein Decl. Ex. 15, Sikirica Dep Tr. 127:21-128:13.

93.     Disputed. Sikirica stated that V.D. could not have caused her own injuries by accident. *Id.* at Ex. 9, Grand Jury Tr. 000913-000914. Further, accepting Sikirica's own autopsy finding that Davis alone caused the injuries while attempting CPR, even under Sikirica's flawed

findings, this should have been ruled an accident not a homicide. *Id.* at Ex. 15, Sikirica Dep Tr. 127:21-128:13.

94.     Disputed.  V.D. was unconscious when Davis found her, and her rib and liver injuries were postmortem. *Id.* at Ex. 6, Trial Tr. VI  33:12-43:7, 62:9-11.  Maloney Decl. Ex. 2, Maloney Rpt. p. 3.

95.     Disputed.  Sikirica concedes that V.D.'s injuries could have been caused by Davis' CPR attempt.  Klein Decl. Ex. 6, Trial Tr. IV 58:15-25; Ex. 15, Sikirica Dep. Tr. Dep. 83:18-84:11; Ex. 32, Brady Disclosure.

96.     Not disputed that this was his testimony but note that Sikirica testified he could not dispute that V.D. was unresponsive when Davis found her. *Id.* at Ex. 15, Sikirica Dep. Tr. 66:21-67:3

97.     Not disputed that Sikirica ignored literature that contradicted his findings.

98.     Not disputed that he so testified but move to strike insofar as the literature and/or study, or citation to said literature, was never produced to plaintiff and is not in evidence and therefore its reliability is unknown, nor could plaintiff provide the study to his expert for review and comment.

99.     Not disputed that he so testified but move to strike insofar as the study is not in evidence.

100.     Disputed.  V.D.'s lacerations did not go beyond what can be expected from CPR. Klein Decl. Ex. 6, Tr. VI 43:8-44:3, 63:12-64:15.  Maloney Decl. ¶ 8.

101.     Not disputed that this is his testimony but disputed that any inference can be drawn from this insofar as other medical examiners have observed similar injuries.  Klein Decl. Ex. 6, Trial Tr. VI 43:8-44:3, 63:12-64:15.  Maloney Decl. ¶ 8.

102.     Not disputed this was his classification but disputed that Sikirica was correct.

**APPENDIX**

Maloney Decl. Ex. 2, Maloney Rpt.

103.     Not disputed that he worked in cooperation with TPD and Rensselaer County District Attorney's Office, but whether or not this was customary is irrelevant to the motion.

104.     Not disputed.

105.     Disputed.  Sikirica concedes that he factored in information from law enforcement and without the information he learned from law enforcement he would not have linked V.D.'s death to Davis.  Klein Decl. Ex. 15, Sikirica Dep Tr. 89:10-16, 94:8-19, 98:19-99:3.

106.     Disputed.  Sikirica testified that the presence of law enforcement at an autopsy was indicative that the death was suspicious and possibly a homicide.  *Id.* at Ex. 4, Trial Tr. IV 49:21-50:2; Ex. 15, Sikirica Dep Tr. 152:21-153:11.

107.     Not disputed.

108.     Not disputed and further note that this supports plaintiff's contention that Sikirica took a myopic view as to V.D.'s death.

109.     Not disputed.

110.     Not disputed.

111.     Not disputed.

112.     Not disputed.

113.     Not disputed.

114.     Not disputed.

115.     Move to strike insofar as the citation does not support the proposition asserted. Further, Fountain testified that he both apprised the RCDAO of investigatory information and took investigatory direction from them.  *Id.* at Ex. 18, Fountain Dep. Tr. 43:23-44:9.

116.     Not disputed.

117.     Not disputed.

118.    Not disputed.

119.    Not disputed, but note he participated in email communications with Akerman, Fountain, and Colaneri.  *Id.* at Ex. 26, March 1, 2015, Email.

120.    Not disputed.

121.    Disputed.  Some evidence supports that he did, including being included in an investigation related email, participating in a meeting during trial wherein Dr. Sikirica expressed his dismay with the handling of the case by the assigned ADA, and comments post trial that he was aware the case was not strong but did not regret pursuing it.  *Id.* at Ex. 26, March 1, 2015, Email;        *https://www.troyrecord.com/2016/08/25/former-professional-basketball-player-acquitted-in-lansingburgh-toddlers-death*

122.    Not disputed.

123.    Not disputed.

124.    Disputed.  Sikirica testified he met with RCDAO after he issued his report and before testifying before the grand jury.  *Id.* at Ex. 15, Sikirica Dep. Tr. 26:2-10.

125.    Move to strike as irrelevant to the issues presented insofar as Abelove became the Rensselaer County District Attorney after other relevant matters were prosecuted by the RCDAO including the *People v. Adrian Thomas* matter.  *Id.* at Ex. 24, Abelove Dep. Tr. 19:15-22.

126.    Move to strike as irrelevant to the issues presented.

127.    Not disputed.

128.    Move to strike to the extent Sikirica cannot testify as to what is in someone else's mind.

129.    Not disputed.

130.    Not disputed.

131.    Not disputed.

132.    Not disputed.

133.    Not disputed.

134.    Move to strike insofar as the experts' opinions are clearly in dispute and therefore not proper for a Rule 56.1 statement of undisputed facts.

135.    Move to strike insofar as the experts' opinions are clearly in dispute and therefore not proper for a Rule 56.1 statement of undisputed facts.

136.    Move to strike insofar as the experts' opinions are clearly in dispute and therefore not proper for a Rule 56.1 statement of undisputed facts.

137.    Not disputed.

138.    Move to strike insofar as the experts' opinions are clearly in dispute and therefore not proper for a Rule 56.1 statement of undisputed facts.  Further clarify that Dr. Teas testified that sudden unexpected death could occur through age 30, involving people who die unexpectedly, and it is not limited to infants.  *Id.* at Ex. 6, Trial Tr. VI 45:23-46:16.

139.    Disputed.  A sudden unexpected death can occur through aged thirty involving people who die unexpectedly, and it is not limited to infants.  Trial Tr. VI 45:23-46:16.

140.    Disputed.  The category for an unexplained death in a toddler is Sudden Unexplained Death in Childhood.  Maloney Decl. Ex. 2, Maloney Rpt. p. 2-3.

141.    Disputed.  The liver lacerations were consistent with CPR and did not contribute to V.D.'s death.  *Id.*

142.    Not disputed.

143.    Not disputed.

# APPENDIX

**1465**

Dated: April 1, 2022
      New York, New York

                                   BRETT H. KLEIN, ESQ., PLLC
                                   Attorneys for the Plaintiff
                                   305 Broadway, Suite 600
                                   New York, New York 10007
                                   (212) 335-0132

                        By:    *Brett Klein*
                                   BRETT H. KLEIN
                                   LISSA GREEN-STARK

# APPENDIX

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X

MICHAEL DAVIS-GUIDER,

                              Plaintiff,

                                                                 17 CV 1290 (DJS)

            -against-

CITY OF TROY, RONALD FOUNDTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES MCDONALD,
Individually, TIM COLANERI, Individually, ADAM R. MASON,
Individually, RENSSELAER COUNTY, MICHAEL SIKIRICA,
Individually, and JOEL ABELOVE, Individually,

                              Defendant.

--------------------------------------------------------------------------------X

### PLAINTIFF'S RESPONSE TO THE CITY DEFENDANTS' STATEMENT OF MATERIAL FACTS

**BRETT H. KLEIN, ESQ., PLLC**
Attorneys for the Plaintiff
305 Broadway, Suite 600
New York, New York 10007
(212) 335-0132

# APPENDIX

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X

MICHAEL DAVIS-GUIDER,                                    **PLAINTIFF'S**
                                                        **LOCAL RULE 56.1**
                                        Plaintiff,      **COUNTER**
                                                        **STATEMENT**
                -against-

CITY OF TROY, RONALD FOUNTAIN, Individually,           17 CV 1290 (DJS)
DANIELLE COONRADT, Individually, CHARLES MCDONALD,
Individually, TIM COLANERI, Individually, ADAM R. MASON,
Individually, RENSSELAER COUNTY, MICHAEL SIKIRICA,
Individually, and JOEL ABELOVE, Individually, and JOHN and
JANE DOE 1-10, Individually,

                                        Defendants.

--------------------------------------------------------------------------------X

Plaintiff respectfully submits this Local Rule 56.1 Counter Statement in support of his

opposition to defendants City of Troy, Adam R. Mason, Ronald Fountain, and Tim Colaneri's

motion for summary judgment, and to defendants Rensselaer County, Michael Sikirica and Joel

Abelove's motion for summary judgment.

    1.      V.D. is the daughter of plaintiff's girlfriend, but plaintiff loved and cared for her as

if she was his own daughter.  Klein Decl. Ex. 1, Davis Dep. Tr. 42:18-43:9.

    2.      Approximately one week before her death, V.D. was sick with a fever, coughing,

and vomiting.  *Id.* at Ex. 1, Davis Dep Tr. 47:9-48:17.

    3.      V.D. had also complained of chest pain.  *Id.* at Ex. 2, Fountain Notes 000424-25

    4.      V.D. suffered from low iron and a postmortem metabolic screening detected an

elevated thyroid stimulation hormone consistent with hypothyroidism.  *Id.* at Ex. 1, Davis Dep Tr.

46:21-47:5; Maloney Decl. Ex. 2, Maloney Rpt. p. 2.

5.      V.D.'s autopsy also revealed evidence of chronic inflammation of the bronchi. Klein Decl. Ex. 6, Trial Tr. VI 52:9-20.

6.      The night before V.D.'s death, Michael Davis watched basketball with a friend across the street, while V.D. remained home with her mother Rebecca Parker, and V.D. was already asleep when Davis returned home. *Id.* at Ex. 1, Davis Dep. Tr. 49:18-53:3.

7.      On February 26, 2015, when Davis woke up in the morning, he smelled poop and called V.D. out from her room to the living room where he and Rebecca slept. *Id.* at Ex. 1, Davis Dep. Tr. 55:23-57:11.

8.      When V.D. came out to Davis, she appeared low energy, sluggish, and not her normal self. *Id.* at Ex. 1, Davis Dep. Tr. 56:14-57:11; Ex. 8, Parker Witness Dep 000494.

9.      Davis helped V.D. finish going to the bathroom, changed V.D.'s diaper, and offered her food and a sippy cup, which V.D. declined. *Id.* at Ex. 1, Davis Dep. Tr. 56:14-57:11.

10.      Consistent with Davis' explanation of the morning events, police would later find a sippy cup, soiled diaper, and pants on the floor near the bed in the living room, and V.D. in a clean unsoiled diaper. *Id.* at Ex. 9, Grand Jury Tr. 000892-000893; Ex. 10, Mar. 2, 2015, Interrogation Tr. 176:9-177:24

11.      Seeing that V.D. appeared abnormally tired, Davis put her back to bed. *Id.* at Ex. 1, Davis Dep. Tr. 56:14-57:11.

12.      Davis put on a movie in the living room and fell asleep himself. *Id.* at Ex. 1, Davis Dep. Tr. 56:14-57:11.

13.      When Davis woke up, he found V.D. unresponsive in her bed. *Id.* at Ex. 1, Davis Dep. Tr. 59:22-61:6.

# APPENDIX

14.     Davis attempted CPR a few times, including doing a few compressions where he pressed down on her stomach with his hand behind her back, and then at 1:09 p.m., called 911 from a restaurant across the street because Davis did not have a working phone at home.  *Id.* at Ex. 1, Davis Dep. Tr. 61:4-67:19; Ex. 11, 911 Call Sheet.

15.     When emergency medical service providers (hereinafter "EMS") arrived at the scene, V.D. was already in cardiac arrest, was not breathing, had no pulse, no heart activity, and was warm to the touch.  *Id.* at Ex. 3, Trial Tr. III 38:9-42:18; Ex. 12, Bayley Witness Dep. 000496; Ex. 13, CPS Case Notes 000499.

16.     EMS immediately started CPR in the home, using two hands pressing very hard on V.D., while V.D. was on a soft futon.  *Id.* at Ex. 1, Davis Dep. Tr. 65:10-12, 72:9-73:5; Ex. 3, Trial Tr. III 6:15-7:14, 15:22-24; Ex. 5, Trial Tr. V 52:5-53:17.

17.     CPR should neither be performed with two hands on a child, nor should it be performed on a soft surface.  *Id.* at Ex. 6, Trial Tr. VI 64:2-15.

18.     CPR was continued in the ambulance en route to St. Mary's Hospital.  *Id.* at Ex. Ex. 3, Trial Tr. III 8:23-9:17.

19.     Davis and Parker were not given an opportunity to go with V.D. in the ambulance. *Id.* at Ex. 1, Davis Dep. Tr. 77:9-17; Ex. 5, Trial Tr. V 54:17-55:18; Ex. 8, Parker Witness Dep.

20.     EMS performed 100 to 120 compressions per minute for the 20 minutes CPR was performed in the home and on the way to the hospital.  *Id.* at Ex. 3, Trial Tr. III 29:7-30:23.

21.     Only after performing CPR did EMS briefly detect some heart activity while in the ambulance.  *Id.* at Ex. 3, Trial Vol III 38:9-40:12.

22.     At no time did V.D. regain a pulse or start breathing. *Id.* at Ex. 3, Trial Tr. III 8:25-9:6.

23.     CPR was continued at the hospital for another thirty minutes, before V.D. was pronounced dead at 2:10 p.m.  *Id.* at Ex. 3, Trial Tr. III 53:25-54:9; Ex. 14, Crisafulli Witness Dep. 000495.

24.     A total of approximately 6,000 compressions were done collectively by EMS and hospital staff.  *Id.* at Ex. 15, Sikirica Dep. Tr. 57:1-5.

25.     Defendant Troy Police Department (hereinafter "TPD") Officer Danielle Coonradt was the first officer to respond to the scene and despite that per EMS, V.D. had no visible injuries, Coonradt began searching the house in a manner that indicated she was suspicious of something, including opening cupboards and looking in high places.  *Id.* at Ex. 1, Davis Dep. Tr. 73:17-75:11, 152:4-153:6, 155:21-159:15; *Id.* at Ex. 3, Trial Tr. III 42:22-43:625.

26.     Coonradt also questioned plaintiff and prepared an inaccurate report of her conversation with Davis, falsely recording in an official police report that Davis purportedly told her he tried to wake V.D. up at 11:00 a.m., and that he responded to Coonradt's statement that it was now 1:30 p.m. by stating that time must be flying.  *Id.* at Ex. 1, Davis Dep. Tr. 79:16-81:4, 145:10-146:6; Ex. 16, Coonradt Dep. Tr. 15:13-16:7; Ex. 17, Coonradt Supp. Rpt. 000490.

27.     To the contrary, Davis told the police that he was not sure what time he woke up because he did not have a clock in the house and his phone was not working.  *Id.* at Ex. 1, Davis Dep. Tr. 79:16-81:4.

28.     Defendants former TPD Detective Ronald Fountain and Detective Charles McDonald were jointly assigned to conduct the investigation of the case and responded to the Mr. Davis' home on February 26, 2015.  *Id.* at Ex. 18, Fountain Dep. Tr. 34:12-20, 40:6-11, 41:3-20; Ex. 19, McDonald Dep. Tr. 27:6-29:8.

29.     Fountain told plaintiff he would be driven to the hospital, but instead McDonald and Fountain drove Davis to the TPD headquarters. *Id.* at Ex. 1, Davis Dep. Tr. 152:4-154:10.

30.     At the TPD headquarters, McDonald first sat with plaintiff trying to keep him occupied while Fountain went to the hospital to gather more information. *Id.* at Ex. 19, McDonald Dep. Tr. 36:20-38:7.

31.     Defendant Tim Colaneri was also involved in the investigation, first going to the hospital with an evidence technician to take photographs, and then going to plaintiff's home, where he got a briefing from an officer on scene, assisted in executing a search warrant, and also assisted in canvassing the neighborhood and speaking to witnesses. *Id.* at Ex. 20, Colaneri Dep Tr. 16:5-24:3, 24:20-25:8; Ex. 22, Cont. Suppression Hearing Tr. 26:11-13.

32.     Fountain, McDonald, and Colaneri then interrogated Davis at the precinct. *Id.* at Ex. Ex. 19, McDonald Dep. Tr. 38:8-39:22; Ex. 20, Colaneri Dep. Tr. 24:4-25:17.

33.     Colaneri was the primary questioner during the first interrogation of Davis, and he recorded part of the interrogation on his cell phone. *Id.* at Ex. 18, Fountain Dep. Tr. 37:5-38:2; Ex. 20, Colaneri Dep. Tr. 24:4-25:17; Ex. 21, Suppression Hearing Tr. 115:8-14.

34.     Davis provided no incriminating statements during his first conversation with police, and defendants concede probable cause to arrest plaintiff did not exist based on the known information. *Id.* at Ex. 18, Fountain Dep. Tr. 38:3-13; Ex. 20, Colaneri Dep. Tr. 27:12-15.

35.     On February 27, 2015, an autopsy was conducted by defendant Michael Sikirica, the Rensselaer County medical examiner, which was attended by defendants McDonald, Fountain, and Colaneri, evidence technician Anthony Buttofucco, and an Assistant District Attorney (hereinafter "ADA") from the Rensselaer County District Attorney's Office (hereinafter

"RCDAO") Andra Ackerman. *Id.* at Ex. 18, Fountain Dep. Tr. 48:5-49:5, Ex. 23, Feb. 27, 2015, Sign in Sheet 000436.

36.     Andra Ackerman's overall supervisor was District Attorney Joel Abelove. *Id.* at Ex. 24, Abelove Dep. Tr. 29:13-30:20.

37.     Law enforcement presence is not necessary for Sikirica to perform an autopsy and law enforcement is generally not present for all autopsies conducted by Sikirica. *Id.* at Ex. 4, Trial Tr. IV 47:21-50:2; Ex. 18, Fountain Dep Tr. 118:19-119:19.

38.     The TPD officers were present during V.D.'s autopsy to feed Sikirica information. *Id.* at Ex. 9, Grand Jury Tr. 000901.

39.     Fountain would have told Sikirica that Davis was the only person home when V.D. died. *Id.* at Ex. 18, Fountain Dep. Tr. 118:19-119:19.

40.     As part of the autopsy, Sikirica ordered some tests relevant to determining whether V.D. had died of natural causes, but despite that the results of said tests were outstanding, Sikirica informed Fountain that he planned to rule the death a homicide. *Id.* at Ex. 13, CPS Records 000507, 000521.

41.     Sikirica's decision to rule the death a homicide based solely on his discussions with the defendant TPD officers, and on the observed injuries, resulted in Sikirica failing to fully explore potential natural causes of death. *Id.* at Ex. 6, Trial Tr. VI 49:6-50:21.

42.     The National Academy of Science recommends that law enforcement and prosecutors should not be present during autopsies because they may influence the medical examiner. *Id.* at Ex. 6, Trial Tr. VI 55:14-56:14.

43.　　On February 27, 2015, plaintiff and Ms. Parker were questioned again by Mason and TPD Sergeant Parrow. *Id.* at Ex. 1, Davis Dep. Tr. 90:17-92:19; Ex. 25, Mason Dep. Tr. 29:19-31:18.

44.　　On March 1, 2015, ADA Ackerman sent an email to defendants Fountain and Colaneri, copying defendant Abelove, concerning a February 28, 2015, meeting held regarding next steps in investigating Davis and V.D.'s death. *Id.* at Ex. 18, Fountain Dep. Tr. 121:2-122:21; Ex. 26, March 1, 2015, Email.

45.　　On March 2, 2015, Fountain conducted a second interview of Davis inside an interrogation room at TPD headquarters, which lasted approximately two hours and was recorded by the TPD defendants via a video camera. *Id.* at Ex. 18, Fountain Dep. Tr. 61:10-63:23.

46.　　McDonald participated in the interview by monitoring the video feed on a computer from a separate room. *Id.* at Ex. 19, McDonald Dep. Tr. 46:11-23.

47.　　The March 2, 2015, interview yielded no additional information to support probable cause to arrest Davis, and it was still unknown to the defendants what caused V.D.'s death. *Id.* at Ex. 18, Fountain Dep Tr. 63:7-67:18.

48.　　On March 12, 2015, a subsequent meeting was held with defendant Sikirica, attended by defendants Fountain, Colaneri, and Mason, as well as ADA Ackerman, and TPD Detective Sergeant Parrow, to discuss the case. *Id.* at Ex. 18, Fountain Dep. Tr. 68:6-69:16; Ex. 27, March 12, 2015, Sign in Sheet 000439.

49.　　Sometime before or after the meeting, Sikirica received a copy of the March 2, 2015, interrogation video from the TPD defendants, during which Davis demonstrated how he had attempted to perform CPR on V.D. *Id.* at Ex. 15, Sikirica Dep. 118:15-119:12.

50.     Over the next several months, Fountain and McDonald questioned plaintiff at least two more times while he was out walking and Fountain told him, in sum and substance, that he needed him to tell the truth because his boss was pressuring him to close the case.  *Id.* at Ex. 1, Davis Dep. Tr. 93:14-94:15, 138:9-140:8, 162:8-163:23.

51.     Fountain also met with the RCDAO a few times during the investigation and before the final autopsy report was released.  *Id.* at Ex. 18, Fountain Dep. Tr. 43:17-44:17, 70:19-72:2.

52.     The only evidence linking Davis to V.D.'s death was that he was with her when she died, which alone is not sufficient to charge a person with murder.  *Id.* at Ex. 18, Fountain Dep. Tr. 64:2-21, 97:22-99:10.

53.     On August 14, 2015, defendant Sikirica issued his final autopsy report determining in relevant part that the manner of V.D.'s death was purportedly a homicide and that V.D. had died of "[h]ypovolemic shock due to a large hemoperitoneum due to multiple lacerations of the liver with right rib fractures due to blunt force trauma" and noting a "[h]istory of decedent reportedly found unresponsive with reported history of attempted cardiopulmonary resuscitation by a large adult."  *Id.* at Ex. 28, Autopsy Rpt. 000110, 000119.

54.     Sikirica made this determination after watching the video of Davis demonstrating CPR and linking the pattern of injuries observed to be most consistent with what Davis had demonstrated on the video.  *Id.* at Ex. 15, Sikirica Dep. 83:18-84:11.

55.     Had Sikirica not seen the video he would not have attributed the death to Davis.  *Id.* at Ex. 15, Sikirica Dep. Tr. 98:2-99:3.

56.     Sikirica failed to note in his autopsy report that an additional 6,000 compressions were also performed on V.D. by EMS and hospital staff of various sized hands, despite conceding

he was aware that V.D. had undergone prolonged CPR.  *See Id.* at Ex. 15, Sikirica Dep. Tr. 101:1-102:5; Ex. 28, Autopsy Rpt.

57.     The size of an individual's hands cannot be medically correlated to the resultant CPR-related injury based on accepted medical research and knowledge.  Maloney Decl. ¶ 10; Ex. 2, Maloney Rpt. p. 2.

58.     Notwithstanding that he was given the supporting depositions of EMS and medical staff taken by TPD, Sikirica neither spoke to EMS nor to the emergency room doctors who performed CPR to determine how CPR was conducted by them prior to issuing his report, but rather just assumed it was done correctly and without compressing the abdomen.  Klein Decl. Ex. 15, Sikirica Dep. Tr. 53:18-55:7, 72:10-78:19.

59.     Sikirica should have spoken to all the individuals who performed CPR where it was known that extensive CPR involving several thousand compressions was performed and there was a known possibility that V.D.'s injuries were CPR related.  *Id.* at Ex. 6, Trial Tr. VI 22:5-19.

60.     Sikirica's assumption that CPR was performed correctly was faulty given that EMS had performed CPR with two hands while V.D. was on a soft futon.  *Id.* at Ex. 1, Davis Dep. Tr. 65:10-12, 72:9-73:5; Ex. 3, Trial Tr. III 6:15-7:14, 15:22-24; Ex. 5, Trial Tr. V 52:5-53:17; Ex. 6, Trial Tr. VI 64:2-15.

61.     Sikirica destroyed the contemporaneous dictation he made from which the final autopsy report was drafted.  *Id.* at Ex. 4, Trial Tr. IV 41:11-42:24.

62.     At the time of these events, Davis was 6' 10" tall and approximately 240 to 250 pounds and had very big hands.  *Id.* at Ex. 1, Davis Tr. 62:21-63:4.

63. Without the autopsy findings linking the death to a large adult, i.e., Davis, there was no probable cause to arrest Davis for V.D.'s death. *Id.* at Ex. 19, McDonald Dep. Tr. 67:9-23.

64. When Sikirica determined V.D.'s death was a homicide, it was foreseeable to him that this would lead to a homicide prosecution, and Sikirica further understood that his determination and testimony would be important to the prosecution. *Id.* at Ex. 15, Sikirica Dep. Tr. 82:9-14, 140:11-21.

65. On September 9, 2015, Fountain, along with McDonald, interviewed Davis in the aforementioned interrogation room on video for a third time, during which no new information to support an arrest was learned. *Id.* at Ex. 18, Fountain Dep Tr. 75:21-76:6, 78:8-13; Ex. 19, McDonald Dep. Tr. 52:2-53:16

66. Fountain believed, based on conversations with Sikirica, that V.D.'s ribs had been fractured and that the ribs had lacerated the liver, causing V.D. to die. *Id.* at Ex. 18, Fountain Dep. Tr. 50:12-51:15.

67. According to Sikirica, Fountain's understanding of V.D.'s death was incorrect, and he would not have told him that was the cause of death. *Id.* at Ex. 18, Fountain Dep. Tr. 92:1-93:8.

68. McDonald, along with Fountain, met with a prosecutor, believed to be ADA Ackerman from the RCDAO, prior to the grand jury presentation to discuss what would be charged, but did not testify because he was on vacation when the grand jury was convened. *Id.* at Ex. 19, McDonald Dep. Tr. 91:21-94:18.

69.     Fountain falsely testified to the grand jury that Davis said it was a normal occurrence for V.D. to wake up tired.  *Id.* at Ex. 8, Parker Witness Dep. 000494; Ex. 9, Grand Jury Tr. 000878-000879; Ex. 10, Mar. 2, 2015, Interrogation 74:9-75:10.

70.     Fountain falsely informed the grand jury that V.D.'s bed was really neat and made up, and not fussed or messed up at all, and therefore inconsistent with someone performing CPR on the bed as Davis claimed he did.  *Id.* at Ex. 9, Grand Jury Tr. 000881-000882; Ex. 29, Photo of Bed DSC_7357.

71.     Fountain falsely informed the grand jury that Davis and Parker were not prevented from going to the hospital in the ambulance.  *Id.* at Ex. 8, Parker Witness Dep. 000493; Ex. 9, Grand Jury Tr. 000868-000869.

72.     Fountain falsely informed the grand jury that Davis was calm, subdued, even keeled, and not acting like you would think somebody would if they had a two-and-a-half-year-old who was not breathing.  *Id.* at Ex. 9, Grand Jury Tr. 000876.

73.     To the contrary, on February 26, 2015, Davis was distraught, upset, concerned, sniffling, and crying at times.  *Id.* at Ex. 21, Suppression Hearing Tr. 18:23-19:2; 25:10-22; 115:15-116:11; 157:13-160:8; Ex. 30, Brown St. 001538; Ex. 31, Brown Witness Dep. 0001680.

74.     Sikirica met with the RCDAO after he issued his report and before testifying before the grand jury.  *Id.* at Ex. 15, Sikirica Dep. Tr. 26:2-10.

75.     Sikirica falsely told the grand jury that he had ruled out *any* natural cause of death or other explanation for V.D. to have been unconscious, despite later conceding that it was possible V.D. had died of a natural event and that he could not dispute that V.D. could have been in cardiac arrest before Davis attempted CPR.  *Id.* at Ex. 9, Grand Jury Tr. 000911-000912, 000917; *Id.* at Ex. 15, Sikirica Dep. Tr. 66:21-67:3, 79:17-82:8.

76.     In his direct testimony presented by RCDAO to the grand jury, Sikirica did not inform the grand jury of his final autopsy finding that he had correlated V.D.'s injuries to a "[h]istory of decedent reportedly found unresponsive with reported history of attempted cardiopulmonary resuscitation by a large adult." *Id.* at Ex. 9, Grand Jury Tr. 000895-000917; Ex. 28, Autopsy Rpt. 000119.

77.     The District Attorney placed into evidence before the grand jury only photos of the lacerated liver and the final death certificate, omitting the final autopsy report which referenced the performance of CPR by a large adult. *Id.* at Ex. 9, Grand Jury Tr. 000895-000917.

78.     Only when recalled to the grand jury and pressed by a grand juror did Sikirica concede that the manner in which Davis described doing CPR could cause rib fractures and lacerations to the liver. *Id.* at Ex. 9, Grand Jury Tr. 000853-000862.

79.     This concession was exculpatory evidence which was later disclosed by RCDAO pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). *Id.* at Ex. 31, July 20, 2016, Disclosure.

80.     Sikirica falsely informed the grand jury that the amount of blood found in V.D.'s abdomen indicated that the fractures and lacerations did not occur during Davis' CPR attempt and that V.D. was alive after the injuries were inflicted because the five squeezes described by Davis would not have amounted to 400 MLs of blood. *Id.* at Ex. 9, Grand Jury Tr. 000861-000862.

81.     Sikirica failed to put in his autopsy report or to otherwise inform the grand jury that after Davis' five squeezes, EMS and hospital staff did approximately 6,000 additional compressions which would have contributed to the amount of blood found in V.D.'s abdomen at autopsy. *Id.* at Ex. 9, Grand Jury Tr. 000853-000864; Ex. 15, Sikirica Dep. Tr. 77:9-23; Maloney Decl. Ex. 2, Maloney Rpt. p. 2.

# APPENDIX

82. No pathologist should draw the conclusion that the amount of blood seen on autopsy was present at the time of death because it is known that humans continue to bleed after death with CPR. Klein Decl. Ex. 6, Trial Tr. VI 52:21-55:10.

83. The amount of blood in V.D.'s abdomen at autopsy was consistent with CPR and with the fact that lacerations to the liver continue to bleed. Maloney Decl. Ex. 2, Maloney Rpt. p. 2.

84. EMS reported that V.D.'s stomach was not distended upon arrival, which also supports that additional blood accumulated while CPR was being performed by EMS and hospital staff. Maloney Decl. Ex. 2, Maloney Rpt. p. 2.

85. Sikirica falsely informed the grand jury that when EMS arrived, V.D. was cool to the touch and had some electrical activity in her heart, when in actuality per EMS V.D. was warm to the touch and had no electrical activity. Klein Decl. Ex. 3, Trial Tr. III 38:9-42:18; Ex. 9, Grand Jury Tr. 000853Ex. 12, Bayley Witness Dep. 000496; Ex. 13, CPS Case Notes 000499.

86. Sikirica falsely informed the jury that based on the false fact that V.D. purportedly had electrical activity when EMS responded, V.D.'s injuries had occurred approximately 15 to 20 minutes prior to the arrival of EMS. *Id.* at Ex. 9, Grand Jury Tr. 000863-000864.

87. After hearing the testimony of only Fountain and Sikirica, the grand jury indicted plaintiff. *Id.* at Ex. 9, Grand Jury Tr.; Ex. 33, Indictment P000031-P000033.

88. Joel Abelove signed the indictment. *Id.* at Ex. Ex. 33, Indictment P000033.

89. After the indictment, an arrest warrant was issued, and plaintiff was arrested on October 2, 2015, and jailed until his acquittal after a jury trial on August 25, 2016. *Id.* at Ex. 1, Davis Dep. Tr. 13:11-14:5; Ex. 7, Trial Tr. VII 19:20-23:17; Ex. 18, Fountain Dep Tr. 46:19-47:8; Ex. 34, Arrest Report 000534; Ex. 35, Davis City 50-h 11:4-13:7.

# APPENDIX

90.     Coonradt testified at a suppression hearing conducted on May 3, 2016, where she reiterated her false claims that plaintiff had informed her that he told V.D. to go back to bed because it was too early, that he woke up at 11:00 a.m., and made a comment that time must be flying. *Id.* at Ex. 21, Suppression Hearing Tr. 10:4-18.

91.     McDonald testified at the suppression hearing conducted on May 3, 2016, during which he conceded plaintiff was upset, sniffling, and on the verge of tears, and repeatedly expressed that he did not know what happened and was trying to figure out what happened. *Id.* at Ex. 21, Suppression Hearing Tr. 112:9-113:17.

92.     Coonradt testified at trial and again reiterated her false claims that plaintiff had informed her that he told V.D. to go back to bed because it was too early, that he woke up at 11:00 a.m., and made a comment that time must be flying. *Id.* at Ex. 3, Trial Tr. III 67:17-68:3.

93.     Sikirica testified at trial and, like with the grand jury, during his direct testimony Sikirica did not inform the jury of his final autopsy finding that he had correlated V.D.'s injuries to Davis' attempted CPR with large hands, instead informing the jury it would take the force of a motor vehicle accident or severe blunt force trauma caused by being hit in the abdomen with an object or running into an object for such injuries to the liver to occur. *Id.* at Ex. 4, Trial Tr. IV 12:11-13:2; Ex. 28, Autopsy Rpt. 000119.

94.     Sikirica denied at trial that his medical opinion was based on the video which depicted Davis performing CPR despite that he directly referenced information learned from the video in his autopsy report. *Id.* at Ex. 4, Trial Tr. IV 54:11-19.; Ex. 28, Autopsy Rpt. 000119.

95.     Fountain also testified at the trial, although he had retired from TPD after he himself had been indicted by defendant Abelove for corruption. *Id.* at Ex. 18, Fountain Dep. Tr. 89:11-91:17.

**APPENDIX**

96.     The investigation which led to plaintiff's arrest was a collaborative effort among Sikirica, RCDAO, and the TPD.  *Id.* at Ex. 25, Mason Dep. Tr. 42:20-44:20.

97.     Sikirica was not a neutral witness, as evidenced by his decision to call a meeting with ADA Hall and defendant Abelove to express his frustration and criticism of the trial ADA, ADA Cindy Chavkin.  *Id.* at Ex. 15, Sikirica Dep. Tr. Dep 48:2-51:13, 85:19-87:1.

98.     Abelove conceded after the acquittal that the case against Davis was not strong but stated that he did not regret pursuing it.  *https://www.troyrecord.com/2016/08/25/former-professional-basketball-player-acquitted-in-lansingburgh-toddlers-death/*.

99.     CPR can cause lacerations to the liver and fracture ribs, and the liver and ribs are the more likely areas to be injured during CPR.  *Id.* at Ex. 6, Trial Tr. VI 25:13-30:15, 65:3-24; Ex. 15, Sikirica Dep. Tr. 100:19-23; Maloney Decl. Ex. 2, Maloney Rpt.

100.    Prolonged CPR, as V.D. underwent, is significantly associated with a higher incident of rib fractures, as is CPR if performed with a hand behind the decedent as Davis did here. Klein Decl. Ex. 15, Sikirica Dep. Tr. 57:14-60:4.

101.    The longer CPR is performed, the more CPR-associated injuries will be seen. Maloney Decl. ¶ 9.

102.    V.D. had no exterior bruising, or bruising or injuries to other organs, which is also indicative of V.D.'s injuries being CPR related.  Klein Decl. Ex. 6, Trial Tr. VI 41:7-43:7.

103.    All experts concede the type of compressions Davis demonstrated were consistent with the compressive injuries sustained by V.D.  *Id.* at Ex. 4, Trial Tr. IV 58:15-25; Ex. 15, Sikirica Dep. Tr. Dep. 83:18-84:11; Ex. 32, Brady Disclosure.  Maloney Decl. Ex. 2, Maloney Rpt. p. 2.

104.    V.D.'s injuries to her liver and ribs were obviously postmortem and did not contribute to her death.  Klein Decl. Ex. 6, Trial Tr. VI  33:12-43:7, 62:9-11.  Maloney Decl. Ex. 2, Maloney Rpt. pp. 2-3.

105.    Sikirica cannot dispute that V.D. was already unresponsive when Davis performed CPR.  Klein Decl. Ex. 15, Sikirica Dep. Tr. 66:21-67:3.

106.    Sikirica concedes that injuries inflicted during the process of resuscitation efforts when a person is already in extremis would not be a homicide.  *Id.* at Ex. 15, Sikirica Dep Tr. 127:21-128:13.

107.    Had Sikirica determined that the rib and liver injuries leading to death were from EMS performing CPR, he would not have determined the death was a homicide, but rather would have left the death undetermined or accidental.  *Id.* at Ex. 15, Sikirica Dep. Tr. 127:21-128:6.

108.    Sikirica performs approximately 600 autopsies per year, which is almost double the maximum number of autopsies recommended by the National Board of Medical Examiners.  *Id.* at Ex. 4, Trial Tr. IV 36:20-39:24.

109.    Sikirica has a history known to Rensselaer County of ignoring evidence of natural deaths in children and of providing cause of death determinations and medical diagnoses consistent with investigating police and prosecutors who are seeking manslaughter convictions for child deaths, as established by the trials of Joseph McElheny in 2011 and Adrian Thomas in 2015.  ECF Doc. 77 ¶¶ 51-54.

110.    Joseph McElheny was arrested by TPD officers, prosecuted by the RCDAO, and in 2011, acquitted of murdering his four-month-old daughter, based on a defense that defendant Sikirica ignored extensive medical evidence which supported a finding that the child had died of

APPENDIX

natural causes. *Id.* at ¶ 52; Klein Decl. Ex. 38, *Joseph McElheny Acquitted of Manslaughter and*

*Murder in Death of his 4-Month-Old Daughter*, Saratogian, Oct. 12, 2011.

111. Adrian Thomas was also arrested by TPD officers, including some of the TPD

defendants herein, prosecuted by RCDAO, and in 2015, acquitted of charges including murder

arising from the death of his four-month-old son based on a defense that defendant Sikirica ignored

medical evidence that Thomas' son had died of natural causes from sepsis. ECF Doc. 77 ¶ 54;

Klein Decl. Ex. 39, The National Registry of Exonerations, June 21, 2014, Post on Adrian Thomas.

*See also Thomas v. Mason, et al.*, 17 CV 626 (DJS), which is currently pending before this Court.

112. Despite such notice, defendant Rensselaer continued to retain defendant Sikirica

and to proffer his reports and otherwise utilize his services in furtherance of wrongful prosecutions

involving juvenile deaths, including that of Davis. ECF Doc. 77 ¶ 58.

113. From 2005 through 2018, Sikirica was paid $72,600 per year to perform autopsies

for Rensselaer County. Klein Decl. Ex. 36, Civil Service Rec.

114. Sikirica received a raise in 2019 to $75,900 per year. *Id.*

Dated: April 1, 2022
New York, New York

BRETT H. KLEIN, ESQ., PLLC
Attorneys for the Plaintiff
305 Broadway, Suite 600
New York, New York 10007
(212) 335-0132

By:  *Brett Klein*
_____
BRETT H. KLEIN
LISSA GREEN-STARK

17

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X

MICHAEL DAVIS-GUIDER,

                           Plaintiff,

                     -against-

CITY OF TROY, RONALD FOUNTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES MCDONALD,
Individually, TIM COLANERI, Individually, ADAM R. MASON,
Individually, RENSSELAER COUNTY, MICHAEL SIKIRICA,
Individually, and JOEL ABELOVE, Individually, and JOHN and
JANE DOE 1-10, Individually,

                           Defendant.

--------------------------------------------------------------------------------X

17 CV 1290 (DJS)

**PLAINTIFF'S LOCAL RULE 56.1 COUNTER STATEMENT**

**BRETT H. KLEIN, ESQ., PLLC**
Attorneys for the Plaintiff
305 Broadway, Suite 600
New York, New York 10007
(212) 335-0132

# APPENDIX

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------------X

MICHAEL DAVIS-GUIDER,

                                         Plaintiff,

       -against-

CITY OF TROY, RONALD FOUNDTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES MCDONALD,
Individually, TIM COLANERI, Individually, ADAM R. MASON,
Individually, RENSSELAER COUNTY, MICHAEL SIKIRICA,
Individually, and JOEL ABELOVE, Individually,

                                    Defendants.

--------------------------------------------------------------------------------X

**PLAINTIFF'S RESPONSE TO THE CITY DEFENDANTS' STATEMENT OF MATERIAL FACTS**

17 CV 1290 (DJS)

Plaintiff respectfully submits this response to the City defendants' statement submitted pursuant to Local Rule 56.1.

1.      Not disputed.

2.      Not disputed.

3.      Not disputed.

4.      Not disputed.

5.      Not disputed.

6.      Not disputed.

7.      Disputed.  Per Fountain's notes, Rebecca left at 8:30 a.m.  Klein Decl. Ex. 2, Fountain Notes 000424; Ex. 37, Fountain Narrative 000441.  Further note that the citation does not support that fact asserted.

8.      Not disputed except that the citation does not support the fact asserted.

9.      Not disputed that plaintiff changed V.D.'s diaper and that V.D then went back to sleep but assert that plaintiff testified that V.D. seemed sluggish and lower energy than normal

for her in the morning and this is why Davis sent her back to bed. *Id.* at Ex. 1, Davis Dep. Tr. 56:14-57:11.

      10.     Not disputed.

      11.     Not disputed.

      12.     Not disputed.

      13.     Not disputed.

      14.     Not disputed.

      15.     Not disputed.

      16.     Not disputed.

      17.     Not disputed.

      18.     Not disputed.

      19.     Not disputed.

      20.     Not disputed.

      21.     Not disputed.

      22.     Not disputed.

      23.     Not disputed.

      24.     Disputed.  Coonradt testified under oath at the criminal trial that she approached plaintiff and spoke to and questioned only him. *Id.* at Ex. 3, Trial Tr. III 66:17-68:3, 73:2-5; Ex. 16, Coonradt Dep. Tr. 14:20-16:16.

      25.     Not disputed that they had a brief conversation but disputed as to any inference that the conversation was initiated by plaintiff, as Coonradt approached plaintiff and questioned him. *Id.*

      26.     Not disputed.

      27.     Not disputed.

# APPENDIX

**1487**

28.     Not disputed.

29.     Not disputed.

30.     Not disputed.

31.     Not disputed.

32.     Not disputed.

33.     Not disputed.

34.     Not disputed.

35.     Not disputed.

36.     Not disputed.

37.     Not disputed.

38.     Not disputed that items were taken from the home but disputed as to any inference that the items implicated Davis in V.D.'s death or provided probable cause to arrest or prosecute. *Id.* at Ex. 19, McDonald Dep Tr. 40:19-41:11.

39.     Not disputed.

40.     Not disputed.

41.     Not disputed.

42.     Disputed that it is common for police to be at autopsies generally.  Sikirica confirmed it is not uncommon in cases involving suspicious deaths or homicides.  *Id.* at Ex. 15, Sikirica Dep Tr. 152:21-153:11.

43.     Not disputed.

44.     Not disputed.

45.     Not disputed.

46.     Not disputed.

47.     Not disputed.

48.  Not disputed.

49.  Not disputed.

50.  Not disputed.

51.  Not disputed.

52.  Not disputed.

53.  Not disputed.

54.  Not disputed.

55.  Not disputed.

56.  Not disputed that Sikirica may have voiced the opinion that V.D.'s injuries could not have been caused by properly performed CPR, but disputed that such an opinion is correct, and further note that Sikirica conceded that the manner in which Davis described doing CPR could cause such injuries, which in this case would have been postmortem. *Id.* at Ex. 4, Trial Tr. IV 58:15-25; Ex. 6, Trial Tr. VI 22:5-31:7, 32:34:7; Ex. 15, Sikirica Dep. Tr. Dep. 83:18-84:11; Ex. 32, Brady Disclosure; Maloney Decl. ¶ 8, Ex. 2, Maloney Rpt.

57.  Not disputed that Sikirica testified that he has not encountered injuries like V.D.'s but disputed that any inference can be drawn from this testimony insofar as other medical examiners have observed similar injuries.  Klein Decl. Ex. 6, Trial Tr. VI 43:8-44:3, 63:12-64:15. Maloney Decl. ¶ 8.

58.  Not disputed.

59.  Not disputed but note that defendant Sikirica also concluded in his autopsy report that the cause of death was due a "[h]istory of decedent reportedly found unresponsive with reported history of attempted cardiopulmonary resuscitation by a large adult."  Klein Decl. Ex. 28, Autopsy Rpt. 000119.

60.  Not disputed that such was the conclusion in his report as to manner of death but

# APPENDIX

disputed that his homicide determination was consistent with his finding that V.D.'s injuries were due to a reported history of CPR by a large adult, insofar as Sikirica concedes that injuries inflicted during the process of resuscitation efforts when a person is already in extremis would not be a homicide, but rather should be categorizes as undetermined or accidental. *Id.* at Ex. 6, Trial Tr. VI 33:12-43:7, 62:9-11; Ex. 15, Sikirica Dep Tr. 127:21-128:13. Maloney Decl. Ex. 2, Maloney Rpt.

61. Not disputed.

62. Not disputed.

63. Not disputed.

64. Not disputed.

65. Not disputed.

66. Not disputed.

67. Not disputed.

68. Not disputed.

69. Not disputed.

70. Not disputed.

71. Not disputed.

72. Not disputed.

73. Disputed. While Coonradt did not personally place plaintiff in handcuffs, she was personally involved in investigatory activity that led in part to plaintiff's arrest. *See* Plaintiff's 56.1 Counter Statement (hereinafter "PCS") ¶¶ 25-26.

74. Not disputed.

75. Disputed. While McDonald did not personally place plaintiff in handcuffs, he was personally involved in investigatory activity that led in part to plaintiff's arrest. *See e.g.,* PCS ¶¶

# APPENDIX

28, 30, 32, 35, 46, 48, 50, 68.

76.  Not disputed.

77.  Not disputed.

78.  Not disputed.

79.  Not disputed.

80.  Not disputed.

81.  Not disputed.

82.  Not disputed.

83.  Not disputed.

84.  Not disputed.

85.  Not disputed.

86.  Not disputed.

87.  Not disputed.

Dated: April 1, 2022
New York, New York

BRETT H. KLEIN, ESQ., PLLC
Attorneys for the Plaintiff
305 Broadway, Suite 600
New York, New York 10007
(212) 335-0132

By:  _Brett Klein_
_____
BRETT H. KLEIN
LISSA GREEN-STARK

6

# APPENDIX 1491

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------------X

MICHAEL DAVIS-GUIDER,

                                   Plaintiff,

                             17 CV 1290 (DJS)

        -against-

CITY OF TROY, RONALD FOUNDTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES MCDONALD,
Individually, TIM COLANERI, Individually, ADAM R. MASON,
Individually, RENSSELAER COUNTY, MICHAEL SIKIRICA,
Individually, and JOEL ABELOVE, Individually,

                                  Defendant.

---------------------------------------------------------------------------------X

## PLAINTIFF'S RESPONSE TO THE CITY DEFENDANTS' STATEMENT OF MATERIAL FACTS

**BRETT H. KLEIN, ESQ., PLLC**
Attorneys for the Plaintiff
305 Broadway, Suite 600
New York, New York 10007
(212) 335-0132

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X

MICHAEL DAVIS-GUIDER,                                      **PLAINTIFF'S**
                                                          **LOCAL RULE 56.1**
                                          Plaintiff,      **COUNTER**
                                                          **STATEMENT**
                      -against-

CITY OF TROY, RONALD FOUNTAIN, Individually,             17 CV 1290 (DJS)
DANIELLE COONRADT, Individually, CHARLES MCDONALD,
Individually, TIM COLANERI, Individually, ADAM R. MASON,
Individually, RENSSELAER COUNTY, MICHAEL SIKIRICA,
Individually, and JOEL ABELOVE, Individually, and JOHN and
JANE DOE 1-10, Individually,

                                          Defendants.

--------------------------------------------------------------------------------X

Plaintiff respectfully submits this Local Rule 56.1 Counter Statement in support of his

opposition to defendants City of Troy, Adam R. Mason, Ronald Fountain, and Tim Colaneri's

motion for summary judgment, and to defendants Rensselaer County, Michael Sikirica and Joel

Abelove's motion for summary judgment.

1.      V.D. is the daughter of plaintiff's girlfriend, but plaintiff loved and cared for her as

if she was his own daughter.  Klein Decl. Ex. 1, Davis Dep. Tr. 42:18-43:9.

2.      Approximately one week before her death, V.D. was sick with a fever, coughing,

and vomiting.  *Id.* at Ex. 1, Davis Dep Tr. 47:9-48:17.

3.      V.D. had also complained of chest pain.  *Id.* at Ex. 2, Fountain Notes 000424-25

4.      V.D. suffered from low iron and a postmortem metabolic screening detected an

elevated thyroid stimulation hormone consistent with hypothyroidism.  *Id.* at Ex. 1, Davis Dep Tr.

46:21-47:5; Maloney Decl. Ex. 2, Maloney Rpt. p. 2.

5.      V.D.'s autopsy also revealed evidence of chronic inflammation of the bronchi. Klein Decl. Ex. 6, Trial Tr. VI 52:9-20.

6.      The night before V.D.'s death, Michael Davis watched basketball with a friend across the street, while V.D. remained home with her mother Rebecca Parker, and V.D. was already asleep when Davis returned home.  *Id.* at Ex. 1, Davis Dep. Tr. 49:18-53:3.

7.      On February 26, 2015, when Davis woke up in the morning, he smelled poop and called V.D. out from her room to the living room where he and Rebecca slept. *Id.* at Ex. 1, Davis Dep. Tr. 55:23-57:11.

8.      When V.D. came out to Davis, she appeared low energy, sluggish, and not her normal self.  *Id.* at Ex. 1, Davis Dep. Tr. 56:14-57:11; Ex. 8, Parker Witness Dep 000494.

9.      Davis helped V.D. finish going to the bathroom, changed V.D.'s diaper, and offered her food and a sippy cup, which V.D. declined.  *Id.* at Ex. 1, Davis Dep. Tr. 56:14-57:11.

10.      Consistent with Davis' explanation of the morning events, police would later find a sippy cup, soiled diaper, and pants on the floor near the bed in the living room, and V.D. in a clean unsoiled diaper.  *Id.* at Ex. 9, Grand Jury Tr. 000892-000893; Ex. 10, Mar. 2, 2015, Interrogation Tr. 176:9-177:24

11.      Seeing that V.D. appeared abnormally tired, Davis put her back to bed.  *Id.* at Ex. 1, Davis Dep. Tr. 56:14-57:11.

12.      Davis put on a movie in the living room and fell asleep himself.  *Id.* at Ex. 1, Davis Dep. Tr. 56:14-57:11.

13.      When Davis woke up, he found V.D. unresponsive in her bed.  *Id.* at Ex. 1, Davis Dep. Tr. 59:22-61:6.

# APPENDIX

14.    Davis attempted CPR a few times, including doing a few compressions where he pressed down on her stomach with his hand behind her back, and then at 1:09 p.m., called 911 from a restaurant across the street because Davis did not have a working phone at home.  *Id.* at Ex. 1, Davis Dep. Tr. 61:4-67:19; Ex. 11, 911 Call Sheet.

15.    When emergency medical service providers (hereinafter "EMS") arrived at the scene, V.D. was already in cardiac arrest, was not breathing, had no pulse, no heart activity, and was warm to the touch.  *Id.* at Ex. 3, Trial Tr. III 38:9-42:18; Ex. 12, Bayley Witness Dep. 000496; Ex. 13, CPS Case Notes 000499.

16.    EMS immediately started CPR in the home, using two hands pressing very hard on V.D., while V.D. was on a soft futon.  *Id.* at Ex. 1, Davis Dep. Tr. 65:10-12, 72:9-73:5; Ex. 3, Trial Tr. III 6:15-7:14, 15:22-24; Ex. 5, Trial Tr. V 52:5-53:17.

17.    CPR should neither be performed with two hands on a child, nor should it be performed on a soft surface.  *Id.* at Ex. 6, Trial Tr. VI 64:2-15.

18.    CPR was continued in the ambulance en route to St. Mary's Hospital.  *Id.* at Ex. Ex. 3, Trial Tr. III 8:23-9:17.

19.    Davis and Parker were not given an opportunity to go with V.D. in the ambulance. *Id.* at Ex. 1, Davis Dep. Tr. 77:9-17; Ex. 5, Trial Tr. V 54:17-55:18; Ex. 8, Parker Witness Dep.

20.    EMS performed 100 to 120 compressions per minute for the 20 minutes CPR was performed in the home and on the way to the hospital.  *Id.* at Ex. 3, Trial Tr. III 29:7-30:23.

21.    Only after performing CPR did EMS briefly detect some heart activity while in the ambulance.  *Id.* at Ex. 3, Trial Vol III 38:9-40:12.

22.    At no time did V.D. regain a pulse or start breathing.  *Id.* at Ex. 3, Trial Tr. III 8:25-9:6.

23.      CPR was continued at the hospital for another thirty minutes, before V.D. was pronounced dead at 2:10 p.m. *Id.* at Ex. 3, Trial Tr. III 53:25-54:9; Ex. 14, Crisafulli Witness Dep. 000495.

24.      A total of approximately 6,000 compressions were done collectively by EMS and hospital staff. *Id.* at Ex. 15, Sikirica Dep. Tr. 57:1-5.

25.      Defendant Troy Police Department (hereinafter "TPD") Officer Danielle Coonradt was the first officer to respond to the scene and despite that per EMS, V.D. had no visible injuries, Coonradt began searching the house in a manner that indicated she was suspicious of something, including opening cupboards and looking in high places. *Id.* at Ex. 1, Davis Dep. Tr. 73:17-75:11, 152:4-153:6, 155:21-159:15; *Id.* at Ex. 3, Trial Tr. III 42:22-43:625.

26.      Coonradt also questioned plaintiff and prepared an inaccurate report of her conversation with Davis, falsely recording in an official police report that Davis purportedly told her he tried to wake V.D. up at 11:00 a.m., and that he responded to Coonradt's statement that it was now 1:30 p.m. by stating that time must be flying. *Id.* at Ex. 1, Davis Dep. Tr. 79:16-81:4, 145:10-146:6; Ex. 16, Coonradt Dep. Tr. 15:13-16:7; Ex. 17, Coonradt Supp. Rpt. 000490.

27.      To the contrary, Davis told the police that he was not sure what time he woke up because he did not have a clock in the house and his phone was not working. *Id.* at Ex. 1, Davis Dep. Tr. 79:16-81:4.

28.      Defendants former TPD Detective Ronald Fountain and Detective Charles McDonald were jointly assigned to conduct the investigation of the case and responded to the Mr. Davis' home on February 26, 2015. *Id.* at Ex. 18, Fountain Dep. Tr. 34:12-20, 40:6-11, 41:3-20; Ex. 19, McDonald Dep. Tr. 27:6-29:8.

29.    Fountain told plaintiff he would be driven to the hospital, but instead McDonald and Fountain drove Davis to the TPD headquarters. *Id.* at Ex. 1, Davis Dep. Tr. 152:4-154:10.

30.    At the TPD headquarters, McDonald first sat with plaintiff trying to keep him occupied while Fountain went to the hospital to gather more information. *Id.* at Ex. 19, McDonald Dep. Tr. 36:20-38:7.

31.    Defendant Tim Colaneri was also involved in the investigation, first going to the hospital with an evidence technician to take photographs, and then going to plaintiff's home, where he got a briefing from an officer on scene, assisted in executing a search warrant, and also assisted in canvassing the neighborhood and speaking to witnesses. *Id.* at Ex. 20, Colaneri Dep Tr. 16:5-24:3, 24:20-25:8; Ex. 22, Cont. Suppression Hearing Tr. 26:11-13.

32.    Fountain, McDonald, and Colaneri then interrogated Davis at the precinct. *Id.* at Ex. Ex. 19, McDonald Dep. Tr. 38:8-39:22; Ex. 20, Colaneri Dep. Tr. 24:4-25:17.

33.    Colaneri was the primary questioner during the first interrogation of Davis, and he recorded part of the interrogation on his cell phone. *Id.* at Ex. 18, Fountain Dep. Tr. 37:5-38:2; Ex. 20, Colaneri Dep. Tr. 24:4-25:17; Ex. 21, Suppression Hearing Tr. 115:8-14.

34.    Davis provided no incriminating statements during his first conversation with police, and defendants concede probable cause to arrest plaintiff did not exist based on the known information. *Id.* at Ex. 18, Fountain Dep. Tr. 38:3-13; Ex. 20, Colaneri Dep. Tr. 27:12-15.

35.    On February 27, 2015, an autopsy was conducted by defendant Michael Sikirica, the Rensselaer County medical examiner, which was attended by defendants McDonald, Fountain, and Colaneri, evidence technician Anthony Buttofucco, and an Assistant District Attorney (hereinafter "ADA") from the Rensselaer County District Attorney's Office (hereinafter

# APPENDIX

"RCDAO") Andra Ackerman. *Id.* at Ex. 18, Fountain Dep. Tr. 48:5-49:5, Ex. 23, Feb. 27, 2015, Sign in Sheet 000436.

36.     Andra Ackerman's overall supervisor was District Attorney Joel Abelove. *Id.* at Ex. 24, Abelove Dep. Tr. 29:13-30:20.

37.     Law enforcement presence is not necessary for Sikirica to perform an autopsy and law enforcement is generally not present for all autopsies conducted by Sikirica. *Id.* at Ex. 4, Trial Tr. IV 47:21-50:2; Ex. 18, Fountain Dep Tr. 118:19-119:19.

38.     The TPD officers were present during V.D.'s autopsy to feed Sikirica information. *Id.* at Ex. 9, Grand Jury Tr. 000901.

39.     Fountain would have told Sikirica that Davis was the only person home when V.D. died. *Id.* at Ex. 18, Fountain Dep. Tr. 118:19-119:19.

40.     As part of the autopsy, Sikirica ordered some tests relevant to determining whether V.D. had died of natural causes, but despite that the results of said tests were outstanding, Sikirica informed Fountain that he planned to rule the death a homicide. *Id.* at Ex. 13, CPS Records 000507, 000521.

41.     Sikirica's decision to rule the death a homicide based solely on his discussions with the defendant TPD officers, and on the observed injuries, resulted in Sikirica failing to fully explore potential natural causes of death. *Id.* at Ex. 6, Trial Tr. VI 49:6-50:21.

42.     The National Academy of Science recommends that law enforcement and prosecutors should not be present during autopsies because they may influence the medical examiner. *Id.* at Ex. 6, Trial Tr. VI 55:14-56:14.

43.     On February 27, 2015, plaintiff and Ms. Parker were questioned again by Mason and TPD Sergeant Parrow.  *Id.* at Ex. 1, Davis Dep. Tr. 90:17-92:19; Ex. 25, Mason Dep. Tr. 29:19-31:18.

44.     On March 1, 2015, ADA Ackerman sent an email to defendants Fountain and Colaneri, copying defendant Abelove, concerning a February 28, 2015, meeting held regarding next steps in investigating Davis and V.D.'s death.  *Id.* at Ex. 18, Fountain Dep. Tr. 121:2-122:21; Ex. 26, March 1, 2015, Email.

45.     On March 2, 2015, Fountain conducted a second interview of Davis inside an interrogation room at TPD headquarters, which lasted approximately two hours and was recorded by the TPD defendants via a video camera.  *Id.* at Ex. 18, Fountain Dep. Tr. 61:10-63:23.

46.     McDonald participated in the interview by monitoring the video feed on a computer from a separate room.  *Id.* at Ex. 19, McDonald Dep. Tr. 46:11-23.

47.     The March 2, 2015, interview yielded no additional information to support probable cause to arrest Davis, and it was still unknown to the defendants what caused V.D.'s death.  *Id.* at Ex. 18, Fountain Dep Tr. 63:7-67:18.

48.     On March 12, 2015, a subsequent meeting was held with defendant Sikirica, attended by defendants Fountain, Colaneri, and Mason, as well as ADA Ackerman, and TPD Detective Sergeant Parrow, to discuss the case.  *Id.* at Ex. 18, Fountain Dep. Tr. 68:6-69:16; Ex. 27, March 12, 2015, Sign in Sheet 000439.

49.     Sometime before or after the meeting, Sikirica received a copy of the March 2, 2015, interrogation video from the TPD defendants, during which Davis demonstrated how he had attempted to perform CPR on V.D.  *Id.* at Ex. 15, Sikirica Dep. 118:15-119:12.

50.     Over the next several months, Fountain and McDonald questioned plaintiff at least two more times while he was out walking and Fountain told him, in sum and substance, that he needed him to tell the truth because his boss was pressuring him to close the case. *Id.* at Ex. 1, Davis Dep. Tr. 93:14-94:15, 138:9-140:8, 162:8-163:23.

51.     Fountain also met with the RCDAO a few times during the investigation and before the final autopsy report was released. *Id.* at Ex. 18, Fountain Dep. Tr. 43:17-44:17, 70:19-72:2.

52.     The only evidence linking Davis to V.D.'s death was that he was with her when she died, which alone is not sufficient to charge a person with murder. *Id.* at Ex. 18, Fountain Dep. Tr. 64:2-21, 97:22-99:10.

53.     On August 14, 2015, defendant Sikirica issued his final autopsy report determining in relevant part that the manner of V.D.'s death was purportedly a homicide and that V.D. had died of "[h]ypovolemic shock due to a large hemoperitoneum due to multiple lacerations of the liver with right rib fractures due to blunt force trauma" and noting a "[h]istory of decedent reportedly found unresponsive with reported history of attempted cardiopulmonary resuscitation by a large adult." *Id.* at Ex. 28, Autopsy Rpt. 000110, 000119.

54.     Sikirica made this determination after watching the video of Davis demonstrating CPR and linking the pattern of injuries observed to be most consistent with what Davis had demonstrated on the video. *Id.* at Ex. 15, Sikirica Dep. 83:18-84:11.

55.     Had Sikirica not seen the video he would not have attributed the death to Davis. *Id.* at Ex. 15, Sikirica Dep. Tr. 98:2-99:3.

56.     Sikirica failed to note in his autopsy report that an additional 6,000 compressions were also performed on V.D. by EMS and hospital staff of various sized hands, despite conceding

he was aware that V.D. had undergone prolonged CPR. *See Id.* at Ex. 15, Sikirica Dep. Tr. 101:1-102:5; Ex. 28, Autopsy Rpt.

57.     The size of an individual's hands cannot be medically correlated to the resultant CPR-related injury based on accepted medical research and knowledge. Maloney Decl. ¶ 10; Ex. 2, Maloney Rpt. p. 2.

58.     Notwithstanding that he was given the supporting depositions of EMS and medical staff taken by TPD, Sikirica neither spoke to EMS nor to the emergency room doctors who performed CPR to determine how CPR was conducted by them prior to issuing his report, but rather just assumed it was done correctly and without compressing the abdomen. Klein Decl. Ex. 15, Sikirica Dep. Tr. 53:18-55:7, 72:10-78:19.

59.     Sikirica should have spoken to all the individuals who performed CPR where it was known that extensive CPR involving several thousand compressions was performed and there was a known possibility that V.D.'s injuries were CPR related. *Id.* at Ex. 6, Trial Tr. VI 22:5-19.

60.     Sikirica's assumption that CPR was performed correctly was faulty given that EMS had performed CPR with two hands while V.D. was on a soft futon. *Id.* at Ex. 1, Davis Dep. Tr. 65:10-12, 72:9-73:5; Ex. 3, Trial Tr. III 6:15-7:14, 15:22-24; Ex. 5, Trial Tr. V 52:5-53:17; Ex. 6, Trial Tr. VI 64:2-15.

61.     Sikirica destroyed the contemporaneous dictation he made from which the final autopsy report was drafted. *Id.* at Ex. 4, Trial Tr. IV 41:11-42:24.

62.     At the time of these events, Davis was 6' 10" tall and approximately 240 to 250 pounds and had very big hands. *Id.* at Ex. 1, Davis Tr. 62:21-63:4.

# APPENDIX

63.     Without the autopsy findings linking the death to a large adult, i.e., Davis, there was no probable cause to arrest Davis for V.D.'s death. *Id.* at Ex. 19, McDonald Dep. Tr. 67:9-23.

64.     When Sikirica determined V.D.'s death was a homicide, it was foreseeable to him that this would lead to a homicide prosecution, and Sikirica further understood that his determination and testimony would be important to the prosecution. *Id.* at Ex. 15, Sikirica Dep. Tr. 82:9-14, 140:11-21.

65.     On September 9, 2015, Fountain, along with McDonald, interviewed Davis in the aforementioned interrogation room on video for a third time, during which no new information to support an arrest was learned. *Id.* at Ex. 18, Fountain Dep Tr. 75:21-76:6, 78:8-13; Ex. 19, McDonald Dep. Tr. 52:2-53:16

66.     Fountain believed, based on conversations with Sikirica, that V.D.'s ribs had been fractured and that the ribs had lacerated the liver, causing V.D. to die. *Id.* at Ex. 18, Fountain Dep. Tr. 50:12-51:15.

67.     According to Sikirica, Fountain's understanding of V.D.'s death was incorrect, and he would not have told him that was the cause of death. *Id.* at Ex. 18, Fountain Dep. Tr. 92:1-93:8.

68.     McDonald, along with Fountain, met with a prosecutor, believed to be ADA Ackerman from the RCDAO, prior to the grand jury presentation to discuss what would be charged, but did not testify because he was on vacation when the grand jury was convened. *Id.* at Ex. 19, McDonald Dep. Tr. 91:21-94:18.

69.     Fountain falsely testified to the grand jury that Davis said it was a normal occurrence for V.D. to wake up tired. *Id.* at Ex. 8, Parker Witness Dep. 000494; Ex. 9, Grand Jury Tr. 000878-000879; Ex. 10, Mar. 2, 2015, Interrogation 74:9-75:10.

70.     Fountain falsely informed the grand jury that V.D.'s bed was really neat and made up, and not fussed or messed up at all, and therefore inconsistent with someone performing CPR on the bed as Davis claimed he did. *Id.* at Ex. 9, Grand Jury Tr. 000881-000882; Ex. 29, Photo of Bed DSC_7357.

71.     Fountain falsely informed the grand jury that Davis and Parker were not prevented from going to the hospital in the ambulance. *Id.* at Ex. 8, Parker Witness Dep. 000493; Ex. 9, Grand Jury Tr. 000868-000869.

72.     Fountain falsely informed the grand jury that Davis was calm, subdued, even keeled, and not acting like you would think somebody would if they had a two-and-a-half-year-old who was not breathing. *Id.* at Ex. 9, Grand Jury Tr. 000876.

73.     To the contrary, on February 26, 2015, Davis was distraught, upset, concerned, sniffling, and crying at times. *Id.* at Ex. 21, Suppression Hearing Tr. 18:23-19:2; 25:10-22; 115:15-116:11; 157:13-160:8; Ex. 30, Brown St. 001538; Ex. 31, Brown Witness Dep. 0001680.

74.     Sikirica met with the RCDAO after he issued his report and before testifying before the grand jury. *Id.* at Ex. 15, Sikirica Dep. Tr. 26:2-10.

75.     Sikirica falsely told the grand jury that he had ruled out *any* natural cause of death or other explanation for V.D. to have been unconscious, despite later conceding that it was possible V.D. had died of a natural event and that he could not dispute that V.D. could have been in cardiac arrest before Davis attempted CPR. *Id.* at Ex. 9, Grand Jury Tr. 000911-000912, 000917; *Id.* at Ex. 15, Sikirica Dep. Tr. 66:21-67:3, 79:17-82:8.

76.    In his direct testimony presented by RCDAO to the grand jury, Sikirica did not inform the grand jury of his final autopsy finding that he had correlated V.D.'s injuries to a "[h]istory of decedent reportedly found unresponsive with reported history of attempted cardiopulmonary resuscitation by a large adult." *Id.* at Ex. 9, Grand Jury Tr. 000895-000917; Ex. 28, Autopsy Rpt. 000119.

77.    The District Attorney placed into evidence before the grand jury only photos of the lacerated liver and the final death certificate, omitting the final autopsy report which referenced the performance of CPR by a large adult. *Id.* at Ex. 9, Grand Jury Tr. 000895-000917.

78.    Only when recalled to the grand jury and pressed by a grand juror did Sikirica concede that the manner in which Davis described doing CPR could cause rib fractures and lacerations to the liver. *Id.* at Ex. 9, Grand Jury Tr. 000853-000862.

79.    This concession was exculpatory evidence which was later disclosed by RCDAO pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). *Id.* at Ex. 31, July 20, 2016, Disclosure.

80.    Sikirica falsely informed the grand jury that the amount of blood found in V.D.'s abdomen indicated that the fractures and lacerations did not occur during Davis' CPR attempt and that V.D. was alive after the injuries were inflicted because the five squeezes described by Davis would not have amounted to 400 MLs of blood. *Id.* at Ex. 9, Grand Jury Tr. 000861-000862.

81.    Sikirica failed to put in his autopsy report or to otherwise inform the grand jury that after Davis' five squeezes, EMS and hospital staff did approximately 6,000 additional compressions which would have contributed to the amount of blood found in V.D.'s abdomen at autopsy. *Id.* at Ex. 9, Grand Jury Tr. 000853-000864; Ex. 15, Sikirica Dep. Tr. 77:9-23; Maloney Decl. Ex. 2, Maloney Rpt. p. 2.

# APPENDIX

82. No pathologist should draw the conclusion that the amount of blood seen on autopsy was present at the time of death because it is known that humans continue to bleed after death with CPR. Klein Decl. Ex. 6, Trial Tr. VI 52:21-55:10.

83. The amount of blood in V.D.'s abdomen at autopsy was consistent with CPR and with the fact that lacerations to the liver continue to bleed. Maloney Decl. Ex. 2, Maloney Rpt. p. 2.

84. EMS reported that V.D.'s stomach was not distended upon arrival, which also supports that additional blood accumulated while CPR was being performed by EMS and hospital staff. Maloney Decl. Ex. 2, Maloney Rpt. p. 2.

85. Sikirica falsely informed the grand jury that when EMS arrived, V.D. was cool to the touch and had some electrical activity in her heart, when in actuality per EMS V.D. was warm to the touch and had no electrical activity. Klein Decl. Ex. 3, Trial Tr. III 38:9-42:18; Ex. 9, Grand Jury Tr. 000853Ex. 12, Bayley Witness Dep. 000496; Ex. 13, CPS Case Notes 000499.

86. Sikirica falsely informed the jury that based on the false fact that V.D. purportedly had electrical activity when EMS responded, V.D.'s injuries had occurred approximately 15 to 20 minutes prior to the arrival of EMS. *Id.* at Ex. 9, Grand Jury Tr. 000863-000864.

87. After hearing the testimony of only Fountain and Sikirica, the grand jury indicted plaintiff. *Id.* at Ex. 9, Grand Jury Tr.; Ex. 33, Indictment P000031-P000033.

88. Joel Abelove signed the indictment. *Id.* at Ex. Ex. 33, Indictment P000033.

89. After the indictment, an arrest warrant was issued, and plaintiff was arrested on October 2, 2015, and jailed until his acquittal after a jury trial on August 25, 2016. *Id.* at Ex. 1, Davis Dep. Tr. 13:11-14:5; Ex. 7, Trial Tr. VII 19:20-23:17; Ex. 18, Fountain Dep Tr. 46:19-47:8; Ex. 34, Arrest Report 000534; Ex. 35, Davis City 50-h 11:4-13:7.

90.      Coonradt testified at a suppression hearing conducted on May 3, 2016, where she reiterated her false claims that plaintiff had informed her that he told V.D. to go back to bed because it was too early, that he woke up at 11:00 a.m., and made a comment that time must be flying. *Id.* at Ex. 21, Suppression Hearing Tr. 10:4-18.

91.      McDonald testified at the suppression hearing conducted on May 3, 2016, during which he conceded plaintiff was upset, sniffling, and on the verge of tears, and repeatedly expressed that he did not know what happened and was trying to figure out what happened. *Id.* at Ex. 21, Suppression Hearing Tr. 112:9-113:17.

92.      Coonradt testified at trial and again reiterated her false claims that plaintiff had informed her that he told V.D. to go back to bed because it was too early, that he woke up at 11:00 a.m., and made a comment that time must be flying. *Id.* at Ex. 3, Trial Tr. III 67:17-68:3.

93.      Sikirica testified at trial and, like with the grand jury, during his direct testimony Sikirica did not inform the jury of his final autopsy finding that he had correlated V.D.'s injuries to Davis' attempted CPR with large hands, instead informing the jury it would take the force of a motor vehicle accident or severe blunt force trauma caused by being hit in the abdomen with an object or running into an object for such injuries to the liver to occur. *Id.* at Ex. 4, Trial Tr. IV 12:11-13:2; Ex. 28, Autopsy Rpt. 000119.

94.      Sikirica denied at trial that his medical opinion was based on the video which depicted Davis performing CPR despite that he directly referenced information learned from the video in his autopsy report. *Id.* at Ex. 4, Trial Tr. IV 54:11-19.; Ex. 28, Autopsy Rpt. 000119.

95.      Fountain also testified at the trial, although he had retired from TPD after he himself had been indicted by defendant Abelove for corruption. *Id.* at Ex. 18, Fountain Dep. Tr. 89:11-91:17.

# APPENDIX

96. The investigation which led to plaintiff's arrest was a collaborative effort among Sikirica, RCDAO, and the TPD. *Id.* at Ex. 25, Mason Dep. Tr. 42:20-44:20.

97. Sikirica was not a neutral witness, as evidenced by his decision to call a meeting with ADA Hall and defendant Abelove to express his frustration and criticism of the trial ADA, ADA Cindy Chavkin. *Id.* at Ex. 15, Sikirica Dep. Tr. Dep 48:2-51:13, 85:19-87:1.

98. Abelove conceded after the acquittal that the case against Davis was not strong but stated that he did not regret pursuing it. *https://www.troyrecord.com/2016/08/25/former-professional-basketball-player-acquitted-in-lansingburgh-toddlers-death/*.

99. CPR can cause lacerations to the liver and fracture ribs, and the liver and ribs are the more likely areas to be injured during CPR. *Id.* at Ex. 6, Trial Tr. VI 25:13-30:15, 65:3-24; Ex. 15, Sikirica Dep. Tr. 100:19-23; Maloney Decl. Ex. 2, Maloney Rpt.

100. Prolonged CPR, as V.D. underwent, is significantly associated with a higher incident of rib fractures, as is CPR if performed with a hand behind the decedent as Davis did here. Klein Decl. Ex. 15, Sikirica Dep. Tr. 57:14-60:4.

101. The longer CPR is performed, the more CPR-associated injuries will be seen. Maloney Decl. ¶ 9.

102. V.D. had no exterior bruising, or bruising or injuries to other organs, which is also indicative of V.D.'s injuries being CPR related. Klein Decl. Ex. 6, Trial Tr. VI 41:7-43:7.

103. All experts concede the type of compressions Davis demonstrated were consistent with the compressive injuries sustained by V.D. *Id.* at Ex. 4, Trial Tr. IV 58:15-25; Ex. 15, Sikirica Dep. Tr. Dep. 83:18-84:11; Ex. 32, Brady Disclosure. Maloney Decl. Ex. 2, Maloney Rpt. p. 2.

104.    V.D.'s injuries to her liver and ribs were obviously postmortem and did not contribute to her death.  Klein Decl. Ex. 6, Trial Tr. VI  33:12-43:7, 62:9-11.  Maloney Decl. Ex. 2, Maloney Rpt. pp. 2-3.

105.    Sikirica cannot dispute that V.D. was already unresponsive when Davis performed CPR.  Klein Decl. Ex. 15, Sikirica Dep. Tr. 66:21-67:3.

106.    Sikirica concedes that injuries inflicted during the process of resuscitation efforts when a person is already in extremis would not be a homicide.  *Id.* at Ex. 15, Sikirica Dep Tr. 127:21-128:13.

107.    Had Sikirica determined that the rib and liver injuries leading to death were from EMS performing CPR, he would not have determined the death was a homicide, but rather would have left the death undetermined or accidental.  *Id.* at Ex. 15, Sikirica Dep. Tr. 127:21-128:6.

108.    Sikirica performs approximately 600 autopsies per year, which is almost double the maximum number of autopsies recommended by the National Board of Medical Examiners.  *Id.* at Ex. 4, Trial Tr. IV 36:20-39:24.

109.    Sikirica has a history known to Rensselaer County of ignoring evidence of natural deaths in children and of providing cause of death determinations and medical diagnoses consistent with investigating police and prosecutors who are seeking manslaughter convictions for child deaths, as established by the trials of Joseph McElheny in 2011 and Adrian Thomas in 2015.  ECF Doc. 77 ¶¶ 51-54.

110.    Joseph McElheny was arrested by TPD officers, prosecuted by the RCDAO, and in 2011, acquitted of murdering his four-month-old daughter, based on a defense that defendant Sikirica ignored extensive medical evidence which supported a finding that the child had died of

natural causes.  *Id.* at ¶ 52; Klein Decl. Ex. 38, *Joseph McElheny Acquitted of Manslaughter and Murder in Death of his 4-Month-Old Daughter*, Saratogian, Oct. 12, 2011.

111.    Adrian Thomas was also arrested by TPD officers, including some of the TPD defendants herein, prosecuted by RCDAO, and in 2015, acquitted of charges including murder arising from the death of his four-month-old son based on a defense that defendant Sikirica ignored medical evidence that Thomas' son had died of natural causes from sepsis.  ECF Doc. 77 ¶ 54; Klein Decl. Ex. 39, The National Registry of Exonerations, June 21, 2014, Post on Adrian Thomas. *See also Thomas v. Mason, et al.,* 17 CV 626 (DJS)*,* which is currently pending before this Court.

112.    Despite such notice, defendant Rensselaer continued to retain defendant Sikirica and to proffer his reports and otherwise utilize his services in furtherance of wrongful prosecutions involving juvenile deaths, including that of Davis.  ECF Doc. 77 ¶ 58.

113.    From 2005 through 2018, Sikirica was paid $72,600 per year to perform autopsies for Rensselaer County.  Klein Decl. Ex. 36, Civil Service Rec.

114.    Sikirica received a raise in 2019 to $75,900 per year.  *Id.*

Dated: April 1, 2022
        New York, New York

                                BRETT H. KLEIN, ESQ., PLLC
                                Attorneys for the Plaintiff
                                305 Broadway, Suite 600
                                New York, New York 10007
                                (212) 335-0132

                        By:     _Brett Klein_____

                                BRETT H. KLEIN
                                LISSA GREEN-STARK

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X

MICHAEL DAVIS-GUIDER,

                             Plaintiff,

                                                               17 CV 1290 (DJS)

         -against-

CITY OF TROY, RONALD FOUNTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES MCDONALD,
Individually, TIM COLANERI, Individually, ADAM R. MASON,
Individually, RENSSELAER COUNTY, MICHAEL SIKIRICA,
Individually, and JOEL ABELOVE, Individually, and JOHN and
JANE DOE 1-10, Individually,

                             Defendant.

--------------------------------------------------------------------------------X

## PLAINTIFF'S LOCAL RULE 56.1 COUNTER STATEMENT

**BRETT H. KLEIN, ESQ., PLLC**
Attorneys for the Plaintiff
305 Broadway, Suite 600
New York, New York 10007
(212) 335-0132

# APPENDIX

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X

MICHAEL DAVIS-GUIDER,

                                 Plaintiff,

      -against-

CITY OF TROY, RONALD FOUNDTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES MCDONALD,
Individually, TIM COLANERI, Individually, ADAM R. MASON,
Individually, RENSSELAER COUNTY, MICHAEL SIKIRICA,
Individually, and JOEL ABELOVE, Individually,

                                Defendants.

--------------------------------------------------------------------------------X

**DECLARATION OF BRETT H. KLEIN**

17 CV 1290 (DJS)

       BRETT H. KLEIN, declares under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

       1.     My firm represents the plaintiff, Michael Davis-Guider, in the above-captioned action. I make this declaration in support of plaintiff's memorandum of law, responses to defendants' statements of material fact, and plaintiff's Local Rule 56.1 counter statement, which are all respectfully submitted in opposition to defendants' motions for summary judgment.

       2.     Attached hereto as Exhibit 1 are excerpts from the deposition testimony of Michael Davis-Guider conducted on May 19, 2021.

       3.     Attached hereto as Exhibit 2 are investigative notes recorded by defendant Ronald Fountain.

       4.     Attached hereto as Exhibit 3 are excerpts from the criminal trial testimony taken on August 19, 2016.

       5.     Attached hereto as Exhibit 4 are excerpts from the criminal trial testimony taken on August 22, 2016.

6.     Attached hereto as Exhibit 5 are excerpts from the criminal trial testimony taken on August 23, 2016.

7.     Attached hereto as Exhibit 6 are excerpts from the criminal trial testimony taken on August 24, 2016.

8.     Attached hereto as Exhibit 7 are excerpts from the criminal trial testimony taken on August 25, 2016.

9.     Attached hereto as Exhibit 8 is a copy of a witness statement entitled deposition of witness, signed by Rebecca Parker, bearing Bates numbers 000493-000494.

10.     Attached hereto as Exhibit 9 is a copy of grand jury testimony presented on September 29, 2015.

11.     Attached hereto as Exhibit 10 are excerpts from the Interrogation of Michael Davis-Guider conducted on March 2, 2015.

12.     Attached hereto as Exhibit 11 is the Rensselaer County 911 call sheet relating to Davis' February 26, 2015, call, bearing Bates number 000529-000531.

13.     Attached hereto as Exhibit 12 is a copy of a witness statement entitled deposition of witness, signed by Michael Bayley, bearing Bates numbers 000496.

14.     Attached hereto as Exhibit 13 are excerpts from investigation conducted by the Child Protective Services.

15.     Attached hereto as Exhibit 14 is a copy of a witness statement entitled deposition of witness, signed by Kathleen Crisafulli, bearing Bates numbers 000495.

16.     Attached hereto as Exhibit 15 are excerpts of the deposition of Michael Sikirica conducted on May 24, 2021.

# APPENDIX

17.     Attached hereto as Exhibit 16 are excerpts of the deposition of Danielle Coonradt conducted on May 28, 2021.

18.     Attached hereto as Exhibit 17 is a copy of Danielle Coonradt's supplement report prepared on February 26, 2015.

19.     Attached hereto as Exhibit 18 are excerpts of the deposition of Ronald Fountain conducted on May 21, 2021.

20.     Attached hereto as Exhibit 19 are excerpts of the deposition of Charles McDonald conducted on May 26, 2021.

21.     Attached hereto as Exhibit 20 are excerpts of the deposition of Timothy Colaneri conducted on May 26, 2021.

22.     Attached hereto as Exhibit 21 are excerpts testimony presented during the criminal court suppression hearing conducted on May 3, 2016.

23.     Attached hereto as Exhibit 22 are excerpts testimony presented during the criminal court continued suppression hearing conducted on July 7, 2016.

24.     Attached hereto as Exhibit 23 is a copy of the sign in sheet for the February 27, 2015, autopsy, bearing Bates number 000436.

25.     Attached hereto as Exhibit 24 are excerpts of the deposition of Joel Abelove conducted on May 28, 2021.

26.     Attached hereto as Exhibit 25 are excerpts from the deposition of Adam Mason conducted on May 21, 2021.

27.     Attached hereto as Exhibit 26 is a copy of an email sent by Assistant District Attorney Andra Ackerman on March 1, 2015.

28.     Attached hereto as Exhibit 27 is a copy of the sign in sheet for the March 12, 2015, meeting held with defendant Sikirica, bearing Bates number 000439.

29.     Attached hereto as Exhibit 28 is a copy of the final Autopsy Report issued by defendant Michael Sikirica on April 14, 2015, bearing Bates number 000109-000123.

30.     Attached hereto as Exhibit 29 is a sworn statement dated August 15, 2016, signed by Russel Brown, bearing Bates number 0001538-001539.

31.     Attached hereto as Exhibit 30 are excerpts of the testimony of defendant Adam R. Mason given during the grand jury proceedings held on September 26, 2008.

32.     Attached hereto as Exhibit 31 is a copy of a witness statement entitled deposition of witness, signed by Russel Brown, bearing Bates numbered 001680-001681.

33.     Attached hereto as Exhibit 32 is a copy of the July 20, 2016, *Brady* disclosures served by the Rensselaer County District Attorney's Office.

34.     Attached hereto as Exhibit 33 is a copy of the indictment filed against plaintiff on October 2, 2015 and signed by Joel E. Abelove.

35.     Attached hereto as Exhibit 34 is a copy of the Troy Police Department arrest report, bearing Bates number 000534.

36.     Attached hereto as Exhibit 35 are excerpts from G.M.L. 50-h hearing conducted by City of Troy on March 30, 2017.

37.     Attached hereto as Exhibit 36 are records from the Rensselaer County Civil Service Commission regarding defendant Sikirica's employment.

38.     Attached hereto as Exhibit 37 is a copy of an investigative report prepared by defendant Fountain on March 1, 2015, bearing Bates number 000441.

39.    Attached hereto as Exhibit 38 is an Article *Joseph McElheny Acquitted of Manslaughter and Murder in Death of his 4-Month-Old Daughter*, printed in the Saratogian, Oct. 12, 2011.

40.    Attached hereto as Exhibit 39 is a copy of a post from The National Registry of Exonerations, June 21, 2014, regarding Adrian Thomas.

Dated: New York, New York
        April 1, 2022

                         BRETT H. KLEIN, ESQ., PLLC
                         Attorneys for the Plaintiff
                         305 Broadway, Suite 600
                         New York, New York 10007
                         (212) 335-0132

            By:    _____
                         BRETT H. KLEIN

# APPENDIX

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X

MICHAEL DAVIS-GUIDER,

                                                   Plaintiff,

         -against-                                                                17 CV 1290 (DJS)

CITY OF TROY, RONALD FOUNDTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES MCDONALD,
Individually, TIM COLANERI, Individually, ADAM R. MASON,
Individually, RENSSELAER COUNTY, MICHAEL SIKIRICA,
Individually, and JOEL ABELOVE, Individually,

                                                   Defendants.

--------------------------------------------------------------------------------X

## DECLARATION OF BRETT H. KLEIN

**BRETT H. KLEIN, ESQ., PLLC**
Attorneys for the Plaintiff
305 Broadway, Suite 600
New York, New York 10007
(212) 335-0132