# 23-589

IN THE

# United States Court of Appeals
# for the Second Circuit

---

MICHAEL DAVIS-GUIDER,
*Plaintiff-Counter-Defendant-Appellant,*

— v. —

CITY OF TROY, RONALD FOUNTAIN, INDIVIDUALLY,
DANIELLE COONRADT, INDIVIDUALLY,
CHARLES MCDONALD, INDIVIDUALLY,
TIM COLANERI, INDIVIDUALLY,
*Defendants-Cross-Claimants-Counter-Claimants-Appellees,*

RENSSELAER COUNTY,
MICHAEL SIKIRICA, INDIVIDUALLY,
*Defendants-Cross-Defendants-Counter-Claimants-Appellees,*

ADAM R. MASON, INDIVIDUALLY
*Defendant-Cross-Claimant-Counter-Claimant,*

JOEL ABELOVE, INDIVIDUALLY,
*Defendant-Cross-Defendant-Counter-Claimant,*

JOHN AND JANE DOES 1-10, INDIVIDUALLY,
MICHAEL E. PARROW, ANDRA ACKERMAN,
*Defendants.*

---

On Appeal from the United States District Court
for the Northern District of New York
Case No. 1:17-cv-1290 (FJS/DJS)

---

## APPENDIX VOLUME 8 OF 11

# **APPENDIX VOLUME 8 TABLE OF CONTENTS**

ECF 123-1: Exhibit 1 .................................................................. 1516

ECF 123-2: Exhibit 2 .................................................................. 1569

ECF 123-3: Exhibit 3 .................................................................. 1571

ECF 123-4: Exhibit 4 .................................................................. 1601

ECF 123-5: Exhibit 5 .................................................................. 1616

ECF 123-6: Exhibit 6 .................................................................. 1621

1

2              **DEPOSITION of MICHAEL DAVIS-GUIDER**

3

4   UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF NEW YORK
5   ---------------------------------------------X
    MICHAEL DAVIS-GUIDER,
6
                        Plaintiff,
7
    -against-          Civil Case No.: 1:17-cv-01290
8                      (FJS/DJS)

9   CITY OF TROY, RONALD FOUNTAIN, Individually,
    DANIELLE COONRADT, Individually, CHARLES
10  MCDONALD, Individually, TIM COLANERI,
    Individually, ADAM R. MASON, Individually,
11  RENSSELAER COUNTY, MICHAEL SIKIRICA,
    Individually, and JOEL ABELOVE,
12  Individually,

13                      Defendants.
    ---------------------------------------------X

14

15       DEPOSITION of the Plaintiff, **MICHAEL DAVIS-**

16  **GUIDER**, held on May 19, 2021, commencing at

17  9:32 a.m., being held virtually by Zoom, pursuant

18  to Notice; before Susan Florio, a Registered

19  Professional Reporter and Notary Public in and for

20  the State of New York.

21

22

23

1    **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2    and on.

3       Q.   So you didn't have a permanent place that

4    you were residing?

5       A.   No.  I did not.

6       Q.   And about how long were you doing that?

7       A.   After I came home I was with the mother

8    of my child for a few months and then I moved on

9    to stay with a friend and it was like that until

10   I stayed with my cousin.

11      Q.   Okay.  So, when you say after you came

12   home, came home from where?

13      A.   From being locked up.

14      Q.   So was that from being in jail?

15      A.   Yes.

16      Q.   Okay.  And when you say being locked up

17   or being in jail, was that in relation to the

18   criminal proceeding that's the subject of this

19   lawsuit, the one that happened in February of

20   2015 --

21      A.   Yes.

22      Q.   -- or the incident that happened in 2015?

23   Okay.

1    **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2         All right.  Do you know what year you got

3    out of jail or month and year?

4         A.   It was 2016.  I don't recall the actual

5    month.

6         Q.   Okay.  And you said that you when you got

7    out of jail you went and you lived with, is it

8    Shaquana, that's who you lived with when you got

9    out?

10        A.   Yes.

11        Q.   Okay.  And how long did you stay with

12   her?

13        A.   For a few months.

14        Q.   And did you reside there with your

15   daughter?

16        A.   No.  My daughter didn't live there at the

17   time.

18        Q.   Okay.  Where was your daughter residing?

19        A.   She was staying with her godmother.

20        Q.   Do you know why your daughter wasn't

21   residing with Shaquana at the time?

22        A.   Because it was a new apartment and she

23   was working all the time so she couldn't really

Case 1:17-cv-08290-DJS Document 94-11 Filed 04/01/22 Page 43 of 53

1  **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2      Q.    What hours would she work?

3      A.    Morning to afternoon.

4      Q.    When you say morning, around what time in

5  the morning would she be leaving?

6      A.    Probably -- because the job wasn't that

7  far away so I would say maybe 7:30, 7:20, so she

8  can get the bus or walk up the block, depends on

9  where they had her at.

10     Q.    Okay.  Her location would change?

11     A.    Yeah.  There was two different locations

12 that they would have her at if they needed her.

13     Q.    And was V.D. in daycare at the time?

14     A.    No.

15     Q.    So, were you staying with V.D. during the

16 day while Rebecca was working?

17     A.    Yes.  I was taking care of her.

18     Q.    Tell me about your relationship with V.D.

19 How would you describe it?

20     A.    It was a great relationship.  I was like

21 her father and that's how she looked at me.

22 That's what she called me.  I would do everything

23 with her.  Watching her TV shows, feeding her,

1  **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2  changing her Pampers, washing her, taking her out

3  with me to the park.  I would just do everything.

4  She was very happy.  Before me she was always

5  crying and yelling and screaming, but I got her

6  being able to talk more and at two years old she

7  was able to talk pretty well.  I just had a lot

8  of good times with her.  I loved her.  She was

9  like my daughter.

10      Q.   Did you see her fairly frequently before

11  you and Rebecca moved in together?  When I say

12  her, I mean V.D.

13      A.   Yes.

14      Q.   About how often?

15      A.   Probably like once or twice every week.

16      Q.   And where were Rebecca and V staying

17  during that time before you moved in together?

18      A.   She was staying with her mother in

19  Manhattan.

20      Q.   So, the three of you -- so, did Rebecca

21  move to Troy with V.D. when you guys moved in

22  together?

23      A.   She moved to Troy and stayed with me and

Case 1:17-cv-01290-DJS Document 99-2 1:22-14 Filed 04/01/22 Page 46 of 53

1  **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2      A.    Besides her being sick the week before,

3  her mother, which is Rebecca, she was adopted

4  when she was a baby and they sealed the records

5  so I didn't really know any medical history that

6  she had.  She didn't know of her own medical

7  history.  I just know she said -- since she's

8  been her mother she's had like, you know, low

9  iron.  She would faint sometimes.

10     Q.    Is this Rebecca or V?

11     A.    Rebecca.

12     Q.    Okay.

13     A.    This is what she said or what she knows,

14  but she didn't really know anything about her

15  medical history, her parents, because they sealed

16  the records.

17     Q.    To your knowledge, had V been identified

18  by any doctor she had seen as having a medical

19  condition?

20     A.    Not to my knowledge.

21     Q.    Has Rebecca told you whether V had ever

22  been diagnosed with a medical condition?

23     A.    The only thing that they said, that she

1  [MICHAEL DAVIS-GUIDER - By Ms. Peck]

2  had low iron and to watch it.  That's the only

3  thing she told me.

4      Q.   V herself?

5      A.   Yes.

6      Q.   Okay.

7      A.   They said it was something to do with her

8  family trait or something like that.

9      Q.   Now, you mentioned that V had been sick a

10  week before.  When you say a week before, are you

11  talking about a week before her death?

12      A.   Yes.

13      Q.   Okay.  And she died -- did she die on

14  February 26th, 2015?  Does that date sound

15  accurate?

16      A.   Yes.

17      Q.   Tell me about her being sick the week

18  before.

19      A.   To me it just seemed like a normal cold.

20  She'd be coughing a lot.  We gave her like the

21  baby medicine for coughing and I guess she threw

22  up a few times but other than that it was, seemed

23  like a simple cold.

1   **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2       Q.   Did she have a fever?

3       A.   Yes.

4       Q.   I'm sorry?

5       A.   I said yes.

6       Q.   Yes.  Do you know how high the fever was?

7       A.   I'm not sure, but it wasn't that high

8   because the fever was off and on.

9       Q.   And did she see any doctors for this?

10      A.   I believe her mother took her to the

11  doctor.  They said something like it was a normal

12  cold, I guess, make sure that she gets a lot of

13  rest and stuff and it will pass.

14      Q.   When you say a week before, was she sick

15  five days before this, seven days before this,

16  about how long?

17      A.   Yeah.  About seven days before.

18      Q.   And were her symptoms lessening

19  leading --

20      A.   From what I could tell.

21      Q.   As far as you could tell they were

22  lessening?

23      A.   Yes.

1   **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2           MR. KLEIN:  Mike, just do the wait

3           three seconds thing so that Crystal can

4           finish her question.  She may have

5           finished, but it sounds like she may not

6           have.  Leave a little space even if you

7           know the answer.

8           THE WITNESS:  Okay.

9   Q.   I'm sorry.  That should have been one of

10  the ground rules to begin with, too, because a

11  lot of times you'll anticipate what I'm going to

12  say and want to jump right in with the answer.

13  But so that we are not talking over each other

14  for the court reporter, we want to make sure that

15  there's a clear question and a clear answer

16  following.

17  A.   Okay.

18  Q.   So, the night before her death, were you

19  home that night?

20  A.   I went across the street when her mother

21  came home to see a friend of mine.  His name is

22  Willie Robinson.  I'd always go over there when

23  she comes home, that gave me a time to relax a

1   **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2 little bit myself.  So, I just watched the NBA

3 games with him.  He looked at me kind of like a

4 son because I was around his son's age.  So, we

5 would just talk and watch the basketball games.

6     Q.  Around what time did you head over there

7 the day before?

8     A.  I would probably say 7:00, around there.

9     Q.  And did you have any alcoholic beverages

10 or any drugs while you were over there watching

11 the game?

12     A.  No.

13     Q.  Okay.  How long were you over there?

14     A.  Roughly an hour and a half, maybe

15 two hours.

16     Q.  Do you remember about what time you came

17 home?

18     A.  I guess around 9-9:30.

19     Q.  Was V.D. awake when you got home?

20     A.  No.  Not to my knowledge.  She was in her

21 room sleeping.

22     Q.  How was she acting before you left to go

23 over to Mr. Robinson's?

1    [MICHAEL DAVIS-GUIDER - By Ms. Peck]

2        A.    She was excited, had energy.  I played

3    with her and watched her cartoons and stuff like

4    that and read books to her so she was happy.

5        Q.    And she seemed to be feeling well?

6        A.    Yeah.

7        Q.    What did you do when you got home that

8    night?

9        A.    When I got home that night I was -- I

10   probably did a little workout and then I went,

11   took a shower.  I was happy because that weekend

12   I was taking her to the city, and I was going to

13   the city to also see my daughter so I was excited

14   about that.  Because I barely get a chance to go

15   to the city.  So, that was pretty much on my

16   mind.

17       Q.    Do you remember what day of the week this

18   was, the day before at least?

19       A.    I believe it was either a Thursday or

20   Friday.  I'm not sure.

21       Q.    How often would you see your own daughter?

22       A.    Whenever I get a chance to go to the city

23   I would see her so.

1    [MICHAEL DAVIS-GUIDER - By Ms. Peck]

2    Q.   About how often would that be, that you'd

3    get a chance to go to the city?

4    A.   Maybe twice a month, but I was constantly

5    talking to her over the phone.

6    Q.   The apartment that you lived in with

7    Rebecca and V how many bedrooms was it?

8    A.   There was one bedroom, a big living room

9    area and there was a kitchen and a bathroom.

10   Q.   Okay.  And where did V.D. sleep?

11   A.   She slept in the bedroom.

12   Q.   Where did you sleep, you and Rebecca

13   sleep?

14   A.   We slept in the living room.

15   Q.   So, when you got home that night V was

16   asleep in the bedroom?

17   A.   Yes.  To my knowledge.

18   Q.   Did you have any alcoholic beverages when

19   you got home that night?

20   A.   No.

21   Q.   Any sort of drugs or medication?

22   A.   No.

23   Q.   Was Rebecca awake when you got home that

1    **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2    night?

3         A.   Yes.

4         Q.   And tell me, what did you and Rebecca do.

5         A.   We never really talked much that night.

6    She was relatively upset because prior to that

7    night Clarence, who is the father of V, he was

8    about six hours without her family being able to

9    watch him so she was pretty much still upset

10   about that.  So, we didn't really talk much that

11   night.  She didn't want him to be able to watch

12   her because he was very violent to his daughter.

13   And she didn't want somebody -- she wanted

14   somebody from her family to be there, to be able

15   to watch her to make sure he's not doing

16   anything.

17        Q.   What time would you say you went to bed

18   that night?

19        A.   I would say 10:30, maybe 11.

20        Q.   And was Rebecca working the next morning?

21        A.   Yes, but at the time she told me she was

22   off.  So, I'm guessing while I was sleeping she

23   probably got a text or a phone call to come in

1    **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2    me almost half to death.  Like 3 in the morning

3    she woke me up and she was like daddy, potty, and

4    I started to tear up a little bit because I was

5    potty training her and I was very happy that she

6    came to me.  Like she wasn't scared of the dark

7    or anything.  She came to me, I would take her to

8    the potty and clean her up and send her back to

9    bed, you know.

10        Q.    Would you normally get up with her in the

11    evening or would Rebecca?

12        A.    I would normally.

13        Q.    Okay.  And why was that?

14        A.    Because Rebecca was either working or she

15    came home and she was tired from work, which I

16    could understand, she dealt with a lot of crazy

17    people at her job so it would be very stressful.

18    So, for the most part I would be the one taking

19    care of her.

20        Q.    The night before V's death did she wake

21    up in the middle of the night at all?

22        A.    No.  She didn't.

23        Q.    What time did you wake up the next

1  **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2  morning?

3     A.   I'm not sure, but Rebecca was already

4  dressed so I figured it was in the morning.  So,

5  I figured it was 7-something probably in the

6  morning because she was going to work.

7     Q.   So you woke up before Rebecca went to

8  work the next morning?

9     A.   Right before she was about to leave out

10  the door.  She was already dressed, which is

11  unusual.  Because I usually get her stuff

12  together for her.  But I guess she was rushing

13  and I ended up waking up.

14     Q.   Was V up at this time?

15     A.   I believe so.  Because I woke up.  I

16  smelled poop, I guess, and I called her into the

17  room.  And I guess she had an accident, pooped on

18  herself.  She came in there.  But she wasn't

19  like -- she always had energy in the morning no

20  matter what time it is when she wakes up, but she

21  didn't really have a lot of energy that morning.

22  She seemed like she was very down, kind of

23  sluggish.  But I just assumed it's early in the

1   **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2   morning, she's probably a little tired, so I

3   just -- Rebecca, she gave her hug and kiss when

4   she goes to work. I just took her in the

5   bathroom, in the bathroom changed her Pamper. I

6   asked her if she wanted something to eat and

7   drink, she said, she shook her head no. So, I

8   figured it was still early. I took her back in

9   her room, put her back to bed, and I put on a

10   movie to watch and must have dosed off to the

11   movie while I was watching it.

12      Q. When you put her back to bed -- you said

13   she had an accident. Did you have to change the

14   sheets or did she -- was the bed okay?

15      A. Yeah. The bed was okay. It was just in

16   the Pamper.

17      Q. Okay. Did she talk to you at all when

18   you were taking her to the bathroom during this

19   time?

20      A. I usually sit her on the toilet and give

21   her her privacy and I sit outside. I told her to

22   call me when she's finished and that's pretty

23   much what she did. She called me when she was

1  [MICHAEL DAVIS-GUIDER - By Ms. Peck]

2              MS. PECK:  Okay.  That sounds good.

3              (Recess taken at 10:55 a.m.;

4         proceedings resumed at 11:20 a.m.)

5      Q.   So, Mr. Guider, before the break we were

6  talking about the morning of February 26th, 2015.

7  I believe that you had testified that you had

8  woken up that morning, that V -- you had helped V

9  go to the bathroom, put her back to bed and then

10  you had put on a movie and fell asleep when the

11  movie was on.  Is that accurate?

12     A.   Yes.

13     Q.   Do you know about what time you woke up

14  from falling asleep?

15     A.   I don't know what time I woke up.

16     Q.   Okay.  Do you recall giving a statement

17  to the police that you had woken up around 11

18  a.m.?

19     A.   No.  I told them I had no idea of the

20  time.  They tried to give a time.  I told them I

21  didn't know what time it was.

22     Q.   Okay.  So when you woke up what did you

23  do?

1    [MICHAEL DAVIS-GUIDER - By Ms. Peck]

2        A.    When I woke up I called for her.  She

3    didn't come to her name like she usually would.

4    I went to the door.  I called for her again.  She

5    didn't respond.  When I looked she was just

6    laying in the bed.

7        Q.    Did she look like she was sleeping?

8        A.    Yes.

9        Q.    Could you see her breathing?

10       A.    Not to my knowledge, no.

11       Q.    Did you notice whether she was breathing

12   or you didn't notice one way or the other?

13       A.    No.  She wasn't moving at all.  I called

14   for her.

15       Q.    What did you do when you saw she wasn't

16   moving or responding to you calling her?

17       A.    I went to her and I tried to give her a

18   little nudge just to say, you know, it's time for

19   breakfast and she wouldn't move.

20       Q.    When you say you were trying to give her

21   a little nudge, describe for me what you mean by

22   that?

23       A.    Like, like shaking her shoulder from the

1   **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2   top part of her bed, trying to wake up.  I see

3   she didn't move.  I don't know so.

4   Q.   So, what did you do next?

5   A.   I tried to give her CPR.  She wasn't

6   moving or responding to me at all.

7   Q.   Did you ever take any courses or training

8   on how to conduct CPR?

9   A.   I had a class my freshman year.  It

10  wasn't on CPR though, but they show a video of

11  CPR.

12  Q.   So, how did you -- describe for me how

13  you gave CPR when she was in the bed?

14  A.   I blew into her mouth and I pushed down a

15  little bit on her chest area and I blew into her

16  mouth again and it seemed like her stomach would

17  like stay full.  So, I tried to push it down a

18  little bit.  I put no pressure on her at all

19  because I was very nervous and scared.  And I

20  tried that twice.  Nothing happened.  So, I took

21  her into the living room and I tried to like use

22  these phones that were on the table.  The phones

23  wasn't working.  They were extremely dead.  I

1   [MICHAEL DAVIS-GUIDER - By Ms. Peck]

2   tried to plug them up.  It would take forever to

3   like come on.  So, I rushed out the house to my

4   friend's house, Willie, knocking on his door to

5   ask for help.  Nobody answered.  So, I went back

6   over and checked on her.  There was no -- nothing

7   new happened.  So, I was thinking, you know, the

8   pizza place across the street.  So, I ran over

9   there and actually used their phone.  I called

10  for an ambulance from their phone.

11      Q.   When you first attempted to administer

12  CPR when she was in her bed, tell me exactly how

13  you did it.  Did you try to -- did you open her

14  mouth to be able to blow into it?

15      A.   Yes.

16      Q.   Okay.  And you said you did chest

17  compressions; is that right?

18      A.   Yes.  Very lightly on her chest.

19      Q.   Okay.  Did you use two hands or one hand?

20      A.   I used one hand.

21      Q.   One hand when you did the chest

22  compressions?

23      A.   Yeah, because my hands were very big.

1   **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2     Q.  About how tall are you?  How tall were

3 you then and how much did you weigh?

4     A.  6'10".  Probably 240-250.

5     Q.  So, when you went to do the chest

6 compressions with the one hand, can you recall

7 did your hand like cover her entire chest area,

8 were you just pressing on one side, to the best

9 of your memory?

10     A.  I was pressing on the top of her chest

11 area like this, I wasn't covering the whole

12 chest.

13     Q.  Okay.  And you said that her stomach

14 seemed to inflate and not deflate during this

15 time?

16     A.  Yes.

17     Q.  Okay.  And then when it was inflated did

18 you -- you said you pressed on the stomach, too?

19     A.  A little bit.

20     Q.  Okay.  And did the stomach go down while

21 you were pressing on it?

22     A.  Yes.

23     Q.  Okay.  Did you notice air coming out of

1    **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2   her mouth when you were pressing on her stomach?

3      A.   No.  I didn't.

4      Q.   While you were pressing on her stomach

5   where was your other hand?

6      A.   I had put my hand under her because they

7   said, you know, to have like a level area,

8   something like stabled under her.  So, that's

9   what I did.

10      Q.   So you had one hand underneath her.

11   Where was it, in the middle of her back, on the

12   top of her back, bottom?

13      A.   It was on like the middle area, I guess.

14      Q.   Okay.  So, you had a hand underneath in

15   the middle of her back and then another one

16   pressing down to try to get the air out of her

17   stomach or what you thought was air in her

18   stomach?

19      A.   Yes.

20      Q.   And when that didn't work where did you

21   bring her?  You said you brought her somewhere.

22   Where did you bring her to after that?

23      A.   To the living room.

1    **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2        Q.    How did you pick her up?

3        A.    By her body like this with two hands.

4        Q.    Okay.  So you had your arms underneath

5    her and her body was on top?

6        A.    Yes.

7        Q.    Okay.  And where did you bring her in the

8    living room?

9        A.    To the futon.

10       Q.    And is the futon soft, is it hard?  Is it

11   pretty firm?

12       A.    It's soft.

13       Q.    And did you try to do CPR again on the

14   futon?

15       A.    I tried one time.

16       Q.    And how did you do that on the futon?

17       A.    Just keep blowing into her mouth and just

18   pushing on her chest a little bit.

19       Q.    With one hand or two hands?

20       A.    With one hand.

21       Q.    And then you stated that you went to, you

22   went to go try to get help or was it that you

23   tried to go to the phone next?

1  **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2      A.   I tried to get the phone next.

3      Q.   Okay.  And the phone was dead?

4      A.   Yes.

5      Q.   Did you have a landline at the time?

6      A.   No.

7      Q.   And then you went over to Mr. Robinson's

8  to try to get help.  Is that accurate?

9      A.   Yes.

10     Q.   And Mr. Robinson's, is it next door to

11 you or across the street?

12     A.   It's across the street.

13     Q.   About how long would it take you to get

14 there?

15     A.   A few seconds I'm guessing.

16     Q.   And how long did you try to get someone

17 to come to the door there?

18     A.   I'm not sure.

19     Q.   Do you have any idea about how long

20 between the time you left the house and how long

21 it took you to get back?

22     A.   No.

23     Q.   When you came back to the house did you

1   **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2   try to do CPR again?

3       A.   No.

4       Q.   Was that when you decided to go to the

5   pizza place?

6       A.   Yes.

7       Q.   And where was the pizza place in relation

8   to your house?

9       A.   It was like a diagonal across the street.

10      Q.   And did you use their phone to call --

11  you were looking for a phone in the pizza place?

12      A.   Yes.

13      Q.   Did you use their phone or did you have

14  to use someone's, you know, a customer's or

15  private person's phone?

16      A.   I used somebody's phone that was sitting

17  in the seat.

18      Q.   And who did you call?

19      A.   I dialed 911.

20      Q.   And tell me about that call.  What did

21  you say?

22      A.   I told them that my daughter was not

23  breathing from when I woke up in the morning and

1    **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2    the police arrived?

3        A.   Yes.

4        Q.   Was Rebecca also inside the house?

5        A.   Yes.

6        Q.   And were the paramedics working on V on

7    the futon?

8        A.   Yes.

9        Q.   What did the police say when they came in

10   the house?

11       A.   Initially they came in to see what was

12   going on.  And by the time they really said

13   anything to me, to like move out the house is

14   when I seen how they was doing CPR on V.  I had

15   said something about it and that's when they

16   asked me to move out of the house to the front.

17       Q.   What did you observe about how they were

18   performing CPR?

19       A.   They were pushing down on her chest

20   extremely hard almost like banging her body into

21   the futon and I had said to them, "Why are you

22   pushing down on her so hard?"  I guess that's

23   what you are supposed to do.  And when I said

```
1   [MICHAEL DAVIS-GUIDER - By Ms. Peck]

2   that is when I believe her name was Officer

3   Coonradt and her partner asked us to leave out

4   the house.  I stood on the front of the stairs

5   just watching what they were doing.

6       Q.   Were you able to see into the apartment

7   from the front stairs?

8       A.   Yes.

9       Q.   And are these stairs exterior stairs of

10  the house or they are inside the building?

11      A.   They are outside.  Just like two, three

12  steps, something like that.

13      Q.   Did you have any conversations with

14  Rebecca at this time?

15      A.   No.  I just couldn't believe that was

16  happening.

17      Q.   Did anyone -- did the police come out to

18  try to talk to you?

19      A.   No.  They just started searching the

20  house.

21              MR. KLEIN:  So, Mike, she just

22          asked if they came out to talk.  So, just

23          listen to the, yes or no just to her
```

1  **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2  question.  And then if she asks you

3  another question about what they were

4  doing then you can answer that.  All

5  right?  Just stick to what she's asking.

6  Q.  When you say they were searching the

7  house, what did you observe the police doing?

8  A.  I figured they were looking for something

9  that could have made her unresponsive I'm

10  guessing.  But they just put on these purple

11  gloves and started searching the whole house.

12  Q.  And when you say searching the whole

13  house what exactly did you observe them doing?

14  Were they picking things up, opening doors, like

15  what actually did you observe?

16  A.  Yes.  It was looking in the cabinets,

17  looked in the freezer, refrigerator.  They looked

18  in the bathroom.  Then they went in her room, V's

19  room.  Started going in there, but I couldn't see

20  what they were doing in there at the time.  I was

21  outside.

22  Q.  So you were still standing outside.  How

23  much of the apartment could you see from outside?

Case 1:17-cv-01290-DJS Document 123-14 Filed 04/01/22 Page 29 of 53

1  **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2  　　　　Wait.  You are muted.  Hold on.  Start

3  over again.

4  　　A.  Could you repeat what you asked?

5  　　Q.  Sure.  When you were standing outside how

6  much of the apartment could you see from outside?

7  　　A.  I could see everything but V's room.

8  　　Q.  Okay.  So, when you say everything, do

9  you mean the kitchen, dining room, living room

10  areas?

11  　　A.  Yes.

12  　　Q.  Okay.  At some point did the police come

13  out to talk to you?

14  　　A.  They only came out when they were

15  bringing V out.

16  　　Q.  How many officers responded?

17  　　A.  Two that I seen.

18  　　Q.  Other than the officers and the

19  paramedics did anyone else respond?

20  　　A.  The two detectives, Ron Fountain and his

21  partner, McDonald.

22  　　Q.  Are the two detectives in addition to the

23  police officers you mentioned before or are they

Case 1:17-cv-01290-DJS Document 127-1 Filed 04/01/22 Page 30 of 52

1   [MICHAEL DAVIS-GUIDER - By Ms. Peck]

2       A.   When they put V in the ambulance they

3   drove away with her.  And I got up and I said

4   well, what's going on to one of the people and

5   the police officer, Coonradt, kind of like told

6   me to sit down and be quiet and during that time

7   the detectives walked up to me and they asked me

8   to come downtown with them.

9       Q.   Did Rebecca go with V in the ambulance?

10      A.   No.  They just drove off without either

11  one of us in the ambulance.

12      Q.   Were there any conversations about either

13  you or Rebecca going in the ambulance with V?

14      A.   No.  When I -- when they put her in the

15  ambulance I said, "Shouldn't somebody be in there

16  with her," and that's when they drove off, when I

17  had said that.

18      Q.   Other than the detectives asking you to

19  come down to the station did they have any other

20  conversations with you actually at the apartment?

21      A.   No.

22           MS. PECK:  I want to mark an

23           exhibit if you could give me one minute

1   [MICHAEL DAVIS-GUIDER - By Ms. Peck]

2           you are ready.  Don't feel pressure to do

3           it fast or slow.  Just take whatever time

4           you need.

5               MS. PECK:  That's fine.

6       Q.  And when you need me to scroll down just

7   tell me.

8       A.  Okay.

9       Q.  Do you need me to scroll down now?

10      A.  A little bit.  Yes.  Okay.

11      Q.  There's two more pages.  There's only a

12  little bit on this page.

13      A.  Okay.

14      Q.  And this is the last page.

15      A.  Okay.

16      Q.  Okay.  So, what I want to ask you is that

17  this is a report by Officer Coonradt and I

18  believe you mentioned her earlier as one of the

19  officers that had responded to the scene.  Is

20  that accurate?

21      A.  Yes.

22      Q.  Okay.  And in this report it mentions

23  that you had told Officer Coonradt that you had

1  **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2  woken -- that you went to wake up her, her being

3  V.D., at 11 a.m. and she wouldn't wake up and

4  when Officer Coonradt told you it was 1:30 you

5  responded with "time must be flying."  You

6  mentioned -- you testified earlier that you never

7  actually told the officers a time when you tried

8  to wake up V.D.

9        Is the statement that was represented in

10  this report, are you saying that it's not

11  accurate?

12        MR. KLEIN:  Objection to form.

13  A.   No.

14  Q.   I'm sorry.  Say that one more time.

15        MR. KLEIN:  You can answer, Mike.

16  A.   No.  It's not accurate.  I told her that

17  I did not know the time because the only working

18  phone was the one that Rebecca took to work with

19  her.  She tried to give a time.

20  Q.   Okay.  So, the conversation that is in

21  this report between you and Officer Coonradt, did

22  that conversation occur even if -- did you have a

23  conversation with Officer Coonradt about what

1    **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2    time you went to go wake up V?

3        A.    Yes.  I believe she asked me and I told

4    her I did not know.

5        Q.    Okay.  Did you go down to the police

6    station that day with the officers?

7        A.    Yes.

8        Q.    And did you go down in their patrol car

9    or did you go separately?  Did you arrive in

10   separate vehicles?

11       A.    I went down with them in their car.

12       Q.    And at this point did any of the officers

13   tell you that you were under arrest?

14       A.    No.

15       Q.    Do you know about what time you arrived

16   at the police station?

17       A.    No.  I do not.

18       Q.    What happened when you got to the police

19   station?

20       A.    They sat me in a room and questioned me

21   on video.

22       Q.    Who questioned you, if you know?

23       A.    There was a different officer.  I do not

1  **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2      A.    Yes.

3      Q.    Okay.  Do you know what time it was when

4  you left the police station?

5      A.    I do not.

6      Q.    What did you and Rebecca do when you went

7  home?

8      A.    Nothing we really could do, just, just a

9  horrible, horrible day.

10     Q.    Did Rebecca go to the hospital at all do

11  you know?

12     A.    She told me that they took her to the

13  hospital.

14     Q.    Do you know what hospital they took her

15  to?

16     A.    I do not.

17     Q.    When was the next time you were contacted

18  by the police after V's death?

19     A.    Had to be the very next day, I believe.

20     Q.    Who contacted you?

21     A.    I do not remember.  But I know two

22  officers came over to the house.  Two detectives,

23  I believe.

1  **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2      Q.   Do you know what time of day that was?

3      A.   In the afternoon I'm guessing.

4      Q.   Did they call you first or did they just

5  show up?

6      A.   I believe they called and said they was

7  coming over.

8      Q.   What did the detectives say to you when

9  they arrived at your house?

10     A.   Just asking questions about what

11 happened.

12     Q.   What type of questions?  Do you remember

13 any of the specific questions that were asked?

14     A.   What I was doing that morning, what

15 happened after I woke up, stuff like that.

16     Q.   Were these police officers different

17 officers from the ones that arrived at the scene

18 the day before?

19     A.   Yes.

20     Q.   Did you answer their questions?

21     A.   Yes.

22     Q.   Did they do anything other than ask you

23 questions, meaning did they search your house,

1     **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2     did they ask you to provide them anything?

3          A.   No.

4          Q.   How long were they at your house asking

5     questions?

6          A.   Maybe an hour.

7          Q.   Was Rebecca home?

8          A.   Yes.

9          Q.   Did they ask her any questions?

10         A.   Yes.  They did, but she couldn't really

11    answer anything.

12         Q.   Did they talk to the two of you together,

13    were you in the same room while you were talking

14    to the police?

15         A.   Yes.

16         Q.   Did the police provide you any

17    information at that time as to what they believed

18    caused V's death?

19         A.   No.

20         Q.   Have you spoken to any, you or Rebecca

21    spoken to any doctors about what may have caused

22    V's death?

23         A.   No.

1    **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2        Q.    After the police left when was the next

3    time you had contact with the police regarding

4    V's death?

5        A.    I can't remember if it was that time but

6    it was maybe a few months, I guess.

7        Q.    Let me ask.  The interview we saw

8    recorded was dated March 2nd.  That would have

9    been a couple days after V's death.  Do you

10   recall going back down to the police station and

11   speaking with police again a couple days later?

12       A.    After that interview I don't think I had

13   another interview for a while.

14       Q.    So, a couple months went by and you

15   hadn't heard anything from the police?

16       A.    No.  They would see me outside and just

17   ask me questions.

18       Q.    They would see you outside and ask you

19   questions.  How?  Were they coming to your house

20   to ask you questions or were they just in the

21   neighborhood?  How did that --

22       A.    I can't -- I could say they were just in

23   the neighborhood.  When we went on walks a few

1    **[MICHAEL DAVIS-GUIDER - By Ms. Peck]**

2    times and they would drive up to us while we was

3    walking.

4        Q.    And they would ask you questions about V?

5        A.    Yes.

6        Q.    What types of questions would they ask

7    you while you were out walking?

8        A.    Pretty much the same thing they was

9    asking before regarding how this could have

10   happened, what was -- happened.

11       Q.    Do you know any of the officers that

12   approached you while you were out walking?  Do

13   you know any of their names?

14       A.    I don't.  The second people, it was the

15   detectives that came to the apartment.

16               MR. KLEIN:  If I could just chime

17               in, Mike.  I'm having trouble ending what

18               you say.  It kind of trails off a little

19               bit.  You are very soft spoken.  I don't

20               know if Susan hears it, but if you could

21               try to project because --

22               THE WITNESS:  Okay.

23               MR. KLEIN:  -- we want to make sure

1  **[MICHAEL DAVIS-GUIDER - By Ms. Spencer]**

2  interview?

3     A.   No.  I didn't.  I just figured one would

4  have came because I talked to him on the phone

5  about me having one and he said okay.  So, I just

6  assumed one would have came.  Me personally, I

7  feel like I didn't need one because I did nothing

8  wrong but.

9     Q.   When do you recall the next time you

10  spoke with Officer Fountain was after the March

11  2nd interview either in person or on the phone?

12     A.   He was one of the people who stopped me

13  when me and Rebecca was walking on one of the

14  walks.  We took many walks after that and he

15  would stop me in the car, ask me some questions.

16  That's about it.  I'm not sure exactly the time

17  or what date it was.

18     Q.   How many times would you estimate that

19  Detective Fountain stopped you while you were on

20  your walks?

21     A.   Probably twice.

22     Q.   Twice.  And was he with anybody else?

23     A.   His partner, McDowell, McDonald.

1  **[MICHAEL DAVIS-GUIDER - By Ms. Spencer]**

2  Q.  Both times that you estimate?

3  A.  Yes.

4  Q.  When you -- okay.  Was he driving a Troy

5  police marked vehicle or was it an unmarked

6  vehicle?

7  A.  It was an unmarked vehicle.

8  Q.  And how long would you estimate that he

9  and Detective McDonald spoke with you for?

10  A.  I'll say 15 minutes.

11  Q.  And was it one of the detectives who did

12  most of the talking or did they both speak with

13  you?

14  A.  Detective Fountain did most of the

15  talking.

16  Q.  And was the conversations only regarding

17  what happened to V or did they ask you any other

18  questions?

19  A.  Regarding what happened.

20  Q.  Did they ever ask you about the days

21  prior to V's passing?

22  A.  Yes.

23  Q.  And were those questions when they would

1  **[MICHAEL DAVIS-GUIDER - By Ms. Spencer]**

2  stop you while walking or while you were

3  interviewed?

4      A.   They stopped us while walking.

5      Q.   And were there any other instances where

6  other police officers or detectives stopped you

7  while you were walking?

8      A.   No.

9      Q.   And after the incidences where you were

10  stopped while you were walking, when would you

11  say the next time you spoke to Officer Fountain

12  would be?

13      A.   It would be I guess for the second or

14  third meeting that we had he would meet me

15  downstairs at the precinct.  He would ask me to

16  go to the precinct.  I would meet him downstairs.

17  He would talk to me while walking up to the

18  interview room.

19      Q.   How long would you estimate you met with

20  him during that third interview or second?

21      A.   Probably an hour each time.  I'm not

22  sure.

23      Q.   And how would you describe his tone while

1    **[MICHAEL DAVIS-GUIDER - By Ms. Spencer]**

2    my trial that these were things that were not

3    supposed to take place.  With Officer Fountain

4    and the district attorney talking to the guy,

5    Dr. Sikirica, because he had no actual findings

6    of what happened until they sent him a video or

7    go to see him on different occasions to talk to

8    him.  This was all told at my trial that that was

9    not supposed to be taking place.

10       Q.   And what is your contention that --

11   strike that.

12          What is the factual basis for your

13   contention that Officer Coonradt conspired with

14   Defendants Sikirica and D.A. Abelove?

15                MR. KLEIN:  Same objection to form.

16                To the extent it calls for legal

17                conclusions, questions for the court to

18                decide, without waiving or limiting

19                objections, Mike, please answer if you

20                can.

21       A.   I'm guessing how, like I said, I started

22   only realizing all of this at trial but I don't

23   know how to explain that one.  I don't know.  The

1 | **[MICHAEL DAVIS-GUIDER - By Ms. Spencer]**

2 only thing I can say is her statement and what

3 she put down that I didn't say, giving a time or

4 trying to say I told her an exact time, which I

5 never did, about what took place.  That's the

6 only thing I can say.

7 Q.   And do you have any knowledge of Officer

8 Coonradt meeting with Dr. Sikirica at any point?

9 A.   No.  I do not.

10 Q.   And what is the factual basis for your

11 contention that Detective McDonald conspired with

12 Defendants Sikirica and D.A. Abelove?

13 MR. KLEIN:  Same objection to form.

14 I won't repeat it at length, but the same

15 objection as previously stated, without

16 waiving or limiting, Mike, you can

17 answer.

18 A.   That only at trial that they all was

19 going to see Sikirica, Dr. Sikirica, before the

20 trial proceedings to I guess come up with a

21 narrative and that was something that they wasn't

22 supposed to be doing.  This was all told to me at

23 trial.

1  **[MICHAEL DAVIS-GUIDER - By Ms. Spencer]**

2  discretion, and disposition to be employed as

3  police officers.

4       What's your factual contention that

5  Police Officer Coonradt lacked the objectivity to

6  be employed as a police officer?

7            MR. KLEIN:  Objection.  Same

8            objection to form.  Calls for legal --

9            questions of law for the court.  Mike,

10           you can answer if you know.

11  A.    The only thing that I can say is that

12  besides how they searched the apartment, when the

13  ambulance pulled up without allowing anybody to

14  get inside the ambulance truck, I had got up and

15  I said, you know, what is going on, and also

16  Coonradt, she didn't pull her gun out of her

17  holster but she put her hand on her gun and said

18  you need to sit down and be quiet.  And I said, I

19  put my hands up and I said what the hell is going

20  on.  Excuse my language.  And that's when

21  Detective Fountain and his partner walked up to

22  me as the ambulance is pulling off.  And he said

23  that he was going to take us to the hospital, but

1  **[MICHAEL DAVIS-GUIDER - By Ms. Spencer]**

2  he never took me to the hospital.  He took me

3  straight to the precinct.  So, how she reacted

4  from when she saw me was what I would say.  She

5  didn't treat me like I was a human at all and she

6  was very disrespectful to me.

7      Q.   Did you ever complain to anybody or

8  inform anyone about Officer Coonradt's reaction

9  that you just explained?

10     A.   I explained it to Detective Fountain when

11 he put me in the car on the way down to the

12 precinct and he kind of like nudged it off, like

13 whatever, you know, you're a big black guy, he

14 said to me.  You know, he said that's not -- he

15 kind of looked at me.  What did you just say to

16 me?  Then his partner, who was sitting in the

17 back seat, he was like, well, he's trying to say

18 you are a big guy, you know, you are dark and she

19 was probably just a little startled by you.  I

20 kind of felt like that was a little racist, but I

21 was just like wow, you know, all this craziness

22 that's going on and I just continued to ride down

23 to the precinct with them.

1    **[MICHAEL DAVIS-GUIDER - By Ms. Spencer]**

2    Q.   And at what point did you realize you

3    were going down to the precinct and not to the

4    hospital?

5    A.   As soon as we got in the car I asked was

6    he taking me to the hospital and he was like

7    yeah, but I just have to ask you a few questions

8    at the precinct first.  So, pretty much when I

9    got in the car, he pretty much told me he was

10   taking me down to the precinct.

11   Q.   And did you object to that?

12   A.   No.   I cooperated with them in any way I

13   possibly can to try and find out what was going

14   on or what could have happened.

15   Q.   And what is your factual basis for the

16   assertion that Officer Mason lacks the

17   objectivity to be employed as a police officer?

18              MR. KLEIN:  Same objection.  Mike,

19        you can answer if you know.

20   A.   I don't know.  But I know if I had

21   probably met with him it would have been

22   something because everybody, everyone else I had

23   contact with was kind of like, looked at me kind

1   [MICHAEL DAVIS-GUIDER - By Ms. Spencer]

2   of like I was a criminal and me being big and

3   having dreads I guess didn't help how they saw me

4   at the time.

5       Q.   And what is the basis for your assertion

6   that the City of Troy was aware that the

7   individual officers lacked objectivity to be

8   employed as a police officer?

9               MR. KLEIN:  Same objection.  Mike,

10          you can answer if you know.

11      A.   I have no basis on that.

12      Q.   And what makes you assert that Officer

13  Fountain was not properly trained?

14              MR. KLEIN:  Objection.  Same

15          objection.  You can answer, Mike.

16      A.   He said he was, you know, 15-20 years on

17  the force, but the way he handled himself with

18  me, it just seemed like he was trying to get an

19  arrest and he didn't care if it was the truth or

20  not and that's what it seemed like so.

21      Q.   What about with regards to Officer

22  Coonradt, what forms your basis for asserting

23  that she was not properly trained?

1    **[MICHAEL DAVIS-GUIDER - By Ms. Spencer]**

2           MR. KLEIN:  Same objection.

3    A.    During the chaos when she saw me and she

4    asked me to move out of the apartment when they

5    put on these purple gloves, they just started

6    searching the apartment.  It wasn't a search like

7    they were looking what could have caused V to be

8    unresponsive.  It was a search like they were

9    looking for drugs or guns or something.  That's

10   the kind of search that they were doing.  It was

11   like it was quick to see.  They were looking in

12   areas that she couldn't have possibly got to

13   like.  And then her whole attitude with me was

14   just outrageous.  Like when she reached for her

15   gun I thought she was going to shoot me.  You

16   know, I was in fear of my life.  I didn't even

17   understand what was going on, you know, living in

18   a nightmare, like it was outrageous.

19   Q.    Do you know if Officer Coonradt tried to

20   figure out if you were able to ride with V in the

21   ambulance before --

22   A.    No.

23   Q.    No, you don't know, or no, she did not?

1  **[MICHAEL DAVIS-GUIDER - By Ms. Spencer]**

2      A.   No.  She did not.

3      Q.   And what makes you come to the conclusion

4  that she was searching the apartment to find guns

5  or any other things you mentioned as opposed to

6  trying to locate anything that could have harmed

7  V?

8               MR. KLEIN:  Let me note an

9               objection to form.  I believe he

10              answered.  So, asked and answered.  Mike,

11              you can answer.

12     A.   It was -- it was how she searched.  If

13  you watched a crime show you would see how people

14  do searches completely different.  You can tell

15  how she was searching the apartment with her

16  partner.  It was like a serious thorough search

17  that she was reaching -- she was searching in

18  areas that V couldn't have got to at no point in

19  time.  She was a very small child.  She would

20  look on top of the refrigerator.  She looked in

21  the freezer.  She looked in all the cabinets and

22  it was very thorough.  You could tell by the way

23  they were doing their search.  It wasn't

1  **[MICHAEL DAVIS-GUIDER - By Ms. Spencer]**

2  searching for something that would have led to V

3  being unresponsive.  It was something else.

4  Plus in the --

5      Q.   Go ahead.

6      A.   I was going to say plus in the area that

7  I was staying in, maybe they felt like I didn't

8  deserve to be in that area, a very nice area, you

9  know.  So, I'm not sure.

10     Q.   What makes you think that that was part

11 of the police officers belief?

12              MR. KLEIN:  Objection.  He just

13              said he's not sure.  So, asked and

14              answered.  But, Mike, you can answer

15              again.

16     A.   I only say that because one time a police

17 officer asked me like, you know, what am I doing

18 in that area.  He didn't know whether I lived in

19 the house on the corner and he was just like, oh,

20 what are you doing in this area.  And I was just

21 like I live in this area.  So, it was, it seemed

22 like they didn't want me there, I guess.

23     Q.   And did that interaction happen before

1    **[MICHAEL DAVIS-GUIDER - By Ms. Spencer]**

2    V's death or after?

3        A.    Before.

4        Q.    Did Officer Coonradt take anything from

5    the apartment during that additional search that

6    we were just discussing?

7        A.    I do not know.  They took me in a car and

8    drove me to the precinct so I don't know what

9    they did.

10       Q.    Well, when you were observing her in the

11   apartment and you said that she was searching in

12   areas that V couldn't have reached, at that point

13   did you see that she had taken anything or bagged

14   anything or taken any pictures of anything?

15       A.    No.

16       Q.    What is the factual basis for your

17   assertion that the police officers acted with

18   malice?

19                  MR. KLEIN:  Same objection as

20              before to form.  Calls for legal

21              conclusions.  Mike, you can answer.

22       Q.    I'll finish the question.

23       A.    Can you elaborate on malice?

1  **[MICHAEL DAVIS-GUIDER - By Ms. Spencer]**

2  her.  I never gave a timeline at any point in

3  time.  I said the only thing when I was there was

4  tooken.  There were no clocks on the walls or

5  anything.  So, for her to write down something

6  that I said of a timeline that I did not was very

7  concerning.

8     Q.   And what about officer, or Detective

9  McDonald, what do you mean his involvement was?

10                 MR. KLEIN:  Same objection.  Mike,

11          you can answer.

12     A.   I believe just going along with his

13  partner.  But to be honest I feel like he knew I

14  didn't do something but his partner, Detective

15  Fountain, was very aggressive with it, asking the

16  questions, anything like that.

17     Q.   And how was Officer Fountain aggressive

18  with it as you stated?

19     A.   Just trying to continuously get me to say

20  something that I could not say.  Try to say maybe

21  this was the timeline or maybe this happened and

22  stuff that I couldn't answer.  He was forceful in

23  a way.

1  [MICHAEL DAVIS-GUIDER - By Ms. Spencer]

2  Q.   So, previously you had mentioned that

3  Detective Fountain was soft spoken with you and

4  calm, I believe was one of the words?

5  A.   Yes.  In the interviews at the precinct.

6  When he was outside he was a completely different

7  person.

8  Q.   Outside of the precinct?

9  A.   Yes.

10  Q.   And outside of the precinct meeting with

11  you he was different?

12  A.   Yes.  He was very forceful with his

13  questions.  Like I said, he would be upset that I

14  wouldn't say what he wanted me to say and he made

15  it seem like, you know, his boss is about to fire

16  him if he didn't bring this case to an ending,

17  like very frustrated whenever I talked to him on

18  the streets.

19  Q.   And was that those two times that you had

20  discussed previously?

21  A.   Yes, ma'am.

22  Q.   And there were no other times?

23  A.   No.

Case 1:17-cv-01290-DJS Document 122-3 Filed 04/01/22 Page 1 of 2

Case 23-589, Document 98, 01/18/2024 3604736d, Page56 of 148

C℗ 20320. Guider 2.26.15 2³⁰ Pm Chucks Office

Michael L. Davis 5-29-86.

22  Rebecca Parker 6-2-92
856- 24th Av. OR.

— V███ D███ (Toddler) = 2. ███

Rebecca leaves 8³⁰ to work.
V███ awake Mike awake.
- Spoke to V███ about 15 min.
not hungry was told to go back
to bed. After discussion about potty
training. Viola. poops goes to bed.
- V███ goes in room on her own.
back to bed.
- Mike goes into Bed in living room
puts in National treasure movie
- Mike Falls asleep wakes up credits
running. awakes then calls for her no ans
- After while goes to ck on V███
who doesn't answer picks her up and
child feels limp. un aware of time
- Mike Attempts to necessitate child
by pushing on her chest and breathing
in her mouth. Still unresponsive.
- Mike tries. to plug in dead phone
to call 911 doesn't work.
Runs across Street to Friends house
to use phone (willie possibly Johnson) No answer
at door. the
- Went back to apt. For a minute
trying to wake V███ up she doesn't
wake.
- Runs to Testo calls on a cell phone
goes home. Rebecca Pulling up. She runs
in house Fire and Police arrive.

Case 1:17-cv-01290-DJS Document 123-2 Filed 04/01/22 Page 2 of 2

Case 23-589, Document 93, 01/18/2024, 3604736, Page57 of 148

- Child had cold appox 1 week ago. Stated her chest hurt.
- Gave child cold medicine over the counter from Family Dollar. made her feel better. No other meds known to Mike.
- Last few day never left house to cold.

- No falls recently atleast mont.
- Few months ago would run & slide on sock.
  Keep her door open so she doesn't mess around.
  Duct tape on outlet so she doesn't get hurt
- Did give her cup of water in sip cup she didn't want it.
- Didn't eat. since last night last ate some pasta.
- No one else at house 72 hours

**APPENDIX**     **1571**

1

```
 1 |
   |
 2 | STATE OF NEW YORK          COUNTY COURT
   | COUNTY OF RENSSELAER       CRIMINAL TERM
 3 | ******************************************
   | THE PEOPLE OF THE STATE OF NEW YORK,
 4 |
   | - against -                    15-1094
 5 |
   | MICHAEL DAVIS,
 6 |
   |                    Defendant.
 7 | ******************************************
   |                    Rensselaer County Courthouse
 8 |                    Congress and Second Streets
   |                    Troy, New York  12180
 9 |                    August 19, 2016
   |
10 |            Trial - Volume 3
   |
11 | B e f o r e :
   |
12 |    HONORABLE ANDREW G. CERESIA,
   |                    County Court Judge
13 |
   |
14 | A p p e a r a n c e s :
   |
15 | For  THE PEOPLE OF THE STATE OF NEW YORK:
   |
16 |    JOEL E. ABELOVE, ESQ.
   |    Rensselaer County District Attorney
17 |    Rensselaer County Courthouse
   |    Congress and Second Streets
18 |    Troy, New York 12180
   |
19 |    BY:  CINDY CHAVKIN, ESQ.
   |         Assistant District Attorney
20 |
   |
21 | For  DEFENDANT:
   |
22 |    JOHN C. TURI, ESQ.
   |    Rensselaer County Public Defender
23 |    Congress and Second Streets
   |    Troy, New York 12180
24 |
   |    BY:  WILLIAM ROBERTS, ESQ. and
25 |         JESSICA ZWICKLBAUER, ESQ.
   |         Assistant Public Defenders
```

**M. Bayly - Direct Examination by Ms. Chavkin**

1  **M. Bayly - Direct Examination by Ms. Chavkin**

2  me on the engine company and the ambulance that's

3  stationed at the Lansingburgh Firehouse as well.

4      Q    Do you recall approximately how long it took

5  you to get there?

6      A    Probably two minutes.

7      Q    When you got to 856 Fourth Avenue what did

8  you observe?

9      A    We went to the house and we found a small

10  child in cardiac arrest.

11      Q    When you say cardiac arrest, what does that

12  mean exactly?

13      A    She was not breathing and there was no

14  pulse.

15      Q    And what, if anything, did you do?

16      A    We started to work her right away with CPR.

17            MR. ROBERTS:  Judge, can I -- I'm going

18            to object to the characterization of "we".

19            I would just prefer the witness talk about

20            what he did specifically.

21            THE COURT:  Well, the witness can

22            testify as to what he did specifically or

23            what he personally observed, so I'm going to

24            overrule the objection at this point in

25            time, but I will ask the witness to make

**M. Bayly - Direct Examination by Ms. Chavkin**

1

2          sure he testifies regarding what he

3          personally did or what he personally

4          observed happening.

5     Q    So what did you do at that time?

6     A    I proceeded to the -- to the head of the

7 child.  I was running the call.  I was -- being the

8 person in charge at the time, I was, you know, running

9 the overall scene.

10    Q    Do you recall where the child was when you

11 entered the apartment?

12    A    I do.  She was on a couch that was right in

13 the front room, I believe, to the left as we walked

14 through the door.

15    Q    How was she positioned, do you recall?

16    A    She was laying flat on her back with her

17 head towards -- facing in towards the house, more like

18 towards the kitchen area.

19    Q    And did you see any adult in the house?

20    A    I did.  I remember -- recall seeing some

21 people as we walked through the door.

22    Q    And did you come to know the name of the

23 child?

24    A    Yes.

25    Q    What was her name?

| | | |
|---|---|---|
| 1 | **M. Bayly - Direct Examination by Ms. Chavkin** | |
| 2 | A | V█████ D█████. |
| 3 | Q | Are you certified in CPR? |
| 4 | A | I am. |
| 5 | Q | How long have you been certified in CPR? |
| 6 | A | Since my initial EMT certification.  It's |
| 7 | almost 24 years. | |
| 8 | Q | And have you performed CPR on a child |
| 9 | previously? | |
| 10 | A | I have. |
| 11 | Q | Approximately how many times? |
| 12 | A | Probably ten or more. |
| 13 | Q | Can you please describe how CPR is properly |
| 14 | performed on a two year old child? | |
| 15 | A | For a two year old it is a one handed CPR |
| 16 | technique.  You usually -- you put your hand in between | |
| 17 | the -- right in the center -- center of the breast bone | |
| 18 | and then you press down. | |
| 19 | Q | Is there any breathing involved in that too |
| 20 | or -- | |
| 21 | A | There is, yes.  We breathe for them with a |
| 22 | bag valve mask. | |
| 23 | Q | And where, if anywhere, did you take the |
| 24 | child? | |
| 25 | A | After we treated her at the scene we took |

| | |
|---|---|
| 1 | **M. Bayly - Cross Examination by Mr. Roberts** |
| 2 | her to St. Mary's Hospital. |
| 3 |     Q    Captain, during the time that you were |
| 4 | working on V█████ did she ever regain a pulse or did |
| 5 | she ever start breathing? |
| 6 |     A    She did not. |
| 7 |     Q    And what, if anything, did you do en route |
| 8 | to the hospital? |
| 9 |     A    We just continued -- I just continued a |
| 10 | normal ACLS, Advanced Cardiac Life Support, running off |
| 11 | a protocol set of standards that we use. We don't call |
| 12 | a doctor for everything for a call like that. We |
| 13 | pretty much just run a standard algorithm of CPR and |
| 14 | drugs. |
| 15 |     Q    And which -- which hospital did you take her |
| 16 | to? |
| 17 |     A    St. Mary's in Troy. |
| 18 |             MS. CHAVKIN: I have no further |
| 19 |             questions on direct, your Honor. |
| 20 |             THE COURT: Mr. Roberts? |
| 21 |             MR. ROBERTS: Yes, your Honor, thank |
| 22 |             you. |
| 23 |         *Cross Examination by Mr. Roberts* |
| 24 |     Q    Good morning. |
| 25 |     A    Good morning. |

1  **M. Bayly - Cross Examination by Mr. Roberts**

2  　　　　　MR. ROBERTS:  Can I have a moment,

3  　　　Judge?

4  　　　　　THE COURT:  Sure.

5  　　　　　(Whereupon, a brief moment was taken.)

6  　　　　　(In open court.)

7  　　Q　　Could you describe the make up of the couch,

8  what it felt like?

9  　　A　　I mean, I realized it was, you know, a

10 futon.  I didn't really look at much other than her,

11 but it was like a leather -- leather couch.

12 　　Q　　And did you have an opportunity to observe

13 the firmness of the couch?

14 　　A　　It was firmer than most couches.

15 　　Q　　Okay.  And while performing CPR is it

16 recommended to perform CPR on a couch?

17 　　A　　Usually no.  For an adult you would normally

18 move the person to the -- to the floor for a harder

19 surface to work on but because the couch was relatively

20 stable we kept the child on the couch.  For a child it

21 is not necessary to do that.

22 　　Q　　So it is your testimony that you performed

23 CPR on this futon or couch as you put it, correct?

24 　　A　　We did.

25 　　Q　　All right.  You would agree with me it is

**M. Bayly - Cross Examination by Mr. Roberts**

1

2  ideal to perform CPR on a hard surface, correct?

3      A      Yes.

4      Q      Okay.  And would you agree with me the

5  reason for doing that is that it is important to have

6  the pressure of CPR -- withdrawn.

7          You would agree with me the importance of

8  having on a hard surface is to ensure that the

9  mechanisms that CPR are intended to function on are

10  actually effective, correct?

11      A      I'm not sure I understood what you said.

12      Q      Okay.  It is important to do CPR on a hard

13  surface so it works, correct?

14      A      You want something that isn't bouncy.

15      Q      Okay.

16      A      As long as it isn't bouncy it is okay.

17      Q      Okay.  And would you agree with me if

18  something is bouncy it can lead to unintended

19  consequences of the CPR, correct?

20      A      No.

21      Q      Okay.  You would agree with me that the

22  purpose of having a firm surface is to not incur injury

23  to the subject, correct?

24      A      No.  It speaks only to the effectiveness of

25  CPR.

**M. Bayly - Cross Examination by Mr. Roberts**

1

2    Q    You would agree with me that if you are

3 applying pressure on the chest cavity of an individual

4 on a softer surface you don't know how the pressure is

5 being exerted back from the -- the give of the subject

6 of what -- you're less -- bad question. I'm going to

7 strike that question.

8    You would agree with me because -- it is

9 designed -- CPR is designed to be used against a hard

10 surface because the procedure of CPR is designed to

11 compress the heart, correct?

12    A    It compresses the chest cavity.

13    Q    Okay. And it is important not to have a

14 bounce back because then you are going to have a

15 compression on the back of the subject, correct?

16    A    That's not my understanding. It speaks

17 solely to the effectiveness of CPR. You want a firm

18 surface so the CPR is effective.

19    Q    Okay. So you would agree with me it is less

20 effective if you're not on a firm surface?

21    A    The CPR is less effective. The results

22 you're trying to gain from CPR are less effective.

23    Q    Have you been trained, in any respect, with

24 respect to the effects of performing CPR on a softer

25 surface? The effects on the body?

**M. Bayly - Cross Examination by Mr. Roberts**

1

2      A      No.   Only to the effect that the CPR is less

3  effective if you're not on a firm surface.

4      Q      Okay.  So under ideal circumstances you're

5  to have a firm surface, correct?

6      A      Correct.

7      Q      And you would agree with me that a floor is

8  a very firm surface, correct?

9      A      Correct.

10      Q      And a couch or a futon is designed to be sat

11  upon so it is comfortable and accommodating when you

12  sit on it, correct?

13      A      Correct.

14      Q      All right.  For instance, when you're buying

15  a couch you're not looking for one that feels like a

16  floor, correct?

17      A      Correct.

18                  MR. ROBERTS:  I will just take this

19                  back before I steal it.

20      Q      Since you were initially trained on CPR how

21  many advances have moved forward in the practice of

22  CPR?

23      A      Quite a few.

24      Q      For instance, how were you initially trained

25  on how to perform CPR on a toddler?

**M. Bayly - Cross Examination by Mr. Roberts**

1

2     A     My initial training?

3     Q     Yes.

4     A     I couldn't tell you.

5     Q     When was your last training?

6     A     Within the last -- we're trained every two

7  years, so it was within the last two years.

8     Q     Do you remember the specific date you were

9  retrained?

10    A     I do not.

11    Q     Where was that training?

12    A     At the fire department.

13    Q     Who instructed it?

14    A     Our CPR EMS Battalion Chief or our EMS

15  Captain.

16    Q     Do you know how often he is -- he is

17  re-certified or how he gets up-to-date on the latest

18  techniques?

19    A     I know he's an American Heart Association

20  CPR instructor.  I don't know what he receives as

21  updates.

22    Q     So your training is only as good effectively

23  as his training, correct?

24    A     Correct.

25    Q     And did you ever have -- did you ever check

**M. Bayly - Cross Examination by Mr. Roberts**

1  to see if your training was in accordance with the

2  known standards for CPR or did you rely on your

3  instructor?

4      A      When we have a -- when we re-certify our CPR

5  certification it comes with all the American Heart

6  Association handouts and a Power Point, so we're not

7  just relying on what we're being told.  We're also

8  seeing a lecture.

9      Q      Okay.  And when you had that last lecture do

10  you know what date the materials you were being

11  lectured on were based on?  Was it 2012?  2014?  2015?

12  Did you check?

13      A      I did not.

14      Q      Okay.  So you would agree with me today that

15  you would have to rely upon the individual who last

16  gave you your trainings to determine whether or not it

17  was in the acceptable standards for CPR, correct?

18      A      Going there for an update every two years I

19  just assume that we're receiving the current update.

20      Q      Okay.

21      A      If that's what you're asking me.

22      Q      Right.  So you assume you're getting the

23  current update, there is no need for you to check into

24  it, correct?

**M. Bayly - Cross Examination by Mr. Roberts**

1

2     A    Correct.

3     Q    All right.  Now, Captain, when you arrived

4 you said you were also kind of the supervisory guy at

5 the time, right?  Were you the ranking fire responder

6 when you got to the apartment?

7     A    When we first got there actually Captain

8 Shoemaker outranks me, but I have more paramedic

9 experience so I -- I was running the call.

10     Q    Okay.  When you say "running the call", what

11 does that mean?

12     A    For every cardiac arrest we pretty much do

13 things.  We do the same thing.  It is called running

14 the code.  Somebody runs the code.  Somebody is in

15 charge.  It is calling out what is going to be done,

16 what medications are going to be given.  That way --

17 because there's a lot of people there, you know, that

18 way there aren't eight people --

19     Q    -- trying to do the same thing.

20     A    Yes

21     Q    Okay.  And this was --

22     A    Orchestrating.  One person is kind of

23 orchestrating the whole thing.

24     Q    You would agree with me this is in a

25 relatively small room that you're working in, correct,

**M. Bayly - Cross Examination by Mr. Roberts**

on February 26, 2015?

    A    I wouldn't say -- it didn't seem that small.
I've been in smaller rooms.

    Q    Okay.  It got small with nine people in
there quickly, correct?

    A    Not necessarily.  I mean, we -- there is,
you know, some guys that come that are -- are just kind
of helping out behind the scenes and there was myself
and I know Danny Riley was doing part of the treatment
and, you know, there was three or four people around
her at most.

    Q    All right.  And how big would you -- are you
familiar with dimensions, feet?

    A    Yes.

    Q    How large would you estimate the room was?

    A    Fifteen by fifteen.

    Q    Okay.  So you would agree with me that maybe
from myself to the wall is about 15 feet, correct?

    A    Okay.

    Q    Would you agree with me?  Is it more or
less?

    A    I guess you're in the ballpark.

    Q    Okay.  So, 15 by 15.  So from me to the wall
and then kind of squared off we're talking about for a

1  **M. Bayly - Cross Examination by Mr. Roberts**

2  room.  Then there is some furniture, a bed, a futon, a

3  table, correct?

4       A     Correct.

5       Q     All right.

6       A     Looking at the picture I saw more than what

7  I really recall from seeing that day because we're

8  going in, we have a child in cardiac arrest, I go right

9  to the head, I start telling people what we're going to

10 do, and I'm not really looking at dimensions or wall

11 color or anything like that.

12      Q     Absolutely.  You were there to lend

13 assistance and save a life, correct?

14      A     Correct.

15      Q     All right.  So everything is very fast paced

16 and it is important and immediate, correct?

17      A     Correct.

18      Q     So when you first responded were -- was it

19 your first directive to have one of your associates

20 start CPR or did you, yourself, initiate CPR?

21      A     Somebody else started CPR.

22      Q     Who started CPR?

23      A     I don't recall who it was.  Possibly it

24 would be on the -- on the -- on the PCR.

25            MR. ROBERTS:  May I have a moment, your

| | |
|---|---|
| 1 | **M. Bayly - Cross Examination by Mr. Roberts** |
| 2 | Honor? |
| 3 | THE COURT: Yes. |
| 4 | (Whereupon, a brief moment was taken.) |
| 5 | (In open court.) |
| 6 | (PCR was marked Defendant's Exhibit B |
| 7 | for identification.) |
| 8 | Q What's a PCR? |
| 9 | A Pre-Hospital Care Report. |
| 10 | Q If I were to show you the Pre-Hospital Care |
| 11 | Report would that refresh your recollection, |
| 12 | potentially, relative to who did what? |
| 13 | A It would. |
| 14 | MR. ROBERTS: May I? |
| 15 | Q I will show you what's been marked as |
| 16 | Defendant's Exhibit B. After you review that document |
| 17 | please let me know if that refreshes your recollection |
| 18 | in any way. |
| 19 | All set? |
| 20 | A Yes. |
| 21 | Q I will just take that back from you. Thank |
| 22 | you. After looking at Defendant's Exhibit B, does that |
| 23 | refresh your recollection in any way? |
| 24 | A It says CPR by other. So when -- on that |
| 25 | particular program you list some of the caregivers that |

M. Bayly - Cross Examination by Mr. Roberts

1    Q    To a bag?

2    A    -- ratio.  Not 30 to a bag.

3    Q    In fact, it is much more than that.  It's
upward of 100 to 120 compressions, correct?

4    A    Correct.

5    Q    So when we say 100 to 120 compressions, that
means the pushing down with your hands on the chest
cavity 100 to 120 times per cycle, correct?

6    A    I would call it a 30 -- I would call it a 30
to a cycle and I would call that 100 to 120 per minute.

7    Q    And how many minutes, from the beginning of
your call to your ultimate arrival at the hospital, was
compressions given to this child?

8    A    She had CPR the whole time.  She never had a
heartbeat so we were doing CPR.

9    Q    So you performed CPR for probably --

10   A    From our -- the time on the PCR from the
arrival at the house until the time we got to the
hospital.

11   Q    Is that about 45 minutes?  How long did it
take for you to get -- how long did you work on her in
the house?

12   A    I would have to look at the PCR for the
times.

**M. Bayly - Cross Examination by Mr. Roberts**

1    Q    Do you recall getting to the hospital around 1:41?

A    Again, I would have to -- it is all on the PCR.

Q    Okay.  I will show you what's been marked as Defendant's Exhibit B, which is the PCR.  Would that refresh your recollection?

A    It would.

MR. ROBERTS:  May I?

A    1336, 1:36 is when we got to St. Mary's.

Q    1:36.  And you got on scene at 1:11?

A    We got there at 1:14.

Q    Okay.  I will take that back.  So about 20 minutes you were performing CPR?

A    Correct.

Q    So for 20 minutes you were applying pressure at what rate?

A    100 -- 100 to 120.  You know, there are some interruptions for movement.

Q    Movement meaning personnel?

A    And getting her in and out of -- you know, out of the house into the ambulance.

Q    And you would agree with me that after -- after Danny Riley was doing compressions someone else

**Cheryl M. Moore, Senior Court Reporter**

**M. Bayly - Cross Examination by Mr. Roberts**

1
2    A    That we -- no.  In the ambulance they have

3    paddles or pads, but yeah.

4    Q    What type of mechanical electrical tests did

5    you use on the child in the apartment?

6    A    The whole time the EKG monitor was hooked up

7    to her so that's how we treat whatever rhythm she may

8    be in.

9    Q    Can you explain to me what an EKG is and

10   when and how it was utilized in this case?

11   A    When we went inside I was at the head.  We

12   pulled her up to the head.  CPR was started.  The very

13   next thing that happens is the EKG monitor was hooked

14   on her.

15   Q    Why?

16   A    We need to know what rhythm she is in in

17   order to establish how we're going to treat her.

18   Q    What do you mean what rhythm she is in?

19   What are you looking for?

20   A    Heart activity.

21   Q    Okay.  And after utilizing the EKG in this

22   specific case -- is it a hand held device?  Comes in a

23   -- is it something you need to plug in?  Does it come

24   in a case?

25   A    It is a -- comes in a case.  It's its own --

**M. Bayly - Cross Examination by Mr. Roberts**

1

2  its own - --

3      Q    Self-contained unit.

4      A    -- self-contained unit.

5      Q    Did there come a time that you utilized this

6  unit?

7      A    Correct.

8      Q    And what, if anything, did you learn because

9  of using this medical device?  What did you find?

10      A    We found she was in asystole, which is

11  basically she had no heart activity.  It was a flat

12  line rhythm.

13      Q    Throughout the -- the process of CPR, were

14  you able to obtain a rhythm again?

15      A    At one point during the code, I believe it

16  was on the way to the hospital, she did go into what we

17  would call a shockable rhythm, something that you

18  can -- something that you can shock.

19      Q    What's that?  What do you mean a shockable

20  rhythm?  How is that -- how -- withdrawn.

21          When you say shockable rhythm, what does

22  that mean?

23      A    There's two rhythms in the heart you can

24  shock.  The same way -- it's the same way an automatic

25  defibrillator works that's probably out in the hallway.

**M. Bayly - Cross Examination by Mr. Roberts**

1  It reads either v tach, which is ventricular

2  tachycardia or ventricular fibrillation.  Those are the

3  only two rhythms that are what we call shockable

4  rhythms, something the electricity might have a chance

5  of reversing the cardiac arrest and getting a normal

6  beat back in the heart.

7      Q    At what point did you find that rhythm to

8  occur?

9      A    On the way to the hospital I believe she

10 went into v tach briefly and then into v fib and then

11 we shocked her.

12     Q    Okay.  And when you say you shocked her,

13 what does that mean?  Explain the process to the jury.

14     A    Deliver an electrical current based on her

15 weight.  We set the machine to that -- to that amount

16 of energy and then you deliver the shock.

17     Q    And who specifically performed this

18 function?

19     A    I don't recall.

20     Q    But you recall watching it occur, correct?

21     A    Correct.

22     Q    Now, you would agree with me when you first

23 arrived and found the child on the futon she was warm

24 to the touch, correct?

**M. Bayly - Cross Examination by Mr. Roberts**

1

2    A    Yeah.  I believe she was warm to the touch.

3    Q    And what part of her body were you

4 touching?

5    A    Mostly her upper body.

6    Q    Okay.  Did you have an opportunity to touch

7 her arms?

8    A    Well, when I pulled her up and her -- I

9 think it was more her -- her core that was a little

10 warmer, her upper body.  Like I said, I was working

11 mostly at her head.

12    Q    Okay.  Did you have an opportunity to touch

13 her arms, legs, when you moved her?

14    A    I'm sure I did.  You -- you know, we pulled

15 her up.

16    Q    Okay.  Fair to say you didn't make any

17 notations that she was cold to the touch, correct?

18    A    No, unless it is in the PCR.

19    Q    Okay.  So your recollection is when you

20 first found her within minutes of arrival she was warm

21 to the touch?

22    A    I would have to look to see what I -- I'm

23 sure I noted something there.

24    Q    Do you recall giving a deposition to a Troy

25 police officer in this matter?

**M. Bayly - Cross Examination by Mr. Roberts**

1

2      A      I do.

3      Q      If you reviewed that would that refresh your

4   recollection?

5      A      Yes.

6              MR. ROBERTS:   Judge, could I utilize

7              the copy machine?   I have a note on it.   I

8              apologize.

9              THE COURT:   Yes.

10             (Whereupon, a brief moment was taken.)

11             (In open court.)

12             (M. Bayly's Deposition was marked

13             Defendant's Exhibit C for identification.)

14     Q      Captain, I will show you what's been marked

15   as Defendant's Exhibit C.   I will direct your attention

16   to about the eighth line down.   If you could read that

17   sentence.

18     A      She was warm to the touch.

19     Q      Okay.

20     A      When you're asking me what part of her body

21   was warm to the touch, I couldn't tell you.

22     Q      Okay.   You -- when you encountered the child

23   prior to initiating CPR you make an overall visual

24   assessment, correct?

25     A      Correct.

**M. Bayly - Cross Examination by Mr. Roberts**

1     Q    And you would agree with me that when you

2 first encountered her, and through the duration of the

3 time that you were encountering the child, at no point

4 did you observe any visible injuries, correct?

5     A    Correct.

6     Q    Now, Captain, when you responded do you

7 recall any members of the public at the apartment?  The

8 occupants, do you recall seeing them?

9     A    I know there was people there, but I -- I

10 couldn't tell you who they were.

11     Q    Were there police officers there when you

12 arrived?

13     A    I'm not sure if we got there first or they

14 did.  Some calls they're there first, some calls we're

15 there first, so...

16     Q    You would agree with me that while you were

17 there you had discovered an opiate derivative,

18 prescription drug, correct?

19     A    It was discovered.

20     Q    Okay.  Was it Hydrocodone, Hydrocodeine, do

21 you recall?

22     A    I don't recall.

23                MR. ROBERTS:  One moment, Judge.

24                (Whereupon, a brief recess was taken.)

53

| 1 | **K. Crisafulli - Direct Examination by Ms. Chavkin** |

2 sorry, withdrawn.

3         On February 26, 2015 at approximately 1:30

4 p.m., do you recall that date and time?

5     A    Yes.

6     Q    Did anything memorable happen on that date

7 and time?

8     A    Yes.

9     Q    And please describe that.

10     A    A two year old was brought to the emergency

11 department by EMS in cardiorespiratory arrest.

12     Q    How did the child arrive?

13     A    She arrived in an ambulance with Troy Fire.

14 CPR was in progress.

15     Q    When you say she was in arrest, what exactly

16 does that mean?

17     A    Cardiorespiratory arrest means she was

18 unresponsive, she wasn't breathing and she had no

19 effective heartbeat.

20     Q    Did you come to know the name of the

21 child?

22     A    Yes.

23     Q    What was her name?

24     A    V:▮▮▮  Da▮▮▮▮

25     Q    Did you attempt to treat V:▮▮?

| | | |
|---|---|---|
| 1 | | **K. Crisafulli - Direct Examination by Ms. Chavkin** |
| 2 | A | Yes. |
| 3 | Q | What did you do? |
| 4 | A | We continued resuscitation. |
| 5 | Q | Do you know for how long, approximately? |
| 6 | A | About half an hour. |
| 7 | Q | What ultimately happened with V███ on that |
| 8 | day? | |
| 9 | A | She died. |
| 10 | Q | Did you pronounce her? |
| 11 | A | Yes. |
| 12 | Q | Were you able to determine the cause of |
| 13 | death at that time? | |
| 14 | A | No. |
| 15 | Q | Did you speak to anyone after V███ was |
| 16 | pronounced dead? | |
| 17 | A | Yes. |
| 18 | Q | Who did you speak to? |
| 19 | A | I spoke to her mom. |
| 20 | Q | What did she say? |
| 21 | | MR. ROBERTS:  Objection. |
| 22 | | THE COURT:  Basis? |
| 23 | | MR. ROBERTS:  It is hearsay. |
| 24 | | THE COURT:  What do the People say in |
| 25 | | response to the hearsay objection? |

**K. Crisafulli - Cross Examination by Mr. Roberts**

        MS. CHAVKIN:  It is not being offered for the truth of the matter asserted, your Honor.

        THE COURT:  What's it being offered for?

        MS. CHAVKIN:  To demonstrate what the speaker --

        MR. ROBERTS:  Can we approach the bench?

        MS. CHAVKIN:  -- thought.

        THE COURT:  No.  The hearsay objection is sustained.

        MS. CHAVKIN:  I have no further questions, Judge.

        THE COURT:  Mr. Roberts?

        MR. ROBERTS:  Thank you.

        *Cross Examination by Mr. Roberts*

Q   Good morning, Doctor.

A   Hi.

Q   How are you?

A   Fine.

Q   You have been a physician since 1990?

A   Correct.

Q   And you have practiced medicine?

**D. Coonradt - Direct Examination by Ms. Chavkin**

1    scene.  The defendant was standing out front of the

2    house.

3        Q    When you say the defendant, who are you

4    talking about?

5        A    That gentleman over there, Mr. Davis.

6        Q    Okay.  And he was at the house?

7        A    Yes, ma'am.

8        Q    Can you please describe where he is sitting

9    and what he is wearing?

10       A    He's sitting over next to the woman in the

11   pink with a suit jacket on.

12           MS. CHAVKIN:  May the record reflect

13           that the witness has identified the

14           defendant in this case?

15           THE COURT:  It is noted.

16       Q    What did you observe when you got to that

17   location?

18       A    He was standing in front and -- I believe at

19   that time on the sidewalk and the fire department was

20   inside.  Some, I believe, inside already.

21       Q    Did you see anyone else -- anyone else on

22   the scene?

23       A    I believe the mother of the child was there.

24       Q    And did you speak to anyone on the scene?

| 1 | **D. Coonradt - Direct Examination by Ms. Chavkin** |
|---|---|

2     A    I spoke to the defendant.

3     Q    All right.  And what did you say to the

4 defendant?

5     A    I asked him what had happened.

6     Q    And what did he respond?

7     A    I would have to refer to my paperwork just

8 to be precise.

9     Q    You're now being shown what's been marked as

10 People's 20 for identification purposes.

11     A    Thank you.

12     Q    What is that?

13     A    This is my supplemental report.

14     Q    Can you please read that and tell me if your

15 recollection is refreshed?

16     A    Yes.

17     Q    So what did the defendant say to you?

18     A    He said at 8:30 V.&#9608; woke up and he told

19 her it was too early, to go back to bed.  And he said

20 he went back in at 11:00 a.m. and she was unresponsive

21 and wouldn't wake up.

22     Q    And what, if anything, did you respond to

23 that?

24     A    I said to him, okay, but I asked if he was

25 aware it was 1:30 p.m. at that time.

| | | |
|---|---|---|
| 1 | **D. Coonradt - Cross Examination by Mr. Roberts** | |
| 2 | Q | And what did he say? |
| 3 | A | And he said time must be flying. |
| 4 | Q | Where were you when you had this |
| 5 | conversation with Michael Davis? | |
| 6 | A | In front of the home. |
| 7 | Q | What was Michael Davis's demeanor like when |
| 8 | you were on the scene? | |
| 9 | A | He seemed a little bit confused, maybe just |
| 10 | a little out of it. | |
| 11 | | MS. CHAVKIN:  I have no further |
| 12 | | questions for this witness, your Honor. |
| 13 | | THE COURT:  Okay.  Mr. Roberts? |
| 14 | | MR. ROBERTS:  Yes, Judge, thank you. |
| 15 | | *Cross Examination by Mr. Roberts* |
| 16 | Q | Good morning. |
| 17 | A | Good morning, sir. |
| 18 | Q | How are you? |
| 19 | A | Good.  How are you? |
| 20 | Q | I'm doing well, thank you. |
| 21 | | So, you currently work for Lake Placid, but |
| 22 | back in February of 2015 you were a member of the Troy | |
| 23 | Police Department? | |
| 24 | A | Yes, sir. |
| 25 | Q | How long were you a Troy police officer? |

**D. Coonradt - Cross Examination by Mr. Roberts**

1 

2      Q    Okay. After you encountered Michael you

3 went into -- well, did you also encounter the mother of

4 the child?

5      A    I don't believe I spoke to her.

6      Q    Did you see her?

7      A    Yes.

8      Q    What was she doing when you arrived?

9      A    I don't remember.

10     Q    Do you recall if she was crying?

11     A    I don't remember.

12     Q    Do you recall if she was upset?

13     A    I don't remember.

14     Q    Do you have a specific recollection of

15 anything that happened that day while you are sitting

16 here testifying here today?

17     A    I don't understand what you're asking.

18     Q    Sure. You previously referred to your

19 notes.

20     A    (Nods head.)

21     Q    Are you testifying as to what your notes are

22 telling you or are you testifying what you actually

23 remember?

24     A    I'm testifying to both of those things.

25     Q    Okay. So there are portions of your

Case 1:17-cv-01290-DJS Document 84-18/2021 Filed 04/01/22 Page 18 of 15

```
 1

 2   STATE OF NEW YORK                    COUNTY COURT
     COUNTY OF RENSSELAER                 CRIMINAL TERM
 3   ****************************************************
     THE PEOPLE OF THE STATE OF NEW YORK,
 4
     - against -                          15-1094
 5
     MICHAEL DAVIS,
 6
                        Defendant.
 7   ****************************************************
                        Rensselaer County Courthouse
 8                      Congress and Second Streets
                        Troy, New York  12180
 9                      August 22, 2016

10                   Trial - Volume 4

11   B e f o r e :

12         HONORABLE ANDREW G. CERESIA,
                             County Court Judge
13

14   A p p e a r a n c e s :

15   For  THE PEOPLE OF THE STATE OF NEW YORK:

16         JOEL E. ABELOVE, ESQ.
           Rensselaer County District Attorney
17         Rensselaer County Courthouse
           Congress and Second Streets
18         Troy, New York 12180

19         BY:  CINDY CHAVKIN, ESQ.
                Assistant District Attorney
20
     For  DEFENDANT:
21
           JOHN C. TURI, ESQ.
22         Rensselaer County Public Defender
           Congress and Second Streets
23         Troy, New York 12180

24         BY:  WILLIAM ROBERTS, ESQ. and
                JESSICA ZWICKLBAUER, ESQ.
25              Assistant Public Defenders
```

**M. Sikirica - Direct Examination by Ms. Chavkin**

1

2   lobes.   There was a total of five lacerations.   The

3   longest was about three inches long and it actually --

4   a portion of her liver had been ripped away.   This

5   fragment had actually separated from the liver due to

6   one of the large lacerations along the top of the right

7   lobe.

8       Q      Have you ever seen injuries like that before

9   in the liver?

10      A      Yes.

11      Q      Can you please describe the circumstances

12  under which you see these kind of injuries?

13      A      You can see these --

14                  MR. ROBERTS:   Objection.

15                  THE COURT:   What basis?

16                  MR. ROBERTS:   Relevance.

17                  THE COURT:   Overruled.

18      A      You can see these injuries in things like

19  motor vehicle accidents, severe blunt force trauma to

20  the abdomen, if someone's hit by an object or ran into

21  an object.   The liver tears fairly easily and bleeds

22  after it tears.

23      Q      So what would be the force necessary to

24  lacerate a liver like that?

25                  MR. ROBERTS:   Objection.   Foundation.

| | | M. Sikirica - Direct Examination by Ms. Chavkin |
|---|---|---|
| 1 | | M. Sikirica - Direct Examination by Ms. Chavkin |
| 2 | | THE COURT: Sustained. |
| 3 | Q | Did you discover any other injuries? |
| 4 | A | Yes. |
| 5 | Q | What other injuries did you discover? |
| 6 | A | There were fractures of two ribs in the back |

1   M. Sikirica - Direct Examination by Ms. Chavkin

2              THE COURT:  Sustained.

3      Q     Did you discover any other injuries?

4      A     Yes.

5      Q     What other injuries did you discover?

6      A     There were fractures of two ribs in the back

7   of the right chest.  The ninth and tenth rib were

8   fractured.  And this was a fresh fracturing.  And there

9   was a significant note of hemorrhage around those

10  fractures in the muscle and soft tissue on the back of

11  the right rib cage.

12     Q     Doctor, you're now being shown what's been

13  marked as People's Exhibit 5 for identification

14  purposes.  Do you recognize it?

15     A     Yes.

16     Q     What is it?

17     A     This is the large laceration of the right

18  lobe of the liver.  To the left of the laceration is

19  the piece that has actually been torn off of it.

20     Q     Is that photograph from the autopsy that you

21  performed on V▮▮▮ Davis on February 27, 2015?

22     A     Yes.

23     Q     And does this accurately reflect what the

24  liver looked like on that day?

25     A     Yes.

**M. Sikirica - Cross Examination by Mr. Roberts**

2 autopsy and decedents.

3    Q    Okay. Has that been the extent of your

4 medical practice, essentially, working with

5 decedents?

6    A    Well, I did a fellowship in neuropathology

7 and that was -- you know, that was more hospital based,

8 analysis of the brain and the muscles and the skin,

9 reading biopsies and such, but...

10    Q    When was that?

11    A    Early '90s. Early '90s.

12    Q    How many years was your fellow?

13    A    Twenty-nine years ago.

14    Q    How much time did you -- how much hands-on

15 experience did you have with live patients?

16    A    Since medical school, very little.

17    Q    Okay. So essentially you work with dead

18 people?

19    A    Yes.

20    Q    Okay. You had talked a little bit about

21 your experience, as well as your accreditation. What's

22 The National Board of Medical Examiners?

23    A    It is an organization that I belong to that

24 publishes a journal and also has a yearly meeting and

25 publishing some guidelines.

**M. Sikirica - Cross Examination by Mr. Roberts**

1

2    Q    When you say you're a member of it, what

3    does that mean?

4    A    That means that I apply for position and was

5    accepted as a member.

6    Q    Okay.  And they also have certain

7    recommendations on how to perform autopsies, do they

8    not?

9    A    They do, yes.

10    Q    They go through the criteria related to

11    autopsies, correct?

12    A    Yes.

13    Q    All right.  And you do autopsies here in

14    Rensselaer County, correct?

15    A    No, I do the autopsies at Albany Med, but I

16    do them for Rensselaer County, yes.

17    Q    Bad question on my part.  You perform the

18    autopsies here for Rensselaer County, correct?

19    A    I perform them at Albany Med for Rensselaer

20    County.

21    Q    Essentially individuals who die in

22    Rensselaer County, they are transported over to Albany

23    County and then you perform your medical procedures on

24    them, correct?

25    A    Yes.

**M. Sikirica - Cross Examination by Mr. Roberts**

1

2     Q    Okay.  Medical procedures, you do the

3 autopsy?

4     A    Correct.

5     Q    And you also work for a number of other

6 counties, correct?

7     A    Yes, I do.

8     Q    What other counties do you work for?

9     A    Well, exclusively I work for Saratoga

10 County, Hamilton County.  I have worked for Ulster

11 County, but I'm dropping that in the middle of October.

12 And then I worked for other counties on an as needed

13 basis.  When there are cases that need to be done they

14 will contact my office and I will perform the autopsy,

15 if required.

16     Q    Your termination with Ulster County, is that

17 just based upon the volume of autopsies?

18     A    Yeah, volume and the idea that it is quite a

19 trip to go to Kingston to do autopsies, they're not

20 brought here, so I don't like to say it, but I waste a

21 lot of time in the car.

22     Q    So you testified on direct that you

23 perform -- performed about six hundred autopsies.  Was

24 that last year?  Was that the calendar year of 2015?

25     A    Yes.

**M. Sikirica - Cross Examination by Mr. Roberts**

1

2    Q    And obviously how many days in a year are

3  there, Doctor?

4    A    Three hundred sixty-five.

5    Q    And do you take any vacations or holidays?

6    A    I have had a couple of days off last year

7  but I haven't had a vacation in fifteen years.

8    Q    So of 365 days you are not working maybe two

9  days, three days a year?

10    A    Well, I work -- when I do autopsies

11  sometimes I might have two autopsies in a day,

12  sometimes I might have three.  And the next day I might

13  not have any, so it varies quite a bit.

14    Q    Okay.  And you would agree with me that the

15  National Board of Medical Examiners indicates that

16  the -- 250 is the recommended amount of autopsies that

17  you should do in a year, correct?

18    A    That's correct.

19    Q    And they say you should do no more, absolute

20  ceiling, of about 360, correct?

21    A    That is correct.

22    Q    Okay.  So you were performing almost double

23  of their red line limit, correct?

24    A    Correct.

25    Q    And you would agree with me by doing as many

**M. Sikirica - Cross Examination by Mr. Roberts**

1    individual may not be the day that the autopsy is

2    concluded, correct?

3    A    Well, the physical autopsy would be

4    concluded, you know, the work on the decedent, but

5    there's a lot of other things that have to be evaluated

6    many times.  I have to look at witness statements,

7    medical records, wait for toxicology, look at the

8    microscopic slides, so it may take months before the

9    final thing is done.

10   Q    And in completing your final autopsy report,

11   as well as opinion, do you take live notes or do you

12   dictate?

13   A    What I do is I take notes at the time of the

14   autopsy and then later in my office I will dictate the

15   report from those notes.

16   Q    And that dictation is recorded on a digital

17   device or, I'll say, old school, like, a tape?

18   A    We moved from the old school probably five

19   years ago, so it is a digital device.

20   Q    And is that recording preserved?

21   A    No, it is written over for the next time.

22   Q    And you work as an employee of Rensselaer

23   County, correct?

24   A    Correct.

**M. Sikirica - Cross Examination by Mr. Roberts**

1

2 Q Are you able to save those recordings?

3 A I haven't checked on saving those

4 recordings.

5 Q Okay.  Is this a specific device that you

6 use, a hand-held device, recording device?

7 A Yes.  Yes, it is.

8 Q Do you have the ability to upload that to a

9 computer and save it?

10 A It gets uploaded and then my girls will type

11 off my dictation, but I don't save the dictation.  We

12 don't save the dictation sound.

13 Q So you're saying your girls will type off.

14 You have some assistants that will help you complete

15 your work product?

16 A Yes.  I have two ladies that will help me do

17 that.

18 Q So they will take your impressions off of

19 the recording and formalize them in the form of a

20 report, a written report?

21 A Yes, which I go on to review.

22 Q Then you review that report and sign off on

23 it?

24 A Correct.

25 Q When you review that report do you look at

1 **M. Sikirica - Cross Examination by Mr. Roberts**

2     Q    Do you recall, Doctor, if Detective Fountain

3 got there at the beginning of the autopsy, the middle

4 or the end?

5     A    I don't recall.

6     Q    Do you recall having interactions with

7 Detective Fountain?

8     A    I would -- I would estimate that I did, but

9 I don't recall any specifics.

10     Q    So you don't recall what you said to

11 Detective Fountain?

12     A    No.

13     Q    And you don't recall what Detective Fountain

14 would have asked you?

15     A    Correct.

16     Q    What about Detective Colaneri and McDonald,

17 same response?

18     A    Same response.

19     Q    As well as the prosecutor?

20     A    Correct.

21     Q    You would agree with me that in performing

22 your autopsy, your visual examination of the decedent,

23 those five individuals don't help you in any manner,

24 correct?

25     A    No, they don't.

**M. Sikirica - Cross Examination by Mr. Roberts**

1

2    Q    So you can perform this autopsy without them

3 physically being there, correct?

4    A    Well, except for the photographer.  He has

5 to be there because I don't take photographs in

6 homicide cases.

7    Q    So you would agree with me that -- well,

8 withdrawn.

9         Of the 600 autopsies that you performed in

10 2015, how many involved law enforcement personnel?

11    A    Oh, I would probably say 60 percent.

12    Q    Okay.  So 40 percent of your autopsies you

13 don't have anyone there, correct, other than your lab

14 personnel?

15    A    Yes.

16    Q    So that's a few hundred that you're unaided

17 by law enforcement, correct?

18    A    Yes.

19    Q    And the only -- so you would agree with me

20 that of the 40 percent of autopsies you're not taking

21 photos?

22    A    I take them myself.

23    Q    So you do have the capabilities to take

24 photos?

25    A    Yes, I do.

**M. Sikirica - Cross Examination by Mr. Roberts**

1

2    Q    Is that camera provided to you by the

3    facility that you are using for the dissection or do

4    you bring that with you?

5    A    I bring it with me.

6    Q    Okay.  So when we were talking about V█████,

7    you didn't need any of those personnel there to perform

8    the autopsy, correct?

9    A    Well, I did.  As I said, I don't take

10   photographs in homicide cases.

11   Q    Well, you would agree with me that when you

12   initially began the -- withdrawn.

13        You would agree with me that homicide is a

14   determination by you, correct?

15   A    Yes, it is part of the death certificate,

16   yes.

17   Q    You would agree with me that when you are

18   performing the autopsy you haven't made a determination

19   yet, correct?

20   A    That's correct.

21   Q    So you would agree with me that when you

22   started the examination of V█████ the police were there

23   because they believed they had a homicide, correct?

24   A    I don't know if they believed it.  I can't

25   say what they believed.  But it was a suspicious death

| 1 | **M. Sikirica - Cross Examination by Mr. Roberts** |

2  in a young child that had had no reason to be dead.

3     Q     Well, you would agree with me that there

4  was -- withdrawn.

5           Did you ask -- did you -- how long did you

6  spend speaking with law enforcement before beginning

7  the examination?

8     A     This was a year and a half ago, I cannot

9  remember.

10     Q     You don't remember?

11     A     No.

12     Q     Well, how long -- do you recall being in the

13  presence of law enforcement before you started your

14  examination?

15     A     Again, I don't remember.

16     Q     Had you worked with Detective Fountain in

17  the past?

18     A     Yes.

19     Q     So you have a cordial relationship with

20  him?

21     A     Yes, I would say that, sure.

22     Q     For instance, if he walked up on the street

23  and he said hello, Doctor, how are you, you would

24  recognize him as Detective Fountain from the Troy

25  Police Department?

1 | **M. Sikirica - Cross Examination by Mr. Roberts**

2 agree with me the final report in this case, based

3 upon -- with your determinations, was actually

4 generated six months later?

5     A    The final report was, yes.

6     Q    And the video that you viewed, did you watch

7 all three plus hours of video?

8     A    No, I did not.

9     Q    How much video did you look at?

10     A    I can't recall.

11     Q    Well, do you recall expending a large

12 portion of time viewing the video?

13     A    I would say at least an hour.

14     Q    At least an hour.  And part of that video

15 was an individual -- withdrawn.

16           On that video you had -- withdrawn.

17           Based upon your opinion here today, in part,

18 is on that video, correct?

19     A    Not really, no.

20     Q    Now, you testified on direct that there was

21 350 milliliters of blood and 50 milliliters clot?

22     A    Approximately 50 mls of clot, yes.

23     Q    That was discovered in the cavity of the

24 decedent, correct?

25     A    In the abdominal cavity, yes.

**M. Sikirica - Cross Examination by Mr. Roberts**

1

2  liver, correct?

3      A    No, I couldn't say that.  I mean they're

4  both caused by a compressive blunt force trauma so

5  they're both caused by the same thing.

6      Q    Well, you would agree with me that you --

7  you can't associate in space and time to the broken

8  liver occurring -- excuse me, the fractured ribs

9  occurring at the same time that the liver injury

10  occurred, correct?

11      A    They might be seconds or minutes apart.

12      Q    Okay.  Now, you testified that this is a

13  compressive injury, correct?

14      A    Yes.

15      Q    And you indicated that you observed a video

16  of Michael Davis, correct?

17      A    Correct.

18      Q    And on that video he indicated -- well, he

19  demonstrated to you a -- a type of compressive

20  exertion, correct?

21      A    Yes.

22      Q    And you indicated that that type of

23  mechanism could have caused the injuries that we were

24  seeing, correct?

25      A    Yes.

1

2   STATE OF NEW YORK          COUNTY COURT
    COUNTY OF RENSSELAER       CRIMINAL TERM
3   ********************************************
    THE PEOPLE OF THE STATE OF NEW YORK,
4
    - against -                      15-1094
5
    MICHAEL DAVIS,
6
                      Defendant.
7   ********************************************
                      Rensselaer County Courthouse
8                     Congress and Second Streets
                      Troy, New York  12180
9                     August 23, 2016

10              *Trial - Volume 5*

11  B e f o r e :

12        HONORABLE ANDREW G. CERESIA,
                           County Court Judge
13

14  A p p e a r a n c e s :

15  For  THE PEOPLE OF THE STATE OF NEW YORK:

16        JOEL E. ABELOVE, ESQ.
          Rensselaer County District Attorney
17        Rensselaer County Courthouse
          Congress and Second Streets
18        Troy, New York 12180

19        BY:  CINDY CHAVKIN, ESQ.
                   Assistant District Attorney
20

21  For  DEFENDANT:

22        JOHN C. TURI, ESQ.
          Rensselaer County Public Defender
23        Congress and Second Streets
          Troy, New York 12180
24
          BY:  WILLIAM ROBERTS, ESQ. and
25             JESSICA ZWICKLBAUER, ESQ.
               Assistant Public Defenders

**Cheryl M. Moore, Senior Court Reporter**

# APPENDIX

**M. Davis - Direct Examination by Mr. Roberts**

2     Q    Despite you being emotional, do you have a

3  clear recollection of what you saw them do?

4     A    Yes, sir.

5     Q    Now, when you saw them perform CPR, do you

6  recall how many people were doing it?

7     A    I believe it was like two different people.

8  One was doing CPR.

9     Q    And when you saw them performing CPR, were

10  they performing it with one hand or two hands?

11     A    They was doing it with two hands like this,

12  just pushing down very physical on her chest.  I asked

13  them, are you supposed to press down that hard on her?

14     Q    Let me stop you there.  So you said they

15  were physical with her, what do you mean?

16     A    They was just pressing down, like, kind of

17  like hard.

18     Q    How could you tell they were pressing

19  hard?

20     A    I could see over them.  I could see how,

21  like, they was pressing on her.

22     Q    How did that relate to how hard you were

23  pressing on her?

24     A    I kind of was bugging out because I didn't

25  press her no where near that hard.  I was kind of like

**M. Davis - Direct Examination by Mr. Roberts**

1
2 are you supposed to press on her that hard?  But they
3 was just telling me to back up out the apartment.
4     Q    Why were you concerned they were pressing so
5 hard?
6     A    I was wondering if they was hurting her.
7     Q    How long did they perform CPR like that?
8     A    I would say roughly 15 minutes, something
9 like that.
10     Q    Were they continuously performing CPR while
11 you were there?
12     A    Yes, sir.
13     Q    Was both gentlemen performing CPR in the
14 same manner?
15     A    Yes.
16     Q    The same type of force?
17     A    Yes, sir.
18     Q    Why didn't you stop them, say you're pushing
19 too hard?
20     A    Because I just figured they were doing their
21 job, they knew better than I did because I'm not a
22 professional, I don't know CPR.  I figured they were
23 doing their job and it didn't feel right, like they
24 were pushing down so hard on her.
25     Q    Did you interfere with them at all?

**M. Davis - Direct Examination by Mr. Roberts**

1

2      A    No, I didn't.

3      Q    At some point did they stop performing

4  CPR?

5      A    No.

6      Q    At some point do they leave the apartment?

7      A    Yes.

8      Q    How did they leave the apartment?

9      A    They took her on a stretcher out the

10 apartment.

11     Q    Were they performing CPR while she was still

12 on the stretcher?

13     A    Yes.

14     Q    All the way out the door, all the way into

15 the ambulance?

16     A    Yes.

17     Q    When they walk out to the ambulance what did

18 you do?

19     A    When we walked out to the ambulance they had

20 put her in the ambulance and they closed the door and I

21 said, shouldn't somebody be in there with her?  She is

22 only two years old.

23     Q    When you said that somebody should be in

24 there with her, wasn't there already people with her?

25 Weren't EMTs with her?

**M. Davis - Direct Examination by Mr. Roberts**

1

2    A    Yes.

3    Q    What did you mean by that?

4    A    Me or her mother in the hospital, somebody

5 going to the hospital with her.

6    Q    And when you brought that to someone's

7 attention how were -- what was the response?

8    A    When I actually said that I said to -- to

9 Officer Coonradt, because she was the one standing on

10 the side, she was outside, I said they put her in there

11 and closed the door.  I said, isn't someone supposed to

12 be with her?  Her mother just came home from work.

13 When I said that they pulled off in the ambulance.

14    Q    Did they ever give you an opportunity to get

15 in the ambulance with Ola?

16    A    No.

17    Q    What about Rebecca?

18    A    No.

19    Q    So as the ambulance drove away what happened

20 next?

21    A    I had stood up off the stairs.  I said,

22 what's going on?  Why did they drive off with her?  And

23 Officer Coonradt was like calm down, calm down, sit

24 down.  I said, I am calm.  I want to know why they

25 drove off with her.  And when I said that two

```
 1

 2    STATE OF NEW YORK                    COUNTY COURT
      COUNTY OF RENSSELAER                 CRIMINAL TERM
 3    ************************************************
      THE PEOPLE OF THE STATE OF NEW YORK,
 4
      - against -                          15-1094
 5
      MICHAEL DAVIS,
 6
                         Defendant.
 7    ************************************************
                         Rensselaer County Courthouse
 8                       Congress and Second Streets
                         Troy, New York  12180
 9                       August 24, 2016

10                    Trial - Volume 6

11   B e f o r e :

12        HONORABLE ANDREW G. CERESIA,
                         County Court Judge
13

14   A p p e a r a n c e s :

15   For  THE PEOPLE OF THE STATE OF NEW YORK:

16        JOEL E. ABELOVE, ESQ.
          Rensselaer County District Attorney
17        Rensselaer County Courthouse
          Congress and Second Streets
18        Troy, New York 12180

19        BY:  CINDY CHAVKIN, ESQ.
               Assistant District Attorney
20

21   For  DEFENDANT:

22        JOHN C. TURI, ESQ.
          Rensselaer County Public Defender
23        Congress and Second Streets
          Troy, New York 12180
24
          BY:  WILLIAM ROBERTS, ESQ. and
25             JESSICA ZWICKLBAUER, ESQ.
               Assistant Public Defenders
```

**APPENDIX**

1 | **Dr. S. Teas - Direct Examination by Mr. Roberts**

2 | there's a stab wound or if I do an autopsy and I find

3 | an acute myocardial infarction, M-Y-O-C-A-R-D-I-A-L,

4 | infarction, if I find evidence of a heart attack, clear

5 | cut heart attack -- Heart attack is a layman's term.

6 | It is not a medical term.  -- then I may not need a

7 | more detailed history.  But if I don't find anything

8 | that is just staring at me in the face then I would

9 | want to know more about the circumstances and I would

10 | want to know more about the history of the person who

11 | is dead and also maybe a family history.

12 |      Q    Is it possible to see something staring you

13 | in the face and neglect the need to see that medical

14 | history?

15 |      A    No.  You always try to get it, try to get as

16 | much information as you can and in a child there, I

17 | would want to get all the history starting with the

18 | birth and starting with the antenatal of the mother.

19 |      Q    What about the recitation of family history

20 | from the mother, would that be helpful?

21 |      A    Yes.

22 |      Q    What about the father?

23 |      A    Yes.

24 |      Q    How can genetic traits of the mother and

25 | father affect your ultimate findings?

# APPENDIX

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1
2    A    So there is a certain percentage of our
3 cases that we don't find an obvious cause of death and
4 so in more recent years, since our geno has been
5 identified now, there are certain mutations in our
6 genes that are associated with -- with sudden death.
7 So it is helpful to get that information.  It is still
8 not routine because it is still expensive to do it but
9 sometimes in a young person that may have died and we
10 don't have something obvious you can pursue that,
11 depending on what the importance is.
12    Q    Now, Doctor, you performed autopsies?
13    A    I have.
14    Q    How many autopsies have you performed, not
15 just you directly but also been assisting?
16    A    So, I don't assist anybody usually.  I have
17 gone and observed some autopsies at the request of
18 attorneys on the opposite side, both in criminal and
19 civil cases.  I personally performed over 6,000
20 postmortem examinations.  But I worked in a very busy
21 office where there were five pathologists performing
22 autopsies and so we always looked at our own interest
23 in cases.  I try not to perform autopsies anymore but I
24 did perform one on Monday.  Main reason, I'm getting
25 old.  And so -- and it was no different.  It was easy.

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1

2    individuals who had received CPR has that included both

3    adults as well as children?

4        A     Yes.

5        Q     Have you had the opportunity to personally

6    observe with your own eyes how CPR both performed

7    correctly and incorrectly can affect the systems of the

8    body?

9        A     What I do know from my own observation and

10   from reading the literature, that CPR can cause

11   injuries that can easily be misinterpreted as being

12   injuries that have either lead to death or been -- are

13   associated with death.  So, depending on the injuries

14   it is essential to look at other things to try and

15   differentiate whether these are injuries that occurred

16   during life or could they have been possibly been

17   occurred as a result of the CPR.  And so you go back to

18   get the history of exactly how CPR was performed, by

19   whom it was performed, what was their knowledge base.

20       Q     Okay.  Have you had an opportunity to

21   examine organs that have been affected by the effects

22   of CPR?

23       A     Yes.

24       Q     What type of organs are affected by CPR?

25       A     So CPR can cause a lot of injuries and there

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1
2   is literature where different offices have gone back
3   and looked at that. So whether you're looking at
4   children or adults, it can occur in both, usually you
5   can get fractures of the ribs, you can get fractures of
6   the sternum, which is the big breast bone that holds
7   the ribs together. You can get injuries to lungs. You
8   can get injuries to the liver. You can get injuries to
9   the kidneys. You can get injuries to the spleen. You
10   can get what we call retroperitoneal hemorrhage, which
11   is there is a hemorrhage behind the organs where our
12   organs sit. So you can get different kinds -- and of
13   course you can get facial injuries because when they
14   intubate, part of recessitation is to put a tube down
15   your throat so that you can send oxygen to the lungs.
16   So you can get a lot of oral injuries and facial
17   injuries.
18       Q   Are you familiar with the term of what a
19   laceration to the liver is?
20       A   Yes.
21       Q   What is a laceration to the liver?
22       A   So a laceration is a -- an injury that
23   quote, unquote you can say is caused by blunt trauma.
24   Where if it is in the skin the entire thickness of the
25   skin is broken. And as opposed to an abrasion which is

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1   just on the surface. And the liver, it is the same

2   thing, that you get not only the capsule, the liver is

3   covered with a thin lawyer of fibrous tissue which we

4   call a capsule, but the peritoneal or the liver tissue

5   itself is damaged.

6   Q     And in order to lacerate a liver do you need

7   something poking into it?

8   A     No.

9   Q     How do you form a laceration where you don't

10  have something jabbing into a liver?

11  A     It is just blunt trauma because the liver

12  is --

13  Q     Could you explain to me what blunt trauma

14  is? It sounds awful.

15  A     So, the way forensic pathology describes

16  trauma is a sudden penetrating injury. Where the

17  bullet is passing through. You can have a stab wound

18  where the knife passes through. Blunt trauma is where

19  you can see abrasions, lacerations, et cetera. Where,

20  say, in a motor vehicle accident or somebody punches

21  you, the pushes compress you. So those are the

22  mechanisms that you look at. And so the liver is

23  relatively soft and pliable sometimes even when I'm

24  doing the autopsy and I go to pick up the liver my

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1 
2  thumbs or my fingers will dig in and cause denting and

3  a laceration and then depending on -- on what was going

4  on.  So I can cause that by just picking it up and

5  pushing my fingers in it so that would all be

6  considered blunt trauma.  It is a big general category.

7      Q    So if I were to bump my arm on this table

8  and left a bruise is that considered blunt trauma?

9      A    Yes.

10     Q    Regardless of the amount of force the term

11 itself means just that?

12     A    Yes.

13     Q    Okay.  Now, with respect to the liver, how

14 is injury associated with CPR -- bad question.  How

15 does CPR cause the laceration to a liver?

16     A    So to understand what you need to know is

17 the anatomy and it is not -- the heart sits right here

18 in what we call our pericardium.  Then there is a thin

19 layer of muscular tissue that we call the diaphragm

20 that separates the thorax, the chest cavity, from the

21 abdominal cavity.  Right below that is the liver on the

22 right side, but it also extends a little bit to the

23 left of the midline because it has two major lobes and

24 then two smaller lobes.

25     Q    Doctor, I notice you're pointing a lot to

| | **Dr. S. Teas - Direct Examination by Mr. Roberts** |
|---|---|
| 1 | |
| 2 | your body.  In preparation of your testimony here did |
| 3 | you prepare a Power Point that relates the position of |
| 4 | the organs in the body? |
| 5 | A    Yes. |
| 6 | Q    And if I were to play that Power Point with |
| 7 | you would that assist you in your explanation of the |
| 8 | anatomy to this jury? |
| 9 | A    Yes. |
| 10 | Q    Okay.  Would it assist you in your testimony |
| 11 | in explaining the various relations of the organs, |
| 12 | their placement, as well as to CPR? |
| 13 | A    Yes. |
| 14 | MR. ROBERTS:  Your Honor, at this |
| 15 | opportunity I would ask permission to put up |
| 16 | on the screen, for demonstrative purposes, |
| 17 | some slides that the doctor can illustrate |
| 18 | what she is discussing with the jury. |
| 19 | THE COURT:  Any objection? |
| 20 | MS. CHAVKIN:  No objection. |
| 21 | THE COURT:  Okay.  You may proceed. |
| 22 | MR. ROBERTS:  Bear with me while we get |
| 23 | this up and running, Doctor. |
| 24 | THE WITNESS:  That's fine. |
| 25 | MS. ZWICKLBAUER:  Can I turn on the |

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1

2      television?

3              THE COURT:  Of course.  Mr. Roberts,

4          are you going to have the witness step down?

5              MR. ROBERTS:  I think that would be

6          best, your Honor.  Ms. Zwicklbauer is going

7          to control the slides.  If I can ask Dr.

8          Teas to come down.

9              THE COURT:  You just have to make sure

10         that the jury can see the witness.  So if

11         she was going to remain on the stand --

12             MR. ROBERTS:  Yes, Judge.  I was going

13         ask permission for the witness to come down

14         so she can point out specifically what we're

15         talking about.  I was trying to position the

16         television.  I apologize.

17             THE COURT:  That's okay.  Doctor, you

18         may step down.

19             THE WITNESS:  Thank you.  Is this good?

20             MR. ROBERTS:  You tell me.

21    Q    Is that in a position that you're able to

22    talk about the relation of the organs as well as talk

23    to the jury?

24    A    Yes.

25    Q    You'll be able to keep your voice up loud

1    **Dr. S. Teas - Direct Examination by Mr. Roberts**

2    enough?

3        A    I will.  I will.  Raise your hand if you

4    can't hear me or understand me.

5        Q    All right.  Now, Doctor, what you were

6    discussing was the relationship of the liver to the

7    heart anatomically.  Could you explain to the jury, now

8    that we have this diagram up, could you talk about what

9    you were talking about on the stand.  Where is the

10   liver and how does it relate to other organs?

11       A    So looking at -- it doesn't want to shine

12   right there.  I will just use the tip.  So looking at

13   this figure that is on the left-hand side, it is just

14   actually showing you the blood vessels that come out of

15   the heart and the liver.  And I have -- actually did

16   that from the internet, from a digital site.  So what

17   you see here is the heart.  And you are looking at it

18   at an angle, not head on, but just a little bit from

19   the right side.  And this is the heart.  These are the

20   blood vessels.  This is the blood vessel right to the

21   blue, that's called the inferior vena cava that comes

22   out the liver and goes to the right side of the heart

23   taking in deoxygenated blood that goes to the right

24   side of the heart and then it goes to the lung, gets

25   oxygenated and comes back on the opposite side.  But

1 | **Dr. S. Teas - Direct Examination by Mr. Roberts**

2 | this is the heart. This is the right side of the

3 | heart. And it is quite not that far to the left, but I

4 | think this is done just to show the relationship. And

5 | this is the liver. This is the right lobe of the

6 | liver. This small part is the left lobe. The heart

7 | actually sits at an angle and it rests on the diaphragm

8 | which is between the chest cavity and the abdominal

9 | cavity. And so it is sitting on it. This, the one to

10 | the -- to the right, or to the left, I don't know

11 | which, depending on the way you're looking, if you're

12 | facing it it would be to your left, is a head-on from a

13 | model of the human body. And so what you are seeing

14 | here that's marked in blue arrows is the heart. And I

15 | have color coded them both so that you are looking, you

16 | know, everything that is blue is the heart. And to the

17 | left is the right side of the heart and to the right is

18 | actually the left side of the heart. So this part is

19 | the right side and this, the one that is marked in a

20 | darker blue, is the diaphragm which is a thin lawyer of

21 | muscular tissue and fibrous tissue that separates the

22 | two cavities. And the liver just sits right underneath

23 | it. So the heart is actually almost resting on the

24 | liver so it's close proximity. So I guess the question

25 | was how does it cause damage --

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1

2     Q     Yes.

3     A     -- doing compressions?  If you're doing

4  compressions, depending on how you're doing it, you're

5  essentially pushing the chest cavity with the ribs back

6  to your -- to the back.  And you are compressing what I

7  call the anterior to the posterior, front to back, and

8  the recommendations are that you push the sternum about

9  a third of -- a third of the way to half of the way so

10  there is a lot of force going on there that, because

11  they're so close, that you can cause injury to the

12  liver and also the chest cavity is such -- I mean, you

13  put the compressive force, the ribs can fracture either

14  in the front or the side and also in the back because

15  those are the stress points.

16     Q     Can the duration of the CPR affect the

17  injury?

18     A     So the procedure of doing CPR, especially in

19  children, has undergone changes over the years.  It

20  always used to be that you use two hands.  That they

21  recommended that you in children you use two fingers

22  and then they started saying it is better to hold the

23  chest cavity with your hands like this.  I don't know

24  how to describe it.  So you're doing two thumb pressure

25  and there are -- there is literature out there when

31

| 1 | **Dr. S. Teas - Direct Examination by Mr. Roberts** |

2  they started using that, I think it was in 2005, that

3  they started seeing more rib fractures when they were

4  doing that kind of procedure, but it is effective in

5  getting the rhythm back. So you have got to weigh the

6  bad effects and the good effects of it. So that's how

7  it can cause damage to the liver and to the ribs.

8      Q    When you're performing CPR what's the

9  purpose of pushing on the heart? What are you doing?

10      A    Because you're mechanically trying to push

11  blood and get it to -- to start beating on its own.

12      Q    So you're essentially applying force

13  squishing the heart?

14      A    Yes.

15      Q    And the heart is returning back to normal

16  size when you're squishing it again?

17      A    Correct.

18      Q    How does blood enter and leave the heart

19  when you're performing that procedure?

20      A    It is just mechanical. It is like it is

21  sucking it in and then you're pushing it back.

22      Q    Okay. Why don't you get back in your seat

23  for a little bit. I will move this out of the way.

24          Doctor, have you had an opportunity to

25  review materials relative to the examination of V

32

1  **Dr. S. Teas - Direct Examination by Mr. Roberts**

2  Davis?

3      A    I have.

4      Q    What materials have you reviewed?

5      A    So I reviewed the autopsy report by --

6  performed by Dr. Sikirica.  I reviewed the histology

7  slides that he took under the microscope.  I reviewed

8  the autopsy photographs taken at the time of autopsy

9  and also photographs of V███ taken the day before, I

10  think by the police.  I reviewed some scene

11  photographs.  I reviewed the medical records, I think

12  it was from Seton Hospital, on V███.  And I also

13  reviewed some Well Baby or immunization records on

14  V███.  I reviewed all the police reports.  And with

15  the autopsy was included the toxicology and the

16  ancillary studies that were done.  I also reviewed

17  three interrogation tapes where Mr. Davis was

18  interrogated by the police.

19      Q    Okay.  And, Doctor, are you aware of Dr.

20  Sikirica's opinion that V███ had ultimately died based

21  on blood loss?

22      A    Yes.

23      Q    Are you in agreement with that opinion?

24      A    No.

25      Q    Why not?

| | **Dr. S. Teas - Direct Examination by Mr. Roberts** |
|---|---|
| 1 | |
| 2 | A    So it's -- it's the appearance of the |
| 3 | injury, both grossly and also under the microscope, |
| 4 | correlated with the interrogation tapes where Mr. Davis |
| 5 | describes how and where he performed CPR.  So those are |
| 6 | the things that I took into -- into consideration and |
| 7 | also my knowledge that liver injuries do not bleed very |
| 8 | rapidly to cause death in minutes to 30 minutes. |
| 9 | Q    Okay.  Do you have an opinion within a |
| 10 | medical degree -- within a certainty of medical -- |
| 11 | withdrawn. |
| 12 | Do you have an opinion with a reasonable |
| 13 | degree of medical certainty as to if V     D    died |
| 14 | because she bled out? |
| 15 | A    I have no evidence to suggest that she bled |
| 16 | out.  And when you are looking at a case like this you |
| 17 | really need to analyze everything to either say that |
| 18 | she died because of bleeding or to say that she did not |
| 19 | die of bleeding.  And I have taken that into |
| 20 | consideration with my experience and my knowledge about |
| 21 | liver injuries.  I have a little interest in liver |
| 22 | injuries, so... |
| 23 | Q    Okay. |
| 24 | A    So my opinion is that these liver injuries |
| 25 | were actually caused by CPR. |

34

```
 1   │ Dr. S. Teas - Direct Examination by Mr. Roberts

 2   │      Q    Okay.

 3   │      A    And --

 4   │      Q    Were these injuries caused when the child

 5   │ was alive or are these injuries postmortem injuries?

 6   │      A    When I say they were caused by CPR they're

 7   │ postmortem.

 8   │      Q    Why do you say that?

 9   │      A    The reason I say that the liver injuries are

10   │ postmortem is the appearance of the gross liver

11   │ injuries and also the microscopic findings are

12   │ extremely important.  When you have an injury to any

13   │ living tissue, you have blunt trauma, what you're doing

14   │ is you're crushing the tissue so under the microscope

15   │ they will not only just be bleeding but there will be

16   │ destruction of the cells that make up the organ.  So if

17   │ you are looking at the liver it would be -- the cells

18   │ are called hepatocytes.  Hepato means liver, cytes

19   │ means cells of the liver.  So if you were to look at

20   │ them under the microscope you would see that the cell

21   │ structure is destroyed in the area where the laceration

22   │ or the blunt trauma has occurred.  The microscopic

23   │ appearance of -- of V      's liver shows that the cells

24   │ are completely intact in the margins where the

25   │ lacerations occurred.  The gross gives you a clue to
```

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1
2  what you may find in the microscope but the microscope
3  beats it all. For example, say a woman has breast
4  cancer and the surgeon goes and then takes the lump out
5  and sends it to the pathology department. The
6  pathologist looks at it and may suspect that it is
7  cancerous but he or she cannot tell you by just looking
8  at it that it is cancerous or benign because there is a
9  marked overlap. It is only when he looks under the
10 microscope that he can say whether it is cancerous or
11 it's not or it's a benign condition. So then,
12 depending on that, the surgeon or the oncologist or the
13 breast doctor will take action as to what needs to be
14 done in that person. And then sometimes you have to do
15 other ancillary studies on this tissue that you get to,
16 you know, look at the origin because there are
17 different kinds of cancers to determine exactly what
18 kind of cancer it is.
19     Q    Doctor, did you perform -- did you perform
20 -- did you organize any slides that would assist you to
21 demonstrate to the jury just exactly what you're
22 talking about?
23     A    Yes.
24               MR. ROBERTS: Your Honor, may I have
25          the witness come down again so we can

1  **Dr. S. Teas - Direct Examination by Mr. Roberts**

2              discuss this?

3                   THE COURT:  Yes, you may.

4                   THE WITNESS:  I'm so sorry.

5        A     So these are actually pictures of V    's

6  liver taken at autopsy by -- by Dr. Sikirica.  The top

7  one shows the front of the liver.  So as I'm standing

8  here this is the right lobe.  And you can see that the

9  laceration is on the top of the right lobe.  So it is

10 not where the ribs were fractured.  It is away from

11 there.  And that this is the whole laceration.  Then

12 the piece of the liver that overlines that has

13 separated.  I don't know whether it was completely

14 separated or got separated as you removed the liver

15 from the body.  And then on the back of the liver, the

16 left lobe showed another laceration and there was some

17 small lacerations on the back of the right lobe too.

18 But what's important is to look at this top laceration

19 and what you see is that -- first of all, it's not in

20 any position where the blood -- big blood vessels come

21 from the liver.  The artery was intact.  There's no

22 mention that the inferior mesenteric vein and the

23 pressure in the veins is much lower.  If you were to

24 bleed it would bleed pretty slowly.  But the arteries

25 were not mentioned or were not torn to cause a rupture

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1
2  of the arteries that would bleed extensively and very
3  soon.  But what's interesting is that when you look at
4  the way the tissue looks you're not seeing pieces of
5  blood clots stuck in there.  There is hardly any.  And
6  you really have to see a comparison on what -- the
7  ante-mortem liver laceration to make the comparison.
8  But when I looked at that grossly I knew I had to look
9  at the microscope to draw any kind of conclusions from
10 it.
11     Q    Did you prepare a slide to compare and
12 contrast relative to what we're talking about?
13     A    I did because I had cases of both that I
14 have called CPR when I did the autopsy and cases where
15 I have done a second autopsy I agreed that it was
16 ante-mortem.  The question with that was the timing of
17 injuries.
18     Q    And this specific slide, does that speak to
19 what we're discussing?
20     A    Yes.  So this is another case that I
21 actually did a second autopsy, that somebody else did
22 the autopsy and that's why it is cut in a different way
23 but what you do is this is all the laceration here and
24 this was similar, it had actually opened up on one
25 side.  So you can see the thick blood that's got --

1  **Dr. S. Teas - Direct Examination by Mr. Roberts**

2  that is, like, embedded in the laceration itself.  It

3  doesn't just fall off.  And in contrast to -- this is

4  V      's liver, where you see that there isn't that

5  necrotic, like, blood that is, you know, stuck there

6  for awhile, so...

7      Q    What does that tell you in layman's terms?

8      A    It just tells me that I need to look further

9  and rule out CPR may have caused that injury.  I mean,

10  I looked at this right away and I said it is

11  antemortem.  This is the trauma that was responsible

12  for the child's death.

13      Q    Is that present in V      s liver?

14      A    No, it is not.  And there are other things.

15  There are little subcapsular hemorrhages which is very

16  typical of what we see in CPR associated liver

17  injuries.

18      Q    Now, with respect to what you were

19  discussing on a cellular lever, do you have some slides

20  that you can demonstrate visually for the jury what

21  you're talking about?  Do you know which one you need

22  here?

23      A    It is further forward.  Right -- right after

24  the first liver that you showed.  Further.  Move

25  forward.  Yeah, that's it.  Maybe this -- maybe one

| | |
|---|---|
| 1 | **Dr. S. Teas - Direct Examination by Mr. Roberts** |
| 2 | before that. Yeah. Okay. I have two slides of that. |
| 3 | Q What are we looking at here, Doctor? |
| 4 | A So this is V███'s liver. This is one of |
| 5 | the slides that I received from the autopsy that Dr. |
| 6 | Sikirica had performed. So you can see all these red |
| 7 | blood cells that they're actually still pretty rounded. |
| 8 | They haven't -- the red blood cells after that just |
| 9 | fall apart. That actually helps sometimes with the |
| 10 | timing. But what you can see even in the area of |
| 11 | hemorrhage I can recognize each liver cell or |
| 12 | hepatocyte. The blue part is what we call the nucleus |
| 13 | of the cell. The pink part for each cell is the |
| 14 | cytoplasm. That's the two main components of the cell. |
| 15 | You have the nucleus where DNA resides and then you |
| 16 | have the cytoplasm where there are other organs that |
| 17 | control our -- control your function. These two are |
| 18 | the same slides. This is a higher power. And you can |
| 19 | recognize each cell separately. If this was a crush |
| 20 | injury that occurred during death those cells would not |
| 21 | be recognizable. They would be -- they would lyse, |
| 22 | they would be open, so I wouldn't be able to recognize |
| 23 | the structure. Go to the next one. And so this is |
| 24 | another area and here you can see that this is a |
| 25 | laceration that was recognized -- that was seen. And |

1 **Dr. S. Teas - Direct Examination by Mr. Roberts**

2 then this blue line marks the edge of the laceration

3 and I can see the cells but what is more important is

4 as you go on the higher power you can literally see

5 this -- this is from the same area as that and you can

6 just recognize the entire cell separately. It is

7 pretty intact. It doesn't show what we call necrosis.

8 Necrosis is cell death during life. If -- if a cell

9 dies after death, and it does, then you call that

10 lysis. The cell is just splitting up because of the

11 time that's passed between -- between the time a person

12 passed and -- that's what happens when the body starts

13 to decompose. So this is a comparison. This is,

14 again, to contrast this, this is from the other liver

15 that I showed you so you can see how different it

16 looks. The blood is stuck. It is not moving away.

17 This -- this -- so you compare. This is V   's liver

18 and you can see the edge here and you can see the edge

19 there. And you -- what has happened, not only is there

20 hemorrhage, this whole tissue, you can see little

21 specks of -- of nuclei but it is destroyed. It's --

22 it's necrotic.

23    Q    And all of these slides on the cellular

24 level point to whether or not V   was alive or

25 deceased at the time of CPR?

41

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1

2    A    It points to -- to me that this is more

3 likely to be a CPR related injury.

4    Q    Okay.  Well --

5    A    I don't know if you want to go through the

6 others, but --

7    Q    Sure.  While you're down here let's talk

8 about the other ones.

9    A    The other thing that is important when you

10 have trauma that has occurred in life you just don't

11 get the liver lacerated, you get a lot -- everything is

12 just situated pretty tight; the pancreas is right

13 behind the liver, the adrenal glands are there, the

14 kidneys are there.  So you often get injuries to those

15 organs that you can see grossly or not under the

16 microscope.  And the hemorrhage will just spread

17 between those tissues.  So you need to look at all

18 that.  This is actually a section of the pancreas from

19 the other case that I told you and that it was my

20 opinion that this was antemortem, and that wasn't the

21 issue in that case at all, but you can see how the

22 blood has dissected into the connective tissue between

23 the pancreas.  These are little lobules of the

24 pancreas.  The pancreas is a gland that sits behind the

25 liver that produces enzymes and digests your food and

| | **Dr. S. Teas - Direct Examination by Mr. Roberts** |
|---|---|
| 1 | |
| 2 | also produces insulin. It is sitting right there.  You |
| 3 | see the massive hemorrage it's caused.  The adrenal |
| 4 | gland is a small gland that sits on top of the kidney, |
| 5 | controls a lot of functions and there is extensive |
| 6 | hemorrhage in the tissue surrounding it.  And none of |
| 7 | that was present in V⬛, so that's another clue. |
| 8 | Q     What do you mean it's a clue? |
| 9 | A     It is a clue that you should look further |
| 10 | and inspect further as to why you are getting just an |
| 11 | isolated liver injury with a little hemorrhage in the |
| 12 | muscles of the diaphragm, that you should look more |
| 13 | closely at could this possibly be CPR related. |
| 14 | Q     Now if this was a blunt force trauma injury |
| 15 | to the abdomen that lacerated the liver, how would that |
| 16 | force affect surrounding organs? |
| 17 | A     It should -- it should affect them too. |
| 18 | With CPR, because the liver is more pliable and softer |
| 19 | than some of the other organs it is more likely to be |
| 20 | injured than some of the other organs. |
| 21 | Q     And did you -- what value, if any, did the |
| 22 | lack of bruising on the exterior of V⬛ play into |
| 23 | your determination? |
| 24 | A     I think that's another clue because the skin |
| 25 | is -- I think that's another clue to warn you to look |

**Cheryl M. Moore, Senior Court Reporter**

1 | **Dr. S. Teas - Direct Examination by Mr. Roberts**

2 further. Though you may sometimes get intraabdominal

3 injuries without external injuries but if you -- if you

4 were seeing that you may not be able to see the skin

5 surface but you often see hemorrhages in the -- in the

6 connective tissue underneath the skin and none of that

7 was seen in this case either.

8    Q    Okay. Are we all set with the slides,

9 Doctor? Is there --

10    A    The only other slides I put in is of another

11 case that it was my opinion that it's CPR and I did the

12 autopsy and the lacerations were pretty extensive.

13 This is V       's liver. This is another case that I had

14 that it was my opinion that this was CPR. I did the

15 autopsy. I raised the issue and investigated to see

16 how CPR had been done.

17    Q    Do you notice similarities?

18    A    Yes, I do. As you can see, again, what you

19 are seeing the dark here is really not blood. When

20 there is an opening and you take a photograph that area

21 appears to be dark rather than blood. This is a little

22 bit of blood. But, again, you see there is hardly any

23 blood stuck compared to the other ones. This liver was

24 lacerated inside and then it was lacerated on the back

25 too and, again, you are seeing these little subcapsular

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1  
2   hemorrhages which are more typical of CPR related liver

3   injury.

4       Q    Okay.  Why don't you shut that down.

5           Now, Doctor, are you familiar with the term

6   sudden unexpected death --

7       A    Yes.

8       Q    -- associated -- what is that?

9       A    So, sudden unexpected death is when somebody

10  dies without having a medical history and the person

11  just dies suddenly.  And different people define it

12  differently.  Some people say it's like they had no

13  symptoms for 24 hours.  Some people say they had no

14  symptoms ever.  So it varies.  But when somebody dies

15  but has no medical history.  So when a 16 year old

16  drops dead and there's no medical history then we call

17  that sudden unexpected death.

18      Q    So are you familiar with the term SIDS?

19      A    Yes.

20      Q    What is SIDS?

21      A    So SIDS, it stands for Sudden Infant Death

22  Syndrome.  And it was a term that was formed back in

23  1969 when the first definition of SIDS.  Since I'm

24  almost that old I have seen the changes that have

25  occurred.  So it was defined as the death of a kid who

1 | **Dr. S. Teas - Direct Examination by Mr. Roberts**

2 was under two years of age and died suddenly. Then it

3 was revised in the '80s to decrease the age to one year

4 and with the caveat that you have to do a scene

5 investigation to rule out environmental factors.

6     Q    Okay. Was there a cut-off period for when

7 SIDS was related to age?

8     A    Yes. So originally the original definition

9 from 1969 was two years and then I think it was '89

10 that they changed it to one year and then over -- since

11 then the terminology has undergone a lot of changes

12 where some people don't like to use the term SIDS

13 because SIDS implies that it was definitely natural and

14 they started using the term sudden unexplained infant

15 death and so that it could include other things because

16 they felt some of these cases where it may have been

17 suffocation, either accidental or intentional, and with

18 the back to sleep campaign where instead of putting the

19 infant down -- face down with the -- the kid is on the

20 back. They have changed some of the terminology.

21 Unfortunately or fortunately the records department

22 still codes them all as SIDS.

23     Q    Is there -- is there any difference with

24 unexplained death as opposed to SIDS as to what you see

25 in a two and a half year old?

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1

2     A    It is similar excepting sudden death in the

3 first year of life is more common than in a toddler.

4 However, you can get sudden death all the way going

5 into their 20s and 30s. So, I mean, I have seen many

6 cases where a 16-year-old, 15-year-old just drops dead

7 with no medical history. And actually no cause that I

8 find when I do the autopsy. Or if I find a cause it is

9 a very subtle cause that the coronary arteries didn't

10 rise the same way, then you say could this possibly be

11 because of that. And as they started to do more

12 studies, just metobolic studies with conduction studies

13 in the heart, they find at least maybe five to ten

14 percent of these cases do have a cause but you have to

15 do the extra studies to -- to find out what may have

16 caused the death.

17     Q    Is that what we're talking about, the geno?

18     A    Correct.

19     Q    Okay. So it is necessary to rule out these

20 other issues to go into the geno?

21     A    Correct. I mean it is like the condition

22 known as Long QT Syndrome because when you are looking

23 at the QRS complex it is the rhythm of the heart that

24 is the issue and so they're associated with certain

25 mutations and genes so you specifically look for those

| 1 | **Dr. S. Teas - Direct Examination by Mr. Roberts** |
|---|---|

2  mutations. They're pretty specialized studies, cost a

3  lot of money. Few places do it at this time and it is

4  not routine.

5      Q    Now, with respect to V⬛⬛⬛, the materials

6  that you reviewed, could you -- could you explain to me

7  what -- withdrawn.

8          Could you explain what a seizure is?

9      A    Okay. A seizure is like having something in

10  the brain that causes a person to have convulsions.

11  And the theory, it is a theory, is that when you have a

12  seizure somehow it affects the rhythm of your heart.

13  Because we know as forensic pathologists that a certain

14  percentage of people who have a history of seizure just

15  die suddenly and we may not find anything in autopsy.

16  In Cooke County, when I worked there, we had about 50

17  cases a year that people had a history of seizure, or

18  there was a question that they may have had it, that

19  died suddenly and some of them we found a cause of the

20  seizure but in most of them we didn't find a cause for

21  the seizure.

22      Q    And if an individual passes without someone

23  seeing the symptoms before that individual was either

24  unconscious or resulted in their death, what would you

25  look for to determine -- or are you able to determine

| | |
|---|---|
| 1 | **Dr. S. Teas - Direct Examination by Mr. Roberts** |
| 2 | to suggest that they have any drugs involved or any |
| 3 | foul play involved, I would say the cause of death was |
| 4 | cardiac arrhythmia. What I'm saying is that it was a |
| 5 | functional death rather than an anatomical death. |
| 6 | Q    Now, in reviewing the materials provided by |
| 7 | Dr. Sikirica, as well as his opinions, did you see any |
| 8 | value that Dr. Sikirica associated with the first-hand |
| 9 | account of V    's mother, as well as Mr. Davis, that |
| 10 | she was lethargic and didn't have an appetite the |
| 11 | morning before she received emergency services? |
| 12 | A    I mean, I don't know what you mean. I don't |
| 13 | know what Dr. Sikirica was thinking. |
| 14 | Q    Okay. |
| 15 | A    I can't fathom that. |
| 16 | Q    In this specific case, are you aware of the |
| 17 | fact that the child was lethargic and wasn't eating |
| 18 | that morning? |
| 19 | A    Yes. And there was also a history that she |
| 20 | complained of chest pain the week before. |
| 21 | Q    And did you see that specific event, the |
| 22 | lethargic child, was that taken into account in any of |
| 23 | the reports that you looked at from Dr. Sikirica? |
| 24 | A    Again, I don't know what you mean that he |
| 25 | took it into account. I don't know whether he assigned |

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1   

2  any significance to it, whether he considered it or

3  not.

4     Q   Is that -- is that specific first-hand

5  account from witnesses related to moments before she

6  receives treatment, is that significant?

7     A   It is.  You take everything into

8  consideration that you wonder was something going on in

9  this child.  And I thought the possible history of the

10  chest pain in a two and a half year old is also

11  important.

12     Q  So with that specific report, does it in any

13  way relate that it is more important to then speak with

14  the mother and get the history of both the child in

15  addition to the mother's familial history?

16     A   It is always important when you have a death

17  that you cannot figure out what happened.  The problem

18  is if you decide that's the injury that caused the

19  death then everything else comes to a screeching halt.

20     Q   Is that your opinion that occurred here?

21     A   Yes.

22     Q   What, if anything -- what, if any,

23  significance did you put relative to -- well, what's

24  vitreous fluid?

25     A   V-I-T-R-E-O-U-S.

1 | **Dr. S. Teas - Direct Examination by Mr. Roberts**

2 glucose or electrolyte results to evaluate V    for

3 dehydration, especially if she had a history of not

4 drinking and I don't know exactly whether she was

5 hydrated or not, and I don't have those results, I

6 cannot draw any conclusions about her electrolytes

7 being normal. And if your electrolytes are abnormal

8 that can affect the rhythm of the heart too.

9     Q    Doctor, did you note whether or not there

10 was any infection in V   ?

11     A    So the -- there was a history that she

12 wasn't quite well the week before and the lungs

13 actually did show some chronic inflammation and I think

14 I had taken some sections and put it on the Power Point

15 too. So there are chronic inflamed cells around the

16 bronchi. The tracheal-bronchial tree is like a tree.

17 You get the trachea that then divides into two main

18 bronchi and then divides into smaller ones. And the

19 little bronchi under the microscope had evidence of

20 chronic inflammation cells around them.

21     Q    Now, Doctor, the one last thing I want to

22 talk to you about is the volume of blood in the

23 abdominal cavity of V   . I think there are records

24 that indicate there was 350 milliliters and 50

25 milliliter clot. How would you explain how blood gets

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1
2  into the abdominal cavity if the person is deceased?

3      A      So we continue to bleed after death.  When I

4  do an autopsy, and sometimes it is 24 hours after that,

5  and I cut a vessel it will just bleed all over.  There

6  have been cases where the organ transplant people have

7  tried to put a needle and draw blood from a big vessel

8  and then I open the chest cavity and there is a lot of

9  blood, or they try to put a central line which they are

10 trying to put a central line when they're trying to

11 resuscitate or stabilize a person whose -- whose lost

12 consciousness, they can tear the blood vessel and that

13 will also produce blood.  We know that you can bleed

14 after death.  We use suction all the time when we're

15 doing an autopsy because blood leaking out of blood

16 vessels obstruct our feel and we want to take that out.

17 No pathologist should draw the conclusion that because

18 you're seeing 350 or 400ccs of blood in the abdominal

19 cavity that that whole amount was present when the

20 person died.  We don't know how much of it came before

21 the person died and how much of it came after the

22 person died.  And it is mentioned in the bionetes

23 textbooks, it is not just my experience.  So we have no

24 way of knowing exactly how much blood or if there was

25 any blood in V      's abdomen when she died.  So I think

**Cheryl M. Moore, Senior Court Reporter**

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1
2  that should be taken with cautiousness. And so the
3  next thing you do is to try to calculate that the blood
4  volume that I'm seeing in this person is that
5  sufficient to be a cause of death, is it sufficient to
6  lead to shock for this person to collapse. And V
7  did have about 40 percent, 38 to 40 percent of her
8  blood volume in her abdominal cavity so it would be
9  sufficient for her to start going in shock. The
10 problem is that when you go into shock you just don't
11 die, bing, go suddenly, it is a process. It's -- so by
12 the time you have lost 40 percent you start to go in
13 shock, your heart rate beats faster, your respiration
14 gets faster, your blood pressure starts to fall. It
15 is -- it is not instantaneous. That kind of a death is
16 not instantaneous. And so you need to start looking at
17 that and realize that I really have no way of
18 estimating how much blood volume there was when this
19 person dropped. In the other case that I had with the
20 CPR she also had just barely enough blood to be a cause
21 of death. And that to a lay person and detectives
22 around is very hard to explain but that is the reality
23 when you see all the cases that you cannot estimate
24 that. And that I also take into fact that liver
25 lacerations do not kill instantaneously. There are

**Dr. S. Teas - Direct Examination by Mr. Roberts**

1  cases where they go to the emergency room and they are

2  sent home.  In fact, Moritz, M-O-R-I-T-Z, is called,

3  like, the grandfather of forensic pathology.  He has a

4  book of trauma.  He mentions a case.  ER physicians

5  know that liver lacerations bleed slowly.  Surgeons

6  will not operate legitimately even on major

7  lacerations.  So it is a process.  It doesn't just

8  happen suddenly.  So that's -- those are the other

9  things that you need to take into consideration.

10       Q     You mentioned briefly that you performed

11  autopsies with detectives around, correct?

12       A     Yes.

13       Q     Have you ever experienced situations where

14  law enforcement have a certain expectation when you're

15  performing the autopsy?

16       A     I mean, I don't know if they are

17  expectations, but they are often there, sometimes more,

18  sometimes few.  Often times a prosecutor is there.

19  When I work in the medical examiner's office we tried

20  to keep them out because the medical examiner was in

21  charge.  All I had to do was tell my boss I don't want

22  them around, you tell them to go to the next room.

23  When I worked in another county they had a window, they

24  would be out and when I got done I would go and talk to

| | **Dr. S. Teas - Direct Examination by Mr. Roberts** |
|---|---|
| 1 | |
| 2 | them, but -- |
| 3 | Q    Why didn't you want them in the room? |
| 4 | A    I -- personally, they just delay me and -- |
| 5 | and make things difficult and draw conclusions that |
| 6 | they shouldn't be drawing.  And the NAS, National |
| 7 | Academy of Science, actually came out in a report from |
| 8 | 2009 that the law enforcement and the prosecutors |
| 9 | shouldn't be influencing the forensic pathologist. |
| 10 | Q    Have you experienced an attempt to influence |
| 11 | your determination? |
| 12 | A    Definitely on the case that I showed you in |
| 13 | the liver they tried to influence me a great deal. |
| 14 | Q    Okay. |
| 15 |         MR. ROBERTS:  Could I have a moment, |
| 16 |         your Honor? |
| 17 |         THE COURT:  You may. |
| 18 |         (Whereupon, a pause ensued.) |
| 19 |         MR. ROBERTS:  I have no further |
| 20 |         questions. |
| 21 |         Thank you, Dr. Teas. |
| 22 |         THE WITNESS:  Thank you. |
| 23 |         THE COURT:  Okay.  Members of the Jury, |
| 24 |         we're going to take a brief break at this |
| 25 |         time.  We'll break for about 15 minutes. |

58

| 1 | **Dr. S. Teas - Cross Examination by Ms. Chavkin** |
|---|---|
| 2 | Thank you. The Court will stand in |
| 3 | recess. |
| 4 | (Whereupon, a brief recess was taken.) |
| 5 | (In open court.) |
| 6 | THE COURT: We'll bring the jury back |
| 7 | in, please. |
| 8 | (Whereupon, the jury entered the |
| 9 | courtroom.) |
| 10 | THE COURT: Okay. Please be seated. |
| 11 | Members of the Jury, the sworn witness |
| 12 | remains Shaku Teas. |
| 13 | Ma'am, I remind you that you're still |
| 14 | under oath. |
| 15 | And, Ms. Chavkin, you may proceed |
| 16 | whenever you're ready. |
| 17 | MS. CHAVKIN: Thank you, your Honor. |
| 18 | *Cross Examination by Ms. Chavkin* |
| 19 | Q    Good morning, Doctor. |
| 20 | A    Good morning. |
| 21 | Q    Just a few questions on your background |
| 22 | before we start. Are you licensed in the State of New |
| 23 | York? |
| 24 | A    No, I'm not. |
| 25 | Q    And do you do trials as an expert witness? |

1  **Dr. S. Teas - Cross Examination by Ms. Chavkin**

2  for the coroner's I had access to the labs that the --

3  that the samples went to.

4      Q    Doctor, have you ever heard the term ratio

5  failure?

6      A    I -- that's a toxicology issue.  I do not

7  know anything about it and I have not discussed that

8  with any toxicologist.

9      Q    Just to be clear, Doctor, it is your

10  testimony that the liver injury was postmortem?

11      A    Yes, it was due to CPR.

12      Q    Okay.  And that there is no explanation for

13  V      's death at this point?

14      A    Correct.  At this point I have no

15  explanation.

16      Q    You received some slides in this case,

17  correct?

18      A    I did.

19      Q    And do the slides assist you in coming to

20  your conclusion about the cause of death?

21      A    It came to my assistance to help me

22  understand the liver injuries were secondary to CPR.

23      Q    And did the slides explain why V      needed

24  any attempts to be made to revive her?

25      A    I beg your pardon?

63

1 **Dr. S. Teas - Cross Examination by Ms. Chavkin**

2    Q    Okay.  Did the slides explain why V

3 needed any attempts to be made to revive her?

4    A    I'm not sure that the slides would help me

5 in that case anyway, so...

6    Q    Okay.  Do they reveal any reason for her to

7 be unconscious?

8    A    No.

9    Q    Would the loss of 350 to 400 mls of blood

10 cause her to be unconscious?

11    A    It could lead to shock, yes.

12    Q    Have you seen injuries like this before?

13    A    I think I just demonstrated at least one

14 case and where they were very similar.  There are no

15 two cases that are identical in forensic pathology.

16 Every one is a little different, but there are

17 similarities.

18    Q    On your slide that you showed, Doctor, isn't

19 it true that comparing to V      's liver you showed the

20 slide of an adult liver?

21    A    No.  What was -- it was the actual liver

22 from children.  The one that I said was due to CPR was

23 actually a seven month old and I think the other one

24 that I said was a real liver injury was a toddler.  I

25 don't remember the exact age.

| | |
|---|---|
| 1 | **Dr. S. Teas - Cross Examination by Ms. Chavkin** |
| 2 | Q    How does one perform CPR on a two and a half |
| 3 | year old? |
| 4 | A    So I'm not an emergency room physician or |
| 5 | cardiologist, but as I mentioned, that they have gone |
| 6 | through changes.  The first thing you do with CPR, |
| 7 | whether an adult or child, is to take and lay the |
| 8 | person on a flat surface and not on a soft surface, not |
| 9 | a bed, not a futon.  The other case that I showed CPR |
| 10 | was also done on a bed to that child.  So that's the |
| 11 | first thing that you do.  And then with an adult you |
| 12 | actually use two hands, one hand over the other.  With |
| 13 | a child you can either use the two fingers or use the |
| 14 | thumbs.  But you're not suppose to put one hand behind |
| 15 | and one hand in front and push. |
| 16 | Q    As you saw the Defendant do on video? |
| 17 | A    Yes. |
| 18 | Q    Does CPR involve pressure applied to the |
| 19 | abdomen? |
| 20 | A    You should not, but a lot of procedures are |
| 21 | done incorrectly, especially by lay people.  Just as |
| 22 | you can do an incorrect Heimlich maneuver.  When you do |
| 23 | a Heimlich maneuver you are supposed to push up.  If |
| 24 | you bush back you cause a lot of damage.  And I've had |
| 25 | cases where the Heimlich maneuver was performed |

1 | **Dr. S. Teas - Cross Examination by Ms. Chavkin**

2 | incorrectly and lead to ruptures of a viscous.

3 | Q    So applying pressure to the abdomen is not

4 | caused by CPR, correct?

5 | A    It's not, but the heart, as I demonstrated

6 | earlier, the heart and the liver are very close so even

7 | if you're applying just pressure on the chest the liver

8 | is right there.  The liver is really not in the

9 | abdominal -- in the abdomen.  As you look at it

10 | externally it's, it's -- depending on whether you are

11 | inspiring or expiring in your respiration it moves up

12 | and down.  So it can actually go all the way up to the

13 | fifth rib.

14 | Q    Well, are you aware of which of V        's ribs

15 | were fractured?

16 | A    Dr. Sikirica mentioned I think ninth and

17 | tenth fracture posteriorly.

18 | Q    Posteriorly.  If a person applies pressure

19 | to the abdomen what risks are involved?

20 | A    Depends on how you're applying the pressure.

21 | You can cause rupture of the viscous or the liver, the

22 | spleen, you know, different organs.  So the liver often

23 | is the most common.  Again, it is because of its

24 | structure.

25 | Q    Have you ever heard of the term CPR