# 23-589

IN THE

# United States Court of Appeals
# for the Second Circuit

MICHAEL DAVIS-GUIDER,
*Plaintiff-Counter-Defendant-Appellant,*

— v. —

CITY OF TROY, RONALD FOUNTAIN, INDIVIDUALLY,
DANIELLE COONRADT, INDIVIDUALLY,
CHARLES MCDONALD, INDIVIDUALLY,
TIM COLANERI, INDIVIDUALLY,
*Defendants-Cross-Claimants-Counter-Claimants-Appellees,*

RENSSELAER COUNTY,
MICHAEL SIKIRICA, INDIVIDUALLY,
*Defendants-Cross-Defendants-Counter-Claimants-Appellees,*

ADAM R. MASON, INDIVIDUALLY
*Defendant-Cross-Claimant-Counter-Claimant,*

JOEL ABELOVE, INDIVIDUALLY,
*Defendant-Cross-Defendant-Counter-Claimant,*

JOHN AND JANE DOES 1-10, INDIVIDUALLY,
MICHAEL E. PARROW, ANDRA ACKERMAN,
*Defendants.*

On Appeal from the United States District Court
for the Northern District of New York
Case No. 1:17-cv-1290 (FJS/DJS)

## APPENDIX VOLUME 9 OF 11

# APPENDIX VOLUME 9 TABLE OF CONTENTS

ECF 123-7: Exhibit 7 .................................................................. 1662

ECF 123-8: Exhibit 8 .................................................................. 1668

ECF 123-10: Exhibit 10 .............................................................. 1670

ECF 123-11: Exhibit 11 .............................................................. 1676

ECF 123-12: Exhibit 12 .............................................................. 1679

ECF 123-13: Exhibit 13 .............................................................. 1680

ECF 123-14: Exhibit 14 .............................................................. 1683

ECF 123-16: Exhibit 16 .............................................................. 1684

ECF 123-17: Exhibit 17 .............................................................. 1688

ECF 123-18: Exhibit 18 .............................................................. 1691

ECF 123-19: Exhibit 19 .............................................................. 1732

ECF 123-20: Exhibit 20 .............................................................. 1750

ECF 123-22: Exhibit 22 .............................................................. 1763

ECF 123-23: Exhibit 23 .............................................................. 1765

ECF 123-24: Exhibit 24 .............................................................. 1766

ECF 123-25: Exhibit 25 .............................................................. 1770

ECF 123-26: Exhibit 26 .............................................................. 1777

ECF 123-27: Exhibit 27 .............................................................. 1778

ECF 123-28: Exhibit 28 .............................................................. 1779

ECF 123-29: Exhibit 29 .............................................................. 1794

ECF 123-30: Exhibit 30 .............................................................. 1795

ECF 123-31: Exhibit 31 .............................................................. 1797

# <u>APPENDIX VOLUME 9 TABLE OF CONTENTS</u>

ECF 123-32: Exhibit 32..............................................................1799

ECF 123-33: Exhibit 33..............................................................1804

ECF 123-34: Exhibit 34..............................................................1807

ECF 123-35: Exhibit 35..............................................................1808

ECF 123-36: Exhibit 36..............................................................1814

ECF 123-37: Exhibit 37..............................................................1817

ECF 123-38: Exhibit 38..............................................................1818

ECF 123-39: Exhibit 39..............................................................1822

# APPENDIX

```
1
2   STATE OF NEW YORK                    COUNTY COURT
    COUNTY OF RENSSELAER                 CRIMINAL TERM
3   ************************************************
    THE PEOPLE OF THE STATE OF NEW YORK,
4
    - against -                          15-1094
5
    MICHAEL DAVIS,
6
                          Defendant.
7   ************************************************
                          Rensselaer County Courthouse
8                         Congress and Second Streets
                          Troy, New York  12180
9                         August 25, 2016

10              Trial - Volume 7

11  B e f o r e :

12       HONORABLE ANDREW G. CERESIA,
                          County Court Judge
13

14  A p p e a r a n c e s :

15  For  THE PEOPLE OF THE STATE OF NEW YORK:

16       JOEL E. ABELOVE, ESQ.
         Rensselaer County District Attorney
17       Rensselaer County Courthouse
         Congress and Second Streets
18       Troy, New York 12180

19       BY:  CINDY CHAVKIN, ESQ.
              Assistant District Attorney
20

21  For  DEFENDANT:

22       JOHN C. TURI, ESQ.
         Rensselaer County Public Defender
23       Congress and Second Streets
         Troy, New York 12180
24
         BY:  WILLIAM ROBERTS, ESQ. and
25            JESSICA ZWICKLBAUER, ESQ.
              Assistant Public Defenders
```

**Cheryl M. Moore, Senior Court Reporter**

People v. Michael Davis

```
 1
 2          Thank you.
 3          (Whereupon, the deliberating jury
 4    exited the courtroom to resume
 5    deliberations.)
 6          THE COURT:  Any exceptions to the read
 7    back from the People?
 8          MS. CHAVKIN:  No, your Honor.
 9          THE COURT:  From the defense?
10          MR. ROBERTS:  No, your Honor.
11          THE COURT:  Okay.  The Court will stand
12    in recess.
13          Thank you.
14          (Whereupon, a recess was taken awaiting
15    further communication from the deliberating
16    jury.)
17          (In open court.)
18          (Jury Note was marked Court's Exhibit
19    4.)
20          THE COURT:  Please be seated.
21          Were there any members of the media who
22    sought audio/visual coverage of the
23    recording of the verdict?  No.  Okay.  We
24    will proceed.
25          All right.  The Court is in receipt of
```

**People v. Michael Davis**

```
 2                 a note from the jury.  The note has been
 3                 marked Court's Exhibit 4.  Copies of the
 4                 note have been provided to the attorneys.
 5                 The note indicates that the jury has reached
 6                 a verdict.
 7                      It will be the Court's intention at
 8                 this time to bring the jury back into court
 9                 and record the verdict.
10                      People okay with that?
11                      MS. CHAVKIN:  Yes, your Honor.
12                      THE COURT:  Defense okay with that?
13                      MR. ROBERTS:  Absolutely, your Honor.
14                      THE COURT:  Okay.  We'll bring the jury
15                 back in, please.
16                      (Whereupon, the deliberating jury
17                 entered the courtroom.)
18                      THE COURT:  Okay.  Please be seated.
19                      Members of the Jury, the Court is in
20                 receipt of your note.  The note has been
21                 marked Court's Exhibit 4.  The note
22                 indicates that the jury has reached a
23                 verdict.
24                      I will ask the Foreperson, sir, is that
25                 correct?
```

**Cheryl M. Moore, Senior Court Reporter**

# APPENDIX

1  People v. Michael Davis

2         FOREPERSON OF THE JURY:  That's

3  correct, your Honor.

4         THE COURT:  Okay.  If you would please

5  hand the verdict sheet up to the Court for

6  my review.

7         Thank you.

8         (Whereupon, a pause ensued.)

9         THE COURT:  Okay.  At this time the

10  Court will hand the verdict sheet back to

11  the Foreperson.  I ask the Foreperson to

12  please stand.  I will ask the Defendant and

13  his attorneys to rise and please face the

14  jury.  I will ask that the Court Clerk to

15  record the verdict.

16         CLERK OF THE COURT:  Has the jury

17  reached a verdict?

18         FOREPERSON OF THE JURY:  Yes, it has.

19         CLERK OF THE COURT:  Is your verdict

20  unanimous?

21         PROSPECTIVE JUROR:  Yes, it is.

22         CLERK OF THE COURT:  In the matter of

23  the People of the State of New York versus

24  Michael Davis, Indictment Number 15-1094, as

25  to Count One, Manslaughter in the First

**People v. Michael Davis**

```
1
2          Degree, in violation of Penal Law Section
3          125.20(4), how do you find; guilty or not
4          guilty?
5               FOREPERSON OF THE JURY:  Not guilty.
6               CLERK OF THE COURT:  Is this verdict
7          unanimous?
8               FOREPERSON OF THE JURY:  It is.
9               CLERK OF THE COURT:  As to Count Two,
10         Manslaughter in the Second Degree, in
11         violation of Penal Law Section 125.15(1),
12         how do find guilty or not guilty?
13              FOREPERSON OF THE JURY:  Not guilty.
14              CLERK OF THE COURT:  Is this verdict
15         unanimous?
16              FOREPERSON OF THE JURY:  Yes.
17              THE COURT:  As to the Count Three,
18         Endangering the Welfare of a Child, in
19         violation of Penal Law Section 260.10(1),
20         how do you find; guilty or not guilty?
21              FOREPERSON OF THE JURY:  Not guilty.
22              CLERK OF THE COURT:  Is this verdict
23         unanimous?
24              FOREPERSON OF THE JURY:  Yes.
25              CLERK OF THE COURT:  Members of the
```

# APPENDIX

**People v. Michael Davis**

1

2      Jury, harken to your verdict as recorded by

3      this Court, as to Count One, Manslaughter in

4      the First Degree, you say you find the

5      Defendant not guilty; as to Count Two,

6      Manslaughter in the Second Degree, you say

7      you find the Defendant not guilty; as to

8      Count Three, Endangering the Welfare of a

9      Child, you say you find the Defendant not

10      guilty.

11      So say you all?

12      (Whereupon, the jury answered

13      collectively in the affirmative.)

14      THE COURT:  Do the People wish the jury

15      polled?

16      MS. CHAVKIN:  No, your Honor, that's

17      okay.

18      THE COURT:  Okay.  The Defendant and

19      his attorneys may be seated.

20      All right.  Members of the Jury, at

21      this time I would like to take this

22      opportunity to publicly thank you for the

23      service that you have given to us.  The

24      sacrifice that you all made over the course

25      of the last couple of weeks, all the time

**APPENDIX**                                          **1668**

CONTROL #   020320-15                    PHONE
                                          HOME   347-659-4396

                                          WORK _____

## DEPOSITION OF A WITNESS          **COURT**

STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

NAME _ Rebeccca A. Parker_____     DATE OF BIRTH ▆▆▆▆

RESIDING AT __856 4th Avenue Troy NY 12182 ____ AGE _22_____

OCCUPATION ___Clerk Stewarts Glen and 6th Avenue Troy NY _____

DEPOSE AND SAY:

R.P. ✕ I would like to state that I am the mother of V▆ V D▆her date of birth was ▆▆▆. I would like to state that I currently reside with my boyfriend Michael Davis and my daughter. We have been here for approximately 9 months. We used to live in NYC. V▆ father is Clarence Davis who resides in NYC presently. I was a victim of domestic violence from him and so was my daughter from him.

On February 26th 2015 I was home with my daughter and my boyfriend. I got up at about 7:45 A.M . I got ready for work. I work at Stewarts at Glen and Sixth Avenue in Troy New York. My boyfriend got up and went into my daughter's room. He went in to take her to the bathroom. I saw her in the hallway heading to the bathroom I told her I loved her and I see her when I came home from work. I left my house and took the bus to work. I worked to about 1 P.M. A friend of mine by the name of Russell Brown took me home. I just happen to look at my phone when we arrived at my apartment. It was 1:23 P.M I went into my apartment and saw my daughter lying face up on the black futon in my apartment She was lying on her back with what looked like to me to be her leg hanging off. I really wasn't to concerned She, V▆, sleeps in funny positions. I grabbed some checks to show Mr. Brown that had been cashed in my account that were fraudulent. I thought it was funny that Mike was not there. I walked outside and was talking to Mr. Brown when Mike came out of Testo Restaurant. He said to me "Call 911" He looked upset. He said 911 He said C▆ is not breathing. I ran into the apartment and went to my daughter I was right behind me. He said he tried going to the neighbors but no one was home/. I was on phone when the Fire Department arrived. I told them to hurry up. So did Mike. Three or four of them came in and began working on my daughter. At one point one of them said they had something.. I saw a blip on one of the screen in a machine. They took V▆ out to the ambulance. They wouldn't let me go to the hospital with my daughter. Mike told them I was her mother but they left without me. I went with the Police Officer to the Troy Police Station Mike came there to. At the Station I was told my daughter had passed away. I told the Detectives what I knew of what happened. I left and went to St Mary's Hospital. I then returned to the Police Department after I saw my daughter at the hospital

After a few hours, I left with Mike and went home.

Since that time Mike and I have talked. He told me he said after I left that morning He put C▆ on the toilet. He told me he asked if she was hungry She told him no He told me

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR PURSUANT TO SECTION ✕ R.P.
210.45 OF THE PENAL LAW OF THE STATE OF NEW YORK.

DATE  3/2/15   TIME: 2:08 SIGNED: _Rebecca Parker_

WITNESS: _____

1 of 2

**APPENDIX**                                                                    **1669**

CONTROL #  _020320-15

PHONE
HOME ___347-659-4396
WORK _____

**DEPOSITION OF A WITNESS**                                    **COURT**
STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

NAME _ Rebeccca A. Parker_____  DATE OF BIRTH ▮▮▮▮▮▮▮

RESIDING AT __856 4ᵗʰ Avenue Troy NY 12182 ____ AGE _22_____

OCCUPATION ___Clerk Stewarts Glen and 6ᵗʰ Avenue Troy NY_____

*R.P.*

DEPOSE AND SAY:

he gave her bottle but she really wasn't drinking it He said he then sent her back to bed. He told me he watched a movie. He told me he had fallen asleep. He woke up around 11:00 A.M. He told me it could have been 12 He didn't look at a clock. He called for her but she didn't answer. He went into her bedroom. He said she was not moving in her bed. He said he listen for breathing but didn't hear any. He began CPR. He told me he really didn't know how but saw movies about it. He had some CPR training in college too. He then took her to the living room and put her down on the black futon couch. The same one I saw her on when I came home. He said he tried cpr again. He got no reaction. He said he ran out after trying to get his phone to call 911. He couldn't get it working. He went to the neighbor house and they were not home or didn't answer. Mike said he then ran across the street to Testo's Restaurant and asked to call 911 centers. The 911 asked him a lot of questions. He came outside and saw me and told me.

Mike and I have been crying over this all weekend, Mike told me he thought he might have hurt V▮▮ trying to do cpr. We were told by Detective Fountain that V▮▮,s ribs were broke. Mike thought maybe his hands had done it because his hands were so big.

On March 3ʳᵈ 2015 at about noon I came to the troy Police Department with Mike and my mother Nancy Parker of ▮▮▮▮▮▮▮▮▮▮▮▮ New York New York 917▮▮▮▮▮ I met with Detectives Fountain and McDonald. I spoke to Detective Sergeant Parrow at that time He asked my to recount my day of my daughters death and her conditions prior to her death.

I told Sergeant Parrow my daughter was a health and active child. The day of the death she was a little sluggish. I attributed this to her just getting up in the morning. I told Sergeant Parrow that V▮▮ had a cold a couple of weeks prior and was treated with over the counter medication. I had not given her any medince in a few days. I told him that V▮▮ has a Nurse Practitioner in New York It is at Westside Pediatric Care 86th and Central Park West New York NY. End of Statement. *R.P.*

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL LAW OF THE STATE OF NEW YORK.

DATE _3/2/15_  TIME:_2.05 pm_ SIGNED: _Rebecca Parker_

WITNESS _____

2 of 2

000494

# APPENDIX



Troy Police Department Interview of

MICHAEL DAVIS

March 2, 2015

By Detective Ronald Fountain

**Michael Davis Interview, 3-2-15**

1

2          DETECTIVE FOUNTAIN:  Do you

3     know how hard you were pushing?

4       MR. DAVIS:  I really wasn't

5     sure 'cause I was like kinda

6     panicking.  So I don't really

7     think I was pushing like

8     extremely hard, but I know I was

9     just going like this on her chest

10    trying to like get her to wake

11    up.

12          DETECTIVE FOUNTAIN:  Now was

13    it the top of her chest?  I mean,

14    your hands probably covered her

15    whole --

16       MR. DAVIS:  Yeah, it was like

17    --

18          DETECTIVE FOUNTAIN:  -- from

19    her belly to her chest.

20       MR. DAVIS:  Yeah, it was like

21    my hand's like near the top of

22    her chest.

23          DETECTIVE FOUNTAIN:  Okay.

24       MR. DAVIS:  And my bottom of

25    my hand be like her stomach or

**Michael Davis Interview, 3-2-15**

1
2          time, I had to go in there.   I
3          called her, I could hear her like
4          moving in her bed, so I go in
5          there and I say, "Ola, just get
6          up," and she would get up off the
7          bed and come.
8                DETECTIVE FOUNTAIN:   Gotcha.
9                MR. DAVIS:   But she just
10         seemed extremely tired that day.
11         I've never seen her that tired,
12         you know, that day and I just
13         like really...
14                DETECTIVE FOUNTAIN:   I
15         understand.
16                MR. DAVIS:   Bugged Rebecca
17         out; and as I'm like using --
18         making her use the bathroom,
19         she's just seemed really tired,
20         so she didn't want to drink
21         nothing.
22                She usually always drink
23         something at morning.   No matter
24         what, she usually always drink
25         something and she just put the

| | |
|---|---|
| 1 | **Michael Davis Interview, 3-2-15** |
| 2 | bottle to her mouth and acted |
| 3 | like she was drinking it; and you |
| 4 | could tell whether she's drinking |
| 5 | it or not, you know, and she |
| 6 | wasn't drinking it. |
| 7 | I said to her just go back in |
| 8 | her room and she was like, |
| 9 | "Okay," and she was in the |
| 10 | room. |
| 11 | DETECTIVE FOUNTAIN: Okay. |
| 12 | Umm, you never heard her |
| 13 | gurgling, never -- she never |
| 14 | yelled or anything? Because you |
| 15 | say you're a light sleeper. |
| 16 | MR. DAVIS: Yeah, I'm a light |
| 17 | sleeper. Like I said, I'm a |
| 18 | light sleeper because of -- |
| 19 | DETECTIVE FOUNTAIN: Your |
| 20 | past growing up. |
| 21 | MR. DAVIS: Yeah with being a |
| 22 | foster kid and my foster brothers |
| 23 | was doing to me, but... |
| 24 | I was extremely tired that |
| 25 | day 'cause like I didn't go to |

Case 1:17-cv-01290-DJS Document 84-18/20210 351ed 04/01/22 16 Page 65 of 6

**Michael Davis Interview, 3-2-15**

1

2          if she felt cold or not.

3               DETECTIVE FOUNTAIN:  You just

4          panicked.

5               MR. DAVIS:  Yeah, I can't

6          even say if she felt cold or if

7          she didn't feel cold, you know, I

8          didn't --

9               DETECTIVE FOUNTAIN:  Did you

10          ever think when you ran out the

11          door, did you want to take her

12          with you?

13               MR. DAVIS:  I wanted to, but

14          she's like -- I would have had to

15          put her clothes on and all that

16          stuff and I was just panicking

17          and trying to find somebody to --

18          you know what I'm saying -- get

19          the ambulance to the house, so,

20          like I didn't want to leave her

21          on the couch whereas I felt like

22          I kinda had to, you know, 'cause

23          she didn't have nothing on and I

24          feel like we trying to put her

25          clothes on and stuff like that

**Michael Davis Interview, 3-2-15**

2     was just messing my head up.
3          DETECTIVE FOUNTAIN:  Did she
4     have on pajamas?
5          MR. DAVIS:  Umm, she had on
6     her, umm, I think she had on her
7     Pamper and she had on, umm, a
8     purple shirt with a flower,
9     yellow flower on it --
10         DETECTIVE FOUNTAIN:  Okay.
11         MR. DAVIS:  -- that I think
12    they kinda cut off of her.
13         DETECTIVE FOUNTAIN:  Gotcha.
14         MR. DAVIS:  That was the only
15    thing that she had on.
16         DETECTIVE FOUNTAIN:  She
17    didn't -- she didn't wear pants?
18         MR. DAVIS:  No, I don't think
19    she had her pants on from when I
20    changed her pants (inaudible).  I
21    think she just had a Pamper on
22    and like a purple shirt with that
23    yellow and white flower on top of
24    it.
25         DETECTIVE FOUNTAIN:  No

Run: 5/03/2016
13:11:00

**RENSSELAER COUNTY 911**
**DETAIL CALL SHEET**

| | | | | | | |
|---|---|---|---|---|---|---|
| Call No.: | 15 0000020320 | Type: Cardiac / Respiratory Arrest EMD9 | | | Date/Time 2/26/2015 Call Taker Done | 13:09:35 13:12:03 |

**Incident**
Address:   856.00   4                   AV   Suite: FLR 1
           TROY CITY              NY 12180

CrossSt/Int: 124 ST & NORTHERN DR

**Caller:**   SPRINT

Address:   55          LEVERSEE                    Suite: W SECTOR
           TROY        NY                          Phone: 518-892-5980

**Contact:**   MIKE DAVIS
How
Received:   C9                Beat/Dist: Z4      Disposition: Transport to Hospital

Report No.: 01-15-006144         Fire Report No.: 39-15-001836      EMS Report No.:

Dispatcher: 02-D44           ESN: 828         Map Ref:

Comments: LAT:+042.784667 LON:-073.669746 ELV:+00000 COF:21      COP:063
ACROSS FROM TESTOS--
2 YOF NOT BREATHING--
CALLER IS NOT WITH THE PT--
ECHO
CALLER IS ACROSS THE STREET CALLING--
NO HOUSE PHONE
CALLER UNABLE TO TAKE PHONE TO THE PT----
CALLER WAS USING CELL PHONE OF MIKE RUSTIN WHO WORKS AT TESTO'S
1:14 MOTHER CALLED AND SAID CHILD NOT BREATHING AND ASKED ABOUT DOING CPR
AND SHE SAID HER BOYFRIEND WAS DOING CPR BUT IT WAS NOT WORKING   THEN THE
MEDICS ARRIVED
1515 - CALL PRINTED PER REQ OF CCC GLASSER #D15

Disposition STM
Comments 3205 AND CPS REPORT BY TP-266
         SEARCH WARRANT EXECUTED BY TP-144 AND TP-263

GOG:

Equipment:

Alerts:

Range:   From: 855 To: 860
         CALL BOX / 8141
         FIRE BOX / 1420

| Unit | Car No. | Time | Status | Log Entry |
|---|---|---|---|---|
| TFE1 | E-1 | 13:11:44 | Dispatched | 856.0 4 AV TROY CITY |
| TFM1 | M-1 | 13:11:49 | Dispatched | 856.0 4 AV TROY CITY |

# APPENDIX

Run: 5/03/2016
13:11:00

**RENSSELAER COUNTY 911**
**DETAIL CALL SHEET**

| | | | | |
|---|---|---|---|---|
| TFR | RS | 13:12:20 | Dispatched | 856.0 4 AV TROY CITY |
| TFC4 | CUMMINGS | 13:12:23 | Dispatched | 856.0 4 AV TROY CITY |
| TFC4 | CUMMINGS | 13:12:51 | EnRoute | 856.0 4 AV    TROY CITY |
| TFE1 | E-1 | 13:12:52 | EnRoute | 856.0 4 AV    TROY CITY |
| TFR | RS | 13:12:54 | EnRoute | 856.0 4 AV    TROY CITY |
| TFM1 | M-1 | 13:12:56 | EnRoute | 856.0 4 AV    TROY CITY |
| TP-S23 | 312 | 13:13:22 | Dispatched | 856.0 4 AV TROY CITY |
| TP-266 | 401 | 13:13:31 | Dispatched | 856.0 4 AV TROY CITY |
| TP-266 | 401 | 13:13:31 | EnRoute | 856.0 4 AV    TROY CITY |
| TP-S23 | 312 | 13:13:45 | EnRoute | 856.0 4 AV    TROY CITY |
| TFE1 | E-1 | 13:14:19 | On Scene | 856.0 4 AV    TROY CITY |
| TFM1 | M-1 | 13:14:21 | On Scene | 856.0 4 AV    TROY CITY |
| TFM1 | M-1 | 13:16:45 | N | WORKING FULL ARREST |
| TP-248 | 301L | 13:17:23 | Dispatched | 856.0 4 AV TROY CITY |
| TP-248 | 301L | 13:17:23 | EnRoute | 856.0 4 AV    TROY CITY |
| TP-139 | 302 | 13:17:31 | Dispatched | 856.0 4 AV TROY CITY |
| TP-139 | 302 | 13:17:31 | EnRoute | 856.0 4 AV    TROY CITY |
| TFR | RS | 13:18:35 | On Scene | 856.0 4 AV    TROY CITY |
| TP-266 | 401 | 13:18:55 | On Scene | 856.0 4 AV    TROY CITY |
| TP-139 | 302 | 13:19:41 | On Scene | 856.0 4 AV    TROY CITY |
| TP-248 | 301L | 13:28:52 | On Scene | 856.0 4 AV    TROY CITY |
| TFR | RS | 13:28:55 | N | STM 2YO FULL ARREST |
| TP-S23 | 312 | 13:29:31 | On Scene | 856.0 4 AV    TROY CITY |
| TFM1 | M-1 | 13:31:20 | To Hospita | STM |
| TFR | RS | 13:31:26 | To Hospita | STM |
| TFC4 | CUMMINGS | 13:35:45 | On Scene | 856.0 4 AV    TROY CITY |
| TP-248 | 301L | 13:36:05 | At Hospita | stm |
| TFM1 | M-1 | 13:36:52 | At Hospita | STM |
| TFE1 | E-1 | 13:38:44 | In Service | 856.0 4 AV FLR 1 TROY CITY |
| TFE1 | E-1 | 13:38:47 | In Quarter | 856.0    4 AV    TROY CITY |
| TFR | RS | 13:38:55 | At Hospita | STM |
| TP-139 | 302 | 13:41:53 | TL | CS 87659 |
| TFC4 | CUMMINGS | 13:43:38 | Cleared | 856.0 4 AV    TROY CITY |
| TP-139 | 302 | 13:54:06 | AL | CS 87663 |
| TP-139 | 302 | 13:59:52 | To Hospita | STM 87663 |
| TP-S23 | 312 | 14:01:48 | Cleared | 856.0 4 AV    TROY CITY |
| TFM1 | M-1 | 14:03:50 | N | BC OFFICE FOR PAY ROLL CHECKS |
| TP-139 | 302 | 14:10:14 | At Hospita | STM 87664 |
| TFR | RS | 14:14:46 | In Service | 856.0 4 AV FLR 1 TROY CITY |
| TFR | RS | 14:19:48 | In Quarter | 856.0    4 AV    TROY CITY |
| TFM1 | M-1 | 14:20:25 | Cleared | 856.0 4 AV    TROY CITY |
| TP-144 | 311 | 14:37:22 | Dispatched | 856.0 4 AV TROY CITY |
| TP-144 | 311 | 14:37:22 | EnRoute | 856.0 4 AV    TROY CITY |

# APPENDIX
## RENSSELAER COUNTY 911
### DETAIL CALL SHEET

| TP-144 | 311  | 14:41:00 | On Scene   | 856.0  4 AV     TROY CITY |
| TP-144 | 311  | 14:41:06 | At Hospita | STM |
| TP-231 | 401C | 15:46:58 | Dispatched | 856.0  4 AV  TROY CITY |
| TP-231 | 401C | 15:46:58 | EnRoute    | 856   4 AV     TROY CITY |
| TP-231 | 401C | 15:56:27 | On Scene   | 856.0  4 AV     TROY CITY |
| TP-144 | 311  | 16:01:16 | Cleared    | 856.0  4 AV     TROY CITY |
| TP-248 | 301L | 16:15:31 | Cleared    | 856.0  4 AV     TROY CITY |
| TP-144 | 311B | 16:16:32 | Dispatched | 856.0  4 AV TROY CITY |
| TP-144 | 311B | 16:16:38 | AL         | CS |
| TP-144 | 311B | 16:17:07 | Dispatched | CS |
| TP-263 | 311B | 16:17:07 | Dispatched | 856.0  4 AV TROY CITY |
| TP-144 | 311B | 16:17:07 | EnRoute    | 856.0  4 AV     TROY CITY |
| TP-263 | 311B | 16:17:07 | EnRoute    | 856.0  4 AV     TROY CITY |
| TP-144 | 311B | 16:18:45 | On Scene   | 856.0  4 AV     TROY CITY |
| TP-263 | 311B | 16:18:45 | On Scene   | 856.0  4 AV     TROY CITY |
| TP-231 | 401C | 16:18:48 | Cleared    | 856.0  4 AV     TROY CITY |
| TP-266 | 401  | 16:25:34 | Cleared    | 856.0  4 AV     TROY CITY |
| TP-231 | 401C | 16:25:44 | Dispatched | 856.0  4 AV TROY CITY |
| TP-231 | 401C | 16:25:44 | EnRoute    | 856.0  4 AV     TROY CITY |
| TP-231 | 401C | 16:25:44 | On Scene   | 856.0  4 AV     TROY CITY |
| TP-144 | 311B | 17:58:03 | TLC        | CS |
| TP-263 | 311B | 17:58:03 | TLC        | |
| TP-231 | 401C | 18:30:13 | Cleared    | 856.0  4 AV     TROY CITY |
| TP-144 | 311B | 20:27:29 | Cleared    | 856.0  4 AV     TROY CITY |
| TP-263 | 311B | 20:27:29 | Cleared    | 856.0  4 AV     TROY CITY |

**APPENDIX**                                                              **1679**

Phone:

Control #: __20320-15_____

**DEPOSITION OF A WITNESS**                    Home: _____
STATE OF NEW YORK
COUNTY OF RENSSELAER                           Work: _____
CITY OF TROY
                                               Cell: ██████████

Name: _ _Michael Bayly_____   Date of birth: ██████

Residing at: __City of Troy Fire Department_   Age: ___43____

Occupation: Captain Troy Fire Department _____ _____

**Depose and say**: I would like to state that I was
working Engine 1 Station City of Troy NY 12182 at about
1:11 P.M. on February 26th 2015. My station received a
Medical call for 856 4th Avenue 1st Floor Troy NY for 2
yr. old in Cardiac arrest. Upon arrival I enter the 1st
floor residence and found on a black colored bench
couch a small black female child. She was unresponsive
but warm to touch. An evaluation showed she was not
breathing. Her pupils were fixed and dilated. We began
CPR protocol. I attempted to open the child jaw, it was
slightly stiff. I bagged the child and began pushing
air. Her jaw became more responsive. I then continued
CPR with members of my unit. We administered 4 round of
Epinephrine and we electro shocked her after she went
into to shock able rhythm while enroute to St Mary's
hospital. I stayed at the St Mary's hospital Emergency
rooms and assisted in the treatment. After she was
pronounced by ER Doctor we secured and returned to the
Fire Station and prepared our report. On February 27th
2015 I was contacted by Captain Sprauge and requested
to come to the Troy Police Station and tell them my
initial findings. I came to the Police Station and met
with Detective Sergeant Parrow and gave him this
statement. End of Statement

**FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR
PURSUANT TO SECTION 210.45 OF THE PENAL LAW OF THE STATE OF NEW YORK.**

Date: ___February 27th 2015_____        Time: _3:20P.M _____

Signed: _____                Page: 1

Witness: _____

000496

*****WARNING*****
CONFIDENTIAL INFORMATION
AUTHORIZED PERSONNEL ONLY

**APPENDIX**

Investigation
Progress Notes

| CASE NAME: | Parker,Rebecca | CASE ID: | 26054825 |
|---|---|---|---|
| STAGE NAME: | Parker,Rebecca | STAGE ID: | 30062883 |

**Progress Notes Narrative:**

TCT- Dr. Sikirica's office @⬛⬛⬛, cw spoke with Missa and asked if she there were any preliminary findings as a result of the autopsy regarding ch V⬛. Missa said no, but that she would let the ME know that this cw called inquiry about the autopsy.
***********************************************End of Note*************************************************

| | | | | | |
|---|---|---|---|---|---|
| **Event Date:** | 3/2/2015 | | | | |
| **Entry Date:** | 3/3/2015 | **Dist.Agy:** | A38 | **Note Status:** Final | |
| **Author:** | Corbin, Kristin C | | | **Entered By:** Corbin,Kristin C | |
| **Method:** | Phone | | | | |
| **Type(s):** | Collateral Contact | | | | |
| **Other Participant(s):** | Other | | | | |

**Progress Notes Narrative:**

TCT- Troy Fire Dept. @⬛⬛⬛, cw spoke with Asst. Chief Hughes, cw asked for a copy of the PCR and he advised that he already sent this information to the police dept., as they had provided a subpeona. He advised that b/c it is medical information and if there is a possibility of court proceedings, a subpeona is needed. Cw then asked who the first responders were at the scene. He reported that the first responders were Capt. Bailey, Lt. Tidings, Cpt. Schoonmaker, Cpt. Vogt, as well as firefighters, Riley, Lucy, Judge, and Rosetto. Cw asked how cw can get a hold of these responders. He advised that Capt. Bailey is not working until Wed. but that Lt. Tidings is working today in Lansingburgh and he gave the number as ⬛⬛⬛, he advised that he will call there and let Lt. Tidings know that cw will be calling. Cw thanked him and then hung up.
***********************************************End of Note*************************************************

| | | | | | |
|---|---|---|---|---|---|
| **Event Date:** | 3/2/2015 | | | | |
| **Entry Date:** | 3/3/2015 | **Dist.Agy:** | A38 | **Note Status:** Final | |
| **Author:** | Corbin, Kristin C | | | **Entered By:** Corbin,Kristin C | |
| **Method:** | Phone | | | | |
| **Type(s):** | Collateral Contact | | | | |
| **Other Participant(s):** | Other | | | | |

**Progress Notes Narrative:**

TCT- Lt. Tidings @ ⬛⬛⬛, Cw asked if he was first on the scene and he stated that Engine 1 was with Cpt. Schoomarker, Firefighter Riley and Capt. Vogt. He reported that he was on the ambulance that arrived within 5 seconds of Engine 1. He stated that ch had no pulse when he arrived and immediately began CPR, he advised that she started working on the ch. He stated that ch was in the front room on the 1st floor laying on the futon, he denied seeing mo or her boyfriend. He denied that ch had any visible injuries and he reported that she never regained a pulse. He denied that she was cold when he was with her in the apt. and that no rigimortis had set in. Cw thanked him and then hung up.
***********************************************End of Note*************************************************

| | | | | | |
|---|---|---|---|---|---|
| **Event Date:** | 3/2/2015 | | | | |
| **Entry Date:** | 3/3/2015 | **Dist.Agy:** | A38 | **Note Status:** Final | |
| **Author:** | Corbin, Kristin C | | | **Entered By:** Corbin,Kristin C | |
| **Method:** | Phone | | | | |
| **Type(s):** | Collateral Contact | | | | |
| **Other Participant(s):** | Other | | | | |

**Progress Notes Narrative:**

TCT- Troy Dispatch, cw spoke with the Supervisor on duty and asked for a copy of the 911

**APPENDIX**

| | | | | |
|---|---|---|---|---|
| **CASE NAME:** | Parker,Rebecca | **CASE ID:** | 26054825 | |
| **STAGE NAME:** | Parker,Rebecca | **STAGE ID:** | 30062883 | |

| | | | | |
|---|---|---|---|---|
| **Event Date:** | 3/24/2015 | | | |
| **Entry Date:** | 3/29/2015 | **Dist.Agy:** | A38 | **Note Status:** Final |
| **Author:** | Corbin, Kristin C | | | **Entered By:** Corbin,Kristin C |
| **Method:** | Phone | | | |
| **Type(s):** | Collateral Contact | | | |
| **Other Participant(s):** | Law Enforcement | | | |

**Progress Notes Narrative:**

TCT- Ron Fountain (Troy PD detective), cw asked for any update on case. He advised that they are waiting for Dr. Sikirica to sign the autopsy report, as the cause of death will be ruled a homicide, he advised that the doctor is just waiting for a couple labs to come back first. He further advised that he spoke with bio-fa Clarence for a long time and he reported that Michael is a coneiver. Cw asked if he has Michael's child's mother contact information and he advised that her name is Shaquana Pitts and her number is ▓▓▓▓. Cw advised that cw is going to attempt contact with mo and he said go ahead. He further reported that Clarence reported that he petitioned the court for an OOP in October against Michael protecting V▓▓, as he had concerns at that time that Michael was hitting Viola. He reported that he heard Michael hitting ch during a phone call. Cw thanked him and then hung up.

***************************************************End of Note***************************************************

# APPENDIX 1682

*****CONFIDENTIAL INFORMATION
AUTHORIZED PERSONNEL ONLY

| | | | |
|---|---|---|---|
| CASE NAME: | Parker,Rebecca | CASE ID: | 26054825 |
| STAGE NAME: | Parker,Rebecca | STAGE ID: | 30062883 |

**Location:** LDSS Office/Field Office
**Type(s):** Collateral Contact
**Other Participant(s):** Law Enforcement
**Progress Notes Narrative:**

This cw spoke with Det. Fountain at this cw's office.  Det. Fountain advised that no arrest can be made until they have a copy of the autopsy stating what the cause and manner of death is.  He advised that the Medical Examiner's office has told him that ch's death was a homocide but until the death certificate is signed by the medical examiner, he can't move forward with the criminal investigation.  Cw asked for copies of the photos of the scene.  Det. advised that until the case moves forward he will be unable to provide this cw with the photos, but once an arrest has been made, he will get copies of the photos of the scene to this cw.  Cw asked for a copy of the PCR and he advised for cw to touch base next week and he will make a copy of this for this cw's file.  Cw thanked him and then he left.

*******************************************End of Narrative***

000521

APPENDIX **1683**

CONTROL # 20320-15

HOME

WORK 258-5000

## DEPOSITION OF A WITNESS

STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

COURT

NAME Kathleen CRisafulli

DATE OF BIRTH ████████

RESIDING AT St Mary's Hospital. Troy NY 12180

AGE 58

OCCUPATION Emergency Room Doctor.

DEPOSE AND SAY: KCMD ON February 26th 2015 I was working the Emergency Rm of ST mary's Hospital Troy NY. A Black Female child approximately 2 yrs of age was Brought in in Full Arrhost, I, Along with staff Worked To resuscitate KCMD The child, We were unable AND I pronouced The Death of The child This was Approximately 2:10 pm.

At About 2:30 pm. The mother of The child Rebecca Parker Arrived at The Hospital. I met with Her, She said to me "Why is she Dead? Babies Dont go to sleep And Not wake up, I Told her I really Don't know. She said to me "Why is My BABY Dead, Was she Strangled" I Told her I didn't know.

ON March 5 2015 I met with Detective Sn Pannow And gauchin This statement. KCMD

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL LAW OF THE STATE OF NEW YORK.

DATE 3/5/15   TIME: 11:30 am   SIGNED: Kathleen Crisafulli MD

WITNESS: D/Sgt M Pannow

TPD 118/82

000495

1

2                    **DEPOSITION of DANIELLE COONRADT**

3

4   UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF NEW YORK
5   ---------------------------------------------X
    MICHAEL DAVIS-GUIDER,
6
                            Plaintiff,
7
    -against-              Civil Case No.: 1:17-cv-01290
8                          (FJS/DJS)

9   CITY OF TROY, RONALD FOUNTAIN, Individually,
    DANIELLE COONRADT, Individually, CHARLES
10  MCDONALD, Individually, TIM COLANERI,
    Individually, ADAM R. MASON, Individually,
11  RENSSELAER COUNTY, MICHAEL SIKIRICA,
    Individually, and JOEL ABELOVE,
12  Individually,

13                          Defendants.
    ---------------------------------------------X

14

15       DEPOSITION of the Defendant, **DANIELLE COONRADT,**

16  held on May 28, 2021, commencing at 1:00 p.m.,

17  being held virtually by Zoom, pursuant to Notice;

18  before Susan Florio, a Registered Professional

19  Reporter and Notary Public in and for the State of

20  New York.

21

22

23

1    [DANIELLE COONRADT - By Mr. Klein]

2        Q.    Okay.  Were you alone or with someone

3    when you got the call?

4        A.    I was in the patrol car by myself.

5        Q.    Okay.  And did you respond?  Where were

6    you when you got the call?

7        A.    I don't recall that.

8        Q.    And did you respond to the location?

9        A.    Yes.

10       Q.    Okay.  And what did you observe upon

11   arrival at Fourth Avenue?

12       A.    I observed Mr. Davis outside.  I don't

13   recall specifically what he was doing.

14       Q.    Had you ever seen him before that date?

15       A.    No.

16       Q.    No.  And had you had any dealings with

17   him since other than in connection with this

18   arrest and prosecution?

19       A.    No.

20       Q.    At some point did Rebecca Parker, the

21   mother of V.D., did she arrive at the scene or

22   was she there when you got there?

23       A.    I don't recall if she was there when I

**APPENDIX**                                                **1686**

1    **[DANIELLE COONRADT - By Mr. Klein]**

2    got there.  I do remember her being there though.

3        Q.   Had you ever seen her before?

4        A.   No.

5        Q.   Okay.  Have you had any dealings with her

6    since this incident other than as it relates to

7    this case?

8        A.   No.

9        Q.   Okay.  Were any other members of the

10   service there other than yourself or were you the

11   first to arrive on scene?

12       A.   I was the first officer on scene.

13       Q.   Okay.  So, when you saw Mr. Davis can you

14   describe his demeanor, anything he said, or

15   anything else that you observed?

16       A.   I recall asking him what happened and him

17   saying that -- to paraphrase, because I don't

18   have my paperwork in front of me, him saying she

19   woke me up at -- she woke me up at 8:00.  I told

20   her it was too early, to go back to bed, and then

21   I went to wake her up at 11 and she wouldn't wake

22   up, something to that effect.

23       Q.   Okay.  Did he tell you anything else or

1   **[DANIELLE COONRADT - By Mr. Klein]**

2   he may have, but you don't remember without

3   looking at your paperwork?

4       A.   I believe I said it's 1:30 or something

5   along those lines and he said time must be flying

6   and that was the extent of my conversation with

7   him.

8       Q.   Do you recall what time it was, was it

9   1:30 or --

10      A.   Yes.

11      Q.   How long had you been there when you were

12  speaking with him, was it instantaneous or were

13  you there for some time before you spoke with

14  him?

15      A.   I don't recall how long I was there

16  prior.

17      Q.   When you spoke with him were any members

18  of the service or EMS at the scene or was it just

19  you and him?

20      A.   EMS was inside.  I was outside with him.

21      Q.   Okay.  And what happened next?

22      A.   I went inside, took a look around the

23  apartment without touching anything or opening

| □ CONTINUATION | □ FOLLOW-UP APPENDIX □ SUPPLEMENTAL | | 1688 CONTROL NUMBER 20320 | |
|---|---|---|---|---|
| TYPE OF ORIGINAL REPORT 3205 | NAME OF SUBJECT (VICTIM, DEFENDANT) D____, V____ (DOB ____ | | DATE OF ORIGINAL REPORT 02/26/15 | DATE OF THIS REPORT 02/26/15 |

On the above date, at 1309, I responded to 85 b 4th ave for a report of a juvenile cardiac arrest. Upon arrival, Michael Davis and Rebecca Parker were standing outside. I asked Michael what happened, he stated that at 08:30, he told V____ to go back to bed because it was too early. Then he said he went to wake her up a 100 and she wouldn't wake up. When I told Michael it was 1:30, he didn't seem to understand and said "time must be flying." When I went in the apartment, I saw a bottle of pills on the table & asked a fireman what they were. He checked & said they were hydro codiene. I took a quick look around the apartment without touching anything to see if there was anything visible that they baby could have gotten into. I didn't see anything obvious. The fire dept. was still working on V____ throughout this time. The fire dept. cleared & brought V____ to St. Marys. Officer Bristol followed them. Inv. Fountain & Inv. Mcdonald brought Michael Davis to CS, & PO Rasmussen brought Rebecca Parker to CS. Officer Bristol informed me that time of death would be 1408. I held the scene for a search warrant & also completed started a crime scene log. I cleared

| CASE STATUS: | □ unfounded | ☒ open/active | | □ closed/not cleared | |
|---|---|---|---|---|---|
| □ CLEARED AS FOLLOWS: | □ arrest | □ warrant obtained | | □ compl. refused prosec. | |
| | □ death of offender | □ outside prosecution | | □ juvenile | |
| REPORTING OFFICER Coonradt | EMP. NO. 7624 | SECOND OFFICER | EMP. NO. | APPROVING OFFICER | EMP. NO. 7452 | PAGE NO. 1/3 |

TROY POLICE DEPARTMENT

T. P. D. — 120

| ☐ CONTINUATION | ☐ FOLLOW-UP **APPENDIX** ☐ SUPPLEMENTAL | CONTROL NUMBER 20320 |
| --- | --- | --- |

| TYPE OF ORIGINAL REPORT | NAME OF SUBJECT (VICTIM, DEFENDANT) | DATE OF ORIGINAL REPORT | DATE OF THIS REPORT |
| --- | --- | --- | --- |
| 3205 | D⬛⬛, V⬛⬛ | 02/26/15 | 02/26/15 |

the scene at 1600 w relief.

---

**CASE STATUS:** ☐ unfounded ☑ open/active ☐ closed/not cleared

☐ **CLEARED AS FOLLOWS:** ☐ arrest ☐ warrant obtained ☐ compl. refused prosec.
☐ death of offender ☐ outside prosecution ☐ juvenile

| REPORTING OFFICER | EMP. NO. | SECOND OFFICER | EMP. NO. | APPROVING OFFICER | EMP. NO. | PAGE NO. |
| --- | --- | --- | --- | --- | --- | --- |
| Coonradt | 7624 | | | | 7462 | 2/3 |

TROY POLICE DEPARTMENT

T. P. D. — 120

APPENDIX

☐ CONTINUATION    ☐ FOLLOW-UP    ☐ SUPPLEMENTAL    **1600** CONTROL NUMBER

20320

| TYPE OF ORIGINAL REPORT | NAME OF SUBJECT (VICTIM, DEFENDANT) | DATE OF ORIGINAL REPORT | DATE OF THIS REPORT |
|---|---|---|---|
| 5205 | Davis, Michael, L | 2/26/15 | 2/26/15 |

Statements made by above subject

"I told her to go back to bed because
it was too early. Then I went to
get her up @ 11 & she wouldn't wake
up."

"Ok but it's 1:30 now." - PO Coonradt

"Time must be flying then"

---

**CASE STATUS:**   ☐ unfounded   ☑ open/active   ☐ closed/not cleared

☐ CLEARED AS FOLLOWS:   ☐ arrest   ☐ warrant obtained   ☐ compl. refused prosec.
☐ death of offender   ☐ outside prosecution   ☐ juvenile

| REPORTING OFFICER | EMP. NO. | SECOND OFFICER | EMP. NO. | APPROVING OFFICER | EMP. NO. | PAGE NO. |
|---|---|---|---|---|---|---|
| Coonradt | 266 | | | | 7462 | 3/3 |

TROY POLICE DEPARTMENT

T. P. D. — 120

1

## DEPOSITION of RONALD FOUNTAIN

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
----------------------------------------------X
MICHAEL DAVIS-GUIDER,

                          Plaintiff,

-against-              Civil Case No.: 1:17-cv-01290
                      (FJS/DJS)

CITY OF TROY, RONALD FOUNTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES
MCDONALD, Individually, TIM COLANERI,
Individually, ADAM R. MASON, Individually,
RENSSELAER COUNTY, MICHAEL SIKIRICA,
Individually, and JOEL ABELOVE,
Individually,

                          Defendants.
----------------------------------------------X

     DEPOSITION of the Defendant, **RONALD FOUNTAIN**,

held on May 21, 2021, commencing at 9:00 a.m.,

being held virtually by Zoom, pursuant to Notice;

before Susan Florio, a Registered Professional

Reporter and Notary Public in and for the State of

New York.

1　**[RONALD FOUNTAIN - By Mr. Klein]**

2　　Q.　Was that before the Michael Davis case?

3　　A.　I believe.  Yes.

4　　Q.　Did you take anything from the Colonie

5　training that you implemented in your practices

6　in the nine years or so that you continued to

7　investigate or did you just kind of trial and

8　error due to how you felt was best?

9　　　　　MS. SPENCER:  Object to form.  You

10　　　can answer.

11　　A.　I did the way I thought it was best.

12　　Q.　Okay.  So, on February 26th, 2015,

13　assuming it's approximately correct that it was a

14　911 call at around 1 p.m., when did you get

15　notified by, I think you said it was Captain

16　Sprague?

17　　A.　We received a phone call that afternoon

18　to go down.  I don't know what time.

19　　Q.　Okay.  And what did you do?

20　　A.　We responded to the address.

21　　Q.　Okay.  And what did you observe and what

22　happened there?

23　　A.　To the best of my recollection I believe

1   **[RONALD FOUNTAIN - By Mr. Klein]**

2   I believe Sergeant Colaneri came in at one time

3   and put his cell phone down to record it and I

4   don't know how we took -- no clue.

5       Q.   There's about 12 minutes of a video,

6   which we could show you, but other than that it

7   doesn't seem to have recorded the entire

8   interaction.  Do you recall whether the entire

9   interaction was recorded or just part of it?

10      A.   Just that part that Colaneri did.  It

11  was very --

12      Q.   Okay.  Do you recall it being about 12

13  minutes?

14      A.   Sure.  Yes.

15      Q.   Rather than an hour or hours?

16      A.   I don't believe it was that long, but I

17  don't know how long it was.

18      Q.   Was there some kind of conferral between

19  you and McDonald or Colaneri to hit record or did

20  Colaneri do it without you realizing it and you

21  found out later, how did that come to pass?

22              MS. SPENCER:  Object to form.

23      A.   I don't believe he told me about it so I

1    [RONALD FOUNTAIN - By Mr. Klein]

2    think Colaneri just did it because he was in --

3        Q.    And would you agree that nothing -- Mike

4    Davis did not incriminate himself or otherwise

5    give you any reason to believe a crime was

6    committed at that time?

7        A.    Correct.

8              MS. SPENCER:  Object to form,

9              please.

10       Q.    And so you didn't have probable cause at

11   that time, correct?

12             MS. SPENCER:  Object to form.

13       A.    Correct.

14       Q.    Okay.  Now, is there anything else you

15   can recall about that interview?

16       A.    I believe we talked a little bit about

17   looking through the house and had him sign a

18   waiver so we could look through the house.

19       Q.    Now, at that time did you or any of your

20   colleagues share with you that an opinion was

21   formed a child died and so this must be foul play

22   as opposed to some type of natural cause?  Did

23   you guys have any theory at that point within the

**APPENDIX**                                          **1695**

40

1   [RONALD FOUNTAIN - By Mr. Klein]

2      Q.   So, how would you describe your role for

3   the record, were you like the lead investigator

4   in this case?

5      A.   I would say yes.

6      Q.   Okay.  And just how did you become the

7   lead in this case, were you next up on the wheel

8   or Captain Sprague told you or something else?

9      A.   Because I was assigned to the juvenile

10  division Captain Sprague said it was mine and

11  Officer McDonald's case.

12     Q.   Got it.  Was Adam Mason a detective

13  sergeant at that time like he was years earlier

14  at the Thomas case?

15     A.   Yes.

16     Q.   Was he your direct supervisor?

17     A.   I don't believe so.  No.

18     Q.   Okay.  He was part of -- was he part of

19  the detective squad?

20     A.   Yes.

21     Q.   Okay.  And Tim Colaneri, Sergeant

22  Colaneri, was he part of the detective squad or

23  something else?

**APPENDIX**  **1696**

41

1  [RONALD FOUNTAIN - By Mr. Klein]

2      A.    Detective Sergeant Colaneri.

3      Q.    Okay.  So, what was -- you were the lead

4  investigator.  What role did -- was it Detective

5  McDonald or Officer McDonald, what role did he

6  play in this case?

7      A.    I mean, he was an officer assigned to the

8  detective bureau like myself.

9      Q.    Okay.  And what involvement did he have

10  in this case?  He was present during the first

11  interview, correct?

12      A.    He was my partner.

13      Q.    Okay.

14      A.    All parts of the case he was part of it.

15      Q.    So, if you, for instance, if you went

16  down and met with the District Attorney's Office

17  to prep for trial or speak to him about the case,

18  was he generally with you and aware of what was

19  going on?

20      A.    I believe so.

21      Q.    Okay.  What was Sergeant Colaneri's role

22  in this case to your knowledge?

23      A.    I don't recall.  I believe maybe he typed

1   **[RONALD FOUNTAIN - By Mr. Klein]**

2   there.  Do you know who she is?

3       A.   I do.

4       Q.   And what was her role in this case to

5   your knowledge?

6       A.   At the time I believe she was the

7   assigned D.A. to the case.

8       Q.   Okay.  And do you have any knowledge as

9   to whether she reported directly to Joel Abelove

10  or whether she had chains of command in her

11  office?

12      A.   I have no idea what they did at the time.

13      Q.   Did you ever come to learn whether Joel

14  Abelove had personal involvement in the direction

15  of this case or handling of this case?

16      A.   Not to my knowledge.

17      Q.   Was Andra Ackerman involved in the

18  investigatory phase of this case, meaning in the

19  months before there was any judicial indictment

20  or proceedings?

21      A.   I'm sure I ran things past Andra.  I

22  don't remember what.

23      Q.   Okay.  Would you have been working with

1   **[RONALD FOUNTAIN - By Mr. Klein]**

2   the D.A.'s office to confer with them as to what

3   steps to take or would you just merely keep them

4   apprised and you were making the decisions?

5                MS. SPENCER:  Object to form.

6                MR. FIRTH:  Same objection.

7       A.   I believe both.  I believe that I kept

8   them apprised and took direction if they told me,

9   you know, they needed more information.

10      Q.   Well, the information you gave to the

11  D.A.'s office in this case, did you give it to

12  anyone other than Andra Ackerman?

13               MS. SPENCER:  Object to form.

14      A.   I thought when I got towards the end I

15  thought Andra was gone and I can't think of her

16  name now.  The first assistant I think I gave.

17  She was involved, too.

18      Q.   Shaftkin (phonetic)?

19      A.   No.  No.  She was a brand new attorney

20  who got assigned the case.

21      Q.   Oh.

22      A.   First Assistant District Attorney under

23  Abelove and I can't remember her name off the top

1   **[RONALD FOUNTAIN - By Mr. Klein]**

2   involved in the initiation of the prosecution

3   here other than you?

4       A.   I don't know.

5               MS. SPENCER:  Object to form.

6       Q.   Okay.  Well, do you have reason to think

7   that anyone else did other than you or given your

8   experience you were likely the only one who did?

9               MR. FIRTH:  Object to form.

10              MS. SPENCER:  Object to form.

11      A.   I really don't recall.

12      Q.   Okay.  It's fair to say that you, through

13  your testimony coupled with Dr. Sikirica's

14  testimony you initiated this prosecution by

15  testifying in the grand jury?

16              MS. SPENCER:  Object to form.

17              MR. FIRTH:  Object to form.

18      A.   I don't understand.

19      Q.   You were personally -- this case wasn't

20  started with an arrest, pre-warrant arrest, this

21  was -- there was a sealed indictment?

22      A.   Correct.

23      Q.   That resulted in a warrant and then you

1  **[RONALD FOUNTAIN - By Mr. Klein]**

2  had Mr. Davis surrender under warrant, correct?

3              MS. SPENCER:  Object to form.

4              MR. FIRTH:  Objection.

5      Q.   Or you went to pick him up?

6              MR. FIRTH:  Form.

7      A.   I believe the marshals picked him up and

8  I met him afterwards.

9      Q.   Right.  So, this case was, this

10  prosecution was started via your testimony, among

11  other testimony of others in the grand jury, is

12  that your understanding?

13              MR. FIRTH:  Objection to form.

14              MS. SPENCER:  Object to form.

15      A.   Yes.

16      Q.   Okay.  So, on February 26th, 2015, going

17  back to the interview where there was a cell

18  phone recording of part of it, after that

19  interview what happened after that?  Was Mike

20  allowed to leave?

21      A.   Yes.

22      Q.   And I think you said you didn't have any

23  reason to believe a crime was committed or that

1   **[RONALD FOUNTAIN - By Mr. Klein]**

2   he committed it at that time, correct?

3           MS. SPENCER:  Object to form.

4       A.   At the time we had no idea what happened.

5       Q.   Okay.  And so what did you do next in

6   this investigation?

7       A.   I think the next day there was an

8   autopsy.

9       Q.   And you attended it?

10      A.   Correct.

11      Q.   Okay.  And who else was there?

12      A.   I didn't see the sign-in sheet.  I'm

13  going to assume -- I know Officer McDonald was

14  there.  I believe A.D.A. Ackerman was there.

15  Dr. Sikirica was there.  I don't know who else.

16      Q.   Okay.  I have it here and we can put it

17  up and mark it, but I'll represent to you it's

18  McDonald, Fountain, Evidence Tech Buttofucco?

19      A.   Correct.

20      Q.   Zeigler I think from Dr. Sikirica's

21  office?

22      A.   Yup.  Mike.

23      Q.   And it looks like Detective Colaneri?

**APPENDIX**                    **1702**

49

1    [RONALD FOUNTAIN - By Mr. Klein]

2        A.   Okay.

3        Q.   And Andra Ackerman.  Does that sound

4    right?

5        A.   Yes.

6             MR. FIRTH:  Just for the record,

7         you are reading from a sign-in sheet?

8             MR. KLEIN:  Yeah.  And we can mark

9         it.  Sue, should I just e-mail it to

10        everyone or?

11            THE REPORTER:  Sure.

12            MR. KLEIN:  I don't really feel

13        it's that important.  I think we all

14        agree -- if we all agree there's a

15        sign-in sheet Meeting/Autopsy dated

16        February 27th, 2015, I don't know that I

17        need to take the time to do it, but if

18        everyone feels better marking it for the

19        record.

20            MR. FIRTH:  I would feel better

21        marking it and I think what we can do is,

22        I think you can just share your screen

23        and then you can e-mail it to Sue

1  **[RONALD FOUNTAIN - By Mr. Klein]**

2          afterwards and circulate.

3              MR. KLEIN:  I'll do that now.

4              (Plaintiff's Exhibit No. 1, Sign-in

5          Sheet, 2/27/15, marked this date for

6          identification.)

7  Q.   Does this appear to be a sign-in sheet

8  from February 27th, 2015?

9  A.   Yes.

10 Q.   Reflecting the attendees at the autopsy?

11 A.   Yes.

12 Q.   What, if anything, do you recall about

13 the autopsy?

14 A.   I recall V.D. being on a table cracked

15 open.  I recall the doctor pointing to her liver

16 saying this isn't right.  I recall the holes in

17 her liver very vividly.  And him telling me that

18 she must have -- something happened, I don't

19 know, I don't remember exactly what he said.

20 Q.   Okay.  Did he tell you that there were

21 fractured ribs that he observed on autopsy?

22 A.   Yes.

23 Q.   And that they were not displaced -- did

1   **[RONALD FOUNTAIN - By Mr. Klein]**

2   he tell you that they weren't visible on X-ray,

3   but saw them on autopsy?

4       A.   I don't recall what he said.

5       Q.   Okay.  Did he tell you or were you

6   informed that the ribs lacerated the liver?

7       A.   Yes.

8       Q.   Okay.  And have you come to learn at any

9   time since then up until now that that was

10  incorrect?

11                 MR. FIRTH:  Objection to form.

12      A.   No.

13      Q.   I'm sorry?

14      A.   I don't recall that not being correct.  I

15  thought that's what it was.

16      Q.   No.  And so when you testified at trial,

17  do you recall testifying on the same day as

18  Dr. Sikirica?

19      A.   I do not.

20      Q.   Okay.  Do you recall being asked at trial

21  that if you knew that Dr. Sikirica testified and

22  put in his report that the ribs did not lacerate

23  the liver?

1   **[RONALD FOUNTAIN - By Mr. Klein]**

2      A.   Just if he could come down we'd like to

3   speak to him.

4      Q.   Okay.  And was he cooperative?

5      A.   Absolutely.

6      Q.   Was Mike Davis cooperative from the time

7   you met him on February 26th through the time

8   that you -- he was brought to headquarters to be

9   charged and booked on the indictment?

10     A.   Yes.

11     Q.   Okay.  So, the meeting -- the interview

12  on March 2nd, 2015, at headquarters, that's one

13  where you sat with Mike Davis for, don't quote me

14  on the exact time, but approximately two hours

15  and interviewed him on video?

16     A.   I won't quote you on the exact time.  If

17  you say so that sounds right to me.

18     Q.   It was a lengthy interview?

19     A.   Was it two hours?  I didn't know it was

20  that long.

21     Q.   Okay.  And that interview on 3/2/15,

22  other than there being a video memorializing it,

23  were there any written notes or statements

1  **[RONALD FOUNTAIN - By Mr. Klein]**

2  written up for Davis to sign?

3      A.    Not to the best of my knowledge.  Unless

4  you have one I don't know.

5      Q.    Well, in this case I'm not aware of it.

6  I think you have a Miranda card here, but I'm not

7  aware of a written statement.  So, that's the

8  same room you interviewed Adrian Thomas in 2008,

9  correct?

10                MS. SPENCER:  Object to form.

11     A.    Correct.

12     Q.    Same video camera or had it been updated

13  or?

14     A.    I have no idea.

15     Q.    Was it the same place, the camera?

16     A.    Yes.

17     Q.    And it was monitored in 2015 similarly to

18  how it was in 2008 in a nearby office with a

19  computer monitor?

20     A.    Yes.

21     Q.    Who was monitoring the interview on March

22  2nd, 2015, if you know?

23     A.    I don't recall.

Case 1:17-cv-01290-DJS Document 94-1 Filed 04/02/21 Page 67 of 41

1    [RONALD FOUNTAIN - By Mr. Klein]

2       Q.   Who determined the direction of that

3    interview that day, was that you or did you work

4    in cooperation with your partner, McDonald, or

5    someone else?

6       A.   I'm sure I did.  I'll say me.

7       Q.   Okay.  And do you recall that interview

8    sitting here today, whether specifically or just

9    generally?

10      A.   Just that I recall that it was really of

11   non-substance when it was all said and done.

12      Q.   Right.  In other words, Mike, at the

13   conclusion of that interview you had no

14   additional or further explanation of what

15   happened compared to what you knew on the day of

16   the incident, correct?

17      A.   Correct.

18      Q.   You had no reason to believe that a crime

19   was committed or that Mike Davis committed it as

20   of the end of that interview on March 2nd, 2015?

21              MS. SPENCER:  Object to form.

22      A.   I believe I just knew that we were still

23   investigating a suspicious death.

1  **[RONALD FOUNTAIN - By Mr. Klein]**

2      Q.   Right, but to answer the question I asked

3  you is different.  You have no reason to believe

4  that Mike Davis committed any crime at that

5  point?

6                  MS. SPENCER:  Object to form.

7                  MR. FIRTH:  Form.

8      A.   I knew that something happened bad to a

9  child.  I just didn't know how or what.

10     Q.   And you didn't know who either?  You

11 didn't know if Mike Davis did it or something

12 happened weeks earlier that led to the child

13 dying or something else, you didn't know either

14 way, correct?

15                 MS. SPENCER:  Object to form.

16     A.   I knew that he was the only one alone

17 with the child when she died.  That's what I

18 knew.

19     Q.   That's not the basis though to charge

20 someone with a murder necessarily; is it?

21     A.   No.  It's not.

22     Q.   And that was -- was that the working

23 theory though in this case that he had access to

**APPENDIX**                                    **1709**

65

1   **[RONALD FOUNTAIN - By Mr. Klein]**

2   the child for the three or four hours from when

3   she went to sleep until the time that she was

4   found unresponsive so he was the prime suspect?

5   Was that the working theory?

6                    MR. FIRTH:  Brett, what do you mean

7           by working theory?

8       Q.   Was that your theory of pursuing him as a

9   suspect, that he was there so it was more than

10  likely than not him that did something

11  suspicious?

12                   MS. SPENCER:  Object to form.

13      A.   So, being that we had a suspicious death

14  of a child and we don't know how she died and he

15  was the only one there so, yes, he was the prime

16  person we expected to know why this child had

17  died.

18      Q.   Okay.  And is it fair to say that that

19  was the way you proceeded in the Adrian Thomas

20  case as well?  Adrian was alone with M and you

21  targeted Adrian to try to do what you could to

22  get him to incriminate himself because you

23  believed given his access to the child, one of

# APPENDIX

66

1  **[RONALD FOUNTAIN - By Mr. Klein]**

2  two adults in the home, that you believed with a

3  suspicious death he had to have been responsible?

4              MS. SPENCER:  Object to the form.

5      Q.   Is that a similar theory of working up

6  the case?

7      A.   Yeah.

8      Q.   Okay.  Was that a theory of working up a

9  case that you employed in other cases as well, or

10 does it just happen to be the two that I happen

11 to know about?

12             MS. SPENCER:  Object to form.

13     A.   I'm going to go with the two you know

14 about.

15     Q.   Okay.  There was I think reference to

16 trial of a res ipsa theory of prosecute -- of law

17 enforcement that you just -- something, there was

18 a baby that tragically passed on, there was

19 someone there, and you just went with it that

20 this person had to have been involved?  Is that a

21 fair summary of how you proceeded here?

22             MR. FIRTH:  Form.

23             MS. SPENCER:  Object to form.

**APPENDIX** **1711**

67

1   **[RONALD FOUNTAIN - By Mr. Klein]**

2   A.   I believe that there was a suspicious

3   death, he was the only one there and we wanted to

4   know why this child died, yes.

5   Q.   Okay.  So, but just circling back to

6   March 2nd, 2015, after the hour or two recorded

7   interview you were not any closer to having

8   reason to believe Michael Davis caused this

9   death, correct?

10                  MS. SPENCER:  Object to form.

11   A.   I didn't know how this death was caused

12   yet, no.

13   Q.   I'm not asking how.  But I'm saying you

14   weren't any closer believing that Michael Davis

15   had a role in it, correct?

16                  MS. SPENCER:  Object to form.

17   A.   Not to my knowledge at that time.

18   Q.   Okay.  So, what happened next in terms of

19   the investigation after that interview on March

20   2nd?

21   A.   I believe we met with Dr. Sikirica.  I

22   want to say we met with the D.A.'s office a

23   couple times.  I'm sure my captain in a couple --

68

1    **[RONALD FOUNTAIN - By Mr. Klein]**

2    and maybe Sergeant Colaneri was involved, as a

3    supervisor, we met a few times of what was going

4    on in the case and what we could do and what we

5    couldn't do.

6         Q.   So, I'm showing what we'll call Exhibit

7    2.

8              (Exhibit No. 2, Sign-in Sheet,

9              3/12/15, marked this date for

10             identification.)

11        Q.   Which is a sign-in sheet from March 12th,

12   2015.  This is a meeting with Dr. Sikirica, Andra

13   Ackerman, Detective Sergeant Parrow, Detective

14   Fountain, Detective Colaneri, Detective Sergeant

15   Adam Mason.

16             Is this kind of what you were referring

17   to as the next, one of the next meetings that you

18   recall?

19        A.   One of them.  I'm sure there were others.

20        Q.   Okay.  And can you recall anything

21   specifically that happened at that meeting, what

22   was discussed?  Was linking Michael Davis to the

23   injuries that Dr. Sikirica observed on autopsy,

1    **[RONALD FOUNTAIN - By Mr. Klein]**

2    was that discussed?  What else, what, if

3    anything, was discussed at that meeting?

4                    MS. SPENCER:  Object to form.

5                    MR. FIRTH:  Form.

6        A.    I don't know.  I don't recall.

7        Q.    What types of things generally -- you've

8    attended meetings like that in the past in other

9    cases as well, correct?

10       A.    Correct.

11       Q.    Post autopsy meetings with the D.A. and

12   the medical examiner, is that fair?

13       A.    Yeah.

14       Q.    And what types of things are generally

15   discussed at some meetings?

16       A.    How the person maybe passed.

17       Q.    Okay.  Well, that would have been

18   discussed at the autopsy itself.  So, was this

19   kind of rediscussed, what Dr. Sikirica found, so

20   that you could discuss it more in depth or was it

21   to discuss things that you've learned since that

22   time or you don't know?

23       A.    I don't remember.

Case 1:17-cv-01290-DJS   Document 94-7   Filed 04/01/22   Page 124 of 41

1  **[RONALD FOUNTAIN - By Mr. Klein]**

2      Q.   Okay.  Who was driving the investigation

3  as of that date, ten days after your interview

4  with Mike Davis, on March 12th, were you charged

5  with finding an answer to this question or was

6  the D.A. giving you tasks to do or what?

7                   MS. SPENCER:  Object to form.

8                   MR. FIRTH:  Form.

9      A.   It was still an open investigation.  I

10  don't remember who was driving it or whether we

11  were still talking.  We still knew we had a child

12  that was dead and it was suspicious and somebody

13  had to have done something because that's what we

14  were told.

15      Q.   Okay.  Would you have taken notes at that

16  meeting?

17      A.   I don't remember.  If I did you have

18  them.

19      Q.   Okay.  Can you recall any other meetings

20  before the autopsy was released?  I don't have

21  any other meeting sheets other than there's a

22  meeting sheet with the D.A. and Sikirica after

23  the autopsy but you are not there.

1   **[RONALD FOUNTAIN - By Mr. Klein]**

2         Do you believe you were at other meetings

3   with Sikirica and/or the D.A.?

4     A.   Together I don't recall.  I believe I met

5   with the D.A. a few times just on, you know, what

6   could be done or what they needed me to do if

7   they wanted to go further with this.

8     Q.   So, walk us through those meetings.  Were

9   they close in time to February 26th, were they

10  scattered from February 26th through the arrest

11  in October of 2015 or something else?

12    A.   I don't remember the whole layout of it.

13  I'm sorry.

14    Q.   Okay.  And whenever you don't, that's

15  fine.  But we need you to tell us to the best of

16  your recollection what you do remember.  So, if

17  you believe there were possibly two or three or

18  seven or ten, you need to tell us to the best of

19  your ability.

20    A.   I don't -- I recall Ms. Ackerman left the

21  D.A.'s office.  I believe I spoke with -- again,

22  I can't remember her name, the first assistant

23  D.A. under Abelove, about the case.  I don't

1   [RONALD FOUNTAIN - By Mr. Klein]

2   recall how many times.  Maybe two.

3      Q.   Okay.  And was there ever any skepticism

4   or question about whether there would be an

5   indictment sought in this case?

6      A.   I don't recall.

7      Q.   Okay. So, what do you recall next?  I

8   mean, there's evidence in the record in your --

9   that you were called frequently by CPS.  They

10  were inquiring on the status of this

11  investigation and you said under numerous

12  occasions in sum and substance that you are

13  waiting for the M.E. to give you the cause and

14  manner of death and you couldn't give them any

15  more information.  Do you recall generally that

16  you would be contacted by CPS?

17     A.   On that case and numerous other cases I'm

18  sure.

19     Q.   Okay.  Do you recall anything specific

20  that CPS did or that you said to them in this

21  case that stands out other than status reports?

22     A.   Not that I recall.

23     Q.   Okay.  So, what's the next big event in

# APPENDIX

1    [RONALD FOUNTAIN - By Mr. Klein]

2              MS. SPENCER:  Object to form.

3        Q.    Okay.  Just because you believe now you

4    would not have done that can you state

5    affirmatively that you didn't do it?

6              MS. SPENCER:  Object to form.

7        A.    I didn't do that.

8        Q.    Okay.  So, just for the avoidance of

9    doubt, is there anything else you can recall in

10   terms of your investigation between the March

11   12th meeting at Dr. Sikirica's office that I

12   showed you the sign-in sheet and the time you

13   became aware or advised of the autopsy findings?

14       A.    Not that I can recall.

15       Q.    Okay.  So, was it around August or when

16   was it you became aware of the autopsy finding?

17       A.    When I received the autopsy.

18       Q.    Okay.  That's a good answer.  You don't

19   know exactly when that was?

20       A.    No.

21       Q.    Okay.  Well, Mike Davis was interviewed

22   by you, we'll call it the third interview I

23   guess, at headquarters on 9/9/15.  Does that

Case 1:17-cv-01290-DJS Document 94-31 Filed 04/01/22 Page 28 of 41

1    [RONALD FOUNTAIN - By Mr. Klein]

2    sound right?

3         A.   Sure.

4         Q.   Okay.  So, I didn't hear an answer just

5    for the record.  I don't know if you got it.

6         A.   Yes.

7         Q.   So how long before that did you get the

8    autopsy, was it days or weeks or?

9         A.   I don't recall.

10        Q.   Whose determination was it to get Mike in

11   upon receipt of the autopsy, was it your call?

12        A.   I don't recall.

13        Q.   Okay.  Was Mike living in the home where

14   the -- where V passed or was he living somewhere

15   else at that time?

16        A.   He was not living in the home where she

17   passed, but I don't remember.

18        Q.   And he had advised you where he would be

19   and how you could reach him, correct?

20        A.   I don't believe so.  No.

21        Q.   Okay.  How did you find him?

22        A.   I think the marshals found him.

23        Q.   Okay.  Well, you found him before the

1    **[RONALD FOUNTAIN - By Mr. Klein]**

2       Q.   It's possible?

3       A.   Yes.

4       Q.   So you don't know whether he evaded you

5    or not, you have no recollection either way?

6       A.   I don't believe he evaded me.  I just

7    don't --

8       Q.   Okay.  So, after the interview on 9/9/15

9    would you say in that interview as well he didn't

10   give you anything of substance as you described

11   for the March 2nd interview?

12      A.   Nothing more than I already had I don't

13   believe.

14      Q.   Right.  And what you already had you

15   described earlier I think you used the words

16   "nothing of substance."  Were those the words you

17   used?

18                  MS. SPENCER:  Object to form.

19      A.   Yeah.  Besides him --

20      Q.   Okay.  So, if you had nothing more than

21   what you had on March 2nd, would you agree as of

22   interviewing him on 9/9/15 you still didn't have

23   reason to believe that he was responsible for the

**APPENDIX**  **1720**

89

1    **[RONALD FOUNTAIN - By Mr. Klein]**

2    you were authorized to break the law?

3             MS. SPENCER:  Objection.

4        A.    It just means I didn't commit petty

5    larceny.  I had permission.

6        Q.    Okay.  You were also charged with

7    conspiracy and what else?

8        A.    I don't remember.  But if you want to

9    discuss that, I mean, my attorney I'm sure would

10   be happy to.

11       Q.    You were charged with public corruption,

12   and official misconduct, conspiracy, criminal

13   solicitation.  All of those acts alleged to have

14   taken place in October of 2015.

15            So, now that we are up to September 9th,

16   2015.  Michael Davis was arrested on October 2nd

17   of 2015.  Just in terms of what was going on with

18   you and your colleagues involved in this case,

19   when were you arrested -- when did those events

20   with the 911 tape occur in relation to Mike

21   Davis' arrest, did they overlap?  Was it early

22   October, was it mid October, late October?

23            MS. SPENCER:  Object to form.

1  [RONALD FOUNTAIN - By Mr. Klein]

2      A.   I believe it was late October.

3      Q.   Okay.  Did your involvement in that case

4  either, that you were adversarial to D.A. Abelove

5  who was prosecuting Mike Davis but also

6  investigating you or did your colleagues who you

7  worked with at Troy flipping on you, did any of

8  that interfere with the Mike Davis prosecution?

9              MS. SPENCER:  Objection to

10             characterization.

11             MR. FIRTH:  Objection.

12     A.   Not to my knowledge.

13     Q.   When you resigned, I think you said it

14  was April or May of 2016?

15     A.   April or March.

16     Q.   Was that negotiated by your attorney that

17  you mentioned earlier, your criminal attorney?

18     A.   No.

19     Q.   You just resigned?

20     A.   I retired.

21     Q.   You retired.  Did you have pending

22  charges where you could have been fired if it

23  went any further, even administrative charges

1    [RONALD FOUNTAIN - By Mr. Klein]

2    related to taking the 911 recording?

3        A.    There were no administrative charges when

4    I left.

5        Q.    Okay.  Were they resolved or there were

6    just none whatsoever?

7        A.    There was none whatsoever.

8        Q.    All right.  When you left did you agree

9    to participate in the Mike Davis prosecution and

10   any other cases that you were involved before you

11   retired or did they have to subpoena you and have

12   you come in involuntarily?

13                    MR. FIRTH:  Objection.

14       A.    I was --

15       Q.    Like Mike Davis' trial was in August of

16   2016.  Does that sound right?

17       A.    Correct.

18       Q.    And so you had been off the job for about

19   five months or so at that point, correct?

20       A.    Sounds right.

21       Q.    So, were you cooperating with the D.A.'s

22   office and your department, your former

23   department at that time to prepare and assist in

1   **[RONALD FOUNTAIN - By Mr. Klein]**

2   this case or were you -- you just came in for

3   trial because you had to with a subpoena?

4              MS. SPENCER:  Object to form.

5       A.   I didn't come in because of the subpoena.

6   I came in because I had cooperated with the

7   assistant D.A. who was handling the case.

8       Q.   Okay.  Did you have any contact with Joel

9   Abelove during the Davis prosecution?

10      A.   Not that I can recollect.

11      Q.   Have you had any contact with him since

12  the incident, since you left the department?

13      A.   Not that I recall.

14      Q.   So, after the 9/9/15 interview it was

15  about three weeks, let's say, roughly until

16  August -- until October 2nd when Mike Davis was

17  arrested.  What, if anything, transpired during

18  those weeks if you can recall?

19      A.   You know, the district attorney's name is

20  Jessica Hall, was the first D.A., and I believe I

21  talked to her about it and she talked about

22  indicting him.  I think she was the one who

23  indicted him.  I'm not sure.

1    [RONALD FOUNTAIN - By Mr. Klein]

2        Q.  So, was it after that interview on 9/9

3    and before the arrest on the warrant on 10/2 that

4    you testified at the grand jury?

5        A.  I'm going to say yes.

6        Q.  Okay.  Did you speak -- when you met with

7    Jessica Hall, or whomever it was, about the grand

8    jury, did you meet with Dr. Sikirica as well or

9    was your prep alone?

10       A.  I believe it was alone.  I don't recall.

11       Q.  Okay.  So, what do you recall next?  Do

12   you recall the day that Mike Davis surrendered or

13   anything prior to that?

14       A.  I really don't recall.

15       Q.  Okay.  When Mike surrendered what was --

16   he wasn't surrendered, he was picked up at his

17   home and brought to headquarters, correct, for

18   processing?

19       A.  Correct.

20       Q.  What was the procedure there?  Did you

21   have to do an arrest report?

22       A.  Yes.

23       Q.  We have that.  What else did you do, if

1   [RONALD FOUNTAIN - By Mr. Klein]

2       Q.   And you learned and you knew that there

3   was an affirmative duty of all police officers to

4   intervene to stop other law enforcement officers

5   from engaging in violations of the constitution,

6   you -- that's something that all police officers

7   learned, right?

8               MS. SPENCER:  Object to form.

9       A.   I don't believe there was a violation of

10  the constitution for me testifying in a court

11  after I had retired but.

12      Q.   Well, if there's a prosecution going on

13  where you found there was not grounds for the

14  prosecution, you hypothetically based on your

15  training and your experience you are aware that

16  you have a duty to say something, to intervene to

17  the best that you can?

18              MS. SPENCER:  Object to form.

19              MR. FIRTH:  Objection.

20      A.   I was a retired police officer at the

21  time of this.

22      Q.   Okay.  So, did you feel there were no

23  grounds to prosecute Mike, but you just did it

1   **[RONALD FOUNTAIN - By Mr. Klein]**

2   because you were told to do and you retired

3   and --

4     A.   No.   I knew this child died and I believe

5   Michael Davis had something to do with it.

6               MS. SPENCER:   Please note my

7         objection.

8     Q.   You just don't know what it is to this

9   day, but you believe it was something?   Is that

10   fair?

11     A.   I believe he caused the death of that

12   child.

13     Q.   Okay.   Well, how do you believe he caused

14   the death?   Is it just he was there and something

15   had to have happened and that's it?   Is that a

16   fair summary, or do you have any additional facts

17   that you can set forth that form the basis of

18   that belief?

19               MR. FIRTH:   In addition to what

20         he's already testified to today?

21               MR. KLEIN:   Yes.

22               MS. SPENCER:   Object to form.

23     A.   I have no additional facts of anything.

1   **[RONALD FOUNTAIN - By Mr. Klein]**

2   How's that?

3      Q.   So, can you just summarize your basis of

4   belief?  In other words, I don't want to say it.

5   I want to hear you say it so it's not, you know,

6   it's from your mouth.  Is it correct that

7   something suspicious happened to the child, Mike

8   was alone with her for a few hours, that's the

9   basis of your belief or is there anything else?

10     A.   That's the basis of my belief.

11             MS. SPENCER:  Note my objection.

12             MR. FIRTH:  Yeah.  Note my

13          objection, too.  He testified about other

14          things as well.  The record speaks for

15          itself though.

16     Q.   When you met with Troy fire do you recall

17  learning how many chest compressions they did, in

18  other words, was it, you know, a hundred per

19  minute over 20 minutes or some other type of

20  number that you could quantify?

21             MS. SPENCER:  Object to form.

22     A.   I don't recall.

23     Q.   Do you know approximately how many they

1   [RONALD FOUNTAIN - By Mr. Klein]

2   interview Mike gave you a black Motorola cell

3   phone?

4       A.   It's my signature.  Yes.  I can't -- I'm

5   not going to lie, it's too far away.

6       Q.   Well, let's make it bigger so you can see

7   it.

8       A.   That's good.  Okay.

9       Q.   So, this confirms in June of 2016 after

10  you retired you gave this supporting deposition

11  saying that Mike gave you his black phone,

12  correct, during the interview on March 2nd, 2015?

13      A.   Yes.

14      Q.   Okay.  So, does that refresh your

15  recollection about the phone?

16      A.   I still don't remember but okay.  I

17  signed it.  I'm sure I did.  That's my signature.

18  Yes.  I did, but I don't remember.

19      Q.   Okay.  Did you ever inquire or

20  investigate any other -- withdrawn.

21           When you met with Dr. Sikirica on

22  February 27th, 2015, for the autopsy, did you

23  discuss with him your conversation with Mike

**APPENDIX**          **1729**

119

1    **[RONALD FOUNTAIN - By Mr. Klein]**

2    Davis and your belief that something suspicious

3    happened?

4         A.   I don't recall.

5         Q.   Okay.  Was that your practice to do so?

6              MS. SPENCER:  Object to form.

7         A.   I don't -- would I tell the doctor what I

8    thought was going on, that we had a house with a

9    dead person and he was the only one home and we

10   don't know anything.  I'm sure I told him that.

11        Q.   Okay.  In other words, was it the

12   practice and procedure in these investigations at

13   that time for you to have an open conversation

14   with Dr. Sikirica while he's doing this autopsy

15   or, for instance, would you be in a room, you

16   know, with a window and without communication

17   with him?  Would it be --

18        A.   We would be in the room if we went to the

19   autopsy, you know, we didn't go to every autopsy.

20        Q.   In a case like this was it collaborative

21   while he was doing his work you would share what

22   you found out to see if it helps him out at all

23   or not, you would share what you knew?

1  **[RONALD FOUNTAIN - By Mr. Klein]**

2  conversation you would have with Dr. Sikirica in

3  these cases like Thomas and this case and any

4  others would there be a discussion of okay, this

5  is what you see her today, it will be helpful to

6  have corroborative statements from the suspect or

7  anything else?  Was there any discussion like

8  that in sum or substance?

9              MR. FIRTH:  Objection.

10             MS. SPENCER:  Object to form.

11     A.   Not that I recall with me.

12     Q.   Okay.  If this was on the 27th and there

13  were 28 days in the month and on March 1st Andra

14  Ackerman says good to meet with you yesterday,

15  which was the 28th, does it seem more likely than

16  not that there was a meeting, a post-autopsy

17  meeting the day after the autopsy?

18             MS. SPENCER:  Object to form.

19             MR. FIRTH:  Object to form.

20     A.   It makes sense, but I don't remember

21  everything.

22     Q.   Okay.  So, did you plan your interview of

23  Mike Davis on March 2nd at that meeting?

1    [RONALD FOUNTAIN - By Mr. Klein]

2              MS. SPENCER:  Object to form.

3    Q.   You can answer.

4    A.   Not that I recall.

5    Q.   Okay.  You are not saying you didn't, you

6    just don't remember how you came to plan that

7    meeting?

8    A.   Correct.

9    Q.   Okay.  Do you think it's more likely

10   right than wrong that after attending the autopsy

11   with Ackerman and your colleagues you then met

12   with them the next day and discussed next

13   investigatory steps including the interview that

14   you then scheduled that day for the next day?

15   A.   That would make sense.  Yes.

16   Q.   Okay.

17             MS. SPENCER:  Brett, do you mind

18             just putting your camera on?

19             MR. KLEIN:  Oh.  I didn't realize

20             it was off.  I don't mind at all.  Sorry.

21             I thought you were going to tell me

22             that I was still sharing my screen and

23             you are looking at my notes.

1

2                          **DEPOSITION of CHARLES McDONALD**

3

4    UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF NEW YORK
5    ----------------------------------------------X
     MICHAEL DAVIS-GUIDER,
6
                              Plaintiff,
7
     -against-              Civil Case No.: 1:17-cv-01290
8                           (FJS/DJS)

9    CITY OF TROY, RONALD FOUNTAIN, Individually,
     DANIELLE COONRADT, Individually, CHARLES
10   MCDONALD, Individually, TIM COLANERI,
     Individually, ADAM R. MASON, Individually,
11   RENSSELAER COUNTY, MICHAEL SIKIRICA,
     Individually, and JOEL ABELOVE,
12   Individually,

13                           Defendants.
     ----------------------------------------------X
14

15        DEPOSITION of the Defendant, **CHARLES McDONALD,**

16   held on May 26, 2021, commencing at 9:35 a.m.,

17   being held virtually by Zoom, pursuant to Notice;

18   before Susan Florio, a Registered Professional

19   Reporter and Notary Public in and for the State of

20   New York.

21

22

23

1  **[CHARLES McDONALD - By Mr. Klein]**

2      Q.   Did you listen to the recording of the,

3  or watch the video from the interview that you

4  testified about at the suppression hearing?

5      A.   Not recently, no.

6      Q.   Okay.  So, directing your attention to

7  February 26th, 2015, how did you become involved

8  in the investigation of the death of V.D.?

9      A.   We were dispatched up to the address for

10  an unresponsive child.

11      Q.   And when you say "we," who are you

12  referring to?

13      A.   Patrol and then Detective Fountain and

14  myself.

15      Q.   Okay.  Were you on duty at the time or

16  were you notified off duty because there was a

17  death?

18      A.   No.  We were on duty.

19      Q.   Okay.  And did you hear the 911 call or

20  were you just made aware of it and you responded

21  after someone told you about it?

22      A.   I believe we were called and told to

23  respond up there.

1  **[CHARLES McDONALD - By Mr. Klein]**

2    Q.   Okay.  And did you go there with

3  Detective Fountain?

4    A.   I did.

5    Q.   And walk us through what you observed

6  when you got there?

7    A.   Mr. Davis was outside.  His girlfriend,

8  Rebecca was outside.  We went in.  They brought

9  us in, showed us where the baby was.  Prior to

10  being taken by the ambulance and everything and

11  we asked what had happened and we asked if they

12  would come down to the station and talk to us.

13    Q.   Was the baby, the decedent, V.D., was she

14  still there when you got there?

15    A.   No.

16    Q.   Okay.  And so you asked Michael and

17  Rebecca to go to headquarters with you?

18    A.   Correct.

19    Q.   And whose determination was that?

20    A.   Detective Fountain's.

21    Q.   Okay.  And was it -- I think we've heard

22  that you said also that he was the -- was he the

23  lead detective in this case?

1    [CHARLES McDONALD - By Mr. Klein]

2        A.    Yes.

3        Q.    Okay or was it considered "his case"?

4        A.    I guess --

5        Q.    Well, you tell me.  I just want to know

6    what the terminology was.  Was it assigned to

7    Detective Fountain or to you both?

8        A.    To both of us.

9        Q.    Okay.  And did he -- was he senior to you

10   or did he take a lead role for some particular

11   reason even if he wasn't senior?

12       A.    Well, I was senior as far as seniority

13   goes, but he had been in the detective bureau for

14   a year, few years and I was new to it.

15       Q.    Okay.  How new to it were you?

16       A.    I was only up there for a few months.

17       Q.    Had you worked on any homicides to date

18   or was this the first one that you had been

19   assigned to work on?

20       A.    In the detective bureau?

21       Q.    Yes.

22       A.    I believe that would have been the first

23   one.  I'm not positive.

1    [CHARLES McDONALD - By Mr. Klein]

2    with him and talked, asked him about his

3    basketball career, where he talked about that and

4    things that were not related to V.D.  Is that

5    right?

6        A.    Correct.

7        Q.    Can you just describe anything else that

8    was said that you can recall other than small

9    talk?

10       A.    I know he talked a little bit about his

11   upbringing.  What he had said I don't recall, but

12   that was about it.

13       Q.    Okay.  Did you get any of the

14   circumstances of how V, how he discovered V

15   unresponsive or anything he did after he

16   discovered her unresponsive?

17              MS. SPENCER:  Object to form.  You

18         can answer.

19       A.    No.

20       Q.    Okay.  So, what was your role at that

21   point, was it to like, for lack of a better word

22   babysit him while your colleagues did some

23   digging to see, try to find out more information

1    [CHARLES McDONALD - By Mr. Klein]

2    about what happened?

3                    MS. SPENCER:  Object to form.  You

4            can answer.

5    A.    Yes.

6    Q.    Okay.  Would you call it babysitting, I

7    mean, or what was your role?

8    A.    Sit with him.

9    Q.    What?

10   A.    Just to sit with him.

11   Q.    Sit with him.  Right.  Keep him occupied

12   if he stays there.  He had a right to leave, but

13   you weren't offering that to him?

14           Is it fair to say he had a right to

15   leave, but you weren't like volunteering that for

16   him?  If he wanted to go he could have, but you

17   weren't like opening the door for him to go,

18   correct?

19                   MS. SPENCER:  Object to the form.

20           If I object to form you can still answer.

21   A.    Yes.  He could have left.

22   Q.    But your job was to try to keep him there

23   voluntarily to the extent possible, correct?

1    **[CHARLES McDONALD - By Mr. Klein]**

2                    MS. SPENCER:  Object to form.

3         A.   Correct.

4         Q.   Okay.  And while Fountain was at the

5    hospital were you getting status reports from him

6    from time to time or were you just waiting?

7         A.   I believe I was just waiting.

8         Q.   Okay.  What is the next thing you recall

9    other than making small talk with Mike Davis?

10        A.   I remember they came back down and then

11   Sergeant Colaneri and Detective Fountain came

12   back in the office and then Detective Sergeant

13   Colaneri had a sheet that he was reading off of

14   asking questions.

15        Q.   And what was that sheet?

16        A.   I don't know to be honest with you.

17        Q.   Have you inquired since then up until

18   today even if you didn't know at the time?

19        A.   No.

20        Q.   Did it seem like a medical sheet or notes

21   or do you not know?

22        A.   I want to say it was almost like a CPS

23   form.

1  **[CHARLES McDONALD - By Mr. Klein]**

2      Q.   And what kind of things was Colaneri

3  saying?

4      A.   Oh, I don't recall that.

5      Q.   Okay.  What was the nature of the

6  conversation?

7      A.   Just back and forth.

8      Q.   About what though, was it known to

9  Colaneri and Fountain that V had passed away at

10  that point and did they let Mike know?

11      A.   That I don't know.

12      Q.   Okay.  So, what was the back and forth

13  about?

14      A.   It was the questionnaire.

15      Q.   Okay.  But was it about what happened in

16  the home that morning when V was discovered

17  unresponsive in sum and substance?

18      A.   I don't recall.

19      Q.   Okay.  So, what do you recall?  How long

20  did that back and forth or that questionnaire

21  discussion go on for?

22      A.   Maybe ten minutes.  Maybe.  I don't know.

23      Q.   Okay.  And what do you recall next?

1    **[CHARLES McDONALD - By Mr. Klein]**

2        A.   I believe they went and got a search

3    warrant after that.

4        Q.   When you say "they," is that Fountain and

5    Colaneri or anyone else?

6        A.   Yes.

7        Q.   Okay.  Were you not involved in that?

8    Were you still sitting with Davis?

9        A.   I believe I still sat with Mr. Davis at

10   that time.

11       Q.   Okay.  And what happened next?  Did they

12   get a search warrant?

13       A.   They did.

14       Q.   Okay.  Did you have any role in that or

15   you just sat by?

16       A.   I don't recall to be honest with you.

17       Q.   Okay.  What do you recall next?

18       A.   I don't remember.  I don't recall really.

19       Q.   You don't recall?

20       A.   I'm not positive that I went over -- I

21   think I might have went with them to do the

22   search warrant but I'm not positive.

23       Q.   Okay.  And so you don't remember being at

1    **[CHARLES McDONALD - By Mr. Klein]**

2    the home.  You may have been there, you just

3    don't remember it?

4        A.   Correct.

5        Q.   Okay.  And then what do you remember

6    happened next in regards to this investigation?

7        A.   That we wound up letting him go.

8        Q.   Okay.  And at that time he was let go was

9    there any reason to believe there was any

10   criminality or that he was involved in it?

11       A.   No.

12       Q.   Okay.  What was the next thing that

13   happened in this investigation that you can

14   recall?

15       A.   I believe it was the next day that we

16   went to the autopsy.

17       Q.   Okay.  And you saw a sign-in sheet

18   showing that you were there along with Fountain,

19   Colaneri, and was it Mason, or who else was

20   there?

21            MS. SPENCER:  Objection.

22       A.   I'm not sure.  I believe Fountain, I

23   believe Colaneri and the evidence tech, which I

46

1    **[CHARLES McDONALD - By Mr. Klein]**

2        Q.   Okay.  What was your next involvement, if

3    any, in this investigation?

4        A.   At one point Mr. Davis was brought back

5    in for an interview.

6        Q.   And that interview, there were two

7    subsequent interviews, one was on March 12th, I

8    believe, and the other one was in September.  Are

9    you talking about the one in March?

10       A.   I believe so.  Yes.

11       Q.   Okay.  And what was your involvement, if

12   any, in that interview?

13       A.   I sat in with Detective Fountain.

14       Q.   Okay.  On the video that I saw Detective

15   Fountain is alone during the interview in the

16   room on the third floor with Mike Davis.  Is that

17   a fair assessment of what was recorded on the

18   video?

19       A.   Without seeing it, yes, probably.

20       Q.   So, where would you have sat in?  Were

21   you in another room monitoring on a CTD terminal

22   or computer?

23       A.   I believe so.  Yes.

1  **[CHARLES McDONALD - By Mr. Klein]**

2     Q.   Okay.  But you recall there being an

3  interview.  Do you recall there being an

4  interview closer in time to the indictment in

5  this case?

6     A.   I believe so.  Yes.

7     Q.   Okay.  And you recall being part of that

8  interview?

9     A.   I believe I was there for that.

10    Q.   And Mike Davis was let go from that

11 interview as well, correct?

12    A.   Correct.

13    Q.   And he basically, is it fair to say he

14 said basically exactly what he told you in the

15 prior interviews?

16             MS. SPENCER:  Object to form.

17    Q.   Or did his story change at all?

18    A.   I believe it was the same as prior.

19    Q.   So, when he left that -- can we call that

20 interview closer to the indictment the final

21 interview before his indictment, is that the

22 final one that you know?

23    A.   I believe so.  Yes.  I'm not positive.

1   **[CHARLES McDONALD - By Mr. Klein]**

2      Q.   When he left that interview did you have

3   any reason to believe that he committed a crime?

4      A.   I don't recall.

5      Q.   Okay.  Well, if it was the same

6   information you got from the March interview, is

7   it fair to say at that time you didn't know

8   whether he committed a crime, you didn't have

9   reason to believe at that time?

10             MS. SPENCER:  Object to form.

11      A.   He didn't confess, I'll put it that way.

12      Q.   Right.  If there was probable cause for

13   arrest at that point you could have arrested him

14   pre-indictment, correct?

15             MS. SPENCER:  Object to form.

16      A.   I believe so, yes.

17      Q.   So, do you recall there being a

18   discussion that day before he was let go, either

19   with Ron Fountain, Tim Colaneri, or anyone else

20   about letting him go because you didn't have

21   grounds to take him in?

22             MS. SPENCER:  Object to form.

23      A.   I don't recall.

Case 1:17-cv-01290-DJS  Document 94-87  Filed 04/01/22  Page 64 of 18

1    [CHARLES McDONALD - By Mr. Klein]

2       Q.   Okay.  You are not aware of anything

3    else?  It's not a trick question.  I just want to

4    know if there's anything else that you can point

5    to that supported charges here, other than

6    information given to the D.A.'s office by your

7    office and information provided by Dr. Sikirica.

8       A.   Correct.

9       Q.   Okay.  But as a -- in your training,

10   education and experience, based on your

11   conversations with Mike Davis you didn't know --

12   you didn't have reason to believe he committed a

13   crime to your knowledge, it was once Dr. Sikirica

14   provided a link that's when he was charged?  Is

15   that a fair summary?

16                   MR. FIRTH:  Object to form.

17                   MS. SPENCER:  Object to form.

18      A.   Like I stated he never confessed.

19      Q.   So, is what I said accurate in sum or

20   substance?

21                   MS. SPENCER:  Object to form.

22                   MR. FIRTH:  Same objection.

23      A.   Correct.

1    [CHARLES McDONALD - By Mr. Firth]

2        Q.    At what school or for what company?

3        A.    It's University Heights Association.  We

4    do security for Sage, Albany Law School and

5    Albany College of Pharmacy.

6        Q.    You've been doing that since you left the

7    PD?

8        A.    Nope.  I've been doing that for the past

9    three years, four years, and then I did just

10   regular security for the company before I took

11   the new position.

12               MR. KLEIN:  Okay.  I believe that's

13          all the questions I have for you for

14          today.  I want to thank you for your time

15          and cooperation.

16               THE WITNESS:  All right.

17               MS. SPENCER:  Anything for you,

18          Bill?

19               MR. FIRTH:  Yes.

20   BY MR. FIRTH:

21       Q.    Detective, just a quick, most likely a

22   single question.  Did you ever talk with anyone

23   at the D.A.'s office or were you part of any

**[CHARLES McDONALD - By Mr. Firth]**

1

2   meeting with the D.A.'s office in terms of the

3   basis to move forward with the indictment of

4   Mr. Davis?

5       A.   I believe I was present for the

6   conference before they went to grand jury.  I

7   went on vacation so I wasn't around for grand

8   jury or anything like that.

9       Q.   Conference before the grand jury took

10  place?

11      A.   I believe so.  Yeah.

12      Q.   Who was that conference with do you

13  remember?

14      A.   I believe ADA Ackerman was there and I

15  don't remember who else was in there.

16      Q.   Anyone else from the Troy police

17  department?

18      A.   I'm sorry?

19      Q.   Was there anyone else from the Troy

20  police department?

21      A.   I don't recall.  I know Detective

22  Fountain would have been there.  I don't know if

23  anybody else was there or not.

1  **[CHARLES McDONALD - By Mr. Firth]**

2  Q. Okay. Can you state at least whether

3  Joel Abelove was present for that?

4  A. I can't. I don't recall that.

5  Q. All right. Do you recall having any

6  personal discussions with Joel Abelove about this

7  investigation?

8  A. I don't believe I did. No.

9  Q. Okay. Are you aware one way or another

10  whether he was actively involved in this

11  investigation?

12  A. I believe he did the trial. I'm not

13  positive.

14  Q. Okay. That aside, any other role in the

15  investigation?

16  A. Other than probably meeting with him, you

17  know, looking into this stuff, I don't know what

18  other role he had into it.

19  Q. As you sit here today do you know whether

20  he -- do you recall any meetings that he was

21  involved with, with respect to the investigation

22  leading up to the indictment?

23  A. That I don't recall. I don't recall him.

**APPENDIX**

**1749**

94

1    [CHARLES McDONALD - By Mr. Firth]

2        Q.    That meeting that you attended with Andra

3    Ackerman before the indictment, do you recall

4    what was discussed there?

5        A.    I believe what they were going to -- how

6    they were going to proceed with it as far as

7    charges.

8        Q.    In terms of at the grand jury?

9        A.    I believe so.  Yes.

10       Q.    You are saying you believe so, but do you

11   have any recollection one way or the other?

12       A.    No.

13       Q.    Okay.  And, to your knowledge, it was

14   just that single meeting that you had with the

15   D.A.'s office leading up to the indictment?

16       A.    I believe so.  I don't recall -- I

17   remember meeting with them once.  I don't know if

18   it was more than once.

19                    MR. FIRTH:  Okay.  Well, that's all

20                    I have.  I think I said I was only going

21                    to be asking one question, but that's

22                    okay.  You tolerated it well.  I

23                    appreciate it.

1

2                    **DEPOSITION of TIMOTHY COLANERI**

3

4   UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF NEW YORK
5   --------------------------------------------X
    MICHAEL DAVIS-GUIDER,
6
                         Plaintiff,
7
    -against-          Civil Case No.: 1:17-cv-01290
8                      (FJS/DJS)

9   CITY OF TROY, RONALD FOUNTAIN, Individually,
    DANIELLE COONRADT, Individually, CHARLES
10  MCDONALD, Individually, TIM COLANERI,
    Individually, ADAM R. MASON, Individually,
11  RENSSELAER COUNTY, MICHAEL SIKIRICA,
    Individually, and JOEL ABELOVE,
12  Individually,

13                       Defendants.
    --------------------------------------------X

14

15       DEPOSITION of the Defendant, **TIMOTHY COLANERI,**

16  held on May 26, 2021, commencing at 1:35 p.m.,

17  being held virtually by Zoom, pursuant to Notice;

18  before Susan Florio, a Registered Professional

19  Reporter and Notary Public in and for the State of

20  New York.

21

22

23

1   **[TIMOTHY COLANERI - By Mr. Klein]**

2   did you become aware to the best of your memory,

3   if you know?

4       A.   I don't remember.

5       Q.   Okay.  And so what happened next?

6   Because there was a death of a child, your squad

7   would have responded to the scene to see what

8   happened?

9       A.   Well, because it was a juvenile case the

10  juvenile officers responded.  I think I was just

11  doing a canvass of the neighborhood.  I grew up

12  near there so I knew, not everybody involved, but

13  I knew some of the people that may have been

14  potential witnesses.

15      Q.   Who did you know?

16      A.   I knew the owner of Testo's restaurant,

17  Jimmy Testo.

18      Q.   And did you ever speak with Jimmy or were

19  you present when he was interviewed by anyone?

20      A.   I was present and he said that Mr. Davis

21  came in and he tried to use the phone.

22      Q.   Did he say anything else, was Davis

23  frantic, was he calm, what did he say about

1  **[TIMOTHY COLANERI - By Mr. Klein]**

2  Davis' demeanor?

3     A.   I don't remember.

4     Q.   Okay.  Did you take notes during that

5  conversation?

6     A.   I couldn't find any notes in anything,

7  that I wrote anything down.

8     Q.   Okay.  Did Jimmy Testo give you

9  information that was to your knowledge consistent

10  with Mike Davis' statements to either you or your

11  colleagues, that he tried to resuscitate the

12  baby, he went to a neighbor, he went back home,

13  then went to Testo's, then went back home which

14  is when his wife -- the baby's mother was there

15  and EMS was arriving, that general timeline did

16  that jive with what Jimmy Testo told you?

17              MS. SPENCER:  Object to form.  You

18       can answer.

19     A.   Jimmy Testo said he came in to use the

20  phone.

21     Q.   Okay.

22     A.   And that's about it.

23     Q.   Okay.  Did he overhear the call to your

1  **[TIMOTHY COLANERI - By Mr. Klein]**

2  knowledge?

3      A.   I'm sorry.  What was that?

4      Q.   Did Jimmy tell you whether he overheard

5  the call that Mike Davis made?

6      A.   I think Mr. Davis left Testo's and went

7  to a neighbor's house to use the phone.

8      Q.   So he asked to use a phone.  Did Jimmy

9  Testo tell you whether he used the phone or you

10  don't recall that?

11      A.   I don't recall that.

12      Q.   Okay.  Do you recall anything else about

13  speaking, your interview with Jimmy?

14      A.   No.

15      Q.   Did you interview anyone else from his

16  restaurant, any staff or any patrons of the

17  restaurant?

18      A.   I don't think there were any patrons at

19  the time.  It was lunchtime, but the kitchen is

20  separate from the dining area and I was next to

21  the kitchen when I was asking questions.

22      Q.   And just for the record did this

23  interview take place on the date the child passed

1   **[TIMOTHY COLANERI - By Mr. Klein]**

2   away, which was February 26th?

3       A.   Yes.

4       Q.   Okay.  So, I guess if you could just walk

5   us through chronologically.  When you responded

6   to the location was Testo's the first place you

7   went or did you do anything else first?  Take us

8   through and in order.

9       A.   Well, I'm pretty sure I got a briefing

10  from the officer at the scene and then we decided

11  to do a canvass of the neighborhood.  I started

12  with a neighbor across the street, on the, let's

13  see, southeast corner of the intersection.

14      Q.   And what were the results of that

15  canvass?

16      A.   She said she didn't see or hear anything,

17  as far as I can recall.

18      Q.   Okay.  And what else did you do, if

19  anything, other than speak to this neighbor on

20  the corner?

21      A.   I went up and down the block and tried to

22  talk to everybody that was out or saw something

23  or heard something.

1    **[TIMOTHY COLANERI - By Mr. Klein]**

2        Q.    Okay.  And did anyone have any

3    information that was helpful?

4        A.    Not that I recall.

5        Q.    Okay.  And how many people did you

6    interview other than the lady on the corner, was

7    it two or three people or ten people?

8        A.    Maybe four or five people.

9        Q.    And did you conduct this canvass alone or

10   with someone, other officers?

11       A.    I think I was with someone but I don't

12   remember who.

13       Q.    Okay.  And what do you recall doing next?

14   Is that when you spoke with Jimmy Testo or did

15   you do something else first?

16       A.    Jimmy Testo was involved in the entire

17   canvass of the area.

18       Q.    He went with you?

19       A.    No.  He was at his store.

20       Q.    Okay.

21       A.    We -- not Jimmy, but myself and the

22   person I was with went all around the

23   neighborhood trying to find somebody to answer a

1   **[TIMOTHY COLANERI - By Mr. Klein]**

2   door or talk to us and during the time we

3   interviewed Jimmy.

4       Q.   I see.  The other officer that was with

5   you, do you believe it was one officer or more

6   than one other officer?

7       A.   I think it was just one.

8       Q.   Do you know if that officer took notes,

9   given that maybe you were the senior officer, you

10  have a rank and file patrol officer, detective,

11  is it more than likely you had somebody taking

12  notes?

13      A.   I don't remember if they took notes or

14  not.  Generally what we would do is if they

15  answered the door we would write down the

16  address, name and contact information, and I

17  would hand out cards and so would the person,

18  handing out cards.  I didn't write anything down

19  so I don't know if the other person I was with

20  was writing stuff down or not.

21      Q.   You've had a chance to review the file

22  with your counsel, Ms. Spencer in this case, the

23  TPD file in this case?

1   **[TIMOTHY COLANERI - By Mr. Klein]**

2     A.  I reviewed some of the file, yes.

3 Yesterday.

4     Q.  You haven't seen any notes that appear to

5 be from this canvass; have you?

6     A.  No.  I haven't seen any handwritten notes

7 at all.

8     Q.  So, does that suggest to you that they

9 are missing because they would have been done or

10 does that suggest to you they may not have been

11 done?

12     A.  It just may not have been done unless

13 there was some type of witness obviously to see

14 what was going on.

15     Q.  Got you.  Okay.  So, other than -- what,

16 if anything, else transpired on that canvass if

17 not already said?

18         You searched the general vicinity,

19 including Testo's, anything else of significance

20 during the canvass?

21     A.  No.

22     Q.  Okay.  What happened next?

23     A.  I don't remember.

**APPENDIX** **1758**

23

1    **[TIMOTHY COLANERI - By Mr. Klein]**

2        Q.    Did you go to the hospital?

3        A.    Oh.  I think I was at the hospital prior

4    to this, prior to going down there.

5        Q.    Okay.

6        A.    With the baby and the evidence technician

7    had come up and started taking pictures and then

8    I went to the scene after that.

9        Q.    Okay.  Were you given any information at

10   the hospital by medical staff or anyone else?

11       A.    I don't remember.

12       Q.    Okay.  Did you know that the baby was

13   deceased?

14       A.    Yes.

15       Q.    Okay.  So you at least knew that.  Do you

16   recall whether you knew anything else or do you

17   believe that was basically it?  You had a

18   deceased baby, who you took photos of, and then

19   you went to the scene?  Is that a fair assessment

20   of what you knew at the time or was there more to

21   it?

22       A.    Well, the evidence technician took the

23   photos.  I just went there, I believe we spoke

# APPENDIX **1759**

24

1    **[TIMOTHY COLANERI - By Mr. Klein]**

2    with the mom very quickly.  She was up at the

3    hospital and then we went to the scene.

4        Q.   Okay.  And what did you do?  So, you went

5    to the hospital pre-scene.  Then you canvassed at

6    the scene.  What other involvement did you have

7    that day in this investigation?

8        A.   I believe we may have interviewed Mike

9    Davis.

10       Q.   Okay.  And so there's about 12 minutes of

11   a cell phone video that was turned on seems like

12   mid interview, not clear at what point.  That was

13   your cell phone, right?

14       A.   Yes.

15       Q.   Okay.  So, did you have an iPhone at that

16   time or an Android?  Do you remember what kind of

17   phone it was?

18       A.   It's most probably an Android.  I've

19   never had an iPhone.

20       Q.   So, was the interview with Mike Davis the

21   next thing that happened when you went back to

22   headquarters after the canvass or did you do --

23   were there any other investigative steps taken

1    **[TIMOTHY COLANERI - By Mr. Klein]**

2    that you can recall?

3                  MS. SPENCER:  Object to form.  You

4            can answer.

5        A.   I remember I took a walk-through of the

6    scene, but I don't remember if that was before or

7    after the interviews.  It was probably after when

8    the search warrant was obtained and we went up.

9        Q.   Who conducted the interview?

10       A.   It was Ron Fountain and Officer Chuck

11   McDonald.

12       Q.   Okay.  And was Davis -- were you present

13   in the room for the interview?

14       A.   Yes.  I was.

15       Q.   So, it was you, Chuck, Ron and Michael

16   Davis?

17       A.   Correct.

18       Q.   Was anyone else present or observing it

19   even if they were in a different room?

20       A.   No.  The camera -- there were no cameras

21   in the juvenile area.

22       Q.   Okay.  Have you looked at that video to

23   refresh your recollection for today's deposition?

1   **[TIMOTHY COLANERI - By Mr. Klein]**

2   rise to -- didn't -- wasn't an admission of any

3   crime.  There was no reason to believe he

4   committed a crime based on what he said.  Do you

5   agree with that?

6             MS. SPENCER:  Object to form.  You

7        can answer.

8    A.   Well, I only spoke to him the one time I

9   believe.  I didn't do any follow-up.  So, I

10   really wouldn't know what the other detectives

11   found or didn't find or whether --

12    Q.   On that day fair to say that he didn't

13   admit to any crime and you didn't have grounds to

14   arrest him for any crime at that time?

15    A.   At that time?  No.  He was not arrested.

16    Q.   So, what did he tell you?  Did he just

17   walk you through what happened that morning

18   starting with V woke up and then she went back to

19   sleep and he fell asleep and then woke up and she

20   was unresponsive?  Was it that story that was

21   told to you at that time?

22    A.   Yes.

23    Q.   And that he then went to a neighbor, then

1    **[TIMOTHY COLANERI - By Mr. Klein]**

2    Q.   Okay.  So, in this case Detective

3    Sergeant Parrow, your colleague, interviewed

4    Firefighter Bayley, other firefighters as well.

5    Were you aware of that generally or have you seen

6    their supporting deps specifically?

7    A.   I have not seen their depositions.

8    Q.   Do you recall being at headquarters

9    during some or any or all of these interviews?

10   A.   I don't understand.  I wasn't on Mike

11   Parrow's interview I don't believe.

12   Q.   Okay.  So, Mike Parrow's interviews refer

13   to -- withdrawn.

14        Do you know how those interviews, those

15   supporting deps were delegated out to Parrow?

16   Did he step up for it or did you assign people

17   different tasks?  How would he have been involved

18   in that?

19   A.   I was not the lead detective in this and

20   I didn't assign anybody any task.  That would be

21   the captain of the detectives who would assign

22   the tasks and who would determine who was the

23   lead detective.

Case 1:17-cv-00192-DJS   Document 84   Filed 04/01/22   Page 1 of 2

```
 1      STATE OF NEW YORK

 2      COUNTY COURT                   COUNTY OF RENSSELAER

 3      - - - - - - - - - - - - - - - - - - - - - - - - - - X

 4      THE PEOPLE OF THE STATE OF NEW YORK

 5      - against -                    Indictment #15-1094

 6      MICHAEL DAVIS,

 7              Defendant.

 8      - - - - - - - - - - - - - - - - - - - - - - - - - - X

 9      CONTINUATION OF SUPPRESSION HEARINGS

10
                                County Courthouse
11                              Congress and Second Streets
                                Troy, New York 12180
12                              July 7, 2016

13      B e f o r e :

14              HONORABLE ANDREW G. CERESIA,
                County Court Judge.
15
        A p p e a r a n c e s :
16
                        For the People:
17                      JOEL ABELOVE, ESQ.,
                        District Attorney, Rensselaer County,
18                      by CINDY CHAVKIN, ESQ., Assistant District
                        Attorney, of counsel,
19                      Rensselaer County Courthouse
                        Troy, New York.
20
                        For the Defendant:
21                      JOHN C. TURI, ESQ.,
                        Public Defender, Rensselaer County,
22                      by WILLIAM ROBERTS, ESQ., Assistant Public
                        Defender, of counsel,
23                      Rensselaer County Courthouse
                        Troy, New York.
24
                        MICHAEL DAVIS, Defendant, in person.
25
```

*(Fountain - People - Direct)*

Case 1:17-cv-01290-DJS Document 61-10 Filed 04/01/23 Page 3 of 2

1     A.   I don't believe so.

2     Q.   Do you recall when the search warrant was issued?

3     A.   February 26, 2015.

4     Q.   And was the search warrant executed?

5     A.   Yes, it was.

6     Q.   When was the search warrant executed?

7     A.   February 26, 2015, after it was signed.

8     Q.   And did you have a copy of the search warrant with

9     you when you executed the search warrant?

10    A.   Yes, I did.

11    Q.   Who executed the search warrant?

12    A.   Myself, at the time Officer Buttafucco, and I believe

13    Sergeant Tim Colaneri.

14    Q.   And can you please describe the search?

15         THE COURT:  Actually, before you do that, what

16    was the date the search warrant was executed?

17         THE WITNESS:  Same date, February 26, 2015.

18         THE COURT:  Thank you.

19    A.   We went into the residence.  The evidence technician

20    photoed it, grabbed some of the bedding.  He took a few other

21    items that we thought might have been pertinent to the case,

22    and then we left the house.

23    Q.   Was Michael Davis present during the search warrant?

24    A.   No, he was not.

25    Q.   Do you know where he was?

# APPENDIX

**1765**

CASE #: MS15-120
DECEDENT: ▮▮▮▮▮ ▮▮▮▮▮
DATE: February 27, 2015

**FORENSIC MEDICAL SERVICES**
**50 BROAD STREET**
**WATERFORD, NY 12188**
**(518) 237-3211**
**Fax (518) 237-7423**

ROSARIO
MATERIAL

Case 23-589, Document 94, 01/18/2024, 3604737, Page107 of 166

## SIGN IN SHEET
## MEETING / AUTOPSY

| TITLE (Ex. Det./Inv.) | PRINT NAME (CLEARLY) | SIGNATURE | REPRESENT (Ex. NYSP or Albany Police) | CONTACT # |
|---|---|---|---|---|
| Det | CHARLES McDONALD | *(signature)* | Troy PD | 578-810-8750 |
| Det | Ronald Fountain | *(signature)* | Troy PD | 810 4083 |
| E.T. | Anthony BottoRucco | *(signature)* | Troy PD | 270-4421 |
| ML&I | Ziegler N.M. | *(signature)* | Rens-Cty DoH ME | 270-2626 |
| Det | Tim Colaneri | Tim Colaneri | Troy Police | 270 4438 |
| AOA | Andra Ackerman | *(signature)* | R.C. D.A's Office | 270-4027 |
|  |  |  |  |  |
|  |  |  |  |  |

1

## DEPOSITION of JOEL ABELOVE

2

3

4 UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
5 ---------------------------------------------X
MICHAEL DAVIS-GUIDER,
6
                         Plaintiff,
7
   -against-          Civil Case No.: 1:17-cv-01290
8                     (FJS/DJS)

9 CITY OF TROY, RONALD FOUNTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES
10 MCDONALD, Individually, TIM COLANERI,
Individually, ADAM R. MASON, Individually,
11 RENSSELAER COUNTY, MICHAEL SIKIRICA,
Individually, and JOEL ABELOVE,
12 Individually,

13                      Defendants.
   ---------------------------------------------X

14

15      DEPOSITION of the Defendant, **JOEL ABELOVE**,

16 held on May 28, 2021, commencing at 9:35 a.m.,

17 being held virtually by Zoom, pursuant to Notice;

18 before Susan Florio, a Registered Professional

19 Reporter and Notary Public in and for the State of

20 New York.

21

22

23

1    **[JOEL ABELOVE - By Mr. Klein]**

2        Q.   Okay.

3        A.   He's testified for me before in cases.

4        Q.   Okay.  And this idea, this fact that came

5    out at trial that he did over 700 autopsies a

6    year in 2015, is that something that was known to

7    you before this trial?

8        A.   I don't recall.  I know I knew it at some

9    point.  I don't know when I knew that number.

10       Q.   Okay.  Were you aware of the volume of

11   autopsies he had performed per year during the

12   years that you were an ADA in the office, had it

13   ever come up?

14       A.   I don't believe so.

15       Q.   When did you take office?

16       A.   January 1st, 2015.

17       Q.   Okay.  You came in after the Adrian

18   Thomas trial, but were you familiar with the

19   outcome of that trial, the Court of Appeals

20   decision and then the outcome of that trial?

21       A.   I think at some point I was made aware of

22   it or I became aware of it.  I don't recall how.

23       Q.   Did it ever come to your attention that

**APPENDIX**

**1768**

29

1    [JOEL ABELOVE - By Mr. Klein]

2    they may need or, you know, whether it's a grand

3    jury subpoena or a judicial subpoena, have our

4    office assist them in any way that they need for

5    their investigation.  That's about it.

6        Q.   The autopsy was conducted the day after

7    the death, which was February 27th, 2015.  Are

8    you aware of that from looking at notes or just

9    generally does that sound right?

10       A.   Well, I'm not aware of it from looking at

11   any type of notes but generally that does sound

12   right.  The autopsy is often the following day.

13       Q.   And there's a sign-in sheet from that

14   autopsy where Andra Ackerman is there together

15   with a number of Troy PD officers and I believe

16   an evidence tech and someone from the Rensselaer

17   medical examiner's office.

18            But generally do you recall that Andra

19   Ackerman was assigned to work, that she otherwise

20   attended the autopsy?

21            MS. PECK:  Object to form.

22            MS. SPENCER:  Object to form.

23       A.   I don't recall that she attended the

1    **[JOEL ABELOVE - By Mr. Klein]**

2    autopsy.  I know she was assigned to be the

3    person from my office who was the liaison with

4    the Troy Police Department to help them with

5    their case.

6        Q.   And is her name Andra, not Andrea,

7    A-n-d-r-a?

8        A.   Correct.  Andra.

9        Q.   And what was her job or role in your

10   office at that time?

11       A.   She was an assistant district attorney.

12       Q.   Did she have a supervisory role or was

13   she like a line assistant?

14       A.   Her immediate supervisor would have been

15   my Chief Assistant District Attorney Jessica Hall

16   who then reports to me.

17       Q.   And Jessica Hall remained your chief

18   assistant through conclusion of the Davis trial,

19   is that fair?

20       A.   Yes.

21       Q.   Okay.  So, would you have been involved

22   in assigning Andra Ackerman to attend the autopsy

23   or was Jessica Hall involved in that or it could

1

**DEPOSITION of ADAM MASON**

2

3

4  UNITED STATES DISTRICT COURT
   NORTHERN DISTRICT OF NEW YORK
5  ---------------------------------------------X
   MICHAEL DAVIS-GUIDER,
6
                             Plaintiff,
7
   -against-              Civil Case No.: 1:17-cv-01290
8                          (FJS/DJS)

9  CITY OF TROY, RONALD FOUNTAIN, Individually,
   DANIELLE COONRADT, Individually, CHARLES
10 MCDONALD, Individually, TIM COLANERI,
   Individually, ADAM R. MASON, Individually,
11 RENSSELAER COUNTY, MICHAEL SIKIRICA,
   Individually, and JOEL ABELOVE,
12 Individually,

13                           Defendants.
   ---------------------------------------------X
14

15       DEPOSITION of the Defendant, **ADAM MASON**, held

16 on May 21, 2021, commencing at 1:20 p.m., being

17 held virtually by Zoom, pursuant to Notice; before

18 Susan Florio, a Registered Professional Reporter

19 and Notary Public in and for the State of New

20 York.

21

22

23

1  **[ADAM MASON - By Mr. Klein]**

2      Q.   Okay.  Has there been any discussion as

3  to whether there should be any change in

4  procedures, training or guidelines with regards

5  to interrogation tactics since that decision that

6  were ultimately not implemented?

7      A.   Not to my knowledge.

8      Q.   Okay.  Did that decision in that case and

9  the outcome of that case hold you back -- it

10  didn't hold you back from getting promoted to

11  captain, right?

12              MS. SPENCER:  Object to the form.

13      A.   No.

14      Q.   Okay.  Do you have any plans to retire or

15  are you up for any other promotions or are you

16  captain and on the job for now?

17      A.   I am not up for any other promotions and

18  I have no immediate plan to retire.

19      Q.   Okay.  So, going back to February 26th of

20  2015, can you walk us through your involvement in

21  these events, how you came to hear about it,

22  what, if any, involvement you had and we'll go

23  from there?

1   **[ADAM MASON - By Mr. Klein]**

2     A.   I was inside the offices of the detective

3   bureau and I was aware that an incident that

4   occurred involving an infant death and Detective

5   Fountain had returned to the detective bureau and

6   he was having a conversation with the detective

7   captain, Sprague, at the time, and he had

8   indicated that -- his conversations with Michael

9   Davis and the infant's mother, I don't recall her

10   name.

11     Q.   Rebecca Parker.

12     A.   That they hadn't gone very well. I don't

13   recall the exact terminology. So, it was

14   suggested by the detective captain that myself

15   and Sergeant Parrow go to the residence and kind

16   of like just repair, if there was any damage

17   caused in the previous interactions with

18   Detective Fountain, just kind of repair that

19   damage and have a conversation. At which point

20   myself and Sergeant Parrow drove to the Old Judge

21   Manor I believe it's called where they were

22   staying at the time. We went inside. I remained

23   in the front room. I did not have any

# APPENDIX
## 1773

1   **[ADAM MASON - By Mr. Klein]**

2   interaction with either individual.  And Sergeant

3   Parrow in a different room I believe had a

4   conversation with Mike Davis.  Upon the

5   completion of that conversation, we left and went

6   back down to the detective bureau.  And I don't

7   recall when it was, I had no further involvement

8   at that point.  And then at some point there was

9   a discussion about interviewing Mike Davis.  And

10  there was a -- talk about myself interviewing

11  him.  Then there was a meeting with Dr. Sikirica,

12  the ADA, and myself, Sergeant Parrow, I believe,

13  Detective Fountain was there, and I'm not sure

14  who else was there but I'd refer to that sheet

15  where it was discussed on whatever course was

16  going to happen with the case.  And that was the

17  extent of my involvement.  I did not interview

18  him and I had no further involvement after that.

19      Q.   Okay.  Thank you.  So, this -- going back

20  to the date of V's passing.  When you ^ CHECK say

21  said that ^ CHECK the Fountain was informing

22  Captain Sprague that the conversations had not

23  gone well with Michael Davis and Rebecca Parker,

**APPENDIX**

**1774**

42

1   **[ADAM MASON - By Mr. Klein]**

2   specifically whether there would be another

3   interview by you or Fountain, and what is your

4   understanding of how that played out?

5       A.   I was not assigned to the investigation.

6   I didn't work the investigation. And there was a

7   discussion on interviewing him. And my interview

8   skills were respected within the office so my

9   name was brought up. And being that I really

10   didn't know much about the suspect or much about

11   the investigation, I was not in favor of just

12   stepping in at that point in time to interview,

13   but I was willing to entertain the thought and we

14   had a conversation about it and that's what that

15   particular meeting was. And there was some

16   discussion about the incident. I don't recall

17   specifically what information I obtained, but

18   ultimately I decided not to take the lead on that

19   particular interview.

20       Q.   Okay. Was it your understanding that

21   this was a collaborative team among the medical

22   examiner's office, the D.A.'s office, and your

23   department working together to push forward with

1    **[ADAM MASON - By Mr. Klein]**

2    this investigation, or was there one particular

3    person or agency driving it?

4                    MS. SPENCER:  Object to the form.

5                    MR. FIRTH:  Same objection.

6        A.   No.  I agree that it was collaborative.

7        Q.   And Dr. Sikirica, was he part of the

8    strategy going forward with who would question

9    Michael Davis and what kind of information was

10   needed to enhance or further the charges going

11   further?

12                   MR. FIRTH:  Objection.

13                   MS. SPENCER:  Object to the form.

14       A.   I don't believe that's an accurate

15   statement.  I think he was there to provide

16   information, but I don't believe that he played a

17   role in any tactics that were used.

18       Q.   Well, when you say you don't believe, was

19   there a discussion among Sikirica, ADA Ackerman,

20   and your colleagues about what medically -- what

21   was presented, you know, on the autopsy and what

22   information was needed essentially in sum or

23   substance from Michael Davis to proceed with a

1    [ADAM MASON - By Mr. Klein]

2    criminal case?  Was there such a discussion in

3    that room?

4                    MS. SPENCER:  Objection.  Object to

5            form.

6        A.    I specifically remember Dr. Sikirica

7    stating that he -- the death was the result of a

8    homicide.  I don't recall what particular organs

9    were damaged inside the victim, but I remember

10   him stating that one of the organs was, I think

11   the phrase he used was ground like hamburger meat

12   and that it appeared as though it was caused by

13   someone's large hands squeezing the child.  I

14   remember sum and substance a conversation similar

15   to that.  So, I think he, you know, his role in

16   the meeting was just providing his medical

17   expertise as to, you know, the cause of the

18   death.  But not necessarily, you know, moving

19   forward who would conduct an interview or any of

20   those particular tactics.

21       Q.    Now, ten days earlier Ron Fountain did an

22   interview with Michael Davis where he had Michael

23   Davis demonstrate how he tried CPR, and that

Ron.Fountain

| | |
|---|---|
| **From:** | Ackerman, Andra <AAckerman@rensco.com> |
| **Sent:** | Sunday, March 01, 2015 11:38 AM |
| **To:** | Ron.Fountain; Tim.Colaneri |
| **Cc:** | Abelove, Joel |
| **Subject:** | child fatality investigation |

Hey there!

A few things I just wanted to make sure that I can get to review as soon as you are able to get them to me.

A copy of all of the **depositions of the fire dept and EMS** who responded to the scene. If possible I would like the depositions to include how the child appeared (e.g. any rigamortis/levitity/ blood/vomit/ etc.. as well as everything they can remember about what the suspect says happened to the child – what he did – how the child appeared, etc....

A copy of all of the **EMS and fire dept completed paperwork**. If you need any assistance with this – like if you need me to subpoena it please let me know. I just do not know yet who the EMS company is so it might be quicker if they will give it to you with a phone call.

A copy of all CPS paperwork on this – Ron you mentioned they will give it to you with a call from you. Thanks so much.

A copy of any depositions taken from neighbors. If they heard anything relating to a child crying/suspect yelling/ him coming/going – anything he may have said to them or that the babys' mother said to them as well as any past suspicious behavior or sounds coming from the home like fighting/crying etc....

A copy of any depositions from any family members or friends that spoke with the suspect. What he told them happened that day. I subpoena's his cell phone records so we will see who he has been speaking with shortly before and after 911 was called – I will give those to you once I receive them.

I will subpoena the hosptital records – from NYC at birth from the information you gave me as well as the hospital records relating to this death. Can you give me all hospitals that you know of. I will get AMC but did she go to a hospital in this county first?

A copy of the 911 call.

A copy of all videos that you are able to obtain.

Any prior CPS history on this guy or domestic history that you can find?

I want to thank you both for including me in on the meeting yesterday and making me feel like part of the team. I have always found that when everyone is able to work together the cases are much stronger. So thanks again. If you need anything from me please let me know how I can help.

**APPENDIX**

**1778**

**FORENSIC MEDICAL SERVICES**
**50 BROAD STREET**
**WATERFORD, NY 12188**
**(518) 237-3211**
**Fax (518) 237-7423**

CASE #: MS.15.120
DECEDENT: V█████ D█████
DATE: 3.12.15

<span style="color:red">ROSARIO MATERIAL</span>

<u>SIGN IN SHEET</u>
(MEETING / AUTOPSY)

PLEASE INCLUDE
CONTACT NUMBER

| TITLE (Ex. Det./Inv./Trooper/A.D.A) | PRINT NAME | SIGNATURE | REPRESENT (Ex. NYSP or Albany Police) |
|---|---|---|---|
| DS | D Skinica | *(signature)* | RCME |
| Assistant D.A. | Andria Ackerman | *(signature)* | DA's Office · R.C. |
| D/Sgt | Michael E Pancavish | *(signature)* | Troy P.D |
| Detective | Ron Fountin | *(signature)* | Troy PD |
| DETECTIVE | TIM Colaneri | Tim Colaneri | TROY P.D. |
| D/Sgt. | Adam Mason | *(signature)* | Troy PD |
|  |  |  |  |
|  |  |  |  |

MICHAEL SIKIRICA, M.D.
50 Broad Street
Waterford, New York 12188
TEL (518) 237-3211
FAX (518) 237-7423

I, Michael Sikirica , M.D., Forensic Pathologist, certify that to the best of my knowledge, the attached twenty page report is a true and accurate copy of the original final autopsy report dated August 14, 2015, following the autopsy that I performed on V█████D████ on February 27, 2015, at the Albany Medical Center, Albany, NY.

Michael Sikirica, M.D.
Forensic Pathologist
DATED:  August 14, 2015

FINAL AUTOPSY REPORT

CASE #:                          MS-15-120
                                 OCA-15-46 (Albany Medical Center)
                                 15-02-092 (RCME)

DECEDENT:                        V█ D█

DATE OF BIRTH:                   ████████

PRONOUNCEMENT DATE:              February 26, 2015

PRONOUNCEMENT TIME:              2:08 PM

DATE OF AUTOPSY:                 February 27, 2015, 9:30 AM

PLACE OF AUTOPSY:                Albany Medical Center, Albany, NY

PROSECTOR:                       Michael Sikirica M.D.

ASSISTING:                       Mrs. Sarah Bourdon

INVESTIGATOR:                    Mr. Michael Ziegler, Rensselaer County

MEDICAL EXAMINER:                Michael Sikirica, M.D., Rensselaer County


Cause of Death:                  Hypovolemic shock due to large hemoperitoneum due to
                                 multiple lacerations of the liver with right rib fractures due to
                                 blunt force trauma

Manner of Death:                 Homicide


Michael Sikirica, M.D./nw
DATE: 5-14-2015

000110

## External Description

The body is received in a small white plastic body pouch. There is a medical examiner's tag attached to the pouch listing the decedent's name and date of ███████ with the date and time of death listed. The tag also lists the names of Investigator Ziegler and Rensselaer County and case number 15-2-92 with lock number 406847 listed. The pouch is secured with a blue plastic lock number 406847 and the lock is in place and intact. The body is that of an 86 cm, 27 pound normally-developed, well nourished black female toddler appearing the reported age of 2 to 3 years with moderate rigor mortis and slight posterior fixed livor mortis. The body temperature is cool to the touch after refrigeration. The general appearance of the body is of good health and hygiene.

The body is received wrapped in a white sheet. The body is received unclothed. There is no jewelry present on the body or included with it. The following measurements are obtained:

        Head circumference:  49.5 cm
        Chest circumference:  48.5 cm
        Abdominal circumference:  46.5 cm
        Crown to rump length:  55 cm
        Distance between inner canthi:  2.7 cm
        Distance between outer canthi:  8.5 cm
        Distance between nipples:  11 cm
        Length of the right foot:  13 cm
        Length of the left foot:  12.8 cm.

The scalp hair is black and arranged into small braids. The irides are brown. The right and left pupils each measure 3 to 4 mm in diameter. The corneas are clear and the sclerae and conjunctivae are unremarkable. The face is symmetric and the

facial bones are intact to palpation. There are no materials in the mouth, nose or the ears. The teeth are natural and in good condition and consistent with age. There is no injury to the lips, teeth or gums. The neck is free from masses. There are no unusual marks or lesions on the skin of the neck. The larynx is midline and the thyroid not palpable. The chest is of normal contour. The breasts are those of a toddler female. The abdomen is mildly protuberant and firm. The posterior torso shows no significant abnormalities. The upper extremities are symmetric, and the fingernails are intact and show no foreign material. No clubbing or cyanosis is noted. The external genitalia are those of an immature female. There is no evidence of injury or abnormal secretions. The hymen is intact. The buttocks and anus are unremarkable. The skin is black in color and smooth. There is a very small scar beneath the lateral right eyebrow. There are no additional scars noted. Passive motion of the head, neck and extremities reveals no abnormal mobility or crepitus. There is no unusual odor about the body.

## Evidence of Recent Medical Therapy

There are square EKG pads present along the upper anterior left shoulder and the distal medial portion of each calf. There are circular impressions consistent with adhesive pad type residue along the left upper chest, right upper chest and the lateral right shoulder. There is a hospital identification bracelet around the right wrist listing the decedent's name and date of birth with a medical record number 521200. There is an intraosseous port inserted into the upper portion of each calf with a large bandage covering the left port and smaller bandage over the right port.

## Evidence of Injury

There is slight lifting along the toenail of the right great toe without evidence of significant bruising or hemorrhage.

## Procedure and Specimens

The organs are exposed utilizing the standard Y-shaped thoracoabdominal and posterior scalp incisions. Cardiac blood, vitreous fluid, and blood from the abdominal cavity are taken for toxicologic evaluation and submitted to the Forensic Toxicology Laboratory at the Albany Medical Center. An additional lavender top blood sample tube is retained for further testing if needed. Prior to removing the decedent from the body pouch and cleaning multiple additional samples are obtained. Samples are obtained including swabs from the right upper thigh, swabs from the left upper thigh, nail scrapings, pulled head hair, swabs of the anterior left and right neck, vulvar swabs and smears, anal swabs and smears, perianal swabs, oral swabs and smears and an additional buccal reference sample. All the swabs and smears are transferred to the officers present from the Troy Police Department. Representative portions of the major viscera are retained in formalin and appropriate sections processed for microscopic slides. Present at the autopsy are Evidence Technician Anthony Buttofucco along with Detectives Charles McDonald, Ronald Fountain and Tim Colaneri. Assistant District Attorney Andra Acherman is also present at the examination along with Rensselaer County Medicolegal Death Investigator Mr. Michael Ziegler. The autopsy is assisted by

autopsy assistant Mrs. Sarah Bourdon. Prior to toxicology sampling blood cultures are obtained from the inferior vena cava for bacterial studies. Tissues are obtained from each lung for viral and bacterial studies using sterile technique. Multiple skeletal x-rays are obtained and evaluated. An additional dried blood sample is submitted for metabolic screening. A copy of the decedent's recent emergency room records from Seton Health Services/St. Mary's Hospital is also received and evaluated with the decedent's name and medical record number M000521200. Additional records for the decedent from the West Care Medial Associated are also received and evaluated. A sketch of the scene where the decedent was living is also received from the officers in the report material. Photographs of the decedent taken at the emergency room are also obtained. A disc of a video interview taken by the Troy Police Department from Michael Davis on March 2nd, 2015 is also later received and reviewed. Copies of additional depositions are also received from Rebecca A. Parker (DOB          ), Russell E. Brown (DOB          ), Michael Bayly (DOB          ), James D. Tidings (DOB          ), Jason S. Lucey (DOB          ), Frank H. Shoemaker III (DOB          ), Michael I. Rustin (DOB          ) and Kathleen Crisafulli (DOB          ). A copy of a Troy Police Department Incident Report for the decedent is also later received and evaluated with incident number 20320.

## Internal Examination

Thoracoabdominal incision reveals approximately 1 cm of normal appearing abdominal panniculus. The thoracic and abdominal viscera have normal anatomic relationships with evidence of injury to be described.

### Body Cavities

There are no significant fluids in the pleural or peritoneal cavities. There are approximately 350 mls of liquid blood (measured) and a slight amount of blood clot in the abdominal cavity. There are no significant adhesions.

### Musculoskeletal System

The skeletal muscles are firm and normally developed. There are fractures along the posterior aspects of the right 9th and 10th ribs with associated hemorrhage and slight hemorrhage but without fracturing along the posterior right 8th rib.

### Neck Organs

The larynx and thyroid gland are unremarkable. The thyroid is homogeneously tan/brown without nodularity. The laryngeal cartilages and hyoid bone are intact. There are no laryngeal hemorrhages or hemorrhages in the soft tissues of the neck. The carotid arteries and jugular veins are intact. The cervical spine is intact.

### Respiratory System

The right lung weighs 95 grams, the left 104 grams. The pleural surfaces are smooth and glistening. There is no significant anthracotic pigmentation and there is only mild diffuse vascular congestion. Upon sectioning there are no focal lesions. The

tracheobronchial and arterial trees are unremarkable. No aspirated material or thromboemboli are found.

Cardiovascular System

The pericardial sac is intact and contains a few mls of normal serous pericardial fluid. The heart weighs 61 grams and has a normal external configuration with a glistening epicardial surface and a normal amount of epicardial fat. The myocardium is firm and red/brown and shows no focal lesions. The cardiac chambers are of normal size and contain clotted blood. The right ventricle measures 2 mm and the left ventricle 6 mm in maximum thickness. The cardiac valves are normally formed and appear in good functional condition with thin pliable valve leaflets and thin discrete tendineae chordae. The mitral valve measures 52 mm, the tricuspid 75 mm, the pulmonary 35 mm and the aortic 35 mm in circumference. The endocardium is smooth and glistening without fibrosis or petechiae. The coronary arteries arise normally through unobstructed ostia and pursue their usual anatomic course. Serial cross sections at 2 mm intervals reveal no significant anomalies. The atria and appendages are normal. The aorta is of normal caliber and branching distribution and is intact with no anomalies. The vena cavae is intact and unremarkable.

Liver and Biliary Tree

The liver weighs 327 grams and has a smooth capsule and normal brown coloration and soft lobular architecture. There is a jagged laceration along the posterior aspect of the left lobe measuring 5 x 5 x 0.5 cm in size and an additional laceration along the anterior aspect of the medial left lobe measuring 2.5 x 1.4 cm. There is an additional laceration along the upper right lobe measuring 7.5 x 0.5 cm with tearing off a

significant portion of liver tissues and a perforation along the posterior right lobe measuring 1.8 x 0.4 cm with a second measuring 1 x 0.3 cm in size. There is additional slight tearing along the caudate and quadrate lobes. There is a zone of posterior chest wall hemorrhage behind the liver measuring approximately 18 x 30 cm in size. The gallbladder is flat appearing. The remainder of the extrahepatic biliary system is unremarkable.

Spleen

The spleen weighs 19 grams and has a smooth intact capsule and normal purple coloration with an indistinct white pulp. There is no evidence of traumatic injury.

Pancreas

Firm lobulated tan parenchyma

Adrenals

Thin bright yellow/orange cortical ribbons and tan medullae

Genitourinary System

The right kidney weighs 51 grams, the left 48 grams. The capsules strip easily to reveal slightly pale cortical surfaces with a normal persistent fetal lobulation pattern. There are no parenchymal lesions. The ureters are patent into the bladder, which is empty and is otherwise unremarkable. The internal reproductive organs are present and normal for age without disease or injury.

Gastrointestinal System

The esophagus is unremarkable. The stomach contains a trace of brown fluid without identifiable digestate. There are no recognizable fragments of tablets or capsules. The mucosa and rugae are flat and slightly autolyzed but otherwise

unremarkable.  The small and large intestines and appendix have a normal
configuration and show no evidence of significant traumatic injury and the appendix is
unremarkable.

Brain

The scalp is retracted by an intermastoidal incision.  There are no subgaleal
hemorrhages.  The bones of the calvarium and base of the skull are intact.  The fresh
brain weighs 1129 grams.  The cerebral hemispheres are symmetric with a normally
developed gyral pattern.  There is no evidence of epidural, subdural or subarachnoid
hemorrhage.  The meninges are clear.  The cerebral vasculature is intact with no
significant anomalies.  Serial coronal sections through the cerebrum, cerebellum and
brainstem reveal a myelination pattern consistent with age without focal lesions.
Stripping the dura reveals no fractures.  The pituitary gland is not enlarged.

## Microscopic Examination (slides 1-25)

Portions of the major internal organs are examined microscopically including
sections of brain, heart, lungs, liver, kidneys and additional tissues and organs as
required.  Sections of the lungs reveal patchy areas of acute congestion and slight
atelectasis but no evidence of significant acute or chronic inflammation.  There is patchy
hemorrhage in the alveolar spaces.  Sections of the kidneys are unremarkable and no
significant crystals are noted in the kidney parenchyma under polarized light
examination.  Sections of the adrenal glands are unremarkable.  Sections of the
myocardium show no significant pathologic abnormalities.  A section of trachea is

unremarkable. A section of thymus reveals evidence of focal petechial formation without evidence of a significant ongoing stress reaction. Sections of the spleen are unremarkable. A section of thyroid gland shows no significant pathologic abnormalities. A section of pancreas is unremarkable with no evidence of hemorrhage, necrosis or inflammation. Sections of the liver reveal acute congestion and foci of intraparenchymal hemorrhage without other significant pathologic abnormalities. Sections of the brain are unremarkable.

## Anatomic Diagnoses

I.   Hypovolemic shock due to large hemoperitoneum due to multiple lacerations of the liver with right rib fractures due to blunt force trauma.

   a. History of decedent reportedly found unresponsive with reported history of attempted cardiopulmonary resuscitation by a large adult.

   b. Approximately 350 mls of bloody fluid and a small amount of blood clot in the abdominal cavity.

   c. Multiple lacerations of the left and right lobes of the liver.

   d. Fractures along the posterior aspects of the right 9th and 10th ribs with hemorrhage in the surrounding muscular and soft tissue.

II.  No evidence of significant natural disease.

III. No evidence of significant infection noted in the lungs by bacterial and viral culture analysis.

IV.  No evidence of significant sepsis or bacteriemia by blood culture analysis.

Case 1:17-cv-08290-DLC  Document 31-1  Filed 04/04/22  Page 132 of 15

APPENDIX

1790

MS-15-120
OCA-15-46/15-02-092
V██████ D██████
Page 11

V.    No significant findings by noted by toxicology evaluation.

VI.   Elevated level of Thyroid Stimulating Hormone (TSH) detected in metabolic

      screen consistent with hypothyroidism.

Joseph M. Quashnock, PhD
Laboratory Director

**APPENDIX**, Inc.
PO Box 219
Bridgeville, PA 15017

Date of Report 03/04/2015

(412) 220-2300 Phone
(412) 220-0784 Fax

Page 1 of 1

Initial Release: 03/04/2015 10:58

Date Collected: 02/27/2015  Date Recvd: 03/02/2015  Birth Date:
Submitter: Forensic Medical Services  Cond. of Spec: S
Filter Paper: 8938015  Patient's Name: UNKNOWN  Sex: F
PS ID: 6093182  AKA Name:
Accession No: 2015058380  Med. Rec. No: MS15-120
Mother's Name: UNKNOWN  Physician: SIKIRICA, MICHAEL

## Autopsy Specimen Report

| Screening Test | Outcome |
| --- | --- |
| Acylcarnitine Profile | Negative |
| CAH 17-OHP | Negative |
| Congenital Hypothyroidism-TSH | Abnormal |
| Galactose- (Gal and Gal-1-P) | Negative |

### OUTCOME DEFINITIONS

ABNORMAL - The analyte detected exceeds the concentration usually found in such analyses. A text explanation of the finding is included. Interpretation should be in conjunction with other findings.

NEGATIVE - The analyte detected does not exceed the concentration usually found in such analyses. Interpretation should be in conjunction with other findings.

### SELECTED REFERENCE RANGE

17 OH P
Cutoff values for 17 hydroxyprogesterone are age dependent. For infants less than 91 days of age, abnormal is defined as a value > 19.0 ng/mL; for infants 91 days to 1 year of age, abnormal is > 5.0 ng/mL; for age > 1 year, abnormal is > 4.0 ng/mL. Note new reference range for 17-hydroxyprogesterone effective November 1, 2010.

TSH
Cutoff values for TSH are age dependent. For infants < 7 days of age, abnormal is defined as a TSH value >50 uIU/mL; for infants 7 days or older, abnormal is > 30 uIU/mL.

GAL
Abnormal is defined for all infant ages as a total galactose > 20 mg/dL.

### Comments:

TSH = 36.7 µIU/mL  (Abnormal > 30.0)

In the absence of histological evidence of hypothyroidism, a moderate elevation in TSH in an autopsy blood sample may be the result of an autolytic process occurring after death rather than an indication of disease.

The results of PerkinElmer Genetics post-mortem testing are analytically accurate within the limits of the test technology used. Factors including specimen source, quality of specimen and patient variables will affect results. Limited information on reference ranges is available. Interpretation of results should be in conjunction with additional clinical or laboratory evidence to help support or disprove the presence of a specific disorder.

17OHP, IRT, T4 and hTSH - Time-resolved fluoroimmunoassay
Acyl-carnitines, Amino Acids, and Organic Acids - Tandem Mass Spectrometry
Biotinidase, DHPR - Enzymatic colorimetric assay    Hemoglobin - Iso-electric focusing
DNA Mutation Analysis – PCR and allele specific hybridization
Galactose, G6PD and Uridyl Transferase - Enzymatic fluorometric assay
Pterins - Colorimetric Assay

**Laboratory Report**

000121

Joseph M. Quashnock, PhD     **APPENDIX** Inc.     Date of Report **1792**
Laboratory Director     **PO Box 219**     03/11/2015

**Bridgeville, PA 15017**

(412) 220-2300 Phone

(412) 220-0784 Fax     Page 1 of 1

Initial Release: 03/04/2015 10:58

| | | |
|---|---|---|
| Date Collected: 02/27/2015 | Date Recvd: 03/02/2015 | Birth Date: ███ |
| Submittor: Forensic Medical Services | | Cond. of Spec: S |
| Filter Paper: 8938015 | Patient's Name: D██ V██ | Sex: F |
| PS ID: 6093182 | AKA Name: | |
| Accession No: 2015058380 | Med. Rec. No: MS15-120 | |
| Mother's Name: UNKNOWN | | Physician: SIKIRICA, MICHAEL |

-

## Autopsy Specimen Report

| Screening Test | Outcome |
|---|---|
| Acylcarnitine Profile | Negative |
| CAH 17-OHP | Negative |
| Congenital Hypothyroidism-TSH | Abnormal |
| Galactose- (Gal and Gal-1-P) | Negative |

## OUTCOME DEFINITIONS

ABNORMAL - The analyte detected exceeds the concentration usually found in such analyses. A text explanation of the finding is included. Interpretation should be in conjunction with other findings.

NEGATIVE - The analyte detected does not exceed the concentration usually found in such analyses. Interpretation should be in conjunction with other findings.

## SELECTED REFERENCE RANGE

17 OH P

Cutoff values for 17 hydroxyprogesterone are age dependent. For infants less than 91 days of age,abnormal is defined as a value > 19.0 ng/mL; for infants 91 days to 1 year of age, abnormal is > 5.0 ng/mL; for age > 1 year, abnormal is > 4.0 ng/mL. Note new reference range for 17-hydroxyprogesterone effective November 1, 2010.

TSH

Cutoff values for TSH are age dependent. For infants < 7 days of age,abnormal is defined as a TSH value >50 uIU/mL; for infants 7 days or older, abnormal is > 30 uIU/mL.

GAL

Abnormal is defined for all infant ages as a total galactose > 20 mg/dL.

## Comments:

AMENDED REPORT on 3/11/15 - Baby's name was updated per submitter.     af

TSH = 36.7 µIU/mL (Abnormal > 30.0)

In the absence of histological evidence of hypothyroidism, a moderate elevation in TSH in an autopsy blood sample may be the result of an autolytic process occurring after death rather than an indication of disease.

The results of PerkinElmer Genetics post-mortem testing are analytically accurate within the limits of the test technology used. Factors including specimen source, quality of specimen and patient variables will affect results. Limited information on reference ranges is available. Interpretation of results should be in conjunction with additional clinical or laboratory evidence to help support or disprove the presence of a specific disorder.

17OHP, IRT, T4 and hTSH - Time-resolved fluoroimmunoassay
Acyl-carnitines, Amino Acids, and Organic Acids - Tandem Mass Spectrometry
Biotinidase, DHPR - Enzymatic colorimetric assay     Hemoglobin - Iso-electric focusing
DNA Mutation Analysis – PCR and allele specific hybridization
Galactose, G6PD and Uridyl Transferase - Enzymatic fluorometric assay
Pterins - Colorimetric Assay

**Laboratory Report**

D    M            **DOB:**             **Age at exam:** 2 Y, 7 M  **Sex:** F      **MRN:** 0002154
**ACC:** 5227878              **Exam:** SKELETAL SURVEY, COMPLETE        **Org:** iSite
02/27/2015 9:45 AM        **Ex. Sts:** P   **Report Status:** Preliminary        **Perf. Resource:** PDI

**Signs and Symptoms:**
**Pt Loc:**    **Phone:**

**Attending:**    SIKIRICA, MICHAEL
**Requesting:** SIKIRICA, MICHAEL

Diagnostic report text

DATE OF EXAM: Feb 27 2015

SKELETAL SURVEY, COMPLETE (Acc#:5227878):

CLINICAL HISTORY: Deceased toddler. Evaluate skeletal system.

RESULT: AP and lateral views of the axial skeleton were obtained with
AP views of the appendicular skeleton. The osseous structures appear
unremarkable without congenital or developmental anomalies. There are no
findings to suggest acute or remote/healing fractures/trauma. The chest is
opacified, consistent with the patient being deceased. There are multiple
air-filled loops of large and small bowel.

IMPRESSION: Normal skeletal survey.

**Responsible & Contributing Providers**
Unassigned, Provider

**End of Report for ACC:** 5227878

Case 1:17-cv-01290-DJS Document 123-33 Filed 04/01/23 Page 1 of 1



Troy, My     8/15/16

LOCATION     CITY     STATE     DATE

1. I, Russell E Brown, state and depose
2. That my date of birth is ▮▮▮▮▮▮.
3. My address is ▮▮▮▮▮▮▮▮▮▮▮▮, Troy,
4. NY 12182. I am a retired mechanic.
5. On February 26, 2015, I gave Rebecca
6. Parker a ride home from Stewart's, where
7. she was employed. I drove her to her
8. residence, 856 4th avenue, Troy, NY 12182.
9. I used to drive Rebecca home quite often.
10. As I recall, we arrived at Rebecca's
11. residence at approximately 1:15 PM.
12. Rebecca went into her building, briefly,
13. to get a letter she received from her
14. bank. She wanted me to read her letter,
15. so I could advise her about that situation.
16. She came out with the letter, but before
17. I could look at it, I observed that
18. Michael Davis, Rebecca's live-in boyfriend,
19. was crossing the street from the other
20. side toward 856 4th avenue. I observed
21. that Michael Davis was obviously upset,
22. since he was crying. Just at that
23. time, I observed that emergency
24. and Police vehicles began to arrive
25. There. The Troy Fire Department personnel
26. and the other emergency workers began
27. Russell Brown        William Reilly

| LOCATION | CITY | STATE | DATE |

1. to bring emergency equipment into the
2. house. Both Michael Davis and Rebecca
3. Parker were very good when they
4. learned that ████ had died. Michael
5. advised Rebecca that he couldn't wake
6. up ████ and he went to find a
7. phone so he could get help for her
8.
9. I have read the above 2 pages
10. and they are true to the best of
11. my knowledge.
12.
13. X Russell Brown
14.
15.
16. Sworn to before me this 15th day
17. of August, 2016
18.
19. William Bradley
20.
21.
22. Notary Public State of New York
23. Commissioned in Albany County
24. Exp. 12/19/17
25.
26.
27.

**DO NOT WRITE BELOW THIS LINE**

**APPENDIX**

CONTROL # 20320

PHONE

HOME _____

WORK _308-3897_

**DEPOSITION OF A WITNESS**
STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

COURT

NAME _Russell E Brown_ DATE OF BIRTH _____

RESIDING AT _13 Gurley Ave Apt. 101 Troy NY_ AGE _87_

OCCUPATION _RB Retired_

DEPOSE AND SAY: _That on 2/26/15 at approx. 9:00am I went to the stew stewarts at Glen + 6 9ave to get my coffee like I do every day. I was talking to Rebecca who works there + she asked me if I would give her a ride home today, I do this for her a couple times a week, I told her I would. I went back to stewarts about 1250pm + I waited for her to finish working we left stewarts at about 5-7 minutes after 100pm + we got to Rebecca's house around 118-120pm, Rebecca had told me that someone had hacked her checking account + I told her someone had done that to me to so I asked her to see the checks to see if it was the same kind of check that was used to fraud me, when we pulled up to Rebecca's house she got out of my vehicle + went in to the house + came out with the check + when she got to my car + handed me the check + at that time I saw + heard Rebecca's boyfriend Running across the street crying + yelling to call 911, that he couldn't get anyone to call 911 + that he was at the restaurant for_

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL LAW OF THE STATE OF NEW YORK.

DATE _3/6/15_ TIME: _1035_ SIGNED: _Russell Brown_

WITNESS: _PTL C Petrillo 5B39_

TPD 118/82

CONTROL # __20320__

PHONE

HOME _____

WORK __308-3897__

**DEPOSITION OF A WITNESS**
STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

COURT

NAME __Russell E Brown__ DATE OF BIRTH _____

RESIDING AT __13 Gurley Ave Apt 101 Troy NY__ AGE __87__

OCCUPATION __Recovery__

DEPOSE AND SAY: 20 minutes with 911 but no one was coming. At that time Rebecca Ran ran into the house & I got out of my car & ran in the house & at that time it seemed like the Police & Firemen All showed up. & the Firemen started doing CPR, the baby was laying on the sofa when we got into the apartment. After they put the baby in the ambulance I stayed a couple minutes & then left

RB

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL LAW OF THE STATE OF NEW YORK.

DATE __3/6/15__ TIME __1035__ SIGNED: __Russell Brown__

WITNESS: __M. Cana 5839__

TPD 118/82

001681



# DISTRICT ATTORNEY
# COUNTY OF RENSSELAER

RENSSELAER COUNTY COURTHOUSE
80 Second Street
TROY, NEW YORK 12180
Phone: (518) 270-4040   Fax: (518) 270-4025

**Joel. E. Abelove**
**District Attorney**

July 20, 2016

William Roberts, Esq.
Assistant Public Defender
Rensselaer County Public Defender's Office
County Courthouse
Troy, NY 12180

               Re:    People v Michael Davis

Dear Mr. Roberts,

Attached please find a portion of the grand jury minutes in the above-referenced case that I believe constitutes <u>Brady</u> material.

Yours truly,

Cindy B. Chavkin, ADA
Rensselaer County DA's Office
(518) 270-4027

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15                    81

1    he squeezed the baby to give it

2    C.P.R.  Did you just say that a few

3    minutes ago?

4              THE WITNESS:  Yes.

5              GRAND JUROR:  Did he

6    testify to that?

7              MS. HALL:  You -- your

8    recollection recalls.  I can't --

9              GRAND JUROR:  Yes.

10             MS. HALL:  -- answer that

11   for you.

12   BY MS. HALL:  (Cont'g.)

13        Q.    With respect to how Michael Davis

14   performed C.P.R., did you observe that on a video

15   anywhere?  A recording?

16        A.    Yes.

17        Q.    Okay.  And what he was demonstrating

18   on that video, could that have caused the

19   injuries in V██████ D████?

20        A.    What he was demonstrating could have

21   caused the injuries on V████, the squeezing

22   effect to her abdomen.  Yes.

23        Q.    What injury would you see as a result

24   of that?

1      A.    You would see the tearing of the

2    liver.  He -- I saw he was a very big man.  He --

3    he had very large hands.  The liver would be

4    torn, could be lacerated severely, and you could

5    break ribs.




OFFICE OF THE
**DISTRICT ATTORNEY**
**COUNTY OF RENSSELAER**
RENSSELAER COUNTY COURTHOUSE
80 Second Street
TROY, NEW YORK 12180
Phone: (518) 270-4040 Fax: (518) 270-4025

**Joel. E. Abelove**
**District Attorney**

RENSSELAER COUNTY COURT
JUL 19 2016
HON. ANDREW G. CERESIA

July 18, 2016

Honorable Andrew G. Ceresia
Rensselaer County Court Judge
Rensselaer County Courthouse
Troy, New York 12180

Re: People v Michael Davis
Indictment No. 15-1094

Dear Judge Ceresia,

I am hereby requesting that Your Honor grant me authority to release a portion of the grand jury minutes of the testimony of Dr. Michael Sikirica to defense counsel as I believe it constitutes Brady material.

Respectfully,

Cindy B. Chavkin, ADA
Rensselaer County DA's Office
(518) 270-4027

7/19/16 So Ordered!

Andrew G. Ceresia

cc: William D. Roberts, Esq.
Assistant Public Defender
Rensselaer County Public Defender's Office
County Court Building
Troy, NY 12180

10:43

1803

**OFFICE OF THE**
## DISTRICT ATTORNEY
## COUNTY OF RENSSELAER
RENSSELAER COUNTY COURTHOUSE
80 Second Street
TROY, NEW YORK 12180
Phone: (518) 270-4040   Fax: (518) 270-4025

Joel. E. Abelove
District Attorney

July 20, 2016

Honorable Andrew G. Ceresia
Rensselaer County Court Judge
Renssselaer County Courthouse
Troy, New York 12180

Re:    People v Michael Davis
         Suppression Hearing

Dear Judge Ceresia,

As per your Honor's request, I write this letter to inform the Court that the people will not be submitting a written argument for the suppression hearing previously held and will rely on the record for your Honor's decision.

Respectfully,

Cindy B. Chavkin, ADA
Rensselaer County DA's Office
(518) 270-4027

cc    William Roberts, Esq.
        Assistant Public Defender
        Rensselaer County Public Defender's Office
        Rensselaer County Courthouse
        Troy, New York 12180

STATE OF NEW YORK
COUNTY COURT

COUNTY OF RENSSELAER

THE PEOPLE OF THE STATE OF NEW YORK

INDICTMENT NO.: 15-1094

    -against-

**MICHAEL DAVIS** (DOB ▮▮▮▮▮,
                          **Defendant.**

**COUNT ONE**

    The Grand Jury of the County of Rensselaer and State of New York, by this Indictment, hereby accuses the above-named defendant of the crime of **MANSLAUGHTER IN THE FIRST DEGREE**, a class B felony, in violation of section 125.20, subdivision 4, of the Penal Law of the State of New York, committed as follows:

    The defendant, on or about the 26th day of February, 2015, at 856 4th Avenue, in the City of Troy, County of Rensselaer and State of New York, being eighteen years old or more and with intent to cause physical injury to a person less than eleven years old, the defendant recklessly engaged in conduct which created a grave risk of serious physical injury to such person and thereby caused the death of such person, **to wit**: at the aforementioned date and place, the defendant, being eighteen years old or more and with intent to cause physical injury to a person whose identity is known to the Grand Jury and having a date of birth of ▮▮▮▮▮▮▮, the defendant recklessly engaged in conduct which created a grave risk of serious physical injury to a person whose identity is known to the Grand Jury and having a date of birth of ▮▮▮▮▮ and thereby caused the death of a person whose identity is known to the Grand Jury and having a date of birth of ▮

▮▮▮

**99690992**
**SERIAL NUMBER**

P000031

**APPENDIX**

**COUNT TWO**

The Grand Jury of the County of Rensselaer and State of New York, by this Indictment, hereby accuses the above-named defendant of the crime of **MANSLAUGHTER IN THE SECOND DEGREE,** a class C felony, in violation of Section 125.15, subdivision 1, of the Penal Law of the State of New York, committed as follows:

The defendant, on or about the 26th day of February, 2015, at 856 4th Avenue, in the City of Troy, County of Rensselaer and State of New York, recklessly caused the death of another person, **to wit**: at the aforementioned date and place, the defendant, recklessly caused the death of a person whose identity is known to the Grand Jury and having a date of birth of █████████

**COUNT THREE**

The Grand Jury of the County of Rensselaer and State of New York, by this Indictment, hereby accuses the above-named defendant of the crime of **ENDANGERING THE WELFARE OF A CHILD,** a class A misdemeanor, in violation of section 260.10, subdivision 1, of the Penal Law of the State of New York, committed as follows:

The defendant, on or about the 26th day of February 26, 2015, at 856 4th Avenue, in the City of Troy, County of Rensselaer and State of New York, did knowingly act in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old or directed or authorized such child to engage in an occupation involving substantial risk of danger to his life or health, **to wit**: on the aforementioned date and location the defendant did knowingly act in a manner likely to be injurious to the physical, mental or moral welfare of a person whose identity is known to the Grand Jury and having a date of birth of █████████

# APPENDIX

Dated: Troy, New York
     October 2, 2015

JOEL E. ABELOVE
Rensselaer County District Attorney

Denise Landy
Grand Jury Foreperson

P000033

# APPENDIX

## ARREST REPORT
New York State Case No. 020320

Division / Precinct

| 1. NYSID No. | 2. OBTS No. | | 3. Case No. 020320 | 4. Ref. No. **1807** |
|---|---|---|---|---|
| 5. FBI No. 136346 | 6. Arrest No. | 7. Agency Troy Police Bureau | 8. Division / Precinct | 4a. |

**9. Name (Last, First, Middle)** Davis-Guider , Michael Leroy

**10. Alias / Nickname / Maiden Name (Last, First, Middle)**

**11. Phone Number** (000)953-8619

**12. Street Number and Name, Building No., Apt. No.** 4 Glen Av

**13. City, State, Zip** (C ☒ T ☐ V ☐) Troy Ny 12182

**14. Residence Status** ☐ Resident ☐ Foreign Non-Resident ☐ Non-Resident ☒ Unk

**15. Place of Birth** ☓

### DEFENDANT INFORMATION

| 16. Date of Birth [redacted] | 17. Age 28 YRS | 18. Sex ☒M ☐F ☐U | 19. Race ☐White ☒Black ☐Asian ☐Indian ☐Other ☐Unknown | 20. Ethnic ☒Non-Hispanic ☐Hispanic ☐Unknown | 21. Skin ☐Light ☐Medium ☒Dark ☐Other ☐Unknown |

| 22. Height 6' 10" | 23. Weight 275 | 24. Hair BLK | 25. Eyes BRO | 26. Glasses ☐Yes ☒No ☐Contacts | 27. Build ☐Small ☐Med ☒Large | 28. Marital Status ☐Married ☒Single ☐Separated ☐Divorced ☐Widowed ☐Unk ☐Comm Law | 29. U.S. Citizen ☒Yes ☐No ☐Unknown | 30. Citizen of USA |

| 31. Social Security No. 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 | 32. Education 12 | 33. Religion None | 34. Occupation | 35. Employed ☐Yes ☒No | 36. Scars / Marks / Tattoos (Describe) |

### ARREST INFORMATION

**37. Arresting Officer** Fountain, Ronald J **38. ID No.** 5838 **39. Assisting Officer** Epstein, Ronald L / Millington, Mark S **40. ID No.** 23/220 **41. Arrest Date** 10/02/2015 **42. Time** 15:20 **43. Location of Arrest** (C ☐ T ☐ V ☐) 4 Glen AV Troy, NY 2180

| 44. Juvenile ☐Juv-No Further Process ☐Yes ☒No | 45. Condition of Defendant at Arrest ☐Impaired Drugs ☐Mental Dis ☒App Norm ☐Impaired Alco ☐Injrll | 46. Weapon(s) at Arrest | 47. Co-defendants Arrest No. |

| 48. Miranda ☐Yes ☒No | 49. Miranda By | 50. Miranda Date | 51. Miranda Time | 52. Statements ☐Written ☐None ☐Verbal | 53. Status ☐Bail / ROR ☐Parole ☐Probation | 54. Search Warrant ☐Yes ☐No | 55. ID Procedure ☐Line-Up ☐None ☐Show Up ☐Photo |

**56. Arraignment Court** Rens. Co. **57. Arraignment Judge** Presiding **58. Date** **59. Time** **60. Property** ☐Yes ☒No **61. Evidence** ☐Yes ☒No **61a. Processed By** **61b. Disposition**

**62. Incident No.** 1-15-6564 **63. Arrestee Status** ☐ROR ☐Cash Bail ☐Bail Bond ☐Police Bail ☒Held ☐App Tkt ☐Rel to 3rd Party **64. Bail Amount** **65. Bondsman** **66. Photo No.**

**67. Arrest Type** ☐PW ☐IW ☐SUM ☐CIP ☐COMP ☐OP ☐FC ☐VOP ☐BW ☐AW ☐OT **68. Warrant No.** 15-1094 **69. Arrest FOA** ☐Yes ☒No **70. Other Agency** **71. F / P Taken** ☒Yes ☐No

**72. Location of Offense** (C ☒ T ☐ V ☐) 856 4th AV 1 Troy NY 12182 **73. Offense Date** 2/26/2015 **74. No. Offenders** ☒ **75. No. Victims** 1 **76. Return Court** **77. Return Judge** **78. Return Date** **79. Time**

**80. Defendant / Case TOT Agency** **80a. Officer's Name** **80b. ID No.** **81. Time** **82. Date**

### CHARGE INFORMATION

| 83. LAW | Article & Section | SUB | CL | CAT | DEG | ATT | NAME OF OFFENSE | CTS | NCIC code | Age | Sex | Handicap | ASSOC. NO. | TYPE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PL | 125.20 | 04 | B | F | 1 | O | MANSLAUGHTER 1ST-18 Unde | 1 | 0 9 9 9 | | | | | ☐APP ☐UTT ☐OTH |
| PL | 125.15 | 01 | C | F | 2 | O | MANSLAUGHTER 2ND-Reckles | 1 | 0 9 9 9 | | | | | ☐APP ☐UTT ☐OTH |
| PL | 260.10 | 01 | A | M | 0 | O | END WEL CHILD-Under 17, | 1 | 3 8 0 1 | | | | | ☐APP ☐UTT ☐OTH |

### ASSOCIATED PERSONS INFORMATION

84. Person Type: OT = Other, SP = Spouse, CD = Co-Defendant, SC = School, PO = Parole Officer, VI = Victim, RE = Relative, RP = Religious Person, EM = Employer, CH = Child, PA = Parent, AS = Associate, LA = Lawyer, PR = Probation Officer, WI = Witness, CO = Complainant, DR = Doctor

| TYPE | NAME (LAST, FIRST, MIDDLE, TITLE) | STREET-NAME & NUMBER | CITY / STATE / ZIP | TELEPHONE NO. |
|---|---|---|---|---|
| OT | Davis, Michael | 856 4th AV 1 | Troy NY 12182 | |
| OT | D[redacted] | 856 4th AV 1 | Troy NY 12182 | |
| OT | Parker, Rebecca A | 856 4th Av 1 | Troy NY 12182 | (347)456-4396 |

### NARRATIVE

85. above subject arrested for above charges w/o incident (Rens. Co. Indictment #15-1094) by members of the TPD and USMS RFTF

neg wants  neg col

**86. Arresting Officer's Signature** Fountain, Ronald J **87. ID No.** 5838 **88. Supervisor's Signature** **89. ID No.** **94.** 1 Page of 1 pages

**90. Arrest Made As A Result Of A SAFIS Latent Print Identification?** ☐Yes ☒No ☐Unknown **91.** **92.** **93.**

DCJS 3203 (1/91 3/98)

ORIGINAL

```
 1    -------------------------------------------
      In the Matter of the Claim of:
 2
      MICHAEL DAVIS.
 3
                       Claimant,
 4
        -against-
 5
      CITY OF TROY and COUNTY OF RENSSELAER,
 6
                       Respondent.
 7    -------------------------------------------

 8

 9              STENOGRAPHIC MINUTES OF DEPOSITION conducted

10    of Claimant, MICHAEL DAVIS, pursuant to Article 50-H of

11    the General Municipal Law, on March 30, 2017, at the

12    offices of Pattison Sampson, 22 First Street, Troy, New

13    York, commencing at 11:35 a.m.; before ELLEN J.

14    FRANKOVITCH, a Shorthand Reporter and Notary Public

15    within and for the State of New York.

16

17

18

19

20

21

22

23

24
```

# APPENDIX

*(Michael Davis - March 30, 2017)*

| | | |
|---|---|---|
| 1 | Q. | So that was some months after the baby's death; |
| 2 | | correct? |
| 3 | A. | Yes, sir. |
| 4 | Q. | And Michael, do you remember who arrested you, |
| 5 | | actually?  Was it Troy police officers or was it |
| 6 | | sheriff's deputies or state police? |
| 7 | A. | It was the Troy police officers, I believe.  The |
| 8 | | detective, Detective Fountain and McDarrell... |
| 9 | Q. | McDonald. |
| 10 | A. | McDonald. |
| 11 | Q. | Okay.  And you were arraigned in police court, were |
| 12 | | you not? |
| 13 | A. | Yes, sir. |
| 14 | Q. | And I think -- and you again can correct me if I am |
| 15 | | wrong -- you were committed to jail in lieu of |
| 16 | | bail? |
| 17 | A. | Yes. |
| 18 | Q. | How long -- withdrawn. |
| 19 | | Did there come a time when you were released |
| 20 | | on bail? |
| 21 | A. | No.  I wasn't given bail. |
| 22 | Q. | When did the trial commence? |
| 23 | A. | When did it come to an end? |
| 24 | | MR. KLEIN:  When did it start. |

*(Michael Davis - March 30, 2017)*

```
 1    BY MR. SHANLEY:
 2    Q.   When did it start?  You don't have to give me the
 3         exact date.  What month?
 4    A.   Roughly, I would say... I don't recall the exact
 5         month that it started, but I would say around
 6         August, if I'm not mistaken.
 7    Q.   August of 2016?
 8    A.   August of 2016.
 9    Q.   So were you in jail from October 2, 2015, to August
10         of 2016?
11    A.   Yes, sir.
12    Q.   Was bail ever set?
13    A.   No, I was never given bail.  The judge just told
14         me, no bail.
15              MR. KLEIN:  He's just asking yes or no;
16         okay?  Just take your time.
17              MR. SHANLEY:  That's okay.  I was
18         interrupting.
19    Q.   Was there ever a bail hearing, Mike?
20    A.   Yes.
21    Q.   Trying to accept bail?
22    A.   Yes.
23    Q.   Where was that?  In county court or in police
24         court?
```

# APPENDIX

*(Michael Davis - March 30, 2017)*

1    A.   I believe in county court.

2    Q.   County court?  Do you remember the judge's name?

3    A.   It was Ceresio, I believe.

4    Q.   Ceresia?  Andrew?

5    A.   Yes.  He was my judge the whole time.

6    Q.   Okay, and he refused to set bail?

7    A.   Yes, sir.

8    Q.   Okay.  Now, you had the public defender, didn't

9        you?

10    A.   Yes, I did.

11    Q.   Was that William Roberts?

12    A.   Yes, sir.

13    Q.   He tried the case, didn't he?

14    A.   Yes, sir.

15    Q.   How long did the trial last, approximately?

16    A.   Picking a jury and everything, probably a week, I

17        would say.  Not longer than that.

18    Q.   And then the verdict came in and you were then

19        released; correct?

20    A.   Yes.

21    Q.   Okay.  Now, working with Mr. Roberts, did you

22        review any statements by any of the Troy officials?

23            MR. KLEIN:  I'm just going to note an

24           objection.  I know Mr. Shanley is not asking

Case 1:74-cv-00290-DJS Document 04-61 (04/22/3353 Filed 04/01/22 154 Page 45 of 6

*(Michael Davis - March 30, 2017)*

```
 1              minutes.

 2    BY MR. SHANLEY:

 3    Q.   All right.  And then there came a time when you

 4         left the house and ran across to a friend's house,

 5         Willie Robinson?

 6    A.   Willie Robinson.

 7    Q.   He wasn't home; you couldn't get an answer.

 8    A.   No, he was working.

 9              MR. KLEIN:  So the answer is:  Yes, he

10         wasn't home and you couldn't get an answer?

11              THE WITNESS:  Yes.

12              MR. KLEIN:  Okay, so just answer the

13         question.

14    BY MR. SHANLEY:

15    Q.   He was working.  That answers the question; he

16         wasn't home.  Right?

17    A.   Yes.

18    Q.   Then there came a time when you went to Testo's?

19    A.   Yes, sir.

20    Q.   Now, that is an Italian restaurant -- or

21         Italian-American restaurant, located on the corner

22         of 124th and Fourth?

23    A.   Yes, sir.

24    Q.   That would be directly across the street from where
```

Case 1:17-cv-00290-DJS Document 61-6 (812-3353) Filed 04/01/22 Page 6 of 6

*(Michael Davis - March 30, 2017)*

```
 1          you lived?

 2     A.   More of a diagonal.

 3     Q.   Okay.  And were they open at the time, Michael?

 4     A.   Yes.

 5     Q.   And you went in?

 6     A.   Yes.

 7     Q.   And did you talk to someone in there?

 8     A.   I went right to the counter at first and asked for

 9          a phone.  They said they didn't have a landline.

10          So I asked the worker who was sitting in a chair,

11          can I use your cell phone.

12     Q.   Okay, and you called 911?

13     A.   Yes.

14     Q.   Were you connected?

15     A.   Yes.

16     Q.   Do you recall, Michael, in words or substance,

17          whether you told them that there was a baby that

18          had stopped breathing?

19     A.   Yes.

20     Q.   Did they respond to the...

21     A.   They did.  They just --

22               MR. KLEIN:  Did they respond?

23               THE WITNESS:  Yes.

24
```

# APPENDIX

**1814**

## RENSSELAER COUNTY CIVIL SERVICE COMMISSION

| EFFECTIVE DATE | REPORT ALL PERSONNEL CHANGES ON THIS FORM, SEND THREE COPIES PRIOR TO PAYROLL AFFECTED BY THIS CHANGE **REPORT OF PERSONNEL CHANGE** | PAY PERIOD ENDING DATE |
|---|---|---|
| 1 | 1 | 19 | | | | |

**NAME** Michael Sikurica

**ADDRESS** _____

**CITY/STATE/ZIP** _____

**TOWN** _____

**AGENCY** _____

**SOCIAL SECURITY NO.** _____

**EMPLOYEE NO.** 01185 1201

**RETIREMENT NO.** _____

☐ Veteran  ☐ Disabled Veteran
☐ Non-Disabled Veteran  ☐ Exempt Volunteer Fireman

| TITLE OF POSITION | Vacancy # | Position # | Hourly Rate | Annual Rate | Bi-Weekly Hours | Fringe Code | Grade |
|---|---|---|---|---|---|---|---|
| Chief Medical Examiner | | 105.0 | 2.5453 | 75.900 | | | |
| **NAME OF LAST INCUMBENT** | no | | | | 70 | 76 | |

| | APPOINTMENTS | ELIGIBLE LIST NO. |
|---|---|---|
| **DEPARTMENT** HC 1/h | PERMANENT | |
| **DEPARTMENT CODE** 445 | CONTINGENT PERMANENT | |
| **COST CENTER** _____ | PERMANENT PROMOTION | |
| **PAY CYCLE** _____ | PROVISIONAL | |
| | PROVISIONAL PROMOTION | |

| | | FROM | TO |
|---|---|---|---|
| ☐ COMPETITIVE  ☐ LABOR | TEMPORARY | | |
| ☐ EXEMPT  ☐ UNCLASSIFIED | TERM OF OFFICE | | |
| ☐ NON-COMPETITIVE | PROBATIONARY PERIOD | | |

### PERSONNEL CHANGES

| | |
|---|---|
| RESIGNATION: MUST ATTACH RESIGNATION LETTER | COMPLETION OF PROBATIONARY PERIOD |
| RETIREMENT | CHANGE TO GRADE RATE * |
| TERMINATED | CHANGE IN TITLE |
| DECEASED | X CHANGE IN SALARY * |
| LAYOFF | CHANGE IN FRINGE CODE |
| LEAVE OF ABSENCE: FROM ___ TO ___ CODE ___ | CHANGE IN BASE SCHEDULED HOURS |
| TRANSFER | CHANGE IN NAME |
| REINSTATEMENT | CHANGE IN ADDRESS |
| SUSPENSION | OTHER |

**REMARKS:**

Change in salary for 2019 voted budget

| | CIVIL SERVICE COMMISSION |
|---|---|
| **REQUESTED BY** _____ | ☐ APPROVED |
| **DATE** 12/11/18 | |
| **APPROVED BY** _____ **DATE** 2/2/16 | ☐ DISAPPROVED _____ |
| **REVIEWED BY** _____ **DATE** _____ | |
| **ENTERED BY** _____ **DATE** _____ | **BY** _____ **DATE** _____ |

Form MSD-426R
Rev 10-12-07

**Distribution:** White-Civil Service, Green-Employee, Yellow-Department
Pink-Human Resources, Gold-Finance

* Grade Rates and Salary Changes
Require Budget Department Approval

# APPENDIX

**1815**

## RENSSELAER COUNTY CIVIL SERVICE COMMISSION

| EFFECTIVE DATE | REPORT ALL PERSONNEL CHANGES ON THIS FORM, SEND THREE COPIES PRIOR TO PAYROLL AFFECTED BY THIS CHANGE | PAY PERIOD ENDING DATE |
|---|---|---|
| 6 / 30 / 18 | **REPORT OF PERSONNEL CHANGE** | |

**NAME** Michael Sikirica

**ADDRESS** _____

**CITY/STATE/ZIP** _____

**TOWN** _____

**AGENCY** _____

**SOCIAL SECURITY NO.** _____

**EMPLOYEE NO.** 0118512201

**RETIREMENT NO.** _____

☐ Veteran  ☐ Disabled Veteran
☐ Non-Disabled Veteran  ☐ Exempt Volunteer Fireman

| TITLE OF POSITION | Vacancy | Position # | Hourly Rate | Annual Rate | Bi-Weekly Hours | Fringe Code | Grade |
|---|---|---|---|---|---|---|---|
| Chief Medical Examiner | 1110 | | 39.9397 | 72100 | 70 | 70 | |
| NAME OF LAST INCUMBENT | | | | | | | |

| | APPOINTMENTS | ELIGIBLE LIST NO. |
|---|---|---|
| **DEPARTMENT** Health | PERMANENT | |
| **DEPARTMENT CODE** 1185 | CONTINGENT PERMANENT | |
| **COST CENTER** _____ | PERMANENT PROMOTION | |
| **PAY CYCLE** _____ | PROVISIONAL | |
| | PROVISIONAL PROMOTION | |

| | | FROM | TO |
|---|---|---|---|
| ☐ COMPETITIVE  ☐ LABOR | TEMPORARY | | |
| ☐ EXEMPT  ☐ UNCLASSIFIED | TERM OF OFFICE | | |
| ☐ NON-COMPETITIVE | PROBATIONARY PERIOD | | |

### PERSONNEL CHANGES

| | |
|---|---|
| RESIGNATION: MUST ATTACH RESIGNATION LETTER | COMPLETION OF PROBATIONARY PERIOD |
| RETIREMENT | CHANGE TO GRADE RATE ★ |
| TERMINATED | CHANGE IN TITLE |
| DECEASED | CHANGE IN SALARY ★ |
| LAYOFF | CHANGE IN FRINGE CODE |
| LEAVE OF ABSENCE: FROM ___ TO ___ CODE ___ | CHANGE IN BASE SCHEDULED HOURS |
| TRANSFER | CHANGE IN NAME |
| REINSTATEMENT | CHANGE IN ADDRESS |
| SUSPENSION | OTHER |

**REMARKS:** ★ (Change to Correction in salary
(should have been no change to salary for 2018.)

| | CIVIL SERVICE COMMISSION |
|---|---|
| REQUESTED BY _MJWac_ | |
| DATE 7/10/18 | ☑ APPROVED |
| APPROVED BY _____ DATE 7/3/18 | ☐ DISAPPROVED _____ |
| REVIEWED BY _____ DATE _____ | |
| ENTERED BY ___ LL ___ DATE 7/___ | BY _____ DATE 7/16/18 |

Form MSD-426R
Rev 10-12-07

★ Grade Rates and Salary Changes
Require Budget Department Approval

**Distribution:** White-Civil Service, Green-Employee, Yellow-Department
Pink-Human Resources, Gold-Finance

# RENSSELAER COUNTY CIVIL SERVICE COMMISSION

| EFFECTIVE DATE | REPORT ALL PERSONNEL CHANGES ON THIS FORM, SEND THREE COPIES PRIOR TO PAYROLL AFFECTED BY THIS CHANGE | PAY PERIOD ENDING DATE |
|---|---|---|
| 01 01 05 | **REPORT OF PERSONNEL CHANGE** | 01 14 05 |

NAME Michael Sikirica

SOCIAL SECURITY NO. ▮▮▮▮▮▮▮

ADDRESS _____

EMPLOYEE NO. 0118520l

CITY/STATE/ZIP _____

RETIREMENT NO. _____

TOWNSHIP _____ CODE _____

☐ Veteran ☐ Disabled Veteran
☐ Non-Disabled Veteran ☐ Exempt Volunteer Fireman

| TITLE OF POSITION | Position Number | Job Code | Hourly Rate | Annual Rate | Bi-Weekly Hours | Fringe Code |
|---|---|---|---|---|---|---|
| Medical Examiner | | | | | | |
| NAME OF LAST INCUMBENT | | 1110 | 51.890110 | 72600 | 70 | 70 |

DEPARTMENT Health

DEPARTMENT CODE 1185

COST CENTER _____

ALLOCATION CODE _____

| APPOINTMENTS | | ELIGIBLE LIST NO. |
|---|---|---|
| PERMANENT | | |
| CONTINGENT PERMANENT | | |
| PERMANENT PROMOTION | **RECEIVED** | |
| PROVISIONAL | | |
| PROVISIONAL PROMOTION | DEC 2004 FROM | |

☐ COMPETITIVE ☐ LABOR
☐ EXEMPT ☐ UNCLASSIFIED
☐ NON-COMPETITIVE

| | FROM | TO |
|---|---|---|
| TEMPORARY | RENSSELAER COUNTY BUREAU OF HUMAN RESOURCES | |
| TERM OF OFFICE | | |
| PROBATIONARY PERIOD | | |

## PERSONNEL CHANGES

| | | |
|---|---|---|
| RESIGNATION: CODE _____ | | COMPLETION OF PROBATIONARY PERIOD |
| RETIREMENT | | CHANGE TO GRADE RATE |
| TERMINATED | | CHANGE IN TITLE |
| DECEASED | ✗ | CHANGE IN SALARY |
| LAYOFF | | CHANGE IN FRINGE CODE |
| LEAVE OF ABSENCE: FROM ___ TO ___ CODE ___ | | CHANGE IN BASE SCHEDULED HOURS |
| TRANSFER | | CHANGE IN NAME |
| REINSTATEMENT | | CHANGE IN ADDRESS |
| SUSPENSION | | OTHER |

**REMARKS:**
Per 2005 Budget

REQUESTED BY _[signature]_

DATE 12/3/04

| | |
|---|---|
| APPROVED BY _[signature]_ DATE ___ | **CIVIL SERVICE COMMISSION** |
| REVIEWED BY ___ DATE ___ | ☐ APPROVED |
| ENTERED BY _JB_ DATE 12/13/04 | ☐ DISAPPROVED _____ |
| | BY _____ DATE _____ |

Form MSD-426R
Rev 6/25/03

Distribution: White-Personnel, Green-Employee, Yellow-Department
Pink-Civil Service, Gold-Finance

# APPENDIX  1817



## TROY POLICE DEPARTMENT
### INVESTIGATION REPORT

| VICTIM'S NAME: | REPORT DATE: | INCIDENT NUMBER: | DB NUMBER: |
|---|---|---|---|
| Suspicious Death Inv | 03-01-15 | 20320-15 | |

## NARRATIVE

I/Os responded to 856 4th Ave for a child death call. Upon arrival saw a Female and Male subject sitting on fron step of residence. I/O was briefed by Ptls Rasmussen and Coonradt to the specifics 2 ½ year old female vi transported to St Mary's hospital by TFD believed un responsive. I/Os spoke with subject sitting in front of residence both were very quiet when introduced to us by patrol. Subject one and caretaker of child during time of death was a Michael L Davis-Guider( ██████ and Mother of Victim was Rebecca Parker ( ██████ . Both were asked to come to station and talk with I/Os. Both agreed Davis-Guider rode with I/Os in front seat due to his size. Female Parker was driven to CS by Ptl Rasmussen in front seat of his patrol car. Upon arrival at CS Davis-Guider was in Det CP Mcdonalds office and Parker was in 2nd floor DB office. I/O was then notified that 2 ½ year old V████ D███ ( ██████ ) had passed. I/O then informed Parker who was brought to St Marys hospital. I/Os then spoke with Davis-Guider in McDonalds Office. Notes taken on Days events at 856 4th Ave. Only people at 856 4th Ave 1st Floor were Davis-Guider and Viola Parker from 0830 hours to aprox 1PM.

I/o then applied or a search warrant of residence 856 4th Ave 1st floor. Also permission to search apt. was granted and signed by Davis-Guider. Search warrant was executed ETs Buttafuoco and Marble processed scene. ET reports are available. I/O along with Sgt T Colaneri also at scene during ET processing.          I/Os then again spoke with Davis-Guider who had been sitting with Mcdonald during search warrant execution. Davis-Guider then left station with ¹with Parker they were picked up by Russell Brown.   2-27-15 I/Os responded to AMC for Autopsy also present were Sgt T Colaneri ET Buttafuoco ADA A Ackerman. Dr M Sickirika performed Autopsy with his staff. Results to follow.

Aprox 1PM I/Os stopped at residence on 4th Ave to speak with Parker and Davis-Guider they were present also Parkers Mother Nancy Parker and Aunt Mercedes Hall-Chestaro were present. Again asked Davis-Guider a couple of questions and also answered questions pertaining to child and next steps in process. I/O advised family and Davis-Guider that we could meet Monday 3-2-15 and go over entire incident all agreed to meet at police station 3-2-15.

| DETECTIVE ASSIGNED | SUPERVISOR APPROVAL | PAGE NUMBER |
|---|---|---|
| Fountain/CP Mcdonald | | |

CASE STATUS:

# APPENDIX

**NEWS**

# Joseph McElheny acquitted of manslaughter and murder in death of his 4-month-old daughter

By **SARATOGIAN** I news@saratogian.com I
PUBLISHED: October 12, 2011 at 7:07 a.m. I UPDATED: July 22, 2021 at 5:01 a.m.



# APPENDIX

TROY — After close to 35 hours of deliberation, jurors acquitted Joseph McElheny on eight of nine charges Wednesday in the May 2010 death of his 4-month-old daughter Ina. Jurors found McElheny, 32, of Hoosick Falls, not guilty of murder, manslaughter, criminal negligence, reckless endangerment and four counts of assault. After six hours of deliberation Wednesday and a request to hear the definition of the charge, jurors remained deadlocked on the final count, endangering the welfare of a child, leading Judge Andrew Ceresia to declare a mistrial on that charge. The prosecution and defense will meet next week to discuss how to proceed on that count, a misdemeanor. District Attorney Richard McNally said that it would most likely be dropped, as McElheny has already served more than a year in prison, the maximum sentence for a conviction on that charge. As the jury foreman read each "Not guilty" verdict, McElheny's family, who were present every day of the nearly month-long trial, wept with joy. One family member whispered to another, "It's over," wiping away tears. After Ceresia declared McElheny be released, McElheny bear-hugged his attorney, Gregory Cholakis, and embraced his wife, Melinda. Outside the courtroom, Melinda McElheny sang the defense's praises and said in a written statement that its medical witnesses helped discredit what she called an "epidemic" of parents being wrongly accused of child abuse. "Parents are being targeted, often at the worst moments in their lives, by overzealous police and child protective investigators," McElheny said. "These investigators use the parents' grief and the memories of their children to coerce them into making statements of self-implication. Most often, the parents want answers even more than authorities do. Instead, what they get are accusations and blame. None of this would be possible without the medical establishment standing by and doing nothing. This is a discussion we all should be having as a society. … We need to shine a light on child abuse, but not at the expense of tearing apart innocent families, and not with a blind eye toward the injustice that results from jumping to conclusions." The couple has another daughter, Murphy, born in April, who was seized the day after she was born by the Vermont Department of Children and Families pending the outcome of this trial. Asked for her immediate reaction to her husband's acquittal, McElheny said it was "great." "I need to go pick him up," she said with a smile. Prosecutors claimed that McElheny repeatedly abused Ina throughout her short life, breaking 18 of her hones and administering a blow that led to a fatal abdominal infection. The defense argued that Ina suffered from a host of medical conditions, including rickets and an intestinal disorder known as intussusception, that caused her injuries and ultimately the torn bowel which initiated her infection. Dueling medical witnesses attempted to bolster each of those theories, but juror Nathaniel Ekstrom said it was the testimony of both Joseph and Melinda McElheny that had the biggest impact. Seeing how Ina's parents conducted themselves on the stand



played a large part in his decision to find Joseph McElheny not guilty, Ekstrom said, as well as the video evidence of Ina herself. "She never seemed to be in any discomfort," he said. "There was never … any clear evidence that she was in pain or being mistreated." Cholakis also cited the videos as one of the strongest points in his case, adding that that visual evidence coupled with numerous character witnesses who extolled on the virtues of McElheny's parenting helped his client walk free. He said that Joseph and Melinda McElheny have "maintained an incredible dignity" throughout the last 17 months. "Can you imagine, you haven't even buried your child, and you can't stop for five minutes to even grieve about it because you have the threat of indictment hanging over your head from day one?" Cholakis said. As for that indictment, McNally said he stood by his office's actions. Commenting on the length of the jury's deliberation – the longest he'd seen in his 22 years as an attorney – McNally said in cases where medical evidence is the biggest form of proof, juries often struggle to process it all. "We did the right thing, and we believe we did the right thing. We understand what our burden is and what our obligations are, and we felt that we had met those," he said. " … The jury saw the proof not sufficient to convict, and we respect that. And that's our system, and I make no excuses for that." The prosecution and defense will meet again Tuesday morning to determine the course of action on McElheny's remaining charge.

## Be the first to know.
*Sign up for Breaking News email alerts*

Enter your email

**SIGN UP**

By signing up, you agree to our privacy policy and terms of service.



# Saratogian



SPONSORED CONTENT

Case 1:23-cv-01290-DJC Document 94-01/18/25 3830/57874/Page 63 Page 66 of 4

**Penny Hoarder Issues "Urgent" Alert: 6 Companies Are...**

By The Penny Hoarder

How many times have we fallen for this?

## Join the Conversation

We invite you to use our commenting platform to engage in insightful conversations about issues in our community. We reserve the right at all times to remove any information or materials that are unlawful, threatening, abusive, libelous, defamatory, obscene, vulgar, pornographic, profane, indecent or otherwise objectionable to us, and to disclose any information necessary to satisfy the law, regulation, or government request. We might permanently block any user who abuses these conditions.





A PROJECT OF THE UNIVERSITY OF CALIFORNIA IRVINE NEWKIRK CENTER FOR SCIENCE & SOCIETY,
UNIVERSITY OF MICHIGAN LAW SCHOOL & MICHIGAN STATE UNIVERSITY COLLEGE OF LAW

**THE NATIONAL REGISTRY
OF EXONERATIONS**

**3,042 EXONERATIONS SINCE 1989
MORE THAN 26,700 YEARS LOST**

BROWSE CASES     ISSUES     RESOURCES     ABOUT US                              MAKE A GIFT

# ADRIAN THOMAS

*Other New York False Confession Cases*


Thomas and defense lawyer Stephen Coffey

On September 21, 2008, four-month-old Matthew Thomas's parents found him limp and unresponsive in his bed in Troy, New York. Matthew's mother, Wilhelmina Hicks, accompanied emergency personnel who took him to Samaritan Hospital in Troy. Matthew's father, 26-year-old Adrian Thomas, remained home with the couple's six other children.

An initial diagnosis of septic shock was made, although head injuries were not ruled out. Matthew was treated with antibiotics and then transferred to the pediatric intensive care unit at Albany Medical Center in Albany, New York. The treating physician in Albany believed there was a cranial fracture and concluded that the baby was a victim of blunt force trauma.

Police went to Thomas's home and removed the other children to child protective services. Thomas was taken to the police station for questioning. After about 2 hours, Thomas expressed suicidal thoughts and was taken to a hospital. He was returned to the police station 15 hours later, on September 22, and police resumed questioning him.

By the time the second portion of the interrogation began, Matthew had died. The detectives, however, told Thomas that Matthew was alive and that the only way to save Matthew's life was for him to tell them what he had done to Matthew. When Thomas said he had accidentally dropped Matthew five or six inches into his crib about 10 to 15 days earlier, a detective entered the interrogation room and said that based on his experience with head injuries in the military in Operation Desert Storm, he knew that Thomas was lying. The detective said that the child's head injuries were consistent with the type of injuries suffered in a high speed auto collision.

After that detective left, other detectives suggested to Thomas that perhaps he had been depressed, emotionally overwhelmed, upset after his wife berated him for chronic unemployment and acted out of frustration and hurled the child to the mattress. Eventually, Thomas was persuaded to re-enact what the police believed he did, using a clipboard to stand in for the baby.

Thomas was charged with murder on September 22, based on his statement during the seven hour interrogation that he slammed Matthew down on a mattress on three occasions, including the day before Matthew died. Almost immediately after he was charged, Thomas recanted to his defense attorney saying he did not harm Matthew.

Prior to trial, Thomas's attorney filed a motion to suppress the confession on the ground that it was coerced. The trial judge denied the motion and Thomas went to trial in Rensselaer County Supreme Court in October 2009.

The medical examiner who performed Matthew's autopsy, an expert on

| State: | New York |
|---|---|
| County: | Rensselaer |
| Most Serious Crime: | Murder |
| Additional Convictions: | |
| Reported Crime Date: | 2008 |
| Convicted: | 2009 |
| Exonerated: | 2014 |
| Sentence: | 25 to life |
| Race/Ethnicity: | Black |
| Sex: | Male |
| Age at the date of reported crime: | 26 |
| Contributing Factors: | False Confession, False or Misleading Forensic Evidence, Official Misconduct |
| Did DNA evidence contribute to the exoneration?: | No |

# APPENDIX

child abuse, and the treating physicians at Albany Medical Center testified for the prosecution. They cited radiologic and post-mortem findings of subdural fluid collections, brain swelling and retinal hemorrhaging as the cause of Matthew's death. According to their testimony, the initial finding of a cranial fracture was incorrect—there was no fracture. The prosecution played portions of Thomas's videotaped interrogation, during which Thomas, who weighed more than 300 pounds, demonstrated how he raised Matthew above his head and forcefully threw him down onto a low mattress.

A pathologist and an infectious disease physician testified for the defense that based on their examination of the medical records, Matthew, who was born prematurely, had died of sepsis—a bacterial infection that invades the entire body.

On October 22, 2009, a jury convicted Thomas of murder. He was sentenced to 25 years to life in prison.

In March 2012, the Appellate Division of the New York Supreme Court rejected defense claims that the confession was coerced and upheld Thomas's conviction.

Also in March, 2012, filmmakers Blue Hadeagh and Grover Babcock released a documentary film that critically examined the interrogation of Thomas and went on to win numerous awards. (A trailer for the film, "Scenes of a Crime," can be viewed here: http://scenesofacrime.com/)

In February 2014, the New York Court of Appeals vacated Thomas's conviction and ordered a new trial. The Court of Appeals ruled that the interrogation was "highly coercive" and that Thomas's statements were involuntary.

The Court of Appeals pointed to portions of the interrogation where detectives told Thomas that Matthew's injuries were so severe that they could only have been inflicted by an adult and that if he had not harmed the child, his wife must have done it. The detectives threatened to arrest Hicks, Thomas's wife, if he did not admit to harming Matthew.

"By the end of the initial two-hour interrogation, (Thomas) agreed to 'take the fall' for his wife," the Court noted. Thomas denied harming Matthew and did not believe his wife had done so either, but said he would take responsibility to protect her.

The appeals court noted that detectives told Thomas more than 20 times that "his disclosure of the circumstances under which he injured his child was essential to assist the doctors attempting to save the child's life." The court said, "These falsehoods were coercive..."

The court also criticized the detectives' repeated promises that "whatever had happened was an accident, that he could be helped if he disclosed it all, and that, once he had done so, he would not be arrested, but would be permitted to return home."

"It is plain that (Thomas) was cajoled" into the re-enactment, the Court of Appeals held. The Court found that if there had been only a few deceptive reassurances, there would be a question of whether the confession was coerced. But, the Court noted, in fact Thomas was told 67 times that what had been done to the baby was an accident, 14 times that he would not be arrested and eight times that he would be going home.

Thomas went to trial a second time in May 2014. Without the confession or the testimony of the detectives who interrogated Thomas, the prosecution relied primarily upon the testimony of the physicians who said the baby had suffered blunt force trauma.

The defense presented the pathologist and infectious disease physician who had testified in the first trial and, for the first time, the testimony of Patrick Barnes, a Stanford University physician who has testified extensively about brain trauma in children. Barnes examined the radiologic reports and concluded that the trauma that prosecution physicians diagnosed as recent

based on brain bleeding was in fact not recent and was consistent with a diagnosis of sepsis.

On June 12, 2014, the jury acquitted Thomas and he was released. In June 2016, Thomas filed a claim for compensation with the New York Court of Claims.

*– Maurice Possley*

Report an error or add more information about this case.

Posting Date: 6/21/2014
Last Updated: 11/20/2016

**ABOUT THE REGISTRY**

The National Registry of Exonerations is a project of the Newkirk Center for Science & Society at University of California Irvine, the University of Michigan Law School and Michigan State University College of Law. It was founded in 2012 in conjunction with the Center on Wrongful Convictions at Northwestern University School of Law. The Registry provides detailed information about every known exoneration in the United States since 1989   cases in which a person was wrongly convicted of a crime and later cleared of all the charges based on new evidence of innocence. The Registry also maintains a more limited database of known exonerations prior to 1989.

**CONTACT US**

We welcome new information from any source about exonerations already on our list and about cases not in the Registry that might be exonerations.

Tell us about an exoneration that we may have missed

Correct an error or add information about an exoneration on our list

Other information about the Registry

Sign up for our Newsletter

Follow Us