# 23-589

IN THE

# United States Court of Appeals
# for the Second Circuit

---

MICHAEL DAVIS-GUIDER,
*Plaintiff-Counter-Defendant-Appellant,*

— v. —

CITY OF TROY, RONALD FOUNTAIN, INDIVIDUALLY,
DANIELLE COONRADT, INDIVIDUALLY,
CHARLES MCDONALD, INDIVIDUALLY,
TIM COLANERI, INDIVIDUALLY,
*Defendants-Cross-Claimants-Counter-Claimants-Appellees,*

RENSSELAER COUNTY,
MICHAEL SIKIRICA, INDIVIDUALLY,
*Defendants-Cross-Defendants-Counter-Claimants-Appellees,*

ADAM R. MASON, INDIVIDUALLY
*Defendant-Cross-Claimant-Counter-Claimant,*

JOEL ABELOVE, INDIVIDUALLY,
*Defendant-Cross-Defendant-Counter-Claimant,*

JOHN AND JANE DOES 1-10, INDIVIDUALLY,
MICHAEL E. PARROW, ANDRA ACKERMAN,
*Defendants.*

---

On Appeal from the United States District Court
for the Northern District of New York
Case No. 1:17-cv-1290 (FJS/DJS)

---

## APPENDIX VOLUME 10 OF 11

## <u>APPENDIX VOLUME 10 TABLE OF CONTENTS</u>

ECF 123-40: Redacted Exhibit 9 ................................................. 1825

ECF 123-41: Redacted Exhibit 15 .............................................. 1895

ECF 123-42: Redacted Exhibit 21 .............................................. 1940

ECF 124: Declaration of Katherine F. Maloney, M.D. ............. 1952

ECF 124-1: Exhibit 1 ................................................................. 1955

ECF 124-2: Exhibit 2 ................................................................. 1961

ECF 129-1: Response to Plaintiff's Local Rule 56.1

Counter-Statement ..................................................................... 1964

ECF 130-1: Rhiannon I. Spencer Attorney Reply

Declaration ................................................................................. 1979

ECF 130-2: Exhibit D ................................................................ 1981

Case 1:17-cv-00150-DJS-m Document 85-3 Filed 04/01/22e Page 3 of 79

RICA - INVESTIGATION - DAVIS, 9/29/15

                    GRAND JURY:    Sure.

                    (Off the record.)

                    (Whereupon, MICHAEL

    SIKIRICA, M.D., was recalled to the

    grand jury room.)

                    MS. HALL:    I'll remind you

        that you are still under oath and

        sworn to tell the truth.

                    THE WITNESS:    Yes.

                    MS. HALL:    A couple of

        followup questions, Doctor.

THER EXAMINATION BY MS. HALL:

    Q.    With respect to the condition V█████

    found at the residence in Troy when the

    medics arrived, do you know what -- what

    e she was in physically?

    A.    Well, she was cool to the touch, she

    unresponsive, but they did detect,

    posedly, some electrical activity in her

    t, so they did transport her to the hospital.

    Q.    And what time was she pronounced dead?

    A.    She was pronounced at 2:08 p.m.

    Q.    And that was at the hospital?

    A.    Yes.

Case 1:17-cv-01290-DJS Document 95 Filed 04/01/23 Page 2 of 79

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

Q.    Okay.  And with respect to the
injuries that you observed on V█████ D█████ during
your autopsy performed on February 27th, 2015,
the injuries that you observed, is that
consistent with C.P.R.?

A.    No.

Q.    The injuries that you observed, could
they have been caused by C.P.R.?

A.    No.

Q.    And in your professional, over the
last, since, what, '89, as a medical examiner?

A.    Yes --

Q.    In your career as a medical examiner,
have you had the opportunity to observe the
interior organs of people that have had C.P.R.
performed on them?

A.    Yes.

Q.    And would that include children?

A.    Yes.

Q.    And have you ever seen injuries of
this nature?

A.    Not of this extent.  No.

Q.    And the type of injury -- injuries you
observed, what type of injuries have you seen

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

those in?

A.    As I said, motor -- motor vehicle
accidents, severe blunt force injuries to the
abdomen, and a -- a child in a car crash or run
over by an automobile or something.

            MS. HALL:  Does that
      answer your question, grand juror?

            GRAND JUROR:  He said they
      didn't know what they were doing
      with C.P.R.  Could they accidentally
      do this if they just had no idea and
      was pretending to do C.P.R.?

            MS. HALL:  Go ahead,
      Doctor, if you --

            THE WITNESS:  Well, I
      think everyone knows where the heart
      is.  So if you're going to do C.P.R.
      you're going to do it here
      (indicating), you're not going to
      squeeze from here (indicating).

            GRAND JUROR:  I see.  Got
      it.

BY MS. HALL:  (Cont'g.)

      Q.    And where were the broken ribs with

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

respect to the heart?

     A.      Way down in the back, on the opposite
side of the heart.

                    GRAND JUROR:   On both
     sides --

BY MS. HALL:  (Cont'g.)

     Q.      Lower right side, Doctor?

     A.      Lower right side.  Yes --

                    GRAND JUROR:   On both
     sides or one side?

                    THE WITNESS:   One side.
     Nine and ten.

                    GRAND JUROR:   Okay.

BY MS. HALL:  (Cont'g.)

     Q.      Were there any broken ribs on the left
side of her body?

     A.      No.

                    MS. HALL:   Any other
     questions?

                    Yes, sir.

                    GRAND JUROR:   Yeah, if you
     did stop breathing, and you did the
     C.P.R., and he did break her ribs
     during C.P.R., would the blood still

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

flow into the liver?

        THE WITNESS:  Well, C.P.R.
can -- can -- can bleed -- you can
bleed with C.P.R., but you're not
going to bleed 350 M.L.s of blood.
You're not going to bleed 40 percent
of your blood volume into your
abdominal cavity if you use C.P.R.

        MS. HALL:  Okay.  There's
another hand back there, I believe?
Nope?

        Yes, grand juror.

        THE FOREPERSON:  Were --
C.P.R. for an infant, would that be
the same as for an adult, 30
compressions, two breaths?

        MS. HALL:  Well, I don't
believe there's been any testimony
with respect to -- your recollection
recalls.

        Doc, if you can answer?

        THE WITNESS:  I think the
breathing part of it has been
somewhat discontinued.  I think it's

SIKIRICA — INVESTIGATION — DAVIS,  9/29/15

just pumping the chest at this point
in time.

BY MS. HALL:  (Cont'g.)

Q.    And with respect to Michael Davis, are
you aware of his attempt at C.P.R.?

A.    Yes.

Q.    And did he tell you approx —— or are
you aware approximately how many times he
attempted it?

A.    He squeezed four or five times, is
what he said.

Q.    And when you say "squeezed," what do
you mean by "squeezed"?

A.    Between his two hands, he claimed that
he had squeezed the baby four or five times.

            MS. HALL:  Yes, ma'am.

            GRAND JUROR:  How much did
V█████ weigh and how tall was she?

            THE WITNESS:  She weighed
27 pounds, and she was 88
centimeters.  So she'd be around ——
she was pretty small.  Less than ——
88 centimeters....  I'd have to —— I
think I have her grow chart.  I can

IKIRICA - INVESTIGATION - DAVIS, 9/29/15

look at that, actually, and tell
you.

(Whereupon, The Witness
examining said document.)

THE WITNESS: She was
about 34 inches tall.

MS. HALL: If I -- yes,
ma'am.

GRAND JUROR: You said it
was blunt force trauma, is that
correct?

THE WITNESS: Yes.

GRAND JUROR: So that
would eliminate kicking or an
object, because it would be bruised
on the outside, correct?

THE WITNESS: Well, it
could possibly be something like a
kick, but the kick wouldn't -- it
would have to be in the back, and I
would see bruising in the back --

GRAND JUROR: On the back?

THE WITNESS: -- to break
the ribs. And there was no evidence

Case 1:17-cv-01290-DJS Document 123-40 Filed 04/01/22 Page 8 of 70
Case 23-589, Document 68, 10/13/2023, 3604758, Page10 of 213

**APPENDIX**

**1832**

80

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

of any bruising to the skin.

GRAND JUROR: So -- so she was, like, squeezed that hard --

THE WITNESS: She was squeezed. Yes.

GRAND JUROR: Okay.

MS. HALL: Okay. Any other questions from the Grand Jury?

Yes, ma'am.

GRAND JUROR: He just mentioned just before that him -- the man said that he squeezed the baby giving it C.P.R. Could he then damage the back if he tried to give C.P.R. by squeezing? I've never heard anybody doing that before, but...

THE WITNESS: The back -- the broken ribs could be from squeezing to the back, yes, but it wouldn't be associated with C.P.R. --

GRAND JUROR: No. But I meant -- you mentioned that he said

SIKIRICA - INVESTIGATION — DAVIS, 9/29/15

he squeezed the baby to give it

C.P.R. Did you just say that a few

minutes ago?

        THE WITNESS: Yes.

        GRAND JUROR: Did he

testify to that?

        MS. HALL: You -- your

recollection recalls. I can't --

        GRAND JUROR: Yes.

        MS. HALL: -- answer that

for you.

BY MS. HALL: (Cont'g.)

    Q. With respect to how Michael Davis

performed C.P.R., did you observe that on a video

anywhere? A recording?

    A. Yes.

    Q. Okay. And what he was demonstrating

on that video, could that have caused the

injuries in V████ D██████?

    A. What he was demonstrating could have

caused the injuries on V███, the squeezing

effect to her abdomen. Yes.

    Q. What injury would you see as a result

of that?

82

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

A.    You would see the tearing of the liver. He -- I saw he was a very big man. He -- he had very large hands. The liver would be torn, could be lacerated severely, and you could break ribs. But the amount of bleeding suggests that she was alive afterwards. Four or five squeezes is not going to produce that kind of blood in the abdominal cavity.

Her heart probably only has maybe 10 M.L.s of blood. So if you squeeze every 10 M.L.s of -- of blood out of that heart five times, which is very unlikely, you would, at the most, get 50 M.L.s of blood.

Q.    And, again, how much was in her abdominal cavity?

A.    Closer to 400 M.L.s.

Q.    And with respect to your finding, was there anything about V█████ D██████ in your examination and autopsy of her that would indicate why she would have lost consciousness without this injury?

A.    No.

Q.    In other words, would there be a reason to find her in bed not responsive?

JOAN L. BURLEIGH (518) 767-3030

A.      No.

Q.      No illness?  Nothing metabolic?

A.      A healthy child.

        MS. HALL:  All right.
Anything further?

        Yes.

        ASSISTANT FOREPERSON:  It
was -- I believe I just heard that
if there was some electrical -- it
was detected that there was some
heart -- electrical impulse --

        (Whereupon, the Court
Reporter asked for clarification.)

        ASSISTANT FOREPERSON:  --
activity when the -- when the
ambulance arrived.

        MS. HALL:  Okay.

        ASSISTANT FOREPERSON:  And
is -- would -- would that indicate
that she was -- that her -- that she
had passed before the ambulance or
she was, like, within minutes of
passing, so to speak?

        MS. HALL:  If you can

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

answer that question --

THE WITNESS: I can
understand the question.

It would indicate -- if --
if these injuries occurred, she
would have been dying in a course of
about 15 or 20 minutes.

So to find the electrical
activity indicated that they
occurred 15 or 20 minutes before the
ambulance got there.

BY MS. HALL: (Cont'g.)

Q. Was there any saving this child?

A. No.

MS. HALL: Grand jurors
have any other questions?

(Whereupon, the Grand Jury
indicates in the negative.)

MS. HALL: Okay. I'll
thank this witness. Thank you.

THE WITNESS: Yup. Thank
you.

(Whereupon, The Witness
was excused.)

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15

43

1    Thereupon,

2                    RONALD FOUNTAIN,

3    having been duly sworn by The Foreperson of the

4    Grand Jury, was examined and testified as

5    follows:

6    EXAMINATION BY MS. HALL:

7         Q.    Again, if you would state your name

8    and spell it for the record, please?

9         A.    It's Ronald Fountain, F-O-U-N-T-A-I-N.

10        Q.    And where are you currently employed?

11        A.    Troy Police Department.

12        Q.    And how long have you been employed

13   there?

14        A.    Twenty-three years.

15        Q.    And in what capacity are you currently

16   working in?

17        A.    I am the juvenile investigator/sex

18   crimes for the City of Troy Police.

19        Q.    And what exactly do you do on a daily

20   basis?

21        A.    I am assigned every case in the City

22   of Troy, well, just about, regarding a sexual

23   assault, a child injury, a child fatality, an

24   adult sexual assault, all come to me.

**APPENDIX**

**1838**

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15

44

1    Q.    Do you have any specialized training

2  with respect to those cases?

3    A.    I do.  I've been to Dallas, Texas for

4  the Crimes Against Children conference.  They

5  sent me to Seattle, Washington for the Juveniles

6  for Justice.  I've been to the New York State

7  Best Practices, the Advanced Best Practices,

8  investigator school, and probably a whole bunch

9  of other little trainings every year to keep me

10  updated on all the laws.

11    Q.    And how long have you been in that

12  capacity?

13    A.    About eight years.

14    Q.    And were you working in that capacity

15  on February 26th of 2015?

16    A.    I was.

17    Q.    And did there come a point in time

18  when you were called to respond to 856 4th Ave.?

19    A.    Yes.

20    Q.    And where is that?

21    A.    It is in Lansingburgh, the northern

22  part of the city.

23    Q.    City of Troy?

24    A.    County of Rensselaer, State of New

45

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15

1    York.

2        Q.    And what was your purpose of going

3    there?

4        A.    There was a call for a child fatality

5    at the time.  They didn't know if the child was

6    going to make it or not, so they called -- my

7    Captain called myself and told me to respond to

8    the scene.

9        Q.    And you in fact did that?

10       A.    I did.

11       Q.    And describe what occurred when you

12   arrived.

13       A.    When we got there there was a couple

14   of patrol officers that were already at the

15   scene.  An ambulance had already left.  I think I

16   caught the tail end of the ambulance pulling

17   away.  And the mother of the child and the

18   boyfriend of the mother were both still at the

19   scene, outside, waiting.

20       Q.    And what was the mother's name, if you

21   recall?

22       A.    Her name is Rebecca Parker.

23       Q.    And what was the mother's boyfriend's

24   name?

# APPENDIX

**1840**

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15

1       A.     Michael Davis Guider (phonetic

2  spelling).

3       Q.     And with respect to Michael Davis

4  Guider, do you know his date of birth?

5       A.     I'm going to go with ███████.

6       Q.     Are you guessing?

7       A.     I'm pretty sure.  I know it's 19██.

8  That's for sure.

9       Q.     You said the ambulance had left.

10      A.     It did.

11      Q.     Who took her?  Who left in the

12 ambulance, if you know?

13      A.     The 2-and-a-half year old, V████

14 Davis.

15      Q.     And mom nor Michael Davis went in that

16 ambulance?

17      A.     Neither one of them went in the

18 ambulance.

19      Q.     Do the Troy Police prevent either

20 party from going in an ambulance?

21      A.     No, we would not.

22      Q.     Would the paramedics -- have you

23 worked with paramedics before?

24      A.     Twenty-six years.

47

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15

1    Q.    And do they prevent a parent or a

2    legal guardian to go with a child in an

3    ambulance?

4    A.    Absolutely they would let them go.

5    Q.    Would let me go?  They wouldn't

6    prevent them from going --

7    A.    They would not stop them.  No.

8    Q.    And once you arrived at this address,

9    February 26th, 2015, describe what you did.

10   A.    Well, we spoke to Michael and Rebecca

11   just briefly, and asked them if they would come

12   down to the police station and talk to us because

13   we didn't know what was going on yet.

14        So myself and my partner, Chuck

15   McDonald, asked Michael to go with us.  Michael

16   sat in the front see, because he's a very big

17   fellow, and Chuck sat in the backseat, and we

18   drove down to the police station.  Rebecca was

19   brought down by one of the patrol officers who

20   was there, and she was brought to the station.

21   Q.    And they both went voluntarily?

22   A.    They did.

23   Q.    And did there come a point in time on

24   February 26th when you had a conversation with

Case 1:17-cv-01290-DJS   Document 123-40   Filed 04/01/22   Page 18 of 70
Case 23-369, Document 44, 04/12/23, 3004738, Page20 of 213

**APPENDIX**                                                    **1842**

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                              48

1    Michael Davis?

2         A.    There did.

3         Q.    Would you describe that for the grand

4    jurors, please.

5         A.    He was sitting downstairs in Chuck

6    McDonald's office, which is right next to mine.

7    We're in the juvenile section of the police

8    department, the back part of it.  And we asked

9    Michael -- well, we started off by asking him how

10   the day went.  Who was at the house.  What could

11   have happened.  And according to Michael, there

12   was nobody at the house but him from the time

13   Rebecca left for work in the morning at 8:30.

14   And when she returned home at 1 p.m., the only

15   person in that house was him and V███ D███

16        Q.    And did you at any point in time

17   verify that information?

18        A.    He did.  We got a statement from

19   Rebecca, we got a statement from an independent

20   witness that she was at work, and we got her

21   Stewart's work records for that day, that she was

22   using the -- the cash register at Stewart's

23   between the hours of 9 a.m. and 1 p.m.

24        Q.    So she was not with the child between

Case 1:17-cv-01290-DJS   Document 123-40   Filed 04/01/22   Page 19 of 70
Case 23-589, Document 45, 06/14/2024, 3604738, Page21 of 213

**APPENDIX**

**1843**

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                    49

1    9 and 1 -- at 9 a.m. and 1 p.m. on February 26th?

2         A.    That's correct.

3         Q.    And did Michael describe the day, or

4    how the day started?

5         A.    He did.

6         Q.    And could you describe that for the

7    Grand Jury, please.

8         A.    Michael said that he woke up to the

9    smell of V█████ pooping in her Pamper.  And

10   they're trying to potty train her, so he

11   immediately made her stop pooping in her Pamper

12   and he guided her towards the back bathroom.  The

13   bathroom was in the back part of the apartment.

14        At that same time Rebecca was leaving

15   and said, goodbye, I love you, to them and walked

16   out the door.  He continued to bring her back,

17   helped her get on the toilet, and I guess she

18   finished pooping, according to him, at 8:30 in

19   the morning.

20        Then after that he brought her back

21   into the living room where he sleeps.  He put a

22   new Pamper on her, he got her something to drink

23   and she didn't want it, and then she was tired at

24   8:30 in the morning and decided she wanted to go

50

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15

1    back to bed.

2         Q.    Can you describe for the grand jurors

3    the layout of the apartment, the size of the

4    apartment?

5         A.    Sure.  It's -- it's not huge, but it's

6    not tiny either.  When you walk in the main entry

7    door you're in like a living room, that's

8    probably about, I don't know, 15, 20 feet by 15

9    feet.  And that's where they have a couple of

10   mattresses and they sleep --

11        Q.    When you say "they" who are you

12   referring to?

13        A.    Oh.  Rebecca and Michael have a

14   mattress and they sleep in there.  There's a T.V.

15   with a -- with a D.V.D. player attached to it.

16   There's a futon to the left, that they can push

17   down into a bed, also.  And then they have a

18   dresser in that room.

19             Immediately to the right of that room

20   is where V███ slept.  And there is a single bed,

21   a bunch of clothes and stuff like that.  She has

22   a dresser, I believe.  And then there's a space

23   heater on the ground to keep her warm because

24   they said that room kind of gets cold.

Case 1:17-cv-01290-DJS   Document 123-40   Filed 04/01/22   Page 21 of 70
Case 20-3689, Document 123-40   04/04/06, Page23 of 243

**APPENDIX**

**1845**

51

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15

1          The next room up is the kitchen, and

2     then after the kitchen is the bathroom.  And

3     that's the entire house.

4          Q.    The wall where Rebecca and Michael

5     sleep, is that a shared wall with V████'s room?

6          A.    It is.

7          Q.    Okay.  From the room where V████ --

8     where Michael and Rebecca sleep, can you see into

9     V███'s room?

10         A.    You can.

11         Q.    Describe what, if anything, he says

12    next.

13         A.    He told me that she went back to bed

14    because she was tired.  And he put a D.V.D. in

15    the recorder and he watched -- National Treasure

16    was the D.V.D. he told me he watched.  He watched

17    the D.V.D. and he fell asleep.

18         Q.    What's the next thing he told you.

19         A.    He told me that he awoke and the

20    credits were playing, and he decided to get up

21    and start making breakfast for him and V████.  He

22    said he called in for V████ a couple of times and

23    she didn't respond.  And we're assuming this is

24    around 12:30 p.m.  So about four hours later.

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                    52

1      Q.    Well, did the defendant at any point

2  in time tell you what time he woke up?

3      A.    He said he thought it was 11 or 12:00.

4  He wasn't sure.  He said he went in to see ▮,

5  she was lying in her bed.  He went to wake her up

6  and shake her, she wouldn't move.  At which time

7  he said that he started what he believed to be

8  C.P.R.  And he started compressions in the room.

9      Q.    Did he tell you how many times he did

10  that?

11      A.    He said in the room he did it once,

12  then he carried her out into the living room, put

13  her on the futon and there he again tried C.P.R.

14  When she didn't respond, he said he tried to get

15  a phone to work, but the phones weren't working,

16  his cell phones.  So he ran up to a neighbor's

17  house, and left V▮ there.  He ran up about

18  five doors, knocked on a friend's house up the

19  street, nobody answered.  He went back again to

20  the house, checked on V▮, who still wasn't

21  moving or breathing, again tried to give her

22  C.P.R.  She didn't respond.  He left the house

23  again, leaving V▮ in the house, proceeded over

24  to the restaurant across the street.  It's

53

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15

1    Testo's Restaurant in Troy, which is kitty-corner

2    to where they live.  He asked if he could use the

3    phone, one of the employees said, here.  You can

4    use my cell phone.  He then called for an

5    ambulance.  He called 9-1-1.  And I believe

6    within the next ten minutes the Fire Department

7    arrived at the scene.

8         Q.   Did he tell you what he did after

9    that?

10        A.   After he left Testo's, he was crossing

11   the street, at the same time the -- V█████'s

12   mother, Rebecca, was pulling in the house.  She

13   had gotten a ride from Mr. Brown, who was

14   dropping her off after her shift at Stewart's.

15   He went and said, she's not breathing.  She's not

16   breathing, to Rebecca.  And at the same time the

17   Fire Department was pulling in and the police

18   were pulling in.  And he said that was it.

19        Q.   Did -- at any point in time did he

20   describe how V█████ was in the morning?

21        A.   He said she was a little slow to the

22   go.  I mean, he was -- she just wasn't, like, all

23   with it.  But she walked to the bathroom fine,

24   she wasn't thirsty.  He said she had had a cold,

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                54

1    but that was about a week before.  She -- they

2    given her some over-the-counter Motrin from

3    Family Dollar.  She was fine.  She hadn't been

4    sick lately, not in the last few days.

5         Q.    Did he indicate when the last time he

6    had given her Motrin was, or Family Dollar

7    Ibuprofen?

8         A.    He said it was over a few days ago.

9    At least a few days ago.

10        Q.    Did he -- if you would, can you

11   describe what you observed as Michael Davis'

12   demeanor?

13        A.    Calm.  He wasn't running around or

14   screaming like you would think somebody would if

15   they had had a 2-and-a-half year old who wasn't

16   breathing.  And -- and he -- he was kind of

17   subdued.  He wasn't yelling.  He wasn't

18   screaming.  He wasn't claiming, I don't know what

19   happened.  He was just very even keel about

20   everything.

21        Q.    What is Michael Davis' relationship to

22   V███████ D██████?

23        A.    I think in a roundabout way, he might

24   be a cousin of hers.  He's not the biological

**APPENDIX**                                    **1849**

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                    55

1    father, but he might be a cousin of the

2    biological father.  And I'm not sure if there's

3    an actual blood relation or if it's an adoption

4    thing.

5         Q.    Okay.  But, suffice to say, Michael

6    Davis is cousins with V████ D████' biological

7    father?

8         A.    Correct.

9         Q.    What, if anything, did he say after

10   that?

11        A.    Well, once we got to the police

12   station we spoke to him at length.  He told us

13   about his basketball career.  He told us about

14   how he got home the night before after going out

15   to a friend's house.  How V████ was already

16   asleep the night before when he got home around

17   ten.  She was already in bed.  It might have been

18   a little bit latter than that.  That she had

19   eaten SpaghettiOs, he thinks, the night before.

20   But besides that, he talked about himself a lot,

21   that he was the only person in the house.  There

22   was never anybody else in there.  He told me that

23   numerous times.

24              At subsequent interviews he told me he

# APPENDIX

**1850**

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15

1   knew his own strength and he knew that he

2   couldn't harm a child.

3        Q.    Couldn't harm a child or --

4        A.    Well, he knew how to treat a child,

5   and that he had held many children and he knew

6   that he would not hurt them by holding them or

7   doing anything wrong.

8        Q.    Going back to that interview, did he

9   account for -- well, if you know, what time was

10  9-1-1 called?

11       A.    About 1:07 p.m., 1:05 p.m.

12       Q.    And you said he said he woke up

13  between 11 and 12?

14       A.    Yes.  But there was also no clocks,

15  and the phones weren't working, so he really

16  wasn't too sure of the time.

17       Q.    Did he have any explanation for a time

18  difference between 11 and 12 and when 9-1-1

19  arrived?

20       A.    He could not explain that.

21       Q.    Did he talk about V&#9608;&#9608;&#9608;&#9608; being injured

22  or hurt in any way that morning?

23       A.    He said there was nothing wrong with

24  her.  It's normal occurrence for her to be a

Case 1:17-cv-01290-DJS   Document 123-40   Filed 04/01/22   Page 27 of 70
Case 23-589, Document 44, 08/18/2023, 3564738, Page29 of 213

**APPENDIX**

**1851**

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                    '57

1    little tired and sometimes go back to bed at 8:30

2    in the morning for a 2-and-a-half year old.

3          Q.    Did he indicate to you how C.P.R. was

4    performed?

5          A.    He did.   He --

6          Q.    Could you describe that, please.

7          A.    He explained to me in -- in -- he

8    would place his hand underneath her back and he

9    would push very gently on the front of her chest

10   and her stomach area, and then he would blow into

11   her mouth a few times.   And he said her chest

12   would rise and the air wouldn't come out.   So he

13   slowly, again, pushed the air out of her and

14   would try blowing in again, but the air wouldn't

15   come out, he'd have to push it out.

16         Q.    Did he tell you how many times he

17   tried that?

18         A.    At least three different times.

19         Q.    And you said that he went for help, he

20   left the child at the house?

21         A.    Twice.

22         Q.    Was anyone home with that child?

23         A.    No one.

24         Q.    With respect to V█████ D█████, do you

1  know what she was wearing on February 26th of

2  2015?

3          A.    I believe she had on a -- some type of

4  nightshirt, with a flower on it, and a Pamper.

5          Q.    And was there any discussion with him

6  with respect to the Pamper?

7          A.    We asked him if he had changed it

8  recently.  We asked him if he changed it after he

9  gave her C.P.R.  We asked him about the one that

10  was on the floor.  And how he stopped her in mid

11  poop from pooping in the rest of it and then got

12  back to the toilet to continue pooping.  He --

13  he -- his explanation was, this is what -- how

14  they do it, and this is how they're potty

15  training her.

16              He stated he had not changed her

17  diaper after C.P.R.  And that was the way we

18  found her.

19          Q.    And with respect to the diaper, were

20  there any observations made at the time that the

21  child was found?

22          A.    I believe the diaper was clean.

23          Q.    When you say "clean," is that dry

24  and --

59

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15

1          A.    Dry and no fecal matter.

2          Q.    Did you have an opportunity to walk

3    through the house?

4          A.    I did.

5          Q.    Did you make any observations with

6    respect to the apartment, and specifically

7    V████'s room?

8          A.    Her bedsheets, it -- it kind of looked

9    like made.  There was a little indentation on the

10   pillow where the head was, and then the sheet was

11   perfect, and the -- and the blanket over the

12   sheet was really neat.  It wasn't like fussed up

13   or messed up or anything.  It was all kind of

14   very neat, like somebody had just got out of bed

15   and pulled everything back up.

16         Q.    And is that the area where Michael

17   Davis described finding V████ D████ unresponsive?

18         A.    Yes.

19         Q.    Was the information -- what you were

20   seeing with your eyes consistent with the

21   information he was giving you?

22         A.    Yes.

23         Q.    It looked like C.P.R. had been

24   performed in that --

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15

60

1    A.    Oh, no.  It -- there was no messy

2    stuff.  He definitely wasn't moving her on top

3    and messing up the sheets.  It just didn't look

4    like it.  But could he have?  I don't know.

5    Q.    And you said with respect to a dirty

6    diaper, you observed a dirty diaper?

7    A.    It was sitting on (sic) the living, on

8    the floor next to a sippy cup.

9    Q.    With respect to V█████, did you have a

10   conversation with Michael Davis about her being

11   in any pain or expressing pain in any way?

12   A.    I did.  And I asked him if she cried

13   at all, if she screamed and yelled when she went

14   back to bed at 8:30 and he said, nope, she didn't

15   say a word.  She didn't yell.  She didn't say she

16   was hurt.  He actually said, usually if she's

17   hurt, she would tell me if something hurt.

18   Q.    And did she indicate to him in any way

19   that she was hurt?

20   A.    No, she did not.

21   Q.    With respect to -- during the course

22   of the conversation, did you ask him about him

23   touching her, or doing anything to her, injuring

24   her in any way?

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                    61

1       A.    I did.  I asked him if maybe by

2   chance, when he brought her back to the bathroom

3   to finish the morning poop, if he was upset again

4   about changing the child's diaper.  I asked him

5   if he had maybe picked her up or squeezed her and

6   said that this is where poop comes from.  Did you

7   actually give her a squeeze and tell her, this is

8   what it feels like and -- and that's how you know

9   when you have to go to the bathroom.  And, again,

10  he said he did not do that.

11      Q.    Did you discuss his size and his

12  strength?

13      A.    We did, at length.  I --

14      Q.    And what was discussed with respect to

15  that?

16      A.    I asked him if he knew that his size,

17  being one 6 foot 10 and 300 pounds, compared to

18  her size, being a tiny little girl, that he

19  wouldn't have to squeeze very hard to hurt her.

20  And he said he knows his own strength and he

21  knows that he would not hurt a child.  He knows

22  how to handle children.

23      Q.    Did there -- anything with respect to

24  the February 26th interview -- anything in the

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                    62

1    February 26th, 2015 interview that gave you any

2    sort of further information?

3        A.    I remember him telling us how he was

4    alone, how there was no one else there on the

5    February 26th, but that interview was very short

6    and brief, because we didn't even know at that

7    time how V█████ had passed.

8        Q.    Did there come a point in time when

9    you re-interviewed and met with Michael again?

10       A.    I met with him two other times.  I met

11   with him on February 2nd of 2015 and --

12       Q.    February 2nd?

13       A.    I'm sorry.  March 2nd of 2015 at the

14   police station, and I interviewed him on tape.

15   And then I met with him again on September 9th at

16   the police station.  Interviewed him a few weeks

17   ago.

18       Q.    Did you learn any other information

19   than that which you previously given to the grand

20   jurors?

21       A.    I believe I've said everything.  I

22   could be missing something.  It's been a while.

23       Q.    During the course of those interviews,

24   if you could recall what was said, in sum and

APPENDIX                              **1857**

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                   63

1   substance, with respect to that day and V█████'s

2   injuries.

3        A.   I -- the last interview I had with him

4   on September 9th, I spoke at length, telling him

5   that we knew now the cause of death, how she had

6   died, and that there had to be somebody who did

7   this to her.  And he stated to me again that he

8   was the only person in the house, there was no

9   one else there the entire day.  He also stated

10  that he knew his own strength, and he knew that

11  he would not harm a child because he knew it was

12  like to use his strength, and he would not do

13  that.  I believe that's everything.

14              (Pause.)

15              MS. HALL:  I don't think I

16       have anything further from (sic)

17       this witness.

18              Do any of the grand jurors

19       have any questions?

20              Yes, ma'am.

21              GRAND JUROR:  I'm

22       confused.  Where did she die?  In

23       the house or in the hospital or in

24       transport?

Case 1:17-cv-01290-DJS   Document 123-40   Filed 04/01/22   Page 34 of 70
Case 23-589, Document 95, 01/18/2024, 3604738, Page36 of 213

APPENDIX                                    1858

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                    64

1                    MS. HALL:  Detective

2          Fountain?

3                    THE WITNESS:  The easiest

4          way to answer that is, the hospital

5          has to pronounce deaths, whether

6          you're dead or not.  So --

7                    GRAND JUROR:  No.  I know

8          that.  But where did -- where did

9          she expire?

10    BY MS. HALL:  (Cont'g.)

11         Q.    Do you recall V█████ -- or do you know

12    V████'s condition at the house, at 856 4th Ave.,

13    when 9-1-1 arrived, or the paramedics arrived?

14         A.    She was not breathing, and they were

15    doing everything they could to try and get her to

16    breathe.  She was -- there was no heartbeat and

17    there was no breath at that time.

18         Q.    So the child was in full cardiac

19    arrest?

20         A.    According to the medical people.  I'm

21    not medical people, though.

22                    MS. HALL:  Did that answer

23          your question, ma'am?

24                    GRAND JUROR:  Uh-huh.

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                           65

1               GRAND JUROR:  What time

2      was that?

3  BY MS. HALL:  (Cont'g.)

4      Q.    What time was 9-1-1 called?

5      A.    1:05 p.m.-ish, give or take a couple

6  of minutes.

7      Q.    And with respect to the earlier

8  question, so the actual death was pronounced...

9      A.    At St. Mary's Hospital by the

10  attending physician, whoever that was.

11      Q.    Do you know if they were ever able to

12  revive ▮▮▮▮▮ or get any life back to her?

13      A.    I heard there was some kind of rhythm

14  somewhere, but I don't know --

15      Q.    I want -- if you don't know, don't --

16      A.    I don't know.

17      Q.    Okay.

18               MS. HALL:  Any other

19      questions from the grand jurors?

20               GRAND JUROR:  What time

21      did the individual go over to the

22      restaurant to use the phone?

23               THE WITNESS:  About 1:05

24      p.m.  They were there within five

Case 1:17-cv-01290-DJS   Document 123-40   Filed 04/01/22   Page 36 of 70
Case 23-589, Document 95, 01/18/2024, 3604738, Page38 of 213

APPENDIX                          1860

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                    66

1          minutes of him calling, the Fire

2          Department had showed up.

3   BY MS. HALL: (Cont'g.)

4          Q.    And is the Fire Department who

5   appropriately responds in Troy when there's a

6   medical emergency?

7          A.    Yes.   They have -- we have our own

8   ambulance service.   So the Fire Department and

9   the ambulance from Troy go to every medical scene

10  in the city.

11                GRAND JUROR:  Could the

12          damage have been caused by him

13          trying to do C.P.R.?

14                MS. HALL:  I don't believe

15          that's an appropriate question for

16          this witness --

17                GRAND JUROR:  It's the

18          other one.  I'm sorry.

19                MS. HALL:  I --

20                GRAND JUROR:  Because I

21          didn't know there was C.P.R.

22          involved before this.

23                MS. HALL:  Well, your

24          recollection refresh -- you know,

Case 1:17-cv-01290-DJS   Document 123-40   Filed 04/01/22   Page 37 of 70
Case 23-589, Document 95, 01/18/2024, 3604738, Page39 of 213

APPENDIX

**1861**

67

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15

1        your recollection recalls what the

2        testimony was.  If you want to call

3        that witness back, we can do that.

4        If you want to ask for a read back,

5        we can do that as well.

6                    GRAND JUROR:  No.  He

7        didn't say anything about C.P.R.

8                    GRAND JUROR:  Yes, he

9        did --

10                    MS. HALL:  Your

11        recollection -- wait.  That's for

12        your deliberations --

13                    GRAND JUROR:  Sorry.

14                    MS. HALL:  Your

15        recollection re -- recalls.  So,

16        it's -- if the grand jurors want to

17        call back in that witness, we can do

18        that as well.

19                    Any other questions for

20        this witness?

21                    Oh.  I'm sorry.  Yes,

22        ma'am.

23                    THE FOREPERSON:  Mr.

24        Davis, at the time of Mr. Davis

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15

1    spoke that he -- they have a way in

2    to change her diaper.  Was were they

3    have to -- a way to change -- change

4    her diaper?  Was there any kind of

5    noise she was making or any kind of

6    sound?

7              MS. HALL:  If you know the

8    answer to that?

9              THE WITNESS:  He said that

10   she had awoken and he had gotten up

11   because she was pooping in her

12   diaper.  How --

13             MS. HALL:  Not -- in the

14   morning.  At -- are you referring to

15   the afternoon?

16             THE FOREPERSON:  I'm

17   referring when he first spoke, that

18   he got up to change her --

19             MS. HALL:  Okay.

20             THE FOREPERSON:  -- to

21   change her diapers.

22             MS. HALL:  Okay.  Thank

23   you for clarifying.

24             THE WITNESS:  He had told

Case 1:17-cv-01290-DJS  Document 123-40  Filed 04/01/22  Page 39 of 70
Case 23-589, Document 95, 01/18/2024, 3604738, Page41 of 213
**APPENDIX**                                              **1863**

69

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15

1      me that he had heard her, and that's

2      when he woke up because he knew she

3      was pooping in her diaper.  How he

4      knew, I don't know --

5            THE FOREPERSON:  Heard her

6      doing what?

7            GRAND JUROR:  Pooping --

8            MS. HALL:  He can only

9      answer the question as to what he

10     was -- what he told him --

11           THE WITNESS:  He said he

12     knew she was pooping.

13           MS. HALL:  And those are

14     Mr. Davis' words?

15           THE WITNESS:  They are.

16   BY MS. HALL:  (Cont'g.)

17      Q.    And with respect to V███████'s activity

18   that morning, did he describe that to you?

19      A.    Just that she had awoken and she was

20   pooping.  And -- and I helped -- you know, I

21   started changing her and told her to stop and

22   brought her to the bathroom.  That's what he told

23   me.

24      Q.    Other than being tired, as you

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15

70

1    testified to earlier, did he mention that she

2    was --

3        A.    She wasn't thirsty.  She took the

4    sippy cup and she didn't take a drink.  She put

5    it to her mouth and tasted it and put it down.

6              THE FOREPERSON:  So he --

7          so he changed her and brought her

8          back into the area where she --

9          where he went to go change her?

10              MS. HALL:  Well, we can

11          re-ask that question, if you --

12    BY MS. HALL:  (Cont'g.)

13        Q.    If you would, Detective Fountain, what

14    did Michael Davis tell you he did after changing

15    her, or tell -- tell you what happened after

16    changing █████?

17        A.    After he stopped her from pooping, he

18    guided her back to the bathroom in the back of

19    the house so she could finish going to the

20    bathroom on the toilet, then he brought her back

21    to the living room where he sleeps and he put a

22    new Pamper on her there, and then she went back

23    to bed in the bedroom right next to that room.

24        Q.    Did he put her to bed or did she put

FOUNTAIN - INVESTIGATION - DAVIS, 9/29/15                          71

1    herself to bed --

2         A.    He said she puts herself to bed.   She

3    went in there and went back to sleep, were his

4    words.

5         Q.    And did you find the -- or where did

6    you find the sippy cup and the dirty diaper that

7    you testified to earlier?

8         A.    Right in the living room where Mr.

9    Davis sleeps.

10        Q.    In the area where he testified

11   changing her Pamper?

12        A.    Yes.  And that's between -- you know,

13   it's a common -- it's the living room, and then

14   her doorway into her bedroom.  And that -- it was

15   right before her doorway, in the living room.

16   Sitting on the floor was the crumpled up paper

17   and the sippy cup of water.

18              MS. HALL:  Any other

19        questions from the Grand Jury for

20        this witness?

21              (Whereupon, the Grand Jury

22        indicates in the negative.)

23              MS. HALL:  Let the record

24        reflect in the negative.

**APPENDIX**                                    **1866**

INVESTIGATION - DAVIS, 9/29/15                                    72

1                         Excuse you at this time.

2                         Thank you.

3                         THE WITNESS:  Thanks.

4                         (Whereupon, The Witness

5           was excused.)

6                         (Off the record.)

7                         MS. HALL:  Okay.  That's

8           the conclusion in this -- the

9           conclusion of proof in this case

10          with respect to the investigation

11          into the death of V███ D███.

12                        Is this any additional

13          questions the Grand Jury has at this

14          time?

15                        GRAND JUROR:  Yes.  Can

16          you read back what the doctor said

17          about the C.P.R.?

18                        MS. HALL:  Would you like

19          me to recall the doctor?

20                        GRAND JUROR:  If he

21          doesn't mind.  I just didn't hear

22          the part --

23                        MS. HALL:  Is that the

24          request of the grand jurors?

1  having been duly sworn by The Foreperson of the

2  Grand Jury, was examined and testified as

3  follows:

4  EXAMINATION BY MS. HALL:

5      Q.   Good morning.  Would you state and

6  spell your name again for the record, please?

7      A.   Yes.  My name is Michael Sikirica,

8  S-I-K-I-R-I-C-A.

9      Q.   And, Dr. Sikirica, are you currently

10  employed?

11      A.   Yes.

12      Q.   And what is your employment?

13      A.   Well, I'm the medical examiner for

14  Rensselaer County, and I also have a private

15  business serving many other counties in the area.

16      Q.   And what is "medical examiner for

17  Rensselaer County" mean?  Can you describe that?

18      A.   Well, it's an appointed position.  I

19  was appointed by the director of the Health

20  Department.  I manage the death investigations in

21  this county, the medical/legal death

22  investigations, work with the police department.

23  We have four death scene investigators.  And I do

24  the autopsies that are required in this county.

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1    Q.    What are your -- well, you said you

2    work in other counties with your private business

3    as well?

4    A.    Yes.

5    Q.    Do you do those same responsibilities

6    in other counties?

7    A.    A little bit less.  Many counties in

8    New York State don't have medical examiners or --

9    they have a coroner system.  So they need someone

10   with the training to do the autopsies.  So I do

11   the autopsies for many counties.

12   Q.    And when you say "training", what is

13   your training?  What's your educational

14   background?

15   A.    Yes.  I graduated from med. school in

16   1989, State University of New York in Buffalo.  I

17   did a general pathology residency in Berkshire

18   Medical Center, Pittsfield, Massachusetts.  I did

19   a fellowship in forensic pathology in San

20   Antonio, Texas.  And a fellowship in

21   neuropathology at Brown University in Rhode

22   Island Hospital before I went to work.

23   Q.    And where did you first work, Doctor?

24   A.    I first began working as an assistant

1    to the medical examiner for the State of Rhode

2    Island, and then I became the deputy chief for

3    the State of Rhode Island.  And in 2001 I came

4    back to this area.

5         Q.    Doing the duties and responsibilities

6    you prescribed -- described previously?

7         A.    Yes.

8         Q.    Over the course of your career, how

9    many autopsies would you estimate that you've

10   performed?

11        A.    Well, I know I've done over ten

12   thousand.

13        Q.    And how many of those autopsies have

14   been on children or infants?

15        A.    It would have been at least several

16   hundred.

17        Q.    Do you hold any certificates?

18        A.    Yes.

19        Q.    And what would those be?

20        A.    I'm Board Certified in anatomic

21   pathology, clinical pathology, forensic pathology

22   and neuropathology.

23        Q.    And did there come a point in time

24   when you were asked to perform an autopsy on a

Case 1:17-cv-01290-DJS   Document 123-40   Filed 04/01/22   Page 46 of 70
Case 23-589, Document 65-2, 08/04/2024, 3604738, Page48 of 213

**APPENDIX**                                                    **1870**

18

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1   person by the name of V▬ D▬?

2        A.    Yes.

3        Q.    And do you recall what date that was?

4        A.    I believe that was on the 27th of

5   February.

6        Q.    Of what year?

7        A.    This year.

8        Q.    2015?

9        A.    Yes.

10       Q.    Okay.  And do you recall V▬ D▬'

11   date of birth?

12       A.    It was in July.  I'd have to look at a

13   copy of my record, if --

14       Q.    You have a copy of your report with

15   you, Doctor?

16       A.    Yes, I do.

17       Q.    And referring to that, will that help

18   refresh your recollection with respect to the

19   autopsy performed on V▬ D▬?

20       A.    Yes.

21       Q.    I'd ask you to refer to that.

22             (Whereupon, The Witness

23       complying with request.)

24       A.    Yes.  Her date of birth was ▬

Case 1:15-cv-01290-DJS Document 112-10 Filed 04/01/22 Page 49 of 70

1    ████████.

2    BY MS. HALL:   (Cont'g.)

3        Q.    At the time of -- when you performed

4    the autopsy on V███ D███, about how long had

5    she been deceased?

6        A.    She had been deceased about 20 hours

7    or so.

8        Q.    Do you know her time of death?

9        A.    It would have been around 2:00 in the

10   evening the day before.

11       Q.    February 26th of 2015?

12       A.    Yes.

13       Q.    And why were you asked to perform an

14   autopsy on V███ D█████?

15       A.    Well, this was an unusual death in a

16   healthy 2-and-a-half to 3-year-old child, that we

17   didn't have a -- we didn't have a reason for

18   V████ to be dead.  So, of course, she does need

19   an autopsy.

20       Q.    And what exactly is an autopsy?

21       A.    Well, an autopsy is an external

22   examination, combined with an internal

23   examination, and it also involves analysis of

24   other things that could be important.  Things

Case 1:20-cv-01290-DJS Document 13-10 Filed 04/01/22 Page 248 of 70

1  like medical records, witness statements, police

2  reports, photographs, other kind of testing like

3  toxicology.  Other specific testing may be

4  X-rays, microbiology testing to see if a person

5  may have an infection.  So it's -- it's a

6  conglomeration of these modalities to determine

7  the cause and manner of death.

8      Q.    And in this particular case of V█████

9  D███, can you describe the procedure that you

10  used with respect to the autopsy?

11      A.    Yes.  In -- in V████'s case, she came

12  to us in a -- in a body pouch.  It was locked up

13  from the hospital where she was pronounced.  We

14  open the pouch, we took some photographs.  We

15  took measurements of her body.  We look for any

16  evidence of trauma.  In her case, we also did a

17  sexual assault kit.  We arranged to have X-rays

18  taken.  X-rays were done in the morgue.  We

19  measured her height and her weight.  Just

20  recorded her general features.  And then we went

21  ahead and we did the internal examination.

22      Q.    Okay.  And with respect to the

23  external examination -- well, let me take a step

24  back.  Who was present doing this autopsy?  Do

Case 1:15-cv-01229-GLS-DJS Document 187-23 Filed 04/01/22 Page 49 of 70

1   you know?

2       A.    The representatives from Troy P.D.

3   were present, including Troy -- Tim Colaneri,

4   Detective Fountain.  And there was another

5   detective, if I could refer here (indicating).

6                   (Whereupon, The Witness

7        examining said document.)

8       A.    It was Charles McDonald.  And there

9   was also the Assistant District Attorney, at the

10  time was Andra Ackerman.

11  BY MS. HALL:  (Cont'g.)

12      Q.    And what is the purpose for Troy

13  Police being present for the autopsy?

14      A.    Well an autopsy can't occur in a

15  vacuum, so we have to have some information of

16  what the police or other people may know about

17  the case.  So they are there to feed me

18  information, I'm there to ask them questions.

19  It's a give and take situation.  And they're also

20  there to take photographs and to collect any

21  evidence that might need to be secured.

22      Q.    And did that occur in ██████'s case?

23      A.    Yes.

24      Q.    And you then testified that you were

Case 1:17-cv-01290-DJS   Document 91   Filed 04/01/22   Page 50 of 70

1    doing observations of her external body?

2         A.    Yes.

3         Q.    What, if any, findings did you find or

4    meet --

5         A.    There was just a very slight lifting

6    of the -- of the toenail along the right great

7    toe.  So that was the extent of it.  It -- there

8    was no trauma -- no significant trauma.

9         Q.    Any bruising noted at all?

10        A.    No.

11        Q.    And then from that point did you begin

12   an internal examination?

13        A.    Yes, we did.

14        Q.    Could you describe that for the Grand

15   Jury, please?

16        A.    Well, the internal examination starts

17   with a "Y" shaped incision that goes down, cross

18   the chest and abdomen.  And then we also, later

19   on, do an incision of the scalp and remove the

20   brain.

21              But the remarkable thing, as doing the

22   "Y" shaped incision, as we cut into the abdominal

23   cavity, there was a large amount of blood that

24   started to ooze from the abdominal cavity.

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1    Q.    And is it normal to have blood -- is

2 that a finding you would normally see in the

3 abdomen cavity?

4    A.    No.

5    Q.    Okay.  And why not?

6    A.    Well, the -- there's no blood

7 circulating in the abdominal cavity.  Your

8 intestines are there, your liver or your spleen.

9 So you don't have free blood in the abdominal

10 cavity.

11    Q.    So it's not something you would see in

12 a normal child --

13    A.    No.

14    Q.    -- a healthy child?

15    A.    No.

16    Q.    Were you able to quantify or qualify

17 or measure that amount of blood in there?

18    A.    Yes, I was.

19    Q.    And what, if you recall, was the

20 measurement?

21    A.    We had about 350 M.L.s of liquid

22 blood, plus a small amount of blood clot, totally

23 and probably about 400 M.L.s.

24    Q.    And based on -- with respect to a

Case 1:17-cv-01290-DJS-Document 25, 04/13/2021  Filed 04/01/22  Page 52 of 79

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1    child of V████'s age, height and weight, that you

2    described taking earlier, how many blood is in

3    her body overall?  Or how much blood -- how much

4    blood flow -- for her age and size, how much

5    blood was in that abdominal cavity overall?

6    Meaning, compared to what her norm -- amount of

7    blood in her entire body is?  Do you follow that

8    question?

9         A.     Yes, I think so.

10                   (Laughter.)

11        A.     The -- the blood volume on a child of

12   -- of V████'s age would be somewhere between 800

13   and 1,000 milliliters.  So there was about 40

14   percent of her blood volume that had leaked into

15   her abdominal cavity.

16             And once it gets into the abdominal

17   cavity it's out of circulation.  So it's not

18   pumped anywhere, it's just internal bleeding.

19   BY MS. HALL:  (Cont'g.)

20        Q.     Can't go through the heart and to the

21   extremities or anywhere else?

22        A.     No.

23        Q.     Okay.  Were you able to determine, at

24   some point, where that came from?

Case 1:15-cv-01290-DoS Document 81-4 Filed 04/01/22 Page 53 of 70

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1        A.    Yes.

2        Q.    Would you describe that for the Grand

3    Jury, please?

4        A.    Well, it was fairly obvious that there

5    were very severe lacerations of the liver.  There

6    were lacerations to the effect that a large

7    portion of liver had actually been torn away.

8              And the liver is -- is an organ that

9    we describe as friable.  And -- and that means,

10   it doesn't have a thick capsule around it, it's

11   kind of crumbly.

12             So when blunt force trauma is applied

13   to the abdomen, we can see damage to the liver,

14   and the liver tears.  It lacerates.  Because

15   the -- it's a crumbly organ, with only a very

16   thin capsule around it.  It -- it's -- it's like

17   no other organ, really, in the body, in that

18   effect, that it is very friable.

19       Q.    And the encapsulation around the

20   liver, was that intact?

21       A.    No.  That was torn.

22             (Whereupon, Grand Jury            MK

23         Exhibits Number 2, 3 and 4 were

24         marked for identification.)

1   BY MS. HALL:  (Cont'g.)

2       Q.    Doctor, I'm going to show you what's

3   been premarked as Grand Juror's Exhibit 2, 3 and

4   4 for identification.

5           I'm going to ask that you take a look

6   at those.  And if you would, tell me what is it

7   you're looking at here?

8                   (Whereupon, The Witness

9       complying with request.)

10      A.    Number -- Number 4 is a laceration on

11  the top surface of the liver.  Number 3 is a

12  closeup of a severe laceration to the top of the

13  liver.  And Number 4 is an additional picture,

14  pretty much the same -- excuse me.  Number -- it

15  would be Number -- looks like Number 4.

16  BY MS. HALL:  (Cont'g.)

17      Q.    And do those pictures fairly and

18  accurately depict V█████ D█████' liver?

19      A.    Yes.  This shows one of the

20  lacerations, it doesn't show them all.

21      Q.    But it -- just -- which laceration

22  does that show?

23      A.    This shows the one on the top, right

24  portion of the liver.

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1      Q.    Other than the exhibit stickers, has

2  that been changed or altered in any way from when

3  you viewed it at the time of the autopsy?

4      A.    No.

5              MS. HALL:  At this time

6       I'm going to ask that Grand Juror's

7       2, 3 and 4 be moved into evidence.

8              (Whereupon, Grand Jury          RCD

9       Exhibits Number 2, 3 and 4 were

10      received into evidence.)

11             MS. HALL:  I'm going to

12      leave up on the table for any of the

13      grand jurors who wish to review

14      those during their deliberation.

15 BY MS. HALL:  (Cont'g.)

16     Q.    Doctor, with respect to the injury,

17 what else did you observe during your internal

18 examination?

19     A.    There was evidence of fracturing of

20 two ribs along the back of the lower right chest.

21 Those ribs were number 9 and 10.

22     Q.    And are those ribs located in the area

23 of the heart?

24     A.    No.

Case 1:17-cv-01290-DJS Document 31-12 Filed 04/01/22 Page 56 of 71

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1      Q.    Are those ribs located in the area of

2    the liver?

3      A.    Yes.

4      Q.    Okay.  Can you describe the ribs of a

5    2-year-old child, or a 2-and-a-half, 3-year-old

6    child?

7      A.    Well, at -- at that age of about

8    2-and-a-half or 3, they're very flexible yet.

9    They -- they're not calcified yet.  It's very

10   hard to detect a fracture by X-ray.

11          When we took the X-rays we did not see

12   a fracture, but it was quite obvious, when you

13   got in there, that the ribs were broken.  And

14   when the ribs broke, they torn some small blood

15   vessels in the area and there was actually

16   hemorrhage around the fracture site.

17     Q.    And you mentioned taking X-rays.  You

18   took X-rays with -- of V        ?

19     A.    Yes.

20     Q.    And did they show anything?

21     A.    No.  No.

22     Q.    In addition to your internal

23   examination, with the injury to the liver and to

24   the ribs, did you make any other observations

JOAN L. BURLEIGH (518) 767-3030

Case 1:17-cv-01290-DJS Document 71-1 Filed 04/01/22 Page 53 of 79

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1    with respect to internal injury?

2         A.    There was no other internal injury.

3         Q.    Could the ribs, broken ribs, you said

4    they're in the area of the liver, is that

5    correct?

6         A.    They're behind the liver --

7         Q.    They're behind?  Could those ribs,

8    broken ribs, have caused damage to the liver?

9         A.    No.

10        Q.    In addition to doing the internal and

11   external examination of V█████ D█████, what other

12   tests did you run, if any?

13        A.    Well, we did a full toxicology screen

14   on -- on V████.  We draw -- we drew fluids for

15   toxicology testing.  Those were drugs of abuse

16   and any kind of pharmaceutical drugs.  That only

17   showed the presence of atropine, which is a

18   substance they would use in the emergency room to

19   try and revive her.

20             Oh.  I did cultures from her blood and

21   her lungs.  These are a small piece of tissue

22   that are taken to see if anything grows, any

23   bacteria or virus will grow, that she may have an

24   infection.  That was negative.

1           I also took multiple -- I took 25

2    sections of various internal organs for

3    microscopic examination, and they didn't really

4    show any significance.

5           And I sent a dried blood sample out

6    for what we call a metabolic screening analysis.

7    These are -- this is a screening that's done

8    typically at birth in the hospital.  This is New

9    York State mandated law, that if you're born in

10   the hospital, a couple of drops of blood are

11   taken, then they're sent to the Health Department

12   Laboratory.  This detects undiag -- sort of

13   inborn errors of metabolism.  Things that could

14   lead to retardation and things that you may not

15   see initially on -- on a baby.

16          So I sent a sample of that out.  I did

17   detect -- they did detect a slightly elevated

18   thyroid stimulating hormone, but that can also be

19   elevated postmortem.  And it wasn't a significant

20   elevation.

21          So, really, the test showed no

22   evidence of any significant natural disease.

23       Q.    Out of any of the tests that you've

24   just described?

APPENDIX

Case 1:17-cv-01290-DJS    Document 123-40    Filed 04/01/22    Page 59 of 70
Case 20-3665, Document 40, 02/04/2021, 3004736, Page61 of 213

1883

31

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1    A.    Correct.

2    Q.    If V██████ D███ was ill or sick in some

3    respect, or diseased in some represent prior to

4    death, would that have been revealed in some

5    capacity or some form based on the test that you

6    ran?

7    A.    Yeah.    To a medical -- a reasonable

8    degree of medical certainty, there was no

9    evidence of any sickness or illness.

10   Q.    So with respect to the toxicology, did

11   that give you any information with respect to the

12   cause of death?

13   A.    No.

14   Q.    With respect to the slides and the

15   sections you talked about, did that give you any

16   indication or help you contribute to the cause of

17   death?

18   A.    No.

19   Q.    And with respect to the microbiology

20   cultures and met -- or the metabolic screening,

21   did either of them give you any information to

22   help determine the cause of death?

23   A.    No.    They were -- they were all

24   negative.    And, I guess, a negative finding by

1    itself is significant to determine the cause of

2    death.

3        Q.    And why is that?

4        A.    Well, because we ruled out any natural

5    cause of death.  And this massive amount of blood

6    in the abdomen cavity would lead to shock and

7    death.

8        Q.    And about how much time would it take

9    after the initial injury to loss of

10   consciousness?

11       A.    Probably within ten minutes.

12       Q.    And how much time would it take from

13   the initial injury to death?

14       A.    Within about 15 minutes or so.

15       Q.    And in this particular case, Doctor,

16   were you able to ascertain to a reasonable degree

17   of medical certainty what caused the death of

18   V____ D____?

19       A.    Yes.

20       Q.    And, if you would, describe what

21   caused her death to the Grand Jury.

22       A.    It would be hypovolemic shock due to

23   large hemoperitoneum, due to multiple lacerations

24   of the liver, with right rib fractures due to

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1    blunt force trauma.

2         Q.   And in English?

3              (Laughter.)

4         A.   A large amount of internal bleeding

5    into the abdominal cavity due to the severe

6    lacerations of the liver, the tearing injury of

7    the liver, and also a presence of the right rib

8    fractures.

9         Q.   And that's the cause of death,

10   correct?

11        A.   Yes.

12        Q.   And were you able to make a

13   determination with respect to the manner of

14   death?

15        A.   Yes.

16        Q.   And what was that?

17        A.   The manner in this case is homicide.

18        Q.   And what exactly does "homicide" mean?

19        A.   Simply means death at the hands of

20   another individual.

21        Q.   Could this trauma to V████'s interior

22   organs have been caused by some sort of accident?

23        A.   No.

24        Q.   Could she have caused these injuries

1    to her --

2         A.    Well, I -- I -- if I could qualify

3    myself.  It could be something like a car

4    accident.

5         Q.    Have you seen those types of

6    injuries --

7         A.    Yes.

8         Q.    -- previously?

9         A.    Yes.  I've seen those in car accidents

10   and severe trauma like that, but nothing that

11   V███ would have done to herself.

12        Q.    And with respect to the type of injury

13   you observed internally on V███, could that have

14   been as a result of C.P.R.?

15        A.    No.

16        Q.    With respect to the amount of pain,

17   would V███ -- V███ D███ have experienced pain

18   as a result of her injuries?

19        A.    Yes.

20        Q.    Could you describe that for the grand

21   jurors, please.

22        A.    Well, she had broken two ribs.  And

23   rib fractures can be very painful.  The liver

24   laceration, the liver doesn't have much in the

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1    way of a nervous innervation, but the ribs surely

2    do.  So she would have been in pain from the rib

3    fractures.

4         Q.    Would you have expected her -- outward

5    signs of pain or seen outward signs of pain?

6         A.    Yes.

7         Q.    And describe what you would expect to

8    see with those types of injuries.

9         A.    She would have been crying and she

10   would have had a tender spot along the back of

11   her right skin and soft tissue.

12        Q.    Would these injuries have caused her

13   to suffer?

14        A.    Yes.

15        Q.    As a result of the autopsy you

16   performed on February 27th of 2015 of V█████

17   D█████, did you fill out your portion of a Death

18   Certificate --

19        A.    Yes.

20        Q.    -- with respect to your findings?

21        A.    Yes.

22        Q.    I'm going to show you what's marked as

23   Grand Juror's 1, and just ask that you take a

24   look at your portion there.

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1                    (Whereupon, The Witness

2          complying with report.)

3        A.    Yes.

4   BY MS. HALL:   (Cont'g.)

5        Q.    And does that accurately reflect your

6   finding?

7        A.    Yes.

8        Q.    Okay.

9                 MS. HALL:   At this time

10       I'm going to ask that Grand Juror's

11       Exhibit 1 be moved in pursuant to

12       C.P.L.R. 4518 under business record.

13                 (Whereupon, Grand Jury        RCD

14       Exhibit Number 1 was received into

15       evidence.)

16                 MS. HALL:   I'm also going

17       to leave that on the table for any

18       of the grand jurors who wish to view

19       this document as part of their

20       deliberation.

21   BY MS. HALL:   (Cont'g.)

22       Q.    And, lastly, Doctor, is there anything

23   with respect to the pathology, as well as your

24   internal or external examination, that would

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1    account for why V■■■■ D■■■ would have lost

2    consciousness?

3        A.    She lost consciousness because of the

4    bleeding into her abdominal cavity.   That's why

5    she lost her consciousness.

6        Q.    With respect to the pathology, the

7    toxicology and all the studies, aside from the

8    injury, is there anything else that would have

9    rendered her unconscious?

10       A.    No.

11       Q.    There's no explanation other than the

12   injury that would cause her to become unconscious

13   on February 26th of 2015?

14       A.    Correct.

15            MS. HALL:   I don't have

16        any further questions for this

17        witness.

18            Does anyone else have any

19        questions for this witness from the

20        Grand Jury?

21            Yes, ma'am.   I'd ask that

22        you direct it to me and --

23            GRAND JUROR:   Yes.   I just

24        heard, is it unusual to have no

Case 1:17-cv-01290-DJS   Document 123-49   Filed 04/01/22   Page 66 of 70
Case 23-589, Document 63, ..., 3004738, Page68 of 213

APPENDIX                           1890

                                          38

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1    outer signs when there's an injury

2    to a rib or a fracture?

3              You said there was no

4    outer signs, you know, that there

5    was an injury.  Is that --

6              MS. HALL:  Doctor, I'll

7    ask that you -- do you ask -- answer

8    that question from grand juror.

9              THE WITNESS:  Yes.  It's

10   not unusual.  This -- this injury

11   occurred due to compression of the

12   abdominal cavity, blunt force

13   compressive injury to the abdominal

14   cavity, leading to a lot of blood

15   into the abdominal cavity

16   (demonstrating.)  But it's not

17   necessarily going to bruise anything

18   because it's a soft part of the

19   body.  So you're not going to push

20   the skin or the soft tissue against

21   a bone or something where you're

22   going to really compress it.  It's

23   flexible, it's going to squeeze in.

24   And as it squeezes in, as the

Case 1:17-cv-01290-DJS   Document 123-40   Filed 04/01/22   Page 67 of 70
Case 23-589, Document 53-3, 09/12/2024, 3604738, Page69 of 213

**APPENDIX**                                                    **1891**

39

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1        abdomen squeezes in it tears the

2        liver.  It doesn't necessarily leave

3        any marks on the outside.

4    BY MS. HALL:   (Cont'g.)

5        Q.    And when you say "blunt force trauma,"

6    and you're indicating with your hand, as part of

7    your determination to the manner and cause of

8    death, could you describe for the Grand Jury the

9    mechanism that would have caused this injury?

10       A.    It would be a blunt force trauma of a

11   compressive nature, a squeezing nature to the

12   abdomen.

13                   MS. HALL:  Any further

14       questions from the Grand Jury?

15                   THE FOREPERSON:  What was

16       the result from her metabolic

17       screening?

18                   MS. HALL:  Doctor, if you

19       could, please.

20                   THE WITNESS:  Yes.  It

21       just showed a mildly elevated

22       thyroid stimulating hormone.  But

23       that's a -- could be easily

24       explained as a heart attack because

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1      that hormone elevates after death.

2      And it was only elevated a small

3      amount, and it would not have played

4      into her medical -- any medical

5      conditions or anything.

6  BY MS. HALL:  (Cont'g.)

7      Q.    Would it have caused her to lose

8  consciousness --

9      A.    No.

10      Q.    -- in any respect?

11      A.    No.

12              MS. HALL:  Any other

13      questions from Grand Jury?

14              THE FOREPERSON:  If I

15      could finish.  From -- at postpartum

16      (sic), that's performed after

17      metabolic screening in all of your

18      autopsies?

19              THE WITNESS:  I'm...

20              MS. HALL:  Let me -- I'll

21      direct the question.

22  BY MS. HALL:  (Cont'g.)

23      Q.    Doctor, with respect to the organ

24  sectioning, the metabolic screening, the

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1    pathology that was run, this was all done

2    postmortem, correct?

3        A.    Yes.  Everything was done postmortem,

4    and everything was pended at the time.  On the

5    death certificate you'll see that the "pending"

6    is crossed out.  I didn't make the determination

7    of the cause of death until all the results came

8    back.  But that is -- these are typically all

9    tests that were done postmortem.

10              Now the metabolic screening is the

11    same type of test that's done on a newborn,

12    healthy child.  But I did it on V███ because I

13    didn't have much information about where V███

14    was born.  Occasionally children are born outside

15    of the hospital, things could be missed.  So we

16    decided to go ahead and do the -- the screening

17    tests.

18              MS. HALL:  Grand juror in

19        the back.

20              GRAND JUROR:  Yeah.  With

21        regard to the ribs being broken,

22        could they have been broken like a

23        couple of weeks before that?  Or is

24        this something that happened right

Case 1:17-cv-01290-DJS   Document 123-49   Filed 04/01/23   Page 70 of 70
Case 23-389, Document 1122-49, 05/04/730, Page72 of 219

APPENDIX

1894

42

SIKIRICA - INVESTIGATION - DAVIS, 9/29/15

1    about the time of the death?

2              MS. HALL:  Doctor, if you

3    could answer that question --

4              THE WITNESS:  Yes.  These

5    were very fresh hemorrhages.  There

6    was no healing, there was no

7    discoloration of the blood around

8    them.  They occurred around the time

9    of the lacerations to the liver.

10             MS. HALL:  Any other

11   questions from the grand jurors?

12             (Whereupon, the Grand Jury

13   indicates in the negative.)

14             MS. HALL:  I have no

15   further questions of The Witness.

16             THE WITNESS:  Thank you.

17             MS. HALL:  Thank you very

18   much, Doctor.

19             (Whereupon, The Witness

20   was excused.)

21             (Off the record.)

22             (Whereupon, the People's

23   next witness entered the grand jury

24   room.)

```
 1   UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF NEW YORK
 2   - - - - - - - - - - - - - - - - - - - - - - - - - - -

 3   MICHAEL DAVIS-GUIDER,

 4                              Plaintiff,

 5        - against -        CV:  1:17-cv-01290

 6   CITY OF TROY, RONALD FOUNTAIN, Individually,
     DANIELLE COONRADT, Individually, CHARLES McDONALD,
 7   Individually, TIM COLANERI, Individually,
     ADAM R. MASON, Individually, RENSSELAER COUNTY,
 8   MICHAEL SIKIRICA, Individually, and JOEL ABELOVE,
     Individually,
 9
                              Defendants.
10   - - - - - - - - - - - - - - - - - - - - - - - - - - -

11

12        DEPOSITION of MICHAEL SIKIRICA, held on the 24th

13   day of May 2021, commencing at 9:33 a.m., via ZOOM,

14   before Jeanne O'Connell, Registered Professional

15   Reporter and Notary Public in and for the State of New

16   York.

17

18

19

20

21

22

23
```

```
 1      A.  I think it was early March, yes.

 2      Q.  Early March.

 3          And then was the next thing you issued your

 4  report sometime in August or so?

 5      A.  Yes.

 6      Q.  And then you, thereafter, met with the DA's

 7  office after that?

 8      A.  Yes.

 9      Q.  And then you testified in the grand jury?

10      A.  Correct.

11      Q.  And then you testified at trial?

12      A.  Correct.

13      Q.  Presumably, you met with the DA to prepare for

14  trial at least once or a few times, correct?

15              MS. PECK:  Objection to form.

16              You can answer.

17              THE WITNESS:  Yes.

18  BY MR. KLEIN:

19      Q.  Have I missed any significant meetings in this

20  case, or events?

21      A.  I did meet with the defense attorneys as well,

22  yes.

23      Q.  And was it just -- how many defense attorneys
```

48

```
1      A.  Yes.

2      Q.  Then at some point thereafter you heard about the

3    acquittal?

4      A.  Yes.

5      Q.  And then, how long after that did you reach out

6    to set up this meeting with Joel Abelove and Jessica

7    Hall?

8          Was it upon hearing about the acquittal or weeks

9    or months later, if you know?

10     A.  It would have been very shortly afterwards, maybe

11   the same day.  I instructed one of the investigators

12   that I had to talk to them immediately, and we had the

13   meeting at my office.

14     Q.  Did you convey that message through your

15   assistant that you were upset about how the case went?

16              MS. PECK:  Objection.

17              MS. SPENCER:  Object to form.

18              THE WITNESS:  Yes.

19   BY MR. KLEIN:

20     Q.  How did you communicate that?  Let them know I

21   need to see them right away, or what type of words or

22   message was communicated?

23     A.  Well, I told the investigator for the office that
```

1    I wanted to see them immediately, and they came.

2      Q.   And can you describe, walk us through that

3    meeting?

4         Who was present for it and what was discussed?

5      A.   Well, this is the meeting with Jessica Hall and

6    Joel Abelove.  That was the meeting.  And we discussed

7    the -- we discussed the prosecution ineptness at

8    following through on questioning Dr. Teas.

9         Also, the judge had not given -- in my opinion,

10   the judge had not given me enough time, for 15 minutes,

11   to go over the flaws I found in Dr. Teas' testimony, and

12   I was very frustrated.

13     Q.   So, what was the tone of the meeting?  Was it

14   just you venting or was it -- did they share your

15   concerns, or did they push back on it, or something

16   else?

17     A.   They were like spanked puppies.

18     Q.   What do you mean by that?

19     A.   They were very apologetic and they totally

20   understood where I was coming from.

21     Q.   Dr. Sikirika, were you a little sore, so to

22   speak, from the experience you had the year before on

23   the Adrian Thomas acquittal?

1      Did that prompt some of your feelings in seeking

2  a meeting with the DA directly after this?

3             MS. PECK:  Objection.

4  BY MR. KLEIN:

5     Q.  You can answer.

6     A.  No.  This was a whole different animal.

7      This was my frustration with an attorney that I

8  did not think belonged in a prosecutor's office.  That

9  was the extent of my frustration.

10      This woman may be a fine person, I'm sure she

11  was, but she did not belong in the courtroom.

12     Q.  What did Joel Abelove say in response that you

13  can recall?

14      Did he agree?  Did he say he would look into it

15  or anything else?

16     A.  He did.  He basically said, I understand where

17  you're coming from.  She came highly recommended and I'm

18  very disappointed in her performance.

19     Q.  What about Jessica Hall, what if anything do you

20  recall her saying at the meeting?

21     A.  Basically the same thing.

22     Q.  What else was said at the meeting that you can

23  recall?

1    A.  That was about it.

2    Q.  Was anyone else present at the meeting other than

3    you, DA Abelove, and ADA Hall?

4    A.  No.

5    Q.  To your knowledge, did they take any job action

6    against ADA Chavkin, whether a transfer, demotion or

7    anything else, because of this case?

8              MS. PECK:  Objection.

9              THE WITNESS:  Not to my knowledge.

10   BY MR. KLEIN:

11   Q.  Have you dealt with her again since that case up

12   until today?

13   A.  No, and I never will.

14             (Sikirica Exhibit 2 marked for

15      identification.)

16   Q.  Now, DA Abelove issued a statement to the press.

17   I'm showing it to you now.  Do you guys see this?  We'll

18   call this Exhibit 2, Sikirika 2 -- this is Defendant's

19   Response to Plaintiff's Request for Interrogatories and

20   Request for Production of Documents.

21        I will scroll down to page Exhibit C which starts

22   at page 53.

23        Did you ever see or were you aware of the

```
 1        At the trial, did you witness or were you made

 2   aware of the testimony of the responding fire department

 3   witness named Bayly?

 4     A.   Well, I was not aware or -- I was not made aware

 5   of his testimony, but I did have the copy of a statement

 6   that he had previously made.

 7     Q.   Right.  I'm going to flip to that right now on

 8   Exhibit 1.

 9        Michael Bayly, from the City of Troy Fire

10   Department, issued a statement.  The Bates number in

11   Exhibit 1 is 1682.

12        Is this the statement that was in your file?

13     A.   Yes.

14     Q.   So, in this statement, other than receiving this

15   written typed out deposition, did you ever meet or speak

16   with Michael Bayly?

17     A.   No.

18     Q.   Other than receiving written or typed out

19   depositions from other fire department employees, like

20   James Titans, lieutenant, James Lucey, firefighter

21   medic, Frank Shumaker, captain, and maybe others, did

22   you ever speak with any of them?

23     A.   No.
```

1    Q.  Did you come to learn, either during trial or

2   since trial, that Firefighter Bayly testified that they

3   were working on V███ for about 20 minutes, doing I

4   believe as many -- approximately a hundred chest

5   compressions a minute from the time they started working

6   on her in the home.  There was a period of time until

7   they put her in an ambulance, maybe about 10, 15

8   minutes.  And there was another 20-minute period of time

9   where they continued working on her a hundred chest

10   compressions per minute to the hospital.

11         Were you aware of that, of in sum and substance

12   testimony of that nature by Firefighter Bayly?

13    A.  I knew that the child had received CPR

14   resuscitation at the scene and during transport and in

15   the emergency room.

16         I'm not sure I could imagine 100 pumps per

17   minute, but I was aware that CPR had been given to her

18   over a long period, yes.

19    Q.  Actually, I have the details here.

20         Bayly, who was the EMT, said 120 per minute is

21   what he recalled.  16 minutes at home and then 20

22   minutes on the way to the hospital, with three or so men

23   switching because of exertion, to avoid being exerted.

1    Are those facts that you were aware of when you

2  issued your report?

3    A.  Yes.

4    Q.  You knew that there were thousands of chest

5  compressions just done by EMTs alone before she even got

6  to the hospital?

7    A.  Yes.

8    Q.  And then there was a Dr. Crisafulli, an ER

9  doctor, from St. Mary's.

10    Did you have a deposition from her?

11    A.  Yes.

12    Q.  And I'm showing you that, page 1689.

13    This deposition, other than this written

14  deposition, did you ever speak with her?

15    A.  No.

16    Q.  This doesn't say anything about the number of

17  chest compressions that were done by hospital staff,

18  does it?

19    A.  No.

20    Q.  She testified at trial.  Did you know that?

21    Did you see her testimony or did you ever get to

22  read it?

23    A.  No.

1    Q.  Did you have an understanding of that when you

2   rendered your opinions in this case, that there were,

3   more likely than not, 6,000 chest compressions done by

4   fire department and hospital staff?

5    A.  Yes.

6            MS. SPENCER:  Object to form.

7   BY MR. KLEIN:

8    Q.  When medical, EMTs and hospital staff do chest

9   compressions, they are literally squishing the heart so

10   that the blood will pump through it, correct?

11            MS. PECK:  Objection to form.

12            THE WITNESS:  Correct.

13   BY MR. KLEIN:

14    Q.  Were you familiar with literature on CPR-related

15   trauma as of 2015?

16    A.  Yes.

17    Q.  Were you aware that prolonged CPR was

18   significantly associated with a higher incidence of rib

19   fractures?

20            MS. PECK:  Objection to form.

21            THE WITNESS:  Some studies have suggested

22     that, yes.

23   BY MR. KLEIN:

1    Q.   Any reason that you discount those or think that

2  those are not right?

3    A.   Other studies have disclaimed that, have

4  countered that.

5    Q.   Can you point to any of them?

6         Do you have them?

7    A.   The Wake Forest study.  The Wake Forest study.

8    Q.   For 2010?

9    A.   Yes.

10    Q.   Do you agree that CPR typically is performed for

11  less than 30 minutes?

12    A.   In children, it can be prolonged, yes.  Most of

13  the time it's less than 30 minutes, but in children, you

14  want to do as much as possible, and it can go on for a

15  considerable amount of time.

16    Q.   And during CPR sometimes rib fractures can't be

17  avoided.  Is that a fair statement?

18    A.   Can be voided?

19    Q.   Can't be avoided.

20    A.   Can't be avoided, that's correct, yes.

21    Q.   There are studies that document avoidable rib

22  fractures, meaning that hand placement may have been

23  incorrect by trained medical staff, right?

```
 1              MS. PECK:  Objection to form.
 2   BY MR. KLEIN:
 3      Q.  Are you aware of that?
 4          Are you aware of any literature where there were
 5   avoidable rib fractures at the hands of EMTs or medical
 6   staff?
 7              MS. PECK:  Objection.
 8              THE WITNESS:  Yes.  There's
 9       recommendations that certain positions in the
10        hands be avoided to prevent rib fractures.
11   BY MR. KLEIN:
12      Q.  But even -- so is it your understanding, just
13   from the literature and your experience, that even
14   trained EMTs and medical providers trained in CPR can
15   get the hand placement wrong and resulting in avoidable
16   hand fractures -- avoidable rib fractures?
17      A.  I don't quite understand the question.
18          Could you repeat it, please.
19      Q.  Are there incidents that you're aware of either
20   anecdotally, through literature, or through colleagues,
21   of avoidable rib fractures at the hands of well
22   intending EMTs and medical staff?
23              MS. PECK:  Object to form.
```

```
1              THE WITNESS:  I'm not aware of those
2         studies, but I know studies have proven that, if
3         you put your hands behind the decedent and you
4         try to perform CPR, you do risk fractures.
5    BY MR. KLEIN:
6       Q.  Similarly, if you do it on a soft surface you
7    risk fracturing as well, correct?
8              MS. PECK:  Objection to form.
9              THE WITNESS:  Not so much fracturing on a
10        soft surface, but if you do it on your knee.
11             If you take a child and try and perform
12        CPR with the child's back against your knee, you
13        do risk fracture.
14   BY MR. KLEIN:
15      Q.  What were the ribs that were fractured in this
16   case?
17      A.  I believe -- if I can check my report quickly.
18      Q.  Yeah.
19      A.  They were the posterior aspects of the ninth and
20   tenth rib.
21      Q.  Are you aware of the literature or other reports
22   of ruptured livers attributed to placement of the hands
23   or compressions that are too vigorously applied by
```

1 mechanisms that could be from the I think we said 6,000

2 compressions?

3          Could they be caused by that?

4               MS. PECK:  Objection.

5               THE WITNESS:  No.

6 BY MR. KLEIN:

7    Q.  No?  Not at all?  No way?

8               MS. PECK:  Objection to form.

9               THE WITNESS:  Correct.  No way.

10   Q.  Why no way?

11   A.  Because these liver lacerations were extremely

12 severe.  Actually, a portion of the liver had been torn

13 away from itself.  These went way beyond anything

14 described in the literature or in my experience.  I have

15 never seen more than one laceration of the liver with

16 any person suffering from CPR, and I've never seen

17 lacerations over the top of the liver like that.

18          These were a question of quantity.  The quantity

19 of the lacerations, the five of them, are way beyond

20 what would be expected in any kind of CPR situation.

21   Q.  So, do you dispute that V███ D███ was found

22 unresponsive, possibly in cardiac arrest, before any

23 compressive compression was done to her by Michael Davis

Case 1:17-cv-01290-DJS Document 95-4 1/23/2024 Filed 04/01/22 Page 215 of 45

1   as described in the video?

2       A.  I can't dispute that, but I can't confirm it

3   either.  I can't confirm she was in cardiac arrest.

4       Q.  If you can't dispute it, how do you know she

5   hadn't already -- she wasn't already postmortem when

6   Michael Davis attempted just a few efforts at CPR?

7       A.  Well, I found no reason for her to be dead.

8       Q.  You heard or -- you heard and you read Dr. Teas'

9   testimony about sudden unexplained death, right?

10      A.  Yes.

11      Q.  Is that something that you credit as a cause of

12  death?

13      A.  No.

14      Q.  What is sudden unexplained death and can you tell

15  us what your view on that is as a diagnosis?

16      A.  Are you referring to SUDI or SIDS?

17      Q.  Well, this would be a SUDI situation because of

18  her age, right?

19      A.  No, it wouldn't be.

20      Q.  It would be a SIDS?

21      A.  No.  It wouldn't be a SIDS at all.  It would be

22  neither.

23      Q.  Well, Dr. Teas testified that it was a SUDI

1    hospital has prolonged CPR.  It's very, very common.

2         I wish the EMTs would leave them at the scene,

3    actually, when they know they're dead, because now you

4    complicate it with all the therapeutic changes that are

5    going to occur.

6         They do what they have to do to save the child's

7    life, so they do prolong CPR all the time.  It's very,

8    very common.  And I've never in my career seen anything

9    like these liver lacerations from CPR.

10   Q.  Well, do you think it would have been important

11   to know how the fire department employees actually did

12   the CPR by speaking with each one of them?

13        Same with the emergency room personnel.  Was that

14   something that would have been helpful for you to rule

15   out CPR post injuries as being postmortem or premortem?

16   A.  No, because they are trained how to do the CPR

17   properly and I assume they would do it properly.

18   Q.  Right, but we all know that people make mistakes

19   or, you know, even well-intentioned medical

20   professionals could get it wrong, which is why there are

21   CPR injuries that are not intended but may occur; is

22   that fair?

23   A.  I suppose that's fair.

**APPENDIX** 1911

1    Q.  So, what would be the reason to not interview the

2  fire department?  In a case like this where there's such

3  extreme injury as you described to the liver, that

4  you've never seen before, why make the assumption that

5  they did it properly or they were well trained?

6        What if they weren't?  What if you could have

7  helped expose that they weren't and maybe they had a

8  real system failure here in how they do CPR in infants?

9        Maybe they knew how to do adults well but they

10  didn't know how to adjust it to this size to V███'s

11  stature?

12        You just never evaluated any of that, did you?

13          MS. PECK:  Objection.

14          THE WITNESS:  No, I did not.  I trusted

15      the CPR was done properly by the trained

16       personnel.

17  BY MR. KLEIN:

18    Q.  If it was not, and we don't know whether it was

19  or was not because you didn't speak with them, that

20  could be a contributing cause to the rib and liver

21  injuries, whether or not that caused the death, correct?

22          MS. PECK:  Objection to form.

23          THE WITNESS:  Even with an untrained --

1          even with improper CPR, these injuries are beyond

2          what would be expected in any CPR situation.  The

3          injuries are blunt force, severe, compressive

4          injuries to the abdomen.

5    BY MR. KLEIN:

6      Q.  So, the theory is that this man just squeezed a

7    baby for no reason to do CPR but it was really an act of

8    abuse?

9          What is your thought about why this happened?

10              MS. PECK:  Objection to form.

11              THE WITNESS:  I have no thoughts about

12          why it happened.  I don't make that assumption

13          why it happened, but I can tell you that it

14          happened because someone applied very severe

15          compressive injuries to that child's abdomen,

16          crushing two breaks -- breaking two ribs and

17          crushing the liver.

18   BY MR. KLEIN:

19     Q.  But you would never know if it's someone or if it

20   was multiple people because you never specifically

21   inquired with Bayly or any of these other fire

22   department personnel or medical, ER personnel, correct?

23              MS. PECK:  Objection.

```
 1              Brett, you're asking and answering the
 2      same question over and over again.
 3              MR. KLEIN:  You can object to form.
 4              THE WITNESS:  So, you're asking me why I
 5       didn't interrogate the EMS people?
 6  BY MR. KLEIN:
 7    Q.  Not interrogate, more just interview them so that
 8  you were -- had clear understanding of the nature of the
 9  CPR intervention in this case.
10    A.  I simply assumed they knew how to do it in
11  children.
12    Q.  Is that an assumption that in retrospect would
13  have been better not to assume in a case like this?
14              MS. PECK:  Objection.
15              THE WITNESS:  No.
16  BY MR. KLEIN:
17    Q.  When they testified at trial to collectively
18  6,000 chest compressions, is that something that you
19  fully expected at trial, or were you surprised that it
20  was that long?
21              MS. PECK:  Objection.
22              THE WITNESS:  No.  Again, Brett, as I've
23       said, you know, these children receive very
```

```
 1       prolonged CPR.  So, the number is -- sounds like
 2       a lot, but it's common.  It's very common in my
 3       opinion.
 4  BY MR. KLEIN:
 5     Q.  In terms of the fluid in the abdominal cavity,
 6  the bleeding, the internal bleeding, every time there
 7  was a pump of the heart that's pumping blood through the
 8  heart to the liver?
 9     A.  As effectively as possible, yes, but it's pumping
10  actually blood to the liver but throughout the entire
11  body as well.
12     Q.  Do you agree that liver lacerations typically do
13  not kill people instantly or quickly, that it's a slow
14  bleeding organ?
15     A.  It would depend on the severity of the
16  lacerations, definitely.
17     Q.  Do you agree that each chest compression was a --
18  do you agree that a human like V█████ D█████ can bleed
19  postmortem, that she could continue to bleed after her
20  -- after she was in cardiac arrest and dead?
21     A.  There may be postmortem bleeding.  I agree with
22  that, yes.
23     Q.  You have cases where you have to use suction and
```

Case 1:17-cv-01290-DDS Document 95-94 173024 - Filed 70970122 9 Page 211 of 45

1    you see bleeding as much as a day after a death?

2         Have you had that experience?

3    A.   Yes.   I've used suction after cases of CPR with

4    liver lacerations.

5    Q.   So, when you're seeing 350 or 400 CCs of blood or

6    is it MLs or CCs?   I'm sorry.

7    A.   ML is equivalent to a CC.   They're basically the

8    same thing.

9    Q.   So, when you're seeing that much blood in an

10   abdominal cavity, are you correct in assuming the whole

11   amount was present in a case like this when V█████ died,

12   or do you assume that there was a significant amount of

13   blood pumped in through extensive CPR efforts?

14              MS. PECK:   Objection.

15              THE WITNESS:   Well, I would always assume

16        that some of it could be accounted for by CPR.   I

17        would, yes.

18   BY MR. KLEIN:

19   Q.   Do you note that in your report anywhere?

20   A.   No.

21   Q.   Any particular reason why not?

22   A.   Because it's simply an assumption.   I tend to

23   report what I see.

1    Q.  Well, wasn't it an assumption that it was Michael

2  Davis that did the compression but not the EMTs that

3  caused the injuries, whether or not they caused the

4  death?

5        Didn't you make an assumption there that they

6  just did it right so he must have been the one who did

7  it wrong?

8    A.  Well, he illustrated doing something to the

9  child.  So, he's the one who did the compression of the

10  abdomen.  So, I assumed that he is the one who did it.

11    Q.  Well, when they did CPR, they would have done

12  compression of the abdomen as well; would they not?

13    A.  No.  They would have been working on the chest.

14    Q.  But with such a small body, the hand would have

15  -- if they used the hand rather than fingers, they would

16  have been in the area of the chest cavity, correct?

17    A.  Well, they would have been in the area of the

18  liver possibly, yes, but they would have concentrated on

19  the chest.

20    Q.  So, I'm sorry if you asked and answered this, but

21  I don't recall.

22        Do you agree that liver lacerations typically

23  bleed slowly?

Case 1:17-cv-01290-DDS Document 95-1 12/18/2024 - Filed 04/01/22 Page 23 of 45

1    A.  I would agree if they're small lacerations, yes.

2    Q.  So, in this case, was it a large one or was it a

3  small one that would be the type that bleeds slowly?

4    A.  These lacerations would have bled profusely,

5  because they were very large and a portion of the liver

6  had actually been torn away.

7    Q.  Did you consider, in your evaluation in this

8  case, that -- withdrawn.

9      You testified at trial that this would have been

10  very painful for V█████, that just the broken ribs alone

11  she would have been screaming and crying, correct?

12         MS. PECK:  Objection.

13         THE WITNESS:  I don't recall if I used

14    the words "very painful".  I may have.  But the

15    ribs would have been painful, yes.

16  BY MR. KLEIN:

17    Q.  So, what do you make of the fact that she was not

18  responsive and flat lining asystole when they got there?

19  There was no reports of her screaming, crying or

20  anything like that, and the only report was from the

21  father that she just was lethargic and then didn't wake

22  up.

23      Would you expect that there would have been a

Case 1:17-cv-01290-DDC Document 95-04 173/2021 Filed 07/01/22 Page 24 of 45

1    witness to her screaming, whether by EMS, by EMTs or by

2    neighbors or anyone else, and is there any significance

3    if there is no note of that in this case?

4               MS. PECK:  Objection to form.

5               THE WITNESS:  No, I don't.

6               I think she had already passed out from a

7          significant loss of blood.  That's my assumption.

8    BY MR. KLEIN:

9       Q.   How do you know she didn't pass out from whatever

10   caused her to pass out which lead to Mr. Davis being

11   concerned that she was passed out?

12              How do you know that?  Other than that it's

13   unexplained, which is rare but it happens.

14      A.   You're asking me to chase gremlins.

15      Q.   No.  I'm asking you -- this is what Mr. Davis,

16   who has been found not guilty, said from his first

17   interview on the night of the incident, to his recorded

18   interview that you were given, to a subsequent interview

19   that he did right before the grand jury, to his

20   testimony at trial, and he was consistent about that.

21   Doesn't mean, you know, and so, he -- there's no other

22   account other than that she was unresponsive.

23              We may assume she was because you see this

1  damaged her liver, but crediting that she was

2  unresponsive, how do you know that there was not some

3  unexplained cause of death, even if it's extremely rare,

4  that this was not one of those situations?

5          MS. PECK:  Objection to form.

6          THE WITNESS:  You could never, ever rule

7     out that in any circumstances if you wanted to

8     use that logic, because even a traffic accident

9     could have been caused by some arrythmia rather

10     than a drunk driver.  Even a person who dies of

11     pneumonia may have some cardiac arrythmia that

12     went undiagnosed.

13          That's why we do a complete autopsy on

14     these children.  We look for anything that we can

15     rule out that would put her in a state of

16     unconsciousness or cardiac arrest.  We look for

17     bacterial infections.  We look for viral

18     infections.

19          I sent out a metabolic screening to make

20     sure she didn't have an inherited disease that we

21     could not detect.

22          We took x-rays.  We did a full workup on

23     this child to rule out any reason that she would

1    be deceased that could explain why he supposedly

2    did this.  I could find no reason, other than

3    this mysterious sudden death, which she had no

4    symptoms of prior.

5              It's possible, I will not say it's

6    impossible, but it's very, very highly unlikely

7    that she had died from a natural event before

8    this series of events.

9    Q.  When you're charging someone -- when you're

10   ruling this a homicide rather than, at most,

11   undetermined, it's foreseeable to you that someone is

12   going to be charged with murder and face life in prison;

13   is that fair?

14   A.  I would assume that, yes.

15   Q.  So, why not call this at most undetermined and

16   let the prosecutor decide if there's criminality?

17             If that's something you can't exclude, and the

18   only firsthand account, corroborated by his wife, that

19   she was up that morning but sluggish and then went back

20   to bed and then was unresponsive before any chest

21   compressions, and before 6,000 compressions by EMS, why

22   not say this is at most undetermined?  It didn't

23   preclude a prosecution, did it?

Case 1:17-cv-01290-DDD Document 95-31 11/22/21 Filed 07/01/22 Page 227 of 45

1          MS. PECK:  Objection.

2          THE WITNESS:  Well, even by calling it a

3   homicide does not guarantee a prosecution.  The

4   district attorney can do whatever he wants to do

5   or she wants to do to pursue this.

6          If the district attorney seriously thinks

7   that Mr. Davis did this in a flurry of panic or

8   whatever, he's free not to prosecute this.  My

9   homicide ruling is only my ruling for the death

10   certificate.  Whatever they do with it is up to

11   them.

12 BY MR. KLEIN:

13   Q.  You looked at the video -- well, apparently it's

14 part of your file but we don't have it here.

15       Is that the video from Mr. Davis's interview with

16 Detective Fountain on March, I believe, 2nd of 2015?

17   A.  Yes.

18   Q.  So, you saw his interview and you determined that

19 he committed a murder; is that fair?

20         MS. PECK:  Objection.

21         THE WITNESS:  I never determined murder.

22 BY MR. KLEIN:

23   Q.  I'm not saying you made a legal determination,

1    but you determined -- his statement and demonstration of

2    compression, you determined that to be the cause of

3    death rather than looking at -- and you assumed that the

4    EMTs and hospital staff acted appropriately, you linked

5    it to him based on the interview; did you not?

6                  MS. PECK:  Objection.

7                  THE WITNESS:  Well, I linked the pattern

8         of injuries to be the most consistent, the far

9         most consistent, with what he demonstrated doing

10        to V███.  That's what I linked him to.  That's

11        the only linkage I made.

12        Q.  Well, when you watched that video, did you ever

13   watch it with anyone from the police department and/or

14   the DA's office or did you watch it either alone or with

15   your own staff?

16        A.  I watched it in my office later on after I

17   received it, by myself.

18        Q.  Did you then speak with Detective Fountain,

19   anyone from the DA's office, or anyone else, after you

20   watched it?

21        A.  No.

22        Q.  Did the police department video inform your

23   findings in this case about specifically -- let me

1    scroll to the autopsy report.

2         So, looking at the anatomic diagnoses on page

3    1596 of Exhibit 1, hypovolemic shock due to large

4    hemoperitoneum due to multiple lacerations of the liver

5    with right rib fractures due to blunt force trauma, A,

6    history of decedent reportedly found unresponsive with

7    reported history of attempted CPR, cardiopulmonary

8    resuscitation, by a large adult.

9         So, this part about a large adult, you

10   specifically incorporated what you were informed by the

11   police and what you saw in the video in this autopsy

12   diagnosis, correct?

13              MS. PECK:  Object to form.

14              THE WITNESS:  Yes.

15              MR. KLEIN:  Why don't we take a break

16      now.

17              (Recess taken.)

18   BY MR. KLEIN:

19     Q.  Good morning, Dr. Sikirika.  We just took about a

20   20-minute break.

21         Given the break, is there anything you wish to

22   clarify, change or correct with your testimony so far

23   today?

1    A.  Yes, please.

2         With regard to the meeting that I had with

3    Jessica Hall and Joel Abelove, that didn't occur after

4    the verdict.

5         That actually occurred after I witnessed the

6    testimony of Dr. Teas and the prosecution's line of

7    questioning.  That's the day that I insisted on seeing

8    them.

9         As soon as that testimony of Dr. Teas was done

10   and I wasn't allowed a chance to give a rebuttal,

11   through the investigator, Jimmy Morgan, I told them that

12   I had to see them ASAP, and they came over that

13   afternoon.

14   Q.  Do you have any e-mails, notes, memoranda, or any

15   other writings, that document this meeting?

16   A.  No.

17   Q.  Either --

18   A.  Didn't have notes on that.

19   Q.  Did Joel Abelove or anyone in his office ever

20   correspond you with in writing, even if you didn't with

21   them in writing, about the meeting?

22   A.  No.  Nothing ever written down.  They were, you

23   know, very attentive and apologetic about the way -- the

1  performance, but nothing was ever put on paper.

2     Q.  Did you ever speak with either or both of them

3  after the acquittal, the not guilty verdict?

4     A.  Not that I recall, no.

5     Q.  Do you recall testifying at the grand jury,

6  quote, with regard to the -- you were asked about

7  district attorneys and police being at the autopsy, that

8  quote, "they are there to feed me information about what

9  the police or other people may know about the case, so

10  they are there to feed me information.  I'm there to ask

11  them questions.  It's a give and take situation".

12        You said that on page one, lines 12 to 21.

13        Do you recall giving that testimony?

14     A.  Yes.

15     Q.  Is that accurate?  You stand by that today?

16     A.  Yes.

17     Q.  So, they're not just there to observe, they're

18  there to feed you information true, correct?

19     A.  Yes.  They're there to give me the information

20  that I'm requesting about the case and let me know about

21  it.

22     Q.  And is it your testimony that their narrative

23  does not influence you in any way, or are you maybe

1     pended the case at that point.

2          So, it is very common I receive things

3     sometimes weeks or months after the autopsy, and

4     I eventually consolidate all those into my

5     report.

6          But the police really didn't influence my

7     report in any way, either -- whatever they

8     wanted.

9  BY MR. KLEIN:

10    Q.   Well, it did influence it.  You used their

11 interview and you used information in this give and take

12 situation, right, to factor into your report.

13         Whether you call that influenced or factoring in,

14 you factored it in.

15              MS. PECK:  Objection.

16              THE WITNESS:  Yes.  I factored it in.

17 BY MR. KLEIN:

18    Q.   Now, you talked about how when you did the

19 Y-shaped incision -- in the grand jury -- there was

20 large amount of blood oozing from the abdominal cavity

21 and you normally don't see free blood circulating.

22         Do you recall that?

23    A.   Yes.

1   called into question.

2       There was a reason why the confession didn't come

3   into trial at the retrial, right?

4          MS. SPENCER:  Objection.

5          THE WITNESS:  Yes, I would have been

6     aware of that, yes.

7   BY MR. KLEIN:

8     Q.  So, given that I'll tell you it was about several

9   months before that trial, several months before V█████

10   D████'s death, did you factor in any question about

11   Ronald Fountain's credibility when you used evidence

12   that he gave you to factor into your autopsy?

13          MS. SPENCER:  Objection to form.

14          MS. PECK:  Objection.

15          THE WITNESS:  Well, the only evidence

16     that I factored into the autopsy finding on the

17     final report was the video of Michael Davis

18     applying pressure or replicating applying

19     pressure to V█████.

20   BY MR. KLEIN:

21     Q.  Did you come to learn that in the Thomas case

22   that anytime Adrian Thomas was throwing the briefcase on

23   the floor the court determined, as a matter of law, it

Case 17-cv-08290-DJS   Document 142-1   Filed 04/01/22   Page 34 of 45

```
 1   BY MR. KLEIN:

 2       Q.  If you had not seen the video, would you have

 3   opined that the injury occurred due to compression of

 4   the abdominal cavity?

 5             MS. SPENCER:  Object to form.

 6             THE WITNESS:  No.  I would have -- could

 7        you repeat that question, please.

 8   BY MR. KLEIN:

 9       Q.  Had you not seen the video of Detective

10   Fountain's interview, would you have opined and

11   testified that the injury occurred due to compression of

12   the abdominal cavity?

13       A.  Yes.

14       Q.  So, you would have found that there was blunt

15   force compressive injury leading to the loss of blood,

16   leading to the blood in the cavity, even if you had not

17   seen the video?

18       A.  Yes.

19       Q.  Now, if you had not seen the video, would you

20   have been able to conclude that it was Michael Davis

21   versus EMTs or emergency room physicians?

22             MS. SPENCER:  Objection.

23             THE WITNESS:  Without seeing the video, I
```

1      would not know who did it, who applied the

2      pressure, but I would not assume that it was EMS

3      or done by CPR.

4  BY MR. KLEIN:

5    Q.  When you put in the words that we've discussed

6  before the break in your anatomic diagnoses, attempted

7  CPR by a large adult, you were specifically linking

8  Michael Davis to the injuries in this case in your

9  autopsy, correct?

10    A.  Not specifically linking him to it.  I didn't

11  mention his name.

12      It said -- if I could refer to my report.  It

13  said, history of decedent, reportedly found unresponsive

14  with reported history, reported history of attempted

15  cardiopulmonary resuscitation by a large adult.

16      He reported that he did this.  There are no

17  witnesses that Michael Davis ever did CPR to this child.

18  None.

19    Q.  Well, he's a witness.

20      What about the 6,000 compressions of attempted

21  CPR by potentially small, medium and large other adults,

22  EMTs and ER staff, what was the reason you didn't put

23  that in here, or did not know of it at the time you did

1    your report?

2              MS. PECK:  Object to form.

3              THE WITNESS:  I knew about it.  It's

4        standard practice to do CPR to a child brought

5        into the hospital.  And the extent of the

6        injuries on V███ were far beyond anything

7        applicable to -- attributable to CPR.

8    BY MR. KLEIN:

9      Q.  Well, as you said earlier, you assume they did it

10   right, but if they didn't, it could be attributable to

11   some or many of the 6,000 compressions.

12        You just don't know either way because you

13   assumed.  Is that fair?

14              MS. PECK:  Objection.

15              THE WITNESS:  It's fair to say that

16        whatever Michael Davis was doing to her abdomen

17        was not CPR.

18   BY MR. KLEIN:

19     Q.  It's also fair that trained -- individuals

20   trained in CPR are -- it's documented that they can

21   cause injuries to ribs and liver related even if they're

22   trained in CPR, correct?

23     A.  That is correct.

1      Q.  So, when you say there's a history here of
2  attempted CPR by a large adult, there's likewise a
3  history of CPR over the course of over an hour by other
4  adults that you don't put in here.
5         I guess my question is just simple.  Why was that
6  history not significant enough to put in your report?
7         Was it an oversight?  Would it have been more
8  complete to put that in your report?
9              MS. PECK:  Objection.
10             THE WITNESS:  It was simply assumed that
11        CPR would have been performed all the way into
12        the hospital.  I just assumed that people would
13        understand that she was pronounced in the
14        hospital.
15             If you read the entire report, there are
16        hospital records.  I simply assumed that CPR
17        would have been performed all the way until the
18        time she was pronounced.
19  BY MR. KLEIN:
20     Q.  Right, but it's not -- my question is different.
21        You may assume that, maybe anybody would have
22  assumed that, but isn't it relevant history here, when
23  you have potential CPR related injuries, isn't it

1    important history so that you could explain why they

2    were not causative of the injuries or death?

3        A.  Well, this is not CPR-related injury.  This is

4    blunt force, compressive injury to the abdomen which

5    does not qualify as CPR.

6        Q.  Well, you seem to document it as a reported

7    history of attempted CPR.  So, you just reported it but

8    you don't believe that's what it was?

9        A.  No.

10       Q.  But when you know, based on your training and

11   extensive experience, and review of the literature, that

12   these types of injuries could be -- could occur due to

13   CPR, even if you don't believe that happened here, isn't

14   it important to document that in your report and rule it

15   out?

16              MS. PECK:  Objection.

17              THE WITNESS:  No.  You said that -- these

18        are not consistent with CPR.  They're vastly more

19        severe than anything that's been seen in CPR.

20   BY MR. KLEIN:

21       Q.  Do you agree the ribs, even the posterior ribs,

22   are stress points that can fracture during CPR, even if

23   the rear ribs are more rarely fractured than the front

1      A.   No.

2      Q.   That's because of the extent of the tearing to

3   the liver that you described earlier?

4      A.   Yeah.

5      Q.   And the amount of blood?

6      A.   Correct.

7      Q.   Any other reason or those are the two reasons?

8      A.   Those are the reasons.

9      Q.   Then we have the Albany Med file.  So that's just

10   an order for radiological consult.

11          Did you request the full skeletal survey?

12     A.   Yes.

13     Q.   Those results were nonsignificant, correct?

14     A.   Correct.

15     Q.   So, this is -- page 1624 is the post-autopsy

16   meeting on March 12, 2015?

17     A.   Yes.

18     Q.   Do you recall when you got the interview, a copy

19   of the video, from March 2nd?

20          In other words, would it have been at this

21   meeting that they brought you a copy of it, or did you

22   have it in advance of this meeting, or subsequent, or

23   something else?

```
 1       A.   I can't remember if I got it at this meeting or I

 2   may have looked at the -- at this myself and been unable

 3   to open it.  Sometimes the Troy PD programs I can't open

 4   on my computer --

 5       Q.   Same here.

 6       A.   -- and we looked at it here, but it was done at

 7   my office.

 8       Q.   Do you know if it was a video watched or at least

 9   given to you during this meeting?

10            Is that typically what happens?

11       A.   I don't recall if it was given prior or after

12   this meeting.

13       Q.   Is there typically a post-autopsy meeting like

14   this a few weeks after the autopsy, or was this unusual

15   in this case?

16       A.   In a child it's pretty normal.

17       Q.   Do you have any notes of the agenda from that day

18   or any notes of what was discussed?

19       A.   No.

20       Q.   Do you remember?

21       A.   No.

22       Q.   The next page, 1625, is the sign-in sheet for the

23   autopsy?
```

Case 1:17-cv-01290-DJS   Document 142-11   Filed 04/01/22   Page 113 of 45

1   but these injuries to the liver would have bled her out

2   very quickly and that would explain why she is

3   unresponsive.

4        Nothing else I did in her examination showed me

5   why she was unresponsive.  Nothing showed why she had

6   any reason to be unresponsive other than these liver

7   lacerations.

8   Q.   Unless it was a sudden, unexplained death that

9   you misdiagnosed, but in your view you correctly

10  diagnosed it, but that would be fair, right?

11       If you misdiagnosed a sudden, unexplained death,

12  that would be an explanation for it.

13  A.   There is no such thing as misdiagnosing a sudden,

14  unexplained death.  It's simply a sudden, unexplained

15  death.

16  Q.   Right.

17  A.   Rule out everything else, and if you have no

18  other cause of death that's what you would put, but

19  there is no cause of death on her other than bleeding

20  from liver laceration as largely appeared to me.

21  Q.   If it was -- assume hypothetically for this

22  question that if the rib injuries and liver injuries

23  were caused by EMS and medical ER personnel, not by

1    Michael Davis, and those injuries caused the death,

2    would it be considered a homicide because it was at the

3    hands of another just medical personnel rather than

4    Michael Davis?

5        A.   It would have probably been left undetermined or

6    accidental.

7        Q.   So, explain why in that scenario, if CPR caused,

8    even if unintended, caused her death, why that would not

9    be a homicide just by virtue of it being at the hands of

10   another.

11       A.   Well, it's at the hands of another during

12   resuscitative process, which she is already in extremis.

13   So, I would not call that a homicide.

14       Q.   So, if Michael Davis -- you have no reason to

15   question his veracity that he was attempting CPR.

16           You just think he did it wrong, correct?

17       A.   No.   I don't think he ever -- he may have

18   attempted CPR after he did something that's not CPR,

19   crushing her abdomen.

20       Q.   So, just to be clear:   The demonstration that you

21   saw on the video that you determined to be attempted

22   CPR, is that the crushing?   Or do you think there was

23   something that he didn't demonstrate that preceded the

1   BY MR. KLEIN:

2     Q.  So, Dr. Sikirika, in this case, were you aware

3   that Detective Fountain was the lead Troy investigator

4   in this case?

5     A.  I don't recall ever knowing that he was the lead,

6   but I knew he was one of the investigators.

7     Q.  Were you aware -- were you working in cooperation

8   with the Troy police department throughout the

9   investigation of this case before it was indicted?

10    A.  Yes.  We cooperated with each other, yes.

11    Q.  Did you have an understanding, during the

12  investigatory phase of this case, that your testimony,

13  plus Ron Fountain's testimony at this meeting with

14  Michael Davis, formed the evidence that would lead to a

15  prosecution in this case?

16              MS. PECK:  Object to form.

17              MS. SPENCER:  Object to form.

18              THE WITNESS:  I didn't know how much

19        Detective Fountain was involved in the case, but

20        I knew that my testimony would be important in

21        the case.  That's all I can tell you.

22  BY MR. KLEIN:

23    Q.  Even though you didn't know it was Ron Fountain,

1      A.   No.   No.   That's about it.

2      Q.   Is there anything about the way the science has

3  evolved, your view of Dr. Teas' testimony, learning your

4  about the details of the 6,000 compressions by Fireman

5  Bayly and Dr. Crisafulli, anything else that impacts

6  your views in this case?

7      A.   No.   Not at this time, no.

8            MR. KLEIN:   Well, thanks for this time.

9      You've been very generous with it.   We appreciate

10     it.

11  EXAMINATION

12  BY MS. SPENCER:

13     Q.   Dr. Sikirika, my name is Rhiannon Spencer.   I'm

14  an attorney for Pattison Sampson Ginsberg and Griffin.

15  I represent the City of Troy, Ronald Fountain, Danielle

16  Coonradt, Charles McDonald, Tim Colaneri and Adam Mason,

17  I believe are all the individuals named from the Troy

18  police department.

19            I just have a few questions for you.   Same rules

20  as with Brett.

21            Let's see.   So, in your experience, are there

22  certain or specific types of scenarios when the police

23  or the ADA or the district attorney's office would

1    request to be present during an autopsy?

2        A.    Yes.  If they know that it is a homicide from the

3    beginning, they're often there.  If there's anything

4    suspicious about a death in a young person, they're

5    often there, even if it's not suspicious.

6            Young people generate more interest,

7    understandably, whenever they die, especially children.

8    Even if the child is in an accident, they may often be

9    there.

10           So, they are there quite a bit if there's

11   anything unusual about a case or unknown.

12       Q.    And is it part of the expected standards or

13   customary practices for medical examiners to work

14   cooperatively with the police and the ADA's office?

15       A.    Yes.  Forensic pathology is a medical legal

16   investigation of death.  So, we have to rely on police

17   many times for things that we don't have access to.

18           Sometimes the DAs have to give us things that we

19   don't have access to.  They may provide subpoenas and

20   get us records if required, but it's a cooperative

21   effort and we all function independently of each other.

22       Q.    And part of that cooperative relationship would

23   include, you know, reviewing the police reports from the

Case 1:17-cv-01290-DJS Document 85-4 Filed 03/29/22 Page 2 of 12
Case 1:23-cv-01290-DJS Document 65 Filed 04/01/22 Page 13 of 12
1940

# APPENDIX

1

```
1
2    STATE OF NEW YORK          COUNTY COURT
     COUNTY OF RENSSELAER      CRIMINAL TERM
3    * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
     THE PEOPLE OF THE STATE OF NEW YORK.
4
     - against -                   Indictment 15-1094
5
     MICHAEL DAVIS,
6                              Defendant.
     * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
7                         Rensselaer County Courthouse
                          Congress and Second Streets
8                         Troy, New York   12180
                          May 3, 2016
9
                         Suppression Hearings
10
     B e f o r e :
11
         HONORABLE ANDREW G. CERESIA,
12             County Court Judge
13   A p p e a r a n c e s :
14   For THE PEOPLE OF THE STATE OF NEW YORK:
15       JOEL ABELOVE, District Attorney
          of Rensselaer County
16          By:   JESSICA HALL, ESQ.,
              Chief Assistant District Attorney
17       Rensselaer County Courthouse
         Congress and Second Streets
18       Troy, New York 12180
19   For DEFENDANT:
20       JOHN C. TURI, ESQ.
         Rensselaer County Public Defender
21          By:   WILLIAM D. ROBERTS, ESQ.
          and JESSICA ZWICKLBAUER, ESQ.,
22            Assistant Public Defenders
         Congress and Second Streets
23       Troy, New York   12180
24   Also Present:
25       Michael Davis, Defendant
         Clerk of the Court
```

**D. Coonradt - Cross by Mr. Roberts**

1  day?

2      A    I remember it being cold.

3      Q    When you say "cold", what do you

4  mean by that?

5      A    Cold.  I was cold.

6      Q    Were you dressed in a jacket?

7      A    No, sir.

8      Q    Were you dressed in gloves?

9      A    No.

10     Q    When you approached my client,

11 you indicated he was on the sidewalk,

12 correct?

13     A    Yes.

14     Q    And he was with another

15 individual or by himself?

16     A    He was with another individual.

17     Q    You would agree with me that

18 based upon your training and experience,

19 you could tell that they were the

20 residents of the apartment, correct?

21     A    I don't know.

22     Q    You would agree with me that the

23 female and my client were -- appeared to

24 be distraught and confused, correct?

**D. Coonradt - Cross by Mr. Roberts**

2      A    Yes.

3      Q    And it was based upon those

4 outward indications you approached them

5 and began speaking with him, correct?

6      A    I'm assuming so.

7      Q    Well, I don't want you to assume.

8 Do you recall?

9      A    Well, I guess.

10     Q    Okay. And it was at this point

11 you had this interaction with my client,

12 correct?

13     A    Yes.

14     Q    Your motivations were to

15 ascertain some information to provide

16 the firefighters, correct?

17     A    Correct.

18     Q    And that after speaking with my

19 client, you went in and spoke to the

20 firefighters, correct?

21     A    Correct.

22     Q    And you also went in the apart-

23 ment at this time to look and see what

24 you could find, correct?

25     A    Correct, in plain view.

**D. Coonradt - Cross by Mr. Roberts**

1

2    A    He didn't seem to understand the

3  question that I asked about what

4  happened.

5    Q    When you say "he didn't seem to

6  understand", what indicated to you that

7  he didn't, that he was having trouble?

8    A    Taking awhile to answer, looking

9  around.

10    Q    Okay.  Would you agree with me

11  that you had an opportunity to observe

12  his face during this conversation?

13    A    That I what?

14    Q    Had an opportunity to look at his

15  facial features.

16    A    Yes.

17    Q    Would you agree he appeared to be

18  distressed?

19    A    Yeah, absolutely.

20    Q    Also he was concerned, correct?

21    A    I couldn't say he seemed

22  concerned.  He seemed upset.

23    Q    Was he crying?

24    A    I don't recall.

25    Q    Was the female crying?

1944

| | |
|---|---|
| 1 | **C. McDonald - Cross by Mr. Roberts** |
| 2 | relative to the passage of time, |
| 3 | correct? |
| 4 | A    Sure. |
| 5 | Q    And you would agree with me at |
| 6 | times a minute can seem like an hour, |
| 7 | correct? |
| 8 | A    True. |
| 9 | Q    And you sat and spoke with my |
| 10 | client for some time but an undetermined |
| 11 | amount of time? |
| 12 | A    Correct. |
| 13 | Q    And you would agree with me he |
| 14 | was cordial with you, correct? |
| 15 | A    Absolutely. |
| 16 | Q    And he was concerned about the |
| 17 | child, was he not? |
| 18 | A    He repeated over and over that he |
| 19 | was trying to figure out what happened. |
| 20 | He doesn't know what happened. |
| 21 | Q    You would agree with me that he |
| 22 | appeared very distressed, correct? |
| 23 | A    He was a little upset, yeah. |
| 24 | Q    What leads you to the conclusion |
| 25 | he was upset?  What was he doing? |

**C. McDonald - Cross by Mr. Roberts**

1  A  Sniffling, that type of thing.

2  Q  When you say "sniffling", what do

3  you mean by that?

4  A  You know, almost on the verge of

5  crying, maybe.

6  Q  For what duration of the small

7  talk that you were making with my client

8  was he almost on the verge of crying

9  before Detective Fountain got back?

10  A  It was off and on while they were

11  talking.

12  Q  So you would agree with me that

13  at a number of different intervals

14  during that time period, he appeared to

15  be physically upset?

16  A  Yes.

17  Q  And part of the reason behind you

18  making small talk with my client was

19  one, to pass the time, correct?

20  A  Correct.

21  Q  And the second was to comfort him

22  and getting his mind off of other things

23  such as the child's care, correct?

24  A  A little bit, yeah.

Case 1:17-cv-01290-DJS Document 85-24 Filed 04/01/22 Page 73 of 12

**C. McDonald - Cross by Mr. Roberts**

1

2 got there?

3    A  I really don't know.  I know they

4 walked in and you could see on the video

5 when he comes in and starts talking and

6 asking the questions, so I really don't

7 know prior to that.

8    Q  Okay.  And you were present for

9 the entire interview?

10    A  Yes.

11    Q  And during the interview, it was

12 primarily questions that were fielded by

13 which detective?

14    A  Sergeant Colaneri.

15    Q  Sergeant Colaneri.  And during

16 these questions, you would agree with me

17 that you had an opportunity to observe

18 my client, correct?

19    A  Yes.

20    Q  And you indicated that you

21 listened to that.  You would agree with

22 me that throughout various portions of

23 that recording, there are what appears

24 to be sniffling, do you recall that?

25    A  Correct.

**C. McDonald - Cross by Mr. Roberts**

Q    What observations physically of my client were occurring when you hear that audio?

A    I don't remember.  I mean, he had his head down sometimes and other times he had his head up and he'd wipe his nose.

Q    Was he crying at times?

A    A little bit here and there, yeah.

Q    How many times did he wipe away tears?

A    I have no idea.

Q    You've been a police detective at this point for how many years?

A    At that time, a couple months.

Q    Well, you'd been a police officer for how long?

A    Probably 21 years.

Q    Based upon your experience, you would agree with me what you observed were genuine concerns over the safety of this child, correct?

                MS. HALL:  Objection,

```
 1  K. Barry - Cross by Mr. Roberts

 2      A    The lights in the living room

 3  were not on, no.

 4      Q    And you testified you went to the

 5  door, knocked on the door and my client

 6  answered the door?

 7      A    Yes.

 8      Q    How was he dressed?

 9      A    I don't recall.

10      Q    And at this juncture, were you

11  aware that the child was deceased?

12      A    Yes.

13      Q    And did you relay that

14  information to Mr. Davis at this

15  point?

16      A    I don't recall.  I know we

17  addressed the report that was regarding

18  the child's death.

19      Q    How did you address that?

20      A    We asked him to relay, you know,

21  the events of the day leading up to what

22  happened with the police arriving and

23  the ambulance arriving.

24      Q    What did he tell you?

25      A    He relayed -- what he told me
```

**K. Barry - Cross by Mr. Roberts**

1

2      was, you know, his events of the day,

3      when he woke up, you know, what happened

4      when he tried to wake her up, and what

5      happened when he tried to call 911.

6         Q    How long did you speak with him

7      for?

8         A    About a half an hour, I think.

9         Q    And you would agree with me that

10     Ms. Parker was in the room?

11        A    She was in the living room.

12        Q    Where in the living room?

13        A    Laying on a mattress on the

14     floor.

15        Q    And how did she appear?

16             MS. HALL:    Objection,

17             relevance.

18             THE COURT:    Mr. Roberts,

19             what's the relevance of that?

20             MR. ROBERTS:    I think on

21             direct they indicated who was

22             present in the apartment, Judge.

23             I think it's relevant to test

24             what her recollection is relative

25             to her testimony on direct.

**K. Barry - Cross by Mr. Roberts**

1

2          If she can't recollect simply

3      how an individual appeared, then

4      it tests whether or not she has a

5      specific recollection of any of

6      the events.

7          THE COURT:  I'll allow that

8      question, but we're not going to

9      go too far down that road.

10          I'll allow that question on

11      that topic.

12    A    She was laying on the mattress.

13 She appeared very sad.  She didn't lift

14 her head off the mattress as we talked

15 to her.

16    Q    And when you were presented with

17 Mr. Davis, he also presented very sad,

18 did he not?

19    A    Yes.

20    Q    And you had an extensive time to

21 speak with him, correct?

22    A    I'm sorry?

23    Q    You spoke with him for an

24 extended time, correct?

25    A    About a half an hour.

**K. Barry - Cross by Mr. Roberts**

Q    He was responsive to your questions, correct?

A    Yes.

Q    He was polite?

A    Yes.

Q    He was distraught.

A    I believe so, yes.

Q    Well, you would agree with me that he had outward physical appearances -- he indicated to you he was in physical distress over the loss of his child, correct?

A    I don't know what you mean.

Q    Sure. When you were discussing the death of V▓▓▓▓, how did he appear?

A    He appeared sad. He was sullen. He talked very quietly when we were talking about that.

Q    Yet despite that, you continued to conduct your interview, correct?

A    Yes.

Q    Would you agree with me he was cordial?

A    Cordial?

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X

MICHAEL DAVIS-GUIDER,

                                    Plaintiff,

        -against-

CITY OF TROY, RONALD FOUNTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES MCDONALD,
Individually, TIM COLANERI, Individually, ADAM R. MASON,
Individually, RENSSELAER COUNTY, MICHAEL SIKIRICA,
Individually, and JOEL ABELOVE, Individually, and JOHN and
JANE DOE 1-10, Individually,

                                 Defendants.

--------------------------------------------------------------------------------X

**DECLARATION
OF KATHERINE
F. MALONEY, M.D.**

17 CV 1290 (DJS)

      KATHERINE F. MALONEY, M.D., declares under penalty of perjury pursuant to 28

U.S.C. § 1746 that the following is true and correct:

    1.      I am board certified in forensic pathology and anatomic and clinical pathology.

    2.      I am currently employed as the Deputy Chief Medical Examiner for the Erie

County Medical Examiner's Office.

    3.      I have been retained by plaintiff Michael Davis to provide an expert opinion in the

above captioned matter as to the cause of death of V.D.  As such, I am fully familiar with the

facts and circumstances of this case.

    4.      My credentials to serve as an expert, including my education, licensures, and

employment history, are set forth in my curriculum vitae, which is attached hereto as Exhibit 1.

    5.      In my capacity as an expert, I reviewed relevant documentation relating to this

matter and rendered an expert opinion as set forth in the November 1, 2021, letter report attached

hereto as Exhibit 2.

6.      All of the opinions set forth in my report are based on my review of the materials listed in said report and my experience and knowledge of forensic pathology and are stated to a reasonable degree of medical certainty.

7.      The opinions set forth in my report truly and accurately reflect my opinions in this matter.

8.      I further submit that I have personally encountered liver injuries sustained during CPR and it is my opinion V.D.'s injuries are consistent with injuries I have observed from CPR.

9.      The longer CPR is performed, the more CPR-associated injuries will be seen.

10.     The size of an individual's hands cannot be medically correlated to the resultant CPR- related injury based on accepted medical research and knowledge.

Dated: Buffalo, New York
        April 30, 2022

By: _____
        KATHERINE F. MALONEY

2

# APPENDIX

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------------X

MICHAEL DAVIS-GUIDER,

                        Plaintiff,

                                                            17 CV 1290 (DJS)

            -against-

CITY OF TROY, RONALD FOUNTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES MCDONALD,
Individually, TIM COLANERI, Individually, ADAM R. MASON,
Individually, RENSSELAER COUNTY, MICHAEL SIKIRICA,
Individually, and JOEL ABELOVE, Individually, and JOHN and
JANE DOE 1-10, Individually,

                        Defendant.

-----------------------------------------------------------------------------------X

## DECLARATION OF KATHERINE F. MALONEY, M.D.

**BRETT H. KLEIN, ESQ., PLLC**
Attorneys for the Plaintiff
305 Broadway, Suite 600
New York, New York 10007
(212) 335-0132

# Katherine F. Maloney, M.D.

Nickel City Forensics, L.L.C.
P.O. Box 114
Getzville, NY 14068
(774) 249-8241
nickelcityforensics@gmail.com

## Professional Experience

**Deputy Chief Medical Examiner**                                    2016 – Present
**Erie County Medical Examiner's Office**
Buffalo, NY

**Associate Chief Medical Examiner**                                 2013 – 2016
**Erie County Medical Examiner's Office**
Buffalo, NY

**City Medical Examiner**                                            2011 – 2013
**Office of Chief Medical Examiner**
New York, NY

## Education and Training

**Fellow in Forensic Neuropathology and Cardiac Pathology**          2012 – 2013
**Office of Chief Medical Examiner**
New York, NY

**Fellow in Forensic Pathology**                                     2011 – 2012
**Office of Chief Medical Examiner**
New York, NY

**Resident in Anatomic and Clinical Pathology**                      2007 – 2011
**New York Presbyterian Hospital - Weill Cornell Medical Center**
Department of Pathology and Laboratory Medicine
New York, NY

**Doctor of Medicine**                                               2003 – 2007
**University of Massachusetts Medical School**
Worcester, MA

**Bachelor of Science, Biology**                                     1998 – 2002
**Boston College, College of Arts & Sciences**
Chestnut Hill, MA

# APPENDIX

Katherine F. Maloney, M.D.

## Academic Appointments

**Clinical Assistant Professor**                                        2014 – Present
**Pathology and Anatomical Sciences, University at Buffalo**
Buffalo, NY

**Clinical Instructor**                                                 2011 – 2013
**Department of Forensic Medicine, New York University**
New York, NY

## Medical Licensing and Examinations

Forensic Pathology Board Certified                     Certification Date 9/4/2012
Anatomic and Clinical Pathology Board Certified        Certification Date 7/29/2011
New York State Medical License – #250114                  Licensure Date 8/22/2008
United States Medical Licensing Examination, Steps 1-3

## Professional Organizations

American Academy of Forensic Sciences                          2014 – Present
New York State Association of County Coroners & Medical Examiners   2014 – Present
National Association of Medical Examiners                       2011 – Present
United States & Canadian Academy of Pathology                  2008 – Present
American Society for Clinical Pathology                         2008 – Present
College of American Pathologists                               2007 – Present

## Service to the Profession

**Forensic Pathology Section Editor**                          2017 – Present
American Society for Clinical Pathology Forensic Pathology Case Reports

**National Association of Medical Examiners**                  2016 – Present
Protocols for Interagency Interactions in Mass Fatality Incidents Committee

**National Association of Medical Examiners**                  2016 – 2017
Forensic Pathology Fellowship Training Committee

**Forensic Pathology Case Reviewer**                          2016 – Present
Sudden Unexpected Death in Childhood (SUDC) Registry and Research Collaborative

**Case Reviewer**                                              2014 – Present
American Society for Clinical Pathology Forensic Pathology Check Samples

# APPENDIX

## Teaching Experience

**CRJ303: Criminal Investigation I Lab**                     2019 – Present
Medaille College
Buffalo, NY

**Child Homicide Investigations**                     2018 – Present
National Criminal Justice Training Center
Fox Valley Technical College

**Forensic Lecture Series**                     September 2017
Jefferson Medical College, Lenox Hill Hospital, Albert Einstein College of Medicine, Weill
Cornell Medical College

**Resident Lectures**                     2013 – Present
**Erie County Medical Examiner's Office**
Buffalo, NY

**Resident Lectures**                     2011 – 2013
**Office of Chief Medical Examiner**
New York, NY

**Small Group Instructor**                     2007 – 2011
**Weill Medical College of Cornell University**
New York, NY

**Teaching Assistant**                     2000 – 2002
**Boston College**
Chestnut Hill, MA

## Research Experience

**Graduate Research**                     2008 – 2011
**New York-Presbyterian Hospital - Weill Cornell Medical Center**
Department of Pathology
New York, NY
    <u>Mentor</u>: Rebecca Baergen
    <u>Project</u>: Types of Maternal Hypertensive Disease and Their Association with
        Placental Pathologic Lesions and Clinical Factors

**Undergraduate Research Assistant**                     2006-2007
**University of Massachusetts Medical School**
Department of Pathology
Worcester, MA
    <u>Mentor</u>: Dr. Ashraf Kahn

Katherine F. Maloney, M.D.

<u>Senior Project</u>: Expression of Vascular Endothelial Growth Factor Subtypes and Their Relationship to Tumor Progression

**Research Assistant** June – August 2004
**University of Southern California**
Division of Research Immunology/Bone Marrow Transplantation
Los Angeles, CA

**Research Assistant** 2002 – 2003
**Massachusetts General Hospital**
Department of Molecular Pathology and Neuro-Oncology
Boston, MA

**Undergraduate Research Assistant** 2000 – 2002
**Boston College**
Department of Biology
Chestnut Hill, MA

**Research Assistant** 1998 – 1999
**University of Massachusetts Medical School**
Department of Molecular Pathology
Worcester, MA

# Publications

---

**Maloney KF**, Webb M. "Overdose death associated with vaping designer fentanyl analogs." *Clinical and Forensic Toxicology News (Quarterly, AACC/CAP),* 2019 December.

Miller AO, Buckwalter SP, Henry MW, Wu F, **Maloney KF**, Abraham BK, Hartman BJ, Brause BD, Whittier S, Walsh TJ, Schuetz AN. "*Globicatella sanguinis* Osteomyelitis and Bacteremia: Review of an Emerging Human Pathogen with an Expanding Spectrum of Disease." *Open Forum Infect Dis* 2017, 4(1): ofw277.

**Maloney KF**, Schoppe CS. "Obesity and non-atherosclerotic cardiovascular disease." *Academic Forensic Pathology* 2013 March, 3(1): 8-12.

Gill JG, **Maloney KF**, Hirsch CH. "The consistency and advantage of therapeutic complication as a manner of death." *Academic Forensic Pathology* 2012 June, 2(2): 176-182.

**Maloney KF**, Baergen RN. "Maternal floor infarction (Massive perivillous fibrin deposition)." *Pathology Case Reviews* 2010, 15(2):58-61.

Katherine F. Maloney, M.D.

**Maloney KF**, Heller DS, Baergen RN. "Types of Maternal Hypertensive Disease and Their Association with Pathologic Lesions and Clinical Factors." *Fetal and Pediatric Pathology* 2012 Oct;31(5):319-23.

## Abstracts and Poster Presentations

**Maloney KF** and Webb M. "An Overdose Death Associated with Vaping Designer Fentanyl Analogs." National Association of Medical Examiners (NAME) Annual Meeting; Virtual: October 16-17, 2020.

**Maloney KF**, Hart AM, Reed S, Mahar TJ. "Your patient is going to die I: A review of iatrogenic injuries." National Association of Medical Examiners (NAME) Annual Meeting; Virtual: October 16-17, 2020.

**Maloney KF**, Hart AM, Reed S, Mahar TJ. "Your patient is going to die II: A review of missed diagnoses." National Association of Medical Examiners (NAME) Annual Meeting; Virtual: October 16-17, 2020.

Hart AM, **Maloney KF**, Yarid NA, Mahar TJ. "Two dead bodies in a cemetery: An unexpected lightning strike." American Academy of Forensic Sciences (AAFS) Annual Meeting; Seattle, WA: February 19-24, 2018.

**Maloney KF**, Yarid NA, Giffin CR, Corcoran CM, Blank J, Mahar TJ. "U-47700: A synthetic opioid of unknown significance." American Academy of Forensic Sciences (AAFS) Annual Meeting; New Orleans, LA: February 13-18, 2017.

**Maloney KF**, Yarid NA, Giffin CR, Corcoran CM, Blank J, Mahar TJ. "Butyrylfentanyl and acetylfentanyl levels in driving under the influence and overdose cases." National Association of Medical Examiners (NAME) Annual Meeting; Minneapolis, MN: September 7-13, 2016.

**Maloney KF**, Yarid NA, Blank J, Mahar TJ. "Deaths associated with a November 2014 snowstorm ("Winter Storm Knife") in Erie County, New York." American Academy of Forensic Sciences (AAFS) Annual Meeting; Las Vegas, NV: February 22-27, 2016.

Gill JG, **Maloney KF**, Hirsch CH. "The consistency and advantage of therapeutic complication as a manner of death." National Association of Medical Examiners (NAME) Annual Meeting; Baltimore, MD: October 5-9, 2012.

**Maloney KF**, Heller DS, Baergen RN. "Types of Maternal Hypertensive Disease and Their Association with Pathologic Lesions and Clinical Factors." United States & Canadian Academy of Pathology (USCAP) Annual Meeting; Boston, MA: March 7-13, 2009.

**Maloney KF**, Savageau J, Pulver T, Prasad M, Quinlan R, Ashraf K. "Expression of Vascular Endothelial Growth Factor Subtypes and Their Relationship to Tumor Progression." College of American Pathologists (CAP) Annual Meeting; Chicago, IL: April 14-18, 2007.

**Maloney KF**, Petri WH. "The Utility of Eight Canine Microsatellite Markers for Determining Genetic Variation in the Eastern Coyote (*Canis latrans*)." 60th Annual Eastern New England Biological Research Conference; Boston, MA: April 2002.

## Media Appearances

**Forensic Pathology Expert**                                    TBA
"Hell and Gone – The Mitrice Richardson Case"
School of Humans, Podcast

**Forensic Pathology Expert**                                    TBA
"Exhumed – The Stacey Caster Case"
Milojo Downtown LLC, Oxygen Network

**Forensic Pathology Expert**                                    2019 – 2020
"Crime Stories with Nancy Grace"
Crime Online, Podcast

**Forensic Pathology Expert**                                    June 2019
"Wrong Man"
Radical Media, Starz

**Forensic Pathology Expert**                                    June 2019
"Murder and Justice: The Case of Martha Moxley"
Jupiter Productions, Oxygen Network

**Forensic Pathology Expert**                                    April 2018
"Deadly Intelligence"
Beyond Productions, Science Channel

**Forensic Pathology Expert**                                    January 2018
"Final Appeal"
Peacock Productions, Oxygen Network

**APPENDIX** **1961**

Nickel City Forensics

November 1, 2021

Katherine Maloney, M.D.
Nickel City Forensics, LLC
PO Box 114
Getzville, NY 14068

**Case information**
Decedent: V████ D████, DOB:████████, DOD: 2/26/15
Postmortem case number: MS-15-120

**Items provided for review**
Autopsy report and medical examiner's office file
Autopsy photographs
Scene photographs
Pediatrician medical records
EMS report
Hospital records from terminal admission
Police reports and drawing of the scene
Police deposition of Russell Brown (friend)
Police deposition of Rebecca Parker (mother)
Police deposition of Michael Bayley (firefighter/EMS)
Police deposition of James Tidings (firefighter/EMS)
Police deposition of Jason Lucey (firefighter/EMS)
Police deposition of Frank Shoemaker III (firefighter/EMS)
Police deposition of Michael Rustin (restaurant employee)
Police deposition of Kathleen Crisafulli (ER doctor)
Grand jury testimony of Dr. Michael Sikirca 9/25/15
Deposition of Dr. Michael Sikirca 5/24/21
Deposition of Michael Davis 3/30/17, 5/19/21
Transcripts of trial testimony

**Facts of the incident**
Per report, the decedent seemed lethargic and tired on the morning of the day she died (2/26/15) as noted by the decedent's mother and mother's boyfriend (Michael Davis). The decedent's mother

Nickel City Forensics

went to work and Mr. Davis was responsible for watching her during the day. The decedent was placed for a nap by Mr. Davis in the late morning who also took a nap at that time. When he awoke, he reported that the decedent was unresponsive. He attempted cardiopulmonary resuscitation (CPR) by pacing one hand on her back and one on her chest/stomach and compressing the decedent's torso. Mr. Davis did not have a phone, so after attempting CPR and getting no response, he went to a restaurant down the street to use their phone to call 911. When the decedent's mother arrived home from work, Mr. Davis was coming down the street back to the residence after having called 911 for assistance.

The ambulance arrived at 13:14 and CPR was initiated. In his deposition, firefighter/EMS personnel, Frank Shoemaker II stated that the decedent's abdomen was "not distended" when they arrived and CPR was initiated. The decedent arrived to the emergency room at 13:46 and was pronounced dead at 14:08. During this time, CPR was continued by medical personnel.

Autopsy photographs revealed lacerations of the anterior and posterior right and left lobes of the liver with pulpification of the intervening parenchyma of the right lobe, and approximately 350 ml of liquid blood in the peritoneal cavity. They also revealed fractures of the posterior right 9th and 10th ribs with surrounding hemorrhage in the soft tissue; no overlying skin hemorrhage (contusion) of the back was demonstrated. Postmortem metabolic screening detected a slightly elevated level of thyroid stimulation hormone (TSH) consistent with hypothyroidism.

**Opinion**

The injuries to the decedent's liver are consistent with CPR, as is the amount of blood in the peritoneal cavity. While CPR is being performed, the heart is kept artifactually "beating" allowing injuries, like liver lacerations, to continue oozing blood and bleeding into the surrounding soft tissue. Of note, one of the EMS personnel stated that her abdomen did not appear distended when they arrived to the residence, which suggests that additional blood accumulated while CPR was being performed by EMS and hospital staff.

It is not uncommon to see rib fractures during routine CPR. While routine CPR usually does not cause posterior rib fractures (as were seen in this case), Mr. Davis stated that when he performed CPR, he placed one of his bands on the decedent's back and one of his hands on the decedent's front. The hand placed on the back could have caused the posterior rib fractures identified in this case, and as such, they are not concerning for inflicted trauma. The nature and extent of the CPR related injuries would not have provided information about the size of Mr. Davis's hands, despite the size of his hands being specifically being listed in the autopsy report.

The autopsy and subsequent examination did not identify a cause of death. As such, the decedent's death would be classified as Sudden Unexplained Death in Childhood with Intrinsic Factors (hypothyroidism), using the latest recommendations of the National Association of Medical

Examiners. Deaths that fall into this category are often thought to be due to cardiac arrhythmias (when the heart beats irregularly or stops beating) or seizures. Further work-up of these diagnoses includes extensive review of brain and cardiac tissue, genetic testing, and referral to the Sudden Unexplained Death in Childhood Registry and Research Collaborative may be considered. It is possible that a thorough evaluation of the heart and brain could have provided information about the cause of death. Additionally further studies of the thyroid gland could have been considered given the decedent's abnormal thyroid metabolic screening. It is not clear if these studies were performed in this case, as all of the emphasis was placed on the non-fatal and non-contributory to death CPR related injuries.

To a reasonable degree of medical and scientific certainty, there is no evidence that the injuries to the decedent's liver and ribs were due to anything other than CPR, and they did not contribute to her death.

The facts and opinions above are based on the provided information, and may change should new information be provided. Please do not hesitate to contact me if there are further questions.

Katherine Maloney, M.D.
Nickel City Forensics, LLC

# APPENDIX

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

MICHAEL DAVIS-GUIDER,

**RESPONSE TO PLAINTIFF'S
LOCAL RULE 56.1 COUNTER-
STATEMENT**

Plaintiff,

Civil Case No.: 1:17-cv-01290
(FJS/DJS)

-against-

CITY OF TROY, RONALD FOUNTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES
MCDONALD, Individually, TIM COLANERI, Individually,
ADAM R. MASON, Individually, RENSSELAER COUNTY,
MICHAEL SIKIRICA, Individually, and JOEL ABELOVE,
Individually,

Defendants.

---

Pursuant to 56.1(b) of the Local Rules of Practice for the United States District
Court for the Northern District of New York, Defendants RENSSELAER COUNTY,
MICHAEL SIKIRICA, and JOEL ABELOVE (collectively, "County defendants"), by and
through their attorneys, Bailey, Johnson & Peck, P.C., hereby submit the following
response to Plaintiff Michael Davis-Guider's ("Davis") counter-statement of material facts.
All exhibit citations refer to those exhibits attached to the County defendants' moving
statement of material facts [Dkt. No. 115-3].

1.      Admit only that V.D. is the daughter of Davis's girlfriend, but object to the
remaining statement as it sets forth unsupported opinion—as opposed to assertions of
fact—in contravention of the rules of this Court.

2.      Admit only that Davis testified accordingly, and add that he "guess[ed that
V.D.] threw up a few times but other than that it was, seemed like a simple cold." *Exhibit
"D," pp. 47-48.*

3.     Admit only that the cited exhibits set forth information consistent with the statement, but deny that any medically significant inference can be drawn from the statement supportive of Davis's causes of action. *Exhibit "F," pp. 29-30, 64, 73-74, 82, 121; exhibit "A," pp. 33-34*; *exhibit "N," pp. 31-34*.

4.     Admit only that the cited exhibits set forth information consistent with the statement, but deny that any medically significant inference can be drawn from the statement supportive of Davis's causes of action. *Exhibit "F," pp. 29-30, 64, 73-74, 82, 117-18, 121; exhibit "A," pp. 33-34*; *exhibit "N," pp. 31-34; exhibit "L," generally*.

5.     Admit only that the cited exhibits set forth information consistent with the statement, but deny that any medically significant inference can be drawn from the statement supportive of Davis's causes of action. *Exhibit "F," pp. 29-30, 64, 73-74, 82, 117-18, 121; exhibit "A," pp. 33-34*; *exhibit "N," pp. 31-34; exhibit "L," generally*.

6.     Admit.

7.     Admit.

8.     Admit only that the cited exhibits set forth information consistent with the statement, and object insofar as it is claimed that V.D. was not her normal self, as it is a conclusion unsupported by a proper citation.

9.     Admit.

10.     Admit only that the cited exhibits set forth information consistent with the statement, and object insofar as Davis sets forth opinion about the consistency of his explanation of the morning events—as opposed to assertions of fact—in contravention of the rules of this Court.

11.     Admit.

2

12.    Admit.

13.    Admit only that Davis testified accordingly, and add that he testified that when he woke up, he called to V.D. to let her know her breakfast was ready, but she did not respond. *Exhibit "A," p. 38; exhibit "D," p. 60*.

14.    Admit only that Davis testified accordingly, and deny the statement to the extent that it implies or attempts to imply that Davis did not cause V.D.'s death due to his infliction of severe blunt-force trauma. *Exhibit "F," pp. 29-30, 64, 73-74, 82, 117-18, 121; exhibit "A," pp. 33-34*; *exhibit "N," pp. 31-34; exhibit "L," generally*.

15.    Admit.

16.    Admit only that Davis testified accordingly, and deny the statement to the extent that it implies or attempts to imply that Davis did not cause V.D.'s death due to his infliction of severe blunt-force trauma. *Exhibit "F," pp. 29-30, 64, 73-74, 82, 117-18, 121; exhibit "A," pp. 33-34*; *exhibit "N," pp. 31-34; exhibit "L," generally*.

17.    County defendants object to the statement as it sets forth opinion—as opposed to assertions of fact—in contravention of the rules of this Court; object insofar as the expert opinions are in dispute in this case; and without waiving said objections, admit only that the cited exhibits set forth information consistent with the statement, but deny that any medically significant inference can be drawn from the statement supportive of Davis's causes of action. *Exhibit "F," pp. 29-30, 64, 73-74, 82, 121*; *exhibit "N," pp. 31-34*.

18.    Admit.

19.    Admit only that the cited exhibits set forth information consistent with the statement.

20.    Admit.

21.    Admit.

22.    Admit.

23.    Admit.

24.    Admit.

25.    Admit only that Coonradt was the first to respond; deny knowledge and information sufficient to respond to the remainder of this particular statement; and object to the statement as it sets forth opinion—as opposed to assertions of fact—in contravention of the rules of this Court.

26.    Admit only that Coonradt talked with Davis, and deny that she prepared an inaccurate or false report. *Klein affidavit, exhibit "16," pp. 15-16; Klein affidavit, exhibit "17."*

27.    Admit only that Davis testified accordingly, and deny knowledge and information sufficient to respond to the remainder of this particular statement, and therefore deny the same.

28.    Admit only that Fountain and McDonald responded to the Davis home, and deny knowledge and information sufficient to respond to the remainder of this particular statement, and therefore deny the same.

29.    Admit only that Davis testified accordingly.

30.    Admit only that the cited exhibits set forth information consistent with the statement.

31.    Admit.

32.    Admit.

4

33.     Admit.

34.     Admit.

35.     Admit.

36.     Admit only that Abelove testified that Ackerman's immediate supervisor was Jessica Hall, who reported to Abelove. *Klein affidavit, exhibit "24," p. 30*.

37.     Admit only that law enforcement are not required to attend, but deny the remainder of the statement. *Klein affidavit, exhibit "4," p. 48; exhibit "F," pp. 38, 87, 153.*

38.     Admit.

39.     County defendants object to this particular statement, as it sets forth conjecture and speculation—as opposed to assertions of fact—in contravention of the rules of this Court. Without waiving said objections, Fountain testified that he does not recall what information he imparted to Dr. Sikirica. *Exhibit "G," pp. 118-20*.

40.     Deny, to the extent that Davis attempts to limit Dr. Sikirica's determination that V.D. did not die of natural causes to simply conducting some tests, and admit only that the cited exhibits set forth information consistent with the statement that Dr. Sikirica intended to rule the death a homicide. *Exhibit "F," pp. 36, 81, 118, 121; exhibit "L."*

41.     County defendants object to the statement as it sets forth opinion and conclusions—as opposed to assertions of fact—in contravention of the rules of this Court, and object insofar as the expert opinions are in dispute in this case. Without waiving said objections, deny. *Exhibit "F," pp. 29-30, 36, 64, 73-74, 81-82, 118, 121*; *exhibit "N," pp. 31-34; exhibit "L."*

42.     Deny. *Exhibit "F," p. 21*.

43.     Admit.

5

**APPENDIX**

44. Admit.

45. Admit.

46. Admit.

47. County defendants object to the statement as it sets forth opinion and a conclusion of law—as opposed to assertions of fact—in contravention of the rules of this Court. Without waiving said objection, Fountain testified that V.D.'s death was suspicious in nature. *Klein affidavit, exhibit "18," pp. 63-65.*

48. Admit.

49. Admit.

50. Admit only that the cited exhibits set forth information consistent with the statement, and deny knowledge and information sufficient to respond to the remainder of this particular statement, and therefore deny the same.

51. Admit.

52. County defendants object to the statement as it sets forth opinion and a conclusion of law—as opposed to assertions of fact—in contravention of the rules of this Court. Without waiving said objection, deny. *Exhibit "F," pp. 29-30, 36, 64, 73-74, 81-82, 84, 88-89, 118, 121; exhibit "A," pp. 33-34*; *exhibit "N," pp. 31-34; exhibit "L."*

53. County defendants object to "purportedly," as that word is not used within the report. *Exhibit "L."* Without waiving said objection, admit.

54. Admit.

55. Deny. Dr. Sikirica did not attribute the death to Davis specifically. *Exhibit "L."*

56.     Admit only that the number of compressions are not included in the report, but deny this particular statement insofar as it alleges or tends to allege that any medically significant inference can be drawn from the statement supportive of Davis's causes of action. *Exhibit "F," pp. 29-30, 64, 73-74, 82, 117-18, 121; exhibit "N," pp. 31-34; exhibit "L," generally*.

57.     County defendants object to the statement as it sets forth opinion—as opposed to assertions of fact—in contravention of the rules of this Court; object insofar as the expert opinions are in dispute in this case; and without waiving said objections, admit only that the cited exhibits set forth information consistent with the statement, but deny that any medically significant inference can be drawn from the statement supportive of Davis's causes of action. *Exhibit "F," pp. 29-30, 64, 73-74, 82, 121; exhibit "A," pp. 33-34*; *exhibit "N," pp. 31-34*.

58.     Admit only that the cited exhibits set forth information consistent with the statement, but deny that any medically significant inference can be drawn from the statement supportive of Davis's causes of action. *Exhibit "F," pp. 29-30, 64, 73-74, 82, 121; exhibit "N," pp. 31-34*.

59.     County defendants object to the statement as it sets forth opinion—as opposed to assertions of fact—in contravention of the rules of this Court, and deny that any medically significant inference can be drawn from the statement supportive of Davis's causes of action. *Exhibit "F," pp. 29-30, 64, 73-74, 82, 121; exhibit "A," pp. 33-34*; *exhibit "N," pp. 31-34*.

60.     County defendants object to the statement as it sets forth opinion—as opposed to assertions of fact—in contravention of the rules of this Court, and deny that

7

any medically significant inference can be drawn from the statement supportive of Davis's causes of action. *Exhibit "F," pp. 29-30, 64, 73-74, 82, 121; exhibit "A," pp. 33-34*; *exhibit "N," pp. 31-34*.

61.  Admit, and add that that is his custom and practice. *Klein affidavit, exhibit "4," p. 41*.

62.  Admit only that Davis testified accordingly, and deny knowledge and information sufficient to respond to this particular statement, and therefore deny the same.

63.  County defendants object to the statement as it sets forth conclusions of law—as opposed to assertions of fact—in contravention of the rules of this Court. Without waiving said objections, deny that the report links the death to a large adult. *Exhibit "L."*

64.  Admit.

65.  Admit.

66.  Admit only that Fountain testified that he thought the ribs lacerated the liver, but deny knowledge and information sufficient to respond in terms of what Fountain believed.

67.  County defendants object to this particular statement, as the cited exhibit does not support it.

68.  Admit.

69.  Admit only that Fountain testified in accord with the cited exhibit, but deny knowledge and information sufficient to respond in terms of what Davis advised him, and therefore deny the statement.

70.     Admit only that Fountain testified in accord with the cited exhibit, but deny knowledge and information sufficient to respond in terms of what Fountain observed at the scene, and therefore deny the statement.

71.     Admit only that Fountain testified in accord with the cited exhibit, but deny knowledge and information sufficient to respond in terms of what occurred at the scene, and therefore deny the statement.

72.     Admit only that Fountain testified in accord with the cited exhibit, but deny knowledge and information sufficient to respond in terms of Davis's presentation at the time, and therefore deny the statement.

73.     Admit only that the cited exhibits set forth information consistent with the statement, but deny knowledge and information as to the accuracy of the statement, and therefore deny the same.

74.     Admit.

75.     Admit only that Dr. Sikirica testified before the grand jury that V.D. did not die from natural causes, and he testified at deposition that he could neither confirm nor dispute that Davis found V.D. in an unresponsive state. County defendants deny that Dr. Sikirica conceded at any time that V.D. died of a natural event, or falsely testified before the grand jury, and object to the mischaracterization of his testimony. *Klein affidavit, exhibit "15," pp. 66-67*.

76.     County defendants object to the statement insofar as it mischaracterizes and incorrectly sets forth the autopsy findings, results, and cause of death. Furthermore, County defendants deny that Dr. Sikirica correlated V.D.'s injuries to the nature and manner as described by Davis. *Exhibit "N," pp. 29, 33; exhibit "L," generally*.

9

77. County defendants object to this statement insofar as it mischaracterizes the presentation of evidence, and fails to cite to an exhibit that supports the statement, i.e., the transcript of the entirety of the grand-jury proceedings.

78. County defendants object to this statement insofar as fails to cite to an exhibit that supports the statement, i.e., the transcript of the entirety of Dr. Sikirica's grand-jury testimony before being recalled as a witness. Without waiving said objection, County defendants deny the statement insofar as it alleges or tends to allege that CPR caused the injuries at issue. *Exhibit "F," pp. 29-30, 64, 73-74, 82, 117-18, 121*; *exhibit "N," pp. 31-34; exhibit "L," generally*.

79. County defendants deny that the evidence was exculpatory; admit only that it was disclosed by the RCDAO; and object to the statement to the extent that it fails to cite to any exhibit supporting the timing of the disclosure.

80. County defendants object to the statement as it sets forth opinion—as opposed to assertions of fact—in contravention of the rules of this Court; object insofar as the expert opinions are in dispute in this case; and without waiving said objections, deny that Dr. Sikirica offered false testimony. *Exhibit "F," pp. 29-30, 64, 73-74, 82, 121; exhibit "A," pp. 33-34*; *exhibit "N," pp. 31-34*.

81. Admit only that the number of compressions are not included in the report, but deny this particular statement insofar as it alleges or tends to allege that any medically significant inference can be drawn from the statement supportive of Davis's causes of action. *Exhibit "F," pp. 29-30, 64, 73-74, 82, 117-18, 121; exhibit "N," pp. 31-34; exhibit "L," generally*.

82.     County defendants object to the statement as it sets forth opinion and conclusions—as opposed to assertions of fact—in contravention of the rules of this Court.

83.     County defendants object to the statement as it sets forth opinion—as opposed to assertions of fact—in contravention of the rules of this Court, and further object insofar as the expert opinions are in dispute in this case. Without waiving said objections, County defendants deny this statement insofar as it alleges that the blood in the abdomen was consistent with CPR. *Exhibit "F," pp. 77, 91, 100*.

84.     County defendants object to the statement to the extent that it fails to cite to any exhibit supporting that EMS reported that V.D.'s stomach was not distended upon arrival, and deny this particular statement insofar as it alleges or tends to allege that any medically significant inference can be drawn from the statement supportive of Davis's causes of action. *Exhibit "F," pp. 29-30, 64, 73-74, 77, 91, 82, 100, 117-18, 121; exhibit "N," pp. 31-34; exhibit "L," generally*.

85.     County defendants deny that Dr. Sikirica offered false testimony, and regardless, deny that any medically significant inference can be drawn from the statement supportive of Davis's causes of action. *Exhibit "F," pp. 29-30, 64, 73-74, 82, 121; exhibit "A," pp. 33-34*; *exhibit "N," pp. 31-34*.

86.     County defendants object to this particular statement, as it is a conclusion unsupported by a proper citation.  Without waiving said objection, County defendants deny that Dr. Sikirica offered false testimony, and deny that any medically significant inference can be drawn from the statement supportive of Davis's causes of action. *Exhibit "F," pp. 29-30, 64, 73-74, 82, 121; exhibit "N," pp. 31-34.*

11

87.     Admit only that Fountain and Dr. Sikirica testified before the grand jury and that Davis was indicted, but deny that testimonial evidence was the only evidence presented to the jury. *Klein affidavit, exhibit "9."*

88.     Admit.

89.     Admit.

90.     Admit only that Coonradt testified at a suppression hearing, and deny knowledge and information sufficient to respond to the remainder of this particular statement, and therefore deny the same.

91.     Admit only that McDonald testified at a suppression hearing and that the cited exhibits set forth information consistent with the statement.

92.     Admit only that Coonradt testified at trial and that the cited exhibits set forth information consistent with the statement.

93.     County defendants object to the statement insofar as it mischaracterizes Dr. Sikirica's testimony and incorrectly sets forth the autopsy findings, results, and cause of death. Furthermore, County defendants deny that Dr. Sikirica correlated V.D.'s injuries to the nature and manner as described by Davis. *Exhibit "L," generally; Klein affidavit, exhibit "4," p. 12.*

94.     Admit only that Dr. Sikirica testified accordingly, but clarify that had Dr. Sikirica not seen the video of Fountain's interview—wherein Davis portrayed squeezing V.D.—he still would have opined that the severe compressive injury to her liver occurred due to compression of her abdominal cavity. *Exhibit "F," pp. 98, 117.*

95.     Admit only that Fountain testified at trial and was retired, and deny knowledge and information sufficient to respond to the remainder of this particular statement insofar as the underlying reason for his retiring.

96.     Deny. The role of the DA's office in this case was advisory in nature; it did not direct TPD in terms of how to conduct its investigation. *Exhibit "E," p. 33*.

97.     Deny. *Exhibit "F," pp. 38, 89, 154-55*.

98.     Admit.

99.     Admit only that Dr. Sikirica has personally observed ruptured livers attributed to placement of the hands or compressions that are too vigorously applied, but clarify that ruptured livers are associated with fractures to the anterior chest wall and the sternum, most of which involve calcified bones in older adults. *Exhibit "F," pp. 58, 61*.

100.    County defendants object to the statement as it sets forth opinion—as opposed to assertions of fact—in contravention of the rules of this Court; object insofar as the expert opinions are in dispute in this case; and without waiving said objections, admit only that Dr. Sikirica testified that some studies have suggested and some have disclaimed that prolonged CPR is significantly associated with a higher incidence of rib fractures. *Exhibit "F," pp. 57-58*.

101.    County defendants object to the statement as it sets forth opinion—as opposed to assertions of fact—in contravention of the rules of this Court, and object insofar as the expert opinions are in dispute in this case.

102.    Admit only that V.D. exhibited no external bruising, but deny the remainder of the statement. *Exhibit "F," pp. 29-30, 64, 73-74, 82, 121; exhibit "N," pp. 31-34*.

103.    County defendants object to the statement insofar as it mischaracterizes Dr. Sikirica's testimony, and admit only that Dr. Sikirica opined that the liver lacerations were most consistent with force applied to V.D.'s abdomen and the back simultaneously, similar to what Davis portrayed in the video of his questioning by Fountain and McDonald. *Exhibit "F," p. 65*.

104.    Deny. The injuries to her ribs and liver were antemortem—conclusively or to a reasonable degree of medical certainty—and were caused by blunt-force trauma. *Exhibit "F," pp. 33, 125, 132*.

105.    Admit only that Dr. Sikirica testified at deposition that he could neither confirm nor dispute that Davis found V.D. in an unresponsive state. *Exhibit "F," pp. 66-67*.

106.    County defendants object to the statement insofar as it mischaracterizes Dr. Sikirica's testimony, and admit only that Dr. Sikirica testified hypothetically that if V.D. had already been *in extremis*, and died at the hands of another during resuscitative process, that would not be considered homicide. *Exhibit "F," p.128*.

107.    County defendants deny the statement insofar as it alleges or tends to allege that CPR caused the injuries at issue. *Exhibit "F," pp. 29-30, 64, 73-74, 82, 117-18, 121*; *exhibit "N," pp. 31-34; exhibit "L," generally*.

108.    Admit.

109.    County defendants object to this statement as it is argumentative; sets forth a conclusion unsupported by record evidence or appropriate citation; and goes to a matter in dispute, all in contravention of the rules of this Court.

14

# APPENDIX

110.   Admit only that McElheny was arrested, prosecuted, and acquitted, and object to the remainder of the statement as the cited exhibit does not support the proffered conclusion.

111.   Admit only that Thomas was arrested, prosecuted, and acquitted, and object to the remainder of the statement as it relies upon conjecture and speculation, and as the cited exhibits do not support the proffered conclusion.

112.   County defendants admit only that Dr. Sikirica continued to perform autopsies for Rensselaer County; deny the statement to the extent that it alleges any wrongdoing on the part of County defendants; and object insofar as the statement improperly sets forth arguments, conclusions of law, and unsupported facts.

113.   County defendants admit only that Dr. Sikirica was paid for his work by Rensselaer County, but deny knowledge and information sufficient to respond to the remainder of the statement as it is unsupported by the cited exhibit.

114.   Admit only that the cited exhibit sets forth information consistent with the statement.

Dated:  May 12, 2022

BAILEY, JOHNSON & PECK, P.C.

By: _____
        William C. Firth
        Bar Roll No. 513832
        Attorneys for Defendants Rensselaer County,
        Michael Sikirica, and Joel Abelove
        5 Pine West Plaza, Suite 507
        Washington Avenue Extension
        Albany, New York 12205

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MICHAEL DAVIS-GUIDER,

                                Plaintiff,

        -against-

CITY OF TROY, RONALD FOUNTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES
MCDONALD, Individually, TIM COLANERI, Individually,
ADAM R. MASON, Individually, RENSSELAER COUNTY,
MICHAEL SIKIRICA, Individually, and
JOEL ABELOVE, Individually,

                              Defendants.

_____

**ATTORNEY
REPLY
DECLARATION**
Case No.:  1:17-cv-1290
(FJS/DJS)

      **RHIANNON I. SPENCER, ESQ**., under penalty of perjury, sets forth the following:

      1.      I am an attorney duly licensed and admitted to practice in all Courts of the State of New York and I am admitted to practice in the United States District Court for the Northern District of New York.  I am employed by the law firm of Pattison, Sampson Ginsberg & Griffin, PLLC who are the attorneys for the above-named defendants City of Troy, Ronald Fountain, Danielle Coonradt, Charles McDonald, Adam R. Mason, and Tim Colaneri (hereinafter referred to as the "City Defendants").

      2.      The Plaintiff has consented to the dismissal of Adam R. Mason from the instant action, has withdrawn his false arrest/ false imprisonment claims and has withdrawn his 42 U.S.C. § 1985 conspiracy claims as referenced in his Fifth Cause of Action.

      3.      I submit this Reply Declaration, together with the accompanying Memorandum of Law in reply to the Plaintiff's opposition to the City Defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking dismissal of the Plaintiff's

1

Third Amended Complaint in its entirety against these moving defendants.

    4.    As discussed in the accompanying Memorandum of Law, the City Defendants (movants) seek a dismissal of Plaintiff's Third Amended Complaint on the grounds that there is no question of material fact that a jury ought to consider or, in the alternative, because the City Defendants are entitled to qualified immunity.

    5.    The following exhibits are provided in reply to the Plaintiff's opposition:

D.  Exhibit "D": August 19, 2016, Criminal Trial Vol III-Paramedic Bayly's Testimony;

E.  Exhibit "E": August 23, 2015, Criminal Trial Vol. V-Michael Davis-Guider;

F.  Exhibit "F": May 3, 2016, Suppression Hearing Testimony of Danielle Coonradt and Charles McDonald

Dated: May 12, 2022.

*Rhiannon I. Spencer*

Rhiannon I. Spencer, Esq.
**Pattison, Sampson, Ginsberg & Griffin, PLLC**
Bar Roll No. 102582
*Attorneys for Defendants, The City of Troy,*
*Danielle Coonradt, Charles McDonald,*
*Adam R. Mason, Ronald Fountain, and*
*Tim Colaneri*
22 First Street - P. O. Box 208
Troy, New York 12181-0208
(518) 266-1001

# EXHIBIT D

```
 1

 2    STATE OF NEW YORK              COUNTY COURT
      COUNTY OF RENSSELAER           CRIMINAL TERM
 3    * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
      THE PEOPLE OF THE STATE OF NEW YORK,
 4
      - against -                    15-1094
 5
      MICHAEL DAVIS,
 6
                          Defendant.
 7    * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
                          Rensselaer County Courthouse
 8                        Congress and Second Streets
                          Troy, New York  12180
 9                        August 19, 2016

10                   Trial - Volume 3

11    B e f o r e:

12         HONORABLE ANDREW G. CERESIA,
                          County Court Judge
13

14    A p p e a r a n c e s:

15    For  THE PEOPLE OF THE STATE OF NEW YORK:

16         JOEL E. ABELOVE, ESQ.
           Rensselaer County District Attorney
17         Rensselaer County Courthouse
           Congress and Second Streets
18         Troy, New York 12180

19         BY:  CINDY CHAVKIN, ESQ.
                Assistant District Attorney
20

21    For  DEFENDANT:

22         JOHN C. TURI, ESQ.
           Rensselaer County Public Defender
23         Congress and Second Streets
           Troy, New York 12180
24
           BY:  WILLIAM ROBERTS, ESQ. and
25                JESSICA ZWICKLBAUER, ESQ.
                 Assistant Public Defenders
```

```
 1
 2   Also Present:
 3       Michael Davis, Defendant
 4       Clerk of the Court
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1
 2              (In open court.)
 3              THE COURT:  Are the People ready to
 4         proceed with the jury?
 5              MS. CHAVKIN:  The People are ready,
 6         your Honor.
 7              THE COURT:  Defense ready to proceed?
 8              MR. ROBERTS:  Yes, your Honor.
 9              THE COURT:  Okay.  We'll bring the jury
10         in, please.
11              (Whereupon, the jury entered the
12         courtroom.)
13              THE COURT:  Okay.  Please be seated.
14              All right.  Members of the Jury, good
15         morning.  I welcome you all back to the
16         courthouse.
17              We are ready to continue with the trial
18         at this point in time.
19              You all may be seated.
20              The People may call their first
21         witness.
22              MS. CHAVKIN:  Thank you, your Honor.
23         The People call Michael Bayly.
24                   MICHAEL BAYLY,
25    the witness hereinbefore named, being first duly
```

**M. Bayly - Direct Examination by Ms. Chavkin**

1

2 cautioned and sworn or affirmed to tell the truth, the

3 whole truth, and nothing but the truth, was examined

4 and testified as follows:

5      CLERK OF THE COURT: The sworn witness

6      is Michael Bayly, B-A-Y-L-Y.

7      THE COURT: Okay. Ms. Chavkin you may

8      proceed.

9      And just so the attorneys are aware,

10      attorneys may approach the witnesses freely

11      throughout the trial without requesting

12      permission, okay?

13      MR. ROBERTS: Thank you, your Honor.

14      MS. CHAVKIN: Thank you, your Honor.

15     *Direct Examination by Ms. Chavkin*

16   Q  Can you please introduce yourself to the

17 jury?

18   A  Captain Michael Bayly, Troy Fire Department.

19   Q  What is your occupation, Captain?

20   A  I'm a firefighter and paramedic.

21   Q  How long have you been a paramedic?

22   A  Twenty-two years.

23   Q  What are your responsibilities?

24   A  Now as a captain we respond to EMS calls and

25 fires. Generally I'm in charge of the scene until a

1  **M. Bayly - Direct Examination by Ms. Chavkin**

2  higher officer arrives.

3       Q     And what were your responsibilities on

4  February 26, 2016?

5       A     I was a paramedic on an engine company,

6  Engine 1 in Lansingburgh.

7       Q     Were you on duty on February 26, 2015?

8       A     I was.

9       Q     And approximately 1:11 p.m. on February 26,

10  2015 did you get a call out?

11       A     We did.

12       Q     Do you recall to where?

13       A     856 Fourth Avenue.

14       Q     Is that in the City of Troy?

15       A     In Troy.

16       Q     County of Rensselaer?

17       A     Yes.

18       Q     State of New York?

19       A     Yes.

20       Q     What was the nature of the call?

21       A     It was for a cardiac arrest.

22       Q     Did you proceed to the address?

23       A     We did.

24       Q     Did you go alone or with anyone else?

25       A     The first response was two other people with

| | |
|---|---|
| 1 | **M. Bayly - Direct Examination by Ms. Chavkin** |
| 2 | me on the engine company and the ambulance that's |
| 3 | stationed at the Lansingburgh Firehouse as well. |
| 4 | Q    Do you recall approximately how long it took |
| 5 | you to get there? |
| 6 | A    Probably two minutes. |
| 7 | Q    When you got to 856 Fourth Avenue what did |
| 8 | you observe? |
| 9 | A    We went to the house and we found a small |
| 10 | child in cardiac arrest. |
| 11 | Q    When you say cardiac arrest, what does that |
| 12 | mean exactly? |
| 13 | A    She was not breathing and there was no |
| 14 | pulse. |
| 15 | Q    And what, if anything, did you do? |
| 16 | A    We started to work her right away with CPR. |
| 17 | MR. ROBERTS:  Judge, can I -- I'm going |
| 18 | to object to the characterization of "we". |
| 19 | I would just prefer the witness talk about |
| 20 | what he did specifically. |
| 21 | THE COURT:  Well, the witness can |
| 22 | testify as to what he did specifically or |
| 23 | what he personally observed, so I'm going to |
| 24 | overrule the objection at this point in |
| 25 | time, but I will ask the witness to make |

M. Bayly - Direct Examination by Ms. Chavkin

1

2          sure he testifies regarding what he

3          personally did or what he personally

4          observed happening.

5     Q    So what did you do at that time?

6     A    I proceeded to the -- to the head of the

7  child.  I was running the call.  I was -- being the

8  person in charge at the time, I was, you know, running

9  the overall scene.

10    Q    Do you recall where the child was when you

11 entered the apartment?

12    A    I do.  She was on a couch that was right in

13 the front room, I believe, to the left as we walked

14 through the door.

15    Q    How was she positioned, do you recall?

16    A    She was laying flat on her back with her

17 head towards -- facing in towards the house, more like

18 towards the kitchen area.

19    Q    And did you see any adult in the house?

20    A    I did.  I remember -- recall seeing some

21 people as we walked through the door.

22    Q    And did you come to know the name of the

23 child?

24    A    Yes.

25    Q    What was her name?

**M. Bayly - Direct Examination by Ms. Chavkin**

2     A     V███ D███.

3     Q     Are you certified in CPR?

4     A     I am.

5     Q     How long have you been certified in CPR?

6     A     Since my initial EMT certification. It's

7 almost 24 years.

8     Q     And have you performed CPR on a child

9 previously?

10    A     I have.

11    Q     Approximately how many times?

12    A     Probably ten or more.

13    Q     Can you please describe how CPR is properly

14 performed on a two year old child?

15    A     For a two year old it is a one handed CPR

16 technique. You usually -- you put your hand in between

17 the -- right in the center -- center of the breast bone

18 and then you press down.

19    Q     Is there any breathing involved in that too

20 or --

21    A     There is, yes. We breathe for them with a

22 bag valve mask.

23    Q     And where, if anywhere, did you take the

24 child?

25    A     After we treated her at the scene we took

**M. Bayly - Cross Examination by Mr. Roberts**

1

2    her to St. Mary's Hospital.

3         Q       Captain, during the time that you were

4    working on V████, did she ever regain a pulse or did

5    she ever start breathing?

6         A       She did not.

7         Q       And what, if anything, did you do en route

8    to the hospital?

9         A       We just continued -- I just continued a

10   normal ACLS, Advanced Cardiac Life Support, running off

11   a protocol set of standards that we use.  We don't call

12   a doctor for everything for a call like that.  We

13   pretty much just run a standard algorithm of CPR and

14   drugs.

15        Q       And which -- which hospital did you take her

16   to?

17        A       St. Mary's in Troy.

18                  MS. CHAVKIN:  I have no further

19               questions on direct, your Honor.

20                  THE COURT:  Mr. Roberts?

21                  MR. ROBERTS:  Yes, your Honor, thank

22               you.

23            *Cross Examination by Mr. Roberts*

24        Q    Good morning.

25        A    Good morning.

| | | |
|---|---|---|
| 1 | | M. Bayly - Cross Examination by Mr. Roberts |
| 2 | Q | Is it Captain Bayly? |
| 3 | A | That's correct. |
| 4 | Q | Okay. Captain, you have been with the Troy |
| 5 | | Fire for the entirety of your career? |
| 6 | A | No. I have been a paramedic longer than |
| 7 | | I've been with the fire department. I've been with the |
| 8 | | fire department for 15 years. |
| 9 | Q | And so you have been a paramedic for 22 |
| 10 | | years, fireman for, I'm sorry, 15? |
| 11 | A | Correct. |
| 12 | Q | And how long have you been a captain? |
| 13 | A | November will be three years. |
| 14 | Q | Now, you testified that on February 26, |
| 15 | | 2015, you responded to a report of a child in cardiac |
| 16 | | arrest, correct? |
| 17 | A | Correct. |
| 18 | Q | Who did you respond with? |
| 19 | A | Other members of the crew that I was on? |
| 20 | Q | Yes, please. |
| 21 | A | Frank Shoemaker was there, and I believe |
| 22 | | firefighter Danny Riley. |
| 23 | Q | There was only -- |
| 24 | A | That's who I responded with with the engine |
| 25 | | I was on, correct. |

| | | |
|---|---|---|
| 1 | | M. Bayly - Cross Examination by Mr. Roberts |
| 2 | Q | Did another engine respond? |
| 3 | A | Another ambulance responded and another -- |
| 4 | | the rescue squad out of the downtown station also |
| 5 | | responded. |
| 6 | Q | So all total how many people responded to |
| 7 | | the apartment to assist the toddler? |
| 8 | A | Nine plus the Battalion Chief. |
| 9 | Q | And -- |
| 10 | A | I'm sorry, nine including the Battalion |
| 11 | | Chief. |
| 12 | Q | Who's the Battalion Chief? |
| 13 | A | Ed Cummings was the chief at the time. |
| 14 | Q | And when you arrived -- how would you |
| 15 | | describe the weather on that day? |
| 16 | A | I don't recall. |
| 17 | Q | It was February, correct? |
| 18 | A | I know it was the winter but I don't |
| 19 | | remember what kind of day it was. |
| 20 | Q | To your recollection it was winter but you |
| 21 | | don't necessary recall whether it was super cold or |
| 22 | | warm? |
| 23 | A | Correct. |
| 24 | Q | Okay. When you responded how were you |
| 25 | | greeted at the apartment? |

**M. Bayly - Cross Examination by Mr. Roberts**

1

2    A    Just an open door.  We just -- I went right
3    in, you know.  We just go right in.

4    Q    What do you mean there was an open door?

5    A    The door of the apartment was open.  I think
6    there was somebody standing there to let us in, but I
7    don't remember who it was.

8    Q    Do you have any idea how long the door was
9    open?

10   A    No.

11   Q    And the apartment, itself, could you
12   describe the layout of the apartment?

13   A    I only recall seeing the front room.  When
14   we're called for something like that I don't
15   necessarily look around all that much.  I remember the
16   couch.  I remember the child being on the couch, but I
17   didn't recall looking past that at all.

18                    MR. ROBERTS:  May I have this marked?

19                    (Photograph was marked Defendant's

20                    Exhibit A for identification.)

21                    MR. ROBERTS:  Sorry, Judge, I wanted to

22                    ask to approach the witness.

23                    THE COURT:  If you ask, that's okay,

24                    but I'm telling you you don't have to ask.

25                    MR. ROBERTS:  Certainly.

| | |
|---|---|
| 1 | **M. Bayly - Cross Examination by Mr. Roberts** |
| 2 | Q    Captain, I will show you what's been marked |
| 3 | as Defendant's Exhibit A.  I will ask you to take a |
| 4 | look at that photo. |
| 5 | A    Okay. |
| 6 | Q    Captain, you would agree with me that's a |
| 7 | photo of the front room that you entered on the date in |
| 8 | question, correct? |
| 9 | A    Yes. |
| 10 | Q    And to the -- that depicts what you |
| 11 | encountered from the front door, correct? |
| 12 | A    Correct. |
| 13 | Q    And you would agree with me that fairly and |
| 14 | accurately depicts what you saw on February 26, 2015, |
| 15 | correct? |
| 16 | A    Yes. |
| 17 | Q    It doesn't -- it is a fair representation, |
| 18 | it hasn't been changed or altered in any way, |
| 19 | correct? |
| 20 | A    To my knowledge, no. |
| 21 | Q    Okay. |
| 22 | MR. ROBERTS:  Your Honor, at this time, |
| 23 | I would move Defendant's A into evidence. |
| 24 | MS. CHAVKIN:  No objection, your |
| 25 | Honor. |

Case 1:17-cv-00290-DJS Document 50-4 Filed 06/13/22 Page 173 of 213 **APPENDIX** Case 1:17-cv-00290-DJS Document 50-4 Filed 06/13/22 Page 173 of 55 **1995**

14

M. Bayly - Cross Examination by Mr. Roberts

              THE COURT:  Defendant's A is received.

              (Defendant's Exhibit A, having been previously marked for identification, was received into evidence.)

    Q    So, Captain, what we're looking at here is a photo of the apartment.  On the left side is the window.  The door would be just before the window, correct?

    A    I believe so.

    Q    Which allowed you to come into the edge of the table and then this is the black futon that you were talking about?

    A    Yes.

    Q    All right.  And this is where you performed -- well, you discovered the child on February 26, 2015, correct?

    A    Yes.  Yes.

    Q    And you indicated that when you discovered her, her head was facing away from the door towards the kitchen, correct?

    A    Yeah.  I believe she was further up on the couch than what you see in the picture there.

    Q    Okay.

| | |
|---|---|
| 1 | **M. Bayly - Cross Examination by Mr. Roberts** |
| 2 | MR. ROBERTS: Can I have a moment, |
| 3 | Judge? |
| 4 | THE COURT: Sure. |
| 5 | (Whereupon, a brief moment was taken.) |
| 6 | (In open court.) |
| 7 | Q    Could you describe the make up of the couch, |
| 8 | what it felt like? |
| 9 | A    I mean, I realized it was, you know, a |
| 10 | futon.  I didn't really look at much other than her, |
| 11 | but it was like a leather -- leather couch. |
| 12 | Q    And did you have an opportunity to observe |
| 13 | the firmness of the couch? |
| 14 | A    It was firmer than most couches. |
| 15 | Q    Okay.  And while performing CPR is it |
| 16 | recommended to perform CPR on a couch? |
| 17 | A    Usually no.  For an adult you would normally |
| 18 | move the person to the -- to the floor for a harder |
| 19 | surface to work on but because the couch was relatively |
| 20 | stable we kept the child on the couch.  For a child it |
| 21 | is not necessary to do that. |
| 22 | Q    So it is your testimony that you performed |
| 23 | CPR on this futon or couch as you put it, correct? |
| 24 | A    We did. |
| 25 | Q    All right.  You would agree with me it is |

Case 1:17-cv-01290-DJS  Document 91-18/230-4, 350-4736/P3 02175 of 213 of 55
APPENDIX
1997

**M. Bayly - Cross Examination by Mr. Roberts**

2  ideal to perform CPR on a hard surface, correct?

3       A    Yes.

4       Q    Okay.  And would you agree with me the

5  reason for doing that is that it is important to have

6  the pressure of CPR -- withdrawn.

7            You would agree with me the importance of

8  having on a hard surface is to ensure that the

9  mechanisms that CPR are intended to function on are

10  actually effective, correct?

11       A    I'm not sure I understood what you said.

12       Q    Okay.  It is important to do CPR on a hard

13  surface so it works, correct?

14       A    You want something that isn't bouncy.

15       Q    Okay.

16       A    As long as it isn't bouncy it is okay.

17       Q    Okay.  And would you agree with me if

18  something is bouncy it can lead to unintended

19  consequences of the CPR, correct?

20       A    No.

21       Q    Okay.  You would agree with me that the

22  purpose of having a firm surface is to not incur injury

23  to the subject, correct?

24       A    No.  It speaks only to the effectiveness of

25  CPR.

**M. Bayly - Cross Examination by Mr. Roberts**

1

2     Q    You would agree with me that if you are

3  applying pressure on the chest cavity of an individual

4  on a softer surface you don't know how the pressure is

5  being exerted back from the -- the give of the subject

6  of what -- you're less -- bad question. I'm going to

7  strike that question.

8       You would agree with me because -- it is

9  designed -- CPR is designed to be used against a hard

10  surface because the procedure of CPR is designed to

11  compress the heart, correct?

12     A    It compresses the chest cavity.

13     Q    Okay. And it is important not to have a

14  bounce back because then you are going to have a

15  compression on the back of the subject, correct?

16     A    That's not my understanding. It speaks

17  solely to the effectiveness of CPR. You want a firm

18  surface so the CPR is effective.

19     Q    Okay. So you would agree with me it is less

20  effective if you're not on a firm surface?

21     A    The CPR is less effective. The results

22  you're trying to gain from CPR are less effective.

23     Q    Have you been trained, in any respect, with

24  respect to the effects of performing CPR on a softer

25  surface? The effects on the body?

**M. Bayly - Cross Examination by Mr. Roberts**

1

2    A    No.    Only to the effect that the CPR is less

3    effective if you're not on a firm surface.

4    Q    Okay.    So under ideal circumstances you're

5    to have a firm surface, correct?

6    A    Correct.

7    Q    And you would agree with me that a floor is

8    a very firm surface, correct?

9    A    Correct.

10    Q    And a couch or a futon is designed to be sat

11    upon so it is comfortable and accommodating when you

12    sit on it, correct?

13    A    Correct.

14    Q    All right.    For instance, when you're buying

15    a couch you're not looking for one that feels like a

16    floor, correct?

17    A    Correct.

18            MR. ROBERTS:    I will just take this

19            back before I steal it.

20    Q    Since you were initially trained on CPR how

21    many advances have moved forward in the practice of

22    CPR?

23    A    Quite a few.

24    Q    For instance, how were you initially trained

25    on how to perform CPR on a toddler?

M. Bayly - Cross Examination by Mr. Roberts

2    A    My initial training?

3    Q    Yes.

4    A    I couldn't tell you.

5    Q    When was your last training?

6    A    Within the last -- we're trained every two

7 years, so it was within the last two years.

8    Q    Do you remember the specific date you were

9 retrained?

10    A    I do not.

11    Q    Where was that training?

12    A    At the fire department.

13    Q    Who instructed it?

14    A    Our CPR EMS Battalion Chief or our EMS

15 Captain.

16    Q    Do you know how often he is -- he is

17 re-certified or how he gets up-to-date on the latest

18 techniques?

19    A    I know he's an American Heart Association

20 CPR instructor.  I don't know what he receives as

21 updates.

22    Q    So your training is only as good effectively

23 as his training, correct?

24    A    Correct.

25    Q    And did you ever have -- did you ever check

M. Bayly - Cross Examination by Mr. Roberts

1  to see if your training was in accordance with the

2  known standards for CPR or did you rely on your

3  instructor?

4      A     When we have a -- when we re-certify our CPR

5  certification it comes with all the American Heart

6  Association handouts and a Power Point, so we're not

7  just relying on what we're being told.  We're also

8  seeing a lecture.

9      Q     Okay.  And when you had that last lecture do

10  you know what date the materials you were being

11  lectured on were based on?  Was it 2012?  2014?  2015?

12  Did you check?

13     A     I did not.

14     Q     Okay.  So you would agree with me today that

15  you would have to rely upon the individual who last

16  gave you your trainings to determine whether or not it

17  was in the acceptable standards for CPR, correct?

18     A     Going there for an update every two years I

19  just assume that we're receiving the current update.

20     Q     Okay.

21     A     If that's what you're asking me.

22     Q     Right.  So you assume you're getting the

23  current update, there is no need for you to check into

24  it, correct?

M. Bayly - Cross Examination by Mr. Roberts

    A    Correct.

    Q    All right. Now, Captain, when you arrived
you said you were also kind of the supervisory guy at
the time, right? Were you the ranking fire responder
when you got to the apartment?

    A    When we first got there actually Captain
Shoemaker outranks me, but I have more paramedic
experience so I -- I was running the call.

    Q    Okay. When you say "running the call", what
does that mean?

    A    For every cardiac arrest we pretty much do
things. We do the same thing. It is called running
the code. Somebody runs the code. Somebody is in
charge. It is calling out what is going to be done,
what medications are going to be given. That way --
because there's a lot of people there, you know, that
way there aren't eight people --

    Q    -- trying to do the same thing.

    A    Yes

    Q    Okay. And this was --

    A    Orchestrating. One person is kind of
orchestrating the whole thing.

    Q    You would agree with me this is in a
relatively small room that you're working in, correct,

1 | **M. Bayly - Cross Examination by Mr. Roberts**

2 on February 26, 2015?

3     A    I wouldn't say -- it didn't seem that small.

4 I've been in smaller rooms.

5     Q    Okay. It got small with nine people in

6 there quickly, correct?

7     A    Not necessarily. I mean, we -- there is,

8 you know, some guys that come that are -- are just kind

9 of helping out behind the scenes and there was myself

10 and I know Danny Riley was doing part of the treatment

11 and, you know, there was three or four people around

12 her at most.

13     Q    All right. And how big would you -- are you

14 familiar with dimensions, feet?

15     A    Yes.

16     Q    How large would you estimate the room was?

17     A    Fifteen by fifteen.

18     Q    Okay. So you would agree with me that maybe

19 from myself to the wall is about 15 feet, correct?

20     A    Okay.

21     Q    Would you agree with me? Is it more or

22 less?

23     A    I guess you're in the ballpark.

24     Q    Okay. So, 15 by 15. So from me to the wall

25 and then kind of squared off we're talking about for a

**M. Bayly - Cross Examination by Mr. Roberts**

 2   room.   Then there is some furniture, a bed, a futon, a

 3   table, correct?

 4        A     Correct.

 5        Q     All right.

 6        A     Looking at the picture I saw more than what

 7   I really recall from seeing that day because we're

 8   going in, we have a child in cardiac arrest, I go right

 9   to the head, I start telling people what we're going to

10   do, and I'm not really looking at dimensions or wall

11   color or anything like that.

12        Q     Absolutely.   You were there to lend

13   assistance and save a life, correct?

14        A     Correct.

15        Q     All right.   So everything is very fast paced

16   and it is important and immediate, correct?

17        A     Correct.

18        Q     So when you first responded were -- was it

19   your first directive to have one of your associates

20   start CPR or did you, yourself, initiate CPR?

21        A     Somebody else started CPR.

22        Q     Who started CPR?

23        A     I don't recall who it was.   Possibly it

24   would be on the -- on the -- on the PCR.

25             MR. ROBERTS:   May I have a moment, your

Case 1:17-cv-00290-DJS Document 05-1 084891-2 350-4 08/13/22 18 Page 25 of 55 **APPENDIX** Filed 08/13/22 18 Page 25 of 55 **2005**

24

1 | M. Bayly - Cross Examination by Mr. Roberts

2         Honor?

3             THE COURT: Yes.

4              (Whereupon, a brief moment was taken.)

5              (In open court.)

6              (PCR was marked Defendant's Exhibit B

7         for identification.)

8     Q     What's a PCR?

9     A     Pre-Hospital Care Report.

10     Q     If I were to show you the Pre-Hospital Care

11 Report would that refresh your recollection,

12 potentially, relative to who did what?

13     A     It would.

14            MR. ROBERTS: May I?

15     Q     I will show you what's been marked as

16 Defendant's Exhibit B. After you review that document

17 please let me know if that refreshes your recollection

18 in any way.

19         All set?

20     A     Yes.

21     Q     I will just take that back from you. Thank

22 you. After looking at Defendant's Exhibit B, does that

23 refresh your recollection in any way?

24     A     It says CPR by other. So when -- on that

25 particular program you list some of the caregivers that

| | M. Bayly - Cross Examination by Mr. Roberts |
|---|---|
| 1 | |
| 2 | were there and everybody else that was there.  CPR was |
| 3 | done.  It is listed as an other. |
| 4 | Q    Okay.  So when you arrived you arrived |
| 5 | specifically with whom? |
| 6 | A    Frank Shoemaker and Danny Riley. |
| 7 | Q    Frank Shoemaker and Danny Riley.  Did you |
| 8 | observe -- when you gave the direction to start CPR was |
| 9 | there anyone else in the room? |
| 10 | A    Yes. |
| 11 | Q    Who else was in the room? |
| 12 | A    Frank and Dan.  Jim Tysner (phonetic) would |
| 13 | have been there.  He was a lieutenant on the ambulance. |
| 14 | Q    So of those people who started CPR? |
| 15 | A    I would say looking at the PCR it was |
| 16 | probably Frank. |
| 17 | Q    How long has Frank been an EMS responder? |
| 18 | A    He's been with the fire department a year |
| 19 | more than me. |
| 20 | Q    Okay.  Do you know when he was last |
| 21 | certified for CPR? |
| 22 | A    We're all on the same rotation so we do it |
| 23 | all at the same time. |
| 24 | Q    Was he there when you did CPR, your |
| 25 | recertification?  You have a specific recollection of |

| | M. Bayly - Cross Examination by Mr. Roberts |
|---|---|
| 1 | |
| 2 | it? |
| 3 | A     It's usually over one or two nights.  We do |
| 4 | shift work.  I don't know if he was in class with me or |
| 5 | not. |
| 6 | Q     Okay.  As you sit here today you don't know |
| 7 | when he was last certified, fair to say?  You're |
| 8 | assuming he was certified? |
| 9 | A     Correct. |
| 10 | Q     How long did Frank perform CPR? |
| 11 | A     For the duration of the call until |
| 12 | somebody -- you know, somebody may at some point may |
| 13 | have switched out with him.  And I don't think he went |
| 14 | to the hospital with us, so he wasn't doing CPR on the |
| 15 | way to the hospital. |
| 16 | Q     You have a specific recollection of watching |
| 17 | Frank do CPR? |
| 18 | A     No. |
| 19 | Q     So as you sit here today you don't know if |
| 20 | Frank used one hand or two hands on the child, correct? |
| 21 | Don't assume.  Do you have a recollection? |
| 22 | A     If he wasn't doing CPR right I would have |
| 23 | told him -- |
| 24 | MR. ROBERTS:  Judge, I would ask -- |
| 25 | A     -- to do it differently. |

| | |
|---|---|
| 1 | **M. Bayly - Cross Examination by Mr. Roberts** |
| 2 | THE COURT: He's attempting to answer |
| 3 | your question. |
| 4 | MR. ROBERTS: Okay. |
| 5 | Q     Captain, you would agree with me you do not |
| 6 | have a specific recollection as to the manner in which |
| 7 | he was doing CPR, correct, yes or no? |
| 8 | A     No. |
| 9 | Q     Again, you would agree with me that it is a |
| 10 | very hectic situation when you ran in there, correct? |
| 11 | A     It is a controlled situation. |
| 12 | Q     Okay. |
| 13 | A     So I would say no, that's not correct. |
| 14 | Q     And you would agree with me that CPR |
| 15 | involves the use of force against the sternum, |
| 16 | correct? |
| 17 | A     It involves compression against the sternum. |
| 18 | It doesn't have to be forcible.  It is a controlled |
| 19 | pressure. |
| 20 | Q     Okay.  And you would agree with me when I'm |
| 21 | saying -- you would agree with me that in order to |
| 22 | correctly perform CPR you must compress the chest |
| 23 | cavity, correct? |
| 24 | A     Correct. |
| 25 | Q     And to compress the chest cavity you push |

M. Bayly - Cross Examination by Mr. Roberts

downward, correct?

    A    Correct.  For a child you want to push about one third of the way of the diameter of their chest.

    Q    What was the diameter of the child's chest in this case?

    A    It is not something I would have measured. It is -- it is all --

    Q    You kind of eye it when you do it?

    A    Absolutely.

    Q    Okay.

    A    It is all on feel.

    Q    Okay.  So you would agree with me that your feel is different than someone else's feel, correct?

    A    Correct.

    Q    And because you kind of eye it you kind of gauge based upon your own experience the manner in which you perform CPR, correct?

    A    Correct.

    Q    And you would agree with me that when performing CPR on a toddler you give approximately 30 chest compressions over the duration of a minute and then utilize the bag, correct?

    A    No.  It is not 30.  It is not 30 compressions in a minute.  It is 30 to -- it is 30 --

| | |
|---|---|
| 1 | M. Bayly - Cross Examination by Mr. Roberts |
| 2 | Q    To a bag? |
| 3 | A    -- ratio.  Not 30 to a bag. |
| 4 | Q    In fact, it is much more than that.  It's |
| 5 | upward of 100 to 120 compressions, correct? |
| 6 | A    Correct. |
| 7 | Q    So when we say 100 to 120 compressions, that |
| 8 | means the pushing down with your hands on the chest |
| 9 | cavity 100 to 120 times per cycle, correct? |
| 10 | A    I would call it a 30 -- I would call it a 30 |
| 11 | to a cycle and I would call that 100 to 120 per minute. |
| 12 | Q    And how many minutes, from the beginning of |
| 13 | your call to your ultimate arrival at the hospital, was |
| 14 | compressions given to this child? |
| 15 | A    She had CPR the whole time.  She never had a |
| 16 | heartbeat so we were doing CPR. |
| 17 | Q    So you performed CPR for probably -- |
| 18 | A    From our -- the time on the PCR from the |
| 19 | arrival at the house until the time we got to the |
| 20 | hospital. |
| 21 | Q    Is that about 45 minutes?  How long did it |
| 22 | take for you to get -- how long did you work on her in |
| 23 | the house? |
| 24 | A    I would have to look at the PCR for the |
| 25 | times. |

| 1 | **M. Bayly - Cross Examination by Mr. Roberts** |

2    Q    Do you recall getting to the hospital around

3  1:41?

4    A    Again, I would have to -- it is all on the

5  PCR.

6    Q    Okay.  I will show you what's been marked as

7  Defendant's Exhibit B, which is the PCR.  Would that

8  refresh your recollection?

9    A    It would.

10        MR. ROBERTS:  May I?

11    A    1336, 1:36 is when we got to St. Mary's.

12    Q    1:36.  And you got on scene at 1:11?

13    A    We got there at 1:14.

14    Q    Okay.  I will take that back.  So about 20

15  minutes you were performing CPR?

16    A    Correct.

17    Q    So for 20 minutes you were applying pressure

18  at what rate?

19    A    100 -- 100 to 120.  You know, there are some

20  interruptions for movement.

21    Q    Movement meaning personnel?

22    A    And getting her in and out of -- you know,

23  out of the house into the ambulance.

24    Q    And you would agree with me that after --

25  after Danny Riley was doing compressions someone else

Case 1:17-cv-01290-DJS Document 91-6 Filed 05/13/21 Page 32 of 55
Case 2:3-cv-01,290-DJS Document 91-6 Filed 05/13/21 Page 32 of 212

1  M. Bayly - Cross Examination by Mr. Roberts

2  took over, correct?

3      A    Somebody took over.  I think, like I said,

4  it was Frank who was doing CPR.

5      Q    Frank.  Okay.  So Frank and then someone

6  else took over for Frank.  It may have been Dan

7  Riley?

8      A    Possibly.  He was -- he rode to the

9  hospital.

10      Q    All right.  And you would agree with me that

11  the purpose of having someone take over performing CPR

12  is that it is -- it is tiring, correct?

13      A    Correct.

14      Q    It is a physical exertion on the body such

15  that a grown man possibly has to let another grown man

16  take over, correct?

17      A    At times.

18      Q    Did you personally perform CPR on the

19  child?

20      A    No.

21      Q    So Danny Riley, how long has he been on the

22  EMT responders?

23      A    He has less time than me.  I'm not sure how

24  long he's been on.  Somewhere in the area of ten years.

25      Q    All right.  And, again, do you know when his

| 1 | M. Bayly - Cross Examination by Mr. Roberts |
| 2 | last certification of CPR occurred without guessing? |
| 3 | A    I don't, other than the fact we do it all at |
| 4 | the same time. |
| 5 | Q    Okay. |
| 6 | A    And I don't know for sure if he was doing |
| 7 | CPR. |
| 8 | Q    All right.  Fair to say that because more |
| 9 | than one individual performed CPR you have no idea if |
| 10 | that individual -- what the force was that individual |
| 11 | was using, correct? |
| 12 | A    It is not something we normally gauge. |
| 13 | Q    Sure.  So, no, you don't know how much force |
| 14 | that individual used? |
| 15 | A    No. |
| 16 | Q    Because it is -- it is all -- you would |
| 17 | agree with me that the manner in which someone performs |
| 18 | CPR is sort of unique to that individual, correct, |
| 19 | pursuant to how they gauge the situation? |
| 20 | A    I think you're asking me more than I can |
| 21 | answer. |
| 22 | Q    Okay.  So, did you go en route to the |
| 23 | hospital with whoever was performing CPR? |
| 24 | A    I did. |
| 25 | Q    In the -- in the ambulance? |

| | | |
|---|---|---|
| 1 | **M. Bayly - Cross Examination by Mr. Roberts** | |
| 2 | A | Correct. |
| 3 | Q | And as you sit here today you don't recall |
| 4 | who was doing CPR in the ambulance? | |
| 5 | A | I don't. |
| 6 | Q | So is it fair to say you don't recall the |
| 7 | manner in which they were doing CPR, correct? | |
| 8 | A | Correct. |
| 9 | Q | And when -- when you were in the ambulance |
| 10 | where were you situated? | |
| 11 | A | I was at the head of the stretcher.  There |
| 12 | is a chair there.  I was basically working her airway | |
| 13 | the whole time. | |
| 14 | Q | When you say "working the airway" that is |
| 15 | that you put a bag over her -- when I say a bag, a | |
| 16 | device that you can squeeze air manually? | |
| 17 | A | We use a bag valve mask first and then I |
| 18 | intubated her with an intratracheal tube and then I | |
| 19 | basically stayed at the head and worked the airway. | |
| 20 | Q | At some point someone administered Narcan, |
| 21 | correct? | |
| 22 | A | Correct. |
| 23 | Q | Tell the jury what that is. |
| 24 | A | It is a drug used to reverse the effects of |
| 25 | opiates. | |

**Cheryl M. Moore, Senior Court Reporter**

| 1 | M. Bayly - Cross Examination by Mr. Roberts |
| 2 | Q   And where's that administered? |
| 3 | A   I would have to look at the PCR to -- I'm |
| 4 | sure it is on there. |
| 5 | Q   Okay.  So fair to say you don't recall when |
| 6 | or where it was administered? |
| 7 | A   I know it is in the document. |
| 8 | Q   Okay.  I understand you know it is in the |
| 9 | document.  Fair to say, as you testify right now you |
| 10 | don't have a specific recollection? |
| 11 | A   No. |
| 12 | Q   Okay.  Would reviewing the document refresh |
| 13 | your recollection? |
| 14 | A   It would. |
| 15 | Q   Okay.  I will show you once again what's |
| 16 | marked Exhibit B.  Let me know when your memory is |
| 17 | sufficiently refreshed. |
| 18 |           THE COURT:  Mr. Roberts, he's ready to |
| 19 |           proceed. |
| 20 |           MR. ROBERTS:  Oh, yes. |
| 21 | Q   Is your memory sufficiently refreshed, |
| 22 | Captain? |
| 23 | A   It is.  It was in the -- it was after we |
| 24 | left.  It was en route to the hospital. |
| 25 | Q   Okay.  When you arrived at the apartment do |

| | | |
|---|---|---|
| 1 | | **M. Bayly - Cross Examination by Mr. Roberts** |
| 2 | | you recall the temperature in the apartment? |
| 3 | A | I don't. |
| 4 | Q | And at some point -- withdrawn. |
| 5 | | How long was CPR performed within the |
| 6 | | apartment on the futon? |
| 7 | A | From the time we got there until the time |
| 8 | | that we left. So we got there at 14 and we left at |
| 9 | | 1331. |
| 10 | Q | Sixteen minutes? |
| 11 | A | Sixteen minutes, seventeen minutes. |
| 12 | Q | If my math is off tell me. Around sixteen |
| 13 | | minutes you worked on her on the futon? |
| 14 | A | Right. |
| 15 | Q | When you encountered her did you change her |
| 16 | | body position on the futon or did you work on her as |
| 17 | | she was found? Did you move her left or right or up |
| 18 | | and down? |
| 19 | A | I moved her up right to the edge of the |
| 20 | | couch so I could work her airway. |
| 21 | Q | Okay. |
| 22 | A | I thought that would -- determined that was |
| 23 | | the best position to work her in. Her being so small, |
| 24 | | moving her to the floor would have made it more |
| 25 | | difficult for us to do, you know, our procedures. |

**M. Bayly - Cross Examination by Mr. Roberts**

1

2    Q    All right.  And while you were moving her on

3    the futon are you moving her arms and legs and kind of

4    shifting her entire body over to this location?

5    A    We just pulled her up to the edge.

6    Q    Pulled her up.  All right.  When you moved

7    her from the apartment to the ambulance, how did you

8    transport her?

9    A    We carried her out on a -- we put her on a,

10   like, a pediatric backboard we call it, just for ease

11   of movement, just to make it easier to move her.

12   Q    Explain to the jury how you secure her to

13   that backboard.

14   A    Put the backboard on the couch, rolled her

15   over and just rolled her onto it.  It has a bunch of

16   straps and we just strapped her on it and then two guys

17   carry her out.

18   Q    When you say rolled her over, is that so you

19   can slide the backboard underneath her?

20   A    Right.  So we can slide it underneath, roll

21   her back and put the straps on there.

22   Q    And then -- do you recall who moved her from

23   the apartment to the ambulance?

24   A    I don't.

25   Q    Were you giving those directions?

**M. Bayly - Cross Examination by Mr. Roberts**

1

2      A      I was.  At that point there was a Battalion

3  Chief there but, you know, we don't need to direct

4  every action of every person on the scene.  You know,

5  I'm sure there are two guys that realized we needed to

6  move her outside and they don't need to be told to move

7  her outside.

8      Q      Who made the determination to -- how long

9  you were going to try to work on her in the apartment?

10     A      We normally just -- enough time to get her

11 intubated, get an IV, give her her first round of

12 drugs.  Generally any cardiac arrest, from an infant up

13 to the oldest adult, your best chance in pre-hospital

14 cardiac arrest is right there on the scene so we

15 usually stay there, you know, in the ten to fifteen

16 minute range to accomplish what we want to accomplish.

17     Q      Okay.  And when you say what you normally

18 do, do you have a specific recollection as to who made

19 the determination it was time to go?

20     A      Probably me.

21     Q      Now, there was other efforts that were

22 undertaken by your unit to resuscitate her in the

23 apartment, correct?

24     A      What do you mean?

25     Q      Did you utilize paddles?

**M. Bayly - Cross Examination by Mr. Roberts**

1

2     A     That we -- no.  In the ambulance they have

3  paddles or pads, but yeah.

4     Q     What type of mechanical electrical tests did

5  you use on the child in the apartment?

6     A     The whole time the EKG monitor was hooked up

7  to her so that's how we treat whatever rhythm she may

8  be in.

9     Q     Can you explain to me what an EKG is and

10  when and how it was utilized in this case?

11     A     When we went inside I was at the head.  We

12  pulled her up to the head.  CPR was started.  The very

13  next thing that happens is the EKG monitor was hooked

14  on her.

15     Q     Why?

16     A     We need to know what rhythm she is in in

17  order to establish how we're going to treat her.

18     Q     What do you mean what rhythm she is in?

19  What are you looking for?

20     A     Heart activity.

21     Q     Okay.  And after utilizing the EKG in this

22  specific case -- is it a hand held device?  Comes in a

23  -- is it something you need to plug in?  Does it come

24  in a case?

25     A     It is a -- comes in a case.  It's its own --

| | |
|---|---|
| 1 | **M. Bayly - Cross Examination by Mr. Roberts** |
| 2 | its own - -- |
| 3 | Q    Self-contained unit. |
| 4 | A    -- self-contained unit. |
| 5 | Q    Did there come a time that you utilized this |
| 6 | unit? |
| 7 | A    Correct. |
| 8 | Q    And what, if anything, did you learn because |
| 9 | of using this medical device?  What did you find? |
| 10 | A    We found she was in asystole, which is |
| 11 | basically she had no heart activity.  It was a flat |
| 12 | line rhythm. |
| 13 | Q    Throughout the -- the process of CPR, were |
| 14 | you able to obtain a rhythm again? |
| 15 | A    At one point during the code, I believe it |
| 16 | was on the way to the hospital, she did go into what we |
| 17 | would call a shockable rhythm, something that you |
| 18 | can -- something that you can shock. |
| 19 | Q    What's that?  What do you mean a shockable |
| 20 | rhythm?  How is that -- how -- withdrawn. |
| 21 | When you say shockable rhythm, what does |
| 22 | that mean? |
| 23 | A    There's two rhythms in the heart you can |
| 24 | shock.  The same way -- it's the same way an automatic |
| 25 | defibrillator works that's probably out in the hallway. |

| | M. Bayly - Cross Examination by Mr. Roberts |
|---|---|
| 2 | It reads either v tach, which is ventricular |
| 3 | tachycardia or ventricular fibrillation. Those are the |
| 4 | only two rhythms that are what we call shockable |
| 5 | rhythms, something the electricity might have a chance |
| 6 | of reversing the cardiac arrest and getting a normal |
| 7 | beat back in the heart. |
| 8 | Q At what point did you find that rhythm to |
| 9 | occur? |
| 10 | A On the way to the hospital I believe she |
| 11 | went into v tach briefly and then into v fib and then |
| 12 | we shocked her. |
| 13 | Q Okay. And when you say you shocked her, |
| 14 | what does that mean? Explain the process to the jury. |
| 15 | A Deliver an electrical current based on her |
| 16 | weight. We set the machine to that -- to that amount |
| 17 | of energy and then you deliver the shock. |
| 18 | Q And who specifically performed this |
| 19 | function? |
| 20 | A I don't recall. |
| 21 | Q But you recall watching it occur, correct? |
| 22 | A Correct. |
| 23 | Q Now, you would agree with me when you first |
| 24 | arrived and found the child on the futon she was warm |
| 25 | to the touch, correct? |

Case 1:17-cv-01290-DJS   Document 94-3   Filed 05/13/22   Page 42 of 55
Case 1:23-cv-00... Document ... Filed 05/13/22   Page 200 of 213

**APPENDIX**   2022

41

M. Bayly - Cross Examination by Mr. Roberts

1

2    A    Yeah.  I believe she was warm to the touch.

3    Q    And what part of her body were you

4  touching?

5    A    Mostly her upper body.

6    Q    Okay.  Did you have an opportunity to touch

7  her arms?

8    A    Well, when I pulled her up and her -- I

9  think it was more her -- her core that was a little

10 warmer, her upper body.  Like I said, I was working

11 mostly at her head.

12   Q    Okay.  Did you have an opportunity to touch

13 her arms, legs, when you moved her?

14   A    I'm sure I did.  You -- you know, we pulled

15 her up.

16   Q    Okay.  Fair to say you didn't make any

17 notations that she was cold to the touch, correct?

18   A    No, unless it is in the PCR.

19   Q    Okay.  So your recollection is when you

20 first found her within minutes of arrival she was warm

21 to the touch?

22   A    I would have to look to see what I -- I'm

23 sure I noted something there.

24   Q    Do you recall giving a deposition to a Troy

25 police officer in this matter?

| 1 | **M. Bayly - Cross Examination by Mr. Roberts** |

2    A    I do.

3    Q    If you reviewed that would that refresh your

4 recollection?

5    A    Yes.

6            MR. ROBERTS:  Judge, could I utilize

7            the copy machine?  I have a note on it.  I

8            apologize.

9            THE COURT:  Yes.

10           (Whereupon, a brief moment was taken.)

11           (In open court.)

12           (M. Bayly's Deposition was marked

13           Defendant's Exhibit C for identification.)

14   Q    Captain, I will show you what's been marked

15 as Defendant's Exhibit C.  I will direct your attention

16 to about the eighth line down.  If you could read that

17 sentence.

18   A    She was warm to the touch.

19   Q    Okay.

20   A    When you're asking me what part of her body

21 was warm to the touch, I couldn't tell you.

22   Q    Okay.  You -- when you encountered the child

23 prior to initiating CPR you make an overall visual

24 assessment, correct?

25   A    Correct.

M. Bayly - Cross Examination by Mr. Roberts

Q    And you would agree with me that when you first encountered her, and through the duration of the time that you were encountering the child, at no point did you observe any visible injuries, correct?

A    Correct.

Q    Now, Captain, when you responded do you recall any members of the public at the apartment? The occupants, do you recall seeing them?

A    I know there was people there, but I -- I couldn't tell you who they were.

Q    Were there police officers there when you arrived?

A    I'm not sure if we got there first or they did. Some calls they're there first, some calls we're there first, so...

Q    You would agree with me that while you were there you had discovered an opiate derivative, prescription drug, correct?

A    It was discovered.

Q    Okay. Was it Hydrocodone, Hydrocodeine, do you recall?

A    I don't recall.

            MR. ROBERTS:  One moment, Judge.

            (Whereupon, a brief recess was taken.)

M. Bayly - Redirect Examination by Ms. Chavkin

1  M. Bayly - Redirect Examination by Ms. Chavkin

2                    (In open court.)

3                    MR. ROBERTS:  I don't have anything

4          further I don't believe.

5                    Thank you, Captain.

6                    THE WITNESS:  You're welcome.

7                    THE COURT:  Any redirect from the

8          People?

9                    MS. CHAVKIN:  Just briefly, your

10         Honor.

11              **Redirect Examination by Ms. Chavkin**

12         Q    Captain, I believe you testified that it is

13    your usual protocol to put a patient on the floor

14    before you begin CPR?

15         A    Correct.

16         Q    Why did you -- did you not put V█████ on the

17    floor?

18         A    Because of her size and her being so small I

19    had -- I had said it is normally that standard for an

20    adult, you would immediately pull them out of bed and

21    put them on the floor.  For a child, if the surface is

22    firm enough, it is not necessary.

23         Q    And did you feel that the surface was firm

24    enough?

25         A    I did.

| | | |
|---|---|---|
| 1 | **M. Bayly - Recross Examination by Mr. Roberts** | |
| 2 | Q | And when you're giving compressions during |
| 3 | CPR you're doing that on the sternum, correct? | |
| 4 | A | Yes. |
| 5 | Q | Not on the abdomen? |
| 6 | A | On the sternum in between -- for a child it |
| 7 | would be between the nipple line on the sternum. | |
| 8 | Q | Is CPR ever performed on the abdomen? |
| 9 | A | No, it is not. |
| 10 | Q | And I believe the testimony was that there |
| 11 | was narcotics in the house? | |
| 12 | A | At some point we -- some -- one of the |
| 13 | police officers had -- you know, we had heard in the | |
| 14 | course of running the code or working on the child that | |
| 15 | there was narcotics in the house. | |
| 16 | | MR. ROBERTS: Objection, your Honor. |
| 17 | | Withdrawn. |
| 18 | Q | Is that why you gave her Narcan? |
| 19 | A | Correct. |
| 20 | | MS. CHAVKIN: I have no further |
| 21 | | questions, your Honor. |
| 22 | | THE COURT: Mr. Roberts, anything else? |
| 23 | | MR. ROBERTS: Yes, your Honor. |
| 24 | | *Recross Examination by Mr. Roberts* |
| 25 | Q | So you testified that if CPR is done |

**Cheryl M. Moore, Senior Court Reporter**

| | |
|---|---|
| 1 | **M. Bayly - Recross Examination by Mr. Roberts** |
| 2 | correctly it is on the sternum between the nipples, |
| 3 | correct, between the nipples, is that what you |
| 4 | testified to? |
| 5 | A    Correct. |
| 6 | Q    As you sit here today, you don't have any |
| 7 | specific recollection as to how the members of your |
| 8 | unit were performing CPR, correct, other than they were |
| 9 | doing it? |
| 10 | A    Correct. |
| 11 | Q    Yes or no? |
| 12 | A    Correct. |
| 13 | Q    And you would agree with me that the |
| 14 | reason -- the importance of doing CPR on the sternum |
| 15 | between the nipples is if you perform CPR in a |
| 16 | different manner it can cause injury, correct? |
| 17 | A    Correct. |
| 18 | Q    And are you aware how many children either |
| 19 | Danny Riley or Frank had resuscitated prior to |
| 20 | encountering V████? |
| 21 | A    No. |
| 22 | Q    So, as you sit here today, you have no |
| 23 | direct knowledge if this was their first child? |
| 24 | A    No. |
| 25 | Q    How many times over your career have you |

| | M. Bayly - Recross Examination by Mr. Roberts |
|---|---|
| 1 | |
| 2 | performed CPR in its entirety? |
| 3 | THE COURT:  Mr. Roberts, we have |
| 4 | covered that on direct.  If it is a |
| 5 | transition question -- |
| 6 | MR. ROBERTS:  It is. |
| 7 | THE COURT:  -- into something else |
| 8 | that's okay. |
| 9 | MR. ROBERTS:  It is. |
| 10 | THE COURT:  But let's stick -- |
| 11 | MR. ROBERTS:  It is a transition |
| 12 | question. |
| 13 | THE COURT:  Let's stick to what was |
| 14 | addressed on redirect. |
| 15 | MR. ROBERTS:  I will withdraw it. |
| 16 | Q      You performed this on hundreds of people? |
| 17 | A      I -- more than that. |
| 18 | Q      More than that.  Okay.  You follow up with |
| 19 | their medical progression after you perform CPR on |
| 20 | individuals? |
| 21 | A      Yes.  I mean, if we -- if we have a cardiac |
| 22 | arrest reversal, yes, we do -- we do follow up. |
| 23 | Q      More than hundreds, what would be your |
| 24 | ballpark figure?  I'm sorry. |
| 25 | A      I couldn't possibly -- it is 22 years, |

**M. Bayly - Recross Examination by Mr. Roberts**

thousands of calls a year, it would only be an

estimate.  100, 200, maybe more.  I've worked in busy

systems, I've worked in slow systems.  It is hard to

put a number on that.

    Q    You have broken ribs doing CPR, have you

not?

    A    On adults.

    Q    Okay.  And you have only performed ten on

children, correct?

    A    That's an estimate as well, but that's it.

    Q    Did you follow up with the medical prognosis

of all ten of those children to determine if you had

broken ribs on any of them?

    A    No.

    Q    So, as you sit here today, you don't know if

you have broken ribs on children, correct?

    A    Well, when you --

    Q    Yes or no.

    A    When you break a rib doing CPR you know it

because you feel it.

    Q    Okay.

    A    I've never felt it doing CPR on a child.

    Q    And of all the times you've done CPR on a

child how many times have you done it on a futon?

**M. Bayly - Recross Examination by Mr. Roberts**

1 

2    A    More than once we have.

3    Q    How many?

4    A    I don't know.  I don't know.

5    Q    Fair to say when you feel a rib being broken

6 it is because you're pushing on the chest against a

7 hard surface and you can feel the change, correct?

8    A    To me it has nothing to do with the surface.

9 If you feel -- you feel it in -- you can feel it in

10 your hands.

11    Q    But you didn't perform CPR, did you?

12    A    No.

13        MR. ROBERTS:  Nothing further, Judge,

14        thank you.

15        THE COURT:  Anything else from the

16        People?

17        MS. CHAVKIN:  No, your Honor

18        THE COURT:  Okay.  Captain, you may

19        step down, thank you.

20        (Whereupon, the witness, Michael Bayly,

21        was excused from the witness stand.)

22        THE COURT:  All right.  Members of the

23        Jury, we'll take a 15 minute break at this

24        time.

25        During the course of this break please

**People v. Michael Davis**

CERTIFICATION

I, CHERYL M. MOORE, Senior Court Reporter for Rensselaer County Court and Notary Public in and for the State of New York, do hereby certify:

The foregoing to be a true transcription, to the best of my ability, of the stenographic notes as taken by me of the aforesaid proceedings and provided on a daily-copy basis. As such, minor typographical errors may be found and will be corrected when the official final copy of the record is provided.

IN WITNESS WHEREOF, I have hereunto set my hand this ___ day of _March_ 2020.

_____
CHERYL M. MOORE

Cheryl M. Moore, Senior Court Reporter

1    **People v. Michael Davis**

2               *INDEX TO PROCEEDINGS*

3    FOR THE PEOPLE:

4    MICHAEL BAYLY
   Direct Examination by Ms. Chavkin...............4
5    Cross Examination by Mr. Roberts................9
   Redirect Examination by Ms. Chavkin...........44
6    Recross Examination by Mr. Roberts............45
   Witness Excused...............................49

7

   KATHLEEN CRISAFULLI
8    Direct Examination by Ms. Chavkin..............51
   Cross Examination by Mr. Roberts...............55
9    Witness Excused...............................63

10   DANIELLE COONRADT
   Direct Examination by Ms. Chavkin..............64
11   Cross Examination by Mr. Roberts...............68
   Witness Excused...............................88

12

   REBECCA PARKER
13   Direct Examination by Ms. Chavkin..............88
   Cross Examination by Mr. Roberts...............95
14   Redirect Examination by Ms. Chavkin...........136
   Recross Examination by Mr. Roberts............136
15   Witness Excused..............................138

16   KRISTIN CORBIN
   Direct Examination by Ms. Chavkin.............139
17   Cross Examination by Mr. Roberts..............144
   Witness Excused..............................155

18

   MATTHEW METZGER
19   Direct Examination by Ms. Chavkin.............162
   Voir Dire Examination by Mr. Roberts..........164
20   Cross Examination by Mr. Roberts..............167
   Redirect Examination by Ms. Chavkin...........170
21   Recross Examination by Mr. Roberts............171
   Witness Excused..............................174

22

23   Matter Adjourned.............................182

24

25

| | |
|---|---|

1    **People v. Michael Davis**

2             *INDEX TO EXHIBITS*

3    PEOPLE'S EXHIBITS          FOR ID     REC'D

4     1    Miranda Warnings

5     2    Autopsy Photograph

6     3    Autopsy Photograph

7     4    Autopsy Photograph

8     5    Autopsy Photograph

9     6    Autopsy Photograph

10    7    Autopsy Photograph

11    8    Autopsy Photograph

12    9    Photograph

13    10   Photograph

14    11   Photograph

15    12   Photograph

16    13   911 CD                      166

17    14   Interview DVD

18    15   Interview DVD

19    16   M. Bayly's Statement

20    17   R. Fountain - Police
                  Narrative

21

22    18   R. Parker's Statement

23    19   K. Crisafulli's Statement

     20   TPD Supplemental Report

24    21   Crime Scene Attendance

25             Log

**People v. Michael Davis**

## INDEX TO EXHIBITS (Continued)

| PEOPLE'S EXHIBITS | | FOR ID | REC'D |
|---|---|---|---|
| 22 | Autopsy Report | | |
| 23 | Black & White Photograph | | |
| 24 | Black & White Photograph | | |
| 25 | 9/9/15 Video CD | | |

People v. Michael Davis

## *INDEX TO EXHIBITS (Continued)*

| DEFENDANT'S EXHIBITS | | FOR ID | REC'D |
|---|---|---|---|
| A | Photograph | 12 | 14 |
| B | PCR Report | 24 | |
| C | TPD - M. Bayly's Deposition | 42 | |
| D | Photograph | 76 | 77 |
| E | Photograph | 76 | 79 |
| F | CPS Report - pgs. 44-45 | 152 | |
| G | 2/24/15 Interview CD | | |

COURT'S EXHIBITS

1  Verdict Sheet............................

2  Jury Note................................

3  Jury Note................................