# 23-589

IN THE

# United States Court of Appeals for the Second Circuit

MICHAEL DAVIS-GUIDER,
*Plaintiff-Counter-Defendant-Appellant,*

— v. —

CITY OF TROY, RONALD FOUNTAIN, INDIVIDUALLY,
DANIELLE COONRADT, INDIVIDUALLY,
CHARLES MCDONALD, INDIVIDUALLY,
TIM COLANERI, INDIVIDUALLY,
*Defendants-Cross-Claimants-Counter-Claimants-Appellees,*

RENSSELAER COUNTY,
MICHAEL SIKIRICA, INDIVIDUALLY,
*Defendants-Cross-Defendants-Counter-Claimants-Appellees,*

ADAM R. MASON, INDIVIDUALLY
*Defendant-Cross-Claimant-Counter-Claimant,*

JOEL ABELOVE, INDIVIDUALLY,
*Defendant-Cross-Defendant-Counter-Claimant,*

JOHN AND JANE DOES 1-10, INDIVIDUALLY,
MICHAEL E. PARROW, ANDRA ACKERMAN,
*Defendants.*

On Appeal from the United States District Court
for the Northern District of New York
Case No. 1:17-cv-1290 (FJS/DJS)

## APPENDIX VOLUME 11 OF 11

# APPENDIX VOLUME 11 TABLE OF CONTENTS

ECF 130-3: Exhibit E ..................................................................... 2036

ECF 130-4: Exhibit F ..................................................................... 2150

ECF 130-5: City Defendants' Reply to Plaintiff's

Counter-Statement of Material Facts ........................................ 2243

ECF 134: Decision and Order ..................................................... 2278

ECF 139: Transcript of Proceedings .......................................... 2308

# EXHIBIT E

# APPENDIX

**2037**

```
 1

 2   STATE OF NEW YORK            COUNTY COURT
     COUNTY OF RENSSELAER         CRIMINAL TERM
 3   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
     THE PEOPLE OF THE STATE OF NEW YORK,
 4
     - against -                        15-1094
 5
     MICHAEL DAVIS,
 6
                         Defendant.
 7   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
                         Rensselaer County Courthouse
 8                       Congress and Second Streets
                         Troy, New York  12180
 9                       August 23, 2016

10                Trial - Volume 5

11   B e f o r e:

12       HONORABLE ANDREW G. CERESIA,
                         County Court Judge
13

14   A p p e a r a n c e s:

15   For  THE PEOPLE OF THE STATE OF NEW YORK:

16       JOEL E. ABELOVE, ESQ.
         Rensselaer County District Attorney
17       Rensselaer County Courthouse
         Congress and Second Streets
18       Troy, New York 12180

19       BY:  CINDY CHAVKIN, ESQ.
              Assistant District Attorney
20

21   For  DEFENDANT:

22       JOHN C. TURI, ESQ.
         Rensselaer County Public Defender
23       Congress and Second Streets
         Troy, New York 12180

24
         BY:  WILLIAM ROBERTS, ESQ. and
25            JESSICA ZWICKLBAUER, ESQ.
              Assistant Public Defenders
```

**Cheryl M. Moore, Senior Court Reporter**

# APPENDIX

1   **People v. Michael Davis**

2

  Also Present:

3

      Michael Davis, Defendant
4       Clerk of the Court

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**People v. Michael Davis**

1

2              (In open court.)

3              THE COURT:  Please be seated.

4              (Whereupon, the Defendant entered the

5       courtroom.)

6              THE COURT:  Okay.  We'll go on the

7       record.  We're outside the presence of the

8       jury.  When we broke yesterday the People --

9       excuse me, the Defendant made a motion for a

10      trial order of dismissal.  The People had

11      opposed.  The Court reserved.  The Court is

12      prepared to rule at this time.

13              The following evidence, the Court

14      notes, has been submitted by the People:

15      Evidence that the victim suffered injuries

16      in the form of fractured ribs and multiple

17      liver lacerations which lead to severe

18      internal bleeding.  Evidence that the

19      injuries were caused at or about the same

20      time by the same injury producing traumatic

21      event.  Evidence that the injuries,

22      particularly the liver lacerations and

23      internal bleeding, caused the victim's

24      death.  Evidence that the victim's injuries

25      could not have been caused by herself and

**People v. Michael Davis**

1

2      therefore had to have been caused by another

3      person.

4          The evidence concerning the nature, the

5      type and the extent of the injuries was such

6      that the jury can reasonably infer and

7      conclude that the Defendant acted with the

8      reckless intent and reckless elements that

9      make up the charges set forth in the

10     indictment.

11         With respect to the issue of the timing

12     of the victim's injuries and the linking

13     those injuries to having been caused by the

14     Defendant, the evidence was such that the

15     jury can reasonably infer and conclude that

16     the injuries occurred during the approximate

17     four to five hour period of time prior to

18     the victim's death when the Defendant was

19     alone with the victim.  In that regard, the

20     victim's mother testified that she observed

21     the victim before she left for work that

22     morning.  According to her observations the

23     victim had a cold a couple of weeks prior to

24     that but was feeling better.  Although the

25     victim appeared a little tired and sluggish

**People v. Michael Davis**

 the mother observed the victim up and out of bed walking around and going into the bathroom to use the bathroom.  According to the Defendant's statement to the police the victim and her mother exchanged a hug and a kiss before the mother left for work and then the mother left for work that day.  The last thing that the mother observed that morning before leaving was the victim in the bathroom walking toward the Defendant. Following that, according to the Defendant's statement, the victim got on the toilet and went to the bathroom.

 Based upon that evidence of the victim's behavior, just prior to being left alone with the Defendant, the jury can reasonably infer and conclude that as of that time she had not yet been subjected to the injuries that lead to her demise.

 In that regard the Court notes that Dr. Sikirica testified that the victim's injuries would have been painful; specifically the rib fractures.

 In addition, common sense and everyday

1 | **People v. Michael Davis**

2 | life experience allows the jury to

3 | reasonably infer that a two and a half year

4 | old toddler who had been subjected to

5 | multiple rib fractures, along with multiple

6 | lacerations to the liver, one of which was

7 | three inches in length and one of which was

8 | severe enough to cause part of the liver to

9 | tear away, would be experiencing and

10 | displaying signs of pain and distress.

11 | Accordingly, the evidence is such that

12 | the jury can reasonably infer and conclude

13 | that the victim's behavior prior to being

14 | left alone with the Defendant was not

15 | consistent with someone who had been exposed

16 | to the type of injuries that the evidence

17 | indicates she sustained in this case,

18 | injuries which would have caused significant

19 | pain.

20 | As such, having considered all of the

21 | trial evidence submitted by the People and

22 | all reasonable inferences that can be drawn

23 | therefrom in the light most favorable to the

24 | People, as the Court is required to do, the

25 | Court finds that the People have submitted

Case 1:17-cv-08290-DJS Document 133-24 Filed 05/13/22 Page 396 of 114

**People v. Michael Davis**

1  

2        legally sufficient evidence making out a

3        prima facie case in support of each of the

4        elements of the charged crimes.

5        Okay. With that said, are the People

6        ready to proceed with the jury?

7        MS. CHAVKIN: The People are ready.

8        THE COURT: Defense ready to proceed?

9        MR. ROBERTS: Yes, your Honor.

10       THE COURT: Okay. We'll bring the jury

11       in, please.

12       (Whereupon, the jury entered the

13       courtroom.)

14       THE COURT: Okay. Please be seated.

15       All right. Members of the Jury, good

16       morning. Welcome back to the courthouse.

17       We are prepared to resume with the trial at

18       this time.

19       Mr. Roberts, defense may call its first

20       witness.

21       MR. ROBERTS: Your Honor, at this time,

22       defense calls Michael Davis.

23       ***MICHAEL DAVIS,***

24 the witness hereinbefore named, being first duly

25 cautioned and sworn or affirmed to tell the truth, the

**Cheryl M. Moore, Senior Court Reporter**

**M. Davis - Direct Examination by Mr. Roberts**

1  whole truth, and nothing but the truth, was examined

2  and testified as follows:

3              CLERK OF THE COURT:  The sworn witness

4          is Michael Davis.

5              THE COURT:  Mr. Roberts, you made

6          proceed when you're ready.

7              MR. ROBERTS:  Thank you.

8          *Direct Examination by Mr. Roberts*

9      Q    Good morning.

10     A    Good morning.  Good morning.

11     Q    Mike, could you pull that microphone a

12  little bit closer.

13          Could you please state your name for the

14  jury?

15     A    Michael Davis.

16     Q    Michael, how long have you lived in the City

17  of Troy?

18     A    For roughly, I will say, two years.

19     Q    Okay.  And tell the jury a little bit about

20  yourself.  Where did you go to high school?

21     A    Xaverian High School.  It is in Brooklyn.

22     Q    And did you graduate from high school?

23     A    Yes, sir.

24     Q    From high school what did you do?

Case 1:17-cv-04290-DLC Document 94-1 Filed 05/13/22 Page 12 of 298

**M. Davis - Direct Examination by Mr. Roberts**

1

2    A    I actually went to a prep school to play

3 basketball for one year and then I went to college.

4    Q    What was the prep school?

5    A    It was in Fitchburg, Massachusetts.

6    Q    Okay.  And how long did you attend the prep

7 school?

8    A    Just for a year playing basketball.

9    Q    And then after concluding your year at the

10 prep school what did you do?

11    A    I went to Seton Hall University.  It's a D-1

12 school in Jersey, South Orange.

13    Q    What does D-1 mean?

14    A    It means like the highest level of

15 basketball that a college could produce.

16    Q    And you said it was Seton -- Seton Hall.

17 Where is that located?

18    A    It is in Jersey, South Orange.

19    Q    What did you study at Seton Hall?

20    A    I studied business and social psychology.

21    Q    And you said that you played for their team.

22 What was your position?

23    A    I was a center.  I was a four man, a three.

24 I could play multiple positions on a court.

25    Q    How long have you played basketball, Mike?

Case 1:17-cv-01290-DLC Document 241-1 Filed 05/13/22 Page 11 of 114

**M. Davis - Direct Examination by Mr. Roberts**

1
2      A      Since I was like ten years old.

3      Q      And from Seton Hall did you transfer

4  anywhere?

5      A      Yeah.  I transferred to Saint Francis

6  University in Brooklyn.

7      Q      And how long did you attend Saint Francis?

8      A      For roughly a year.  The coach got fired at

9  the end of the year so I signed with an agent and

10  started playing professional.

11      Q      What do mean you signed with an agent?

12      A      At the end of the year, when the coach got

13  fired, there was somebody else coming in.  I didn't

14  know how he was with the team and stuff so I just got

15  an agent and signed with them at the end of the school

16  year.

17      Q      Okay.  So after being concerned about how

18  you were going to fit in with the new coach coming in,

19  did you continue to play basketball?

20      A      Yeah, I did continue to play ball.

21      Q      For schools or for -- professionally?

22      A      Professionally.  It was a -- when I

23  transferred it was a sit out year so I never played,

24  like, on a team that year.

25      Q      What do you mean it was a sit out year?

Case 1:17-cv-01290-DDC Document 98-4 Filed 05/13/22 Page 228 of 114

**M. Davis - Direct Examination by Mr. Roberts**

    A    When you transfer from one school to another you have to sit out a full year before you can play basketball again. Just, like part of the rules.

    Q    Part of the NCAA rules, if you transfer from one school to another?

    A    You can't play directly if you transfer from one D-1 school to another.

    Q    Okay. So, you left college early, decided to play professional ball?

    A    Yes, sir.

    Q    Okay. Where did you first start playing professional ball?

    A    For the D League. It is the developmental league for the NBA. It was Texas Legends, a D League team for the Dallas Mavericks in Dallas, Texas.

    Q    Where were they stationed, in Texas?

    A    Yes, sir.

    Q    How long did you play for the NCAA? Basically it's a farm team, right?

    A    D League is for the developmental league of the NBA, kind of different. NCAA is like college bound stuff but I played for them for one year.

    Q    And then from -- from there what did you do for a career?

**M. Davis - Direct Examination by Mr. Roberts**

1

2 A I just went to various teams all over the

3 world; China, Lithuania, parts of Canada, Puerto Rico,

4 just playing basketball.

5 Q How did you arrange to play for these

6 various teams overseas?

7 A My agent pretty much set it up through other

8 agents from overseas.

9 Q Okay. When you say an agent, is that -- you

10 mean someone who would -- how would the agent discover

11 basketball teams for you to play with? Are you aware

12 how that worked?

13 A He -- actually in Brooklyn or Manhattan he

14 would set up, like, programs for me to go and play in

15 front of NBA, like, scouts or scouts from overseas to

16 see if they would like you, and if they liked you

17 enough they'd probably pick you up or call the agent

18 and make arrangements.

19 Q Did there come a time you met with a woman

20 by the name of Rebecca Parker?

21 A Yes, sir.

22 Q When did you meet Rebecca?

23 A I met her in the City, actually.

24 Q And did there come a time that you took up a

25 relationship with Rebecca?

M. Davis - Direct Examination by Mr. Roberts

2      A     Yes, sir.

3      Q     When did that occur?

4      A     Roughly a year and a half ago.

5      Q     And when you met Rebecca did she have any
6  children?

7      A     Yes.

8      Q     Who was her child?

9      A     Viola.

10     Q     Did you call her V████?  What did you call
11 her?

12     A     I called her ████, but her name is V████, but
13 we always called her ███ for short.

14     Q     Okay.  And how old was ███ when you first
15 met her?

16     A     When I first met ███ she was probably a
17 couple of months, I would say when I first met her, to
18 a year, around in there.

19     Q     When did you predominantly become involved
20 in Rebecca's and ███'s lives?

21     A     When she was one and a half, I would say,
22 something around there.

23     Q     Where did that occur?

24     A     It occurred up here in Kings.

25     Q     Okay.  At some point you -- did there come a

**M. Davis - Direct Examination by Mr. Roberts**

2   time you moved to Troy?

3       A     Yes.

4       Q     And who did you move to Troy with?

5       A     My older cousin.

6       Q     Okay.

7       A     His name is Terence.  He was the first one I

8   actually moved to Troy with.

9       Q     When you moved to Troy how did Rebecca get

10  up here?

11      A     She came -- they had actually went to the

12  City.  I was watching their five kids for roughly three

13  weeks when they went down to the City and then she came

14  up here with them from the City.

15      Q     Your cousin Terence, you were taking care of

16  their children in New York City?

17      A     I was taking care of the children up here in

18  Troy.

19      Q     Okay.  And Rebecca came up here?

20      A     Yeah.  She came up here with them.

21      Q     And when would you say your relationship

22  with her romantically began?

23      A     Probably roughly a month or two after she

24  came up here.

25      Q     Okay.  And when she came up from New York

**M. Davis - Direct Examination by Mr. Roberts**

City where was ██?

    A    She came with her.

    Q    Did there come a time that you took up residence with her, started living with her?

    A    Yes.

    Q    When did that happen?

    A    Roughly, approximately, maybe a year and change I would say.

    Q    Now, have you and Rebecca discussed your living arrangements?

    A    Actually, yeah, we kind of did because it was one of her, I will say, her managers had an apartment that --

    Q    Her managers from where?

    A    From Stewart's.

    Q    Okay.  So she was working at Stewart's?

    A    Yes.  She worked at Stewart's at the time. The manager had an apartment that was just, like, vacated a couple of days from when I moved out around the corner from him.  He said, you know, if you and your daughter want to move in, but she didn't really have anybody to watch ██ so I told her I would go take care of ██ while she was working.

    Q    And how did she respond to that?

**M. Davis - Direct Examination by Mr. Roberts**

1

2      A    I was taking care of ██ a few months prior

3  to that so she kind of was happy about it.

4      Q    What do you mean you were taking care of

5  ██? What would you do for ██ before you actually

6  started to move in with Rebecca?

7      A    She had a job. When she first moved up here

8  she got a job and I was just watching her, watching the

9  movies while we were at my cousin's house in the Kings,

10  just feeding her, bathing her, changing Pampers, normal

11  stuff.

12      Q    And when you first started to watch ██,

13  where was she developmentally?

14      A    She wasn't really talking a lot. She was

15  pretty much -- I would say she was very advanced for

16  her age, but at that time she wasn't really talking a

17  lot. I had to, like, get her to talk a lot, sing with

18  her, stuff like that, that type of stuff.

19      Q    What do you mean you would talk a lot and

20  sing with her, in what context?

21      A    Like, when we watched the movies and stuff

22  like that, cartoons and stuff, she would sing songs and

23  then I would start singing and she liked it, so she

24  would smile and she would, like, try to sing but her

25  being so young but she was just trying. It was cute.

| | **M. Davis - Direct Examination by Mr. Roberts** |
|---|---|
| 1 | |
| 2 | Q    And her day-to-day needs, when Rebecca was |
| 3 | at work, what else would you do for ▇ when you first |
| 4 | started caring for her? |
| 5 | A    Well, I pretty much showed her how to eat |
| 6 | with, like, a spoon and a fork.  And I would read, |
| 7 | like, books and stuff to her, do her ABCs and 123s, |
| 8 | stuff like that.  I would show her how to say please |
| 9 | and thank you.  And she developed pretty well.  So when |
| 10 | she was out around people they would say, how old is |
| 11 | she?  I would say oh, she's going on two years old. |
| 12 | And they would say she talks very well for her age.  I |
| 13 | said, well, I work with her, with her speech and stuff, |
| 14 | so... |
| 15 | Q    And who -- did you have an opportunity to |
| 16 | observe Rebecca work with her on those subjects? |
| 17 | A    Well, here and there but because she worked |
| 18 | a lot she didn't really spend a lot of time with |
| 19 | working on subjects.  I pretty much did everything, |
| 20 | so... |
| 21 | Q    What about diapers, who took care of ▇▇'s |
| 22 | sanitary needs? |
| 23 | A    I did.  I changed ▇▇'s diapers. |
| 24 | Q    From what age to what age? |
| 25 | A    From one and a half until she passed away I |

1    **M. Davis - Direct Examination by Mr. Roberts**

2    changed all of her diapers.

3        Q      Did you have any problems changing her

4    diapers?

5        A      I never did.  I have daughters of my own.

6    I'm pretty much a great father, so I didn't have a

7    problem changing diapers or stuff like that.  It didn't

8    bother me.

9        Q      You had previous experience changing

10   diapers?

11       A      I did it a lot when I was a kid in school

12   and when I was in foster care too, so...

13       Q      Now, I'm going to fast forward you a little

14   bit until February 2015.  Where were you living?

15       A      We were living in Lansingburgh actually,

16   124th and Fourth Avenue.

17       Q      And could you describe the apartment for

18   me?

19       A      It is not really a big apartment.  It is a

20   first floor apartment.  Everything is right there on

21   the first floor.  The living room is right when you

22   walk in and then off to the right is ████'s bedroom and

23   then if you go straight through it is like an open end

24   of the kitchen and then the bathroom is in the back.

25       Q      Was the apartment a multi structure building

**M. Davis - Direct Examination by Mr. Roberts**

or was there a tenant upstairs?

    A    Yes, sir.

    Q    Okay.  And --

            MR. ROBERTS:  May I approach the witness, your Honor?

            THE COURT:  Of course.

    Q    Mike, I will show you what's been marked as People's 11 in evidence.  What do you recognize that front door as?

    A    Yes, that's our front door.

    Q    Front door to your apartment?

    A    Yes, sir.

    Q    And in February -- well, withdrawn.

            What were the conditions of the apartment when you first moved in?

    A    It was pretty much horrible.

    Q    What do you mean?

    A    There was just stuff all over the floor.  It was -- somebody had lived there prior to us, they didn't take care of it.  They weren't too fond of the landlord so it was in really bad condition when we first moved in.  That's why the landlord gave us two weeks at first rent free, so...

    Q    Okay.  And when you moved in was there any

**M. Davis - Direct Examination by Mr. Roberts**

materials that had to be cleaned?

    A    Everything pretty much had to be cleaned.

    Q    Okay. Specifically, did you have any issue with any of the walls?

    A    Yeah, there was actually black mold inside some of the walls and stuff like that and protruding out of the wall. You could kind of see it when we first came in. So it wasn't the greatest, but she was giving it to us for a decent amount of time. It was our first time, both of us, having our own place, so...

    Q    And did the landlord come in and remove that? What happened with the mold issue?

    A    We pretty much got into an argument with her back and forth, like, about removing it because she didn't do it at first. She always kept on saying she would do it, just pay this month's rent, and we would pay it. Then she would say well, pay the next month's rent. And then I told her, like, let's see what she will do, let's pay the next month's rent. But she never did it, so...

    Q    How long did the mold issue continue in the apartment when you moved in?

    A    Probably for about four or five months until we just decided, like, unless you fix this stuff we're

**M. Davis - Direct Examination by Mr. Roberts**

not going to pay you. That's pretty much what we came

up with.

    Q    In February how was your apartment heated?

    A    It was actually heated from coils that go

around the whole entire, like, basically the apartment.

    Q    Baseboard heating?

    A    Yeah. Like a base of coils around the

bottom that goes around the apartment but it pretty

much didn't work at all. Like every time you put new

batteries in it, it would work for 15 minutes and then

completely shut off. That happened off and on for

maybe a few weeks. As it was getting into winter it

completely shut off and wouldn't work at all, no matter

how many different batteries we bought, so we kept on

telling her but she never did anything about it.

    Q    And with your problems with the heat how

would you heat the apartment?

    A    We would either use the top of the stove.

We would heat with the top of the stove or the oven so

it heated around the whole apartment or we had gotten

a, like, a little space heater from her mother's house

that Rebecca had in storage and that's what we brought

up there and we used it in ███'s room to pretty much

keep her room warm because she had the coldest room in

Cheryl M. Moore, Senior Court Reporter

**M. Davis - Direct Examination by Mr. Roberts**

the house.   We stayed in the living room because it was

a one bedroom apartment with a big living room and

kitchen and bathroom.

    Q    And Rebecca's mother's name, what's her

name?

    A    Nancy Parker.

    Q    Now, in February what was the working

situation at your home?

    A    Like the apartment and stuff or people?

    Q    Bad question.

    A    Yeah.  I don't understand.

    Q    In February was Rebecca still working at

Stewart's?

    A    Yes, sir.

    Q    And what about yourself?

    A    I was just a stay-at-home dad.

    Q    When you say you were a stay-at-home dad,

what do you mean?

    A    I pretty much stayed at home and just took

care of ▮▮▮ and took care of the apartment, cooked,

clean, stuff like that.  I did clothes, you know.

    Q    What do you think of that?

    A    I was actually all right with it.

    Q    Well, when you say stay-at-home dad, why are

Case 1:17-cv-01290-DDD-JMC Document 98-4 Filed 05/13/22 Page 24 of 114

| | |
|---|---|
| 1 | **M. Davis - Direct Examination by Mr. Roberts** |
| 2 | you calling yourself a dad? |
| 3 |     A    Because ▓▓ was my daughter, that's how I |
| 4 | looked at her.  That's how -- |
| 5 |     Q    Was she biologically your child? |
| 6 |     A    No, sir. |
| 7 |     Q    Did she have any blood relation to you? |
| 8 |     A    Yes, sir. |
| 9 |     Q    Who was she in relation to your family? |
| 10 |     A    She was my little cousin's cousin -- his |
| 11 | daughter.  My little cousin's daughter, excuse me. |
| 12 |     Q    So Rebecca was dating your cousin? |
| 13 |     A    Yes, sir. |
| 14 |     Q    That didn't work out and then you and her |
| 15 | ended up falling for one another? |
| 16 |     A    Yes, sir.  We liked a lot of the same |
| 17 | things.  I was relaxed how she was.  We like to watch |
| 18 | movies and stuff like that, you know, family movies, |
| 19 | comedy movies, stuff like that. |
| 20 |     Q    And when you referred to ▓▓, did you refer |
| 21 | to her as your cousin or Rebecca's child?  What did you |
| 22 | call her? |
| 23 |     A    I called her ▓▓ or I said my daughter. |
| 24 |     Q    Did you hold her out to the public as your |
| 25 | daughter? |

**M. Davis - Direct Examination by Mr. Roberts**

 A  Yes. Everybody knew her as my daughter, everybody that was around her.

 Q  Why did you call her your daughter, Mike?

 A  Because she was my daughter.

 Q  What do you mean?

 A  To me that's how she was, that's how I loved her, like she was my daughter.

 Q  What do you mean you loved her like a daughter?

 A  Like any real father would treat their daughter. I loved her. That's how it was with her.

 Q  How did you treat her?

 A  With love and care. I just always did everything with her pretty much, laugh, played with her, read her books. I watched cartoons with her. Her favorite cartoon was Princess and The Frog, which was a movie, or Frozen. I'd sing songs with her and stuff like that, so she liked that.

 Q  How would ▓▓ respond to you? Did you have an opportunity to observe ▓▓ when she interacts with you?

 A  Yes.

 Q  How -- describe for the jury how ▓▓ would respond when you're caring for her?

M. Davis - Direct Examination by Mr. Roberts

1

2    A    She always loved me.  She would say daddy.

3    Every time I talked to her she would come and give me

4    hugs and she'd kind of like sniffle at your nose and

5    stuff like that and it was just kind of cute when she

6    would do it.

7    Q    How long did she call you daddy?

8    A    She probably called me daddy a month after I

9    had her in my care she started calling me daddy.  I

10   just pretty much did everything with her, so...

11   Q    While you were caring for ▓▓▓ did you and

12   Rebecca have discussions about you returning to

13   basketball?

14   A    Yeah.  She always said that she was -- first

15   I would ask her, you know, maybe if you want me to, I

16   need a job or something like that, I would, but she was

17   like, you know, at this time I'll work and you just

18   help take care of her so maybe we can get into housing

19   and get it situated where we can get her in a day care

20   or something like that and you can go back and play

21   ball, so I said okay.

22   Q    And when Rebecca got home from work was

23   it -- what were your responsibilities with ▓▓▓?  Was it

24   done when Rebecca came home?

25   A    No.  I was still taking care of her a lot of

**M. Davis - Direct Examination by Mr. Roberts**

times.  But a few times she came home from work I would

go across the street to my friend's house, Willie.

    Q    What about when you and Rebecca were in the

apartment together, who was in charge of diaper duty?

    A    Me still pretty much.

    Q    What do you mean?

    A    Meaning like if she pooped or had accidents

or stuff like that I would pretty much still change her

diaper.

    Q    How would you determine you would change the

diaper as opposed to mom?

    A    Well, I changed her diapers for so long.  I

guess, like, the smell of her pooping wasn't sitting

that well on her stomach.  She would ask me to change

her.  I had no problem.  I was used to smelling that

for a really long time so I would change her diaper and

stuff, so I kind of got, you know, used to it so it was

nothing for me to change a diaper.

    Q    You were better with the nasty diapers than

Rebecca?

    A    Yeah, pretty much.

    Q    Okay.  Now, let's talk about specifically

February 26th.  Now, on the 25th you recall the late

evening hours of that day?

**M. Davis - Direct Examination by Mr. Roberts**

1

2  A    Yes, sir.

3  Q    Okay.  What happened around 7:00 or 8:00?

4  A    I actually made some baked chicken.  I put

5  it in the oven, then I told her I was going across the

6  street to Willie's house to watch the basketball game.

7  Q    When you prepared the chicken was Rebecca

8  home or was she at work?  What was happening?

9  A    She was home when I prepared the chicken.  I

10  was actually -- I asked her to watch it, the chicken,

11  for me while I go across the street.

12  Q    And so you put the chicken in the oven and

13  you were going across the street to do what?

14  A    To watch the basketball game.  There was,

15  like, two different games on, NBA games.  I went across

16  the street to watch it.

17  Q    Why not just watch them at your street?

18  A    Because we got no cable, even no regular

19  television or anything like that.  We didn't have

20  any -- any of that.

21  Q    Were you able to pick up the television over

22  the air, you know, with the rabbit ears, that type of

23  thing?

24  A    No.  We had a DVD player with a bunch of

25  movies.

M. Davis - Direct Examination by Mr. Roberts

    Q    Okay.  So, because you didn't have cable at your house or any television you had discussed with Rebecca going over to watch a basketball game?

    A    Yeah, I went over there plenty of times to watch games and stuff like that.

    Q    Your neighbor's name was what?

    A    Willie Robinson.

    Q    And did you -- did you go over and watch the games with Willie?

    A    Yes, sir.

    Q    And then after the games what happened?

    A    After the games it was pretty late so I just came back over to the apartment.

    Q    And when you got home was there anyone awake?

    A    Rebecca was still up.

    Q    Okay.  How long did you continue to be up that evening?

    A    I took a shower and then I went to bed, so I'm not really sure of the amount of time I was up.

    Q    Okay.  Do you recall what you were dressed in that evening?  Well, bad question.  After you took a shower what did you dress in?

    A    Pajama pants and a t-shirt, like, with

**M. Davis - Direct Examination by Mr. Roberts**

regular socks.

    Q    When you came home on the 25th where was Ola?

    A    She was still -- when I came home she was in her bed actually when I came home.  When I left she was still up.

    Q    When you left she was still up?

    A    Yes, sir.

    Q    How can you be sure she was still up?

    A    She was standing right in the living room when I left.

    Q    Okay.  When you came in you didn't see her?

    A    No, she was in her room sleeping from what her mother told me.

    Q    Okay.  So after you go to bed what's the next thing that happened, Mike?

    A    After I went to bed that night I woke up, I don't know exactly what time it was, but I had woke up in the morning to Rebecca getting ready to go to work.

    Q    Okay.  And she was working where at this time?

    A    At Stewart's.

    Q    Still Stewart's?

**M. Davis - Direct Examination by Mr. Roberts**

1

2      A      Yeah, on Glen Avenue.

3      Q      While Rebecca was getting ready for work

4  what happened next?

5      A      As she was getting ready for work and I was

6  kind of, like, waking up, I was smelling, like, kind of

7  a poop smell.

8      Q      Where was ███?

9      A      She was in her room.

10      Q      Okay.  And how far from where your head is

11  lying to where ███'s bed is?

12      A      I guess for me it would be like three steps,

13  but it was like right in the next room.

14      Q      Okay.  So you thought maybe she had gone to

15  the bathroom, so what did you do?

16      A      I actually called for her and -- because I

17  also heard her, like, kind of moving around in the bed

18  so I said, ███, and she came out the bedroom and came

19  to me but she just didn't look like her normal self

20  when she came to me in the room that morning.

21      Q      What do you mean she didn't look like her

22  normal self?

23      A      She was very down and like sluggish.  Like

24  she was moving really slow.  And she is never like

25  that.  I mean, she would sleep for an hour and wake up

**M. Davis - Direct Examination by Mr. Roberts**

with all the energy in the world. She never looked

that exhausted before. She never looked like that ever

before. She always had energy at all times.

    Q    But this morning is different?

    A    Yeah. She just -- she acted like she had no

energy at all when she came to me, so I just -- I said

are you okay? And she just -- she kept her head down.

She was very, like, moving slow and --

    Q    She came out to where you were. Were you

still lying in bed or had you gotten up?

    A    I was kind of up on the bed, but like with

my body still laying down, but I was up a little.

    Q    Where was Rebecca?

    A    She was putting her coat on getting ready to

leave out the door.

    Q    How long did you interact with ▓▓▓ as you

kind of -- near your bed?

    A    Probably like for a couple of seconds, I

would say. I just said, you know, you've been doing so

well with pooping because she always said something to

me about it. I said, you're doing so well, if you make

mistakes it is okay, but she didn't really look up or

say nothing. She had her head down like she was just

extremely exhausted and I didn't understand why she

**M. Davis - Direct Examination by Mr. Roberts**

1  looked like that.

2  Q    Well, you said that you had made -- it is

3  okay to make mistakes, what were you talking about?

4  A    Because I was -- when I was potty training

5  her she would poop and then she would -- I guess she

6  would poop and she really wouldn't say nothing to me,

7  so I would just talk to her about it, like I normally

8  do.  I was good at just conversating with her.  I was

9  like, it is okay, you pooped and it is okay.  But she

10  liked going to the potty.  She had a nice little duck

11  type potty, the cushion you put on top of the toilet,

12  she would waive bye bye to the water.  She would always

13  want to flush the toilet and stuff like that.  That's

14  how she was.

15  Q    How long were you working on her with the

16  potty training, Mike?

17  A    For a few months and she actually progressed

18  like pretty fast.  She's an advanced child for her age.

19  She would progress real fast actually.

20  Q    Would Rebecca work with the potty training

21  as well?

22  A    Once in awhile she would but I pretty much

23  did all that myself.

24  Q    Okay.  So that morning when you told her it

**M. Davis - Direct Examination by Mr. Roberts**

1  is okay, it is okay to have mistakes, how did she

2  respond?

3      A      She didn't really respond.  She just -- it

4  was her head down, kind of like slow moving.  She just

5  really wasn't responding at all.

6      Q      So what did you do with respect to the dirty

7  diaper?

8      A      Rebecca actually told her bye, gave her hug

9  and left the house.

10     Q      Before you dealt with the diaper Rebecca

11 said good bye?

12     A      Yes.  Before the diaper.  I said let's go to

13 the bathroom because she was still making a face like

14 she was pushing the poop out, like she never really

15 finished.  So I took her in the bathroom, and I took

16 the Pamper off.  I said go poop.  She had the face like

17 she was still pooping, so I lifted her up by her

18 underarms and sat her on the cushion and went into the

19 kitchen.  Because sometimes I sit in there with her,

20 sometimes I say call me when you're done.  So I went to

21 the kitchen but she usually calls me.  She never did.

22 I came in and I finally said, are you done?  And she

23 was kind of like nodding her head.  I said okay.  I

24 wiped her up, put a new Pamper -- I took her off the

**M. Davis - Direct Examination by Mr. Roberts**

toilet, put a new Pamper on her.  I asked if she wanted

something to eat or drink and she normally do want

something to eat or drink.  She shook her head no.  I

gave her the bottle anyway and I just was trying to

have her drink something.

    Q    Let me slow you down.  So you asked her if

she wanted anything to eat and drink?

    A    Yes.

    Q    She shook her head or did she physically

verbally say no?

    A    No, she was kind of like nodding her head

like that.

    Q    After she said no you decided to get her one

to see if she would drink?

    A    I gave her the bottle anyway.

    Q    Where did you get the bottle?

    A    I already had the bottle.  It was sitting on

the counter in the kitchen.

    Q    What was in the bottle?

    A    Just like water.

    Q    Okay.  When you gave her the bottle, are we

talking about a bottle with a nipple on it or what type

of --

    A    A sippy cup.  It wasn't a bottle with a

**M. Davis - Direct Examination by Mr. Roberts**

1 nipple. It was a sippy cup.

2     Q    So you give her the sippy cup and what did

3 you observe?

4     A    What she usually do, if she don't want to

5 drink some of it, she puts it to her mouth and holds it

6 there. She won't drink anything like that. So I seen

7 her doing that so I said, okay, just if you don't want

8 to drink just go back to bed, it is relatively early,

9 so. But she was -- she just didn't look right. But

10 usually in the morning she never does, so...

11     Q    Okay. So, did you take the bottle from her?

12 What happened to the bottle?

13     A    She actually took the bottle into her room

14 with her.

15     Q    Then what happened, Mike?

16     A    I watched her go in, put the bottle on the

17 floor, then she got back into bed.

18     Q    Then what did you do?

19     A    I was relatively tired but I was still up a

20 little bit so I put a movie in. So I put in National

21 Treasurer II, Nicholas Cage, one of my favorites. It

22 is like a treasure hunt movie. I put it in and I

23 started watching a movie.

24     Q    Okay. And did you watch the movie?

*Cheryl M. Moore, Senior Court Reporter*

| | |
|---|---|
| 1 | **M. Davis - Direct Examination by Mr. Roberts** |
| 2 | A    I think I watched it for a couple of minutes |
| 3 | because I ended up dozing off watching the movie laying |
| 4 | down on the bed.  It was still early so I think I dozed |
| 5 | off and fell asleep. |
| 6 | Q    Okay.  And did there come a time you woke |
| 7 | up? |
| 8 | A    Yeah, I woke up. |
| 9 | Q    What happened? |
| 10 | A    I'm not sure what time it was. |
| 11 | Q    What is the first thing you did when you |
| 12 | woke up? |
| 13 | A    First thing I did, I noticed I dozed off so |
| 14 | I got up and I called for ▓▓ for breakfast. |
| 15 | Q    When you said you got up, what do you mean? |
| 16 | Were you standing? |
| 17 | A    No, I kind of like sat up on the bed kind of |
| 18 | like just waking up, like rubbing my eyes and stuff |
| 19 | like that. |
| 20 | Q    Okay.  And then you called to ▓▓? |
| 21 | A    Yeah. |
| 22 | Q    How did you call to her? |
| 23 | A    I said ▓▓, it is time to wake up, I'm going |
| 24 | to make breakfast. |
| 25 | Q    What happened? |

**M. Davis - Direct Examination by Mr. Roberts**

2      A    She didn't answer me. She didn't come out.

3 I figured maybe because of her looking so tired that

4 morning she was really sleeping, so I got up and I

5 actually went in her room to her because she -- to call

6 her again. I got to the door and I called her again

7 and she didn't answer me, she didn't wake up, she

8 didn't move or nothing.

9      Q    Did you see her?

10     A    Yeah, I seen her.

11     Q    Okay. What did you do when you saw her

12 after you called to her and she wasn't responding to

13 you?

14     A    I kind of like went to -- because I'm still

15 waking up myself I kind of went to nudge her on the

16 shoulder to try to wake her up. I said, ███, come on,

17 it is time to wake up.

18     Q    Have you ever had to wake her up in the past

19 like that?

20     A    Not really, no.

21     Q    Okay. So after you touched her shoulder

22 what happened?

23     A    She wasn't moving or anything like that, so

24 I'm like ███, come on, wake up, wake up, and she didn't

25 want to wake up.

M. Davis - Direct Examination by Mr. Roberts

Q    Then what did you do next after touching her shoulder, Mike?

A    After she didn't wake up I tried to do CPR. I pulled the cover off of her and I'm like kind of panicking like why are you not waking up, you're not waking up, so I tried to do CPR on her and nothing was working, so I tried to do CPR.

Q    When you say CPR, have you been trained in CPR?

A    No.  I only, like, watch it on movies and stuff.

Q    Okay.  What -- you say you tried CPR.  What did you do?

A    I liked held her nose and blew in her mouth and it looked like the air didn't go out of the stomach so I put my hand under her and I pushed directly on her stomach.  Then I went one, two, three on her chest.  I didn't want to hurt her so I was doing it really light.

Q    This was on the bed?

A    This was on the bed, sir.

Q    How long were you in the bedroom with her?

A    Probably for a minute or two.  I'm not sure of the time but it was relatively short.

Q    Okay.  So after you tried performing CPR on

**M. Davis - Direct Examination by Mr. Roberts**

2    her, what -- what did you do next?

3          A    I took her out of the bed and I brought her

4    into the living room because that's where the phone was

5    at, so went -- I brought her into the living room so

6    she's in front of me in case they tell me to do

7    something or whatever for me to help her.  I looked on

8    the table for the actual working phone, it wasn't

9    there.

10         Q    What did you mean -- let me back that up for

11    a minute.  Do you have a -- I will characterize it as a

12    landline.  Do you have a hardwired phone in your house?

13         A    No, sir.  We didn't have the money to get

14    that type of landline phone or nothing, so...

15         Q    Okay.  So you didn't have a Time Warner

16    cable --

17         A    No, sir.

18         Q    -- line coming through your home?

19         A    (Shakes head.)

20         Q    And you said you brought ▓▓ out and put her

21    on the futon?

22         A    Yes, sir.

23         Q    Okay.

24                MR. ROBERTS:  May I approach the

25               witness, your Honor?

**M. Davis - Direct Examination by Mr. Roberts**

1    **M. Davis - Direct Examination by Mr. Roberts**

2                THE COURT:  You may.

3       Q    I will show you what's been marked as

4    Defendant's Exhibit A.  Is that the futon we're talking

5    about?

6       A    Yes, sir, that's the futon.

7       Q    Okay.  So after you laid her on the futon

8    you said you went to look for a phone.  What were you

9    looking for?

10       A    I was looking for the cell phone.  We only

11    had one cell phone at that time.

12       Q    When you say we only had one cell phone, who

13    are you referring to?

14       A    Me and Rebecca because my cell phone had got

15    cut off a month prior to that, so we pretty much kept

16    that one from her being sick off and on in case

17    anything happened I could either call her or call the

18    ambulance because all the numbers was in the phone,

19    so...

20       Q    But on this day you couldn't find the

21    phone?

22       A    I couldn't find the phone.  I was looking

23    for it.  That's the first thing I looked for and I

24    couldn't find it, so we had --

25       Q    Do you later learn where the phone was?

M. Davis - Direct Examination by Mr. Roberts

1

2     A     Yes.

3     Q     Where was the phone?

4     A     Rebecca took it to work with her.

5     Q     Okay.  So you said you had two other phones

6  in the house.  What did you do with those phones?

7     A     I tried to plug one phone in.  It was the

8  phone I had that got cut off a month prior.  And

9  another phone was a phone we found at Price Chopper on

10  the floor outside in the parking lot and we used that

11  phone pretty much just for calling our conversations

12  with Clarence.

13     Q     Okay.  And so were you able to dial like an

14  emergency number on those phones?

15     A     I figured if I could get the phone to come

16  on I could dial an emergency number but the phone

17  wouldn't come on.  It was extremely dead.  We didn't

18  use it.  I had the phone off and the other one we just

19  used it for recordings.  But both of them died

20  relatively fast so it was just on the table and I tried

21  to plug them up and it didn't work.  It wouldn't come

22  on.

23     Q     While you were dealing with your phones, how

24  were you dealing with ⬤?

25     A     She was right in front of me laying on the

1 | **M. Davis - Direct Examination by Mr. Roberts**

2 couch and the phones was right here plugged into the

3 wall so I was still observing her while I was trying to

4 get the phone to work.

5     Q    Did you attempt to help her on the futon as

6 well?

7     A    Yes. I tried CPR again on the futon.

8     Q    Did you try that before or after you were

9 looking for the phones?

10     A    I tried that -- no, I put her on the futon

11 first, then I went for the phones. When the phones

12 wouldn't work I tried CPR.

13     Q    Okay. And how long did you try CPR on

14 her?

15     A    I did it like two more times.

16     Q    Okay. And, again, how did you perform

17 CPR?

18     A    I blew in her mouth. When I blew in her

19 mouth her stomach went out, like the air wasn't coming

20 out, so I put my hand on her back and I pushed very

21 lightly and I would go 1, 2, 3 and it didn't work so I

22 pretty much ran out of the house to my neighbor's

23 house.

24     Q    Now, Mike, obviously we can see you're a big

25 man. How much force did you use doing CPR?

**M. Davis - Direct Examination by Mr. Roberts**

A    I was doing it very light because I didn't want to hurt her at all.  I didn't know how much force to use.  I pushed down very light.  I didn't push down hard at all because I know I'm a big guy, I know my strength, so I didn't push down hard at all.  Like, I felt like I didn't push down hard enough because I was going so light.  I was going like this.

Q    Were you trying to hurt ████?

A    No.

Q    What were you trying to do?

A    I was trying to save her life or get her at least to respond to me because she wasn't waking up.

Q    Was she breathing?

A    To my knowledge she wasn't.

Q    What did you do to see if she was breathing?

A    I would put my face like toward her face to see if I could feel her breathing from her nose or something like that, but she wasn't breathing.

Q    So after you -- you couldn't find the phones and you performed CPR trying to help her again, what's the next thing that you did?

A    I ran to my neighbor's house because I know he works in the morning but his girlfriend, she stays

| | M. Davis - Direct Examination by Mr. Roberts |
|---|---|
| 1 | |
| 2 | at home, so... |
| 3 | Q     Who was your neighbor? |
| 4 | A     Willie Robinson. |
| 5 | Q     When you ran over to Willie's house, do you |
| 6 | recall what you were dressed in? |
| 7 | A     Slippers, my pajama pants and a t-shirt. |
| 8 | Q     Why not -- well, you ran over there in your |
| 9 | slippers? |
| 10 | A     Yeah. |
| 11 | Q     Why didn't you put your shoes on, Mike? |
| 12 | A     I was in a hurry.  I wasn't thinking about |
| 13 | putting my shoes on.  I came out trying to find some |
| 14 | help. |
| 15 | Q     So you ran over to Willie's house and what |
| 16 | happened? |
| 17 | A     I knocked on the door downstairs because it |
| 18 | was like a two bedroom -- well, two apartment kind of, |
| 19 | like, house, and I knocked on my neighbor downstairs |
| 20 | and nobody came.  I was knocking on the door for a |
| 21 | couple of minutes, so I ran upstairs and I was knocking |
| 22 | on their door too but nobody was answering the door.  I |
| 23 | was thinking why isn't anybody answering the door.  Am |
| 24 | I in a nightmare?  What is going on? |
| 25 | Q     You're knocking on the door.  Are you saying |

**M. Davis - Direct Examination by Mr. Roberts**

anything?

    A    I'm yelling, yeah.

    Q    How loud are you yelling?

    A    Extremely loud.  I know I'm not a loud talker, but I was yelling extremely loud banging on the door.

    Q    Why were you yelling?

    A    Because I was trying to get them to open the door so I could help ███.

    Q    How were you feeling at that time?

    A    Very panicky.  I didn't know what to think.

    Q    Did you care about waking anybody up at that time?

    A    No, not at all.  I was hoping to wake somebody up.

    Q    What happened after there was nobody at Willie's house, what did you do?

    A    I ran back over to ███ to check on her, to see if anything had changed.  Nothing had changed.  She was just laying there on the couch.  So I tried CPR again and nothing was working, so...

    Q    Again, this time, how did you perform CPR on her?

    A    I was blowing in her mouth and it just

**M. Davis - Direct Examination by Mr. Roberts**

looked like air would go in her belly, so I put my hand on her back and put my hand like this very lightly and went 1, 2, 3.

    Q     How long did you perform CPR the third time?

    A     Just once.

    Q     Why? Why perform CPR again?

    A     Just to see if she would wake up or something because I didn't understand why she didn't wake up. So I just tried it again to see if anything would change. Nothing changed.

    Q     Then what did you do?

    A     Then I was saying in my head, Testo's got to be opened. It was a restaurant, like, kiddie corner across the street, something like that. They have to be open. So I dashed out of the house again and ran to Testo's. I asked them if they had a phone. They said they didn't have, like, a landline phone. So there was a guy sitting on the stairs -- I mean, sitting on the desk inside the restaurant. He was on the phone. I said, can I use your phone, my daughter is not waking up, she is not breathing.

    Q     When you went over there, Mike, how were you acting?

**M. Davis - Direct Examination by Mr. Roberts**

   A    Very panicky, in tears, because I didn't understand what was going on.

   Q    Were you pleasant and polite to the guys over at Testo's?

   A    Polite as I can be while trying to ask them to use the phone, yes.

   Q    How is your voice?

   A    It was --

   Q    Was it raised?  Was it low?  How were you acting?

   A    I was acting very panicky when I went over there.  My voice was kind of raised, can I please use your phone, my daughter is not waking up.

   Q    When you saw the gentleman on the phone, how did he respond when you were asking to use his phone?

   A    He got right off the phone and just gave it to me.

   Q    Then what did you do?

   A    I called 911 and I asked him please hurry up, I woke up and my daughter wasn't breathing and it just seemed like he was taking forever.

   Q    So we heard the 911 tape played in this courtroom.  Do you recall listening to that?

   A    Yeah.

**M. Davis - Direct Examination by Mr. Roberts**

1

    Q    You appear to be a little bit short tempered with the gentleman on 911. Why is that?

    A    Because he was asking me a lot of questions and I was just trying to get him to come to the apartment and help -- to help ████.

    Q    And when he had you on the phone what did you want to do?

    A    I was just trying to get back to her because I had left her in the apartment.

    Q    And when he kept asking you the same questions over and over again how did that make you feel, Mike?

    A    Just kind of frustrating that he was asking me the same questions and it didn't seem like he was trying to get anybody there to help me.

    Q    And you're focused on doing what?

    A    Trying to help ████ and get back to ████ because I did leave her in the apartment.

    Q    You actually -- we heard the 911 tape. Did you finish your conversation with the 911 operator? What happened?

    A    No. I kind of got frustrated and I gave the guy back his phone. I was pretty much telling him that she was in the apartment by herself, so I gave him back

M. Davis - Direct Examination by Mr. Roberts

1 his phone and went to run back across the street and I

2 answered whatever questions he needed at that time so

3 he could bring help.

4      Q     Because you wanted to get back to ███?

5      A     Yes, sir.

6      Q     And as you approached the apartment who did

7 you encounter?

8      A     Mr. Brown and Rebecca standing outside

9 actually having a conversation.

10      Q     Was your -- did you have an opportunity to

11 observe your apartment door?  Was it opened or closed

12 at that time?

13      A     It was kind of like cracked open at the

14 time.

15      Q     You ran into Rebecca.  When you left the

16 apartment did you leave the door opened or closed?

17      A     I don't remember actually leaving it opened

18 or closed or not.  I just remember opening it and

19 running out of the apartment.  I don't remember if I

20 closed it or not.

21      Q     Okay.  And what happened when you

22 encountered Rebecca?

23      A     She was just standing in front just having a

24 normal conversation with Mr. Brown so I ran across the

APPENDIX

50

M. Davis - Direct Examination by Mr. Roberts

street like panicking, like call an ambulance, ⬛ is

not waking up, she is not breathing, call the

ambulance.  So she kind of turned and looked at me and

started, like, going up the stairs to the apartment.

    Q    Did she go into the apartment?

    A    Yes, sir.

    Q    What happened when she went into the

apartment?

    A    She went into the apartment and she got on

the phone.  She, like, tapped ⬛, figuring she would

wake up.  Wake up, wake up, but she is not waking up.

So she on the phone and she called the ambulance and as

she was calling the fire department was coming into the

apartment.

    Q    Where were you when the first responders got

there?

    A    I was standing kind of right next to the

couch just like panicking about this whole situation,

period.

    Q    Do you recall seeing the EMTs come in?

    A    Yes, sir.

    Q    How many came in, Mike?

    A    I would say four or five.  There was a whole

bunch of them.  They kind of rushed into the apartment

**M. Davis - Direct Examination by Mr. Roberts**

1  at one time.

2    Q    Where were you when they were coming into the apartment?

3  A    I was standing by the couch with Rebecca when they came into the apartment. They kind of told us to back up out of the apartment and let them do their job.

4  Q    Okay. What did you observe? What was happening?

5  A    They came in the apartment. They brought a little machine and they sat it next to her and they were taking her clothes off, sticking her with needles and stuff like that, just working her like this and they were pushing down on her. I guess trying to revive her themselves.

6  Q    From your vantage point, could you see what they were doing?

7  A    Yeah. I'm taller than everybody, so, yeah, I could see what they were doing.

8  Q    Now, emotionally how were you doing when the EMTs came in?

9  A    I was just very emotional. I was just wanting them to save her life. When they came in they was just --

**M. Davis - Direct Examination by Mr. Roberts**

Q    Despite you being emotional, do you have a clear recollection of what you saw them do?

A    Yes, sir.

Q    Now, when you saw them perform CPR, do you recall how many people were doing it?

A    I believe it was like two different people. One was doing CPR.

Q    And when you saw them performing CPR, were they performing it with one hand or two hands?

A    They was doing it with two hands like this, just pushing down very physical on her chest. I asked them, are you supposed to press down that hard on her?

Q    Let me stop you there. So you said they were physical with her, what do you mean?

A    They was just pressing down, like, kind of like hard.

Q    How could you tell they were pressing hard?

A    I could see over them. I could see how, like, they was pressing on her.

Q    How did that relate to how hard you were pressing on her?

A    I kind of was bugging out because I didn't press her no where near that hard. I was kind of like

M. Davis - Direct Examination by Mr. Roberts

1

2 are you supposed to press on her that hard?  But they

3 was just telling me to back up out the apartment.

4     Q    Why were you concerned they were pressing so

5 hard?

6     A    I was wondering if they was hurting her.

7     Q    How long did they perform CPR like that?

8     A    I would say roughly 15 minutes, something

9 like that.

10     Q    Were they continuously performing CPR while

11 you were there?

12     A    Yes, sir.

13     Q    Was both gentlemen performing CPR in the

14 same manner?

15     A    Yes.

16     Q    The same type of force?

17     A    Yes, sir.

18     Q    Why didn't you stop them, say you're pushing

19 too hard?

20     A    Because I just figured they were doing their

21 job, they knew better than I did because I'm not a

22 professional, I don't know CPR.  I figured they were

23 doing their job and it didn't feel right, like they

24 were pushing down so hard on her.

25     Q    Did you interfere with them at all?

# APPENDIX

| | | |
|---|---|---|
| 1 | | M. Davis - Direct Examination by Mr. Roberts |
| 2 | A | No, I didn't. |
| 3 | Q | At some point did they stop performing |
| 4 | CPR? | |
| 5 | A | No. |
| 6 | Q | At some point do they leave the apartment? |
| 7 | A | Yes. |
| 8 | Q | How did they leave the apartment? |
| 9 | A | They took her on a stretcher out the |
| 10 | apartment. | |
| 11 | Q | Were they performing CPR while she was still |
| 12 | on the stretcher? | |
| 13 | A | Yes. |
| 14 | Q | All the way out the door, all the way into |
| 15 | the ambulance? | |
| 16 | A | Yes. |
| 17 | Q | When they walk out to the ambulance what did |
| 18 | you do? | |
| 19 | A | When we walked out to the ambulance they had |
| 20 | put her in the ambulance and they closed the door and I | |
| 21 | said, shouldn't somebody be in there with her? She is | |
| 22 | only two years old. | |
| 23 | Q | When you said that somebody should be in |
| 24 | there with her, wasn't there already people with her? | |
| 25 | Weren't EMTs with her? | |

Case 1:17-cv-01290-DJS Document 89-11 Filed 04/19/2024 Page 52 of 298    Page 56 of 114
Case 1:17-cv-01290-DJS Document 89-11 Filed 05/13/22 Page 56 of 114    55
APPENDIX
2091

**M. Davis - Direct Examination by Mr. Roberts**

1

2     A    Yes.

3     Q    What did you mean by that?

4     A    Me or her mother in the hospital, somebody

5 going to the hospital with her.

6     Q    And when you brought that to someone's

7 attention how were -- what was the response?

8     A    When I actually said that I said to -- to

9 Officer Coonradt, because she was the one standing on

10 the side, she was outside, I said they put her in there

11 and closed the door. I said, isn't someone supposed to

12 be with her? Her mother just came home from work.

13 When I said that they pulled off in the ambulance.

14     Q    Did they ever give you an opportunity to get

15 in the ambulance with ▮▮?

16     A    No.

17     Q    What about Rebecca?

18     A    No.

19     Q    So as the ambulance drove away what happened

20 next?

21     A    I had stood up off the stairs. I said,

22 what's going on? Why did they drive off with her? And

23 Officer Coonradt was like calm down, calm down, sit

24 down. I said, I am calm. I want to know why they

25 drove off with her. And when I said that two

**M. Davis - Direct Examination by Mr. Roberts**

detectives had got out of the car and walked up to us.

    Q    That's when you met with Detective Fountain?

    A    Detective Fountain and his partner.

    Q    Okay.  And from there you went and accompanied Detective Fountain to the Troy Police Department?

    A    Yes, sir.

    Q    How did you get in the car with them?

    A    I sat in the front seat and Fountain was driving, Detective Fountain, and his partner sat in the back kind of behind Detective Fountain.

    Q    Why did you want to go talk to the detectives?

    A    They asked me to.

    Q    Were you worried about anything?

    A    Worried about ██.

    Q    Then we heard in evidence the videotape of -- of you speaking to the detectives.  Do you recall listening to that?

    A    Yes, sir.

    Q    And you kept saying over and over, I was just with her this morning.  Do you recall hearing that?

1  **M. Davis - Direct Examination by Mr. Roberts**

2      A    Yes.

3      Q    What were you talking about?

4      A    I was just talking about she was just up

5  that morning, she looked -- she didn't look herself but

6  I didn't think, you know, there was anything wrong with

7  her.  She just didn't look herself that morning.  I was

8  just up with her that morning.

9      Q    Why were you saying it over and over and

10 over again, Mike?

11     A    Because when they told me she had passed

12 away I just couldn't understand that at all.  I was

13 just talking with her that morning.  I was just up with

14 her that morning.  That's why I kept saying it over and

15 over, because I just couldn't understand that she was

16 gone.  It just wasn't registering that she was gone and

17 how could she have been gone.

18     Q    You heard Dr. Sikirica say this was a

19 compressive force.  Do you remember that testimony?

20     A    Yes, sir.

21     Q    Did you hurt ████ that morning?

22     A    No.

23     Q    Did you squeeze ████ that morning?

24     A    No.

25     Q    Do you have any idea how those injuries

**M. Davis - Direct Examination by Mr. Roberts**

1
2  occurred to ██?

3      A      No, I don't because when I did CPR on her I

4  didn't use any force at all.  When I was doing CPR I

5  was being extremely light.  I didn't want to hurt her,

6  no way.

7      Q      Why not just call 911 and let them deal with

8  it?  Why just not say she doesn't appear to be

9  breathing?  Why not just call them and let them do

10  their job?  Why did you perform CPR that morning?

11      A      Because as a father the first thing you want

12  to try to do is try to revive them in some way.  I

13  guess even to get them to wake up or something like

14  that.

15      Q      Did you ever hurt ██ before?

16      A      No, never physical with her.

17      Q      Did you ever hit ██ when you discipline

18  her?

19      A      No.

20      Q      Did you ever put a hand in anger on her

21  body?

22      A      No, I didn't.

23      Q      Did you ever bruise her?

24      A      No.  I would never do nothing like that.

25      Q      What did you do to ██?

Case 1:17-cv-01290-DDD Document 98-91 1/80/24 Filed 05/13/22 Page 608 of 114

**M. Davis - Direct Examination by Mr. Roberts**

1

2    A    The most we would do is I would actually

3 stand her in the corner for maybe two minutes or

4 wouldn't give her her favorite snack or something like

5 that, but being physical with her, I would never do

6 that because it just wasn't me.

7    Q    Did you have any reason to hurt ▓▓ that

8 morning, Michael?

9    A    No, not at all.

10   Q    How have you changed since ▓▓'s passed?

11   A    Since she's passed I've just been pretty

12 much -- I'm pretty much still messed up in the head

13 about it.

14   Q    How has it affected you?

15   A    Just really not wanting to do much of

16 anything.  Just -- I'm still moping around, not

17 believing that she is gone, you know, because she was

18 just a --

19   Q    Could you have done anything else for ▓▓

20 that morning?

21   A    I would have hoped I could but I did

22 everything I could possibly do.

23   Q    Tell this jury, Mike, did you kill ▓▓?

24   A    No, I did not.  I would have never hurt her,

25 no way, ever.

Cheryl M. Moore, Senior Court Reporter

**M. Davis - Direct Examination by Mr. Roberts**

1

2          MR. ROBERTS:  May I have a moment, your

3      Honor?

4          THE COURT:  You may.

5          (Whereupon, a brief moment was taken.)

6          (In open court.)

7     Q     Michael, we talked about heating and you

8  kept the burners on.  I will show you what's been

9  marked as Defendant's Exhibit D.  Do you recognize what

10  that is?

11     A     Yes.  That's the stove in our kitchen.

12     Q     The stove you use in the kitchen?

13     A     Yes.

14     Q     I will also show you what's in evidence as

15  Defendant's Exhibit E.  Do you recognize what that

16  is?

17     A     Yes, that's her mother's pill bottle.

18     Q     Where was that pill bottle kept in the

19  apartment?

20     A     It was usually kept on top of the

21  refrigerator.  That's pretty much where I put it to

22  keep it away from ▆▆.

23     Q     Who used those Hydrocodones?

24     A     Her mother used them.

25     Q     Well, in your apartment?

**People v. Michael Davis**

 1    A    Rebecca, her mother.

 2    Q    Oh, I'm sorry.  And why would you keep them

 3  above -- why would you store them above the

 4  refrigerator?

 5    A    Because ▓▓ couldn't reach the refrigerator

 6  and she would probably look at it like candy and

 7  probably try to take one.

 8    Q    And do you have any -- do you have any

 9  direct knowledge why those were located on a table by

10  the door?

11    A    When she's taking the pills for, like, knee

12  pain and stuff she usually leave them on the table.  I

13  usually take them and put them on top of the

14  refrigerator.

15            MR. ROBERTS:  Nothing further.

16            Thank you, Mike.

17            THE COURT:  Okay.  Members of the Jury,

18            it is quarter to twelve right now.  We'll

19            take a 15 minute break and then we'll

20            continue.

21            During the course of this break, please

22            don't discuss this case.

23            Don't read or listen to any media

24            accounts.

**People v. Michael Davis**

1

2          Don't visit or view any locations

3     mentioned during this trial.

4          Do not conduct any research about this

5     case.

6          Do not request or accept any payment or

7     benefit in return for supplying any

8     information.

9          Please don't form any judgments or

10    opinions about this case.

11         If anyone attempts to improperly

12    influence you, please report that directly

13    to me.

14         We'll break for 15 minutes at this

15    time.

16         Thank you.

17         (Whereupon, the jury exited the

18    courtroom.)

19         THE COURT:    Okay.    Mr. Davis, you may

20    step down.    The Court will stand in recess

21    for 15 minutes.

22         (Whereupon, the witness, Michael,

23    Davis, stepped down from the witness stand.)

24         (Whereupon, a brief recess was taken.)

25         (In open court.)

**People v. Michael Davis**

1

2           MR. ROBERTS:  Judge, could we approach?

3           THE COURT:  On or off-the-record?

4           MR. ROBERTS:  On the record.

5           THE COURT:  There is no jury here.  Do

6 you need to approach?

7           MR. ROBERTS:  I guess we don't,

8 Judge.

9           THE COURT:  Okay.  We're outside the

10 presence of the jury.  We are on the record.

11           Go ahead, Mr. Roberts.

12           MR. ROBERTS:  Your Honor, there was a

13 *Sandoval* ruling wherein the People were

14 going to inquire as to whether or not my

15 client was using marihuana on the date of

16 the indictment, 2/26/15.  I would ask what

17 the People's good faith basis is to ask that

18 question related to marihuana on the date of

19 the discovery of ███.

20           THE COURT:  Ms. Chavkin?

21           MS. CHAVKIN:  Well, I believe there's

22 already been a ruling, but it shows the

23 Defendant's tenancy to put his own concerns

24 before --

25           THE COURT:  I understand that, but the

**People v. Michael Davis**

point that the defense is making, if I
understand it correctly, is that you need to
have a good faith basis for asking such a
question, so what is your good faith basis
to believe you will be able to ask a
question as to whether this witness smoked
marihuana on the date in question?

MS. CHAVKIN: That his judgment is
skewed, that his memory would be skewed,
that his ability to take care of the child
was lessened because he may have been under
the influence of marihuana.

THE COURT: I understand that, but what
is your good faith basis to ask that
question? What makes you believe -- what
has lead you to believe that he used
marihuana on the date in question? You have
to have a good faith basis --

MS. CHAVKIN: I'm sorry.

THE COURT: -- before you ask -- ask
something.

MS. CHAVKIN: There were photographs of
marihuana in the house and the Defendant
told Detective Fountain that he used

**People v. Michael Davis**

1

2          marihuana on that date, which is part of the

3          redacted -- which is what was redacted out.

4                    THE COURT:  Mr. Roberts?

5                    MR. ROBERTS:  I would disagree, your

6          Honor.  There was some general talk about

7          marihuana with Detective Fountain in the

8          video that's not in evidence.  Essentially

9          he said we found some marihuana

10         paraphernalia in the house but we're not

11         talking about that.

12                   So, my position is that there is no

13         good faith basis that my client utilized

14         marihuana that morning.  There is two

15         individuals in the apartment -- three

16         individuals in the apartment, Ms. Parker as

17         well as Mr. Davis as well as the child.

18         Those would be the only three individuals

19         who would have witnessed marihuana usage on

20         2/26/2015.

21                   Because none of those individuals have

22         indicated that there was marihuana usage I

23         would take the position there is no good

24         faith basis for marihuana usage on the date

25         in question and I would move to preclude the

**People v. Michael Davis**

1

2   People from any inquiry relative to

3  marihuana because there is no good faith

4  basis of the usage.

5   THE COURT: Okay. Well, the allowance

6  of -- of the People to ask this Defendant

7  regarding whether he had used marihuana

8  doesn't necessarily have to be limited to

9  the date in question because it is being

10  offered to impact his credibility for

11  impeachment purposes. So I'm not sure that

12  it needs to be demonstrated that he used

13  marihuana on the date in question.

14   With that said, there's been some

15  dispute between the attorneys as to what is

16  or is not contained on the video. I don't

17  recall what the video reflects. Is there

18  anything on the video which indicates the

19  Defendant admitting that he smokes

20  marihuana?

21   MR. ROBERTS: Not from my recollection,

22  your Honor.

23   And with -- with respect to the date in

24  question, that was the People's *Sandoval*

25  proffer and that was the ruling that I

**Cheryl M. Moore, Senior Court Reporter**

**People v. Michael Davis**

1
2       relied upon in the direct of my client, as

3       well as the preparation for this case in its

4       entirety.

5           So I'm asking that the People be held

6       relative to the Court's -- to their proffer

7       and the Court's pretrial ruling relative to

8       *Sandoval* that marihuana usage would be

9       limited to the date in question.

10          THE COURT:  That's a fair point and

11      thinking back on the People's motion it was

12      pertaining to the date in question.

13          The Court is reconsidering its ruling

14      in that regard and finds that based upon

15      what has been represented to the Court from

16      the attorneys, at this time, there is --

17      there is an insufficient basis to ask such a

18      question.

19          Although the Court had previously found

20      that such a line of questioning and its

21      probative value outweighed that of its

22      prejudicial impact, it is still minimally

23      probative even as far as impeaching

24      credibility, so the Court will reconsider

25      its decision at this time, the Court will

**M. Davis - Cross Examination by Ms. Chavkin**

1
2          reverse its decision, and the People will be
3          precluded from inquiring whether the
4          Defendant smoked marihuana.
5                  Defense ready to proceed?
6                  MR. ROBERTS:  I am, your Honor, thank
7          you.
8                  THE COURT:  People ready to proceed?
9                  MS. CHAVKIN:  Ready.
10                 THE COURT:  Okay.  We'll bring the jury
11         back in, please.
12                 (Whereupon, the jury entered the
13         courtroom.)
14                 THE COURT:  Okay.  Please be seated.
15                 All right.  Members of the Jury, the
16         sworn witness remains Michael Davis.
17                 Sir, I remind you that you are still
18         under oath.
19                 Ms. Chavkin, whenever you're ready.
20                 MS. CHAVKIN:  Thank you, your Honor.
21             *Cross Examination by Ms. Chavkin*
22     Q     Mr. Davis, it is your testimony that the
23  night before V███ died you went to your neighbor
24  Willie's house?
25     A     Yes, ma'am.

| | |
|---|---|
| 1 | **M. Davis - Cross Examination by Ms. Chavkin** |
| 2 | Q What time did you get there? |
| 3 | A I don't remember the time I went there, but |
| 4 | I believe I left around 7:00, 7:30. |
| 5 | Q You left the house around 7:30? |
| 6 | A I believe so. |
| 7 | Q How long did you stay there? |
| 8 | A I watched two games but I can't be sure but |
| 9 | I watched two basketball games. |
| 10 | Q Was it before or after midnight? |
| 11 | A Probably came home after midnight I'm |
| 12 | guessing probably. |
| 13 | Q Would you agree with me that it is important |
| 14 | to be awake and responsive when you're watching a |
| 15 | toddler? |
| 16 | A Yes, ma'am. |
| 17 | Q All right. Why did you go to Willie's |
| 18 | house? |
| 19 | A Just to watch a basketball game. |
| 20 | Q Was there any problems with Rebecca? |
| 21 | A No. |
| 22 | Q And you say you woke up the next morning to |
| 23 | the smell of V███ pooping, correct? |
| 24 | A I actually woke up to Rebecca moving around |
| 25 | the apartment. |

**Cheryl M. Moore, Senior Court Reporter**

**M. Davis - Cross Examination by Ms. Chavkin**

1  
2       Q    I'm sorry?

3       A    I actually woke up to Rebecca moving around

4 the apartment. As I was waking up I smelled some

5 pooping.

6              MR. ROBERTS: Judge, could I ask the

7              witness to take the microphone a little bit?

8              I'm having some trouble hearing him.

9              THE COURT: Sir, if I could remind you

10             to keep your voice up, okay?

11             THE WITNESS: All right.

12             THE COURT: Thank you.

13       Q    And you had been potty training her,

14 correct?

15       A    Yes, ma'am.

16       Q    But she was pooping in her diaper?

17       A    Here and there she was still, yes.

18       Q    And what did you do?

19       A    Changed her diaper.

20       Q    Did you put her on the potty?

21       A    Yes, ma'am.

22       Q    How did you put her on the potty?

23       A    I just lifted her up like under her arms and

24 sat her down on the potty.

25       Q    Did you put your arms around her?

**M. Davis - Cross Examination by Ms. Chavkin**

     A     Yes, ma'am.

     Q     You say the child seemed sluggish that morning?

     A     Very sluggish and down, like she had never looked like that.

     Q     She's never looked like that before?

     A     No.

     Q     Did you think about maybe taking her to the doctor?

     A     No.  I just figured she was just extremely tired from the night before.  I didn't know how long her mother had her up the night before.

     Q     So you just thought that she was tired.  And then your testimony is that you went back to bed?

     A     After I told her to go back to bed because it was relatively early I seen her go into her room and lay down on her bed.

     Q     Does she normally go to sleep right after she wakes up?

     A     No.  It wasn't normal for her but she was very tired.  I said, okay, she don't want to drink her bottle, just go back to bed.

     Q     What time did Rebecca leave that morning?

     A     I'm not sure exactly what time she leaves.

Case 1:17-cv-01290-DJS Document 98-4 04/19/2021 3304789 Page 75 of 298
APPENDIX
Case 20-3585, Document Filed 03/18/22 Page 73 of 114
2108

72

**M. Davis - Cross Examination by Ms. Chavkin**

I know she tries to catch the bus early, but I don't

remember her actually having to work that morning but I

figured she called the night before and --

     Q    So --

     A    -- she went to work.

     Q    -- you were the only person in the house

with V████ that morning; is that correct?

     A    After her mother went to work, yes.

     Q    You say you started watching a movie.  How

long -- do you know how long that movie is?

     A    I would say maybe an hour or two.  I'm not

sure really.  I never timed it.

     Q    What time did you start watching the

movie?

     A    After I asked V████ to go back to bed.

     Q    And then you say you woke up to the credits

playing?

     A    Yes, ma'am.

     Q    So that would be approximately two hours?

     A    The movie -- I don't know exactly what it

would have been.  The movie could have been off for a

while.  The credits could have actually been, like,

playing.

     Q    And then you claimed to have found V████

**M. Davis - Redirect Examination by Mr. Roberts**

1  

2  unresponsive?

3  　　　A　　Yes.　I woke up and I called for her and she

4  didn't come out of the room so I kind of went into her

5  room to her.

6  　　　Q　　What time did the EMTs arrive?

7  　　　A　　Still I'm not sure what time they arrived.

8  　　　Q　　Do you recall what time you called them?

9  　　　A　　No, I didn't really look at the phone when I

10  was calling.

11  　　　Q　　And you stated to Officer Coonradt that you

12  found V████ unresponsive at 11:00 a.m., is that true?

13  　　　A　　I never gave her an exact time that I found

14  her unresponsive.

15  　　　　　　　MS. CHAVKIN:　No further questions,

16  　　　　　　　your Honor.

17  　　　　　　　THE COURT:　Okay.　Mr. Roberts, any

18  　　　　　　　redirect?

19  　　　　　　　MR. ROBERTS:　Yes, please, your

20  　　　　　　　Honor.

21  　　　　*Redirect Examination by Mr. Roberts*

22  　　　Q　　Do you have any working clocks in your

23  apartment, Mike?

24  　　　A　　No, sir.

25  　　　Q　　What did you utilize to determine what time

**M. Davis - Redirect Examination by Mr. Roberts**

```
 1
 2  it was?
 3       A     Rebecca's phone.
 4       Q     Okay.  So that morning when you got up and
 5  found ███ as you found her, were you worried about the
 6  time?
 7       A     No.
 8       Q     What were you focused on?
 9       A     V███.
10       Q     Why didn't you know what time it was?
11       A     Because the farthest thing from my mind was
12  what time it was.
13       Q     Some questions regarding the movie playing,
14  was your VCR such that if the movie ended it would
15  continue playing?
16       A     It would play over again if the movie is on
17  the front screen for a very long time.
18       Q     So when you awoke are you aware whether the
19  movie had played through once or twice?
20       A     I wasn't aware of it.
21       Q     Okay.  What did you do when you woke and
22  found the television playing?  What did you do?
23       A     Relatively nothing.  I just got up and I
24  called for her and then after that I unplugged the TV.
25       Q     Why did you unplug the TV?
```

**M. Davis - Redirect Examination by Mr. Roberts**

1

2     A     Because we don't really like her to eat her

3 food and watch television.  She won't eat.  She will

4 pretty much stare at the TV.

5     Q     Was it part of your routine that when you

6 fed her you would unplug the television?

7     A     Yeah.  I would unplug the television because

8 of that and just trying to save electricity.

9     Q     Why didn't you just turn it off?  Why unplug

10 it?

11     A     Because my grandmother always told me when I

12 was young you save electricity by unplugging it.  You

13 don't leave it plugged in the wall.  So that's why I

14 unplugged it.

15     Q     So you unplugged it so V▓▓▓ would not be

16 distracted when you got her up, correct?

17     A     Yes, sir.

18     Q     When you found V▓▓▓ were you expecting her

19 to be in the state that you found her in?

20     A     No.

21     Q     How were you expecting to find V▓▓▓ that

22 morning?

23     A     I was expecting her to just wake up.

24     Q     Wake up as any day as ever?

25     A     Yeah.

**M. Davis - Redirect Examination by Mr. Roberts**

1

2     Q    Did you hurt her that morning, Michael?

3     A    No.

4     Q    Did you do anything to her to cause her to

5 not wake up that morning?

6     A    No.

7     Q    Tell this jury what you did that morning to

8 V█████, Mike?

9     A    I just tried to wake her up.  I tried to

10 save her life as best as I can.

11     MR. ROBERTS:  Nothing further, thank

12 you.

13     THE COURT:  Okay.  Anything further

14 from the People?

15     MS. CHAVKIN:  No, your Honor.

16     THE COURT:  Okay.  Sir, you may step

17 down.  Thank you.

18     (Whereupon, the witness, Michael Davis,

19 was excused from the witness stand.)

20     THE COURT:  Okay.  Defense may call its

21 next witness.

22     MR. ROBERTS:  May I get one, Judge?

23     THE COURT:  Yes.

24     MR. ROBERTS:  Thank you.

25     (Whereupon, a brief moment was taken.)

| | | R. Brown - Direct Examination by Mr. Roberts |
|---|---|---|
| 1 | | **R. Brown - Direct Examination by Mr. Roberts** |
| 2 | | (In open court.) |
| 3 | | MR. ROBERTS: Defense calls Russell |
| 4 | | Brown, your Honor. |
| 5 | | ***RUSSELL BROWN,*** |
| 6 | the witness hereinbefore named, being first duly |
| 7 | cautioned and sworn or affirmed to tell the truth, the |
| 8 | whole truth, and nothing but the truth, was examined |
| 9 | and testified as follows: |
| 10 | | CLERK OF THE COURT: The sworn witness |
| 11 | | is Russell Brown. |
| 12 | | THE COURT: Okay. You may proceed, Mr. |
| 13 | | Roberts. |
| 14 | | ***Direct Examination by Mr. Roberts*** |
| 15 | Q | Good morning. |
| 16 | A | Good morning. |
| 17 | Q | Please introduce yourself to the jury. |
| 18 | A | I didn't understand you. |
| 19 | Q | Could you please tell the jury what your |
| 20 | name is? |
| 21 | A | My name is Russell Brown. |
| 22 | Q | And, Mr. Brown, how old are you? |
| 23 | A | I'm 88. |
| 24 | Q | Mr. Brown, do you know Rebecca Parker? |
| 25 | A | Yes, I do. |

**R. Brown - Direct Examination by Mr. Roberts**

Q    I will direct your attention to February 26, 2015.  Do you recall that date?

A    Yes.

Q    Approximately 1:30 in the afternoon?

A    1:15, yes.

Q    1:15?

A    Yes.

Q    Did there come a time that you were in the area of 856 Fourth Avenue?

A    Yes.

Q    Why were you going to that location?

A    Rebecca asked me at 10:00 on that morning could I drive her home at 1:00 so she could get home sooner because the bus was causing her to be later and she wanted to get home soon to be with her kid.

Q    And when -- did there come a time that you brought Rebecca home to 856 Fourth Avenue?

A    Yes.

Q    And when you got to that address what did you see?

A    I got to the address, Rebecca went in the house to get her paper and come right back out and at this time Mike was coming across the street from over towards Testo's restaurant and he seemed like he was

| | | |
|---|---|---|
| 1 | | **R. Brown - Direct Examination by Mr. Roberts** |
| 2 | | very upset and -- |
| 3 | Q | Why?  What do you mean he was very, very |
| 4 | | upset? |
| 5 | A | Like, he was crying or something. |
| 6 | Q | What do you mean like he was crying?  What |
| 7 | | did you see? |
| 8 | A | I thought he was crying. |
| 9 | Q | What lead you to believe he was crying? |
| 10 | A | I believed he was crying. |
| 11 | Q | Okay.  Could you see him crying? |
| 12 | A | I believe I saw him crying, yes. |
| 13 | Q | And how would you describe the way Mike was |
| 14 | | acting? |
| 15 | A | I didn't pay too much attention to that |
| 16 | | because at this time 911 drove up, the police car drove |
| 17 | | up, and all them was there within three to five minutes |
| 18 | | at the same time. |
| 19 | Q | Did Mike have any interaction with you at |
| 20 | | all? |
| 21 | A | No. |
| 22 | Q | When we say Mike, we're talking about Mike |
| 23 | | Davis.  Do you see him in the courtroom today? |
| 24 | A | Yes. |
| 25 | Q | Well, after the paramedics were there how |

**R. Brown - Direct Examination by Mr. Roberts**

long did you stay at the apartment?

    A    I stayed there for awhile but I didn't have no more contact with nobody else.

    Q    Okay.

            MR. ROBERTS:  Nothing further.

            Thank you, Mr. Brown.

            THE COURT:  Ms. Chavkin?

            MS. CHAVKIN:  I have no questions for this witness, your Honor.

            THE COURT:  Okay.  Sir, you may step down.  Thank you.

            THE WITNESS:  Thank you, sir.

            (Whereupon, the witness, Russell Brown, was excused from the witness stand.)

            THE COURT:  Defense may call its next witness.

            MR. ROBERTS:  The Defense calls Willie Robinson, your Honor.

            THE COURT:  Last name?

            MR. ROBERTS:  Robinson.

            THE COURT:  Thank you.

            ***WILLIE LEE ROBINSON,***

the witness hereinbefore named, being first duly cautioned and sworn or affirmed to tell the truth, the

| | W. Robinson - Direct Examination by Mr. Roberts |
|---|---|
| 1 | **W. Robinson - Direct Examination by Mr. Roberts** |
| 2 | whole truth, and nothing but the truth, was examined |
| 3 | and testified as follows: |
| 4 | CLERK OF THE COURT:  The sworn witness |
| 5 | is Willie Lee Robinson. |
| 6 | THE COURT:  Go ahead, Mr. Roberts. |
| 7 | *Direct Examination by Mr. Roberts* |
| 8 | Q    Good afternoon. |
| 9 | A    Good morning. |
| 10 | Q    Please introduce yourself to the jury. |
| 11 | A    Willie Robinson. |
| 12 | Q    And, Mr. Robinson, do you know Michael |
| 13 | Davis? |
| 14 | A    Yes. |
| 15 | Q    How do you know Michael? |
| 16 | A    Well, he's a neighbor of mine. |
| 17 | Q    How long has he been a neighbor? |
| 18 | A    Maybe a year and some change, just about |
| 19 | that. |
| 20 | Q    Have you ever met Rebecca Parker? |
| 21 | A    Yes. |
| 22 | Q    And what about a little girl that was living |
| 23 | with Rebecca? |
| 24 | A    Yes, I seen her. |
| 25 | Q    Who was she to Michael? |

W. Robinson - Direct Examination by Mr. Roberts

1

2    A    Sir, his step daughter.

3    Q    Okay.  Did you have an opportunity to

4  observe Michael's interaction with ██?

5    A    Yes.

6    Q    How many times did you observe Michael and

7  her together?

8    A    Well, quite a lot because we use to take her

9  to the park, you know, go shoot around.

10   Q    And describe how Michael and ██

11  interacted?

12   A    He was great with her.

13   Q    What do you mean?

14   A    I mean, as far as I -- just like normal, you

15  know, how a parent would be, you know.

16   Q    When you say a parent, what do you mean by

17  that?

18   A    I mean -- well, you know, interact, you

19  know, how your child, you know, suppose to be with your

20  parent, you know.

21   Q    Did Michael represent her as his niece or

22  his daughter?

23   A    Well, daughter.

24   Q    And when you saw him interact with ██, how

25  would she respond to Michael?

**W. Robinson - Direct Examination by Mr. Roberts**

1

2    A    Very well.

3    Q    What do you mean very well?

4    A    I mean, well, if he was saying, you know,

5  stop this or do this and she would, you know, respond.

6    Q    Did you ever see them play?

7    A    Yeah.

8    Q    Did you ever see them laugh together?

9    A    Yes.

10   Q    Did you ever see Mike get angry with ███?

11   A    No, I've never seen that.

12   Q    Did you ever see Michael act inappropriate

13 with her?

14   A    No, I never seen it.

15   Q    And they lived how close to your house for

16 that year?

17   A    Maybe from here to -- well, I'm on 863.  He

18 was, you know, right by Testo's.  You know, a little

19 ways up on the corner.  Not far.

20   Q    Now, I'm going to direct your attention to

21 February 25, 2015.  Do you recall that date?

22   A    Yeah, I remember.  I worked that day, yeah.

23   Q    Okay.  Well, do you remember seeing a whole

24 lot of emergency -- do you recall when ███ passed?

25   A    No, I wasn't -- I wasn't -- I was at work.

| | | |
|---|---|---|
| 1 | | W. Robinson - Direct Examination by Mr. Roberts |
| 2 | Q | Okay. |
| 3 | A | You know, then I found out after, you know, |
| 4 | | afterwards. |
| 5 | Q | The day before ⬛ had passed, do you recall |
| 6 | | who you were with in the evening hours? |
| 7 | A | You mean the day that she -- |
| 8 | Q | The night before. Did there come a time you |
| 9 | | watched a basketball game? |
| 10 | A | Right. |
| 11 | Q | On the 25th? |
| 12 | A | Right. |
| 13 | Q | Who was that with? |
| 14 | A | Me and Mike was watching the game. |
| 15 | Q | And where did that happen? |
| 16 | A | I was at my house. |
| 17 | Q | How long was he there, do you recall? |
| 18 | A | Well, you know, a hoop game is maybe two and |
| 19 | | a half hours, you know. |
| 20 | Q | Was it one game or two games you watched |
| 21 | | that evening? |
| 22 | A | I can't remember if it was one game or -- I |
| 23 | | don't know. It only could have been one. I don't |
| 24 | | know. I'm not particularly sure because sometimes, you |
| 25 | | know, there's 7:00 games and then they have 10:30 |

| | |
|---|---|
| 1 | **W. Robinson - Direct Examination by Mr. Roberts** |
| 2 | games, but I think it was just one, I believe.  I'm |
| 3 | trying to remember. |
| 4 |     Q    But you're not sure?  So one way or the |
| 5 | other you remember watching basketball? |
| 6 |     A    Right. |
| 7 |     Q    And do you remember interacting with Mike |
| 8 | that evening? |
| 9 |     A    Saying we was watching the game? |
| 10 |     Q    Yeah.  You were with Mike that evening? |
| 11 |     A    Yeah. |
| 12 |     Q    Did you have an opportunity to observe his |
| 13 | demeanor? |
| 14 |     A    Yeah.  He was just like he would be |
| 15 | normally.  He was -- you know, he was just fine, you |
| 16 | know. |
| 17 |     Q    What do you mean?  Did he look agitated? |
| 18 |     A    No, not really.  If he did, you know, I |
| 19 | didn't see it. |
| 20 |     Q    Was he angry? |
| 21 |     A    No. |
| 22 |     Q    Was he complaining about anything? |
| 23 |     A    No. |
| 24 |     Q    What did you do watching the basketball |
| 25 | game? |

Case 1:17-cv-01290-DDD-JDC Document 89-4 Filed 05/13/22 Page 878 of 114

**W. Robinson - Direct Examination by Mr. Roberts**

1

2    A    We just sat back and, you know, reacted how

3    the game was going.  You know, he goes good cross over,

4    you know, interacting with the game, how the game went,

5    you know.

6    Q    Did you like watching basketball with

7    Mike?

8    A    Yeah.

9    Q    Why?

10   A    You know -- well, I'm a ball player myself.

11   Well, I was when I was a younger man.  But, you know,

12   and I know he loved the game and we just watched it

13   together and, you know, had fun doing it, you know,

14   just watching the game.

15   Q    Did you have fun that evening?

16   A    Yeah.  I mean, we just sit back -- sit back

17   and watch the game like normal, you know.

18   Q    Did you and Mike get into an argument that

19   evening.

20   A    No, I never argued with him.

21   Q    Did he have any money on the game?  Was he

22   angry about a loss?

23   A    No, nothing like that.  Just a friendly, you

24   know, just watching the game.

25   Q    Just a game?

| | | |
|---|---|---|
| 1 | | **W. Robinson - Direct Examination by Mr. Roberts** |
| 2 | A | That's it. |
| 3 | Q | When he left that house that evening was he |
| 4 | | any different than when he walked in? |
| 5 | A | No. |
| 6 | Q | Was he over emotional when he left? |
| 7 | A | Nope. |
| 8 | Q | Same old Mike? |
| 9 | A | Same old Mike. |
| 10 | | MR. ROBERTS: One moment, your Honor? |
| 11 | | (Whereupon, a brief moment was taken.) |
| 12 | | (In open court.) |
| 13 | Q | Do you see Michael Davis in the courtroom |
| 14 | | here today? |
| 15 | A | Yes, I do. |
| 16 | Q | Could you point him out for the jury? |
| 17 | A | Right there. |
| 18 | Q | On February 26th, what were your work |
| 19 | | hours? |
| 20 | A | I was 6:30 to 2:30. |
| 21 | Q | Okay. So at around 1:00 would you have been |
| 22 | | home on the 26th? |
| 23 | A | No. I usually don't get home -- because |
| 24 | | when I get off at 2:30 I have to get a bus. I usually |
| 25 | | don't get to my house until like after 3:00. |

| | |
|---|---|
| 1 | **W. Robinson - Direct Examination by Mr. Roberts** |
| 2 | Q    Do you recall getting home that evening? |
| 3 | A    Excuse me? |
| 4 | Q    On the 26th, the day that ▋▋ passed, do you |
| 5 | remember getting home? |
| 6 | A    Yeah, because I got -- you know, I walked |
| 7 | right by his house to get to mine. |
| 8 | Q    What did you observe? |
| 9 | A    I seen -- let me see, was the police there |
| 10 | at the time?  They might have left, but I seen him and |
| 11 | then he had let me know that she had passed because I |
| 12 | didn't know that. |
| 13 | Q    When you observed him on that day how was |
| 14 | he? |
| 15 | A    Yeah, he was emotional. |
| 16 | Q    What do you mean emotional? |
| 17 | A    He was tearing up.  You know, I could tell |
| 18 | something was wrong, but -- |
| 19 | Q    How? |
| 20 | A    You know, because his demeanor.  You know, |
| 21 | he wasn't the same Mike that I had seen, you know, from |
| 22 | the days that I seen him.  He wasn't the same. |
| 23 | Q    Okay. |
| 24 | MR. ROBERTS:  Nothing further. |
| 25 | Thank you, Mr. Robinson. |

**People v. Michael Davis**

1

2          THE WITNESS:  Yes.

3          THE COURT:  Ms. Chavkin?

4          MS. CHAVKIN:  I have no questions for

5  this witness, your Honor.

6          THE COURT:  Okay.  Sir, you may step

7  down.  Thank you.

8          THE WITNESS:  Thank you.

9          (Whereupon, the witness, Willie Lee

10  Robinson, was excused from the witness

11  stand.)

12          THE COURT:  Defense may call its next

13  witness.

14          MR. ROBERTS:  May we approach, Judge?

15          THE COURT:  Sure.  Off-the-record?

16          MR. ROBERTS:  Yes.

17          (Whereupon, an off-the-record

18  discussion was held.)

19          (In open court.)

20          THE COURT:  Okay.  Members of the Jury,

21  the defense has advised me that they have

22  one additional witness to call that is a

23  witness from out of town who cannot be

24  available until tomorrow morning.

25          So, I realize it is only about 12:30

**People v. Michael Davis**

1

2       right now, but we're going to break for the

3       day at this point in time.

4           Just so you understand where we stand

5       in the progression of this case, that

6       witness will be called tomorrow morning when

7       we resume and the Court is going to work

8       with the attorneys this afternoon while

9       you're not here to make sure that we have

10       hopefully everything ready to go by way of

11       final jury instructions such that if

12       everything goes according to plan tomorrow

13       morning you will hear the last witness,

14       we'll then be prepared to move right into

15       the closing arguments, followed by my jury

16       instructions to you and then the case will

17       be in your hands for deliberations.

18           So, this case is moving along at the

19       pace that we anticipated it would and that I

20       told you it would during jury selection.

21           So, with that said, I'm going to excuse

22       everyone for the day at this time.

23           I will remind you during the course of

24       this break, please don't discuss this case

25       among yourselves or with anyone else.

**People v. Michael Davis**

Don't read or listen to any media
accounts of this case.

Do not visit or view any locations or
premises mentioned during this trial.

Don't conduct any research about this
case or anything related to this case.

Don't request or accept any payment or
benefit in return for supplying any
information about this trial.

Do not form any judgments or opinions
about this case.

Finally, if anyone attempts to
improperly influence either you or any other
members of the jury, please make sure you
bring that directly to my attention.

I want to thank you all very much for
your time and attention and patience.

We'll see you -- you probably need to
know what time to report back here tomorrow.
That would be critical.

Okay. We'll start at 10:00 a.m.
tomorrow. Sorry about that. We'll see
everyone back here tomorrow morning at
10:00.

**People v. Michael Davis**

                    Have a good afternoon.  Thanks.

                    (Whereupon, the jury exited the
          courtroom.)

                    THE COURT:  Okay.  Everyone may be
          seated.

                    All right.  What the Court would intend
          to do, and I advised the parties of this
          just a moment ago off-the-record, but at
          2:00 today -- we'll take a lunch break now
          for a little over an hour, I guess almost an
          hour and a half, and at 2:00 the Court will
          begin the charge conference.

                    At that time I will provide the parties
          with the Court's intended jury instructions
          and at this time I will listen to any
          objections from either party or requests for
          modifications or requests for additions.

                    If you're going to request a charge
          that is not included in the Court's
          instructions and that charge is set forth in
          the CJI, you may simply reference what
          charge it is and I will consider it.

                    If you're going to ask that the Court
          charge something that is not set forth in

**People v. Michael Davis**

1   the CJI, then you must provide to me in

2   writing exactly what you're asking that the

3   Court instruct the jury.

4   I will also provide the parties a

5   proposed verdict sheet at that time for your

6   review and then you can let me know if you

7   have any objections to that.

8   We will proceed tomorrow morning with

9   the Defendant's final witness.  Following

10   that final witness if there are any

11   additional matters or issues that need to be

12   resolved with respect to the Court's jury

13   instructions, of course each party will be

14   given an opportunity to be heard at that

15   time.

16   Is that schedule acceptable to the

17   People?

18   MS. CHAVKIN:  Yes, your Honor.

19   THE COURT:  Is that acceptable to the

20   defense?

21   MR. ROBERTS:  It is, your Honor, thank

22   you.

23   THE COURT:  Okay.  We'll see everyone

24   back here in this courtroom at 2:00 p.m.

Cheryl M. Moore, Senior Court Reporter

**People v. Michael Davis**

1
2              Thank you for your time.
3              The Court will stand in recess.
4              MR. ROBERTS:  Thank you, your Honor.
5              (Whereupon, a luncheon recess was
6      taken.)
7              (In open court.)
8              (Whereupon, the Defendant entered the
9      courtroom.)
10             THE COURT:  Okay.  We'll go on the
11     record.
12             We are outside the presence of the
13     jury.  We are in open court and on the
14     record, as I just said.
15             The Court will begin the charge
16     conference at this time.
17             The Court is mindful that the defense
18     has an additional witness to call and they
19     will be calling that witness tomorrow
20     morning.  Following the completion of the
21     proof in this case if there are any
22     additional issues that either or both
23     parties wish to address in connection with
24     the Court's final jury instructions or
25     anything else that is related to the charge

**People v. Michael Davis**

1

2　　　　conference they, of course, may be heard

3　　　　further at that time.  But, as I said, we'll

4　　　　begin the charge conference at this time.

5　　　　　　I'm going to hand to the parties, and

6　　　　the record should also reflect, of course,

7　　　　that the Defendant is present in court.  I

8　　　　will hand to the parties a copy of the

9　　　　Court's proposed jury instructions.  As you

10　　　　will see this is a table of contents of the

11　　　　Court's proposed instructions taken directly

12　　　　from the most recent online version of the

13　　　　CJI.  I would ask that the attorneys review

14　　　　the Court's proposed instructions and once

15　　　　you've had a chance to do that I will give

16　　　　each side a chance to advise me whether they

17　　　　have any objections or requests for

18　　　　additions or modifications.

19　　　　　　(Whereupon, a pause ensued.)

20　　　　　　THE COURT:  Ms. Chavkin, on behalf of

21　　　　the People, first off, any objections to the

22　　　　Court's proposed instructions?

23　　　　　　MS. CHAVKIN:  No objections, your

24　　　　Honor.

25　　　　　　THE COURT:  Any requests for either

**People v. Michael Davis**

```
 1
 2          modifications of the instructions or
 3          requests for additions?
 4               MS. CHAVKIN:  No, your Honor.
 5               THE COURT:  Okay.  The People are
 6          satisfied?
 7               MS. CHAVKIN:  Yes, your Honor.
 8               THE COURT:  Okay.  Mr. Roberts, how
 9          about you?
10               MR. ROBERTS:  Your Honor, respectfully
11          we would request an adverse inference charge
12          relative to the preservation of *Rosario*
13          material.
14               THE COURT:  Okay.  Give me one second.
15          Before we get to that, any objections to
16          what the Court proposes to instruct?
17               MR. ROBERTS:  No, your Honor.
18               THE COURT:  Okay.  You have requests
19          for additions?
20               MR. ROBERTS:  I do, your Honor.
21               THE COURT:  Go ahead.
22               MR. ROBERTS:  Adverse inference charge
23          with respect to *Rosario* with Dr. Sikirica.
24          I would rely on this Court's ruling in
25          *People v. Heimroth* that recently concluded
```

**People v. Michael Davis**

1

2       with this specific issue and Dr. Sikirica's

3       recorded statements that were destroyed. He

4       is a member of the employ of the county and

5       as such would be under the control of the

6       People. They're well aware of his practice

7       techniques for Rensselaer County and they

8       had a duty to preserve. That material has

9       been destroyed so I ask the Court to give

10       such an instruction.

11       THE COURT: Okay. People wish to be

12       heard?

13       MS. CHAVKIN: Yes, your Honor. It is

14       the People's position that we are neither in

15       possession -- the **Rosario**, the destroyed

16       dictation, was not in the possession of a

17       law enforcement agency and it was not in the

18       control of the People.

19       The -- I have case law here, **People v.**

20       **Washington** where the Court of Appeals in

21       1995 ruled that the New York City ME did not

22       fall under either of the **Rosario**

23       requirements. I don't know if the Court

24       wants --

25       THE COURT: Sure, if you're relying on

**People v. Michael Davis**

1

2        case law you can either provide me a copy of

3        the case or -- you have a copy.  Great.

4              MS. CHAVKIN:  Yes, your Honor.

5              THE COURT:  And do you have a copy to

6        give to defense counsel?

7              MR. ROBERTS:  Thank you.

8              THE COURT:  Okay.  Anything else from

9        the People?

10             MS. CHAVKIN:  No, your Honor.

11             THE COURT:  The Court will reserve on

12       the Defendant's request and advise the

13       parties in the morning as to its ruling in

14       that regard.

15             Mr. Roberts, anything else?

16             MR. ROBERTS:  With respect to the

17       People's position, your Honor, I would take

18       the position that in this case it is

19       distinguishable from the case law presented

20       by the People in that at the time of the

21       autopsy the District Attorney's office was

22       participating in the autopsy with members of

23       law enforcement.  So I think it changes the

24       role of the ME in this particular case

25       because he is a county employee and at that

**People v. Michael Davis**

1

2         juncture he is working in conjunction with

3         law enforcement and the very District

4         Attorney's office who is here presiding over

5         the matter.  So they're well aware of his

6         practices as a county employee and because

7         he was essentially acting as their agent at

8         the time of the autopsy with their

9         participation it changes the role of *Rosario*

10        in this specific case.

11            THE COURT:  Okay.  I understand both

12        parties' positions.

13            Okay.  Any other requests from the

14        defense?

15            MR. ROBERTS:  No, your Honor.

16            THE COURT:  Okay.  Otherwise satisfied

17        with the Court's proposed instructions?

18            MR. ROBERTS:  Yes, your Honor.

19            THE COURT:  Okay.  A couple of

20        questions now the Court has predominantly

21        for the defense but, of course, the People

22        can weigh in.  The Court has not included,

23        as both parties can see, any instructions

24        regarding corroboration of statements.  Now,

25        there is evidence in this case, of course,

**People v. Michael Davis**

1
2       of the Defendant having made statements to
3       the police but if you read that particular
4       instruction it refers to corroboration of
5       confessions and/or admissions and I'm not
6       sure anything the Defendant said would
7       constitute a confession or admission and for
8       that reason the Court didn't include it in
9       the instructions.
10              Now, with that said, if either party
11      wants to be heard as to either agreeing or
12      disagreeing with the Court and taking a
13      different position you may do so.  I just
14      wanted the record to be clear that I'm aware
15      of that instruction and that I proposed not
16      including it for those reasons.
17              People wish to be heard?
18              MS. CHAVKIN:  No, your Honor.
19              THE COURT:  Defense wish to be heard?
20              MR. ROBERTS:  Can I give the Court a
21      determination on that tomorrow?
22              THE COURT:  Yeah.  Let me say this for
23      the record.  If the defense wants it I will
24      instruct it.  If the defense doesn't want it
25      I won't instruct it.  I will defer to the

**People v. Michael Davis**

                    Defendant on this particular issue.  I have

          explained why I didn't include it but that

          doesn't mean you have to agree with my

          interpretation and if you believe that it is

          appropriate and you want to be heard on that

          you can let me know.

                    Ms. Chavkin, I will let the People be

          heard, of course, as is always the case, but

          I would intend -- I would be inclined to

          defer to the Defendant's request on this but

          you can let me know in the morning if you

          wish.

                    MR. ROBERTS:  I would tell the Court

          that I'm probably inclined to request that

          specific language.  I will tell you

          definitively, your Honor, just so you can

          prepare, I'm probably going to request it.

                    THE COURT:  Okay.  Let me say this then

          before I get ahead of myself.  Do the People

          have any objection to that being included if

          the Defendant is requesting it?

                    MS. CHAVKIN:  No, your Honor.

                    THE COURT:  Okay.  If the Defendant

          requests it, it will be in.  If the

**People v. Michael Davis**

1
2    Defendant says he does not want it, it will

3    not be in.  It will -- will be the

4    Defendant's choice.  You can let me know in

5    the morning.

6        MR. ROBERTS:  Thank you, your Honor.

7        THE COURT:  As far as expert witness

8    and that portion of the Court's charge, what

9    specific witnesses do the parties believe

10   should be identified?  I would presume Dr.

11   Sikirica?

12       MS. CHAVKIN:  Yes, your Honor.

13       THE COURT:  Any other witnesses?

14       MS. CHAVKIN:  No.

15       THE COURT:  Okay.  The defense is

16   calling a witness tomorrow?

17       MR. ROBERTS:  We are, your Honor.  We

18   are calling an individual, Shaku, S-H-A-K-U,

19   last name Teas, T-E-A-S.  She's a forensic

20   pathologist.

21       THE COURT:  Okay.  So you would ask

22   that I include her under that portion and

23   you have no objection to Dr. Sikirica being

24   included as well?

25       MR. ROBERTS:  Yes, your Honor.

**People v. Michael Davis**

THE COURT:   Okay.   And the People are okay with those two names being included?

MS. CHAVKIN:   Yes, your Honor.

THE COURT:   Okay.   Finally, and if the Defendant wants to make this choice tomorrow at the close of the proof he may do so, but there's the issue of the alternates and whether the defense would like the alternates held and sequestered upon commencement of deliberations or discharged.

If he wants to wait until tomorrow, that's fine.   If you have an answer now, that's fine.

MR. ROBERTS:   You can discharge them.

THE COURT:   At the Defendant's request the alternate jurors will be discharged upon commencement of deliberations.

Okay.   The other thing the Court wanted to do at this time was to hand to the parties copies of the proposed verdict sheet.   I would ask the parties to review the proposed verdict sheet and let me know if you have any objections.

(Whereupon, a pause ensued.)

**People v. Michael Davis**

THE COURT:  Any objections from the People?

MS. CHAVKIN:  No objections, your Honor.

MR. ROBERTS:  May I have a moment, your Honor?

THE COURT:  Sure.

(Whereupon, a pause ensued.)

MR. ROBERTS:  Thank you, your Honor, for the brief moment to converse with my client.  There is no objection to the proposed verdict sheet.

THE COURT:  If there's no objection from either party we'll have the original verdict sheet marked as Court's Exhibit 1 at this time.

(Verdict Sheet was marked Court's Exhibit 1.)

THE COURT:  Sheila, I will give you Court's Exhibit 1.

CLERK OF THE COURT:  Absolutely.

THE COURT:  Thank you.  That is all that the Court had intended to address at this charge conference.

**People v. Michael Davis**

1

2          Is there anything else that the People

3 need to address at this time?

4          MS. CHAVKIN: Your Honor, we may ask

5 Dr. Sikirica to come in as a rebuttal

6 witness depending upon what the testimony of

7 Dr. Teas is and we would ask permission for

8 Dr. Sikirica to sit in on her testimony.

9          THE COURT: Okay. Mr. Roberts?

10          MR. ROBERTS: Judge, in the event if it

11 is envisioned Dr. Sikirica is going to

12 testify in rebuttal I would oppose him being

13 present in the courtroom. Obviously I don't

14 oppose him being present in the courtroom to

15 discuss the expert's testimony with the

16 People but just very clearly I'm going to

17 oppose the recalling of Dr. Sikirica simply

18 so the People can have the last word.

19          It is my position that that is not

20 appropriate rebuttal testimony. Obviously

21 it is within the province of the Court to

22 make that determination but I think the case

23 law is clearly abundant that you don't get

24 to hold back some testimony so you can come

25 back and fill in the gaps.

Cheryl M. Moore, Senior Court Reporter

**People v. Michael Davis**

Dr. Sikirica was here, he had testified concerning the People's direct case. He was aware of the subject matter of his testimony. The People have also been aware of the subject matter of his testimony. They had a full and fair opportunity to cross him from anything to the initial autopsy, to the conclusion of the autopsy, to him reviewing documents.

So to the extent that he's going to come in simply to say, oh, no that expert is wrong, again -- and again testify I would obviously be opposing that when and if the People make that application.

THE COURT: Okay. The Court can't rule at this time on whether rebuttal testimony is appropriate or not so the People can certainly reserve their right to make that request at the end of the Defendant's case and if and when that request is made I will consider it and rule on it at that time.

With respect to whether Dr. Sikirica can sit in the courtroom and observe the Defendant's expert testimony, I will reserve

Case 1:17-cv-03891-DLI-SMG Document 1-4 Filed 05/13/22 Page 1098 of 114

2143

**People v. Michael Davis**

on that at this time and issue a ruling tomorrow.

Certainly, and I believe the Defendant doesn't have any objection to this, if the People were not intending to call Dr. Sikirica as a witness in rebuttal he would be allowed to be in the courtroom but I understand you're at least reserving -- the People are at least reserving their right to ask the Court for such a rebuttal opportunity.

So again, I can't rule on that now until I have heard what the defense expert's testimony is and whatever arguments the respective parties may make but I will give you a ruling tomorrow in advance of the defense expert testifying as to whether Dr. Sikirica can be present in the courtroom.

MS. CHAVKIN: Thank you, your Honor.

THE COURT: Okay. Anything else from the People?

MS. CHAVKIN: No, your Honor.

THE COURT: Was there anything else that the Defendant wanted to address before

**People v. Michael Davis**

1

2      we break for the day?

3           MR. ROBERTS:  No, your Honor, thank

4      you.

5           THE COURT:  I thank you all for the

6      time.  Have a great afternoon and evening.

7      We'll see you back here tomorrow at 10:00

8      a.m.

9           (Whereupon, a brief recess was taken.)

10           (Whereupon, the matter was adjourned to

11      August 24, 2016 at 10:00 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**People v. Michael Davis**

1

2                    CERTIFICATION

3

4                    I, CHERYL M. MOORE, Senior Court
     Reporter for the Third Judicial District and
5     Notary Public in and for the State of New York,
     do hereby certify:
6
                       The foregoing to be a true and
7     accurate transcription, to the best of my
     ability, of the stenographic notes as taken by me
8     of the aforesaid proceedings.

9
                       IN WITNESS WHEREOF, I have
10    hereunto set my hand this ⁴ᵗʰ day of
     _March_, 2020.
11

12

13

14    CHERYL M. MOORE
     Senior Court Reporter
15

16

17

18

19

20

21

22

23

24

25

**Cheryl M. Moore, Senior Court Reporter**

Case 1:17-cv-01290-DJS  Document 34  Filed 09/19/2021  5004789  Page 143 of 298  of 144
**APPENDIX**  Filed 08/15/22  Page 111 of 144  **2146**

110

**People v. Michael Davis**

*INDEX TO PROCEEDINGS*

FOR THE DEFENDANT:

MICHAEL DAVIS
Direct Examination by Mr. Roberts..............8
Cross Examination by Mr. Chavkin..............68
Redirect Examination by Mr. Roberts...........73
Witness Excused...............................76

RUSSELL BROWN
Direct Examination by Mr. Roberts.............77
Witness Excused...............................80

WILLIE ROBINSON
Direct Examination by Mr. Roberts.............81
Witness Excused...............................89

Charge Conference.............................94

Matter Adjourned.............................108

**People v. Michael Davis**

### *INDEX TO EXHIBITS*

PEOPLE'S EXHIBITS                    FOR ID    REC'D

| | | | |
|---|---|---|---|
| 1 | Miranda Warnings | | |
| 2 | Autopsy Photograph | | |
| 3 | Autopsy Photograph | | |
| 4 | Autopsy Photograph | | |
| 5 | Autopsy Photograph | | |
| 6 | Autopsy Photograph | | |
| 7 | Autopsy Photograph | | |
| 8 | Autopsy Photograph | | |
| 9 | Photograph | | |
| 10 | Photograph | | |
| 11 | Photograph | | |
| 12 | Photograph | | |
| 13 | 911 CD | | |
| 14 | Interview DVD | | |
| 15 | Interview DVD | | |
| 16 | M. Bayly's Statement | | |
| 17 | R. Fountain - Police Narrative | | |
| 18 | R. Parker's Statement | | |
| 19 | K. Crisafulli's Statement | | |
| 20 | TPD Supplemental Report | | |
| 21 | Crime Scene Attendance Log | | |

People v. Michael Davis

## *INDEX TO EXHIBITS* (Continued)

PEOPLE'S EXHIBITS                    FOR ID    REC'D

22  Autopsy Report

23  Black & White Photograph

24  Black & White Photograph

25  9/9/15 Video CD

1 | **People v. Michael Davis**

2 | *INDEX TO EXHIBITS (Continued)*

3 | DEFENDANT'S EXHIBITS        FOR ID    REC'D

4 | A   Photograph

5 | B   PCR Report

6 | C   TPD - M. Bayly's Deposition

7 | D   Photograph

8 | E   Photograph

9 | F   CPS Report - pgs. 44-45

10 | G   2/24/15 Interview CD

11 |

12 |

13 |

14 | COURT'S EXHIBITS

15 | 1   Verdict Sheet..............................104

16 | 2   Jury Note...................................

17 | 3   Jury Note...................................

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

**Cheryl M. Moore, Senior Court Reporter**

Case 1:17-cv-01290-DLC Document 834 Filed 09/13/22 Page 296 of 93

# EXHIBIT F

```
 1

 2   STATE OF NEW YORK        COUNTY COURT
     COUNTY OF RENSSELAER    CRIMINAL TERM
 3   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
     THE PEOPLE OF THE STATE OF NEW YORK.
 4
     - against -              Indictment 15-1094
 5
     MICHAEL DAVIS,
 6                            Defendant.
     * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
 7                   Rensselaer County Courthouse
                     Congress and Second Streets
 8                   Troy, New York   12180
                     May 3, 2016
 9
                     Suppression Hearings
10
     B e f o r e:
11
          HONORABLE ANDREW G. CERESIA,
12               County Court Judge

13   A p p e a r a n c e s:

14   For THE PEOPLE OF THE STATE OF NEW YORK:

15       JOEL ABELOVE, District Attorney
         of Rensselaer County
16         By:   JESSICA HALL, ESQ.,
              Chief Assistant District Attorney
17       Rensselaer County Courthouse
         Congress and Second Streets
18       Troy, New York 12180

19   For DEFENDANT:

20       JOHN C. TURI, ESQ.
         Rensselaer County Public Defender
21         By:   WILLIAM D. ROBERTS, ESQ.
         and JESSICA ZWICKLBAUER, ESQ.,
22           Assistant Public Defenders
         Congress and Second Streets
23       Troy, New York   12180

24   Also Present:

25       Michael Davis, Defendant
         Clerk of the Court
```

2

2152



1
2
3
4       *TABLE  OF  CONTENTS*
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1 **Colloquy**

2       (Prior to going on the

3 record, People's Exhibits 1

4 through 7 were marked for

5 identification.)

6       THE COURT: The Court calls

7 the case of the People versus

8 Michael Davis, indictment number

9 15-1094. This matter is now on

10 before the Court for a *Huntley*,

11 *Mapp*, *Dunaway* hearing as well as

12 visibility and audibility

13 hearings.

14       Are the People ready to

15 proceed?

16       MS. HALL: The People are

17 ready, your Honor.

18       THE COURT: Defense ready to

19 proceed?

20       MR. ROBERTS: Yes, your

21 Honor. Thank you.

22       THE COURT: Okay. The People

23 may call their first witness.

24       MS. HALL: At this time,

25 we'll call Danielle Coonradt.

1    Colloquy

2                    **DANIELLE COONRADT,**

3          called as a witness, having been

4          first duly sworn, was examined

5          and testified as follows:

6              THE CLERK OF THE COURT:  This

7          sworn witness is Daniel Coonradt,

8          C-o-o-n-r-a-d-t.

9              THE COURT:  Ms. Hall, you may

10         proceed.

11             MS. HALL:  Your Honor, as a

12         preliminary matter, I have

13         provided defense counsel with 68

14         pages of *Rosario* material prior

15         to the proceedings today.  I did

16         not receive the 2/26 interview

17         with the defendant, the 3/2

18         interview with the -- excuse me.

19         The 9/9 interview with the

20         defendant as they were attached

21         to the 710.30 notice and the

22         supplemental notices.

23             I will, at this time, provide

24         the Court with a copy of that

25         duplicate *Rosario*, if I may

D. Coonradt - Direct by Ms. Hall

approach.

   THE COURT:   You can hold onto

that.   I don't need that right

now.   I'll let you know if I need

to look at materials, but thank

you for that.

      Anything else, Ms. Hall, or

are you ready to go with this

witness?

      MS. HALL:   With this witness,

your Honor, we are ready to

proceed.   Thank you.

      THE COURT:   Okay.


      *DIRECT EXAMINATION BY MS. HALL*


   Q   Can you state your name for the

record?

   A   Danielle Coonradt.

   Q   And where are you currently

employed?

   A   Lake Placid, New York.

   Q   In what capacity?

   A   Police officer.

D. Coonradt - Direct by Ms. Hall

Q   And directing your attention back to February 26th of 2015, were you employed during that time?

A   Yes, ma'am.

Q   And where were you employed?

A   City of Troy Police Department.

Q   In what capacity?

A   Police officer.

Q   And how long have you been with the City of Troy Police Department?

A   At that time, about seven years, I believe.

Q   Okay.  And was your rank police officer?

A   Yes, ma'am.

Q   And in order to be a police officer with the City of Troy Police Department, do you have any training that goes with that?

A   Yes.  I did a sixth-month academy in Schenectady.

Q   Did you successfully complete that?

A   Yes.

D. Coonradt - Direct by Ms. Hall

1

2    Q    And did you have any supplemental

3    or subsequent training to that?

4    A    Over the years, different

5    in-service trainings, things of that

6    nature.

7    Q    February 26 of 2015, what were

8    your duties and responsibilities?

9    A    Patrol officer.

10    Q    Were you working in your capacity

11    as a patrol officer that day?

12    A    Yes.

13    Q    What do you do as a patrol

14    officer?

15    A    Vehicle and Traffic Law, answer

16    calls as they come in, things of that

17    nature.

18    Q    Did there come a point in time

19    where you responded to 856 Fourth

20    Avenue?

21    A    Yes.

22    Q    Is that in the City of Troy?

23    A    Yes.

24    Q    County of Rensselaer?

25    A    Yes.

1  **D. Coonradt - Direct by Ms. Hall**

2      Q      State of New York?

3      A      Yes.

4      Q      And what was your purpose for

5  being called to that address?

6      A      I responded to a report of a

7  juvenile in cardiac arrest.

8      Q      And what did you do when you

9  responded?

10      A      I arrived there for the

11  specific -- could I refer to my

12  paperwork?

13      Q      Well, you went to that address?

14      A      Yeah, I went to the address.

15      Q      What did you do when you got

16  there?

17      A      I got out and the fire department

18  was already there and I believe I spoke

19  to the defendant.

20      Q      Okay.  When you say "defendant",

21  is that Michael Davis?

22      A      Yes.

23      Q      Do you see him here in the

24  courtroom today?

25      A      Yes.

**D. Coonradt - Direct by Ms. Hall**

1

2    Q   And would you point him out and

3   identify something he's wearing?

4    A   A green jumpsuit.

5          MS. HALL: Let the record

6          reflect she's identified the

7          defendant, your Honor.

8          THE COURT: It's noted.

9    Q   And what was your purpose of

10  speaking with Mr. Davis?

11    A   To find out what had occurred

12  prior to the child having cardiac

13  arrest.

14    Q   Why was that important?

15    A   I wanted to see if maybe she had

16  gotten into something or fallen. I

17  wanted to see if there was something

18  that the fire department needed to know

19  in their treatment of her.

20    Q   And what exactly -- well, where

21  did you encounter Mr. Davis?

22    A   He was outside the home.

23    Q   Okay, and what, if anything, did

24  you say to him?

25    A   I asked him what had occurred.

1 | D. Coonradt - Direct by Ms. Hall

2      Q    And did he respond to that?

3      A    Yes.

4      Q    And what did he say to you?

5      A    He said he woke the child --

6 V ▓▓▓ woke up at 8, around 8, I believe.

7 He told her it was too early, told her

8 to go back to bed and he said he went in

9 at 11 and she was unresponsive.

10      Q    Did you say anything to him in

11 response to those statements?

12      A    I said, "Do you know what --" I

13 believe I said something like, "Well,

14 it's 1:30 now and he said, "Well, time

15 must be flyin', then."

16      Q    Did you have any other conver-

17 sation with Mr. Davis that day?

18      A    No.

19      Q    Who was present when you had that

20 conversation with him?

21      A    The child's mother was there.

22      Q    And what type of tone were you

23 using when speaking with him?

24      A    Just like I'm talking to you now.

25 I wasn't too excitable or anything.

**D. Coonradt - Direct by Ms. Hall**

1

2    Q   Did you know the status of the

3  child at that point?

4    A   No, I did not.

5    Q   What type of demeanor did you

6  observe with respect to the defendant?

7    A   He seemed -- for lack of a better

8  term, he seemed a little out of it, a

9  little confused, like he didn't under-

10  stand what I was asking him.

11    Q   Did he answer your questions?

12    A   Yes.

13    Q   Did the answers that he gave you,

14  other than what you previously stated

15  with respect to the time gap, did they

16  make sense?

17    A   I don't know that I asked him any

18  other questions besides the one I

19  documented.

20    Q   Was Mr. Davis cooperative in

21  answering your questions?

22    A   For the most part, yes.

23    Q   Did he indicate he didn't want to

24  speak to you or that he didn't want to

25  talk to you in any way?

1 D. Coonradt - Cross by Mr. Roberts

2    A    No.

3    Q    When you said he was outside the

4 residence, that was at 856 fourth Ave?

5    A    Yes.

6    Q    Where exactly did you speak with

7 him?  Describe the area or the...

8    A    Sidewalk, it was on the sidewalk

9 away from the door because there was a

10 lot of medical personnel going in and

11 out.

12    Q    Did he have to speak to you?

13    A    No.

14    Q    Did he indicate he didn't wish to

15 speak to you?

16    A    No.

17         MS. HALL:  Nothing further,

18         your Honor.

19         THE COURT:  Okay.  Mr.

20         Roberts?

21         MR. ROBERTS:  Yes, thank you,

22         your Honor.

23

24    *CROSS-EXAMINATION BY MR. ROBERTS*

25

| 1 | D. Coonradt - Cross by Mr. Roberts |
| 2 | Q | Good afternoon, Officer Coonradt. |
| 3 | A | Afternoon. |
| 4 | Q | You're currently in Lake Placid? |
| 5 | A | Yes, sir. |
| 6 | Q | When did you transfer there? |
| 7 | A | It's beautiful there. Why |
| 8 | wouldn't I transfer there? |
| 9 | Q | When? |
| 10 | A | January. |
| 11 | Q | January of this year? |
| 12 | A | This year, yes. |
| 13 | Q | Okay. Now you testified on |
| 14 | direct that February 22nd you were |
| 15 | working patrol, correct -- excuse me. |
| 16 | The 26th, you were working patrol, |
| 17 | correct? |
| 18 | A | Yes. |
| 19 | Q | You arrived in a marked cruiser? |
| 20 | A | Yes, sir. |
| 21 | Q | And when you arrived on scene, |
| 22 | how many individuals were present? |
| 23 | A | I'm not entirely sure. I |
| 24 | couldn't be sure. |
| 25 | Q | Were you the first responding |

**D. Coonradt - Cross by Mr. Roberts**

officer?

    A   I believe I was the first patrol officer, yes.

    Q   When you arrived, what do you recall seeing?

    A   Just the fire department coming in and out. Fire trucks were already on scene.

    Q   And what was the first thing that you did when you approached the apartment?

    A   I spoke to your client first.

    Q   Okay.

    A   I didn't want to get in the way of them coming in and out, so...

    Q   Didn't want to get in the way of who coming in and out?

    A   Fire department.

    Q   When you say "they", how many people are we talking about?

    A   Oh, I'm not sure how many firemen were there.

    Q   More than three? More than four?

    A   I couldn't say for sure.

| | |
|---|---|
| 1 | **D. Coonradt - Cross by Mr. Roberts** |
| 2 | Q    Well, there was one person there, |
| 3 | correct? |
| 4 | A    At least, yes. |
| 5 | Q    Okay.  How many fire trucks |
| 6 | responded? |
| 7 | A    I don't know. |
| 8 | Q    Was there more than one? |
| 9 | MS. HALL:  Objection, Judge. |
| 10 | She doesn't recall. |
| 11 | THE COURT:  Overruled. |
| 12 | A    I don't know. |
| 13 | Q    So you arrived on the scene, |
| 14 | there was at least one fire truck there, |
| 15 | correct? |
| 16 | A    Yes. |
| 17 | Q    And you approached the front |
| 18 | door; was it open or closed? |
| 19 | A    I don't recall. |
| 20 | Q    Well, you said there was fire |
| 21 | department coming in and out of the |
| 22 | apartment, correct? |
| 23 | A    Correct. |
| 24 | Q    How did they get in and out of |
| 25 | the apartment? |

Case 23-590, Document 96-4, 11/09/2023, 3584755, Page 133 of 298
Case 1:17-cv-01290-DJS    APPENDIX    Document 45 Filed 05/13/22    Page 17 of 93    **2166**

16

| 1 | **D. Coonradt - Cross by Mr. Roberts** |

2    A    Well, I couldn't be sure if they

3    shut the door behind them coming in and

4    out, so...

5    Q    Okay. Well, Did you observe them

6    coming in and out?

7    A    Yes.

8    Q    How long were you standing

9    outside of the apartment that you

10   observed this?

11   A    I don't know.

12   Q    How long were you at the scene

13   before you encountered my client?

14   A    I couldn't be sure.

15   Q    Okay. Do you have a specific

16   recollection of what you did on this

17   date, Officer?

18   A    Yes, yes.

19   Q    You do?

20   A    I couldn't give times specific-

21   ally, without looking at my paperwork.

22   Q    All right. It's difficult to

23   recall times, correct?

24   A    (Witness nodded affirmatively.)

25   Q    You would agree with me?

**D. Coonradt - Cross by Mr. Roberts**

1

2　　A　　Yes.

3　　Q　　Okay.　And you're a trained

4 member of the police department,

5 correct?

6　　A　　Estranged?

7　　Q　　A trained member of the Troy

8 Police Department, correct?

9　　A　　Yes, yes.

10　　Q　　You've been given specific

11 instruction to note times, dates and

12 places during your training, correct?

13　　A　　Yes.

14　　Q　　And it's your testimony that you

15 don't recall the time because this was a

16 very hectic scene you came across,

17 correct?

18　　A　　Correct.

19　　　　　MS. HALL:　Objection,

20　　　　　mischaracterizes her statement.

21　　　　　THE COURT:　Overruled.

22　　Q　　When you encountered my client,

23 how was he dressed?

24　　A　　I don't recall.

25　　Q　　What was the weather out that

D. Coonradt - Cross by Mr. Roberts

day?

    A    I remember it being cold.

    Q    When you say "cold", what do you mean by that?

    A    Cold. I was cold.

    Q    Were you dressed in a jacket?

    A    No, sir.

    Q    Were you dressed in gloves?

    A    No.

    Q    When you approached my client, you indicated he was on the sidewalk, correct?

    A    Yes.

    Q    And he was with another individual or by himself?

    A    He was with another individual.

    Q    You would agree with me that based upon your training and experience, you could tell that they were the residents of the apartment, correct?

    A    I don't know.

    Q    You would agree with me that the female and my client were -- appeared to be distraught and confused, correct?

**D. Coonradt - Cross by Mr. Roberts**

    A    Yes.

    Q    And it was based upon those outward indications you approached them and began speaking with him, correct?

    A    I'm assuming so.

    Q    Well, I don't want you to assume. Do you recall?

    A    Well, I guess.

    Q    Okay. And it was at this point you had this interaction with my client, correct?

    A    Yes.

    Q    Your motivations were to ascertain some information to provide the firefighters, correct?

    A    Correct.

    Q    And that after speaking with my client, you went in and spoke to the firefighters, correct?

    A    Correct.

    Q    And you also went in the apartment at this time to look and see what you could find, correct?

    A    Correct, in plain view.

**D. Coonradt - Cross by Mr. Roberts**

1

2    Q    Okay. Fair to say when you

3  entered the apartment at this time you

4  did not get the permission of my client

5  to enter the apartment, correct?

6    A    Correct.

7    Q    And at this juncture, you didn't

8  have a warrant that was signed, correct?

9    A    Correct.

10   Q    And prior to walking into the

11 apartment, you put on latex gloves so as

12 not to contaminate the scene, correct?

13   A    I don't remember if I did or not.

14   Q    Well, are you trained relative to

15 not contaminating an alleged crime

16 scene?

17   A    Yes.

18        MS. HALL: Judge, I'm going

19        to object at this point. It's

20        beyond the scope.

21        MR. ROBERTS: We're here for

22        a *Mapp/Dunaway* hearing, Judge.

23        She discussed her interaction

24        with the firemen on direct. It

25        goes to what she did with the

| | |
|---|---|
| 1 | **D. Coonradt - Cross by Mr. Roberts** |
| 2 | firemen when she walked into the |
| 3 | apartment. |
| 4 | THE COURT: Well, we are here |
| 5 | for a *Mapp/Dunaway* hearing. On |
| 6 | direct examination, this witness |
| 7 | was asked questions only pertain- |
| 8 | ing to the *Huntley* portion. |
| 9 | Ms. Hall, does this witness, |
| 10 | from your perspective, have any |
| 11 | relevant information or testimony |
| 12 | with respect to the issue of |
| 13 | probable cause? |
| 14 | MS. HALL: To probable cause? |
| 15 | No, your Honor. With respect to |
| 16 | defense counsel opening the door, |
| 17 | I do have some followup questions |
| 18 | with respect to her observations |
| 19 | in the house. |
| 20 | THE COURT: I'll allow you to |
| 21 | continue, Mr. Roberts. |
| 22 | MR. ROBERTS: Thank you, your |
| 23 | Honor. |
| 24 | Q  Now, after you had that inter- |
| 25 | action with my client where he indicated |

1 | **D. Coonradt - Cross by Mr. Roberts**

2 | to you that time must be flying, you

3 | indicated that you then went in to have

4 | discussions with the fire department,

5 | correct?

6 |     A    I didn't go in with the purpose

7 | of having a discussion with the fire

8 | department.

9 |     Q    Okay. So it was your purpose of

10 | walking into that apartment to see if

11 | you could find anything, correct?

12 |     A    That's not correct.

13 |     Q    Okay. Fair to say when you went

14 | into the apartment, you located a bottle

15 | of pills and asked the firefighter to

16 | search the container, correct?

17 |     A    No, I asked him what they were

18 | and he looked at the label and told me.

19 |     Q    So you asked him what they were

20 | and he checked to indicate what those

21 | items were, he had a discussion with

22 | you?

23 |     A    He looked at the label and he

24 | said, "They're hydrocodeine."

25 |     Q    Okay. With that knowledge, what

D. Coonradt - Cross by Mr. Roberts

did you do?

A    I just documented it.  I didn't do anything else with it.

Q    Isn't it fair to say you walked around the apartment, looked around?

A    Yeah, I looked around, correct.

Q    When you say you looked around the apartment, fair to say that you walked into several rooms around the apartment, correct?

A    Correct.

Q    You made a specific note not to touch anything, correct?

A    Correct.

Q    You indicated on direct that my client looked confused, that he seemed somewhat out of it, correct?

A    Correct.

Q    And you would agree with me that you have responded in the duration of your career to other incidents involving a fatality, correct?

A    Correct.

Q    You would agree with me that his

1 | **D. Coonradt - Cross by Mr. Roberts**

2 responses were consistent with what

3 you've seen in the past regarding

4 deaths, correct?

5      A    I've seen all sorts of responses

6 and all of them different. I couldn't

7 say that there was a normal response to

8 that.

9      Q    Well, you would agree with me

10 that your observation did not seem out

11 of the ordinary, correct?

12      A    I don't have an ordinary --

13 there's no controlled study for that.

14 Everyone reacts differently. I don't

15 know what an ordinary response to that

16 would be.

17      Q    How did Mr. Davis react?

18      A    He was confused.

19      Q    When you say "confused", what do

20 you mean?

21      A    He seemed like -- seemed a little

22 bit out of it, like he was confused.

23      Q    What led you to the conclusion

24 that he was out of it and confused?

25 What specifically did you observe?

**D. Coonradt - Cross by Mr. Roberts**

1

2      A    He didn't seem to understand the

3 question that I asked about what

4 happened.

5      Q    When you say "he didn't seem to

6 understand", what indicated to you that

7 he didn't, that he was having trouble?

8      A    Taking awhile to answer, looking

9 around.

10      Q    Okay. Would you agree with me

11 that you had an opportunity to observe

12 his face during this conversation?

13      A    That I what?

14      Q    Had an opportunity to look at his

15 facial features.

16      A    Yes.

17      Q    Would you agree he appeared to be

18 distressed?

19      A    Yeah, absolutely.

20      Q    Also he was concerned, correct?

21      A    I couldn't say he seemed

22 concerned. He seemed upset.

23      Q    Was he crying?

24      A    I don't recall.

25      Q    Was the female crying?

1 | **D. Coonradt - Cross by Mr. Roberts**

2 |   A    I don't recall.

3 |   Q    You testified on direct that he

4 | told you that the child -- excuse me.

5 | He found the child unresponsive around

6 | 11 o'clock, correct?

7 |   A    Correct.

8 |   Q    Then you informed him that it was

9 | 1:30, correct?

10 |   A    Correct.

11 |   Q    And you would agree with me upon

12 | you informing him of that time he was

13 | surprised at the time of day, correct?

14 |   A    Yes.

15 |   Q    That's part of the confusion for

16 | which you're speaking of, correct?

17 |   A    Yes.

18 |   Q    You would agree with me it

19 | appeared to you that his time and space

20 | relation was not consistent with reality

21 | at that point, correct?

22 |   A    Correct.

23 |   Q    When you were in the apartment

24 | with the fire department, obviously you

25 | had a conversation with one responder.

**D. Coonradt - Cross by Mr. Roberts**

How many were in the apartment when you were there at that point?

    A    I couldn't be sure how many.

    Q    But you would agree with me that there was individuals working on the child at that point?

    A    Yes.

    Q    And you would agree with me at that point it was very chaotic in that apartment?

    A    Yes.

    Q    And chaotic -- what observations did you see that led you to the conclusion that it was a very chaotic scene in the apartment?

    A    Lots of, you know, talking back and forth to each other, trying to move around each other as far as the fire department goes.

    Q    And it's a small apartment, correct?

    A    Yes.

    Q    And you would agree with me that the -- you observed the primary purpose

**D. Coonradt - Cross by Mr. Roberts**

1

2    of the fire department was to render

3    assistance to the child as opposed to

4    taking care to preserve the scene,

5    correct?

6      A    Correct, yes.

7      Q    Okay. And at some point you

8    observed my client outside with -- once

9    the child was transported to the

10    ambulance, you observed my client

11    outside with the responding personnel,

12    correct?

13      A    Yes.

14      Q    And did you have any discussions

15    with him at this time?

16      A    No.

17      Q    And what did you do when my

18    client was making requests as to whether

19    or not he could accompany the child or

20    the mother could accompany the child to

21    the ER?

22      A    I didn't have -- none of those

23    requests were made to me.

24      Q    Okay. Did you observe my client

25    making those inquiries to other

| | | |
|---|---|---|
| 1 | **D. Coonradt - Cross by Mr. Roberts** | |
| 2 | officers? | |
| 3 | A | I don't remember. |
| 4 | Q | You had no interaction with |
| 5 | that? | |
| 6 | A | No. |
| 7 | Q | And then after the EMS responders |
| 8 | left, you held the scene for a search | |
| 9 | warrant, correct? | |
| 10 | A | Yes. |
| 11 | Q | Now in your supplemental you said |
| 12 | "held the scene"; what does that mean? | |
| 13 | A | I waited outside with a crime |
| 14 | scene log. | |
| 15 | Q | When did you become aware that |
| 16 | there was an application for a search | |
| 17 | warrant? | |
| 18 | A | I wasn't. I was relieved at I |
| 19 | believe 1600 and that was -- that was | |
| 20 | it. That was my end with the call. | |
| 21 | Q | So at 1600 you were relieved? |
| 22 | A | Yes. |
| 23 | Q | Who instructed you to hold the |
| 24 | scene for a search warrant? | |
| 25 | A | My sergeant. |

**D. Coonradt - Cross by Mr. Roberts**

Q    What time did that happen?

A    I don't know the specific time that he told me to.

Q    Well, you arrived at the residence at what time?

A    I'm not sure the exact time.

Q    Around 1300 hours?

A    I'd have to look at my paperwork which I'm not even sure I put my exact arrival time on.

MR. ROBERTS:  Your Honor, may I have an item marked?

THE COURT:  You may.

(Whereupon, Defendant's Exhibit A was marked for identi- fication.)

MR. ROBERTS:  May I approach?

THE COURT:  You may.

Q    Officer Coonradt, would looking at your supplemental report 120 refresh your memory relative to the time you responded?

A    Yes.

Q    I show you what's been previously

| | |
|---|---|
| 1 | **D. Coonradt - Cross by Mr. Roberts** |
| 2 | marked as Defendant's Exhibit A. Let me |
| 3 | know if that refreshes your memory with |
| 4 | respect to that question. |
| 5 | A    It says at 1309 I responded. |
| 6 | Q    So fair to say you were at the |
| 7 | crime -- the respond scene for approxi- |
| 8 | mately three hours? |
| 9 | A    I'm not sure. I believe 1309 is |
| 10 | when the call came in, so I'm not sure |
| 11 | how long it took me to arrive there. |
| 12 | Q    Okay. Well, let me ask you, if |
| 13 | you responded -- at 1309, you responded |
| 14 | to a call for a juvenile in cardiac |
| 15 | arrest; how long did it take you to get |
| 16 | there? |
| 17 | A    I don't remember what end of the |
| 18 | city I was coming from. |
| 19 | Q    You would agree with me it would |
| 20 | be anywhere from five to fifteen |
| 21 | minutes? |
| 22 | MS. HALL:  Objection. |
| 23 | A    I couldn't give a -- |
| 24 | MS. HALL:  She said she |
| 25 | doesn't remember, Judge. It's |

**D. Coonradt - Cross by Mr. Roberts**

2           calling for speculation.

3             THE COURT: Overruled. He

4           can follow up. It's cross-

5           examination.

6    Q   In your experience as a Troy

7 police officer, how long does it take to

8 get from one end of the city to the

9 other end of the city with your

10 emergency lights on?

11    A   It depends on the time of day,

12 the traffic, pedestrian traffic. I

13 couldn't give an exact time.

14    Q   Okay. If you received a call at

15 1309, could you approximate how long it

16 took you to get there?

17    A   No, because I don't recall the

18 traffic or pedestrian traffic.

19    Q   Fair to say you got there before

20 1400, correct?

21    A   Yes.

22    Q   And you would agree with me that

23 when you responded, the emergency

24 responders were working on the child,

25 correct?

| | |
|---|---|
| 1 | **D. Coonradt - Cross by Mr. Roberts** |
| 2 | A   Yes. |
| 3 | Q   Okay.  So you would agree with me |
| 4 | that you responded relatively soon after |
| 5 | you got the initial call, correct? |
| 6 | A   Most likely. |
| 7 | Q   Would the -- you indicated that |
| 8 | you filled out a log relative to when |
| 9 | you checked out at 1600, is that |
| 10 | correct? |
| 11 | A   Yes. |
| 12 | Q   Would that log indicate when you |
| 13 | checked into the scene? |
| 14 | A   I would have to look at it; I |
| 15 | don't know. |
| 16 | MR. ROBERTS:  Sure.  May I |
| 17 | have a copy of that log? |
| 18 | MS. HALL:  Judge, I don't |
| 19 | have a copy of the log.  It was |
| 20 | not part of my direct testimony; |
| 21 | hasn't been turned over. |
| 22 | MR. ROBERTS:  To the extent |
| 23 | it would be considered *Rosario* |
| 24 | material regarding this witness's |
| 25 | testimony, Judge, I would ask |

**D. Coonradt - Cross by Mr. Roberts**

2          anyway. Even if it's done at

3          some point later this week or

4          when it can reasonably be

5          accomplished, it does not need to

6          be done today.

7          I do appreciate you looking

8          into it up to this point in time.

9          Mr. Roberts, are you ready to

10          proceed at this time?

11          MR. ROBERTS: I am. If I can

12          just have the log marked.

13          THE COURT: You may.

14          Officer, I'll remind you that

15          your still under oath.

16          (Whereupon, Defendant's

17          Exhibit B was marked for identi-

18          fication.)

19      Q    Officer Coonradt, you previously

20 testified that you were dispatched to

21 the scene at 1309, correct?

22      A    Yes.

23      Q    And would you agree with me that

24 you filled out a scene log shortly

25 thereafter?

D. Coonradt - Cross by Mr. Roberts

A    Yes.

Q    And would reviewing that scene log indicate to you at a minimum the earliest time you recorded when you were present at the scene?

A    Yes.

Q    If I showed that to you, would that refresh your recollection?

A    Yes.

MR. ROBERTS:  May I approach, your Honor?

THE COURT:  You may.

MR. ROBERTS:  Thank you.

Q    When your memory is refreshed, please let me know.

A    I don't believe I put myself on here.  No, I don't have myself on there.

Q    Would you agree with me that Defendant's B has the name "Coonradt" written on it?

A    Yes, sir.  That's indicating I'm the one that logged them in and out, but I didn't put myself on there.

Q    Okay.  So you are logging someone

1 | **D. Coonradt - Cross by Mr. Roberts**

2 in at 1314, is that how you read this?

3     A    Can I look again, please?

4     Q    Sure. Sorry.

5     A    Thank you. I haven't seen one in

6 awhile. What I would have done was

7 called down to Dispatch, had them give

8 me the times that Troy fire was in, and

9 1338 would have been the time that I had

10 recorded that on the paper.

11     Q    Okay, and the recording of -- so

12 this isn't helpful with understanding

13 when you got there, correct?

14     A    Correct, yes.

15     Q    Okay. Do you recall how you were

16 informed to hold the scene to allow a

17 search warrant to be obtained?

18     A    I don't recall, no.

19     Q    And would those communications

20 with your department regarding your

21 instructions regarding to hold the

22 scene, would that have occurred over

23 your dispatch communication system?

24     A    My sergeant was on scene, so it

25 very well may have been in person, but I

67

| 1 | **D. Coonradt - Cross by Mr. Roberts** |
|---|---|

1  **D. Coonradt - Cross by Mr. Roberts**

2  don't recall either way.

3      Q   Okay.  Now, back to the house,

4  how long did you go in the house?

5      A   I'm not sure how long I was in

6  there for.

7      Q   Fair to say you walked through

8  every room?

9      A   Yes.

10      Q   And did you have an opportunity

11  to observe items within the rooms?

12      A   Yes.

13      Q   And you would agree with me that

14  nothing stood out of note that you

15  marked it on your Troy 120, correct?

16          MS. HALL:  Judge, I'm going

17          to object at this point.  We're

18          getting far afield of the

19          People's direct.

20          MR. ROBERTS:  No problem,

21          Judge.  I'll just call her in the

22          future as my own witness.  I have

23          a subpoena for her.

24          THE COURT:  If you want to

25          make her your own witness now by

**D. Coonradt - Cross by Mr. Roberts**

going outside the scope of the

People's direct, you may do so,

but you can't lead her.

    MR. ROBERTS: Absolutely,

Judge. Thank you.

    THE COURT: Okay. You may

continue.

Q    Officer Coonradt, did there come

a time that you entered the apartment?

A    Yes.

Q    And what rooms did you enter?

A    Whatever ones were in there. I

don't remember how many there were.

Q    Did you make any observations

regarding the child's bedroom?

A    Not that I could recall.

Q    What, if anything, did you

observe that appeared out of place in

the living room?

A    I don't recall.

Q    How long did you interact with

the firefighters in the living room?

A    I don't recall. I wouldn't even

call it an interaction. The only verbal

**D. Coonradt - Cross by Mr. Roberts**

interaction I had was asking what the
pills on the table were.

    Q    And you found the pills where?

    A    In the living room.

    Q    Okay.  And did you -- what other
rooms did you go into, other than the
living room and the bedroom?

    A    Whatever ones were in the
apartment.  I went in every room.  I
don't recall how many bedrooms or...

    Q    Did you notice anything on the
floor?

           MS. HALL:  Objection,
           leading.

    Q    What, if anything, did you notice
on the floor?

    A    I don't recall.

    Q    What information, if any, did you
relay to the fire department after your
discussion with my client?

    A    I don't know that I did.

           MR. ROBERTS:  Nothing
           further.  Thank you, Officer.

           THE COURT:  Ms. Hall, any

1   **D. Coonradt - Redirect by Ms. Hall**

2              redirect?

3

4        *REDIRECT EXAMINATION BY MS. HALL*

5

6        Q    When you approached the

7   defendant, were you in a Troy P.D.

8   uniform?

9        A    Yes, ma'am.

10       Q    So he was clearly able to

11  identify you?

12       A    Yes.

13       Q    And what was your purpose for

14  speaking to him?

15       A    Just to see what had occurred

16  prior to the fire department being

17  called there.

18       Q    And at that point in time, did

19  you have any reason to know or believe

20  that there was criminal activity?

21       A    No.

22       Q    Did you -- at what point in time

23  did you learn that the child was

24  deceased?

25       A    Officer Bristol informed me over

| | |
|---|---|
| 1 | **D. Coonradt - Redirect by Ms. Hall** |
| 2 | the phone, I believe.  I'm not sure the |
| 3 | exact time. |
| 4 | Q    Would your 120 help refresh your |
| 5 | recollection? |
| 6 | A    Yes. |
| 7 | Q    Let me show you what has been |
| 8 | premarked as Defendant's A for identi- |
| 9 | fication. |
| 10 | A    It says, "Officer --" |
| 11 | Q    I don't want you to read from it. |
| 12 | A    Okay. |
| 13 | Q    Are you able to determine from |
| 14 | that document what time you were |
| 15 | notified? |
| 16 | A    Yes. |
| 17 | Q    And what time was that? |
| 18 | A    1408. |
| 19 | Q    And what time in nonmilitary is |
| 20 | that? |
| 21 | A    2:08. |
| 22 | Q    So at 2:08, had you already had |
| 23 | the conversation with defendant by that |
| 24 | point? |
| 25 | A    Yes. |

**D. Coonradt - Redirect by Ms. Hall**

Q    And there came a point in time you said you went into the apartment, correct?

A    Yes.

Q    And what was your role at the scene at that time?

A    I wanted to see if there was anything obvious that could have occurred to maybe help the fire department with their treatment of the child. They were really busy.

Q    You didn't have any role with respect to the search warrant, correct?

A    No.

Q    Were you involved in executing the search warrant at all?

A    No.

Q    And at that point in time when you went into the house, to your knowledge, was the child still alive?

A    Yes.

Q    Is it true that your concern for the child had nothing to do with the

1 | D. Coonradt - Redirect by Ms. Hall

2 defendant at that point?

3     A    Yes.

4     Q    There was questions earlier from

5 defense counsel with respect to

6 defendant being confused. When you

7 describe him as being confused, was he

8 confused about the time or was he

9 confused about the questions you were

10 asking him or something other?

11         MR. ROBERTS: Objection,

12       form, leading.

13         THE COURT: Sustained.

14     Q    You testified earlier that he

15 seemed confused. Was defendant confused

16 at all by the questions you were asking

17 him?

18         MR. ROBERTS: Objection.

19         THE COURT: What basis?

20         MR. ROBERTS: Argumentative.

21         THE COURT: Overruled.

22     A    He seemed -- when I asked him

23 what had happened, he seemed to take

24 awhile to answer and kind of was looking

25 around and that's what made me feel like

**D. Coonradt - Redirect by Ms. Hall**

he didn't quite understand what was
going on.

    Q    What was your interpretation
about what you were experiencing?

    A    About him being confused?

    Q    Correct.

    A    I don't understand the question.

    Q    Did he seem medicated or
intoxicated in any way?

    A    He just seemed just out of it. I
didn't look at his pupils, I was more
concerned with what was going on, but
he -- I mean, in my experience with
dealing with people on some sort of
depressant, it would fit that, you know.

    Q    Prior to leaving the scene, did
you make any observations with respect
to illicit drugs?

    A    As far as...

    Q    Or illegal drugs? Did you smell
anything, see anything other than the
codeine you testified to earlier?

    A    I don't believe so.

    Q    Based on your observations of

| | |
|---|---|
| 1 | **D. Coonradt - Redirect by Ms. Hall** |
| 2 | defendant and his confusion, did you |
| 3 | feel it was necessary to ask him the |
| 4 | question in a different way? |
| 5 | MR. ROBERTS: Objection. |
| 6 | THE COURT: What basis? |
| 7 | MR. ROBERTS: Form, argu- |
| 8 | mentative. |
| 9 | THE COURT: Overruled. |
| 10 | A    Did I ask him the question more |
| 11 | than once? |
| 12 | Q    Yes. |
| 13 | A    I don't remember. |
| 14 | Q    You testified that you went into |
| 15 | the house and the firefighters were in |
| 16 | there working on the child, correct? |
| 17 | A    Yes. |
| 18 | Q    And with respect to the location |
| 19 | of the firefighters, you talked about |
| 20 | there being confusion and chaos, |
| 21 | correct? |
| 22 | A    Yes. |
| 23 | Q    Was that confusion and chaos |
| 24 | extended beyond the area of the futon |
| 25 | where they were working on the child? |

D. Coonradt - Redirect by Ms. Hall

2          MR. ROBERTS: Objection.

3      Leading, form.

4    A   No.

5          THE COURT: Sustained as to

6      leading.

7    Q   Where was the chaos that you

8 testified to earlier located?

9    A   In the area around the child.

10 Might have been completely calm for

11 them; for me -- I'm not a medical

12 personnel, I don't know. For me it

13 looked -- I didn't understand what was

14 going on, so for me it looked chaotic.

15    Q   Were they in any other areas of

16 the home?

17    A   No.

18    Q   Other than the medication that

19 you testified to earlier locating, did

20 you see or observe anything else that

21 the child may have got into?

22    A   No.

23    Q   And prior to starting the time,

24 the crime scene log that you were shown

25 earlier by defense counsel, is it fair

1 **D. Coonradt - Redirect by Ms. Hall**

2 to say you had done a number of things

3 prior to starting that crime scene log?

4     A   Yes.

5     Q   How long after you arrived did

6 you speak with defendant?

7     A   I couldn't be sure of an exact

8 time.

9     Q   Without stating the exact time,

10 do you know how long in terms of

11 immediacy? Was it right when you

12 arrived, within minutes of arriving?

13     A   There was probably some sort of a

14 gap in between.

15     Q   And what information did you have

16 before you spoke to defendant?

17     A   I'm not sure.

18         MS. HALL: Nothing further,

19         Judge. Thank you.

20         THE COURT: Okay.

21         Mr. Roberts, anything else?

22         MR. ROBERTS: Yes, your

23         Honor.

24

25

D. Coonradt - Recross by Mr. Roberts

*RECROSS-EXAMINATION BY MR. ROBERTS*

Q    You indicated you had no part
with the search warrant?

A    Correct.

Q    Your role was delegated to
securing the scene so a search warrant
could be executed, correct?

A    I was told to hold the scene. I
didn't know what they were doing until
after.

Q    Well, you indicated in your
supplemental that you held the scene for
a search warrant, correct?

A    Um-hum.

Q    So is it your testimony that when
you were told to hold the scene you
didn't know for what purpose?

A    I don't know, actually. I don't
know if he said it up front that that
was the reason, or...

Q    Fair to say you, in your
supplemental, indicated you held the
scene for a search warrant, correct?

1  **D. Coonradt - Redirect by Ms. Hall**

2      A    Yes.

3      Q    So you were involved in securing

4  the scene for the execution of the

5  search warrant.

6      A    I guess, yes.

7      Q    Would you agree with me that

8  holding the scene for a search warrant

9  is an important role as it ensures there

10  is no tampering with the scene, correct?

11      A    Correct.

12      Q    So that was a role that was

13  delegated to you to follow up with,

14  correct?

15      A    Correct.

16          MR. ROBERTS:  Thank you.

17          Thank you, your Honor.

18          THE COURT:  Ms. Hall,

19      anything else?

20          MS. HALL:  One -- very

21      briefly.

22

23  *FURTHER REDIRECT EXAMINATION BY MS. HALL*

24

25      Q    During that time you were

**D. Coonradt - Redirect by Ms. Hall**

1  securing the scene for the search

2  warrant, did anyone tamper with the

3  scene?

4          A     No.

5              MS. HALL:   Thank you.

6          Nothing further.

7              THE COURT:   Mr. Roberts,

8          anything else?

9              MR. ROBERTS:   No, thank you,

10         your Honor.

11             THE COURT:   Officer, you may

12         step down.   Thank you.

13             THE WITNESS:   Thank you.

14             (Whereupon, the witness was

15         excused.)

16             THE COURT:   Ms. Hall, you may

17         call your next witness.

18             MS. HALL:   Your Honor, at

19         this time, the People will call

20         Chuck McDonald to the stand.

21

22             *CHARLES McDONALD,*

23         called as a witness, having been

24         first duly sworn, was examined

C. McDonald - Direct by Ms. Hall

and testified as follows:

    THE CLERK OF THE COURT: This sworn witness is Charles McDonald, M-c-D-o-n-a-l-d.

**_DIRECT EXAMINATION BY MS. HALL_**

Q    Good afternoon. State your name for the record.

A    Charles McDonald.

Q    Where, on February 26 of 2015, were you employed?

A    City of Troy Police Department.

Q    Are you still employed there?

A    No, I am not.

Q    And in what capacity in February, 2015 were you employed with Troy P.D?

A    Juvenile Detective Bureau.

Q    Briefly, what were your duties and responsibilities at that time?

A    We were assigned to any cases dealing with juveniles.

Q    Did you have any crossover? Did you do work involved in other cases, as

1  **C. McDonald - Direct by Ms. Hall**

2  well?

3      A    Yes, absolutely.

4      Q    With respect to the People of the

5  State of New York versus Michael Davis,

6  did there come a point in time on

7  February 26 of 2015 when you came in

8  contact with Michael Davis?

9      A    Yes.

10     Q    And if you would tell the Court

11 where that was, please.

12     A    At his residence.

13     Q    And what was the purpose for you

14 being at his residence?

15     A    A call came in for an unrespon-

16 sive child.

17     Q    Is that how you were involved?

18 Is that considered the juvenile?

19     A    That was part of it.

20     Q    Your connection to the case?

21     A    Yes.

22     Q    What did you do when you got

23 there?

24     A    We arrived at the scene.  Mr.

25 Davis and his girlfriend, Rebecca, were

**C. McDonald - Direct by Ms. Hall**

standing out in front. The child had already been removed from the scene by ambulance. We asked them if they would accompany us down to the police station.

Q    And when you say "the child", was that Viola Davis?

A    Yes.

Q    Do you know her status at that time, whether she's alive or dead?

A    No, not at that time, I did not know.

THE COURT:    If I can just clarify.    Who did you ask to accompany you back to the station?

THE WITNESS:    Mr. Davis and Rebecca, his wife.

THE COURT:    Thank you.

Q    Rebecca, is that Viola Davis's mother?

A    Yes.

Q    Biological mother?

A    Yes.

Q    The Michael Davis that you asked

**C. McDonald - Direct by Ms. Hall**

to accompany you back to the police

station, do you see him in the courtroom

today?

    A   Yes, I do.

    Q   Can you point him out, identify

him for the Court, please?

    A   He's the gentleman sitting there

with the green jumpsuit.

        MS. HALL: Let the record

        reflect that he's identified Mr.

        Davis.

        THE COURT: That's noted.

    Q   You said you requested that

Ms. Parker and Mr. Davis come back to

the station with you, correct?

    A   Yes.

    Q   And did they, in fact, do that?

    A   Yes.

    Q   Who was with you?

    A   Detective Fountain was with me.

    Q   I'm sorry, Detective...

    A   Fountain, Ron Fountain.

    Q   Did Mr. Davis agree to go with

you?

C. McDonald - Direct by Ms. Hall

2    A    Yes.

3    Q    And how did he indicate that to

4    you?

5    A    He said he would come down to the

6    station and talk with us.

7    Q    How did you get to the station?

8    A    We drove.

9    Q    When you say "we drove", who

10   drove?

11   A    Officer Fountain drove and I sat

12   in the back seat.  The defendant

13   couldn't fit in the back seat because of

14   his size, so he rode in the front seat

15   and I rode in the back.

16   Q    Was he handcuffed or anything at

17   that point in time?

18   A    No.

19   Q    If Mr. Davis indicated he wasn't

20   willing to speak to you, would that have

21   been an option?

22              MR. ROBERTS:  Objection,

23         leading, form.

24              THE COURT:  Overruled.

25   A    Yeah.  It would have been an

**C. McDonald - Direct by Ms. Hall**

option.

Q    How long did it take you to get to the station from 856 Fourth Street?

A    Ten, fifteen minutes, whatever the traffic was.  We drove directly there.

Q    Is there any conversation in the car between any of you?

A    I don't believe so, no.

Q    What do you do when you get to the police station?

A    We went in the back through to the juvenile area into my office which was located on the first floor of the police station, the back half of the police station.

Q    Describe your office, please.

A    Four walls, nice wooden desk and a door right there; and then the there's an open area, a bathroom across the hall.  There's a couple other offices in there.

Q    Who's in the room with you?

A    Detective Fountain was in there

1  **C. McDonald - Direct by Ms. Hall**

2  with me and then later on Sergeant

3  Colaneri came in, also.

4      Q    Was Mr. Davis in there, as well?

5      A    Yes.

6      Q    Describe what takes place when

7  you get to your office.

8      A    I sat with Mr. Davis. Detective

9  Fountain left with Sergeant Colaneri, I

10  believe they went up to the hospital. I

11  know they left the area there, and I

12  stayed with Mr. Davis there in my

13  office.

14      Q    While you're with Mr. Davis, are

15  you having any conversation?

16      A    Just general conversation;

17  nothing particular.

18      Q    Okay. What type of general

19  conversation are you having?

20          MR. ROBERTS: Objection,

21          relevance. Also, it hasn't been

22          710.30'ed. Move to preclude.

23          Outside the scope and pursuant to

24          my motion.

25          THE COURT: The objection's

**C. McDonald - Direct by Ms. Hall**

overruled. I'll allow the testimony.

I'll certainly consider respective arguments as to whether the substance of any of these statements falls under the ambit of the 710.30 that was served or not, but I'll allow the question.

Q    What type of general conversation are you having?

A    We talked about his basketball, how he traveled around for basketball, that kind of thing. He talked about his childhood upbringing, that kind of thing. You know, repeatedly saying, "I don't understand how this happened."

Q    Are you asking him any questions at this point in time?

A    No, not at all, not pertaining to anything, like just like outside stuff, you know what I mean?

Q    But nothing with respect to the events of February 26?

**C. McDonald - Direct by Ms. Hall**

A    Nothing with respect to the investigation whatsoever.

THE COURT:  If I can clarify, I'm not undertanding the testi-mony right this minute, you indicated, sir, that in the room with you was Detective Fountain, and is it Detective Colaneri?

THE WITNESS:  At the beginning, it was myself, Detective Fountain and the defendant; and then Sergeant Colaneri came down and then they, Detective Fountain and Sergeant Colaneri, had left and it was just myself and the defendant sitting there.

THE COURT:  So at the point you're talking about this general conversation between you and the defendant, it was only the two of you?

THE WITNESS:  Just the two of us.

1 | **C. McDonald - Direct by Ms. Hall**

2 THE COURT: Okay, thank you.

3 Q What's the tone of the conversa-

4 tion that you're having?

5 A Just general conversation, you

6 know. That's it.

7 Q Do you know at that point in time

8 if you had your gun on you?

9 A I believe I did, yes, at that

10 time.

11 Q Why were you just making small

12 talk?

13 MR. ROBERTS: Objection,

14 relevance.

15 THE COURT: Overruled.

16 A We didn't know what was wrong

17 with the child. I didn't have any

18 reason to question anything. I didn't

19 know what, you know, the outcome was

20 with the child at that point in time.

21 Q Did there come a time you learned

22 the outcome of the child?

23 A Later on, yes.

24 Q Okay, and what happens after

25 you're sitting in this room with Mr.

1 **C. McDonald - Direct by Ms. Hall**

2 Davis having this general conversation?

3 What happens?

4 A    A little while later, Detective

5 Fountain and Sergeant Colaneri came

6 back.

7 Q    Do you know how long that was?

8 A    I do not.

9 Q    Do you know what time that was?

10 A    I do not.

11 Q    Do you know how long you were

12 alone with defendant?

13 A    No, I don't.

14 Q    During that time, did you make

15 him any promises?

16 A    No.

17 Q    Did you do anything improper with

18 respect to your conduct, threatening him

19 in any way?

20 A    No.

21 Q    Did you coerce him in any way?

22 A    Not at all.

23 Q    Did you apply any undue pressure

24 to him in any way?

25 A    Not at all.

C. McDonald - Direct by Ms. Hall

1

2    Q    Did you make any promises to him
3 in any way?

4    A    Not at all.

5    Q    Did you use any deception when
6 you were speaking with the defendant?

7              MR. ROBERTS:  Objection,
8         argumentative, leading.

9              THE COURT:  Overruled.

10   A    No, I did not.

11   Q    Did there come a point in time
12 other people came back into the room?

13   A    Yes.

14   Q    And who was that?

15   A    Detective Fountain and Detective
16 Colaneri.

17   Q    And who was sitting where, if you
18 recall?

19   A    I was sitting at my desk,
20 Detective Fountain would be sitting to
21 my left over in the corner, and Sergeant
22 Colaneri was sitting closer to the door
23 area.

24   Q    At that point in time, what
25 information, if any, did you know with

**C. McDonald - Direct by Ms. Hall**

2    respect to the child?

3        A    That she had passed.

4        Q    And did there come a point in

5    time when you started having a conver-

6    sation with defendant that was more

7    specific to the events of February 26,

8    2015?

9        A    Me, personally, no, not at that

10   time.

11       Q    While you were in the room, did

12   there come a point in time?

13       A    Yes.

14       Q    And could you describe that,

15   please?

16       A    Sergeant Colaneri was asking

17   questions from a sheet of paper that he

18   had.

19       Q    "Questions" meaning -- what types

20   of questions?

21       A    Basically information about the

22   child, was she sick, any medicines, that

23   type of stuff.

24       Q    Okay.  Did the defendant indicate

25   while you were present that he was

**C. McDonald - Direct by Ms. Hall**

2    willing to answer those questions?

3        A    Yes.

4        Q    At any point in time, did he ask

5    for an attorney while those questions

6    were being asked?

7        A    No, He did not.

8        Q    At any point in time did he

9    indicate he didn't wish to speak to you?

10       A    No, he did not.

11       Q    At that point in time, was he

12   free to leave?

13       A    Yes.

14       Q    Did there come a point in time

15   that you learned that that conversation

16   had been recorded?

17       A    Yes.

18       Q    And if you would tell the Court

19   what conversation was recorded?  We have

20   talked about a number of them.

21       A    The conversation with Sergeant

22   Colaneri asking the questions from the

23   piece of paper that he had.

24       Q    And while you were present, did

25   anyone else threaten Mr. Davis?

**C. McDonald - Direct by Ms. Hall**

    A    No.

    Q    Did anyone make him any promises?

    A    No.

    Q    Did they coerce him in any way?

    A    No.

    Q    Did anyone apply any undue pressure to get him to speak to you?

    A    No.

    Q    How was his level of cooperation?

    A    He was fine.  He cooperated, answered all the questions.

    Q    Was Ms. Parker present during this time?

    A    No.

    Q    Do you recall how long Investigator or Detective Sergeant Colaneri spoke with Mr. Davis?

    A    I don't know.

    Q    I'm going to show you what's been premarked as People's Exhibit 1 for identification.

               MS. HALL:  May I approach the

C. McDonald - Direct by Ms. Hall

2          witness, your Honor?

3                    THE COURT:  Of course.  Yes.

4     Q    Do you recognize this CD?

5     A    Yes.

6     Q    What do you recognize that CD

7 as?

8     A    The conversation that he had with

9 Sergeant Colaneri.

10    Q    Have you reviewed this?

11    A    I did.

12    Q    You reviewed it in its entirety?

13    A    Yes.

14    Q    And does it fairly and accurately

15 depict the conversation that you had or

16 that you were present for between Tim

17 Colaneri and Michael Davis?

18    A    Yes.

19    Q    Has it been changed or altered in

20 any way?

21    A    No.

22    Q    The content of that conversation

23 is what you experienced and witnessed?

24    A    Yes.

25                    MS. HALL:  At this time,

C. McDonald - Direct by Ms. Hall

2 　　　　Judge, I would request that be

3 　　　　moved into evidence.

4 　　　　　MR. ROBERTS: May I voir dire

5 　　　　on the exhibit?

6 　　　　　THE COURT: Sure.

7

8 　　**VOIR DIRE EXAMINATION BY MR. ROBERTS**

9

10 　　Q 　Good afternoon. What's your

11 current rank? I'm sorry.

12 　　A 　Public safety officer now.

13 　　Q 　You're retired?

14 　　A 　I retired.

15 　　Q 　So it's your testimony that

16 People's 1 was recorded by Detective

17 Sergeant Colaneri?

18 　　A 　Yes.

19 　　Q 　And it was recorded on what type

20 of device?

21 　　A 　I don't even remember, be honest

22 with you.

23 　　Q 　Cell phone video, do you

24 recall?

25 　　A 　I don't know.

| | |
|---|---|
| 1 | **C. McDonald - Direct by Ms. Hall** |
| 2 | Q   All right.   And when was the last |
| 3 | time you looked at People's Exhibit 1? |
| 4 | A   The last time?   Yesterday. |
| 5 | Q   Yesterday?   Did you have an |
| 6 | opportunity to compare it to the |
| 7 | original recording that's kept at Troy |
| 8 | P.D.? |
| 9 | A   No, just what was played for me |
| 10 | yesterday, that's it. |
| 11 | Q   So when was the last time you |
| 12 | observed the original copy? |
| 13 | A   Whatever was recorded that day, |
| 14 | and then yesterday I listened to that. |
| 15 | That was it. |
| 16 | Q   You would agree with me that |
| 17 | People's Exhibit 1 starts recording mid |
| 18 | conversation, correct? |
| 19 | A   I don't remember being mid |
| 20 | conversation.   I don't know, to be |
| 21 | honest with you. |
| 22 | Q   So as you sit here today, can |
| 23 | you -- you would agree with me that |
| 24 | you're not aware whether or not People's |
| 25 | Exhibit 1 contains the entire recording |

| | **C. McDonald - Direct by Ms. Hall** |
|---|---|
| 1 | |
| 2 | or if it's a portion thereof? |
| 3 | A Correct. I know the portion I |
| 4 | listened to, what's on there, I was |
| 5 | there for that part. If there was more |
| 6 | before or after, I don't know. I was |
| 7 | shown this part yesterday. |
| 8 | Q So this part, People's Exhibit 1, |
| 9 | as you sit here today, because you |
| 10 | haven't compared it to the original, you |
| 11 | would agree with me you are unsure if |
| 12 | that's an exact copy of what was |
| 13 | contained in the Troy Police Department, |
| 14 | correct? |
| 15 | A Correct. |
| 16 | MR. ROBERTS: Okay. |
| 17 | Objection, your Honor. |
| 18 | THE COURT: The objection is |
| 19 | overruled. This witness |
| 20 | testified that he was present |
| 21 | when the conversation contained |
| 22 | on People's 1 happened. |
| 23 | He testified that he reviewed |
| 24 | People's 1 and that it fairly and |
| 25 | accurately depicts that portion |

Case 1:17-cv-01290-DJS Document 94 Filed 09/30/21 Page 198 of 93
Case 1:21-cv-01290-DJS Document 44-1 Filed 05/13/22 Page 718 of 93
APPENDIX
2220
100

**C. McDonald - Direct by Ms. Hall**

1

2        of the conversation for which he

3        was present. That is a suffi-

4        cient foundation and, therefore,

5        the objection is overruled.

6        People's 1 will be marked

7        into the record at this time. I

8        would ask it to be provided to

9        the Court Reporter, if it hasn't

10        already. We'll have it marked

11        in, please.

12        (Whereupon, People's Exhibit

13        1 was received into evidence.)

14

15   *FURTHER DIRECT EXAMINATION BY MS. HALL*

16

17   Q    At the conclusion of what's

18   contained in that recording, what

19   happened?

20   A    Detective Fountain and Sergeant

21   Colaneri went and did a search warrant

22   up at the house.

23   Q    If you know, what happened with

24   Mr. Davis?

25   A    I stayed at the station with him

**C. McDonald - Direct by Ms. Hall**

until it was over.

    Q    During the course of the search warrant?

    A    Yup.

    Q    You were present with him?

    A    Yup.

    Q    During that part of it, did you have any further conversation with respect to February 26 of 2015?

    A    Just the same type of conversation he had before.

    Q    What's contained therein on the recording?

    A    About the basketball, his upbringing.

    Q    Back to the generic?

    A    He kept referring back to that type of stuff.

    Q    Nothing further?

    A    Nothing further with regards to the case.

    Q    The events of February 26?

    A    Nope.

    Q    Do you know how long you stayed

**C. McDonald - Direct by Ms. Hall**

with Mr. Davis?

    A    I don't. I don't. I really don't.

    Q    Did there come a point in time Mr. Davis left?

    A    Yes.

    Q    When was that?

    A    After Detective Fountain and Sergeant Colaneri got back.

    Q    Do you know how he got home?

    A    I believe Mr. Russell brown picked him up.

    Q    Left on his own accord?

    A    Yes.

    Q    At any time before he left did he request an attorney?

    A    No.

    Q    Did he ask to speak with anybody, other --

    A    No.

    Q    During that time you were with him, was he allowed to use the bathroom?

    A    Yeah.

    Q    Was he offered food or drink?

Case 1:17-cv-01290-DJS Document 84 Filed 05/13/22 Page 248 of 93

**C. McDonald - Direct by Ms. Hall**

 A    Yeah, yup.  I offered to go to --
to see if he needed anything from
Stewart's or anything like that.

 Q    Did he indicate he did?

 A    No.

 Q    To your knowledge, does he
smoke?

.    A    I don't believe so.  I don't
know.

 Q    Did he ask for a smoke break?

 A    No, never asked to go smoke or
anything.

 Q    During that time, did you part
with him at all or did he stay with you
the entire time?

 A    Other than I think he went to the
bathroom once and he stayed there, right
there with me.

 Q    At that point in time, did you
have a cause of death?

 A    No.

 MS. HALL:  I have no further
 questions, your Honor.

 THE COURT:  Mr. Roberts?

C. McDonald - Cross by Mr. Roberts

                    MR. ROBERTS: Thank you, your
        Honor.


        CROSS-EXAMINATION BY MR. ROBERTS


        Q    Is it all right if I still call
you debt?
        A    That's fine.
        Q    Detective, your initial contact
with my client first occurred in your
office, or did you meet him back at the
residence?
        A    At the residence.
        Q    At what time did you arrive at
the residence that day?
        A    What time did I arrive?  That, I
don't know.
        Q    How long did you stay there?
        A    Not long.
        Q    Well, when you say "not long",
what does that --
        A    Maybe 15 minutes.  I don't know.
        Q    You're not sure of the time?
        A    I'm not sure of the times, no.

```
 1  C. McDonald - Cross by Mr. Roberts

 2       Q    Was it yourself or another

 3  officer that requested that Mr. Davis

 4  accompany them back to the police

 5  station?

 6       A    Another officer.

 7       Q    Who?

 8       A    Detective Fountain.

 9       Q    At that point, was that request

10  made for both him and Ms. Parker?

11       A    Yes.

12       Q    And where were they located when

13  that question was asked?

14       A    Everybody was outside.

15       Q    All right, and would you agree

16  with me at this point, Ms. Davis was

17  extremely upset?

18       A    She seemed a little upset; I

19  wouldn't say extremely.

20       Q    She seemed a little upset?

21       A    Yes.

22       Q    You would agreed that Mr. Davis

23  seemed upset?

24       A    A little bit, yeah.

25       Q    And at this juncture, at this
```

C. McDonald - Cross by Mr. Roberts

juncture when you were interacting with them, you do not know what the status of the child is, correct?

A    No.

Q    As well as there has been no information relayed to Ms. Parker or my client relative to what the status of the child is, correct?

A    At that time, no.

Q    Okay.  So your request of my client was to come down to the station to talk?

A    Yes.

Q    Did you give him the opportunity to take his own transportation to get there?

A    They didn't have any way there.

Q    Who suggested that they get into a squad car?

A    I'm sorry?

Q    Who suggested that they accompany a police officer?

A    It was how we were going to transport them down there.  We said, "We

**C. McDonald - Cross by Mr. Roberts**

can drive you down."

    Q    They agreed to be driven down?

    A    Yes.

    Q    At some point, you arrived back at the juvenile bureau?

    A    The Troy Police Station.

    Q    The Juvenile Bureau, where is that located in the building?

    A    In the back part where the Key Bank lot is, it's off of there.

    Q    It has its own driveway?

    A    Yes.

    Q    And at this point it was yourself, Detective Fountain and Detective Sergeant Colaneri?

    A    He came down afterward, yes.

    Q    Initially it's just yourself and Detective Fountain?

    A    Correct.

    Q    You're accompanying Mr. Davis. Who is accompanying Ms. Parker?

    A    I believe one of the patrol officers drove her down.

    Q    This is also for questioning

**C. McDonald - Cross by Mr. Roberts**

2  related to the death of the child at

3  this point?

4      A    It was just for interview, yeah.

5      Q    So you would agree with me that

6  when you brought my client into the rear

7  of the building, he was separated from

8  Ms. Davis?

9      A    From Ms. Davis?

10     Q    Yes.

11     A    Yes.

12     Q    Excuse me.  Ms. Parker.

13     A    Ms. Parker, yeah.

14     Q    And you would agree with me that

15  that was a conscious decision amongst

16  the detectives to separate the two

17  parties, correct?

18     A    Yes.

19     Q    What was the purpose in

20  separating the two of them?

21     A    Talk to Ms. Parker, find out what

22  occurred prior to her coming home.  She

23  had told us she wasn't there, so we

24  separated them to find out what took

25  place.

**C. McDonald - Cross by Mr. Roberts**

Q    Would you agree with me at this point you're testifying they weren't suspects, correct?

A    Correct.

Q    So there was nothing preventing you from asking these questions while they were both present with one another, correct?

A    I don't know.  That was new to me so -- we always separated them, so...

Q    You would agree with me that it's a tactic that you were trained to separate?

A    I don't know if it's a tactic or a practice, but...

Q    Well, you were trained relative to interrogating individuals who could be a suspect, correct?

MS. HALL:  Objection to form, use of the --

THE COURT:  Overruled.

A    It was for interview.  At the time we didn't know what we had.

Q    Sure, so it was a conscious

C. McDonald - Cross by Mr. Roberts

2  decision to separate the two of them

3  from one another, correct?

4      A    Yes.

5      Q    And you brought my client to one

6  portion of the building and the female

7  to another portion of the building,

8  correct?

9      A    Yes.

10      Q    And yourself and Detective

11  Fountain were with my client and he was

12  unhandcuffed when he came into the

13  building, correct?

14      A    Yes.

15      Q    And do you recall what he was

16  dressed like at that point?

17      A    I can't remember.

18      Q    Then you testified that you went

19  into your office and, after a period of

20  time elapsed, Detective Fountain left?

21      A    Yes.

22      Q    And what was your understanding

23  of why he was leaving?

24      A    They went to the hospital, him

25  and Sergeant Colaneri went to the

**C. McDonald - Cross by Mr. Roberts**

hospital to find out the status of the

baby, as far as I know.

    Q   How long were they gone?

    A   I don't know.

    Q   Was it longer than an hour?

    A   I don't think so.  Maybe an hour,

45 minutes.  I really don't know.  I

can't say.

    Q   The reason you can't say is it's

hard to judge the passage of time at

times, correct?

          MS. HALL:  Objection, Judge.

          THE COURT:  What basis?

          MS. HALL:  Argumentative.

        He's trying to boast his client's

        position about the 11 to 1.

          THE COURT:  Overruled.

          MS. HALL:  Relevance.

          THE COURT:  Overruled.

    A   I don't know how long, I really

don't.  I didn't look at my watch.

    Q   Sure, and you would agree with me

you're a trained detective to make notes

and to take specific information

APPENDIX

1  **C. McDonald - Cross by Mr. Roberts**

2  relative to the passage of time,

3  correct?

4      A    Sure.

5      Q    And you would agree with me at

6  times a minute can seem like an hour,

7  correct?

8      A    True.

9      Q    And you sat and spoke with my

10  client for some time but an undetermined

11  amount of time?

12      A    Correct.

13      Q    And you would agree with me he

14  was cordial with you, correct?

15      A    Absolutely.

16      Q    And he was concerned about the

17  child, was he not?

18      A    He repeated over and over that he

19  was trying to figure out what happened.

20  He doesn't know what happened.

21      Q    You would agree with me that he

22  appeared very distressed, correct?

23      A    He was a little upset, yeah.

24      Q    What leads you to the conclusion

25  he was upset? What was he doing?

**C. McDonald - Cross by Mr. Roberts**

A     Sniffling, that type of thing.

Q     When you say "sniffling", what do you mean by that?

A     You know, almost on the verge of crying, maybe.

Q     For what duration of the small talk that you were making with my client was he almost on the verge of crying before Detective Fountain got back?

A     It was off and on while they were talking.

Q     So you would agree with me that at a number of different intervals during that time period, he appeared to be physically upset?

A     Yes.

Q     And part of the reason behind you making small talk with my client was one, to pass the time, correct?

A     Correct.

Q     And the second was to comfort him and getting his mind off of other things such as the child's care, correct?

A     A little bit, yeah.

**C. McDonald - Cross by Mr. Roberts**

1

2     Q   And after the passage of time,

3   eventually Detective Fountain came back

4   into the room, correct?

5     A   Correct.

6     Q   At which time he started

7   asking -- excuse me.  Sergeant Colaneri

8   started asking some questions off of a

9   printed paper?

10     A   Yes.

11     Q   All right.  And the video that's

12   now in evidence, you would agree with me

13   that that video does not depict the

14   initial inception of the interview,

15   correct?

16     A   Correct.

17          MS. HALL:  Objection, asked

18         and answered.

19          THE COURT:  Overruled.

20     Q   How much time elapsed from the

21   initial conversation once they arrived

22   back into the room to the time that the

23   video in evidence, how much time elapsed

24   from what is in evidence, what you see

25   in evidence, to the time that they first

**C. McDonald - Cross by Mr. Roberts**

1

2 got there?

3     A    I really don't know. I know they

4 walked in and you could see on the video

5 when he comes in and starts talking and

6 asking the questions, so I really don't

7 know prior to that.

8     Q    Okay. And you were present for

9 the entire interview?

10     A    Yes.

11     Q    And during the interview, it was

12 primarily questions that were fielded by

13 which detective?

14     A    Sergeant Colaneri.

15     Q    Sergeant Colaneri. And during

16 these questions, you would agree with me

17 that you had an opportunity to observe

18 my client, correct?

19     A    Yes.

20     Q    And you indicated that you

21 listened to that. You would agree with

22 me that throughout various portions of

23 that recording, there are what appears

24 to be sniffling, do you recall that?

25     A    Correct.

**C. McDonald - Cross by Mr. Roberts**

1

2     Q     What observations physically of

3  my client were occurring when you hear

4  that audio?

5     A     I don't remember.  I mean, he had

6  his head down sometimes and other times

7  he had his head up and he'd wipe his

8  nose.

9     Q     Was he crying at times?

10    A     A little bit here and there,

11 yeah.

12    Q     How many times did he wipe away

13 tears?

14    A     I have no idea.

15    Q     You've been a police detective at

16 this point for how many years?

17    A     At that time, a couple months.

18    Q     Well, you'd been a police officer

19 for how long?

20    A     Probably 21 years.

21    Q     Based upon your experience, you

22 would agree with me what you observed

23 were genuine concerns over the safety of

24 this child, correct?

25              MS. HALL:  Objection,

C. McDonald - Cross by Mr. Roberts

relevance.

THE COURT: Sustained.

Q You testified on direct that my client wasn't promised or threatened, correct?

A Correct.

Q And you had the opportunity to observe his demeanor, correct?

A Correct.

Q And at any time did he appear to outwardly show fear towards the officers' questions?

A No.

Q And at any time did you have concerns that his physical distress caused him not to understand what was going on?

A No.

Q What type of physical distress did you observe?

MS. HALL: Objection, asked and answered.

THE COURT: Mr. Roberts, is this about crying again?

**C. McDonald - Cross by Mr. Roberts**

1

2          MR. ROBERTS: No, your Honor.

3          It's during the interview; other

4          than crying and putting his hands

5          up.

6          THE COURT: Okay. I'll allow

7          it.

8     A    That was it, just the sniffling,

9  wiping his nose, that type of thing. He

10 just sat in the chair.

11    Q    During the time you spent alone

12 with him, did you ever express to him he

13 could leave?

14    A    Nope.

15    Q    Did you ever express to him that

16 he wasn't required to speak with you?

17    A    No.

18    Q    The door to the investigators'

19 room, does that lock from the outside or

20 the inside?

21    A    From my office?

22    Q    Yes.

23    A    From my office, the inside.

24          MS. HALL: Objection,

25          relevance.

**C. McDonald - Cross by Mr. Roberts**

2     THE COURT:  Overruled.

3     Q    Locks from the inside?

4     A    I'm sorry, the outside, with a

5 key.

6     Q    To leave your office, do you need

7 a key to exit?

8     A    No, not to exit, no.  The door

9 stays open and...

10     Q    What about to the exterior of the

11 building, is that a secure lock?

12     A    To come in, yes.  To go out, you

13 just push it and go out.

14     Q    Okay.  Detective McDonald, did

15 you take any notes relative to this

16 interview?

17     A    A couple things I wrote down,

18 yes.

19          MR. ROBERTS:  Do you know

20          which notes are his?

21          May I have a moment, your

22          Honor?

23          THE COURT:  You may.

24          (A pause ensued.)

25          MR. ROBERTS:  I have nothing

C. McDonald - Cross by Mr. Roberts

2    further.  Thank you.

3         THE COURT:  Ms. Hall,

4    anything else?

5         MS. HALL:  Briefly, Judge.

6

7    *REDIRECT EXAMINATION BY MS. HALL*

8

9    Q    Was the door -- at any point in

10   time that you spent with Mr. Davis on

11   February 26 of 2015, was the door

12   closed?

13   A    No.  My office door?

14   Q    Yes.

15   A    Stayed open the whole time.

16   Q    During the course of that

17   interview -- what was the purpose of the

18   interview and meeting with Mr. Davis on

19   that day?

20   A    To find out what happened with

21   the child, what was she doing prior to

22   the 911 call.

23   Q    And Mr. Roberts asked you a

24   number of questions about Mr. Davis's

25   demeanor.

**C. McDonald - Cross by Mr. Roberts**

    A    Um-hum.

    Q    At any point in time was he in
such an emotional state that he was
incapable of communicating with you?

    A    No.

    Q    Did you observe him being in any
sort of emotional state that made him
incapable of dealing with the situation
at hand?

    A    No.

            MR. ROBERTS:  Objection,
        form.

            THE COURT:  Overruled.

    Q    Other than the sniffling and the
head down, did you make any other
observations with respect to his
emotional state?

    A    No.

    Q    And during the time you talked
about -- the down time, not discussing
the date February 26, 2015, who did the
talking during that point in time?

    A    Mr. Davis did most of it.

    Q    And in your presence at all while

C. McDonald - Cross by Mr. Roberts

2   you spent with Mr. Davis, did any other

3   person make any threats, promises or

4   representations to Mr. Davis with

5   respect to him speaking to you or any

6   other member of Troy P.D.?

7       A     No.

8             MS. HALL: Nothing further,

9           Judge.

10           'THE COURT: Mr. Roberts,

11           anything else?

12             MR. ROBERTS: Nothing

13           further, Judge.

14             THE COURT: Sir, you may step

15           down. Thank you.

16           THE WITNESS: Thank you.

17           (Whereupon, the witness was

18           excused.)

19           THE COURT: Ms. Hall, the

20           People may call their next

21           witness.

22             MS. HALL: Judge, before we

23           proceed with the next witness, it

24           is a CPS employee, in fact, one

25           of the investigating case workers

# APPENDIX

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MICHAEL DAVIS-GUIDER,

                             Plaintiff,

               -against-

CITY OF TROY, RONALD FOUNTAIN, Individually,
DANIELLE COONRADT, Individually, CHARLES
MCDONALD, Individually, TIM COLANERI, Individually,
ADAM R. MASON, Individually, RENSSELAER COUNTY,
MICHAEL SIKIRICA, Individually, and
JOEL ABELOVE, Individually,

                             Defendants.

_____

**CITY DEFENDANTS'
REPLY TO PLAINTIFF'S
COUNTER-STATEMENT
OF MATERIAL FACTS**
Case No.: 1:17-cv-1290
      (FJS/DJS)

The above-named Defendants, the City of Troy (the "City"), Ronald Fountain ("Fountain"), Danielle Coonradt ("Coonradt"), Charles McDonald ("McDonald"), Tim Colaneri ("Colaneri"), and Adam R. Mason ("Mason") (collectively referred to as the "City Defendants"), submit the foregoing in response to the Plaintiff's purported Counter Statement:

1.     V.D. is the daughter of plaintiff's girlfriend, but plaintiff loved and cared for her as if she was his own daughter. (Klein Decl. Ex. 1, Davis Dep. Tr. 42:18-43:9).

        **RESPONSE 1:** It is undisputed that V.D. was the daughter of Plaintiff's girlfriend. While it is undisputed that the Plaintiff testified at his May 19, 2021 deposition that he loved and cared for V.D. as if she was his own daughter, the City Defendants object to such as an improper assertion of an opinion in contravention of the requirements of the NDNY Local Rule 56.1.

2.     Approximately one week before her death, V.D. was sick with a fever, coughing, and vomiting. (*Id.* at Ex. 1, Davis Dep Tr. 47:9-48:17).

        **RESPONSE 2:** Disputed. The Plaintiff testified that V.D. had a "normal" and "simple" cold with coughing, a low on and off fever, and he "guess[ed] she threw up a few times." (Ex. 1 to Klein Decl., Davis Dep Tr. 47:9-48:17).

1

3.      V.D. had also complained of chest pain. (*Id.* at Ex. 2, Fountain Notes 000424-25).

      **RESPONSE 3:** It is undisputed that Defendant Fountain's notes taken at the time of V.D.'s death investigation indicate that the Plaintiff told Defendant Fountain that V.D. "stated her chest hurt."

4.      V.D. suffered from low iron and a postmortem metabolic screening detected an elevated thyroid stimulation hormone consistent with hypothyroidism. (*Id.* at Ex. 1, Davis Dep Tr. 46:21-47:5; Maloney Decl. Ex. 2, Maloney Rpt. p. 2).

      **RESPONSE 4:** Disputed. The sources cited do not support the assertion that V.D. suffered from low iron. Additionally, such assertion is disputed to the extent that the Maloney Report specifically states that the postmortem metabolic screening detected a "**slightly** elevated level of thyroid stimulation hormone (TSH) consistent with hypothyroidism." (emphasis supplied). (Ex. "C" to Spencer, 2/4/22 Aff., p. 2).

5.      V.D.'s autopsy also revealed evidence of chronic inflammation of the bronchi. (Klein Decl. Ex. 6, Trial Tr. VI 52:9-20).

      **RESPONSE 5:** Not disputed that such was a statement made by the Plaintiff's criminal trial expert but assert that such medical expert opinions are in dispute.

6.      The night before V.D.'s death, Michael Davis watched basketball with a friend across the street, while V.D. remained home with her mother Rebecca Parker, and V.D. was already asleep when Davis returned home. (*Id.* at Ex. 1, Davis Dep. Tr. 49:18-53:3).

      **RESPONSE 6:** It is undisputed that the Plaintiff testified at his May 19, 2021, deposition consistent with such statement.

7.      On February 26, 2015, when Davis woke up in the morning, he smelled poop and called V.D. out from her room to the living room where he and Rebecca slept. (*Id.* at Ex. 1, Davis Dep. Tr. 55:23-57:11).

      **RESPONSE 7:** It is undisputed that the Plaintiff testified at his May 19, 2021, deposition consistent with such statement.

8.    When V.D. came out to Davis, she appeared low energy, sluggish, and not her

normal self. (*Id.* at Ex. 1, Davis Dep. Tr. 56:14-57:11; Ex. 8, Parker Witness Dep 000494).

> **RESPONSE 8:** Disputed that V.D. did not appear to be "her normal self" as no
> such cited evidence supports such. The Plaintiff testified at his May 19, 2021
> deposition specifically: "But she wasn't like -- she always had energy in the
> morning no matter what time it is when she wakes up, but she didn't really have a
> lot of energy that morning. She seemed like she was very down, kind of sluggish.
> But I just assumed it's early in the morning, she's probably a little tired. . . I asked
> her if she wanted something to eat and drink, she said, she shook her head no. So,
> I figured it was still early." (Exhibit "1" to Klein Decl., Davis Dep. p. 56, L. 18-p.
> 57, L. 2). Ms. Parker provided a witness statement dated March 2, 2015, in which
> she stated: "The day of the death [V.D.] was a little sluggish. I attributed this to her
> just getting up in the morning." (Exhibit "8" to Klein Decl., Parker Dep., p. 2).

9.    Davis helped V.D. finish going to the bathroom, changed V.D.'s diaper, and offered

her food and a sippy cup, which V.D. declined. (*Id.* at Ex. 1, Davis Dep. Tr. 56:14-57:11).

> **RESPONSE 9:** It is undisputed that the Plaintiff testified according to such
> statement.

10.    Consistent with Davis' explanation of the morning events, police would later find

a sippy cup, soiled diaper, and pants on the floor near the bed in the living room, and V.D. in a

clean unsoiled diaper. (*Id.* at Ex. 9, Grand jury Tr. 000892-000893; Ex. 10, Mar. 2, 2015,

Interrogation Tr. 176:9-177:24).

> **RESPONSE 10:** It is undisputed that the police observed such evidence.

11.    Seeing that V.D. appeared abnormally tired, Davis put her back to bed. (*Id.* at Ex.

1, Davis Dep. Tr. 56:14-57:11).

> **RESPONSE 11:** Disputed the extent that such statement asserts that V.D. appeared
> "abnormally" tired as no such evidence cited supports such contention. The
> evidence supports that V.D. was "probably a little tired."

12.     Davis put on a movie in the living room and fell asleep himself. (*Id.* at Ex. 1, Davis Dep. Tr. 56:14-57:11).

> **RESPONSE 12:** It is undisputed that the Plaintiff testified according to such statement.

13.     When Davis woke up, he found V.D. unresponsive in her bed. (*Id.* at Ex. 1, Davis Dep. Tr. 59:22-61:6).

> **RESPONSE 13:** It is undisputed that the Plaintiff testified to such statement.

14.     Davis attempted CPR a few times, including doing a few compressions where he pressed down on her stomach with his hand behind her back, and then at 1:09 p.m., called 911 from a restaurant across the street because Davis did not have a working phone at home. (*Id.* at Ex. 1, Davis Dep. Tr. 61:4-67:19; Ex. 11, 911 Call Sheet).

> **RESPONSE 14:** It is undisputed that at 1:09 p.m. the Plaintiff called 911 from a restaurant across the street from his home and that he did not have a working phone at home. It is undisputed that the Plaintiff testified and represented that he attempted CPR a few times, including doing a few compressions where he pressed down on V.D.'s stomach with his hand behind her back.

15.     When emergency medical service providers (hereinafter "EMS") arrived at the scene, V.D. was already in cardiac arrest, was not breathing, had no pulse, no heart activity, and was warm to the touch. (*Id.* at Ex. 3, Trial Tr. III 38:9-42:18; Ex. 12, Bayley Witness Dep. 000496; Ex. 13, CPS Case Notes 000499).

> **RESPONSE 15:** Not disputed.

# APPENDIX

16.     EMS immediately started CPR in the home, using two hands pressing very hard on

V.D., while V.D. was on a soft futon. *Id.* at Ex. 1, Davis Dep. Tr. 65:10-12, 72:9-73:5; Ex. 3, Trial

Tr. III 6:15-7:14, 15:22-24; Ex. 5, Trial Tr. V 52:5-53:17.

>    **RESPONSE 16:** It is undisputed that EMS started CPR at the home and that such
>    CPR was performed on a futon. It is disputed that EMS used two hands to perform
>    CPR as Paramedic Bayly specifically testified that CPR is conducted with use of
>    one hand. (Exhibit "3" to Klein Decl., p.8, L. 15). Furthermore, as omitted from
>    Plaintiff's Exhibit "3", Paramedic Bayly further testified in response to the question
>    whether he knew if CPR was performed on V.D. with one or two hands, that: "If
>    he wasn't doing CPR right, I would have told him - - to do it differently." (Exhibit
>    "D" to Spencer 5/12/22 Aff., p. 26, L. 19-L.25).   It is further disputed that such
>    futon was "soft" as Paramedic Bayly testified at the criminal trial that such futon
>    was "firmer than most couches" and was "relatively stable." (Exhibit "3" to Klein
>    Decl., p. 15, L. 7-L.21). It is also disputed that CPR was performed by "pressing
>    very hard" as the Plaintiff testified at his criminal trial that his basis for asserting
>    that the paramedics were "pressing very hard" was based upon the fact that he could
>    see the paramedics, but it is undisputed that the Plaintiff has no medical training or
>    ability to assert whether such CPR was improper or "very hard." (Exhibit "3' to
>    Klein Decl., p. 52, L. 7-L.21).

17.     CPR should neither be performed with two hands on a child, nor should it be

performed on a soft surface. (*Id.* at Ex. 6, Trial Tr. VI 64:2-15).

>    **RESPONSE 17:** The cited evidence does not support the assertion. It was testified
>    to that it is "not ideal" to perform CPR on a soft surface as it could impact the
>    "effectiveness" of the CPR. It is undisputed that CPR is performed with one hand
>    on a child. (*Id.* at Ex. 6, Trial Tr. VI 64:2-15).

18.     CPR was continued in the ambulance en route to St. Mary's Hospital. (*Id.* at Ex.

Ex. 3, Trial Tr. III 8:23-9:17).

>    **RESPONSE 18:** Not disputed.

19.     Davis and Parker were not given an opportunity to go with V.D. in the ambulance.

(*Id.* at Ex. 1, Davis Dep. Tr. 77:9-17; Ex. 5, Trial Tr. V 54:17-55:18; Ex. 8, Parker Witness Dep).

> **RESPONSE 19:** Disputed. It is unclear what transpired as the Plaintiff testified at his criminal trial as follows:
>
> Q: Were [the paramedics] performing CPR while she was still on the stretcher?
>
> A: Yes.
>
> Q: All the way out the door, all the way into the ambulance?
>
> A: Yes.
>
> Q: When they walked out to the ambulance what did you do?
>
> A: When we walked out to the ambulance they had put her in the ambulance and they closed the door and I said, shouldn't somebody be in there with her? She is only two years old.
>
> Q; When you said that somebody should be in there with her, wasn't there already people with her? Weren't' EMTs with her?
>
> A: Yes.
>
> Q: What did you mean by that?
>
> A: Me or her mother in the hospital, somebody going to the hospital with her.
>
> Q: And when you brought that to someone's attention how were - -  what was the response?
>
> A: When I actually said that I said to - - to Officer Coonradt, because she was the one standing on the side, she was outside, I said they put her in there and closed the door. I said, isn't' someone supposed to be with her? Her mother just came home from work. When I said that they pulled off in the ambulance.  [p. 54, L. 11-p. 55, L. 13 of Exhibit "E" to Spencer 5/12/22 Decl.; Trial Vol. V].

20.     EMS performed 100 to 120 compressions per minute for the 20 minutes CPR was

performed in the home and on the way to the hospital. (*Id.* at Ex. 3, Trial Tr. III 29:7-30:23).

> **RESPONSE 20:** It is undisputed that EMS performed CPR on V.D. while at the house and on the way to the hospital which was approximately 20 minutes, and that CPR typically consists of 100 to 120 compressions per minute.

21.    Only after performing CPR did EMS briefly detect some heart activity while in the ambulance. (*Id.* at Ex. 3, Trial Vol III 38:9-40:12).

      **RESPONSE 21:** Not disputed.

22.    At no time did V.D. regain a pulse or start breathing. (*Id.* at Ex. 3, Trial Tr. III 8:25-9:6).

      **RESPONSE 22:** Not disputed.

23.    CPR was continued at the hospital for another thirty minutes, before V.D. was pronounced dead at 2:10 p.m. (*Id.* at Ex. 3, Trial Tr. III 53:25-54:9; Ex. 14, Crisafulli Witness Dep. 000495).

      **RESPONSE 23:** Not disputed.

24.    A total of approximately 6,000 compressions were done collectively by EMS and hospital staff. (*Id.* at Ex. 15, Sikirica Dep. Tr. 57:1-5).

      **RESPONSE 24:** It is undisputed that a large number of chest compressions were more likely than not performed by EMS and hospital staff. (Ex. "15 to Klein Decl., p. 57, L. 1-5).

25.    Defendant Troy Police Department (hereinafter "TPD") Officer Danielle Coonradt was the first officer to respond to the scene and despite that per EMS, V.D. had no visible injuries, Coonradt began searching the house in a manner that indicated she was suspicious of something, including opening cupboards and looking in high places. (*Id.* at Ex. 1, Davis Dep. Tr. 73:17-75:11, 152:4-153:6, 155:21-159:15; *Id.* at Ex. 3, Trial Tr. III 42:22-43:625).

      **RESPONSE 25:** The City Defendants object to such statement as improper assertion of conjecture that the cited evidence does not support. Officer Coonradt was never told by EMS that V.D. did not have visible injuries nor did Officer Coonradt inspect V.D. Furthermore, it is undisputed that Officer Coonradt testified that she looked around the home for any items in "plain-view" that V.D. may have gotten into so Officer Coonradt could assist the paramedics. (Ex. "K" Firth Aff., p. 16, L. 22-p. 17, L. 10). It is further

undisputed that Officer Coonradt testified that the only information she had was that she was responding to a cardiac arrest of a child. (Ex. "K," p. 13, L. 17-20). It is further disputed that Officer Coonradt searched in cupboards and "in high places" as she testified that she "went inside, took a look around the apartment without touching anything or opening anything. . ." (Ex. "K," p. 16, L. 22-p. 17, L. 10; Suppression Transcript, Ex. "F" to Spencer 5/12/22 Aff. p. 19, L. 22-p. 20, L. 9; p 22, L. 9-p. 23, L. 12).

26.     Coonradt also questioned plaintiff and prepared an inaccurate report of her conversation with Davis, falsely recording in an official police report that Davis purportedly told her he tried to wake V.D. up at 11:00 a.m., and that he responded to Coonradt's statement that it was now 1:30 p.m. by stating that time must be flying. (*Id.* at Ex. 1, Davis Dep. Tr. 79:16-81:4, 145:10-146:6; Ex. 16, Coonradt Dep. Tr. 15:13-16:7; Ex. 17, Coonradt Supp. Rpt. 000490).

> **RESPONSE 26:** The City Defendants object to the Plaintiff's improper conjecture that is not supported by the evidence cited in contravention of the intent of L.R. 56.1. Furthermore, no evidence cited supports the assertion that Officer Coonradt "falsely record[ed]" information in her police report. Furthermore, Ms. Parker informed the police that: "[The Plaintiff] told me he watched a movie. He told me he had fallen asleep. He woke up around 11:00 A.M. He told me it could have been 12, he didn't look at a clock." (Exhibit "8" to Klein Decl., Rebecca Parker's March 2, 2015, statement to the police). Furthermore, Defendant Fountain testified before the Grand jury that the Plaintiff said he woke up between 11 and 12 "but there was also no clocks, and the phones weren't' working, so he really wasn't too sure of the time." (Klein Declaration, Exhibit "9", p. 56, L. 12-L. 16).

27.     To the contrary, Davis told the police that he was not sure what time he woke up because he did not have a clock in the house and his phone was not working. (*Id.* at Ex. 1, Davis Dep. Tr. 79:16-81:4).

> **RESPONSE 27:** Disputed to the extent that such asserts that the Plaintiff's assertion was contrary to Coonradt's notes taken at the time she responded to the scene. *See*, Coonradt's Statement attached as Exhibit "B" to Coonradt Affidavit. Further, *see*, Rebecca Parker's March 2, 2015 statement attached as Exhibit "8" to Klein Declaration in which Ms. Parker stated: "[The Plaintiff] told me he watched a movie. He told me he had fallen asleep. He woke up around 11:00 A.M. He told me it could have been 12, he didn't look at a clock." It is undisputed that at some point in time, the Plaintiff did state that he was not sure what time he woke up. (Klein Declaration, Exhibit "9", Fountain Grand Jury, p. 56, L. 12-L. 16).

# APPENDIX

**2251**

28.     Defendants former TPD Detective Ronald Fountain and Detective Charles McDonald were jointly assigned to conduct the investigation of the case and responded to the Mr. Davis' home on February 26, 2015. (*Id.* at Ex. 18, Fountain Dep. Tr. 34:12-20, 40:6-11, 41:3-20; Ex. 19, McDonald Dep. Tr. 27:6-29:8).

**RESPONSE 28:** Not disputed.

29.     Fountain told plaintiff he would be driven to the hospital, but instead McDonald and Fountain drove Davis to the TPD headquarters. (*Id.* at Ex. 1, Davis Dep. Tr. 152:4-154:10).

**RESPONSE 29:** Disputed. During the Plaintiff's testimony at his criminal trial, he testified as follows:

Q: Okay. And from there you went and accompanied Detective Fountain to the Troy Police Department?

A: Yes, sir.

Q: How did you get in the car with them?

A: I sat in the front seat and Fountain was driving, Detective Fountain, and his partner sat in the back kind of behind Detective Fountain.

Q: Why did you want to go talk to the detectives?

A: They asked me to. (p. 56, L. 6-17 of Trial Volume V attached to 5/12/22 Spencer Declaration as Exhibit "E")

30.     At the TPD headquarters, McDonald first sat with plaintiff trying to keep him occupied while Fountain went to the hospital to gather more information. (*Id.* at Ex. 19, McDonald Dep. Tr. 36:20-38:7).

**RESPONSE 30:** Not disputed.

31.     Defendant Tim Colaneri was also involved in the investigation, first going to the hospital with an evidence technician to take photographs, and then going to plaintiff's home, where he got a briefing from an officer on scene, assisted in executing a search warrant, and also assisted in canvassing the neighborhood and speaking to witnesses. (*Id.* at Ex. 20, Colaneri Dep Tr. 16:5-24:3, 24:20-25:8; Ex. 22, Cont. Suppression Hearing Tr. 26:11-13).

**RESPONSE 31:** Not disputed.

32.     Fountain, McDonald, and Colaneri then interrogated Davis at the precinct. (*Id.* at Ex. Ex. 19, McDonald Dep. Tr. 38:8-39:22; Ex. 20, Colaneri Dep. Tr. 24:4-25:17).

**RESPONSE 32:** Disputed to the extent the Plaintiff asserts that he was "interrogated" as he was never interrogated but instead, "interviewed." *See*, ¶ 35, of Plaintiff's Response to the City Defendants' Statement of Material Facts wherein the Plaintiff does not dispute that he was "interviewed." (E.C.F. Doc. No. 122).

33.     Colaneri was the primary questioner during the first interrogation of Davis, and he recorded part of the interrogation on his cell phone. (*Id.* at Ex. 18, Fountain Dep. Tr. 37:5-38:2; Ex. 20, Colaneri Dep. Tr. 24:4-25:17; Ex. 21, Suppression Hearing Tr. 115:8-14).

**RESPONSE 33:** Disputed to the extent the Plaintiff asserts that he was "interrogated" as he was never interrogated but instead, "interviewed." *See*, ¶ 35, of Plaintiff's Response to the City Defendants' Statement of Material Facts wherein the Plaintiff does not dispute that he was "interviewed." (E.C.F. Doc. No. 122).

34.     Davis provided no incriminating statements during his first conversation with police, and defendants concede probable cause to arrest plaintiff did not exist based on the known information. (*Id.* at Ex. 18, Fountain Dep. Tr. 38:3-13; Ex. 20, Colaneri Dep. Tr. 27:12-15).

**RESPONSE 34:** Disputed to the extent that Plaintiff asserts that the Defendants "conceded" probable cause to arrest did not exist as such was a statement. Further, such cited evidence does not support the assertion that the Defendants "conceded" to such assertion.

35.     On February 27, 2015, an autopsy was conducted by defendant Michael Sikirica, the Rensselaer County medical examiner, which was attended by defendants McDonald, Fountain, and Colaneri, evidence technician Anthony Buttofucco, and an Assistant District Attorney (hereinafter "ADA") from the Rensselaer County District Attorney's Office (hereinafter "RCDAO") Andra Ackerman. (*Id.* at Ex. 18, Fountain Dep. Tr. 48:5-49:5, Ex. 23, Feb. 27, 2015, Sign in Sheet 000436).

        **RESPONSE 35:** Not disputed.

36.     Andra Ackerman's overall supervisor was District Attorney Joel Abelove. (*Id.* at Ex. 24, Abelove Dep. Tr. 29:13-30:20).

        **RESPONSE 36:** Not disputed.

37.     Law enforcement presence is not necessary for Sikirica to perform an autopsy and law enforcement is generally not present for all autopsies conducted by Sikirica. (*Id.* at Ex. 4, Trial Tr. IV 47:21-50:2; Ex. 18, Fountain Dep Tr. 118:19-119:19).

        **RESPONSE 37:** Disputed. The evidence cited does not support the assertion. Dr. Sikirica testified that a police photographer is necessary because he does not take photographs in homicide cases. He further testified "of the 600 autopsies that [he] performed in 2015," 60 percent involved law enforcement personnel being present." (Exhibit "4" to Klein Decl., Trial Tr. IV, p. 48, L. 2-L. 11).

38.     The TPD officers were present during V.D.'s autopsy to feed Sikirica information. (*Id.* at Ex. 9, Grand Jury Tr. 000901).

        **RESPONSE 38:** Not disputed that Dr. Sikirica testified to such in the context of asserting that TPD officers are present "to give [him] the information that [he's] requesting about the case [to] let [him] know about [the case]." (Exhibit "F" to Firth Aff., Sikirica EBT, p. 87, L. 17-L. 21.

39.     Fountain would have told Sikirica that Davis was the only person home when V.D. died. (*Id.* at Ex. 18, Fountain Dep. Tr. 118:19-119:19).

>   **RESPONSE 39:** Not disputed that Fountain testified that he would most likely have been the person to inform Sikirica of such as the lead investigator on the case.

40.     As part of the autopsy, Sikirica ordered some tests relevant to determining whether V.D. had died of natural causes, but despite that the results of said tests were outstanding, Sikirica informed Fountain that he planned to rule the death a homicide. (*Id.* at Ex. 13, CPS Records 000507, 000521).

>   **RESPONSE 40:** Disputed. The evidence cited does not support the assertion that the outstanding tests were "relevant to determining whether V.D. had died of natural causes" but, just that Dr. Sikirica was "waiting for a couple labs to come back" before issuing the final autopsy report.  (*See*, Exhibit "13" to Klein Decl. CPS Records 000507).

41.     Sikirica's decision to rule the death a homicide based solely on his discussions with the defendant TPD officers, and on the observed injuries, resulted in Sikirica failing to fully explore potential natural causes of death. *(Id.* at Ex. 6, Trial Tr. VI 49:6-50:21).

>   **RESPONSE 41:** Disputed. The cited evidence does not support the assertion that Dr. Sikirica decided "to rule the death a homicide based solely on his discussions with the defendant TPD officers, and on the observed injuries" nor that Dr. Sikirica "fail[ed] to fully explore potential natural causes of death." (Exhibit "6" to Klein Decl., Trial Tr. VI 49:6-50:21). Furthermore, Dr. Sikirica testified extensively to his observations and the tests he conducted in order to determine that V.D.'s death was a homicide as opposed to a death caused by natural causes. (*See*, Exhibit "F" to Firth Aff., Sikirica EBT, p. 80, L. 15-p. 82, L. 8) (*See also*, Autopsy Report, Exhibit "L" to Firth Aff.).

42.     The National Academy of Science recommends that law enforcement and prosecutors should not be present during autopsies because they may influence the medical examiner. *Id.* at Ex. 6, Trial Tr. VI 55:14-56:14.

> **RESPONSE 42:** Disputed. The cited evidence does not support the assertion. According to Dr. Teas criminal trial testimony, the National Academy of Science had stated, at the time of the criminal trial, only that law enforcement should not be "influencing" a forensic pathologist. (Ex. 6, Trial Tr. VI 55:14-56:14).

43.     On February 27, 2015, plaintiff and Ms. Parker were questioned again by Mason and TPD Sergeant Parrow. (*Id.* at Ex. 1, Davis Dep. Tr. 90:17-92:19; Ex. 25, Mason Dep. Tr. 29:19-31:18).

> **RESPONSE 43:** Disputed that such interview occurred on February 27, 2015 and that Defendant Mason participated in such interview. Defendant Mason testified that he did not speak with Ms. Parker or the Plaintiff when he accompanied TPD Sergeant Parrow to where the Plaintiff was residing and only Parrow had spoken with the Plaintiff. Furthermore, such date of the interview is not accurate. Defendant Mason testified that when he went with TPD Sergeant Parrow to speak with the Plaintiff and Ms. Parker, they were residing at the "Old Judgement Manor", and they had not been residing as such location one day after the homicide. *See*, Ex. "J" to Firth Aff., Mason EBT, p. 29, L. 19-p. 8; p. 36, L. 15-p. 37, L. 7).

44.     On March 1, 2015, ADA Ackerman sent an email to defendants Fountain and Colaneri, copying defendant Abelove, concerning a February 28, 2015, meeting held regarding next steps in investigating Davis and V.D.'s death. (*Id.* at Ex. 18, Fountain Dep. Tr. 121:2-122:21; Ex. 26, March 1, 2015, Email).

> **RESPONSE 44:** Not disputed.

45.     On March 2, 2015, Fountain conducted a second interview of Davis inside an interrogation room at TPD headquarters, which lasted approximately two hours and was recorded by the TPD defendants via a video camera. (*Id.* at Ex. 18, Fountain Dep. Tr. 61:10-63:23).

> **RESPONSE 45:** Not disputed.

46. McDonald participated in the interview by monitoring the video feed on a computer from a separate room. (*Id.* at Ex. 19, McDonald Dep. Tr. 46:11-23).

> **RESPONSE 46:** Not disputed that to the best of McDonald's recollection, he was present for the interview by monitoring the same in a separate room. (McDonald Aff. in Support of Summary Judgment, ⁋ 28).

47. The March 2, 2015, interview yielded no additional information to support probable cause to arrest Davis, and it was still unknown to the defendants what caused V.D.'s death. (*Id.* at Ex. 18, Fountain Dep Tr. 63:7-67:18).

> **RESPONSE 47:** Not disputed that Fountain testified that the Plaintiff did not provide any additional information than what he had previously stated but, disputed to the extent that Fountain had been informed by Dr. Sikirica at the February 27, 2015 autopsy that it was "a suspicious death" and that V.D. had severe liver trauma and fractured ribs which appeared to have caused the death. (Exhibit "G" to Firth Aff., Fountain EBT, p. 50, L. 7-22; p. 58, L. 4-L.16).

48. On March 12, 2015, a subsequent meeting was held with defendant Sikirica, attended by defendants Fountain, Colaneri, and Mason, as well as ADA Ackerman, and TPD Detective Sergeant Parrow, to discuss the case. (*Id.* at Ex. 18, Fountain Dep. Tr. 68:6-69:16; Ex. 27, March 12, 2015, Sign in Sheet 000439).

> **RESPONSE 48:** Not disputed.

49. Sometime before or after the meeting, Sikirica received a copy of the March 2, 2015, interrogation video from the TPD defendants, during which Davis demonstrated how he had attempted to perform CPR on V.D. (*Id.* at Ex. 15, Sikirica Dep. 118:15-119:12).

> **RESPONSE 49:** Disputed to the extent that the Plaintiff asserts that he was interrogated on March 2, 2015. There is no cited evidence to support the assertion of an interrogation. Furthermore, the Plaintiff did not dispute that such March 2, 2015 meeting was an interview in his Response to the City Defendants' Statement of Material Facts. (*See*, ⁋ 44, ECF Doc. No. 122).

14

50. Over the next several months, Fountain and McDonald questioned plaintiff at least two more times while he was out walking and Fountain told him, in sum and substance, that he needed him to tell the truth because his boss was pressuring him to close the case.

**RESPONSE 50:** Disputed. Both Defendants Fountain and McDonald testified that they never questioned the Plaintiff "while he was out walking." (*See*, Firth Aff. Ex. "G" Fountain, p. 72, L. 23-p. 74, L. 7; Firth Aff. Ex. "H" McDonald, p. 62, L. 17-p. 63, L. 9).

51. Fountain also met with the RCDAO a few times during the investigation and before the final autopsy report was released. (*Id.* at Ex. 18, Fountain Dep. Tr. 43:17-44:17, 70:19-72:2).

**RESPONSE 51:** Not disputed.

52. The only evidence linking Davis to V.D.'s death was that he was with her when she died, which alone is not sufficient to charge a person with murder. (*Id.* at Ex. 18, Fountain Dep. Tr. 64:2-21, 97:22-99:10).

**RESPONSE 52:** Disputed. The evidence cited does not support the assertion. The grand jury considered all circumstantial evidence associated with the charges when they indicted the Plaintiff including the manner in which the death occurred, the relevant timeframe, and the opportunity. (*See*, Indictment, Ex. "O" to Firth Aff.).

53. On August 14, 2015, defendant Sikirica issued his final autopsy report determining in relevant part that the manner of V.D.'s death was purportedly a homicide and that V.D. had died of "[h]ypovolemic shock due to a large hemoperitoneum due to multiple lacerations of the liver with right rib fractures due to blunt force trauma" and noting a "[h]istory of decedent reportedly found unresponsive with reported history of attempted cardiopulmonary resuscitation by a large adult." (*Id.* at Ex. 28, Autopsy Rpt. 000110, 000119).

**RESPONSE 53:** Disputed only to the extent that such asserts that Dr. Sikirica issued his autopsy report determining that the manner of death was "purportedly a homicide" as Dr. Sikirica issued his report and determined that the manner of V.D.'s death was a homicide. (Klein Decl., Ex. 28, Autopsy Rpt. 000110, 000119).

54. Sikirica made this determination after watching the video of Davis demonstrating CPR and linking the pattern of injuries observed to be most consistent with what Davis had demonstrated on the video. (*Id.* at Ex. 15, Sikirica Dep. 83:18-84:11).

> **RESPONSE 54:** The City Defendants object to such assertion as it is an unclear statement. Furthermore, the City Defendants object to such statement as an improper assertion that is not supported by the evidence cited as Dr. Sikirica did not testify that he ruled the death a homicide because of the video. It is undisputed that Dr. Sikirica testified: "Well, I linked the pattern of injuries to be the most consistent, the far most consistent, with what he demonstrated doing to [V.D.]. That's what I linked him to. That's the only linkage I made." (Sikirica EBT, ECF Doc. No. 123-15, p. 84, L. 7-11).

55. Had Sikirica not seen the video he would not have attributed the death to Davis. (*Id.* at Ex. 15, Sikirica Dep. Tr. 98:2-99:3).

> **RESPONSE 55:** The City Defendants object to such statement as an improper assertion that is not supported by the evidence cited. Furthermore, such is disputed as Dr. Sikirica testified: "Not specifically linking him to it. I didn't mention his name. It said -- if I could refer to my report. It said, history of decedent, reportedly found unresponsive with reported history, reported history of attempted cardiopulmonary resuscitation by a large adult. He reported that he did this. There are no witnesses that Michael Davis ever did CPR to this child. None." (Sikirica EBT, Exhibit "F" to Firth Aff., p. 99, L. 10-18).

56. Sikirica failed to note in his autopsy report that an additional 6,000 compressions were also performed on V.D. by EMS and hospital staff of various sized hands, despite conceding he was aware that V.D. had undergone prolonged CPR. (*See Id.* at Ex. 15, Sikirica Dep. Tr. 101:1-102:5; Ex. 28, Autopsy Rpt).

> **RESPONSE 56:** The City Defendants object to such statement as an improper assertion that is not supported by the evidence cited. Furthermore, such is disputed as Dr. Sikirica never testified that "he failed to note" that additional compressions were performed by EMS and hospital staff and, instead, Dr. Sikirica testified that it was not an oversight because "it was simply assumed that CPR would have been performed all the way into the hospital. I just assumed that people would understand that she was pronounced in the hospital. If you read the entire report, there are hospital records." (Sikirica EBT, Exhibit "F" to Firth Aff., p. 101, L. 1-18).

16

# APPENDIX

57. The size of an individual's hands cannot be medically correlated to the resultant CPR-related injury based on accepted medical research and knowledge. (Maloney Decl. ¶ 10; Ex. 2, Maloney Rpt. p. 2).

> **RESPONSE 57:** Not disputed that such was stated by Dr. Maloney.

58. Notwithstanding that he was given the supporting depositions of EMS and medical staff taken by TPD, Sikirica neither spoke to EMS nor to the emergency room doctors who performed CPR to determine how CPR was conducted by them prior to issuing his report, but rather just assumed it was done correctly and without compressing the abdomen. (Klein Decl. Ex. 15, Sikirica Dep. Tr. 53:18-55:7, 72:10-78:19).

> **RESPONSE 58:** Not disputed.

59. Sikirica should have spoken to all the individuals who performed CPR where it was known that extensive CPR involving several thousand compressions was performed and there was a known possibility that V.D.'s injuries were CPR related. (*Id.* at Ex. 6, Trial Tr. VI 22:5-19).

> **RESPONSE 59:** The City Defendants object to such statement as an improper assertion that is not supported by the evidence cited. The testimony cited is: "So, depending on the injuries it is essential to look at other things to try and differentiate whether these are injuries that occurred during life or could they have been, possibly occurred as a result of the CPR. And so you go back to get the history of exactly how CPR was performed, by who it was performed, what was their knowledge base." Dr. Sikirica had such relevant information through the medical records. (Sikirica EBT, Exhibit "F" to Firth Aff., p. 101, L. 1-18).

60.     Sikirica's assumption that CPR was performed correctly was faulty given that EMS had performed CPR with two hands while V.D. was on a soft futon. (*Id.* at Ex. 1, Davis Dep. Tr. 65:10-12, 72:9-73:5; Ex. 3, Trial Tr. III 6:15-7:14, 15:22-24; Ex. 5, Trial Tr. V 52:5-53:17; Ex. 6, Trial Tr. VI 64:2-15).

> **RESPONSE 60:** None of the cited evidence supports the assertion that "Sikiricia's assumption that CPR was performed correctly was faulty" and such assertion is simply Plaintiff's improper conjecture. Further, it is disputed that EMS used two hands to perform CPR as Paramedic Bayly specifically testified that CPR is conducted with use of one hand. (Trial Tr. III, Exhibit "3" to Klein Decl., p.8, L. 15). Furthermore, as omitted from Plaintiff's Exhibit "3", Paramedic Bayly further testified in response to the question whether he knew if CPR was performed on V.D. with one or two hands, that: "If he wasn't doing CPR right, I would have told him - - to do it differently." (Exhibit "D" to Spencer 5/12/22 Aff., p. 26, L. 19-L.25).  It is further disputed that such futon was "soft" as Paramedic Bayly testified at the criminal trial that such futon was "firmer than most couches" and was "relatively stable." (Trial Tr. III, Exhibit "3" to Klein Decl., p. 15, L. 7-L.21).

61.     Sikirica destroyed the contemporaneous dictation he made from which the final autopsy report was drafted. (*Id.* at Ex. 4, Trial Tr. IV 41:11-42:24).

> **RESPONSE 61:** Not disputed that such was destroyed.

62.     At the time of these events, Davis was 6' 10" tall and approximately 240 to 250 pounds and had very big hands. (*Id.*  at Ex. 1, Davis Tr. 62:21-63:4).

> **RESPONSE 62:** Not disputed.

63.     Without the autopsy findings linking the death to a large adult, i.e., Davis, there was no probable cause to arrest Davis for V.D.'s death. (*Id.* at Ex. 19, McDonald EBT. 67:9- 23).

> **RESPONSE 63:** The City Defendants object to such statement as an improper assertion that is not supported by the evidence cited. Furthermore, such is disputed as the autopsy did not "link" the death to a large adult. Furthermore, Defendant McDonald only testified that the Plaintiff did not confess to the crime however, despite the fact that the Plaintiff did not confess to such crime, there was probable cause to arrest the Plaintiff as it is undisputed that he was indicted by the grand jury. (Indictment, Exhibit "O" to Firth Affidavit).

64. When Sikirica determined V.D.'s death was a homicide, it was foreseeable to him that this would lead to a homicide prosecution, and Sikirica further understood that his determination and testimony would be important to the prosecution. (*Id.* at Ex. 15, Sikirica Dep. Tr. 82:9-14, 140:11-21).

**RESPONSE 64:** Not disputed.

65. On September 9, 2015, Fountain, along with McDonald, interviewed Davis in the aforementioned interrogation room on video for a third time, during which no new information to support an arrest was learned. (*Id.* at Ex. 18, Fountain Dep Tr. 75:21-76:6, 78:8-13; Ex. 19, McDonald Dep. Tr. 52:2-53:16).

**RESPONSE 65:** Not disputed.

66. Fountain believed, based on conversations with Sikirica, that V.D.'s ribs had been fractured and that the ribs had lacerated the liver, causing V.D. to die. (*Id.* at Ex. 18, Fountain Dep. Tr. 50:12-51:15).

**RESPONSE 66:** Not disputed.

67. According to Sikirica, Fountain's understanding of V.D.'s death was incorrect, and he would not have told him that was the cause of death. (*Id.* at Ex. 18, Fountain EBT 92:1- 93:8).

**RESPONSE 67:** The City Defendants object to such statement as the evidence cited does not support the contention.

68.     McDonald, along with Fountain, met with a prosecutor, believed to be ADA Ackerman from the RCDAO, prior to the grand jury presentation to discuss what would be charged, but did not testify because he was on vacation when the grand jury was convened. *Id.* at Ex. 19, McDonald Dep. Tr. 91:21-94:18.

> **RESPONSE 68:** Disputed to the extent that such assertion is that Defendant McDonald and Defendant Fountain met with an ADA to jointly decide what charges would be brought as Defendant McDonald testified that he believes that they discussed what criminal charges the RCDAO planned on bringing against the Plaintiff. (Exhibit "H" to Firth Aff., p. 94, L. 2-L.9; p. 95, L. 8-p. 96, L. 16). The police do not dictate what charges will be presented to the grand jury.

69.     Fountain falsely testified to the grand jury that Davis said it was a normal occurrence for V.D. to wake up tired. (*Id.* at Ex. 8, Parker Witness Dep. 000494; Ex. 9, Grand Jury Tr. 000878-000879; Ex. 10, Mar. 2, 2015, Interrogation 74:9-75:10).

> **RESPONSE 69:** The Defendants object to such statement as improper conjecture that is not supported by the evidence cited. Furthermore, such is disputed as there is no cited evidence to support the assertion that Defendant Fountain testified "falsely." Furthermore, Ex. 10 does not support the assertion as such purports to state that Michael Davis said that "she seemed extremely tired that day. I've never seen her that tired, you know, that day . . ." However, Davis testified that V.D. appeared a "little tired" on the morning of her death. (Davis EBT 56:14-57:11).

70.     Fountain falsely informed the grand jury that V.D.'s bed was really neat and made up, and not fussed or messed up at all, and therefore inconsistent with someone performing CPR on the bed as Davis claimed he did. (*Id.* at Ex. 9, Grand Jury Tr. 000881-000882; Ex. 29, Photo of Bed DSC_7357).

> **RESPONSE 70:** The City Defendants object to such statement as an improper assertion that is not supported by the evidence cited. Furthermore, such is disputed as there is no evidence to support the assertion that Defendant Fountain testified "falsely" as such was based upon his personal observations which were not inconsistent with Plaintiff's Exhibit's "29" particularly considering the actual testimony of Defendant Fountain which was as follows:

Q: Did you make any observations with respect to the apartment, and specifically Viola's room?

A: Her bedsheets, it-- it kind of looked like made. There was a little indentation on the pillow where the head was, and then the sheet was perfect, and the-the blanket over the sheet was really neat. It wasn't like fussed up or messed up anything. It was all kind of very near, like somebody had just got out of bed and pulled everything back up.

Q: And is that the area where Michael Davis described finding [V.D.] unresponsive?

A: Yes.

Q: Was the information - - what you were seeing with your eyes consistent with the information he was giving you?

A: Yes.

Q: It looked like C.P.R. had been performed in that - -

A: Oh, no. It- - there was no messy stuff. He definitely wasn't moving her on top and messing up the sheets. It just didn't look like it. But could he have? I don't know. [Exhibit "A" to Spencer 2/4/22 Decl.; Fountain GJ, p. 59, L. 5-p. 60, L. 4).

Furthermore, the Plaintiff stated that he had only attempted CPR once while V.D. was in bed which Defendant Fountain testified to. (Ex. 9, 000874).

71. Fountain falsely informed the grand jury that Davis and Parker were not prevented from going to the hospital in the ambulance. (*Id.* at Ex. 8, Parker Witness Dep. 000493; Ex. 9, Grand Jury Tr. 000868-000869).

**RESPONSE 71:** The City Defendants object to such statement as an improper assertion that is not supported by the evidence cited. Furthermore, such is disputed as there is no evidence to support the assertion that Defendant Fountain testified "falsely." Furthermore, it is undisputed that the ambulance had departed prior to Fountain arriving on scene. (Klein Exhibit "9", 000867). Furthermore, Detective Fountain testified to the grand jury that:

Q: And mom nor Michael Davis went in that ambulance?

A: Neither one of them went in the ambulance.

Q: Do the Troy Police prevent either party from going in an ambulance?

A: No, we would not.

21

Q: Would the paramedics—have you worked with paramedics before?

A: Twenty-Six years.

Q: And do they prevent a parent or a legal guardian to go with a child in an ambulance?

A: Absolutely they would let them go.

Q: Would let me go? They wouldn't prevent them from going –

A: They would not stop them. No. [p. 46, L. 15-p. 47, L. 7 of Exhibit "A" to Spencer 2/4/22 Declaration].

Additionally, the Plaintiff testified on direct at his criminal trial, the following:

Q: Were [the paramedics] performing CPR while she was still on the stretcher?

A: Yes.

Q: All the way out the door, all the way into the ambulance?

A: Yes.

Q: When they walked out to the ambulance what did you do?

A: When we walked out to the ambulance they had put her in the ambulance and they closed the door and I said, shouldn't somebody be in there with her? She is only two years old.

Q; When you said that somebody should be in there with her, wasn't there already people with her? Weren't' EMTs with her?

A: Yes.

Q: What did you mean by that?

A: Me or her mother in the hospital, somebody going to the hospital with her.

Q: And when you brought that to someone's attention how were - -  what was the response?

A: When I actually said that I said to - - to Officer Coonradt, because she was the one standing on the side, she was outside, I said they put her in there and closed the door. I said, isn't' someone supposed to be with her? Her mother just came home from work. When I said that they pulled off in the ambulance.  [p. 54, L. 11-p. 55,

L. 13 of Exhibit "E" to Spencer 5/12/22 Decl.; Trial Vol. V].

72.     Fountain falsely informed the grand jury that Davis was calm, subdued, even keeled, and not acting like you would think somebody would if they had a two-and-a-half-year-old who was not breathing. (*Id.* at Ex. 9, Grand Jury Tr. 000876).

> **RESPONSE 72:** The City Defendants object to such statement as an improper assertion that is not supported by the evidence cited. Furthermore, such is disputed as there is no evidence to support the assertion that Defendant Fountain testified "falsely." Defendant Fountain testified as to his personal observations when he arrived on scene. Fountain specifically testified:
>
> Q: Did he - - if you would, can you describe what you observed as Michael Davis' demeanor.
>
> A: Clam. He wasn't running around or screaming like you would think somebody would if they had had a 2-and-ahalf year old who wasn't breathing. And- - and he - - he was kind of subdued. He wasn't yelling. He wasn't screaming. He wasn't claiming, I don't know what happened. He was just very even keel about everything." (Klein Decl. Exhibit "9," 000876).
>
> Defendant Fountain's personal observations when he arrived on scene were consistent with First Responders' observations.  According to Troy Fire Lt. James D. Tiding, the Plaintiff "did not speak or act upset." (March 2, 2015 statement, Exhibit "F" to Holehan Aff.). Lt. Tiding further stated, "I don't recall anyone being really upset that this was happening." (Exhibit "F" to Holehan Aff.). Firefighter medic, Jason D. Lucey stated: "I exited my ambulance and heard a large black male say 'can yall hurry up please.' He was not excited. He was very calm." (March 2, 2015 statement, Exhibit "G" to Holehan Aff.).

73.     To the contrary, on February 26, 2015, Davis was distraught, upset, concerned, sniffling, and crying at times. (*Id.* at Ex. 21, Suppression Hearing Tr. 18:23-19:2; 25:10-22; 115:15- 116:11; 157:13-160:8; Ex. 30, Brown St. 001538; Ex. 31, Brown Witness Dep. 0001680).

> **RESPONSE 73:** Such assertions are not contrary to Detective Fountain's personal observations.
>
> Furthermore, the Plaintiff's citation to evidence to support his contention are at different times than when Defendant Fountain had testified to which was in reference to when he had arrived on scene.

First, Defendant Coonradt testified that her observation of the Plaintiff when she arrived on scene, approximately 20 minutes before Defendant Fountain, and she testified that the Plaintiff: "seemed - - for lack of a better term, he seemed a little out of it, a little confused, like he didn't understand what I was asking him." (p. 11, L. 7-L. 10 of Exhibit "F" to Spencer 5/12/22 Affirmation). The Suppression Hearing testimony cited by the Plaintiff, (Klein Decl. Ex. 21, p. 18, L. 23-p. 19, L. 2), refers to both Rebecca Parker, who appeared distraught, and the Plaintiff who appeared confused. Defendant Coonradt further testified that the Plaintiff appeared upset but not crying. (Klein Decl. Ex. 21, p. 25, L. 10-L. 22)

Defendant McDonald testified that when he was sitting with the Plaintiff alone on February 26, 2015, when Defendant Fountain was at the hospital, the Plaintiff was "sniffling" which led Defendant McDonald to believe that he was "a little upset" at that time. (Klein Decl. Ex. 21, p. 112, L. 21-p. 113, L. 4).

When Defendant Fountain returned from the hospital with Defendant Colaneri and had a conversation with Plaintiff, Defendant McDonald testified in response to the questions "was he crying at times," "a little bit here and there, yeah." (Klein Decl. Ex. 21, p. 116, L. 9-L. 11).

Critically though, the first responders' observations as quoted in Response Numbered 72, support Defendant Fountain's personal observations at the time that he had arrived on scene.

74.    Sikirica met with the RCDAO after he issued his report and before testifying before the grand jury. (*Id.* at Ex. 15, Sikirica Dep. Tr. 26:2-10).

**RESPONSE 74:** Not disputed.

75.    Sikirica falsely told the grand jury that he had ruled out any natural cause of death or other explanation for V.D. to have been unconscious, despite later conceding that it was possible V.D. had died of a natural event and that he could not dispute that V.D. could have been in cardiac arrest before Davis attempted CPR. (*Id.* at Ex. 9, Grand Jury Tr. 000911-000912, 000917; *Id.* at Ex. 15, Sikirica Dep. Tr. 66:21-67:3, 79:17-82:8).

**RESPONSE 75:** The City Defendants object to such statement as improper conjecture that is not supported by the evidence cited. Furthermore, such is disputed as there is no evidence to support the assertion that Defendant Sikirica testified "falsely." Furthermore, Defendant Sikirica did not "concede" that it was possible

V.D. had died of a natural event. Defendant Sikirica testified as follows:

Q: How do you know she didn't pass out from whatever caused her to pass out which led to Mr. Davis being concerned that she was passed out? How do you know that? Other than that it's unexplained, which is rare but it happens.

A: You're asking me to chase gremlins.

Q: No. I'm asking you -- this is what Mr. Davis, who has been found not guilty, said from his first interview on the night of the incident, to his recorded interview that you were given, to a subsequent interview that he did right before the grand jury, to his testimony at trial, and he was consistent about that. Doesn't mean, you know, and so, he -- there's no other account other than that she was unresponsive. We may assume she was because you see this damaged her liver, but crediting that she was unresponsive, how do you know that there was not some unexplained cause of death, even if it's extremely rare, that this was not one of those situations?

A: You could never, ever rule out that in any circumstances if you wanted to use that logic, because even a traffic accident could have been caused by some arrythmia rather than a drunk driver. Even a person who dies of pneumonia may have some cardiac arrythmia that went undiagnosed. That's why we do a complete autopsy on these children. We look for anything that we can rule out that would put her in a state of unconsciousness or cardiac arrest. We look for bacterial infections. We look for viral infections. I sent out a metabolic screening to make sure she didn't have an inherited disease that we could not detect. We took x-rays. We did a full workup on this child to rule out any reason that she would be deceased that could explain why he supposedly did this. I could find no reason, other than this mysterious sudden death, which she had no symptoms of prior. It's possible, I will not say it's impossible, but it's very, very highly unlikely that she had died from a natural event before this series of events. (Ex. 15, Sikirica Dep. Tr. 79:17-82:8).

76.     In his direct testimony presented by RCDAO to the grand jury, Sikirica did not inform the grand jury of his final autopsy finding that he had correlated V.D.'s injuries to a "[h]istory of decedent reportedly found unresponsive with reported history of attempted cardiopulmonary resuscitation by a large adult." (*Id.* at Ex. 9, Grand Jury Tr. 000895-000917; Ex. 28, Autopsy Rpt. 000119).

**RESPONSE 76:** The City Defendants object to the statement insofar as it mischaracterizes and incorrectly sets forth the autopsy findings, results and cause of death. Furthermore, such statement does not make sense and the cited documents do not support the assertion.

25

77.     The District Attorney placed into evidence before the grand jury only photos of the lacerated liver and the final death certificate, omitting the final autopsy report which referenced the performance of CPR by a large adult. (*Id.* at Ex. 9, Grand Jury Tr. 000895-000917).

**RESPONSE 77:** Not disputed.

78.     Only when recalled to the grand jury and pressed by a grand juror did Sikirica concede that the manner in which Davis described doing CPR could cause rib fractures and lacerations to the liver. (*Id.* at Ex. 9, Grand Jury Tr. 000853-000862).

> **RESPONSE 78:** The City Defendants object to the improper conjecture and such is disputed to the extent that such asserts that a grand juror "pressed" Dr. Sikirica or that he "conceded" anything as the evidence cited does not support the same. The evidence clearly shows that a juror requested to recall Dr. Sikirica to clarify a question and that Dr. Sikirica answered the questions. (Klein Decl., Exhibit 9, Grand Jury Tr. 000853-000862). Furthermore, Dr. Sikrica testified that V.D.'s injuries that he observed are not consistent with CPR. (Klein Decl., Exhibit 9, Grand Jury Tr. 000854).

79.     This concession was exculpatory evidence which was later disclosed by RCDAO pursuant to Brady v. Maryland, 373 U.S. 83 (1963). (*Id.* at Ex. 31, July 20, 2016, Disclosure).

**RESPONSE 79:** Not disputed.

80.     Sikirica falsely informed the grand jury that the amount of blood found in V.D.'s abdomen indicated that the fractures and lacerations did not occur during Davis' CPR attempt and that V.D. was alive after the injuries were inflicted because the five squeezes described by Davis would not have amounted to 400 MLs of blood. (*Id.* at Ex. 9, Grand Jury Tr. 000861-000862).

> **RESPONSE 80:** The City Defendants object to such statement as the evidence cited does not support the contention that Sikirica "falsely" informed the grand jury of the aforementioned. The expert opinions are in dispute herein. (*See*, Exhibit "L" to Firth Affidavit for Autopsy Report supporting Dr. Sikirica's opinions).

81. Sikirica failed to put in his autopsy report or to otherwise inform the grand jury that after Davis' five squeezes, EMS and hospital staff did approximately 6,000 additional compressions which would have contributed to the amount of blood found in V.D.'s abdomen at autopsy. (*Id.* at Ex. 9, Grand Jury Tr. 000853-000864; Ex. 15, Sikirica Dep. Tr. 77:9-23; Maloney Decl. Ex. 2, Maloney Rpt. p. 2).

>**RESPONSE 81:** Disputed to the extent that such asserts that Dr. Sikirica "failed to put in his autopsy report" as the decision on what evidence to present to the grand jury is that of the Assistant District Attorney.

82. No pathologist should draw the conclusion that the amount of blood seen on autopsy was present at the time of death because it is known that humans continue to bleed after death with CPR. (Klein Decl. Ex. 6, Trial Tr. VI 52:21-55:10).

>**RESPONSE 82:** The City Defendants object to such statement as it sets forth a disputed expert opinion, as opposed to a statement of fact as required by the Local Rules.

83. The amount of blood in V.D.'s abdomen at autopsy was consistent with CPR and with the fact that lacerations to the liver continue to bleed. (Maloney Dec. Ex. 2, p. 2).

>**RESPONSE 83:** The City Defendants object to such statement as it sets forth a disputed expert opinion, as opposed to an assertion of fact as required by the Local Rules. (*See*, Autopsy Report attached as Exhibit "L" to Firth Affidavit).

84. EMS reported that V.D.'s stomach was not distended upon arrival, which also supports that additional blood accumulated while CPR was being performed by EMS and hospital staff. (Maloney Decl. Ex. 2, Maloney Rpt. p. 2).

>**RESPONSE 84:** The City Defendant object to such statement to the extent it asserts that V.D.'s stomach was not distended upon arrival as it fails to cite to any exhibit supporting the same. Further, such statement is not disputed to the extent that such represents Dr. Maloney's conflicting expert opinion in dispute in this matter.

85.     Sikirica falsely informed the grand jury that when EMS arrived, V.D. was cool to the touch and had some electrical activity in her heart, when in actuality per EMS V.D. was warm to the touch and had no electrical activity. (Klein Decl. Ex. 3, Trial Tr. III 38:9-42:18; Ex. 9, Grand Jury Tr. 000853; Ex. 12, Bayley Witness Dep. 000496; Ex. 13, CPS Case Notes 000499).

> **RESPONSE 85:** Not disputed that Dr. Sikirica incorrectly informed the grand jury that when EMS arrived, V.D. was cool to the touch and that the EMT's "did detect, supposedly, some electrical activity in her heart. . ."

86.     Sikirica falsely informed the jury that based on the false fact that V.D. purportedly had electrical activity when EMS responded, V.D.'s injuries had occurred approximately 15 to 20 minutes prior to the arrival of EMS. (*Id.* at Ex. 9, Grand Jury Tr. 000863-000864).

> **RESPONSE 86:** The City Defendants object to such statement as there is no evidence cited to support the assertion that Sikirica offered false testimony or that such assertion that some electrical activity was observed was false as Paramedic Bayly;s witness statement provided: "We administered 4 rounds of Epinephrine and we electro shocked her after she went into shock able rhythm while enroute to St. Mary's hospital." (Bayly Statement, Ex. "C" to Holehan Affidavit). It is undisputed that Dr. Sikirica did testify that to observe such electrical activity: "It would indicate - - if - - if these injuries occurred, she would have been dying in a course of about 15 or 20 minutes." (Klein Decl. Ex. 9, Grand Jury Tr. 000863-000864).

87.     After hearing the testimony of only Fountain and Sikirica, the grand jury indicted plaintiff. (*Id.* at Ex. 9, Grand Jury Tr.; Ex. 33, Indictment P000031-P000033).

> **RESPONSE 87:** Not disputed.

88.     Joel Abelove signed the indictment. (*Id.* at Ex. Ex. 33, Indictment P000033).

> **RESPONSE 88:** Not disputed.

# APPENDIX

89. After the indictment, an arrest warrant was issued, and plaintiff was arrested on October 2, 2015, and jailed until his acquittal after a jury trial on August 25, 2016. (*Id.* at Ex. 1, Davis Dep. Tr. 13:11-14:5; Ex. 7, Trial Tr. VII 19:20-23:17; Ex. 18, Fountain Dep Tr. 46:19-47:8; Ex. 34, Arrest Report 000534; Ex. 35, Davis City 50-h 11:4-13:7).

**RESPONSE 89:** Not disputed.

90. Coonradt testified at a suppression hearing conducted on May 3, 2016, where she reiterated her false claims that plaintiff had informed her that he told V.D. to go back to bed because it was too early, that he woke up at 11:00 a.m., and made a comment that time must be flying. (*Id.* at Ex. 21, Suppression Hearing Tr. 10:4-18).

> **RESPONSE 90:** The City Defendants object to the assertion that Defendant Coonradt offered false testimony as no evidence cited supports such conjecture. Further, the Plaintiff did not provide a copy of the Suppression Hearing Testimony cited to. Notwithstanding the same, Defendant Coonradt testified consistently with the statement obtained on the date of the incident. (Ex. "B" to Coonradt Aff.).

91. McDonald testified at the suppression hearing conducted on May 3, 2016, during which he conceded plaintiff was upset, sniffling, and on the verge of tears, and repeatedly expressed that he did not know what happened and was trying to figure out what happened. (*Id.* at Ex. 21, Suppression Hearing Tr. 112:9-113:17).

> **RESPONSE 91:** The City Defendants object to such statement to the extent that it asserts such conjecture that Defendant McDonald "conceded" to the above as Defendant McDonald testified as to his personal observations. Furthermore, Defendant McDonald testified that the Plaintiff "was a little upset," because he was "sniffling . . . you know, almost on the verge of crying, maybe." (Exhibit "21" to Klein Decl., p. 112, L. 16-p. 113, L. 6).

92.     Coonradt testified at trial and again reiterated her false claims that plaintiff had informed her that he told V.D. to go back to bed because it was too early, that he woke up at 11:00 a.m., and made a comment that time must be flying. (*Id.* at Ex. 3, Trial Tr. III 67:17-68:3).

> **RESPONSE 92:** The City Defendants object to the assertion that Defendant Coonradt offered false testimony or made false claims as no evidence cited supports such conjecture. Furthermore, Defendant Coonradt testified consistently with the statement obtained on the date of the incident. (Ex. "B" to Coonradt Aff.).

93.     Sikirica testified at trial and, like with the grand jury, during his direct testimony Sikirica did not inform the jury of his final autopsy finding that he had correlated V.D.'s injuries to Davis' attempted CPR with large hands, instead informing the jury it would take the force of a motor vehicle accident or severe blunt force trauma caused by being hit in the abdomen with an object or running into an object for such injuries to the liver to occur. (*Id.* at Ex. 4, Trial Tr. IV 12:11-13:2; Ex. 28, Autopsy Rpt. 000119).

> **RESPONSE 93:** The City Defendants object to such statement as it is not supported by the evidence cited and is an unclear statement. Notwithstanding, it is not disputed that Sikirica did testify that the type of injuries observed were consistent with blunt force trauma similar to the that of a motor vehicle accident.

94.     Sikirica denied at trial that his medical opinion was based on the video which depicted Davis performing CPR despite that he directly referenced information learned from the video in his autopsy report. (*Id.* at Ex. 4, Trial Tr. IV 54:11-19.; Ex. 28, Autopsy Rpt. 000119).

> **RESPONSE 94:** Not disputed.

95.     Fountain also testified at the trial, although he had retired from TPD after he himself had been indicted by defendant Abelove for corruption. (*Id.* at Ex. 18, Fountain Dep. Tr. 89:11-91:17).

> **RESPONSE 95:** Not disputed.

96.     The investigation which led to plaintiff's arrest was a collaborative effort among Sikirica, RCDAO, and the TPD. (*Id.* at Ex. 25, Mason Dep. Tr. 42:20-44:20).

>     **RESPONSE 96:** Not disputed to the extent such statement asserts that the investigation was collaborative in nature as TPD provided information to Dr. Sikirica and RCDAO and each party had assisted the other in obtaining information that one party may not have access to. (Exhibit "F" to Firth Affidavit, Sikirica EBT, p. 153, L. 12-p. 154, L. 21).

97.     Sikirica was not a neutral witness, as evidenced by his decision to call a meeting with ADA Hall and defendant Abelove to express his frustration and criticism of the trial ADA, ADA Cindy Chavkin. (*Id.* at Ex. 15, Sikirica Dep. Tr. Dep 48:2-51:13, 85:19-87:1).

>     **RESPONSE 97:** The City Defendants object to such as mere conjecture unsupported by the evidence cited.

98.     Abelove conceded after the acquittal that the case against Davis was not strong but stated that he did not regret pursuing it. https://www.troyrecord.com/2016/08/25/former-professional-basketball-player-acquitted-in-lansingburgh-toddlers-death.

>     **RESPONSE 98:** Not disputed.

99.     CPR can cause lacerations to the liver and fracture ribs, and the liver and ribs are the more likely areas to be injured during CPR. (*Id.* at Ex. 6, Trial Tr. VI 25:13-30:15, 65:3-24; Ex. 15, Sikirica Dep. Tr. 100:19-23; Maloney Decl. Ex. 2, Maloney Rpt).

>     **RESPONSE 99:** Not disputed.

100.    Prolonged CPR, as V.D. underwent, is significantly associated with a higher incident of rib fractures, as is CPR if performed with a hand behind the decedent as Davis did here. (Klein Decl. Ex. 15, Sikirica Dep. Tr. 57:14-60:4).

> **RESPONSE 100:** Disputed to the extent such misrepresents the testimony as Dr. Sikirica testified that some studies have suggested that prolonged CPR is associated with a higher incidence of rib fractures while other studies have disclaimed the same. (Klein Decl. Ex. 15, Sikirica Dep. Tr. p. 57, L. 14-p. 58, L. 4).

101.    The longer CPR is performed, the more CPR-associated injuries will be seen.

> **RESPONSE 101:** Not disputed.

102.    V.D. had no exterior bruising, or bruising or injuries to other organs, which is also indicative of V.D.'s injuries being CPR related. (Klein Decl. Ex. 6, Trial Tr. VI 41:7-43:7).

> **RESPONSE 102:** Not disputed that V.D. did not have exterior bruising or bruising to other organs but object to the remainder of the assertion as such is an opinion in dispute. (Final Autopsy attached as Exhibit "L" to Firth Affidavit). Furthermore, such statement refers to a disputed medical opinion.

103.    All experts concede the type of compressions Davis demonstrated were consistent with the compressive injuries sustained by V.D. (*Id.* at Ex. 4, Trial Tr. IV 58:15-25; Ex. 15, Sikirica Dep. Tr. Dep. 83:18-84:11; Ex. 32, Brady Disclosure. Maloney Decl. Ex. 2, Maloney Rpt. p. 2).

> **RESPONSE 103:** Not disputed.

104.    V.D.'s injuries to her liver and ribs were obviously postmortem and did not contribute to her death. (Klein Decl. Ex. 6, Trial Tr. VI 33:12-43:7, 62:9-11. Maloney Decl. Ex. 2, Maloney Rpt. pp. 2-3).

> **RESPONSE 104:** Disputed. The expert opinions are in dispute (*See*, Exhibit "F" to Firth Affidavit, Sikirica EBT: p. 28, L.12-p.29, L. 13; p.64, L. 11-L.20; p. 73, L. 18-p. 74, L. 17; p. 81, L. 6-p. 82, L. 8) (*See also*, Exhibit "N" to Firth Affidavit, Sikirica's Grand Jury Testimony, p. 31-34).

105.    Sikirica cannot dispute that V.D. was already unresponsive when Davis performed

CPR. (Klein Decl. Ex. 15, Sikirica Dep. Tr. 66:21-67:3).

> **RESPONSE 105:** The City Defendants object to such mischaracterization of Dr.
> Sikirica's testimony. Further such is disputed, Dr. Sikirica testified as follows:
>
> Q: So, do you dispute that V.D. was found unresponsive, possibly in cardiac arrest,
> before any compressive compression was done to her by Michael Davis as
> described in the video?
>
> A: I can't dispute that, but I can't confirm it either. I can't confirm she was in
> cardiac arrest.
>
> Q: If you can't dispute it, how do you know she hadn't already – she wasn't already
> postmortem when Michael Davis attempted just a few efforts at CPR?
>
> A: Well, I found no reason for her to be dead. (Sikirica EBT, ECF Doc. No. 123-
> 15, p. 66, L. 21-p. 67, L. 7).

106.    Sikirica concedes that injuries inflicted during the process of resuscitation efforts

when a person is already in extremis would not be a homicide. (*Id.* at Ex. 15, Sikirica Dep Tr.

127:21-128:13).

> **RESPONSE 106:** The City Defendants object to the conjecture that Dr. Sikirica
> "conceded" otherwise undisputed.

107.    Had Sikirica determined that the rib and liver injuries leading to death were from

EMS performing CPR, he would not have determined the death was a homicide, but rather would

have left the death undetermined or accidental. (*Id.* at Ex. 15, Sikirica Dep. Tr. 127:21-128:6).

> **RESPONSE 107:** Not disputed that Dr. Sikirica testified to such hypothetical.

108.    Sikirica performs approximately 600 autopsies per year, which is almost double the

maximum number of autopsies recommended by the National Board of Medical Examiners. (*Id.*

at Ex. 4, Trial Tr. IV 36:20-39:24).

> **RESPONSE 108:** Not disputed.

109. Sikirica has a history known to Rensselaer County of ignoring evidence of natural deaths in children and of providing cause of death determinations and medical diagnoses consistent with investigating police and prosecutors who are seeking manslaughter convictions for child deaths, as established by the trials of Joseph McElheny in 2011 and Adrian Thomas in 2015. ECF Doc. 77 ¶¶ 51-54.

> **RESPONSE 109:** The City Defendants object to such as an improper assertion not supported by the evidence cited.

110. Joseph McElheny was arrested by TPD officers, prosecuted by the RCDAO, and in 2011, acquitted of murdering his four-month-old daughter, based on a defense that defendant Sikirica ignored extensive medical evidence which supported a finding that the child had died of natural causes. (*Id.* at ¶ 52; Klein Decl. Ex. 38, *Joseph McElheny Acquitted of Manslaughter and Murder in Death of his 4-Month-Old Daughter*, Saratogian, Oct. 12, 2011).

> **RESPONSE 110:** It is undisputed that Joseph McElheny was arrested, prosecuted, and acquitted and that he put forth a defense in the criminal trial, but there is no evidence cited that conclusively determines why the jury acquitted him.

111. Adrian Thomas was also arrested by TPD officers, including some of the TPD defendants herein, prosecuted by RCDAO, and in 2015, acquitted of charges including murder arising from the death of his four-month-old son based on a defense that defendant Sikirica ignored medical evidence that Thomas' son had died of natural causes from sepsis. (ECF Doc. 77 ¶ 54; Klein Decl. Ex. 39, The National Registry of Exonerations, June 21, 2014, Post on Adrian Thomas. *See also* Thomas v. Mason, et al., 17 CV 626 (DJS), which is currently pending before this Court).

> **RESPONSE 111:** It is undisputed that Adrian Thomas was arrested, prosecuted and acquitted and that he put forth a defense in the criminal trial, but there is no evidence cited that conclusively determines why the jury acquitted him.

112.    Despite such notice, defendant Rensselaer continued to retain defendant Sikirica

and to proffer his reports and otherwise utilize his services in furtherance of wrongful prosecutions

involving juvenile deaths, including that of Davis. (ECF Doc. 77 ¶ 58).

> **RESPONSE 112:** The City Defendants object to such as an improper assertion
> not supported by the evidence cited as such, it is disputed that Rensselaer County
> had notice or that Rensselaer County retained Dr. Sikirica to utilize his services in
> furtherance of wrongful prosecutions.

113.    From 2005 through 2018, Sikirica was paid $72,600 per year to perform autopsies

for Rensselaer County. (Klein Decl. Ex. 36, Civil Service Rec.).

> **RESPONSE 113:** Disputed. Dr. Sikirica was compensated $72,600 per year, from
> 2005 through 2018, as Rensselaer County's Chief Medical Examiner and such role
> may have required additional job duties in addition to preforming autopsies.

114.    Sikirica received a raise in 2019 to $75,900 per year. (*Id.*).

> **RESPONSE 114:** Not disputed.

Dated: May 13, 2022.

                              *Rhiannon I. Spencer*

                              Rhiannon I. Spencer, Esq.
                              **PATTISON, SAMPSON, GINSBERG & GRIFFIN, PLLC**
                              *Attorneys for Defendants City of Troy, Danielle*
                              *Coonradt, Adam Mason, Charles McDonald Ronald*
                              *Fountain, & Tim Colaneri*
                              22 First Street, P.O. Box 208
                              Troy, New York 12181-0208
                              (518) 266-1001

# APPENDIX

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

MICHAEL DAVIS-GUIDER,

Plaintiff,

v.

1:17-CV-1290
(DJS)

CITY OF TROY, RONALD FOUNTAIN, DANIELLE
COONRADT, CHARLES McDONALD, RENSSELAER
COUNTY, MICHAEL SIKIRICA, and TIM COLANERI,

Defendants.

---

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| OFFICE OF BRETT H. KLEIN, PLLC<br>Attorney for Plaintiff<br>305 Broadway<br>Suite 600<br>New York, New York 10007 | BRETT H. KLEIN, ESQ. |
| PATTISON, SAMPSON, GINSBERG,<br>& GRIFFIN, PLLC<br>Attorney for City of Troy Defendants<br>22 First Street<br>P.O. Box 208<br>Troy, New York 12181-0208 | RHIANNON I. GIFFORD, ESQ. |
| BAILEY, JOHNSON, & PECK, P.C.<br>Attorney for Rensselaer County Defendants<br>5 Pine West Plaza<br>Suite 507<br>Albany, New York 12205 | CRYSTAL R. PECK, ESQ.<br>JOHN W. BAILEY, ESQ.<br>WILLIAM C. FIRTH, ESQ. |

**DANIEL J. STEWART
United States Magistrate Judge**

# APPENDIX

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

This case began on February 26, 2015 with the death of two year old "V.D.," the daughter of Plaintiff's girlfriend. On October 2, 2015, Plaintiff was arrested in connection with the death, following his indictment by a Rensselaer County Grand Jury. Plaintiff has long maintained his innocence and was acquitted by a jury in Rensselaer County Court in August 2016. In 2017, Plaintiff filed this action alleging violations of his rights under 42 U.S.C. § 1983 and state law. Dkt. No. 1. The operative pleading before the Court is Plaintiff's Third Amended Complaint. Dkt. No. 77, Third Am. Compl. As a result of the decision on a motion to dismiss filed by the County Defendants, Dkt. No. 35, the following causes of action remain in this litigation:

1) false arrest/false imprisonment under 42 U.S.C. § 1983, asserted against Defendants Coonradt, Fountain, McDonald, and Sikirica,[1] Third Am. Compl. at ¶¶ 64-66;

2) malicious prosecution under 42 U.S.C. § 1983, asserted against Defendants Coonradt, Fountain, McDonald, Colaneri, and Sikirica, *id.* at ¶¶ 67-76;

3) denial of the right to a fair trial under 42 U.S.C. § 1983, asserted against Defendants Coonradt, Fountain, McDonald, Colaneri, and Sikirica, *id.* at ¶¶ 77-81;

4) failure to intervene under 42 U.S.C. § 1983, asserted against Defendants Coonradt, Fountain, McDonald, and Colaneri, *id.* at ¶¶ 82-86;

---

[1] Plaintiff has now abandoned this claim. *See* Dkt. No. 125, Pl.'s Mem. of Law at p. 18 (noting that "plaintiff has withdrawn his false arrest claim"); *see also id.* at p. 12 n.2.

5) section 1983 conspiracy claims related to Plaintiff's false arrest, malicious prosecution, and fair trial claims, *id.* at ¶¶ 87-90;[2]

6) *Monell* municipal liability claims against the City of Troy and County of Rensselaer, *id.* at ¶¶ 91-113; and

7) a state law claim for malicious prosecution against all Defendants, *id.* at ¶¶ 114-124.

The parties proceeded through discovery and presently pending are Motions for Summary Judgment on behalf of Defendants Sikirica and Rensselaer County, Dkt. No. 115, and Defendants City of Troy, Colaneri, Coonradt, Fountain, and McDonald. Dkt. No. 116.[3] Plaintiff opposes the Motions. Dkt. Nos. 121-125. Defendants filed replies. Dkt. Nos. 129-130. The Court heard oral arguments on the Motions in December 2022 and now grants each Motion for the reasons set forth below.

## II. FACTUAL BACKGROUND

In February 2015, Plaintiff was living in Troy, New York with his girlfriend Rebecca Parker and Ms. Parker's two and a half year old daughter, V.D. Dkt. No. 115-4 at pp. 22-23 & 33. On the morning of February 26, 2015, after Ms. Parker went to work, Plaintiff was home alone with V.D. Dkt. No. 123-1 at pp. 56-67. At some point around 7:00 that morning, Plaintiff helped V.D. go to the bathroom and put her back to sleep. *Id.* at pp. 56-57. Plaintiff also fell asleep. *Id.* at p. 59. Later that morning or in the early

---

[2] Given Plaintiff's withdrawal of his false arrest claim, the related conspiracy claim is dismissed.

[3] The respective motions were also originally made on behalf of Joel Abelove and Adam Mason, who by stipulation of the parties have since been dismissed from the case. Dkt. No. 131.

afternoon, Plaintiff discovered V.D. unresponsive in her bed. *Id.* at p. 60; Dkt. No. 115-4 at p. 54. When she did not respond to his calls, he attempted CPR. Dkt. No. 123-1 at p. 61. Unable to find a working phone in his apartment, Plaintiff went across the street to call 911. *Id.* at p. 66-67. Emergency personnel arrived at Plaintiff's apartment as did officials from the Troy Police Department. Dkt. No. 115-4 at p. 72. V.D. was transported to St. Mary's Hospital and was in cardiac arrest when she arrived at the hospital. Dkt. No. 116-3 at p. 20. V.D. was pronounced dead soon after the ambulance arrived at the hospital. *Id.*

Troy Police officials began an investigation into the circumstances of V.D.'s death, which included interviewing Plaintiff on February 26 and on several subsequent occasions. *See* Dkt. No. 116-1 at ¶¶ 6, 34, 38, & 70. On February 27, 2015, Dr. Sikirica conducted an autopsy on V.D. Dkt. No. 115-9 at p. 25. The investigation into V.D.'s death continued for several months without an arrest. Dr. Sikirica issued a final autopsy report on August 14, 2015. Dkt. No. 123-28. The report concluded that there was "[n]o evidence of significant natural disease," but found "multiple lacerations of the liver with right rib fractures due to blunt force trauma." *Id.* at p. 11.

Defendants Fountain and Sikirica testified before a Rensselaer County Grand Jury investigating V.D.'s death. Dkt. No. 123-9. The Grand Jury returned an indictment charging Plaintiff with two counts of manslaughter and endangering the welfare of a child. Dkt. No. 115-18. Plaintiff was acquitted following a jury trial. Third Am. Compl. at ¶ 45.

# APPENDIX

## III. LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. at 323. To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully

limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV. DISCUSSION

### A. Malicious Prosecution

"To state a § 1983 malicious prosecution claim a plaintiff 'must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law.'" *Cornelio v. Connecticut*, 32 F.4th 160, 178 (2d Cir. 2022) (quoting *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010)). In New York, that substantive showing requires Plaintiff to prove "(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding and (4) actual malice." *Kee v. City of New York*, 12 F.4th 150, 161–62 (2d Cir. 2021) (quoting *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 195 (2000)). No party contests that Plaintiff, given his acquittal, satisfies the favorable termination element. Defendants do, however, maintain that summary judgment is appropriate as to the remaining elements.

### 1. Initiation of the Criminal Prosecution

Defendants Coonradt and Colaneri seek summary judgment on the ground that they did not initiate Plaintiff's prosecution. Dkt. No. 116-9 at pp. 8-10.

"To initiate a prosecution, a defendant must do more than report the crime or give testimony. He must 'play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.'" *Manganiello v. City of New York*, 612 F.3d at 163 (quoting *Rohman v. New York City Transit Authority*, 215 F.3d 208, 217 (2d Cir. 2000)) (alteration in the original). "Initiation in this context is a term of art." *Sotak v. Bertoni*, 501 F. Supp. 3d 59, 83 (N.D.N.Y. 2020) (internal quotation and citation omitted). By that, courts look not to whether a party had any role in events leading to the prosecution, but whether a party had an active or significant role in bringing it about. *Tretola v. Cnty. of Nassau*, 14 F. Supp. 3d 58, 76 (E.D.N.Y. 2014); *Mitchell v. Victoria Home*, 434 F. Supp. 2d 219, 227 (S.D.N.Y. 2006).

### a. Defendant Coonradt

The undisputed record establishes that Coonradt played a limited role in the investigation of V.D.'s death. The only substantive factual dispute between the parties about her role is whether a particular statement attributed to Plaintiff and recorded by Coonradt in her police report was false. Coonradt was the first police officer on the scene. Dkt. No. 116-2 at ¶ 4. She filed a report recounting that Plaintiff told her that he had gone to wake up V.D. at "1100 and she wouldn't wake up. When I told Michael it was 1:30, he didn't seem to understand and said 'time must be flying.'" *Id.* at Ex. B. Plaintiff disputes the accuracy of the timing reported by Coonradt. *See* Dkt. No. 123-1 at pp. 79-81. Specifically, Plaintiff claims that he did not tell Coonradt what time he attempted to wake V.D. *Id.* at p. 80. While Plaintiff disputes the reported timing, the record reflects that V.D.'s mother later gave police a statement in which she reported that Plaintiff had

6

told her he went to wake V.D. at 11 a.m. or 12 p.m.  Dkt. No. 123-8 at p. 2.  While a dispute of fact may exist about statements reportedly made by Plaintiff, the Court does not find that dispute material to a determination regarding the extent of Coonradt's role in the investigation.

Coonradt had no other role in the investigation of V.D.'s death beyond her initial interactions with Plaintiff.  Dkt. No. 116-2 at ¶ 26.  She did not testify before the Grand Jury and was not present when Plaintiff was arrested.  *Id.* at ¶¶ 29 & 30.  "Clearly, these allegations - involving the taking of a statement and the drafting of a police report - are insufficient to constitute the requisite personal involvement of Defendants in initiating Plaintiff's prosecution."  *Melendez v. City of New York*, 2017 WL 4221083, at *4 (S.D.N.Y. Sept. 20, 2017).  Merely furnishing information to those investigating a crime is insufficient to establish an individual's role in initiating a prosecution. *Jiang v. Corpuz*, 2020 WL 5517237, at *4 (E.D.N.Y. Sept. 13, 2020).  And even assuming that Coonradt was mistaken, "a mistake does not support liability for malicious prosecution." *Bornschein v. Herman*, 304 F. Supp. 3d 296, 302 (N.D.N.Y. 2018).

Plaintiff nonetheless argues that Coonradt played a role in initiating the criminal prosecution against him because her purportedly inaccurate statement "created an inference that there was two hours of essentially 'lost time' between when plaintiff woke up and when he called police."  Dkt. No. 125, Pl.'s Mem. of Law at p. 15.  In Plaintiff's view, because a reasonable jury could find that this "created a gap in plaintiff's story," it may have contributed to the initiation of Plaintiff's prosecution.  *Id.*  This view of the initiation element has no limiting principle.  Under it, any investigating officer who makes

7

any report which a plaintiff later alleges was inaccurate or untrue could be said to have initiated a prosecution. The Court declines to adopt such a sweeping theory of what it means to initiate a prosecution.

Coonradt's Motion for Summary Judgment, therefore, is granted.

### b. Defendant Colaneri

The Court reaches the same conclusion with respect to Defendant Colaneri. There is no meaningful dispute among the parties regarding his role in the investigation. He was present during an early interview with Plaintiff and asked questions, but all agree that Plaintiff did not incriminate himself during that interview, it did not lead to Plaintiff's arrest at that time, and no claim of misconduct during the interview has been made against Colaneri. He also attended V.D.'s autopsy and a meeting of people involved in the investigation. Dkt. No. 116-5 at ¶¶ 12 & 24. Unlike even Defendant Coonradt, however, there is no allegation that Colaneri authored any false investigative reports. He was present when Plaintiff was arrested following his indictment, but Colaneri testified neither before the Grand Jury nor at Plaintiff's trial. Dkt. No. 116-5 at ¶¶ 28, 30, & 32. None of those undisputed facts suggest an active role in the investigation or initiation of the criminal charges against Plaintiff. Initiation requires specific actions on the part of the Defendant that Plaintiff has failed to sufficiently allege here. *Keller v. Vill. of Hempstead*, 2014 WL 2718573, at *3 (E.D.N.Y. June 12, 2014) (dismissing claim in absence of "specific" allegation of role in initiating prosecution); *Roper v. Hynes*, 2006 WL 2773032, at *9 (S.D.N.Y. Sept. 27, 2006) (same).

8

Case 1:17-cv-01290-DJS Document 144 Filed 03/29/23 Page 109 of 30

In opposing the Motion, Plaintiff says of Colaneri only that he was "directly involved in nearly every step of the investigation that ultimately led to Sikirica determining V.D.'s death was a purported homicide." Pl.'s Mem. of Law at pp. 15-16. Plaintiff offers no evidence to support that assertion, however, and "Plaintiff's conclusory allegations do not satisfy the initiation prong of a malicious prosecution claim." *Salim v. City of New York*, 2017 WL 946345, at *2 (S.D.N.Y. Feb. 28, 2017); *see also Rys v. Grimm*, 2021 WL 827671, at *6 (N.D.N.Y. Mar. 4, 2021).

Defendant Colaneri's Motion for Summary Judgment, therefore, is granted.

### 2. Probable Cause

"[U]nder New York law, indictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983)). "[I]t is the plaintiff who bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment." *Id.* at 73; *see also Dufort v. City of New York*, 874 F.3d 338, 352 (2d Cir. 2017); *Bernard v. United States*, 25 F.3d 98, 104 (2d Cir. 1994). That burden has been characterized as "heavy." *Cunny v. City of New York*, 2001 WL 863431, at *5 (S.D.N.Y. July 31, 2001) (citing *Simms v. Village of Albion*, 115 F.3d 1098, 1107 (2d Cir. 1997)).

Plaintiff was arrested after the Grand Jury returned an indictment charging him with manslaughter in the second degree. Dkt. No. 115-18. Plaintiff recognizes that the Indictment created a presumption of probable cause. Pl.'s Mem. of Law at p. 19.

However, he makes several arguments regarding the evidence presented, or not presented, to the Grand Jury to overcome that presumption. These arguments fail to satisfy Plaintiff's heavy burden. Summary judgment for all Defendants, therefore, is warranted.

Plaintiff contends that the District Attorney's Office "presented extremely limited evidence to the grand jury . . . which appeared to intentionally omit" evidence Plaintiff believes is exculpatory, including findings in the autopsy report. Pl.'s Mem. of Law at pp. 19 & 22. First, the District Attorney has been dismissed from this case in large part based on Plaintiff's concession that the DA is "absolutely immune" from suit for his role in prosecuting the case. *Id.* at p. 18. In light of that and on the facts of this case, Plaintiff cannot hold the remaining parties liable for the evidence the District Attorney's Office failed to present to the Grand Jury. *Burgess v. DeJoseph*, 2017 WL 1066662, at *7 (N.D.N.Y. Mar. 21, 2017), *aff'd*, 725 F. App'x 36 (2d Cir. 2018) ("it was the prosecutor, not the Defendant officers, who had the discretion and authority to decide what evidence to present to the grand jury") (internal quotations omitted). Second, "[t]he People maintain broad discretion in presenting their case to the Grand Jury and need not seek evidence favorable to the defendant or present all of their evidence tending to exculpate the accused." *Williams v. City of New York*, 2003 WL 22434151, at *7 (S.D.N.Y. Oct. 23, 2003), *aff'd*, 120 F. App'x 388 (2d Cir. 2005) (quoting *People v. Mitchell*, 82 N.Y.2d 509, 515 (1993)); *see also United States v. Regan*, 103 F.3d 1072, 1081 (2d Cir. 1997) ("The government had no obligation to present exculpatory material to a grand jury.") (citing *United States v. Williams*, 504 U.S. 36, 51-52 (1992)). Given the lack of a duty to do so, the failure to present exculpatory evidence is not evidence of bad faith. *Savino v.*

10

*City of New York*, 331 F.3d at 73; *Battisti v. Rice*, 2017 WL 78891, at *11 (E.D.N.Y. Jan. 9, 2017) (citing cases). As a result, the purported limited nature of the evidence presented by the District Attorney's Office is not a basis for finding the presumption of probable cause overcome.

Plaintiff also relies extensively on his view that Defendants Fountain and Sikirica testified falsely at the Grand Jury. This, he claims, is evidence of bad faith sufficient to rebut the presumption. *See* Pl.'s Mem. of Law at pp. 20-21. For reasons outlined below in Section IV(B) of this opinion, the Court disagrees with Plaintiff's characterization of much of the testimony he relies on as false. But in the first instance, this argument runs headlong against the decision in *Rehberg v. Paulk*, 566 U.S. 356 (2012) which affords absolute immunity from section 1983 liability for testimony presented to a Grand Jury.

Historically, witnesses who testified at a trial were afforded absolute immunity for that testimony. *Briscoe v. LaHue*, 460 U.S. 325, 330 (1983). In *Rehberg*, the Court considered the extent of immunity a witness testifying before a Grand Jury should receive. The Court concluded that "grand jury witnesses should enjoy the same immunity as witnesses at trial." *Rehberg v. Paulk*, 566 U.S. at 369. By its express terms, that immunity extends to law enforcement personnel testifying before a Grand Jury. *Id.* at 368-369; *Coggins v. Buonora*, 776 F.3d 108, 112 (2d Cir. 2015); *Boyde v. Barnes*, 2022 WL 11765034, at *5 (N.D.N.Y. Oct. 20, 2022) (Report-Recommendation and Order) ("This immunity attaches even if the testimony is false and given by a police officer."). "Following *Rehberg*, a plaintiff may not be able to rebut the presumption of probable cause by relying on a police officer's perjurious testimony before the grand jury."

11

*Adamou v. Doyle*, 2017 WL 1230541, at *3 (S.D.N.Y. Jan. 12, 2017); *see also Crespo v. Rivera*, 2018 WL 4500868, at *12 (S.D.N.Y. Sept. 19, 2018) (collecting cases). Under these standards, the allegedly false evidence relied upon by Plaintiff to rebut the presumption of probable cause is immunized under *Rehberg* to the extent it is the result of testimony offered to the Grand Jury and cannot be used for that purpose by Plaintiff. *Appling v. City of New York*, 2021 WL 695061, at *6 (E.D.N.Y. Feb. 23, 2021) ("Plaintiff cannot, in light of *Rehberg*, rely on grand jury testimony to rebut the presumption of probable cause created by his indictment.").[4]

Citing no other evidence of bad faith, Plaintiff is unable to overcome the presumption of probable cause and his malicious prosecution claim, therefore, must be dismissed.

### 3. Actual Malice

Nor has Plaintiff shown any evidence to suggest actual malice existed here. "As for actual malice, plaintiff[] must show that the defendant 'commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" *LaFontaine v. City of New York*, 2009 WL 3335362, at *9 (S.D.N.Y. Oct. 14, 2009) (quoting *Rounseville v. Zahl*, 13 F.3d 625, 630 (2d Cir. 1994)). Plaintiff's opposition papers rely almost exclusively on his view that questions of fact exist regarding probable cause which would then carry over to the actual malice element. Pl.'s Mem. of Law at pp. 23-24. For the reasons set forth above, Plaintiff has not

---

[4] Nor can a plaintiff attempt an end run around this immunity by alleging a conspiracy with other individuals to present false testimony. *Rehberg v. Paulk*, 566 U.S. at 369.

established questions of fact on the probable cause element. "Therefore, the [P]laintiff's argument that malice may be inferred by a lack of probable cause fails." *McGee v. Dunn*, 940 F. Supp. 2d 93, 102 (S.D.N.Y. 2013).

Plaintiff also briefly alleges that malice is shown by what Plaintiff considers Defendants' "myopic focus" on him as a suspect. Dkt. No. 125 at p. 24. He, however, offers nothing more than this conclusory statement to support this assertion, which is insufficient to establish malice. *Fowler v. Kingston City Police Dep't*, 2009 WL 3064775, at *8 (N.D.N.Y. Sept. 22, 2009). *Manganiello v. City of N.Y.*, on which Plaintiff relies, also does not support his position. Plaintiff takes the Second Circuit's reference to myopic focus as a basis for inferring actual malice out of context because it was just one of several factors identified by the Circuit in making an inference of malice. 612 F.3d at 164. The other cited grounds for inferring malice were the defendant's "otherwise seemingly inexplicable false statements about [plaintiff's] conduct that were contrary to the reported first-hand knowledge of others; [defendant's] willingness to coerce an inculpatory statement from one unwilling person in exchange for not reporting that person's known criminal activities; and his willingness to have [plaintiff] indicted on the basis of testimony of another person who was known to have lied to [defendant] at least once in this very matter and who was evidently willing to intimidate others into falsely providing the evidence [defendant] sought." *Id.* There is no claim of coercion here, nor any claim that Defendants knowingly relied on false testimony of third parties. And while Plaintiff claims that Defendants falsified statements, he offers no evidence that Defendants were aware of any third party who supported Plaintiff's version of the

13

particular statements at issue here. Those factors, present in *Manganiello* are, therefore, absent here. Moreover, there is no dispute that Plaintiff was alone with V.D. when she was found unresponsive. Given that fact, police officials certainly had a reasonable basis to examine Plaintiff's role in her death. For all these reasons, *Manganiello* is inapposite.

The Court, therefore, grants Defendants' Motions for Summary Judgment as to Plaintiff's section 1983 malicious prosecution claim.[5]

### B. Right to a Fair Trial

Plaintiff's claim regarding the denial of a fair trial relates to the alleged "creation, forwarding to prosecutors and use of false, fabricated evidence." Third. Am. Compl. at ¶ 80. The Third Amended Complaint asserts this claim against all "individually named defendants." *Id.* at ¶ 78. Plaintiff now appears to pursue this claim only against Defendants Fountain, Coonradt, and Sikirica. *See* Pl.'s Mem. of Law at pp. 26 (discussing City Defendants' Motion and noting that this claim should "proceed to trial as to Fountain and Coonradt") & 28 (asserting issues of fact as to Dr. Sikirica on this claim). Because there are no specific allegations of fabrication on the part of Colaneri and McDonald, the fair trial claim against them is dismissed.

"To succeed on a fabricated-evidence claim, a plaintiff must establish that an (1) investigating official (2) fabricated information (3) that is likely to influence a jury's verdict, (4) forwarded that information to prosecutors, and (5) the plaintiff suffered a deprivation of life, liberty, or property as a result." *Jeanty v. Cerminaro*, 2023 WL

---

[5] Given that "the state and the federal claims [are] identical," *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003), Plaintiff's state law malicious prosecution claim is also dismissed.

325012, at *5 (2d Cir. Jan. 20, 2023) (quoting *Ashley v. City of New York*, 992 F.3d 128, 139 (2d Cir. 2021)).

The Court assumes for purposes of these Motions that Plaintiff has established, or at least raised a question of fact, as to the first, fourth, and fifth elements identified above. The Court, therefore, focuses its analysis specifically on whether Plaintiff has raised a question of fact about the existence of fabricated evidence that was likely to influence a jury's verdict.[6]

As U.S. District Court Judge Mae D'Agostino recently noted, "there is a notable bar for evidence to be considered 'fabricated.'" *McDonough v. Smith*, 2022 WL 3279348, at *24 (N.D.N.Y. Aug. 11, 2022). Courts across the country have recognized that "testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong." *Halsey v. Pfeiffer*, 750 F.3d 273, 295 (3d Cir. 2014); *see also Richards v. Cnty. of San Bernardino*, 2022 WL 2292830, at *1 (9th Cir. June 24, 2022); *Johnson v. City of New York*, 2020 WL 2192830, at *5 (S.D.N.Y. May 5, 2020). This imposes a high burden on a civil plaintiff. *See Black v. Montgomery Cnty.*, 835 F.3d 358, 372 (3d Cir. 2016)(quoting *Halsey v. Pfeiffer*, 750 F.3d at 295) ("we expect that it will be an unusual case in which a police officer cannot obtain a summary judgment in a civil action charging him with having fabricated evidence used in an earlier criminal case.").

---

[6] The Court also assumes for purposes of this Motion, that *Rehberg* does not preclude Plaintiff from relying on the objected to statements for purposes of his fair trial claim. *See Rucks v. City of New York*, 96 F. Supp. 3d 138, 149 (S.D.N.Y. 2015).

With respect to alleged fabrication, a plaintiff cannot survive summary judgment simply by raising a question of fact as to the truth of the information that is forwarded to prosecutors. *Bennett v. Vidal*, 267 F. Supp. 3d 487, 498 (S.D.N.Y. 2017) ("[A] mere difference in testimony between the defendant [officer], the plaintiff, and the plaintiff's mother of what occurred on the day of the arrest is not sufficient evidence to create a genuine dispute of material fact as to whether [the officer] intentionally falsified information or fabricated evidence."); s*ee also Hewitt v. City of New York*, 2012 WL 4503277, at *6 & 11 (E.D.N.Y. Sept. 28, 2012), *aff'd*, 544 F. App'x 24 (2d Cir. 2013). Despite Plaintiff's assertion that facts relied upon by officers are fabrications, "summary judgment is appropriate where a plaintiff has failed to present evidence indicating that an officer falsified information or fabricated evidence." *Johnson v. McMorrow*, 2023 WL 1797063, at *7 (S.D.N.Y. Feb. 7, 2023) (internal quotations and alteration omitted) (citing cases).

Plaintiff alleges that Defendants Coonradt, Fountain, and Sikirica each fabricated evidence, either by falsely reporting statements made by Plaintiff or by misrepresenting the evidence collected. As discussed more fully below, as to none has Plaintiff raised a question of fact as to fabrication or materiality of the evidence at issue. What the record shows is not that the evidence which Plaintiff characterizes as "false and misleading," Pl.'s Mem. of Law at p. 19, was in fact fabricated, but simply that Plaintiff has a different view of that evidence. Each Defendant, therefore, is entitled to summary judgment.

## *1. The City Defendants*

As discussed above, Coonradt allegedly fabricated a report following her initial arrival at Plaintiff's residence. Plaintiff alleges Coonradt fabricated a statement suggesting "lost time between when plaintiff woke up and when he called police." Pl.'s Mem. of Law at p. 15. Plaintiff also alleges that Coonradt falsely testified that on the morning of V.D.'s death, Plaintiff told police that he put V.D. back in bed because he was tired, while Plaintiff claims he did so because she seemed tired. Plaintiff's only evidence that Coonradt fabricated the first of the two statements is his denial that he made the statements. *See* Dkt. No. 122-1 at ¶ 26. The record, however, demonstrates that he made a similar, if not verbatim, statement to others. Fountain testified that Plaintiff had told him he woke up sometime between 11 a.m. and noon and could not explain the gap in time between waking up and calling 911. Dkt. No. 123-9 at p. 26. Plaintiff's girlfriend also reported to police that Plaintiff had told her that he had awakened between 11 a.m. and noon. Dkt. No. 123-8 at p. 2. As such, this is not a case where there is a stark conflict between the plaintiff and one defendant about what was said, *see Bellamy v. City of N.Y.*, 914 F.3d 727, 746 (2d Cir. 2019), but one where multiple sources report the same or similar evidence. *See Isaac v. City of New York*, 2020 WL 1694300, at *9 (E.D.N.Y. Apr. 6, 2020) ("Plaintiff claims that the testimony of four witnesses and [the] defendant . . . was false, but offers no evidence in support, other than his own testimony."). Given the record evidence that Plaintiff made this statement to multiple people, he cannot meet his burden to establish that Coonradt "created false information." *Garnett v. Undercover Officer C0039*, 839 F.3d 265, 280 (2d Cir. 2016). Nor, in any event, could a reasonable

17

jury conclude that this one comment was likely to influence the ultimate verdict of the criminal jury, or that the inclusion of the statement in a single police report, months before Plaintiff was indicted had any role at all in Plaintiff being deprived of his liberty. As to the second alleged fabrication, Plainiff cites to Coonradt's testimony during Plaintiff's criminal case, but does not cite to any evidence at all from any source suggesting that the statement was untrue. *See* Dkt. No. 122-1 at ¶ 92.

Consider next the testimony offered by Defendant Fountain that Plaintiff now claims was false or misleading. According to Plaintiff:

> These false facts include Fountain's testimony to the grand jury that Davis said it was a normal occurrence for V.D. to wake up tired, that V.D.'s bed was really neat and made up, and not fussed or messed up at all, and therefore inconsistent with someone performing CPR on the bed as Davis claimed he did, that Davis and Parker were not prevented from going in the ambulance to the hospital, and that Davis was calm, subdued, even keeled, and not acting like you would think somebody would if they had found a two-and-a-half-year-old who wasn't breathing.

Pl.'s Mem. of Law at p. 20.

Plaintiff has offered no independent evidence to suggest fabrication. *See Demosthene v. City of New York*, 2018 WL 10072931, at *7 (E.D.N.Y. July 20, 2018), *report and recommendation adopted*, 2019 WL 3992868 (E.D.N.Y. Aug. 16, 2019), *aff'd*, 831 F. App'x 530 (2d Cir. 2020). What the record establishes at most regarding this testimony is that Plaintiff disagrees with the statements made by Fountain to the Grand Jury. That, however, as just noted falls far short of his burden on the Motion for Summary Judgment because "a plaintiff cannot survive summary judgment merely by establishing a genuine issue of fact as to the veracity of the information that the officer forwarded to

prosecutors." *Steinbergin v. City of New York*, 2021 WL 396690, at *6 (S.D.N.Y. Feb. 4, 2021), *aff'd*, 2022 WL 1231709 (2d Cir. Apr. 27, 2022); *see also Lauderdale v. City of New York*, 2018 WL 1413066, at *8 (S.D.N.Y. Mar. 19, 2018).

Fountain testified that Plaintiff commented to him that it was a "normal occurrence for [V.D.] to be a little tired" and go back to bed in the morning. Dkt. No. 123-9 at pp. 56-57. While Plaintiff cites to several other statements in the record as evidence that this statement was false, none establishes the falsity of Fountain's testimony. Plaintiff cites, for example, to a statement from V.D.'s mother that she observed V.D. to be "a little sluggish." Dkt. No. 123-8. While speaking to police, Plaintiff advised that V.D. "seemed extremely tired" the morning of her death. Dkt. No. 123-10 at p. 3. These statements, which are consistent with Fountain's testimony, simply fail to demonstrate the falsity of, let alone the fabrication of, Fountain's testimony.

During his deposition, Plaintiff testified that he attempted CPR on V.D. in the bedroom. Specifically, he testified:

> Q. So, how did you -- describe for me how you gave CPR when she was in the bed?
>
> A. I blew into her mouth and I pushed down a little bit on her chest area and I blew into her mouth again and it seemed like her stomach would like stay full. So, I tried to push it down a little bit. I put no pressure on her at all because I was very nervous and scared. And I tried that twice. Nothing happened. So, I took her into the living room and I tried to like use these phones that were on the table.

Dkt. No. 123-1 at p. 19; *see also* Dkt. No. 115-4 at p. 38 ("I tried two times on the bed."). Fountain testified to the Grand Jury about the condition of V.D.'s bedroom that V.D.'s bed "looked like made." Dkt. No. 123 at p. 29. He further told the Grand Jury that it did

not appear that the bed was "messed up." *Id.* According to Plaintiff this testimony gave the false impression to the jury that Plaintiff had not been truthful regarding statements he made about conducting CPR on the bed. Dkt. No. 125 at p. 20. The record of Fountain's Grand Jury testimony belies this claim because, despite his testimony about the condition of the bed, Fountain testified very clearly that he did not know whether or not CPR had been performed. Dkt. No. 123-9 at p. 30.

Nor does Plaintiff's claim that Fountain falsely testified that no one prevented Plaintiff or V.D.'s mother from riding in the ambulance with her, undercut the presumption of probable cause. Neither Plaintiff nor Ms. Parker ever specifically stated that any Defendant or any member of the Troy Police Department prevented them from riding in the ambulance. Ms. Parker stated only that "they" would not let her ride in the ambulance, but it is unclear whether she was referring to police or EMS officials. *See* Dkt. No. 123-8. Plaintiff's deposition contained similar testimony indicating "[t]hey just drove off without either of us in the ambulance." Dkt. No. 123-1 at p. 30. In fact, he testified that there was "no" conversation about either of them going in the ambulance because when he raised the issue "they" just drove off. *Id.* In this context, "they" rather clearly refers to EMS personnel. *See id.* Fountain testified that neither Troy Police nor emergency services personnel would have prevented Plaintiff or Ms. Parker from riding in the ambulance. Dkt. No. 123-9 at pp. 16-17. At most, Plaintiff's deposition can be read to suggest that Coonradt intimidated Plaintiff into not riding in the ambulance. *See* Dkt. No. 123-1 at p. 44. But nothing suggests that, even if true, Fountain was aware of this when he testified. *Id.* (noting Fountain arrived after Coonradt told Plaintiff to sit

20

down).  Plaintiff's evidence does not provide any basis for concluding that this statement was false.

Finally, Plaintiff cites Fountain's testimony before the Grand Jury that Plaintiff was "calm" and had a "very even keel about everything" when questioned by police.  Dkt. No. 123-9 at p. 24.  The record demonstrates that those who interacted with Plaintiff found him to be experiencing, not surprisingly, a range of emotions.  One of the emergency services personnel who responded to the initial 911 call stated that "did not . . . act upset," while another described Plaintiff as "calm."  Dkt. No. 116-3 at pp. 16 & 18.  Others variously described Plaintiff as "upset," Dkt. No. 123-21 at p. 4, crying at times, *id.* at p. 8, and "distraught."  *Id.* at p. 12.  Fountain was describing Plaintiff's demeanor at the police station after he was taken there for questioning.  The other individuals observed Plaintiff at different times.  It is certainly possible, and would not be unexpected, that Plaintiff's demeanor would be different at different times.  There is simply no evidence in this record that even raises a factual question about the accuracy of Defendant Fountain's observations at the moment in time that he testified before the Grand Jury.  The citations to the record on which Plaintiff relies all appear to be from times at which Defendant Fountain was not present.  *See* Dkt. No. 130-5 at ¶ 73.  In any event, "[v]ariations in one's testimony or with other witnesses' testimony do not mean that testimony is untrustworthy."  *Thorpe v. Duve*, 2022 WL 332804, at *3 (2d Cir. Feb. 4, 2022).

Nor has Plaintiff satisfied his burden of establishing a question of fact on the materiality of the fabrications alleged by the City Defendants.  "[A] civil plaintiff alleging

21

that . . . the prosecutor used fabricated evidence should not be permitted to survive a motion for summary judgment . . . unless he can demonstrate that the record supports a conclusion that the allegedly fabricated evidence was so significant that it could have affected the outcome of the criminal case." *Halsey v. Pfeiffer*, 750 F.3d at 295; *see also Appling v. City of New York*, 2021 WL 695061, at *8 (E.D.N.Y. Feb. 23, 2021) (citing *Garnett v. Undercover Officer C0039*, 838 F.3d at 277). The testimony that Plaintiff alleges was fabricated here falls far short of reaching this standard. Plaintiff's sole argument in this regard is that the alleged fabrications were material because they "served to undermine [his] consistent explanation of the incident." Pl.'s Mem. of Law at p. 26. There is no evidence to suggest that Grand Jurors were made aware of Plaintiff's version of events, however, and so no way Coonradt's report or Fountain's testimony could undermine that narrative.

### 2. Defendant Sikirica

Plaintiff also cites several alleged fabrications on the part of Defendant Sikirica that purportedly denied him the right to a fair trial. The Court finds that Plaintiff has similarly failed to raise a triable issue of fact as to fabrication regarding the objected to statements by Dr. Sikirica and, he too, is entitled to summary judgment.

Plaintiff first argues that Sikirica falsely testified to the Grand Jury that there was no natural cause of death possible and cites as evidence his later "concession" that it was possible the child had died of a natural event. Pl.'s Mem. of Law at pp. 20-21. Plaintiff makes more of the purported concession than the record will bear. At his deposition Dr. Sikirica stated "[i]t's possible, I will not say it's impossible, but it's very, very highly

22

unlikely that she died from a natural event before this series of events." Dkt. No. 123-15 at p. 82. He made this statement only after outlining his findings and why he did not view the death as resulting from natural causes. Dr. Sikirica's testimony that essentially anything is theoretically possible is hardly a concession demonstrating perjured testimony.

Plaintiff next relies on Dr. Sikirica's testimony regarding particular autopsy report findings, the performance of CPR, and V.D.'s injuries. Plaintiff's objection that Sikirica "did not inform" the jury of certain findings, Pl.'s Mem. of Law at p. 21, again goes to what evidence a prosecutor chooses to present to a Grand Jury and is no basis for finding fabrication. *Burgess v. DeJoseph*, 2017 WL 1066662, at * 7.

Plaintiff also makes much of Dr. Sikirica's allegedly false statements about the amount of blood present in V.D.'s abdomen, including the purported medical and legal significance of that testimony, the timing of V.D.'s injuries and potential blood loss, her condition when emergency personnel responded to the home, and the alleged correlation of Sikirica's findings with Plaintiff's statements to police. According to Plaintiff, those statements were all false. Pl.'s Mem. of Law at pp. 21-22 & 27-28. Plaintiff, however, offers no evidence of falsity, let alone fabrication. The only evidence on these points is that Plaintiff's criminal trial expert and the retained expert in this case disagree with Dr. Sikirica's statements and opinions. Dkt. Nos. 123-6 (trial testimony of Dr. Teas) & 124-2 (expert report of Dr. Maloney). Plaintiff offers no evidence to suggest that Dr. Sikirica did not actually hold the medical opinions to which he testified. Neither of the doctors

upon whom Plaintiff relies specifically state an opinion that Dr. Sikirica fabricated his findings.

That these medical professionals disagree about the relevant medical findings regarding V.D. "evinces nothing more than a professional disagreement over what conclusions can properly be drawn from the medical evidence; what the evidence does not do is support the assertion that Defendant[] fabricated evidence." *Ferris v. City of Cadillac, Mich.*, 726 F. App'x 473, 483 (6th Cir. 2018); *see also Caminata v. Cnty. of Wexford*, 664 F. App'x 496, 501 (6th Cir. 2016) ("Although this testimony impugns the quality of [defendant's] investigation, it is insufficient to establish knowing fabrication or deliberate or reckless falsehoods, rather than mere negligence."). At best, Plaintiff has raised questions of fact about the correctness of statements or medical conclusions reached by Sikirica. That Plaintiff, and some of his witnesses, disagree with Sikirica does not make those statements or conclusions fabricated.

### C. Qualified Immunity

The doctrine of qualified immunity provides an immunity from suit, and thus liability, for public officials acting reasonably under the circumstances presented. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78-79 (2017) (internal quotation and citation omitted); *see also Behrens v. Pelletier*, 516 U.S. 299, 305 (1996). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal

quotation omitted); *see also Reichle v. Howards*, 566 U.S. 658, 664 (2012) ("To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right.") (internal quotations and citations omitted). "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009).

The rights to be free from malicious prosecution and the fabrication of evidence were clearly established at the time of Plaintiff's prosecution. *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003); *Zahrey v. Coffey*, 221 F.3d 342, 357 (2d Cir. 2000). Conduct of a defendant, however, is judged by a standard of objective reasonableness. *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). The appropriate standard for reviewing, then, is whether, despite these clearly established rights, a reasonable police officer under the circumstances then presented to Defendants could have known that their actions violated those rights. *Id.* at 227. Here, because the answer to that question is no, the individual police officers are each entitled to qualified immunity.

Defendants Coonradt and Fountain are accused of fabricating evidence about Plaintiff's conduct and statements on the day of V.D.'s death. Viewed in the light most favorable to Plaintiff, the record might, at best, raise questions about the accuracy of some of those statements. Others, on the contrary, are clearly supported by contemporary statements of others. Rebecca Parker, V.D.'s mother, for example, made statements at or near the time of V.D.'s death that corroborate statements about the way V.D. was acting on the day of her death and the timeline of her being found unresponsive which Plaintiff

25

now alleges are false. These differing opinions about facts, none of which directly

implicate or exculpate Plaintiff, provide no direct evidence of the fabrication underlying

Plaintiff's claims against these Defendants. Given that, and the corroboration of at least

some of the statements attributed to Defendants, no reasonable police official could have

known that reporting or testifying as to them violated any of Plaintiff's clearly established

rights.

Finally, the record reveals no specific claim of misconduct regarding either

Colaneri or McDonald, other than being a part of the overall investigation of V.D.'s death.

Given the lack of specific allegations of misconduct qualified immunity is appropriate as

to them. *See*, *e.g.*, *Gallagher v. Town of Fairfield*, 2011 WL 3563160, at *6 (D. Conn.

Aug. 15, 2011)

Dr. Sikirica also is entitled to qualified immunity.[7] Plaintiff's malicious

prosecution and fair trial claims accuse Dr. Sikirica of the same misconduct – that he

fabricated evidence. This allegation is largely based on conclusory assertions of a

conspiracy among Defendants. What the record evidence establishes, however, is only

that several different medical professionals have different views of the medical evidence.

In light of that evidence, Dr. Sikirica is clearly entitled to qualified immunity. To hold

otherwise, based on a purely conclusory claim of misconduct, would "open the floodgates

---

[7] The Court has considered Sikirica's claim of entitlement to absolute immunity and the arguments advanced by the parties on this question. Though ultimately not necessary to resolution of the Motion, the Court finds that absolute immunity is not proper here. *Newton v. City of New York*, 738 F. Supp.2d 397 (S.D.N.Y. 2010), on which Sikirica relies, is readily distinguishable since that case involved a lab technician, not a coroner, and in any event the Court is persuaded here by the cases cited by Plaintiff more closely analogizing the role of a medical examiner to that of an investigating police officer. *See*, *e.g.*, *Kompare v. Stein*, 801 F.2d 883, 887 (7th Cir. 1986). Here, in particular, Sikirica's role was closely tied to the investigation of V.D.'s death.

for civil rights claims against coroners by acquitted criminal defendants who believe a coroner made a mistake in performing an autopsy or in reaching a conclusion about the cause or causes of death of a victim." *Storey v. Chelan Cty.*, 2011 WL 1575506, at *9 (E.D. Wash. Apr. 26, 2011); *see also Laurent v. Edwin*, 528 F. Supp. 3d 69, 92 (E.D.N.Y. 2021).

### D. Plaintiff's Remaining Claims

Each of Plaintiff's remaining claims is dependent upon the existence of a violation of a constitutional right. Because Plaintiff has raised no triable question of fact as to the claims discussed above, the remaining claims must also be dismissed.

Plaintiff alleges that individual Defendants witnessed the violation of his rights by other Defendants, but failed to intervene. Third Am. Compl. at ¶¶ 83-86. Such a claim "is contingent upon the disposition of the primary claims underlying the failure to a intervene claim." *Matthews v. City of New York*, 889 F. Supp. 2d 418, 443-44 (E.D.N.Y. 2012). "Since all of plaintiff's other claims have been dismissed, no predicate constitutional violation remains to support a failure-to-intervene claim. This claim is therefore dismissed as well." *Grinols v. Beers*, 532 F. Supp. 3d 95, 108-09 (W.D.N.Y. 2021).

Plaintiff also alleges the existence of a conspiracy to "undermine" Plaintiff's right to be free from malicious prosecution and the fabrication of evidence. Third Am. Compl. at ¶ 88. Because Plaintiff has failed to establish any underlying constitutional violation, his related conspiracy claim necessarily fails. *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001); *Mitchell v. Cnty. of Nassau*, 786 F. Supp. 2d 545, 564 (E.D.N.Y. 2011)

(citing cases) ("a § 1983 conspiracy claim fails as a matter of law where there is no underlying constitutional violation.").

Finally, Plaintiff's Sixth and Seventh causes of action assert *Monell* municipal liability claims against the City of Troy and County of Rensselaer.  Third. Am. Compl. at ¶¶ 91-113.  *Monell* liability requires the existence of an "underlying constitutional violation."  *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006); *see also Claudio v. Sawyer*, 675 F. Supp. 2d 403, 408 (S.D.N.Y. 2009), *aff'd*, 409 F. App'x 464 (2d Cir. 2011) ("Under Second Circuit case law, however, a prerequisite to municipal liability under *Monell* is an underlying constitutional violation by a state actor.").  Dismissal of the substantive claims against the individual actors mandates dismissal of Plaintiff's *Monell* claim.  *Demosthene v. City of New York*, 831 F. App'x 530, 534 n.3 (2d Cir. Oct. 9, 2020) ("[I]n light of the absence of an underlying constitutional violation, the district court correctly dismissed the claim against the [c]ity pursuant to *Monell*."); *Morales v. City of New York*, 752 F.3d 234, 238 (2d Cir. 2014) (similar).

## V.  CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED**, that the Motions for Summary Judgment (Dkt. Nos. 115 & 116) are **GRANTED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-

# APPENDIX

Decision and Order upon the parties to this action.

Dated:   March 29, 2023
         Albany, New York

Daniel J. Stewart
U.S. Magistrate Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MICHAEL DAVIS-GUIDER,

                              Plaintiff,

                    -v-   17-cv-1290

CITY OF TROY, et al.,

                              Defendants.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE DANIEL J. STEWART
                      December 5, 2022
                445 Broadway, Albany, New York


FOR THE PLAINTIFF:

BRETT H. KLEIN, ESQ.
305 Broadway, Suite 600
New York, New York 10007


FOR DEFENDANT RENSSELAER COUNTY:

BAILEY, JOHNSON & PECK, P.C.
By:  William C. Firth, Esq.
5 Pine West Plaza, Suite 507
Albany, New York 12205


FOR DEFENDANT CITY OF TROY:

PATTISON SAMPSON GINSBERG & GRIFFIN PLLC.
BY:  Michael Ginsberg, Esq.
     Rhiannon Gifford, Esq.
P.O. Box 208
Troy, New York 12180

———DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290———

1          COURT CLERK:  We are back on the record.  The

2    case is Michael Davis-Guider versus City of Troy and

3    others, case number 17-cv-1290.

4          Please state your appearances for the record.

5          MR. KLEIN:  Brett Klein, for the plaintiff.

6    Good afternoon, Judge.

7          THE COURT:  Good afternoon.

8          MR. FIRTH:  Your Honor, William Firth, on

9    behalf of Dr. Sikirica and Rensselaer County.

10          THE COURT:  Good afternoon to you.

11          MS. GIFFORD:  Your Honor, Rhiannon Gifford

12    from Pattison, Sampson, Ginsberg & Griffin, on behalf of

13    the City of Troy, Ronald Fountain, Danielle Coonradt,

14    Charles McDonald, and Tim Colaneri.

15          THE COURT:  Good afternoon.

16          MR. GINSBERG:  Mike Ginsberg of Pattison,

17    Sampson, Ginsberg and Griffin, for the same defendants,

18    your Honor.

19          THE COURT:  All right.  Thank you.  So we have

20    presently pending in this case a motion for summary

21    judgment on the issue of liability and on the issue of

22    qualified immunity.

23          Rhiannon, why don't I have you summarize the

24    position of the City defendants.

25          MS. GIFFORD:  Yes, your Honor.  Thank you.


              Lisa L. Tennyson, CSR, RMR, FCRR
             UNITED STATES DISTRICT COURT - NDNY

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1    The City defendants' position, as detailed in

2    our brief, is that there's no genuine issue of material

3    fact in this matter.  There was an indictment to proceed

4    with the prosecution against Mr. Davis-Guider.  This

5    matter does not involve any sort of confession or nature

6    that is similar to Thomas.

7    The issue here is that the plaintiff

8    essentially seems to dispute about four statements that

9    were made at the grand jury presentation to support his

10   theory that there was perjury or police misconduct to

11   overcome the probable cause created by the indictment.

12   We submit that those four statements that he

13   relies upon are, one, not false.  There's no evidence to

14   indicate that they were false or made with the intent to

15   deceive or lie; they're in response to the material

16   facts statement that was submitted by the plaintiff.  We

17   detailed extensively additional evidence that supports

18   why Detective Fountain made those statements to the

19   grand jury and to prove that they are not false.

20   There's no indication or evidence submitted by

21   the plaintiff to create a question of fact as to any

22   police misconduct or inappropriate behavior that caused

23   the prosecution to proceed or the arrest from the grand

24   jury indictment to be improper.

25   For -- I think for this, it's a little

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1    difficult because there are four different police

2    officers that are charged with -- or accused of

3    misconduct by the plaintiff but they kind of had

4    different roles and need to be analyzed individually.

5    For example, Danielle Coonradt, she was the responding

6    officer on the scene.  She obtained a single statement

7    of essentially an excited utterance from the plaintiff

8    when she arrived on scene and asked what happened.

9         At that point in time, Officer Coonradt had no

10   idea that the child would be declared deceased at any

11   point.  She had no idea that a crime had actually even

12   occurred.  She was just arriving in response to the 911

13   call made by Mr. Davis-Guider.  He -- the plaintiff

14   repeatedly claims that she falsified the statement that

15   he made guessing or saying that it was 11:00 when he had

16   woken up.

17        I submit that that's not only not false,

18   there's evidence she has maintained and consistently

19   testified to that statement, was in her police reports,

20   but it's not relevant.  It's not relevant because when

21   Detective Fountain was presenting to the grand jury, he

22   even said and conceded the plaintiff said maybe he woke

23   up maybe 11 or 12 but he wasn't really sure.  There were

24   no clocks, there were no phones available for him to be

25   precise about it.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1       Simply recording a statement that was made and

2    putting it in the record as she received it cannot

3    overcome or serve as evidence that she knowingly and

4    intentionally falsified a statement.  There's just no

5    evidence to support that contention.  Ms. Parker even

6    said herself that Mr. Davis-Guider had alluded to or

7    potentially even being 11:00 wake-up, but he wasn't

8    certain.

9       The theme there was he didn't know exactly

10   what time it was.  But Miss -- Police Officer Coonradt

11   was doing her job when she arrived on the scene to take

12   down the statement.  She has really no involvement, is

13   entitled to summary judgment on all of the claims

14   against her on those grounds.

15      And turning to Charles McDonald and Tim

16   Colaneri, they are kind of in a similar boat where

17   there's really no allegations of impropriety made

18   against them.  There's no threats.  There's no coercion.

19   They didn't really do anything.  They testified before

20   the grand jury.  I believe McDonald maybe testified at

21   one pretrial hearing but didn't testify at trial.  Those

22   two officers really had no involvement in the

23   prosecution at all and were not involved in any sort of

24   improper police conduct in furtherance of obtaining the

25   grand jury indictment that created the probable cause.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1          THE COURT:  Okay.

2          MS. GIFFORD:  Detective Fountain was the only

3     individual who testified at the grand jury, and as

4     stated, plaintiff's claims really center around the four

5     misstatements that he asserts were made by Fountain;

6     however, the plaintiff's arguments are his own

7     conjecture in response to what Fountain testified to at

8     the grand jury.

9          Case law in this Circuit mandates that a plus

10    factor be presented.  Some sort of corroborating

11    evidence outside of the grand jury testimony to support

12    his claim that Fountain lied or that it was a competing

13    version of events.

14         Competing versions of events are not evidence

15    in and of itself of lying or improper misconduct before

16    the grand jury, and this is important in the context of

17    noticing that Fountain is entitled to ultimate, I mean

18    absolute immunity for his grand jury testimony.

19         The plaintiff did not make any claims or

20    accusations about police misconduct by Fountain outside

21    of anything that was said during the grand jury

22    testimony, and as the case law cited in our briefs,

23    *Rehberg* and *Bonds versus City of New York* makes clear

24    the Court can't over -- the plaintiff must come forth

25    with that plus factor to try to take the testimony from

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1    the grand jury outside of the absolute immunity grounds

2    that he's entitled to.

3              THE COURT:  Okay.

4              MS. GIFFORD:  And if -- unless the Court has

5    any other questions, I believe we will rely on the

6    briefs for the arguments.

7              THE COURT:  No, I understand your argument.

8              Mr. Firth.

9              MR. FIRTH:  Thank you, your Honor.  As

10   Rhiannon pointed out and the Court is well aware, we're

11   dealing with another case that has a presumption of

12   probable cause by virtue of the grand jury indictment.

13             Plaintiff was required again to come forward

14   with evidence of -- on the part of Dr. Sikirica in terms

15   of suppressing evidence, committing perjury --

16             THE COURT:  What was the basis for

17   Dr. Sikirica testifying that the fractured ribs were

18   caused by someone with large hands?

19             MR. FIRTH:  I believe that it was reported to

20   him, your Honor, that that's what had occurred.

21             THE COURT:  Who reported that to him?

22             MR. FIRTH:  As I stand here now, Judge, I'm

23   not sure.  I'm not sure if it's in our statement of

24   facts or in our papers.  I'm not certain where that

25   information came from.

                    Lisa L. Tennyson, CSR, RMR, FCRR
                 UNITED STATES DISTRICT COURT - NDNY

1      THE COURT:  I understand you're standing in

2  for Crystal.

3      MR. FIRTH:  Yeah.  That was my case.  I

4  probably should just go home, you know.  But that

5  doesn't correlate the -- that doesn't correlate with

6  Mr. Davis to -- in terms of these injuries.  It was

7  reported to him as a matter of fact.  It didn't

8  influence his cause of death determination or manner of

9  death determination.

10      THE COURT:  Well, it influenced who the grand

11  jury is going to indict.  If he says it was caused with

12  someone with large hands and the testimony was that

13  Mr. Davis-Guider had large hands, you know, I'm not sure

14  where it came from.  I'm not sure what the -- what

15  the medical basis for that is.

16      MR. FIRTH:  Well, Judge, nobody else --

17      THE COURT:  If somebody has a purple hand that

18  caused this and there was only one person who has a

19  purple hand, you know -- I'm just trying to figure out.

20      MR. FIRTH:  I'm sorry I can't answer that.

21  But the fact remains that he was the only one home alone

22  with V.D. at the time.  And even if he did indicate that

23  in his report --

24      THE COURT:  What about the other people who

25  did the -- the CPR chest compressions on the child?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1         MR. FIRTH:  Sure.

2         THE COURT:  I mean, how do -- what's the

3    evidence that it was -- it was caused by something that

4    he did as opposed to them?

5         MR. FIRTH:  He didn't say that it was caused

6    by Mr. Davis at all.

7         THE COURT:  How do they know that someone with

8    large hands was the one who caused the fracture of the

9    ribs and the severing of the liver?

10         MR. FIRTH:  How did he know that it was

11    Mr. Davis?

12         THE COURT:  How does he know someone with

13    large hands?

14         MR. FIRTH:  I don't think that he does know

15    that it was someone with large hands.  I think he just

16    talks about it anecdotally -- anecdotally in his report,

17    and for purposes of Dr. Sikirica, I'm not sure it

18    matters, Judge, because how would that amount to a

19    constitutional violation?  It's just something that he

20    put in his report.  You know, the inclusion of that is

21    not what fueled this prosecution against Mr. Davis.  He

22    was the only one with V.D. at the time.

23         And plaintiff also takes issue with the fact

24    that he did not mention in his autopsy report the number

25    of compressions that were applied.  He does certainly

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1   indicate that there was a history of -- of CPR, and he

2   testified before the grand jury that these were not

3   CPR-related injuries.  He could not have been more

4   clear, and he even testified to the fact that this was

5   something -- these injuries are something that you'd

6   expect to see only in the case of a car accident but no

7   other accident would result in these types of injuries.

8           THE COURT:  Okay.

9           MR. FIRTH:  You know, and also along these

10  same lines, Judge, the prosecution was aware of the

11  number of compressions, defense team was aware of the

12  number of compressions, and it was -- it was ferreted

13  out at the trial and at the grand jury testimony again

14  that these were not CPR-related injuries.  They were

15  caused by blunt-force trauma.

16          And again, Mr. Davis was the only one who was --

17  only one who there was.  There's been no indication that

18  anybody else was there.  And in the absence of any

19  evidence contrary to having, you know, an accident be

20  the basis of this, they move forward the prosecution.

21  This was Dr. Sikirica's medical judgment, again, in his

22  experience in conducting over 10,000 autopsies, that

23  these were severe injuries.  The injury to the liver

24  just could not have happened from CPR.

25          Did he get it wrong?  Probably not, Judge.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1    But, you know, at most, that would be negligent.

2    Certainly not amount to fraud or suppression of

3    evidence -- of evidence required to overcome the

4    presumption of probable cause in this case.

5            And, your Honor, I could continue.  Let me

6    just touch base briefly on the conspiracy claim.  The

7    plaintiff refers -- Brett, very respectfully, rather

8    uniquely, your Honor, he does not have much to work with

9    here to, quote-unquote, at least a tacit agreement with

10   Troy P.D. and prosecutors to label this as a homicide.

11   There's just no evidence of that.  There's a lot of

12   speculation, circumstantial evidence at most.

13           And the *Monell* claim against the county relies

14   on two cases, *McElheny* and *Thomas*.  Certainly the *Thomas*

15   case does not put the county on notice that Dr. Sikirica

16   would require additional supervision and the *McElheny*

17   case relies on the inadmissible news article, nothing

18   more, and those talk about dueling medical witnesses,

19   which is at the very heart.  Medical judgments, medical

20   opinion, not -- not a constitutional tort.

21           Unless Your Honor has any specific questions,

22   I will rely on my brief for the remainder.

23           THE COURT:  No, I think I'll hear from

24   Mr. Klein at this point in time.

25           MR. FIRTH:  Thank you, your Honor.


                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1          MR. KLEIN:  Thank you, Judge.  Your Honor,

2     Michael Davis was arrested and prosecuted in a case

3     where there was, again, in the light most favorable to

4     Mr. Davis, similar to a case earlier today, the Thomas

5     case, no crime.

6          Mr. Davis testified consistently, stated to

7     police consistently on the day of the death of V.D. what

8     happened, that she was not feeling well for a couple of

9     days, that she awoke -- she was sick that morning, I

10    think diarrhea, went back to sleep and was then

11    unresponsive.  He tried calling 911, but didn't have a

12    phone that worked in the house.  Tried to do some chest

13    compressions himself, maybe four or five at most and

14    then went and made a call and then he -- police and his

15    girlfriend, the mother the child, all came back.

16         What happened here was not a crime.

17    Plaintiff's expert also -- the -- the same expert as in

18    Thomas, the deputy county medical center from Erie

19    County had -- will testify to the jury that to a

20    reasonable degree of medical certainty this was a sudden

21    unexplained death, phenomenon occurs, that the blood

22    present in the liver was not consistent with -- with the

23    child bleeding out from that before CPR was attempted,

24    and on and on as set forth in our papers.

25         THE COURT:  So why isn't, as Mr. Firth said,

1   why isn't that competing medical testimony rather

2   than -- is your doctor saying that Dr. Sikirica

3   falsified an autopsy?

4           MR. KLEIN:  Right.  So -- so this -- similar

5   to the pattern that we have seen, Judge, *Davis* and

6   *McElheny*, this is a case where we go through this

7   extensively in our papers, without any link of this

8   death whatsoever to Mr. Davis other than that he's

9   present when she's found unresponsive, no other

10  reason -- no reason to think which is not probable cause

11  to arrest.  It's -- it's mere presence at the scene

12  of -- in this case, as in Davis and other cases, where

13  there's a natural causes death in the light most

14  favorable to the plaintiff.

15          And Dr. Sikirica, within hours of meeting with

16  the police, getting their statement of their interview

17  with him where he describes his three or four or five

18  CPR attempts with his large hands, says on the death

19  certificate this is a homicide.

20          And that starts a chain of events that is

21  foreseeable that Mr. Davis and Dr. Sikirica acknowledges

22  that by calling this a homicide, that this set of chain

23  of events that would likely result in grand jury action

24  and a murder charge, and he would not -- and

25  Dr. Sikirica concedes that this is bias cascade that we

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1   have seen in other cases, started with the information

2   given to him by police.

3           So it's not that we're saying per se it's

4   improper for the medical examiner to get information for

5   their forensic review of a death to evaluate all the

6   factors.  It's certainly -- we have cited the medical

7   examiner standards.  It's not recommended but -- but

8   beyond that, what's -- the issue in this case is

9   different.

10          Is it -- is there an inference that a

11  reasonable jury could credit that Dr. Sikirica was given

12  this story from the police, their suspicions of a

13  homicide, and he basically crafted his determination

14  without regard for natural causes.

15          THE COURT:  What proof do you have of that?

16  He's obviously denied it.  I mean, Second Circuit is

17  pretty clear about conspiracies, that there's got to be

18  some proof with regard to it.

19          MR. KLEIN:  We do have -- we do lay out,

20  Judge, in our -- in our papers, I believe, that there

21  were labs or swabs done to determine if there were

22  natural causes potentially contributing just like in the

23  Thomas case, where there were -- there was evidence

24  of streptococcus pneumonia that came back.  I believe

25  similarly here there were tests that were done or could

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1   have been done but Dr. Sikirica deemed this a homicide

2   after speaking with the police.  There's no -- even if

3   that's the case, there's no reason to think Michael

4   Davis committed a homicide, and as the defendants

5   maintain, there's no suggestion here that CPR resulted

6   in her -- in V.D.'s death.

7           So the suggestion here is that there's some

8   period of time although these goalposts seem to have

9   change and that's the essence of the claim here of this

10  fabricated false testimony, not that the child died but

11  that Michael Davis was responsible for this blunt-force

12  trauma and a homicide when there was no evidence of it.

13          The only evidence that Dr. Sikirica knew in

14  rendering his autopsy was what the police -- to answer

15  your question before -- what they showed him and told

16  him based on their interview with Michael Davis, which

17  they acknowledge, did not give them probable cause to

18  arrest.

19          THE COURT:  All right.

20          MR. KLEIN:  It's only when Dr. Sikirica takes

21  that information and links it to this large hand that

22  they then, you know, prosecuted Mr. Davis based on this

23  bias cascade.  So this information --

24          THE COURT:  All right.  So with regard to --

25  I'm just trying to break this down.  Okay?  Dr. Sikirica

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1    does the autopsy, comes to a conclusion.  Your doctor

2    reviews the medical records, comes to a different

3    conclusion, correct?  Is it fair to say that reasonable

4    medical professionals can disagree?

5              MR. KLEIN:  Not in our view.  Not in the view

6    of our expert that --

7              THE COURT:  Is your expert testifying that the

8    conclusions that Dr. Sikirica -- were false, fraudulent

9    or amounted to malpractice?

10             MR. KLEIN:  Yeah, that's the essence of her

11   testimony.  That his -- his -- his -- his medical --

12   just as in the Thomas case, this was a -- without

13   question in her mind to a reasonable degree of

14   professional certainty a case of natural cause of death,

15   and she absolutely disagrees that there's any other way

16   to look at this.

17             THE COURT:  But in Thomas, we have the five

18   other doctors who have a different view with regard to

19   that.

20             MR. KLEIN:  Well, there were different -- it's

21   very nuance, Judge.  There's views about the fluid

22   collection in the brain, about a hematoma, and there's

23   views about the -- the spreading of the fontanels in the

24   brain and the -- I believe it's called the -- the

25   sutures of the brain, the brain -- of the skull

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1    swelling, whether that could be consistent with trauma.

2             It doesn't necessarily mean there was a trauma

3    consistent with abuse.  There's trauma that results from

4    medical staff touching the child from postmortem

5    contact, from blood filling up in the brain due to an

6    overwhelming septic infection in that case resulting in

7    meningitis.  In this case, there's no evidence -- just

8    like in that case, there's no evidence of any physical

9    struggle.  There's no bruising.  There's no evidence --

10   sign of any trauma whatsoever.

11            But what we have is this being classified as a

12   homicide after a meeting with the police, further

13   meetings with the police after they don't -- they

14   concede they don't have enough to rope Mr. Davis in in

15   this case, and then -- and efforts by the police to get

16   Mr. Davis to give them more.  To confess.  They take him

17   in the same room that they had Mr. Thomas in.

18            And then the officers conveying to prosecutors

19   a story that is disputed, and I think that's really the

20   thing here, as in the Davis case.  The police will say

21   we have this information written down that the plaintiff

22   said this or that, and so they just merely pass that on.

23   But the -- but that misses a crucial issue at this stage

24   of the proceedings, Judge.

25            Plaintiff denies this information was ever

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1    said about the timing and such.  But it created and it

2    was material enough to be presented.  It was influential

3    enough to prosecutors that it resulted in the testimony

4    being given based on statements made to prosecutors

5    which gets outside of *Rehberg* that shows that

6    Mr. Davis didn't have -- didn't have a credible story,

7    and this was false and this was disputed and he was

8    found innocent at trial.

9            So, when you take the conduct together,

10   this initial determination of a homicide after speaking

11   with the officers about their feelings about this,

12   having no reason to think that Mr. Davis was anything

13   but merely present when a child who was sick woke up

14   unresponsive, completely disregarding the evidence of

15   natural causes, of a natural cause of death, later

16   conceding that if she died in extreme -- due to CPR from

17   EMTs or Mr. Davis, that wouldn't be a homicide but

18   maintaining that something happened here, resulting in

19   this severe trauma and sticking to their story.

20           I think a jury could find that that is

21   manufactured evidence in an effort to come up with a

22   story that's consistent with the police theory of what

23   happened here.  It's --

24           THE COURT:  A lot of speculation.

25           MR. KLEIN:  I don't think so, Judge.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1          THE COURT:  Let me ask you this, then.  Were

2     there any -- what meetings were there between what

3     detectives and what police officers and Dr. Sikirica

4     where they suggested to him that they make a certain

5     finding?  Do we have any evidence of that?

6          MR. KLEIN:  In terms of suggesting the -- only

7     they were at the meetings and they discussed the --

8          THE COURT:  How many meetings were there?

9          MR. KLEIN:  There were at least -- there was

10     one I believe a day after the -- the child was found

11     dead, another one after Mr. Davis was interviewed within

12     a couple of weeks after that, and then another one again

13     in mid March and then there were meetings with

14     prosecutors several months later when the autopsy was

15     created.

16          And this autopsy, again, I think, again,

17     credibility issues was -- was drafted by someone who's

18     working for many counties in Upstate New York, not just

19     Rensselaer, conducting several hundred autopsies a year,

20     testifies that each one takes days to do.  And so based

21     on that, those numbers, it would seem impossible for him

22     to have been doing less than a few per day, and then he

23     does a report months and months and months later.

24          And they paint this picture of -- of -- after

25     these -- tying Mr. Davis to this crime, A, when -- and

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1   Mr. Davis is -- in a light most favorable to Mr. Davis,

2   there's no credible medical evidence of any crime.  Even

3   the officers found, I believe, gave a statement that it

4   was his understanding when they made one last effort to

5   talk to Mr. Davis in an interrogation room after the

6   autopsy was finally issued months later that it was his

7   understanding from speaking with Dr. Sikirica that

8   Mr. Davis squeezed the child during CPR effort and broke

9   the rib and caused the rib to lacerate the liver.

10           I don't think there's any question, the rib

11  didn't lacerate the liver and that these injuries,

12  again, per Mr. Davis' experts and I believe per

13  Dr. Sikirica wouldn't have caused the death.  So, there

14  was this effort to get their man and to do what they had

15  to do to get someone to get Mr. Davis responsible for

16  this crime and it failed in this case and the Thomas

17  case it succeeded until it failed.

18           But this is really a striking pattern.  It's

19  not a coincidence and, you know, we have a credible

20  evidence of natural cause of death and no trauma in both

21  cases and -- and extreme efforts to prosecute someone

22  when there was no reason to believe that this person

23  committed any crime.

24           THE COURT:  All right.

25           MR. KLEIN:  They say that he was calm, not

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1    acting like someone who just lost a child that he loved.

2    He said he was distraught and crying.  They say that he

3    wasn't clear about the timing.  He said he never said

4    that and they paint this image of --

5              THE COURT:  Those are factual issues in every

6    criminal case I have ever had.

7              MR. KLEIN:  Right, but they disputed factual

8    issues.  So for the defense to say here, as they did in

9    our other case today, Thomas, well, they wrote down

10   contemporaneously this or that so there's no evidence of

11   the contrary, there is.  Just want to state for the

12   record these are disputed facts and they all together

13   led to this malicious prosecution in violation of due

14   process.

15             THE COURT:  Okay.  Thank you.

16             MR. KLEIN:  Thank you, Judge.

17             THE COURT:  All right.  Anything further from

18   the defense counsel?

19             Mr. Firth, anything further?

20             MR. FIRTH:  Your Honor, all the points made by

21   Brett are addressed in our brief.

22             THE COURT:  Okay.  Anything further from the

23   state defendants?

24             MS. GIFFORD:  I just wanted to briefly address

25   the point about the conflicting statements in

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1   Mr. Klein's final point that they are disputed based

2   upon Mr. Davis-Guider.

3          The plaintiff's mere conjecture and

4   speculation surmise isn't enough to create the question

5   of fact, and as my response to his material statements

6   makes clear, there's significant corroborating evidence

7   outside of what the police said was the version of

8   events that they recall.

9          As a -- stated, we have statements from Miss

10   Parker who corroborated the timing issue in her written

11   statement to the police.  There's pictures of the bed.

12   There's the EMTs' own statements, which almost all of

13   them agree that Mr. Davis-Guider appeared pretty calm,

14   subdued.  All of that evidence is before the Court.

15   It's not simply just two versions of events from the

16   plaintiff and the defendant.

17          There's significant other corroborating

18   evidence that hasn't been addressed or discussed by the

19   plaintiff or said to have been included in this scheme

20   to frame his client.  I just wanted to address that kind

21   of misstatement in my thought.

22          THE COURT:  Thank you.  Thank you both.  Thank

23   you both -- all three of you -- four of you.  So I

24   appreciate the substance of this oral argument.  We will

25   go ahead and issue a decision on both cases in due

DAVIS-GUIDER v CITY OF TROY, ET AL. - 17-cv-1290

1    course.

2            Is there anything further on behalf of the

3    plaintiff you want me to address while we're here?

4            MR. KLEIN:  Just one second, Judge.  I will

5    look at my notes.  No, Judge, I think that's all for us.

6    Thank you so much.

7            THE COURT:  All right.  On behalf of the

8    county?  Dr. Sikirica?  Anything further?

9            MR. FIRTH:  No, your Honor.

10           THE COURT:  On behalf of the city, anything

11   further?

12           MS. GIFFORD:  No.  Thank you, your Honor.

13           THE COURT:  All right.  Thanks, everybody.

14           (Proceeding concluded.)

15               * * * * * * * * *

16

17

18

19

20

21

22

23

24

25

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

C E R T I F I C A T I O N


    I, Lisa L. Tennyson, RMR, CSR, CRR, Federal

Official Realtime Court Reporter, in and for the United

States District Court for the Northern District of New

York, do hereby certify that pursuant to Section 753,

Title 28, United States Code, that the foregoing is a

true and correct transcript of the stenographically

reported proceedings held in the above-entitled matter

and that the transcript page format is in conformance

with the regulations of the Judicial Conference of the

United States.


                    __/s/ Lisa L. Tennyson_____

                    Lisa L. Tennyson, RMR, RPR, FCRR


                    Lisa L. Tennyson, CSR, RMR, FCRR
                    UNITED STATES DISTRICT COURT - NDNY